WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x
                                            :
**In re**                                   :          **Chapter 11**
                                            :
**AÉROPOSTALE, INC.,** *et al.*,            :          **Case No. 16-_____ (___)**
                                            :
          **Debtors.**[1]                   :          **Joint Administration Requested**
                                            :
---------------------------------------------------------x

**DECLARATION OF DAVID J. DICK**
**PURSUANT TO RULE 1007-2 OF THE LOCAL BANKRUPTCY**
**RULES FOR THE SOUTHERN DISTRICT OF NEW YORK**

I, David J. Dick, make this declaration under 28 U.S.C. § 1746:

1.       I am the Chief Financial Officer of Aéropostale, Inc. ("*Aéropostale*") and

its subsidiaries, the debtors and debtors in possession in the above-captioned chapter 11 cases

(collectively, the "*Debtors*").   I have been Aéropostale's Chief Financial Officer since

February 17, 2015 and its principal accounting officer since January 14, 2016.  I have over 20

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal tax identification number, as applicable, are as follows:  Aéropostale, Inc. (3880); Aéropostale West, Inc. (7013); Jimmy'Z Surf Co., LLC (0461); Aero GC Management LLC (4257); Aeropostale Procurement Company, Inc. (8518); Aeropostale Licensing, Inc. (8124); P.S. from Aeropostale, Inc. (5900); GoJane LLC (4923); Aeropostale Canada Corp. (N/A); Aeropostale Holdings, Inc. (7729); and Aeropostale Puerto Rico, Inc. (6477).  The Debtors' corporate headquarters is located at 112 West 34th Street, 22nd Floor, New York, NY 10120.

years in the retail industry.  Prior to joining Aéropostale, I was employed by dELiA*s, Inc. where I held a number of positions, including Chief Financial Officer and Treasurer, as well as Chief Accounting Officer and Controller.  From 1993 to 2006, I worked at Linens 'n Things, Inc. where I held a number of positions including Vice President, Controller, and Treasurer.

2.      On the date hereof (the "**Commencement Date**"), each of the Debtors commenced with this court (the "**Court**") a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

3.      The Debtors are a national retail chain and iconic brand with stores located in all 50 states, as well as Puerto Rico and Canada, employing approximately 14,500 persons. Additionally the Debtors' brands are licensed internationally and sold in over 300 additional locations in 17 different countries.  Until recently, the Debtors' equity securities were publicly traded on the New York Stock Exchange.

4.      Prior to the commencement of these chapter 11 cases (the "**Chapter 11 Cases**") the Debtors had already begun to implement their publicly-announced comprehensive strategic review and restructuring of their retail operations and store profile.  The Debtors' efforts had started to generate significant positive results, when one of their largest suppliers, Sycamore Partners LLC's ("**Sycamore**") portfolio company, TSAM (Delaware) LLC (d/b/a MGF Sourcing US LLC) ("**MGF**"), took precipitous and unauthorized action to force the Debtors into cash in advance terms when the Debtors had availability well in excess of $100 million under their revolving credit facility.  These actions not only jeopardized the Debtors' ongoing efforts, but also imperiled the Debtors' survival as a going concern.  It has become increasingly clear to me over the course of the last several weeks since Sycamore and MGF first demanded cash in advance terms — before manufacturing or supplying any merchandise — that

Sycamore was using its leverage over MGF to precipitate the filing of these chapter 11 cases. MGF's demands systematically caused a cash drain on the Debtors' enterprise through onerous and unreasonable terms and deprived the Debtors of critical merchandise. Why Sycamore was determined to cause a precipitous chapter 11 filing immediately is not yet known with certainty.

5.    With $240 million of annual distribution supply effectively cut off from terms, the Debtors were forced to consider every alternative to give the Debtors the best chance to survive. And despite overwhelming odds, the Debtors have secured a viable path through an expedited chapter 11 case in this Court with a fresh source of financing. In short, the Debtors have structured a dual path exit from chapter 11 in which they have an option to pursue a standalone chapter 11 plan with their new financing source while simultaneously pursuing ongoing M&A efforts for the enterprise. Likewise, the Debtors also will utilize all available tools in chapter 11 to right size the business and resolve their ongoing dispute with Sycamore. A short outline of the Debtors' path toward exit from chapter 11 is outlined below and is part of the Debtors' DIP financing package:

Plan Milestones:

- Negotiate with key landlords and continue pre-filing M&A process during the first 60 days of the Chapter 11 Cases;

- File a plan and disclosure statement no later than 60 days after the Commencement Date;

  o The Debtors' chapter 11 plan may be a plan for either a stand-alone enterprise or consummated via an M&A transaction;

- Obtain entry of an order approving the disclosure statement no later than 95 days after the Commencement Date;

- Commence a confirmation hearing no later than 130 days after the Commencement Date; and

- Obtain entry of an order confirming a plan of reorganization no later than 140 days after the Commencement Date.

WEIL:\95641329\20\11727.0012

Sale Milestones:

- File motion to approve bid procedures, establish the date of an auction, and file a form of stalking horse sale and purchase agreement no later than 75 days after the Commencement Date;

- Court approval of a stalking horse sale and purchase agreement and bid procedures no later than 105 days after the Commencement Date

- Conduct an auction no later than 141 days after the Commencement Date;

- Obtain entry of an order approving a sale of the Debtors' assets no later than 143 days after the Commencement Date; and

- Consummation of a sale no later than 145 days after the Commencement Date.

6.      Speed is critical to maximizing recoveries for all creditors and preserving jobs of as many of the Debtors' 14,500 employees as possible.  Accordingly, the Debtors intend to proceed towards confirmation of a plan of reorganization on the foregoing aggressive, but realistic, timeframe.  In accordance with the milestones above, a plan of reorganization may involve either a stand-alone reorganization of the Debtors' operations premised on a smaller footprint of profitable stores or a sale to a third-party buyer to be consummated pursuant to a plan.  As an initial step along either path, the Debtors are seeking approval of procedures to effectuate the immediate closing of 154 stores.

7.      I am knowledgeable and familiar with the Debtors' day-to-day operations, business and financial affairs, books and records, and the circumstances leading to the commencement of these Chapter 11 Cases.

8.      Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, or my opinion based upon my experience,

4

knowledge, and information concerning the Debtors' operations and the retail clothing industry. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

9.    This Declaration is submitted pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "*Local Rules*") for the purpose of apprising the Court and parties in interest of the circumstances that compelled the commencement of these Chapter 11 Cases and providing support for the motions and applications that the Debtors have filed with the Court, including the "first-day motions" (the "*First Day Pleadings*").  I am authorized to submit this Declaration on behalf of the Debtors.

10.    This Declaration is intended to provide a summary overview of the Debtors' businesses and the need for their restructuring pursuant to chapter 11 of the Bankruptcy Code.  Section I provides an overview of the Debtors' businesses.  Section II describes the Debtors' capital structure.    Section III describes the circumstances that precipitated the commencement of the Chapter 11 Cases.  Section IV provides a summary of the First Day Pleadings and the factual bases for the relief requested therein.  Section V identifies the attached schedules of information required by Local Rule 1007-2.

## I.
## The Debtors' Businesses

**A.        History and Formation**

11.    The Aéropostale brand was established by R.H. Macy & Co., Inc. ("*Macy's*"), as a department store private label in the early 1980s.  Macy's subsequently opened the first mall-based Aéropostale store in 1987.  Over the next decade, Macy's expanded Aéropostale to over 100 stores.  In August 1998, Macy's, then part of Federated Department Stores, Inc., sold its specialty store division, including Aéropostale, to Aéropostale management and Bear Stearns Merchant Banking.  In May 2002, management took Aéropostale public

through an initial public offering and listed the company's common stock on the New York Stock Exchange under the symbol "ARO."

**B.            The Debtors' Current Business Operations**

12.    Aéropostale is a specialty retailer of casual apparel and accessories, principally serving young women and men through its Aéropostale stores and website, and 4 to 12 year-olds through its P.S. from Aéropostale stores and website. The Debtors provide customers with a focused selection of high quality fashion and fashion-basic merchandise at compelling values in an exciting and friendly store environment. The average Aéropostale store is smaller than that of the Debtors' mall-based competitors. The Debtors believe that this enables them to achieve higher sales productivity and project a sense of greater action and excitement in the stores. GoJane.com, Inc. ("*GoJane*") is an online women's fashion footwear and apparel retailer that was acquired by the Debtors in November 2012.

 

13.    Aéropostale maintains control over its proprietary brands by designing, sourcing, marketing, and selling all of its own merchandise, other than in licensed stores. As of the 2015 fiscal year end, the Debtors operated 811 stores, consisting of 745 Aéropostale stores in all 50 states and Puerto Rico, 41 Aéropostale stores in Canada, and 25 P.S. from Aéropostale

WEIL:\95641329\20\11727.0012

stores in 12 states. In addition, the Debtors have license agreements with unaffiliated third party operators located outside of the United States. These agreements are generally structured with royalty income paid as a percentage of inventory purchases or sales, for the use of the Debtors' trademarks, trade name and branding, and/or income from buying commissions for inventory purchased by the international licensees from the Debtors' vendors. Pursuant to these licensing agreements, the Debtors' licensees operated over 300 Aéropostale and P.S. from Aéropostale locations in the Middle East, Asia, Europe, and Latin America.



14.    The Debtors maintain two distribution centers to process merchandise and warehouse inventory and to support the Debtors' stores in the United States and Puerto Rico. The Debtors lease a 315,000 square foot distribution center facility in South River, New Jersey, and a 360,000 square foot distribution center facility in Ontario, California. The staffing of these distribution centers is outsourced to a third party provider that operates each facility and processes the Debtors' merchandise while the Debtors manage each facility. The Debtors have an agreement

WEIL:\95641329\20\11727.0012

with another third party to provide distribution services for their Canadian stores.  The Canadian

distribution center, which receives, processes, and warehouses the Debtors' merchandise for all of

their Canadian stores, is located in Etobicoke, Ontario, Canada.  In addition, a third party provides

fulfillment and shipment services in Kentucky for the Aéropostale and P.S. from Aéropostale e-

commerce businesses, including warehousing inventory and fulfilling and shipping customers'

sales orders.    The Debtors outsource the shipment of merchandise through third party

transportation providers.  These third parties ship the Debtors' merchandise from the distribution

facilities to the Debtors' stores.



15.    The Debtors operate 41 stores in Canada, through Aéropostale Canada

Corp. ("*Aero Canada*").  Aero Canada has filed its own Chapter 11 Case in this Court, and will

file a petition for recognition in Canada under the Companies' Creditors Arrangement Act. Unless a purchaser can be found for Aero Canada's operations on a going concern basis, the Debtors expect to close all of their Canadian stores.

## C.        The Debtors' Cost Structure

16.    The Debtors' cost structure includes certain fixed and variable costs, including employee related costs, workers' compensation liabilities, costs associated with the Debtors' sourcing arrangements, and real estate leases and related costs.  The cost of doing business for the Debtors also includes, without limitation, costs pertaining to purchasing, receiving, warehousing, shipping, advertising and other related items.

### *Employee Related Costs*

17.    *Employee Compensation and Benefits*:  The Debtors have approximately 14,500 employees including 3,000 full-time employees, and 11,500 part-time store-line employees.  The Debtors also employee approximately 4,000 part-time seasonal employees each year to assist with the Debtors' peak sales seasons.  On average, the Debtors' gross payroll is approximately $8 million every two weeks for the Debtors' employees in the United States and Puerto Rico and CAD 350,000 for the Debtors' employees in Canada.

18.    The Debtors contribute to a number of employee benefit plans providing medical, pharmacy, dental, vision and other ancillary benefits to the Debtors' employees. Payments by the Debtors on account of these plans totaled approximately $36 million in 2015. The Debtors are not party to any collective bargaining agreements.  The Debtors have no defined benefit pension plans.

19.    *Workers' Compensation Liabilities*:    The Debtors maintain workers' compensation insurance as required by statute in each state in which they operate (the "***Workers' Compensation Programs***").  Seven hundred and thirty-three of the Debtors' locations, including

9

728 stores, have Workers' Compensation Programs that are insured by third-party insurers. Under these programs, the Debtors are responsible for each valid workers' compensation claim up to a $250,000 deductible. After this deductible is exhausted, the Debtors continue to be responsible for any additional payments, but may seek reimbursement from the third-party insurer.

20.    For the remainder of the Debtors' stores, as well as their Canadian distribution center, the Debtors are statutorily required to obtain workers' compensation insurance from a government fund. Assessments for workers' compensation are billed by the states in which the Debtors operate that require employers to obtain workers' compensation insurance from a government fund, Puerto Rico, and all of the Canadian provinces in which the Debtors operate.

21.    As of the Commencement Date, there are approximately 60 pending claims under the Workers' Compensation Programs. To secure payment of the Debtors' obligations under the Workers' Compensation Programs, the Debtors have posted varying amounts of cash collateral to an account from which a third-party administrator draws to process claims. As of the Commencement Date, the aggregate amount of outstanding cash collateral posted by the Debtors is approximately $2.3 million. The Debtors estimate that approximately $625,000 is disbursed from collateral per year on account of workers' compensation claims.

### Other Operating Costs

22.    _Trade_:    In 2015, the Debtors sourced approximately 80% of their merchandise from their top five merchandise suppliers. Although the Debtors design the products sold in their stores and on-line retail operations, the Debtors' merchandise suppliers

WEIL:\95641329\20\11727.0012

manufacture the products. The Debtors' top two merchandise suppliers are an affiliate of Li &
Fung Limited ("*Li &Fung*") and MGF.

23.     For 2016, MGF is planned to be the Debtors' second largest merchandise
supplier, supplying approximately 30% of the Debtors' goods in 2016. MGF is an affiliate of
Sycamore Partners, which is also an affiliate of Aero Investors LLC ("*Aero Investors*"), the
Debtors' largest secured creditor. In May 2014, as a condition to Aero Investors providing
financing to the Debtors, one of the Debtors, Aéropostale Procurement Company, Inc. ("*Aero
Procurement*") entered into a non-exclusive sourcing agreement (the "*Sourcing Agreement*")
with MGF. Aéropostale Inc. guaranteed the obligations of Aero Procurement under the Sourcing
Agreement. The Sourcing Agreement requires the Debtors to purchase a minimum volume of
product for a period of 10 years commencing on the first fiscal quarter of 2016 of between $240
million and $280 million per annum depending on the year. If the Debtors fail to purchase the
applicable minimum volume of product in any given year, the Debtors are required to pay a
shortfall commission to MGF, based on a scaled percentage of the applicable shortfall during the
applicable period. Under the Sourcing Agreement, MGF is obligated to pay the Debtors an
annual rebate based on the volume of annual purchases made by the Debtors in any given year.
The Sourcing Agreement requires the annual rebate to be applied towards the payment of the
required amortization on the Tranche B Loan provided by Aero Investors.

24.     The Debtors are also parties to a master sourcing agreement with their
largest merchandise supplier, LF Sourcing (Millwork) LLC ("*L&F*"), an affiliate of Li &Fung,
dated as of February 2, 2015 (the "*L&F Agreement*"). The L&F Agreement has an initial term
of ten years. The L&F Agreement requires the Debtors to purchase a minimum volume of
product of $350,000,000 each year. If the Debtors fail to purchase the applicable minimum

11

volume of product in any given year, the Debtors are required to pay a shortfall commission to L&F, based on a percentage of the applicable shortfall during the relevant period. The Debtors are also entitled to certain rebates under the L&F Agreement. Effective as of April 1, 2016, the Debtors entered into an amended and restated master sourcing agreement with LF Sourcing (the "**Amended L&F Agreement**") which also has a term of ten years. Under the Amended L&F Agreement, the Debtors are required to purchase a minimum volume of product of $175,000,000 each year. Similar to the L&F Agreement, under the Amended L&F Agreement, if the Debtors fail to purchase the applicable minimum volume of product in any given year, the Debtors are required to pay a shortfall commission to L&F, based on a percentage of the applicable shortfall during the relevant period. The Debtors are also entitled to certain rebates under the Amended L&F Agreement. The Debtors obtain the remainder of their merchandise from approximately 100 other suppliers.

25.     The Debtors' peak sales seasons are the December holiday and the back-to-school seasons. The back-to-school season typically begins in mid-July and lasts until early September. The Debtors estimate that approximately 18% of their yearly sales are attributable to the back-to-school season.

26.     For these cases to have a successful outcome, it is essential that the Debtors make a smooth transition into chapter 11 and be able to fully stock their stores with merchandise by mid-July. To be able to stock the stores by mid-July, merchandise is normally received by the Debtors' distribution center 3-4 weeks in advance, or mid- to late June. Thus, it is critical that the Debtors act expeditiously to obtain whatever relief is necessary to obtain merchandise.

WEIL:\95641329\20\11727.0012

27.    _Real Estate Lease Obligations_:   The Debtors lease all of their store locations.  Most of the Debtors' stores are located in shopping malls throughout the United States and Canada.  Most of the Debtors' store leases have a fixed rental payment due in advance and also require the Debtors to pay additional rent based on specified percentages of sales after the Debtors achieve specified annual sales thresholds.  Percentage rent is generally due on the first day of each month.   The estimated incurred actual costs for the Debtors' stores will be approximately $200-225 million in fiscal year 2016.

28.    The Debtors lease 121,000 square feet of office space in New York, New York for corporate headquarters and for the Debtors' design, sourcing, and production teams.  The Debtors also lease 69,000 square feet of office space in Lyndhurst, New Jersey for administrative offices for finance, operations, and information systems personnel.  The Debtors lease office space in Los Angeles, California as the administrative offices for GoJane.

## II.
## Corporate and Capital Structure

### A.    Corporate Structure and Management

29.    Aéropostale, Inc. is a publicly-traded company and, until recently, its equity securities traded on the New York Stock Exchange under the symbol "ARO."[2]  During the summer/fall of 2013, Lemur LLC ("**Lemur**"), an affiliate of Sycamore Partners, acquired approximately eight (8) percent of the Debtors' common equity in the open market.  Lemur sold its equity stake in early 2016.

---

[2] On April 22, 2016, Aéropostale, Inc.'s equity was delisted from the New York Stock Exchange, and began trading on the OTCQX Best Market under the symbol "AROP."

WEIL:\95641329\20\11727.0012

30.     Aéropostale, Inc. is the direct or indirect corporate parent of each of the other Debtors.  An organizational chart illustrating the corporate structure of the Debtors is annexed hereto as **Exhibit "A"**.

31.     The Debtors employ numerous individuals with the title Vice President or Senior Vice President.  The following individuals are executive officers of the Debtors:[3]

- Julian R. Geiger, Chief Executive Officer
- Marc D. Miller, Executive Vice President – Chief Operating Officer
- David J. Dick, Senior Vice President – Chief Financial Officer
- Marc G. Schuback, Senior Vice President – General Counsel & Secretary

32.     Additional information regarding the Debtors' senior management team is set forth in **Schedule 10** annexed hereto.

## B.     Capital Structure

33.     As of the Commencement Date, the Debtors had outstanding funded debt obligations in the aggregate amount of approximately $223 million (the "***Prepetition Debt Obligations***") which is comprised of (i) approximately $73 million in borrowings under an asset-based revolving credit facility in an amount up to $215 million, and (ii) a $100 million "Tranche A" term loan and a $50 million "Tranche B" term loan.  The Debtors have granted security interests and liens on all or substantially all of their assets to secure the Prepetition Debt Obligations.

34.     The Debtors file annual and quarterly reports, as well as other required financial information with the Securities and Exchange Commission.

---

[3] Persons have been included herein for informational purposes only and such individuals should not, simply by virtue of being listed herein, be deemed to be "insiders" in terms of control of the Debtors, management responsibilities or functions, decision-making or corporate authority, and/or as otherwise defined by applicable law, or with respect to any theories of liability or for any other purpose.

WEIL:\95641329\20\11727.0012

C.      **Prepetition ABL Facility**

35.      Aéropostale and certain of the Debtors are parties to that certain Third Amended and Restated Loan and Security Agreement, dated September 22, 2011 (as amended, modified, or otherwise supplemented from time to time, the "***Prepetition ABL Agreement***," and together with all agreements and documents delivered pursuant thereto or in connection therewith, the "***Prepetition ABL Documents***"), by and among Aéropostale as borrower, each Debtor-guarantor named therein, the various financial institutions and other persons party thereto from time to time (the "***Prepetition ABL Lenders***"), and Bank of America, N.A. as administrative agent and collateral agent (in such capacities, the "***Prepetition ABL Agent***," and together with the Prepetition ABL Lenders, the "***Prepetition ABL Secured Parties***").  Pursuant to the Prepetition ABL Agreement, the Prepetition ABL Lenders provided revolving credit commitments in an aggregate principal amount of up to $215 million, with a $40 million sublimit for the issuance of letters of credit (the "***Prepetition ABL Facility***").[4]  As of the Commencement Date, the aggregate amount outstanding in connection with the Prepetition ABL Facility was approximately $73 million in unpaid principal and approximately $240,000 in an undrawn letter of credit.

36.      On August 18, 2015, the Debtors entered into a fourth amendment to the Prepetition ABL Facility, which, among other things, extended the maturity date of the Prepetition ABL Facility until at least February 21, 2019.[5]

---

[4] The Prepetition ABL Facility was amended on August 18, 2015 to, among other things, reduce the total availability under the revolving credit facility to $215 million.

[5] A copy of the Prepetition ABL Credit Agreement is annexed hereto as **Exhibit B**.

WEIL:\95641329\20\11727.0012

D.     **Prepetition Term Loan Facility**

37.    Aéropostale and certain of the Debtors are party to that certain Loan and Security Agreement, dated May 23, 2014 (as amended, modified, or otherwise supplemented from time to time, the "***Prepetition Term Loan Agreement***," and together with all agreements and documents delivered pursuant thereto or in connection therewith, the "***Prepetition Term Loan Documents***")[6], by and among Aéropostale as borrower, each Debtor-guarantor named therein, the various financial institutions and other persons party thereto from time to time (the "***Prepetition Term Loan Lenders***"), and Aero Investors as administrative agent and collateral agent (in such capacities, the "***Prepetition Term Loan Agent***," and together with the Prepetition Term Loan Lenders, the "***Prepetition Term Loan Secured Parties***").   The Prepetition ABL Secured Parties and the Prepetition Term Loan Secured Parties are collectively referred to as the "***Prepetition Secured Parties***."

38.    Pursuant to the Prepetition Term Loan Agreement, the Prepetition Term Loan Lenders provided term loans in the aggregate principal amount of $150 million, split among two tranches: $100 million in Tranche A and $50 million in Tranche B (collectively, the "***Prepetition Term Loan Facility***").   The Tranche A loan is scheduled to mature on May 23, 2019.  The Tranche B Loan was included by Sycamore Partners as a way to secure the Debtors' obligations to MGF under the Sourcing Agreement.  The Tranche B loan is scheduled to mature on the earlier of (i) the tenth anniversary of the end of the Start-Up Period (as defined in the Sourcing Agreement) and (ii) the expiration or termination of the Sourcing Agreement.  The Prepetition Term Loan Facility contains a $70 million minimum liquidity covenant.

---

[6] A copy of the Prepetition Term Loan Agreement is attached hereto as **Exhibit C**.

**E.      Security and Intercreditor Agreement**

39.      To secure prompt, punctual, and faithful performance of all of the obligations under the Prepetition ABL Documents, each of Aéropostale and the Debtor-guarantors (collectively, the "*Grantors*") granted to the Prepetition ABL Agent, for the ratable benefit of the Prepetition ABL Secured Parties, a continuing security interest in and to, all of the assets of such Grantor, subject to certain exceptions (the "*Prepetition ABL Collateral*").

40.      To secure prompt, punctual, and faithful performance of all of the obligations under the Prepetition Term Loan Documents, each Grantor granted to the Prepetition Term Loan Agent, for the ratable benefit of the Prepetition Term Loan Secured Parties, a continuing security interest in and to, all of the assets of such Grantor, subject to certain exceptions (the "*Prepetition Term Loan Collateral*").

41.      There is significant overlap between the Prepetition ABL Collateral and the Prepetition Term Loan Collateral.  The relative priorities of the liens held by the Prepetition ABL Secured Parties and the Prepetition Term Loan Secured Parties and the restrictions on the respective parties' ability to exercise remedies against collateral are governed by that certain Intercreditor Agreement, dated as of May 23, 2014, by and among the Prepetition ABL Agent and the Prepetition Term Loan Agent (as may be amended, supplemented, restated, amended or otherwise modified from time to time, the "*Intercreditor Agreement*").

42.      The Intercreditor Agreement defines "ABL Priority Collateral" to include substantially all of the Debtors' assets.  The Intercreditor Agreement defines "Term Priority Collateral" to include all common collateral other than ABL Priority Collateral.

43.      Pursuant to the Intercreditor Agreement, the Prepetition ABL Secured Parties and the Prepetition Term Loan Secured Parties agreed that the Prepetition ABL Secured

WEIL:\95641329\20\11727.0012

Parties would be senior as to the ABL Collateral and the Prepetition Term Loan Secured Parties would be senior as to the Term Collateral.

44.  Section 6.1(a) of the Intercreditor Agreement further provides that if the Prepetition ABL Agent or Prepetition ABL Secured Parties seek to provide the Debtors with, or consent to a third party providing, debtor-in-possession financing: (i) the Prepetition Term Loan Agent and the Prepetition Term Loan Secured Parties will not object to such financing, or to the liens securing such financing due to a failure to provide adequate protection or any other ground; (ii) the Prepetition Term Loan Agent and the Prepetition Term Loan Secured Parties will not request any additional adequate protection; and (iii) the Prepetition Term Loan Agent will not propose any or support any other debtor-in-possession financing so long as certain conditions (the "*Intercreditor DIP Financing Conditions*") are satisfied.

45.  The Intercreditor DIP Financing Conditions include: (i) the aggregate outstanding principal balance of any proposed DIP Financing, plus the principal balance of the outstanding loans under the Prepetition ABL Credit Agreement that are not refinanced with the DIP financing, plus the aggregate face amount of any letters of credit issued and not reimbursed shall not exceed $264.5 million; (ii) the Prepetition Term Loan Agent shall retain its liens on the Prepetition Term Loan Collateral and such lien shall have the same priority as existed prior to the Commencement Date; (iii) all liens on the Prepetition ABL Priority Collateral shall be senior to or *pari passu* with the liens of the Prepetition ABL Agent and Prepetition ABL Secured Parties on the Prepetition ABL Priority Collateral; and (iv) nothing in the DIP financing shall prevent the Prepetition Term Loan Agent or the Prepetition Term Loan Secured Parties from objecting to any provision in the DIP financing relating to any provision or content of a plan of reorganization.

WEIL:\95641329\20\11727.0012

### F.    General Unsecured Creditors

46.    In addition to the Debtors' outstanding obligations under the Prepetition ABL Facility and the Prepetition Term Loan Facility, the Debtors also have significant unsecured debt including amounts owed to trade vendors and to landlords.

47.    The Debtors rely on a broad network of hundreds of individual vendors to supply merchandise for their stores, including clothing, shoes and accessories.  A majority of the vendors conduct business with the Debtors on an invoice-by-invoice basis and are paid on prearranged terms.  As of the Commencement Date, the Debtors estimate that approximately $23 million of merchandise trade debt is due and outstanding, of which $2.5 million relates to goods provided to the Debtors in the 20 days prior to the Commencement Date.

48.    As discussed above, the Debtors operate exclusively in leased facilities, and maintain over 800 real property leases.  The Debtors estimate that they will accrue approximately $200-225 million in lease-related expenses in fiscal year 2016.

### G.    Series B Convertible Preferred Stock

49.    Concurrent with, and as a condition to, entering into the Term Loan Facility, the Debtors issued 1,000 shares of the Series B Preferred Stock to affiliates of Sycamore Partners at an aggregate offer price of $100,000.  Each share of Series B Preferred Stock is convertible at any time at the option of the holder on or prior to May 23, 2024 into shares of common stock at an initial conversion rate of 3,932.018 for each share of Series B Preferred Stock.  The common stock underlying the Series B Preferred Stock represents 5% of the Debtors' issued and outstanding common stock as of May 23, 2014.  The Series B Preferred Stock is convertible into shares of the common stock at an initial cash conversion price of $7.25 per share of the underlying common stock.  Inasmuch as Aéropostale's common stock currently

WEIL:\95641329\20\11727.0012

trades at under five cents per share it is not expected that Sycamore Partners would exercise its conversion option.

### III.
### The Need for Chapter 11 Relief and the Events
### Compelling the Commencement of The Chapter 11 Cases

50.     The Debtors' operations have generally been profitable during the past thirty years; however, declining mall traffic, a highly promotional and competitive teen retail environment, and a shift in customer demand away from apparel to technology and personal experiences all contributed to the Debtors' declining financial performance.  These pressures were not unique to the Debtors; a number of other retailers, including competitors such as American Apparel, Caché, Wet Seal, Quiksilver, and Pacific Sun, have all recently filed for bankruptcy after facing similar market conditions.

51.     In response to their declining revenues and continued financial difficulties, the Debtors embarked on a series of initiatives to restructure and streamline their businesses. Since early 2014, the Debtors have engaged in a comprehensive effort to restructure the P.S. from Aéropostale business, closing 126 P.S. from Aéropostale stores primarily located in shopping malls, to focus on P.S. from Aéropostale stores in off-mall locations.  In an effort to right-size the Debtors' Aéropostale store base and optimize their real estate portfolio, the Debtors embarked on a review of their lease terms and retained a real estate consulting firm to investigate the economics of accelerated lease buyouts, as well as to identify opportunities for negotiating more competitive rents across the Debtors' real estate portfolio.

52.     The Debtors closed 122 Aéropostale stores in the United States and Canada during fiscal year 2014.  The Debtors closed an additional 50 stores in fiscal year 2015.

53.     Another initiative on which the Debtors embarked in 2016 was the creation of a two-store format, splitting the Debtors' stores between a factory format and a traditional mall format.  The factory stores are geographically positioned to capture broader and growing demographics and appeal to the Debtors' most loyal customer base.  They are located primarily at outlet malls and more value focused B and C mall locations and predominately offer the Debtors' core merchandise, including logo-bearing merchandise.  The mall format stores are located primarily in higher-end, or A and B, malls and are focused on more updated, classic merchandise with fewer logo-bearing products.  The mall stores will serve as a showcase for the Debtors' brands and products and will serve as a feeder of merchandise for the factory stores and the Debtors' online retail operation.  The Debtors have implemented the factory store model in 460 stores and have experienced strong initial results, while trends in the mall format stores have also improved as a result of the repositioned merchandise assortment.  Additionally, the Debtors have developed additional brands for the 2016 back-to-school season that they anticipate will perform strongly in the mall stores.  The Debtors have also reduced corporate headcount and taken various other strategic actions geared toward improving profitability, generating approximately $35 million to $40 million in estimated annualized pre-tax savings for fiscal 2016.

54.     The Debtors' strategic initiatives and cost cutting measures resulted in significant operational improvements.  The Debtors, however, have been unable to realize the full benefit of these measures due to a disruption of their supply chain that resulted from the precipitous action taken by Sycamore through its affiliate, MGF.

55.     Specifically, in the summer of 2015, when Aéropostale requested a routine consent from Aero Investors in connection with an amendment to the Prepetition ABL Facility, Aero Investors sought to impose unreasonable and onerous terms that would improve its position

21

at the Debtors' expense.  When the proposed amendment was revised so as to obviate the need for Aero Investor's consent, upon information and belief, Sycamore attempted to use its business contacts to persuade the Prepetition ABL Agent not to move forward.

56.    In a similar vein, upon information and belief, in January 2016, Stefan Kaluzny, the Managing Director of Sycamore reached out to the Debtors' other principal supplier, L&F, and suggested that L&F should change its cash terms to "COD," because Aéropostale was likely to file for bankruptcy in March or April of 2016.  Although I cannot speculate as to Mr. Kaluzny's motives, his interference with the Debtors' trade relationships caused an interruption in supply and compromised our efforts to effect a turnaround without seeking protection under chapter 11.

57.    In February 2016, Sycamore Partners stepped up its efforts that seem designed to orchestrate a precipitous chapter 11 filing.  On February 5, 2016, Sycamore's representative on the Debtors' Board of Directors, Kent Kleeberger resigned from the board.  Additionally, Lemur LLC ("Lemur") another affiliate of Sycamore, which had acquired approximately eight (8) percent of the Debtors' common equity in the summer/fall of 2013, sold its equity stake in early 2016.

58.    Further, by letter, dated February 24, 2016 (the "***February 24th Letter***"), MGF unilaterally declared that, "upon information and belief," a Credit Review Period had been triggered under the Sourcing Agreement.  MGF provided no other basis for its unsupported assertion that a Credit Review Period had been triggered, did not identify how far below the $150,000,000 liquidity threshold Aéropostale had supposedly fallen, and did not provide a date on which the Credit Review Period had supposedly started.  Based on its assertion that a Credit Review Period had been triggered, MGF stated that it was immediately refusing to accept orders

for merchandise—which are necessary for the Debtors' retail sales and vital to the Debtors' business—unless the Debtors delivered concurrently cash or "an irrevocable standby letter of credit."  The conditions unilaterally sought to be imposed by MGF were the most onerous payment terms possible—full payment at the time of placement of an order, or based on the typical lead time for manufacturing and delivering goods, at least 90 days before the goods are received by the Debtors at their distribution center.

59.    Thus, in response to the February 24th Letter, the Debtors requested, among other things, that MGF provide "information evidencing your conclusions that a Credit Review Period has been triggered as well as identifying the source(s) of such information." MGF never responded to this request. By letter, dated February 29, 2016, MGF again asserted that the Debtors were operating in a Credit Review Period under the Sourcing Agreement and stated that MGF was immediately suspending performance on pending orders without payment in advance (seeking to change terms from payment 30 days after delivery to the Debtors' distribution center to well in advance of delivery to the Debtors' distribution center).  The effect of this notice was that MGF would immediately halt delivery on all pending orders for merchandise unless the Debtors paid in full prior to shipment.  These goods were necessary for the Debtors' retail sales and, in particular, their spring break and Easter season.

60.    The payment terms that MGF unilaterally sought to impose were unreasonable.  The Debtors had well over $100 million in liquidity and had continued to make every payment to MGF.  The imposition of the most restrictive terms possible—payment in full at the time an order was placed—was wholly unjustified.  Moreover, MGF improperly sought to alter the payment terms retroactively for purchase orders that had already been agreed to and placed based on "net 30" payment terms.  Thus, even if MGF could have altered terms for future

WEIL:\95641329\20\11727.0012

orders, it could not alter the payment terms unilaterally and retroactively for goods already ordered and agreed to under "net 30" payment terms.

61.     Throughout this period the Debtors informed MGF that they had well in excess of $100 million of liquidity.  Nonetheless, MGF continuously refused to ship goods to the Debtors absent payment in advance—even though orders had been previously accepted on normal terms.

62.     MGF's actions also affected L&F.  In February 2016, L&F was required, pursuant to the terms of the L&F Agreement, to pay the Debtors a rebate of approximately $9 million.  L&F refused to make the rebate payment as required and by letter, dated March 4, 2016, L&F contacted the Debtors regarding L&F's supply agreement with the Debtors.  The Debtors understand that Sycamore contacted L&F and encouraged L&F to cut off payment terms despite the existence of a confidentiality provision in the Sourcing Agreement barring the disclosure of confidential information.  L&F demanded shortened payment terms for any goods shipped to the Debtors.   Unlike MGF, L&F has acted somewhat reasonably under the circumstances.  Ultimately, the Debtors and L&F agreed to payment terms of essentially "net 20"—which means that Aéropostale has 20 days after delivery to make payment.  In contrast, MGF sought terms whereby Aéropostale would pay for goods at the time an order was placed— or approximately 110 to 170 days earlier than Aéropostale's other chief supplier.  To date, MGF remains the only significant supplier that cut off the Debtors' supply and demanded cash in advance terms.

63.     On March 18, 2016, MGF delivered a purported notice of default under the Sourcing Agreement to the Debtors asserting that the Debtors' refusal to accept delivery or pay for orders under the terms unilaterally set forth in MGF's previous letters constituted a

WEIL:\95641329\20\11727.0012

material breach of the terms and conditions of the Sourcing Agreement.  MGF reserved its right to terminate the Sourcing Agreement following the fifteenth business day after the delivery of the notice of default.[7]  Although the Debtors dispute the allegations contained in the notice of default as well as MGF's right to terminate the Sourcing Agreement based on those allegations, the notice was another act that hastened the commencement of these cases by the Debtors.

64.     Between April 1, 2016 and April 8, 2016, due to an immediate need for inventory, the Debtors made preferential payments to MGF of approximately $15.8 million in order to induce MGF to ship goods that were past due.  MGF delivered some, but not all, of the outstanding inventory of the Debtors.

65.     The Debtors engaged in settlement discussions with Sycamore and MGF on April 8, 2016.  Subsequently, on April 20, 2016, MGF delivered a second notice of default under the Sourcing Agreement to the Debtors again asserting that the Debtors' refusal to accept delivery or pay for orders under the terms set forth in MGF's previous communications constituted a material breach of the terms and conditions of the Sourcing Agreement.  Under extreme duress due to their critical needs for inventory, on April 22, 2016, the Debtors made an additional preferential payment to MGF of approximately $10.1 million and MGF delivered additional merchandise.

66.     The significant delays by MGF and L&F in shipping product to the Debtors resulted in less product being available in the Debtors' stores for the peak spring break and Easter break sales period.  The actions of MGF caused a disruption in the Debtors' supply chain and a corresponding negative impact on the Debtors' liquidity.  I would estimate, based on historical performance, that the Debtors' lost in excess of $5 million in sales due to these delays.

---

[7] MGF subsequently withdrew the notice of default.

WEIL:\95641329\20\11727.0012

If MGF continues to delay delivery of product to the Debtors, the Debtors may suffer further losses in sales.

67.    MGF's actions placed the Debtors at risk of violating the $70 million minimum liquidity covenant in the Prepetition Term Loan Agreement, which was provided by a different affiliate of Sycamore.  A default under the Prepetition Term Loan Agreement would have triggered a cross-default under the Prepetition ABL Agreement, and defaults under both agreements would have jeopardized the Debtors' ability to obtain inventory for their stores and otherwise operate their businesses.  To restore access to inventory, which is the lifeblood of any retail business, and to otherwise maintain the ability to operate their businesses, the Debtors commenced the Chapter 11 Cases.

## IV.
## First-Day Pleadings

68.    The Debtors operate in a highly competitive industry.  It is imperative that they make a seamless transition into chapter 11 to preserve the reputation of their businesses and the loyalty and goodwill of their customers, suppliers, and employees.  Sales and operations must continue in the ordinary course of business to preserve the value of the Debtors' estates.  Accordingly, the Debtors have filed a number of First Day Pleadings designed to facilitate their transition into chapter 11.  The Debtors anticipate that the Court will conduct a hearing soon after the Commencement Date at which the Court will hear and consider many of the First Day Pleadings.[8]

69.    I have reviewed each of the First Day Pleadings with the Debtors' counsel, and I believe that the relief sought in each of the First Day Pleadings is tailored to meet the goals

---

[8] Capitalized terms used below in the descriptions of the First Day Pleadings and not otherwise defined have the ascribed to such terms in the applicable First Day Pleading.

WEIL:\95641329\20\11727.0012

described above, will be necessary and critical to the Debtors' successful reorganization, and is in the best interests of the Debtors' estates and creditors. I adopt and affirm the factual representations contained in each of the First Day Pleadings. A description of the relief requested and the facts supporting each of the pleadings is set forth below.

## A.    Administrative Motions

(i)    Motion of Debtors Pursuant to Fed. R. Bankr. P. 1015(b) for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases (the "*Joint Administration Motion*")

70.    The Debtors request entry of an order (i) directing joint administration of the Chapter 11 Cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b), (ii) providing that the Court maintain one file and one docket for all of the Chapter 11 Cases under the lead case, Aéropostale, Inc., and (iii) granting authority to file monthly operating reports required by the *Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees* issued by the Executive Office of the U.S. Trustee on a consolidated basis.

71.    There are eleven (11) Debtors, and more than 24,000 creditors and other parties in interest in the Chapter 11 Cases. I understand that a court may order the joint administration of multiple chapter 11 cases where debtors are "affiliates" as defined in section 101(2) of the Bankruptcy Code. Each of the Debtors is a direct or indirect subsidiary of Aéropostale, Inc. Accordingly, I understand that Debtors are "affiliates" and this Court is authorized to order joint administration of their estates. Joint administration of the Chapter 11 Cases will allow for the efficient and convenient administration of the Debtors' interrelated Chapter 11 Cases, will yield significant cost savings, and will not prejudice the substantive rights of any party in interest.

WEIL:\95641329\20\11727.0012

72.     The Debtors operate as an integrated international business with common ownership and control.  The Debtors also share a number of financial and operational systems.  As a result, many of the motions and orders that will be filed and entered in the Chapter 11 Cases almost certainly will affect each Debtor.

73.     The entry of an order directing joint administration of the Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings and objections and will allow all parties in interest to monitor the Chapter 11 Cases with greater ease and efficiency.  The relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate their businesses in chapter 11 with minimal disruption.

(ii)     Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a) and 521(a)(1)(B) and Fed. R. Bankr. P. 1007(c) for Entry of Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs (the "***Schedules and Statements Motion***")

74.     The Debtors request entry of an order granting additional time to file their schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs.  As a consequence of the size and complexity of the Debtors' business operations, the number of creditors likely to be involved in the Chapter 11 Cases, the geographical breadth of the Debtors' operations, the numerous critical operational matters that the Debtors' management and employees must address, a 31-day extension (without prejudice to further extensions) is necessary and appropriate.  I believe this will ultimately maximize the value of the Debtors' estates for the benefit of their creditors and all other parties in interest.

WEIL:\95641329\20\11727.0012

      (iii)    Motion of Debtors Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c), 2002(m), and 9007 for Entry of an Order Implementing Certain Notice and Case Management Procedures (the "**Case Management Motion**")

75.     The Debtors seek entry of an order approving and implementing certain notice, case management, and administrative procedures (collectively, the "**Case Management Procedures**").

76.     Given the size and scope of these cases, the Case Management Procedures will facilitate service of notices, motions, applications, declarations, objections, responses, memoranda, briefs, supporting documents, and other papers filed in the Chapter 11 Cases that will be less burdensome and costly than serving such documents on every potentially interested party. This, in turn, will maximize the efficiency and orderly administration of the Chapter 11 Cases, while at the same time ensuring that appropriate notice is provided.

      (iv)    Application of Debtors Pursuant to 28 U.S.C. § 156(c), 11 U.S.C. § 105(a), and Local Rule 5075-1 for an Order Authorizing the Debtors to Retain Prime Clerk LLC as Claims and Noticing Agent (the "**Claims and Noticing Agent Retention Application**")

77.     The Debtors request authority to retain Prime Clerk LLC ("**Prime Clerk**") as claims and noticing agent ("**Claims and Noticing Agent**") in accordance with the terms and conditions of that certain engagement agreement dated March 30, 2016, by and between Prime Clerk and the Debtors (the "**Engagement Agreement**"), effective *nunc pro tunc* to the Commencement Date. Prime Clerk's duties will include assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in these Chapter 11 Cases. I believe the Debtors' selection of Prime Clerk to serve as their Claims and Noticing Agent has satisfied the Court's Protocol for the Employment of Claims and Noticing Agents Under 28 U.S.C. § 156(c). Specifically, the Debtors have solicited and

WEIL:\95641329\20\11727.0012

reviewed engagement proposals from at least two other Court-approved claims and noticing agents to ensure selection through a competitive process.

78.    I believe that Prime Clerk's rates are competitive and reasonable given Prime Clerk's quality of services and expertise.  The terms of Prime Clerk's retention are set forth in the Engagement Agreement attached to, and filed contemporaneously with, the Claims and Noticing Agent Retention Application.  Appointing Prime Clerk as the Debtors' Claims and Noticing Agent will maximize the efficiency of the distribution of notices and the processing of claims, as well as relieve the Office of the Clerk of the Bankruptcy Court of the administrative burden of processing a large number of claims and notices.

> (v)    Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a) and 342(a), and Fed. R. Bankr. P. 1007(a)(3) and 2002(a), (d), (f), and (l), for Entry of an Order (I) Waiving Requirement to File a List of Creditors, (II) Granting Debtors Authority to Establish Procedures for Notifying Creditors of Commencement of Chapter 11 Cases, and (III) Waiving Requirements to File List of Equity Security Holders and Provide Notice to Equity Security Holders (the "***Notice Motion***")

79.    The Debtors request a waiver of the requirement to file a list of creditors on the Commencement Date and seek authority to establish and implement procedures for notifying creditors of the commencement of the Chapter 11 Cases and other important information.  As noted, the Debtors propose to retain Prime Clerk as Claims and Noticing Agent to assist the Debtors in preparing creditor lists and mailing the Notice of Commencement.  With such assistance, the Debtors will be prepared to file a computer-readable consolidated list of creditors upon request and will be capable of undertaking all necessary mailings in a timely and efficient manner.

80.    In addition to mailing the Notice of Commencement to the Debtors' creditors, the Debtors propose to publish, as soon as practicable, the Notice of Commencement

once in the national edition of *The New York Times*, and post it on the website to be established by Prime Clerk, as well as on the Debtors' website.

81.    The Debtors also request that the Court waive the requirements to (i) file a list (the "*List*") of equity security holders (the "*Equity Security Holders*") of Aéropostale, and (ii) provide the Equity Security Holders with the Notice of Commencement.  Aéropostale is a public company and, as of the Commencement Date, has approximately 80.6 million shares of common stock outstanding.  Identifying Aéropostale's Equity Security Holders (who change on a daily basis), preparing a List of Equity Security Holders with last known addresses, and sending notice to all parties on the List will be expensive, time consuming, and difficult to do quickly and accurately.  Instead, the Debtors propose to publish the Notice of Commencement in the national edition of *The New York* Times, and post it on the Debtors' website and Prime Clerk's case-specific website.  Accordingly, the Equity Security Holders will be provided with sufficient notice of the commencement of the Chapter 11 Cases.

**B.    Operational Motions Requesting Immediate Relief**

82.    The Debtors intend to ask for immediate relief with respect to the following First Day Pleadings and, therefore, will present these motions at the First Day Hearing.

    (i)    Motion of Debtors for Interim and Final Authority to (a) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364I, (b) Use Cash Collateral Pursuant to 11 U.S.C. § 363(c)(2), (c) Grant Certain Protections to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364, and (d) Schedule a Final Hearing Pursuant to Fed. R. Bankr. P. 4001(b) and (c) (the "*DIP Financing Motion*")

83.    The Debtors request entry of interim and final orders (collectively, the "*DIP Orders*") granting the Debtors authority to obtain postpetition debtor-in-possession

financing, use cash collateral, and provide adequate protection to the Prepetition Term Loan Secured Parties on the terms set forth in the Interim DIP Order and the other DIP documents.

84.  The Debtors operate in a highly competitive industry.  It is imperative that they make a seamless transition into chapter 11 to preserve the reputation of their businesses and the loyalty and goodwill of their customers, suppliers, and employees.  Sales and operations must continue in the ordinary course of business to preserve the value of the Debtors' estates and the proposed DIP Facility provides the necessary liquidity to support these needs.  Specifically, the $160 million DIP Facility, comprised of a new money term loan facility and an asset-based revolving credit facility, is necessary to facilitate the Debtors' chapter 11 strategy.

85.  The DIP Facility is a senior superpriority facility from Crystal Financial LLC as agent, for itself and for a syndicate of financial institutions.  The DIP Facility will repay the amounts outstanding under the Prepetition ABL Facility and will serve as the Debtors' primary means to fund its day-to-day operations.  The DIP Facility will be secured by, among other things, a first priority lien on the assets currently securing the Prepetition ABL Facility, and a junior lien on the assets currently securing the Prepetition Term Loan Facility.

86.  The DIP Facility was procured after a robust marketing and negotiating process lead by the Debtors' investment banker, Stifel, Nicolaus & Co., Inc. and Miller Buckfire & Company LLC (collectively, "*Stifel*").

87.  As discussed more fully in the DIP Financing Motion and the *Declaration of James Doak in Support of Motion of Debtors for Interim and Final Authority to (A) Obtain Postpetition Financing Pursuant 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e), (B) Use Cash Collateral Pursuant to 11 U.S.C. § 362(c)(2), (C) Grant Certain Protections to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, and*

WEIL:\95641329\20\11727.0012

*364, and (D) Schedule a Final Hearing Pursuant to Fed. R. Bankr. P. 4001(b) and (c)*, the terms of the DIP Lenders' proposal were clearly more favorable to the Debtors than any other alternative financing. Moreover, it provides the Debtors with the ability to pursue a stand-alone plan. In an exercise of sound business judgment, the Debtors elected to move forward with the DIP Facility. The DIP Facility is in the best interests of the Debtors, their estates, and their creditors.

88.     The Debtors are also seeking authority to use their Cash Collateral to, among other things, fund the cash needs related to their operations (including amounts necessary to administer the Chapter 11 Cases). The Debtors' access to sufficient working capital and liquidity, aided by the use of Cash Collateral, and the incurrence of new indebtedness under the DIP Facility is vital to the Debtors' ability to pursue their chapter 11 strategy. As set forth in the *Declaration of Robert J. Duffy in Support of (I) Motion of Debtors for Interim and Final Authority to (A) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e), (B) Use Cash Collateral Pursuant to 11 U.S.C. § 363(c)(2), (C) Grant Certain Protections to Prepetition Secured Parties Pursuant 11 U.S.C. §§ 361, 362, 363, and 364, and (D) Schedule a Final Hearing Pursuant to Fed. R. Bankr. P. 4001(b) and (c), and (II) Motion of Debtors Pursuant to sections 105(a), 362, and 365 of the Bankruptcy Code for Interim and Final Relief and to Compel Performance of MGF Sourcing US LLC's Obligations under Executory Contract and to Enforce the Automatic Stay* (the "**Duffy Declaration**"), the Debtors and their advisors determined that the Debtors require additional liquidity to fund working capital for the back-to-school season while implementing their reorganization strategy. Specifically, FTI projects that Debtors will require $100 million on

an interim basis to fund the Chapter 11 Cases, successfully execute on their chapter 11 strategy, and repay the amounts outstanding under the Prepetition ABL Facility. *See* Duffy Decl. ¶ 8.

      (ii)      Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 503(b)(9) for Interim and Final Authority to Pay Certain Prepetition Obligations to Critical Vendors, Approval of Related Procedures, and Related Relief (the "***Critical Vendors Motion***")

89.      It is absolutely essential to the success of the Chapter 11 Cases that the Debtors' supply chain remains uninterrupted. Even a short-term disruption could be catastrophic to the Debtors' operations and businesses. To enable the Debtors to maintain access to necessary inventory on commercially reasonable terms, the Debtors request "critical vendor" relief to preserve the going-concern value of their businesses.

90.      The requested authority will enable the Debtors to pay the prepetition claims (up to a $4 million cap) of only those vendors verified as "critical" to the Debtors' operations, pursuant to a carefully-designed protocol overseen by a core, centralized team consisting of senior members of the Debtors' management and professional advisors. The *quid pro quo* for the Debtors' payment of a vendor's prepetition claim will be that vendor's commitment to continue providing goods and services to the Debtors on trade terms at least as favorable as those terms in effect before the Commencement Date.

      (iii)      Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363 and 507(a) for Interim and Final Authority to (I) Pay Certain Prepetition Wages and Reimbursable Employee Expenses, (II) Pay and Honor Employee Medical and Other Benefits, (III) Continue Employee Benefits Program, and for Related Relief (the "***Wages and Benefits Motion***")

91.      The Debtors request the entry of interim and final orders authorizing, but not directing, the Debtors to (i) pay prepetition wages, salaries and other compensation, taxes, withholdings, and related costs and reimbursable employee expenses, (ii) pay and honor obligations relating to employee medical, insurance, and other benefits programs, and

WEIL:\95641329\20\11727.0012

(iii) continue their employee medical, insurance, and other benefits programs on a postpetition basis.

92.     The relief requested includes compensation for the Debtors' full-time and part-time employees.  As of the date hereof, certain prepetition obligations to such employees may be due and owing.

93.     As of the Commencement Date, the Debtors employ approximately 14,500 employees (the "*Employees*"), including (i) approximately 3,000 full-time Employees, regularly scheduled to work a minimum of forty (40) to forty-five (45) hours per week, depending on location; and (ii) approximately 11,500 part-time Employees.  As of the Commencement Date, the Debtors owe their Employees in the United States and Puerto Rico approximately $5.1 million in Unpaid Compensation and owe their Canadian Employees CAD 275,000 in Unpaid Compensation.  As of the Commencement Date, the Debtors owe approximately $1.1 million on account of Employee Benefit Programs, and $90,000 on account of Reimbursable Expenses.

94.     The majority of the Debtors' workforce relies on the Debtors' compensation, benefits, and reimbursement of expenses to satisfy daily living expenses.  The Debtors' employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid compensation, benefits, and reimbursable expenses. Moreover, if the Debtors are unable to satisfy such obligations, morale and loyalty will be jeopardized at a time when employee support is critical.  In the absence of such payments, the Debtors' employees may seek alternative employment opportunities, including with the Debtors' competitors, hindering the Debtors' ability to serve their customers and, likely, diminishing customer confidence.  The distraction caused by the loss of valuable employees could prevent

WEIL:\95641329\20\11727.0012

the Debtors from focusing on revamping their operations and administering the Chapter 11 Cases.

> (iv)   Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 503(b) for Interim and Final Authority to (I) Maintain, Renew, and Continue their Insurance Policies and Programs, and (II) Honor all Insurance Obligations (the "*Insurance Motion*")

95.   The Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors to (i) continue to maintain, renew, and continue their various insurance policies and workers' compensation programs in the ordinary course of business, and (ii) pay any prepetition obligations related thereto, including, without limitation, premiums, broker or advisor fees, assessments, taxes, and workers' compensation liabilities.

96.   The Debtors maintain various liability, property, and other insurance policies, which provide the Debtors with insurance coverage related to, among other things, general liability, excess liability, directors' and officers' liability, employment practices liability, fiduciary liability, and cyber and privacy liability, as well as workers' compensation, property, crime, automobile, earthquake, kidnap and ransom, special risk, and terrorism (collectively, the "*Insurance Policies*").   The Debtors maintain the Insurance Policies to help manage and limit the various risks associated with operating their businesses.

97.   The Debtors maintain workers' compensation insurance as required by statute in each of the states in which they operate.   A number of the Debtors' locations have Workers' Compensation Programs that are insured by third-party insurers.   Under these programs, the Debtors are responsible for each valid workers' compensation claim up to a $250,000 deductible.   After this deductible is exhausted, the third-party insurer is responsible for any additional payments.   For the remainder of their locations, the Debtors are statutorily required to obtain workers' compensation insurance from a government fund.

WEIL:\95641329\20\11727.0012

98.    Continuation of the Debtors' Insurance Policies and Workers' Compensation Programs (collectively, the "***Insurance Policies and Programs***") is essential to the preservation of the value of the Debtors' businesses, properties and assets, and, in certain instances, is required by law. If any of the Debtors' Insurance Policies and Programs are terminated or lapse, the Debtors would be exposed to substantial liability to the detriment of all parties in interest and could be in violation of law. Accordingly, having authority to pay all insurance-related obligations is crucial to the continued operation of the Debtors' businesses.

(v)    Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363, 364, 503, and 507 for Interim and Final Authority to (I) Continue Using Existing Cash Management System, Bank Accounts, and Business Forms, (II) Implement Changes to the Cash Management System in the Ordinary Course of Business, (III) Continue Intercompany Transactions, (IV) Provide Administrative Expense Priority for Postpetition Intercompany Claims and for Related Relief (the "***Cash Management Motion***")

99.    The Debtors request authorization to (i) continue their existing cash management system, including, without limitation, the continued maintenance of their existing bank accounts and business forms, (ii) implement changes to their cash management system in the ordinary course of business, including, without limitation, opening new or closing existing bank accounts, (iii) continue, in their business judgment and at their sole discretion, to perform under and honor intercompany transactions in the ordinary course of business, and (iv) provide postpetition intercompany claims with administrative expense priority.

100.    In the ordinary course of business, the Debtors utilize an integrated, centralized cash management system to collect, transfer, and disburse funds generated by their operations (the "***Cash Management System***"). The Cash Management System is comprised of approximately 800 bank accounts at various financial institutions (the "***Banks***") to accommodate different business divisions and to collect, organize and track various forms of customer receipts

(collectively, the "**Bank Accounts**").   The Cash Management System is tailored to meet the Debtors' operating needs as an operator of retail stores.   The Cash Management System enables the Debtors to efficiently collect and disburse cash generated by their business, pay their financial obligations, centrally control and monitor corporate funds and available cash, comply with the requirements of their financing agreements, reduce administrative expenses, and efficiently obtain accurate account balances and other financial data.   It is critical that the Cash Management System remain intact to ensure seamless continuation of operations and uninterrupted collection of revenues.

101.    In the ordinary course of business, the Debtors incur intercompany receivables and payables (the "**Intercompany Claims**") pursuant to certain intercompany transactions (the "**Intercompany Transactions**").

102.    Intercompany Claims are not settled by actual transfers of cash among the Debtors.   Instead, the Debtors track all Intercompany Transactions electronically in their accounting system, which concurrently are recorded on the applicable Debtor's balance sheets and regularly reconciled.   The accounting system requires that all general-ledger entries be balanced at the legal-entity level; therefore, when the accounting system enters an intercompany receivable on one entity's balance sheet, it automatically creates a corresponding intercompany payable on the applicable affiliate's balance sheet.   This results in a net balance of zero when accumulating all intercompany accounts.

103.    To ensure each individual Debtor will not fund, at the expense of its creditors, the operations of another entity, the Debtors request that, pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code, all Intercompany Claims arising after the Commencement Date be accorded administrative expense priority.   In this manner, each entity

WEIL:\95641329\20\11727.0012

utilizing funds flowing through the Cash Management System should continue to bear ultimate repayment responsibility for such ordinary course transactions.

104.    The Debtors incur periodic service charges and other fees from the Banks and credit card processors in connection with the maintenance of the Cash Management System (collectively, the "**Service Charges**").  Payment of any prepetition Service Charges is in the best interests of the Debtors and all parties in interest in the Chapter 11 Cases, as it will prevent unnecessary disruptions to the Cash Management System and ensure that the Debtors' receipt of funds is not delayed.  Further, because the Banks and credit and debit card processors likely have setoff rights for the Service Charges, payment of prepetition Service Charges should not alter the rights of unsecured creditors in the Chapter 11 Cases.

105.    To minimize expenses, the Debtors seek authorization to continue using all business forms and checks substantially in the forms used immediately prior to the Commencement Date, without reference to the Debtors' status as debtors in possession; provided that in the event that the Debtors generate new business forms and/or checks during the pendency of these cases, such business forms and checks will include a legend referring to the Debtors as "Debtors-In-Possession."  To the extent practicable, the Debtors also will laser print such legend on any business forms and checks electronically generated during these cases.

106.    Finally, the Debtors seek entry of an order authorizing and directing their Banks to continue to treat, service, and administer the Bank Accounts as accounts of the Debtors, as debtors in possession, without interruption and in the usual and ordinary course, and to receive, process, honor, and pay all checks, drafts, wires, or Automated Clearing House Payments drawn on the Bank Accounts after the Commencement Date; provided that any

payments issued or made prior to the Commencement Date will not be honored absent direction of the Debtors and an order of the Court.

> (vi)   Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 363, 365, and 554 for Approval of (I) Procedures for (a) Store Closings, and (b) the Expedited Sale, Transfer, or Abandonment of De Minimis Assets, and (III) Entry Into a Liquidation Consulting Agreement (the "***Store Closing Motion***")

107.   In the Store Closing Motion, the Debtors seek to implement a key component of their restructuring strategy and right-size their operations by closing underperforming or geographically undesirable stores.  Such closures will help stem the Debtors' significant cash burn, increase the Debtors' liquidity, and allow the Debtors to focus their reorganization efforts around a smaller footprint of more profitable stores.

108.   The Debtors and their advisors have identified 154 stores that require prompt closure (the "***Closing Stores***").  The Closing Stores include 113 of the Debtors' stores operating in the United States and all 41 of the Debtors' stores operating in Canada.

109.   The Debtors are seeking approval of streamlined procedures to sell the inventory, furniture, fixtures, and equipment at any store scheduled for closure during the Chapter 11 Cases, in each case free and clear of liens, claims and encumbrances (the "***Store Closing Procedures***").  The Debtors are seeking interim approval to apply the Store Closing Procedures to the Closing Stores given the significant operating losses continuing in the Closing Stores in the aggregate, the Debtors' liquidity constraints, and the budget set forth in the Debtors' proposed postpetition financing facility.  To maximize value for their creditors, the Debtors may need to close additional stores during the Chapter 11 Cases (such stores, the "***Additional Closing Stores***").  The Debtors will seek authority to apply the Store Closing Procedures to any Additional Closing Stores at a final hearing.

WEIL:\95641329\20\11727.0012

110.   To run a seamless and efficient large-scale store closing process and to maximize the value of the assets being sold, the Debtors are also seeking immediate authority to assume their liquidation consulting agreements (the "*Liquidation Consulting Agreements*") with Tiger Capital Group, LLC and Great American Group, LLC (the "*Liquidation Consultant*"), liquidation consulting firms that the Debtors have determined in their business judgment are capable of performing the required tasks and have proposed favorable terms.

> (vii)   Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 507(a) for Interim and Final Authority to (I) Maintain and Administer Prepetition Customer Programs, Promotions, and Practices, and (II) Pay and Honor Related Prepetition Obligations (the "*Customer Programs Motion*")

111.   The Debtors request authority to, in the ordinary course of business and consistent with past practice, (i) maintain and administer prepetition customer programs, promotions, and practices, and (ii) pay and otherwise honor their obligations to customers relating thereto, whether arising prior to or after the Commencement Date, as necessary and appropriate in the Debtors' business judgment.

112.   The Debtors' businesses depend upon the loyalty of their customers.  To maximize customer loyalty, the Debtors have implemented and followed, in the ordinary course of business, various practices and programs (collectively, the "*Customer Programs*") to reward and provide incentives to existing customers and to attract new customers to the Debtors' stores. Such programs are standard in the retail apparel business.  Without the ability to continue their Customer Programs and to satisfy prepetition obligations in connection therewith, the Debtors risk losing market share, adversely affecting the value of their businesses.

113.   Consistent with industry practice and to accommodate customers' needs, the Debtors maintain refund, return, exchange, and price adjustment policies with respect to both in-store and online purchases (collectively, the "*Return and Exchange Policies*").  To maintain

WEIL:\95641329\20\11727.0012

the Debtors' reputation for reliability and to maintain the loyalty, goodwill, and support of their customers, the Debtors must maintain their Return and Exchange Policies.  The preservation of customer loyalty generated by the Return and Exchange Policies outweighs the associated costs.  As a result, the Debtors seek authorization to continue to honor the Return and Exchange Policies in the ordinary course of business, with respect to merchandise and gift cards purchased prior to, and after the Commencement Date.

114.    The Debtors maintain a program (the "***Gift Card Program***") by which their customers can purchase physical or electronic, pre-paid, non-expiring gift cards in various denominations up to $300 (the "***Gift Cards***") that can be redeemed in-store or online for merchandise at a later date.  The Debtors contract with certain third party administrators to track sales and usage of Gift Cards, and provide customer service in respect of the Gift Card Program.  The Debtors also contract with various gift card distributors and loyalty marketing companies, who arrange for the Gift Cards to be sold directly to customers through third-party retail locations, including grocery stores, drug stores and convenience stores, as well as hundreds of third-party websites.  Failure to honor the Gift Cards would have a disastrous effect on the Debtors' customer relationships.  The Debtors are seeking authorization to maintain the Gift Card Program and to honor all Gift Cards issued by the Debtors prior to the Commencement Date.  In connection with the Gift Card Program, the Debtors are also seeking authority to continue to pay the Gift Card Fees, and to allow the Distributors to offset the Sales Fees against amounts remitted to the Debtors, in each case in the ordinary course, whether arising before or after the Commencement Date.  To preserve the goodwill of their customer base, the Debtors also seek authorization to honor all Sales Promotions and Coupons in a manner consistent with

42

their ordinary business practices, whether offered or issued prior to or after the Commencement Date.

> (viii)   Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), 507(a), and 541 for Interim and Final Orders Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees ("***Taxes and Fees Motion***")

115.   The Debtors request authorization, but not direction, to remit and pay sales tax, use tax, state and local income tax, real and personal property tax, and other taxes, assessments, fees and charges (collectively, the "***Taxes and Fees***").

116.   The Debtors collect, withhold, or incur an assortment of Taxes and Fees that they remit to various federal, state, and local taxing, licensing, regulatory, and other governmental authorities (collectively, the "***Authorities***").  Many of the Taxes and Fees collected are held in trust for and must be turned over to the Authorities.  The Debtors also seek to pay certain prepetition Taxes and Fees to, among other things, forestall Authorities from taking actions that might interfere with the administration of the Chapter 11 Cases, which may include asserting liens on the Debtors' property, assessing penalties and/or significant interest on past-due taxes, or commencing personal liability actions against directors, officers, and other key employees.  In addition, the non-payment of such Taxes and Fees may give rise to priority claims pursuant to section 507(a)(8) of the Bankruptcy Code.  Accordingly, I believe that the relief requested in the Taxes and Fees Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest, and will facilitate the Debtors' continued operation of their businesses.

WEIL:\95641329\20\11727.0012

(ix)   Motion of Debtors Pursuant to 11 U.S.C. §§ 363 and 503 for Interim And Final Orders: (I) Authorizing Payment of Prepetition Claims of Shippers, Warehousing, and Miscellaneous Lien Claimants, and (II) Confirm Administrative Expense Priority of Undisputed Pre-Commencement Date Orders and Authorizing Payment of Such Obligations in the Ordinary Course of Business (the "**Shippers, Warehousemen and Lienholders Motion**")

117.    The Debtors seek an order authorizing them to pay prepetition claims of Warehousing and Miscellaneous Lien Claimants.

118.    The Debtors contract with various third-party transporters (collectively, the "**Shippers**") and one third-party storage facility provider (together with the Shippers, the "**Warehousemen**") to transport certain inventory and other goods and to store such inventory and other goods prior to ultimate delivery to the Debtors' stores or customers.  In the event that the Debtors fail to reimburse the Warehousemen for charges incurred in connection with the transport and storage of the inventory, various state laws may permit the Warehousemen to assert statutory liens against the inventory in their possession, potentially blocking the Debtors' access to such inventory.  To maintain access to the inventory that is essential to the continued viability of the Debtors' retail operations and to preserve the value of such inventory, the Debtors seek authority to honor outstanding invoices related to the shipping and warehousing services provided to the Debtors prior to the Commencement Date.

119.    The Debtors contract with a number of third parties (collectively, the "**Miscellaneous Lien Claimants**") to make improvements and repairs to their property, including the furniture, fixtures, and equipment located in the Debtors' stores and distributions centers. The Miscellaneous Lien Claimants could potentially assert liens, including mechanic's liens, artisan's liens and materialman's liens (the "**Miscellaneous Lien Claims**") against the Debtors' property for amounts the Debtors owe to those third parties.  If the Debtors are unable to pay the

44

Miscellaneous Lien Claims, they risk losing access to facilities and equipment that are critical to the continued operation of their business.

> (x)    Motion of the Debtors for the Entry of an Order Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Interests and Claims in the Debtors (the "***NOLs Motion***")

120.    The Debtors request entry of interim and final orders authorizing the Debtors to establish procedures (the "***Procedures***") as set forth herein to protect the potential value of the Debtors' consolidated net operating loss carryforwards ("***NOLs***") and certain other tax attributes for federal income tax purposes (together with the NOLs, the "***Tax Attributes***") for use in connection with the reorganization of the Debtors.  The Procedures apply to (i) common stock (the "***Common Stock***") and preferred stock (the "***Preferred Stock***") of Aéropostale, Inc. and any options or similar rights (within the meaning of applicable U.S. Treasury regulations) to acquire such stock ("***Options***" and together with Common Stock and Preferred Stock, the "***Aéropostale Stock***"), and (ii) Claims (as hereinafter defined) against one or more of the Debtors.

121.    The Debtors have certain Tax Attributes, which include, as of Commencement Date, approximately $250 million in estimated NOLs.  The Tax Attributes are valuable assets.  Title 26 of the United States Code (the "***Tax Code***") generally permits corporations to carry forward their tax attributes to reduce future taxable income.  *See* Tax Code § 172.  Accordingly, the Tax Attributes are available to offset any income realized through the taxable year that includes the effective date of a chapter 11 plan, and potentially thereafter (though any Tax Attributes remaining thereafter may be significantly reduced or eliminated as a result of a discharge of debt and, to the extent otherwise available, may be subject to additional limitations, as discussed below).  Accordingly, absent any intervening limitations and depending

upon future operating results, the Tax Attributes could translate into future tax savings over time and any such savings could enhance the Debtors' cash position for the benefit of all parties in interest and contribute to the Debtor's efforts toward a successful reorganization.

122.    An ownership change, pursuant to section 382 of the Tax Code (which is described further in the NOL Motion), prior to the effective date of a chapter 11 plan could effectively eliminate the Debtors' ability to use their Tax Attributes, thereby resulting in a significant loss of potential value to the Debtors' estates.  Accordingly, the Procedures seek authority to monitor and approve certain changes in the ownership of Aéropostale Stock and Claims (including by claiming any worthless deduction).

> (xiii)    Motion of Debtors Pursuant to 11 U.S.C. § 1505 for Entry of an Order Authorizing Aéropostale, Inc. To Act As Foreign Representative On Behalf Of The Debtors' Estates (the "***Foreign Representative Motion***")

123.    The Debtors request that Aéropostale, Inc. be authorized to act as the "foreign representative" on behalf of the Debtors' estates (the "***Foreign Representative***") in any judicial or other proceedings in a foreign country, including the ancillary proceeding the Foreign Representative intends to commence in Canada pursuant to the Companies' Creditors Arrangement Act (Canada), R.S.C. 1985, c. C-36 as amended (the "***CCAA***") in the Ontario Superior Court of Justice (Commercial List) (the "***Canadian Court***") in Toronto, Ontario, Canada.

124.    The Debtors further request that, as Foreign Representative, Aéropostale shall be expressly authorized to (i) seek recognition of the Chapter 11 Cases in Canada, (ii) request that the Canadian Court lend assistance to this Court in protecting the property of the Debtors' estates, and (iii) seek any other appropriate relief from the Canadian Court that is just and proper in furtherance of the protection of the Debtors' estates.

WEIL:\95641329\20\11727.0012

C.       **Motion to Compel**

(xi)     Debtors' Motion Pursuant to Sections 105(a), 362, and 365 of the Bankruptcy Code for Interim and Final Relief and to Compel Performance of MGF Sourcing US, LLC's Obligations Under Executory Contract and to Enforce the Automatic Stay (the "***Interim Motion to Compel***")

125.     The Debtors request the entry of an interim and final order requiring MGF to comply with the terms of the Sourcing Agreement.  The Interim Motion to Compel seeks to require MGF to (a) continue to source, manufacture, and deliver goods already ordered in the ordinary course of business, (b) comply with the purchase orders placed and accepted based on "net 30" terms prior February 24, 2016 (the "***Original Orders***"), and (c) deliver the orders placed after February 24, 2016 (the "***Post-February 24 Orders***") on "net 20" payment terms.  There are nearly $82 million in Original Orders for which the Debtors are prepared to adhere to the "net 30" terms that were the basis for the order being placed.  Absent interim relief, the Debtors risk not having sufficient product for the critical back-to-school period or the liquidity necessary to effectively reorganize under the terms of the DIP Facility.

126.     The Interim Motion to Compel also seeks to have the Court require that any Post-February 24 Orders be on reasonable payment terms.  On an interim basis, the Debtors request that with respect to such orders, the Court compel payment on no fewer than 20 days after delivery to the Debtors' distribution centers.  This would simply provide MGF with the same reasonable payment terms that are sufficient for the Debtors' other major supplier, L&F—namely "net 20" payment terms.  Absent this relief, the Debtors would have to pay for any Post-February 24 Orders at least 90 days before those goods were received by the Debtors at their distribution centers.

WEIL:\95641329\20\11727.0012

127.    The Debtors' financial advisors have concluded that if MGF is permitted to impose onerous payment terms requiring cash before delivery of existing orders and payment in full before ordering any new goods, the Debtors will not have the liquidity to effectively reorganize and will be forced to liquidate.

128.    MGF will not be injured by this interim relief.  MGF will be a priority administrative creditor and the liquidity projections in connection with the DIP Facility demonstrate that the Debtors will have more than sufficient liquidity to pay MGF (and other vendors) at least on reasonable "net 20" payment terms.  Accordingly, I believe that the interim relief requested is not only in the best interests of the Debtors' estates and their creditors, but it is essential to the ability of the Debtors to operate in the normal course and effectively reorganize.

**D.    Operational Motions Requesting Second Day Relief**

129.    The Debtors intend to ask for non-immediate relief with respect to the following First Day Pleadings.  The following pleadings will be presented at a future hearing.

(xi)    Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a) and 366 for Entry of an Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Providers, (II) Establishing Procedures for Determining Adequate Assurance of Payment for Future Utility Services, and (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service (the "*Utilities Motion*")

130.    The Debtors request entry of an order (i) approving the Debtors' proposed form of adequate assurance of payment to utility providers, (ii) establishing procedures for determining adequate assurance of payment for future utility services, and (iii) prohibiting utility providers from altering or discontinuing service on account of outstanding prepetition invoices.

131.    Preserving utility services on an uninterrupted basis is essential to the Debtors' ongoing operations.  Indeed, any interruption in utility services—even for a brief period of time—would seriously disrupt the Debtors' ability to continue operations and service their

customers.  This disruption would adversely impact customer relationships and would result in a precipitous decline in the Debtors' revenues.  Such a result could seriously jeopardize the Debtors' restructuring efforts and, ultimately, creditor recoveries.  Therefore, it is critical that utility services continue uninterrupted during the Chapter 11 Cases.

132.    The Debtors intend to pay postpetition obligations owed to the Utility Providers in a timely manner.  The Debtors expect that cash flows from operations, together with their DIP Financing, will be sufficient to pay postpetition obligations related to their utility services in the ordinary course of business.

133.    Nevertheless, the Debtors propose to deposit into a newly-created, segregated, interest-bearing bank account a sum equal to the cost of two weeks' worth of the average utility cost for each Utility Provider (less any amounts already on deposit with any such Utility Provider that have not been applied to outstanding prepetition amounts)[9], based on the Debtors' average usage per week for the past five weeks (collectively, the "***Adequate Assurance Deposit***").

134.    I believe that the Adequate Assurance Deposit, in conjunction with the DIP Financing, cash flow from operations, and cash on hand demonstrates the Debtors' ability to pay for future utility services in the ordinary course of business and constitutes sufficient adequate assurance to the Utility Providers.

---

[9]  Nothing herein shall prejudice the Debtors' rights, if any, to demand reimbursement of any amounts of previously issued deposits.

WEIL:\95641329\20\11727.0012

    (xi)   Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 327, and 330 for Authority to Employ Professionals Used in the Ordinary Course of Business *Nunc Pro Tunc* to the Commencement Date (the "***OCP Motion***")

135.    The Debtors seek authority to (i) establish certain procedures to retain and compensate those professionals that the Debtors employ in the ordinary course of business (collectively, the "***Ordinary Course Professionals***"), effective as of the Commencement Date, without (a) the submission of separate employment applications and (b) the issuance of separate retention orders for each individual Ordinary Course Professional, and (ii) compensate and reimburse such professionals without individual fee applications.

136.    The Debtors seek the continued employment of the Ordinary Course Professionals to render professional services to the Debtors' estates in the same manner and for the same purposes as the Ordinary Course Professionals were retained prior to the Commencement Date.  In the past, these professionals have provided professional services to the Debtors relating to such matters as intellectual property, litigation, tax, financial advisory, audit, consulting, and actuarial services, as well as other services relating to matters that have a direct and significant impact on the Debtors' day-to-day operations.  It is thus essential to avoid disruption of the Debtors' normal business operations that the employment of these Ordinary Course Professionals, many of whom are already familiar with the Debtors' business and financial affairs, be continued.

    (xii)   Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 330, 331, Fed. R. Bankr. P. 2016, and Local Rule 2016-1, for Entry of an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals (the "***Interim Compensation Motion***")

137.    The Debtors request the entry of an order establishing an orderly, regular process for the monthly allowance and payment of compensation and reimbursement of expenses

WEIL:\95641329\20\11727.0012

for professionals whose services are authorized by the Court pursuant to sections 327, 328, or 1103 of the Bankruptcy Code and who will be required to file applications for allowance of compensation and reimbursement of expenses pursuant to sections 330 and 331 of the Bankruptcy Code. It is my belief that establishing orderly procedures to pay the Debtors' professionals and attorneys whose retentions are approved by this Court and who will be required to file applications for the allowance of compensation and reimbursement of expenses will streamline the administration of these chapter 11 cases and otherwise promote efficiency for the Court, the Office of the U.S. Trustee for Region 2, and all parties in interest. Specifically, a streamlined process for serving interim fee applications and notices thereof is in the best interests of the Debtors because it will facilitate efficient review of the retained professionals' fees and expenses and will save the Debtors from incurring unnecessary expenses.

## V.
## Information Required by Local Rule 1007-2

138.    In accordance with Local Rule 1007-2, the schedules attached hereto provide certain information related to the Debtors.

139.    Pursuant to Local Rule 1007-2(a)(3), **Schedule 1** hereto lists the names and addresses of the members of, and attorneys for, any committee organized prior to the Commencement Date and a brief description of the circumstances surrounding the formation of the committee and the date of its formation.

140.    Pursuant to Local Rule 1007-2(a)(4), **Schedule 2** hereto lists the holders of the Debtors' forty (40) largest unsecured claims on a consolidated basis, excluding claims of insiders.

141.    Pursuant to Local Rule 1007-2(a)(5), **Schedule 3** hereto lists the holders of the five (5) largest secured claims against the Debtors on a consolidated basis.

WEIL:\95641329\20\11727.0012

142.    Pursuant to Local Rule 1007-2(a)(6), **Schedule 4** hereto provides a summary of the (unaudited) consolidated assets and liabilities for the Debtors and their non-Debtor affiliates.

143.    Pursuant to Local Rule 1007-2(a)(7), **Schedule 5** hereto provides the following information: the number and classes of shares of stock, debentures, and other securities of the Debtors that are publicly held and the number of record holders thereof; and the number and classes of shares of stock, debentures, and other securities of the Debtors that are held by the Debtors' directors and officers, and the amounts so held.

144.    Pursuant to Local Rule 1007-2(a)(8), **Schedule 6** hereto provides a list of all of the Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity, giving the name, address, and telephone number of each such entity and the location of the court in which any proceeding relating thereto is pending.

145.    Pursuant to Local Rule 1007-2(a)(9), **Schedule 7** hereto provides a list of the premises owned, leased, or held under other arrangement from which the Debtors operate their businesses.

146.    Pursuant to Local Rule 1007-2(a)(10), **Schedule 8** hereto provides the location of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

147.    Pursuant to Local Rule 1007-2(a)(11), **Schedule 9** hereto provides a list of the nature and present status of each action or proceeding, pending or threatened, against the

WEIL:\95641329\20\11727.0012

Debtors or their property where a judgment against the Debtors or a seizure of their property may be imminent.

148.    Pursuant to Local Rule 1007-2(a)(12), **Schedule 10** hereto provides a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

149.    Pursuant to Local Rule 1007-2(b)(1)-(2)(A), **Schedule 11** hereto provides the estimated amount of payroll to the Debtors' employees (not including officers, directors, stockholders, and partners) and the estimated amount to be paid to officers, stockholders, directors, members of any partnerships, and financial and business consultants retained by the Debtors for the thirty (30) day period following the filing of the Debtors' Chapter 11 Cases.

150.    Pursuant to Local Rule 1007-2(b)(3), **Schedule 12** hereto provides, for the thirty (30) day period following the filing of the Chapter 11 Cases, a list of estimated cash receipts and disbursements, net cash gain or loss, obligations, and receivables expected to accrue that remain unpaid, other than professional fees.

## Conclusion

151.    This declaration describes the factors that have precipitated the commencement of the Chapter 11 Cases and demonstrates the critical need for the Debtors to obtain the relief sought in the First-Day Pleadings.

152.    I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed this 4th day of May, 2016

                                                    /s/ David J. Dick
                                                    David J. Dick

WEIL:\95641329\20\11727.0012