WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail

*Proposed Attorneys for Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------x
                                              :
In re                                         :    Chapter 11
                                              :
AÉROPOSTALE, INC., *et al.*,                  :    Case No. 16-_____ (___)
                                              :
          Debtors.[1]                         :    Joint Administration Requested
                                              :
--------------------------------------------------------x

**MOTION OF DEBTORS FOR INTERIM AND FINAL
AUTHORITY TO (A) OBTAIN POSTPETITION FINANCING
PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3),
364(d)(1), AND 364(e), (B) USE CASH COLLATERAL PURSUANT TO 11 U.S.C.
§ 363(c)(2), (C) GRANT CERTAIN PROTECTIONS TO PREPETITION SECURED
PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363, AND 364, AND (D) SCHEDULE
A FINAL HEARING PURSUANT TO FED. R. BANKR. P. 4001(b) AND (c)**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Aéropostale, Inc. ("*Aéropostale*") and its subsidiaries, as debtors and debtors in

possession in the above-captioned chapter 11 cases (collectively, the "*Debtors*"), respectfully

represent as follows:

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal tax identification number, as applicable, are as follows:  Aéropostale, Inc. (3880); Aéropostale West, Inc. (7013); Jimmy'Z Surf Co., LLC (0461); Aero GC Management LLC (4257); Aeropostale Procurement Company, Inc. (8518); Aeropostale Licensing, Inc. (8124); P.S. from Aeropostale, Inc. (5900); GoJane LLC (4923); Aeropostale Canada Corp. (N/A); Aeropostale Holdings, Inc. (7729); and Aeropostale Puerto Rico, Inc. (6477).  The Debtors' corporate headquarters is located at 112 West 34th Street, 22nd Floor, New York, NY 10120.

**Preliminary Statement**

1.      The Debtors commenced these chapter 11 cases (the "***Chapter 11 Cases***")
after the actions of one of their key suppliers caused a disruption in their supply chain and a
corresponding negative impact on their liquidity.  In order to restore access to inventory, which
is the lifeblood of any retail business, the Debtors commenced the Chapter 11 Cases.  Despite
overwhelming odds, the Debtors have secured a viable path through an expedited chapter 11 case
in this Court with a fresh source of financing.  The Debtors have structured a dual path exit from
chapter 11 in which they have an option to pursue a standalone chapter 11 plan with their new
financing source, while simultaneously pursuing ongoing M&A efforts for the enterprise.

2.      The Debtors operate in a highly competitive industry.  It is imperative that
they make a seamless transition into chapter 11 to preserve the reputation of their businesses and
the loyalty and goodwill of their customers, suppliers, and employees.  Sales and operations must
continue in the ordinary course of business to preserve the value of the Debtors' estates.  The
proposed DIP Facility provides liquidity that is critical to support these needs.  Specifically, the
$160 million DIP Facility, comprised of a term loan facility and an asset-based revolving credit
facility, is necessary to facilitate the Debtors' chapter 11 strategy.

3.      The DIP Facility is a senior superpriority facility from Crystal Financial
LLC as agent, for itself and for a syndicate of financial institutions.  The DIP Facility will repay
the amounts outstanding under the Prepetition ABL Facility[2] and will serve as the Debtors'
primary means to fund its day-to-day operations.  It will be secured by, among other things, a

---

[2] Terms used but not defined herein shall have the meanings ascribed to them in the *Declaration of David J. Dick
Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York* and the Interim Order
(as defined herein).

WEIL:\95664695\9\11727.0012

first priority lien on the assets that comprise the Prepetition ABL Collateral and a junior lien on the assets that comprise the Prepetition Term Loan Collateral.

4.        The DIP Facility was procured after a robust marketing and negotiating process lead by the Debtors' investment banker, Stifel, Nicolaus & Co., Inc. and Miller Buckfire & Company LLC (collectively, "***Stifel***").  As discussed more fully below, and in the Declaration of James Doak, a Managing Director of Stifel, sworn to on May 2, 2016 and filed concurrently herewith (the "***Doak Declaration***") out of the four proposals the Debtors received, the final decision was between two proposals.  One proposal was submitted by the DIP Lenders, and the other proposal was submitted by Bank of America, the Prepetition ABL Agent.  When compared side-by-side, the terms of the DIP Lenders' proposal were clearly more favorable to the Debtors, primarily because the tight timelines set forth in the Prepetition ABL Agent's proposal would not support the Debtors' objective of averting an immediate liquidation.  In an exercise of sound business judgment, the Debtors elected to move forward with the DIP Facility.  Approval of the DIP Facility is in the best interests of the Debtors, their estates, and their creditors, and provides the only viable means of averting liquidation and charting a clear path towards reorganization.

5.        The Debtors are also seeking authority to use their Cash Collateral to, among other things, fund the cash needs related to their operations (including amounts necessary to administer the Chapter 11 Cases).  The Debtors' access to sufficient working capital and liquidity, aided by the use of Cash Collateral, and the incurrence of new indebtedness under the DIP Facility is vital to the Debtors' ability to pursue their chapter 11 strategy.

6.        For the reasons set forth herein, the Debtors believe that authority to obtain DIP financing, as provided under the DIP Facility and use of Cash Collateral is in the best interests of the Debtors, their estates, and their creditors and should be granted.

WEIL:\95664695\9\11727.0012

## Relief Requested

7.    Pursuant to sections 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) of title 11 of the United States Code (the "***Bankruptcy Code***"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and Rule 4001-2 of the Local Bankruptcy Rules for the Southern District of New York (the "***Local Rules***"), the Debtors request the following relief:

(a)    Authority for Aéropostale to be a borrower (in such capacity, the "***Borrower***") under the DIP Facility;

(b)    Authority for each Debtor listed on the signature page to the DIP Credit Agreement to serve as guarantor under the DIP Facility (the "***Guarantors***" and, together with the Borrower, the "***DIP Loan Parties***");

(c)    Authority for the DIP Loan Parties to execute and enter into the DIP Credit Agreement[3] (and, together with any exhibits attached thereto and other agreements related thereto, including, without limitation, all guarantees, all security agreements, all related or ancillary documents and agreements, and any mortgages contemplated thereby, the "***DIP Documents***"), and to perform all such other and further acts as may be necessary or appropriate in connection with the DIP Documents;

(d)    Authority for the Borrowers to make an initial draw under the DIP Facility in the aggregate amount of up to $100 million to avoid immediate and irreparable harm in accordance with the DIP Budget;

(e)    Authority for the Debtors to grant security interest, liens, and superpriority claims to the DIP Lenders, and related protections to secure all obligations of the Debtors under and with respect to the DIP Facility in the order of priority and as provided in the DIP Orders and the DIP Documents;

(f)    Authority for the Debtors to provide adequate protection on the terms set forth in the Interim Order and in the DIP Documents to the Prepetition Term Loan Secured Parties;

---

[3] A copy of the DIP Credit Agreement is annexed hereto as **Exhibit B**.

WEIL:\95664695\9\11727.0012

(g)    Authority for the Debtors to use Cash Collateral in accordance with the DIP Budget;

(h)    Modification of the automatic stay set forth in section 362 of the Bankruptcy Code on the terms and conditions set forth herein to the extent necessary to implement and effectuate the terms of the DIP Documents and this Interim Order;

(i)    Waiver of any applicable stay with respect to the effectiveness and enforceability of this Interim Order (including under Bankruptcy Rule 6004); and

(j)    Scheduling of a final hearing (the "*Final Hearing*"), pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, within fourteen (14) days of entry of the Interim Order granting the relief requested herein to consider entry of an order granting the relief requested in the Motion on a final basis.

8.    A proposed form of order granting the relief requested herein on an interim basis is annexed hereto as **Exhibit A** (the "*Interim Order*" and, together with the order granting relief on a final basis, the "*Final Order*," the "*DIP Orders*").

## Concise Summary of the Terms of the DIP Facility

9.    In accordance with Bankruptcy Rules 4001(b) and 4001(d) and Local Rule 4001-2(a), the following table summarize significant terms of the Interim Order and the DIP Documents:[4]

---

[4]    This concise statement is qualified in its entirety by reference to the applicable provisions of the DIP Credit Agreement or the Interim Order. To the extent there exists any inconsistency between this concise statement and the provisions of the DIP Credit Agreement, the provisions of the DIP Credit Agreement shall control. Any capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Credit Agreement or the Interim Order, as applicable. **In accordance with Local Rule 4001-2, sections that must be highlighted for the Court are in bold and marked with an asterisk.**

WEIL:\95664695\9\11727.0012

| MATERIAL TERMS OF THE DIP FACILITY | |
|---|---|
| **Borrower**<br>Bankruptcy Rule 4001(c)(1)(B) | Aéropostale, Inc. *See* **DIP Credit Agreement, Art. 1; Interim Order, Preamble.** |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | Each Debtor listed on the signature page to the DIP Credit Agreement. *See* **DIP Credit Agreement, Art. 1; Interim Order, Preamble.** |
| **DIP Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | Crystal Finance SPV LLC and a syndicate of lenders to be formed by the Agent reasonably acceptable to the Borrower, as lenders. *See* **DIP Credit Agreement Art. 1; Interim Order, Preamble.** |
| **DIP Agent**<br>Bankruptcy Rule 4001(c)(1)(B) | Crystal Financial LLC. *See* **DIP Credit Agreement, Art. 1; Interim Order, Preamble.** |
| **DIP Facility**<br>Bankruptcy Rule 4001(c)(1)(B);<br>Local Rule 4001-2(a)(ii) | $160 million DIP credit facility, comprised of: (i) a $75 million term loan facility, of which up to $45 million will be borrowed as an interim draw, and (ii) a $85 million revolver, of which up to $55 million will be borrowed as an interim draw. *See* **DIP Credit Agreement, Art. 1; Interim Order, Preamble.** |
| **Borrowing Limits**<br>Bankruptcy Rule 4001(c)(1)(B) | Initial Draw: $100 million. *See* **Interim Order ¶ 2(b).** |
| **Budget**<br>Bankruptcy Rule 4001(c)(1)(B);<br>Local Rule 4001-2(a)(2) | Borrower shall not make any disbursements other than those set forth in the DIP Budget approved by Agent and Required Lenders, subject to a weekly variance not to exceed 15% of the projected amounts for total disbursements set forth in the DIP Budget for such period, including professional fees for professionals not retained by the Debtors.  Professional fees for professionals retained by the Debtors are subject to a monthly variance of 20% of the projected amounts for professional fees set forth in the DIP Budget for such period. Compliance with both variances shall be tested on a trailing 4-week basis. *See* **DIP Credit Agreement Art. 5-14; Interim Order ¶ 2(c).** |
| **Use of DIP Proceeds**<br>Bankruptcy Rule 4001(c)(1)(B);<br>Local Bankruptcy Rule 4001-2(a)(6)-(a)(7) | Provide general corporate working capital purposes, repay the outstanding pre-petition obligations under the ABL Credit Agreement, establish an escrow account for indemnification obligations in the amount of $350,000, cash collateralize certain cash management obligations owed to Bank of America, N.A. in the amount of $250,000 and to Wells Fargo Bank, N.A. in the amount of $10,000, cash collateralize certain bank product obligations related to credit cards in an amount not to exceed $3,720,977.30, all in accordance with the Budget.<br><br>*See* **DIP Credit Agreement Art. 4-35; Interim Order ¶ G.** |
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B) | Base Rate:  90-day LIBOR + 5%<br>Default Interest Rate:  An additional 2% per annum.<br><br>*See* **DIP Credit Agreement § 2-10(f).** |
| **Expenses and Fees\***<br>Local Rule 4001-2(a)(3) | Work Fee: A fee of $650,000.  The Work Fee will be credited towards the Underwriting Fee upon entry of a Final Order. |

WEIL:\95664695\9\11727.0012

| MATERIAL TERMS OF THE DIP FACILITY | |
|---|---|
| | **Interim Commitment Fee**: A fee of 5.00% of the Interim Funding Amount, which will be credited towards the Underwriting Fee upon entry of a Final Order. |
| | **Underwriting Fee**: 5.00% of the DIP Credit Facility amount, of which 3.25% will be paid upon entry of the Final Order and 1.75% will be paid on the termination date. |
| | **Interim Arrangement Fee**: Borrower shall pay to the DIP Agent a fee of 0.25% of the aggregate Interim Term Loan Commitment and Interim Revolving Credit Commitment. The Interim Arrangement Fee will be credited towards the Final Arrangement Fee. |
| | **Final Arrangement Fee**: Borrower shall pay to the DIP Agent a fee of 0.25% of the aggregate Commitments upon entry of the Final DIP Order. |
| | **Unused Facility Fee**: Borrower shall pay a fee of 0.375% per annum on the unused portion of the Revolving Credit Commitment. |
| | **Agency Fee**: $7,500 non-refundable fee due and payable to the Agent at closing for such month, and in advance, on the first day of each thereafter. |
| | *See* **Fee Letter** |
| **Maturity Date**<br>Bankruptcy Rule 4001(c)(1)(B);<br>Local Rule 4001-2(10) | Earliest of (i) 12 months, (ii) the date of consummation of a sale of all or substantially all of the assets of the DIP Loan Parties under section 363 of the Bankruptcy Code, (iii) the effective date of any plan, (iv) the date of filing of a plan that (a) does not provide for indefeasible payment in full in cash of all Liabilities and (b) is not otherwise acceptable to the Prepetition ABL Agent and the Required Lenders in their sole discretion or (v) upon the occurrence of the acceleration of any of the DIP Obligations.<br><br>*See* **DIP Credit Agreement Art. 1.** |
| **Prepayments**<br>Local Rule 4001-2(a)(13) | The Borrower shall pay the DIP Agent any amount necessary so that the unpaid balance of the revolving loans does not exceed Availability, the unpaid balance of any protective advances does not exceed 5% of the borrowing base, and/or the unpaid balance of the Term Loan does not exceed the borrowing base at any time the unpaid balance of the revolving credit loans is $0 while revolving credit commitments are outstanding.<br><br>If the Borrower or any Subsidiary receives net cash proceeds of any voluntary or involuntary sale or disposition by Borrower or any of its Subsidiaries of assets constituting ABL Priority Collateral (including casualty losses or condemnations and all sales or dispositions) and such proceeds are not directly deposited into the cash collateral account, then the Borrower shall prepay the Loans in an amount equal |

| MATERIAL TERMS OF THE DIP FACILITY | |
|---|---|
| | to 100% of such net cash proceeds.  Any amounts received by any Group Member which are identified as Prepetition Term Collateral shall be exempt from the requirement for prepayment. *See* **DIP Credit Agreement Art. 2.9(b)(i) and (ii); 2.9(f).** |
| **Collateral and Priority** Bankruptcy Rule 4001(c)(1)(B)(ii); Local Rule 4001-2(a)(4) | The DIP Obligations shall be secured by a fully perfected security interest in substantially all of the existing and after acquired assets of the DIP Loan Parties, including, without limitation, as applicable, all otherwise unencumbered assets.  The priority of such DIP Liens shall consistent with the lien priority set forth in the intercreditor agreement between the Borrower's Prepetition ABL Secured Parties and Prepetition Term Loan Secured Parties. *See* **DIP Credit Agreement Art. 8-1; Interim Order ¶ 2(i).** |
| **Conditions to Closing and Borrowing** Bankruptcy Rule 4001(c)(1)(B);Local Rule 4001-2(a)(2) | Customary borrowing conditions, including, among other things: (i) Liens on all of the collateral shall have been perfected to the satisfaction of the Agent (ii) Satisfactory completion of due diligence (iii) All necessary consents and approvals to the DIP Financing shall have been obtained (iv) Execution and delivery of definitive documentation (v) The Agent shall have received such corporate resolutions, certificates and other documents as the Agent shall reasonably request (vi) Review of any ongoing material litigation and/or breaches of any material contract (vii) Minimum excess availability under the DIP Credit Facility per a satisfactory DIP Budget (viii) Entry of Interim Order *See* **DIP Credit Agreement Art. 3-1; 3-3.** |
| **Covenants** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(8) | Usual and customary for financings of this type, including, among other things:<br><br>**General Covenants:** payment and performance of liabilities; maintain properties; payment of taxes; material contracts; compliance with terms of leases; cash management system; employment of financial advisor; limits on encumbrances; limits on investments; limitations on lines of business; limits on loans; affiliate transactions; prepayments of indebtedness; limitations on licenses; restricted payments; use of proceeds; certain case management related covenants.<br><br>**Financial Covenants**: Excess Availability of at least $25 million in May 2016 and $13 million at all times thereafter; maintain records; allow access to records; prompt notice to agent; compliance with DIP Budget.<br><br>*See* **DIP Credit Agreement Art. 4** |
| **Events of Default** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(10) | Usual and customary for financings of this type, including, among other things: |

8

| MATERIAL TERMS OF THE DIP FACILITY | |
|---|---|
| | • Failure to make payments<br>• Failure to perform covenants<br>• Misrepresentations<br>• Default on Material Indebtedness<br>• The occurrence of any event such that any Material Leases or more than 20 retail location leases could be terminate<br>• The occurrence of any uninsured loss, theft, damage or destruction of Collateral having an aggregate value in excess of $500,000<br>• Entry of any uninsured judgment in excess of $500,000 which is not satisfied or appealed from within 30 days of entry<br>• Criminal indictments and forfeitures<br>• Default by any Guarantor or Subsidiary or the termination of any Guaranty or any material lien<br>• Any challenge to the validity, applicability or enforceability of any Loan Document<br>• ERISA<br>• Failure to make postpetition payments when due in respect of any Material Contract<br>• Appointment of a trustee or examiner<br>• Dismissal of any of the chapter 11 cases or conversion to a case under chapter 7 of the Bankruptcy Code<br>• Any order is entered modifying the DIP Orders without prior written consent of the Agent<br>• Entry of an order granting relief from the automatic stay with respect to any claim and such orders taken together grant relief with respect to collateral exceeding $1 million<br>• Entry of an order terminating or reducing the Loan Parties' exclusivity period for proposing a plan of reorganization<br>• Failure to comply with any of the Milestones<br>• Entry of an order confirming a plan of reorganization or liquidation that fails to provide for the indefeasible payment in full in cash of all liabilities.<br>• Any violation of the DIP Orders<br>• Rejection of any unexpired lease or Material Contract without prior written consent of the Agent and Required Lenders<br>• Any Loan Party or any Creditors' Committee commences or supports an adversary proceeding challenging the DIP Liens<br>• Any loan party makes a payment or grants adequate protection on any prepetition debt other than as approved by the Prepetition ABL Agent, the Required Lenders and the Court<br>***See* DIP Credit Agreement Art. 10; Interim Order ¶ 15.** |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)(vi); Local Rule 4001-2(10) | • Interim Order approving the DIP Credit Facility shall be entered by the Bankruptcy Court no later than 3 business days following the Commencement Date<br>• Final Order approving the DIP Credit Facility shall be entered by the Bankruptcy Court no later than 30 days following the |

WEIL:\95664695\9\11727.0012

| MATERIAL TERMS OF THE DIP FACILITY |
|---|

| | Commencement Date |
|---|---|
| | • Borrower shall have filed a motion under section 365 of the Bankruptcy Code requesting an extension of the date on which the Borrower must assume or reject leases to 210 days after the Commencement Date no later than 10 days after the Commencement Date, with such order being entered by the Bankruptcy Court no later than 30 days after the Commencement Date |
| | • No later than 60 days after the Commencement Date the Borrower shall have filed a plan of reorganization, in form and substance reasonably satisfactory to the Agent and the Required Lenders, and disclosure statement, in form and substance satisfactory to Agent and the Required Lenders |
| | • The Bankruptcy Court shall have entered an order approving the disclosure statement on or prior to 95 days after the Commencement Date |
| | • The Borrower shall have commenced solicitation on the plan of reorganization no later than 100 days after the Commencement Date |
| | • The Bankruptcy Court shall have commenced the hearing to consider confirmation of the plan of reorganization on or prior to 130 days after the Commencement Date |
| | • The Bankruptcy Court shall have entered an order confirming the plan of reorganization on or prior to 140 days after the Commencement Date |
| | • The plan of reorganization shall have been consummated on or prior to 145 days after the Commencement Date |
| | • Simultaneously with the plan process, the Borrower shall pursue a sale process under Section 363 of the Bankruptcy Code, in accordance with the following timeline: |
| |     o No later than 75 days after the Commencement Date, the Borrower shall file a motion with the Bankruptcy Court to approve bid procedures and establish the date of an auction, which shall include a form of stalking horse sale and purchase agreement |
| |     o No later than 75 days after the Commencement Date, the Borrower shall forward so-called "bid packages" to potential bidders, including without limitation, alternative bid packages to liquidation firms |
| |     o No later than 105 days after the Commencement Date, the Bankruptcy Court shall have entered an order approving the Stalking Horse sale and purchase agreement and bid procedures motion, which shall be in form and substance acceptable to Agent and the Required Lenders in their sole and absolute discretion |
| |     o No later than 141 days after the Commencement Date, the Borrower shall conduct the Auction |
| |     o No later than 143 days after the Commencement Date, the |

WEIL:\95664695\9\11727.0012

| MATERIAL TERMS OF THE DIP FACILITY | |
|---|---|
| | Bankruptcy Code shall enter an order approving the sale of the Borrower's assets to the party determined to have made the highest or otherwise best bid, which shall be in form and substance acceptable to Agent and the Required Lenders in their sole and absolute discretion<br>○ No later than 145 days after the Commencement Date, the Borrower shall have consummated the sale to the party determined to have made the highest or otherwise best bid in accordance with the sale order pursuant to the stalking horse sale and purchase agreement or other sale and purchase agreement<br>• The Borrower may choose to abandon the plan process at any time. The Borrower may not abandon the sale process without the prior written consent of the Agent and Required Lenders.<br><br>***See* DIP Credit Agreement Exhibit M-1** |
| **Carve-Out**<br>Local Rule 4001-2(a)(5) | There shall be a carve-out to be defined in a manner to be agreed in the Interim Order and Final Order to include:<br>(i) professional fees and expenses of the DIP Loan Parties, comprised of: (a) for professionals retained directly by the Borrower, amounts accrued but unpaid as of any default under the DIP Credit Facility, (b) for other professionals, budgeted amounts accrued but unpaid as of any default under the DIP Credit Facility, and (c) an amount for professional fees and expenses incurred after receipt of notice of such event of default not to exceed $2 million; *provided*, that such carve out shall be pre-funded in the amount of 120% of the budgeted fees and expenses of case professionals for the upcoming week and, thereafter, shall be replenished to include an amount equal to the total budgeted weekly fees of case professionals for the next unfunded week set forth in the budget and<br>(ii) fees payable to the United States Trustee<br><br>***See* Interim Order ¶ 8.** |
| **Use of Cash Collateral**<br>Bankruptcy Rule<br>4001(b)(1)(B)(ii)<br>Local Rule 4001-2(a)(ii) | The Debtors shall be authorized to use Cash Collateral in a manner consistent with and subject to the terms and conditions of the DIP Financing Documents, and in compliance with the DIP Budget, solely for the purposes set forth in the DIP Financing Documents including to pay or fund (i) certain costs, fees, and expenses related to the Chapter 11 Cases; (ii) the repayment of the Prepetition ABL Obligations; (iii) cash collateralization of certain outstanding letters of credit; (iv) funding the Carve Out; (v) cash collateralization of Wells Fargo credit card obligations; and (vi) the working capital needs of the Debtors during the Chapter 11 Cases.<br>***See* DIP Credit Agreement Art. 14-25; Interim Order ¶ 3.** |
| **Duration of Use of Cash Collateral**<br>Bankruptcy Rule<br>4001(b)(1)(B)(iii) | The Debtors' authority to use Cash Collateral shall terminate upon the occurrence of an Event of Default under the DIP Credit Agreement.<br><br>***See* Interim Order ¶ 16(a).** |

WEIL:\95664695\9\11727.0012

| MATERIAL TERMS OF THE DIP FACILITY | |
| --- | --- |
| **Liens, Cash Payments or Adequate Protection Provided for Use of Cash Collateral\*** Bankruptcy Rule 4001(b)(1)(B)(iv) and (c)(1)(B)(ii) | The Prepetition Term Loan Agent, on behalf of itself and the Prepetition Term Loan Secured Parties, as adequate protection against any diminution in value of their interests in the Prepetition Collateral, shall be granted adequate protection liens on the DIP Collateral junior only to: (i) with regard to the Prepetition Term Collateral securing the Term Priority Obligations, (a) the Carve Out, (b) the Prepetition Term Loan Liens, and (c) any Other Prepetition Senior Liens; and (ii) with regard to all other DIP Collateral other than Prepetition Term Collateral securing the Term Priority Obligations, (a) the Carve-Out; (b) the DIP Liens; and (iii) any Other Prepetition Senior Liens.<br><br>The Prepetition Term Loan Agent, on behalf of itself and the Prepetition Term Loan Secured Parties will also be granted, as further adequate protection against any diminution in value of their interests in the Prepetition Collateral, an adequate protection superpriority claim.<br><br>*See* **Interim Order ¶ 4.** |
| **Liens on Avoidance Actions\*** Bankruptcy Rule 4001(c)(1)(B)(xi); Local Bankruptcy Rule 4001-2(a)(i)(C) | **None, although the superpriority claim of the DIP Lenders may be paid from proceeds of avoidance actions.**<br><br>**Interim Order ¶ 2(g), 4(c)** |
| **Determination Regarding Prepetition Claim** Bankruptcy Rule 4001(c)(1)(B)(iii) | The Interim Order contains stipulated findings of fact, including those related to the validity and enforceability of the Prepetition ABL Obligations and the liens securing the Prepetition ABL Secured Parties.<br><br>*See* **Interim Order ¶ E.**<br><br>There is a 60 day challenge period for a committee appointed under section 1102 of the Bankruptcy Code and other parties-in-interest to investigate and challenge the validity of the Prepetition ABL Obligations.<br>**Interim Order ¶ 7.** |
| **Effect of Debtors' Stipulations on Third Parties** Bankruptcy Rule 4001(c)(1)(B)(iii),(viii) | The stipulations and admissions contained in the Interim Order shall be binding upon each Debtor, each party to the DIP Documents, and other parties-in-interest, subject to the challenge period.<br>*See* **Interim Order ¶ 7.** |
| **Waiver or Modification of the Automatic Stay\*** Bankruptcy Rule 4001(c)(1)(B)(iv) | **Five (5) days' prior notice to the Debtors, the automatic stay is vacated to permit the exercise of remedies by the DIP Agent and DIP Lenders to the extent set forth in the DIP Orders.**<br><br>*See* **DIP Credit Agreement Art. 11-1; Interim Order ¶ 16(b)**. |
| **Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to** | All security interests and liens in "DIP Collateral" (as defined in the Interim Order) in the DIP Credit Agreement, shall be valid and perfected upon entry of the Interim Order. *See* **DIP Credit** |

WEIL:\95664695\9\11727.0012

| MATERIAL TERMS OF THE DIP FACILITY | |
|---|---|
| the Perfection or Enforcement of a Lien<br>Bankruptcy Rule 4001(c)(1)(B)(vii) | Agreement Art. 4-37; Interim Order ¶ 6(a). |
| Section 506(c) Waiver*<br>Bankruptcy Rule 4001(c)(1)(B)(x) | Subject to entry of the Final Order, except to the extent of the Carve Out.<br>See Interim Order ¶ 11 |
| Section 552(b) Waiver<br>Bankruptcy Rule 4001(c)(1)(B) | The "equities of the case" exception in section 552(b) of the Bankruptcy Code shall not apply to the secured claims held by the DIP Agents and the DIP Lenders.<br>See Interim Order ¶ 18(g). |
| Release, Waivers or Limitation on any Claim or Cause of Action<br>Bankruptcy Rule 4001(c)(1)(B)(viii) | The Debtors grant the Prepetition ABL Agent and Prepetition ABL Secured Parties a release of claims after the expiration of the challenge period. See Interim Order ¶ 7.<br><br>The Debtors shall release the DIP Secured Parties and Indemnified Persons (as defined in the DIP Credit Agreement) to the extent set forth in the DIP Financing Documents.<br>See Interim Order ¶ 20. |

## Jurisdiction

10.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157(a)-(b) and 1334(b) and the *Amended Standing Order of Reference M-431*, dated January

31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

11.     On the date hereof (the "***Commencement Date***"), each of the Debtors

commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  The

Debtors continue to operate their businesses and manage their properties as debtors in possession

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or

statutory committee of creditors has been appointed in these chapter 11 cases.

12.     Contemporaneously herewith, the Debtors have filed a motion requesting

joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).

WEIL:\95664695\9\11727.0012

13.     Information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of David J. Dick Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York*, sworn to on the date hereof (the "***First Day Declaration***"), which has been filed with the Court contemporaneously herewith.[5]

**Prepetition Indebtedness**

14.     As of the Commencement Date, the Debtors had outstanding funded debt obligations in the aggregate amount of approximately $223 million (the "***Prepetition Debt Obligations***") which amount is composed of (i) approximately $73 million in outstanding borrowings under an asset-based revolving credit facility in an amount up to $215 million, and (ii) a $100 million "Tranche A" term loan and a $50 million "Tranche B" term loan. *See* First Day Decl. ¶ 33.  The Debtors have granted security interests and liens on all or substantially all of their assets to secure the Prepetition Debt Obligations.

A.     Prepetition ABL Facility

15.     Aéropostale and certain of the Debtors are party to that certain Third Amended and Restated Loan and Security Agreement, dated September 22, 2011 (as amended, modified, or otherwise supplemented from time to time, the "***Prepetition ABL Agreement***," and together with all agreements and documents delivered pursuant thereto or in connection therewith, the "***Prepetition ABL Documents***"), by and among Aéropostale as borrower, each Debtor-guarantor named therein, the various financial institutions and other persons party thereto from time to time (the "***Prepetition ABL Lenders***"), and Bank of America, N.A. as administrative agent and collateral agent (in such capacities, the "***Prepetition ABL Agent***," and

---

[5] Capitalized terms not otherwise herein defined shall have the meanings ascribed to such terms in the First Day Declaration.

WEIL:\95664695\9\11727.0012

together with the Prepetition ABL Lenders, the "***Prepetition ABL Secured Parties***"). Pursuant to the Prepetition ABL Agreement, the Prepetition ABL Lenders provided revolving credit commitments in an aggregate principal amount of up to $215 million, with a $40 million sublimit for the issuance of letters of credit (the "***Prepetition ABL Facility***"). As of the Commencement Date, the aggregate amount outstanding in connection with the Prepetition ABL Facility was approximately $73 million in unpaid principal and approximately $240,000 in an undrawn letter of credit.

B.    Prepetition Term Loan Facility

16.    Aéropostale and certain of the Debtors are party to that certain Loan and Security Agreement, dated May 23, 2014 (as amended, modified, or otherwise supplemented from time to time, the "***Prepetition Term Loan Agreement***," and together with all agreements and documents delivered pursuant thereto or in connection therewith, the "***Prepetition Term Loan Documents***"), by and among Aéropostale as borrower, each Debtor-guarantor named therein, the various financial institutions and other persons party thereto from time to time (the "***Prepetition Term Loan Lenders***"), and Aero Investors LLC (an affiliate of Sycamore Partners) as administrative agent and collateral agent (in such capacities, the "***Prepetition Term Loan Agent***," and together with the Prepetition Term Loan Lenders, the "***Prepetition Term Loan Secured Parties***"). The Prepetition ABL Lenders and the Prepetition Term Loan Secured Parties are collectively referred to as the "***Prepetition Secured Parties***." Pursuant to the Prepetition Term Loan Agreement, the Prepetition Term Loan Lenders provided term loans in the aggregate principal amount of $150 million, split among two tranches: $100 million in Tranche A and $50 million in Tranche B (collectively, the "***Prepetition Term Loan Facility***"). As of the

15

Commencement Date, the aggregate outstanding amount of principal under the Prepetition Term Loan Facility was approximately $150 million.

C.      Security and Intercreditor Agreements

17.     To secure prompt, punctual, and faithful performance of all of the obligations under the Prepetition ABL Documents, each of Aéropostale and the Debtor-guarantors (collectively, the "*Grantors*") granted to the Prepetition ABL Agent, for the ratable benefit of the Prepetition ABL Secured Parties, a continuing security interest in and to, and assigned to the Prepetition ABL Agent, for the ratable benefit of the Prepetition ABL Secured Parties, substantially all of the assets of such Grantor, subject to certain exceptions (the "*Prepetition ABL Collateral*").

18.     To secure prompt, punctual, and faithful performance of all of the obligations under the Prepetition Term Loan Documents, each Grantor granted to the Prepetition Term Loan Agent, for the ratable benefit of the Prepetition Term Loan Secured Parties, a continuing security interest in and to, and assigned to the Prepetition Term Loan Agent, for the ratable benefit of the Prepetition Term Loan Secured Parties, certain of the assets of such Grantor, subject to certain exceptions (to the extent that such liens are valid, binding, enforceable, non-avoidable and properly perfected, the "*Prepetition Term Loan Collateral*").

19.     There is significant overlap between the Prepetition ABL Collateral and the Prepetition Term Loan Collateral.  The relative priorities of the liens held by the Prepetition ABL Secured Parties and the Prepetition Term Loan Secured Parties and the restrictions on such parties' ability to exercise remedies against collateral are governed by that certain Intercreditor Agreement, dated as of May 23, 2014, by and between the Prepetition ABL Agent and the

16

Prepetition Term Loan Agent (as may be amended, supplemented, restated, amended and restated or otherwise modified from time to time, the "***Intercreditor Agreement***").[6]

20.    The Intercreditor Agreement defines "ABL Priority Collateral" to include all common collateral consisting of the following:[7]

(a)    all Accounts, other than Accounts which constitute identifiable proceeds of Term Priority Collateral;

(b)    all Intellectual Property;

(c)    cash, money and cash equivalents, other than (i) identifiable net cash proceeds from the sale or disposition of Term Priority Collateral or (ii) proceeds of the Term Loan held in the Term Loan Proceeds Account;

(d)    all (i) Deposit Accounts (other than Term Loan Priority Accounts) (ii) Securities Accounts (other than Term Loan Priority Accounts), Security Entitlements and Securities credited to such a Securities Account (other than Equity Interests in any Credit Party or their Affiliates), (iii) all Commodity Accounts (other than Term Loan Priority Accounts) and commodity contracts and, in each case, subject to the provision governing tracing of and priorities in proceeds, all cash, money, cash equivalents, checks and other property held therein or credited thereto (other than Equity Interests);

(e)    all Inventory;

(f)    to the extent relating to, arising from, evidencing or governing any of the items referred to in the preceding clauses (a) through (e) constituting ABL Priority Collateral, all Documents, General Intangibles (including all Payment Intangibles arising from Accounts and all rights under contracts but excluding any Intellectual Property, as to which clause (b) above shall govern), Instruments (including Promissory Notes), Chattel Paper (including Tangible Chattel Paper and Electronic Chattel Paper), and Commercial Tort Claims; provided that to the extent any of the foregoing also relates to Term Priority Collateral, only that portion

---

[6] A copy of the Intercreditor Agreement is annexed hereto as **Exhibit C**.

[7] For the purpose of clauses (a) through (j) of this paragraph, all capitalized terms shall have the meanings ascribed to them in the Intercreditor Agreement.

WEIL:\95664695\9\11727.0012

related to the items referred to in the preceding clauses (a) through (e) shall be included in the ABL Priority Collateral;

(g)     to the extent relating to, arising from, evidencing or governing any of the items referred to in the preceding clauses (a) through (f) constituting ABL Priority Collateral, all Supporting Obligations and Letter-of-Credit Rights; provided that to the extent any of the foregoing also relates to Term Priority Collateral only that portion related to the items referred to in the preceding clauses (a) through (f) shall be included in the ABL Priority Collateral;

(h)     all books and Records relating to, arising from, evidencing or governing the items referred to in the preceding clauses (a) through (g) constituting ABL Priority Collateral (including all books, databases, customer lists, engineer drawings, and Records, whether tangible or electronic, which contain any information relating to any of the items referred to in the preceding clauses (a) through (g) constituting ABL Priority Collateral);

(i)     all collateral security and guarantees with respect to any of the foregoing and all cash, money, cash equivalents, insurance proceeds (but excluding proceeds of business interruption insurance), Instruments, Securities, and Financial Assets received as proceeds of any of the foregoing; and

(j)     subject to the provision governing tracing of and priorities in proceeds, all Proceeds of any of the items referred to in the preceding clauses (a) through (i).

The Intercreditor Agreement defines "Term Priority Collateral" to include substantially all common collateral other than ABL Priority Collateral.  The ABL Priority Collateral and the Term Priority Collateral are referred to together as the "***Prepetition Collateral***."

21.     Pursuant to the Intercreditor Agreement, the Prepetition ABL Secured Parties and the Prepetition Term Loan Secured Parties agreed, among other things, as follows:[8]

(a)     in respect of any ABL Priority Collateral, any lien on the ABL Priority Collateral securing the ABL Priority Obligations is senior in all respects and prior to any lien on the ABL Priority Collateral securing the Term Loan Secured Parties;

---

[8] For the purpose of clauses (a) through (h) of this paragraph, all capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Intercreditor Agreement.

WEIL:\95664695\9\11727.0012

(b)    any lien on the ABL Priority Collateral securing the Prepetition Term Loan Secured Parties shall be junior in all respects to any lien on the ABL Priority Collateral securing the Prepetition ABL Secured Parties but shall be senior in all respects and prior to any lien on the ABL Priority Collateral securing the ABL Excess Amount;

(c)    any lien on the ABL Priority Collateral securing the ABL Excess Amount shall be junior in all respects to any lien on the ABL Priority Collateral securing the Prepetition Term Loan Secured Parties but shall be senior in all respects and prior to any lien on the ABL Priority Collateral securing the Term Loan Excess Amount;

(d)    any lien on the ABL Priority Collateral securing the Term Loan Excess Amount shall be junior in all respects to any lien on the ABL Priority Collateral securing the ABL Obligations;

(e)    any lien on the Term Priority Collateral securing the Term Priority Obligations shall be senior in all respects and prior to any lien on the Term Priority Collateral securing any ABL Obligations;

(f)    any lien on the Term Priority Collateral securing the ABL Priority Obligations shall be junior in all respects to any lien on the Term Priority Collateral securing the Term Priority Obligations but shall be senior in all respects and prior to any lien on the Term Priority Collateral securing the Term Loan Excess Amount;

(g)    any lien on the Term Priority Collateral securing the Term Loan Excess Amount shall be junior in all respects to any lien on the Term Loan Priority Collateral securing the ABL Priority Obligations but shall be senior in all respects and prior to any lien on the Term Priority Collateral securing the ABL Excess Amount; and

(h)    any lien on the Term Priority Collateral securing the ABL Excess Amount shall be junior in all respects to any lien on the Term Priority Collateral securing the Term Obligations.

**The Debtors' Need for DIP Financing**

22.    Additional facts and circumstances supporting this Motion, the Debtors' need for the DIP Facility and detailing the Debtors' DIP Facility marketing process are set forth in the *Declaration of James Doak in Support of Motion of Debtors for Interim and Final*

Authority to (A) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), (364(c)(2), 364(c)(3), 364(d)(1), and 364(e), (B) Use Cash Collateral Pursuant to 11 U.S.C. § 363(c)(2), (C) Grant Certain Protections to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364, and (D) Schedule a Final Hearing Pursuant to Fed. R. Bankr. P. 4001(b) and (c) (the "**Doak Declaration**") and the Declaration of Robert J. Duffy in Support of (I) Motion of Debtors for Interim and Final Authority to (A) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e), (B) Use Cash Collateral Pursuant to 11 U.S.C. § 363(c)(2), (C) Grant Certain Protections to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364, and (D) Schedule a Final Hearing Pursuant to Fed. R. Bankr. P. 4001(b) and (c) and (II) Motion of Debtors Pursuant to Sections 105(a), 362, and 365 of the Bankruptcy Code for Interim and Final Relief and to Compel Performance of MGF Sourcing US, LLC's Obligations Under Executory Contract and to Enforce the Automatic Stay, (the "**Duffy Declaration**") filed contemporaneously herewith.

23.     As more fully set forth in the First Day Declaration, the Debtors' chapter 11 strategy is focused on the expeditious and successful execution of a comprehensive reorganization and restructuring of their retail operations and store profile.  See First Day Decl. ¶ 6.  Prepetition, the Debtors embarked on a series of initiatives to restructure and streamline their businesses.  In an effort to right-size the Debtors' store base and optimize their real estate portfolio, the Debtors closed 122 Aéropostale stores in the United States and Canada during fiscal year 2014.  The Debtors closed an additional 50 stores in fiscal year 2015.  The Debtors also embarked on a review of their lease terms and retained a real estate consulting firm to

WEIL:\95664695\9\11727.0012

investigate the economics of accelerated lease buyouts, as well as to identify opportunities for negotiating more competitive rents across the Debtors' real estate portfolio.

24.      The Debtors' strategic initiatives and cost cutting measures resulted in significant operational improvements.  The Debtors, however, have been unable to realize the full benefit of these measures due to a disruption of their supply chain that resulted from the precipitous action taken by their two key supplies, as described more fully in the First Day Declaration.  *See* First Day Declaration ¶¶ 54-67.  The actions of the Debtors' key suppliers, and of TSAM (Delaware) LLC (d/b/a MGF Sourcing US LLC) ("***MGF***") in particular, caused a disruption in the Debtors' supply chain and a corresponding negative impact on the Debtors' liquidity, placing the Debtors at risk of violating the $70 million minimum liquidity covenant in the Prepetition Term Loan Agreement.  A default under the Prepetition Term Loan Agreement would have triggered a cross-default under the Prepetition ABL Agreement, and defaults under these agreements would have jeopardized the Debtors' ability to obtain inventory for their stores.

25.      In order to restore access to inventory, which is the lifeblood of any retail business, the Debtors commenced the Chapter 11 Cases.  The DIP Facility to be provided by the DIP Lenders is necessary to allow the Debtors to proceed towards confirmation of a stand-alone plan of reorganization involving a reorganization of the Debtors' operations around a smaller footprint of profitable stores or to pursue a sale to a third-party buyer.  The DIP Facility is essential to address the Debtors' working capital needs, to provide assurances to the Debtors' vendors of the Debtors' ability to continue paying for goods and services in the ordinary course of business, to fund a plan of reorganization, and to repay the Prepetition ABL Facility as the Debtors execute their chapter 11 strategy.

WEIL:\95664695\9\11727.0012

26.    As in any retail case, speed is critical to the Debtors' Chapter 11 Cases, in order to stave off the demise of retail debtors that has become all too common in chapter 11, and to minimize the impact of these Chapter 11 Cases on the Debtors' liquidity and operations.  The need to move swiftly to pursue the Debtors' chapter 11 strategy is evidenced by the DIP Milestones, which condition the Debtors' access to the DIP Facility on satisfying certain dual-track plan and sale related milestones.  The DIP Milestones include:

Plan Milestones:

- File a plan and disclosure statement no later than 60 days after the Commencement Date;

- Entry of an order approving the disclosure statement no later than 95 days after the Commencement Date;

- Commence a confirmation hearing no later than 130 days after the Commencement Date; and

- Entry of an order confirming a plan of reorganization no later than 140 days after the Commencement Date.

Sale Milestones:

- File a motion to approve bid procedures, establish the date of an auction, and file a form of stalking horse sale and purchase agreement no later than 75 days after the Commencement Date;

- Court approval of a stalking horse sale and purchase agreement and bid procedures no later than 105 days after the Commencement Date

- Conduct an auction no later than 141 days after the Commencement Date;

- Entry of an order approving a sale of the Debtors' assets no later than 143 days after the Commencement Date; and

- Consummation of a sale no later than 145 days after the Commencement Date.

27.    As described below, the DIP Facility is the result of the Debtors' robust prepetition marketing efforts and negotiations with various potential lenders, and contains

WEIL:\95664695\9\11727.0012

competitive terms that are favorable to the Debtors and their creditors.  Accordingly, subject to Court approval, the Debtors expect to soon have approximately $40 million in available liquidity upon entry of an interim order approving the DIP Facility, and an additional $60 million upon entry of a final order approving the DIP Facility.  *See* Duffy Decl. ¶ 10.  The Debtors fully anticipate that the DIP Facility, together with the consensual use of cash collateral, will provide them with sufficient liquidity to pursue either a stand-alone plan or a sale to a third-party buyer in an orderly and value-maximizing manner.

28.    The success of the Chapter 11 Cases hinges on the Debtors' access to the DIP Facility and ability to use cash collateral.  Absent this DIP Facility, the Debtors' vendors would likely insist on reduced payment terms or refuse to continue providing goods and services to the Debtors, thus jeopardizing the Debtors' ability to reorganize or pursue an orderly sale strategy.  An immediate infusion of liquidity is also necessary to fund the Debtors' operations during the pendency of these Chapter 11 Cases.

**The Debtors' Marketing Efforts to Obtain Postpetition Financing**

29.    Stifel commenced a competitive DIP financing marketing process reflective of the practical realities of the Debtors' situation.  In particular, Stifel sought to obtain the best DIP financing available notwithstanding substantially all of the Debtors' assets being encumbered by valid and perfected liens.  Marketing for the Debtors' DIP financing began in late March 2016 when Stifel reached out to various third parties, as well as to the Prepetition ABL Agent and Prepetition ABL Secured Parties in order to ascertain their interest in extending postpetition financing to the Debtors.  In total, Stifel contacted more than 30 third party lenders, including banks and hedge funds/private equity funds on behalf of the Debtors.  Twenty-five of

WEIL:\95664695\9\11727.0012

these potential lenders were sent non-disclosure agreements by the Debtors.  *See* Doak Decl. ¶¶ 11-12.

30.    The Debtors initially received four term sheet proposals for the DIP financing.  The first proposal was provided by Bank of America, National Association in its capacity as agent for the Prepetition ABL Facility.  Three third party lenders (the "***Third Party Lenders***"), including Crystal Financial LLC ("***Crystal***" or the "***DIP Lenders***"), who are not in the Debtors' current capital structure, also submitted proposals to provide DIP financing.  Each of the Third Party Lenders submitted proposals to repay the Prepetition ABL Facility.

31.    Over a period of almost three weeks, the Debtors and their advisors engaged in intense parallel-track negotiations with each of the bidders to obtain the best financing terms each was willing to offer.  These negotiations were conducted at arm's length at all times and involved hard bargaining by all interested parties.  *See* Doak Declaration ¶ 14.  The Debtors, together with their advisors, scrutinized in detail each submitted bid, and worked diligently to analyze the details of the competitive proposals, and the strengths and weaknesses of each.

32.    Ultimately, only the DIP Lenders proposed financing that would enable the Debtors to achieve their reorganization objectives and avoid liquidation.  One of the proposals from the Third Party Lenders contained significantly higher fees and was for a much smaller facility—only $125 million, as compared to $160 million—than the other two proposals and another Third Party Lenders' proposal contained provisions requiring the Debtors to file a plan supported by the Prepetition Term Loan Secured Parties within 90 days, which the Debtors did not believe was an achievable condition.  *See* Doak Decl. ¶ 15.  The proposal from the Prepetition ABL Agent provided DIP financing that, while less expensive than the DIP Lenders'

proposal, would mature by August 10, 2016 or within approximately 3 months of the Commencement Date. Such a timeframe would all but guarantee a liquidation of the Debtors' businesses. By comparison, the DIP Facility will not mature for 12 months, and, therefore, offers the Debtors a substantially longer runway to pursue a stand-alone plan or an orderly sale process. The longer maturity for the DIP Facility will also give the Debtors an ability to demonstrate to their vendors the availability of sufficient liquidity through the back-to-school season, which is one of the Debtors' key sales periods. The Prepetition ABL Agent also was not willing to provide financing unless the Debtors complied with a $70 million availability block at all times, which would have reduced the Debtors' borrowing base by $70 million, thus greatly reducing the Debtors' ability to access necessary liquidity, and would have placed the Debtors at substantial risk at all times. *See* Duffy Decl. ¶ 11. Finally, the Bank of America facility only provided $130 million of commitments, as compared to the $160 million provided by the DIP Lenders.

33.     Following this marketing process, the Debtors chose the only viable proposal—the proposal submitted by the DIP Lenders—and entered into a signed term sheet with the DIP Lenders on April 22, 2016. The Debtors informed the other proposed lenders of their decision and commenced finalizing terms of potential DIP financing.

## The DIP Facility

34.     As set forth above and in the Doak Declaration, the Debtors and the DIP Lenders engaged in extensive, good faith, arm's-length negotiations with respect to the terms and conditions of the proposed DIP Facility and the use of Cash Collateral (as such term is defined in section 363 of the Bankruptcy Code). These negotiations successfully culminated in the agreed upon terms set forth in DIP Credit Agreement. The DIP Facility provides that the Debtors may

draw $100 million upon entry of the Interim Order and, upon entry of the Final Order, make an additional draw of $60 million.  The DIP Lenders' commitments provide the Debtors with the flexibility to engage in a plan or sale process and to satisfy their administrative obligations during these Chapter 11 Cases.

   35. In addition to being the Debtors' best available financing option for the reasons discussed above, the DIP Facility is also superior because it is structured to comply with the consent already provided by the Prepetition Term Loan Lenders in the Intercreditor Agreement.  The DIP Facility will be secured by a first lien in the Prepetition ABL Collateral and a second lien in the Prepetition Term Loan Collateral, and as such, the DIP Facility only primes the Prepetition Term Loan Facility to the extent the Prepetition Term Loan Lenders' second lien in the Prepetition ABL Collateral is primed by the addition of a new first priority lien.  Although it is a priming facility, the DIP Facility falls squarely within the DIP financing provisions of the Intercreditor Agreement and, therefore, is insulated from objection by the Prepetition Term Loan Agent and Prepetition Term Loan Lenders *on any grounds*.  Section 6.1 of the Intercreditor Agreement provides that if the Prepetition ABL Agent or the Prepetition ABL Secured Parties provide or consent to a third party providing financing under section 364 of the Bankruptcy Code, or consent to any order for the use of cash collateral constituting Prepetition ABL Collateral under section 363 of the Bankruptcy Code:

> then the [Prepetition Term Loan Agent] on behalf of itself and the [Prepetition Term Loan Secured Parties], agrees that it (i) will raise no objection and will not support any objection to such [DIP financing or use of cash collateral] or to the Liens securing the same on the grounds of a failure to provide "adequate protection" for the Liens of the [Prepetition Term Loan Agent] securing the Term Obligations or on any other grounds; (ii) will not request any adequate protection as a result of such [DIP financing or use of cash collateral]; and (iii) will not . . . propose any or support any other debtor in possession financing . . .

26

*provided* that such DIP financing satisfies certain conditions (the "***Intercreditor DIP Financing***

***Conditions***").  The Intercreditor DIP Financing Conditions are that:

> (w) without the consent of the [Prepetition Term Loan Agent], the aggregate principal balance of the loans to be made under the [DIP financing] (assuming full drawing of the commitments thereunder) plus the aggregate outstanding principal balance of the Revolving Credit Loans under the [Prepetition ABL Facility] not refinanced with the [DIP financing] (assuming full drawing of the commitments thereunder) plus the aggregate face amount of any letters of credit issued and not reimbursed under the [Prepetition ABL Credit Agreement] not refinanced with the [DIP financing] will not exceed the ABL Cap Amount, (x) the [Prepetition Term Loan Agent] retains its Lien on the Collateral to secure the Term Obligations (in each case, including Proceeds thereof arising after the commencement of any Insolvency Proceeding under any Debtor Relief Laws) and, as to the Term Priority Collateral only, such Lien has the same priority as existed prior to the commencement of any Insolvency Proceeding under the subject Debtor Relief Laws and any Lien on the Term Priority Collateral securing such [DIP financing or use of cash collateral] is junior and subordinate to the Lien of the [Prepetition Term Loan Agent] on the Term Priority Collateral, (y) all Liens on ABL Priority Collateral securing any such [DIP financing or use of cash collateral] shall be senior to or on parity with the Liens of the [Prepetition ABL Agent] and the [Prepetition ABL Secured Parties] securing the ABL Obligations on ABL Priority Collateral, and (z) the foregoing provisions of this Section 6.1(a) shall not prevent the [Prepetition Term Loan Agent] and the [Prepetition Term Loan Secured Parties] from objecting to any provision in any [DIP financing] relating to any provision or content of a plan of reorganization or other plan of similar effect under any Debtor Relief Laws.

*See* Intercreditor Agreement § 6.1(a).  The DIP Facility satisfies each of the Intercreditor DIP

Financing Conditions as follows:

- the Prepetition ABL Agent has consented to Crystal, a third party, providing the DIP financing;

- the aggregate outstanding principal balance of the DIP financing, plus the principal balance of the outstanding loans under the Prepetition ABL Credit Agreement that are not refinanced with the DIP financing, plus the aggregate face amount of any letters of credit issued and not reimbursed will be approximately $233 million and, therefore, will not exceed the ABL Cap Amount of $264.5 million;

27

- the DIP Facility provides that the Prepetition Term Loan Agent will retain its liens on the Prepetition Term Loan Collateral in the same priority as existed prior to the Commencement Date, and that the Prepetition Term Loan Agent will also retain its junior liens on the Prepetition ABL Collateral;

- the DIP Facility provides that the liens on the Prepetition ABL Collateral securing the DIP Facility are the same priority as the liens on the Prepetition ABL Collateral securing the Prepetition ABL Facility; and

- nothing in the DIP Documents prevents the Prepetition Term Loan Agent or the Prepetition Term Loan Secured Parties from objecting to any provision in the DIP Documents relating to any provision of or content of a plan of reorganization.

By satisfying each of the Intercreditor DIP Financing Conditions, the DIP Facility provides the Debtors with financing that is broadly insulated from objections "on any . . . grounds" by the Prepetition Term Loan Agent and the Prepetition Term Loan Secured Parties.

36.    To ensure that the proceeds under the DIP Facility are used in the manner most likely to maximize its value, the Debtors and the DIP Lenders have agreed upon weekly statement of receipts and disbursements of the Debtors on a consolidated basis commencing with the first week following the Commencement Date, including (i) aggregate "Total Disbursements" and (ii) the anticipated uses of the proceeds of the DIP Facility and Cash Collateral for such period (the "***DIP Budget***"), in form and substance reasonably satisfactory to the DIP Agent. A copy of the DIP Budget is attached to the Interim Order as **Exhibit A**. The Debtors believe that the DIP Budget is achievable and will allow the Debtors to operate without the accrual of unpaid administrative expenses.

WEIL:\95664695\9\11727.0012

**Basis for Relief**

A.      The Debtors Should Be Authorized to Obtain Secured, Superpriority Postpetition
Financing

37.      Pursuant to section 364 of the Bankruptcy Code, a debtor is authorized to

obtain postpetition financing on a secured or superpriority basis, so long as it was unable to

obtain such financing on an unsecured or administrative expense priority basis.   The Debtors

satisfy this standard.   The Debtors, with the assistance of their advisors, carefully reviewed their

options with respect to postpetition financing, including proposals from various potential lenders

and the DIP Lenders.   To assist in the decision making and review process, the Debtors'

professionals, including Stifel, FTI, and Weil made a number of formal presentations to the

Board of Directors.   *See* Doak Decl. ¶ 17.   The Debtors carefully contemplated the advantages

and disadvantages of the proposals submitted for their consideration and ultimately selected the

proposal that is in the best interests of the Debtors, their estates, and their creditors.   The DIP

Facility is tailored to the Debtors' circumstances and will effectively provide a path to the

Debtors' emergence or facilitate a sale to a third-party.

38.      For the foregoing reasons and those discussed further below, the Debtors

satisfy the necessary conditions under section 364(c) and (d) for authority to enter into the DIP

Facility.

i.      *Entry into the DIP Facility is an Exercise of the Debtors' Sound Business Judgment*

39.      Provided that an agreement to obtain secured credit does not run afoul of

the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor

considerable deference in acting in accordance with its sound business judgment in obtaining

such credit.   *See, e.g.*, *In re Barbara K. Enters., Inc.*, Case No. 08-11474, 2008 WL 2439649, at

*14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business

judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, inter alia, an exercise of "sound and reasonable business judgment.").

40.    In determining whether the Debtors have exercised sound business judgment in selecting the DIP Facility, the Court should consider the economic terms of the DIP Facility in light of current market conditions.  *See* Hr'g Tr. at 734 35:24, *In re Lyondell Chem. Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. March 5, 2009) (recognizing "the terms that are now available for DIP Financing in the current economic environment aren't as desirable" as in the past).  Moreover, the Court may appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility.

41.    The Debtors' determination to secure DIP Financing was a business decision guided by the Debtors' financial and restructuring needs.  Specifically, the Debtors and their advisors determined that the Debtors require additional liquidity to fund and implement either a stand-alone plan of reorganization or a sale to a third-party buyer and to continue operating in the ordinary course of business while they pursued either strategy.  *See* Duffy Decl. ¶¶ 8-10; Doak Decl. ¶¶ 11, 28.  To support these anticipated costs, the DIP Lenders have fully committed to fund the DIP Facilities as an integral part of either strategy.  Bankruptcy courts

generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (footnote omitted).  To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" *In re Dura Auto. Sys. Inc.*, Case No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, at *272 (Bankr. D. Del. Aug. 15, 2007) (citation omitted).

42.     As discussed in the Doak Declaration, a fulsome marketing effort was undertaken and the available DIP Financing options were carefully evaluated by the Debtors' management.  Doak Decl. ¶17.  The Debtors selected the proposed DIP Facility only after engaging in extensive negotiations designed to provide them with the best options available. Doak Decl. ¶ 14-17.

43.     The Debtors' ability to procure a secured DIP financing facility that satisfied the Intercreditor DIP Financing Conditions, *i.e.*, a DIP Facility that will avoid a priming fight, was a critical consideration.  Courts, including courts in this district, have previously enforced the terms of intercreditor agreements against secured creditors.  *See In re ION Media Networks*, 419 B.R. 585 (Bankr. S.D.N.Y. 2009) ("Stay silent" provisions in intercreditor agreement enforced preventing second lien creditors from objecting to chapter 11 plan); *In re Best Products Co., Inc.*, 168 B.R. 35, 69-70 (Bankr. S.D.N.Y. 1994) (confirming a plan of reorganization that, as one of its elements, enforced a subordination agreement as between the debtor's secured creditors); *In re Erickson Ret. Communities, LLC*, 425 B.R. 309, 314 (Bankr. N.D. Tex. 2010) (enforcing subordination agreement against junior secured creditors pursuant to section 510 of the Bankruptcy Code).  The Debtors submit that entry into the DIP Facility is in

31

the best interests of the Debtors' creditors, is necessary to preserve the value of estate assets, and

is an exercise of the Debtors' sound and reasonable business judgment.

> ii.    *The Debtors Should be Authorized to Obtain Postpetition Financing on a Secured and Superpriority Basis*

44.    The Debtors satisfy the requirements for relief under section 364 of the

Bankruptcy Code, which authorizes a debtor to obtain secured or superpriority financing under

certain circumstances.  Specifically, section 364(c) of the Bankruptcy Code provides that:

> If the trustee is unable to obtain unsecured credit allowable under
> section 503(b)(1) of this title as an administrative expense, the
> court, after notice and a hearing, may authorize the obtaining of
> credit or the incurring of debt:
>
> (1) with priority over any or all administrative expenses of the kind
> specified in section 503(b) or 507(b) of this title; [or]
>
> (2) secured by a lien on property of the estate that is not otherwise
> subject to a lien;
>
> (3) secured by a junior lien on property of the estate that is subject
> to a lien[.]

11 U.S.C. § 364(c).

45.    To satisfy the requirements of section 364(c) of the Bankruptcy Code, a

debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor

on an unsecured or administrative expense basis. *Bray v. Shenandoah Fed. Savs. & Loan Ass'n*

(*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986). "The statute imposes no duty to seek

credit from every possible lender before concluding that such credit is unavailable." *Id.*; *see also*

*Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001)

(superpriority administrative expenses authorized where debtor could not obtain credit as an

administrative expense).  When few lenders are likely to be able and willing to extend the

necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to

conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989); *see also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

46.    Despite their efforts and a competitive financing process with several potential financing sources, the Debtors were unable to obtain unsecured financing.   From late-March through the Commencement Date, Stifel contacted a number of financial institutions in an effort to procure DIP Financing.  However, the Debtors decided not to secure financing on terms other than terms that complied with the Intercreditor DIP Financing Conditions because it would be difficult to prime the Prepetition Term Loan Secured Parties absent their consent.   The Debtors believe that the DIP Facility is the best available facility and, given that it satisfies the Intercreditor DIP Financing Conditions, it provides the most advantageous terms possible under the circumstances.   This Court should, therefore, authorize the Debtors to provide the DIP Agents and the DIP Lenders (i) with respect to the Prepetition Collateral that constitutes Prepetition ABL Collateral, superpriority liens and a superpriority administrative expense claim for any obligations arising under the DIP Facility as provided in section 364(c)(1) of the Bankruptcy Code, (ii) with respect to Prepetition Collateral that constitutes Prepetition Term Loan Collateral, a junior lien on those assets, and (iii) a lien on certain unencumbered assets.

iii.    *The Debtors Should be Authorized to Obtain Postpetition Financing Secured by First Priority Liens on the ABL Priority Collateral*

47.    In addition to authorizing financing under section 364(c) of the Bankruptcy Code, courts also may authorize a debtor to obtain postpetition credit secured by a

lien that is senior or equal in priority to existing liens on the encumbered property, without the

consent of the existing lien holders, if the debtor cannot otherwise obtain such credit and the

interests of existing lien holders are adequately protected. *See* 11 U.S.C. § 364(d)(1).

Specifically, section 364(d)(1) of the Bankruptcy Code provides:

> (1) The court, after notice and a hearing, may authorize the
> obtaining of credit or the incurring of debt secured by a senior or
> equal lien on property of the estate that is subject to a lien only if:
>
> (A) the trustee is unable to obtain such credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the
> lien on the property of the estate on which such senior or equal lien
> is proposed to be granted.
>
> (2) In any hearing under this subsection, the trustee has the burden
> of proof on the issue of adequate protection.

11 U.S.C. § 364(d).

48.    Here, the DIP Financing will repay the Prepetition ABL Facility and will

be secured by liens equal to the priority of those currently securing the Prepetition ABL Facility

in the Prepetition ABL Collateral.    Notably, the liens granted to the DIP Lender on the

Prepetition Term Loan Collateral will be junior to the liens securing the Prepetition Term Loan

Facility, as required by the Intercreditor DIP Financing Conditions.

49.    When determining whether to authorize a debtor to obtain credit secured

by senior liens as authorized by section 364(d) of the Bankruptcy Code, courts focus on whether

the transaction will enhance the value of the Debtors' assets. Courts consider a number of

factors, including, without limitation:

- Whether the party subject to a priming lien has consented to such
  treatment;

- Whether alternative financing is available on any other basis (*i.e.*, whether
  any better offers, bids or timely proposals are before the court);

WEIL:\95664695\9\11727.0012

- Whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtors' business;

- Whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtors and proposed lender(s); and

- Whether the proposed financing agreement was negotiated in good faith and at arms' length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors.

*See*, *e.g.*, *Ames Dep't Stores*, 115 B.R. at 37–39; *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003); *Farmland Indus.*, 294 B.R. at 862–79, *In re Lyondell Chem. Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. March 5, 2009); *Barbara K. Enters.*, 2008 WL 2439649 at *10; *see also* 3 Collier on Bankruptcy ¶ 364.04[1] (15th ed. rev. 2008). The DIP Documents satisfy each of these factors.

50.    <u>First</u>, to the extent the Prepetition ABL Secured Parties' or the Prepetition Term Loan Secured Parties' liens on the Prepetition ABL Collateral is being primed, the Prepetition ABL Secured Parties and the Prepetition Term Loan Secured Parties are deemed to have consented pursuant to section 6.1(a) of the Intercreditor Agreement.

51.    <u>Second</u>, the Debtors and their advisors explored a variety of possible financing sources, and ultimately determined that the DIP Lenders offered the best option for obtaining the postpetition financing that the Debtors require. The DIP Loan Documents reflect the most favorable terms on which the DIP Lenders were willing to offer DIP financing. The Debtors have not been able to obtain financing on equal or better terms from the DIP Lenders, or any other source, without granting first priority liens in the Prepetition ABL Collateral.

52.    <u>Third</u>, the Debtors need the proceeds of the DIP Facility to fund the Chapter 11 Cases and allow the Debtors to pursue either of their chapter 11 strategies. Indeed,

without access to the DIP Facility and use of the Cash Collateral, the Debtors will be forced to pursue an immediate sale, which will not maximize value for the Debtors' creditors and other parties in interest. Moreover, providing the Debtors with the liquidity necessary to preserve their going concern value through the pendency of these Chapter 11 Cases is in the best interest of all stakeholders.

53.    <u>Fourth</u>, upon entry of the Interim Order, the DIP Financing will provide access to $100 million, and sufficient liquidity to repay all outstanding obligations under the Prepetition ABL Facility, as well as allow the Debtors to maintain their operations and meet the various obligations they owed to key constituents notwithstanding the commencement of these Chapter 11 Cases. Accordingly, the terms of the DIP Facility are reasonable and adequate to support the Debtors' operations and restructuring activities through the pendency of these Chapter 11 Cases.

54.    <u>Fifth</u>, as described in greater detail above and in the Doak Declaration, the Debtors and the DIP Lenders negotiated the DIP Documents in good faith and at arms' length, and the Debtors' entry into the DIP Documents is an exercise of their sound business judgment. The other proposed lenders submitted less favorable proposals that consisted of more restrictive milestones and covenants, higher interest rates, and/or higher fees. The DIP Lenders are truly the Debtors most logical choice.

   *iv.    The DIP Facility Provides Adequate Protection To The Prepetition Term Loan Secured Parties*

55.    Parties with an interest in Cash Collateral or collateral that may be used to secure DIP Financing are entitled to adequate protection. 11 U.S.C. § 363(e). Here, however, pursuant to the terms of the Intercreditor Agreement, the Prepetition Term Loan Secured Parties agreed not to object to DIP financing or the use of cash collateral on the grounds that either fails

to provide the Prepetition Term Loan Secured Parties with adequate protection and further agreed not to request any adequate protection so long as the Intercreditor DIP Financing Conditions are satisfied.   As explained above, the DIP Financing satisfies each of the Intercreditor DIP Financing Conditions.  Moreover, the interests of the Prepetition ABL Secured Parties and the Prepetition Term Loan Secured Parties are minimally impacted by the DIP Facility because the DIP financing will be used to repay all outstanding amounts under the Prepetition ABL Credit Agreement and the DIP Liens will be subject and junior to the liens of the Prepetition Term Loan Secured Parties in the Prepetition Term Loan Collateral to the extent of the Prepetition Term Loan Obligations.

56.    Nevertheless, the DIP Lenders and the Debtors propose to grant the Prepetition Term Loan Agent, on behalf of the Prepetition Term Loan Secured Parties the following adequate protection:

- **Adequate Protection Liens**: The Debtors will grant the Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Secured Parties, continuing, valid, binding, enforceable, and automatically perfected postpetition security interest in and liens on all of the Prepetition Collateral (the "***Adequate Protection Liens***").  The Adequate Protection Liens shall be junior only: (i) with regard to the Prepetition Term Loan Collateral securing the Term Priority Obligations, to (a) the Carve Out, (b) the Prepetition Term Liens, and (iii) any Other Prepetition Senior Liens; and (ii) with regard to all other Prepetition Collateral, to (i) the Carve Out, (ii) the DIP Liens, and (iii) any Other Prepetition Senior Liens.

- **Superpriority and Administrative Claim**: Subject to the Carve Out and the claims of the DIP Lenders, as protection against any diminution in value of the interests of the Prepetition Term Loan Secured Parties in the Prepetition Collateral, the Prepetition Term Loan Agent, on behalf of itself and the Prepetition Term Loan Secured Parties, will be granted an adequate protection superpriority claim against the Debtors as provided in sections 503(b) and 507(b) of the Bankruptcy Code with priority in payment over any and all administrative expenses and all other claims asserted against the Debtors.

WEIL:\95664695\9\11727.0012

57.    In light of the adequate protection being provided to the Prepetition Term Loan Agent and the Prepetition Term Loan Secured Parties, the Debtors have more than appropriately protected for diminution in value of the Prepetition Term Loan Secured Parties' interests in the Prepetition Collateral.  The adequate protection granted to the Prepetition Term Loan Secured Parties is both fair and reasonable.

B.    The Debtors Should be Authorized to Use the Cash Collateral

58.    For the reasons set forth herein, the Debtors require use of Cash Collateral to provide working capital and implement the transactions contemplated by the DIP Facility. Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's cash collateral.  Specifically, section 363(c) provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
> (A) each entity that has an interest in such cash collateral consents; or
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).

59.    The Debtors have satisfied the requirements of sections 363(c)(2) and (e), and should be authorized to use the Cash Collateral.  The Prepetition Term Loan Secured Parties are not entitled to object to the use of cash collateral under the terms of the Intercreditor Agreement and the Prepetition ABL Secured Parties shall be repaid and otherwise consent. Further, the Debtors are providing the Prepetition Term Loan Secured Parties with adequate protection liens and claims to compensate for any diminution in the value of their collateral. Accordingly, the Court should grant the Debtors the authority to use their Cash Collateral under section 363(c)(2) of the Bankruptcy Code.

WEIL:\95664695\9\11727.0012

C.    The Debtors Should be Authorized to Pay the Fees Required
      by the Lenders and Honor Obligations Under the Commitment Letter

   60. As described above, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Lenders in exchange for their funding the DIP Facilities.  Attached hereto as **Exhibit D** is the fee letter (the "*Fee Letter*").

   61. The interest rate applicable to the DIP Financing will be 90-day LIBOR + 5.00%, which is reasonable for DIP financing in light of the interest rate under the Prepetition ABL Credit Agreement, which was 2.50%.  There is a Work Fee for the DIP Lenders of $650,000, an Interim Commitment Fee of 5.00% of the interim funding amount, and an Underwriting Fee of 5.00% of the DIP Facility, of which 3.25% is payable upon entry of the Final Order and the remaining 1.75% is payable on the termination date.  The Work Fee and the Interim Commitment Fee will be credited towards the Underwriting Fee upon entry of the Final Order.  The Debtors have also agreed to pay an Interim Arrangement Fee of 0.25% of the aggregate interim term loan and interim revolving credit commitments and a Final Arrangement Fee of 0.25% of the aggregate commitments.  The Interim Arrangement Fee will be credited towards the Final Arrangement Fee upon entry of the Final Order.  There is also an Agency fee of $7,500 per month.  The DIP Facility is a reasonably priced facility, satisfies the conditions of the Intercreditor Agreement, and, as stated above, the cost of the facility is offset by the flexibility and runway it provides to the Debtors.  The Debtors considered the fees described above and as set forth in the various financing proposals received when determining in their sound business judgment that the DIP Facility was the best financing available.  Paying these fees in order to obtain the DIP financing, therefore, is in the best interests of the Debtors' estates, creditors, and other parties in interest.

WEIL:\95664695\9\11727.0012

D.    The Scope of the Carve Out is Appropriate

62.    The proposed DIP Facility subjects the DIP Lenders' security interests and administrative expense claims to the Carve Out.  The Carve Out is similar to other arrangements made for professional fees that have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel. *See Ames*, 115 B.R. at 40.

63.    Without the Carve Out, the Debtors' estates or other parties-in-interest might be deprived of possible rights and powers because otherwise the services for which professional persons may be paid in these Chapter 11 Cases could be limited after an event of default.  *Id.* at 38 (observing that courts insist on carve-outs for professionals representing parties-in-interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  Additionally, the Carve Out protects against administrative insolvency during the course of the cases by ensuring that assets remain for the payment of U.S. Trustee fees and professional fees of the Debtors and the Creditors' Committee, if appointed, notwithstanding the grant of superpriority and administrative liens and claims under the DIP Facility.  Upon entry of the Interim Order the Debtors shall draw on the DIP Facility and deposit into an escrow account an amount equal to the sum of (i) 120% of the fees and expense reimbursements for professionals budgeted for the first week set forth in the DIP Budget, plus (ii) $2 million.  The Debtors will continue to fund the escrow account on a weekly basis pursuant to the amounts allocation under the DIP Budget.

E.    The Lenders Should be Deemed Good Faith Lenders under Section 364(e)

64.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the

40

authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

65.     As explained in detail herein and in the Doak Declaration, the DIP Documents are the result of the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain needed postpetition financing, and of extended arms' length, good faith negotiations between the Debtors and the DIP Lenders.  The terms and conditions of the DIP Documents are fair and reasonable, and the proceeds of the DIP Facility will only be used for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Documents other than as described herein.  Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by that section.

F.     Modification of the Automatic Stay is Warranted

66.     The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtors to:  (i) grant the security interests, liens, and superpriority claims described above with respect to the DIP Lenders and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens, (ii) permit the DIP Lenders to exercise, upon the occurrence and during the continuance of an

WEIL:\95664695\9\11727.0012

Event of Default (as defined in the DIP Credit Agreement), after the expiration of the applicable grace period, if any, or the occurrence of Maturity Date, as applicable, (a) certain immediate remedies, as further detailed in the Interim Order, with respect to the loans issued under the DIP Facility, and (b) certain other remedies under the DIP Credit Agreement or the proposed DIP Orders at any time five (5) business days' after giving notice; and (iii) implement the terms of the proposed DIP Orders.

67.    Stay modifications of this kind are ordinary and standard features of postpetition debtor financing facilities and, in the Debtors' business judgment, are appropriate under the present circumstances.  *See, e.g., In re The Great Atlantic & Pacific Tea Company, Inc.*, Case No. 15-23007 (RDD) (Bankr. S.D.N.Y. July 21, 2015) [Docket No. 88]; *In re Chassix Holdings, Inc.*, Case No. 15-10578 (MW) (Bankr. S.D.N.Y. Mar. 13, 2015) [Docket No. 67]; *In re The Great Atlantic & Pacific Tea Company, Inc.*, Case No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 13, 2010) [Docket No. 43]; *In re The Reader's Digest Assoc.*, Case No. 09-23529 (RDD) (Bankr. S.D.N.Y. Aug. 26, 2009) [Docket No. 26]; *In re Lear Corp.*, Case No. 09-14326 (ALG) (Bankr. S.D.N.Y. July 7, 2009) [Docket No. 59].

G.    The Debtors Require Immediate Access to the Cash Collateral and DIP Financing

68.    The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  Fed. R. Bankr. P. 4001(b)(2), (c)(2).  In examining requests for interim relief under this rule, courts in this jurisdiction generally apply the same business judgment standard applicable to other business decisions. *See Ames Dep't Stores*, 115 B.R. at 36.

69.     The Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein, including authorizing the Debtors to borrow up to $100 million, is not granted promptly after the Commencement Date.  The Debtors have insufficient cash to fund operations and provide comfort to vendors, let alone to pursue a stand-alone plan or a sale process, without immediate access to the DIP Financing.  It is necessary that the Debtors pay off the amounts outstanding under the Prepetition ABL Facility because it is not feasible for the Debtors to maintain two concurrent facilities.   Further, the Debtors anticipate that the commencement of these Chapter 11 Cases will significantly and immediately increase the demands on their free cash as a result of, among other things, the costs of administering these Chapter 11 Cases and addressing key constituents' concerns regarding the Debtors' financial health and ability to continue operations in light of these Chapter 11 Cases.  Accordingly, the Debtors have an immediate need for access to liquidity to, among other things, continue the operation of their businesses, maintain their relationships with customers, meet payroll, pay capital expenditures, procure goods and services from vendors and suppliers, and otherwise satisfy their working capital and operational needs, all of which is required to preserve and maintain the Debtors' enterprise value for the benefit of all parties in interest. *See* Duffy Decl. ¶¶ 8-10.

70.     The importance of a debtor's ability to secure postpetition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized in this district in similar circumstances. *See, e.g., In re Eastman Kodak Co.*, Case No. 12-10202 (MEW) (Bankr. S.D.N.Y. Jan. 20, 2012) (order approving postpetition financing on an interim basis) [Docket No. 54]; *In re The Great Atl. & Pac. Tea Co.*, Case No. 10-24549 (RDD) (Bankr. S.D.N.Y. Dec. 13, 2010) (same) [Docket No. 43]; *In re The Reader's Digest Assoc.*, Case No.

09-23529 (RDD) (Bankr. S.D.N.Y. Aug. 26, 2009) (same) [Docket No. 26]; *In re Tronox Inc.*, Case No. 09-10156 (MEW) (Bankr. S.D.N.Y. Jan. 13, 2009) (same) [Docket No. 46]; *In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. Jan. 8, 2009) (same) [Docket No. 79]; *In re Frontier Airlines Holdings, Inc.*, Case No. 08-11298 (RDD) (Bankr. S.D.N.Y. Aug. 5, 2008) (same) [Docket No. 433]. Accordingly, for the reasons set forth above, prompt entry of the Interim Order is necessary to avert immediate and irreparable harm to the Debtors' estates and is consistent with, and warranted under, Bankruptcy Rules 4001(b)(2) and (c)(2).

H.     Request for Final Hearing

71.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date that is no later than 14 days after entry of the Interim Order as a final hearing for consideration of entry of the Final Order.

72.     The Debtors request that they be authorized to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, by first class mail upon the Notice Parties listed below. The Debtors further request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rules 4001(b)(2) and 4001 (c)(2).

**Reservation of Rights**

73.     Nothing contained herein is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, (iii) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code, (iv) an admission that the Prepetition Term Loan Secured Parties are entitled to adequate protection.

WEIL:\95664695\9\11727.0012

## **Bankruptcy Rule 6003 Has Been Satisfied**

74.     Bankruptcy Rule 6003(b) provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" before twenty-one (21) days after filing of the petition.  Fed. R. Bankr. P. 6003(b).  As explained above, the Debtors require immediate access to the interim funding allowed under the DIP Facility.  Accordingly, the Debtors have satisfied the requirements of Bankruptcy Rule 6003.

## **Request for Bankruptcy Rule 6004 Waiver**

75.     To implement the foregoing successfully, the Debtors request a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent such stay applies.

## **Notice**

76.     Notice of this Motion has been provided to (i) the Office of the United States Trustee for Region 2; (ii) the holders of the forty (40) largest unsecured claims against the Debtors (on a consolidated basis); (iii) the holders of the five (5) largest secured claims against the Debtors (on a consolidated basis); (iv) the attorneys for Aero Investors LLC, as agent under the Loan and Security Agreement, dated May 23, 2014 ; (v) the attorneys for Bank of America, N.A., as agent under the Third Amended and Restated Loan and Security Agreement, as amended August 18, 2015; (vi) the Securities and Exchange Commission; (vii) the Internal Revenue Service; (viii) the United States Attorney's Office for the Southern District of New York; and (ix) the attorneys for the DIP Agent.  The Debtors submit that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

WEIL:\95664695\9\11727.0012

77.     No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of the Interim Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: May 4, 2016
         New York, New York

/s/ Ray C. Schrock
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail

*Proposed Attorneys for Debtors
and Debtors in Possession*

WEIL:\95664695\9\11727.0012

**<u>Exhibit A</u>**

**Proposed Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x
                           :

In re                           :          **Chapter 11**
                           :

**AÉROPOSTALE, INC.,** *et al.*,   :          **Case No. 16-_____ (___)**
                           :

        Debtors.[1]        :          **Jointly Administered**
                           :

---------------------------------------------------------x

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§**
**105, 361, 362, 363, AND 364 AND RULES 2002, 4001, AND 9014**
**OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (I) AUTHORIZING**
**INCURRENCE BY THE DEBTORS OF POSTPETITION SECURED INDEBTEDNESS,**
**(II) GRANTING LIENS, (III) AUTHORIZING USE OF CASH COLLATERAL BY THE**
**DEBTORS AND PROVIDING FOR ADEQUATE PROTECTION, (IV) MODIFYING**
**THE AUTOMATIC STAY, AND (V) SCHEDULING A FINAL HEARING**

Upon the motion, dated May 4, 2016 [*ECF No. [__]*] (the "Motion") by the above-captioned debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), seeking, among other things, entry of an interim order (this "Interim Order"):

(i)      authorizing the Debtors, pursuant to sections 363, 364(c), and 364(d) of title 11 of the United States Code (the "Bankruptcy Code"), to (a) obtain postpetition financing of up to $160,000,000 (the "DIP Facility"), comprised of a $75,000,000 term loan and a $85,000,000 revolving credit facility, pursuant to (I) that certain Secured Superpriority Debtor in Possession Loan, Security and Guaranty Agreement (as such agreement may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal tax identification number, as applicable, are as follows: Aéropostale, Inc. (3880); Aéropostale West, Inc. (7013); Jimmy'Z Surf Co., LLC (0461); Aero GC Management LLC (4257); Aeropostale Procurement Company, Inc. (8518); Aeropostale Licensing, Inc. (8124); P.S. from Aeropostale, Inc. (5900); GoJane LLC (4923); Aeropostale Canada Corp. (N/A); Aeropostale Holdings, Inc. (7729); and Aeropostale Puerto Rico, Inc. (6477). The Debtors' corporate headquarters is located at 112 West 34th Street, 22nd Floor, New York, NY 10120.

thereof and hereof, the "DIP Credit Agreement"), substantially in the form attached to the

Motion as Exhibit B, by and among Aéropostale, Inc., as borrower (the "Borrower"), each of the

other guarantor parties thereto including any entities that become guarantors thereunder from

time to time (the "Guarantors" and, together with the Borrower, the "DIP Loan Parties"), Crystal

Financial LLC, as agent (the "DIP Agent"), and the lender parties thereto including any entities

that become lenders thereunder from time to time (the "DIP Lenders" and, together with the DIP

Agent, the "DIP Secured Parties"), and (II) all guarantees and other agreements, documents, and

instruments to be executed and/or delivered with, to, or in favor of the DIP Secured Parties (all

documents comprising the DIP Facility, each as may be amended, restated, supplemented or

otherwise modified from time to time in accordance with the terms thereof and hereof,

collectively, the "DIP Financing Documents"); and (b) incur the "Liabilities" under and as

defined in the DIP Credit Agreement (and such Liabilities are hereinafter referred to as the "DIP

Obligations");

> (ii)    authorizing the Debtors that are Guarantors under the DIP Credit
> Agreement to guarantee the Borrower's DIP Obligations;

> (iii)    authorizing the DIP Loan Parties to execute and deliver the DIP Financing
> Documents and to perform such other acts as may be necessary or desirable in connection
> therewith;

> (iv)    authorizing the Debtors to access up to $100,000,000 of the DIP Facility
> (inclusive of an aggregate amount of approximately $73,000,000 to repay all outstanding
> obligations under the Prepetition ABL Credit Agreement (as defined below)) on an interim basis,
> consisting of up to $55,000,000 at any time outstanding of "Revolving Credit Loans" as
> described in Section 2-1(a) of the DIP Credit Agreement, and up to $45,000,000 of "Term

2

Loans" as described in Section 2-2(a) of the DIP Credit Agreement, for the period (the "Interim Period") from the commencement of these cases through and including the earlier of (I) the entry of the Final Order (as defined below), and (II) thirty (30) days after the Petition Date, in order to avoid immediate and irreparable harm;

(v)      authorizing the use of the proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses under the DIP Financing Documents) during the Interim Period in each case in a manner consistent with and subject to the terms and conditions of the DIP Financing Documents and this Interim Order, and in compliance with the DIP Budget (as defined below), solely for the purposes set forth in the DIP Financing Documents including to pay or fund (a) certain costs, fees and expenses related to the Chapter 11 Cases, (b) the repayment of all Prepetition ABL Obligations (as defined below), including to cash collateralize all outstanding letters of credit issued under the Prepetition ABL Credit Documents (as defined below), and to fund an indemnification escrow in favor of the Prepetition ABL Parties (as defined below), and (c) the working capital needs of the Debtors during the Chapter 11 Cases;

(vi)      granting to the DIP Agent, for the benefit of itself and the DIP Lenders, automatically perfected liens on and security interests in all of the DIP Collateral (as defined below), including, without limitation, all property constituting "cash collateral" (as defined in section 363(a) of the Bankruptcy Code, and hereinafter, "Cash Collateral"), which liens and security interests shall have the priorities set forth in paragraph 2(i) below;

(vii)      granting to the DIP Agent, for the benefit of itself and the DIP Lenders, allowed superpriority administrative claims in each of the Chapter 11 Cases and any Successor Case (as defined below) in respect of all DIP Obligations, pursuant to section 364(c)(1) of the Bankruptcy Code, which shall have the priorities set forth in paragraph 2(j) below;

3

(viii)    authorizing the Debtors' use of Cash Collateral on the terms and conditions set forth in this Interim Order, and providing adequate protection on the terms set forth in this Interim Order to the Prepetition Term Loan Parties (as defined below) for any Diminution in Value (as defined below) for their interests in the Prepetition Collateral (as defined below), including the Cash Collateral;

(ix)    vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Financing Documents and this Interim Order;

(x)    scheduling a final hearing (the "Final Hearing") to consider entry of an order (the "Final Order") granting the relief requested in the Motion on a final basis, and to approve the form and manner of notice with respect to the Final Hearing; and

(xi)    waiving any applicable stay as provided in the provisions of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and/or the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"), and providing for the immediate effectiveness of this Interim Order;

The Court having considered the Motion, the declarations of James Doak [*ECF No. __*] and Robert Duffy [*ECF No. __*] in support thereof, and the declaration of David J. Dick [*ECF No. __*] in support of the Debtors' first day motions and orders, the exhibits attached thereto, the DIP Credit Agreement, and the evidence submitted at the interim hearing held before the Court on May [__], 2016 (the "Interim Hearing"); and in accordance with Bankruptcy Rules 2002, 4001(b), (c), and (d), and 9014 and Rule 4001-2 of the Local Rules, due and proper notice of the Motion and the Interim Hearing having been given; and the Interim Hearing having been held and concluded; and it appearing that approval of the relief requested in the Motion during the

4

Interim Period is necessary to avoid immediate and irreparable harm to the Debtors pending the

Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their

creditors and their estates, and is essential for the continued operation of the Debtors' business

and to preserve and maximize the value of the Debtors' estates for the benefit of all stakeholders;

and it further appearing that the Debtors are unable to secure unsecured credit for money

borrowed allowable as an administrative expense under section 503(b)(1) of the Bankruptcy

Code; and all objections, if any, to the entry of this Interim Order having been withdrawn,

resolved or overruled by this Court; and after due deliberation and consideration, and for good

and sufficient cause appearing therefor:

### IT IS HEREBY FOUND AND CONCLUDED AS FOLLOWS:[2]

A.    **Petition Date**.  On May 4, 2016 (the "Petition Date"), the Debtors filed voluntary

petitions under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for

the Southern District of New York (the "Court").  The Debtors are continuing in the management

and operation of their businesses and properties as debtors in possession pursuant to sections

1107 and 1108 of the Bankruptcy Code.  Pursuant to an order of this Court, the Chapter 11 Cases

have been consolidated for procedural purposes only.  No trustee or examiner has been appointed

in the Chapter 11 Cases.

B.    **Jurisdiction and Venue**.  This Court has jurisdiction over these proceedings and

the parties and property affected hereby pursuant to 28 U.S.C. § 1334. Consideration of the

Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  Venue for the Chapter 11

---

[2] The findings and conclusions set forth in this Interim Order constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

5

Cases and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and

1409.

      **C.**    <u>**Statutory Committee**</u>.  As of the date of this Interim Order, a statutory

committee of unsecured creditors (the "<u>Committee</u>") has not been appointed in the Chapter 11

Cases.

      **D.**    <u>**Notice**</u>.  The Interim Hearing was held pursuant to Bankruptcy Rules 2002 and

4001 and Local Rule 4001-2.  Notice of the Interim Hearing and the emergency relief requested

in the Motion was given by the Debtors, whether by telecopy, email, overnight courier or hand

delivery on May 4, 2016, to certain parties in interest, including: (i) the Office of the United

States Trustee for the Southern District of New York (the "<u>United States Trustee</u>"); (ii) the

Debtors' forty (40) largest unsecured creditors on a consolidated basis; (iii) counsel to the DIP

Agent; (iv) counsel to the Prepetition ABL Agent (as defined below); (v) counsel to the

Prepetition Term Loan Agent (as defined below); (vi) the five (5) largest secured creditors of

record; (vii) the Internal Revenue Service; (viii) the Securities and Exchange Commission; (ix)

the United States Department of Justice; and (x) all parties requesting notice pursuant to

Bankruptcy Rule 2002.  Under the circumstances, such notice of the Interim Hearing and the

emergency relief requested in the Motion is due and sufficient notice and complies with sections

102(1), 363, 364(c), and 364(d) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001(b),

4001(c), 4001(d), and the Local Rules, and no other or further notice of the relief granted

pursuant to this Interim Order is necessary or required.

      **E.**    <u>**The Debtors' Acknowledgements and Agreements**</u>.  Without prejudice to the

rights of parties in interest as set forth in paragraph 7 below, the Debtors admit, stipulate,

acknowledge and agree that (collectively, paragraphs E(i) through E(vii) hereof shall be referred to herein as the "Debtors' Prepetition Secured Lien Stipulations"):

(i) **Prepetition Revolving Credit Facility**.  Prior to the Petition Date, certain of the Debtors were parties to that certain Third Amended and Restated Loan and Security Agreement, dated as of September 22, 2011 (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Prepetition ABL Credit Agreement" and together with all other agreements, documents and instruments executed and/or delivered to or in favor of the parties thereto, the "Prepetition ABL Credit Documents"), by and among the Borrower, the guarantors party thereto, Bank of America, N.A., as agent (the "Prepetition ABL Agent"), and the lenders party thereto (the "Prepetition ABL Lenders" and, together with the Prepetition ABL Agent, the "Prepetition ABL Parties").  Pursuant to the Prepetition ABL Credit Agreement, the Prepetition ABL Lenders made available to the Borrower a secured revolving credit facility in an original principal amount of up to $215,000,000.

(ii) **Prepetition Term Loan Facility**.  Prior to the Petition Date, certain of the Debtors were parties to that certain Loan and Security Agreement, dated as of May 23, 2014 (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Prepetition Term Loan Agreement" and together with all other agreements, documents, and instruments executed and/or delivered to or in favor of the parties thereto, the "Prepetition Term Loan Documents" and, together with the Prepetition ABL Credit Documents, the "Prepetition Secured Credit Documents"), by and among the borrower and guarantors listed therein, and Aero Investors LLC, as agent (the "Prepetition Term Loan Agent" and, together with the Prepetition ABL Agent, the "Prepetition Secured Agents"), and the lender parties thereto (the "Prepetition Term Loan Lenders" and, together with the Prepetition Term Loan Agent, the "Prepetition Term Loan Parties" and, together with the Prepetition ABL Parties, the "Prepetition Secured Parties").

(iii) **Prepetition ABL and Term Loan Obligations**.  As of the Petition Date, the outstanding principal amount of all loans under the Prepetition ABL Credit Documents was approximately $73,000,000 (such amount, together with any amounts paid, incurred or accrued prior to the Petition Date in accordance with the Prepetition ABL Credit Documents and any outstanding letters of credit, accrued and unpaid interest, any fees, expenses and disbursements, indemnification obligations and other charges of whatever nature, whether or not contingent, whenever arising, due or owing in respect thereof, collectively, the "Prepetition ABL Obligations").  As of the Petition Date, the outstanding principal amount of all loans under the Prepetition Term Loan Documents was

7

approximately $150,000,000 (such amount, together with any amounts paid, incurred or accrued, prior to the Petition Date in accordance with the Prepetition Term Loan Documents, accrued and unpaid interest, any fees, expenses and disbursements, indemnification obligations and other charges of whatever nature, whether or not contingent, whenever arising, due or owing in respect thereof, collectively, the "Prepetition Term Loan Obligations" and together with the Prepetition ABL Obligations, collectively, the "Prepetition Secured Obligations").

(iv)    **Liens Securing Prepetition Secured Obligations.**  Prior to the Petition Date, the Debtors granted to the Prepetition ABL Agent (for the benefit of itself and the other Prepetition ABL Lenders) and the Prepetition Term Loan Agent (for the benefit of itself and the other Prepetition Term Loan Lenders) liens upon and security interests, as follows:

   a.    *Prepetition ABL Credit Facility*.  Pursuant to the Prepetition ABL Credit Documents, the Debtors granted to the Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL Lenders, liens (the "Prepetition ABL Liens") on all "Collateral" (as such term is defined in the Prepetition ABL Credit Documents and hereinafter referred to as the "Prepetition Collateral").

   b.    *Prepetition Term Loan*.  Pursuant to the Prepetition Term Loan Documents, the Debtors granted to the Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Lenders, liens (the "Prepetition Term Loan Liens" and, together with the Prepetition ABL Liens, the "Prepetition Secured Liens"), on all Prepetition Collateral.

   c.    *Priority of Liens in Prepetition Collateral*.  Pursuant to that certain Intercreditor Agreement, dated as of May 23, 2014 (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Intercreditor Agreement"), by and between the Prepetition ABL Agent and the Prepetition Term Loan Agent, (I) the Prepetition ABL Liens granted on all "ABL Priority Collateral" to secure the "ABL Priority Obligations" (as such terms are defined in the Intercreditor Agreement) are senior in all respects to the Prepetition Term Loan Liens on all ABL Priority Collateral; and (II) the Prepetition Term Loan Liens granted on all "Term Priority Collateral" to secure the "Term Priority Obligations" (as such terms are defined in the Intercreditor Agreement) are senior in all respects to the Prepetition ABL Liens on all Term Priority Collateral.

8

(v)    **Intercreditor Agreement.**  The Debtors, the Prepetition ABL Agent and the Prepetition Term Loan Agent entered into the Intercreditor Agreement to govern, among other things, the respective rights, interests, obligations and priority of the Prepetition ABL Agent, on behalf of itself and the other Prepetition ABL Parties, and the Prepetition Term Loan Agent, on behalf of itself and the other Prepetition Term Loan Parties, in respect of the Prepetition Collateral.

(vi)    **Validity, Perfection and Priority of Prepetition ABL Liens and Prepetition ABL Obligations.**  As of the Petition Date, (i) the Prepetition ABL Liens are valid, binding, enforceable, non-avoidable and properly perfected; (ii) the Prepetition ABL Liens (x) are senior in priority to any and all other liens on the Prepetition Collateral, subject only to the terms of the Intercreditor Agreement and certain liens, if any, otherwise permitted pursuant to the Prepetition ABL Credit Documents,[3] and (y) are not subject to avoidance, recharacterization, subordination or other challenge pursuant to the Bankruptcy Code or applicable non-bankruptcy law, (iii) the Prepetition ABL Obligations constitute legal, valid, binding and non-voidable obligations of the Debtors, enforceable in accordance with the terms of the Prepetition ABL Credit Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and are not subject to any objection, offset, defense or counterclaim of any kind, and no portion of the Prepetition ABL Obligations is subject to avoidance, disallowance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (iv) the Prepetition ABL Obligations constitute allowed secured claims pursuant to section 506 of the Bankruptcy Code. On the date that this Interim Order is entered, the Debtors have waived, discharged and released the Prepetition ABL Parties, together with their affiliates, agents, attorneys, officers, directors and employees, of any right the Debtors may have (x) to challenge or object to any of the Prepetition ABL Obligations or any security therefor, and (y) to bring or pursue any and all claims, objections, challenges, causes of action and/or choses in action arising out of, based upon or related to the Prepetition ABL Credit Documents or otherwise.  The Debtors do not possess and will not assert any claim, counterclaim, setoff, objection, challenge, cause of action or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of the Prepetition ABL Liens, or any claim of the Prepetition ABL Parties pursuant to the Prepetition ABL Credit Documents.

---

[3] Nothing herein shall constitute a finding or ruling by this Court that any such permitted liens, if any, are valid, enforceable, perfected, non-avoidable or senior to the Prepetition ABL Liens.  Nothing herein shall prejudice the rights of any party in interest including, but not limited to, the Debtors, the Prepetition ABL Parties, the DIP Secured Parties and any Committee to challenge the validity, priority, enforceability, seniority, avoidability, perfection, extent or any other aspect of any such permitted liens.

(vii)   **Interest in Cash Collateral**.  The Prepetition ABL Parties have a security interest in Cash Collateral of the Debtors, including all amounts on deposit in the Debtors' banking, checking, or other deposit accounts and all proceeds of Prepetition Collateral (but only to the extent of their respective security interests in such Prepetition Collateral) to secure their respective prepetition claims, to the same extent and order of priority as that which was held by each such party on the Petition Date.

F.   **Findings Regarding the Post-Petition Financing**.

(i)   **Need for Post-Petition Financing**.  An immediate need exists for the Debtors to obtain funds under the DIP Facility in order to continue remaining operations and to administer and preserve the value of the Debtors' estates.  The ability of the Debtors to meet payroll and finance their remaining operations, and to preserve, maintain and maximize the value of their assets for the benefit of their creditors, requires the immediate availability of working capital provided pursuant to the DIP Facility.  Without immediate access to the DIP Facility, the Debtors have insufficient funds available to sustain operations of any magnitude for any length of time.  The inability to obtain funding under the DIP Facility would immediately and irreparably harm the Debtors, their estates and their creditors, and irreparably damage the Debtors' prospects for a successful reorganization or sale of their assets as a going concern or otherwise.

(ii)   **No Credit Available on More Favorable Terms**.  The Debtors are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  Given their current financial condition, financing arrangements and capital structure, the Debtors are unable to obtain secured credit pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code on more favorable terms and conditions than those provided in the DIP Financing Documents and this Interim Order.  Financing on a postpetition basis is not otherwise available without granting to the DIP Agent, for the benefit of itself and the DIP Lenders, (a) valid and perfected security interests in and liens on all of the Debtors'

10

existing and after acquired assets with the priorities set forth in this Interim Order, (b) superpriority claims with the priorities set forth in this Interim Order, and (c) the other protections, rights and remedies set forth in the DIP Financing Documents and this Interim Order.

G.    **Use of Proceeds of the DIP Facility**.  Proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses under the DIP Financing Documents) shall be used in a manner consistent with and subject to the terms and conditions of the DIP Financing Documents, and in compliance with the DIP Budget and the limitations set forth in this Interim Order, solely for the purposes set forth in the DIP Financing Documents including to pay or fund (i) certain costs, fees and expenses related to the Chapter 11 Cases; (ii) the repayment of the Prepetition ABL Obligations; (iii) the cash collateralization of certain letters of credit as approved by the DIP Agent and the Required Lenders (as such term is defined in the DIP Credit Agreement) from time to time in their sole discretion (the escrow account or accounts in which such cash collateralization is maintained is hereinafter referred to as the "Postpetition LC Account"); (iv) the cash collateralization of certain outstanding letters of credit issued pursuant to the Prepetition ABL Credit Agreement on the terms set forth in the DIP Credit Agreement; (v) an escrow account for payments on account of any contingent indemnity obligations under the Prepetition ABL Credit Documents, in an amount not to exceed $350,000; (vi) the cash collateralization of certain cash management obligations owed to Bank of America, N.A., under the Prepetition ABL Credit Documents in an amount not to exceed $250,000; (vii) the cash collateralization of certain cash management obligations owed to Wells Fargo Bank, N.A., under the Prepetition ABL Credit Documents in an amount not to exceed $10,000; (viii) the cash collateralization of certain bank product obligations related to credit cards under the Prepetition

11

ABL Credit Documents in the amount set forth in the DIP Credit Agreement (each of the accounts solely containing the amounts described in the foregoing clauses (iv)-(viii), the "Prepetition ABL Escrow and Reserve Accounts"); (ix) the Carve-Out (as defined below); and (x) the working capital needs of the DIP Loan Parties during the Chapter 11 Cases.  Payment of the Prepetition ABL Obligations in accordance with this Interim Order is necessary as the DIP Agent and the DIP Lenders will not otherwise consent to providing the DIP Facility and extending credit to the Debtors thereunder, and the Prepetition ABL Parties will not otherwise consent to the use of their Cash Collateral and other Prepetition Collateral or the subordination of their liens to the Carve-Out.  Based on the record of the Interim Hearing, such payment will not prejudice the Debtors or their estates because it appears that the Prepetition ABL Obligations are significantly oversecured and, in any event, such payment is subject to the rights of parties in interest under paragraph 7 of this Interim Order.

H.    **Application of Proceeds of DIP Collateral**.    All proceeds of a sale or other disposition of the DIP Collateral (other than proceeds, if any, from the sale or disposition of Term Priority Collateral, to the extent the liens of the Prepetition Term Loan Agent in the Term Priority Collateral are valid, binding, enforceable, non-avoidable and properly perfected) shall be applied to reduce the DIP Obligations pursuant and subject to the provisions of the DIP Credit Agreement.  Subject to the DIP Intercreditor Provisions (as defined below), the DIP Secured Parties are permitted to treat all cash, cash equivalents, money, collections and payments received by any DIP Secured Party from any account other than the Pre-Petition Term Loan Proceeds Securities Account (as such term is defined in the DIP Credit Agreement) as DIP Priority Collateral (as defined below), and no such amounts received by any DIP Secured Party or applied to the DIP Obligations shall be subject to disgorgement or  deemed to be held in trust

12

for the benefit of the Prepetition Term Loan Parties (and all claims of the Prepetition Term Loan Agent or any other Prepetition Term Loan Party are hereby waived).

I.    **Property of the Estate**.  Each item of the DIP Collateral constitutes property of the Debtors' estates.

J.    **Adequate Protection for Prepetition Term Loan Lenders**.  The DIP Facility complies with Section 6.1(a) of the Intercreditor Agreement and, therefore, pursuant to such Section 6.1(a), the Prepetition Term Loan Parties are deemed not to object to the DIP Facility or the Debtors' use of Cash Collateral pursuant to the terms of this Interim Order and the DIP Financing Documents on any grounds.  The priming of the Prepetition Term Loan Liens on the ABL Priority Collateral pursuant to section 364(d) of the Bankruptcy Code, as further described below, will enable the Debtors to obtain the DIP Facility, to continue remaining operations and to maximize the value of their assets for the benefit of their estates and creditors.  The Prepetition Term Loan Agent is being provided adequate protection as set forth in this Interim Order, pursuant to sections 361, 363 and 364 of the Bankruptcy Code, for any diminution in the value of its interests in the Prepetition Collateral (including Cash Collateral) resulting from the subordination to the Carve-Out and the DIP Liens (as defined below) on the ABL Priority Collateral, the Debtors' use, sale or lease of such Prepetition Collateral, and the imposition of the automatic stay (collectively, and solely to the extent of any such diminution in value the "Diminution in Value").  Pursuant to Sections 361, 363, 364 and 507(b) of the Bankruptcy Code, as adequate protection to the extent of any Diminution in Value of its interests in the Prepetition Collateral (including Cash Collateral), the Prepetition Term Loan Parties will receive the rights and protections set forth in this Interim Order, including pursuant to paragraph 4 of this Interim Order.

13

K.     **Section 506(c) and Section 552(b)**.  In light of the subordination of their liens and superpriority claims to the Carve-Out, the DIP Secured Parties are entitled to (a) all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception shall not apply and (b) subject to the entry of the Final Order, a waiver of the provisions of section 506(c) of the Bankruptcy Code.

L.     **Extension of Financing**.  The DIP Secured Parties have indicated a willingness to provide financing to the Debtors in accordance with the DIP Credit Agreement and subject to (i) the entry of this Interim Order and a Final Order, (ii) the satisfaction of all conditions to borrowing set forth in the DIP Financing Documents, and (iii) findings by the Court that such financing is essential to the Debtors' estates, that the DIP Secured Parties are good faith financiers, and that the superpriority claims, security interests and liens and other protections granted to DIP Secured Parties pursuant to this Interim Order and the DIP Facility will not be affected by any subsequent reversal or modification of this Interim Order or the Final Order unless the Interim Order and/or the Final Order were stayed pending appeal, as provided in section 364(e) of the Bankruptcy Code.

M.     **Business Judgment and Good Faith Pursuant to Section 364(e)**.  (i) The terms and conditions of the DIP Facility and the DIP Credit Agreement, and the fees paid and to be paid thereunder, are fair, reasonable, and the best available under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration; (ii) the DIP Facility was negotiated in good faith and at arms' length between the Debtors and the DIP Secured Parties, (iii) use of the proceeds to be extended under the DIP Facility will be so extended in good faith, and for valid business purposes and uses, as a consequence of which the DIP Secured Parties are entitled

14

56101252v1

to the protection and benefits of section 364(e) of the Bankruptcy Code; and (iv) the DIP Secured Parties are hereby found to be acting in good faith within the meaning of section 364(e) of the Bankruptcy Code in entering into and consummating the DIP Facility contemplated herein and in the DIP Credit Agreement after the entry of this Interim Order.

N.     **Relief Essential; Best Interest; Good Cause**.  The relief requested in the Motion is necessary, essential, and appropriate for continued operations, and for the management, maintenance and preservation of the Debtors' assets and property as it will, among other things, provide the Debtors with the necessary liquidity to (i) minimize disruption to their on-going operations while the Debtors pursue their restructuring goals; (ii) preserve and maximize the value of their estates for the benefit of all creditors; and (iii) avoid immediate irreparable harm to the Debtors, their creditors, their businesses, their employees, and their estates.  It is in the best interest of the Debtors' estates for the Debtors to be allowed to establish the DIP Facility contemplated by the DIP Credit Agreement and to grant the other relief set forth herein.  Good cause has been shown for the relief requested in the Motion and as granted in this Interim Order.

O.     **Final Hearing**.  At the Final Hearing, the Debtors will seek final approval of the proposed DIP Facility and use of Cash Collateral pursuant to a proposed Final Order, which shall be in form and substance acceptable to the DIP Agent and the Required Lenders in their sole and absolute discretion.  Notice of the Final Hearing will be provided in accordance with this Interim Order.

P.     **Entry of Interim Order**.  For the reasons stated above, the Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

Based upon the foregoing findings and conclusions, and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

15

56101252v1

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED:**

1. **Motion Granted**. The Motion is hereby granted, on an interim basis, in accordance with the terms and conditions set forth in this Interim Order, the DIP Credit Agreement and the other DIP Financing Documents.

2. **DIP Facility Authorization**.

(a) **Approval of Entry Into DIP Financing Documents**. The Debtors are expressly and immediately authorized, empowered and directed to execute and deliver the DIP Financing Documents and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Financing Documents, and to execute and deliver all guarantees, instruments and other documents which may be required or necessary for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens described in and provided for by this Interim Order and the DIP Financing Documents. The Debtors are hereby authorized and directed to do and perform all acts, pay and guarantee to pay, as applicable, the principal, interest, fees, expenses and other amounts described in the DIP Financing Documents as such become due, including, as applicable, all commitment fees, underwriting fees, unused facility fees, agency fees and other fees and disbursements (including, without limitation, reasonable attorneys' fees and disbursements) as provided for in the DIP Financing Documents, which amounts (i) shall not be subject to or require further approval of this Court, and (ii) shall not be subject to compliance with the guidelines promulgated by the United States Trustee, and no recipient of such payments shall be required to file any interim or final fee application with respect thereto. All collections and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations or otherwise, will be deposited and applied as required by this Interim Order and DIP Financing Documents. Upon execution and delivery, the DIP Financing Documents shall represent valid

16

and binding obligations of the Debtors enforceable against the Debtors in accordance with their terms.

(b) **Authorization to Borrow**.  To enable the Debtors to continue to operate their businesses during the Interim Period, and subject to the terms, conditions, limitations on availability and reserves set forth in the DIP Credit Agreement, the other DIP Financing Documents, the DIP Budget and this Interim Order, the DIP Loan Parties are hereby authorized to borrow or guarantee, as applicable, on an interim basis up to (i) $55,000,000 at any time outstanding of "Revolving Credit Loans" as described in Section 2-1(a) of the DIP Credit Agreement, and (ii) $45,000,000 of "Term Loans" as described in Section 2-2(a) of the DIP Credit Agreement.

(c) **DIP Budget**.  All borrowing under the DIP Facility and all use of Cash Collateral shall be in compliance with the DIP Budget[4] (as such term is defined in the DIP Credit Agreement), a summary schedule of which is annexed hereto as **Exhibit A** (as the same may be modified from time to time consistent with and subject to the terms of the DIP Credit Agreement, and with the consent of the DIP Agent and the Required Lenders), and the Debtors shall not use any portion of the proceeds of the DIP Facility, directly or indirectly, in excess of the amounts set forth in the DIP Budget, except (and to the extent of) any variance permitted under the DIP Credit Agreement.  The DIP Budget may be updated and amended (with the consent and/or at the request of the DIP Agent and the Required Lenders) from time to time in accordance with the DIP Credit Agreement, provided that such updated or amended DIP Budget shall be in form and substance acceptable to the DIP Agent and the Required Lenders, and the

---

[4] Any reference contained herein to compliance with the DIP Budget shall include any permitted variance permitted by Section 5-14 of the DIP Credit Agreement.

Debtors shall be required always to comply with the DIP Budget and the DIP Credit Agreement. Notwithstanding any "first day" or subsequent orders entered by the Court authorizing the Debtors to pay any prepetition or other claims and expenses, all such payments shall be made only to the extent they are in compliance with the DIP Budget.

(d)   **Use of Cash Collateral and DIP Proceeds and Collections**.   Cash Collateral and the proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses under the DIP Credit Agreement) shall be used, in each case in a manner consistent with and subject to the terms and conditions of the DIP Financing Documents, and in compliance with the DIP Budget and the limitations set forth in this Interim Order, solely for the purposes set forth in the DIP Financing Documents including to pay or fund (i) certain costs, fees and expenses related to the Chapter 11 Cases; (ii) the repayment of the Prepetition ABL Obligations; (iii) the cash collateralization of certain letters of credit as approved by the DIP Agent and the Required Lenders from time to time in their sole discretion into the Postpetition LC Account; (iv) the Prepetition ABL Escrow and Reserve Accounts on the terms set forth in the DIP Credit Agreement; (v) the Carve-Out; and (vi) the working capital needs of the DIP Loan Parties during the Chapter 11 Cases.   Any and all collections and payments received by the DIP Agent, and all other proceeds of the DIP Collateral (other than proceeds, if any, from the sale or disposition of Term Priority Collateral, to the extent the liens of the Prepetition Term Loan Agent in the Term Priority Collateral are valid, binding, enforceable, non-avoidable and properly perfected), shall be applied to reduce the DIP Obligations pursuant and subject to the provisions of the DIP Credit Agreement.   Subject to the DIP Intercreditor Provisions, the DIP Secured Parties are permitted to treat all cash, cash equivalents, money, collections and payments received by any DIP Secured Party from any account other than the Pre-Petition Term Loan Proceeds Securities Account (as

18

56101252v1

such term is defined in the DIP Credit Agreement) as DIP Priority Collateral, and no such amounts received by any DIP Secured Party or applied to the DIP Obligations shall be subject to disgorgement or deemed to be held in trust for the benefit of the Prepetition Term Loan Parties (and all claims of the Prepetition Term Loan Agent or any other Prepetition Term Loan Party are hereby waived).

(e)     **Repayment of Prepetition ABL Obligations.**   Upon the occurrence of the Effective Date (as such term is defined in the DIP Credit Agreement), the Borrower shall use the proceeds of the DIP Facility to pay in full all outstanding Prepetition ABL Obligations, including to cash collateralize all outstanding letters of credit issued under the Prepetition ABL Credit Documents and to fund the Prepetition ABL Escrow and Reserve Accounts in favor of the Prepetition ABL Parties, all in accordance with the terms, conditions, and procedures set forth in the DIP Credit Agreement.

(f)     **Conditions Precedent**.   The DIP Secured Parties shall have no obligation to make any loan or advance under the DIP Credit Agreement during the Interim Period unless the conditions precedent to the making of such loan under the DIP Credit Agreement and this Interim Order have been satisfied in full or waived by the DIP Secured Parties in their sole discretion.

(g)     **DIP Liens and DIP Collateral**.   Effective immediately upon the execution of this Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code, the DIP Agent, for the benefit of itself and the DIP Lenders, is hereby granted continuing, valid, binding, enforceable, non-avoidable and automatically and properly perfected postpetition liens on and security interests in (collectively, the "DIP Liens") any and all presently owned and hereafter acquired property and assets of the Debtors, whether

19

real or personal, tangible or intangible, and wherever located (including, without limitation, all proceeds of insurance policies of the Debtors), and all proceeds, products, offspring, rents, proceeds of interests in leaseholds and profits thereof, and including, without limitation, the following (all collateral described in this paragraph 2(g), collectively, the "DIP Collateral"):  (i) all Prepetition Collateral, and (ii) all Collateral (as defined in the DIP Credit Agreement); provided, however, that the DIP Liens shall not attach to (x) the Postpetition LC Account or to the Prepetition ABL Escrow and Reserve Accounts but shall attach to any residual interest of the Debtors in the funds maintained in such Postpetition LC Account and/or Prepetition ABL Escrow and Reserve Accounts as and when funds in such accounts are released from escrow and returned to the Debtors; and (y) claims and causes of action of the Debtors and their estates under Chapter 5 of the Bankruptcy Code (the "Avoidance Actions") and proceeds thereof. Notwithstanding the foregoing, Excluded Assets (as defined in the DIP Credit Agreement) shall not constitute DIP Collateral or be subject to the DIP Liens.  The DIP Liens shall have the priority set forth in paragraph 2(j) below.

(h)   **Account Control Agreements**.  The Debtors are authorized and directed to deliver to the DIP Agent deposit account control agreements, as and to the extent required by the DIP Financing Documents, duly executed by such parties as are reasonably required by the DIP Secured Parties, and in each case, in form and substance acceptable to the DIP Agent. Notwithstanding the foregoing, to the extent any deposit account control agreements exist for the benefit of the Prepetition ABL Parties (each such agreement, a "Prepetition ABL DACA"), upon the repayment of the Prepetition ABL Obligations pursuant to this Interim Order, the DIP Agent shall be deemed substituted for the Prepetition ABL Agent in any such Prepetition ABL DACA, and such Prepetition ABL DACA shall continue in full force and effect for the benefit of the DIP

20

Secured Parties and any and all non-Debtor counterparties thereto shall continue to honor such agreements.

(i)    **DIP Lien Priority**.  The DIP Liens securing the DIP Obligations shall be senior in priority and superior to any security, mortgage, collateral interest, lien or claim on or to any of the DIP Collateral (all DIP Collateral that is subject to senior priority and superior DIP Liens, the "DIP Priority Collateral"), junior only to (a) the Carve-Out; (b) the Prepetition Term Loan Liens in the Term Priority Collateral securing the Term Priority Obligations, to the extent that such Prepetition Term Loan Liens are valid, binding, enforceable, non-avoidable and properly perfected; and (c) any other valid, perfected, enforceable and non-avoidable liens existing as of the Petition Date that are senior to the Prepetition ABL Liens (any such other liens, the "Other Prepetition Senior Liens").  Other than as expressly set forth herein, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest by any order heretofore or hereafter entered in the Chapter 11 Cases and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (any "Successor Cases"), and/or upon the dismissal of the Chapter 11 Cases or any Successor Cases.  The DIP Liens shall not be subject to sections 506(c) (subject to entry of the Final Order), 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of any estate pursuant to section 551 of the Bankruptcy Code shall be made *pari passu* with or senior to the DIP Liens.

(j)    **DIP Superpriority Administrative Claim**.  Subject to the Carve-Out, all DIP Obligations shall be an allowed superpriority administrative expense claim (the "DIP Superpriority Claim" and, together with the DIP Liens, the "DIP Protections") with priority in

21

the Chapter 11 Cases and any Successor Cases, under sections 364(c)(1), 503, and 507 of the Bankruptcy Code and otherwise, over any and all administrative expense claims of the kinds specified in, arising, or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546, 726, 1113, 1114, or any other provision of the Bankruptcy Code, and, if approved in the Final Order, section 506(c) of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment. Other than the Carve-Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these Chapter 11 Cases, or in any Successor Cases, and no priority claims are, or will be, senior to, prior to or on a parity with the DIP Superpriority Claim. The DIP Superpriority Claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including, without limitation, and after entry of a Final Order, all Avoidance Actions and all proceeds thereof.

(k)      **Enforceable Obligations**.  The DIP Financing Documents shall constitute and evidence the valid and binding obligations of the Debtors, which obligations shall be enforceable in accordance with their terms against the Debtors, their creditors, their estates and any successors thereto (including without limitation, any trustee appointed in the Chapter 11 Cases or in any Successor Cases).

(l)      **Protection of DIP Secured Parties and Other Rights**.  From and after the Petition Date, the Debtors shall use the proceeds of the extensions of credit under the DIP Facility only for the purposes specifically set forth in the DIP Credit Agreement and (until entry of the Final Order) this Interim Order and in compliance with the DIP Budget.

22

(m)   **Intercreditor Provisions**.   The respective rights of the DIP Secured Parties and the Prepetition Term Lender Secured Parties (including, without limitation, with respect to the DIP Liens, the Prepetition Term Loan Liens, and the Adequate Protection Liens (as defined below)) in all respects shall be subject to the terms and provisions set forth on **Exhibit C** attached hereto (the "DIP Intercreditor Provisions"),[5] which DIP Intercreditor Provisions are hereby incorporated into and form a part of this Interim Order, and are approved in their entirety, and shall be binding on and inure to the benefit of the DIP Secured Parties and the Prepetition Secured Parties.

3.   **Authorization to Use Cash Collateral**.   During the Interim Period and subject to the terms and conditions of this Interim Order and the DIP Financing Documents, and in compliance with the DIP Budget, the Debtors are authorized to use Cash Collateral until the earliest to occur of (a) the Repayment in Full of DIP Obligations (as defined herein), and (b) the date such right to use Cash Collateral otherwise terminates as provided in this Interim Order (unless otherwise consented to in writing by the DIP Agent in its sole discretion).   Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or the Debtors' use of Cash Collateral or other proceeds resulting therefrom, except as expressly permitted in this Interim Order, the DIP Financing Documents, and in compliance with the DIP Budget.

4.   **Adequate Protection**.

(a)   **Adequate Protection Liens**.   Pursuant to sections 361, 363(e), and 364(d) of the Bankruptcy Code, but only to the extent that the Prepetition Term Loan Liens are valid,

---

[5] To the extent there are any inconsistencies between this Interim Order and the DIP Intercreditor Provisions, the provisions of this Interim Order shall control.

56101252v1

binding, enforceable, non-avoidable and properly perfected, as adequate protection for the interests of the Prepetition Term Loan Parties in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the Debtors hereby grant to the Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Lenders, continuing, valid, binding, enforceable, and automatically perfected postpetition security interests in and liens on the DIP Collateral and the proceeds thereof (the "Adequate Protection Liens").

(b)      **Priority of Adequate Protection Liens**.  In accordance with the terms of this Interim Order, the Adequate Protection Liens shall be junior only to:

(1)      with regard to the Term Priority Collateral securing the Term Priority Obligations, (i) the Carve-Out, (ii) the Prepetition Term Loan Liens; and (iii) any Other Prepetition Senior Liens; and

(2)      with regard to all other DIP Collateral other than the Term Priority Collateral securing the Term Priority Obligations, (i) the Carve-Out; (ii) the DIP Liens; and (iii) any Other Prepetition Senior Liens.

The Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral.

(c)      **Adequate Protection Superpriority Claims**.  To the extent that the Prepetition Term Loan Liens are valid, binding, enforceable, non-avoidable and properly perfected, as further adequate protection against any Diminution in Value of the Prepetition Term Loan Parties in the Prepetition Collateral, the Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Lenders, is hereby granted, as and to the extent provided

24

by sections 503(b) and 507(b) of the Bankruptcy Code, a separate allowed superpriority administrative expense claim in the Chapter 11 Cases and any Successor Cases (the foregoing superpriority claims shall be referred to as the "Adequate Protection Superpriority Claims"); provided, that, the Adequate Protection Superpriority Claims shall attach to Avoidance Actions only after entry of the Final Order.  Except with respect to the (i) DIP Liens, (ii) DIP Superpriority Claim, and (iii) Carve-Out, the Adequate Protection Superpriority Claims (x) shall have priority in these Chapter 11 Cases under sections 105, 364(c)(1), 503(b), and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature of the kinds specified in or ordered pursuant to sections 503(b) or 507(b) of the Bankruptcy Code, and, if approved in the Final Order, section 506(c) of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, and (y) no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these Chapter 11 Cases, or in any Successor Cases, and no priority claims are, or will be, senior to, prior to or on a parity with the Adequate Protection Superpriority Claims.

(d)     **Section 507(b) Reservation**.  Nothing herein shall impair or modify the Prepetition Term Loan Parties' rights under section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Term Loan Parties hereunder is insufficient to compensate for any Diminution in Value of its interests in the Prepetition Collateral during these Chapter 11 Cases or any Successor Cases, provided, however, that any section 507(b) claim granted in these Chapter 11 Cases or any Successor Case to the Prepetition

Term Loan Parties shall be junior in the right of payment to all DIP Obligations and subject to the Carve-Out.

5.    **Right to Credit Bid**.  The DIP Agent, on behalf of itself and the DIP Lenders, shall have the right to credit bid the amount of all accrued DIP Obligations during any sale of the DIP Collateral (which credit bid rights under section 363(k) of the Bankruptcy Code or otherwise shall not be impaired in any manner), including without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any reorganization plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code or otherwise.

6.    **Perfection of DIP Liens and Adequate Protection Liens**.

(a)    **No Filings Necessary to Perfect.**  All security interests, liens, mortgages, deeds of trust and other interests and rights granted by the Debtors in favor of (i) the DIP Secured Parties pursuant to this Interim Order and the DIP Financing Documents, and (ii) the Prepetition Term Loan Parties pursuant to this Interim Order, shall be valid, binding, enforceable and automatically perfected.  This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens and the Adequate Protection Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement or mortgage agreement) to validate or perfect the DIP Liens  and the Adequate Protection Liens or to entitle the DIP Liens and the Adequate Protection Liens to the priorities granted in this Interim Order.  Notwithstanding the foregoing, the DIP Agent and the Prepetition Term Loan Agent may, each in their sole discretion, file such financing statements, mortgages, notices of liens and other similar documents to perfect in accordance with applicable

26

non-bankruptcy law or to otherwise evidence the applicable DIP Liens or Adequate Protection

Liens, and are hereby granted relief from the automatic stay of section 362 of the Bankruptcy

Code solely in order to do so, and all such financing statements, mortgages, notices and other

documents shall be deemed to have been filed or recorded as of the Petition Date.  Upon the

repayment of the Prepetition ABL Obligations pursuant to this Interim Order, the DIP Agent

shall, in addition to the rights granted to it under the DIP Financing Documents (and without

altering, waiving, or limiting the obligations of the Debtors under the DIP Financing

Documents), be deemed to be the successor in interest to the Prepetition ABL Parties with

respect to all prepetition collateral access agreements, landlord's waivers and all other

agreements with third parties relating to, or waiving claims against, any Prepetition Collateral,

including without limitation, each collateral access agreement and/or landlord's waiver duly

executed and delivered by any landlord of the Debtors and including, for the avoidance of doubt,

all account control agreements, and any and all non-Debtor counterparties to any of the

foregoing agreements shall continue to honor such agreements.

        (b)  **Debtors' Cooperation With Perfection Filings**.  The Debtors shall

execute and deliver to the DIP Agent and the Prepetition Term Loan Agent all such financing

statements, mortgages, notices and other documents as such parties may reasonably request to

evidence, confirm, validate or perfect, or to insure the contemplated priority of, the DIP Liens

and the Adequate Protection Liens.  The DIP Agent and the Prepetition Term Loan Agent, in

their respective sole discretion, may file a photocopy of this Interim Order as a financing

statement with any recording officer designated to file financing statements or with any registry

of deeds or similar office in any jurisdiction in which any Debtor has real or personal property,

and in such event, the recording officer shall be authorized to file or record such copy of this

Interim Order.

(c)    **Release of Prepetition ABL Liens**.    Upon the repayment of the Prepetition ABL Obligations pursuant to this Interim Order, (a) the Prepetition ABL Agent shall execute and deliver to the DIP Agent all documents needed to terminate any and all financing statements, mortgages, notices and other documents evidencing the Prepetition ABL Liens; and (b) the DIP Agent is authorized to file, register, or otherwise record a photocopy of this Interim Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Prepetition ABL Liens on the Prepetition Collateral.

7.    **Reservation of Certain Third Party Rights and Bar of Challenges and Claims**.    Nothing in this Interim Order or the DIP Financing Documents shall prejudice the rights of any Committee or any other party in interest, in each case solely to the extent the Committee or such other parties in interest have been granted standing, to seek, solely in accordance with this paragraph 7, to assert claims against the Prepetition ABL Parties on behalf of the Debtors, their creditors or interest holders or to otherwise challenge any of the Debtors' Prepetition Secured Lien Stipulations.    The Committee or such parties in interest, (i) in each case solely to the extent they have been granted standing at such time, must commence a contested matter or adversary proceeding, or (ii) if they have not been granted any such standing, must file a motion for approval to commence and prosecute an adversary proceeding or contested matter (with a draft complaint attached thereto), raising such objection or challenge, including without limitation, asserting any claim against any Prepetition Secured Party in the nature of a setoff, counterclaim or defense to, as applicable, the Prepetition Secured Obligations (including but not limited to, those under sections 506, 544, 547, 548, 549, 550 and/or 552 of the Bankruptcy Code or by way of suit against the Prepetition Secured Party), within (a) in the case of the Committee

28

and any other party in interest, 60 days following the entry of the Final Order, or (b) such later date consented to in writing by the applicable Prepetition Secured Party in its sole discretion (the "Challenge Period").    The date that is the next calendar day after the termination of the Challenge Period, in the event that no objection or challenge is raised during the Challenge Period, shall be referred to as the "Challenge Period Termination Date."    Upon the Challenge Period Termination Date, any and all such challenges, claims, causes of action and objections by any party (including, without limitation, the Committee, any chapter 11 or chapter 7 trustee appointed herein or in any Successor Cases, and any other party in interest) shall be deemed to be forever waived and barred, and the Prepetition ABL Obligations shall be deemed to be allowed in full as secured claims within the meaning of section 506 of the Bankruptcy Code for all purposes in connection with these Chapter 11 Cases or any Successor Cases, and the Debtors' Prepetition Secured Lien Stipulations shall be binding on all creditors, interest holders and parties in interest (including, without limitation, the Committee, any chapter 11 or chapter 7 trustee appointed herein or in any Successor Cases).    For the avoidance of doubt, no challenge commenced against any Prepetition ABL Party or any relief granted pursuant to any such challenge, shall in any manner impact, impair or alter the validity, priority or enforceability of the DIP Protections or any rights, claims, benefits and entitlements granted to the DIP Secured Parties pursuant to this Interim Order or the DIP Financing Documents.

        8.    **Carve-Out Provisions.**

        (a)    **Carve-Out.**    All liens and claims granted by this Interim Order shall be subject to the Carve-Out.  As used in this Interim Order and the DIP Financing Documents, the "Carve-Out" shall mean:

(i) quarterly fees required to be paid to the United States Trustee pursuant to 28 U.S.C. §1930(a)(6) and any fees payable to the clerk of the Bankruptcy Court;

(ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an aggregate amount not to exceed $25,000;

(iii) all accrued and unpaid claims for fees and expense reimbursements of Case Professionals (as defined below) retained by the Debtors (but not any success or transaction fees) incurred during the period prior to the Carve-Out Trigger Date (as defined below), subject to such accrued and unpaid fees and expense reimbursements becoming Allowed Fees (as defined below);

(iv) with respect to Case Professionals retained by the Committee, if any, all accrued and unpaid claims for fees and expense reimbursements of such Case Professionals incurred prior to the Carve-Out Trigger Date but not to exceed the amounts for such Case Professionals set forth in the DIP Budget for such period, subject to such accrued and unpaid fees and expense reimbursements becoming Allowed Fees; and

(v) an aggregate amount for unpaid fees and expense reimbursements of all Case Professionals incurred after the Carve-Out Trigger Date not to exceed $2,000,000 (the "Professionals Expense Cap"), subject to such fees and expense reimbursements becoming Allowed Fees; provided, however, that any payments actually made to fund unpaid fees and expenses of Case Professionals incurred on or after the Carve-Out Trigger Date shall reduce the Professionals Expense Cap on a dollar for dollar basis.

The Professionals Expense Cap shall be automatically reduced, on a dollar for dollar basis, by

30

(i) the amount of any unused retainers held by Case Professionals on the Carve-Out Trigger

Date and (ii) the amount by which Estimated Professional Fee Escrow Deposits (as defined

below) exceeds the actual amount of fees and expenses incurred by Case Professionals in the

period prior to the Carve-Out Trigger Date.  Any unused retainers held by Case Professionals

on the Petition Date shall be used to pay any Allowed Fees of such Case Professionals before

any payment of such Allowed Fees are made from the Carve-Out Account (as defined below)

or otherwise from the DIP Facility or DIP Collateral.  As used herein, the terms: (i) "Allowed

Fees" shall mean fees and expense reimbursement of Case Professionals solely to the extent

such fees and expenses have been approved, on a final basis, by an order of this Court that has

not been vacated or stayed; (ii) "Case Professionals" shall mean attorneys, accountants,

financial advisors, consultants and other professionals employed, pursuant to sections 327, 328

or 1103 of the Bankruptcy Code, as applicable, by the Debtors or any Committee; and (iii)

"Carve-Out Trigger Date" shall mean the first business day after the DIP Agent provides notice

(the "Carve-Out Trigger Notice") to the Debtors of the occurrence of an Event of Default.  The

Carve-Out and any payments made in respect of the Carve-Out shall not reduce (but shall be

added to and made a part of)  the DIP Obligations, and shall be otherwise entitled to the

protections granted under this Interim Order, the DIP Financing Documents, the Bankruptcy

Code and applicable law.

(b)   **No Direct Payment Obligation.**  Without limiting (and solely to the

extent of) its obligations to fund the Carve-Out, the DIP Secured Parties shall not be

responsible for (i) the direct payment or reimbursement of any fees or disbursements of Case

Professionals incurred in connection with the Chapter 11 Cases, any Successor Cases or

otherwise, or (ii) the administration and maintenance of the Carve-Out Account or the

31

disbursement of funds from the Carve-Out Account to pay Case Professionals. Nothing in this Interim Order or otherwise shall be construed: (i) to obligate the DIP Secured Parties in any way to pay compensation to or to reimburse expenses of any Case Professional, or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement; or (ii) to increase the Carve-Out if Allowed Fees are higher in fact than the amounts subject to the Carve-Out as set forth in this Interim Order.

(c)    **Carve-Out Account**. (i) Within one business day following the entry of this Interim Order and continuing until the Carve-Out Trigger Date, the Debtors shall draw upon the DIP Facility and deposit into an interest-bearing escrow account at a financial institution acceptable to the DIP Agent (the "Carve-Out Account") an amount equal to the sum of (x) 120% of the fees and expense reimbursements for Case Professionals budgeted for the first week set forth in the DIP Budget, plus (y) $2,000,000 (*i.e.*, an amount equal to the maximum Professionals Expense Cap), and (ii) thereafter, on each subsequent Friday (or if such day is not a business day, then the next business day), the Debtors shall deposit into the Carve-Out Account an amount equal to 120% of the aggregate fees and expense reimbursements for Case Professionals for the next upcoming unfunded week set forth in the DIP Budget (all amounts deposited into the Carve-Out Account pursuant to clauses (i) and (ii), hereinafter the "Estimated Professional Fee Escrow Deposits"). All Allowed Fees for periods in which amounts were deposited into the Carve-Out Account shall be paid to the applicable Case Professional from the Carve-Out Account in accordance with the order or orders of the Court allowing such Allowed Fees; provided, however, that the $2,000,000 deposited pursuant to subsection (i)(y) above shall not be used to pay any fees or expense reimbursements incurred prior to the Carve-Out Trigger Date, and such deposited amount shall be deemed segregated in

a sub-account separate from the other Estimated Professional Fee Escrow Deposits. The Carve-Out Account and the proceeds on deposit in the Carve-Out Account shall be available and used only to satisfy obligations of Case Professionals benefitting from the Carve-Out. The DIP Agent and the DIP Lenders shall retain automatically perfected and continuing first priority security interests in any residual interest in the Carve-Out Account available following satisfaction in full of all obligations benefiting from the Carve-Out (the "Residual Carve-Out Amount"). The Debtors will provide, on every other Wednesday commencing on the third Wednesday following the Petition Date, (x) a bi-weekly accounting to the DIP Agent of all deposits to and disbursements from the Carve-Out Account (together with copies of all current bank statements relating to the Carve-Out Account); and (y) a bi-weekly summary of all fees and expense reimbursements of all Case Professionals actually accrued for the two week period ended (and on a cumulative basis since the Petition Date) the Saturday ten days prior to such date, together with a variance report comparing such fees and expense reimbursements to the DIP Budget. Promptly (but in no event later than 5 business days) following the satisfaction in full of all obligations benefiting from the Carve-Out, the Debtor (or, if applicable, the trustee in any Successor Case), is hereby authorized and directed to deliver the Residual Carve-Out Amount, if any, to the DIP Agent for application to the DIP Obligations, if any.

(d)     **No Waiver of Right to Object to Fees; Payment of Compensation**. Nothing in this Interim Order shall be construed as consent to the allowance of any fees or expense reimbursements of any Case Professionals or shall affect the right of the DIP Secured Parties to object to the allowance and payment of such fees and expense reimbursements or to permit the Debtors to pay any such amounts not set forth in the DIP Budget.

33

9.      **Limitations on Use of DIP Facility, DIP Collateral, Cash Collateral, and Carve-Out**.  The DIP Facility, DIP Collateral, Cash Collateral and Carve-Out may not be used: (a) in connection with or to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type (i) adverse to the interests of DIP Agent, DIP Lenders, or the Prepetition ABL Parties, or their respective rights and remedies under the DIP Financing Documents, the Prepetition ABL Credit Documents or this Interim Order, as applicable, including, without limitation, for the payment of any services rendered by professionals retained by the Debtors or any Committee in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration or similar relief, (ii) invalidating, setting aside, avoiding or subordinating, in whole or in part, the DIP Obligations or the Prepetition ABL Obligations, (iii) for monetary, injunctive or other affirmative relief against any DIP Agent, DIP Lender, or Prepetition ABL Party, or their respective collateral, or (iv) preventing, hindering or otherwise delaying the exercise by the DIP Agent or the DIP Lenders of any rights and/or remedies under this Interim Order, the DIP Financing Documents, or applicable law, or the enforcement or realization (whether by foreclosure, credit bid, further order of the Court or otherwise) by the DIP Agent or the DIP Lenders upon any of the DIP Collateral; (b) to make any distribution under a plan of reorganization in any of the Chapter 11 Cases; (c) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the DIP Agent and the Required Lenders; (d) to pay any fees or similar amounts to any person who has proposed or may propose to purchase interests in the Debtors without the prior written consent of the DIP Agent and the

34

56101252v1

Required Lenders; (e) to object to, contest, or interfere with in any way the DIP Agent's or any DIP Lender's enforcement or realization upon any of the DIP Collateral once an Event of Default has occurred; (f) to use or seek to use Cash Collateral or to sell or otherwise dispose of DIP Collateral without the consent of the DIP Agent and the Required Lenders; (g) to object to or challenge in any way the claims, liens, or interests (including interests in the Prepetition Collateral or DIP Collateral) held by or on behalf of the DIP Agent, the DIP Lenders, or the Prepetition ABL Parties; (h) to assert, commence or prosecute any claims or causes of action whatsoever, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against the DIP Agent, DIP Lenders, or the Prepetition ABL Parties; (i) to prosecute an objection to, contest in any manner, or raise any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the Prepetition ABL Obligations, Prepetition ABL Liens, DIP Obligations or DIP Liens or any other rights or interests of the Prepetition ABL Parties, the DIP Agent or DIP Lenders; (j) to seek the modification, stay, or amendment of this Interim Order or any of the DIP Financing Documents; (k) to prevent, hinder or otherwise delay the exercise by the DIP Agent, DIP Lenders or the Prepetition ABL Parties of any rights and remedies granted under this Interim Order; or (l) to distribute or contribute to, or otherwise use for payments or liabilities of, for or on behalf of, directly or indirectly, any subsidiary of the Borrower that is not a DIP Loan Party other than in accordance with the DIP Budget.  Notwithstanding the foregoing, an aggregate amount not to exceed $35,000 of the DIP Facility (subject to the entry of the Final Order), the DIP Collateral, Cash Collateral and Carve-Out may be used by any Committee to investigate the Prepetition Secured Liens within the Challenge Period.

10.     **Additional Covenants and DIP Protections**:  Without in any manner limiting the terms or requirements of the DIP Financing Documents or this Interim Order:

(a)      the Debtors shall convene on the Tuesday immediately after the Petition Date, and during each week thereafter (at a designated time mutually acceptable to the Debtors and the DIP Agent) a telephonic conference call or calls (or, if requested by the DIP Agent, an in person meeting or meetings) among members of management of the Debtors, and representatives of the DIP Agent for the purpose of discussing (i) the Debtors' weekly results, (ii) any other matter relating to or bearing upon the financial and operational performance of the Debtors, or their actual and anticipated collections, and (iii) such other matters as shall be requested by the DIP Agent;

(b)      without in any manner altering the Debtors' obligations under the DIP Financing Documents, the Debtors shall not propose, file, support or pursue confirmation of a chapter 11 plan unless such plan provides for the Repayment in Full of DIP Obligations; and

(c)      the Debtors shall comply with the milestones (the "Milestones") set forth in **Exhibit B** attached hereto; provided, however, that any such Milestones may be extended without further order of the Court upon the prior written consent of the DIP Agent and the Required Lenders in their sole and absolute discretion.

11.      **Section 506(c) Claims**.  Nothing contained in this Interim Order or the DIP Financing Documents shall be deemed a consent by the DIP Secured Parties to any charge, security interest, lien, assessment or claim against the DIP Collateral under section 506(c) of the Bankruptcy Code or otherwise.  Subject to entry of the Final Order, the Debtors hereby waive any right they may have to seek to impose any charge, security interest, lien, assessment or claim against the DIP Secured Parties' interests in the DIP Collateral under section 506(c) of the Bankruptcy Code or otherwise.  Upon entry of the Final Order, and except with respect to the Carve-Out, no costs or expenses of administration which have been or may be incurred in the

36

Chapter 11 Cases or any Successor Cases at any time shall be charged against the DIP Secured Parties, their claims, or DIP Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the DIP Agent and the Required Lenders, and no such consent shall be implied from any other action, inaction or acquiescence by the DIP Agent or the Required Lenders.

12.      **Collateral Rights**.   Unless the DIP Agent and the Required Lenders have provided their prior written consent or (i) all DIP Obligations have been indefeasibly paid in full in cash (or will be paid in full in cash upon entry of an order approving indebtedness described in subparagraph (a) below), (ii) all commitments to lend have terminated, and (iii) all indemnity obligations under the DIP Credit Agreement have been cash collateralized (the actions set forth in clauses (i), (ii) and (iii), collectively, "Repayment in Full of DIP Obligations"), there shall not be entered in these Chapter 11 Cases, or in any Successor Cases, any order which authorizes any of the following:

(a)      the obtaining of credit or the incurring of indebtedness, pursuant to sections 364(c) or 364(d) of the Bankruptcy Code, that is secured by a security, mortgage, or collateral interest or other lien on all or any portion of the DIP Collateral and/or entitled to priority administrative status which is equal or senior to those granted to the DIP Secured Parties; or

(b)      relief from stay by any person holding or asserting liens junior to the liens of the DIP Secured Parties on all or any portion of the DIP Collateral; or

(c)      the Debtors' return of goods constituting DIP Collateral pursuant to section 546(h) of the Bankruptcy Code.

37

13.      **Disposition of Collateral**.  The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, without the prior written consent of the DIP Agent and the Required Lenders (and no such consent shall be implied, from any other action, inaction or acquiescence by the DIP Agent or the Required Lenders, or an order of this Court), except: (i) for sales of the Debtors' inventory in the ordinary course of business and otherwise in compliance with the DIP Credit Agreement, (ii) as otherwise provided for in the DIP Credit Agreement and this Interim Order, or (iii) as otherwise approved by the Court and consented to by the DIP Agent and the Required Lenders.

14.      **Proceeds of Subsequent Financing**.  If at any time prior to the Repayment in Full of DIP Obligations, any of the Debtors, any trustee, examiner with enlarged powers or any responsible officer subsequently appointed, shall obtain credit or incur debt pursuant to section 364(b), 364(c), or 364(d) of the Bankruptcy Code whether or not in violation of the DIP Credit Agreement, any other DIP Financing Documents or this Interim Order, then all of the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent and applied to the DIP Obligations as set forth in the DIP Credit Agreement.  For the sake of clarity, if at any time prior to the Repayment in Full of DIP Obligations, any of the Debtors, any trustee, examiner with enlarged powers or any responsible officer subsequently appointed, shall receive proceeds from the sale of any DIP Collateral, then all of the cash proceeds derived from such shall be applied in accordance with the terms of the DIP Financing Documents and section 2(d) of this Interim Order.

15.      **Events of Default**.

The following shall constitute an event of default under this Interim Order, unless expressly waived in writing by the DIP Agent and the Required Lenders (collectively, the

38

"Events of Default"):

(a)    the occurrence of the "Maturity Date" (as defined in the DIP Credit Agreement) without the Repayment in Full of DIP Obligations on or before such date or, if sooner, the occurrence of an "Event of Default" under the DIP Financing Documents (after giving effect to any applicable notice, cure and grace period in the relevant DIP Financing Documents);

(b)    the failure by the Debtors to satisfy any of the Milestones, provided, however, that the DIP Agent and the Required Lenders may agree to an extension of any of the Milestone dates in their sole and absolute discretion;

(c)    the failure by the Debtors to observe or perform any of the terms, provisions, conditions, covenants or obligations under this Interim Order;

(d)    the reversal, vacatur or modification of any provision of this Interim Order; or

(e)    the failure of the Debtors to obtain entry of the Final Order on or before the date which is thirty (30) days after the Petition Date.

Until the Repayment in Full of DIP Obligations, the DIP Protections afforded to the DIP Secured Parties pursuant to this Interim Order and under the DIP Financing Documents, and any actions taken pursuant thereto, shall survive the entry of any order confirming a plan of reorganization or converting any of these Chapter 11 Cases to a Successor Case, and the DIP Protections shall continue in these Chapter 11 Cases and in any Successor Cases, and the DIP Protections granted herein shall maintain their priorities as provided by this Interim Order.

39

16.    **Rights and Remedies Upon Event of Default**.

(a)    Immediately upon the occurrence and during the continuation of an Event of Default, the DIP Agent may, or shall, at the direction of the Required Lenders, declare (W) all DIP Obligations owing under the DIP Financing Documents to be immediately due and payable, (X) the termination, reduction or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains in effect, (Y) the termination of the DIP Credit Agreement and any other DIP Financing Documents as to any future liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the DIP Liens or the DIP Obligations, and/or (Z) a termination, reduction or restriction on the ability of the Debtors to use Cash Collateral (any such declaration by the DIP Agent shall be referred to herein as a "Termination Declaration").   The Termination Declaration shall be given by email (or other electronic means) to counsel to the Debtors, counsel to the DIP Agent, counsel to the Prepetition Secured Agents, counsel to any Committee and the United States Trustee (the date any such Termination Declaration is made shall be referred to herein as the "Termination Declaration Date").

(b)    The DIP Obligations shall be due and payable, without notice or demand, on the Termination Declaration Date.   From and after the Termination Declaration Date, the Debtors shall not have any right to use, and the Debtors and other parties in interest shall not seek authority to use, Cash Collateral without the express written consent of the DIP Agent and the Required Lenders in their sole discretion.   Any automatic stay otherwise applicable to the DIP Agent or the DIP Lenders is hereby modified so that five (5) days after the Termination Declaration Date (the "Remedies Notice Period"), the DIP Agent and the DIP Lenders shall be entitled to exercise all rights and remedies against the DIP Collateral in accordance with the DIP

40

Financing Documents and this Interim Order and shall be permitted to satisfy the DIP

Obligations and DIP Superpriority Claims, subject to the Carve-Out.   During the Remedies

Notice Period, the Debtors or the Committee shall be entitled to seek an emergency hearing with

the Court for the sole purpose of contesting whether an Event of Default has occurred and/or is

continuing, and seeking other relief in the event it is determined that an Event of Default has not

occurred and/or is continuing.   Unless the Court determines during the Remedies Notice Period

that an Event of Default has not occurred and/or is not continuing, the automatic stay shall

automatically be terminated at the end of the Remedies Notice Period without further notice or

order, and the Debtors (and all other parties in interest) shall have no right to use or seek to use

Cash Collateral, and the DIP Agent and the DIP Lenders shall be permitted to exercise all

remedies set forth herein, in the DIP Credit Agreement and the DIP Financing Documents, as

applicable, and as otherwise available at law against the DIP Collateral, without further order of

or application or motion to the Court, and without restriction or restraint by any stay under

sections 362 or 105 of the Bankruptcy Code, or otherwise, against the enforcement of the liens

and security interests in the DIP Collateral or any other rights and remedies granted to the DIP

Agent and the DIP Lenders with respect thereto pursuant to the DIP Credit Agreement, DIP

Financing Documents or this Interim Order.   The rights and remedies of the DIP Agent and the

DIP Lenders specified herein are cumulative and not exclusive of any rights or remedies that the

DIP Agent and the DIP lenders may have under the DIP Financing Documents or otherwise.

Unless the Court determines during the Remedies Notice Period that an Event of Default has not

occurred and/or is not continuing, upon the expiration of the Remedies Notice Period the Debtors

shall cooperate fully with the DIP Agent and the DIP Lenders in their exercise of rights and

remedies, whether against the DIP Collateral or otherwise, including, without limitation,

41

executing and delivering any documents or other instruments, or filing any motions, applications or pleadings requested by the DIP Agent in furtherance of the exercise of any such rights and remedies.

(c)     If the DIP Agent and/or the DIP Lenders exercise any of their rights and remedies upon the occurrence of an Event of Default under the DIP Financing Documents, the DIP Agent may, or shall, at the direction of the Required Lenders, retain one or more agents to sell, lease or otherwise dispose of the DIP Collateral.  In any exercise of its rights and remedies upon an Event of Default under the DIP Financing Documents, the DIP Agent and the DIP Lenders are authorized to proceed under or pursuant to the DIP Financing Documents.

(d)     Notwithstanding anything contained herein to the contrary and without limiting any other rights or remedies of the DIP Agent, for the benefit of the DIP Lenders, contained in this Interim Order or the DIP Financing Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Financing Documents and this Interim Order, following the Remedies Notice Period, and upon written notice to the landlord of any leased premises that an Event of Default has occurred under the DIP Financing Documents, the DIP Agent may, or shall, at the direction of the Required Lenders, subject to any separate agreement by and between such landlord and the DIP Agent (including, without limitation, any prepetition collateral access agreement, landlord waiver, or similar agreement to which the DIP Agent succeeds to the rights of the Prepetition ABL Parties pursuant to this Interim Order (each, a "Separate Agreement"), enter upon any leased premises of the Debtors for the purpose of exercising any remedy with respect to DIP Collateral located thereon and, subject to any Separate Agreement, shall be entitled to all of the Debtors' rights and privileges as lessee under such lease without interference from such landlord; provided, however, that, subject to any such

42

Separate Agreement, the DIP Agent (on behalf of the DIP Lenders) shall only be obligated to pay rent of the Debtors that first accrues after the written notice referenced above and that is payable during the period of such occupancy by the DIP Agent (on behalf of the DIP Lenders), calculated on a per diem basis. Nothing herein shall require the DIP Agent or the DIP Lenders to assume any lease as a condition to the rights afforded to the DIP Agent in this paragraph.

17.  **Proofs of Claim**.  The DIP Secured Parties will not be required to file proofs of claim in the Chapter 11 Cases or any Successor Cases on account of the DIP Obligations, and the Prepetition ABL Parties will not be required to file proofs of claim in the Chapter 11 Cases or any Successor Cases on account of the Prepetition ABL Obligations.

18.  **Other Rights and DIP Obligations**.

(a)  **Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of Interim Order**.  Based on the findings set forth in this Interim Order and in accordance with section 364(e) of the Bankruptcy Code, with respect to amounts advanced pursuant to this Interim Order, in the event any or all of the provisions of this Interim Order are hereafter reversed or modified by a subsequent order of this or any other Court, the DIP Secured Parties are entitled to the protections provided in section 364(e) of the Bankruptcy Code and, provided that the Interim Order is not stayed pending appeal, no such reversal or modification shall affect the validity and enforceability of any advances made under the DIP Facility or the liens or priority authorized or created hereby.  Notwithstanding any such reversal or modification, any claim granted to the DIP Secured Parties hereunder arising prior to the effective date of such reversal or modification of any DIP Protections granted to the DIP Secured Parties shall be governed in all respects by the original provisions of this Interim Order, and the DIP Secured Parties shall be entitled to all of the rights, remedies, privileges and benefits,

43

including the DIP Protections granted herein, with respect to any such claim, provided that the Interim Order was not stayed at the time the claim arose. Because the loans made pursuant to the DIP Credit Agreement are made in reliance on this Interim Order, the obligations owed the DIP Secured Parties prior to the effective date of any reversal or modification of this Interim Order cannot, as a result of any subsequent order in the Chapter 11 Cases or in any Successor Cases or otherwise, be subordinated, lose their lien priority or superpriority administrative expense claim status, or be deprived of the benefit of the status of the liens and claims granted to the DIP Secured Parties under this Interim Order and/or the DIP Financing Documents, provided that the Interim Order was not stayed.

(b)   **Discharge Waiver.**   The Debtors expressly stipulate, and the Court finds and adjudicates that the DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the Repayment in Full of DIP Obligations has occurred on or before the effective date of a confirmed plan of reorganization. The Debtors shall not propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets or entry of any confirmation order or sale order that is not conditioned upon the Repayment in Full of DIP Obligations on the effective date of such plan of reorganization or sale.

(c)   **Binding Effect**.   All of the provisions of this Interim Order shall be binding upon and inure to the benefit of the DIP Secured Parties, the Debtors, any Committee, all other creditors of the Debtors and all other parties-in-interest, and their respective successors and assigns (including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of the estates of the Debtors) whether in these Chapter

44

11 Cases, in any Successor Cases, or upon dismissal of any of the Chapter 11 Cases or any Successor Cases.

(d)   **No Waiver**.   The failure of the DIP Secured Parties to seek relief or otherwise exercise their respective rights and remedies, as applicable, under the DIP Financing Documents, this Interim Order or otherwise, shall not constitute a waiver of any of the DIP Secured Parties' rights hereunder, thereunder, or otherwise.   Notwithstanding anything herein, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair the rights of the DIP Secured Parties under the Bankruptcy Code or under non-bankruptcy law, including without limitation, the rights of the DIP Secured Parties to (i) request conversion of the Chapter 11 Cases to cases under chapter 7, dismissal of the Chapter 11 Cases, or the appointment of a trustee in the Chapter 11 Cases; (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code and this Interim Order, a plan of reorganization; and (iii) exercise any of the rights, claims or privileges (whether legal, equitable or otherwise) the DIP Secured Parties may have pursuant to this Interim Order or the DIP Financing Documents, or applicable law.

(e)   **No Third Party Rights**.   Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, landlord, lessor, equity holder or any direct, indirect, or incidental beneficiary.

(f)   **No Marshaling**.   The DIP Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.

(g)   **Section 552(b)**.   The DIP Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code.   The "equities of the case"

45

exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Secured Parties with respect to proceeds, product, offspring or profits of any of the DIP Collateral.

(h) **Amendment of DIP Financing Documents**.  The Debtors and the DIP Agent (after having obtain any approvals required of the requisite lenders as required under the DIP Credit Agreement) may amend or waive any provision of the DIP Financing Documents without further order of this Court, provided that such amendment or waiver, in the reasonable judgment of the Debtors and the DIP Agent, is not material.  Except as otherwise provided herein, no waiver, modification, or amendment of any of the provisions of the DIP Financing Documents shall be effective unless set forth in writing, signed by on behalf of the Debtors and the DIP Agent (after having obtain any approvals required of the requisite lenders as required under the DIP Credit Agreement).

19. **Limitation of Liability**.  In determining to provide the DIP Facility, permitting the use of Cash Collateral, or enforcing the rights and remedies afforded to such parties under this Interim Order and/or the DIP Financing Documents, none of the DIP Secured Parties shall be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used  in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§9601 *et seq*. as amended, or any similar federal statute).  Furthermore, nothing in this Interim Order or in the DIP Financing Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties any liability for any claims arising from the prepetition or postpetition activities of the Debtors.

56101252v1

20.     **Release and Indemnification of DIP Secured Parties**.   The Debtors shall defend, indemnify, hold harmless and release the DIP Secured Parties and the Indemnified Persons (as defined in the DIP Credit Agreement) to the extent set forth in the DIP Financing Documents.

21.     **Survival of Interim Order**.   All of the provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (a) confirming any chapter 11 plan in the Chapter 11 Cases, (b) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or any Successor Cases, (c) dismissing any of the Chapter 11 Cases, (d) withdrawing of the reference of any of the Chapter 11 Cases from this Court, or (e) providing for abstention from handling or retaining of jurisdiction of any of the Chapter 11 Cases in this Court.   The terms and provisions of this Interim Order, including the DIP Protections granted pursuant to this Interim Order and the DIP Financing Documents and any protections granted to the Prepetition ABL Parties, shall continue in full force and effect notwithstanding the entry of such order, and such DIP Protections and protections granted to the Prepetition ABL Parties shall maintain their priority as provided by this Interim Order until (i) in the case of the DIP Secured Parties, until all of the DIP Obligations of the Debtors to the DIP Secured Parties pursuant to the DIP Financing Documents (and this Interim Order) have been indefeasibly paid in full and discharged (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms); (ii) in the case of the Prepetition ABL Parties, until all of the Prepetition ABL Obligations of the Debtors to the Prepetition ABL Parties pursuant to the Prepetition ABL Credit Documents have been paid in full and discharged; and (iii) in the case of the Prepetition Term Loan Parties, until all of the Prepetition Term Loan Obligations of the Debtors to the Prepetition Term Loan Parties pursuant

47

to the Prepetition Term Loan Documents have been paid in full and discharged (including, without limitation, any and all adequate protection obligations and claims in respect thereof).

(a) **Inconsistency**.  In the event of any inconsistency between the terms and conditions of the DIP Financing Documents and of this Interim Order, the provisions of this Interim Order shall govern and control.

(b) **Enforceability**.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry of this Interim Order. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.  The rights of all parties in interest to object to the terms of the Final Order, the DIP Credit Agreement and any other DIP Financing Document at the Final Hearing are expressly reserved.

(c) **Objections Overruled**.  All objections to the Motion and the entry of this Interim Order to the extent not withdrawn or resolved, are hereby overruled.

(d) **No Waivers or Modification of Interim Order**.  The Debtors irrevocably waive any right to seek any modification or extension of this Interim Order without the prior written consent of the DIP Agent and the Required Lenders and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Agent or the Required Lenders.

56101252v1

22.    **Headings**.  All paragraph headings used in this Interim Order are for ease of reference only and are not to affect the construction hereof or to be taken into consideration in the interpretation hereof.

23.    **Final Hearing**.

(a)    The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility shall be held before The Honorable [\_\_\_\_\_] at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, [\_\_] Floor, Courtroom [\_\_], New York, New York on **[\_\_\_\_\_], 2016 at [\_\_:\_\_] [a/p.m.] (prevailing Eastern Time)**.  If no objections to the relief sought in the Final Hearing are filed and served in accordance with this Interim Order, no Final Hearing may be held, and a separate Final Order may be presented by the Debtors and entered by this Court.

(b)    On or before [\_\_\_\_\_], 2016, the Debtors shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "Final Hearing Notice"), together with copies of this Interim Order and the Motion, on: (a) the parties having been given notice of the Interim Hearing; (b) any party which has filed prior to such date a request for notices with this Court; (c) counsel for the Committee, if any; (d) the Office of the United States Trustee, (e) the Internal Revenue Service, (f) counsel to the DIP Agent, (g) counsel to the Prepetition Secured Agents, (h) the Debtors' current landlords, (i) the Securities and Exchange Commission, (j) the Office of the Attorney General for the State of New York, (k) the United States Department of Justice, and (l) applicable state taxing authorities.  The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Bankruptcy Court no later than **[\_\_\_\_\_], 2016 at [\_\_:\_\_] [a/p.m.] (prevailing Eastern Time)** which objections shall be served

49

so that the same are received on or before such date by:  (a) counsel for the Debtors, Weil,

Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Ray C. Schrock,

P.C., Jacqueline Marcus and Garrett Fail; (b) counsel for the DIP Agent, Proskauer Rose LLP,

Eleven Times Square, New York, NY 10036, Attn: Scott K. Rutsky and Jared D. Zajac; (c)

counsel for any Committee; and (d) the Office of the United States Trustee for the Southern

District of New York, U.S. Federal Office Building, 201 Varick Street, Room 1006, New York,

New York 10014, Attn: Brian Masumoto and Susan Golden.

     24.    **Retention of Jurisdiction**.  The Court has and will retain jurisdiction to enforce

this Interim Order.

Dated:  May __, 2016

     New York, New York          _____

                                           UNITED STATES BANKRUPTCY JUDGE

50

## <u>Exhibit A</u>

Summary DIP Budget

| 4-5-4 Month / Week Ending / Fiscal Week # / Forecast / Actual | May 7-May Week 14 Forecast | May 14-May Week 15 Forecast | May 21-May Week 16 Forecast | May 28-May Week 17 Forecast | Jun 4-Jun Week 18 Forecast | Jun 11-Jun Week 19 Forecast | Jun 18-Jun Week 20 Forecast | Jun 25-Jun Week 21 Forecast | Jun 2-Jul Week 22 Forecast | Jul 9-Jul Week 23 Forecast | Jul 16-Jul Week 24 Forecast | Jul 23-Jul Week 25 Forecast | Jul 30-Jul Week 26 Forecast | Aug 6-Aug Week 27 Forecast | Aug 13-Aug Week 28 Forecast | Aug 20-Aug Week 29 Forecast | Aug 27-Aug Week 30 Forecast | 18 Week Total Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **I. Cash Flow** | | | | | | | | | | | | | | | | | | |
| 1) Cash Receipts | 23,018 | 22,466 | 23,057 | 25,513 | 21,955 | 21,302 | 21,801 | 20,268 | 22,032 | 19,387 | 21,490 | 22,808 | 29,291 | 36,576 | 35,611 | 31,185 | 25,641 | 423,399 |
| Cash Disbursements | | | | | | | | | | | | | | | | | | |
| 2) Operating Disbursements | (5,832) | (15,382) | (10,520) | (30,141) | (30,815) | (29,717) | (18,762) | (30,021) | (21,159) | (45,880) | (23,411) | (15,109) | (19,171) | (28,681) | (32,100) | (12,214) | (23,152) | (392,067) |
| 3) Financing Disbursements | (715) | - | - | - | (346) | - | - | - | (409) | - | - | - | - | (529) | - | - | - | (1,999) |
| 4) Professional Fees | (4,394) | (3,258) | (1,158) | (1,224) | (1,168) | (1,128) | (1,008) | (1,194) | 200 | (963) | (708) | (708) | (152) | (818) | (708) | (708) | 418 | (18,679) |
| 5) Bankruptcy Related Disbursements | (5,250) | (500) | - | - | (1,341) | (500) | - | (962) | (1,541) | - | - | - | (18,895) | - | - | - | - | (28,989) |
| 6) Total Disbursements | (16,191) | (19,140) | (11,678) | (31,365) | (33,670) | (31,345) | (19,770) | (32,177) | (22,909) | (46,843) | (24,119) | (15,817) | (38,218) | (30,028) | (32,808) | (12,922) | (22,733) | (441,733) |
| 7) Net Cash Flow Before Borrowing/(Pay down) | **6,826** | **3,325** | **11,379** | **(5,852)** | **(11,715)** | **(10,043)** | **2,031** | **(11,909)** | **(877)** | **(27,456)** | **(2,629)** | **6,991** | **(8,927)** | **6,547** | **2,803** | **18,263** | **2,907** | **(18,334)** |
| 8) Beginning Est. Cash Balance - Bank | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| 9) Plus: Net Cash Flow Before Borrowings | 6,826 | 3,325 | 11,379 | (5,852) | (11,715) | (10,043) | 2,031 | (11,909) | (877) | (27,456) | (2,629) | 6,991 | (8,927) | 6,547 | 2,803 | 18,263 | 2,907 | (18,334) |
| 10) Revolver Borrowings / (Pay downs) | (6,826) | (3,325) | (11,379) | 5,852 | 9,715 | 12,043 | (2,031) | 11,909 | (10,764) | 39,097 | 2,629 | (6,991) | (4,713) | 7,093 | (2,803) | (18,263) | (16,548) | 4,693 |
| 11) Change in Float Inc / (Dec) | - | - | - | - | 2,000 | (2,000) | - | - | 11,641 | (11,641) | - | - | 13,641 | (13,641) | - | - | 13,641 | 13,641 |
| 12) Ending Est. Cash Balance - Bank | **3,000** | **3,000** | **3,000** | **3,000** | **3,000** | **3,000** | **3,000** | **3,000** | **3,000** | **3,000** | **3,000** | **3,000** | **3,000** | **3,000** | **3,000** | **3,000** | **3,000** | **3,000** |
| 13) Plus: Outstanding Checks | (1,500) | (1,500) | (1,500) | (1,500) | (3,500) | (1,500) | (1,500) | (1,500) | (13,141) | (1,500) | (1,500) | (1,500) | (15,141) | (1,500) | (1,500) | (1,500) | (15,141) | (15,141) |
| 14) Ending Est. Cash Balance - Book | **1,500** | **1,500** | **1,500** | **1,500** | **(500)** | **1,500** | **1,500** | **1,500** | **(10,141)** | **1,500** | **1,500** | **1,500** | **(12,141)** | **1,500** | **1,500** | **1,500** | **(12,141)** | **(12,141)** |

## **Exhibit B**

Milestones

**Exhibit B**

**Milestones**

(i)      On the Petition Date,[1] the Borrower shall have filed a motion to approve the DIP Credit Agreement, which motion shall be in form and substance reasonably acceptable to the DIP Agent and the Required Lenders. The Interim Order approving the DIP Credit Agreement shall be entered by the Court no later than 3 Business Days (as defined in the DIP Credit Agreement) following the Petition Date, which Interim Order shall be in form and substance acceptable to the DIP Agent and the Required Lenders in their sole and absolute discretion.

(ii)     No later than 30 days after the Petition Date, the Final Order approving the DIP Credit Agreement shall be entered by the Court, which Final Order shall be in form and substance acceptable to the DIP Agent and the Required Lenders in their sole and absolute discretion (and the related motion shall be in form and substance reasonably satisfactory to the DIP Agent and the Required Lenders).

(iii)    No later than 10 days after the Petition Date, the Borrower shall have filed a motion under Section 365 of the Bankruptcy Code, requesting an extension of the date on which the Borrower must assume or reject leases to 210 days after the entry of the order for such relief, with such order being entered by the Court no later than 30 days after the Petition Date (such motion and order to be in form and substance acceptable to the DIP Agent and the Required Lenders in their sole and absolute discretion). The Borrower may not assume, assume and assign, or reject leases without the prior written consent of the DIP Agent and the Required Lenders.

(iv)     (a)      No later than 60 days after the Petition Date the Borrower shall have filed the Plan of Reorganization (as defined in the DIP Credit Agreement) in form and substance reasonably satisfactory to the DIP Agent and the Required Lenders (it being understood and agreed that such Plan of Reorganization shall either repay all outstanding obligations under the DIP Facility in cash on the effective date or provide alternative treatment satisfactory to the DIP Agent and the DIP Lenders in their sole and absolute discretion) and Disclosure Statement (as defined in the DIP Credit Agreement) in form and substance satisfactory to the DIP Agent and the Required Lenders;

         (b)      the Court shall have entered an order approving the Disclosure Statement on or prior to 95 days after the Petition Date;

         (c)      the DIP Loan Parties shall have commenced solicitation on the Plan of Reorganization no later than 100 days after the Petition Date;

         (d)      the Court shall have commenced the hearing to consider confirmation of the Plan of Reorganization on or prior to 130 days after the Petition Date;

         (e)      the Court shall have entered an order confirming the Plan of Reorganization on or prior to 140 days after the Petition Date; and

         (f)      the Plan of Reorganization shall have been consummated on or prior to 145 days after the Petition Date.

---

[1] Capitalized terms used herein but not otherwise defined herein shall have the meaning set forth in the pre-fixed interim order approving postpetition debtor-in-possession financing (the "Interim Order").

(v)        Simultaneously with the plan process outlined in clause (iv) above, the Borrower shall pursue a sale process under Section 363 of the Bankruptcy Code, in accordance with the following timeline:

(a)        No later than 75 days after the Petition Date, the Borrower shall file a motion with the Court to approve bid procedures and establish the date of an auction (the "Auction") to sell all or substantially all of the assets of the Borrower and the Guarantors (the "Bid Procedures Motion"), which shall include a form of a stalking horse sale and purchase agreement ("Stalking Horse SPA"), which shall be in form and substance acceptable to the DIP Agent and the Required Lenders in their reasonable discretion;

(b)        No later than 75 days after the Petition Date, the Borrower shall forward the so-called "bid packages" to any potential bidders, including, without limitation, alternative bid packages to liquidation firms;

(c)        No later than 105 days after the Petition Date, the Court shall have entered an order approving the Stalking Horse SPA and Bid Procedures Motion, which shall be in form and substance acceptable to the DIP Agent and the Required Lenders in their sole and absolute discretion;

(d)        No later than 141 days after the Petition Date, the Borrower shall conduct the Auction;

(e)        No later than 143 days after the Petition Date, the Court shall enter an order approving the sale of the Borrower's assets to the party determined to have made the highest or otherwise best bid for all or substantially all of the assets of the Borrower and the Guarantors (the "Sale Order"), which shall be in form and substance acceptable to the DIP Agent and the Required Lenders in their sole and absolute discretion; and

(f)        No later than 145 days after the Petition Date, the Borrower shall have consummated the sale to the party determined to have made the highest or otherwise best bid for all or substantially all of the assets of the Borrower and the Guarantors in accordance with the Sale Order pursuant to the Stalking Horse SPA or other sale and purchase agreement, which shall be in form and substance acceptable to the DIP Agent and the Required Lenders in their sole and absolute discretion.

It is understood and agreed that the Borrower may choose to abandon the plan process outlined in clause (iv) above at any time.  The Borrower may not abandon the sale process outlined in clause (v) above without the prior written consent of the DIP Agent and Required Lenders.

56097442V1

**<u>Exhibit C</u>**

DIP Intercreditor Provisions

**Exhibit C**

**DIP Intercreditor Provisions**

The terms set forth in this **Exhibit C** constitute the DIP Intercreditor Provisions (as defined in the pre-fixed interim order approving postpetition debtor-in-possession financing (the "Interim Order")) and shall govern the relative rights of the DIP Secured Parties and the Prepetition Term Loan Parties in respect of the DIP Collateral (and the proceeds thereof) with respect to the matters covered by these DIP Intercreditor Provisions. **Capitalized terms used herein but not otherwise defined herein shall have the meaning set forth in the Interim Order.**

The rights and obligations set forth in these DIP Intercreditor Provisions shall not be altered or otherwise affected by (i) any amendment, modification, supplement, extension, increase, replacement, renewal, restatement, or refinancing of any class of DIP Obligations or (ii) the release of any DIP Collateral or of any DIP Loan Party securing or in respect of any DIP Obligations. These DIP Intercreditor Provisions shall remain in full force and effect regardless of whether the Final Order (as defined in the Interim Order) is entered (unless amended, supplemented, stayed, vacated, or otherwise supplemented with the consent of the DIP Agent and, if applicable, the Required Lenders), and regardless of whether the Interim Order remains in full force and effect or is otherwise amended, supplemented, stayed, vacated, or otherwise modified (except to the extent that these DIP Intercreditor Provisions are amended, supplemented, stayed, vacated, or otherwise modified with the consent of the DIP Agent and, if applicable, the Required Lenders).

Solely for purposes of, and as used in, these DIP Intercreditor Provisions, the following terms shall have the meanings set forth below:

"Asset Sale Proceeds Pledge Account" shall mean a Deposit Account subject to a deposit account control agreement in favor of the Prepetition Term Loan Agent in which solely the proceeds from any disposition of Term Priority Collateral are held pending reinvestment pursuant to the Prepetition Term Loan Agreement. For clarity, the amounts on deposit in such Asset Sale Proceeds Pledged Account shall constitute Collateral and Term Priority Collateral.

"Business Day" shall mean any day that is not a Saturday, Sunday or other day on which commercial banks in the Commonwealth of Massachusetts or State of New York are authorized or required by law to remain closed (or are in fact closed).

"Capitalized Leases" shall mean all leases that have been or are required to be, in accordance with GAAP, recorded as capitalized leases; provided that for all purposes hereunder the amount of obligations under any Capitalized Lease shall be the amount thereof accounted for as a liability in accordance with GAAP.

"Collateral" shall mean all Property now owned or hereafter acquired by the any of

the Debtors in or upon which a Lien is granted or purported to be granted to both (i) any of the DIP Secured Parties under the DIP Financing Documents and/or the Interim Order or Final Order and (ii) any of the Prepetition Term Loan Parties under any of the Prepetition Term Loan Documents and/or the Interim Order, Final Order or any other order of the Court, together with all rents, issues, profits, products and Proceeds thereof.

"Commodity Account" shall have the meaning ascribed to it under the Uniform Commercial Code.

"Credit Documents" shall mean the DIP Financing Documents and the Prepetition Term Loan Documents.

"Credit Parties" shall mean the DIP Loan Parties and the Term Credit Parties.

"Deposit Account" shall have the meaning ascribed to it under the Uniform Commercial Code.

"DIP Deposit and Securities Account" shall mean all Deposit Accounts, Securities Accounts, collection accounts and lockbox accounts (and all related lockboxes) of the DIP Loan Parties (other than the Term Loan Priorities Account).

"DIP Loan Party Term Proceeds Notice" shall mean a written notice delivered by a DIP Loan Party to the DIP Agent stating that certain identifiable cash proceeds which may be deposited in a DIP Deposit and Securities Account constitute Term Priority Collateral and reasonably identifying the amount of such proceeds and specifying the origin thereof.

"Discharge of Prepetition Term Loan Obligations" shall mean (i) the payment in full in cash of all outstanding Term Priority Obligations (other than contingent indemnification obligations for which no claim has been asserted) and (ii) with respect to contingent indemnification obligations with respect to known or anticipated claims threatened or asserted in writing, provision of cash collateral in an amount reasonably determined by the Prepetition Term Loan Agent.

"Enforcement Notice" shall mean shall mean a written notice delivered by either the DIP Agent or, following relief from the automatic stay, the Prepetition Term Loan Agent to the other announcing that an Enforcement Period has commenced.

"Enforcement Period" shall mean the period of time following the receipt by either the DIP Agent or the Prepetition Term Loan Agent of an Enforcement Notice from the other and continuing until the earliest of (a) in the case of an Enforcement Period commenced by the Prepetition Term Loan Agent, the Discharge of Prepetition Term Loan Obligations, (b) in the case of an Enforcement Period commenced by the DIP Agent, the Repayment in Full of DIP Obligations, (c) the DIP Agent or the Prepetition Term Loan Agent (as applicable) terminates, or agrees in writing to terminate, the Enforcement Period, or (d) the date on which the Event of Default that was the subject of the Enforcement Notice relating to such Enforcement Period has been cured to the satisfaction of the DIP Agent or Prepetition Term Loan Agent, as applicable, or waived in writing by the DIP Agent or Prepetition Term Loan Agent, as applicable.

2

"<u>Equipment</u>" shall have the meaning ascribed to it under the Uniform Commercial Code.

"<u>Equity Interest</u>" shall mean, with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership or profit interests or units in, including any limited or general partnership interest and any limited liability company membership interest in) such Person and all of the warrants, options or other rights for the purchase, acquisition or exchange from such Person of any of the foregoing (including through convertible securities).

"<u>Event of Default</u>" shall mean (i) with respect to the DIP Facility, an "Event of Default" or similar term used under and as defined in the DIP Credit Agreement, the Interim Order or the Final Order, and (ii) with respect to the Prepetition Term Loan Agreement, an "Event of Default" or similar term used under and as defined in the Prepetition Term Loan Agreement.

"<u>Exercise of Any Secured Creditor Remedies</u>" or "<u>Exercise of Secured Creditor Remedies</u>" shall mean, except as otherwise provided in the final sentence of this definition:

(a) the taking by any of the DIP Secured Parties or the Prepetition Term Loan Parties (such parties, collectively, the "<u>Secured Parties</u>" and individually, a "<u>Secured Party</u>") of any action to enforce or realize upon any Lien, including the institution of any foreclosure proceedings or the noticing of any public or private sale pursuant to Article 9 of the Uniform Commercial Code or other applicable law;

(b) the exercise by any Secured Party of any right or remedy provided to a secured creditor on account of a Lien under any of the Credit Documents, any order of the Court, or under applicable law including the election to retain any of the Collateral in satisfaction of a Lien;

(c) the taking of any action by any Secured Party or the exercise of any right or remedy by any Secured Party in respect of the collection on, set off against, marshaling of, injunction respecting or foreclosure on the Collateral or the Proceeds thereof;

(d) the appointment on the application of a Secured Party, of a receiver, receiver and manager or interim receiver of all or part of the Collateral;

(e) the sale, lease, license or other disposition of all or any portion of the Collateral by private or public sale conducted by any Secured Party or any other means at the direction or with the consent of any Secured Party permissible under applicable law;

(f) the exercise of any other right of a secured creditor under Part 6 of Article 9 of the Uniform Commercial Code or under provisions of similar effect under other applicable law; and

(g) the exercise by any Secured Party of any voting rights relating to any Equity Interest included in the Collateral.

For the avoidance of doubt, none of the following shall be deemed to constitute an

Exercise of Any Secured Creditor Remedies or Exercise of Secured Creditor Remedies: (i) the filing of a proof of claim in the Chapter 11 Cases or the seeking of adequate protection in the Chapter 11 Cases, (ii) so long as the commitments under the DIP Financing Documents have not been terminated as a result of the existence of an Event of Default, the exercise of rights by the DIP Agent in connection with cash dominion as provided in the DIP Credit Agreement, including, without limitation, the notification of account debtors, depository institutions or any other Person to deliver proceeds of DIP Priority Collateral to the DIP Agent, (iii) the consent by the DIP Agent or the Required Lenders (as defined in the DIP Credit Agreement), as applicable, to a store closing sale, going out of business sale, or other disposition by any borrower or guarantor under the Prepetition Term Loan Agreement) and/or a Loan Party (as defined in the DIP Credit Agreement) of any of the DIP Priority Collateral, (iv) the reduction of advance rates or sub-limits or change in borrowing base components or eligibility criteria by the DIP Agent and the Required Lenders, as applicable, or (v) the imposition of Reserves (as defined in the DIP Credit Agreement) by the DIP Agent.

"GAAP" shall mean generally accepted accounting principles in the United States, as in effect from time to time.

"General Intangibles" shall have the meaning ascribed to it under the Uniform Commercial Code.

"Governmental Authority" shall mean the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra- national bodies such as the European Union or the European Central Bank).

"Lien" shall mean any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, encumbrance, collateral assignment, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any Capitalized Lease having substantially the same economic effect as any of the foregoing); provided that in no event shall an operating lease in and of itself be deemed a Lien.

"Lien Priority" shall mean with respect to any Lien of the DIP Parties or the Prepetition Term Loan Parties in the Collateral, the order of priority of such Liens as set forth in the Interim Order.

"Person" shall mean any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Proceeds" shall mean (a) all "proceeds," as defined in Article 9 of the Uniform Commercial Code, with respect to the Collateral, and (b) whatever is recoverable or recovered when any Collateral is sold, exchanged, collected, or disposed of, whether voluntarily or involuntarily.

"Property" shall mean any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible.

"Security Account" shall have the meaning ascribed to it under the Uniform Commercial Code.

"Term Cash Proceeds Notice" shall mean a written notice delivered by the Prepetition Term Loan Agent to the DIP Agent stating that certain identifiable cash proceeds which may be deposited in a DIP Deposit and Securities Account constitute Term Priority Collateral, and reasonably identifying the amount of such proceeds and specifying the origin thereof.

"Term Credit Parties" shall mean, collectively, the borrower, guarantors and each other direct and indirect subsidiary or parent of such borrower or any of its affiliates that is now or hereinafter becomes a party to any Prepetition Term Loan Document.

"Term Loan Priority Accounts" shall mean the Asset Sale Proceeds Pledged Account, the Term Loan Proceeds Account, and any other Deposit Accounts, Securities Accounts or Commodity Accounts, in each case that are intended to solely contain Term Priority Collateral or identifiable proceeds thereof (it being understood that any property in such Deposit Accounts, Securities Accounts, or Commodities Accounts which is not Term Priority Collateral or identifiable proceeds thereof shall not be Term Priority Collateral solely by virtue of being on deposit in the Asset Sale Proceeds Pledged Account or, any such Deposit Account, Securities Account, or Commodity Account).

"Term Loan Proceeds Account" shall mean a Deposit Account maintained with Bank of America, N.A., which is subject to a blocked account agreement among Bank of America, N.A., the borrowers under the Prepetition Term Loan Agreement and the Prepetition Term Loan Agent (as the "first lien holder") and the DIP Agent (as the "junior lien holder"), into which the proceeds of the loans made under the Prepetition Term Loan Agreement were deposited on the closing date of the Intercreditor Agreement.

"Uniform Commercial Code" shall mean the Uniform Commercial Code as in effect from time to time in the State of New York; provided that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection or the priority of a security interest in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect in a jurisdiction other than New York, "Uniform Commercial Code" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or priority or availability of such remedy, as the case maybe.

"Use Period" shall mean the period commencing on the earlier of (x) the date which is identified in an Enforcement Notice that the DIP Agent has provided to the Prepetition Term Loan Agent as the date on which (i) the DIP Agent intends to commence, or (ii) an agent acting on its behalf (or an DIP Secured Party acting with the consent of the DIP Agent) intends to commence, Exercise of Secured Creditor Remedies in connection with the DIP Priority Collateral, or (y) the third Business Day after the Prepetition Term Loan Agent has provided the DIP Agent with notice that the Prepetition Term Loan Agent has obtained possession or

5

control of an item of Term Priority Collateral in connection with an Exercise of Secured Creditor Remedies (the earlier of the dates in subsections (x) and (y) being the "Use Period Commencement Date") and ending on the earlier of (i) 180 days after the Use Period Commencement Date, or (ii) Repayment in Full of DIP Obligations. If any stay or other order that prohibits any of the DIP Agent, the other DIP Secured Parties or any Loan Party (as defined in the DIP Credit Agreement) with the consent of the DIP Agent from commencing and continuing to Exercise Any Secured Creditor Remedies or from liquidating and selling the DIP Priority Collateral has been entered by a court of competent jurisdiction, such 180-day period shall be tolled during the pendency of any such stay or other order and the Use Period shall be so extended.

Section 1.  Inspection and Access Rights.

(a)     Without limiting any rights the DIP Agent or any other DIP Secured Party may otherwise have under applicable law or by agreement, in the event of any Exercise of Any Secured Creditor Remedies by the DIP Agent, and whether or not the Prepetition Term Loan Agent or any other Prepetition Term Loan Party has commenced and is continuing to Exercise Any Secured Creditor Remedies of the Prepetition Term Loan Agent with respect to the Term Priority Collateral or otherwise, the DIP Agent or any other Person (including any DIP Loan Party) acting with the consent, or on behalf, of the DIP Agent, shall have the right (a) during the Use Period and during normal business hours on any Business Day, to access DIP Priority Collateral that (i) is stored or located in or on, (ii) has become an accession with respect to (within the meaning of Section 9-335 of the Uniform Commercial Code), or (iii) has been commingled with (within the meaning of Section 9-336 of the Uniform Commercial Code) Term Priority Collateral, and (b) during the Use Period, shall have the irrevocable right to use the Term Priority Collateral (including, without limitation, Equipment, and General Intangibles arising out of Term Priority Collateral, and real property) on a rent-free, royalty-free basis, each of the foregoing solely for the limited purposes of assembling, inspecting, copying or downloading information stored on, taking actions to perfect its DIP Lien on, completing a production run of Inventory (as defined in the DIP Credit Agreement) involving, taking possession of, moving, preparing, and advertising for sale, selling (by public auction, private sale or a "store closing", "going out of business" or similar sale, whether in bulk, in lots or to customers in the ordinary course of business or otherwise and which sale may include augmented Inventory of the same type sold in any DIP Loan Party's business), storing or otherwise dealing with the DIP Priority Collateral, in each case without notice to (other than an initial Enforcement Notice), the involvement of or interference by any Prepetition Term Loan Party (and whether or not the Prepetition Term Loan Agent or any Prepetition Term Loan Party has commenced and is continuing an Exercise of Secured Creditor Remedies) or liability to any Prepetition Term Loan Party; provided, however, that the expiration of the Use Period shall be without prejudice to the sale or other disposition of the DIP Priority Collateral in accordance with the Interim Order or the Final Order, the DIP Financing Documents, and applicable law.  In the event that any DIP Secured Party has commenced and is continuing the Exercise of Any Secured Creditor Remedies with respect to any DIP Priority Collateral or any other sale or liquidation of the DIP Priority Collateral has been commenced by an DIP Loan Party (with the consent of the DIP Agent), the Prepetition Term Loan Agent may not sell, assign, or otherwise transfer the related Term Priority Collateral prior to the expiration of the Use Period, unless the purchaser, assignee, or transferee thereof agrees in writing to be bound by the provisions of this Section 1.  Notwithstanding the

6

foregoing, it is understood and agreed that to the extent that any Term Priority Collateral is in the possession of a receiver or other third party not under the control of the Prepetition Term Loan Agent, no Prepetition Term Loan Party shall have any obligation to ensure that any DIP Secured Party has access to such Term Priority Collateral (but no Prepetition Term Loan Party will oppose any action by a DIP Secured Party to obtain such access).

(b)    Except as provided for in Section 1(c), (i) the DIP Agent and the DIP Secured Parties shall not be obligated to pay any amounts to the Prepetition Term Loan Agent or the Prepetition Term Loan Parties (or any person claiming by, through or under the Prepetition Term Loan Parties, including any purchaser of the Term Priority Collateral) or to the DIP Loan Parties, for or in respect of the use by the DIP Agent and the DIP Secured Parties of the Term Priority Collateral, and (ii) none of the DIP Agent or the DIP Secured Parties shall be obligated to secure, protect, insure or repair any such Term Priority Collateral (other than for damages caused by the DIP Agent, the DIP Secured Parties, or their respective employees, agents, and representatives). The DIP Agent and the DIP Secured Parties shall not have any liability to the Prepetition Term Loan Agent or the Prepetition Term Loan Parties (or any person claiming by, through or under the Prepetition Term Loan Agent or the Prepetition Term Loan Parties, including any purchaser of the Term Priority Collateral) as a result of any condition (including environmental condition, claim, or liability) with respect to the Term Priority Collateral in existence prior to the date that the DIP Agent first uses the Term Priority Collateral, and the DIP Agent and the DIP Secured Parties shall have no duty or liability (i) to maintain the Term Priority Collateral in a condition or manner better than that in which it was maintained prior to the date of the exercise by an DIP Secured Party of its rights under this Section 1, and (ii) for any acts or omissions of any DIP Loan Party with respect to any Term Priority Collateral.

(c)    The DIP Secured Parties shall (i) use the Term Priority Collateral in accordance with applicable law; (ii) insure or cause to be insured for damage to property and liability to persons, including property and liability insurance for the benefit of the Prepetition Term Loan Parties; and (iii) reimburse the Prepetition Term Loan Parties for any injury or damage to Persons or property (ordinary wear-and-tear excepted) caused by the acts or omissions of Persons under their control; provided, however, that the DIP Secured Parties will not be liable for any diminution in the value of the Term Priority Collateral caused by the absence of the DIP Priority Collateral therefrom or from ordinary wear-and-tear from the use of the Term Priority Collateral.  The Prepetition Term Loan Agent and the other Prepetition Term Loan Parties shall have no obligation to pay any utility, rental, lease or other charges owed to any third parties during the Use Period.

(d)    The Prepetition Term Loan Agent and the other Prepetition Term Loan Parties shall use commercially reasonable efforts not to hinder or obstruct the DIP Agent and the other DIP Secured Parties from exercising the rights described in Section 1(a) hereof.  The DIP Agent and the Prepetition Term Loan Agent shall cooperate and use reasonable efforts to ensure that the activities of the DIP Agent during the Use Period as described above do no interfere materially with the rights of the Prepetition Term Loan Parties including, without limitation, the right of the Prepetition Term Loan Agent to show the Term Priority Collateral to prospective purchasers and to prepare the Term Priority Collateral for sale.

(e)      Subject to the Interim Order (and when entered, the Final Order), the DIP Financing Documents, and the terms hereof, the Prepetition Term Loan Agent may advertise and conduct public auctions or private sales of the Term Priority Collateral without notice (except as required by applicable law or the Interim Order, the DIP Financing Documents, or these DIP Intercreditor Provisions) to any DIP Secured Party, the involvement of or interference by any DIP Secured Party or liability to any DIP Secured Party as long as, in the case of an actual sale, the respective purchaser assumes and agrees in writing to the obligations of the Prepetition Term Loan Agent and the Prepetition Term Loan Parties under this Section 1.

Section 2.  <u>Payment Over</u>.

(a)      So long as the Discharge of Prepetition Term Loan Obligations has not occurred, any Term Priority Collateral or proceeds thereof received by the DIP Agent or any other DIP Secured Party in connection with the Exercise of Any Secured Creditor Remedies (including set off) relating to the Term Priority Collateral in contravention of the Interim Order or the DIP Financing Documents (it being understood that the application of proceeds from any DIP Deposit and Securities Account prior to the delivery of a Term Cash Proceeds Notice or DIP Loan Party Term Proceeds Notice shall not be deemed in contravention of the DIP Intercreditor Provisions) shall be, subject to the terms and provisions of the Interim Order, segregated and held in trust and forthwith paid over to the Prepetition Term Loan Agent for the benefit of the Prepetition Term Loan Parties in the same form as received, with any necessary endorsements or as the Court (or if the Court fails to exercise jurisdiction, as a court of competent jurisdiction may otherwise direct).  The Prepetition Term Loan Agent is hereby authorized to make any such endorsements as agent for the DIP Agent or any such other DIP Secured Parties.   This authorization is coupled with an interest and is irrevocable until such time as these DIP Intercreditor Provisions are terminated.

(b)      So long as the Repayment in Full of DIP Obligations  has not occurred, any DIP Priority Collateral or Proceeds thereof received by the Prepetition Term Loan Agent or any Prepetition Term Loan Parties in connection with the Exercise of Any Secured Creditor Remedies (including set off) relating to the DIP Priority Collateral in contravention of the Interim Order, the DIP Financing Documents, and these DIP Intercreditor Provisions, shall be segregated and held in trust and forthwith paid over to the DIP Agent for the benefit of the DIP Secured Parties in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct.  The DIP Agent is hereby authorized to make any such endorsements as agent for the Prepetition Term Loan Agent or any such Prepetition Term Loan Parties. This authorization is coupled with an interest and is irrevocable until such time as these DIP Intercreditor Provisions are terminated.

Section 3.  <u>Insurance</u>.  Proceeds of Collateral include insurance proceeds and, therefore, the Lien Priority shall govern the ultimate disposition of casualty insurance proceeds. The DIP Agent and the Prepetition Term Loan Agent shall each be named as additional insured, mortgagee or  lenders' loss payee, as applicable, with respect to all insurance policies relating to the Collateral in the manner required in the Prepetition Term Loan Agreement or the DIP Credit Agreement, as applicable.  The DIP Agent shall have the sole and exclusive right, as against the Prepetition Term Loan Agent, to adjust settlement of insurance claims in the event of any covered loss, theft or destruction of any of the DIP Priority Collateral, subject to the rights of the

8

DIP Loan Parties under the DIP Financing Documents. The Prepetition Term Loan Agent shall have the sole and exclusive right, as against the DIP Agent, to adjust settlement of insurance claims in the event of any covered loss, theft or destruction of any of the Term Priority Collateral, subject to the rights of the Term Credit Parties under the Prepetition Term Loan Documents.   Subject to the rights of the Credit Parties under the Credit Documents, if any insurance claim includes both DIP Priority Collateral and Term Priority Collateral, the insurer will not settle such claim separately with respect to DIP Priority Collateral and Term Priority Collateral, and if the DIP Agent and the Prepetition Term Loan Agent are unable after negotiating in good faith to agree on the settlement for such claim, either such agent may apply to a court of competent jurisdiction to make a determination as to the settlement of such claim, and the court's determination shall be binding upon the DIP Agent and the Prepetition Term Loan Agent. All proceeds of such insurance shall be remitted to the DIP Agent or the Prepetition Term Loan Agent, as the case may be, subject, in each case, to the terms of their respective Credit Documents, and each of the DIP Agent and the Prepetition Term Loan Agent shall cooperate (if necessary) in a reasonable manner in effecting the payment of insurance proceeds in accordance with the Interim Order.

Section 4.   Tracing of and Priority in Proceeds.

(a)     The DIP Agent, for itself and on behalf of the DIP Secured Parties, and the Prepetition Term Loan Agent, for itself and on behalf of the Prepetition Term Loan Parties, further agree that prior to an issuance of any notice of Exercise of Any Secured Creditor Remedies by such party, any proceeds of Collateral, whether or not deposited under control agreements, which are used by any Credit Party to acquire other property which is Collateral shall not (solely as between the DIP Agent and the Prepetition Term Loan Agent, and the DIP Lenders and the Prepetition Term Loan Lenders) be treated as Proceeds of Collateral for purposes of determining the relative priorities in the Collateral which was so acquired.

(b)     Notwithstanding anything to the contrary contained in these DIP Intercreditor Provisions or any Prepetition Term Loan Document, unless and until the Repayment in Full of DIP Obligations, the DIP Agent is hereby permitted to deem all collections and payments deposited in any DIP Deposit and Securities Account (for the avoidance of doubt other than Term Loan Priority Account) or the Concentration Account (as defined in the DIP Credit Agreement) to be proceeds of DIP Priority Collateral, and no such funds credited to such account shall be subject to disgorgement or be deemed to be held in trust by the DIP Agent for  the benefit of the Prepetition Term Loan Agent and other Term Credit Parties; *provided* that with respect to any such funds that are identifiable proceeds of Term Priority Collateral credited to any such account, if  the DIP Agent has received (x) a DIP Loan Party Term Proceeds Notice or (y) a Term Cash Proceeds Notice, in both instances prior to the application of such funds by the DIP Agent to the DIP Obligations and a subsequent credit extension under the DIP Credit Agreement, then the DIP Agent shall turn over any misdirected proceeds of the Term Priority Collateral to the Prepetition Term Loan Agent to the extent permitted by applicable law.

9

**<u>Exhibit B</u>**

**Executed DIP Credit Agreement**

**EXECUTION COPY**

**SECURED SUPERPRIORITY DEBTOR IN POSSESSION**

**LOAN, SECURITY AND GUARANTY AGREEMENT**

**AEROPOSTALE, INC.**
the Borrower,

**the Guarantors referenced herein,**

**CRYSTAL FINANCIAL LLC**
as Agent,

and

**the Lenders referenced herein**

May 4, 2016

55718599V12

# TABLE OF CONTENTS

**Page**

**Article 1 -** Definitions: ........................................................................................................................... 1

**Article 2 -** The Credit Facilities: ........................................................................................................ 27
    2-1.    Establishment of Revolving Credit Facilities. ................................................... 27
    2-2.    Term Loans. ........................................................................................................ 28
    2-3.    Voluntary Reduction or Termination of Commitments. ................................... 28
    2-4.    Risks of Value of Collateral ............................................................................... 29
    2-5.    Loan Requests. .................................................................................................... 29
    2-6.    Making of Loans. ............................................................................................... 30
    2-7.    The Loan Account. ............................................................................................. 31
    2-8.    The Notes ............................................................................................................ 32
    2-9.    Payment of the Loans. ........................................................................................ 32
    2-10.    Interest Rates. ..................................................................................................... 33
    2-11.    Other Fees .......................................................................................................... 34
    2-12.    Intentionally Omitted. ........................................................................................ 34
    2-13.    Line (Unused Fee) .............................................................................................. 34
    2-14.    Intentionally Omitted. ........................................................................................ 34
    2-15.    Concerning Fees. ................................................................................................ 34
    2-16.    Agent's Discretion. ............................................................................................ 34
    2-17.    [Intentionally Omitted]. ..................................................................................... 34
    2-18.    [Intentionally Omitted]. ..................................................................................... 34
    2-19.    [Intentionally Omitted]. ..................................................................................... 34
    2-20.    [Intentionally Omitted]. ..................................................................................... 35
    2-21.    Changed Circumstances. .................................................................................... 35
    2-22.    Increased Costs ................................................................................................... 35
    2-23.    Lenders' Commitments. ..................................................................................... 36

**Article 3 -** Conditions Precedent: ....................................................................................................... 37
    3-1.    Conditions Precedent to the Effective Date ...................................................... 37
    3-2.    Conditions Precedent to Fundings on and after the Final Order Entry Date ................... 40
    3-3.    Conditions Precedent to All Fundings ............................................................... 41

**Article 4 -** General Representations, Covenants and Warranties: ..................................................... 42
    4-1.    Payment and Performance of Liabilities. .......................................................... 42
    4-2.    Due Organization - Corporate Authorization - No Conflicts. ........................... 42
    4-3.    Trade Names. ...................................................................................................... 43
    4-4.    Intellectual Property. .......................................................................................... 43
    4-5.    Locations. ........................................................................................................... 44
    4-6.    Title to Assets. .................................................................................................... 44
    4-7.    Indebtedness. ...................................................................................................... 47
    4-8.    Insurance Policies. ............................................................................................. 47

i

| | | |
|---|---|---|
| 4-9. | Licenses | 48 |
| 4-10. | Leases | 48 |
| 4-11. | Requirements of Law | 49 |
| 4-12. | Maintain Properties | 49 |
| 4-13. | Pay Taxes/Tax Shelter Regulations. | 49 |
| 4-14. | No Margin Stock | 53 |
| 4-15. | ERISA | 53 |
| 4-16. | Hazardous Materials. | 53 |
| 4-17. | Litigation | 54 |
| 4-18. | Investments.  No Loan Party shall: | 54 |
| 4-19. | Loans | 55 |
| 4-20. | Protection of Assets | 55 |
| 4-21. | Line of Business | 55 |
| 4-22. | Affiliate Transactions | 55 |
| 4-23. | Additional Assurances. | 55 |
| 4-24. | Adequacy of Disclosure | 56 |
| 4-25. | Deposit Account Investments | 56 |
| 4-26. | Prepayments of Indebtedness | 57 |
| 4-27. | Other Covenants | 57 |
| 4-28. | Labor Matter | 57 |
| 4-29. | Restricted Payments and Payments to Non-Loan Party Group Members. | 57 |
| 4-30. | Licenses | 57 |
| 4-31. | Material Contracts | 58 |
| 4-32. | Customer Relations | 58 |
| 4-33. | Consents | 58 |
| 4-34. | Amendment of Material Documents | 58 |
| 4-35. | Use of Proceeds. | 58 |
| 4-36. | Compliance with Material Leases | 59 |
| 4-37. | Validity and Priority of Security Interest; Administrative Priority | 59 |
| 4-38. | [Intentionally Omitted]. | 60 |
| 4-39. | Cash Management System | 60 |
| 4-40. | Advisors | 60 |
| 4-41. | Case Matters. | 60 |
| 4-42. | Amendments to Orders | 61 |
| 4-43. | Post-Closing Deliverables | 61 |
| 4-44. | Dormant Subsidiaries | 61 |
| 4-45. | Fidelity Account. | 61 |
| 4-46. | Pre-Petition Term Loan Proceeds Securities Account. | 61 |
| 4-47. | Pre-Petition Term Loan Proceeds Account | 61 |
| **Article 5 -** | Financial Reporting and Performance Covenants: | 61 |
| 5-1. | Maintain Records | 61 |
| 5-2. | Access to Records. | 62 |
| 5-3. | Prompt Notice to Agent. | 63 |

5-4.    [Intentionally Omitted]. ................................................................................ 63
5-5.    Borrowing Base Certificates ...................................................................... 64
5-6.    Monthly Reports. ........................................................................................ 64
5-7.    Permitted Store Closing Reports ................................................................ 64
5-8.    [Intentionally Omitted]. ................................................................................ 64
5-9.    Fiscal Year ................................................................................................. 64
5-10.   Inventories, Appraisals, and Audits. ........................................................... 64
5-11.   Additional Financial Information. ................................................................. 65
5-12.   Excess Availability ..................................................................................... 65
5-13.   Committee Communications ........................................................................ 65
5-14.   Disbursements, DIP Budget Variance and Updated DIP Budget. ............... 65

**Article 6 -** Use and Collection of Collateral: ......................................................... 66
6-1.    Use of Inventory Collateral ........................................................................ 66
6-2.    Adjustments and Allowances ...................................................................... 67
6-3.    Validity of Accounts. ................................................................................... 67
6-4.    Notification to Account Debtors .................................................................. 67

**Article 7 -** Cash Management.  Payment of Liabilities: ........................................... 68
7-1.    Depository Accounts. .................................................................................. 68
7-2.    Credit Card Receipts. ................................................................................. 68
7-3.    The Concentration, Blocked, and Operating Accounts. ............................... 68
7-4.    Proceeds and Collection of Accounts: ........................................................ 69
7-5.    Payment of Liabilities. ................................................................................ 70
7-6.    The Operating Account ............................................................................... 71
7-7.    [Intentionally Omitted]. ................................................................................ 71
7-8.    Unrestricted Cash ....................................................................................... 71

**Article 8 -** Grant of Security Interest: .................................................................... 71
8-1.    Grant of Security Interest ............................................................................ 71
8-2.    Extent and Duration of Security Interest ..................................................... 72
8-3.    Use of Assets ............................................................................................. 73
8-4.    Certain Perfection Actions .......................................................................... 73
8-5.    No Filings Required; Priority. ...................................................................... 73
8-6.    Adequate Protection ................................................................................... 73

**Article 9 -** Agent As Borrower's Attorney-In-Fact: ................................................. 74
9-1.    Appointment as Attorney-In-Fact ............................................................... 74
9-2.    No Obligation to Act. .................................................................................. 74

**Article 10 -** Events of Default: ............................................................................... 75
10-1.   [Intentionally Omitted]. ................................................................................ 75
10-2.   Failure To Make Payments ......................................................................... 75
10-4.   Failure to Perform Covenant or Liability (Limited Grace Period) ................ 75
10-5.   [Intentionally Omitted]. ................................................................................ 75

10-6.    [Intentionally Omitted]......................................................................................... 75

10-7.    Misrepresentation................................................................................................. 75

10-8.    Default of Material Indebtedness.......................................................................... 75

10-9.    Default of Material Leases.................................................................................... 75

10-10.   Uninsured Casualty Loss...................................................................................... 75

10-11.   Judgment. Restraint of Business........................................................................... 76

10-12.   [Intentionally Omitted]......................................................................................... 76

10-13.   [Intentionally Omitted]......................................................................................... 76

10-14.   Indictment - Forfeiture......................................................................................... 76

10-15.   Default by Guarantor or Subsidiary...................................................................... 76

10-16.   Termination of Guaranty and Liens....................................................................... 76

10-17.   Challenge to Loan Documents.............................................................................. 76

10-18.   ERISA.................................................................................................................. 76

10-19.   Material Contracts................................................................................................ 77

10-20.   [Intentionally Omitted]......................................................................................... 77

10-21.   [Intentionally Omitted]......................................................................................... 77

10-22.   Trustee; Examiner................................................................................................. 77

10-23.   Chapter 7............................................................................................................. 77

10-24.   DIP Order Modifications; Other Administrative Claims; Other Liens...................... 77

10-25.   Automatic Stay..................................................................................................... 77

10-26.   Exclusivity........................................................................................................... 77

10-27.   Milestone............................................................................................................. 77

10-28.   Other Plans of Reorganization.............................................................................. 78

10-29.   Violation of DIP Orders........................................................................................ 78

10-30.   Rejection of Leases............................................................................................... 78

10-31.   Adversary Proceedings......................................................................................... 78

10-32.   Payment of Other Prepetition Debt....................................................................... 78

**Article 11 -** Rights and Remedies Upon Default:............................................................... 78

11-1.    Remedies.............................................................................................................. 78

11-2.    Sales.................................................................................................................... 79

11-3.    UCC..................................................................................................................... 79

11-4.    Application of Proceeds........................................................................................ 80

11-5.    Relief................................................................................................................... 80

11-6.    Occupation of Business Location.......................................................................... 81

11-7.    Grant of Nonexclusive License............................................................................. 81

11-8.    Assembly of Collatera.......................................................................................... 81

11-9.    Rights and Remedies............................................................................................ 81

11-10.   Warehouse Bailment Agreement........................................................................... 82

11-11.   [Intentionally Omitted]......................................................................................... 82

**Article 12 -** Notices:....................................................................................................... 82

12-1.    Notice Addresses.................................................................................................. 82

12-2.    Notice Given......................................................................................................... 83

iv

**Article 13 -** Term: ................................................................................................... 83
    13-1.    Termination of Revolving Credit and the Term Loan Facility ................. 83
    13-2.    Effect of Termination ............................................................................. 83

**Article 14 -** General: .............................................................................................. 84
    14-1.    Protection of Collateral .......................................................................... 84
    14-2.    Successors and Assigns .......................................................................... 84
    14-3.    Severability ............................................................................................ 84
    14-4.    Amendments; Course of Dealing ........................................................... 84
    14-5.    Power of Attorney .................................................................................. 85
    14-6.    Application of Proceeds .......................................................................... 85
    14-7.    Costs and Expenses of the Credit Parties ............................................... 85
    14-8.    Copies and Facsimiles ............................................................................ 85
    14-9.    New York Law ........................................................................................ 86
    14-10.    Consent to Jurisdiction .......................................................................... 86
    14-11.    Indemnification ...................................................................................... 86
    14-12.    Rules of Construction ............................................................................. 87
    14-13.    Intent ...................................................................................................... 88
    14-14.    Right of Set-Off ..................................................................................... 88
    14-15.    Maximum Interest Rate .......................................................................... 89
    14-16.    Waivers .................................................................................................. 89
    14-17.    Confidentiality ....................................................................................... 90
    14-18.    Press Releases ........................................................................................ 90
    14-19.    No Advisory or Fiduciary Responsibility .............................................. 90
    14-20.    [Intentionally Omitted] ........................................................................... 91
    14-21.    USA PATRIOT Act Notice .................................................................... 91
    14-22.    Foreign Asset Control Regulations ........................................................ 91
    14-23.    Liabilities of Lenders Several ................................................................. 92
    14-24.    Incorporation of DIP Orders by Reference ............................................ 92
    14-25.    Cash Collateral Accounts ....................................................................... 92

**Article 15 -** Guaranty ............................................................................................. 92
    15-1.    Guaranty ................................................................................................. 92
    15-2.    Obligations Not Affected ....................................................................... 92
    15-3.    General Waivers ..................................................................................... 92
    15-4.    Waivers Concerning Election of Remedies ............................................ 93
    15-5.    Waiver of Subrogation ........................................................................... 93
    15-6.    Subordination ......................................................................................... 93
    15-7.    Books and Records ................................................................................. 93
    15-8.    Primary Obligations ............................................................................... 93
    15-9.    Changes in Liabilities ............................................................................ 93
    15-10.    Right of Set-Off ..................................................................................... 94
    15-11.    Joint and Several Obligations ................................................................. 94
    15-12.    Termination ............................................................................................ 94

**Article 16 -** The Agent ...................................................................................................... 94
    16-1.   Appointment and Authority ............................................................. 94
    16-2.   Exculpatory Provisions ................................................................... 94
    16-3.   Reliance by Agent ........................................................................... 95
    16-4.   Nature of Obligations; Non-Reliance on Agent and Other Lenders ................................ 95
    16-5.   Rights as a Lender .......................................................................... 96
    16-6.   Sharing of Set-Offs and Other Payments ....................................... 96
    16-7.   Investments .................................................................................... 96
    16-8.   Resignation of Agent ..................................................................... 97
    16-9.   Delegation of Duties ...................................................................... 97
    16-10.  Collateral Matters. ......................................................................... 97
    16-11.  Agency for Perfection .................................................................... 98
    16-12.  Concerning the Collateral and Related Loan Documents .................................. 98

**Article 17 -** Consents, Amendments and Waivers: ............................................................. 98
    17-1.   Action by Agent, Consents, Amendments, Waivers ....................... 98

**Article 18 -** Assignments and Participations: ..................................................................... 100
    18-1.   Assignments and Assumptions. ...................................................... 100
    18-2.   Participations. ................................................................................ 102
    18-3.   Certain Pledges. ............................................................................. 103

**Article 19 -** Commitments, Fundings and Distributions: ..................................................... 103
    19-1.   Commitments to Make Revolving Credit Loans ............................. 103
    19-2.   Commitments to Make Interim Term Loans .................................. 103
    19-3.   Commitments to Make Final Term Loans ...................................... 103
    19-4.   Nature of Obligations of Lenders .................................................. 103
    19-5.   Funding Procedures. ...................................................................... 103
    19-6.   Payments Generally; Agent's Clawback. ....................................... 104
    19-7.   Settlement Amongst Lenders ......................................................... 105
    19-8.   Defaulting Lender. ......................................................................... 105

55718599V12

EXHIBITS

| | | |
|---|---|---|
| A-1 | : | Additional Pre-Petition Priority Liens |
| C-1 | : | Commitments |
| I-1 | : | Form of Interim DIP Order |
| I-2 | : | Initial DIP Budget |
| M-1 | : | Milestones |
| 2-5 | : | Borrowing Request Notice |
| 2-8(A) | : | Revolving Credit Note |
| 2-8(B) | : | Term Loan Note |
| 4-2 | : | Related Entities |
| 4-3 | : | Trade Names |
| 4-4 | : | Intellectual Property |
| 4-5 | : | Locations, Leases, and Landlords |
| 4-6 | : | Encumbrances |
| 4-7 | : | Indebtedness |
| 4-8 | : | Insurance Policies |
| 4-10 | : | Capital Leases |
| 4-13 | : | Taxes |
| 4-17 | : | Litigation |
| 4-22 | : | Affiliated Transactions |
| 4-23 | : | Excluded Assets |
| 4-28 | : | Collective Bargaining Agreements |
| 4-31 | : | Material Contracts |
| 4-43 | : | Deposit Accounts |
| 4-45 | : | Dormant Subsidiaries |
| 5-5 | : | Form of Borrowing Base Certificate |
| 6-3 | : | Bonds and Deposits |
| 7-1 | : | DDAs |
| 7-2 | : | Credit Card Arrangements |
| 8-1(K) | : | Commercial Tort Claims |
| 18-1 | : | Form of Assignment and Acceptance |

55718599V12

SECURED SUPERPRIORITY DEBTOR IN POSSESSION

LOAN, SECURITY AND GUARANTY AGREEMENT

May 4, 2016

THIS SECURED SUPERPRIORITY DEBTOR IN POSSESSION LOAN, SECURITY AND GUARANTY AGREEMENT (this "**Agreement**") is made between Crystal Financial LLC (in such capacity, the "**Agent**"), as agent for the ratable benefit of the "Lenders" who are, at present, those entities identified on the signature pages of this Agreement or who otherwise become "Lenders" pursuant to the terms of this Agreement from time to time, the Lenders party hereto, Aeropostale, Inc. (hereinafter, the "**Borrower**"), a Delaware corporation with its principal executive offices at 112 West 34th Street, New York, New York 10120, and the Guarantors party hereto; in consideration of the mutual covenants contained herein and benefits to be derived herefrom.

WITNESSETH:

WHEREAS, on May 4, 2016 (the "Petition Date"), the Borrower and the Guarantors (as defined herein) commenced Chapter 11 case numbers [__] through [__], as jointly administered for procedural purposes at Chapter 11 case number [__] (each a "Case" and collectively, the "Cases") by filing with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, and have continued to operate their business as debtors-in-possession pursuant to Sections 1107 and 1108 thereof;

WHEREAS, the Borrower has requested, and the Lenders have agreed to make, term loans and revolving loans to the Borrower consisting of a superpriority debtor-in-possession secured credit facility in an aggregate principal amount not to exceed $160,000,000 subject to this Agreement and, when entered, the Interim DIP Order, and the Final DIP Order (each as defined herein), as applicable;

WHEREAS, the Lenders are willing to extend such credit to the Borrower under this Agreement upon the terms and subject to the conditions set forth in this Agreement and the Interim DIP Order and the Final DIP Order, as applicable.

NOW, THEREFORE, in consideration of the mutual conditions and agreements set forth in this Agreement, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Lenders, the Agent, the Borrower and the Guarantors hereby agree as follows:

**Article 1 - Definitions**:

As herein used, the following terms have the following meanings or are defined in the section of this Agreement so indicated:

"**Acceptable L/C Inventory**":  Inventory which is the subject of a commercial letter of credit in favor of a foreign manufacturer or vendor of such Inventory, which Inventory is to be manufactured for, or delivered to, the Loan Parties and will become Acceptable In-Transit Inventory within thirty (30) days after the date of issuance of the commercial letter of credit.

"**Acceptable In-Transit Inventory**":  Inventory that is in-transit to a Loan Party,

(a)      for which both title and risk of loss to which have passed to the Loan Party;

(b)    which Inventory has been placed with a carrier (f.o.b.) for shipment to the Loan Parties, and which Inventory is scheduled to be received within thirty (30) days at a Loan Party's distribution center in the United States;

(c)    for which a Document of Title has been issued in favor of the Loan Party, as consignee, and in each case as to which the Agent has Control over such Documents of Title and a perfected security interest which is prior and superior to all security interests, claims, and all Encumbrances other than Permitted Encumbrances having priority under applicable Requirements of Law (it being understood, however, that the Agent will not require physical possession of the Documents of Title or any foreign filings to be deemed "perfected");

(d)    which Inventory is insured to the satisfaction of the Agent (including, without limitation, marine cargo insurance); and

(e)    the Agent has received agreements (to the extent relevant to such Inventory) with (i) each sourcing agent under any of the Loan Party's sourcing agreements, and (ii) each Loan Party's carriers, freight forwarders, and customs brokers, each satisfactory in form and substance to the Agent.

Notwithstanding the foregoing, the Agent may, in its business judgment, exclude any particular Inventory from the definition of "Acceptable In-Transit Inventory" in the event the Agent determines that such Inventory is subject to any Person's right of reclamation, repudiation, stoppage in-transit or any event has occurred or is anticipated by the Agent to arise which may otherwise adversely impact the ability of the Agent to realize upon such Inventory.

"**Acceptable Inventory**":  Such of the Loan Parties' Inventory, at such locations, and of such types, character, qualities and quantities, as the Agent in its discretion from time to time determines to be acceptable for borrowing, including, without limitation, Acceptable In-Transit Inventory and Acceptable L/C Inventory (but excluding Blank Stock Inventory), as to which Inventory, the Agent has a perfected security interest which is prior and superior to all security interests, claims, and all Encumbrances other than Permitted Encumbrances with priority under applicable Requirements of Law.  Without limiting the generality of the foregoing, Acceptable Inventory shall in no event include Inventory that is not salable, non-merchandise categories (such as labels, bags and packaging), Inventory not located in the United States (other than Acceptable In-Transit Inventory and Acceptable L/C Inventory), samples, damaged goods, return-to-vendor merchandise, and packaway Inventory.

"**Acceptable Security Interest**": A security interest which (a) exists in favor of the Agent for its benefit and the ratable benefit of the Credit Parties, (b) has superpriority lien status and is superior to all other security interests (other than the Carve-Out, Additional Pre-Petition Priority Liens and the Pre-Petition Term Priority Liens), (c) secures the Secured Liabilities, (d) is enforceable against the Loan Party which created such security interest and (e) is, proposed or intended to be, perfected.

"**Accounts**" and "**Accounts Receivable**":  Include, without limitation, "accounts" as defined in the UCC, and also all:  accounts, accounts receivable, credit card receivables, notes, drafts, acceptances, and other forms of obligations and receivables and rights to payment for credit extended and for goods sold or leased, or services rendered, whether or not yet earned by performance; all "contract rights" as formerly defined in the UCC; all Inventory which gave rise thereto, and all rights associated with such Inventory, including the right of stoppage in transit; and all reclaimed, returned, rejected or repossessed Inventory (if any) the sale of which gave rise to any Account.  As used in the definition of "Eligible Credit Card Receivables" set forth herein, the terms "Accounts" and "Accounts Receivable" shall also include "payment intangibles" as defined in the UCC.

2

"**Account Debtor**":  Has the meaning given that term in the UCC and includes all credit card processors of the Loan Parties.

"**ACH**":  Automated clearing house.

"**Additional Pre-Petition Priority Liens**": Means any valid, perfected, enforceable and non-avoidable Encumbrances existing as of the Petition Date that are senior to the Pre-Petition ABL Liens and the Pre-Petition Term Liens as set forth on Exhibit A-1 hereto.

"**Adequate Protection Liens**":  Has the meaning ascribed to such term in the Interim DIP Order or, upon entry of the Final DIP Order, in the Final DIP Order, as applicable.

"**Adequate Protection Superpriority Claims**": Has the meaning ascribed to such term in the Interim DIP Order or, upon entry of the Final DIP Order, in the Final DIP Order, as applicable.

"**Adjusted Eurodollar Rate**":  With respect to any Eurodollar Loan, an interest rate per annum (rounded upwards, if necessary, to the next 1/16 of one percent) equal to (a) the Eurodollar Rate multiplied by (b) the Statutory Reserve Rate.

"**Administrative Questionnaire**":  An Administrative Questionnaire in a form supplied by the Agent.

"**Affiliate**":  With respect to any two Persons, a relationship in which (a) one holds, directly or indirectly, not less than twenty-five percent (25%) of the capital stock, beneficial interests, partnership interests, or other equity interests of the other; or (b) one has, directly or indirectly, the right, under ordinary circumstances, to vote for the election of a majority of the directors (or other body or Person who has those powers customarily vested in a board of directors of a corporation); or (c) not less than twenty-five percent (25%) of their respective ownership is directly or indirectly held by the same third Person.

"**AGC**":  Aero GC Management LLC, a Virginia Limited Liability Company with an address of 112 West 34th Street, New York, New York 10120, a wholly owned Subsidiary of the Borrower.

"**Agent**":  Defined in the Preamble.

"**Agent's Rights and Remedies**":  Is defined in Section 11-9.

"**Aggregate Outstandings**":  At any time of determination, the sum of (a) the Revolving Credit Loans outstanding, plus (b) the Term Loans outstanding.

"**Appraised Value**":  (i) With respect to Inventory, the net appraised orderly liquidation value of the Loan Parties' Inventory as set forth in the Loan Parties' stock ledger (expressed as a percentage of the Cost of such Inventory), each as determined from time to time by the Agent in accordance with its customary procedures and based upon the most recent appraisal conducted hereunder by an independent appraiser satisfactory to the Agent and the Required Lenders, and (ii) with respect to Trademarks, the appraised forced liquidation value thereof, net of costs and expenses to be incurred in connection with any such liquidation, each as determined from time to time by the Agent in accordance with its customary procedures and based upon the most recent appraisal conducted hereunder by an independent appraiser satisfactory to the Agent and the Required Lenders.

"**Approved Fund**":  Any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender, (c) an entity or an Affiliate of an entity that administers or manages a Lender or (d) the same investment advisor or an advisor under common control with such Lender, Affiliate or advisor, as applicable.

"**Assignee Group**":  Two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"**Assignment and Acceptance**":  Is defined in Section 18-1.

"**Automatic Stay**":  means the automatic stay imposed under Section 362 of the Bankruptcy Code.

"**Availability**":  The lesser of (a) the then applicable Revolving Credit Commitments <u>plus</u> the Term Loan Commitments, and (b) the Borrowing Base, <u>minus</u> the Aggregate Outstandings.

"**Average Outstandings**":  For any one (1) month period, the average Aggregate Outstandings with respect to the Revolving Credit Loans during such period.

"**AWI**":  Aeropostale West, Inc., a Delaware corporation with an address of 125 Chubb Avenue, Lyndhurst, New Jersey 07071, a wholly owned Subsidiary of the Borrower.

"**Bankruptcy Code**":  Title 11 of the United State Code, 11 U.S.C. §§ 101 *et seq.* and any amendments or successor statute thereto.

"**Bankruptcy Court**":  Has the meaning specified in the recitals of this Agreement.

"**Bankruptcy Rules**":  The Federal Rules of Bankruptcy Procedure and local rules of the Bankruptcy Court, each as amended, and applicable to the Cases.

"**Blank Stock Inventory**":  Inventory of the Loan Parties which consists of blank t-shirts and other items of apparel which are in the possession of third Persons for processing, which Inventory otherwise would be deemed Acceptable Inventory.

"**Blocked Account Agreement**": Is defined in Section 7-3.

"**Borrower**":  Is defined in the Preamble.

"**Borrowing Base**":  The amount calculated pursuant to the following formula:

(i)    the Inventory Advance Rate multiplied by the most recent Appraised Value of Acceptable Inventory multiplied by the Cost of Acceptable Inventory; <u>provided</u> that any Acceptable Inventory that is in any Permitted Closing Store (on or after the third week after the liquidation sale commences) shall also be multiplied by the inverse of the prevailing discount;

plus

(ii)    95% of the face amount of Eligible Credit Card Receivables;

plus

(iii)    50% of the most recent Appraised Value of Eligible Trade Names (not to exceed $25,000,000);

minus

(iv)    Reserves;

minus

(v)  an amount equal to the greater of (x) 10% of the sum of the foregoing clauses (i)-(iv) and (y) $10,000,000.

"**Borrowing Base Certificate**": Is defined in Section 5-5.

"**Business Day**":  Any day other than (a) a Saturday or Sunday; (b) any day on which banks in Boston, Massachusetts or New York, New York, generally are not open to the general public for the purpose of conducting commercial banking business; or (c) a day on which the Agent is not open to the general public to conduct business, and, if such day relates to any Eurodollar Loan, means any such day on which dealings in dollar deposits are conducted by and between banks in the London interbank market.

"**Business Plan**":  The Borrower's then current business plan and any revision, amendment, or update of such business plan to which the Agent has provided its written sign-off.

"**Capital Expenditures**":  The expenditure of funds or the incurrence of liabilities which are capitalized in accordance with GAAP; provided that for purposes of this Agreement, capital expenditures funded by the proceeds from the incurrence of Indebtedness permitted hereunder, by the proceeds received from the sale of assets permitted pursuant to §4-12(d) hereof, by casualty insurance proceeds or condemnation proceeds shall, to the extent of such proceeds, not be deemed Capital Expenditures.

"**Capital Lease**":  Any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as liabilities on a balance sheet of such Person under GAAP and the amount of which obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"**Carve-Out**": Has the meaning ascribed to such term in the Interim DIP Order or, upon entry of the Final DIP Order, in the Final DIP Order, as applicable.

"**Carve-Out Reserve**":  A professional fee carve-out reserve equal to $3,000,000, as adjusted from time to time in the Agent's discretion and in accordance with the DIP Orders.

"**Case**" or "**Cases**": Is defined in the Recitals.

"**Cash Collateral Account**" means, deposit account number 9977665971 (ABA number 021-000-089) maintained with Citibank, N.A. (666 Fifth Avenue, New York, New York 10043) in the name of and on behalf of the Agent, for the benefit of the Credit Parties, in accordance with this Agreement and with respect to which the Credit Parties shall have an Acceptable Security Interest.  To the extent required by Section 7-8, all amounts in the Concentration Account will be swept daily into the Cash Collateral Account.

"**Cash Equivalents**": As to any Person, (i) securities issued or directly and fully guaranteed or insured by the United States or any agency or instrumentality thereof (provided that the full faith and

credit of the United States is pledged in support thereof) having maturities of not more than twelve (12) months from the date of acquisition by such Person, (ii) time deposits and certificates of deposit of any commercial bank incorporated in the United States of recognized standing having capital and surplus in excess of $100,000,000.00 with maturities of not more than twelve (12) months from the date of acquisition by such Person, (iii) repurchase obligations with a term of not more than seven (7) days for underlying securities of the types described in clause (i) above; provided that there shall be no restriction on the maturities of such underlying securities pursuant to this clause (iii) entered into with a bank meeting the qualifications specified in clause (ii) above, (iv) commercial paper issued by the parent corporation of any commercial bank (provided that the parent corporation and the bank are both incorporated in the United States) of recognized standing having capital and surplus in excess of $500,000,000.00 and commercial paper issued by any Person incorporated in the United States rated at least A-1 or the equivalent thereof by Standard & Poor's Ratings Group or at least P-1 or the equivalent thereof by Moody's Investors Service, Inc. and in each case maturing not more than twelve (12) months after the date of acquisition by such Person, and (v) investments in money market funds substantially all of whose assets are comprised of securities of the types described in clauses (i) through (v) above.

"**Cash Management Order**": Means an order, in form and substance acceptable to the Agent and the Required Lenders, entered by the Bankruptcy Court with respect to the Loan Parties' use of a cash management system in accordance with the terms of this Agreement and the DIP Orders.

"**Cash Management System**": Is defined in Section 4-39.

"**Chattel Paper**": Has the meaning given that term in the UCC.

"**Collateral**": Is defined in Section 8-1.

"**Commercial Tort Claim**": Has the meaning given that term in the UCC.

"**Commitment**": Subject to the provisions of Sections 2-23, the Term Loan Commitment and the Revolving Credit Commitment, as set forth on Exhibit C-1 hereto.

"**Committee**": An official creditors' committee of creditors holding unsecured claims appointed by the Bankruptcy Court in respect of the Cases pursuant to Section 1102(a) of the Bankruptcy Code.

"**Concentration Account**": Is defined in Section 7-3.

"**Control**": Has the meaning given that term in the UCC.

"**Copyrights**": Collectively, with respect to each Loan Party, all copyrights (whether statutory or common law, whether established or registered in the United States or any other country or any political subdivision thereof whether registered or unregistered and whether published or unpublished) and all copyright registrations and applications made by such Loan Party, in each case, whether now owned or hereafter created or acquired by or assigned to such Loan Party, including, without limitation, the registrations and applications listed in **EXHIBIT 4-4** annexed hereto, together with any and all (i) rights and privileges arising under applicable Requirements of Law with respect to such Loan Party's use of such copyrights, (ii) reissues, renewals, continuations and extensions thereof, (iii) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect thereto, including, without limitation, damages and payments for past, present or future infringements thereof, (iv) rights corresponding thereto throughout the world and (v) rights to sue for past, present or future infringements thereof.

55718599V12

"**Cost**":  The lower of:

(a)      the calculated cost of purchases, as determined from invoices received by the Borrower, the Borrower's purchase journal or stock ledger, based upon the Borrower's accounting practices, known to the Agent, which practices are in effect on the date on which this Agreement was executed; and

(b)      the cost equivalent of the lowest ticketed or promoted price at which the subject inventory is offered to the public, after all mark-downs (whether or not such price is then reflected on the Borrower's accounting system), which cost equivalent is determined in accordance with the retail method of accounting, reflecting the Borrower's historic business practices.

The term "Cost" does not include Inventory capitalization costs or other non-purchase price charges (such as freight) used in the Borrower's calculation of cost of goods sold.

"**Costs of Collection**":  Includes, without limitation all out-of-pocket expenses incurred by the Agent and the Lenders in connection with this Agreement and the other Loan Documents, including without limitation (i) the fees, charges and disbursements of (A) (x) one primary counsel for the Agent and Lenders, (y) additional local counsel in any relevant jurisdiction to the Agent and the Lenders, taken as a whole, as the Agent deems reasonably necessary, and (z) (1) with the prior written consent of the Borrower (not to be unreasonably withheld, delayed, conditioned or burdened) one additional primary counsel for the Lenders, taken as a whole, and (2) any additional counsel to the Lenders required as a result of a conflict of interest (provided, that in the case of such additional counsel contemplated in this clause (z)(1) and (2), so long as no Event of Default has occurred and is continuing, such Costs of Collection shall not exceed $100,000 in the aggregate), (B) appraisers, (C) commercial finance examiners, and (D) all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of the Liabilities and (ii) in connection with (A) the syndication of the credit facilities provided for herein, (B) the preparation, negotiation, administration, management, execution and delivery of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (C) the enforcement or protection of their rights in connection with this Agreement or the Loan Documents or efforts to preserve, protect, collect, or enforce the Collateral or in connection with any proceeding under the Bankruptcy Code, including, without limitation, in each case under this clause (C), outside consultants for the Agent, or (D) any workout, restructuring or negotiations in respect of any Liabilities.

"**Credit Party**" or "**Credit Parties**":  Means (a) individually, (i) each Lender and its Affiliates, (ii) the Agent, (iii) [intentionally omitted], (iv) [intentionally omitted], (v) each beneficiary of each indemnification obligation undertaken by any Loan Party under any Loan Document, (vi) any other Person to whom Liabilities under this Agreement and other Loan Documents are owing, and (vii) the successors and assigns of each of the foregoing, and (b) collectively, all of the foregoing.

"**Crystal**": Is defined in Section 16-1.

"**DDA**":  Any checking or other demand daily depository account maintained by a Loan Party.

"**Defaulting Lender**":   any Lender that (a) has failed to fund any portion of the Loans, participations in Protective Advances or any other amounts required to be funded by it hereunder within one Business Day of the date when due, or (b) has been deemed insolvent or become the subject of a bankruptcy or insolvency proceeding.

55718599V12

"**Deposit Account**":  Has the meaning given that term in the UCC.

"**DIP Budget**":  The 13-week cash flow budget of anticipated and forecasted revenues and expenses and, as in effect from time to time, in form and substance satisfactory to the Agent and the Required Lenders in their sole discretion, including the Initial DIP Budget, as the same may be updated from time to time by the Borrower with the consent of the Agent and the Required Lenders in their sole discretion. Any reference contained herein to compliance with the DIP Budget shall include any permitted variance permitted by Section 5-14.

"**DIP Liens**":  An Acceptable Security Interest in the Collateral granted to the Agent and each of the other Credit Parties pursuant to this Agreement, the other Loan Documents and the DIP Orders.

"**DIP Priority Collateral**":  Has the meaning given that term in the DIP Orders.

"**DIP Orders**":  The Interim DIP Order, the Final DIP Order and any amendment, modification or supplement thereto in form and substance acceptable to the Agent and the Required Lenders in their sole discretion.

"**Disqualified Lender**":  Is any Person who is identified as a "Disqualified Lender" by the Borrower, as agreed to by the Agent and the Lenders, in writing, in their sole discretion as of the date hereof.

"**Documents**":  Has the meaning given that term in the UCC.

"**Documents of Title**":  Has the meaning given that term in the UCC.

"**Dormant Subsidiary**":  Is defined in Section 4-44.

"**Effective Date**":  The date upon which the conditions precedent set forth in Article 3 hereof have been satisfied or waived and this Agreement has become effective.

"**Eligible Assignee**":(a) a Lender or any of its Affiliates; (b) a bank, insurance company, or company engaged in the business of making commercial loans, which Person, together with its Affiliates, has a combined capital and surplus in excess of $250,000,000; (c) an Approved Fund; (d) any Person to whom a Lender assigns its rights and obligations under this Agreement as part of an assignment and transfer of such Lender's rights in and to a material portion of such Lender's portfolio of asset based credit facilities, and (e) any other Person (other than a natural person) approved by the Agent; provided that notwithstanding the foregoing, "Eligible Assignee" shall not include a Loan Party or any of the Loan Parties' Affiliates or Subsidiaries or a Disqualified Lender.

"**Eligible Credit Card Receivables**":  As of any date of determination, Accounts due to a Loan Party from VISA, MasterCard, American Express, Diners Club, Discover Card, and other major credit card processors acceptable to the Agent, in its discretion, as arise in the ordinary course of business consistent with past practices, and which have been earned by performance and are deemed by the Agent in its discretion to be eligible for inclusion in the calculation of the Borrowing Base.  None of the following shall be deemed to be Eligible Credit Card Receivables:

(a)    Accounts that have been outstanding for more than five (5) Business Days from the date of sale;

(b)      Accounts with respect to which a Loan Party does not have good, valid and marketable title thereto, free and clear of any Lien (other than Liens granted to the Agent);

(c)      Accounts that are not subject to a first priority security interest in favor of the Agent;

(d)      Accounts which are disputed, are with recourse, or with respect to which a claim, counterclaim, offset or chargeback has been asserted by the related credit card processor (but only to the extent of such dispute, counterclaim, offset or chargeback);

(e)      Accounts as to which the credit card processor has the right under certain circumstances to require a Loan Party to repurchase the Accounts from such credit card processor;

(f)      Accounts arising from the use of a private label credit card of a Loan Party; or

(g)      Accounts (other than VISA, Master Card, American Express, Diners Club and Discovercard) which the Agent determines in its commercial discretion acting in good faith to be unlikely to be collected.

"**Eligible Trade Names**":  Trademarks of the Loan Parties which, except as otherwise agreed by the Agent, in its discretion, satisfies all of the following conditions:

(a)      such Trademark is validly registered with the United States Patent and Trademark Office;

(b)      a Loan Party owns such Trademark, free and clear of any Encumbrances other than Encumbrances granted to the Agent;

(c)      (i) such Loan Party is in compliance in all respects with the representations, warranties and covenants set forth in the Loan Documents relating to such Trademark, and (ii) without limiting the provisions of the foregoing clause (i), except as otherwise agreed in writing by the Agent, such Trademark is not the subject of any material litigation or other material legal proceeding with respect to infringement by third parties;

(d)      the Agent shall have received an appraisal (based upon Appraised Value) of such Trademark by a third party appraiser acceptable to the Agent and the Required Lenders and otherwise in form and substance satisfactory to the Agent and the Required Lenders; and

(e)      the Agent shall have received evidence that all actions have been taken that the Agent may deem necessary or appropriate in order to create a first-priority, perfected security interest (it being understood and agreed that the entry of the Interim DIP Order shall satisfy this requirement).

"**Employee Benefit Plan**":  As defined in Section 3(2) of ERISA.

"**Encumbrance**":  Each of the following:

(a)      Any security interest, mortgage, pledge, hypothecation, lien, attachment, or charge of any kind (including any agreement to give any of the foregoing); the interest of a lessor under a Capital Lease; conditional sale or other title retention agreement; sale (to the extent of recourse) of accounts receivable or chattel paper; or other arrangement pursuant to which any Person is entitled to any preference or priority with respect to the property or assets of another Person or the income or profits of

9

such other Person or which constitutes an interest in property to secure an obligation; each of the foregoing whether consensual or non-consensual and whether arising by way of agreement, operation of law, legal process or otherwise.

        (b)    The filing of any financing statement under the UCC or comparable law of any jurisdiction.

"**End Date**":  The date upon which all of the following events have occurred:  (a) all Liabilities (other than indemnities, not then due and payable, which survive repayment of the Loans and termination of the Commitments) have been paid in full in cash, and (b) all obligations of the Agent or any Lender to make loans and advances and to provide other financial accommodations to the Borrower hereunder shall have been irrevocably terminated.

"**Environmental Laws**":  All of the following:

        (a)    Any and all federal, state, local or municipal laws, rules, orders, regulations, statutes, ordinances, codes, decrees or requirements which regulate or relate to, or impose any standard of conduct or liability on account of or in respect to environmental protection matters, including, without limitation, Hazardous Materials, as are now or hereafter in effect.

        (b)    The common law relating to damage to Persons or property from Hazardous Materials.

"**Equipment**":  Includes, without limitation, "equipment" as defined in the UCC, and also all motor vehicles, rolling stock, machinery, office equipment, plant equipment, tools, dies, molds, store fixtures, furniture, and other goods, property, and assets which are used and/or were purchased for use in the operation or furtherance of the Borrower's business, and any and all accessions or additions thereto, and substitutions therefor.

"**ERISA**":  The Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**":  Any Person which is under common control with the Borrower within the meaning of Section 4001 of ERISA or is part of a group which includes the Borrower and which would be treated as a single employer under Section 414 of the Internal Revenue Code of 1986, as amended.

"**Eurodollar Loan**":  Any Loan which bears interest at the Adjusted Eurodollar Rate.

"**Eurodollar Rate**":  The rate of interest per annum (rounded upwards, if necessary, to the nearest 1/100 of 1%) published in the "Money Rates" section of The Wall Street Journal as the London interbank offered rate for deposits in Dollars on the date which is two (2) Business Days prior to the commencement of an applicable calendar month (or, if more than one rate is published, then the highest of such rates) for a term of three months, or if such "Money Rates" section is unavailable for any reason on such date, the rate of interest determined by the Agent to be the average (rounded upward, if necessary, to the nearest 1/100th of 1%) of the rates per annum at which deposits in Dollars are offered to such reference banks by other reference banks as the Agent determines in the London interbank market as of 10:00 a.m. two (2) Business Days prior to the first day in an applicable calendar month for a three month term and in an amount comparable to the amount of the applicable portion of the Loans outstanding, as applicable; <u>provided</u> that at no time shall the Eurodollar Rate be less than 0%.

"**Events of Default**":  Is defined in Article 10.

"**Excess Availability**": As of any date of determination, the amount equal to Availability plus Unrestricted Cash, (including an amount up to $10,000,000 of Unrestricted Cash in-transit from store deposit accounts) plus any stub-rent payments for the month of May 2016 that are made prior to the week ending July 30, 2016 minus the aggregate amount, if any, of all payables of the Borrower and its Guarantors aged in excess of the specific time period agreed by such Loan Parties with the applicable counter-parties during the Cases; provided that for purposes of any test of Excess Availability occurring prior to the Final Order Entry Date, "Availability" shall assume that all Final Term Loan Commitments and all Final Revolving Credit Commitments are then available to the Borrower.

"**Excluded Assets**":  (a) all leasehold real property included Leases, (b) all fee-owned real property with a fair market value of less than $2,000,000.00, (c) interests in partnerships, joint ventures and non-wholly-owned subsidiaries which cannot be pledged without the consent of one or more third parties, but only to the extent no such consent has been obtained after the exercise of commercially reasonable efforts by the Loan Parties, (d) the capital stock of Immaterial Subsidiaries, captive insurance subsidiaries, not-for-profit subsidiaries, special purpose entities used for permitted securitization facilities, (e) margin stock, (f) security interests in the stock of any Foreign Subsidiary of the Borrower and the assets of any Foreign Subsidiary of the Borrower, in each case to the extent the same would result in adverse tax consequences as reasonably determined by the Borrower; provided that no more than 35% of the voting stock of any Foreign Subsidiary or any Foreign Subsidiary Holding Company owned directly by a Loan Party or any Foreign Subsidiary Holding Company shall be an Excluded Asset and none of the non-voting stock of any Foreign Subsidiary or Foreign Subsidiary Holding Company owned directly by a Loan Party or Foreign Subsidiary Holding Company shall be an Excluded Asset, (g) any property and assets the pledge of which would require governmental consent, approval, license or authorization, but only to the extent that such consent, approval, license or authorization has not been obtained, (h) any "intent-to-use" trademark applications prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto, to the extent, if any, that, and solely during the period, if any, in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark application under applicable federal law, and (i) leases or licenses and rights thereunder to the extent of enforceable anti-assignment provisions contained therein which have not been waived (in each case after giving effect to the applicable anti-assignment provisions of the UCC or any other applicable law); provided, that, (i) Excluded Assets shall not include, any proceeds of any of the foregoing (unless such proceeds would otherwise constitute Excluded Assets), and (ii) any item of the foregoing that at any time ceases to satisfy the criteria for Excluded Assets (whether as a result of the applicable Loan Party obtaining any necessary consent, any change in any rule of law, statute or regulation, or otherwise), shall no longer be an Excluded Asset; provided, further, that no asset shall constitute an "Excluded Asset" if the same constitutes collateral under the Pre-Petition Term Loan Documents or the DIP Orders.

"**Excluded Taxes**":  With respect to the Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of the Loan Parties hereunder, (a) taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located, (b) any branch profits taxes imposed by the United States or any similar tax imposed by any other jurisdiction in which any Loan Party is located and (c) in the case of a Foreign Lender, any withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party hereto (or designates a new lending office) or is attributable to such Foreign Lender's failure or inability (other than as a result of a change in applicable Requirements of Law) to comply with Section 4-13(i), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Loan Parties with respect to such withholding tax pursuant to Section 4-13(e), (d) [intentionally omitted], and (e) any U.S. federal withholding tax imposed under FATCA.

"**Exigent Circumstances**": Means an event or circumstance that materially threatens the ability of the Agent to realize upon the Collateral, as determined by the Agent in its sole discretion.

"**FATCA**": Current Section 1471 through 1474 of the Internal Revenue Code of 1986, and the regulations promulgated thereunder, as amended and in effect, or any amended version or successor provision that is substantively similar and not materially more onerous to comply with, in each case, any regulations promulgated thereunder, any interpretation and other guidance issued in connection therewith, and any intergovernmental agreements relating thereto.

"**Federal Funds Effective Rate**": means, for any period, a fluctuating interest rate per annum equal to, for each day during such period, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by Agent.

"**Fee Letter**": The letter agreement, dated as of the date hereof, between the Borrower and the Agent with respect to certain fees payable to the Agent and Lenders in connection with this Agreement.

"**Fidelity Accounts**": means, collectively, (i) account number 00702982489 in the name of AWI and maintained at Fidelity Investments Institutional Operations Company, Inc., and (ii) account number 00702978677 in the name of the Borrower and maintained at Fidelity Investments Institutional Operations Company, Inc., in each case together with any successor account therefor. "**Fidelity Account**" shall mean any one of the foregoing.

"**Final DIP Order**": Collectively, the order of the Bankruptcy Court entered in the Cases after notice and final hearing pursuant to the Bankruptcy Rules or such other procedures as approved by the Bankruptcy Court which, among other matters (but not by way of limitation), authorizes the Borrower to obtain credit and the Loan Parties to incur (or guaranty) the Liabilities and grant Liens under the Loan Documents, as the case may be, and provides for the superpriority of the Agent's and the Lenders' claims, and authorizes the use of cash collateral, as the same shall be approved by, and may be modified or supplemented from time to time after the Final Order Entry Date with the written consent of, the Agent and Required Lenders in their sole and absolute discretion.

"**Final Order Effective Date**": The date on which the conditions under Sections 3-2 and 3-3 are satisfied or waived as determined by the Agent and the Required Lenders.

"**Final Order Entry Date**": The date on which the Final DIP Order is entered on the docket of the Bankruptcy Court.

"**Final Revolving Credit Commitment**": On and after the Final Order Effective Date, with respect to each Revolving Credit Lender, the commitment of such Revolving Credit Lender to make Revolving Credit Loans and acquire interests in other Revolving Credit Outstandings, which commitment is in the amount set forth opposite such Lender's name on Exhibit C-1 under the caption "Final Revolving Credit Commitment", as amended to reflect Assignments and as such amount may be reduced pursuant to this Agreement. The aggregate amount of the Final Revolving Credit Commitments on the Final Order Effective Date shall be the lesser of (a) $30,000,000.00 and (b) such amount as approved by the Bankruptcy Court pursuant to the Final DIP Order. It is understood and agreed that the Final Revolving Credit Commitments are in addition to the Interim Revolving Credit Commitments and not a replacement or substitute therefor.

12

"**Final Term Loan**" A single draw term loan to be made on the Final Order Effective Date in the aggregate amount not to exceed the Final Term Loan Commitment.

"**Final Term Loan Commitment**": On the Final Order Effective Date, with respect to each Term Loan Lender, the commitment of such Term Loan Lender to make Term Loans, which commitment is in the amount set forth opposite such Lender's name on Exhibit C-1 under the caption "Final Term Loan Commitment", as amended to reflect Assignments.  The aggregate amount of the Final Term Loan Commitments on the Final Order Effective Date shall be the lesser of (a) $30,000,000.00 and (b) such amount as approved by the Bankruptcy Court pursuant to the Final DIP Order. It is understood and agreed that the Final Term Loan Commitments are in addition to the Interim Term Loan Commitments and not a replacement or substitute therefor.

"**Fixtures**":  Has the meaning given that term in the UCC.

"**Foreign Asset Control Regulations**":  Has the meaning set forth in Section 14-22.

"**Foreign Lender**":  Any Lender that is organized under the laws of a jurisdiction other than that in which the Borrower is resident for Tax purposes.  For purposes of this definition, the United States, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"**Foreign Subsidiary**":  as defined in the Pre-Petition Term Loan Agreement as in effect as of May 23, 2014.

"**Foreign Subsidiary Holding Company**":  as defined in the Pre-Petition Term Loan Agreement as in effect as of May 23, 2014.

"**Fund**":  Any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans, notes and similar extensions of credit in the ordinary course of its business.

"**GAAP**":  Principles which are consistent with those promulgated or adopted by the Financial Accounting Standards Board and its predecessors (or successors) in effect and applicable to that accounting period in respect of which reference to GAAP is being made, provided, however, in the event of a Material Accounting Change, then unless otherwise specifically agreed to by the Agent, the Borrower shall include, with its monthly, quarterly, and annual financial statements a schedule, certified by the Borrower's chief financial officer, on which the effect of such Material Accounting Change to the statement with which provided shall be described.  Notwithstanding the foregoing, any obligations of a Person under a lease (whether existing now or entered into in the future) that is not (or would not be) a Capitalized Lease Obligation under GAAP as in effect on the Effective Date, shall not be treated as a Capitalized Lease Obligation solely as a result of the adoption of changes in GAAP outlined by the Financial Accounting Standards Board in its press release dated March 19, 2009.

"**General Intangibles**":  Includes, without limitation, "general intangibles" as defined in the UCC; and also all:  rights to payment for credit extended; deposits; amounts due to a Loan Party; credit memoranda in favor of a Loan Party; warranty claims; tax refunds and abatements; insurance refunds and premium rebates; all means and vehicles of investment or hedging, including, without limitation, options, warrants, and futures contracts; records; customer lists; telephone numbers; goodwill; causes of action; judgments; payments under any settlement or other agreement; literary rights; rights to performance; royalties; license and/or franchise fees; rights of admission; licenses; franchises; license agreements, including all rights of a Loan Party to enforce same; permits, certificates of convenience and necessity, and similar rights granted by any governmental authority; patents, patent applications, patents pending,

13

and other intellectual property; internet addresses and domain names; developmental ideas and concepts; proprietary processes; blueprints, drawings, designs, diagrams, plans, reports, and charts; catalogs; manuals; technical data; computer software programs (including the source and object codes therefor), computer records, computer software, rights of access to computer record service bureaus, service bureau computer contracts, and computer data; tapes, disks, semi-conductors chips and printouts; trade secrets rights, copyrights, mask work rights and interests, and derivative works and interests; user, technical reference, and other manuals and materials; trade names, trademarks, service marks, and all goodwill relating thereto; applications for registration of the foregoing; and all other general intangible property of the Loan Parties in the nature of intellectual property; proposals; cost estimates, and reproductions on paper, or otherwise, of any and all concepts or ideas, and any matter related to, or connected with, the design, development, manufacture, sale, marketing, leasing, or use of any or all property produced, sold or leased, by a Loan Party or credit extended or services performed, by a Loan Party, whether intended for an individual customer or the general business of a Loan Party, or used or useful in connection with research by a Loan Party.

"**Goods**": Has the meaning given that term in the UCC.

"**Goodwill**": Collectively, with respect to each Loan Party, the goodwill connected with such Loan Party's business including, without limitation, (i) all goodwill connected with the use of and symbolized by any other Intellectual Property in which such Loan Party has any interest, (ii) all know-how, trade secrets, customer and supplier lists, proprietary information, inventions, methods, procedures, formulae, descriptions, compositions, technical data, drawings, specifications, name plates, catalogs, confidential information and the right to limit the use or disclosure thereof by any Person, pricing and cost information, business and marketing plans and proposals, consulting agreements, engineering contracts and such other assets which relate to such goodwill and (iii) all product lines of such Loan Party's business.

"**Group Member**" or "**Group Members**": Individually and collectively the Borrower and each Subsidiary of the Borrower.

"**GSI Agreement**" The Amended and Restated E-Commerce Agreement, dated as of September 22, 2008 (as amended, supplemented or otherwise modified from time to time) by GSI Commerce Solutions, Inc. and the Borrower.

"**Guarantor**" and "**Guarantors**": Means individually and collectively AWI, Jimmy'Z, AGC, Aeropostale Procurement Company, Inc., Aeropostale Licensing, Inc., P.S. from Aeropostale, Inc., GoJane LLC, and any other Subsidiary of the Borrower which executes and delivers a Guarantor Agreement pursuant to the terms of this Agreement from time to time. Notwithstanding the foregoing or any provision of any Loan Document to the contrary, each Subsidiary of the Borrower that is a Guarantor under the Pre-Petition Term Loan Agreement shall be a Guarantor hereunder.

"**Guarantor Agreement**": Each instrument and document executed by a Guarantor of the Liabilities to evidence or secure the Guarantor's guaranty thereof, in form and substance satisfactory to the Agent, and including, without limitation the guaranty set forth in Article 15 hereof.

"**Hazardous Materials**": Any (a) hazardous materials, hazardous waste, hazardous or toxic substances, petroleum products, which (as to any of the foregoing) are defined or regulated as a hazardous material in or under any Environmental Law and (b) oil in any physical state.

"**Indebtedness**": All indebtedness and obligations of or assumed by any Person on account of or in respect to any of the following:

55718599V12

(a)     In respect of money borrowed (including any indebtedness which is non-recourse to the credit of such Person but which is secured by an Encumbrance on any asset of such Person) whether or not evidenced by a promissory note, bond, debenture or other written obligation to pay money.

(b)     In connection with any letter of credit or acceptance transaction (including, without limitation, the face amount of all letters of credit and acceptances issued for the account of such Person or reimbursement on account of which such Person would be obligated).

(c)     In connection with the sale or discount of accounts receivable or chattel paper of such Person other than the sale of retail Accounts to credit card processors.

(d)     On account of deposits or advances.

(e)     As lessee under Capital Leases.

(f)     On account of net obligations under any swap or hedging contract.

(g)     With respect to obligations to purchase, redeem, retire, defease or otherwise make any payment in respect of any equity interest in such Person or any other Person, or any warrant, right or option to acquire such equity interest, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends.

"**Indebtedness**" also includes:

(x)     Indebtedness of others secured by an Encumbrance on any asset of such Person, whether or not such Indebtedness is assumed by such Person.

(y)     Any guaranty, endorsement, suretyship or other undertaking pursuant to which that Person may be liable on account of any Indebtedness of any third party, other than endorsements of negotiable instruments for collection in the ordinary course of business consistent with past practices.

(z)     The Indebtedness of a partnership or joint venture in which such Person is a general partner or joint venturer to the extent that the holder of such Indebtedness has recourse to such Person.

"**Indemnified Claim**":  Is defined in Section 14-11.

"**Indemnified Person**":  Is defined in Section 14-11.

"**Indemnified Taxes**":  Taxes other than Excluded Taxes.

"**Initial DIP Budget**": The DIP Budget delivered to the Agent and the Lenders on the Effective Date, which shall be acceptable to the Agent and the Lenders in their sole discretion.  The Initial DIP Budget is attached as Exhibit I-2 and is acceptable to the Agent and the Lenders.

"**Initial Lenders**": Each Person party to this Agreement as a Lender on the Effective Date.

"**Instruments**":  Has the meaning given that term in the UCC.

"**Intellectual Property**":  Collectively, all Copyrights, Patents, Trademarks, Licenses and Goodwill.

"**Intercreditor Agreement**": That certain Intercreditor Agreement, dated as of May 23, 2014, by and among the Pre-Petition ABL Agent, the Pre-Petition Term Loan Agent and the Loan Parties as amended, restated, supplemented or otherwise modified prior to the Petition Date, as in effect as of such date.

"**Interest Payment Date**": The first Business Day of each month; the Termination Date; and the End Date.

"**Interim DIP Order**": The order of the Bankruptcy Court substantially in the form of Exhibit I-1 (except as may otherwise be agreed in writing or on the record by the Agent and the Required Lenders at the interim hearing with respect to such order in the Cases) entered in the Cases after an interim hearing pursuant to the Bankruptcy Rules, which, among other matters (but not by way of limitation), authorizes, on an interim basis, the Borrower to obtain credit and the Loan Parties to incur (or guaranty) the Liabilities and grant Liens under the Loan Documents, as the case may be, and provides for the superpriority of the Agent's and the Lenders' claims, and authorizes the use of cash collateral, as the same shall be approved by, and may be modified or supplemented from time to time after the Interim Order Entry Date but before the Final Order Entry Date, with the written consent of the Agent and Required Lenders in their sole and absolute discretion.

"**Interim Order Entry Date**": The date on which the Interim DIP Order is entered on the docket of the Bankruptcy Court.

"**Interim Revolving Credit Commitment**": On and after the Effective Date, with respect to each Revolving Credit Lender, the commitment of such Revolving Credit Lender to make Revolving Credit Loans and acquire interests in other Revolving Credit Outstandings, which commitment is in the amount set forth opposite such Lender's name on Exhibit C-1 under the caption "Interim Revolving Credit Commitment", as amended to reflect Assignments and as such amount may be reduced pursuant to this Agreement. The aggregate amount of the Interim Revolving Credit Commitments on the Effective Date shall be the lesser of (a) $55,000,000.00 and (b) such amount as approved by the Bankruptcy Court pursuant to the Interim DIP Order.

"**Interim Term Loan**": A single draw term loan to be made on the Effective Date but prior to the Final Order Entry Date, in the aggregate amount not to exceed the Interim Term Loan Commitment.

"**Interim Term Loan Commitment**": On the Effective Date, with respect to each Term Loan Lender, the commitment of such Term Loan Lender to make Term Loans, which commitment is in the amount set forth opposite such Lender's name on Exhibit C-1 under the caption "Interim Term Loan Commitment", as amended to reflect Assignments. The aggregate amount of the Interim Term Loan Commitments on the Effective Date shall be the lesser of (a) $45,000,000.00 and (b) such amount as approved by the Bankruptcy Court pursuant to the Interim DIP Order.

"**Inventory**": Includes, without limitation, "inventory" as defined in the UCC and also all: packaging, advertising, and shipping materials related to any of the foregoing, and all names or marks affixed or to be affixed thereto for identifying or selling the same; Goods held for sale or lease or furnished or to be furnished under a contract or contracts of sale or service by the Borrower, or used or consumed or to be used or consumed in the Borrower's business; Goods of said description in transit: returned, repossessed and rejected Goods of said description; and all documents (whether or not negotiable) which represent any of the foregoing.

"**Inventory Advance Rate**": (i) Each year, during the four-month period commencing on the date the Agent shall have received the Borrowing Base Certificate for the Borrower's last week of the

fiscal month of March as and when required pursuant to Section 5-5 and ending on the date the Borrower shall have delivered or have been required to deliver the Borrowing Base Certificate for the Borrower's last week of the fiscal month of June pursuant to Section 5-5, 92.5%; and (ii) at all other times, 90%.

"**Investment**":  Any direct or indirect acquisition or investment by any Group Member, whether by means of (a) the purchase or other acquisition of equity interests of another Person, (b) a loan, advance or capital contribution to, guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person, or (c) any acquisition of the assets or equity interests of any Person.

"**Investment Property**":  Has the meaning given that term in the UCC.

"**Jimmy'Z**":  Jimmy'Z Surf Co., LLC, a Delaware limited liability company with an address of 112 West 34th Street, New York, New York 10120, a wholly owned Subsidiary of the Borrower.

"**Lease**":  Any lease or other agreement, no matter how styled or structured, pursuant to which the Borrower is entitled to the use or occupancy of any space.

"**Lenders**":  Defined in the Preamble to this Agreement and shall include Term Loan Lenders and Revolving Credit Lenders, as the context may require.

"**Letter of Credit Rights**":  Has the meaning given that term in the UCC and also shall refer to any right to payment or performance under a letter of credit, whether or not the beneficiary has demanded or at the time is entitled to demand payment or performance.

"**Liabilities**" (in the singular, "**Liability**"):  Includes, without limitation, all and each of the following, whether now existing or hereafter arising:

(a)      Any and all direct and indirect liabilities, debts, and obligations of the Borrower to the Agent or any Lender, each of every kind, nature, and description under the Loan Documents (including, without limitation, in respect of Protective Advances).

(b)      Each obligation to repay any loan, advance, indebtedness, note, obligation, overdraft, or amount now or hereafter owing by the Borrower to the Agent or any Lender under the Loan Documents (including all future advances whether or not made pursuant to a commitment by the Agent or any Lender), whether or not any of such are allowed or allowable, are liquidated, unliquidated, primary, secondary, secured, unsecured, direct, indirect, absolute, contingent, or of any other type, nature, or description, or by reason of any cause of action which the Agent or any Lender may hold against the Borrower under the Loan Documents.

(c)      All notes and other obligations of the Borrower now or hereafter assigned to or held by the Agent or any Lender with respect to the Loan Documents, each of every kind, nature, and description.

(d)      All interest, fees, and charges and other amounts which may be charged by the Agent or any Lender to the Borrower under the Loan Documents and/or which may be due from the Borrower to the Agent or any Lender under the Loan Documents from time to time.

(e)      All costs and expenses incurred or paid by the Agent or any Lender in respect of any of the Loan Documents (including, without limitation, Costs of Collection, attorneys' fees, and all court and litigation costs and expenses).

55718599V12

(f)        Any and all covenants of the Borrower to or with the Agent or any Lender and any and all obligations of the Borrower to act or to refrain from acting in accordance with under Loan Documents.

(g)        [Intentionally Omitted].

(h)        Each of the foregoing as if each reference to the "**Agent**" and "**Lender**" therein were to each of the Affiliates of such Persons.

"**Licenses**":  Collectively, with respect to each Loan Party, all license and distribution agreements with any other Person with respect to any Patent, Trademark or Copyright or any other patent, trademark or copyright, whether such Loan Party is a licensor or licensee, distributor or distributee under any such license or distribution agreement, including the Mexico License, together with any and all (i) renewals, extensions, supplements and continuations thereof, (ii) income, fees, royalties, damages, claims and payments now and hereafter due and/or payable thereunder and with respect thereto including, without limitation, damages and payments for past, present or future infringements or violations thereof, (iii) rights to sue for past, present and future infringements or violations thereof and (iv) other rights to use, exploit or practice any or all of the Patents, Trademarks or Copyrights or any other patent, trademark or copyright.

"**Line (Unused) Fee**":  Is defined in Section 2-13.

"**Loan**":  A Revolving Credit Loan (including, without limitation, any Protective Advances) and/or a Term Loan, as the context may require.

"**Loan Account**":  Is defined in Section 2-7(a).

"**Loan Documents**":  This Agreement, the DIP Orders, the Fee Letter, each instrument and document executed and/or delivered as contemplated by Article 3, and each other instrument or document from time to time executed and/or delivered in connection with the arrangements contemplated hereby, provided by the Agent, any Affiliate of the Agent, or any Lender, as each may be amended from time to time.

"**Loan Party**" or "**Loan Parties**":   Individually and collectively the Borrower and each Guarantor.

"**Material Accounting Change**":  Any change in GAAP applicable to accounting periods subsequent to the Borrower's fiscal year most recently completed prior to the execution of this Agreement, which change has a material effect on the Borrower's financial condition or operating results, as reflected on financial statements and reports prepared by or for the Borrower, when compared with such condition or results as if such change had not taken place.

"**Material Adverse Effect**":  A material adverse effect upon (i) any Group Member's business, assets, properties, liabilities (actual or contingent), operations, financial affairs, or condition (financial or otherwise), taken as a whole, or (ii) the Collateral, taken as a whole, or (iii) the ability of the Loan Parties to perform their respective obligations under this Agreement and the other Loan Documents, or (iv) the validity, enforceability, perfection or priority of this Agreement or the other Loan Documents or of the rights and remedies of the Agent or any Lender under any Loan Document.  In determining whether any individual event would result in a Material Adverse Effect, (i) notwithstanding that such event in and of itself does not have such effect, a Material Adverse Effect shall be deemed to have occurred if the cumulative effect of such event and all other than existing events would result in a Material Adverse

55718599V12

Effect.  Notwithstanding the foregoing, in no event shall any Material Adverse Effect be deemed to exist as a result of the commencement of the Cases or the circumstances and events leading up thereto to the extent that such event(s) would reasonably be expected to result therefrom.

"**Material Contract**":  Solely for purposes of this Agreement, the Mexico License and the GSI Agreement.

"**Material Indebtedness**":  post-petition Indebtedness (other than the Liabilities) of the Borrower and its Subsidiaries in an aggregate principal amount exceeding $1,500,000  For purposes of determining the amount of Material Indebtedness at any time, (a) the amount of the obligations in respect of any swap contract at such time shall be calculated after taking into account the effect of any legally enforceable netting agreement relating to such swap contracts, (b) undrawn committed or available amounts shall be included, (c) all amounts owing to all creditors under any combined or syndicated credit arrangement shall be included and (d) all accounts payable to suppliers or vendors shall be excluded.

"**Material Leases**": Means the Borrower's leases with respect to the following locations (a) 950 North Barrington Avenue, Ontario, California, (b) 2 Brick Plant Road, South River, New Jersey, (c) 112 West 34th Street, New York New York, and (d) 125 Chubb Avenue, Lyndhurst, New Jersey.

"**Maturity Date**":  The earliest of (1) the Scheduled Maturity Date, (2) the consummation of a sale of all or substantially all of the assets of the Borrower pursuant to Section 363 of the Bankruptcy Code or otherwise, (3) the effective date of a plan of reorganization or liquidation in the Case, (4) the date of filing of a Plan of Reorganization that (x) does not provide for indefeasible payment in full in cash of all Liabilities and (y) is not otherwise acceptable to the Agent and the Required Lenders in their sole discretion and (5) the date of termination of the Lenders' Commitments and the acceleration of any outstanding extensions of credit, in each case, under this Agreement in accordance with the terms hereof and the other Loan Documents.

"**Mexico License**":  The License Agreement between Aeropostale Licensing, Inc. and Distribuidora Liverpool, S.A. DE C.V., dated as of December 14, 2012 (as amended by the First Amendment to License Agreement, dated November 1, 2015, as may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time solely with the consent of the Agent and the Required Lenders in their sole discretion.

"**MGF Sourcing Agreement**":  means that certain Sourcing Agreement dated as of May 23, 2014 (as amended, supplemented or otherwise modified from time to time) by and between Aeropostale Procurement Company, Inc. as "Principal" and TSAM (Delaware) LLC (d/b/a MGF Sourcing US, LLC) as "Agent".

"**Milestone**": Each of the milestones set forth on Exhibit M-1 hereto.

"**Operating Account**":  Is defined in Section 7-3.

"**Other Taxes**":  All present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document, excluding, however, any such amounts imposed as a result of an assignment by a Lender of its loan or Commitment.

"**Participant**":  Is defined in Section 18-2.

"**Participant Register**":  Is defined in Section 18-2(d).

"**Patents**":  Collectively, with respect to each Loan Party, all patents issued or assigned to and all patent applications made by such Loan Party (whether established or registered or recorded in the United States or any other country or any political subdivision thereof), including, without limitation, those patents, patent applications listed in **EXHIBIT 4-4** annexed hereto, together with any and all (i) rights and privileges arising under applicable Requirements of Law with respect to such Loan Party's use of any patents, (ii) inventions and improvements described and claimed therein, (iii) reissues, divisions, continuations, renewals, extensions and continuations-in-part thereof, (iv) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable thereunder and with respect thereto including, without limitation, damages and payments for past, present or future infringements thereof, (v) rights corresponding thereto throughout the world and (vi) rights to sue for past, present or future infringements thereof.

"**Payment Intangibles**":  Has the meaning given that term in the UCC and shall also refer to any General Intangible under which the Account Debtor's primary obligation is a monetary obligation.

"**Permitted Encumbrances**":  Those Encumbrances permitted as provided in Section 4-6(a) hereof.

"**Permitted Closing Store**": Each of the 154 store locations (of which, 41 stores are located in Canada), identified to the Agent by the Borrower prior to the Effective Date, that the Borrower intends to close, plus, additional store locations that the Borrower intends to close during the term of this Agreement, in each case as contemplated by, and in accordance with, the applicable DIP Budget in effect at such time.

"**Person**":  Any natural person, and any corporation, limited liability company, trust, partnership, joint venture, or other enterprise or entity.

"**Petition Date**": Has the meaning given to such term in the recitals of this Agreement.

"**Petitions**": The voluntary petitions for relief under Chapter 11 of the Bankruptcy Code filed by the Loan Parties with the Bankruptcy Code.

"**Plan of Reorganization**": A Chapter 11 plan of reorganization submitted by the Loan Parties or any of the Loan Parties to the Bankruptcy Court in connection with the Cases or any Case, as applicable.

"**Post-Petition L/C Reserve Account**": Has the meaning given to such term in Section 4-35 of the Agreement.

"**Pre-Petition ABL Agent**": Bank of America, N.A., as Agent under the Pre-Petition ABL Credit Agreement.

"**Pre-Petition ABL Credit Agreement**": The Third Amended and Restated Loan and Security Agreement, dated as of September 22, 2011 (as amended, restated, supplemented or otherwise modified prior to the Petition Date, as in effect as of such date) among the Borrower, the Pre-Petition ABL Lenders, and the Pre-Petition ABL Agent for the Pre-Petition ABL Lenders.

"**Pre-Petition ABL Escrow and Reserve Accounts**": Has the meaning given to such term in Section 4-35 of this Agreement.

"**Pre-Petition ABL Facility**": The revolving credit facility extended by the Pre-Petition ABL Lenders to the Borrower, including the issuance of letters of credit, under the Pre-Petition ABL Credit Agreement.

"**Pre-Petition ABL Lenders**": The "Lenders" (as defined in the Pre-Petition ABL Credit Agreement), in their capacities as the pre-petition lenders under the Pre-Petition ABL Credit Agreement.

"**Pre-Petition Term Credit Parties**": The "Credit Parties" (as defined in the Pre-Petition Term Loan Agreement), in their capacities as secured creditors with respect to the Pre-Petition Term Indebtedness.

"**Pre-Petition Term Indebtedness**": The Liabilities (as defined in the Pre-Petition Term Loan Agreement) for which the Borrower and certain of its affiliates are indebted and jointly and severally liable to the Pre-Petition Term Lenders, in respect of amounts owed by the Borrower under the Pre-Petition Term Loan Agreement, which such Liabilities are secured by the assets of each of the Loan Parties pursuant to the Loan Documents (under and as defined in the Pre-Petition Term Loan Agreement).

"**Pre-Petition Term Lenders**": The Lenders (as defined in the Pre-Petition Term Loan Agreement), in their capacities as the pre-petition lenders under the Pre-Petition Term Loan Agreement.

"**Pre-Petition Term Loan Agent**": Means AERO Investors LLC, a Delaware limited liability company.

"**Pre-Petition Term Loan Agreement**": That certain Loan and Security Agreement dated as of May 23, 2014, by and among the Borrower, the guarantors from time to time party thereto, the Pre-Petition Term Lenders party thereto, and the Pre-Petition Term Loan Agent, as the same has been amended, restated, supplemented or otherwise modified prior to the Petition Date, as in effect as of such date.

"**Pre-Petition Term Loan Documents**": The Pre-Petition Term Loan Agreement and the other "Loan Documents" as such term is defined in the Pre-Petition Term Loan Agreement, as such Pre-Petition Term Loan Documents have been amended, restated, supplemented or otherwise modified prior to the Petition Date, as in effect as of such date.

"**Pre-Petition Term Loan Proceeds Account**": A Deposit Account maintained with Bank of America, N.A. which is subject to a blocked account agreement among Bank of America, N.A., the Borrower and the Pre-Petition Term Loan Agent, into which the proceeds of the Pre-Petition Term Loans were deposited on May 23, 2014.

"**Pre-Petition Term Loan Proceeds Securities Account**": That certain securities account number xA14 maintained by the Borrower at Merrill Lynch, Pierce, Fenner & Smith Incorporated which is subject to a control agreement among Bank of America, N.A., the Borrower and the Pre-Petition Term Loan Agent, into which solely the proceeds of the Pre-Petition Term Loans, investments of such proceeds and any interest or return on investment thereon (including the proceeds of any sale, maturity or similar disposition of investments of the proceeds of the Pre-Petition Term Loans to the extent such sale, maturity or similar disposition is permitted hereunder) shall be deposited.

"**Pre-Petition Term Loans**": Means, collectively, the Pre-Petition Tranche A Term Loan Facility and the Pre-Petition Tranche B Term Loan Facility.

"**Pre-Petition Term Priority Collateral**": Has the meaning given to "Term Priority Collateral" in the DIP Orders.

"**Pre-Petition Term Priority Liens**": Means the Liens in favor of the Pre-Petition Term Loan Agent on the Pre-Petition Term Priority Collateral to the extent of the Pre-Petition Term Priority Obligations.

"**Pre-Petition Term Priority Obligations**": Has the meaning given to "Term Priority Obligation" in the Intercreditor Agreement.

"**Pre-Petition Tranche A Term Loan Facility**": That certain Tranche A Term Loan Facility in the aggregate principal amount of $100,000,000, defined under, and funded pursuant to, the Pre-Petition Term Loan Agreement.

"**Pre-Petition Tranche B Term Loan Facility**": That certain Tranche B Term Loan Facility in the aggregate principal amount of $50,000,000, defined under, and funded pursuant to, the Pre-Petition Term Loan Agreement.

"**Proceeds**": Includes, without limitation, "Proceeds" as defined in the UCC (defined below), and each type of property described in Section 8-1 hereof.

"**Professional Fees**": All accrued and unpaid claims for fees and expense reimbursements of Professional Persons retained by the Debtors (but not any success or transaction fees).

"**Professional Person**": Means a Person who is an attorney, accountant, appraiser, auctioneer or financial advisor or other professional person who is retained with approval of the Bankruptcy Court by any Loan Party pursuant to Section 327 of the Bankruptcy Code.

"**Protective Advances**": Is defined in Section 2-6(d).

"**Pro Rata Outstandings**": Of any Lender at any time, means, (a) with respect to the Revolving Credit, the outstanding principal amount of Revolving Credit Loans (including Protective Advances) owing to such Lender, and (b) with respect to the Term Loan Facility, the outstanding principal amount of Term Loans owing to such Lender.

"**Pro Rata Share**": With respect to any Lender at any time, (a) with respect to the Revolving Credit, the percentage obtained by dividing (i) the sum of the Revolving Credit Commitments (or, if such Revolving Credit Commitments are terminated, the outstanding principal amount of Revolving Credit Loans) of such Lender then in effect by (ii) the sum of the Revolving Credit Commitments (or, if such Revolving Credit Commitments are terminated, the outstanding principal amount of Revolving Credit Loans) of all Lenders then in effect; and (b) with respect to the Term Loan Facility, the percentage obtained by dividing (i) the sum of the Term Loan Commitments (or, if such Term Loan Commitments are terminated, the outstanding principal amount of Term Loans) of such Lender then in effect by (ii) the sum of the Term Loan Commitments (or, if such Term Loan Commitments are terminated, the outstanding principal amount of Term Loans) of all Lenders then in effect.

"**Receipts**": All cash, cash equivalents, checks, and credit card slips and receipts as arise out of the sale of the Collateral.

"**Receivables Collateral**": That portion of the Collateral which consists of the Loan Parties' Accounts, Accounts Receivable, General Intangibles for the payment of money, Chattel Paper,

Instruments, Investment Property, letters of credit for the benefit of a Loan Party, and bankers' acceptances held by a Loan Party, and any rights to payment.

"**Register**": Is defined in Section 18-1(d).

"**Related Entity**":   (a) Any corporation, limited liability company, trust, partnership, joint venture, or other enterprise which:  is a parent, brother-sister, Subsidiary, or Affiliate, of the Borrower; could have such enterprise's tax returns or financial statements consolidated with the Borrower's; could be a member of the same controlled group of corporations (within the meaning of Section 1563(a)(1), (2) and (3) of the Internal Revenue Code of 1986, as amended from time to time) of which the Borrower is a member; controls or is controlled by the Borrower or by any Affiliate of the Borrower.

(b)    Any Affiliate of the Borrower.

"**Remedies Notice Period**": Is defined in Section 11-1.

"**Required Lenders**": At any time, two (2) or more Lenders (not affiliated with each other) who hold in the aggregate more than 60% of the sum of (a) the Term Loan Commitments then in effect, (or, if such Term Loan Commitments have been terminated, the aggregate principal amount of the Term Loans then outstanding), and (b) the Revolving Credit Commitments then in effect, (or, if such Revolving Credit Commitments are terminated or have been reduced to zero, the Revolving Credit Outstandings) then in effect, ignoring, in such calculation, the amounts held by any Defaulting Lender.

"**Requirement of Law**": As to any Person:

(a)    (i) All statutes, rules, regulations, orders, or other requirements having the force of law and (ii) all court orders and injunctions, arbitrator's decisions, and/or similar rulings, in each instance ((i) and (ii)) of or by any federal, state, municipal, and other governmental authority, or court, tribunal, governmental panel, or other governmental body which has jurisdiction over such Person, or any property of such Person.

(b)    That Person's charter, certificate of incorporation, articles of organization, and/or other organizational documents, as applicable; and

(c)    that Person's by-laws and/or other instruments which deal with corporate or similar governance, as applicable;

provided however, for purposes of this Agreement (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, guidelines or directives in connection therewith, and (ii) all rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall, in each case, be deemed to have gone into effect and been adopted after the Effective Date.

"**Reserves**":  Without duplication of any other reserves or items that are otherwise addressed or excluded either through eligibility criteria or in the most recent appraisal conducted hereunder by an independent appraiser satisfactory to the Agent, such reserves as the Agent from time to time determines in its discretion exercised in good faith as being necessary or appropriate (a) to reflect the impediments to the Agent's ability to realize upon the Collateral, including any claims or liabilities that the Agent determines will need to be satisfied in connection with the realization upon such Collateral (including, without limitation, the Inventory), (b) to reflect costs, expenses and other amounts that the Agent may

23

incur or be required to pay to realize upon the Collateral, including, without limitation, on account of rent, customs and duties and Permitted Encumbrances, (c) to reflect changes in the determination of the saleability, at retail, of Acceptable Inventory, (d) to reflect such other factors as negatively affect the market value of the Acceptable Inventory, (e) to reflect criteria, events, conditions, contingencies or risks which adversely affect any component of the Borrowing Base (including, without limitation, any litigation or other legal proceeding with respect to infringement of Eligible Trade Names by third parties), (f) on account of gift cards, gift certificates, merchandise credits and customer deposits, (g) [intentionally omitted], (h) [intentionally omitted], (i) self-health insurance reserves equal to one (1) month based on the average of the immediately preceding 12 months, (j) the Carve-Out Reserve, and (j) rent reserves not to exceed two (2) month's rent plus any past due amounts.  The Agent shall have the right, at any time and from time to time after the Effective Date in its discretion exercised in good faith as being necessary or appropriate to establish, modify or eliminate Reserves.

The implementation or increase of any Reserve will be based on the analysis of facts or events discovered by Agent after the Effective Date that are different from facts or events known to Agent on the Effective Date, upon at least two Business Days' prior notice to the Borrower (which notice will include a reasonably detailed description of the Reserve being established), unless Exigent Circumstances exist (in which case a Reserve may be implemented immediately without any prior notice). During such two Business Day period, Agent will, if requested, discuss any such Reserve or change with the Borrower, and the Borrower may take such action as may be required so that the event, condition or matter that is the basis for such Reserve or change no longer exists or exists in a manner that would result in the establishment of a lower Reserve or result in a lesser change, in each case, in a manner and to the extent satisfactory to Agent; provided, that to the extent that the Agent believes that such Reserve is necessary to preserve or protect the assets included in the Borrowing Base, or any portion thereof, the Agent may implement, modify or increase such Reserve in its sole discretion at such time, even if the Borrower is taking action to remedy such condition during such period.

"**Responsible Officer**":  The chief executive officer, chief operating officer, treasurer, controller, chief financial officer or general counsel of a Loan Party.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"**Restricted Cash**":  As of any date of determination thereof, the U.S. domestic cash, checks and Cash Equivalents of the Loan Parties that consist of any of the following: (i) petty cash cash and checks in store cash registers, and in the case of cash and checks in amounts that are consistent with the Loan Parties' historic practices for holding such items; (ii) any cash held in disbursement accounts or other accounts for payments on account of any Loan Party (e.g., accounts for payroll, vendor payments) other than the Operating Account; (iii) amounts in the Pre-Petition ABL Escrow and Reserve Accounts; (iv) [intentionally omitted]; (v) amounts in the Professional Fees and Carve-Out Account; (vi) [intentionally omitted], (vii) cash and Cash Equivalents in Trust Deposit Accounts; and (viii) any cash held in accounts pledged to cash collateralize letter of credit obligations permitted pursuant to Section 4-7(d)(1).

"**Restricted Payment**":  Any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other equity interest of any Person or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other equity interest, or on account of any return of capital to such Person's stockholders, partners or members (or the equivalent of any thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment.  Without limiting the foregoing,

"Restricted Payments" with respect to any Person shall also include all payments made by such Person with any proceeds of a dissolution or liquidation of such Person.

"**Revolving Credit**":  Is defined in Section 2-1.

"**Revolving Credit Commitments**": The Interim Revolving Credit Commitment and/or the Final Revolving Credit Commitment, as the context may require.

"**Revolving Credit Lender**": Each Lender that has a Revolving Credit Commitment or holds a Revolving Credit Loan.

"**Revolving Credit Loans**":  Has the meaning specified in Section 2-1.

"**Revolving Credit Note**":  Has the meaning specified in Section 2-8.

"**Revolving Credit Outstandings**" means, at any time, to the extent outstanding at such time, the aggregate principal amount of the Revolving Credit Loans.

"**Safe Harbor Provisions**": Sections 546(e) and (g), 555, 556, 559, 560, 561 and 562 of the Bankruptcy Code.

"**Same Day Advances**": Is defined in Section 2-5(d).

"**Scheduled Maturity Date**": The date that is 12 months after the Effective Date.

"**Settlement Date**": Is defined in Section 19-7(a).

"**Statutory Reserve Rate**":  A fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Federal Reserve Board to which any Lender is subject with respect to the Adjusted Eurodollar Rate, for Eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Federal Reserve Board).  Such reserve percentages shall include those imposed pursuant to such Regulation D.  Eurodollar Loans shall be deemed to constitute Eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to the Lenders under such Regulation D or any comparable regulation.  The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"**Subsidiary**":  As to any Person, any corporation, association, partnership, limited liability company, joint venture or other business entity of which at least fifty percent (50%) or more of the ordinary voting power (or equivalent interests) for the election of a majority of the board of directors (or other equivalent governing body) of such entity is held or controlled by such Person, or by one or more Subsidiaries of such Person, or by such Person and one or more Subsidiaries of such Person; or which is otherwise controlled by such Person, or by one or more Subsidiaries of such Person, or by such Person and one or more Subsidiaries of such Person through the exercise of voting power or otherwise.

"**Supporting Obligation**":  Has the meaning given that term in the UCC and shall also refer to a Letter of Credit Right or secondary obligation that supports the payment or performance of an Account, Chattel Paper, a Document, a General Intangible, an Instrument or Investment Property.

25

"**Suspension Event**":  Any occurrence, circumstance, or state of facts which (a) is an Event of Default, which is continuing; or (b) would become an Event of Default if any requisite notice were given and/or any requisite period of time were to run and such occurrence, circumstance, or state of facts were not absolutely cured within any applicable grace period.

"**Taxes**":  All present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any governmental authority, including any interest, additions to tax or penalties applicable thereto.

 "**Termination Date**":  The earliest of (a) the Maturity Date; or (b) [intentionally omitted]; or (c) date set by notice by the Agent to the Borrower, which notice sets the Termination Date on account of the occurrence of any Event of Default.

"**Term Loan**": The Interim Term Loan and/or the Final Term Loan, as the context may require.

"**Term Loan Commitment**":  The Interim Term Loan Commitment and/or the Final Term Loan Commitment, as the context may require.

"**Term Loan Facility**": Is defined in Section 2-2(c).

"**Term Loan Lender**": Each Lender that has a Term Loan Commitment and/or holds a Term Loan.

"**Term Loan Note**": Is defined in Section 2-8.

"**Trademarks**":  With respect to each Loan Party, all trademarks (including service marks), slogans, logos, certification marks, trade dress, uniform resource locations (URLs), domain names, corporate names and trade names, whether registered or unregistered, owned by or assigned to such Loan Party and all registrations and applications for the foregoing (whether statutory or common law and whether established or registered in the United States or any other country or any political subdivision thereof), including, without limitation, the registrations and applications listed in **EXHIBIT 4-4** annexed hereto, together with any and all (i) rights and privileges arising under applicable Requirements of Law with respect to such Loan Party's use of any trademarks, (ii) reissues, continuations, extensions and renewals thereof, (iii) income, fees, royalties, damages and payments now and hereafter due and/or payable thereunder and with respect thereto, including, without limitation, damages, claims and payments for past, present or future infringements thereof, (iv) rights corresponding thereto throughout the world and (v) rights to sue for past, present and future infringements thereof.

"**Transfer**":  Wire transfer pursuant to the wire transfer system maintained by the Board of Governors of the Federal Reserve Board, or as otherwise may be agreed to from time to time by the Agent and the subject Lender.  Such wire transfer shall be in accordance with the following wire instructions or the wire instructions given by an Person who becomes a "Lender" pursuant to Section 18-1 (which instructions, in each instance, may be revised by written notice given, with respect to a party's wire instructions, by that party to the Agent):

To the Agent:
Crystal Financial LLC
ABA No. 021-000-089
Acct No.:  9977665971

To any Lender:

55718599V12

As set forth in its Administrative Questionnaire.

"**Trust Deposit Accounts**":  Depository accounts established by the Loan Parties the proceeds of which are to be utilized solely for the payment of sales taxes, ad valorem taxes, withholding taxes and other similar Taxes, and other depository accounts established by the Loan Parties for which such Loan Party is a trustee or other fiduciary for any other Persons.

"**UCC**":  The Uniform Commercial Code as presently in effect in New York, provided, however, that if a term is defined in Article 9 of the Uniform Commercial Code differently than in another Article thereof, the term shall have the meaning set forth in Article 9; provided further that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection, of a security interest in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect in a jurisdiction other than New York, "Uniform Commercial Code" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy, as the case may be.

"**Unrestricted Cash**": As of any date of determination thereof, the unrestricted U.S. domestic cash, checks and Cash Equivalents of the Loan Parties (excluding Restricted Cash).  It is expressly understood and agreed that cash, checks and Cash Equivalents shall be considered unrestricted for purposes of this definition notwithstanding that such assets are subject to Encumbrances of a type described in clause (i), (xvii) or (xix) of Section 4-6(a).

(a)    Accounting Terms and Principles.  (i)  GAAP.  All accounting determinations required to be made pursuant hereto shall, unless expressly otherwise provided herein, be made in accordance with GAAP.  No change in the accounting principles used in the preparation of any financial statement hereafter adopted by the Borrower shall be given effect if such change would affect a calculation that measures compliance with any provision of hereof unless the Borrower, the Agent and the Required Lenders agree to modify such provisions to reflect such changes in GAAP and, unless such provisions are modified, all financial statements, compliance certificates and similar documents provided hereunder shall be provided together with a reconciliation between the calculations and amounts set forth therein before and after giving effect to such change in GAAP.  Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under Statement of Financial Accounting Standards 159 (or any other Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of any Loan Party or any Subsidiary of any Loan Party at "fair value."

(ii)    Pro Forma.  All components of financial calculations made to determine compliance shall be adjusted on a pro forma basis to include or exclude, as the case may be, without duplication, such components of such calculations attributable to any pro forma transaction consummated after the first day of the applicable period of determination and prior to the end of such period, as determined in good faith by the Borrower based on assumptions expressed therein and that were reasonable based on the information available to the Borrower at the time of preparation of the compliance certificate setting forth such calculations.

**Article 2 - The Credit Facilities**:

2-1.    Establishment of Revolving Credit Facilities.

(a)    Revolving Credit.

(i)    Subject to Article 3 and the terms and conditions set forth in this Agreement, the Revolving Lenders hereby establish a revolving line of credit (the "**Revolving Credit**") in the Borrower's favor pursuant to which each Revolving Lender, subject to, and in accordance with, this Agreement, agrees to severally (and not jointly, or jointly and severally) make loans and advances (the "**Revolving Credit Loans**" and each, a "**Revolving Credit Loan**") and otherwise provide financial accommodations to and for the account of the Borrower as provided herein from time to time (subject to any limitations contained within the Interim DIP Order or the Final DIP Order, as applicable), and in each case equal to that Revolving Lender's Pro Rata Share up to the maximum amount of such Revolving Lender's Revolving Credit Commitment as in effect as such time; provided that the Aggregate Outstandings shall not at any time in the aggregate exceed the lesser of (A) the aggregate Revolving Credit Commitments then in effect, and (B) the Borrowing Base (as calculated pursuant to the Borrowing Base Certificate in effect from time to time).

(ii)    The proceeds of borrowings under the Revolving Credit shall be used as set forth in Section 4-35.

2-2.    Term Loans.

(a)    Interim Term Loan.  On the Effective Date, each Term Loan Lender, subject to, and in accordance with, this Agreement, agrees to severally, and not jointly or jointly and severally, make the Interim Term Loan to and for the account of the Borrower as provided herein, in the amount of such Term Loan Lender's Interim Term Loan Commitment (subject to any limitations contained within the Interim DIP Order or the Final DIP Order, as applicable).  The Interim Term Loan shall be made in one draw on the Effective Date, but prior to the Final Order Entry Date, the Interim Term Loan Commitments shall be immediately terminated, and once repaid, no part of the Interim Term Loan may be reborrowed.

(b)    Final Term Loan.  On the Final Order Effective Date, each Term Loan Lender, subject to, and in accordance with, this Agreement, agrees to severally, and not jointly or jointly and severally, make the Final Term Loan to and for the account of the Borrower as provided herein, in the amount of such Term Loan Lender's Final Term Loan Commitment (subject to any limitations contained within the Interim DIP Order or the Final DIP Order, as applicable).  The Final Term Loan shall be made in one draw on the Final Order Effective Date, the Final Term Loan Commitments shall be immediately terminated, and once repaid, no part of the Final Term Loan may be reborrowed.

(c)    The proceeds of borrowings under the Interim Term Loan and the Final Term Loan (collectively, the "**Term Loan Facility**") shall be used as set forth in Section 4-35.

2-3.    Voluntary Reduction or Termination of Commitments.

(a)    The Borrower may reduce, or terminate, the Lenders' Revolving Credit Commitments, pro rata, in whole or in part from time to time, by furnishing three (3) Business Days' written notice to the Agent.  Upon the effective date of any such reduction, the Borrower shall pay to the Agent (i) any amounts required by under Section 2-9(b) hereof as a result of such reduction or termination, together with (ii) the accrued Line (Unused) Fee as of the date of such reduction or termination.  No reduction or termination of the Revolving Credit Commitments may be reinstated.  The Borrower may not reduce or terminate the Lenders' Term Loan Commitments, nor may the Borrower make any prepayment of the Term Loans, unless all of the Commitments are terminated in full, and all of the Liabilities are paid in full, in cash.

2-4.    <u>Risks of Value of Collateral</u>.  The Agent's reference to a given asset in connection with the making of loans, credits, and advances and the providing of financial accommodations under this Agreement and/or the monitoring of compliance with the provisions hereof shall not be deemed a determination by the Agent relative to the actual value of the asset in question.  All risks concerning the collectability of the Borrower's Accounts and the saleability of the Borrower's Inventory are and remain upon the Borrower.  All Collateral secures the prompt, punctual, and faithful performance of the Liabilities whether or not relied upon by the Agent or any Lender in connection with the making of loans, credits, and advances and the providing of financial accommodations under this Agreement.

2-5.    <u>Loan Requests</u>.

(a)    Subject to the provisions of this Agreement, Revolving Credit Loans duly and timely requested by the Borrower shall be made pursuant hereto; <u>provided</u> that:

(i)    Availability will not be exceeded.

(ii)    No more than three requests for Revolving Credit Loans may be made per week.

(iii)    The Revolving Credit has not been suspended as provided in Section 2-5(j).

(iv)    Such requested Revolving Credit Loans shall be in a minimum amount of $2,000,000 and integral multiples of $100,000 in excess thereof.

(b)    [Intentionally Omitted].

(c)    [Intentionally Omitted].

(d)    Requests for loans and advances under the Revolving Credit or Term Loan shall be made by an irrevocable written request by a Responsible Officer delivered to the Agent.  Such notice must be received by Agent in writing no later than 1:00 p.m. two Business Days prior to the date that is the requested funding date; provided that Borrower may request a Revolving Credit Loan no later than 1:00 p.m. on a Business Day to be made on that same day if the amount of such Revolving Credit Loan is not more than the total cash receipts received by the Agent in the Cash Collateral Account on such requested date (each, a "<u>Same Day Advance</u>").  Same Day Advances shall not be subject to the limitations set forth in clauses (ii) and (iv) above.

(e)    [Intentionally Omitted].

(f)    Any request for a Loan which is made after the applicable deadline therefor, as set forth above, shall be deemed to have been made at the opening of business on the then next Business Day.

(g)    [Intentionally Omitted].

(h)    The Agent may rely on any request for a loan or advance, or other financial accommodation under the Revolving Credit or Term Loan which the Agent, in good faith, believes to have been made by a Person duly authorized to act on behalf of the Borrower and may decline to make any such requested loan or advance, or issuance, or to provide any such financial accommodation pending

55718599V12

the Agent being furnished with such documentation concerning that Person's authority to act as may be satisfactory to the Agent.

(i)     [Intentionally Omitted].

(j)     Upon the occurrence, and during the continuance, from time to time of any Suspension Event:

(i)     The Agent may suspend the Revolving Credit and the Term Loan Facility immediately.

(ii)     Neither the Agent nor any Lender shall be obligated, during such suspension, to make any loans or advance, or to provide any financial accommodation hereunder.

2-6.   Making of Loans.

(a)     A loan or advance under the Revolving Credit or Term Loan shall be made by the transfer of the proceeds of such loan or advance to the Operating Account or as otherwise instructed by the Borrower.

(b)     A loan or advance shall be deemed to have been made under the Revolving Credit, or Term Loan, as applicable (and the Borrower shall be indebted to the Lenders for their respective pro rata portions of the amount thereof immediately) at the following:

(i)     The Agent's initiation of the transfer of the proceeds of such loan or advance in accordance with the Borrower's instructions (if such loan or advance is of funds requested by the Borrower).

(ii)     The charging of the amount of such loan to the Loan Account (in all other circumstances).

(c)     There shall not be any recourse to or liability of the Agent or any Lender, on account of:

(i)     Any delay in the making of any loan or advance requested under the Revolving Credit or Term Loan unless due to the Agent's, or, if applicable, Lender's, gross negligence or willful misconduct, as determined by a final judgment of a court of competent jurisdiction.

(ii)     Any delay in the proceeds of any such loan or advance constituting collected funds.

(iii)     Any delay in the receipt, and/or any loss, of funds which constitute a loan or advance under the Revolving Credit or Term Loan, the wire transfer of which was properly initiated in accordance with wire instructions provided to the Agent by the Borrower.

(d)     Any contrary provision of this Agreement or any other Loan Document notwithstanding, but subject to Section 19-7, Agent hereby is authorized by Borrower and the Lenders, from time to time in Agent's sole discretion, (A) after the occurrence and during the continuance of a Suspension Event, or (B) at any time that any of the other applicable conditions precedent set forth in Section 3 are not satisfied, to make Revolving Credit Loans to, or for the benefit of, Borrower on behalf

30

of the Lenders (in an aggregate principal amount of Protective Advances outstanding not to exceed five percent (5%) of the Borrowing Base (as calculated pursuant to the Borrowing Base Certificate in effect from time to time)), or such greater amount as consented to by the Required Lenders, that Agent in its sole discretion deems necessary or desirable (1) to preserve or protect the Collateral, or any portion thereof, or (2) to enhance the likelihood of repayment of the Liabilities (any of the Advances described in this Section 2-6(d) shall be referred to as "Protective Advances").  The making of a Protective Advance on any one occasion shall not obligate the Agent or Lenders to make or permit a Protective Advance on any other occasion or to permit such Protective Advance to remain outstanding.  Each Protective Advance shall be deemed to be a Revolving Credit Loan hereunder, except that prior to settlement therefor, all payments on the Protective Advances shall be payable on  a pro rata basis to the Agent and the Lenders who elect to participate in such Protective Advances.  The Protective Advances shall be repayable on demand, secured by the Collateral, constitute Liabilities hereunder, and bear interest at the rate applicable from time to time to Revolving Credit Loans plus the default rate pursuant to Section 2-10(f).   The provisions of this Section 2-6(d) are for the exclusive benefit of Agent and the Lenders and are not intended to benefit the Borrower in any way.  Notwithstanding anything contained in this Agreement or any other Loan Document to the contrary, to the extent any Protective Advance causes the Aggregate Outstandings to exceed the Borrowing Base (as calculated pursuant to the Borrowing Base Certificate in effect from time to time), each such Protective Advance shall be for the separate account of the Agent and the Lenders electing to participate in such Protective Advances, and not for the account of any  Lenders who do not elect to participate in such Protective Advances, and shall be entitled to priority in repayment in accordance with Section 7.5(c).

2-7.    The Loan Account.

(a)    An account ("**Loan Account**") may be opened on the books of the Agent with respect to the Loans.  A record may be kept in the Loan Account of all Loans made under or pursuant to this Agreement and of all payments thereon.

(b)    The Agent may also keep a record (in either Loan Account or elsewhere, as the Agent may from time to time elect) of all interest, fees, service charges, costs, expenses, and other debits owed the Agent and each Lender on account of the Liabilities and of all credits against such amounts so owed.

(c)    All credits against the Liabilities shall be conditional upon final payment to the Agent for the account of each Lender of the items giving rise to such credits.  The amount of any item credited against the Liabilities which is charged back against the Agent or any Lender for any reason or is not so paid shall be a Liability and shall be added to the Loan Account, whether or not the item so charged back or not so paid is returned.

(d)    Except as otherwise provided herein, all fees, service charges, costs, and expenses for which the Borrower is obligated hereunder are payable on demand.

(e)    The Agent, without the request of the Borrower, may advance under the Revolving Credit, any interest, fee, service charge, or other payment to which the Agent or any Lender is entitled from the Borrower pursuant hereto and may charge the same to the Loan Account notwithstanding that such amount so advanced may result in Availability being exceeded.  Such action on the part of the Agent shall not constitute a waiver of the Agent's or any Lender's rights and Borrower's obligations under Section 2-9(b).  Any amount which is added to the principal balance of the Loan Account as provided in this Section 2-7(e) shall bear interest, subject to Section 2-10(f), at the Eurodollar Rate.

(f)    Absent manifest error, any statement rendered by the Agent to the Borrower concerning the Liabilities shall be considered correct and accepted by the Borrower and shall be conclusively binding upon the Borrower unless the Borrower provides the Agent with written objection thereto within thirty (30) days from the receipt of such statement, which written objection shall indicate, with particularity, the reason for such objection. The Loan Account and the Agent's books and records concerning the loan arrangement contemplated herein and the Liabilities shall be prima facie evidence and proof of the items described therein.

2-8.    The Notes.  (a) The obligation to repay loans and advances under the Revolving Credit, with interest as provided herein, may, at the request of any Lender, be evidenced by promissory notes (each, a "**Revolving Credit Note**") in the form of **EXHIBIT 2-8(A)**, annexed hereto, executed by the Borrower.  Neither the original nor a copy of a Revolving Credit Note shall be required, however, to establish or prove any Liability.  In the event that a Revolving Credit Note is ever lost, mutilated, or destroyed, upon receipt of an indemnification with respect to the lost Revolving Credit Note from such Lender in form and substance reasonably satisfactory to the Borrower and the Agent, the Borrower shall execute a replacement thereof and deliver such replacement to such Lender.  (b) The obligation to repay the Term Loans, with interest as provided herein, may, at the request of any Lender, be evidenced by promissory notes (each, a "**Term Loan Note**") in the form of **EXHIBIT 2-8(B)**, annexed hereto, executed by the Borrower.  Neither the original nor a copy of a Term Loan Note shall be required, however, to establish or prove any Liability.  In the event that a Term Loan Note is ever lost, mutilated, or destroyed, upon receipt of an indemnification with respect to the lost Term Loan Note from such Lender in form and substance reasonably satisfactory to the Borrower and the Agent, the Borrower shall execute a replacement thereof and deliver such replacement to such Lender.

2-9.    Payment of the Loans.

(a)    The Borrower may repay all or any portion of the principal balance of the Revolving Credit Loans (but not the Term Loans unless all Liabilities are concurrently repaid at such time) from time to time until the Termination Date.

(b)    (i)    The Borrower, without notice or demand from the Agent or any Lender, shall pay the Agent that amount, from time to time, which is necessary so that (x) the unpaid balance of the Revolving Credit Loans does not exceed Availability, (y) the unpaid balance of any Protective Advances does not exceed 5% of the Borrowing Base (or such greater amount as consented by the Required Lenders in accordance with Section 2.6(d)), and/or (z) the unpaid balance of the Term Loan does not exceed the Borrowing Base at any time the unpaid balance of the Revolving Credit Loans is $0 while the Revolving Credit Commitments are outstanding.

(ii)    If Borrower or any Subsidiary receives net cash proceeds of any voluntary or involuntary sale or disposition by Borrower or any of its Subsidiaries of assets constituting DIP Priority Collateral (including casualty losses or condemnations and all sales or dispositions) that is otherwise not directly deposited into the Cash Collateral Account by such payor, then the Borrower shall, no later than one (1) Business Day following the receipt of such net cash proceeds, prepay the Loans in an amount equal to 100% of such net cash proceeds.

(iii)    All payments received in the Cash Collateral Account pursuant to Section 7-4, or otherwise, shall (a) if no Event of Default has occurred and is continuing, to prepay the outstanding Liabilities in the order as set forth in Section 7-5(c)(i), or (b) if an Event of Default has occurred and is continuing, to repay or prepay as the case may be, all Liabilities provided, and in the order set forth in Section 7-5(c)(ii).

32

(c)        Subject to the provisions of Section 7-5(c) hereof, the Agent shall endeavor to cause those applications of payments (if any), pursuant to Sections 2-9(a) and 2-9(b) against Loans then outstanding in such manner as results in the least cost to the Borrower, but shall not have any affirmative obligation to do so nor liability on account of the Agent's failure to have done so.  In no event shall action or inaction taken by the Agent excuse the Borrower from any indemnification obligation under Section 2-9(f).

(d)        The Borrower shall repay the then entire unpaid balance of the Loan Account and all other Liabilities on the Termination Date.

(e)        The Borrower shall indemnify the Agent and each Lender and hold the Agent and each Lender harmless from and against any loss, cost or expense (excluding loss of anticipated profits) which the Agent or any Lender may sustain or incur (including, without limitation, by virtue of acceleration after the occurrence of any Event of Default) as a consequence of the following:

(i)        Default by the Borrower in payment of the principal amount of or any interest on any Eurodollar Loan as and when due and payable, including any such loss or expense arising from interest or fees payable by the Agent or such Lender to lenders of funds obtained by it in order to maintain its Eurodollar Loans.

(ii)        Default by the Borrower in making a borrowing after the Borrower has given (or is deemed to have given) a request for a Revolving Credit Loan or Term Loan.

(iii)        The making of any payment on a Eurodollar Loan on a day that is not the last day of the applicable interest period with respect thereto, including interest or fees payable by the Lenders to lenders of funds obtained by it in order to maintain any such Loans as "breakage fees" (so-called).

(f)        Notwithstanding anything to the contrary contained in this Agreement or any other Loan Document, any amounts received by any Group Member which are identified as Pre-Petition Term Priority Collateral shall be exempt from the requirement for prepayment under this Section 2.9, from application under Section 7.5 or otherwise of payment of the Liabilities and shall be segregated by the Loan Parties and held in trust for the benefit of the Pre-Petition Term Credit Parties to the extent of the Pre-Petition Term Priority Obligations, pursuant to the DIP Orders or other order of the Bankruptcy Court.

2-10.   Interest Rates.

(a)        [Intentionally Omitted].

(b)        Each Loan shall bear interest at the Adjusted Eurodollar Rate plus 5.0% per annum.

(c)        [Intentionally Omitted].

(d)        [Intentionally Omitted].

(e)        The Borrower shall pay accrued and unpaid interest on each Loan in arrears as follows:

(i)        On the applicable Interest Payment Date for that Loan.

(ii)      On the Termination Date and on the End Date.

(iii)      Following the occurrence, and during the continuance, of any Event of Default, with such frequency as may be determined by the Agent.

(f)      Following the occurrence, and during the continuance, of any Event of Default (and whether or not the Agent exercises the Agent's rights on account thereof), all Loans shall bear interest at a rate which is the aggregate of the interest rate then in effect plus two percent (2%) per annum, unless the Agent, with the consent of the Required Lenders, elects not to exercise its rights to increase the interest rate in effect by said two percent per annum.

(g)      All computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year).

2-11.   Other Fees.  The Borrower shall pay the fees set forth in the Fee Letter in accordance with the terms thereof.  Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

2-12.   Intentionally Omitted.

2-13.   Line (Unused Fee).  In addition to any other fee paid by Borrower on account of the Revolving Credit, the Borrower shall pay the Agent, for the account of the Lenders holding Revolving Credit Loans and/or Revolving Credit Commitments in accordance with their Pro Rata Shares, a line (unused) fee (the "**Line (Unused) Fee**") in arrears, on the first day of each month, commencing with the first calendar month immediately following the Effective Date (and on the Termination Date).  The Line (Unused) Fee shall be equal to 0.375% per annum multiplied by the difference during the month just ended (or relevant period with respect to the payment being made on the Termination Date) between the then-applicable Revolving Credit Commitments and the Average Outstandings.

2-14.   Intentionally Omitted.

2-15.   Concerning Fees.

The Borrower shall not be entitled to any credit, rebate or repayment of any fees payable under the Fee Letter, the Line (Unused) Fee, or any other fee previously earned by the Agent or any Lender pursuant to this Agreement notwithstanding any termination of this Agreement or suspension or termination of the Agent or any Lender's respective obligations hereunder, including obligations to make loans and advances hereunder.

2-16.   Agent's Discretion.

Each reference in the Loan Documents to the exercise of discretion or the like by the Agent shall be to its exercise of its judgment, in good faith, based upon the Agent's consideration of any such factor as the Agent deems appropriate.

2-17.   [Intentionally Omitted].

2-18.   [Intentionally Omitted].

2-19.   [Intentionally Omitted].

34

2-20.    [Intentionally Omitted].

2-21.    Changed Circumstances.

(a)    The Agent may give the Borrower notice of the occurrence of the following:

(i)    The Agent shall have determined in good faith (which determination shall be final and conclusive) on any day on which the rate for a Eurodollar Loan would otherwise be set, that adequate and fair means do not exist for ascertaining such rate.

(ii)    The Agent shall have determined in good faith (which determination shall be final and conclusive) that:

(A)    The continuation of any Revolving Credit Loan to a Eurodollar Loan has been made impracticable or unlawful by the occurrence of a contingency that materially and adversely affects the applicable market or compliance by the Agent in good faith with any applicable Requirements of Law or interpretation or change thereof by any governmental authority charged with the interpretation or administration thereof or with any request or directive of any such governmental authority (whether or not having the force of law).

(B)    The indices on which the interest rates for Eurodollar Loans are based shall no longer represent the effective cost to the Agent or any Lender for U.S. dollar deposits in the interbank market for deposits in which it regularly participates.

(b)    In the event that the Agent gives the Borrower notice of an occurrence described in Section 2-21(a), then, until the Agent notifies the Borrower that the circumstances giving rise to such notice no longer apply:

(i)    The obligation of the Agent and each Lender to make Eurodollar Loans of the type affected by such changed circumstances or to permit the Borrower to select the affected interest rate as otherwise applicable to any Revolving Credit Loans shall be suspended.

(c)    Notwithstanding the foregoing, each Lender agrees to use its reasonable efforts (consistent with its internal policy and legal and regulatory restrictions and so long as such efforts would not be disadvantageous to it, in its reasonable discretion, in any legal, economic or regulatory manner) to designate a different lending office if the making of such designation would allow such Lender or its lending office to continue to make Eurodollar Loans.

2-22.    Increased Costs. If there is adopted after the date hereof any requirement of law, or if there is any new interpretation or application of any law after the date hereof by any court or by any governmental or other authority or entity charged with the administration thereof, whether or not having the force of law, which:

(a)    subjects the Agent or any Lender to any Taxes or changes the basis of taxation, or increases any existing Taxes, on payments of principal, interest or other amounts payable by the Borrower to the Agent or any Lender under this Agreement (except for Taxes on the Agent or any Lender's overall net income or capital imposed by the jurisdiction in which the Agent or such Lender's principal or lending offices are located or in which the Agent or such Lender is organized);

35

(b)    imposes, modifies or deems applicable any reserve, cash margin, special deposit or similar requirements against assets held by, or deposits in or for the account of or loans by or any other acquisition of funds by the relevant funding office of any Lender;

(c)    imposes on any Lender any other condition with respect to any Loan Document; or

(d)    imposes on any Lender a requirement to maintain or allocate capital in relation to the Liabilities;

and the result of any of the foregoing, in the Agent's opinion, is to increase the cost to any Lender of making or maintaining any loan, advance or financial accommodation or to reduce the income receivable by any Lender in respect of any loan, advance or financial accommodation by an amount which the Agent deems to be material, then upon the Agent's giving written notice thereof to the Borrower (such notice to set out in reasonable detail the facts giving rise to and a summary calculation of such increased cost or reduced income), the Borrower shall forthwith pay to the Agent, for the benefit of such Lender, upon receipt of such notice, that amount which shall compensate such Lender for such additional cost or reduction in income, provided that the Borrower shall not be obligated to make payment of such amounts which arise from transactions which occurred more than ninety (90) Business Days prior to the Agent's furnishing notice hereunder.

Notwithstanding the foregoing, each Lender agrees to use its reasonable efforts (consistent with its internal policy and legal and regulatory restrictions and so long as such efforts would not be disadvantageous to it, in its discretion, in any legal, economic or regulatory manner) to designate a different lending office if the making of such designation would allow such Lender or its lending office to avoid the imposition of such increased costs.

2-23.    Lenders' Commitments.

(a)    The Term Loan Commitment, the Revolving Credit Commitment, Pro Rata Shares of the Lenders, and identities of the Lenders (but not the overall Commitment) may be changed, from time to time by the assignment of Commitments and the Loans by the Lenders with other Persons who determine to become "Lenders", provided, however, that

(i)    [Intentionally Omitted].

(ii)    Any assignment shall be subject to the prior written consent of the Agent (not to be unreasonably withheld) and (b) unless an Event of Default has occurred and is continuing, the Borrower (not to be unreasonably withheld), and which consent shall be deemed to be given unless the Borrower provides the Agent with written objection within five Business Days of notice), in each case, unless such assignment is to an Approved Fund, which shall not require such approval.

(iii)    [Intentionally Omitted].

(iv)    No such assignment shall be in an amount less than Five Million Dollars ($5,000,000.00), or, if less, the total Commitment of such assigning Lender.

(b)    Upon written notice given the Borrower from time to time by the Agent, of any assignment or allocation referenced in Section 2-23(a):

55718599V12

(i)      The Borrower shall execute one or more replacement Revolving Credit Notes or Term Loan Notes, as applicable, to reflect such changed Commitments or Loans, and identities and shall deliver such replacement Revolving Credit Notes or Term Loan Notes to the Agent (which promptly thereafter shall deliver to the Borrower the Revolving Credit Notes or Term Loan Notes so replaced); provided, however, in the event that a Revolving Credit Note or Term Loan Note is to be exchanged following its acceleration or the entry of an order for relief under the Bankruptcy Code with respect to the Borrower, the Agent, in lieu of causing the Borrower to execute one or more new Revolving Credit Notes or Term Loan Notes, may issue the Agent's Certificate confirming the resulting Commitments and Pro Rata Shares.

(ii)      Such change shall be effective from the effective date specified in such written notice and any Person added as a Lender shall have all rights and privileges of a Lender hereunder thereafter as if such Person had been a signatory to this Agreement and any other Loan Document to which a Lender is a signatory and any person removed as a Lender shall be relieved of any obligations or responsibilities of a Lender hereunder thereafter.

(c)      The Agent shall maintain a register identifying the Lenders, their names and addresses, and principal amount of the Revolving Credit Loans and Term Loans owing to each Lender, from time to time.

**Article 3 - Conditions Precedent**:

3-1.      <u>Conditions Precedent to the Effective Date</u>.  As a condition to the effectiveness of this Agreement and the availability of Interim Revolving Credit Commitment and the Interim Term Loan Commitment, each of the following documents (each in form and substance satisfactory to the Agent and the Required Lenders) shall have been delivered to the Agent, and the following conditions shall have been satisfied:

(a)      <u>Corporate Due Diligence</u>.

(i)      A Certificate of corporate good standing issued by the Secretary of State of each State in which a Loan Party is organized dated a date not earlier than 2 days prior to the Effective Date.

(ii)      [Intentionally Omitted].

(iii)      A Certificate of each Loan Party's Secretary of the due adoption, continued effectiveness, and setting forth the texts of, each corporate resolution adopted in connection with the establishment of the loan arrangement contemplated by the Loan Documents and attesting to the true signatures of each Person authorized as a signatory to any of the Loan Documents.

(iv)      The Initial DIP Budget certified by a Responsible Officer of the Borrower, certifying that the projections therein have been prepared in good faith based on reasonable assumptions, and that such projections contain no statements or conclusions (and there are no omissions of information) which are based upon or include information known to the Loan Parties to be misleading in any material respect or which fail to take into account information known to the Loan Parties regarding materials reported therein.

(b)      [<u>Intentionally Omitted</u>].

(c)    Officers' Certificates.  Certificate executed by the Chief Financial Officer of the Borrower, satisfactory in form and substance to the Agent, and stating the following:  (i) that the representations and warranties made by the Loan Parties to the Agent and Lenders in the Loan Documents are true and complete in all material respects as of the date of such certificate, except in the case of any representation and warranty qualified by materiality, they shall be true and correct in all respects; (ii) that no event has occurred which is or which, solely with the giving of notice or passage of time (or both) would be a Suspension Event or a Suspension Event; (iii) [Intentionally Omitted]; and (iv) either (1) no consents, licenses or approvals are required in connection with the execution, delivery and performance by the Loan Parties and the validity against any such Loan Party of the Loan Documents to which it is a party, or (2) that all such consents, licenses and approvals have been obtained and are in full force and effect.

(d)    Representations and Warranties.  Each of the representations made by or on behalf of the Loan Parties in this Agreement or in any of the other Loan Documents or in any other report, statement, document, or paper provided by or on behalf of a Loan Party shall be true and complete in all material respects as of the date as of which such representation or warranty was made, except in the case of any representation and warranty qualified by materiality, they shall be true and correct in all respects.

(e)    Borrowing Base Certificate.  The Agent shall have received a Borrowing Base Certificate dated the Effective Date, relating to the week ended on April 30, 2016, and executed by a Responsible Officer of the Borrower.

(f)    All Fees and Expenses Paid.  All fees due at or immediately after the first funding under the Revolving Credit and the Term Loan Facility and all costs and expenses incurred by the Agent and the Lenders in connection with the establishment of the credit facility contemplated hereby (including the fees and expenses of counsel to the Agent and the Lenders) shall have been paid (to the extent then invoiced).

(g)    [Intentionally Omitted.]

(h)    Borrower's Assets.  The Agent and the Required Lenders shall have received a copy of the results of the Loan Parties' most recent physical Inventory and such results shall be satisfactory to the Agent and the Required Lenders.  In addition, the Agent and the Required Lenders shall be satisfied that the Inventory of each Loan Party is located at such places or is in transit to such Loan Party and is in the amounts and of the quality and value previously represented by the Borrower to the Agent and Lenders and the Agent and the Required Lenders shall have received such reports, material and other information concerning the Inventory and the Loan Parties' suppliers as shall satisfy the Agent in its sole discretion.

(i)    Lien Search.  The Agent and the Required Lenders shall have received results of searches or other evidence satisfactory to the Agent and the Required Lenders (in each case dated as of a date satisfactory to the Agent and the Required Lenders) indicating the absence of liens on the assets of Borrower and its Subsidiaries, except for Permitted Encumbrances and liens for which termination statements and releases satisfactory to the Agent and the Required Lenders are being tendered concurrently with the establishment of the Revolving Credit and the Term Loan Facility.

(j)    Perfection of Collateral.  The Agent shall have filed UCC-1 financing statements in the jurisdiction of formation or organization of each Loan Party.

(k)    Insurance.  The Agent shall be satisfied with the Borrower's and its Subsidiaries' insurance arrangements and shall have received insurance summaries, insurance certificates in connection

38

with such insurance including, documentation naming the Agent as "loss payee" or "additional insured", as applicable, under each policy.

(l)     No Suspension Event.  No Suspension Event shall then exist.

(m)     No Adverse Change.  No event shall have occurred or failed to occur since January 31, 2016, which occurrence or failure could be expected to have a Material Adverse Effect.

(n)     Execution and Delivery of Loan Documents.  This Agreement and the other Loan Documents shall have been duly executed and delivered by the parties thereto, and shall be in full force and effect and shall be in form and substance satisfactory to the Agent and the Required Lenders.

(o)     Excess Availability.  After giving effect to (i) any Revolving Credit Loans made on the Effective Date, and (ii) any charges made in connection with the establishment of the credit facility contemplated hereby, Excess Availability shall be not less than $30,000,000.

(p)     Patriot Act.  The Agent and the Lenders shall have received all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA PATRIOT Act.

(q)     Cases.  The Loan Parties shall have filed the Petitions with the Bankruptcy Court commencing the Cases and all "first day orders" entered at the time of commencement of the Cases shall be in form and substance satisfactory to the Agent and the Required Lenders.

(r)     Interim DIP Order and First Day Motions.  The Agent shall have received a certified copy of the Interim DIP Order, which Interim DIP Order (i) shall have been entered on the docket of the Bankruptcy Court on or before the Effective Date and (ii) shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended in any respect without the written consent of the Agent and the Required Lenders in their sole discretion; and, if the Interim DIP Order is the subject of a pending appeal in any respect, neither the making of the Revolving Credit Loans or Interim Term Loans, nor the performance by the Loan Parties of any of their respective obligations hereunder, under the other Loan Documents or under any other instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal.  Such Interim DIP Order shall authorize and approve the Revolving Credit Loans, the Term Loans, this Agreement and the Loan Documents contemplated hereby and thereby.  All motions, orders (including the "first day" orders) and other documents to be filed with and submitted to the Bankruptcy Court on the Petition Date shall be in form and substance satisfactory to the Agent and the Required Lenders in their sole discretion.

(s)     Governmental Approvals.  All governmental and regulatory approvals necessary in connection with the closing of this Agreement and the transactions contemplated hereby and such approvals shall have been received and be in full force and effect.

(t)     Other Proceedings.  No unstayed action, suit, investigation or other proceeding (including without limitation, the enactment or promulgation of a statute or rule) by or before any arbitrator or any Governmental Authority shall be threatened in writing or pending (other than the Cases) and no preliminary or permanent injunction or order by a state or federal court shall have been entered (i) in connection with this Agreement, any other Loan Document, or any transaction contemplated hereby or thereby or (ii) which could be expected to result in a Material Adverse Effect, excluding, in each case, any proceedings challenging this Agreement or the DIP Orders (but only so long as, (x) prior to the Final Order Effective Date, the Interim DIP Order is in effect and has not been stayed, reversed, modified or subject to a motion for reconsideration without the consent of the Agent and the Required Lenders and (y)

39

on and after the Final Order Effective Date, the Final DIP Order is in effect and has not been stayed, reversed, modified or subject to a motion for reconsideration without the consent of the Agent and the Required Lenders).

(u)    Notice of Borrowing.  The Agent shall have received a notice of borrowing from the Borrower, with appropriate insertions and executed by each Responsible Officer of the Borrower, in form and substance satisfactory to the Agent in its sole discretion.

(v)    Debt.  Prior to, or concurrently with, the making of the Revolving Credit Loans and the Interim Term Loans on the Effective Date, all outstanding obligations owing under the Pre-Petition ABL Credit Agreement shall have been paid in full, and the Agent shall have received a "pay-off" letter (or such other evidence) in form and substance satisfactory to the Agent with respect to all such Indebtedness being refinanced with the proceeds of the Revolving Credit Loans and the Interim Term Loans; and arrangements satisfactory to the Agent shall have been made with any Person holding any Lien securing any such Indebtedness, for the release and delivery of such UCC (or equivalent) termination statements, mortgage releases, releases of assignments of leases and rents, stock certificate and other documents or instruments, in each case in proper form for recording or filing, as the Agent shall have requested to release and terminate of record the Liens securing such Indebtedness.  In addition, the Agent shall have received evidence satisfactory to it that no Loan Party or any Subsidiary is liable, directly or indirectly, for any other Indebtedness, other than Indebtedness permitted pursuant to Section 4-7.

(w)    Borrowing Request Notice.  The Agent shall have received a borrowing request in notice in the form of **EXHIBIT 2-5** hereto.

(x)    Additional Documents.  The Agent shall have received such other executed certificates, agreements, reports, statements or other documents as the Agent and Lenders may reasonably request.

(y)    Consents.  Each Loan Party shall have received any consents, permits, licenses and approvals required in accordance with applicable Requirements of Law, or in accordance with any document, agreement, instrument or arrangement to which any Loan Party is a party, in connection with the execution, delivery, performance, validity and enforceability of this Agreement and the other Loan Documents, each in form and substance satisfactory to the Agent and the Required Lenders.  In addition, the Borrower and Subsidiary shall have all such material consents, licenses and approvals required in connection with their continued operation, and such approvals shall be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority which would restrain, prevent or otherwise impose adverse conditions on this Agreement and the actions contemplated hereby.

A request by the Borrower for a loan or advance, or other financial accommodation under the Revolving Credit or Term Loan shall be irrevocable and shall constitute certification by the Borrower that as of the date of such request, each of the foregoing conditions has been satisfied.

3-2.    Conditions Precedent to Fundings on and after the Final Order Entry Date.  As a condition to the availability of Final Revolving Credit Commitments and the Final Term Loan Commitments on or after the Final Order Entry Date, the following conditions shall have been satisfied, in addition to the conditions set forth in Section 3-3:

(a)    Final DIP Order.  The Agent and the Required Lenders shall have received a certified copy of the Final DIP Order, which Final DIP Order (i) shall have been entered on the docket of

the Bankruptcy Court on or before the date that is 30 days after the Petition Date and (ii) shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended in any respect without the written consent of the Agent and the Required Lenders in their sole discretion; and, if the Final DIP Order is the subject of a pending appeal in any respect, neither the making of the Revolving Credit Loans on or after the Final Order Entry Date or Final Order Term Loans, nor the performance by the Loan Parties of any of their respective obligations hereunder, under the other Loan Documents or under any other instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal.  Such Final DIP Order shall authorize and approve the Revolving Credit Loans, Term Loans, this Agreement and the Loan Documents contemplated hereby and thereby.  All motions, orders and other documents to be filed with and submitted to the Bankruptcy Court in connection therewith shall be in form and substance satisfactory to the Agent and the Required Lenders in their sole discretion.

3-3.    <u>Conditions Precedent to All Fundings</u>. As a condition to the availability of Revolving Credit Loans and Term Loans, the conditions shall have been satisfied:

(a)    <u>No Suspension Event</u>.  No Suspension Event shall then exist.

(b)    <u>Representations and Warranties</u>.  Each of the representations made by or on behalf of the Loan Parties in this Agreement or in any of the other Loan Documents or in any other report, statement, document, or paper provided by or on behalf of a Loan Party shall be true and complete in all material respects as of the date as of which such representation or warranty was made, except in the case of any representation and warranty qualified by materiality, they shall be true and correct in all respects.

(c)    <u>Other Conditions</u>.  The conditions set forth in Section 2-5 shall have been satisfied.

(d)    <u>No Adverse Change</u>.  No event shall have occurred or failed to occur since the Effective Date, which occurrence or failure could be expected to have a Material Adverse Effect.

(e)    <u>Other Proceedings</u>.  No unstayed action, suit, investigation or other proceeding (including without limitation, the enactment or promulgation of a statute or rule) by or before any arbitrator or any governmental authority shall be threatened in writing or pending (other than the Cases) and no preliminary or permanent injunction or order by a state or federal court shall have been entered (i) in connection with this Agreement, any other Loan Document, or any transaction contemplated hereby or thereby or (ii) which could be expected to result in a Material Adverse Effect, excluding, in each case, any proceedings challenging this Agreement or the DIP Orders (but only so long as, (x) prior to the Final Order Effective Date, the Interim DIP Order is in effect and has not been stayed, reversed, modified or subject to a motion for reconsideration without the consent of the Agent and the Required Lenders and (y) on and after the Final Order Effective Date, the Final DIP Order is in effect and has not been stayed, reversed, modified or subject to a motion for reconsideration without the consent of the Agent and the Required Lenders.

(f)    <u>DIP Orders</u>.  The applicable DIP Order shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended in any respect without the written consent of the Agent and the Required Lenders in their sole discretion.

(g)    <u>Use of Proceeds</u>.  The use of the proceeds of such Loan shall be in compliance with the DIP Budget.

41

(h)    Borrowing Request Notice.  The Agent shall have received a borrowing request in notice in the form of **EXHIBIT 2-5** hereto.

A request by the Borrower for a loan or advance, or other financial accommodation under the Revolving Credit or Term Loan shall be irrevocable and shall constitute certification by the Borrower that as of the date of such request, each of the foregoing conditions has been satisfied.

**Article 4 - General Representations, Covenants and Warranties**:

To induce the Agent and each Lender to establish the loan arrangement contemplated herein and to make loans and advances and to provide financial accommodations under the Revolving Credit and the Term Loan Facility (each of which loans shall be deemed to have been made in reliance thereupon), the Borrower, in addition to all other representations, warranties, and covenants made by the Borrower in any other Loan Document, makes those representations, warranties, and covenants included in this Agreement.

4-1.    Payment and Performance of Liabilities.  The Borrower shall pay each Liability when due (or when demanded if payable on demand) and shall promptly, punctually, and faithfully perform each other Liability.

4-2.    Due Organization - Corporate Authorization - No Conflicts.

(a)    Each Loan Party presently is and shall hereafter remain in good standing in its State of organization and each is and shall hereafter remain duly qualified and in good standing in every other State in which, by reason of the nature or location of the Loan Parties' assets or operation of the Loan Parties' business, such qualification is necessary, except where the failure to so qualify could not have a Material Adverse Effect.

(b)    Each Related Entity as of the Effective Date is listed on **EXHIBIT 4-2**, annexed hereto.  Each Subsidiary is and shall hereafter remain in good standing in the State in which incorporated and is and shall hereafter remain duly qualified in which other State in which, by reason of that entity's assets or the operation of such entity's business, such qualification may be necessary, except where the failure to so qualify could not be expected to have a Material Adverse Effect.  The Borrower shall provide the Agent with prior written notice of any entity's becoming or ceasing to be a Related Entity.

(c)    No Loan Party shall change its State of incorporation or its taxpayer identification number without the prior consent of the Agent.

(d)    Each Loan Party has all requisite corporate power and authority to execute and deliver all Loan Documents to which such Loan Party is a party and has and will hereafter retain all requisite corporate power to perform all Liabilities.

(e)    The execution and delivery by the Loan Parties of each Loan Document to which it is a party; the Loan Parties' consummation of the transactions contemplated by such Loan Documents (including, without limitation, the creation of security interests by the Loan Parties as contemplated hereby); each Loan Party's performance under those of the Loan Documents to which it is a party; the borrowings hereunder; and the use of the proceeds thereof:

(i)    Have been duly authorized by all necessary corporate action.

42

(ii)     Do not, and will not, contravene in any material respect any provision of any (A) Requirement of Law, (B) Material Indebtedness, or (C) the organizational documents of such Loan Party.

(iii)     Will not result in the creation or imposition of, or the obligation to create or impose, any Encumbrance upon any assets of the Borrower and/or its Subsidiaries pursuant to any Requirement of Law or obligation, except pursuant to the Loan Documents.

(f)     The Loan Documents have been duly executed and delivered by each Loan Party subject to the entry of the DIP Orders and the terms thereof, and are the legal, valid and binding obligations of the Loan Parties enforceable against the Loan Parties in accordance with their respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and similar laws of general application relating to or affecting the rights and remedies of creditors generally, and except as the remedy of specific performance or injunctive relief is subject to the discretion of the court before which any proceeding therefor may be brought.

4-3.     Trade Names.

(a)     **EXHIBIT 4-3**, annexed hereto, is a listing of:

(i)     All names under which the Loan Parties conducted their business within the past five (5) years.

(ii)     All entities and/or persons with whom the Loan Parties consolidated or merged within the past five (5) years, or from whom the Loan Parties, within the past five (5) years, acquired in a single transaction or in a series of related transactions substantially all of such entity's or person's assets.

(b)     No Loan Party will change its name or conduct its business under any name not listed on **EXHIBIT 4-3**.

4-4.     Intellectual Property.

(a)     **EXHIBIT 4-4**, annexed hereto, is a listing of (i) all Patents and Trademarks that have been registered by the Loan Parties in the United States Patent and Trademark Office or any similar governmental authority in the United States (including, without limitation, in any state or other political subdivision thereof), (ii) all Copyrights that have been registered by the Loan Parties in the United States Copyright Office or any similar governmental authority in the United States (including, without limitation, in any state or other political subdivision thereof), and (iii) all Licenses to which any Loan Party is a party (whether as licensor or licensee), in each case as of the Effective Date. Each Loan Party owns and possesses, or has the right to use, all Patents, industrial designs, Trademarks, trade styles, brand names, service marks, logos, Copyrights, trade secrets, know-how, confidential information, and other Intellectual Property or proprietary property of any third Person necessary for the Loan Parties' conduct of their respective business.

(b)     The conduct by the Loan Parties of their respective business does not presently infringe in any manner which could be expected to have a Material Adverse Effect (nor will the Loan Parties conduct their businesses in the future so as to infringe in any manner which could be expected to have a Material Adverse Effect) on the patents, industrial designs, trademarks, trade names, trade styles, brand names, service marks, logos, copyrights, trade secrets, know-how, confidential information, or other intellectual or proprietary property of any third Person.

43

4-5.    Locations.

(a)    The Collateral, and the books, records, and papers of Loan Parties pertaining thereto, are kept and maintained solely at, or in transit to and from, the Loan Parties' chief executive offices at:

(i)    112 West 34th Street, New York, New York 10120

(ii)    125 Chubb Avenue, Lyndhurst, New Jersey 07071

(iii)    those locations which are listed on **EXHIBIT 4-5** annexed hereto, as such EXHIBIT may be amended from time to time, which EXHIBIT includes, with respect to each such location, the name and address of the landlord on the Lease which covers such location (or an indication that a Loan Party owns the subject location) and of all service bureaus with which any such records are maintained.

(b)    No Loan Party shall remove any of the Collateral from said chief executive office or those locations listed on **EXHIBIT 4-5** except:

(i)    to accomplish sales of Inventory in the ordinary course of business, consistent with past practice; or

(ii)    to move Inventory, Equipment and other assets from one such location to another such location; or

(iii)    to utilize such of the Collateral as is removed from such locations in the ordinary course of business, consistent with past practice (such as motor vehicles); or

(iv)    to accomplish other dispositions permitted pursuant to Section 4-12(d) hereof; or

(v)    otherwise upon thirty (30) days prior written notice to the Agent.

(c)    Except (i) with respect to Inventory delivered to a processor for finishing, (ii) with respect to Inventory in transit, and (iii) as otherwise disclosed pursuant to, or permitted by, this Section 4-5, no tangible personal property of a Loan Party is in the care or custody of any third party or stored or entrusted with a bailee or other third party and none shall hereafter be placed under such care, custody, storage, or entrustment.

4-6.    Title to Assets.

(a)    The Borrower and its Subsidiaries are, and shall hereafter remain, the owner of, or holder of subsisting license or leasehold rights in and to, its assets and the Collateral free and clear of all Encumbrances with the exceptions of the following (the "**Permitted Encumbrances**"):

(i)    Encumbrances in favor of the Agent.

(ii)    Those Encumbrances (if any) listed on **EXHIBIT 4-6**, annexed hereto.

(iii)    Purchase money security interests in Equipment to secure Indebtedness otherwise permitted hereby.

(iv)       Encumbrances for Taxes, governmental assessments or charges in the nature of Taxes not yet due or which are being contested in good faith by appropriate proceedings as to which adequate reserves are maintained on the books of such Person in accordance with GAAP.

(v)       Encumbrances in respect of property or assets of the Borrower and its Subsidiaries imposed by law, which were incurred in the ordinary course of business consistent with past practices, such as carriers', warehousemen's, customs broker's, materialmen's, repairmen's, and mechanics' liens and other similar Encumbrances, in each case in respect of obligations not overdue for a period of more than thirty (30) days or which are being contested in good faith by appropriate proceedings.

(vi)       Utility deposits and pledges or deposits in connection with worker's compensation, unemployment insurance and other social security legislation.

(vii)       Encumbrances arising under Capital Leases with an aggregate value not to exceed $500,000.

(viii)       Encumbrances resulting from the sale, transfer and assignment of retail Accounts to credit card processors.

(ix)       Deposits to secure the performance of bids, tenders, trade contracts (other than for borrowed money), leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business consistent with past practice, all to the extent such obligations are otherwise permitted hereunder.

(x)       Other Encumbrances securing obligation with an aggregate value not to exceed $1,000,000, provided that such encumbrances and obligations are subordinated to the Liens and Liabilities hereunder on terms and conditions satisfactory to the Agent and the Lenders in their sole discretion.

(xi)       Encumbrances consisting of the right of setoff of a customary nature or bankers' liens on amounts on deposit incurred in the ordinary course of business consistent with past practice.

(xii)       Encumbrances on goods in favor of customs and revenue authorities which secure the payment of customs duties in connection with the importation of such goods, which obligations are not overdue.

(xiii)       Encumbrances constituting precautionary filings by lessors and bailees with respect to assets which are leased or entrusted to the Borrower or a Subsidiary but in which assets such Person has mere possessory rights.

(xiv)       Encumbrances on cash securing Indebtedness and other obligations in respect of (A) letters of credit in an aggregate amount not to exceed $1,000,000 and (B) the Pre-Petition ABL Escrow and Reserve Accounts, not to exceed the amount set forth in Section 4-35 without the consent of the Agent and the Required Lenders in their sole discretion.

(xv)       Encumbrances (i) arising by reason of zoning restrictions, easements, licenses, reservations, restrictions, covenants, rights-of-way, encroachments, minor defects or

45

irregularities in title (including leasehold title) and other similar encumbrances on the use of real property or (ii) consisting of leases, licenses or subleases granted by a lessor, licensor or sublessor on its real property (in each case other than Capital Leases) that, for each of the Liens in clauses (i) and (ii) above, do not, in the aggregate, materially (x) impair the value or marketability of such real property or (y) interfere with the ordinary conduct of the business conducted and proposed to be conducted at such real property.

(xvi)     Landlords' statutory Encumbrances in respect of rent not in default.

(xvii)    Encumbrances of a collection bank on items in the course of collection arising under Section 4-208 of the UCC as in effect in the State of New York or any similar section under any applicable UCC or any similar Requirement of Law of any foreign jurisdiction.

(xviii)   Encumbrances on Intellectual Property of the Borrower  and its Subsidiaries (other than the Mexico License) to the extent securing Indebtedness permitted pursuant to Section 4-7; provided that such Encumbrances (A) do not cover any other assets of such Person (other than the proceeds and products of such Intellectual Property), and (B) shall be junior and subordinate to the Encumbrances securing the Liabilities and the holder of such Indebtedness shall have entered into an intercreditor and subordination agreement with the Agent on terms acceptable to the Agent and the Required Lenders.

(xix)     Encumbrances in favor of the Pre-Petition Term Loan Agent to secure Indebtedness permitted under Section 4-7(e). solely to the extent subject to the priorities set forth in the DIP Orders.

(xx)      Encumbrances on the interest of non-Loan Party lessors under Leases.

(xxi)     Any "adequate protection liens" expressly provided by the DIP Orders.

(xxii)    Encumbrances constituting cash collateral in an amount not to exceed $1,500,000 pledged to support Indebtedness owing in respect of corporate commercial credit cards.

provided, however, (i) in all such cases, no Encumbrance on an asset of a Loan Party shall be considered a 'Permitted Encumbrance' to the extent such Encumbrance covers any assets constituting Collateral unless and until, if requested by the Agent, the Loan Parties shall have used commercially reasonable efforts to cause the holder of such Encumbrance to deliver to the Agent a use and/or access agreement with respect to such assets, which shall be in form and substance acceptable to the Agent, and (ii) that such Permitted Encumbrances (other than the Carve-Out, Additional Pre-Petition Priority Liens and the Pre-Petition Term Priority Liens), while any portion of the Liabilities remain outstanding, shall at all times be junior and subordinate to the Encumbrances granted under the Loan Documents and the DIP Orders.  The prohibition provided for in this Section 4-6 specifically restricts, without limitation, any Loan Party, the Committee, or any other party-in-interest in the Cases or any successor case, from priming or creating claims, Liens or interests pari passu with any claims, Liens or interests of the Agent, the Lenders, any Lien (other than for the Carve-Out, Additional Pre-Petition Priority Liens and the Pre-Petition Term Priority Liens) irrespective of whether such claims, Liens or interests may be "adequately protected".

(b)      No Loan Party has or shall have possession of any property on consignment.

(c)     No Loan Party shall acquire or obtain the right to use any Equipment, the acquisition or right to use of which Equipment is otherwise permitted by this Agreement, in which Equipment any third party has an interest, except for:

(i)     Equipment which is merely incidental to the conduct of such Loan Party's business.

(ii)    Equipment, the acquisition or right to use of which has been consented to by the Agent and the Required Lenders, which consent may be conditioned upon the Agent's receipt of such agreement with the third party which has an interest in such Equipment as is satisfactory to the Agent.

4-7.    Indebtedness.   No Loan Party has or shall hereafter have any Indebtedness with the exceptions of:

(a)     The Liabilities.

(b)     The Indebtedness (if any) listed on **EXHIBIT 4-7**, annexed hereto.

(c)     Capital Lease obligations and purchase money Indebtedness not to exceed the aggregate principal amount outstanding in excess of $500,000 and extensions, renewals and refinancings thereof on terms no less favorable in any material respect to the Loan Parties than the purchase money Indebtedness or Capital Lease being refinanced.

(d)     Indebtedness in respect of (1) letters of credit in an aggregate amount not to exceed $1,000,000, and the (2) the Pre-Petition ABL Escrow and Reserve Accounts, not to exceed the amounts set forth in Section 4-35 without the consent of Agent and the Required Lenders in their sole discretion.

(e)     Indebtedness under the Pre-Petition Term Loan Documents, in an aggregate principal amount not to exceed the amount outstanding as of the date hereof (other than the result of the accrual of paid-in-kind interest).

(f)     Indebtedness of the Loan Parties and employees in respect of corporate commercial credit cards used in the ordinary course of business consistent with past practices, in an amount not to exceed $1,500,000.

(g)     Other Indebtedness not to exceed $1,500,000 outstanding at any time.

In addition, other with respect to the Carve-Out, no Debt under subclauses (b), (c), (d), (e), (f) and (g) shall be permitted to have an administrative expense claim status under the Bankruptcy Code senior to or *pari passu* with the super priority administrative expense claims of the Agent and the Lenders as set forth herein and in the DIP Orders.

4-8.    Insurance Policies.

(a)     **EXHIBIT 4-8**, annexed hereto, is a schedule of all material insurance policies owned by the Loan Parties or under which the Loan Parties are the named insured as of the Effective Date.  Each of such policies is in full force and effect.  None of the issuers (to the Borrower's knowledge) of any such policy, have provided notice that the Loan Parties are in default or violation of any such policy.

55718599V12

(b)    The Loan Parties shall have and maintain at all times insurance covering such risks, in such amounts, containing such terms, in such form, for such periods, and written by such companies as may be satisfactory to the Agent (it being understood any agreed that the insurance coverage in place on the Effective Date is reasonably satisfactory to the Agent).  The coverage reflected on **EXHIBIT 4-8** presently satisfies the foregoing requirements, it being recognized by the Loan Parties, however, that such requirements may change hereafter to reflect changing circumstances.  All insurance carried by the Loan Parties shall provide for a minimum of fourteen (14) days' written notice of cancellation to the Agent and all such insurance which covers the Collateral shall include an endorsement in favor of the Agent, as lender's loss payee and additional insured, which endorsement shall provide that the insurance, to the extent of the Agent's interest therein, shall not be impaired or invalidated, in whole or in part, by reason of any act or neglect of the Loan Parties or by the failure of the Loan Parties to comply with any warranty or condition of the policy.  In the event of the failure by the Loan Parties to maintain insurance as required herein, the Agent, at its option, may obtain such insurance; provided, however, the Agent's obtaining of such insurance shall not constitute a cure or waiver of any Suspension Event occasioned by the Loan Parties' failure to have maintained such insurance.  The Loan Parties shall furnish to the Agent certificates or other evidence satisfactory to the Agent regarding compliance by the Loan Parties with the foregoing insurance provisions.

(c)    After the occurrence, and during the continuance, of an Event of Default, the Loan Parties shall each advise the Agent of each claim made by a Loan Party under any policy of insurance which covers the Collateral and will permit the Agent, at the Agent's option in each instance, to the exclusion of the Loan Parties, to conduct the adjustment of each such claim.  The Loan Parties each hereby appoint the Agent as such Loan Party's attorney in fact, exercisable after the occurrence, and during the continuance, of an Event of Default, to obtain, adjust, settle, and cancel any insurance described in this section and to endorse in favor of the Agent any and all drafts and other instruments with respect to such insurance.  This appointment, being coupled with an interest, is irrevocable until this Agreement is terminated by a written instrument executed by a duly authorized officer of the Agent.  The Agent shall not be liable on account of any exercise pursuant to said power except for any exercise in actual willful misconduct or bad faith.  The Agent may apply any proceeds of such insurance against the Liabilities, whether or not such have matured, in accordance with the terms of this Agreement and the DIP Orders.

4-9.    Licenses.    Each material license (including the Mexico License), distributorship, franchise, and similar agreement issued to, or to which a Group Member is a party is in full force and effect.  To the Borrower's knowledge, no party to any such license or agreement is in default or violation thereof.  No Loan Party has received any notice or threat of cancellation of any such license or agreement which is not subject to the Automatic Stay or Safe Harbor Provisions.

4-10.    Leases.    **EXHIBIT 4-10**, annexed hereto, is a schedule of all presently effective Capital Leases (other than Capital Leases the total obligations under which do not aggregate more than $100,000.00).  **EXHIBIT 4-5** includes a list of all other presently effective Leases, which Exhibit shall be updated from time to time upon the request of the Agent.  No party is in default or violation under any Material Lease or Capital Lease, and there do not exist defaults or violations under more than 30 retail location leases (other than with respect to Permitted Closing Stores once any going out of business sales are completed), other than for the non-payment of rent for April 2016 and May 2016, as contemplated by the DIP Budget.  The Loan Parties have not received any notice or threat of cancellation of any Material Lease, Capital Lease or more than 30 retail location leases (other than with respect to Permitted Closing Stores once any going out of business sales are completed), other than as a result of the non-payment of rent for April 2016 and May 2016, as contemplated by the DIP Budget.  Each Loan Party hereby authorizes the Agent at any time and from time to time after the occurrence, and during the continuance, of an Event of Default to contact any of the Loan Party's landlords in order to confirm the Loan Party's

48

continued compliance with the terms and conditions of the Material Lease(s) between such Loan Party and that landlord and to discuss such issues, concerning the Loan Party's occupancy under such Material Lease(s), as the Agent may determine. The Leases listed in clauses (a) and (b) of the definition of "Material Leases" are the only Leases in respect of warehouses of the Loan Parties, and the Leases listed in clauses (c) and (d) of the definition of "Material Leases" relates to the Borrower's headquarters and are the only locations containing material books and records of the Loan Parties.

4-11.   Requirements of Law. Each Loan Party is in compliance with, and shall hereafter comply with and use its respective assets in compliance with, all Requirements of Law, except to the extent that such non-compliance could not be expected to have a Material Adverse Effect. No Loan Party has received any notice of any material violation of any Requirement of Law, which violation has not been cured or otherwise remedied.

4-12.   Maintain Properties. The Loan Parties shall:

(a)   Keep the Collateral in good order and repair (ordinary reasonable wear and tear and insured casualty excepted).

(b)   Not suffer or cause the waste or destruction of any material part of the Collateral.

(c)   Not use any of the Collateral in violation of any policy of insurance thereon.

(d)   Not sell, lease, or otherwise dispose of any of the Collateral, other than the following, the proceeds of which shall be applied to the extent required by Section 2-9:

(i)   The sale of Inventory in compliance with this Agreement.

(ii)   As long as no Suspension Event exists or would arise as a result thereof, the disposal of Equipment which is obsolete, worn out, or damaged beyond repair, which Equipment is replaced to the extent necessary to preserve or improve the operating efficiency of the Loan Parties.

(iii)   The surrender, disposition, or expiration of Collateral (such as Trademarks and Copyrights, but excluding Eligible Trade Names and the Mexico License) no longer used or useful for the conduct of the Loan Parties' businesses in the ordinary course, consistent with past practice.

(iv)   The turning over to the Agent of all Receipts as provided herein.

(v)   The transfer, sale and assignment of retail Accounts to credit card processors.

(vi)   The sale, lease or disposal of any assets in connection with any Permitted Closing Stores in accordance with the DIP Budget.

4-13.   Pay Taxes/Tax Shelter Regulations.

(a)   Except as disclosed on **EXHIBIT 4-13** and other than any Taxes or claims arising (and not due) before the Petition Date that have not been authorized to be paid by the Bankruptcy Court), (i) all tax returns (federal, state, local or foreign) that relate to or include any Loan Party and that are due on or before the Effective Date, taking into account any extensions for the filing thereof, have

been or will be prepared and timely filed in accordance in all material respects with applicable Requirements of Law, (ii) all such tax returns are or will be correct and complete insofar as they relate to the Loan Parties, and (iii) all Taxes (federal, state, local or foreign) for which a Loan Party may be liable that are due (whether or not shown on any tax return) have been or will be paid in full.

(b)     Other than Taxes or claims arising before the Petition Date that have not been authorized to be paid by the Bankruptcy Court, each Loan Party has, and hereafter shall:  timely pay, as they become due and payable, all Taxes and unemployment contributions and other charges of any kind or nature levied, assessed or claimed against such Loan Party, or the Collateral by any person or entity whose claim could result in an Encumbrance upon any asset of any Loan Party or by any governmental authority, except to the extent such Taxes are being contested by a Loan Party in good faith, and adequate reserves are being maintained therefor on Loan Parties books in accordance with GAAP; properly exercise any trust responsibilities imposed upon a Loan Party by reason of withholding from employees' pay or by reason of a Loan Party's receipt of sales tax or other funds for the account of any third party; timely make all contributions and other payments as may be required pursuant to any Employee Benefit Plan now or hereafter established by the Loan Parties; and timely file all Tax and other returns and other reports with each governmental authority to whom a Loan Party is obligated to so file, in each case, taking into account any applicable extension periods.

(c)     At its option, after the occurrence, and during the continuance, of an Event of Default, the Agent may, but shall not be obligated to, pay any Taxes, unemployment contributions, and any and all other charges levied or assessed upon a Loan Party, or the Collateral by any person or entity or governmental authority, and make any contributions or other payments on account of a Loan Party's Employee Benefit Plan as the Agent, in the Agent's discretion, may deem necessary or desirable, to protect, maintain, preserve, collect, or realize upon any or all of the Collateral or the value thereof or any right or remedy pertaining thereto; provided, however, the Agent's making of any such payment shall not constitute a cure or waiver of any Suspension Event occasioned by a Loan Party's failure to have made such payment.

(d)     [Intentionally Omitted].

(e)     Any and all payments by or on account of any obligation of the Loan Parties hereunder or under any other Loan Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes; provided that if the Loan Parties shall be required under Requirements of Law to deduct any Indemnified Taxes (including any Other Taxes) from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 4-13) the Agent or Lenders, as the case may be, receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Loan Parties shall make such deductions and (iii) the Loan Parties shall timely pay the full amount deducted to the relevant applicable governmental authority in accordance with Requirements of Law.

(f)     The Loan Parties shall indemnify the Agent, and each Lender, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 4-13) paid by such Agent and such Lender, as the case may be, and any penalties, interest and expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant governmental authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Agent), or by the Agent on its own behalf or on behalf of the Agent, or a Lender, shall be conclusive absent manifest error.

50

(g)    Each Lender shall severally indemnify the Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 18-2 relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant governmental authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Agent to the Lender from any other source against any amount due to the Agent under this paragraph (g).

(h)    As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Loan Parties to a governmental authority, the Borrower shall deliver to the Agent the original or a certified copy of a receipt issued by such governmental authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment satisfactory to the Agent.

(i)    Any Lender that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which any Loan Party is resident for tax purposes, or any treaty to which such jurisdiction is a party, with respect to payments hereunder or under any other Loan Document shall deliver to the Borrower (with a copy to the Agent), at the time or times prescribed by Requirements of Law or reasonably requested by the Borrower or the Agent, such properly completed and executed documentation prescribed by Requirements of Law as will permit such payments to be made without withholding or at a reduced rate of withholding.  Such delivery shall be provided on the Effective Date and on or before such documentation expires or becomes obsolete or after the occurrence of an event requiring a change in the documentation most recently delivered.  In addition, any Lender, if requested by the Borrower or the Agent, shall deliver such other documentation prescribed by Requirements of Law or reasonably requested by the Borrower or the Agent as will enable the Borrower or the Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding three sentences, the completion, execution and submission of such documentation (other than such documentation set forth in this Section 4-13(i)) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

Without limiting the generality of the foregoing, in the event that any Loan Party is resident for tax purposes in the United States, any Foreign Lender shall deliver to the Borrower and the Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Borrower or the Agent, but only if such Foreign Lender is legally entitled to do so), whichever of the following is applicable:

(1)    duly completed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable, claiming eligibility for benefits of an income tax treaty to which the United States is a party,

(2)    duly completed copies of Internal Revenue Service Form W-8ECI,

51

(3)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, (x) a certificate to the effect that such Foreign Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrower within the meaning of section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code and (y) duly completed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable, or

(4)    in the case of a Foreign Lender that is not the beneficial owner of payments made under any Loan Document (including a partnership or a participating Lender), both (x) an IRS Form W-8IMY on behalf of itself and (y) the relevant forms prescribed in clauses (1), (2), (3), and (5) of this paragraph (h) that would be required of each such beneficial owner or partner of such partnership if such beneficial owner or partner were a Lender; provided, however, that if the Lender is a partnership and one or more of its partners are claiming the exemption for portfolio interest under Section 881(c) of the Code, such Lender may provide the certificate described in the foregoing clause (3) above on behalf of such partners,

(5)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Agent), executed copies of any form prescribed by Law as a basis for claiming exemption from or a reduction in United States Federal withholding tax duly completed together with such supplementary documentation as may be prescribed by Law to permit the Borrower to determine the withholding or deduction required to be made, or

(6)    Each Lender that is not a Foreign Lender shall provide two (2) properly completed and duly executed copies of IRS Form W-9 to the Borrower (with a copy to the Agent) certifying such Lender is exempt from United States backup withholding Tax.

(j)    Agent (to the extent it has not otherwise provided such form in its capacity as a Lender) shall supply to the Borrower a duly executed IRS Form W-9 or an applicable IRS Form W-8

(k)    If the Agent or any Lender determines, in its sole discretion, that it has received a refund of any Taxes as to which it has been indemnified by the Loan Parties or with respect to which the Loan Parties have paid additional amounts pursuant to this Section 4-13, it shall pay to the Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Loan Parties under this Section 4-13 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses of the Agent or such Lender, as the case may be, and without interest (other than any interest paid by the relevant governmental authority with respect to such refund); provided that the Loan Parties, upon the request of such Agent or such Lender, agree to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant governmental authority) to such Agent or such Lender in the event that such Agent or such Lender is required to repay such refund to such governmental authority.  Notwithstanding anything to the contrary in this paragraph (j), in no event will such Agent or such Lender be required to pay any amount to the Loan Parties pursuant to this paragraph (j), the payment of which would place such Agent or such Lender in a less favorable net after-Tax position than such Agent or such Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and

52

the indemnification payments or additional amounts with respect to such Tax had never been paid. This subsection shall not be construed to require the Agent or any Lender to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Loan Parties or any other Person.

(l)     If a payment made to a Lender under any Loan Document would be subject to U.S. Federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender, if it is legally eligible to do so, shall deliver to Borrower and Agent, at the time or times prescribed by law and at such time or times reasonably requested by Borrower and Agent, such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower and Agent as may be necessary for Borrower and Agent to comply with its obligations under FATCA, to determine that such Lender has or has not complied with such Lender's obligations under FATCA and, as necessary, to determine the amount to deduct and withhold from such payment. Solely for purposes of this Section 4.13(k), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

4-14.    No Margin Stock. No Loan Party is engaged in the business of extending credit for the purpose of purchasing or carrying any margin stock (within the meaning of Regulations U, T, and X of the Board of Governors of the Federal Reserve System of the United States). No part of the proceeds of any borrowing hereunder will be used at any time to purchase or carry any such margin stock or to extend credit to others for the purpose of purchasing or carrying any such margin stock.

4-15.    ERISA. From and after the date hereof, none of the Loan Parties nor any ERISA Affiliate shall, in any manner which could be expected to have a Material Adverse Effect:

(a)     Fail to comply in all material respects with any Employee Benefit Plan.

(b)     Fail timely to file all reports and filings required by ERISA to be filed by a Loan Party.

(c)     Engage in any non-exempt "prohibited transactions" (as described in ERISA).

(d)     Engage in, or commit, any act such that a tax or penalty could be imposed upon the Loan Parties on account thereof pursuant to ERISA.

(e)     Accumulate any material funding deficiency within the meaning of Section 302 of ERISA.

(f)     Terminate any Employee Benefit Plan such that a lien could be asserted against any assets of the Loan Parties on account thereof pursuant to ERISA.

(g)     Be a member of, contribute to, or have any obligation under any Employee Benefit Plan which is a multiemployer plan within the meaning of Section 4001(a)(3) of ERISA.

4-16.    Hazardous Materials.

(a)     Other than matters that could not be expected to have a Material Adverse Effect, no Loan Party has ever:

(i)        Been legally responsible for any release or threat of release of any Hazardous Material.

(ii)       Received notification of any release or threat of release of any Hazardous Material from any site or vessel occupied or operated by a Loan Party and/or of the incurrence of any expense or loss in connection with the assessment, containment, or removal of any release or threat of release of any Hazardous Material from any such site or vessel.

(b)        The Loan Parties each shall:

(i)        Dispose of any Hazardous Material only in compliance with all Environmental Laws, except for dispositions which could not be expected to have a Material Adverse Effect.

(ii)       Not store on any site or vessel occupied or operated by a Loan Party and not transport or arrange for the transport of any Hazardous Material, except if such storage or transport is in the ordinary course of the Loan Parties' business and is in compliance with all Environmental Laws or could not be expected to have a Material Adverse Effect.

(c)        The Loan Parties shall provide the Agent with written notice upon such Loan Party obtaining knowledge of any incurrence of any expense or loss by any governmental authority or other Person in connection with the assessment, containment, or removal of any Hazardous Material, for which expense or loss a Loan Party may be liable, other than expense or loss that could not be expected to have a Material Adverse Effect.

4-17.    <u>Litigation</u>.  Except as described in **EXHIBIT 4-17** annexed hereto there is not presently pending any unstayed suit, action, proceeding or investigation against the Loan Parties which could reasonably be expected to have a Material Adverse Effect, excluding, any proceedings challenging this Agreement or the DIP Orders, but only so long as, (i) prior to the Final Order Effective Date, the Interim DIP Order is in effect and has not been stayed, reversed, modified or subject to a motion for reconsideration without the consent of the Agent and the Required Lenders and (ii) on and after the Final Order Effective Date, the Final DIP Order is in effect and has not been stayed, reversed, modified or subject to a motion for reconsideration without the consent of the Agent and the Required Lenders.

4-18.    <u>Investments</u>.  No Loan Party shall:

(a)        [Intentionally Omitted].

(b)        [Intentionally Omitted].

(c)        [Intentionally Omitted].

(d)        Merge or consolidate or be merged or consolidated with or into any other corporation or other entity.

(e)        Consolidate any of a Loan Party's operations with those of any other corporation or other entity.

(f)        Organize or create any Subsidiary.

54

(g)        Subordinate any debts or obligations owed to a Loan Party by any third party to any other debts owed by such third party to any other Person.

(h)        Acquire any assets or equity interests in another Person other than by the making of Capital Expenditures to the extent permitted under the DIP Budget.

4-19.    <u>Loans</u>.  No Loan Party shall make any loans or advances to, nor acquire the Indebtedness of, any Person; <u>provided</u>, <u>however</u>, the foregoing does not prohibit any of the following:

(a)        Advance payments made to the Loan Parties' suppliers in the ordinary course, consistent with past practice.

(b)        [Intentionally Omitted].

(c)        Advances on account of sales of Inventory in the ordinary course of business consistent with past practice made on credit and all Accounts arising therefrom, consistent with past practice

(d)        Loans, advances and/or Investments in or on behalf of Aeropostale Puerto Rico, Inc. to the extent permitted by the DIP Budget.

(e)        Loans and/or Investments by one Loan Party to another in the ordinary course of business consistent with past practices to the extent permitted by the DIP Budget

4-20.    <u>Protection of Assets</u>.  The Agent, in the Agent's discretion, and from time to time, may discharge any tax or Encumbrance on any of the Collateral, or take any other action that the Agent may deem necessary to repair, insure, maintain, preserve, collect, or realize upon any of the Collateral.  The Agent shall not have any obligation to undertake any of the foregoing and shall have no liability on account of any action so undertaken except where there is a specific finding in a judicial proceeding (in which the Agent has had an opportunity to be heard), from which finding no further appeal is available, that the Agent had acted in actual bad faith or in a grossly negligent manner.  The Borrower shall pay to the Agent, on demand, or the Agent, in its discretion, may add to the Loan Account, all amounts paid or incurred by the Agent pursuant to this section.  The obligation of the Borrower to pay such amounts is a Liability.

4-21.    <u>Line of Business</u>.  No Loan Party shall engage in any business other than the business in which it is currently engaged (which is agreed to be the design, sourcing, marketing, distribution and sale of apparel products and accessories and the licensing of trade names, trademarks and intellectual property to third Persons in connection with the foregoing), any business reasonably related thereto or any business or activity that is reasonably similar or complementary thereto or a reasonable extension, development or expansion thereof or ancillary thereto.

4-22.    <u>Affiliate Transactions</u>.  No Loan Party shall make any payment, nor give any value to any Related Entity except for goods and services actually purchased by such Loan Party from, or sold by such Loan Party to, such Related Entity for a price and on terms which shall not be less favorable to the Loan Party from those which would have been charged in an arms-length transaction, except as existing as of the Effective Date and set forth on **Exhibit 4-22** hereto.

4-23.    <u>Additional Assurances</u>.

(a)      Except as set forth on **EXHIBIT 4-23**, no Loan Party is the owner of, nor has it any interest in, any property or asset which, immediately upon the satisfaction of the conditions precedent to the effectiveness of the credit facility contemplated hereby (Article 3) will not be subject to a perfected security or other collateral interest in favor of the Agent (subject only to Permitted Encumbrances) to secure the Liabilities.

(b)      Except as set forth on **EXHIBIT 4-23**, no Loan Parties will hereafter acquire any asset or any interest in property which is not, immediately upon such acquisition, subject to a perfected security or other collateral interest in favor of the Agent to secure the Liabilities (subject only to Permitted Encumbrances).

(c)      The Loan Parties shall each execute and deliver to the Agent such instruments, documents, and papers, and shall do all such things from time to time hereafter as the Agent may request to carry into effect the provisions and intent of this Agreement; to protect and perfect the Agent's security interests in the Collateral; and to comply in all material respects with all applicable statutes and laws, and facilitate the collection of the Receivables Collateral.  The Loan Parties shall each execute all such instruments as may be required by the Agent with respect to the recordation and/or perfection of the security interests created herein.

(d)      Each Loan Party hereby designates the Agent as and for such Loan Party's true and lawful attorney, with full power of substitution, to sign and file any financing statements in order to perfect or protect the Agent's security and other collateral interests in the Collateral.

(e)      To the full extent permitted by applicable Requirements of Law, a carbon, photographic, or other reproduction of this Agreement or of any financing statement or other instrument executed pursuant to this Section 4-23 shall be sufficient for filing to perfect the security interests granted herein.

4-24.   Adequacy of Disclosure.

(a)      All financial statements for periods after the Effective Date which are furnished to the Agent by the Loan Parties shall be prepared in accordance with GAAP consistently applied and present fairly, in all material respects, the condition of the Loan Parties at the date(s) thereof and the results of operations and cash flows for the period(s) covered.

(b)      [Intentionally Omitted.]

(c)      As of the Effective Date, no Loan Party has any contingent obligations or obligation under any Lease or Capital Lease which is not noted in the Loan Party's financial statements furnished to the Agent prior to the execution of this Agreement.

(d)      No document, instrument, agreement, or paper now or hereafter given the Agent by or on behalf of a Loan Party in connection with the execution of this Agreement by the Agent contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary in order to make the statements therein not misleading.  There is no fact known to a Loan Party which has, or which, in the foreseeable future could be expected to have, a material adverse effect on the financial condition of the Loan Parties which has not been disclosed in writing to the Agent.

4-25.   Deposit Account Investments.  The Loan Parties may make investments consisting of Cash Equivalents maintained at such bank(s) as the Borrower may select, excluding investments in

certificates of deposit having a term greater than one month (other than in the Concentration Account, which shall be all cash assets).

4-26.    Prepayments of Indebtedness.  No Loan Party will make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash securities or other property) of or in respect of principal of or interest on any Indebtedness, including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Indebtedness (other than the Loans) other than, subject to the approval of the Agent and the approval of the Bankruptcy Court and in each case as and to the extent in accordance with the DIP Budget, payments in the ordinary course of business, prepayments approved in the "first day orders" and the prepayment of the Prepetition ABL Facility.

4-27.    Other Covenants.  No Loan Party shall indirectly do or cause to be done any act which, if done directly by a Loan Party, would breach any covenant contained in this Agreement.

4-28.    Labor Matters.  There are no strikes, lockouts, slowdowns or other material labor disputes against any Loan Party pending or, to the knowledge of any Loan Party, threatened.  The hours worked by and payments made to employees of the Loan Parties comply with the Fair Labor Standards Act and any other applicable federal, state, local or foreign Law dealing with such matters except to the extent that any such violation could not be expected to have a Material Adverse Effect.  No Loan Party has incurred any liability or obligation under the Worker Adjustment and Retraining Act or similar state Law.  All payments due from any Loan Party, or for which any claim may be made against any Loan Party, on account of wages and employee health and welfare insurance and other benefits, have been paid or properly accrued in accordance with GAAP as a liability on the books of such Loan Party.  Except as set forth on **EXHIBIT 4-28** or as filed with the SEC, no Loan Party is a party to or bound by any collective bargaining agreement, management agreement, employment agreement, bonus, restricted stock, stock option, or stock appreciation plan or agreement or any similar plan, agreement or arrangement.  There are no representation proceedings pending or, to any Loan Party's knowledge, threatened to be filed with the National Labor Relations Board, and no labor organization or group of employees of any Loan Party has made a pending demand for recognition.  There are no complaints, unfair labor practice charges, grievances, arbitrations, unfair employment practices charges or any other claims or complaints against any Loan Party pending or, to the knowledge of any Loan Party, threatened to be filed with any governmental authority or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment of any employee of any Loan Party which could be expected to have a Material Adverse Effect.  The consummation of the transactions contemplated by the Loan Documents will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Loan Party is bound.

4-29.    Restricted Payments and Payments to Non-Loan Party Group Members.

(a)    Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so.

(b)    Permit any Collateral (including any proceeds of the Loans) to be distributed or contributed to, or otherwise used for payments or liabilities to, for, or on behalf of, directly or indirectly, any Group Member that is not a Loan Party, unless in accordance with the DIP Budget.

4-30.    Licenses.  No Loan Party shall enter into any new material License, without the prior written consent of the Agent and the Required Lenders, which consent shall not be unreasonably withheld, other than non-exclusive licenses in the ordinary course of business consistent with past conduct.  The Borrower shall give the Agent a copy of such material License, and any proposed ancillary

documentation as reasonably requested by the Agent, all in substantially final form, for the Agent's consideration, no later than seven Business Days' prior to the proposed execution thereof.

4-31.   Material Contracts.

(a)    **EXHIBIT 4-31** sets forth all Material Contracts to which any Loan Party is a party or is bound as of the Effective Date. The Loan Parties have delivered true, correct and complete copies of such Material Contracts to the Agent on or before the Effective Date. The Loan Parties are not in breach or in default in any material respect of or under any Material Contract which is not subject to the Automatic Stay or Safe Harbor Provisions and have not received any notice of the intention of any other party thereto to terminate any Material Contract.

(b)    From and after the Effective Date, the Loan Parties agree they shall each perform and observe all the terms and provisions of each Material Contract to be performed or observed by it, (b) maintain each such Material Contract in full force and effect except to the extent such Material Contract is no longer used or useful in the conduct of the business of the Loan Parties in the ordinary course of business, consistent with past practices, (c) enforce each such Material Contract in accordance with its terms, and, (d) upon request of the Agent, make such demands and requests for information and reports or for action from any other party to each such Material Contract as any Loan Party or any of its Subsidiaries is entitled to make under such Material Contract, and (e) cause each of its Subsidiaries to do the foregoing. No Loan Party shall assume, reject, cancel, terminate, breach, supplement or modify (whether pursuant to Section 365 of the Bankruptcy Code or any other applicable law or otherwise) any Material Contract without the prior written consent of the Agent and the Required Lenders.

4-32.   Customer Relations.  There exists no actual or, to the knowledge of any Loan Party, threatened, termination or cancellation of, or any material adverse modification or change in the business relationship of any Loan Party with any supplier material to its operations, other than with respect to the MGF Sourcing Agreement.

4-33.   Consents.  No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any governmental authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, except for (a) the perfection or maintenance of the liens created hereunder or under any other Loan Document (including the first priority nature thereof) or (b) such as have been obtained or made and are in full force and effect.

4-34.   Amendment of Material Documents.  The Loan Parties shall not amend, modify or waive any of a Loan Party's rights under (a) its organization documents, or (b) any Material Contract or Material Indebtedness.

4-35.   Use of Proceeds.

The Borrower shall not, nor shall it permit any of its Subsidiaries to use the proceeds of the Loans for any purposes other than to pay or fund (i) certain costs, fees and expenses related to the Cases, (ii) with respect to Loans made on the Effective Date, and subject to the DIP Budget and approval of the Bankruptcy Court, the repayment of the Pre-Petition ABL Indebtedness, (iii) the cash collateralization of other letters of credit as approved by the Agent and the Required Lenders from time to time in their sole discretion (the "Post-Petition L/C Reserve Account"); (iv) the cash collateralization of the Pre-Petition ABL Letters of Credit in an amount equal to 103% of the face amount thereof, which shall not exceed $250,000.00; (v) to fund an escrow account for payments on account of any contingent indemnity obligations under the Pre-Petition ABL Facility, in an amount not to exceed $350,000; (vi) the cash

58

collateralization of certain cash management obligations owed to Bank of America, N.A., under the Pre-Petition ABL Facility in an amount not to exceed $250,000; (vii) the cash collateralization of certain cash management obligations owed to Wells Fargo Bank, N.A., under the Pre-Petition ABL Facility in an amount not to exceed $10,000; (viii) the cash collateralization of certain bank product obligations related to credit cards under the Pre-Petition ABL Facility in an amount not to exceed $3,720,977.30 (each of the accounts solely containing the amounts described in the foregoing clauses (iv)-(viii), the "**Pre-Petition ABL Escrow and Reserve Accounts**"), (ix) to fund the Carve-Out and the Professional Fees (the "**Professional Fees and Carve-Out Account**") as described more fully in the DIP Orders, and (x) the working capital needs of the Borrower and the other Loan Parties during the Case, and with respect to each of the foregoing clauses (i)-(x), in accordance with the DIP Budget and the DIP Orders; provided, however, that none of the proceeds of the Loans and none of the Liabilities, the cash collateral, the Collateral or the Carve-Out may be used for any purpose prohibited by the Bankruptcy Court or the DIP Orders.

4-36.    Compliance with Material Leases.    Except as otherwise expressly permitted hereunder, (a) make all payments and otherwise perform all obligations in respect of all Material Leases (other than the non-payment of rent for April 2016 and May 2016 as contemplated by the DIP Budget) and keep such Material Leases in full force and effect, (b) not allow Material Leases or more than 30 retail location leases to lapse or be terminated, or any rights to renew any Material Leases or more than 30 retail location leases to be forfeited or cancelled (except in connection with Permitted Closing Stores once any going out of business sales are completed) or in the ordinary course of business, consistent with past practices, (c) notify the Agent of any default by any party with respect to any Material Leases or if such defaults occur with respect to more than 30 retail location leases (other than with respect to Permitted Closing Stores once any going out of business sales are completed), other than the non-payment of rent for April 2016 and May 2016, as contemplated by the DIP Budget, and cooperate with the Agent in all respects to cure any such default, and (d) cause each of its Subsidiaries to do the foregoing. No Loan Party may assume, assume and assign, or reject any Lease without the prior written consent of the Agent and Required Lenders.

4-37.    Validity and Priority of Security Interest; Administrative Priority.

(a)    The provisions of this Agreement and the other Loan Documents create Liens upon the Collateral in favor of the Agent and the Lenders, which shall be deemed valid and perfected as of the Petition Date by entry of the DIP Orders with respect to the Borrower and each Guarantor and which shall constitute continuing Liens on the Collateral having priority over all other Liens on the Collateral (other than the Carve-Out, Additional Pre-Petition Priority Liens and the Pre-Petition Term Priority Liens), securing all the Liabilities. The Lenders shall not be required to file or record (but shall have the option and authority to file or record) any financing statements, mortgages, notices of Lien or similar instruments, in any jurisdiction or filing office or to take any other action in order to validate, perfect or establish the priority of the Liens and security interest granted by or pursuant to this Agreement, the DIP Orders or any other Loan Document.

(b)    Pursuant to Section 364(c)(1) of the Bankruptcy Code, the Liabilities of the Loan Parties shall at all times constitute allowed administrative expenses against each of the Loan Parties in the Cases (without the need to file any proof of claim or request for payment of administrative expense), with priority over any and all other administrative expenses, adequate protection claims, diminution claims (including all Adequate Protection Superpriority Claims) and all other claims against the Loan Parties, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all other administrative expense claims arising under Sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 546, 726, 1113 and 1114 of the Bankruptcy Code, whether or not such expenses

55718599V12

or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which shall be payable from and have recourse to all pre- and post-petition property of the Loan Parties and their estates and all proceeds thereof, including, without limitation, all avoidance actions and any proceeds of avoidance actions, subject, as to priority, only to the Carve-Out, Additional Pre-Petition Priority Liens and the Pre-Petition Term Priority Liens.

4-38.    [Intentionally Omitted].

4-39.    Cash Management System.  The Loan Parties shall maintain a cash management system, which shall be the same or substantially similar to their pre-petition cash management system, with adjustments satisfactory to the Agent and the Required Lenders in their sole discretion, and which shall include, without limitation, cash sweeps in accordance with Article 7 (the "**Cash Management System**"); provided that, the Loan Parties may only withdraw or transfer from its accounts amounts necessary to fund expenses for the immediately following week as set forth in the relevant DIP Budget.  Any changes to the Cash Management System must be approved by the Agent and the Required Lenders in its sole discretion.

4-40.    Advisors.  (a) The Loan Parties shall employ a financial advisor that is approved by the Agent and the Required Lenders on or prior to the Effective Date and shall at all times continue to employ such financial advisor unless otherwise approved by the Agent and the Required Lenders in their sole discretion (it being understood and agreed that each of Stifel Financial Corp. and FTI Consulting are acceptable to the Agent).  (b) Within 100 days after the Effective Date, the Borrower shall engage Hilco Streambank for the preparation of the Intellectual Property for the 363 sale as contemplated in the Milestones, which engagement shall be on terms and conditions and otherwise pursuant to an agreement satisfactory to the Agent and the Required Lenders in their sole discretion.

4-41.    Case Matters.

(a)    All Professional Fees at any time paid by the Loan Parties, or any of them, shall be paid by the Loan Parties pursuant to procedures established by an order of the Bankruptcy Court and pursuant to the DIP Budget.

(b)    Without the prior written consent of the Agent and the Required Lenders, no Loan Party shall seek or consent to any order (i) dismissing any of the Cases under Sections 105, 305 or 1112 of the Bankruptcy Code or otherwise; (ii) converting any of the Cases to cases under Chapter 7 of the Bankruptcy Code; (iii) appointing a Chapter 11 trustee in any of the Cases; (iv) appointing an examiner with enlarged powers beyond those set forth in sections 1104(d) and 1106(a)(3) and (4) of the Bankruptcy Code in any of the Cases; or (v) granting a change of venue with respect to any Case or any related adversary proceeding.

(c)    The Loan Parties will not return any inventory or other property to any vendor pursuant to Section 546(g) of the Bankruptcy Code, unless otherwise ordered by the Bankruptcy Court in accordance with Section 546(g) of the Bankruptcy Code upon prior notice to the Agent and the Required Lenders or unless otherwise consented to by the Agent and the Required Lenders.

(d)    No Loan Party shall submit to the Bankruptcy Court a Plan of Reorganization without the prior written consent of the Agent and the Required Lenders, unless such Plan of Reorganization will indefeasibly pay the Liabilities in full, in cash and terminate the Commitments.

55718599V12

(e)     No Loan Party shall propose to the Bankruptcy Court, or otherwise, a sale of all or substantially all of the Collateral, without the prior written consent of the Agent and the Required Lenders, unless such sale will indefeasibly pay the Liabilities in full, in cash and terminate the Commitments.

4-42.   <u>Amendments to Orders</u>.   None of the Loan Parties shall amend, modify or waive (or make any payment consistent with an amendment, modification or waiver of), or apply to the Bankruptcy Court for authority to make any amendment, modification or waiver of, any provision of the Interim DIP Order or the Final DIP Order without in each case the prior written consent of the Agent and the Required Lenders.

4-43.   <u>Post-Closing Deliverables</u>.   On or before the date that is the earlier of (a) 45 days after the Effective Date and (b) the Final Order Entry Date (or such later date as agreed by the Agent and the Required Lenders in their sole discretion), the Borrower shall have used commercially reasonable efforts to deliver to the Agent amendments to Loan Parties' existing Blocked Account Agreements in respect of each of the accounts subject to a Blocked Account Agreement with the Pre-Petition ABL Agent (which accounts are set forth on **EXHIBIT 4-43**) as of the Petition Date, in form and substance satisfactory to the Agent.

4-44.   <u>Dormant Subsidiaries</u>.   Each Subsidiary of a Loan Party identified on **EXHIBIT 4-45** (each, a "**Dormant Subsidiary**") is a dormant entity under the laws of its jurisdiction of organization, and (b) no Dormant Subsidiary engages in any business or activity or owns any assets or has any liability.

4-45.   <u>Fidelity Account</u>.

(a)     As of the Effective Date, the aggregate balance in the Fidelity Account is less than $1,000.

(b)     No amount of money may be deposited in the Fidelity Account by a Loan Party or any other Person at any time on or after the Effective Date.

4-46.   <u>Pre-Petition Term Loan Proceeds Securities Account</u>.

(a)     As of the Effective Date, the aggregate balance in the Pre-Petition Term Loan Proceeds Securities Account is less than $1,000.

(b)     No amount of money may be deposited in the Pre-Petition Term Loan Proceeds Securities Account by a Loan Party or any other Person at any time on or after the Effective Date.

4-47.   <u>Pre-Petition Term Loan Proceeds Account</u>.

(a)     As of the Effective Date, the aggregate balance in the Pre-Petition Term Loan Proceeds Account is less than $1,000.

(b)     No amount of money may be deposited in the Pre-Petition Term Loan Proceeds Account by a Loan Party or any other Person at any time on or after the Effective Date.

**Article 5 - Financial Reporting and Performance Covenants**:

5-1.   <u>Maintain Records</u>.   The Borrower shall, and shall cause each Guarantor to:

(a)     At all times, keep proper books of account, in which full, true, and accurate entries shall be made of all of the Loan Parties' transactions, all in accordance with GAAP, applied consistently with all prior periods, to fairly reflect, in all material respects, the financial condition of the Loan Parties at the close of, and its results of operations for, the periods in question.

(b)     Timely provide the Agent with those financial reports, statements, and schedules required by this Article 5 or otherwise, each of which reports, statements and schedules shall be prepared, to the extent applicable, in accordance with GAAP (but for the absence of footnotes and year-end adjustments), applied consistently with all prior periods, to fairly reflect, in all material respects, the financial condition of the Loan Parties at the close of, and their results of operations for, the period(s) covered therein.

(c)     At all times, keep accurate (in all material respects) and current records of the Collateral including, without limitation, accurate current stock, cost, and sales records of its respective Inventory, accurately and sufficiently itemizing and describing the kinds, types, and quantities of Inventory and the cost and selling prices thereof.

(d)     At all times, retain Deloitte & Touche LLP, or such other independent certified public accountants who are reasonably satisfactory to the Agent and the Required Lenders and instruct such accountants to fully cooperate with, and be available to, the Agent to discuss a Loan Party's financial performance, financial condition, operating results, controls, and such other matters, within the scope of the retention of such accountants, as may be raised by the Agent.  Agent shall give the Borrower an opportunity to participate in any discussions Agent has with Borrower's certified public accountant pursuant to this Section 5-1.

5-2.     Access to Records.

(a)     The Borrower shall, and shall cause each Guarantor to, afford the Agent and the Agent's representatives with access from time to time, during normal business hours upon notice, as the Agent and such representatives may require to all properties owned by or over which a Loan Party has control.  The Agent and the Agent's representatives shall have the right, and the Borrower will, and will cause each Guarantor to, permit the Agent and such representatives from time to time as the Agent and such representatives may request, during normal business hours and to examine, inspect, copy, and make extracts from any and all of the Loan Parties' books, records, electronically stored data, papers, and files pertaining to its business operations, financial information or the Collateral.  The Borrower shall, and shall cause the Guarantor to, make copying facilities available to the Agent.

(b)     The Borrower for itself, and as the sole shareholder or member, as applicable, of each Guarantor, hereby authorizes the Agent and the Agent's representatives to, unless an Event of Default has occurred and is continuing, during normal business hours:

(i)     Inspect, copy, duplicate, review, cause to be reduced to hard copy, run off, draw off, and otherwise use any and all computer or electronically stored information or data which relates to the Loan Parties, whether in the possession of a Loan Party or in the possession of any service bureau, contractor, accountant, or other person, (and the Loan Parties each directs any such service bureau, contractor, accountant, or other person fully to cooperate with the Agent and the Agent's representatives with respect thereto).

(ii)     Verify at any time the Collateral or any portion thereof, including verification with Account Debtors, and/or with each Loan Party's computer billing companies, collection agencies, and accountants and to sign the name of the Loan Party on any notice to such

Loan Party's Account Debtors or verification of the Collateral; provided that as long as no Event of Default exists and is continuing, the form and content of any such verification letters shall be subject to the prior approval of the Borrower (whose consent shall not be unreasonably withheld, delayed or conditioned).

5-3.   Prompt Notice to Agent.

(a)   The Borrower shall, and shall cause each Guarantor to, provide the Agent with written notice promptly upon the occurrence of any of the following events, which written notice shall be with reasonable particularity as to the facts and circumstances in respect of which such notice is being given (excluding, in each case, (i) [intentionally omitted], (ii) any information publicly disclosed in any document filed with the Bankruptcy Court and (iii) any information filed with and published by the Securities and Exchange Commission):

(i)   Any change in a Loan Party's executive officers.

(ii)   The completion of any physical count of a Loan Party's Inventory (together with a copy of the certified results thereof).

(iii)   The receipt by any Loan Party of any written notice from any lessor of such lessor's intention to terminate any Material Lease and any such notices if and when received with respect to more than 30 retail location leases (other than with respect to Permitted Closing Stores once any going out of business sales are completed), together with a copy of all such written notices of intended termination from the lessors thereunder.

(iv)   The occurrence of any Suspension Event that has not been cured by the Loan Parties or waived by the Agent.

(v)   Any decision on the part of a Loan Party to discharge a Loan Party's present independent accountants or any withdrawal or resignation by such independent accountants from their acting in such capacity (as to which, see Subsection 5-1(d)).

(vi)   The acquisition by a Loan Party of any Commercial Tort Claim.

(vii)   Any fact, circumstance, and/or event (or set of facts, circumstances and/or events) that could be expected to have a Material Adverse Effect.

(viii)   (x) The occurrence of any default or breach under any Material Contract, (y) any proposed amendment to any Material Contract, and (z) without waiving the Loan Parties' obligations hereunder with respect to any such amendments described in the foregoing clause (y), upon the effectiveness of such amendments, the Borrower shall provide Agent with true and complete copies of such amendments.

(ix)   Such additional documents and information as the Agent may reasonably request from time to time.

(b)   The Borrower shall, and shall cause each Guarantor to, provide the Agent, when received by the Borrower or Guarantor, with a copy of any management letter or similar communications from any accountant of the Borrower or Guarantor.

5-4.   [Intentionally Omitted].

63

5-5.    Borrowing Base Certificates.  Weekly, on the Wednesday of each week, commencing on the first such date following the Effective Date, the Borrower shall provide the Agent with a certificate in the form of **EXHIBIT 5-5** (a "**Borrowing Base Certificate**") showing the Borrowing Base as of the close of business on the Saturday of the immediately preceding week, each such Borrowing Base Certificate to be certified as complete and correct on behalf of the Borrower by a Responsible Officer of the Borrower.

5-6.    Monthly Reports.

(a)    Within thirty (30) days following the end of each of the Borrower's fiscal months, the Borrower shall provide the Agent with original counterparts of an internally prepared financial statement of the Group Members' financial condition and the results of their respective operations for, the period ending with the end of the subject month, which financial statement shall include, at a minimum, a balance sheet, income statement (on a "consolidated" basis), cash flow and comparison of same store sales for the corresponding month of the then immediately previous year, as well as to the Business Plan, and management's analysis and discussion of the operating results reflected therein, all certified by the Borrower's chief financial officer.  At Agent's request, Borrower shall provide the Agent with copies of the bank statements issued by Fidelity with respect to each Fidelity Account for the immediately preceding month.

5-7.    Permitted Store Closing Reports.  Commencing Wednesday, May 18, 2016, provide Agent every Wednesday, and upon Agent's request on or after the date of any store closing, to the extent not previously delivered, all sale information and other information (including such documents and instruments prepared by the liquidators) reasonably requested by Agent in connection with any Permitted Closing Store.

5-8.    [Intentionally Omitted].

5-9.    Fiscal Year.  The Borrower shall not change its fiscal year or permit any other Loan Party to change its fiscal year, or the accounting policies or reporting practices of the Loan Parties, except as required by GAAP; provided that, to the extent any such changes are required by GAAP, the Loan Parties shall promptly deliver notice of same to the Agent pursuant to Section 5-3(a)(v) of this Agreement.

5-10.    Inventories, Appraisals, and Audits.

(a)    The Agent, at the expense of the Borrower, may observe each physical count and/or inventory of so much of the Collateral as consists of Inventory which is undertaken on behalf of, and at the request of, a Loan Party.

(b)    The Loan Parties, at their own expense, shall cause not less than one (1) physical inventory to be undertaken in each twelve (12) month period during which this Agreement is in effect to be conducted by a national third party inventory taker.

(i)    The Loan Parties shall provide the Agent with a copy of the final results of each such inventory (as well as of any other physical inventory undertaken by a Loan Party) within fourteen (14) days following the completion of such inventory.

(ii)    The Borrower shall provide the Agent with a reconciliation of the results of each such inventory (as well as of any other physical inventory undertaken by a Loan Party) to the Loan Party's books and records within forty-five (45) days following completion of such inventory.

55718599V12

(iii)    The Agent, in its sole discretion, following the occurrence, and during the continuance, of an Event of Default, may cause such additional inventories to be taken as the Agent determines (each, at the expense of the Borrower).

(iv)    The Agent, in its reasonable discretion, may cause such additional inventories to be taken as the Agent deems necessary or appropriate in its sole discretion (each, at the expense of the Borrower).

(c)    Upon the Agent's request from time to time, the Borrower shall, and shall cause each Guarantor to, permit the Agent to obtain appraisals conducted by such appraisers as are satisfactory to the Agent and using a methodology similar in scope and nature as was undertaken prior to the effectiveness of this Agreement.  Without limiting the foregoing, the Agent may obtain periodic Inventory and Trademark liquidation analyses performed by Hilco Valuation Services, Great American Group or another liquidation analysis firm selected by the Agent and at the expense of the Borrower.

(d)    Upon the Agent's request from time to time, the Borrower shall, and shall cause each other Loan Party to, permit the Agent to conduct commercial finance audits of the Borrower's and the other Loan Parties' books and records using a methodology similar in scope and nature as was undertaken prior to the effectiveness of this Agreement, and the expense for any such audits shall be borne by the Borrower.

5-11.    Additional Financial Information.

(a)    In addition to all other information required to be provided pursuant to this Article 5, the Borrower promptly shall provide the Agent (and shall cause each other Loan Party and any other guarantor of the Liabilities to also provide the Agent), with such other and additional information concerning the Borrower or Guarantors, the Collateral, the operation of the Borrower's or Guarantors' business, and the Borrower's or Guarantors') financial condition, including original counterparts of financial reports and statements, as the Agent may from time to time request from the Borrower.

(b)    [Intentionally Omitted].

(c)    [Intentionally Omitted].

(d)    The Loan Parties each recognizes that all appraisals, inventories, analysis, financial information, and other materials which the Agent may obtain, develop, or receive with respect to the Loan Parties is confidential to the Agent and that, except as otherwise provided herein, no Loan Party is entitled to receipt of any of such appraisals, inventories, analysis, financial information, and other materials, nor copies or extracts thereof or therefrom.

5-12.    Excess Availability.  At all times, the Borrower and its Subsidiaries shall have minimum Excess Availability of at least (x) $25,000,000 during the month of May 2016, and (y) $13,000,000 at all times thereafter.  The Borrower demonstrate and shall certify to compliance with this covenant on the Wednesday of each week for the immediately preceding calendar week.

5-13.    Committee Communications. Promptly after any delivery thereof, the Loan Parties shall deliver to the Agent copies of all material written reports and presentations delivered by or on behalf of any Loan Party to the Committee in any of the Cases to the extent not publicly filed.

5-14.    Disbursements, DIP Budget Variance and Updated DIP Budget.

(a)     The Borrower and its Subsidiaries may not make any disbursements other than those set forth in the DIP Budget.

(b)     The Borrower shall deliver a certificate to the Agent signed by a Responsible Officer of the Borrower, on Wednesday of each week, commencing on the second Wednesday after the Petition Date, certifying the cash disbursements, sales, margins, inventory and inventory receipts, on a line by line basis, for the week ended (and on a cumulative basis since the Petition Date) the immediately prior Saturday, together with a variance report, on an individual line item basis and an aggregate basis, comparing such disbursements to the DIP Budget.

(c)     The Borrower shall deliver a certificate to the Agent signed by a Responsible Officer of the Borrower on Wednesday of every other week, commencing on the third Wednesday after the Petition Date, certifying as to the accrued Professional Fees for the two week period ended (and on a cumulative basis since the Petition Date) the Saturday ten days prior to such date, together with a variance report comparing such Professional Fees to the DIP Budget.

(d)     The Borrower shall deliver a certificate to the Agent signed by a Responsible Officer of the Borrower on the (i) Wednesday immediately prior to the scheduled hearing date for the Final DIP Order and (ii) Wednesday of each week, commencing on the third Wednesday after the Petition Date, in each case, demonstrating that total disbursements (excluding all professional fees and any stub-rent payments paid prior to the week ending July 30, 2016) for the four-week period (or, shorter period, if any, in the case of the certificate delivered under clause (i)) ending on the Saturday immediately preceding the applicable Wednesday, are no greater than 115% of the projected amounts for total disbursements set forth in the DIP Budget for such period.

(e)     The Borrower shall deliver a certificate to the Agent signed by a Responsible Officer of the Borrower on Wednesday of every other week, commencing on the fifth Wednesday after the Petition Date, demonstrating that accrued Professional Fees for the four-week period (or such shorter period, if any, in the case of the first certificate delivered hereunder) ending on the Saturday ten days prior to such date are no greater than 120% of the projected amounts for Professional Fees set forth in the DIP Budget for such period.

(f)     From time to time, the Borrower may propose an updated budget (the "**Proposed DIP Budget**") which shall reflect the Borrower's good faith projection of all weekly cash receipts and disbursements in connection with the operation of the Loan Parties' and their respective Subsidiaries' business during the next thirteen-week period, including but not limited to, collections, payroll, Capital Expenditures, Professional Fees and other cash outlays, in each case, consistent in form substance (other than dollar amounts) with the Initial DIP Budget.  The Agent and the Required Lenders may approve such Proposed DIP Budget, which will then become the "DIP Budget" then in effect in their sole and absolute discretion.  If the Required Lenders do not approve such Proposed DIP Budget, then the current DIP Budget will remain in effect.  If at any time there is no approved DIP Budget in effect for the current period, such event shall be an immediate Event of Default hereunder.

## Article 6 - Use and Collection of Collateral:

6-1.    Use of Inventory Collateral.

(a)     The Borrower shall not, and shall cause each other Loan Party not to engage in any sale of the Inventory other than for fair consideration in the conduct of the Borrower's or any other Loan Party's business in the ordinary course (other than promotions, markdowns, and discounts in the ordinary course of business consistent with past practices) nor shall either engage in sales or other

66

dispositions to creditors in reduction or satisfaction of such creditors' claims; sales or other dispositions in bulk; or any use of any of the Inventory in breach of any provision of this Agreement.

(b)        No sale of Inventory shall be on consignment, approval, or under any other circumstances such that (with the exception of the Loan Parties' customary return policy applicable to the return of inventory purchased by the Loan Parties' retail customers in the ordinary course and consistent with past practices), may be returned to the Loan Parties, without the consent of the Agent.

6-2.    <u>Adjustments and Allowances</u>.    A Loan Party may grant such allowances or other adjustments to the such Loan Party's Account Debtors as the Loan Party, respectively, may reasonably deem to accord with sound business practice; <u>provided</u>, <u>however</u>, that the authority granted the Loan Parties pursuant to this <u>Section 6-2</u> may be limited or terminated by the Agent at any time after the incurrence, and during the continuation of a Suspension Event in the Agent's discretion.

6-3.    <u>Validity of Accounts</u>.

(a)        The amount of each Account shown on the books, records, and invoices of the Loan Parties represented as owing by each Account Debtor is and will be the correct amount actually owing by such Account Debtor (subject to adjustments for returned Inventory in the ordinary course of business consistent with past practices) and shall have been fully earned by performance by such Loan Party.

(b)        The Agent, from time to time (at the expense of the Borrower in each instance), may verify the validity, amount, and all other matters with respect to the Receivables Collateral directly with Account Debtors (including without limitation, by forwarding balance verification requests to each Loan Party's Account Debtors), and with each Loan Party's accountants, collection agents, and computer service bureaus (each of which is hereby authorized and directed to cooperate in full with the Agent and to provide the Agent with such information and materials as the Agent may request); <u>provided</u> that, so long as no Suspension Event exists and is continuing, the form and content of any such verification letters shall be subject to the prior approval of the Borrower (whose consent shall not be unreasonably withheld or delayed).

(c)        No Loan Party has knowledge of any impairment of the validity or collectibility of any of the Accounts (other than customary adjustments and chargebacks in the ordinary course of business consistent with past practices) and shall notify the Agent of any such fact immediately after a Loan Party becomes aware of any such impairment.

(d)        Except as set forth in **EXHIBIT 6-3**, no Loan Party shall post any bond to secure a Loan Party's performance under any agreement to which a Loan Party is a party nor cause any surety, guarantor, or other third party obligee to become liable to perform any obligation of a Loan Party (other than to the Agent) in the event of Loan Party's failure so to perform, if the amount of any such bond or other obligation of a Loan Party exceeds $150,000 in any one instance, and after giving effect to all existing bonds and obligations permitted hereunder, the aggregate amount thereof does not exceed $250,000.

6-4.    <u>Notification to Account Debtors</u>.    The Agent shall have the right at any time after the occurrence, and during the continuance, of an Event of Default, to notify any of a Loan Party's Account Debtors to make payment directly to the Agent and to collect all amounts due on account of the Collateral.

**Article 7 - Cash Management.  Payment of Liabilities:**

7-1.    Depository Accounts.

(a)    Annexed hereto as **EXHIBIT 7-1** is an Exhibit of all present DDAs, which Exhibit includes, with respect to each depository (i) the name and address of that depository; (ii) the account number(s) of the account(s) maintained with such depository; and (iii) a contact person at such depository.

(b)    [Intentionally Omitted].

(c)    [Intentionally Omitted].

(d)    Notwithstanding the foregoing paragraphs (a) through (c) above, the Borrower shall have no obligation to enter into a Blocked Account Agreement with respect to any Fidelity Account unless at such time the aggregate balance in the Fidelity Accounts equals or exceeds $1,000.

(e)    [Intentionally Omitted].

7-2.    Credit Card Receipts.

(a)    Annexed hereto as **EXHIBIT 7-2** is an Exhibit which describes all arrangements to which each Loan Party is a party with respect to the payment to such Loan Party, of the proceeds of all credit card charges for sales by the Loan Party.

(b)    Neither the Borrower nor any Guarantor shall change notices, directions or designation delivered to its credit card clearinghouses and processors of notice delivered pursuant to Section 7.2(a) of the Pre-Petition ABL Credit Agreement, except upon and with the prior written consent of the Agent.

7-3.    The Concentration, Blocked, and Operating Accounts.

(a)    The following checking accounts have been established (and are so referred to herein):

(i)    The **Concentration Account**:  Established by the Borrower with Bank of America, N.A.

(ii)    The **Cash Collateral Account**.  Established in the name of the Agent with Citibank, N.A.

(iii)    The **Operating Account**:  Established by the Borrower with Bank of America, N.A.

(b)    The contents of each DDA, of the Operating Account, and of the Concentration Account constitute Collateral and Proceeds of Collateral.  The contents of the Cash Collateral Account constitute Collateral and Proceeds of Collateral.

(c)    The Loan Parties:  Subject to Sections 4-43 and 7-1(d):

(i)    To the extent not previously delivered to the Agent contemporaneously with the execution of this Agreement, shall provide the Agent with such agreement (generally

68

referred to as a "**Blocked Account Agreement**") of the depository with which the Concentration Account and the other deposit accounts are is maintained as may be satisfactory to the Agent;

      (ii)      To the extent not previously delivered to the Agent, contemporaneously with the execution of this Agreement, shall provide the Agent with such agreement of the depository with which the Operating Account is maintained as may be satisfactory to the Agent; and

      (iii)      Shall not establish any DDA, Concentration Account, Cash Collateral Account or Operating Account hereafter.

      (d)      The Loan Parties shall pay all fees and charges of, and maintain such impressed balances as may be required by the Agent or by any bank in which any account is opened as required hereby (even if such account is opened by and/or is the property of the Agent).

      7-4.      <u>Proceeds and Collection of Accounts</u>:

      (a)      All Receipts constitute Collateral and proceeds of Collateral, shall be held in trust by the Loan Parties for the Agent; shall not be commingled with any of a Loan Party's other funds; and shall be deposited and/or transferred only to the Cash Collateral Account.

      (b)      The Borrower shall cause, and shall cause each Guarantor to, ACH or wire transfer to the Cash Collateral Account or the Concentration Account, no less frequently than daily (and whether or not there is then an outstanding balance in the Loan Account) of:

      (i)      the then current contents of each DDA (other than the Operating Account), each such transfer to be net of any minimum balance, not to exceed $5,000.00, as may be required to be maintained in the subject DDA by the bank at which such DDA is maintained);

      (ii)      the proceeds of all credit card charges not otherwise provided for pursuant hereto; and

      (iii)      all cash proceeds, and all other cash payments received by a Loan Party from any Person or from any source or on account of any disposition described in <u>Section 2-9(b)(ii)</u>, solely to the extent arising out of DIP Priority Collateral.

Written notice shall be provided to the Agent on each Business Day on which any such transfer is made.

      (c)      Subject to Section 7-8, whether or not any Liabilities are then outstanding, the Loan Parties shall cause the ACH or wire transfer to the Cash Collateral Account, no less frequently than daily, of the entire ledger balance of the Concentration Account, net of such minimum balance, not to exceed $5,000.00, as may be required to be maintained in the Concentration Account by the bank at which the Concentration Account is maintained.

      (d)      In the event that, notwithstanding the provisions of this <u>Section 7-4</u>, a Loan Party receives or otherwise has dominion and control of any Receipts, or any proceeds or collections of any Collateral, such Receipts, proceeds, and collections shall be held in trust by such Loan Party for the Agent and shall not be commingled with any of the Loan Party's other funds or deposited in any account of the Loan Party other than as instructed by the Agent.

55718599V12

(e)     Notwithstanding anything to the contrary in <u>Section 7-4(b)</u>, (i) each of the Loan Parties shall deposit all cash and checks received by such Loan Party (other than cash used by the Loan Parties as petty cash and cash in store cash registers in amounts consistent with the Loan Parties' historic practices) in accordance with the Loan Parties' historic practices for making such deposits, and (ii) so long as any Liabilities in respect of Loans remain outstanding, the Loan Parties shall make the daily transfers to the Cash Collateral Account in accordance with <u>Sections 7-4(b)</u> and <u>(c)</u>.

7-5.    <u>Payment of Liabilities</u>.

(a)     On each Business Day, the Agent shall apply, towards the Liabilities, the then collected balance of the Cash Collateral Account (net of fees charged, and of such impressed balances as may be required by the bank at which the Cash Collateral Account is maintained).

(b)     The following rules shall apply to deposits and payments under and pursuant to this Agreement:

(i)     Funds shall be deemed to have been deposited to the Cash Collateral Account on the Business Day on which deposited, provided that notice of such deposit is available to the Agent by 2:00 PM on that Business Day.

(ii)     Funds paid to the Agent, other than by deposit to the Cash Collateral Account, shall be deemed to have been received on the Business Day when they are good and collected funds; <u>provided</u> that notice of such payment is available to the Agent by 2:00 PM on that Business Day.

(iii)     If notice of a deposit to the Cash Collateral Account (<u>Section 7-5(b)(i)</u>) or payment (<u>Section 7-5(b)(ii)</u>) is not available to the Agent until after 2:00PM on a Business Day, such deposit or payment shall be deemed to have been made at 9:00 AM on the then next Business Day.

(iv)     All deposits to the Cash Collateral Account and other payments to the Agent are subject to clearance and collection.

(c)     (i) So long as no Event of Default has occurred and is continuing, all payments shall be applied (A) <u>first</u>, to pay Liabilities in respect of any cost or expense reimbursements, fees or indemnities then due to the Agent, or reimbursement of Protective Advances, (B) <u>second</u>, to pay Liabilities in respect of any cost or expense reimbursements, fees or indemnities then due to the Lenders, (C) <u>third</u>, to pay interest then due and payable in respect of the Revolving Credit Loans, (D) <u>fourth</u>, to repay the outstanding principal amounts of the Revolving Credit Loans and (E) <u>fifth</u>, to the Operating Account.

(ii)     If an Event of Default has occurred and is continuing, all payments shall be applied (A) <u>first</u>, to pay Liabilities in respect of any cost or expense reimbursements, fees or indemnities then due to the Agent, or reimbursement of Protective Advances (B) <u>second</u>, to pay Liabilities in respect of any cost or expense reimbursements, fees or indemnities then due to the Lenders, (C) <u>third</u>, to pay interest then due and payable in respect of the Revolving Credit Loans and the Term Loans on a pro rata basis, and (D) <u>fourth</u>, to repay the outstanding principal amounts of the Revolving Credit Loans and the Term Loans on a pro rata basis.

(d)    Subject to Section 7-5(c), the Agent shall transfer to the Operating Account any surplus in the Cash Collateral Account remaining after the application towards the Liabilities referred to in <u>Section 7-5(a)</u>, above (less those amounts which are to be netted out, as provided therein).

7-6.    <u>The Operating Account</u>.  Except as otherwise specifically provided in, or permitted by, this Agreement, all checks shall be drawn by the Loan Parties upon, and other disbursements shall be made by the Loan Parties solely from, the Operating Account.

7-7.    [<u>Intentionally Omitted</u>].

7-8.    <u>Unrestricted Cash</u>.  So long as any Liabilities remain outstanding, the Loan Parties shall not have more than (x) during the period commencing on the first day of any fiscal month and ending on the tenth day of such fiscal month, $20,000,000 (or such greater amount as the Agent may agree to in its sole discretion) of Unrestricted Cash in the Operating Account in aggregate amount at the close of the Loan Parties' business on any such day, and (y) during the period commencing on the eleventh day of any fiscal month and ending on the last day of such fiscal month, $7,000,000 (or such greater amount as the Agent may agree to in its sole discretion) of Unrestricted Cash in the Operating Account in aggregate amount at the close of the Loan Parties' business on any such day, in each case, with such excess to be deposited in the Cash Collateral Account at the end of such day and applied in accordance with <u>Section 7-5</u>.

**Article 8 - Grant of Security Interest**:

8-1.    <u>Grant of Security Interest</u>.  To secure the prompt, punctual, and faithful performance of all and each of the Liabilities, the Borrower and each Guarantor hereby grants to the Agent, for the ratable benefit of itself and each other Credit Party, a continuing security interest in and to (subject to the Carve-Out and to the second proviso below), and assigns to the Agent, for the ratable benefit of itself and the other Credit Parties, all of the assets of the Borrower and each Guarantor, including the following, and each item thereof, whether now owned or now due, or in which the Borrower or such Guarantor has an interest, or hereafter acquired, arising, or to become due, or in which the Borrower or such Guarantor obtains an interest, and all products, Proceeds, substitutions, and accessions of or to any of the following (all of which, together with any other property in which the Agent may in the future be granted a security interest, is referred to herein as the "**Collateral**"):

(a)    All Accounts and  Accounts Receivable;

(b)    All Inventory;

(c)    All General Intangibles, including (i) all Intellectual Property, and (ii) all Payment Intangibles;

(d)    All Equipment;

(e)    All Goods;

(f)    All Fixtures;

(g)    All Chattel Paper;

(h)    All Letter of Credit Rights;

71

(i)       All Supporting Obligations;

(j)       All Investment Property, Instruments, Documents, Deposit Accounts and Securities Accounts (including, all DDAs, the Operating Account, the Concentration Account, the Cash Collateral Account, the Professional Fees and Carve-Out Account and to the extent set forth in the DIP Orders, the Pre-Petition ABL Escrow and Reserve Accounts and the Post-Petition L/C Reserve Account), money, policies and certificates of insurance, deposits, impressed accounts, compensating balances, cash, or other property;

(k)       All Commercial Tort Claims, including the Commercial Tort Claims described on Exhibit 8.1(K) hereto;

(l)       All insurance proceeds, refunds, and premium rebates, including, without limitation, proceeds of fire and credit insurance, whether any of such proceeds, refunds, and premium rebates, pertaining to any of the items described in the foregoing clauses (a) through (k);

(m)       All liens, guaranties, rights, remedies, and privileges pertaining to any of the items described in the foregoing clauses (a) through (l), including the right of stoppage in transit; and

(n)       All books, records, and information pertaining to any of the items described in the foregoing clauses (a) through (m) and/or to the operation of the such Loan Party's business, and all rights of access to such books, records, and information, and all property in which such books, records, and information are stored, recorded and maintained;

(o)       All property of the "estate" (within the meaning of the Bankruptcy Code) of the Borrower and each Guarantor;

provided that, the Collateral shall not include Excluded Assets; and

provided further, that, subject to the Carve-Out and subject to the scheme of priority set forth in the DIP Order, pursuant to Bankruptcy Code Section 364(c)(1) the Agent and the Credit Parties have been granted a superpriority administrative claim over any and all administrative claims of the type specified in Bankruptcy Code Section 503(b) and 507(b).  As collateral for the Loans and security for the full and timely payment and performance of all Liabilities when due (whether at stated maturity, by acceleration or otherwise), the Agent, for the benefit of the Credit Parties, is hereby granted (i) pursuant to Section 364(c)(2) of the Bankruptcy Code, a perfected first priority Lien on the Collateral that is otherwise unencumbered as of the commencement of the Cases, but not including avoidance actions under Sections 544-553 of the Bankruptcy Code or the proceeds therefrom, or as otherwise recovered under 506(c); (ii) pursuant to Section 364(c)(3) of the Bankruptcy Code, a perfected Lien on all Collateral of the Loan Parties (other than the assets referred to in the following clause), junior only to (A) the valid, perfected and non-avoidable Liens on such assets as of the Petition Date, and (B) valid Liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code; and (iii) pursuant to Section 364(d)(1) of the Bankruptcy Code, a perfected senior priming Lien on all of the Loan Parties' Collateral that is subject only to Additional Pre-Petition Priority Liens and the Pre-Petition Term Priority Liens.

8-2.    <u>Extent and Duration of Security Interest</u>.  This grant of a security interest is in addition to, and supplemental of, any security interest previously granted by the Borrower to the Agent and shall continue in full force and effect applicable to all Liabilities, until the End Date and the specific

55718599V12

termination in writing by a duly authorized officer of the Agent (which the Agent agrees to do on the End Date) of the security interest granted herein.

8-3.    <u>Use of Assets</u>.  Without limiting any other rights or remedies of the Agent hereunder, the Borrower and each other Loan Party hereby covenant and agree that Agent shall, in connection with the disposition of the Collateral, following any Event of Default, have an irrevocable license to use any assets of the Loan Parties (in addition to those assets constituting Collateral), including all general intangibles, furniture, fixtures and equipment contained in any premises owned or occupied by any Loan Party without cost, subject to the rights, if any, of third parties in such other assets.  Neither the Agent nor any Lender shall have any obligation or liability with respect to the use of any assets of the Loan Parties, except with respect to the gross negligence or willful misconduct of the Agent or such Lender.

8-4.    <u>Certain Perfection Actions</u>.  Notwithstanding anything to the contrary contained herein, the Borrower shall not be required to perfect any security interest to the Agent in any Collateral to the extent (i) the cost, burden, difficulty or consequence of obtaining or perfecting a security interest therein outweighs the benefit of the security afforded thereby as reasonably determined by the Agent and the Required Lenders, (ii) of any actions with respect to assets located outside of the United States, (iii) such Collateral consists of vehicles or other assets subject to certificates of title, or (iv) assets consisting of letter-of-credit rights not constituting DIP Priority Collateral to the extent not perfected by the filing of a Form UCC-1 financing statement.  Notwithstanding the foregoing or any other provision in any Loan Document to the contrary, all assets included as "Collateral" under the Pre-Petition Term Loan Documents shall be included as "Collateral" hereunder and under the other Loan Documents. Notwithstanding the perfection of any security interest granted hereunder pursuant to the order of the Bankruptcy Court under the applicable DIP Order, each Loan Party shall, as applicable, at such Loan Party's expense, perform all steps requested by the Agent or the Lenders at any time to perfect, maintain, protect, and enforce the DIP Liens, including:  upon request by the Agent, delivering to the Agent (who shall hold on behalf of the other Credit Parties) (1) the originals of all certificated Investment Property, instruments, documents, and chattel paper, and all other Collateral of which the Required Lenders reasonably determine the Agent should have physical possession in order to perfect and protect the Agent's security interest therein, duly pledged, endorsed, or assigned to the Agent without restriction and (2) certificates of title (excluding deeds for real estate) covering any portion of the Collateral for which certificates of title have been issued and (4) all letters of credit on which such Loan Party is named beneficiary.  To the fullest extent permitted by applicable law, the Agent may file one or more financing statements disclosing the DIP Liens on the Collateral.

8-5.    <u>No Filings Required; Priority</u>.  The Liens and security interests referred to herein shall be deemed valid and perfected by entry of the DIP Order. The Agent shall not be required to file any financing statements, mortgages, notices of Lien or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or perfect the Lien and security interest granted by or pursuant to this Agreement, any other Loan Document or the DIP Orders.  The DIP Liens in the Collateral will not be junior in priority to any Lien other than the Carve-Out, Additional Pre-Petition Priority Liens and the Pre-Petition Term Priority  Liens (to the extent, and only to the extent, set forth in the DIP Orders).

8-6.    <u>Adequate Protection</u>. The Pre-Petition Term Credit Parties have been granted adequate protection in accordance with the DIP Order to the extent of any diminution in the value of the Collateral as of the Petition Date, including but not limited to any diminution in value resulting from (i) the use, sale or lease of Collateral pursuant to Bankruptcy Code Section 363(c) or (ii) the imposition of the automatic stay pursuant to Bankruptcy Code Section 362(a), in the form of Adequate Protection Liens.

55718599V12

**Article 9 - Agent As Borrower's Attorney-In-Fact**:

9-1.    <u>Appointment as Attorney-In-Fact</u>.  The Borrower hereby irrevocably constitutes and appoints the Agent as the Borrower's true and lawful attorney, with full power of substitution, exercisable only after the occurrence, and during the continuance, of an Event of Default, to convert the Collateral into cash at the sole risk, cost, and expense of the Borrower, but for the sole benefit of the Agent.  The rights and powers granted the Agent by this appointment include but are not limited to the right and power to:

(a)    Prosecute, defend, compromise, or release any action relating to the Collateral.

(b)    Sign change of address forms to change the address to which the Borrower's mail is to be sent to such address as the Agent shall designate; receive and open the Borrower's mail; remove any Receivables Collateral and Proceeds of Collateral therefrom and turn over the balance of such mail either to the Borrower or to any trustee in bankruptcy, receiver, assignee for the benefit of creditors of the Borrower, or other legal representative of the Borrower whom the Agent determines to be the appropriate person to whom to so turn over such mail.

(c)    Endorse the name of the Borrower in favor of the Agent upon any and all checks, drafts, notes, acceptances, or other items or instruments; sign and endorse the name of the Borrower on, and receive as secured party, any of the Collateral, any invoices, schedules of Collateral, freight or express receipts, or bills of lading, storage receipts, warehouse receipts, or other documents of title respectively relating to the Collateral.

(d)    Sign the name of the Borrower on any notice to the Borrower's Account Debtors or verification of the Receivables Collateral; sign the Borrower's name on any proof of claim in Bankruptcy against Account Debtors, and on notices of lien, claims of mechanic's liens, or assignments or releases of mechanic's liens securing the Accounts.

(e)    Take all such action as may be necessary to obtain the payment of any letter of credit and/or banker's acceptance of which the Borrower is a beneficiary.

(f)    Repair, manufacture, assemble, complete, package, deliver, alter or supply goods, if any, necessary to fulfill in whole or in part the purchase order of any customer of the Borrower.

(g)    Use, license or transfer any or all General Intangibles of the Borrower.

9-2.    <u>No Obligation to Act</u>.  The Agent shall not be obligated to do any of the acts or to exercise any of the powers authorized by <u>Section 9-1</u> herein, but if the Agent elects to do any such act or to exercise any of such powers, it shall not be accountable for more than it actually receives as a result of such exercise of power, <u>provided</u> that, if the Agent elects to use or license any General Intangibles of the Borrower consisting of trademarks, copyrights or similar property, the Agent shall use reasonable efforts to preserve and maintain any such trademark, copyright or similar property (but nothing contained herein shall obligate the Agent or any Lender to undertake (or refrain from undertaking) any specific action with respect thereto).  Neither the Agent or any Lender shall be responsible to the Borrower for any act or omission to act pursuant to <u>Section 9-1</u>, except to the extent that the subject act or omission to act had been grossly negligent or the product of willful misconduct as determined by a final, non-appealable judgment of a court of competent jurisdiction.

**Article 10 - Events of Default**:

The occurrence of any event described in this Article 10 shall constitute an "**Event of Default**" herein.  Upon the occurrence, and during the continuance, of any Event of Default, any and all Liabilities may become immediately due and payable, at the option of the Agent (or shall become immediately due and payable at the direction of the Required Lenders) and without notice or demand.  The occurrence and continuance of any Event of Default shall also constitute, without notice or demand, a default under all other Loan Documents, whether such Loan Documents now exist or hereafter arise.

10-1.    [Intentionally Omitted].

10-2.    <u>Failure To Make Payments</u>.  The failure by the Borrower to pay when due (or upon demand, if payable on demand) any payment of any Liability, including, without limitation, any such payment obligations under the DIP Orders.

10-3.    <u>Failure to Perform Covenant or Liability (No Grace Period)</u>.  The failure by the Loan Parties to promptly, punctually, faithfully and timely perform, discharge, or comply with any covenant or Liability not otherwise described in <u>Section 10-1</u> or <u>Section 10-2</u> hereof, and included in any other the following provisions hereof: Sections 4-1, 4-3 – 4-10, 4-12, 4-18 – 4-22, 4-25, 4-26, 4-29, 4-30, 4-31, 4-34 – 4-37, 4-39 – 4-43, 4-45 – 4-47, 5-1, 5-2, 5-5 – 5-7, 5-10 – 5-14, Article 6, Article 7 and Article 8.

10-4.    <u>Failure to Perform Covenant or Liability (Limited Grace Period)</u>.  The failure by the Loan Parties to promptly, punctually and faithfully perform, discharge, or comply with any covenant under any Section not listed in 10-3, in each instance within ten (10) days after the date on which such covenant was to have been performed, discharged or complied with.

10-5.    [<u>Intentionally Omitted</u>].

10-6.    [<u>Intentionally Omitted</u>].

10-7.    <u>Misrepresentation</u>.  Any representation, warranty or certification at any time made by the Borrower to the Agent and/or Lenders (including, without limitation, in connection with this Agreement, the other Loan Documents, and the DIP Orders) is not true or complete in all material respects when given, except to the extent such representation, warranty or certification is qualified by materiality, in which case such representation, warranty or certification is not true in any respect.

10-8.    <u>Default of Material Indebtedness</u>.  The occurrence of any event, such that, any Material Indebtedness could then be accelerated (whether or not the subject creditor takes any action on account of such occurrence).

10-9.    <u>Default of Material Leases</u>.  The occurrence of any event such that any Material Leases or more than 30 retail location leases could then be terminated (except in connection with Permitted Closing Stores once any going out of business sales are completed) (whether or not any or all of the subject lessors take any action on account of such occurrence), other than for the non-payment of rent for April 2016 and May 2016 as contemplated in the DIP Budget.

10-10.    <u>Uninsured Casualty Loss</u>.  The occurrence of any uninsured loss, theft, damage, or destruction of or to any material portion of the Collateral, having an aggregate value in excess of $500,000.

10-11.  Judgment. Restraint of Business.  (a) The entry of any uninsured post-petition judgment against the Borrower, in excess of $500,000, individually or in the aggregate, which judgment is not satisfied (if a money judgment) or appealed from (with execution or similar process stayed) within thirty (30) days of its entry, during which execution shall not be effectively stayed or subject to the Automatic Stay. (b) The entry of any post-petition order or the imposition of any other process having the force of law, in either case applicable specifically to the Borrower, the effect of which is to restrain in any material adverse way the conduct by the Borrower of its business in the ordinary course, which order is not dissolved within ten (10) days of its imposition.

10-12.  [Intentionally Omitted.]

10-13.  [Intentionally Omitted.]

10-14.  Indictment - Forfeiture.  Any Loan Party is (A) criminally indicted or convicted of a felony for fraud or dishonesty in connection with the Loan Parties' business, or (B) charged by a governmental authority under any law that could be expected to lead to forfeiture of any material portion of Collateral, or (ii) any director or senior officer of any Loan Party is (A) criminally indicted or convicted of a felony for fraud or dishonesty in connection with the Loan Parties' business, unless such director or senior officer promptly resigns or is removed or replaced or (B) charged by a governmental authority under any law that could be expected to lead to forfeiture of any material portion of Collateral.

10-15.  Default by Guarantor or Subsidiary.  The occurrence of any of the foregoing Events of Default with respect to any Guarantor, or the occurrence of any of the foregoing Events of Default with respect to any Subsidiary of the Borrower, as if such guarantor or Subsidiary were the "Borrower" described therein.

10-16.  Termination of Guaranty and Liens.  The termination or attempted termination of any Guaranty Agreement by any Guarantor (other than in accordance with its terms or as permitted by the Lenders).  Any Lien with respect to any material portion of the Collateral intended to be secured thereby ceases to be, or is not valid, perfected and prior to all other Liens (other than in respect of the Carve-Out, Additional Pre-Petition Priority Liens and the Pre-Petition Term Priority Liens) or is terminated, revoked, or declared void.

10-17.  Challenge to Loan Documents.

(a)     Any challenge by or on behalf of, or supported by, the Borrower, any Guarantor, or any other guarantor of the Liabilities to the validity of any Loan Document or the applicability or enforceability of any Loan Document strictly in accordance with the subject Loan Document's terms or which seeks to void, avoid, limit, or otherwise adversely affect any security interest created by or in any Loan Document or any payment made pursuant thereto.

(b)     Any determination by any court or any other judicial or government authority that the Loan Documents, are not enforceable strictly in accordance with their terms or which voids, avoids, limits, or otherwise adversely affects any security interest created by any Loan Document or any payment made pursuant thereto.

10-18.  ERISA.  (i) An ERISA Event occurs with respect to a pension plan or multiemployer plan which has resulted or could be expected to result in liability of any Loan Party under Title IV of ERISA to the pension plan, multiemployer plan or the Pension Benefit Guaranty Corporation in an aggregate amount in excess of $500,000 or which could likely result in a Material Adverse Effect, or (ii) a Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period,

76

any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a multiemployer plan in an aggregate amount in excess of $500,000 or which could result in a Material Adverse Effect.

10-19.    <u>Material Contracts</u>.  Any Loan Party or any Subsidiary thereof fails to make any post-petition payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Material Contract or fails to observe or perform any other agreement or condition relating to any such Material Contract, or any other event occurs, the effect of which default or other event is to cause, or to permit the counterparty to such Material Contract to terminate such Material Contract.

10-20.    [<u>Intentionally Omitted</u>.]

10-21.    [<u>Intentionally Omitted</u>.]

10-22.    <u>Trustee; Examiner</u>.  An order shall be entered in any of the Cases appointing, or any Loan Party shall file an application for an order with respect to any of the Cases seeking the appointment of, in either case without the prior written consent of the Agent and the Required Lenders, (i) a trustee under Section 1104 of the Bankruptcy Code or (ii) an examiner or any other Person with enlarged powers relating to the operation of the business (i.e., powers beyond those set forth in Sections 1104(d) and 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code.

10-23.    <u>Chapter 7</u>.  An order shall be entered dismissing a Case or converting a Case to a case under Chapter 7 of the Bankruptcy Code.

10-24.    <u>DIP Order Modifications; Other Administrative Claims; Other Liens</u>.  An order shall be entered with respect to the Case or Cases, without the prior written consent of the Agent and the Required Lenders, (i) to revoke, reverse, stay, vacate or otherwise modify the DIP Orders, (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority equal or superior to the priority of the Credit Parties in respect of the Liabilities other than the Carve-Out and the Adequate Protection Liens granted to the Prepetition Term Lenders pursuant to the DIP Orders, (iii) terminating or denying the use of cash collateral, or (iv) granting or permitting the grant of a lien that is equal in priority with or senior to the liens securing the Liabilities other than the Carve-Out and the Adequate Protection Liens granted to the Prepetition Term Lenders pursuant to the DIP Orders.

10-25.    <u>Automatic Stay</u>.  An order shall be entered that is not stayed pending appeal granting relief from the Automatic Stay to any creditor of a Loan Party (other than the Agent and the Lenders) with respect to any claim against any property that, when taken together with all other orders entered on the docket of the Bankruptcy Court that are not stayed pending appeal granting relief from the Automatic Stay with respect to the Loan Parties' Collateral having a value in excess of $1,000,000.

10-26.    <u>Exclusivity</u>.    An order shall be entered terminating or reducing the Loan Parties' exclusivity period for proposing a Plan of Reorganization (to the extent such motion is not made by Agent or any Lender).

10-27.    <u>Milestones</u>. Failure of the Loan Parties to comply with any of the Milestones; <u>provided</u> that the Agent and Required Lenders may agree to an extension of any of the Milestone dates in their sole and absolute discretion.

10-28.  <u>Other Plans of Reorganization</u>.  An order shall be entered by the Bankruptcy Court confirming a plan of reorganization or liquidation in any of the Cases which does not (a) contain a provision for termination of the Commitments and indefeasible payment in full in cash of all Liabilities hereunder and under the other Loan Documents on or before the effective date of such plan or plans upon entry thereof and (b) provide for the continuation of the Liens and security interests granted to the Agent for the benefit of the Agent and the Lenders with the same priorities under the DIP Orders until such plan effective date.

10-29.  <u>Violation of DIP Orders</u>.  A violation by any Group Member of any of the provisions of the DIP Orders.

10-30.  <u>Rejection of Leases</u>. Any Loan Party rejects an unexpired lease or Material Contract other than with the prior written consent of the Agent and the Required Lenders.

10-31.  <u>Adversary Proceedings</u>.  Any Loan Party or the Committee commences, or supports any person, in any litigation challenging or seeking to challenge the DIP Liens against the Agent, or the Lenders, except as may be permitted under the DIP Orders.

10-32.  <u>Payment of Other Prepetition Debt</u>.  Any Loan Party shall make a payment or grant adequate protection with respect to Debt existing prior to the Petition Date (other than as permitted under this Agreement, the DIP Orders or the "first day" orders (including prepayment of the Prepetition ABL Facility) or otherwise and approved by the Agent and the Required Lenders and the Bankruptcy Court).

## Article 11 - Rights and Remedies Upon Default:

In addition to all of the rights, remedies, powers, privileges, and discretions which the Agent is provided prior to the occurrence of an Event of Default, the Agent shall have the following rights and remedies upon the occurrence, and during the continuance, of any Event of Default.

11-1.  <u>Remedies</u>.  If an Event of Default exists, the Agent may, or shall at the request of the Required Lenders, at any time or times and in any order, without notice to or demand on any Loan Party (except as set forth below), restrict the amount of or refuse to permit any Lender to make any Loan.  If an Event of Default exists, the Agent may, or shall at the request of the Required Lenders, do one or more of the following, in addition to the action described in the preceding sentence, at any time or times and in any order, without notice to or demand on any Loan Party, except for such notice or consent that is expressly provided for hereunder, under the Interim DIP Order or the Final DIP Order, or required by applicable law:  (i) terminate the Commitments, and thereupon the Commitments shall terminate immediately, (ii) declare the Liabilities then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be immediately due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be immediately due and payable, together with accrued interest thereon and all fees and other obligations of the Loan Parties accrued hereunder and under the other Loan Documents, shall become due and payable immediately, without presentment, demand, protest, notice of intent to accelerate, notice of acceleration or other notice of any kind, all of which are hereby waived by the Loan Parties, (iii) exercise the right (after providing five (5) days' prior notice to the Loan  Parties, the United States Trustee, the Committee and any other official committee (but this shall not serve as a consent to the use of the Loans hereunder to pay Professional Fees incurred by any other such official committee)) to realize on all Collateral without the necessity of obtaining any further relief or order from the Bankruptcy Court, subject to the right of the Loan Parties to seek continuation of the automatic stay during such five (5) day period (such period referred to in this <u>Section 11-1</u> as the "**Remedies Notice Period**") solely on the basis that no Event of Default has occurred; and (iv) pursue its other rights and remedies under the Loan Documents, the DIP

Orders and/or applicable law.  Except as otherwise provided in the DIP Orders, the foregoing remedies may be exercised without demand and without further application to or order of the Bankruptcy Court.  In any hearing regarding any exercise of remedies under this <u>Section 11-1</u> (which hearing must take place within the Remedies Notice Period), the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and the Loan Parties, any committee and all other parties in interest shall not be entitled to seek relief, including, without limitation, under Section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the Agent or the Lenders set forth in the DIP Order, this Agreement or the Loan Documents, as applicable.  If no such order is entered during the Remedies Notice Period, all use of the Collateral shall cease and the Agent and the Lenders shall be entitled to enforce the remedies hereunder.

11-2.    <u>Sales</u>.  Each Loan Party recognizes that the Agent may be unable to effect a public sale of any or all of the Collateral that constitutes securities to be sold by reason of certain prohibitions contained in the laws of any jurisdiction outside the United States or in applicable federal or state securities laws but may be compelled to resort to one or more private sales thereof to a restricted group of purchasers who will be obliged to agree, among other things, to acquire such Collateral to be sold for their own account for investment and not with a view to the distribution or resale thereof.  Each Loan Party acknowledges and agrees that any such private sale may result in prices and other terms less favorable to the seller than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall, to the extent permitted by law, be deemed to have been made in a commercially reasonable manner.  Unless required by a Requirement of Law, the Agent shall not be under any obligation to delay a sale of any of such Collateral to be sold for the period of time necessary to permit the issuer of such securities to register such securities under the laws of any jurisdiction outside the United States or under any applicable federal or state securities laws, even if such issuer would agree to do so.  Each Loan Party further agrees to do or cause to be done, to the extent that such Loan Party may do so under Requirements of Law, all such other acts and things as may be necessary to make such sales or resales of any portion or all of such Collateral or other property to be sold valid and binding and in compliance with any and all Requirements of Law at the Loan Parties' expense.  Each Loan Party further agrees that a breach of any of the covenants contained in this <u>Section 11-2</u> will cause irreparable injury to the Agent and the Lenders for which there is no adequate remedy at law and, as a consequence, agrees that each covenant contained in this <u>Section 11-2</u> shall be specifically enforceable against such Loan Party, and each Loan Party hereby waives and agrees, to the fullest extent permitted by law, not to assert as a defense against an action for specific performance of such covenants that (i) such Loan Party's failure to perform such covenants will not cause irreparable injury to the Agent and the Lenders or (ii) the Agent or the Lenders have an adequate remedy at law in respect of such breach.  Each Loan Party further acknowledges the impossibility of ascertaining the amount of damages which would be suffered by the Agent and the Lenders by reason of a breach of any of the covenants contained in this <u>Section 11-2</u> and, consequently, agrees that, if such Loan Party shall breach any of such covenants and the Agent or the Lenders shall sue for damages for such breach, such Loan Party shall pay to the Agent, for the benefit of the Agent  and the Lenders, as liquidated damages and not as a penalty, an aggregate amount equal to the value of the Collateral or other property to be sold on the date the Agent shall demand compliance with this <u>Section 11-2</u>.

11-3.    <u>UCC</u>.  If an Event of Default has occurred and is continuing, the Agent shall have for the benefit of the Lenders, in addition to all other rights of the Agent and the Lenders, the rights and remedies of a secured party under the UCC, and without limiting the generality of the foregoing, the Agent shall be empowered and entitled to, subject to the terms of the DIP Orders: (i) take possession of, foreclose on and/or request a receiver of the Collateral and keep it on any Loan Party's premises at any time, at no cost to the Agent or any Lender, or remove any part of it to such other place or places as the Agent may determine, or the Loan Parties shall, upon the Agent's or Required Lender's demand, at the Loan Parties'

cost, assemble the Collateral and make it available to the Agent at a place convenient to the Agent; (ii) sell and deliver any Collateral at public or private sales, for cash, upon credit, or otherwise, at such prices and upon such terms as the Agent and the Required Lenders deem advisable, in its sole discretion, and may postpone or adjourn any sale of the Collateral by an announcement at the time and place of sale or of such postponed or adjourned sale; (iii) hold, lease, develop, manage, operate, control and otherwise use the Collateral upon such terms and conditions as may be reasonable under the circumstances (making such repairs, alterations, additions and improvements and taking other actions, from time to time, as may be reasonably necessary or desirable), exercise all such rights and powers of each Loan Party with respect to the Collateral, whether in the name of such Loan Party or otherwise, including without limitation the right to make, cancel, enforce or modify leases, obtain and evict tenants, and demand, sue for, collect and receive all rents, in each case, in accordance with the standards applicable to the Agent under the Loan Documents, (iv) employ consultants to inspect the Collateral and to assure compliance by each Loan Party of the terms and conditions of the Loan Documents and (v) take any other actions, as may be necessary or desirable, in connection with the Collateral (including preparing for the disposition thereof), and all actual, out-of-pocket fees and expenses incurred in connection therewith shall be borne by the Loan Parties.  Upon demand from the Agent, the applicable Loan Party shall direct the grantor or licensor of, or the contracting party to, any property agreement with respect to any Property to recognize and accept the Agent, for the benefit of and on behalf of the Lenders, as the party to such agreement for any and all purposes as fully as it would recognize and accept such Loan Party and the performance of such Loan Party thereunder and, in such event, without further notice or demand and at such Loan Party's sole cost and expense, the Agent, for the benefit of and on behalf of the Lenders, may exercise all rights of such Loan Party arising under such agreements.  Without in any way requiring notice to be given in the following manner, each Loan Party agrees that any notice by the Agent of sale, disposition, or other intended action hereunder or in connection herewith, whether required by the UCC or otherwise, shall constitute reasonable notice to such Loan Party if such notice is mailed by registered or certified mail, return receipt requested, postage prepaid, or is delivered personally against receipt, at least ten (10) Business Days prior to such action to the Loan Parties' address specified in or pursuant to <u>Section 12-1</u>.  If any Collateral is sold on terms other than payment in full at the time of sale, no credit shall be given against the Liabilities until the Agent or the Lenders receive payment, and if the buyer defaults in payment, the Agent may resell the Collateral.  In the event the Agent seeks to take possession of all or any portion of the Collateral by judicial process, each Loan Party irrevocably waives:  (A) the posting of any bond, surety, or security with respect thereto which might otherwise be required; (B) any demand for possession prior to the commencement of any suit or action to recover the Collateral; and (C) any requirement that the Agent retain possession and not dispose of any Collateral until after trial or final judgment.  Each Loan Party agrees that the Agent has no obligation to preserve rights to the Collateral or marshal any Collateral for the benefit of any Person.  The proceeds of sale shall be applied as set forth in the DIP Orders.  The Agent will return any excess to the applicable Loan Party and the Loan Parties shall remain liable for any deficiency.

      11-4.   <u>Application of Proceeds</u>.  Notwithstanding anything herein to the contrary, (i) neither the Agent nor any Lender shall take any action under this <u>Article 11</u> (or similar provisions of any Loan Document) except after compliance with any applicable notice requirements applicable thereto set forth in accordance with the DIP Orders, and (ii) following the occurrence and during the continuance of an Event of Default, all amounts received by the Agent on account of the Liabilities, from the Loan Parties and/or all amounts with respect to the proceeds of any Collateral promptly disbursed by the Agent in accordance with <u>Section 7-5(c)(ii)</u>, unless otherwise agreed by the Required Lenders.

      11-5.   <u>Relief</u>.  An Event of Default shall occur as set forth in this Agreement even if an act or circumstance which gives rise, directly or indirectly, to such Event of Default has been authorized by the Bankruptcy Court or another court or tribunal with jurisdiction over the Cases.  Neither the Agent nor any Lender shall have any obligation whatsoever to object to any relief requested by any Loan Party from the

55718599V12

Bankruptcy Court or another court or tribunal with jurisdiction over the Cases if and because such relief would or may constitute, or would or may lead to, an Event of Default, or the Agent's or any Lender's failure to object to such relief shall not limit the Events of Default under this Agreement, constitute a waiver or release of rights and remedies under this Agreement, estop or preclude the Agent or any Lender from fully enforcing the same, or have any res judicata effect on whether an Event of Default has occurred under this Agreement.  Each Loan Party shall be fully responsible for determining whether any relief it seeks from the Bankruptcy Court or another court or tribunal with jurisdiction over the Cases would or may constitute, or would or may lead to, an Event of Default under this Agreement, and authorization for such relief shall not limit in any manner whatsoever such Loan Party's obligation to fully comply with all of the terms and conditions of this Agreement.

11-6.    <u>Occupation of Business Location</u>.  In connection with the Agent's exercise of the Agent's rights under this Article 11, the Agent may enter upon, occupy, and use any premises owned or occupied by the Borrower, and may exclude the Borrower from such premises or portion thereof as may have been so entered upon, occupied, or used by the Agent.  The Agent shall not be required to remove any of the Collateral from any such premises upon the Agent's taking possession thereof, and may render any Collateral unusable to the Borrower.  In no event shall the Agent or any Lender be liable to the Borrower for use or occupancy by the Agent of any premises pursuant to this Article 11, nor for any charge (such as wages for the Borrower's employees and utilities) incurred in connection with the Agent's exercise of the Agent's Rights and Remedies, except for such charges which are incurred as a result of the Agent's or such Lender's gross negligence or willful misconduct.

11-7.    <u>Grant of Nonexclusive License</u>.  The Borrower hereby grants to the Agent a royalty free nonexclusive irrevocable license, exercisable upon the occurrence, and during the continuance, of an Event of Default, to use, apply, and affix any trademark, trade name, logo, or the like in which the Borrower now or hereafter has rights, such license being with respect to the Agent's exercise of the rights hereunder including, without limitation, in connection with any completion of the manufacture of Inventory or sale or other disposition of Inventory.  In exercising its rights under such license, the Agent shall use reasonable efforts to preserve and maintain any such trademark, trade name, or logo, but nothing contained herein shall obligate the Agent to undertake (or refrain from undertaking) any specific action and neither the Agent nor any Lender shall, under any circumstances, have any liability to the Borrower, except for such which are a result of the Agent's or such Lender's gross negligence or willful misconduct.

11-8.    <u>Assembly of Collateral</u>.  The Agent may require the Borrower to assemble the Collateral and make it available to the Agent at the Borrower's sole risk and expense at a place or places which are convenient to the Agent.

11-9.    <u>Rights and Remedies</u>.  The rights, remedies, powers, privileges, and discretions of the Agent and the Lenders hereunder (herein, the "**Credit Parties' Rights and Remedies**") shall be cumulative and not exclusive of any rights or remedies which they would otherwise have.  No delay or omission by the Agent or any Lenders in exercising or enforcing any of the Credit Parties' Rights and Remedies shall operate as, or constitute, a waiver thereof.  No waiver by the Agent or the Lenders of any Event of Default or of any default under any other agreement shall operate as a waiver of any other default hereunder or under any other agreement.  No single or partial exercise of any of the Credit Parties' Rights or Remedies, and no express or implied agreement or transaction of whatever nature entered into between the Agent and any person, at any time, shall preclude the other or further exercise of the Credit Parties' Rights and Remedies.  No waiver by the Agent or the Lenders of any of the Credit Parties' Rights and Remedies on any one occasion shall be deemed a waiver on any subsequent occasion, nor shall it be deemed a continuing waiver.  All of the Credit Parties' Rights and Remedies and all of the Agent's and Lenders' rights, remedies, powers, privileges, and discretions under any other agreement or transaction are cumulative, and not alternative or exclusive, and may be exercised by the Agent and the Lenders, as

81

applicable, at such time or times and in such order of preference as the Agent and the Lenders in their sole discretion may determine.  The Credit Parties' Rights and Remedies may be exercised without resort or regard to any other source of satisfaction of the Liabilities.

11-10.  <u>Warehouse Bailment Agreement</u>.  Notwithstanding anything contained in the Warehouse Bailment Agreement entered into or to be entered into by and among GSI Commerce Solutions, Inc., the Borrower and the Agent, but without limiting the Agent's other rights and remedies set forth in Article 11 arising upon the occurrence of an Event of Default, the demands, notices, directions and orders contemplated by Sections F(3), G and J thereof may only be given by the Agent after the occurrence and during the continuance of an Event of Default.

11-11.  [<u>Intentionally Omitted</u>.]

## Article 12 - Notices:

12-1.  <u>Notice Addresses</u>.  All notices, demands, and other communications made in respect of this Agreement to the Agent or the Borrower (on behalf of the Loan Parties) (other than a request for a loan or advance or other financial accommodation) shall be made to the addresses listed below, and to any Lender to the address listed in such Lender's Administrative Questionnaire, each of which may be changed upon seven (7) days written notice to all others given by certified mail, return receipt requested.

If to the Agent:

> Crystal Financial LLC
> Two International Place, 17th Floor
> Boston, Massachusetts 02110
> Attention:  Evren Ozargun
> Tel:  (617) 428-8715
> Email:  eozargun@crystalfinco.com

With a copy to (which copy shall not constitute notice):

> Proskauer Rose LLP
> Eleven Times Square
> New York, New York  10036
> Attention:  Kristen V. Campana
> Fax:  (212) 969-2900
> Email:  kcampana@proskauer.com

If to the Borrower:

> Aeropostale, Inc.
> 112 West 34th Street, 22nd Floor
> New York, New York 10120
> Attention:  Joseph Pachella, GVP and Treasurer
> Fax:  (973) 872-5650
> Email:  jpachella@aeropostale.com

With copies to (which copies shall not constitute notice):

> Marc G. Schuback, Esquire
> General Counsel
> Aeropostale, Inc.
> West 34th Street, 22nd Floor
> New York, New York 10120

82

Fax:  (646) 619-4873
Email:  mschuback@aeropostale.com

and

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Ray Schrock, P.C. and Jacqueline
Marcus
Fax:  212-310-8007
Email:  ray.schrock@weil.com;
        jacqueline.marcus@weil.com

12-2.    Notice Given.

(a)    Except as otherwise specifically provided herein, notices shall be deemed made and correspondence received, as follows (all times being local to the place of delivery or receipt):

(i)    By mail:  the sooner of when actually received or three (3) days following deposit in the United States mail, postage prepaid.

(ii)    By recognized overnight express delivery:  the Business Day following the day when sent.

(iii)    By Hand:  If delivered on a Business Day after 9:00 AM and no later than three (3) hours prior to the close of customary business hours of the recipient, when delivered.  Otherwise, at the opening of the then next Business Day.

(iv)    By Facsimile or electronic transmission (which must include a header on which the party sending such transmission is indicated):  If sent on a Business Day after 9:00 AM and no later than three (3) hours prior to the close of customary business hours of the recipient, one (1) hour after being sent.  Otherwise, at the opening of the then next Business Day.

(b)    Rejection or refusal to accept delivery and inability to deliver because of a changed address or Facsimile Number for which no due notice was given shall each be deemed receipt of the notice sent.

**Article 13 - Term**:

13-1.    Termination of Revolving Credit and the Term Loan Facility.  The Revolving Credit and the Term Loan Facility (subject to suspension as provided in Section 2-5(k) hereof) shall remain in effect until the Termination Date.

13-2.    Effect of Termination.  On the Termination Date, the Borrower shall pay the Agent (whether or not then due), in immediately available funds, all then Liabilities (other than indemnities, not then due and payable, which survive repayment of the Term Loans, the Revolving Credit Loans and termination of the Commitments), including, without limitation:  the entire balance of the Loan Account; any accrued and unpaid Line (Unused) Fee; any fees due and owing under the Fee Letter, any payments due on account of the indemnification obligations included in Section 2-9(e).  Until such payment, all provisions of this Agreement, other than those contained in Article 2 which place an obligation on the

Agent and the Lenders to make any loans or advances or to provide financial accommodations under the Revolving Credit or otherwise, shall remain in full force and effect until all Liabilities (other than indemnities, not then due and payable, which survive repayment of the Term Loans, the Revolving Credit Loans and termination of the Commitments) shall have been paid in full.  The release by the Agent of the security and other collateral interests granted the Agent by the Borrower hereunder may be upon such conditions and indemnifications as the Agent may require to protect the Agent and Lenders against and chargebacks, credits, returned items and any other reversal of payments which had been received by the Agent and applied toward such Liabilities.

**Article 14 - General**:

      14-1.    <u>Protection of Collateral</u>.  Neither the Agent nor any Lender has a duty as to the collection or protection of the Collateral beyond the safe custody of such of the Collateral as may come into the possession of the Agent and shall have no duty as to the preservation of rights against prior parties or any other rights pertaining thereto.  With the Borrower's prior approval (which shall not be unreasonably delayed or withheld), the Agent may include reference to the Borrower (and may utilize any logo or other distinctive symbol associated with the Borrower) in connection with any advertising, promotion, or marketing undertaken by the Agent.

      14-2.    <u>Successors and Assigns</u>.  This Agreement shall be binding upon the Borrower and the Borrower's representatives, successors, and assigns and shall inure to the benefit of the Agent, the Lenders and their respective successors and assigns; <u>provided</u>, <u>however</u>, no trustee or other fiduciary appointed with respect to the Borrower shall have any rights hereunder.  In the event that the Agent or any Lenders, in accordance with the provisions of this <u>Section 14-2</u>, assign or transfer their respective rights under this Agreement, the assignee shall thereupon succeed to and become vested with all rights, powers, privileges, and duties of such assignor hereunder to the extent of such assignment, and, with respect to the interest so assigned, such assignor shall thereupon be discharged and relieved from its duties and obligations hereunder.

      14-3.    <u>Severability</u>.  Any determination that any provision of this Agreement or any application thereof is invalid, illegal, or unenforceable in any respect in any instance shall not affect the validity, legality, or enforceability of such provision in any other instance, or the validity, legality, or enforceability of any other provision of this Agreement.

      14-4.    <u>Amendments; Course of Dealing</u>.

      (a)    This Agreement and the other Loan Documents incorporate all discussions and negotiations between the Borrower, the Agent, and the Lenders, either express or implied, concerning the matters included herein and in such other instruments, any custom, usage, or course of dealings to the contrary notwithstanding.  No such discussions, negotiations, custom, usage, or course of dealings shall limit, modify, or otherwise affect the provisions thereof.  No failure by the Agent to give notice to the Borrower of the Borrower's having failed to observe and comply with any warranty or covenant included in any Loan Document shall constitute a waiver of such warranty or covenant or the amendment of the subject Loan Document.

      (b)    The Borrower may undertake any action otherwise prohibited hereby, and may omit to take any action otherwise required hereby, upon and with the express prior written consent of the Agent.  No consent, modification, amendment, or waiver of any provision of any Loan Document shall be effective unless executed in writing by or on behalf of the party to be charged with such modification, amendment, or waiver (and if such party is the Agent, then by a duly authorized officer thereof).  Any modification, amendment, or waiver provided by the Agent shall be in reliance upon all representations

55718599V12

and warranties theretofore made to the Agent by or on behalf of the Borrower (and any guarantor, endorser, or surety of the Liabilities) and consequently may be rescinded in the event that any of such representations or warranties was not true and complete in all material respects when given.

14-5.    Power of Attorney.    In connection with all powers of attorney included in this Agreement, the Borrower hereby grants unto the Agent full power to do any and all things necessary or appropriate in connection with the exercise of such powers as fully and effectually as the Borrower might or could do, hereby ratifying all that said attorney shall do or cause to be done by virtue of this Agreement.  No power of attorney set forth in this Agreement shall be affected by any disability or incapacity suffered by the Borrower and each shall survive the same.  All powers conferred upon the Agent by this Agreement, being coupled with an interest, shall be irrevocable until this Agreement is terminated by a written instrument executed by a duly authorized officer of the Agent.

14-6.    Application of Proceeds.  Except as otherwise provided in Sections 7-5 and 11-4 hereof, he proceeds of any collection, sale, or disposition of the Collateral, or of any other payments received hereunder, shall be applied towards the Liabilities in such order and manner as the Agent determines in its sole discretion.   The Borrower shall remain liable for any deficiency remaining following such application.

14-7.    Costs and Expenses of the Credit Parties.

(a)    The Borrower shall pay on demand all Costs of Collection and all out-of-pocket expenses of the Agent in connection with the preparation, execution, and delivery of this Agreement and of any other Loan Documents, whether now existing or hereafter arising, and all other expenses which may be incurred by the Agent and the Lenders in preparing or amending this Agreement and all other agreements, instruments, and documents related thereto, or otherwise incurred with respect to the Liabilities, and all other out-of-pocket costs and expenses of the Agent and the Lenders which relate to the credit facility contemplated hereby.

(b)    The Borrower shall pay on demand all Costs of Collection incurred, following the occurrence, and during the continuance, of any Event of Default, by the Agent and the Lenders in connection with the enforcement, attempted enforcement, or preservation of any rights and remedies under this, or any other Loan Document, as well as any such costs and expenses in connection with any "workout", forbearance, or restructuring of the credit facility contemplated hereby.

(c)    The Borrower authorizes the Agent to pay all such fees and expenses and in the Agent's discretion, to add such fees and expenses to the Loan Account.

(d)    The undertaking on the part of the Borrower in this Section 14-7 shall survive payment of the Liabilities and/or any termination, release, or discharge executed by the Agent in favor of the Borrower, other than a termination, release, or discharge which makes specific reference to this Section 14-7.

14-8.    Copies and Facsimiles.  This Agreement and all documents which relate thereto, which have been or may be hereinafter furnished any of the Loan Parties may be reproduced by such Loan Party by any photographic, microfilm, xerographic, digital imaging, or other process, and the Loan Parties may destroy any document so reproduced.  Any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made in the regular course of business).  Any facsimile which bears proof of transmission shall be binding on the party which or on whose behalf such transmission was

initiated and likewise shall be so admissible in evidence as if the original of such facsimile had been delivered to the party which or on whose behalf such transmission was received.

14-9.  <u>New York Law</u>.  Except to the extent governed by the Bankruptcy Code, this Agreement and all rights and obligations hereunder, including matters of construction, validity, and performance, shall be governed by the laws of The State of New York (without giving effect to the conflicts of laws principals thereof, but including Sections 5-1401 and 5-1402 of the New York General Liabilities Law).

14-10.  <u>Consent to Jurisdiction</u>.

In the event that the Bankruptcy Court does not have or refuses to exercise jurisdiction with respect thereto, the Borrower agrees that any legal action, proceeding, case, or controversy against the Borrower with respect to any Loan Document may be brought in the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, as the Agent and the Required Lenders may elect in their sole discretion. By execution and delivery of this Agreement, the Borrower, for itself and in respect of its property, accepts, submits, and consents generally and unconditionally, to the non-exclusive jurisdiction of the aforesaid courts.

(a)    The Borrower **WAIVES** personal service of any and all process upon it, and irrevocably consents to the service of process out of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by certified mail, postage prepaid, to the Borrower at the Borrower's address for notices as specified herein, such service to become effective ten (10) Business Days after such mailing.

(b)    The Borrower **WAIVES** any objection based on forum non conveniens and any objection to venue of any action or proceeding instituted in the aforesaid courts under any of the Loan Documents.

(c)    Nothing herein shall affect the right of the Agent to bring legal actions or proceedings in any other competent jurisdiction.

The Borrower agrees that any action commenced by the Borrower asserting any claim or counterclaim arising under or in connection with this Agreement or any other Loan Document shall be brought solely in the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and that such Courts shall have exclusive jurisdiction with respect to any such action.

14-11.  <u>Indemnification</u>.  The Loan Parties shall indemnify, defend, and hold the Agent and each other Credit Party and any employee, officer, agent or Affiliate of the Agent and other Credit Parties (each, an "**Indemnified Person**") harmless of and from any claim brought or threatened against any Indemnified Person by the Borrower, any guarantor or endorser of the Liabilities, or any other Person (as well as from attorneys' fees and expenses in connection therewith) on account of the relationship of the Borrower or or of any other guarantor or endorser of the Liabilities with the Agent and other Credit Parties (each, an "**Indemnified Claim**") other than any claim resulting from the gross negligence or willful misconduct of such Indemnified Person as determined by a final, non-appealable judgment of a court of competent jurisdiction. Each Indemnified Claim may be defended, compromised, settled, or pursued by the Indemnified Person with counsel of the Agent's selection (and if such Indemnified Claim is brought by a Person other than the Loan Parties, any guarantor or endorser of the Liabilities or any Affiliate of the Loan Parties, after consultation with (but not approval of) the Loan Parties regarding the selection of such counsel), but at the expense of the Borrower; <u>provided</u> that any Indemnified Claim may not be settled

86

without the consent of the Loan Parties (which shall not be unreasonably withheld or delayed) if as the result of any such settlement the Loan Parties will be obligated to make any payment (other than reimbursement of the costs and expenses of the Indemnified Person).  This indemnification shall survive payment of the Liabilities and/or any termination, release, or discharge executed by the Agent in favor of the Borrower or any other Loan Party, other than a termination, release, or discharge which makes specific reference to this <u>Section 14-11</u>.

14-12.  <u>Rules of Construction</u>.  The following rules of construction shall be applied in the interpretation, construction, and enforcement of this Agreement and of the other Loan Documents:

(a)    Words in the singular include the plural and words in the plural include the singular.

(b)    Titles, headings (indicated by being underlined or shown in SMALL CAPITALS) and any Table of Contents are solely for convenience of reference; do not constitute a part of the instrument in which included; and do not affect such instrument's meaning, construction, or effect.

(c)    The words "includes" and "including" are not limiting.

(d)    Text which follows the words "including, without limitation" (or similar words) is illustrative and not limiting.

(e)    Except where the context otherwise requires or where the relevant subsections are joined by "or", compliance with any Section or provision of any Loan Document which constitutes a warranty or covenant requires compliance with all subsections (if any) of that Section or provision. Except where the context otherwise requires, compliance with any warranty or covenant of any Loan Document which includes subsections which are joined by "or" may be accomplished by compliance with any of such subsections.

(f)    Text which is shown in italics, shown in **bold**, shown IN ALL CAPITAL LETTERS, or in any combination of the foregoing, shall be deemed to be conspicuous.

(g)    The words "may not" are prohibitive and not permissive.

(h)    The word "or" is not exclusive.

(i)    Terms which are defined in one section of any Loan Document are used with such definition throughout the instrument in which so defined.

(j)    The symbol "$" or reference to "dollars" refers to United States Dollars.

(k)    Unless limited by reference to a particular Section or provision, any reference to "herein", "hereof", or "within" is to the entire Loan Document in which such reference is made.

(l)    References to "this Agreement" or to any other Loan Document is to the subject instrument as amended to the date on which application of such reference is being made.

(m)    Except as otherwise specifically provided, all references to time are to Boston time.

55718599V12

(n)        In the determination of any notice, grace, or other period of time prescribed or allowed hereunder:

(i)        Unless otherwise provided (A) the day of the act, event, or default from which the designated period of time begins to run shall not be included and the last day of the period so computed shall be included unless such last day is not a Business Day, in which event the last day of the relevant period shall be the then next Business Day and (B) the period so computed shall end at 5:00 PM on the relevant Business Day.

(ii)        The word "from" means "from and including".

(iii)        The words "to" and "until" each mean "to, but excluding".

(iv)        The word "through" means "to and including".

(o)        References to "presently", "currently", and other similar expressions mean the Effective Date.

(p)        The term "upon the occurrence, and during the continuance, of" a Suspension Event or an Event of Default and any other similar term means, the occurrence of a Suspension Event or an Event of Default which has not been waived by the Agent and the requisite Lenders in accordance with the terms hereof.

(q)        The Loan Documents shall be construed and interpreted in a harmonious manner and in keeping with the intentions set forth in Section 14-13 hereof; provided, however, in the event of any inconsistency between the provisions of this Agreement and any other Loan Document, the provisions of this Agreement shall govern and control.

14-13.   Intent.  It is intended that:

(a)        This Agreement take effect as a sealed instrument.

(b)        The scope of the security interests created by this Agreement be broadly construed in favor of the Agent and Lenders.

(c)        The security interests created by this Agreement secure all Liabilities, whether now existing or hereafter arising.

(d)        All Costs of Collection incurred in connection with its relationship with the Borrower shall be borne by the Borrower.

(e)        Unless otherwise explicitly provided herein, the consent of the Agent or any Lender to any action of the Borrower which is prohibited unless such consent is given may be given or refused by the Agent and Lenders in their discretion.

14-14.   Right of Set-Off.  Any and all deposits (other than Trust Deposit Accounts) or other sums at any time credited by or due to the Borrower from the Agent, any Lender, or any Participant in the credit facility contemplated hereby or any from any Affiliate of the Agent, any Lender, or any Participant and any cash, securities, instruments or other property of the Borrower in the possession of the Agent, any Lender, any Participant or any such Affiliate, whether for safekeeping or otherwise (regardless of the reason such Person had received the same) shall at all times constitute security for all Liabilities and for

88

any and all obligations of the Borrower to the Agent, any Lender or any Participant or any such Affiliate and may be applied or set off against the Liabilities and against such obligations at any time, whether or not such are then due and whether or not other collateral is then available to the Agent, any Lender or any Participant or any such Affiliate.

14-15.  <u>Maximum Interest Rate</u>.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "<u>Maximum Rate</u>").  If any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Revolving Credit Loans, as applicable, or, if it exceeds such unpaid principal, refunded to the Borrower.  In determining whether the interest contracted for, charged, or received by the Agent or Lenders exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Requirements of Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Liabilities hereunder.

14-16.  <u>Waivers</u>.

(a)  The Borrower (and all guarantors, endorsers, and sureties of the Liabilities) make each of the waivers included in <u>Section 14-16(b)</u>, below, knowingly, voluntarily, and intentionally, and understands that the Agent and Lenders, in entering into the financial arrangements contemplated hereby and in providing loans and other financial accommodations to or for the account of the Borrower as provided herein, whether not or in the future, are relying on such waivers.

(b)  THE BORROWER, AND EACH SUCH GUARANTOR, ENDORSER, AND SURETY RESPECTIVELY **WAIVES** THE FOLLOWING:

(i)  Except as otherwise specifically required hereby, and to the extent permissible under applicable Requirements of Law, notice of non-payment, demand, presentment, protest and all forms of demand and notice, both with respect to the Liabilities and the Collateral.

(ii)  Except as otherwise specifically required hereby, and to the extent permissible under applicable Requirements of Law, the right to notice and/or hearing prior to the Agent's and the Lenders' exercising of the Agent's  and the Lenders' rights upon default.

(iii)  THE RIGHT TO A JURY IN ANY TRIAL OF ANY CASE OR CONTROVERSY IN WHICH THE AGENT OR ANY LENDER IS OR BECOMES A PARTY (WHETHER SUCH CASE OR CONTROVERSY IS INITIATED BY OR AGAINST THE AGENT OR ANY LENDER OR IN WHICH THE AGENT OR ANY LENDER IS JOINED AS A PARTY LITIGANT), WHICH CASE OR CONTROVERSY ARISES OUT OF OR IS IN RESPECT OF, ANY RELATIONSHIP AMONGST OR BETWEEN THE BORROWER OR ANY OTHER PERSON AND THE AGENT OR ANY LENDER (AND THE AGENT AND LENDERS LIKEWISE WAIVE THEIR RIGHT TO A JURY IN ANY TRIAL OF ANY SUCH CASE OR CONTROVERSY).

(iv)  Except to the extent that such may not be waived under applicable Requirements of Law, the benefits or availability of any stay, limitation, hindrance, delay, or restriction with respect to any action which the Agent or any Lender may or may become entitled to take hereunder.

(v)     Any defense, counterclaim, set-off, recoupment, or other basis on which the amount of any Liability, as stated on the books and records of the Agent or any Lender, could be reduced or claimed to be paid otherwise than in accordance with the tenor of and written terms of such Liability.

(vi)    Any claim against the Agent or any Lender to consequential, special, or punitive damages.

14-17.   <u>Confidentiality</u>.  The Credit Parties shall keep, and shall cause their respective officers, directors, employees, affiliates and attorneys to keep, all financial statements, reports and other proprietary information furnished to them by the Borrower, the Guarantor or their respective Affiliates (hereinafter collectively, the "Information") confidential and shall not disclose such Information, or cause such Information to be disclosed, to any Person; <u>provided</u>, <u>however</u>, that (i) the Information may be disclosed to any Credit Party's officers, directors, employees, affiliates, attorneys, partners, investors and other advisors as need to know the Information in connection with the Agent's or Lenders' administration of the Liabilities; (ii) the Information may be disclosed to any regulatory or other governmental authorities having jurisdiction over the Agent and Lenders as required in connection with the exercise of their regulatory activity; (iii) the Information may be disclosed to any prospective assignee or participant, who has agreed to be bound by the provisions of this <u>Section 14-17</u>; (iv) the Information may be disclosed in connection with the enforcement of the Liabilities by the Agent or any Lender to the extent required in connection therewith; (v) the Information may otherwise be disclosed to the extent required by law; and (vi) to such Credit Party's financing sources.  Notwithstanding anything herein to the contrary, "Information" shall not include, and each Credit Party (and each employee, representative, or other agent of the Agent and each Lender) may disclose to any and all Persons without limitation of any kind, any information with respect to the "tax treatment" and "tax structure" (in each case, within the meaning of Treasury Regulation Section 1.6011-4) of the transactions contemplated hereby and all materials of any kind (including options or other tax analyses) that are provided to any Credit Party (and each employee, representative, or other agent of any Credit Party) relating to such tax treatment and tax structure; <u>provided</u>, that with respect to any document or similar item that in either case contains information concerning the tax treatment or tax structure of the transaction as well as other information, this sentence shall only apply to such portions of the document or similar item that relate to the tax treatment or tax structure of the Revolving Credit, the Term Loan Facility and other transactions contemplated hereby.

14-18.   <u>Press Releases</u>.  Once the Borrower has filed this Agreement with the Securities and Exchange Commission and disseminated a corresponding press release regarding this Agreement, then Borrower consents to the publication by the Agent and/or Lender of advertising material relating to the financing transactions contemplated by this Agreement using the Borrower's name, product photographs, logo or trademark.  The Agent and/or Lender shall provide a draft reasonably in advance of any advertising material to the Borrower for review and comment prior to the publication thereof.  Subject to the conditions contained in this <u>Section 14-18</u>, the Agent and Lender reserve the right to provide to industry trade organizations information necessary and customary for inclusion in league table measurements.  Notwithstanding the foregoing, the Agent and each Lender may, without consent of any Loan Party, publicly disclose its lending relationship with the Loan Parties, the identity of the Loan Parties, the Commitments, and such other information as is publicly disclosed by any Loan Party through any filing with the Bankruptcy Court.

14-19.   <u>No Advisory or Fiduciary Responsibility</u>.  In connection with all aspects of each transaction contemplated hereby, the Loan Parties acknowledge and agree that:  (i) the credit facility provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Loan Party, on the one hand, and the Agent and

16-11275-shl    Doc 5    Filed 05/04/16    Entered 05/04/16 02:50:18    Main Document
Pg 212 of 549

Lenders, on the other hand, and each of the Loan Parties is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof); (ii) in connection with the process leading to such transaction, the Agent and Lenders are and have been acting solely as principals and not the financial advisor, agent or fiduciary, for the Loan Parties or any of their respective Affiliates, stockholders, creditors or employees or any other Person; (iii) the Agent and Lenders have not assumed and will not assume an advisory, agency or fiduciary responsibility in favor of the Loan Parties with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Loan Document (irrespective of whether the Agent and Lenders have advised or are currently advising the Loan Parties or any of their respective Affiliates on other matters) and the Agent and Lenders have no any obligation to the Loan Parties or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; (iv) the Agent, any Lender and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Affiliates, and the Agent and Lenders have no obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (v) the Agent and Lenders have not provided and will not provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and each of the Loan Parties has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate.  Each of the Loan Parties hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against the Agent and any Lender with respect to any breach or alleged breach of agency or fiduciary duty.

14-20.    [Intentionally Omitted].

14-21.    USA PATRIOT Act Notice.  The Agent and each Lender hereby notifies the Loan Parties that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), it is required to obtain, verify and record information that identifies the Loan Parties, which information includes the name and address of each such Person and other information that will allow the Agent and each Lender to identify the Loan Parties in accordance with the Act.  Each of the Loan Parties is in compliance, in all material respects, with the Patriot Act.  No part of the proceeds of the Term Loans, the Revolving Credit Loans will be used by the Loan Parties, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

14-22.    Foreign Asset Control Regulations.  Neither of the advance of the Term Loans, the Revolving Credit Loans, nor the use of the proceeds of any thereof, will violate the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended) (the "Trading With the Enemy Act") or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) (the "Foreign Assets Control Regulations") or any enabling legislation or executive order relating thereto (which for the avoidance of doubt shall include, but shall not be limited to (a) Executive Order 13224 of September 21, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) (the "Executive Order") and (b) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56)).  Furthermore, none of the Loan Parties or their Affiliates (a) is or will become a "blocked person" as described in the Executive Order, the Trading With the Enemy Act or the Foreign Assets Control Regulations or (b) engages or will engage in any dealings or

transactions, or be otherwise associated, with any such "blocked person" or in any manner violative of any such order.

14-23.  Liabilities of Lenders Several.  The obligations of the Lenders hereunder to make the Term Loans, the Revolving Credit Loans and to make payments hereunder are several and not joint.  The failure of any Lender to make any Term Loan, any Revolving Credit Loan or to make any payment hereunder on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Term Loan, its Revolving Credit Loan or to make its payment hereunder.

14-24.  Incorporation of DIP Orders by Reference.  Each of the Loan Parties, the Agent, and the Lenders agrees that any reference contained herein to (i) the Interim DIP Order shall include all terms, conditions, and provisions of such Interim DIP Order and that the Interim DIP Order is incorporated herein for all purposes, and (ii) the Final DIP Order shall include all terms, conditions, and provisions of such Final DIP Order and that the Final DIP Order is incorporated herein for all purposes.  To the extent there is any inconsistency between the terms of this Agreement and the terms of either the Interim DIP Order or the Final DIP Order, the terms of the Interim DIP Order and the Final DIP Order, as applicable, shall govern.

14-25.  Cash Collateral Accounts.

(a)    The Loan Parties shall utilize the funds contained in the Cash Collateral Accounts only as set forth in the applicable DIP Order and Cash Management Order and in accordance with the DIP Budget.

(b)    If no Suspension Event has occurred and is continuing, the Loan Parties may invest the funds in any Cash Collateral Account as permitted by the Bankruptcy Court and Section 4-35.

(c)    Each Loan Party shall ensure that all payments received by it are deposited directly into a Cash Collateral Account.  The Loan Parties may not add or replace a Cash Collateral Account without the prior written consent of the Agent and the Required Lenders and the authorization of the Bankruptcy Court.

**Article 15 - Guaranty**

15-1.  Guaranty.  For good and valuable consideration, the receipt and sufficiency of which are acknowledged, each Guarantor unconditionally guarantees, in accordance with the terms hereof and without any prior written notice, the payment and performance of the Liabilities of the Borrower.

15-2.  Obligations Not Affected.  The obligations of each Guarantor hereunder shall not be affected by:  any fraudulent, illegal, or improper act by the Borrower, any Guarantor, or any other Person liable or obligated to the Agent or any Lender for or on the Liabilities; any release, discharge, or invalidation, by operation of law or otherwise, of the Liabilities; or the legal incapacity of the Borrower, any Guarantor, or any other Person liable or obligated to the Agent or any Lender for or on the Liabilities.  Interest and Costs of Collection shall continue to accrue and shall continue to be deemed Liabilities guarantied hereby notwithstanding any stay to the enforcement thereof against the Borrower or any Guarantor or the disallowance of any claim therefor against the Borrower or any Guarantor.

15-3.  General Waivers.  Each Guarantor *WAIVES*:  presentment, demand, notice, and protest with respect to the Liabilities and this Guaranty; any delay on the part of the Agent or any Lender; any right to require the Agent or any Lender to pursue or to proceed against the Borrower or any collateral

which might have been granted to secure the Liabilities or to secure the obligations of the Guarantors hereunder; any benefit of, and any right to participate in, any collateral which may secure the Liabilities; any claim which any Guarantor may have or to which any Guarantor may become entitled to the extent that such claim might otherwise cause any transfer to the Agent or any Lender by or on behalf of the Borrower to be avoided as having been, or in the nature of, a preference; and notice of acceptance of this Guaranty.

15-4.    Waivers Concerning Election of Remedies.  Each Guarantor **WAIVES** any claim or defense which is based upon an election of remedies.  In the event that the Liabilities or this Guaranty are secured by real estate, and in the event that the Agent or any Lender elects to enforce its rights against such real property by way of nonjudicial foreclosure through the exercise of the rights of power of sale, each Guarantor **WAIVES** any defense which, but for this waiver, might be available to any Guarantor due to such election of remedies by the Agent or any Lender (including, without limitation, any claim that the Agent or any Lender, by reason of such election of remedies, has extinguished rights of the Guarantors to proceed against the Borrower).

15-5.    Waiver of Subrogation.  No Guarantor shall undertake any of the following:

(a)    Exercise of any right against the Borrower, by way of subrogation, reimbursement, indemnity, contribution, or the like unless and until all Liabilities have been irrevocably paid and satisfied in full.

(b)    The filing of any proof of any claim in competition with the Agent or any Lender in respect of any payment hereunder in any bankruptcy or insolvency proceedings of any nature.

(c)    The claiming of any set-off or counterclaim against the Borrower in respect of any liability of such Guarantor to the Borrower.

15-6.    Subordination.  The payment of any amounts due with respect to any indebtedness of the Borrower now or hereafter held by any Guarantor for borrowed money is hereby subordinated to the prior payment in full of the Liabilities.  No Guarantor shall demand, sue for, or otherwise attempt to collect any such indebtedness.  Any amounts which are collected, enforced and received by any Guarantor shall be held by such Guarantor as trustee for the Agent and shall be paid over to the Agent on account of the Liabilities without affecting in any manner the liability of any Guarantor under this Guaranty.

15-7.    Books and Records.  The books and records of the Agent showing the account between the Agent and the Guarantor shall be admissible in any action or proceeding and constitute prima facie evidence and proof of the items contained therein.

15-8.    Primary Obligations.  The obligations of each Guarantor hereunder are primary, with no recourse necessary by the Agent or any Lender against the Borrower or any collateral given to secure the Liabilities or to secure the obligations of such Guarantor or any other Guarantor hereunder or against any other Person liable for or on the Liabilities prior to proceeding against such Guarantor or any other Guarantor hereunder.

15-9.    Changes in Liabilities.  Each Guarantor assents to any indulgence or waiver which the Agent or any Lender might grant or give the Borrower and/or any other Person liable or obligated for or on the Liabilities.  Each Guarantor authorizes the Agent and Lenders to alter, amend, cancel, waive, or modify any term or condition of the Liabilities and of the obligations of any other Person liable or obligated for or on the Liabilities, without notice to, or consent from, such Guarantor or any other Guarantor.  Each Guarantor authorizes the Agent and Lenders to complete this Guaranty and any

93

instrument or other document which evidences or relates to the Liabilities, to the extent that this Guaranty or such instrument or other document, upon delivery to the Agent or any Lender, is incomplete in any respect. No compromise, settlement, or release by the Agent or any Lender of the Liabilities or of the obligations of any such other Person (whether or not jointly liable with any Guarantor) and no release of any collateral securing the Liabilities or securing the obligations of any such other Person shall affect the obligations of any Guarantor hereunder. No action by the Agent or any Lender which has been assented to herein shall affect the obligations of any Guarantor hereunder.

15-10. <u>Right of Set-Off</u>. Any and all deposits or other sums at any time credited by or due from the Agent or any Lender to any Guarantor or to any Participant or from any Affiliate of the Agent or any Lender or any Participant and any cash, securities, instruments or other property of any Guarantor in the possession of the Agent or any Lender or any Participant or any such Affiliate, whether for safekeeping or otherwise (regardless of the reason the Agent or any Lender or any Participant or any such Affiliate had received the same) shall at all times constitute security for all Liabilities and for any and all obligations of the Guarantors to the Agent or any Lender and any Participant, and may be, following the occurrence and continuation of an Event of Default, applied or set off against the Liabilities and against the obligations of the Guarantors to the Agent or any Lender and any Participant including, without limitation, those arising hereunder, whether or not such are then due and whether or not other collateral is then available to the Agent or any Lender or any Participant or any such Affiliate.

15-11. <u>Joint and Several Obligations</u>. Each of the obligations of each and every Guarantor under this Guaranty are joint and several. This Guaranty may be enforced against any Guarantor without any duty or responsibility to pursue any other Guarantor and such enforcement shall not be a defense to any action brought against any Guarantor hereunder. The Agent and Lenders hereby reserve all rights against each Guarantor.

15-12. <u>Termination</u>. The obligations of each Guarantor hereunder shall remain in full force and effect as to all Liabilities until the termination of this Agreement and payment in full of all Liabilities (other than contingent indemnification obligations). This Guaranty shall continue to be effective or, if previously terminated, shall be automatically reinstated, without any further action, if at any time any payment made or value received with respect to a Liability is rescinded or must otherwise be returned by the Agent or any Lender upon the insolvency, bankruptcy or reorganization of any Guarantor, or otherwise, all as though such payment had not been made or value received.

## Article 16 - The Agent

16-1. <u>Appointment and Authority</u>. Each Lender hereby irrevocably appoints Crystal Financial LLC ("<u>Crystal</u>") to act on its behalf as Agent hereunder and under the other Loan Documents and authorizes Agent to take such actions on its behalf and to exercise such powers as are delegated to Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article 16 are solely for the benefit of Agent and the Lenders, and no Borrower or other Loan Party shall have any rights as a third party beneficiary of any of such provisions.

16-2. <u>Exculpatory Provisions</u>. Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, Agent:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or a Suspension has occurred and is continuing;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that Agent is required to exercise as directed in writing by the Required Lenders; provided that Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose Agent to liability or that is contrary to any Loan Document or applicable law;

(c)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any Loan Party or any of its Affiliates that is communicated to or obtained by the Person serving as Agent or any of its Affiliates in any capacity;

(d)    Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of Required Lenders (or as Agent shall believe in good faith shall be necessary) or (ii) in the absence of its own gross negligence or willful misconduct (as determined by final and nonappealable judgment of a court of competent jurisdiction).    Agent shall be deemed not to have knowledge of any Suspension Event or Event of Default unless and until notice describing such Suspension Event or Event of Default is given to Agent by the Parent or Required Lenders;

(e)    Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Suspension Event or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in Article 3 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to Agent.

16-3.    <u>Reliance by Agent</u>.    Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.    Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.    In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of the Lenders, Agent may presume that such condition is satisfactory to all Lenders (i) if such condition is satisfactory to Required Lenders, or (ii) unless Agent shall have received notice to the contrary from such Lender prior to the making of such Loan.    Agent may consult with legal counsel (who may be counsel for the Loan Parties), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

16-4.    <u>Nature of Obligations; Non-Reliance on Agent and Other Lenders</u>.    Each Lender acknowledges and agrees that the extensions of credit made hereunder or evidenced hereby are commercial loans and not investments in a business enterprise or securities.    Each Lender further represents that it is engaged in making, acquiring or holding commercial loans in the ordinary course of its business and has, independently and without reliance upon the Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement as a Lender, and to make, acquire or hold Loans hereunder.    Each Lender acknowledges that it has, independently and without reliance upon Agent or any other Lender or any of their Affiliates and based on such documents and information as it has deemed appropriate, made its own

95

credit analysis and decision to enter into this Agreement. Each Lender shall, independently and without reliance upon the Agent or any other Lender and based on such documents and information (which may contain material, non-public information within the meaning of the United States securities laws concerning the Loan Parties and their respective Affiliates) as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any related agreement or any document furnished hereunder or thereunder and in deciding whether or to the extent to which it will continue as a lender or assign or otherwise transfer its rights, interests and obligations hereunder.

16-5.    <u>Rights as a Lender</u>.    The Person serving as Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with any Loan Party or any Subsidiary or other Affiliate thereof as if such Person were not Agent hereunder and without any duty to account therefor to the Lenders.

16-6.    <u>Sharing of Set-Offs and Other Payments</u>.    Each Credit Party agrees that if it shall, whether through the exercise of rights under the Loan Documents or rights of banker's lien, set off, or counterclaim against any Loan Party or otherwise, obtain payment of a portion of the aggregate Liabilities owed to it, taking into account all distributions made by Agent under <u>Section 7.5</u> causes such Credit Party to have received more than it would have received had such payment been received by Agent and distributed pursuant to <u>Section 7.5</u>, then (a) it shall be deemed to have simultaneously purchased and shall be obligated to purchase interests in the Liabilities as necessary to cause all Credit Parties to share all payments as provided for in <u>Section 7.5</u>, and (b) such other adjustments shall be made from time to time as shall be equitable to ensure that Agent and all Credit Parties share all payments of Liabilities as provided in <u>Section 7.5</u>; <u>provided</u>, <u>however</u>, that nothing herein contained shall in any way affect the right of any Credit Party to obtain payment (whether by exercise of rights of banker's lien, set-off or counterclaim or otherwise) of indebtedness other than the Liabilities. Each Loan Party expressly consents to the foregoing arrangements and agrees that any holder of any such interest or other participation in the Liabilities, whether or not acquired pursuant to the foregoing arrangements, may to the fullest extent permitted by law exercise any and all rights of banker's lien, set-off, or counterclaim as fully as if such holder were a holder of the Liabilities in the amount of such interest or other participation. If all or any part of any funds transferred pursuant to this section is thereafter recovered from the seller under this section which received the same, the purchase provided for in this section shall be deemed to have been rescinded to the extent of such recovery, together with interest, if any, if interest is required pursuant to the order of a tribunal order to be paid on account of the possession of such funds prior to such recovery.

16-7.    <u>Investments</u>.    Whenever Agent in good faith determines that it is uncertain about how to distribute to Credit Parties any funds which it has received, or whenever Agent in good faith determines that there is any dispute among Credit Parties about how such funds should be distributed, Agent may choose to defer distribution of the funds which are the subject of such uncertainty or dispute. If Agent in good faith believes that the uncertainty or dispute will not be promptly resolved, or if Agent is otherwise required to invest funds pending distribution to Credit Parties, Agent shall invest such funds pending distribution; all interest on any such investment shall be distributed upon the distribution of such investment and in the same proportion and to the same Persons as such investment. All moneys received by Agent for distribution to Credit Parties (other than to the Person who is Agent in its separate capacity as a Credit Party) shall be held by Agent pending such distribution solely as Agent for such Credit Parties, and Agent shall have no equitable title to any portion thereof.

16-8.  <u>Resignation of Agent</u>.  Agent may at any time give notice of its resignation to the Lenders and Borrower.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right to appoint a successor.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may on behalf of the Lenders appoint a successor Agent provided that if Agent shall notify Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any Collateral held by Agent on behalf of the Lenders under any of the Loan Documents, the retiring Agent shall continue to hold such Collateral until such time as a successor Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Agent as provided for above in this paragraph.  Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this paragraph).  The fees payable by Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article 16 and <u>Sections 14-7</u> and <u>14-11</u> shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Affiliates in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Agent.

16-9.  <u>Delegation of Duties</u>.  Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by Agent.  Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates.  The exculpatory provisions of this Article 16 shall apply to any such sub-agent and to the Affiliates of Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Agent.

16-10.  <u>Collateral Matters</u>.

(a)     The Lenders hereby irrevocably authorize Agent, at its option and in its sole discretion, to release any DIP Lien on any Collateral (i) upon the payment and satisfaction in full, in cash by the Loan Parties of all Liabilities and the termination of all Commitments, (ii) constituting property being sold or disposed of if a release is required or desirable in connection therewith and if the Borrower certifies to Agent that the sale or disposition is permitted under this Agreement or the other Loan Documents (and Agent may rely conclusively on any such certificate, without further inquiry) and with the approval of the Bankruptcy Court (to the extent required), (iii) constituting property in which Borrower or their Subsidiaries owned no interest at the time the Agent's DIP Lien was granted nor at any time thereafter, or (iv) constituting property leased to Borrower or their Subsidiaries under a lease that has expired or is terminated in a transaction permitted under this Agreement.  Except as provided above, Agent will not execute and deliver a release of any DIP Lien on any Collateral without the prior written authorization of (y) if the release is of all or substantially all of the Collateral, all of the Lenders, or (z) otherwise, the Required Lenders.  Upon request by Agent or Borrower at any time, the Lenders will confirm in writing Agent's authority to release any such DIP Liens on particular types or items of Collateral pursuant to this <u>Section 16-10</u>; <u>provided</u>, <u>however</u>, that (1) Agent shall not be required to execute any document necessary to evidence such release on terms that, in Agent's opinion, would expose Agent to liability or create any obligation or entail any consequence other than the release of such Lien

97

without recourse, representation, or warranty, and (2) such release shall not in any manner discharge, affect, or impair the Liabilities or any Liens (other than those expressly being released) upon (or obligations of the Loan Parties in respect of) all interests retained by the Loan Parties, including, the proceeds of any sale, all of which shall continue to constitute part of the Collateral.

(b)    Agent shall have no obligation whatsoever to any of the Lenders to assure that the Collateral exists or is owned by the Loan Parties or is cared for, protected, or insured or has been encumbered, or that the Agent's DIP Liens have been properly or sufficiently or lawfully created, perfected, protected, or enforced or are entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to Agent pursuant to any of the Loan Documents, it being understood and agreed that in respect of the Collateral, or any act, omission, or event related thereto, subject to the terms and conditions contained herein, Agent may act in any manner it may deem appropriate, in its sole discretion given Agent's own interest in the Collateral in its capacity as one of the Lenders and that Agent shall have no other duty or liability whatsoever to any Lender as to any of the foregoing, except as otherwise provided herein.

16-11.    <u>Agency for Perfection</u>.    Agent hereby appoints each other Lender as its agent (and each Lender hereby accepts such appointment) for the purpose of perfecting the Agent's DIP Liens in assets which, in accordance with Article 8 or Article 9, as applicable, of the UCC can be perfected by possession or control.    Should any Lender obtain possession or control of any such Collateral, such Lender shall notify Agent thereof, and, promptly upon Agent's request therefor shall deliver possession or control of such Collateral to Agent or in accordance with Agent's instructions.

16-12.    <u>Concerning the Collateral and Related Loan Documents</u>.    Each Credit Party authorizes and directs Agent to enter into this Agreement and the other Loan Documents (including any intercreditor or subordination agreement).    Each Lender Party agrees that any action taken by Agent in accordance with the terms of this Agreement or the other Loan Documents relating to the Collateral and the exercise by Agent of its powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Lenders.

16-13.    <u>Delivery of Documents to Lenders</u>.    Agent agrees to distribute to each Lender copies of all notices, financial statements, certificates, reports and agreements received by Agent and not required to be delivered to each Lender pursuant to the terms of this Agreement.

## Article 17 - Consents, Amendments and Waivers:

17-1.    <u>Action by Agent, Consents, Amendments, Waivers</u>.

(a)    No amendment or waiver of any provision of this Agreement, this Agreement, or any other Loan Document, and no consent to any departure by any Loan Party therefrom, shall be effective unless in writing signed by the Agent, the Required Lenders, and the Borrower or the applicable Loan Party, as the case may be, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; <u>provided</u>, <u>however</u>, that no such amendment, waiver or consent shall:

(i)    increase the Commitment of any Lender (or reinstate any Commitment terminated pursuant to the provisions of this Agreement) without the written consent of such Lender;

55718599V12

(ii)      as to any Lender, postpone any date fixed by this Agreement, this Agreement or any other Loan Document for any scheduled payment (including the Maturity Date) of principal, interest, fees or other amounts due hereunder or under any of the other Loan Documents without the written consent of such Lender or change the definitions of the terms "Maturity Date" or "Termination Date" or any component definition thereof without the written consent of each Lender;

(iii)      as to any Lender, reduce the principal of, or the rate of interest, any Loans held by such Lender, or any fees or other amounts payable under this Agreement or under any other Loan Document to or for the account of such Lender, without the written consent of such Lender;

(iv)      change Sections 7-5(c) or 7-5(d) of this Agreement in a manner that would alter the pro rata sharing of payments required thereby (x) as to any Lender, without the written consent of such Lender, (y) in a manner that would adversely affect the Lenders holding Revolving Loans and/or Revolving Credit Commitments without the written consent of each such Lender, or (z) in a manner that would adversely affect the Lenders holding Term Loans and/or Term Commitments without the written consent of each such Lender;

(v)      (x) change any provision of this Article 17 or the definition of "Required Lenders" or any other provision hereof or of this Agreement specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or under this Agreement or make any determination or grant any consent hereunder or thereunder, without the written consent of each Lender;

(vi)      except as expressly permitted hereunder or under any other Loan Document, release, or limit the liability of, any Loan Party without the written consent of each Lender;

(vii)      except for or as provided in Section 16-10, release all or substantially all of the Collateral from the DIP Liens granted to secure the Liabilities (other than as a result of a Disposition permitted pursuant to the Loan Documents) or the Guarantees under Article 15, without the written consent of each Lender;

(viii)      increase the aggregate Commitments without the written consent of each Lender;

(ix)      except as expressly permitted herein or in any other Loan Document, subordinate the Liabilities or the DIP Liens granted to the Agent under this Agreement or under the other Loan Documents, to any other Indebtedness or lien, as the case may be without the written consent of each Lender;

(x)      change the definition of the term "Borrowing Base" or any component definition thereof or change the criteria used to determine Appraised Value, Acceptable Inventory, Eligible Credit Card Receivables or Eligible Trade Names (in each case, other than changes that result from appraisals) if as a result thereof the amounts available to be borrowed by the Borrower would be increased without the written consent of each Lender, *provided that* the foregoing shall not limit the discretion of the Agent to change, establish or eliminate any Reserves, so long as such change, establishment or elimination will not have the effect of making more credit available to the Borrower than immediately prior to taking such action with respect to

99

the Reserves, other than as a result of changes in underlying factors used in such computation in the Loan Parties' businesses.

<u>provided</u> that no amendment, waiver or consent shall, unless in writing and signed by the Agent in addition to the Lenders required above, affect the rights or duties of any Agent under this Agreement or any other Loan Document.  Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except that the Commitment of such Lender may not be increased or extended without the consent of such Lender. Notwithstanding anything to the contrary set forth in this Article 17, each of the Interim DIP Order and the Final DIP Order may be amended in accordance with the definition thereof, and any such amendments or waivers shall be subject to the satisfaction of the requirements set forth in the Interim DIP Order or the Final DIP Order, as applicable.

(b)     No Lender independently shall exercise any right of action or enforcement against or with respect to any Loan Party or any of the Collateral except with the consent of each Lender.

## Article 18 - Assignments and Participations:

18-1.    <u>Assignments and Assumptions</u>.

(a)     No Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of this <u>Section 18-1</u>, (ii) by way of participation in accordance with the provisions of <u>Section 18-2</u>, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of <u>Section 18-3</u> (and any other attempted assignment or transfer by any party hereto shall be null and void).  Except as provided herein, each Lender (in this <u>Section 18-1</u>, an "Assigning Lender") may assign to one or more Eligible Assignees (in this <u>Section 18-1</u>, each an "Assignee Lender") all or a portion of that Lender's interests, rights and obligations under this Agreement (including all or a portion of its Commitments and Loans), provided that the parties comply with the provisions of <u>Section 2-23</u> (as supplemented and modified herein) and the following provisions:

(i)     in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender, no minimum amount need be assigned;

(ii)     concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether the minimum amount required by <u>Section 2-23</u> of this Agreement has been met;

(iii)     the parties to such assignment shall execute and deliver to the Agent, for recording in the Register, an Assignment and Acceptance substantially in the form of **EXHIBIT 18-1**, annexed hereto, together with an Administrative Questionnaire for the Assignee Lender;

(iv)     the Assigning Lender shall deliver to the Agent, with such Assignment and Acceptance, any applicable Note held by the subject Assigning Lender and the Agent's processing fee of $3,500.00, provided, however, no such processing fee shall be due where the Assigning Lender is one of the Initial Lenders.

(b)     Upon the execution, delivery, acceptance and recording by the Agent of such Assignment and Acceptance, from and after the effective date specified therein, the Eligible Assignee

thereunder shall be a party to this Agreement and this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement and this Agreement, and the Assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement and this Agreement (and, in the case of an Assignment and Assumption covering all of the Assigning Lender's rights and obligations under this Agreement, such Assigning Lender shall cease to be a party thereto and hereto) but shall continue to be entitled to the benefits of this Agreement with respect to facts and circumstances occurring prior to the effective date of such assignment.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this <u>Section 18-1</u> shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with <u>Section 18-2</u>.

(c)    By executing and delivering an Assignment and Acceptance, the parties to thereto confirm to and agree with each other and with all parties to the within Agreement as follows:

(i)    The Assigning Lender:

(A)    makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this any Loan Document or the execution, legality, validity, enforceability, genuineness, sufficiency or value of any Loan Document or any other instrument or document furnished pursuant thereto other than the representation and warranty that it is the legal and beneficial owner of the interest being assigned thereby free and clear of any adverse claim

(B)    makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Borrower or any other Person primarily or secondarily liable in respect of any of the Liabilities, or the performance or observance by the Borrower or any other Person primarily or secondarily liable in respect of any of the Liabilities of any of their obligations under any Loan Documents or any other instrument or document furnished pursuant thereto.

(ii)    The Assignee Lender:

(A)    confirms that it has received copies of this Agreement (and any amendment hereto), this Agreement and other Loan Documents (and any amendment thereto), the most recent financial statements then to have been delivered pursuant to this Agreement, and such other documents and information as that assignee Lender has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance.

(B)    Independently and without reliance upon the Assigning Lender, the Agent or any other Lender and based on such documents and information as the Assignee Lender shall deemed appropriate at the time, made such Person's own credit decision to join in the credit facility contemplated by the Loan Documents and to become a "Lender".

(C)    Will continue to make such Person's own credit decisions in taking or not taking action under this Agreement, this Agreement and the other Loan Documents independently and without reliance upon the Assigning Lender, the Agent or

any other Lender and based on such documents and information as the Assignee Lender shall deem appropriate at the time.

(D)    Appoints and authorizes the Agent to take such action on behalf of that Assignee Lender and to exercise such powers under this Agreement, this Agreement and the other Loan Documents as are delegated to the Agent by the terms hereof or thereof, together with such powers as are reasonably incidental thereto.

(E)    Represents and warrants that it is an Eligible Assignee and is legally authorized to enter into such Assignment and Acceptance.

(d)    The Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain a copy of each Assignment and Acceptance delivered to it and a register or similar list (the "**Register**") for the recordation of the names and addresses of the Lenders and the Commitment of, and principal amount (and stated interest) of the Liabilities owing to, the Lenders from time to time.  The entries in the Register shall be conclusive, in the absence of manifest error, and the Agent and the Lenders may treat each Person whose name is recorded in the Register as a "Lender" hereunder for all purposes of this Agreement.  The Register shall be available for inspection by the Lenders at any reasonable time and from time to time upon reasonable prior notice.

18-2.    Participations.

(a)    Any Lender may at any time, without the consent of, or notice to, the Loan Parties or the Agent, sell participations to any Person (other than a natural person or the Loan Parties or any of the Loan Parties' Affiliates or Subsidiaries or a Disqualified Lender) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement and the other Loan Documents; provided that (i) such Lender's obligations under this Agreement and this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Loan Parties, the Agent, the Lenders and the Issuer shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and this Agreement.  Any Participant shall agree in writing to comply with all confidentiality obligations set forth in Section 14-17 of this Agreement as if such Participant was a Lender hereunder.

(b)    Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement and this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in Section 17-1(a)(ii) and (a)(iii) that affects such Participant.  The Loan Parties agree that each Participant shall be entitled to the benefits of this Agreement to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 18-1.

(c)    A Participant shall not be entitled to receive any greater payment under this Agreement than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.

(d)    Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or

other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.

18-3.    Certain Pledges.

(a)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement and the other Loan Documents to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or thereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

**Article 19 - Commitments, Fundings and Distributions:**

19-1.    Commitments to Make Revolving Credit Loans.  Each Lender shall make available to the Agent, as provided herein, that Lender's Revolving Credit Commitment.

19-2.    Commitments to Make Interim Term Loans.  Each Lender shall make available to the Agent, as provided herein, that Lender's Interim Term Loan Commitment.

19-3.    Commitments to Make Final Term Loans.  Each Lender shall make available to the Agent, as provided herein, that Lender's Final Term Loan Commitment.

19-4.    Nature of Obligations of Lenders.  The obligations of the Lenders hereunder to make Revolving Credit Loans, Interim Term Loans and Final Term Loans, and to make any payments required hereunder are several and not joint.  The failure of any Lender to make any Loan, to fund any participation or to make any payment hereunder on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan(s), to purchase it participation(s), or to make its payment(s) hereunder.

19-5.    Funding Procedures.

(a)    Revolving Credit Loans.  Promptly after receipt of a request for a borrowing of a Revolving Credit Loan pursuant to Section 2-5, and in any event not later than 3:00 p.m., New York time, on the Business Day such borrowing request was received by Agent, Agent shall notify each Lender holding a Revolving Credit Commitment, by telecopy, telephone, or other similar form of transmission, of the requested borrowing. Each such Lender shall make the amount of such Lender's Pro Rata Share of the Revolving Credit Loan available to Agent on the proposed funding date in immediately available funds to an account designated by Agent not later than 11:00 a.m., New York time on such date, and Agent shall make the Revolving Credit Loan available to the  Borrower by transferring immediately as instructed by the Borrower on such date; provided, however, that no Lender shall have the obligation to make its Pro Rata Share of the Revolving Credit Loan and Agent shall not make the Revolving Credit Loan available to the Borrower unless all applicable conditions precedent set forth in Article 3 have been satisfied in full (or waived by Agent and the appropriate Lenders).

(b)    Interim Term Loans. Promptly after receipt of a request for a borrowing of an Interim Term Loan pursuant to Section 2-5, and in any event not later than 3:00 p.m. New York time, on

the Business Day such borrowing request was received by Agent, Agent shall notify each Lender holding an Interim Term Loan Commitment, by telecopy, telephone, or other similar form of transmission, of the requested borrowing. Each such Lender shall make the amount of such Lender's Pro Rata Share of the Interim Term Loan available to Agent on the proposed funding date in immediately available funds to an account designated by Agent not later than 11:00 a.m., New York time on such date, and Agent shall make the Interim Term Loan available to the  Borrower by transferring immediately as instructed by the Borrower on such date; provided, however, that no Lender shall have the obligation to make its Pro Rata Share of the Interim Term Loan and Agent shall not make the Interim Term Loan available to the Borrower unless all applicable conditions precedent set forth in Article 3 have been satisfied in full (or waived by Agent and the appropriate Lenders).

(c)        Final Term Loans.  Promptly after receipt of a request for a borrowing of a Final Term Loan pursuant to Section 2-5, and in any event not later than 3:00 p.m., New York time, on the Business Day such borrowing request was received by Agent, Agent shall notify each Lender holding a Final Term Loan Commitment, by telecopy, telephone, or other similar form of transmission, of the requested borrowing. Each such Lender shall make the amount of such Lender's Pro Rata Share of the Final Term Loan available to Agent on the proposed funding date in immediately available funds to an account designated by Agent not later than 11:00 a.m., New York time on such date, and Agent shall make the Final Term Loan available to the  Borrower by transferring immediately as instructed by the Borrower on such date; provided, however, that no Lender shall have the obligation to make its Pro Rata Share of the Final Term Loan and Agent shall not make the Final Term Loan available to the Borrower unless all applicable conditions precedent set forth in Article 3 have been satisfied in full (or waived by Agent and the appropriate Lenders).

19-6.    Payments Generally; Agent's Clawback.

(a)        Unless the Agent shall have received notice from a Lender prior to the proposed date of any Loans that such Lender will not Transfer to the Agent such Lender's share of such Loan, the Agent may assume that such Lender has Transferred such share on such date in accordance with this Agreement and may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Loan available to the Agent, then the applicable Lender and the Borrower severally agree to pay to the Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation plus any administrative processing or similar fees customarily charged by the Agent in connection with the foregoing.  If the Borrower and such Lender shall pay such interest to the Agent for the same or an overlapping period, the Agent shall promptly remit to the Borrower the amount of such interest paid by the Borrower for such period.  If such Lender pays its share of the applicable Loan to the Agent, then the amount so paid shall constitute such Lender's Loan.  Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Agent.

(b)        If any Lender Transfers to the Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Agreement, and such funds are not made available to the Borrower by the Agent because the conditions to the applicable Loan set forth in Section 3 of this Agreement are not satisfied or waived in accordance with the terms hereof, the Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

55718599V12

(c)     Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under Law, that any Credit Party acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.

19-7.   Settlement Amongst Lenders.

(a)     The amount of each Lender's Pro Rata Outstandings and Commitments shall be computed weekly (or more frequently in the Agent's discretion) and shall be adjusted upward or downward based on all Loans (including Protective Advances) made and any repayments repayments thereof received by the Agent as of 3:00 p.m. on the first Business Day (such date, the "**Settlement Date**") following the end of the period specified by the Agent.

(b)     The Agent shall deliver to each of the Lenders promptly after a Settlement Date a summary statement of the amount of outstanding Loans (including Protective Advances) for the period and the amount of repayments received for the period.  As reflected on the summary statement, (i) the Agent shall transfer to each Lender its Pro Rata Share of repayments, and (ii) each Lender shall Transfer to the Agent (as provided below) or the Agent shall Transfer to each Lender, such amounts as are necessary to ensure that, after giving effect to all such Transfers, the amount of Loans made by each Lender shall be equal to such Lender's Pro Rata Share of all Loans outstanding as of such Settlement Date.  If the summary statement requires Transfers to be made to the Agent by the Lenders and is received prior to 1:00 p.m. on a Business Day, such Transfers shall be made in immediately available funds no later than 3:00 p.m. that day; and, if received after 1:00 p.m., then no later than 3:00 p.m.  on the next Business Day.  The obligation of each Lender to Transfer such funds is irrevocable, unconditional and without recourse to or warranty by the Agent.  If and to the extent any Lender shall not have so made its Transfer to the Agent, such Lender agrees to pay to the Agent, forthwith on demand such amount, together with interest thereon, for each day from such date until the date such amount is paid to the Agent, equal to the greater of the Federal Funds Effective Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation plus any administrative, processing, or similar fees customarily charged by the Agent in connection with the foregoing.

19-8.   Defaulting Lender.

(a)     If for any reason any Lender shall become a Defaulting Lender, then, in addition to the rights and remedies that may be available to the other Credit Parties, the Loan Parties or any other party at law or in equity, and not at limitation thereof, (i) such Defaulting Lender's right to participate in the administration of, or decision-making rights related to, the Liabilities, this Agreement or the other Loan Documents shall be suspended during the pendency of such failure or refusal, (ii) at the option of the Agent, any amount payable to such Defaulting Lender hereunder (whether on account of principal, interest, Fees or otherwise) shall, in lieu of being distributed to such Defaulting Lender, be retained by the Agent as cash collateral for future funding obligations of the Defaulting Lender in respect of any Loan or existing or future participating interest in any Protective Advance, and (iii) a Defaulting Lender shall be deemed to have assigned any and all payments due to it from the Loan Parties (whether on account of principal, interest, fees or otherwise) to the remaining non-Defaulting Lenders for application to, and reduction of, their proportionate shares of all outstanding Liabilities, and the Defaulting Lender's decision-making and participation rights and rights to payments as set forth in clauses (i), (ii) and (iii) hereinabove shall be restored only upon the payment by the Defaulting Lender of its Pro Rata

Outstandings, any participation obligation, or expenses as to which it is delinquent, together with interest thereon at the applicable rate set forth herein from the date when originally due until the date upon which any such amounts are actually paid.

      (b)    The non-Defaulting Lenders shall also have the right, but not the obligation, in their respective, sole and absolute discretion, to cause the termination and assignment, without any further action by the Defaulting Lender for no cash consideration (pro rata, based on the respective Commitments of those Lenders electing to exercise such right), of the Defaulting Lender's Commitment to fund future Loans. Upon any such purchase of the Commitment of any Defaulting Lender, the Defaulting Lender's share in future Loans and its rights under the Loan Documents with respect thereto shall terminate on the date of purchase, and the Defaulting Lender shall promptly execute all documents reasonably requested to surrender and transfer such interest, including, if so requested, an Assignment and Acceptance.

      (c)    Each Defaulting Lender shall indemnify the Agent and each non-Defaulting Lender from and against any and all loss, damage or expenses, including but not limited to reasonable attorneys' fees and funds advanced by the Agent or by any non-Defaulting Lender, on account of a Defaulting Lender's failure to timely fund any of its Commitments or its participation in Protective Advances or to otherwise perform its obligations under the Loan Documents

[signature pages follow]

106

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date above first written.  This Agreement shall take effect as a sealed instrument.

BORROWER:

AEROPOSTALE, INC., as "**Borrower**"

By: _____
Name: David Dick
Title:   Senior Vice President and Chief Financial
         Officer

GUARANTORS:

AEROPOSTALE WEST, INC.
JIMMY'Z SURF CO., LLC
AERO GC MANAGEMENT LLC
AEROPOSTALE PROCUREMENT COMPANY, INC.
AEROPOSTALE LICENSING, INC.
P.S. FROM AEROPOSTALE, INC.
GOJANE LLC,
each as a "**Guarantor**"

By: _____
Name:   David Dick
Title:   Senior Vice President and Chief Financial
         Officer

*[Signature Page Loan, Security and Guaranty Agreement]*

AGENT:

CRYSTAL FINANCIAL LLC,
as "**Agent**"

By: _____

Name:

Title:

Evren Ozargun
Managing Director

LENDERS:

CRYSTAL FINANCIAL SPV LLC,
as a "**Lender**"

By: _____
Name: Evren Ozargun
Title: Managing Director

CRYSTAL FINANCIAL LLC,
as a "**Lender**"

By: _____
Name: Evren Ozargun
Title: Managing Director

SILVER POINT SPECIALITY CREDIT
FUND, L.P.,
as a "**Lender**"

By: _____
Name:
Title:


SILVER POINT SELECT OPPORTUNITIES
FUND A, L.P.,
as a "**Lender**"

By: _____
Name:
Title:


*[Signature Page Loan, Security and Guaranty Agreement]*

SOLAR CAPITAL LTD.,
as a "**Lender**"

By: _____
Name: Cronin Healy
Title: Authorized Signatory

*[Signature Page Loan, Security and Guaranty Agreement]*

TPG SPECIALTY LENDING, INC.,
as a "**Lender**"

By: _____

Name:  Michael Fishman

Title:  Co-Chief Executive Officer

Exhibit A-1 to
Credit Agreement

## <u>Additional Pre-Petition Priority Liens</u>

Encumbrances on the Pre-Petition ABL Escrow and Reserve Accounts

Exhibit 4-6 is incorporated herein by reference

**EXHIBIT C-1**
**COMMITMENTS**

| LENDER | Revolving Credit Commitment | Pro Rata Share Revolving Credit Commitment | Term Loan Commitment | Pro Rata Share Term Loan Commitment |
|---|---|---|---|---|
| Crystal Financial LLC | Interim: $10,312,500.00 Final: $5,625,000.00 | Interim: 18.75% Final: 18.75% | Interim: $0 Final: $0 | Interim: 0% Final: 0% |
| Crystal Financial SPV LLC | Interim: $0 Final: $0 | Interim: 0% Final: 0% | Interim: $8,437,500.00 Final: $5,625,000.00 | Interim: 18.75% Final: 18.75% |
| Silver Point Select Opportunities Fund A, L.P. | Interim: $1,718,750.00 Final: $937,500.00 | Interim: 3.13% Final: 3.13% | Interim: $1,406,250.00 Final: $937,500.00 | Interim: 3.13% Final: 3.13% |
| Silver Point Specialty Credit Fund, L.P. | Interim: $8,593,750.00 Final: $4,678,500.00 | Interim: 15.63% Final: 15.63% | Interim: $7,031,250.00 Final: $4,687,500.00 | Interim: 15.63% Final: 15.63% |
| Solar Capital Ltd. | Interim: $10,312,500.00 Final: $5,625,000.00 | Interim: 18.75% Final: 18.75% | Interim: $8,437,500.00 Final: $5,625,000.00 | Interim: 18.75% Final: 18.75% |
| TPG Specialty Lending, Inc. | Interim: $24,062,500.00 Final: $13,125,000.00 | Interim: 43.75% Final: 43.75% | Interim: $19,687,500 Final: $13,125,000.00 | Interim: 43.75% Final: 43.75% |
| **Totals:** | Interim: $55,000,000 Final: $30,000,000 | Interim: 100.00% Final: 100.00% | Interim: $45,000,000 Final: $30,000,000 | Interim: 100.00% Final: 100.00% |

Exhibit I-1 to
Credit Agreement

**<u>Form of Interim DIP Order</u>**

(See attached)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x
                                             :
In re                                        :          Chapter 11
                                             :
AÉROPOSTALE, INC., *et al.*,                 :          Case No. 16-_____ (___)
                                             :
            Debtors.[1]                      :          Jointly Administered
                                             :
---------------------------------------------------------x

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§
105, 361, 362, 363, AND 364 AND RULES 2002, 4001, AND 9014
OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (I) AUTHORIZING
INCURRENCE BY THE DEBTORS OF POSTPETITION SECURED INDEBTEDNESS,
(II) GRANTING LIENS, (III) AUTHORIZING USE OF CASH COLLATERAL BY THE
DEBTORS AND PROVIDING FOR ADEQUATE PROTECTION, (IV) MODIFYING
THE AUTOMATIC STAY, AND (V) SCHEDULING A FINAL HEARING**

Upon the motion, dated May 4, 2016 [*ECF No. [__]*] (the "Motion") by the above-captioned debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), seeking, among other things, entry of an interim order (this "Interim Order"):

    (i)     authorizing the Debtors, pursuant to sections 363, 364(c), and 364(d) of title 11 of the United States Code (the "Bankruptcy Code"), to (a) obtain postpetition financing of up to $160,000,000 (the "DIP Facility"), comprised of a $75,000,000 term loan and a $85,000,000 revolving credit facility, pursuant to (I) that certain Secured Superpriority Debtor in Possession Loan, Security and Guaranty Agreement (as such agreement may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal tax identification number, as applicable, are as follows: Aéropostale, Inc. (3880); Aéropostale West, Inc. (7013); Jimmy'Z Surf Co., LLC (0461); Aero GC Management LLC (4257); Aeropostale Procurement Company, Inc. (8518); Aeropostale Licensing, Inc. (8124); P.S. from Aeropostale, Inc. (5900); GoJane LLC (4923); Aeropostale Canada Corp. (N/A); Aeropostale Holdings, Inc. (7729); and Aeropostale Puerto Rico, Inc. (6477). The Debtors' corporate headquarters is located at 112 West 34th Street, 22nd Floor, New York, NY 10120.

thereof and hereof, the "DIP Credit Agreement"), substantially in the form attached to the Motion as Exhibit B, by and among Aéropostale, Inc., as borrower (the "Borrower"), each of the other guarantor parties thereto including any entities that become guarantors thereunder from time to time (the "Guarantors" and, together with the Borrower, the "DIP Loan Parties"), Crystal Financial LLC, as agent (the "DIP Agent"), and the lender parties thereto including any entities that become lenders thereunder from time to time (the "DIP Lenders" and, together with the DIP Agent, the "DIP Secured Parties"), and (II) all guarantees and other agreements, documents, and instruments to be executed and/or delivered with, to, or in favor of the DIP Secured Parties (all documents comprising the DIP Facility, each as may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, collectively, the "DIP Financing Documents"); and (b) incur the "Liabilities" under and as defined in the DIP Credit Agreement (and such Liabilities are hereinafter referred to as the "DIP Obligations");

(ii)     authorizing the Debtors that are Guarantors under the DIP Credit Agreement to guarantee the Borrower's DIP Obligations;

(iii)     authorizing the DIP Loan Parties to execute and deliver the DIP Financing Documents and to perform such other acts as may be necessary or desirable in connection therewith;

(iv)     authorizing the Debtors to access up to $100,000,000 of the DIP Facility (inclusive of an aggregate amount of approximately $73,000,000 to repay all outstanding obligations under the Prepetition ABL Credit Agreement (as defined below)) on an interim basis, consisting of up to $55,000,000 at any time outstanding of "Revolving Credit Loans" as described in Section 2-1(a) of the DIP Credit Agreement, and up to $45,000,000 of "Term

2

Loans" as described in Section 2-2(a) of the DIP Credit Agreement, for the period (the "Interim Period") from the commencement of these cases through and including the earlier of (I) the entry of the Final Order (as defined below), and (II) thirty (30) days after the Petition Date, in order to avoid immediate and irreparable harm;

(v)    authorizing the use of the proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses under the DIP Financing Documents) during the Interim Period in each case in a manner consistent with and subject to the terms and conditions of the DIP Financing Documents and this Interim Order, and in compliance with the DIP Budget (as defined below), solely for the purposes set forth in the DIP Financing Documents including to pay or fund (a) certain costs, fees and expenses related to the Chapter 11 Cases, (b) the repayment of all Prepetition ABL Obligations (as defined below), including to cash collateralize all outstanding letters of credit issued under the Prepetition ABL Credit Documents (as defined below), and to fund an indemnification escrow in favor of the Prepetition ABL Parties (as defined below), and (c) the working capital needs of the Debtors during the Chapter 11 Cases;

(vi)    granting to the DIP Agent, for the benefit of itself and the DIP Lenders, automatically perfected liens on and security interests in all of the DIP Collateral (as defined below), including, without limitation, all property constituting "cash collateral" (as defined in section 363(a) of the Bankruptcy Code, and hereinafter, "Cash Collateral"), which liens and security interests shall have the priorities set forth in paragraph 2(i) below;

(vii)    granting to the DIP Agent, for the benefit of itself and the DIP Lenders, allowed superpriority administrative claims in each of the Chapter 11 Cases and any Successor Case (as defined below) in respect of all DIP Obligations, pursuant to section 364(c)(1) of the Bankruptcy Code, which shall have the priorities set forth in paragraph 2(j) below;

3

(viii)    authorizing the Debtors' use of Cash Collateral on the terms and conditions set forth in this Interim Order, and providing adequate protection on the terms set forth in this Interim Order to the Prepetition Term Loan Parties (as defined below) for any Diminution in Value (as defined below) for their interests in the Prepetition Collateral (as defined below), including the Cash Collateral;

(ix)    vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Financing Documents and this Interim Order;

(x)    scheduling a final hearing (the "Final Hearing") to consider entry of an order (the "Final Order") granting the relief requested in the Motion on a final basis, and to approve the form and manner of notice with respect to the Final Hearing; and

(xi)    waiving any applicable stay as provided in the provisions of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and/or the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"), and providing for the immediate effectiveness of this Interim Order;

The Court having considered the Motion, the declarations of James Doak [*ECF No. __*] and Robert Duffy [*ECF No. __*] in support thereof, and the declaration of David J. Dick [*ECF No. __*] in support of the Debtors' first day motions and orders, the exhibits attached thereto, the DIP Credit Agreement, and the evidence submitted at the interim hearing held before the Court on May [__], 2016 (the "Interim Hearing"); and in accordance with Bankruptcy Rules 2002, 4001(b), (c), and (d), and 9014 and Rule 4001-2 of the Local Rules, due and proper notice of the Motion and the Interim Hearing having been given; and the Interim Hearing having been held and concluded; and it appearing that approval of the relief requested in the Motion during the

4

Interim Period is necessary to avoid immediate and irreparable harm to the Debtors pending the

Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their

creditors and their estates, and is essential for the continued operation of the Debtors' business

and to preserve and maximize the value of the Debtors' estates for the benefit of all stakeholders;

and it further appearing that the Debtors are unable to secure unsecured credit for money

borrowed allowable as an administrative expense under section 503(b)(1) of the Bankruptcy

Code; and all objections, if any, to the entry of this Interim Order having been withdrawn,

resolved or overruled by this Court; and after due deliberation and consideration, and for good

and sufficient cause appearing therefor:

### IT IS HEREBY FOUND AND CONCLUDED AS FOLLOWS:[2]

A.      **Petition Date**.  On May 4, 2016 (the "Petition Date"), the Debtors filed voluntary

petitions under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for

the Southern District of New York (the "Court").  The Debtors are continuing in the management

and operation of their businesses and properties as debtors in possession pursuant to sections

1107 and 1108 of the Bankruptcy Code.  Pursuant to an order of this Court, the Chapter 11 Cases

have been consolidated for procedural purposes only.  No trustee or examiner has been appointed

in the Chapter 11 Cases.

B.      **Jurisdiction and Venue**.  This Court has jurisdiction over these proceedings and

the parties and property affected hereby pursuant to 28 U.S.C. § 1334. Consideration of the

Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  Venue for the Chapter 11

---

[2] The findings and conclusions set forth in this Interim Order constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

56101252v1

Cases and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and

1409.

**C.**    **Statutory Committee**.    As of the date of this Interim Order, a statutory

committee of unsecured creditors (the "Committee") has not been appointed in the Chapter 11

Cases.

**D.**    **Notice**.    The Interim Hearing was held pursuant to Bankruptcy Rules 2002 and

4001 and Local Rule 4001-2.    Notice of the Interim Hearing and the emergency relief requested

in the Motion was given by the Debtors, whether by telecopy, email, overnight courier or hand

delivery on May 4, 2016, to certain parties in interest, including: (i) the Office of the United

States Trustee for the Southern District of New York (the "United States Trustee"); (ii) the

Debtors' forty (40) largest unsecured creditors on a consolidated basis; (iii) counsel to the DIP

Agent; (iv) counsel to the Prepetition ABL Agent (as defined below); (v) counsel to the

Prepetition Term Loan Agent (as defined below); (vi) the five (5) largest secured creditors of

record; (vii) the Internal Revenue Service; (viii) the Securities and Exchange Commission; (ix)

the United States Department of Justice; and (x) all parties requesting notice pursuant to

Bankruptcy Rule 2002.    Under the circumstances, such notice of the Interim Hearing and the

emergency relief requested in the Motion is due and sufficient notice and complies with sections

102(1), 363, 364(c), and 364(d) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001(b),

4001(c), 4001(d), and the Local Rules, and no other or further notice of the relief granted

pursuant to this Interim Order is necessary or required.

**E.**    **The Debtors' Acknowledgements and Agreements**.    Without prejudice to the

rights of parties in interest as set forth in paragraph 7 below, the Debtors admit, stipulate,

6

56101252v1

acknowledge and agree that (collectively, paragraphs E(i) through E(vii) hereof shall be referred to herein as the "Debtors' Prepetition Secured Lien Stipulations"):

(i)     **Prepetition Revolving Credit Facility**.  Prior to the Petition Date, certain of the Debtors were parties to that certain Third Amended and Restated Loan and Security Agreement, dated as of September 22, 2011 (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Prepetition ABL Credit Agreement" and together with all other agreements, documents and instruments executed and/or delivered to or in favor of the parties thereto, the "Prepetition ABL Credit Documents"), by and among the Borrower, the guarantors party thereto, Bank of America, N.A., as agent (the "Prepetition ABL Agent"), and the lenders party thereto (the "Prepetition ABL Lenders" and, together with the Prepetition ABL Agent, the "Prepetition ABL Parties").  Pursuant to the Prepetition ABL Credit Agreement, the Prepetition ABL Lenders made available to the Borrower a secured revolving credit facility in an original principal amount of up to $215,000,000.

(ii)    **Prepetition Term Loan Facility**.  Prior to the Petition Date, certain of the Debtors were parties to that certain Loan and Security Agreement, dated as of May 23, 2014 (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Prepetition Term Loan Agreement" and together with all other agreements, documents, and instruments executed and/or delivered to or in favor of the parties thereto, the "Prepetition Term Loan Documents" and, together with the Prepetition ABL Credit Documents, the "Prepetition Secured Credit Documents"), by and among the borrower and guarantors listed therein, and Aero Investors LLC, as agent (the "Prepetition Term Loan Agent" and, together with the Prepetition ABL Agent, the "Prepetition Secured Agents"), and the lender parties thereto (the "Prepetition Term Loan Lenders" and, together with the Prepetition Term Loan Agent, the "Prepetition Term Loan Parties" and, together with the Prepetition ABL Parties, the "Prepetition Secured Parties").

(iii)   **Prepetition ABL and Term Loan Obligations**.  As of the Petition Date, the outstanding principal amount of all loans under the Prepetition ABL Credit Documents was approximately $73,000,000 (such amount, together with any amounts paid, incurred or accrued prior to the Petition Date in accordance with the Prepetition ABL Credit Documents and any outstanding letters of credit, accrued and unpaid interest, any fees, expenses and disbursements, indemnification obligations and other charges of whatever nature, whether or not contingent, whenever arising, due or owing in respect thereof, collectively, the "Prepetition ABL Obligations").  As of the Petition Date, the outstanding principal amount of all loans under the Prepetition Term Loan Documents was

7

approximately $150,000,000 (such amount, together with any amounts paid, incurred or accrued, prior to the Petition Date in accordance with the Prepetition Term Loan Documents, accrued and unpaid interest, any fees, expenses and disbursements, indemnification obligations and other charges of whatever nature, whether or not contingent, whenever arising, due or owing in respect thereof, collectively, the "Prepetition Term Loan Obligations" and together with the Prepetition ABL Obligations, collectively, the "Prepetition Secured Obligations").

(iv)    **Liens Securing Prepetition Secured Obligations.**  Prior to the Petition Date, the Debtors granted to the Prepetition ABL Agent (for the benefit of itself and the other Prepetition ABL Lenders) and the Prepetition Term Loan Agent (for the benefit of itself and the other Prepetition Term Loan Lenders) liens upon and security interests, as follows:

a.    *Prepetition ABL Credit Facility.*  Pursuant to the Prepetition ABL Credit Documents, the Debtors granted to the Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL Lenders, liens (the "Prepetition ABL Liens") on all "Collateral" (as such term is defined in the Prepetition ABL Credit Documents and hereinafter referred to as the "Prepetition Collateral").

b.    *Prepetition Term Loan.*  Pursuant to the Prepetition Term Loan Documents, the Debtors granted to the Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Lenders, liens (the "Prepetition Term Loan Liens" and, together with the Prepetition ABL Liens, the "Prepetition Secured Liens"), on all Prepetition Collateral.

c.    *Priority of Liens in Prepetition Collateral.*  Pursuant to that certain Intercreditor Agreement, dated as of May 23, 2014 (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Intercreditor Agreement"), by and between the Prepetition ABL Agent and the Prepetition Term Loan Agent, (I) the Prepetition ABL Liens granted on all "ABL Priority Collateral" to secure the "ABL Priority Obligations" (as such terms are defined in the Intercreditor Agreement) are senior in all respects to the Prepetition Term Loan Liens on all ABL Priority Collateral; and (II) the Prepetition Term Loan Liens granted on all "Term Priority Collateral" to secure the "Term Priority Obligations" (as such terms are defined in the Intercreditor Agreement) are senior in all respects to the Prepetition ABL Liens on all Term Priority Collateral.

8

(v) **Intercreditor Agreement.** The Debtors, the Prepetition ABL Agent and the Prepetition Term Loan Agent entered into the Intercreditor Agreement to govern, among other things, the respective rights, interests, obligations and priority of the Prepetition ABL Agent, on behalf of itself and the other Prepetition ABL Parties, and the Prepetition Term Loan Agent, on behalf of itself and the other Prepetition Term Loan Parties, in respect of the Prepetition Collateral.

(vi) **Validity, Perfection and Priority of Prepetition ABL Liens and Prepetition ABL Obligations.** As of the Petition Date, (i) the Prepetition ABL Liens are valid, binding, enforceable, non-avoidable and properly perfected; (ii) the Prepetition ABL Liens (x) are senior in priority to any and all other liens on the Prepetition Collateral, subject only to the terms of the Intercreditor Agreement and certain liens, if any, otherwise permitted pursuant to the Prepetition ABL Credit Documents,[3] and (y) are not subject to avoidance, recharacterization, subordination or other challenge pursuant to the Bankruptcy Code or applicable non-bankruptcy law, (iii) the Prepetition ABL Obligations constitute legal, valid, binding and non-voidable obligations of the Debtors, enforceable in accordance with the terms of the Prepetition ABL Credit Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and are not subject to any objection, offset, defense or counterclaim of any kind, and no portion of the Prepetition ABL Obligations is subject to avoidance, disallowance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (iv) the Prepetition ABL Obligations constitute allowed secured claims pursuant to section 506 of the Bankruptcy Code. On the date that this Interim Order is entered, the Debtors have waived, discharged and released the Prepetition ABL Parties, together with their affiliates, agents, attorneys, officers, directors and employees, of any right the Debtors may have (x) to challenge or object to any of the Prepetition ABL Obligations or any security therefor, and (y) to bring or pursue any and all claims, objections, challenges, causes of action and/or choses in action arising out of, based upon or related to the Prepetition ABL Credit Documents or otherwise. The Debtors do not possess and will not assert any claim, counterclaim, setoff, objection, challenge, cause of action or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of the Prepetition ABL Liens, or any claim of the Prepetition ABL Parties pursuant to the Prepetition ABL Credit Documents.

---

[3] Nothing herein shall constitute a finding or ruling by this Court that any such permitted liens, if any, are valid, enforceable, perfected, non-avoidable or senior to the Prepetition ABL Liens. Nothing herein shall prejudice the rights of any party in interest including, but not limited to, the Debtors, the Prepetition ABL Parties, the DIP Secured Parties and any Committee to challenge the validity, priority, enforceability, seniority, avoidability, perfection, extent or any other aspect of any such permitted liens.

(vii)    **Interest in Cash Collateral**.  The Prepetition ABL Parties have a security interest in Cash Collateral of the Debtors, including all amounts on deposit in the Debtors' banking, checking, or other deposit accounts and all proceeds of Prepetition Collateral (but only to the extent of their respective security interests in such Prepetition Collateral) to secure their respective prepetition claims, to the same extent and order of priority as that which was held by each such party on the Petition Date.

F.    **Findings Regarding the Post-Petition Financing**.

(i)    **Need for Post-Petition Financing**.  An immediate need exists for the Debtors to obtain funds under the DIP Facility in order to continue remaining operations and to administer and preserve the value of the Debtors' estates.  The ability of the Debtors to meet payroll and finance their remaining operations, and to preserve, maintain and maximize the value of their assets for the benefit of their creditors, requires the immediate availability of working capital provided pursuant to the DIP Facility.  Without immediate access to the DIP Facility, the Debtors have insufficient funds available to sustain operations of any magnitude for any length of time.  The inability to obtain funding under the DIP Facility would immediately and irreparably harm the Debtors, their estates and their creditors, and irreparably damage the Debtors' prospects for a successful reorganization or sale of their assets as a going concern or otherwise.

(ii)    **No Credit Available on More Favorable Terms**.  The Debtors are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  Given their current financial condition, financing arrangements and capital structure, the Debtors are unable to obtain secured credit pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code on more favorable terms and conditions than those provided in the DIP Financing Documents and this Interim Order.  Financing on a postpetition basis is not otherwise available without granting to the DIP Agent, for the benefit of itself and the DIP Lenders, (a) valid and perfected security interests in and liens on all of the Debtors'

10

existing and after acquired assets with the priorities set forth in this Interim Order, (b) superpriority claims with the priorities set forth in this Interim Order, and (c) the other protections, rights and remedies set forth in the DIP Financing Documents and this Interim Order.

G.    **Use of Proceeds of the DIP Facility**.  Proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses under the DIP Financing Documents) shall be used in a manner consistent with and subject to the terms and conditions of the DIP Financing Documents, and in compliance with the DIP Budget and the limitations set forth in this Interim Order, solely for the purposes set forth in the DIP Financing Documents including to pay or fund (i) certain costs, fees and expenses related to the Chapter 11 Cases; (ii) the repayment of the Prepetition ABL Obligations; (iii) the cash collateralization of certain letters of credit as approved by the DIP Agent and the Required Lenders (as such term is defined in the DIP Credit Agreement) from time to time in their sole discretion (the escrow account or accounts in which such cash collateralization is maintained is hereinafter referred to as the "Postpetition LC Account"); (iv) the cash collateralization of certain outstanding letters of credit issued pursuant to the Prepetition ABL Credit Agreement on the terms set forth in the DIP Credit Agreement; (v) an escrow account for payments on account of any contingent indemnity obligations under the Prepetition ABL Credit Documents, in an amount not to exceed $350,000; (vi) the cash collateralization of certain cash management obligations owed to Bank of America, N.A., under the Prepetition ABL Credit Documents in an amount not to exceed $250,000; (vii) the cash collateralization of certain cash management obligations owed to Wells Fargo Bank, N.A., under the Prepetition ABL Credit Documents in an amount not to exceed $10,000; (viii) the cash collateralization of certain bank product obligations related to credit cards under the Prepetition

11

ABL Credit Documents in the amount set forth in the DIP Credit Agreement (each of the accounts solely containing the amounts described in the foregoing clauses (iv)-(viii), the "Prepetition ABL Escrow and Reserve Accounts"); (ix) the Carve-Out (as defined below); and (x) the working capital needs of the DIP Loan Parties during the Chapter 11 Cases. Payment of the Prepetition ABL Obligations in accordance with this Interim Order is necessary as the DIP Agent and the DIP Lenders will not otherwise consent to providing the DIP Facility and extending credit to the Debtors thereunder, and the Prepetition ABL Parties will not otherwise consent to the use of their Cash Collateral and other Prepetition Collateral or the subordination of their liens to the Carve-Out. Based on the record of the Interim Hearing, such payment will not prejudice the Debtors or their estates because it appears that the Prepetition ABL Obligations are significantly oversecured and, in any event, such payment is subject to the rights of parties in interest under paragraph 7 of this Interim Order.

      **H.**    **Application of Proceeds of DIP Collateral**. All proceeds of a sale or other disposition of the DIP Collateral (other than proceeds, if any, from the sale or disposition of Term Priority Collateral, to the extent the liens of the Prepetition Term Loan Agent in the Term Priority Collateral are valid, binding, enforceable, non-avoidable and properly perfected) shall be applied to reduce the DIP Obligations pursuant and subject to the provisions of the DIP Credit Agreement. Subject to the DIP Intercreditor Provisions (as defined below), the DIP Secured Parties are permitted to treat all cash, cash equivalents, money, collections and payments received by any DIP Secured Party from any account other than the Pre-Petition Term Loan Proceeds Securities Account (as such term is defined in the DIP Credit Agreement) as DIP Priority Collateral (as defined below), and no such amounts received by any DIP Secured Party or applied to the DIP Obligations shall be subject to disgorgement or deemed to be held in trust

12

for the benefit of the Prepetition Term Loan Parties (and all claims of the Prepetition Term Loan Agent or any other Prepetition Term Loan Party are hereby waived).

**I.**      **Property of the Estate**.  Each item of the DIP Collateral constitutes property of the Debtors' estates.

**J.**      **Adequate Protection for Prepetition Term Loan Lenders**.  The DIP Facility complies with Section 6.1(a) of the Intercreditor Agreement and, therefore, pursuant to such Section 6.1(a), the Prepetition Term Loan Parties are deemed not to object to the DIP Facility or the Debtors' use of Cash Collateral pursuant to the terms of this Interim Order and the DIP Financing Documents on any grounds.  The priming of the Prepetition Term Loan Liens on the ABL Priority Collateral pursuant to section 364(d) of the Bankruptcy Code, as further described below, will enable the Debtors to obtain the DIP Facility, to continue remaining operations and to maximize the value of their assets for the benefit of their estates and creditors.  The Prepetition Term Loan Agent is being provided adequate protection as set forth in this Interim Order, pursuant to sections 361, 363 and 364 of the Bankruptcy Code, for any diminution in the value of its interests in the Prepetition Collateral (including Cash Collateral) resulting from the subordination to the Carve-Out and the DIP Liens (as defined below) on the ABL Priority Collateral, the Debtors' use, sale or lease of such Prepetition Collateral, and the imposition of the automatic stay (collectively, and solely to the extent of any such diminution in value the "Diminution in Value").  Pursuant to Sections 361, 363, 364 and 507(b) of the Bankruptcy Code, as adequate protection to the extent of any Diminution in Value of its interests in the Prepetition Collateral (including Cash Collateral), the Prepetition Term Loan Parties will receive the rights and protections set forth in this Interim Order, including pursuant to paragraph 4 of this Interim Order.

13

**K.**     **Section 506(c) and Section 552(b)**.  In light of the subordination of their liens and superpriority claims to the Carve-Out, the DIP Secured Parties are entitled to (a) all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception shall not apply and (b) subject to the entry of the Final Order, a waiver of the provisions of section 506(c) of the Bankruptcy Code.

**L.**     **Extension of Financing**.  The DIP Secured Parties have indicated a willingness to provide financing to the Debtors in accordance with the DIP Credit Agreement and subject to (i) the entry of this Interim Order and a Final Order, (ii) the satisfaction of all conditions to borrowing set forth in the DIP Financing Documents, and (iii) findings by the Court that such financing is essential to the Debtors' estates, that the DIP Secured Parties are good faith financiers, and that the superpriority claims, security interests and liens and other protections granted to DIP Secured Parties pursuant to this Interim Order and the DIP Facility will not be affected by any subsequent reversal or modification of this Interim Order or the Final Order unless the Interim Order and/or the Final Order were stayed pending appeal, as provided in section 364(e) of the Bankruptcy Code.

**M.**     **Business Judgment and Good Faith Pursuant to Section 364(e)**.  (i) The terms and conditions of the DIP Facility and the DIP Credit Agreement, and the fees paid and to be paid thereunder, are fair, reasonable, and the best available under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration; (ii) the DIP Facility was negotiated in good faith and at arms' length between the Debtors and the DIP Secured Parties, (iii) use of the proceeds to be extended under the DIP Facility will be so extended in good faith, and for valid business purposes and uses, as a consequence of which the DIP Secured Parties are entitled

14

to the protection and benefits of section 364(e) of the Bankruptcy Code; and (iv) the DIP Secured Parties are hereby found to be acting in good faith within the meaning of section 364(e) of the Bankruptcy Code in entering into and consummating the DIP Facility contemplated herein and in the DIP Credit Agreement after the entry of this Interim Order.

N.      **Relief Essential; Best Interest; Good Cause**.  The relief requested in the Motion is necessary, essential, and appropriate for continued operations, and for the management, maintenance and preservation of the Debtors' assets and property as it will, among other things, provide the Debtors with the necessary liquidity to (i) minimize disruption to their on-going operations while the Debtors pursue their restructuring goals; (ii) preserve and maximize the value of their estates for the benefit of all creditors; and (iii) avoid immediate irreparable harm to the Debtors, their creditors, their businesses, their employees, and their estates.  It is in the best interest of the Debtors' estates for the Debtors to be allowed to establish the DIP Facility contemplated by the DIP Credit Agreement and to grant the other relief set forth herein.  Good cause has been shown for the relief requested in the Motion and as granted in this Interim Order.

O.      **Final Hearing**.  At the Final Hearing, the Debtors will seek final approval of the proposed DIP Facility and use of Cash Collateral pursuant to a proposed Final Order, which shall be in form and substance acceptable to the DIP Agent and the Required Lenders in their sole and absolute discretion.  Notice of the Final Hearing will be provided in accordance with this Interim Order.

P.      **Entry of Interim Order**.  For the reasons stated above, the Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

Based upon the foregoing findings and conclusions, and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

15

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED:**

1.      **Motion Granted**.    The Motion is hereby granted, on an interim basis, in accordance with the terms and conditions set forth in this Interim Order, the DIP Credit Agreement and the other DIP Financing Documents.

2.      **DIP Facility Authorization**.

        (a)    **Approval of Entry Into DIP Financing Documents**.    The Debtors are expressly and immediately authorized, empowered and directed to execute and deliver the DIP Financing Documents and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Financing Documents, and to execute and deliver all guarantees, instruments and other documents which may be required or necessary for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens described in and provided for by this Interim Order and the DIP Financing Documents. The Debtors are hereby authorized and directed to do and perform all acts, pay and guarantee to pay, as applicable, the principal, interest, fees, expenses and other amounts described in the DIP Financing Documents as such become due, including, as applicable, all commitment fees, underwriting fees, unused facility fees, agency fees and other fees and disbursements (including, without limitation, reasonable attorneys' fees and disbursements) as provided for in the DIP Financing Documents, which amounts (i) shall not be subject to or require further approval of this Court, and (ii) shall not be subject to compliance with the guidelines promulgated by the United States Trustee, and no recipient of such payments shall be required to file any interim or final fee application with respect thereto.  All collections and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations or otherwise, will be deposited and applied as required by this Interim Order and DIP Financing Documents.  Upon execution and delivery, the DIP Financing Documents shall represent valid

16

and binding obligations of the Debtors enforceable against the Debtors in accordance with their terms.

(b)   **Authorization to Borrow**.  To enable the Debtors to continue to operate their businesses during the Interim Period, and subject to the terms, conditions, limitations on availability and reserves set forth in the DIP Credit Agreement, the other DIP Financing Documents, the DIP Budget and this Interim Order, the DIP Loan Parties are hereby authorized to borrow or guarantee, as applicable, on an interim basis up to (i) $55,000,000 at any time outstanding of "Revolving Credit Loans" as described in Section 2-1(a) of the DIP Credit Agreement, and (ii) $45,000,000 of "Term Loans" as described in Section 2-2(a) of the DIP Credit Agreement.

(c)   **DIP Budget**.  All borrowing under the DIP Facility and all use of Cash Collateral shall be in compliance with the DIP Budget[4] (as such term is defined in the DIP Credit Agreement), a summary schedule of which is annexed hereto as **Exhibit A** (as the same may be modified from time to time consistent with and subject to the terms of the DIP Credit Agreement, and with the consent of the DIP Agent and the Required Lenders), and the Debtors shall not use any portion of the proceeds of the DIP Facility, directly or indirectly, in excess of the amounts set forth in the DIP Budget, except (and to the extent of) any variance permitted under the DIP Credit Agreement.  The DIP Budget may be updated and amended (with the consent and/or at the request of the DIP Agent and the Required Lenders) from time to time in accordance with the DIP Credit Agreement, provided that such updated or amended DIP Budget shall be in form and substance acceptable to the DIP Agent and the Required Lenders, and the

---

[4] Any reference contained herein to compliance with the DIP Budget shall include any permitted variance permitted by Section 5-14 of the DIP Credit Agreement.

56101252v1

Debtors shall be required always to comply with the DIP Budget and the DIP Credit Agreement. Notwithstanding any "first day" or subsequent orders entered by the Court authorizing the Debtors to pay any prepetition or other claims and expenses, all such payments shall be made only to the extent they are in compliance with the DIP Budget.

(d)    **Use of Cash Collateral and DIP Proceeds and Collections**.    Cash Collateral and the proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses under the DIP Credit Agreement) shall be used, in each case in a manner consistent with and subject to the terms and conditions of the DIP Financing Documents, and in compliance with the DIP Budget and the limitations set forth in this Interim Order, solely for the purposes set forth in the DIP Financing Documents including to pay or fund (i) certain costs, fees and expenses related to the Chapter 11 Cases; (ii) the repayment of the Prepetition ABL Obligations; (iii) the cash collateralization of certain letters of credit as approved by the DIP Agent and the Required Lenders from time to time in their sole discretion into the Postpetition LC Account; (iv) the Prepetition ABL Escrow and Reserve Accounts on the terms set forth in the DIP Credit Agreement; (v) the Carve-Out; and (vi) the working capital needs of the DIP Loan Parties during the Chapter 11 Cases.  Any and all collections and payments received by the DIP Agent, and all other proceeds of the DIP Collateral (other than proceeds, if any, from the sale or disposition of Term Priority Collateral, to the extent the liens of the Prepetition Term Loan Agent in the Term Priority Collateral are valid, binding, enforceable, non-avoidable and properly perfected), shall be applied to reduce the DIP Obligations pursuant and subject to the provisions of the DIP Credit Agreement.  Subject to the DIP Intercreditor Provisions, the DIP Secured Parties are permitted to treat all cash, cash equivalents, money, collections and payments received by any DIP Secured Party from any account other than the Pre-Petition Term Loan Proceeds Securities Account (as

18

such term is defined in the DIP Credit Agreement) as DIP Priority Collateral, and no such amounts received by any DIP Secured Party or applied to the DIP Obligations shall be subject to disgorgement or  deemed to be held in trust for the benefit of the Prepetition Term Loan Parties (and all claims of the Prepetition Term Loan Agent or any other Prepetition Term Loan Party are hereby waived).

(e)    **Repayment of Prepetition ABL Obligations.**    Upon the occurrence of the Effective Date (as such term is defined in the DIP Credit Agreement), the Borrower shall use the proceeds of the DIP Facility to pay in full all outstanding Prepetition ABL Obligations, including to cash collateralize all outstanding letters of credit issued under the Prepetition ABL Credit Documents and to fund the Prepetition ABL Escrow and Reserve Accounts in favor of the Prepetition ABL Parties, all in accordance with the terms, conditions, and procedures set forth in the DIP Credit Agreement.

(f)    **Conditions Precedent**.    The DIP Secured Parties shall have no obligation to make any loan or advance under the DIP Credit Agreement during the Interim Period unless the conditions precedent to the making of such loan under the DIP Credit Agreement and this Interim Order have been satisfied in full or waived by the DIP Secured Parties in their sole discretion.

(g)    **DIP Liens and DIP Collateral**.    Effective immediately upon the execution of this Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code, the DIP Agent, for the benefit of itself and the DIP Lenders, is hereby granted continuing, valid, binding, enforceable, non-avoidable and automatically and properly perfected postpetition liens on and security interests in (collectively, the "DIP Liens") any and all presently owned and hereafter acquired property and assets of the Debtors, whether

19

real or personal, tangible or intangible, and wherever located (including, without limitation, all proceeds of insurance policies of the Debtors), and all proceeds, products, offspring, rents, proceeds of interests in leaseholds and profits thereof, and including, without limitation, the following (all collateral described in this paragraph 2(g), collectively, the "DIP Collateral"):  (i) all Prepetition Collateral, and (ii) all Collateral (as defined in the DIP Credit Agreement); provided, however, that the DIP Liens shall not attach to (x) the Postpetition LC Account or to the Prepetition ABL Escrow and Reserve Accounts but shall attach to any residual interest of the Debtors in the funds maintained in such Postpetition LC Account and/or Prepetition ABL Escrow and Reserve Accounts as and when funds in such accounts are released from escrow and returned to the Debtors; and (y) claims and causes of action of the Debtors and their estates under Chapter 5 of the Bankruptcy Code (the "Avoidance Actions") and proceeds thereof. Notwithstanding the foregoing, Excluded Assets (as defined in the DIP Credit Agreement) shall not constitute DIP Collateral or be subject to the DIP Liens.  The DIP Liens shall have the priority set forth in paragraph 2(j) below.

(h)    **Account Control Agreements**.  The Debtors are authorized and directed to deliver to the DIP Agent deposit account control agreements, as and to the extent required by the DIP Financing Documents, duly executed by such parties as are reasonably required by the DIP Secured Parties, and in each case, in form and substance acceptable to the DIP Agent. Notwithstanding the foregoing, to the extent any deposit account control agreements exist for the benefit of the Prepetition ABL Parties (each such agreement, a "Prepetition ABL DACA"), upon the repayment of the Prepetition ABL Obligations pursuant to this Interim Order, the DIP Agent shall be deemed substituted for the Prepetition ABL Agent in any such Prepetition ABL DACA, and such Prepetition ABL DACA shall continue in full force and effect for the benefit of the DIP

20

Secured Parties and any and all non-Debtor counterparties thereto shall continue to honor such agreements.

(i)     **DIP Lien Priority**.  The DIP Liens securing the DIP Obligations shall be senior in priority and superior to any security, mortgage, collateral interest, lien or claim on or to any of the DIP Collateral (all DIP Collateral that is subject to senior priority and superior DIP Liens, the "DIP Priority Collateral"), junior only to (a) the Carve-Out; (b) the Prepetition Term Loan Liens in the Term Priority Collateral securing the Term Priority Obligations, to the extent that such Prepetition Term Loan Liens are valid, binding, enforceable, non-avoidable and properly perfected; and (c) any other valid, perfected, enforceable and non-avoidable liens existing as of the Petition Date that are senior to the Prepetition ABL Liens (any such other liens, the "Other Prepetition Senior Liens").  Other than as expressly set forth herein, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest by any order heretofore or hereafter entered in the Chapter 11 Cases and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (any "Successor Cases"), and/or upon the dismissal of the Chapter 11 Cases or any Successor Cases.  The DIP Liens shall not be subject to sections 506(c) (subject to entry of the Final Order), 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of any estate pursuant to section 551 of the Bankruptcy Code shall be made *pari passu* with or senior to the DIP Liens.

(j)     **DIP Superpriority Administrative Claim**.  Subject to the Carve-Out, all DIP Obligations shall be an allowed superpriority administrative expense claim (the "DIP Superpriority Claim" and, together with the DIP Liens, the "DIP Protections") with priority in

21

the Chapter 11 Cases and any Successor Cases, under sections 364(c)(1), 503, and 507 of the Bankruptcy Code and otherwise, over any and all administrative expense claims of the kinds specified in, arising, or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546, 726, 1113, 1114, or any other provision of the Bankruptcy Code, and, if approved in the Final Order, section 506(c) of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment. Other than the Carve-Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these Chapter 11 Cases, or in any Successor Cases, and no priority claims are, or will be, senior to, prior to or on a parity with the DIP Superpriority Claim. The DIP Superpriority Claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including, without limitation, and after entry of a Final Order, all Avoidance Actions and all proceeds thereof.

(k)     **Enforceable Obligations**. The DIP Financing Documents shall constitute and evidence the valid and binding obligations of the Debtors, which obligations shall be enforceable in accordance with their terms against the Debtors, their creditors, their estates and any successors thereto (including without limitation, any trustee appointed in the Chapter 11 Cases or in any Successor Cases).

(l)     **Protection of DIP Secured Parties and Other Rights**. From and after the Petition Date, the Debtors shall use the proceeds of the extensions of credit under the DIP Facility only for the purposes specifically set forth in the DIP Credit Agreement and (until entry of the Final Order) this Interim Order and in compliance with the DIP Budget.

22

(m)  **Intercreditor Provisions**.  The respective rights of the DIP Secured Parties and the Prepetition Term Lender Secured Parties (including, without limitation, with respect to the DIP Liens, the Prepetition Term Loan Liens, and the Adequate Protection Liens (as defined below)) in all respects shall be subject to the terms and provisions set forth on **Exhibit C** attached hereto (the "DIP Intercreditor Provisions"),[5] which DIP Intercreditor Provisions are hereby incorporated into and form a part of this Interim Order, and are approved in their entirety, and shall be binding on and inure to the benefit of the DIP Secured Parties and the Prepetition Secured Parties.

3.  **Authorization to Use Cash Collateral**.  During the Interim Period and subject to the terms and conditions of this Interim Order and the DIP Financing Documents, and in compliance with the DIP Budget, the Debtors are authorized to use Cash Collateral until the earliest to occur of (a) the Repayment in Full of DIP Obligations (as defined herein), and (b) the date such right to use Cash Collateral otherwise terminates as provided in this Interim Order (unless otherwise consented to in writing by the DIP Agent in its sole discretion).  Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or the Debtors' use of Cash Collateral or other proceeds resulting therefrom, except as expressly permitted in this Interim Order, the DIP Financing Documents, and in compliance with the DIP Budget.

4.  **Adequate Protection**.

(a)  **Adequate Protection Liens**.  Pursuant to sections 361, 363(e), and 364(d) of the Bankruptcy Code, but only to the extent that the Prepetition Term Loan Liens are valid,

---

[5] To the extent there are any inconsistencies between this Interim Order and the DIP Intercreditor Provisions, the provisions of this Interim Order shall control.

23

56101252v1

binding, enforceable, non-avoidable and properly perfected, as adequate protection for the interests of the Prepetition Term Loan Parties in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the Debtors hereby grant to the Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Lenders, continuing, valid, binding, enforceable, and automatically perfected postpetition security interests in and liens on the DIP Collateral and the proceeds thereof (the "Adequate Protection Liens").

(b)    **Priority of Adequate Protection Liens**.  In accordance with the terms of this Interim Order, the Adequate Protection Liens shall be junior only to:

(1)    with regard to the Term Priority Collateral securing the Term Priority Obligations, (i) the Carve-Out, (ii) the Prepetition Term Loan Liens; and (iii) any Other Prepetition Senior Liens; and

(2)    with regard to all other DIP Collateral other than the Term Priority Collateral securing the Term Priority Obligations, (i) the Carve-Out; (ii) the DIP Liens; and (iii) any Other Prepetition Senior Liens.

The Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral.

(c)    **Adequate Protection Superpriority Claims**.  To the extent that the Prepetition Term Loan Liens are valid, binding, enforceable, non-avoidable and properly perfected, as further adequate protection against any Diminution in Value of the Prepetition Term Loan Parties in the Prepetition Collateral, the Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Lenders, is hereby granted, as and to the extent provided

24

by sections 503(b) and 507(b) of the Bankruptcy Code, a separate allowed superpriority administrative expense claim in the Chapter 11 Cases and any Successor Cases (the foregoing superpriority claims shall be referred to as the "Adequate Protection Superpriority Claims"); provided, that, the Adequate Protection Superpriority Claims shall attach to Avoidance Actions only after entry of the Final Order.  Except with respect to the (i) DIP Liens, (ii) DIP Superpriority Claim, and (iii) Carve-Out, the Adequate Protection Superpriority Claims (x) shall have priority in these Chapter 11 Cases under sections 105, 364(c)(1), 503(b), and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature of the kinds specified in or ordered pursuant to sections 503(b) or 507(b) of the Bankruptcy Code, and, if approved in the Final Order, section 506(c) of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, and (y) no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these Chapter 11 Cases, or in any Successor Cases, and no priority claims are, or will be, senior to, prior to or on a parity with the Adequate Protection Superpriority Claims.

(d)      **Section 507(b) Reservation**.  Nothing herein shall impair or modify the Prepetition Term Loan Parties' rights under section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Term Loan Parties hereunder is insufficient to compensate for any Diminution in Value of its interests in the Prepetition Collateral during these Chapter 11 Cases or any Successor Cases, provided, however, that any section 507(b) claim granted in these Chapter 11 Cases or any Successor Case to the Prepetition

25

Term Loan Parties shall be junior in the right of payment to all DIP Obligations and subject to the Carve-Out.

5. **Right to Credit Bid**. The DIP Agent, on behalf of itself and the DIP Lenders, shall have the right to credit bid the amount of all accrued DIP Obligations during any sale of the DIP Collateral (which credit bid rights under section 363(k) of the Bankruptcy Code or otherwise shall not be impaired in any manner), including without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any reorganization plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code or otherwise.

6. **Perfection of DIP Liens and Adequate Protection Liens**.

   (a) **No Filings Necessary to Perfect.** All security interests, liens, mortgages, deeds of trust and other interests and rights granted by the Debtors in favor of (i) the DIP Secured Parties pursuant to this Interim Order and the DIP Financing Documents, and (ii) the Prepetition Term Loan Parties pursuant to this Interim Order, shall be valid, binding, enforceable and automatically perfected. This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens and the Adequate Protection Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement or mortgage agreement) to validate or perfect the DIP Liens  and the Adequate Protection Liens or to entitle the DIP Liens and the Adequate Protection Liens to the priorities granted in this Interim Order.  Notwithstanding the foregoing, the DIP Agent and the Prepetition Term Loan Agent may, each in their sole discretion, file such financing statements, mortgages, notices of liens and other similar documents to perfect in accordance with applicable

26

non-bankruptcy law or to otherwise evidence the applicable DIP Liens or Adequate Protection

Liens, and are hereby granted relief from the automatic stay of section 362 of the Bankruptcy

Code solely in order to do so, and all such financing statements, mortgages, notices and other

documents shall be deemed to have been filed or recorded as of the Petition Date.  Upon the

repayment of the Prepetition ABL Obligations pursuant to this Interim Order, the DIP Agent

shall, in addition to the rights granted to it under the DIP Financing Documents (and without

altering, waiving, or limiting the obligations of the Debtors under the DIP Financing

Documents), be deemed to be the successor in interest to the Prepetition ABL Parties with

respect to all prepetition collateral access agreements, landlord's waivers and all other

agreements with third parties relating to, or waiving claims against, any Prepetition Collateral,

including without limitation, each collateral access agreement and/or landlord's waiver duly

executed and delivered by any landlord of the Debtors and including, for the avoidance of doubt,

all account control agreements, and any and all non-Debtor counterparties to any of the

foregoing agreements shall continue to honor such agreements.

    (b) **Debtors' Cooperation With Perfection Filings**.  The Debtors shall

execute and deliver to the DIP Agent and the Prepetition Term Loan Agent all such financing

statements, mortgages, notices and other documents as such parties may reasonably request to

evidence, confirm, validate or perfect, or to insure the contemplated priority of, the DIP Liens

and the Adequate Protection Liens.  The DIP Agent and the Prepetition Term Loan Agent, in

their respective sole discretion, may file a photocopy of this Interim Order as a financing

statement with any recording officer designated to file financing statements or with any registry

of deeds or similar office in any jurisdiction in which any Debtor has real or personal property,

and in such event, the recording officer shall be authorized to file or record such copy of this

Interim Order.

(c)   **Release of Prepetition ABL Liens**.   Upon the repayment of the Prepetition ABL Obligations pursuant to this Interim Order, (a) the Prepetition ABL Agent shall execute and deliver to the DIP Agent all documents needed to terminate any and all financing statements, mortgages, notices and other documents evidencing the Prepetition ABL Liens; and (b) the DIP Agent is authorized to file, register, or otherwise record a photocopy of this Interim Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Prepetition ABL Liens on the Prepetition Collateral.

7.   **Reservation of Certain Third Party Rights and Bar of Challenges and Claims**.   Nothing in this Interim Order or the DIP Financing Documents shall prejudice the rights of any Committee or any other party in interest, in each case solely to the extent the Committee or such other parties in interest have been granted standing, to seek, solely in accordance with this paragraph 7, to assert claims against the Prepetition ABL Parties on behalf of the Debtors, their creditors or interest holders or to otherwise challenge any of the Debtors' Prepetition Secured Lien Stipulations.   The Committee or such parties in interest, (i) in each case solely to the extent they have been granted standing at such time, must commence a contested matter or adversary proceeding, or (ii) if they have not been granted any such standing, must file a motion for approval to commence and prosecute an adversary proceeding or contested matter (with a draft complaint attached thereto), raising such objection or challenge, including without limitation, asserting any claim against any Prepetition Secured Party in the nature of a setoff, counterclaim or defense to, as applicable, the Prepetition Secured Obligations (including but not limited to, those under sections 506, 544, 547, 548, 549, 550 and/or 552 of the Bankruptcy Code or by way of suit against the Prepetition Secured Party), within (a) in the case of the Committee

28

and any other party in interest, 60 days following the entry of the Final Order, or (b) such later date consented to in writing by the applicable Prepetition Secured Party in its sole discretion (the "Challenge Period").  The date that is the next calendar day after the termination of the Challenge Period, in the event that no objection or challenge is raised during the Challenge Period, shall be referred to as the "Challenge Period Termination Date."  Upon the Challenge Period Termination Date, any and all such challenges, claims, causes of action and objections by any party (including, without limitation, the Committee, any chapter 11 or chapter 7 trustee appointed herein or in any Successor Cases, and any other party in interest) shall be deemed to be forever waived and barred, and the Prepetition ABL Obligations shall be deemed to be allowed in full as secured claims within the meaning of section 506 of the Bankruptcy Code for all purposes in connection with these Chapter 11 Cases or any Successor Cases, and the Debtors' Prepetition Secured Lien Stipulations shall be binding on all creditors, interest holders and parties in interest (including, without limitation, the Committee, any chapter 11 or chapter 7 trustee appointed herein or in any Successor Cases).  For the avoidance of doubt, no challenge commenced against any Prepetition ABL Party or any relief granted pursuant to any such challenge, shall in any manner impact, impair or alter the validity, priority or enforceability of the DIP Protections or any rights, claims, benefits and entitlements granted to the DIP Secured Parties pursuant to this Interim Order or the DIP Financing Documents.

8.  **Carve-Out Provisions.**

(a)  **Carve-Out.**  All liens and claims granted by this Interim Order shall be subject to the Carve-Out.  As used in this Interim Order and the DIP Financing Documents, the "Carve-Out" shall mean:

29

(i) quarterly fees required to be paid to the United States Trustee pursuant to 28 U.S.C. §1930(a)(6) and any fees payable to the clerk of the Bankruptcy Court;

(ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an aggregate amount not to exceed $25,000;

(iii) all accrued and unpaid claims for fees and expense reimbursements of Case Professionals (as defined below) retained by the Debtors (but not any success or transaction fees) incurred during the period prior to the Carve-Out Trigger Date (as defined below), subject to such accrued and unpaid fees and expense reimbursements becoming Allowed Fees (as defined below);

(iv) with respect to Case Professionals retained by the Committee, if any, all accrued and unpaid claims for fees and expense reimbursements of such Case Professionals incurred prior to the Carve-Out Trigger Date but not to exceed the amounts for such Case Professionals set forth in the DIP Budget for such period, subject to such accrued and unpaid fees and expense reimbursements becoming Allowed Fees; and

(v) an aggregate amount for unpaid fees and expense reimbursements of all Case Professionals incurred after the Carve-Out Trigger Date not to exceed $2,000,000 (the "Professionals Expense Cap"), subject to such fees and expense reimbursements becoming Allowed Fees; provided, however, that any payments actually made to fund unpaid fees and expenses of Case Professionals incurred on or after the Carve-Out Trigger Date shall reduce the Professionals Expense Cap on a dollar for dollar basis.

The Professionals Expense Cap shall be automatically reduced, on a dollar for dollar basis, by

30

(i) the amount of any unused retainers held by Case Professionals on the Carve-Out Trigger

Date and (ii) the amount by which Estimated Professional Fee Escrow Deposits (as defined

below) exceeds the actual amount of fees and expenses incurred by Case Professionals in the

period prior to the Carve-Out Trigger Date.  Any unused retainers held by Case Professionals

on the Petition Date shall be used to pay any Allowed Fees of such Case Professionals before

any payment of such Allowed Fees are made from the Carve-Out Account (as defined below)

or otherwise from the DIP Facility or DIP Collateral.  As used herein, the terms: (i) "Allowed

Fees" shall mean fees and expense reimbursement of Case Professionals solely to the extent

such fees and expenses have been approved, on a final basis, by an order of this Court that has

not been vacated or stayed; (ii) "Case Professionals" shall mean attorneys, accountants,

financial advisors, consultants and other professionals employed, pursuant to sections 327, 328

or 1103 of the Bankruptcy Code, as applicable, by the Debtors or any Committee; and (iii)

"Carve-Out Trigger Date" shall mean the first business day after the DIP Agent provides notice

(the "Carve-Out Trigger Notice") to the Debtors of the occurrence of an Event of Default.  The

Carve-Out and any payments made in respect of the Carve-Out shall not reduce (but shall be

added to and made a part of)  the DIP Obligations, and shall be otherwise entitled to the

protections granted under this Interim Order, the DIP Financing Documents, the Bankruptcy

Code and applicable law.

(b)   **No Direct Payment Obligation.**   Without limiting (and solely to the

extent of) its obligations to fund the Carve-Out, the DIP Secured Parties shall not be

responsible for (i) the direct payment or reimbursement of any fees or disbursements of Case

Professionals incurred in connection with the Chapter 11 Cases, any Successor Cases or

otherwise, or (ii) the administration and maintenance of the Carve-Out Account or the

31

disbursement of funds from the Carve-Out Account to pay Case Professionals.  Nothing in this Interim Order or otherwise shall be construed:  (i) to obligate the DIP Secured Parties in any way to pay compensation to or to reimburse expenses of any Case Professional, or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement; or (ii) to increase the Carve-Out if Allowed Fees are higher in fact than the amounts subject to the Carve-Out as set forth in this Interim Order.

(c)  **Carve-Out Account**.  (i) Within one business day following the entry of this Interim Order and continuing until the Carve-Out Trigger Date, the Debtors shall draw upon the DIP Facility and deposit into an interest-bearing escrow account at a financial institution acceptable to the DIP Agent (the "Carve-Out Account") an amount equal to the sum of (x) 120% of the fees and expense reimbursements for Case Professionals budgeted for the first week set forth in the DIP Budget, plus (y) $2,000,000 (*i.e.*, an amount equal to the maximum Professionals Expense Cap), and (ii) thereafter, on each subsequent Friday (or if such day is not a business day, then the next business day), the Debtors shall deposit into the Carve-Out Account an amount equal to 120% of the aggregate fees and expense reimbursements for Case Professionals for the next upcoming unfunded week set forth in the DIP Budget (all amounts deposited into the Carve-Out Account pursuant to clauses (i) and (ii), hereinafter the "Estimated Professional Fee Escrow Deposits").  All Allowed Fees for periods in which amounts were deposited into the Carve-Out Account shall be paid to the applicable Case Professional from the Carve-Out Account in accordance with the order or orders of the Court allowing such Allowed Fees; provided, however, that the $2,000,000 deposited pursuant to subsection (i)(y) above shall not be used to pay any fees or expense reimbursements incurred prior to the Carve-Out Trigger Date, and such deposited amount shall be deemed segregated in

32

a sub-account separate from the other Estimated Professional Fee Escrow Deposits.  The

Carve-Out Account and the proceeds on deposit in the Carve-Out Account shall be available

and used only to satisfy obligations of Case Professionals benefitting from the Carve-Out.  The

DIP Agent and the DIP Lenders shall retain automatically perfected and continuing first

priority security interests in any residual interest in the Carve-Out Account available following

satisfaction in full of all obligations benefiting from the Carve-Out (the "<u>Residual Carve-Out</u>

<u>Amount</u>").  The Debtors will provide, on every other Wednesday commencing on the third

Wednesday following the Petition Date, (x) a bi-weekly accounting to the DIP Agent of all

deposits to and disbursements from the Carve-Out Account (together with copies of all current

bank statements relating to the Carve-Out Account); and (y) a bi-weekly summary of all fees

and expense reimbursements of all Case Professionals actually accrued for the two week period

ended (and on a cumulative basis since the Petition Date) the Saturday ten days prior to such

date, together with a variance report comparing such fees and expense reimbursements to the

DIP Budget.  Promptly (but in no event later than 5 business days) following the satisfaction in

full of all obligations benefiting from the Carve-Out, the Debtor (or, if applicable, the trustee in

any Successor Case), is hereby authorized and directed to deliver the Residual Carve-Out

Amount, if any, to the DIP Agent for application to the DIP Obligations, if any.

(d)    <u>**No Waiver of Right to Object to Fees; Payment of Compensation**</u>.

Nothing in this Interim Order shall be construed as consent to the allowance of any fees or

expense reimbursements of any Case Professionals or shall affect the right of the DIP Secured

Parties to object to the allowance and payment of such fees and expense reimbursements or to

permit the Debtors to pay any such amounts not set forth in the DIP Budget.

33

9.      **Limitations on Use of DIP Facility, DIP Collateral, Cash Collateral, and Carve-Out**.  The DIP Facility, DIP Collateral, Cash Collateral and Carve-Out may not be used: (a) in connection with or to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type (i) adverse to the interests of DIP Agent, DIP Lenders, or the Prepetition ABL Parties, or their respective rights and remedies under the DIP Financing Documents, the Prepetition ABL Credit Documents or this Interim Order, as applicable, including, without limitation, for the payment of any services rendered by professionals retained by the Debtors or any Committee in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration or similar relief, (ii) invalidating, setting aside, avoiding or subordinating, in whole or in part, the DIP Obligations or the Prepetition ABL Obligations, (iii) for monetary, injunctive or other affirmative relief against any DIP Agent, DIP Lender, or Prepetition ABL Party, or their respective collateral, or (iv) preventing, hindering or otherwise delaying the exercise by the DIP Agent or the DIP Lenders of any rights and/or remedies under this Interim Order, the DIP Financing Documents, or applicable law, or the enforcement or realization (whether by foreclosure, credit bid, further order of the Court or otherwise) by the DIP Agent or the DIP Lenders upon any of the DIP Collateral; (b) to make any distribution under a plan of reorganization in any of the Chapter 11 Cases; (c) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the DIP Agent and the Required Lenders; (d) to pay any fees or similar amounts to any person who has proposed or may propose to purchase interests in the Debtors without the prior written consent of the DIP Agent and the

34

Required Lenders; (e) to object to, contest, or interfere with in any way the DIP Agent's or any DIP Lender's enforcement or realization upon any of the DIP Collateral once an Event of Default has occurred; (f) to use or seek to use Cash Collateral or to sell or otherwise dispose of DIP Collateral without the consent of the DIP Agent and the Required Lenders; (g) to object to or challenge in any way the claims, liens, or interests (including interests in the Prepetition Collateral or DIP Collateral) held by or on behalf of the DIP Agent, the DIP Lenders, or the Prepetition ABL Parties; (h) to assert, commence or prosecute any claims or causes of action whatsoever, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against the DIP Agent, DIP Lenders, or the Prepetition ABL Parties; (i) to prosecute an objection to, contest in any manner, or raise any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the Prepetition ABL Obligations, Prepetition ABL Liens, DIP Obligations or DIP Liens or any other rights or interests of the Prepetition ABL Parties, the DIP Agent or DIP Lenders; (j) to seek the modification, stay, or amendment of this Interim Order or any of the DIP Financing Documents; (k) to prevent, hinder or otherwise delay the exercise by the DIP Agent, DIP Lenders or the Prepetition ABL Parties of any rights and remedies granted under this Interim Order; or (l) to distribute or contribute to, or otherwise use for payments or liabilities of, for or on behalf of, directly or indirectly, any subsidiary of the Borrower that is not a DIP Loan Party other than in accordance with the DIP Budget.  Notwithstanding the foregoing, an aggregate amount not to exceed $35,000 of the DIP Facility (subject to the entry of the Final Order), the DIP Collateral, Cash Collateral and Carve-Out may be used by any Committee to investigate the Prepetition Secured Liens within the Challenge Period.

10.     **Additional Covenants and DIP Protections**:  Without in any manner limiting the terms or requirements of the DIP Financing Documents or this Interim Order:

35

(a)      the Debtors shall convene on the Tuesday immediately after the Petition Date, and during each week thereafter (at a designated time mutually acceptable to the Debtors and the DIP Agent) a telephonic conference call or calls (or, if requested by the DIP Agent, an in person meeting or meetings) among members of management of the Debtors, and representatives of the DIP Agent for the purpose of discussing (i) the Debtors' weekly results, (ii) any other matter relating to or bearing upon the financial and operational performance of the Debtors, or their actual and anticipated collections, and (iii) such other matters as shall be requested by the DIP Agent;

(b)      without in any manner altering the Debtors' obligations under the DIP Financing Documents, the Debtors shall not propose, file, support or pursue confirmation of a chapter 11 plan unless such plan provides for the Repayment in Full of DIP Obligations; and

(c)      the Debtors shall comply with the milestones (the "Milestones") set forth in **Exhibit B** attached hereto; provided, however, that any such Milestones may be extended without further order of the Court upon the prior written consent of the DIP Agent and the Required Lenders in their sole and absolute discretion.

11.      **Section 506(c) Claims**.  Nothing contained in this Interim Order or the DIP Financing Documents shall be deemed a consent by the DIP Secured Parties to any charge, security interest, lien, assessment or claim against the DIP Collateral under section 506(c) of the Bankruptcy Code or otherwise.  Subject to entry of the Final Order, the Debtors hereby waive any right they may have to seek to impose any charge, security interest, lien, assessment or claim against the DIP Secured Parties' interests in the DIP Collateral under section 506(c) of the Bankruptcy Code or otherwise.  Upon entry of the Final Order, and except with respect to the Carve-Out, no costs or expenses of administration which have been or may be incurred in the

36

Chapter 11 Cases or any Successor Cases at any time shall be charged against the DIP Secured Parties, their claims, or DIP Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the DIP Agent and the Required Lenders, and no such consent shall be implied from any other action, inaction or acquiescence by the DIP Agent or the Required Lenders.

12.    **Collateral Rights**.    Unless the DIP Agent and the Required Lenders have provided their prior written consent or (i) all DIP Obligations have been indefeasibly paid in full in cash (or will be paid in full in cash upon entry of an order approving indebtedness described in subparagraph (a) below), (ii) all commitments to lend have terminated, and (iii) all indemnity obligations under the DIP Credit Agreement have been cash collateralized (the actions set forth in clauses (i), (ii) and (iii), collectively, "Repayment in Full of DIP Obligations"), there shall not be entered in these Chapter 11 Cases, or in any Successor Cases, any order which authorizes any of the following:

(a)    the obtaining of credit or the incurring of indebtedness, pursuant to sections 364(c) or 364(d) of the Bankruptcy Code, that is secured by a security, mortgage, or collateral interest or other lien on all or any portion of the DIP Collateral and/or entitled to priority administrative status which is equal or senior to those granted to the DIP Secured Parties; or

(b)    relief from stay by any person holding or asserting liens junior to the liens of the DIP Secured Parties on all or any portion of the DIP Collateral; or

(c)    the Debtors' return of goods constituting DIP Collateral pursuant to section 546(h) of the Bankruptcy Code.

37

13.     **Disposition of Collateral**.  The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, without the prior written consent of the DIP Agent and the Required Lenders (and no such consent shall be implied, from any other action, inaction or acquiescence by the DIP Agent or the Required Lenders, or an order of this Court), except: (i) for sales of the Debtors' inventory in the ordinary course of business and otherwise in compliance with the DIP Credit Agreement, (ii) as otherwise provided for in the DIP Credit Agreement and this Interim Order, or (iii) as otherwise approved by the Court and consented to by the DIP Agent and the Required Lenders.

14.     **Proceeds of Subsequent Financing**.  If at any time prior to the Repayment in Full of DIP Obligations, any of the Debtors, any trustee, examiner with enlarged powers or any responsible officer subsequently appointed, shall obtain credit or incur debt pursuant to section 364(b), 364(c), or 364(d) of the Bankruptcy Code whether or not in violation of the DIP Credit Agreement, any other DIP Financing Documents or this Interim Order, then all of the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent and applied to the DIP Obligations as set forth in the DIP Credit Agreement.  For the sake of clarity, if at any time prior to the Repayment in Full of DIP Obligations, any of the Debtors, any trustee, examiner with enlarged powers or any responsible officer subsequently appointed, shall receive proceeds from the sale of any DIP Collateral, then all of the cash proceeds derived from such shall be applied in accordance with the terms of the DIP Financing Documents and section 2(d) of this Interim Order.

15.     **Events of Default**.

The following shall constitute an event of default under this Interim Order, unless expressly waived in writing by the DIP Agent and the Required Lenders (collectively, the

38

56101252v1

"Events of Default"):

(a)    the occurrence of the "Maturity Date" (as defined in the DIP Credit Agreement) without the Repayment in Full of DIP Obligations on or before such date or, if sooner, the occurrence of an "Event of Default" under the DIP Financing Documents (after giving effect to any applicable notice, cure and grace period in the relevant DIP Financing Documents);

(b)    the failure by the Debtors to satisfy any of the Milestones, provided, however, that the DIP Agent and the Required Lenders may agree to an extension of any of the Milestone dates in their sole and absolute discretion;

(c)    the failure by the Debtors to observe or perform any of the terms, provisions, conditions, covenants or obligations under this Interim Order;

(d)    the reversal, vacatur or modification of any provision of this Interim Order; or

(e)    the failure of the Debtors to obtain entry of the Final Order on or before the date which is thirty (30) days after the Petition Date.

Until the Repayment in Full of DIP Obligations, the DIP Protections afforded to the DIP Secured Parties pursuant to this Interim Order and under the DIP Financing Documents, and any actions taken pursuant thereto, shall survive the entry of any order confirming a plan of reorganization or converting any of these Chapter 11 Cases to a Successor Case, and the DIP Protections shall continue in these Chapter 11 Cases and in any Successor Cases, and the DIP Protections granted herein shall maintain their priorities as provided by this Interim Order.

56101252v1

16.    **Rights and Remedies Upon Event of Default**.

(a)    Immediately upon the occurrence and during the continuation of an Event of Default, the DIP Agent may, or shall, at the direction of the Required Lenders, declare (W) all DIP Obligations owing under the DIP Financing Documents to be immediately due and payable, (X) the termination, reduction or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains in effect, (Y) the termination of the DIP Credit Agreement and any other DIP Financing Documents as to any future liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the DIP Liens or the DIP Obligations, and/or (Z) a termination, reduction or restriction on the ability of the Debtors to use Cash Collateral (any such declaration by the DIP Agent shall be referred to herein as a "Termination Declaration").  The Termination Declaration shall be given by email (or other electronic means) to counsel to the Debtors, counsel to the DIP Agent, counsel to the Prepetition Secured Agents, counsel to any Committee and the United States Trustee (the date any such Termination Declaration is made shall be referred to herein as the "Termination Declaration Date").

(b)    The DIP Obligations shall be due and payable, without notice or demand, on the Termination Declaration Date.  From and after the Termination Declaration Date, the Debtors shall not have any right to use, and the Debtors and other parties in interest shall not seek authority to use, Cash Collateral without the express written consent of the DIP Agent and the Required Lenders in their sole discretion.  Any automatic stay otherwise applicable to the DIP Agent or the DIP Lenders is hereby modified so that five (5) days after the Termination Declaration Date (the "Remedies Notice Period"), the DIP Agent and the DIP Lenders shall be entitled to exercise all rights and remedies against the DIP Collateral in accordance with the DIP

40

Financing Documents and this Interim Order and shall be permitted to satisfy the DIP

Obligations and DIP Superpriority Claims, subject to the Carve-Out. During the Remedies

Notice Period, the Debtors or the Committee shall be entitled to seek an emergency hearing with

the Court for the sole purpose of contesting whether an Event of Default has occurred and/or is

continuing, and seeking other relief in the event it is determined that an Event of Default has not

occurred and/or is continuing. Unless the Court determines during the Remedies Notice Period

that an Event of Default has not occurred and/or is not continuing, the automatic stay shall

automatically be terminated at the end of the Remedies Notice Period without further notice or

order, and the Debtors (and all other parties in interest) shall have no right to use or seek to use

Cash Collateral, and the DIP Agent and the DIP Lenders shall be permitted to exercise all

remedies set forth herein, in the DIP Credit Agreement and the DIP Financing Documents, as

applicable, and as otherwise available at law against the DIP Collateral, without further order of

or application or motion to the Court, and without restriction or restraint by any stay under

sections 362 or 105 of the Bankruptcy Code, or otherwise, against the enforcement of the liens

and security interests in the DIP Collateral or any other rights and remedies granted to the DIP

Agent and the DIP Lenders with respect thereto pursuant to the DIP Credit Agreement, DIP

Financing Documents or this Interim Order. The rights and remedies of the DIP Agent and the

DIP Lenders specified herein are cumulative and not exclusive of any rights or remedies that the

DIP Agent and the DIP lenders may have under the DIP Financing Documents or otherwise.

Unless the Court determines during the Remedies Notice Period that an Event of Default has not

occurred and/or is not continuing, upon the expiration of the Remedies Notice Period the Debtors

shall cooperate fully with the DIP Agent and the DIP Lenders in their exercise of rights and

remedies, whether against the DIP Collateral or otherwise, including, without limitation,

41

executing and delivering any documents or other instruments, or filing any motions, applications or pleadings requested by the DIP Agent in furtherance of the exercise of any such rights and remedies.

(c)      If the DIP Agent and/or the DIP Lenders exercise any of their rights and remedies upon the occurrence of an Event of Default under the DIP Financing Documents, the DIP Agent may, or shall, at the direction of the Required Lenders, retain one or more agents to sell, lease or otherwise dispose of the DIP Collateral.  In any exercise of its rights and remedies upon an Event of Default under the DIP Financing Documents, the DIP Agent and the DIP Lenders are authorized to proceed under or pursuant to the DIP Financing Documents.

(d)      Notwithstanding anything contained herein to the contrary and without limiting any other rights or remedies of the DIP Agent, for the benefit of the DIP Lenders, contained in this Interim Order or the DIP Financing Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Financing Documents and this Interim Order, following the Remedies Notice Period, and upon written notice to the landlord of any leased premises that an Event of Default has occurred under the DIP Financing Documents, the DIP Agent may, or shall, at the direction of the Required Lenders, subject to any separate agreement by and between such landlord and the DIP Agent (including, without limitation, any prepetition collateral access agreement, landlord waiver, or similar agreement to which the DIP Agent succeeds to the rights of the Prepetition ABL Parties pursuant to this Interim Order (each, a "Separate Agreement"), enter upon any leased premises of the Debtors for the purpose of exercising any remedy with respect to DIP Collateral located thereon and, subject to any Separate Agreement, shall be entitled to all of the Debtors' rights and privileges as lessee under such lease without interference from such landlord; provided, however, that, subject to any such

42

Separate Agreement, the DIP Agent (on behalf of the DIP Lenders) shall only be obligated to pay rent of the Debtors that first accrues after the written notice referenced above and that is payable during the period of such occupancy by the DIP Agent (on behalf of the DIP Lenders), calculated on a per diem basis.  Nothing herein shall require the DIP Agent or the DIP Lenders to assume any lease as a condition to the rights afforded to the DIP Agent in this paragraph.

17.    **Proofs of Claim**.  The DIP Secured Parties will not be required to file proofs of claim in the Chapter 11 Cases or any Successor Cases on account of the DIP Obligations, and the Prepetition ABL Parties will not be required to file proofs of claim in the Chapter 11 Cases or any Successor Cases on account of the Prepetition ABL Obligations.

18.    **Other Rights and DIP Obligations**.

(a)    **Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of Interim Order**.  Based on the findings set forth in this Interim Order and in accordance with section 364(e) of the Bankruptcy Code, with respect to amounts advanced pursuant to this Interim Order, in the event any or all of the provisions of this Interim Order are hereafter reversed or modified by a subsequent order of this or any other Court, the DIP Secured Parties are entitled to the protections provided in section 364(e) of the Bankruptcy Code and, provided that the Interim Order is not stayed pending appeal, no such reversal or modification shall affect the validity and enforceability of any advances made under the DIP Facility or the liens or priority authorized or created hereby.  Notwithstanding any such reversal or modification, any claim granted to the DIP Secured Parties hereunder arising prior to the effective date of such reversal or modification of any DIP Protections granted to the DIP Secured Parties shall be governed in all respects by the original provisions of this Interim Order, and the DIP Secured Parties shall be entitled to all of the rights, remedies, privileges and benefits,

43

including the DIP Protections granted herein, with respect to any such claim, provided that the Interim Order was not stayed at the time the claim arose. Because the loans made pursuant to the DIP Credit Agreement are made in reliance on this Interim Order, the obligations owed the DIP Secured Parties prior to the effective date of any reversal or modification of this Interim Order cannot, as a result of any subsequent order in the Chapter 11 Cases or in any Successor Cases or otherwise, be subordinated, lose their lien priority or superpriority administrative expense claim status, or be deprived of the benefit of the status of the liens and claims granted to the DIP Secured Parties under this Interim Order and/or the DIP Financing Documents, provided that the Interim Order was not stayed.

(b)    **Discharge Waiver.**  The Debtors expressly stipulate, and the Court finds and adjudicates that the DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the Repayment in Full of DIP Obligations has occurred on or before the effective date of a confirmed plan of reorganization. The Debtors shall not propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets or entry of any confirmation order or sale order that is not conditioned upon the Repayment in Full of DIP Obligations on the effective date of such plan of reorganization or sale.

(c)    **Binding Effect**.  All of the provisions of this Interim Order shall be binding upon and inure to the benefit of the DIP Secured Parties, the Debtors, any Committee, all other creditors of the Debtors and all other parties-in-interest, and their respective successors and assigns (including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of the estates of the Debtors) whether in these Chapter

44

11 Cases, in any Successor Cases, or upon dismissal of any of the Chapter 11 Cases or any Successor Cases.

(d) **No Waiver**.  The failure of the DIP Secured Parties to seek relief or otherwise exercise their respective rights and remedies, as applicable, under the DIP Financing Documents, this Interim Order or otherwise, shall not constitute a waiver of any of the DIP Secured Parties' rights hereunder, thereunder, or otherwise.  Notwithstanding anything herein, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair the rights of the DIP Secured Parties under the Bankruptcy Code or under non-bankruptcy law, including without limitation, the rights of the DIP Secured Parties to (i) request conversion of the Chapter 11 Cases to cases under chapter 7, dismissal of the Chapter 11 Cases, or the appointment of a trustee in the Chapter 11 Cases; (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code and this Interim Order, a plan of reorganization; and (iii) exercise any of the rights, claims or privileges (whether legal, equitable or otherwise) the DIP Secured Parties may have pursuant to this Interim Order or the DIP Financing Documents, or applicable law.

(e) **No Third Party Rights**.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, landlord, lessor, equity holder or any direct, indirect, or incidental beneficiary.

(f) **No Marshaling**.  The DIP Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.

(g) **Section 552(b)**.  The DIP Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code.  The "equities of the case"

45

exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Secured Parties with respect to proceeds, product, offspring or profits of any of the DIP Collateral.

(h) **Amendment of DIP Financing Documents**.  The Debtors and the DIP Agent (after having obtain any approvals required of the requisite lenders as required under the DIP Credit Agreement) may amend or waive any provision of the DIP Financing Documents without further order of this Court, provided that such amendment or waiver, in the reasonable judgment of the Debtors and the DIP Agent, is not material.  Except as otherwise provided herein, no waiver, modification, or amendment of any of the provisions of the DIP Financing Documents shall be effective unless set forth in writing, signed by on behalf of the Debtors and the DIP Agent (after having obtain any approvals required of the requisite lenders as required under the DIP Credit Agreement).

19.   **Limitation of Liability**.  In determining to provide the DIP Facility, permitting the use of Cash Collateral, or enforcing the rights and remedies afforded to such parties under this Interim Order and/or the DIP Financing Documents, none of the DIP Secured Parties shall be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used  in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§9601 *et seq*. as amended, or any similar federal statute).  Furthermore, nothing in this Interim Order or in the DIP Financing Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties any liability for any claims arising from the prepetition or postpetition activities of the Debtors.

56101252v1

20.     **Release and Indemnification of DIP Secured Parties**.   The Debtors shall defend, indemnify, hold harmless and release the DIP Secured Parties and the Indemnified Persons (as defined in the DIP Credit Agreement) to the extent set forth in the DIP Financing Documents.

21.     **Survival of Interim Order**.   All of the provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (a) confirming any chapter 11 plan in the Chapter 11 Cases, (b) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or any Successor Cases, (c) dismissing any of the Chapter 11 Cases, (d) withdrawing of the reference of any of the Chapter 11 Cases from this Court, or (e) providing for abstention from handling or retaining of jurisdiction of any of the Chapter 11 Cases in this Court.  The terms and provisions of this Interim Order, including the DIP Protections granted pursuant to this Interim Order and the DIP Financing Documents and any protections granted to the Prepetition ABL Parties, shall continue in full force and effect notwithstanding the entry of such order, and such DIP Protections and protections granted to the Prepetition ABL Parties shall maintain their priority as provided by this Interim Order until (i) in the case of the DIP Secured Parties, until all of the DIP Obligations of the Debtors to the DIP Secured Parties pursuant to the DIP Financing Documents (and this Interim Order) have been indefeasibly paid in full and discharged (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms); (ii) in the case of the Prepetition ABL Parties, until all of the Prepetition ABL Obligations of the Debtors to the Prepetition ABL Parties pursuant to the Prepetition ABL Credit Documents have been paid in full and discharged; and (iii) in the case of the Prepetition Term Loan Parties, until all of the Prepetition Term Loan Obligations of the Debtors to the Prepetition Term Loan Parties pursuant

47

to the Prepetition Term Loan Documents have been paid in full and discharged (including, without limitation, any and all adequate protection obligations and claims in respect thereof).

(a) **Inconsistency**.  In the event of any inconsistency between the terms and conditions of the DIP Financing Documents and of this Interim Order, the provisions of this Interim Order shall govern and control.

(b) **Enforceability**.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry of this Interim Order. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.  The rights of all parties in interest to object to the terms of the Final Order, the DIP Credit Agreement and any other DIP Financing Document at the Final Hearing are expressly reserved.

(c) **Objections Overruled**.  All objections to the Motion and the entry of this Interim Order to the extent not withdrawn or resolved, are hereby overruled.

(d) **No Waivers or Modification of Interim Order**.  The Debtors irrevocably waive any right to seek any modification or extension of this Interim Order without the prior written consent of the DIP Agent and the Required Lenders and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Agent or the Required Lenders.

48

56101252v1

22.    **Headings.**  All paragraph headings used in this Interim Order are for ease of reference only and are not to affect the construction hereof or to be taken into consideration in the interpretation hereof.

23.    **Final Hearing**.

(a)    The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility shall be held before The Honorable [_____] at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, [__] Floor, Courtroom [__], New York, New York on **[_____], 2016 at [__:__] [a/p.m.] (prevailing Eastern Time)**.  If no objections to the relief sought in the Final Hearing are filed and served in accordance with this Interim Order, no Final Hearing may be held, and a separate Final Order may be presented by the Debtors and entered by this Court.

(b)    On or before [_____], 2016, the Debtors shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "Final Hearing Notice"), together with copies of this Interim Order and the Motion, on: (a) the parties having been given notice of the Interim Hearing; (b) any party which has filed prior to such date a request for notices with this Court; (c) counsel for the Committee, if any; (d) the Office of the United States Trustee, (e) the Internal Revenue Service, (f) counsel to the DIP Agent, (g) counsel to the Prepetition Secured Agents, (h) the Debtors' current landlords, (i) the Securities and Exchange Commission, (j) the Office of the Attorney General for the State of New York, (k) the United States Department of Justice, and (l) applicable state taxing authorities.  The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Bankruptcy Court no later than **[_____], 2016 at [__:__] [a/p.m.] (prevailing Eastern Time)** which objections shall be served

49

so that the same are received on or before such date by:  (a) counsel for the Debtors, Weil,

Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Ray C. Schrock,

P.C., Jacqueline Marcus and Garrett Fail; (b) counsel for the DIP Agent, Proskauer Rose LLP,

Eleven Times Square, New York, NY 10036, Attn: Scott K. Rutsky and Jared D. Zajac; (c)

counsel for any Committee; and (d) the Office of the United States Trustee for the Southern

District of New York, U.S. Federal Office Building, 201 Varick Street, Room 1006, New York,

New York 10014, Attn: Brian Masumoto and Susan Golden.

24.     **Retention of Jurisdiction**.  The Court has and will retain jurisdiction to enforce

this Interim Order.

Dated:  May __, 2016

      New York, New York        _____

                                      UNITED STATES BANKRUPTCY JUDGE

50

**Exhibit A**

[Summary DIP Budget]

| 4-5-4 Month<br>Week Ending<br>Fiscal Week #<br>Forecast / Actual | May<br>7-May<br>Week 14<br>Forecast | May<br>14-May<br>Week 15<br>Forecast | May<br>21-May<br>Week 16<br>Forecast | May<br>28-May<br>Week 17<br>Forecast | Jun<br>4-Jun<br>Week 18<br>Forecast | Jun<br>11-Jun<br>Week 19<br>Forecast | Jun<br>18-Jun<br>Week 20<br>Forecast | Jun<br>25-Jun<br>Week 21<br>Forecast | Jun<br>2-Jul<br>Week 22<br>Forecast | Jul<br>9-Jul<br>Week 23<br>Forecast | Jul<br>16-Jul<br>Week 24<br>Forecast | Jul<br>23-Jul<br>Week 25<br>Forecast | Jul<br>30-Jul<br>Week 26<br>Forecast | Aug<br>6-Aug<br>Week 27<br>Forecast | Aug<br>13-Aug<br>Week 28<br>Forecast | Aug<br>20-Aug<br>Week 29<br>Forecast | Aug<br>27-Aug<br>Week 30<br>Forecast | 18 Week<br>Total<br><br>Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **I. Cash Flow** | | | | | | | | | | | | | | | | | | |
| 1) Cash Receipts | 23,018 | 22,466 | 23,057 | 25,513 | 21,955 | 21,302 | 21,801 | 20,268 | 22,032 | 19,387 | 21,490 | 22,808 | 29,291 | 36,576 | 35,611 | 31,185 | 25,641 | 423,399 |
| Cash Disbursements | | | | | | | | | | | | | | | | | | |
| 2) Operating Disbursements | (5,832) | (15,382) | (10,520) | (30,141) | (30,815) | (29,717) | (18,762) | (30,021) | (21,159) | (45,880) | (23,411) | (15,109) | (19,171) | (28,681) | (32,100) | (12,214) | (23,152) | (392,067) |
| 3) Financing Disbursements | (715) | - | - | - | (346) | - | - | - | (409) | - | - | - | - | (529) | - | - | - | (1,999) |
| 4) Professional Fees | (4,394) | (3,258) | (1,158) | (1,224) | (1,168) | (1,128) | (1,008) | (1,194) | 200 | (963) | (708) | (708) | (152) | (818) | (708) | (708) | 418 | (18,679) |
| 5) Bankruptcy Related Disbursements | (5,250) | (500) | - | - | (1,341) | (500) | - | (962) | (1,541) | - | - | - | (18,895) | - | - | - | - | (28,989) |
| 6) Total Disbursements | (16,191) | (19,140) | (11,678) | (31,365) | (33,670) | (31,345) | (19,770) | (32,177) | (22,909) | (46,843) | (24,119) | (15,817) | (38,218) | (30,028) | (32,808) | (12,922) | (22,733) | (441,733) |
| 7) **Net Cash Flow Before Borrowing/(Pay down)** | **6,826** | **3,325** | **11,379** | **(5,852)** | **(11,715)** | **(10,043)** | **2,031** | **(11,909)** | **(877)** | **(27,456)** | **(2,629)** | **6,991** | **(8,927)** | **6,547** | **2,803** | **18,263** | **2,907** | **(18,334)** |
| 8) Beginning Est. Cash Balance - Bank | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| 9) Plus: Net Cash Flow Before Borrowings | 6,826 | 3,325 | 11,379 | (5,852) | (11,715) | (10,043) | 2,031 | (11,909) | (877) | (27,456) | (2,629) | 6,991 | (8,927) | 6,547 | 2,803 | 18,263 | 2,907 | (18,334) |
| 10) Revolver Borrowings / (Pay downs) | (6,826) | (3,325) | (11,379) | 5,852 | 9,715 | 12,043 | (2,031) | 11,909 | (10,764) | 39,097 | 2,629 | (6,991) | (4,713) | 7,093 | (2,803) | (18,263) | (16,548) | 4,693 |
| 11) Change in Float Inc / (Dec) | - | - | - | - | 2,000 | (2,000) | - | - | 11,641 | (11,641) | - | - | 13,641 | (13,641) | - | - | 13,641 | 13,641 |
| 12) **Ending Est. Cash Balance - Bank** | **3,000** | **3,000** | **3,000** | **3,000** | **3,000** | **3,000** | **3,000** | **3,000** | **3,000** | **3,000** | **3,000** | **3,000** | **3,000** | **3,000** | **3,000** | **3,000** | **3,000** | **3,000** |
| 13) Plus: Outstanding Checks | (1,500) | (1,500) | (1,500) | (1,500) | (3,500) | (1,500) | (1,500) | (1,500) | (13,141) | (1,500) | (1,500) | (1,500) | (15,141) | (1,500) | (1,500) | (1,500) | (15,141) | (15,141) |
| 14) **Ending Est. Cash Balance - Book** | **1,500** | **1,500** | **1,500** | **1,500** | **(500)** | **1,500** | **1,500** | **1,500** | **(10,141)** | **1,500** | **1,500** | **1,500** | **(12,141)** | **1,500** | **1,500** | **1,500** | **(12,141)** | **(12,141)** |

**Exhibit B**

**Milestones**

(i)      On the Petition Date,[1] the Borrower shall have filed a motion to approve the DIP Credit Agreement, which motion shall be in form and substance reasonably acceptable to the DIP Agent and the Required Lenders. The Interim Order approving the DIP Credit Agreement shall be entered by the Court no later than 3 Business Days (as defined in the DIP Credit Agreement) following the Petition Date, which Interim Order shall be in form and substance acceptable to the DIP Agent and the Required Lenders in their sole and absolute discretion.

(ii)     No later than 30 days after the Petition Date, the Final Order approving the DIP Credit Agreement shall be entered by the Court, which Final Order shall be in form and substance acceptable to the DIP Agent and the Required Lenders in their sole and absolute discretion (and the related motion shall be in form and substance reasonably satisfactory to the DIP Agent and the Required Lenders).

(iii)    No later than 10 days after the Petition Date, the Borrower shall have filed a motion under Section 365 of the Bankruptcy Code, requesting an extension of the date on which the Borrower must assume or reject leases to 210 days after the entry of the order for such relief, with such order being entered by the Court no later than 30 days after the Petition Date (such motion and order to be in form and substance acceptable to the DIP Agent and the Required Lenders in their sole and absolute discretion). The Borrower may not assume, assume and assign, or reject leases without the prior written consent of the DIP Agent and the Required Lenders.

(iv)    (a)      No later than 60 days after the Petition Date the Borrower shall have filed the Plan of Reorganization (as defined in the DIP Credit Agreement) in form and substance reasonably satisfactory to the DIP Agent and the Required Lenders (it being understood and agreed that such Plan of Reorganization shall either repay all outstanding obligations under the DIP Facility in cash on the effective date or provide alternative treatment satisfactory to the DIP Agent and the DIP Lenders in their sole and absolute discretion) and Disclosure Statement (as defined in the DIP Credit Agreement) in form and substance satisfactory to the DIP Agent and the Required Lenders;

         (b)      the Court shall have entered an order approving the Disclosure Statement on or prior to 95 days after the Petition Date;

         (c)      the DIP Loan Parties shall have commenced solicitation on the Plan of Reorganization no later than 100 days after the Petition Date;

         (d)      the Court shall have commenced the hearing to consider confirmation of the Plan of Reorganization on or prior to 130 days after the Petition Date;

         (e)      the Court shall have entered an order confirming the Plan of Reorganization on or prior to 140 days after the Petition Date; and

         (f)      the Plan of Reorganization shall have been consummated on or prior to 145 days after the Petition Date.

---

[1] Capitalized terms used herein but not otherwise defined herein shall have the meaning set forth in the pre-fixed interim order approving postpetition debtor-in-possession financing (the "Interim Order").

(v)     Simultaneously with the plan process outlined in clause (iv) above, the Borrower shall pursue a sale process under Section 363 of the Bankruptcy Code, in accordance with the following timeline:

(a)     No later than 75 days after the Petition Date, the Borrower shall file a motion with the Court to approve bid procedures and establish the date of an auction (the "Auction") to sell all or substantially all of the assets of the Borrower and the Guarantors (the "Bid Procedures Motion"), which shall include a form of a stalking horse sale and purchase agreement ("Stalking Horse SPA"), which shall be in form and substance acceptable to the DIP Agent and the Required Lenders in their reasonable discretion;

(b)     No later than 75 days after the Petition Date, the Borrower shall forward the so-called "bid packages" to any potential bidders, including, without limitation, alternative bid packages to liquidation firms;

(c)     No later than 105 days after the Petition Date, the Court shall have entered an order approving the Stalking Horse SPA and Bid Procedures Motion, which shall be in form and substance acceptable to the DIP Agent and the Required Lenders in their sole and absolute discretion;

(d)     No later than 141 days after the Petition Date, the Borrower shall conduct the Auction;

(e)     No later than 143 days after the Petition Date, the Court shall enter an order approving the sale of the Borrower's assets to the party determined to have made the highest or otherwise best bid for all or substantially all of the assets of the Borrower and the Guarantors (the "Sale Order"), which shall be in form and substance acceptable to the DIP Agent and the Required Lenders in their sole and absolute discretion; and

(f)     No later than 145 days after the Petition Date, the Borrower shall have consummated the sale to the party determined to have made the highest or otherwise best bid for all or substantially all of the assets of the Borrower and the Guarantors in accordance with the Sale Order pursuant to the Stalking Horse SPA or other sale and purchase agreement, which shall be in form and substance acceptable to the DIP Agent and the Required Lenders in their sole and absolute discretion.

It is understood and agreed that the Borrower may choose to abandon the plan process outlined in clause (iv) above at any time.  The Borrower may not abandon the sale process outlined in clause (v) above without the prior written consent of the DIP Agent and Required Lenders.

2

## Exhibit C

[DIP Intercreditor Provisions]

**Exhibit C**

**DIP Intercreditor Provisions**

The terms set forth in this **Exhibit C** constitute the DIP Intercreditor Provisions (as defined in the pre-fixed interim order approving postpetition debtor-in-possession financing (the "Interim Order")) and shall govern the relative rights of the DIP Secured Parties and the Prepetition Term Loan Parties in respect of the DIP Collateral (and the proceeds thereof) with respect to the matters covered by these DIP Intercreditor Provisions. **Capitalized terms used herein but not otherwise defined herein shall have the meaning set forth in the Interim Order.**

The rights and obligations set forth in these DIP Intercreditor Provisions shall not be altered or otherwise affected by (i) any amendment, modification, supplement, extension, increase, replacement, renewal, restatement, or refinancing of any class of DIP Obligations or (ii) the release of any DIP Collateral or of any DIP Loan Party securing or in respect of any DIP Obligations. These DIP Intercreditor Provisions shall remain in full force and effect regardless of whether the Final Order (as defined in the Interim Order) is entered (unless amended, supplemented, stayed, vacated, or otherwise supplemented with the consent of the DIP Agent and, if applicable, the Required Lenders), and regardless of whether the Interim Order remains in full force and effect or is otherwise amended, supplemented, stayed, vacated, or otherwise modified (except to the extent that these DIP Intercreditor Provisions are amended, supplemented, stayed, vacated, or otherwise modified with the consent of the DIP Agent and, if applicable, the Required Lenders).

Solely for purposes of, and as used in, these DIP Intercreditor Provisions, the following terms shall have the meanings set forth below:

"Asset Sale Proceeds Pledge Account" shall mean a Deposit Account subject to a deposit account control agreement in favor of the Prepetition Term Loan Agent in which solely the proceeds from any disposition of Term Priority Collateral are held pending reinvestment pursuant to the Prepetition Term Loan Agreement. For clarity, the amounts on deposit in such Asset Sale Proceeds Pledged Account shall constitute Collateral and Term Priority Collateral.

"Business Day" shall mean any day that is not a Saturday, Sunday or other day on which commercial banks in the Commonwealth of Massachusetts or State of New York are authorized or required by law to remain closed (or are in fact closed).

"Capitalized Leases" shall mean all leases that have been or are required to be, in accordance with GAAP, recorded as capitalized leases; provided that for all purposes hereunder the amount of obligations under any Capitalized Lease shall be the amount thereof accounted for as a liability in accordance with GAAP.

"Collateral" shall mean all Property now owned or hereafter acquired by the any of

the Debtors in or upon which a Lien is granted or purported to be granted to both (i) any of the DIP Secured Parties under the DIP Financing Documents and/or the Interim Order or Final Order and (ii) any of the Prepetition Term Loan Parties under any of the Prepetition Term Loan Documents and/or the Interim Order, Final Order or any other order of the Court, together with all rents, issues, profits, products and Proceeds thereof.

"Commodity Account" shall have the meaning ascribed to it under the Uniform Commercial Code.

"Credit Documents" shall mean the DIP Financing Documents and the Prepetition Term Loan Documents.

"Credit Parties" shall mean the DIP Loan Parties and the Term Credit Parties.

"Deposit Account" shall have the meaning ascribed to it under the Uniform Commercial Code.

"DIP Deposit and Securities Account" shall mean all Deposit Accounts, Securities Accounts, collection accounts and lockbox accounts (and all related lockboxes) of the DIP Loan Parties (other than the Term Loan Priorities Account).

"DIP Loan Party Term Proceeds Notice" shall mean a written notice delivered by a DIP Loan Party to the DIP Agent stating that certain identifiable cash proceeds which may be deposited in a DIP Deposit and Securities Account constitute Term Priority Collateral and reasonably identifying the amount of such proceeds and specifying the origin thereof.

"Discharge of Prepetition Term Loan Obligations" shall mean (i) the payment in full in cash of all outstanding Term Priority Obligations (other than contingent indemnification obligations for which no claim has been asserted) and (ii) with respect to contingent indemnification obligations with respect to known or anticipated claims threatened or asserted in writing, provision of cash collateral in an amount reasonably determined by the Prepetition Term Loan Agent.

"Enforcement Notice" shall mean shall mean a written notice delivered by either the DIP Agent or, following relief from the automatic stay, the Prepetition Term Loan Agent to the other announcing that an Enforcement Period has commenced.

"Enforcement Period" shall mean the period of time following the receipt by either the DIP Agent or the Prepetition Term Loan Agent of an Enforcement Notice from the other and continuing until the earliest of (a) in the case of an Enforcement Period commenced by the Prepetition Term Loan Agent, the Discharge of Prepetition Term Loan Obligations, (b) in the case of an Enforcement Period commenced by the DIP Agent, the Repayment in Full of DIP Obligations, (c) the DIP Agent or the Prepetition Term Loan Agent (as applicable) terminates, or agrees in writing to terminate, the Enforcement Period, or (d) the date on which the Event of Default that was the subject of the Enforcement Notice relating to such Enforcement Period has been cured to the satisfaction of the DIP Agent or Prepetition Term Loan Agent,  as applicable, or waived in writing by the  DIP Agent or Prepetition Term Loan Agent, as applicable.

2

"Equipment" shall have the meaning ascribed to it under the Uniform Commercial Code.

"Equity Interest" shall mean, with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership or profit interests or units in, including any limited or general partnership interest and any limited liability company membership interest in) such Person and all of the warrants, options or other rights for the purchase, acquisition or exchange from such Person of any of the foregoing (including through convertible securities).

"Event of Default" shall mean (i) with respect to the DIP Facility, an "Event of Default" or similar term used under and as defined in the DIP Credit Agreement, the Interim Order or the Final Order, and (ii) with respect to the Prepetition Term Loan Agreement, an "Event of Default" or similar term used under and as defined in the Prepetition Term Loan Agreement.

"Exercise of Any Secured Creditor Remedies" or "Exercise of Secured Creditor Remedies" shall mean, except as otherwise provided in the final sentence of this definition:

(a) the taking by any of the DIP Secured Parties or the Prepetition Term Loan Parties (such parties, collectively, the "Secured Parties" and individually, a "Secured Party") of any action to enforce or realize upon any Lien, including the institution of any foreclosure proceedings or the noticing of any public or private sale pursuant to Article 9 of the Uniform Commercial Code or other applicable law;

(b) the exercise by any Secured Party of any right or remedy provided to a secured creditor on account of a Lien under any of the Credit Documents, any order of the Court, or under applicable law including the election to retain any of the Collateral in satisfaction of a Lien;

(c) the taking of any action by any Secured Party or the exercise of any right or remedy by any Secured Party in respect of the collection on, set off against, marshaling of, injunction respecting or foreclosure on the Collateral or the Proceeds thereof;

(d) the appointment on the application of a Secured Party, of a receiver, receiver and manager or interim receiver of all or part of the Collateral;

(e) the sale, lease, license or other disposition of all or any portion of the Collateral by private or public sale conducted by any Secured Party or any other means at the direction or with the consent of any Secured Party permissible under applicable law;

(f) the exercise of any other right of a secured creditor under Part 6 of Article 9 of the Uniform Commercial Code or under provisions of similar effect under other applicable law; and

(g) the exercise by any Secured Party of any voting rights relating to any Equity Interest included in the Collateral.

For the avoidance of doubt, none of the following shall be deemed to constitute an

3

Exercise of Any Secured Creditor Remedies or Exercise of Secured Creditor Remedies: (i) the filing of a proof of claim in the Chapter 11 Cases or the seeking of adequate protection in the Chapter 11 Cases, (ii) so long as the commitments under the DIP Financing Documents have not been terminated as a result of the existence of an Event of Default, the exercise of rights by the DIP Agent in connection with cash dominion as provided in the DIP Credit Agreement, including, without limitation, the notification of account debtors, depository institutions or any other Person to deliver proceeds of DIP Priority Collateral to the DIP Agent, (iii) the consent by the DIP Agent or the Required Lenders (as defined in the DIP Credit Agreement), as applicable, to a store closing sale, going out of business sale, or other disposition by any borrower or guarantor under the Prepetition Term Loan Agreement) and/or a Loan Party (as defined in the DIP Credit Agreement) of any of the DIP Priority Collateral, (iv) the reduction of advance rates or sub-limits or change in borrowing base components or eligibility criteria by the DIP Agent and the Required Lenders, as applicable, or (v) the imposition of Reserves (as defined in the DIP Credit Agreement) by the DIP Agent.

"GAAP" shall mean generally accepted accounting principles in the United States, as in effect from time to time.

"General Intangibles" shall have the meaning ascribed to it under the Uniform Commercial Code.

"Governmental Authority" shall mean the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra- national bodies such as the European Union or the European Central Bank).

"Lien" shall mean any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, encumbrance, collateral assignment, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any Capitalized Lease having substantially the same economic effect as any of the foregoing); provided that in no event shall an operating lease in and of itself be deemed a Lien.

"Lien Priority" shall mean with respect to any Lien of the DIP Parties or the Prepetition Term Loan Parties in the Collateral, the order of priority of such Liens as set forth in the Interim Order.

"Person" shall mean any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Proceeds" shall mean (a) all "proceeds," as defined in Article 9 of the Uniform Commercial Code, with respect to the Collateral, and (b) whatever is recoverable or recovered when any Collateral is sold, exchanged, collected, or disposed of, whether voluntarily or involuntarily.

"Property" shall mean any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible.

"Security Account" shall have the meaning ascribed to it under the Uniform Commercial Code.

"Term Cash Proceeds Notice" shall mean a written notice delivered by the Prepetition Term Loan Agent to the DIP Agent stating that certain identifiable cash proceeds which may be deposited in a DIP Deposit and Securities Account constitute Term Priority Collateral, and reasonably identifying the amount of such proceeds and specifying the origin thereof.

"Term Credit Parties" shall mean, collectively, the borrower, guarantors and each other direct and indirect subsidiary or parent of such borrower or any of its affiliates that is now or hereinafter becomes a party to any Prepetition Term Loan Document.

"Term Loan Priority Accounts" shall mean the Asset Sale Proceeds Pledged Account, the Term Loan Proceeds Account, and any other Deposit Accounts, Securities Accounts or Commodity Accounts, in each case that are intended to solely contain Term Priority Collateral or identifiable proceeds thereof (it being understood that any property in such Deposit Accounts, Securities Accounts, or Commodities Accounts which is not Term Priority Collateral or identifiable proceeds thereof shall not be Term Priority Collateral solely by virtue of being on deposit in the Asset Sale Proceeds Pledged Account or, any such Deposit Account, Securities Account, or Commodity Account).

"Term Loan Proceeds Account" shall mean a Deposit Account maintained with Bank of America, N.A., which is subject to a blocked account agreement among Bank of America, N.A., the borrowers under the Prepetition Term Loan Agreement and the Prepetition Term Loan Agent (as the "first lien holder") and the DIP Agent (as the "junior lien holder"), into which the proceeds of the loans made under the Prepetition Term Loan Agreement were deposited on the closing date of the Intercreditor Agreement.

"Uniform Commercial Code" shall mean the Uniform Commercial Code as in effect from time to time in the State of New York; provided that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection or the priority of a security interest in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect in a jurisdiction other than New York, "Uniform Commercial Code" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or priority or availability of such remedy, as the case maybe.

"Use Period" shall mean the period commencing on the earlier of (x) the date which is identified in an Enforcement Notice that the DIP Agent has provided to the Prepetition Term Loan Agent as the date on which (i) the DIP Agent intends to commence, or (ii) an agent acting on its behalf (or an DIP Secured Party acting with the consent of the DIP Agent) intends to commence, Exercise of Secured Creditor Remedies in connection with the DIP Priority Collateral, or (y) the third Business Day after the Prepetition Term Loan Agent has provided the DIP Agent with notice that the Prepetition Term Loan Agent has obtained possession or

control of an item of Term Priority Collateral in connection with an Exercise of Secured Creditor Remedies (the earlier of the dates in subsections (x) and (y) being the "Use Period Commencement Date") and ending on the earlier of (i) 180 days after the Use Period Commencement Date, or (ii) Repayment in Full of DIP Obligations. If any stay or other order that prohibits any of the DIP Agent, the other DIP Secured Parties or any Loan Party (as defined in the DIP Credit Agreement) with the consent of the DIP Agent from commencing and continuing to Exercise Any Secured Creditor Remedies or from liquidating and selling the DIP Priority Collateral has been entered by a court of competent jurisdiction, such 180-day period shall be tolled during the pendency of any such stay or other order and the Use Period shall be so extended.

Section 1.   Inspection and Access Rights.

(a)     Without limiting any rights the DIP Agent or any other DIP Secured Party may otherwise have under applicable law or by agreement, in the event of any Exercise of Any Secured Creditor Remedies by the DIP Agent, and whether or not the Prepetition Term Loan Agent or any other Prepetition Term Loan Party has commenced and is continuing to Exercise Any Secured Creditor Remedies of the Prepetition Term Loan Agent with respect to the Term Priority Collateral or otherwise, the DIP Agent or any other Person (including any DIP Loan Party) acting with the consent, or on behalf, of the DIP Agent, shall have the right (a) during the Use Period and during normal business hours on any Business Day, to access DIP Priority Collateral that (i) is stored or located in or on, (ii) has become an accession with respect to (within the meaning of Section 9-335 of the Uniform Commercial Code), or (iii) has been commingled with (within the meaning of Section 9-336 of the Uniform Commercial Code) Term Priority Collateral, and (b) during the Use Period, shall have the irrevocable right to use the Term Priority Collateral (including, without limitation, Equipment, and General Intangibles arising out of Term Priority Collateral, and real property) on a rent-free, royalty-free basis, each of the foregoing solely for the limited purposes of assembling, inspecting, copying or downloading information stored on, taking actions to perfect its DIP Lien on, completing a production run of Inventory (as defined in the DIP Credit Agreement) involving, taking possession of, moving, preparing, and advertising for sale, selling (by public auction, private sale or a "store closing", "going out of business" or similar sale, whether in bulk, in lots or to customers in the ordinary course of business or otherwise and which sale may include augmented Inventory of the same type sold in any DIP Loan Party's business), storing or otherwise dealing with the DIP Priority Collateral, in each case without notice to (other than an initial Enforcement Notice), the involvement of or interference by any Prepetition Term Loan Party (and whether or not the Prepetition Term Loan Agent or any Prepetition Term Loan Party has commenced and is continuing an Exercise of Secured Creditor Remedies) or liability to any Prepetition Term Loan Party; provided, however, that the expiration of the Use Period shall be without prejudice to the sale or other disposition of the DIP Priority Collateral in accordance with the Interim Order or the Final Order, the DIP Financing Documents, and applicable law.  In the event that any DIP Secured Party has commenced and is continuing the Exercise of Any Secured Creditor Remedies with respect to any DIP Priority Collateral or any other sale or liquidation of the DIP Priority Collateral has been commenced by an DIP Loan Party (with the consent of the DIP Agent), the Prepetition Term Loan Agent may not sell, assign, or otherwise transfer the related Term Priority Collateral prior to the expiration of the Use Period, unless the purchaser, assignee, or transferee thereof agrees in writing to be bound by the provisions of this Section 1.  Notwithstanding the

6

foregoing, it is understood and agreed that to the extent that any Term Priority Collateral is in the possession of a receiver or other third party not under the control of the Prepetition Term Loan Agent, no Prepetition Term Loan Party shall have any obligation to ensure that any DIP Secured Party has access to such Term Priority Collateral (but no Prepetition Term Loan Party will oppose any action by a DIP Secured Party to obtain such access).

(b)     Except as provided for in Section 1(c), (i) the DIP Agent and the DIP Secured Parties shall not be obligated to pay any amounts to the Prepetition Term Loan Agent or the Prepetition Term Loan Parties (or any person claiming by, through or under the Prepetition Term Loan Parties, including any purchaser of the Term Priority Collateral) or to the DIP Loan Parties, for or in respect of the use by the DIP Agent and the DIP Secured Parties of the Term Priority Collateral, and (ii) none of the DIP Agent or the DIP Secured Parties shall be obligated to secure, protect, insure or repair any such Term Priority Collateral (other than for damages caused by the DIP Agent, the DIP Secured Parties, or their respective employees, agents, and representatives). The DIP Agent and the DIP Secured Parties shall not have any liability to the Prepetition Term Loan Agent or the Prepetition Term Loan Parties (or any person claiming by, through or under the Prepetition Term Loan Agent or the Prepetition Term Loan Parties, including any purchaser of the Term Priority Collateral) as a result of any condition (including environmental condition, claim, or liability) with respect to the Term Priority Collateral in existence prior to the date that the DIP Agent first uses the Term Priority Collateral, and the DIP Agent and the DIP Secured Parties shall have no duty or liability (i) to maintain the Term Priority Collateral in a condition or manner better than that in which it was maintained prior to the date of the exercise by an DIP Secured Party of its rights under this Section 1, and (ii) for any acts or omissions of any DIP Loan Party with respect to any Term Priority Collateral.

(c)     The DIP Secured Parties shall (i) use the Term Priority Collateral in accordance with applicable law; (ii) insure or cause to be insured for damage to property and liability to persons, including property and liability insurance for the benefit of the Prepetition Term Loan Parties; and (iii) reimburse the Prepetition Term Loan Parties for any injury or damage to Persons or property (ordinary wear-and-tear excepted) caused by the acts or omissions of Persons under their control; provided, however, that the DIP Secured Parties will not be liable for any diminution in the value of the Term Priority Collateral caused by the absence of the DIP Priority Collateral therefrom or from ordinary wear-and-tear from the use of the Term Priority Collateral.  The Prepetition Term Loan Agent and the other Prepetition Term Loan Parties shall have no obligation to pay any utility, rental, lease or other charges owed to any third parties during the Use Period.

(d)     The Prepetition Term Loan Agent and the other Prepetition Term Loan Parties shall use commercially reasonable efforts not to hinder or obstruct the DIP Agent and the other DIP Secured Parties from exercising the rights described in Section 1(a) hereof.  The DIP Agent and the Prepetition Term Loan Agent shall cooperate and use reasonable efforts to ensure that the activities of the DIP Agent during the Use Period as described above do no interfere materially with the rights of the Prepetition Term Loan Parties including, without limitation, the right of the Prepetition Term Loan Agent to show the Term Priority Collateral to prospective purchasers and to prepare the Term Priority Collateral for sale.

(e)    Subject to the Interim Order (and when entered, the Final Order), the DIP Financing Documents, and the terms hereof, the Prepetition Term Loan Agent may advertise and conduct public auctions or private sales of the Term Priority Collateral without notice (except as required by applicable law or the Interim Order, the DIP Financing Documents, or these DIP Intercreditor Provisions) to any DIP Secured Party, the involvement of or interference by any DIP Secured Party or liability to any DIP Secured Party as long as, in the case of an actual sale, the respective purchaser assumes and agrees in writing to the obligations of the Prepetition Term Loan Agent and the Prepetition Term Loan Parties under this Section 1.

Section 2.  <u>Payment Over</u>.

(a)    So long as the Discharge of Prepetition Term Loan Obligations has not occurred, any Term Priority Collateral or proceeds thereof received by the DIP Agent or any other DIP Secured Party in connection with the Exercise of Any Secured Creditor Remedies (including set off) relating to the Term Priority Collateral in contravention of the Interim Order or the DIP Financing Documents (it being understood that the application of proceeds from any DIP Deposit and Securities Account prior to the delivery of a Term Cash Proceeds Notice or DIP Loan Party Term Proceeds Notice shall not be deemed in contravention of the DIP Intercreditor Provisions) shall be, subject to the terms and provisions of the Interim Order, segregated and held in trust and forthwith paid over to the Prepetition Term Loan Agent for the benefit of the Prepetition Term Loan Parties in the same form as received, with any necessary endorsements or as the Court (or if the Court fails to exercise jurisdiction, as a court of competent jurisdiction may otherwise direct).  The Prepetition Term Loan Agent is hereby authorized to make any such endorsements as agent for the DIP Agent or any such other DIP Secured Parties.  This authorization is coupled with an interest and is irrevocable until such time as these DIP Intercreditor Provisions are terminated.

(b)    So long as the Repayment in Full of DIP Obligations  has not occurred, any DIP Priority Collateral or Proceeds thereof received by the Prepetition Term Loan Agent or any Prepetition Term Loan Parties in connection with the Exercise of Any Secured Creditor Remedies (including set off) relating to the DIP Priority Collateral in contravention of the Interim Order, the DIP Financing Documents, and these DIP Intercreditor Provisions, shall be segregated and held in trust and forthwith paid over to the DIP Agent for the benefit of the DIP Secured Parties in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct.  The DIP Agent is hereby authorized to make any such endorsements as agent for the Prepetition Term Loan Agent or any such Prepetition Term Loan Parties. This authorization is coupled with an interest and is irrevocable until such time as these DIP Intercreditor Provisions are terminated.

Section 3.  <u>Insurance</u>.  Proceeds of Collateral include insurance proceeds and, therefore, the Lien Priority shall govern the ultimate disposition of casualty insurance proceeds. The DIP Agent and the Prepetition Term Loan Agent shall each be named as additional insured, mortgagee or  lenders' loss payee, as applicable, with respect to all insurance policies relating to the Collateral in the manner required in the Prepetition Term Loan Agreement or the DIP Credit Agreement, as applicable.  The DIP Agent shall have the sole and exclusive right, as against the Prepetition Term Loan Agent, to adjust settlement of insurance claims in the event of any covered loss, theft or destruction of any of the DIP Priority Collateral, subject to the rights of the

DIP Loan Parties under the DIP Financing Documents. The Prepetition Term Loan Agent shall have the sole and exclusive right, as against the DIP Agent, to adjust settlement of insurance claims in the event of any covered loss, theft or destruction of any of the Term Priority Collateral, subject to the rights of the Term Credit Parties under the Prepetition Term Loan Documents.   Subject to the rights of the Credit Parties under the Credit Documents, if any insurance claim includes both DIP Priority Collateral and Term Priority Collateral, the insurer will not settle such claim separately with respect to DIP Priority Collateral and Term Priority Collateral, and if the DIP Agent and the Prepetition Term Loan Agent are unable after negotiating in good faith to agree on the settlement for such claim, either such agent may apply to a court of competent jurisdiction to make a determination as to the settlement of such claim, and the court's determination shall be binding upon the DIP Agent and the Prepetition Term Loan Agent. All proceeds of such insurance shall be remitted to the DIP Agent or the Prepetition Term Loan Agent, as the case may be, subject, in each case, to the terms of their respective Credit Documents, and each of the DIP Agent and the Prepetition Term Loan Agent shall cooperate (if necessary) in a reasonable manner in effecting the payment of insurance proceeds in accordance with the Interim Order.

      Section 4.   <u>Tracing of and Priority in Proceeds</u>.

      (a)   The DIP Agent, for itself and on behalf of the DIP Secured Parties, and the Prepetition Term Loan Agent, for itself and on behalf of the Prepetition Term Loan Parties, further agree that prior to an issuance of any notice of Exercise of Any Secured Creditor Remedies by such party, any proceeds of Collateral, whether or not deposited under control agreements, which are used by any Credit Party to acquire other property which is Collateral shall not (solely as between the DIP Agent and the Prepetition Term Loan Agent, and the DIP Lenders and the Prepetition Term Loan Lenders) be treated as Proceeds of Collateral for purposes of determining the relative priorities in the Collateral which was so acquired.

      (b)   Notwithstanding anything to the contrary contained in these DIP Intercreditor Provisions or any Prepetition Term Loan Document, unless and until the Repayment in Full of DIP Obligations, the DIP Agent is hereby permitted to deem all collections and payments deposited in any DIP Deposit and Securities Account (for the avoidance of doubt other than Term Loan Priority Account) or the Concentration Account (as defined in the DIP Credit Agreement) to be proceeds of DIP Priority Collateral, and no such funds credited to such account shall be subject to disgorgement or be deemed to be held in trust by the DIP Agent for  the benefit of the Prepetition Term Loan Agent and other Term Credit Parties; *provided* that with respect to any such funds that are identifiable proceeds of Term Priority Collateral credited to any such account, if  the DIP Agent has received (x) a DIP Loan Party Term Proceeds Notice or (y) a Term Cash Proceeds Notice, in both instances prior to the application of such funds by the DIP Agent to the DIP Obligations and a subsequent credit extension under the DIP Credit Agreement, then the DIP Agent shall turn over any misdirected proceeds of the Term Priority Collateral to the Prepetition Term Loan Agent to the extent permitted by applicable law.

Exhibit I-2 to
Credit Agreement

### Initial DIP Budget

(See attached)

**Project ARO**
**Summary Cash Flow Forecast**
**Weekly Cash Flow Forecast**
**($ thousands)**

| 4-5-4 Month / Week Ending / Fiscal Week # / Forecast / Actual | May 7-May Week 14 Forecast | May 14-May Week 15 Forecast | May 21-May Week 16 Forecast | May 28-May Week 17 Forecast | Jun 4-Jun Week 18 Forecast | Jun 11-Jun Week 19 Forecast | Jun 18-Jun Week 20 Forecast | Jun 25-Jun Week 21 Forecast | Jun 2-Jul Week 22 Forecast | Jul 9-Jul Week 23 Forecast | Jul 16-Jul Week 24 Forecast | Jul 23-Jul Week 25 Forecast | Jul 30-Jul Week 26 Forecast | Aug 6-Aug Week 27 Forecast | Aug 13-Aug Week 28 Forecast | Aug 20-Aug Week 29 Forecast | Aug 27-Aug Week 30 Forecast | 17 Week Total Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **I. Cash Flow** | | | | | | | | | | | | | | | | | | |
| 1) Cash Receipts | 23,018 | 22,466 | 23,057 | 25,513 | 21,955 | 21,302 | 21,801 | 20,268 | 22,032 | 19,387 | 21,490 | 22,808 | 29,291 | 36,576 | 35,611 | 31,185 | 25,641 | 423,399 |
| Cash Disbursements | | | | | | | | | | | | | | | | | | |
| 2) Operating Disbursements | (6,332) | (15,382) | (10,520) | (30,141) | (30,815) | (29,717) | (18,762) | (30,021) | (21,159) | (45,880) | (23,411) | (15,109) | (19,171) | (28,681) | (32,100) | (12,214) | (23,152) | (392,567) |
| 3) Financing Disbursements | (715) | - | - | - | (347) | - | - | - | (411) | - | - | - | - | (531) | - | - | - | (2,004) |
| 4) Professional Fees | (4,394) | (3,258) | (1,158) | (1,224) | (1,168) | (1,128) | (1,008) | (1,194) | 200 | (963) | (708) | (708) | (152) | (818) | (708) | (708) | 418 | (18,679) |
| 5) Bankruptcy Related Disbursements | (5,250) | (500) | - | - | (1,341) | (500) | - | (962) | (1,541) | - | - | - | (18,381) | (30,030) | (32,808) | (12,922) | (22,733) | (28,475) |
| 6) Total Disbursements | (16,691) | (19,140) | (11,678) | (31,365) | (33,671) | (31,345) | (19,770) | (32,177) | (22,910) | (46,843) | (24,119) | (15,817) | (37,704) | (30,030) | (32,808) | (12,922) | (22,733) | (441,725) |
| 7) Net Cash Flow Before Borrowing/(Pay down) | 6,326 | 3,325 | 11,379 | (5,852) | (11,716) | (10,043) | 2,031 | (11,909) | (878) | (27,456) | (2,629) | 6,991 | (8,414) | 6,546 | 2,803 | 18,263 | 2,907 | (18,325) |
| 8) Beginning Est. Cash Balance (1) | 13,000 | 13,000 | 13,000 | 13,000 | 29,843 | 20,127 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 |
| 9) Plus: Net Cash Flow Before Borrowings | 6,326 | 3,325 | 11,379 | (5,852) | (11,716) | (10,043) | 2,031 | (11,909) | (878) | (27,456) | (2,629) | 6,991 | (8,414) | 6,546 | 2,803 | 18,263 | 2,907 | (18,325) |
| 10) Revolver Borrowings / (Pay downs) | (6,326) | (3,325) | (11,379) | 22,695 | - | (2,031) | 11,909 | - | 11,641 | 39,097 | 2,629 | (6,991) | (5,227) | 7,095 | (2,803) | (18,263) | (16,548) | 4,685 |
| 11) Change in Float Inc / (Dec) | - | - | - | - | 2,000 | (2,000) | - | - | 11,641 | (11,641) | - | - | 13,641 | (13,641) | - | - | 13,641 | 13,641 |
| 12) **Ending Est. Cash Balance** | 13,000 | 13,000 | 13,000 | 29,843 | 20,127 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 |
| **II. Liquidity** | | | | | | | | | | | | | | | | | | |
| 13) Borrowing Base Availability | 114,517 | 105,336 | 110,771 | 111,283 | 114,388 | 116,380 | 124,184 | 115,336 | 131,130 | 153,456 | 144,759 | 134,784 | 136,129 | 156,806 | 143,189 | 129,209 | 117,301 | 117,301 |
| 14) Less: Term / Revolving Credit Outstanding | (67,010) | (63,684) | (52,305) | (75,000) | (75,000) | (79,917) | (77,886) | (89,794) | (79,032) | (118,129) | (120,758) | (113,766) | (108,539) | (115,634) | (112,831) | (94,568) | (78,020) | (78,020) |
| Gross Remaining Availability | 47,507 | 41,651 | 58,465 | 36,283 | 39,388 | 36,463 | 46,299 | 25,542 | 52,098 | 35,328 | 24,002 | 21,018 | 27,590 | 41,172 | 30,358 | 34,640 | 39,281 | 39,281 |
| 15) Ending Available Cash | 13,000 | 13,000 | 13,000 | 29,843 | 20,127 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 |
| 16) Ending Total Liquidity | 60,507 | 54,651 | 71,465 | 66,126 | 59,515 | 49,463 | 59,299 | 38,542 | 65,098 | 48,328 | 37,002 | 34,018 | 40,590 | 54,172 | 43,358 | 47,640 | 52,281 | 52,281 |

(1) Includes in-transit cash.

## Milestones

(i)      On the Petition Date, the Borrower shall have filed a motion to approve this Secured Superpriority Debtor in Possession Loan, Security and Guaranty Agreement (the "**Credit Agreement**"), which motion shall be in form and substance reasonably acceptable to Agent and the Required Lenders. The Interim Order approving the Credit Agreement shall be entered by the Bankruptcy Court no later than 3 Business Days following the Petition Date, which Interim Order shall be in form and substance acceptable to Agent and the Required Lenders in their sole and absolute discretion.

(ii)     No later than 30 days after the Petition Date, the Final Order approving the Credit Agreement shall be entered by the Bankruptcy Court, which Final Order shall be in form and substance acceptable to Agent and the Required Lenders in their sole and absolute discretion (and the related motion shall be in form and substance reasonably satisfactory to the Agent and the Required Lenders).

(iii)    No later than 10 days after the Petition Date, the Borrower shall have filed a motion under Section 365 of the Bankruptcy Code, requesting an extension of the date on which the Borrower must assume or reject leases to 210 days after the entry of the order for such relief, with such order being entered by the Bankruptcy Court no later than 30 days after the Petition Date (such motion and order to be in form and substance acceptable to Agent and the Required Lenders in their sole and absolute discretion).  The Borrower may not assume, assume and assign, or reject leases without the prior written consent of the Agent and the Required Lenders.

(iv)     (a)      No later than 60 days after the Petition Date  the Borrower shall have filed the Plan of Reorganization in form and substance reasonably satisfactory to the Agent and the Required Lenders (it being understood and agreed that such Plan of Reorganization shall either repay all outstanding obligations under the DIP Credit Facility in cash on the effective date or provide alternative treatment satisfactory to the Agent and the Lenders in their sole and absolute discretion) and Disclosure Statement in form and substance satisfactory to Agent and the Required Lenders;

         (b)      the Bankruptcy Court shall have entered an order approving the Disclosure Statement on or prior to 95 days after the Petition Date;

         (c)      the Loan Parties shall have commenced solicitation on the Plan of Reorganization no later than 100 days after the Petition Date;

         (d)      the Bankruptcy Court shall have commenced the hearing to consider confirmation of the Plan of Reorganization on or prior to 130 days after the Petition Date;

         (e)      the Bankruptcy Court shall have entered an order confirming the Plan of Reorganization (the "**Confirmation Order**") on or prior to 140 days after the Petition Date; and

         (f)      the Plan of Reorganization shall have been consummated on or prior to 145 days after the Petition Date.

Pg 304 of 549

to Credit Agreement

(v)       Simultaneously with the plan process outlined in clause (iv) above, the Borrower shall pursue a sale process under Section 363 of the Bankruptcy Code, in accordance with the following timeline:

(a)       No later than 75 days after the Petition Date, the Borrower shall file a motion with the Bankruptcy Court to approve bid procedures and establish the date of an auction (the "**Auction**") to sell all or substantially all of the assets of the Borrower and Guarantors (the "**Bid Procedures Motion**"), which shall include a form of a stalking horse sale and purchase agreement ("**Stalking Horse SPA**"), which shall be in form and substance acceptable to Agent and the Required Lenders in their reasonable discretion;

(b)       No later than 75 days after the Petition Date, the Borrower shall forward the so-called "bid packages" to any potential bidders, including, without limitation, alternative bid packages to liquidation firms;

(c)       No later than 105 days after the Petition Date, the Bankruptcy Court shall have entered an order approving the Stalking Horse SPA and Bid Procedures Motion, which shall be in form and substance acceptable to Agent and the Required Lenders in their sole and absolute discretion;

(d)       No later than 141 days after the Petition Date, the Borrower shall conduct the Auction;

(e)       No later than 143 days after the Petition Date, the Bankruptcy Court shall enter an order approving the sale of the Borrower's assets to the party determined to have made the highest or otherwise best bid for all or substantially all of the assets of the Borrower and Guarantors (the "**Sale Order**"), which shall be in form and substance acceptable to Agent and the Required Lenders in their sole and absolute discretion; and

(f)       No later than 145 days after the Petition Date, the Borrower shall have consummated the sale (the "**363 Sale**") to the party determined to have made the highest or otherwise best bid for all or substantially all of the assets of the Borrower and Guarantors in accordance with the Sale Order pursuant to the Stalking Horse SPA or other sale and purchase agreement, which shall be in form and substance acceptable to Agent and the Required Lenders in their sole and absolute discretion.

It is understood and agreed that the Borrower may choose to abandon the plan process outlined in clause (iv) above at any time.  The Borrower may not abandon the sale process outlined in clause (v) above without the prior written consent of the Agent and Required Lenders.

**EXHIBIT 2-5**

**FORM OF BORROWING REQUEST NOTICE**

Crystal Financial LLC,
  as Administrative Agent for
  the Lenders referred to below
Two International Place, 17th Floor
Boston, MA 02110
Attention: Evren Ozargun

[____], 20[__]

Ladies and Gentlemen:

      Reference is made to the Secured Superpriority Debtor in Possession Loan, Security and Guaranty Agreement of even date herewith (the "Agreement"), by and among Aeropostale, Inc. (the "Borrower"), the other Loan Parties from time to time party thereto, the lenders party thereto (the "Lenders") and Crystal Financial LLC, a Delaware limited liability company, as Agent. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in the Agreement.

      The Borrower hereby irrevocably notifies you of the borrowing requested below.

      The proposed Borrowing shall consist of the following:

☐ A borrowing of [an Interim][a Final] Term Loan

☐ A borrowing of [an Interim][a Final] Revolving Credit Loan

| | Type of borrowing | Amount of borrowing[1] | Business Day of proposed borrowing[2] |
|---|---|---|---|
| ☐ | Two Day Request | $[___,___,000.00] | [_____, 20__] |
| ☐ | Same Day Request | $[___,___,000.00] | [_____, 20__] |

[Signature Page Follows]

---

[1] For Two Day Requests the requested borrowing shall be in an aggregate minimum principal amount of $2,000,000 and in integral multiples of $100,000 thereafter.

[2] For Two Day Requests, the Borrowing Request Notice must be received no later than 1:00 p.m. Eastern Standard Time two (2) Business Days prior to the Borrowing date of such Borrowing. For Same Day Advances, the Borrowing Request Notice must be received no later than 1:00 p.m. Eastern Standard Time on such requested Borrowing date. The Borrower may not request more than one (1) Same Day Request on any Business Day. For Two Day Requests, the Borrower may not request more than three (3) Borrowing Requests during any week.

2

The Borrower hereby represents and warrants that the conditions specified in Section [3-2 and][3] 3-3 shall be satisfied on and as of the date of the applicable loan or advance.

AEROPOSTALE, INC.

By:_____

Name:

Title:

---

[3] To be included for initial borrowing only.

Exhibit 2-8(A) to
Credit Agreement

### Form of Revolving Credit Note

[_____]

[_____], 20[__]

FOR VALUE RECEIVED, the undersigned, Aeropostale, Inc., a Delaware corporation with its principal executive offices at 112 West 34th Street, New York, New York 10120 (the "**Borrower**") promises to pay to the order of [_____], a [__][__] with offices at [_____] (hereinafter, with any subsequent holder, a "**Lender**") the aggregate unpaid principal balance of loans and advances made to or for the account of the Borrower pursuant to the Revolving Credit established pursuant to the Secured Superpriority Debtor in Possession Loan, Security and Guaranty Agreement dated as of even date herewith (as such may be amended hereafter, the "**Agreement**") by and among Crystal Financial LLC, as Agent on behalf of itself, the Lender and certain other lenders party thereto, the Guarantors party thereto, and the Borrower, with interest at the rate and payable in the manner stated therein. All capitalized terms used but not defined herein shall have the meaning set forth in the Agreement.

This is a "Revolving Credit Note" to which reference is made in the Agreement and is subject to all terms and provisions thereof. The principal of, and interest on, this Revolving Credit Note shall be payable as provided in the Agreement and shall be subject to acceleration as provided therein.

The Lender's books and records concerning loans and advances pursuant to the Revolving Credit, the accrual of interest thereon, and the repayment of such loans and advances, shall be prima facie evidence of the indebtedness to the Lender hereunder.

No delay or omission by the Lender in exercising or enforcing any of the Lender's powers, rights, privileges, remedies, or discretions hereunder shall operate as a waiver thereof on that occasion nor on any other occasion. No waiver of any default hereunder shall operate as a waiver of any other default hereunder, nor as a continuing waiver.

The Borrower waives presentment, demand, notice, and protest, and also waives any delay on the part of the holder hereof; assents to any extension or other indulgence (including, without limitation, the release or substitution of collateral) permitted by the Lender with respect to this Revolving Credit Note and/or any collateral given to secure this Revolving Credit Note or any extension or other indulgence with respect to any other liability or any collateral given to secure any other liability of the Borrower.

This Revolving Credit Note shall be binding upon the Borrower and upon its successors, assigns, and representatives, and shall inure to the benefit of the Lender and its successors, endorsees, and assigns.

The liabilities of the Borrower, and of any endorser or guarantor of this Revolving Credit Note, are joint and several, *provided, however,* the release by the Lender of any one or more such Persons shall not release any other Person obligated on account of this Revolving Credit Note. Each reference in this Revolving Credit Note to the Borrower, any endorser, and

Exhibit 2-8(A)
to Credit Agreement

any guarantor, is to such Person individually and also to all such Persons jointly. No Person obligated on account of this Revolving Credit Note may seek contribution from any other Person also obligated unless and until all liabilities, obligations and indebtedness to the Lender of the Person from whom contribution is sought have been satisfied in full.

This Revolving Credit Note and all rights and obligations hereunder, including matters of construction, validity, and performance, shall be governed by the laws of The State of New York (without giving effect to the conflicts of laws principals thereof, but including Sections 5-1401 and 5-1402 of the New York General Obligations Law).

The Borrower makes the following waiver knowingly, voluntarily, and intentionally, and understands that the Agent and the Lender, in the establishment and maintenance of its relationship with the Borrower contemplated by the within Revolving Credit Note, are relying thereon.

THE BORROWER, TO THE EXTENT ENTITLED THERETO, *WAIVES* ANY PRESENT OR FUTURE RIGHT OF THE BORROWER OR OF ANY OTHER PERSON LIABLE TO THE AGENT OR THE LENDER ON ACCOUNT OF OR IN RESPECT TO THE LIABILITIES, TO A TRIAL BY JURY IN ANY CASE OR CONTROVERSY IN WHICH THE AGENT OR THE LENDER IS OR BECOMES A PARTY (WHETHER SUCH CASE OR CONTROVERSY IS INITIATED BY OR AGAINST THE AGENT OR THE LENDER OR IN WHICH THE AGENT OR THE LENDER IS JOINED AS A PARTY LITIGANT), WHICH CASE OR CONTROVERSY ARISES OUT OF, OR IS IN RESPECT TO, ANY RELATIONSHIP AMONGST OR BETWEEN THE BORROWER, THE AGENT, ANY SUCH PERSON, AND THE LENDER.

*[Signature Page to Follow]*

Exhibit 2-8(A) to
Credit Agreement

**BORROWER:**

AEROPOSTALE, INC.


By: _____
Name:
Title:

Exhibit 2-8(B) to
Credit Agreement

# **Form of Term Loan Note**

[_____]

[_____], 20[__]

FOR VALUE RECEIVED, the undersigned, Aeropostale, Inc., a Delaware corporation with its principal executive offices at 112 West 34th Street, New York, New York 10120 (the "**Borrower**") promises to pay to the order of [_____], a [__][__] with offices at [____] (hereinafter, with any subsequent holder, a "**Lender**") the aggregate unpaid principal balance of loans and advances made to or for the account of the Borrower pursuant to the Term Loans established pursuant to the Secured Superpriority Debtor in Possession Loan, Security and Guaranty Agreement dated as of even date herewith (as such may be amended hereafter, the "**Agreement**") by and among Crystal Financial LLC, as Agent on behalf of itself, the Lender and certain other lenders party thereto, the Guarantors party thereto, and the Borrower, with interest at the rate and payable in the manner stated therein.  All capitalized terms used but not defined herein shall have the meaning set forth in the Agreement.

This is a "Term Loan Note" to which reference is made in the Agreement and is subject to all terms and provisions thereof.  The principal of, and interest on, this Term Loan Note shall be payable as provided in the Agreement and shall be subject to acceleration as provided therein.

The Lender's books and records concerning loans and advances pursuant to the Term Loan, the accrual of interest thereon, and the repayment of such loans and advances, shall be prima facie evidence of the indebtedness to the Lender hereunder.

No delay or omission by the Lender in exercising or enforcing any of the Lender's powers, rights, privileges, remedies, or discretions hereunder shall operate as a waiver thereof on that occasion nor on any other occasion.  No waiver of any default hereunder shall operate as a waiver of any other default hereunder, nor as a continuing waiver.

The Borrower waives presentment, demand, notice, and protest, and also waives any delay on the part of the holder hereof; assents to any extension or other indulgence (including, without limitation, the release or substitution of collateral) permitted by the Lender with respect to this Term Loan Note and/or any collateral given to secure this Term Loan Note or any extension or other indulgence with respect to any other liability or any collateral given to secure any other liability of the Borrower.

This Term Loan Note shall be binding upon the Borrower and upon its successors, assigns, and representatives, and shall inure to the benefit of the Lender and its successors, endorsees, and assigns.

The liabilities of the Borrower, and of any endorser or guarantor of this Term Loan Note, are joint and several, *provided, however,* the release by the Lender of any one or more such Persons shall not release any other Person obligated on account of this Term Loan Note.

Exhibit 2-8(B)
to Credit Agreement

Each reference in this Term Loan Note to the Borrower, any endorser, and any guarantor, is to such Person individually and also to all such Persons jointly. No Person obligated on account of this Term Loan Note may seek contribution from any other Person also obligated unless and until all liabilities, obligations and indebtedness to the Lender of the Person from whom contribution is sought have been satisfied in full.

This Term Loan Note and all rights and obligations hereunder, including matters of construction, validity, and performance, shall be governed by the laws of The State of New York (without giving effect to the conflicts of laws principals thereof, but including Sections 5-1401 and 5-1402 of the New York General Obligations Law).

The Borrower makes the following waiver knowingly, voluntarily, and intentionally, and understands that the Agent and the Lender, in the establishment and maintenance of its relationship with the Borrower contemplated by the within Term Loan Note, are relying thereon.

THE BORROWER, TO THE EXTENT ENTITLED THERETO, *WAIVES* ANY PRESENT OR FUTURE RIGHT OF THE BORROWER OR OF ANY OTHER PERSON LIABLE TO THE AGENT OR THE LENDER ON ACCOUNT OF OR IN RESPECT TO THE LIABILITIES, TO A TRIAL BY JURY IN ANY CASE OR CONTROVERSY IN WHICH THE AGENT OR THE LENDER IS OR BECOMES A PARTY (WHETHER SUCH CASE OR CONTROVERSY IS INITIATED BY OR AGAINST THE AGENT OR THE LENDER OR IN WHICH THE AGENT OR THE LENDER IS JOINED AS A PARTY LITIGANT), WHICH CASE OR CONTROVERSY ARISES OUT OF, OR IS IN RESPECT TO, ANY RELATIONSHIP AMONGST OR BETWEEN THE BORROWER, THE AGENT, ANY SUCH PERSON, AND THE LENDER.

*[Signature Page to Follow]*

11

Exhibit 2-8(B)
to Credit Agreement

**BORROWER:**

AEROPOSTALE, INC.


By: _____
Name:
Title:

Exhibit 4-2 to
Credit Agreement

## Related Entities

1. Aeropostale West, Inc.

2. Aeropostale Procurement Company, Inc.

3. Jimmy'Z Surf Co., LLC

4. Aeropostale Holdings, Inc.

5. Aero GC Management LLC

6. Aeropostale Puerto Rico, Inc.

7. Aeropostale Licensing, Inc.

8. P.S. from Aeropostale, Inc.

9. GoJane LLC

10. Aeropostale Canada Corp.

Exhibit 4-3 to
Credit Agreement

## **Trade Names**

(a)(i)    Aéropostale
  P.S. from Aéropostale
  GoJane

(a)(ii) None.

Exhibit 4-4 to
Credit Agreement

# **Intellectual Property**

<u>Trademarks and Copyrights</u>

(See Attached).

<u>Patents and Patent Applications</u>

None.

<u>Aéropostale License Agreements</u>

1. Store Renewal Agreement between Aeropostale Licensing, Inc. and Apparel FZCO dated February 1, 2015 (United Arab Emirates, Kuwait, Bahrain, Qatar, Kingdom of Saudi Arabia, Oman, Jordan & Iraq)

2. Store License Agreement between Aeropostale Licensing, Inc. and Montreal PTE Ltd. dated January 11, 2011, as amended February 1, 2015  (Singapore and Malaysia,)

3. Store License Agreement between Aeropostale Licensing, Inc. and Genc Mağazacilik A.Ş. dated October 26, 2011, as amended April 30, 2012, February 2, 2014, July 1, 2014 and February 1, 2015 (Turkey)

4. Store Development and Distribution Agreement between Aeropostale Licensing, Inc. and Store Specialists, Inc. dated May 15, 2012; and License Agreement between Aeropostale Licensing, Inc. and Store Specialists, Inc. dated May 15, 2012 (The Philippines)

5. Store License Agreement between Aeropostale Licensing, Inc. and Central Sport International, Inc. dated July 30, 2012 (Colombia and Panama)

6. License Agreement between Aeropostale Licensing, Inc. and Distribuidora Liverpool, S.A. DE C.V. dated December 14, 2012, as amended February 25, 2016 (Mexico)

7. Store License Agreement between Aeropostale Licensing, Inc. and Sociedad Comercial Grupo Yes dated February 27, 2014 (Chile)

8. Store License Agreement between Aeropostale Licensing, Inc. and Top Trends, S.A. dated November 12, 2014, as amended February 29, 2016 (Greece)

9. Store License Agreement between Aeropostale Licensing, Inc. and Shuz 4 U International Ltd. dated March 6, 2015 (Republic of Ireland and Northern Ireland)

10. Store License Agreement between Aeropostale Licensing Inc., and PT Mitra Adiperkasa Tbk. Dated June 19, 2015 (Republic of Indonesia)

11. Store License Agreement between Aeropostale Licensing, Inc. and Arvind Lifestyle Brands Limited dated July 1, 2015 (Republic of India)

12. Store License Agreement between Aeropostale Licensing, Inc. and Q&A Retail Company dated October 16, 2015 (Arab Republic of Egypt

PS from Aéropostale License Agreements

1. License Agreement between Aeropostale Licensing, Inc. and Distribuidora Liverpool, S.A. DE C.V. dated October 7, 2013 (as amended by the First Amendment to License Agreement, dated November 1, 2015) (Mexico)

2. Store Development and Distribution Agreement between Aeropostale Licensing, Inc. and Store Specialists, Inc. dated October 7, 2013; and License Agreement between Aeropostale Licensing, Inc. and Store Specialists, Inc. dated October 7, 2013 (The Philippines)

3. Store License Agreement between Aeropostale Licensing, Inc. and Sociedad Comercial Grupo Yes dated August 24, 2014 (Chile)

4. Store License Agreement between Aeropostale Licensing, Inc. and Apparel FZCO dated February 1, 2015 (United Arab Emirates, Kuwait, Bahrain, Qatar, Kingdom of Saudi Arabia, Oman, Jordan & Iraq)

Other License Agreements

1. License Agreement between Bethany Mota Global LLC and Aeropostale, Inc. dated June 8, 2015 and effective January 1, 2016 (Bethany Mota Trademark)

2. License Agreement between Aeropostale Procurement Company. Inc. and Himatsingka America Inc. dated August 26, 2015 (Bedding and Bath Products)

Exhibit 4-4 to
Credit Agreement

**Trademarks**

| | Trademark | Status | Appl. No. | Appl. Date | Reg. No. | Reg. Date | Owner |
|---|---|---|---|---|---|---|---|
| 1. | 87 | Registered | 78/251,344 | 19-May-2003 | 3000665 | 27-Sep-2005 | Aeropostale Procurement Company, Inc. |
| 2. | 87 | Registered | 77/149,679 | 05-Apr-2007 | 3651711 | 07-Jul-2009 | Aeropostale Procurement Company, Inc. |
| 3. | 87 | Registered | 77/149,696 | 05-Apr-2007 | 3669841 | 18-Aug-2009 | Aeropostale Procurement Company, Inc. |
| 4. | A & DESIGN | Registered | 76/344,182 | 29-Nov-2001 | 2680386 | 28-Jan-2003 | Aeropostale Procurement Company, Inc. |
| 5. | A GRAPHIC IMAGE OF A TURTLE | Registered | 78/522,220 | 23-Nov-2004 | 3041426 | 10-Jan-2006 | Aeropostale Procurement Company, Inc. |
| 6. | A GRAPHIC IMAGE OF A WHALE | Registered | 78/522,226 | 23-Nov-2004 | 3095135 | 23-May-2006 | Aeropostale Procurement Company, Inc. |

Exhibit 4-4 to
Credit Agreement

| | Trademark | Status | Appl. No. | Appl. Date | Reg. No. | Reg. Date | Owner |
|---|---|---|---|---|---|---|---|
| 7. | A87 & Design  | Registered | 78/746,520 | 03-Nov-2005 | 3151023 | 03-Oct-2006 | Aeropostale Procurement Company, Inc. |
| 8. | A87 | Registered | 77/149,505 | 05-Apr-2007 | 3477550 | 29-Jul-2008 | Aeropostale Procurement Company, Inc. |
| 9. | A87 | Registered | 85/325,662 | 20-May-2011 | 4074223 | 20-Dec-2011 | Aeropostale Procurement Company, Inc. |
| 10. | A87 | Registered | 85/773,041 | 06-Nov-2012 | 4324559 | 23-Apr-2013 | Aeropostale Procurement Company, Inc. |
| 11. | AERO | Registered | 85/310,708 | 03-May-2011 | 4299932 | 12-Mar-2013 | Aeropostale Procurement Company, Inc. |
| 12. | AERO & HEARTS DESIGN  | Registered | 77/074,489 | 02-Jan-2007 | 3529688 | 11-Nov-2008 | Aeropostale Procurement Company, Inc. |
| 13. | AERO (STYLIZED & DESIGN)  | Registered | 77/074,477 | 02-Jan-2007 | 3545732 | 16-Dec-2008 | Aeropostale Procurement Company, Inc. |
| 14. | AERO (STYLIZED)  | Registered | 75/942,762 | 13-Mar-2000 | 2911335 | 14-Dec-2004 | Aeropostale Procurement Company, Inc. |

18

Exhibit 4-4 to
Credit Agreement

| | Trademark | Status | Appl. No. | Appl. Date | Reg. No. | Reg. Date | Owner |
|---|---|---|---|---|---|---|---|
| 15. | AERO AND EXPLOSION DESIGN  | Registered | 78/289,477 | 19-Aug-2003 | 2937762 | 05-Apr-2005 | Aeropostale Procurement Company, Inc. |
| 16. | AERO ATHLETICS | Registered | 78/272,006 | 09-Jul-2003 | 2927817 | 22-Feb-2005 | Aeropostale Procurement Company, Inc. |
| 17. | AERO NOW | Registered | 86/198,852 | 20-Feb-2014 | 4661024 | 23-Dec-2014 | Aeropostale Procurement Company, Inc. |
| 18. | AEROPOSTALE | Registered | 73/708,584 | 01-Feb-1988 | 1525345 | 21-Feb-1989 | Aeropostale Procurement Company, Inc. |
| 19. | AEROPOSTALE | Registered | 73/708,583 | 01-Feb-1988 | 1548372 | 18-Jul-1989 | Aeropostale Procurement Company, Inc. |
| 20. | AEROPOSTALE | Registered | 73/679,424 | 19-Aug-1987 | 1485368 | 19-Apr-1988 | Aeropostale Procurement Company, Inc. |
| 21. | AEROPOSTALE | Registered | 73/679,252 | 18-Aug-1987 | 1487211 | 03-May-1988 | Aeropostale Procurement Company, Inc. |
| 22. | AEROPOSTALE | Registered | 78/907,234 | 13-Jun-2006 | 3233142 | 24-Apr-2007 | Aeropostale Procurement Company, Inc. |
| 23. | AEROPOSTALE | Registered | 77/070,636 | 22-Dec-2006 | 3361415 | 01-Jan-2008 | Aeropostale Procurement Company, Inc. |
| 24. | AEROPOSTALE | Registered | 77/070,654 | 22-Dec-2006 | 3361416 | 01-Jan-2008 | Aeropostale Procurement Company, Inc. |
| 25. | AEROPOSTALE | Registered | 77/052,018 | 28-Nov-2006 | 3287647 | 04-Sep-2007 | Aeropostale Procurement Company, Inc. |
| 26. | AEROPOSTALE | Registered | 77/058,161 | 06-Dec-2006 | 3285272 | 28-Aug-2007 | Aeropostale Procurement Company, Inc. |
| 27. | AEROPOSTALE | Registered | 77/070,674 | 22-Dec-2006 | 3285335 | 28-Aug-2007 | Aeropostale Procurement Company, Inc. |
| 28. | AEROPOSTALE | Registered | 77/149,296 | 05-Apr-2007 | 3443836 | 10-Jun-2008 | Aeropostale Procurement Company, Inc. |
| 29. | AEROPOSTALE | Registered | 77/187,554 | 22-May-2007 | 3444014 | 10-Jun-2008 | Aeropostale Procurement Company, Inc. |
| | AEROPOSTALE | Registered | 86/727,210 | 17-Aug-2015 | 4895881 | 02-Feb-2016 | Aeropostale Procurement Company, Inc. |

WEIL:\95685927\8\11727.0012

Exhibit 4-4 to
Credit Agreement

| | Trademark | Status | Appl. No. | Appl. Date | Reg. No. | Reg. Date | Owner |
|---|---|---|---|---|---|---|---|
| 30. | AEROPOSTALE (STYLIZED) | Registered | 73/502,671 | 05-Oct-1984 | 1354292 | 13-Aug-1985 | Aeropostale Procurement Company, Inc. |
| 31. | AEROPOSTALE 87 | Registered | 85/773,018 | 06-Nov-2012 | 4328454 | 30-Apr-2013 | Aeropostale Procurement Company, Inc. |
| 32. | AEROPOSTALE A & DESIGN | Registered | 76/344,183 | 29-Nov-2001 | 2680387 | 28-Jan-2003 | Aeropostale Procurement Company, Inc. |
| 33. | AEROPOSTALE A87 | Registered | 85/773,154 | 06-Nov-2012 | 4328455 | 30-Apr-2013 | Aeropostale Procurement Company, Inc. |
| 34. | AEROPOSTALE AND BUTTERFLY DESIGN | Registered | 77/067,198 | 19-Dec-2006 | 3384078 | 19-Feb-2008 | Aeropostale Procurement Company, Inc. |
| 35. | AEROPOSTALE AND BUTTERFLY DESIGN | Registered | 77/066,620 | 18-Dec-2006 | 3293234 | 18-Sep-2007 | Aeropostale Procurement Company, Inc. |
| 36. | AEROPOSTALE AND BUTTERFLY DESIGN | Registered | 77/975,079 | 19-Dec-2006 | 3381679 | 12-Feb-2008 | Aeropostale Procurement Company, Inc. |

20

Exhibit 4-4 to
Credit Agreement

| | Trademark | Status | Appl. No. | Appl. Date | Reg. No. | Reg. Date | Owner |
|---|---|---|---|---|---|---|---|
| 37. | AEROPOSTALE COMPAGNIE GENERALE FAISANT L'IMPOSSIBLE!: SERVICE QUOTIDIEN POUR L'ESPAGNE, LE MAROC & L  | Registered | 73/607,577 | 02-Jul-1986 | 1441289 | 02-Jun-1987 | Aeropostale Procurement Company, Inc. |
| 38. | AEROPOSTALE DESIGNED IN NYC (Stylized 1)  | Registered | 86/164,801 | 14-Jan-2014 | 4572424 | 22-Jul-2014 | Aeropostale Procurement Company, Inc. |
| 39. | AEROPOSTALE designed in nyc (Stylized 2)  | Registered | 86/171,612 | 22-Jan-2014 | 4572463 | 22-Jul-2014 | Aeropostale Procurement Company, Inc. |
| 40. | AEROPOSTALE MAXIMUM | Registered | 86/272042 | 05-May-2014 | 4609927 | 23-Sep-2014 | Aeropostale Procurement Company, Inc. |
| 41. | AEROPOSTALE NYC | Registered | 85/773,124 | 06-Nov-2012 | 4395142 | 03-Sep-2013 | Aeropostale Procurement Company, Inc. |
| 42. | #BESTBOOTYEVER | Registered | 86/212,703 | 06-Mar-2014 | 4658719 | 23-Dec-2014 | Aeropostale Procurement Company, Inc. |
| 43. | BROOKLYN CALLING | Registered | 86/197,516 | 19-Feb-2014 | 4661019 | 23-Dec-2014 | Aeropostale Procurement Company, Inc. |
| 44. | EIGHTY 7 | Registered | 78/445,275 | 02-Jul-2004 | 3532383 | 11-Nov-2008 | Aeropostale Procurement Company, Inc. |

Exhibit 4-4 to
Credit Agreement

| | Trademark | Status | Appl. No. | Appl. Date | Reg. No. | Reg. Date | Owner |
|---|---|---|---|---|---|---|---|
| 45. | EIGHTY SEVEN | Registered | 78/445,273 | 02-Jul-2004 | 3421014 | 29-Apr-2008 | Aeropostale Procurement Company, Inc. |
| 46. | FREE STATE | Registered | 86/132,645 | 02-Dec-2013 | 4660903 | 23-Dec-2014 | Aeropostale Procurement Company, Inc. |
| 47. | GO jane & Design  | Registered | 77/978,507 | 27-Aug-2008 | 3864266 | 19-Oct-2010 | Aeropostale, Inc. |
| 48. | GO jane & Design  | Registered | 77/557,269 | 27-Aug-2008 | 4043645 | 25-Oct-2011 | Aeropostale, Inc. |
| 49. | GOJANE | Registered | 77/978,186 | 27-Aug-2008 | 3837976 | 24-Aug-2010 | Aeropostale, Inc. |
| 50. | GOJANE | Registered | 77/557,253 | 27-Aug-2008 | 4047333 | 01-Nov-2011 | Aeropostale, Inc. |
| 51. | GOJANE.COM | Registered | 77/537,503 | 01-Aug-2008 | 4040079 | 18-Oct-2011 | Aeropostale, Inc. |
| 52. | Hearts logo  | Registered | 86/275,816 | 08-May-2014 | 4609931 | 23-Sep-2014 | Aeropostale Procurement Company, Inc. |
| 53. | INVITE ONLY | Registered | 86/200,066 | 21-Feb-2014 | 4697157 | 03-Mar-2015 | Aeropostale Procurement Company, Inc. |
| 54. | JIMMY'Z | Registered | 73/565,650 | 23-Oct-1985 | 1411390 | 30-Sep-1986 | Aeropostale West, Inc. |
| 55. | JIMMY'Z | Registered | 73/672,609 | 17-Jul-1987 | 1490256 | 31-May-1988 | Aeropostale West, Inc. |
| 56. | JIMMY'Z | Registered | 78/566,750 | 14-Feb-2005 | 3240506 | 08-May-2007 | Aeropostale West, Inc. |
| 57. | JIMMY'Z | Registered | 78/690,060 | 10-Aug-2005 | 3170960 | 14-Nov-2006 | Aeropostale West, Inc. |

WEIL:\95685927\8\11727.0012

Exhibit 4-4 to
Credit Agreement

| | Trademark | Status | Appl. No. | Appl. Date | Reg. No. | Reg. Date | Owner |
|---|---|---|---|---|---|---|---|
| 58. | JIMMY'Z | Registered | 78/690,065 | 10-Aug-2005 | 3170961 | 14-Nov-2006 | Aeropostale West, Inc. |
| 59. | JIMMY'Z | Registered | 78/690,075 | 10-Aug-2005 | 3299252 | 25-Sep-2007 | Aeropostale West, Inc. |
| 60. | JIMMY'Z | Registered | 78/977,516 | 09-Sep-2003 | 3160988 | 17-Oct-2006 | Aeropostale West, Inc. |
| 61. | JIMMY'Z | Registered | 77/123,172 | 06-Mar-2007 | 3447587 | 17-Jun-2008 | Aeropostale West, Inc. |
| 62. | JIMMY'Z | Registered | 85/982,067 | 29-Apr-2011 | 4594167 | 29-Apr-2011 | Aeropostale West, Inc. |
| 63. | JUNIE AND JADE | Registered | 86/290,114 | 23-May-2014 | 4733147 | 05-May-2015 | Aeropostale Procurement Company, Inc. |
| 64. | LEAGUE 87 | Registered | 86/271,836 | 05-May-2014 | 4697287 | 03-03-2015 | Aeropostale Procurement Company, Inc. |
| 65. | LIVE LOVE DREAM | Registered | 85/710,446 | 22-Aug-2012 | 4460948 | 07-Jan-2014 | Aeropostale Procurement Company, Inc. |
| 66. | LIVE LOVE DREAM | Registered | 85/755,971 | 17-Oct-2012 | 4482218 | 11-Feb-2014 | Aeropostale Procurement Company, Inc. |
| 67. | LIVE LOVE DREAM | Registered | 85/794,355 | 04-Dec-2012 | 4502798 | 25-Mar-2014 | Aeropostale Procurement Company, Inc. |
| 68. | LIVE LOVE DREAM AERO | Registered | 85/710,464 | 22-Aug-2012 | 4460949 | 07-Jan-2014 | Aeropostale Procurement Company, Inc. |
| 69. | LIVE LOVE DREAM AEROPOSTALE | Registered | 85/794,134 | 04-Dec-2012 | 4324601 | 23-Apr-2013 | Aeropostale Procurement Company, Inc. |
| 70. | LLD Heart Logo  | Registered | 86/019,535 | 25-Jul-2013 | 4491028 | 04-Mar-2014 | Aeropostale Procurement Company, Inc. |

WEIL:\95685927\8\11727.0012

Exhibit 4-4 to
Credit Agreement

| | Trademark | Status | Appl. No. | Appl. Date | Reg. No. | Reg. Date | Owner |
|---|---|---|---|---|---|---|---|
| 71. | LLD Heart Logo  | Registered | 86/020,274 | 25-Jul-2013 | 4491065 | 04-Mar-2014 | Aeropostale Procurement Company, Inc. |
| 72. | LLD Heart logo  | Registered | 86/271,696 | 05-May-2014 | 4697284 | 03-Mar-2015 | Aeropostale Procurement Company, Inc. |
| 73. | LOCKERSTOCK | Registered | 86/197,697 | 19-Feb-2014 | 4661020 | 23-Dec-2014 | Aeropostale Procurement Company, Inc. |
| 74. | LORIMER | Registered | 86/127,083 | 22-Nov-2013 | 4660874 | 23-Dec-2014 | Aeropostale Procurement Company, Inc. |
| 75. | MAP TO MARS | Registered | 86/127,129 | 22-Nov-2013 | 4660875 | 23-Dec-2014 | Aeropostale Procurement Company, Inc. |
| 76. | PIER 62 | Registered | 86/271,794 | 05-May-2014 | 4697285 | 03-Mar-2015 | Aeropostale Procurement Company, Inc. |
| 77. | PRIME AEROPOSTALE | Registered | 86/271,762 | 05-May-2014 | 4721541 | 14-Apr-2015 | Aeropostale Procurement Company, Inc. |

WEIL:\95685927\8\11727.0012

Exhibit 4-4 to
Credit Agreement

| | Trademark | Status | Appl. No. | Appl. Date | Reg. No. | Reg. Date | Owner |
|---|---|---|---|---|---|---|---|
| 78. | PS ACTIVATE and triangle design  | Registered | 86/041,750 | 19-Aug-2013 | 4696765 | 03-Mar-2014 | Aeropostale Procurement Company, Inc. |
| 79. | PS COUTURE ESTABLISHED MMIX New York (Stylized)  | Registered | 86/163,683 | 13-Jan-2014 | 4596355 | 02-Sep-2014 | Aeropostale Procurement Company, Inc. |
| 80. | PS FROM AEROPOSTALE | Registered | 77/488,907 | 02-Jun-2008 | 3693636 | 06-Oct-2009 | Aeropostale Procurement Company, Inc. |
| 81. | PS FROM AEROPOSTALE | Registered | 77/976,066 | 02-Jun-2008 | 4150648 | 29-May-2012 | Aeropostale Procurement Company, Inc. |
| 82. | PS FROM AEROPOSTALE | Registered | 77/488,966 | 02-Jun-2008 | 3709721 | 10-Nov-2009 | Aeropostale Procurement Company, Inc. |
| 83. | PS FROM AEROPOSTALE | Registered | 77/978,100 | 02-Jun-2008 | 3716916 | 24-Nov-2009 | Aeropostale Procurement Company, Inc. |
| 84. | PS FROM AEROPOSTALE | Registered | 77/979,123 | 02-Jun-2008 | 3794934 | 25-May-2010 | Aeropostale Procurement Company, Inc. |
| 85. | PS09 | Registered | 85/311,863 | 04-May-2011 | 4067167 | 06-Dec-2011 | Aeropostale Procurement Company, Inc. |
| 86. | PS09 | Registered | 85/314,169 | 06-May-2011 | 4067245 | 06-Dec-2011 | Aeropostale Procurement Company, Inc. |
| 87. | PS4U | Registered | 85/311,949 | 04-May-2011 | 4067170 | 06-Dec-2011 | Aeropostale Procurement Company, Inc. |
| 88. | PS4U | Registered | 85/314,287 | 06-May-2011 | 4067246 | 06-Dec-2011 | Aeropostale Procurement Company, Inc. |

WEIL:\95685927\8\11727.0012

Exhibit 4-4 to
Credit Agreement

| | Trademark | Status | Appl. No. | Appl. Date | Reg. No. | Reg. Date | Owner |
|---|---|---|---|---|---|---|---|
| 89. | SIGNATURE POCKET STITCH  | Registered | 78/625,787 | 09-May-2005 | 3336202 | 13-Nov-2007 | Aeropostale Procurement Company, Inc. |
| 90. | SOHO NIGHTS AEROPOSTALE | Registered | 86/272,570 | 06-May-2014 | 4721546 | 23-Sep-2014 | Aeropostale Procurement Company, Inc. |
| 91. | TOKYO DARLING | Registered | 86/135,920 | 05-Dec-2013 | 4660909 | 23-Dec-2014 | Aeropostale Procurement Company, Inc. |
| 92. | WOODY CAR DESIGN  | Registered | 85/308,597 | 29-Apr-2011 | 4184146 | 31-Jul-2012 | Aeropostale West, Inc. |
| 93. | WOODY CAR DESIGN (REAR VIEW)  | Registered | 78/605,132 | 08-Apr-2005 | 3262442 | 10-Jul-2007 | Aeropostale West, Inc. |
| 94. | WOODY CAR DESIGN SIDE VIEW  | Registered | 78/976,863 | 08-Apr-2005 | 3146955 | 19-Sep-2006 | Aeropostale West, Inc. |
| | | | | | | | |

26

Exhibit 4-4 to
Credit Agreement

## Trademark Applications

|  | Trademark | Status | Appl. No. | Appl. Date | Reg. No. | Reg. Date | Owner |
|---|---|---|---|---|---|---|---|
| 1. | AERO | Pending | 86/486,763 | 19-Dec-2014 | 4794024 | 18-Aug-2015 | Aeropostale Procurement Company, Inc. |
| 2. | AERO | Pending | 86/531,091 | 11-Feb-2015 | N/A | N/A | Aeropostale Procurement Company, Inc. |
| 3. | AERO NYC | Pending | 85/772,770 | 06-Nov-2012 | N/A | N/A | Aeropostale Procurement Company, Inc. |
| 4. | AERONYC | Pending | 85/772,819 | 06-Nov-2012 | N/A | N/A | Aeropostale Procurement Company, Inc. |
| 5. | AEROPOSTALE CLOUD 9 | Pending | 86/272,597 | 06-May-2014 | N/A | N/A | Aeropostale Procurement Company, Inc. |
| 6. | AEROPOSTALE GENERAL STORE | Pending | 86/680,628 | 01-Jul-2015 | N/A | N/A | Aeropostale Procurement Company, Inc. |
| 7. | BROOKLYN CALLING | Pending | 86/511,499 | 22-Jan-2015 | N/A | N/A | Aeropostale Procurement Company, Inc. |
| 8. | BROOKLYN CALLING | Pending | 86/511,518 | 22-Jan-2015 | N/A | N/A | Aeropostale Procurement Company, Inc. |
| 9. | INVITE ONLY | Pending | 86/525,390 | 05-Feb-2015 | N/A | N/A | Aeropostale Procurement Company, Inc. |
| 10. | LIVE LOVE DREAM | Pending | 85/794,301 | 04-Dec-2012 | N/A | N/A | Aeropostale Procurement Company, Inc. |
| 11. | LOVE[3] | Pending | 86/564,920 | 16-Mar-2015 | N/A | N/A | Aeropostale Procurement Company, Inc. |
|  | PRINCE & FOX | Pending | 86/866,961 | 06-Jan-2016 | N/A | N/A | Aeropostale Procurement Company, Inc. |
| 12. | TWIN FARMS GENERAL STORE | Pending | 86/706,831 | 28-Jul-2015 | N/A | N/A | Aeropostale Procurement Company, Inc. |
| 13. | TWIN FARM TRADING COMPANY | Pending | 86/706,886 | 28-Jul-2015 | N/A | N/A | Aeropostale Procurement Company, Inc. |
| 14. | TOKYO DARLING | Pending | 86/511,509 | 22-Jan-2015 | N/A | N/A | Aeropostale Procurement Company, Inc. |
| 15. | TOKYO DARLING | Pending | 86/511,521 | 22-Jan-2015 | N/A | N/A | Aeropostale Procurement Company, Inc. |
|  |  |  |  |  |  |  |  |

Exhibit 4-4 to
Credit Agreement

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **PRINCE & FOX** | Pending | 86/926,314 | 02-Mar-2016 | N/A | N/A | Aeropostale Procurement Company, Inc. |
| | PRINCE & FOX | Pending | 86/919,805 | 25-Feb-2016 | N/A | N/A | Aeropostale Procurement Company, Inc. |
| | (DESIGN ONLY) | Pending | 86/919,892 | 25-Feb-2016 | N/A | N/A | Aeropostale Procurement Company, Inc. |
| | (DESIGN ONLY) | Pending | 86/867,021 | 06-Feb-2016 | N/A | N/A | Aeropostale Procurement Company, Inc. |
| | CAPE ⊳ JUBY | Pending | 86/867,232 | 06-Jan-2016 | N/A | N/A | Aeropostale Procurement Company, Inc. |
| | CAPE ⊳ JUBY | Pending | 86/920,011 | 25-Feb-2016 | N/A | N/A | Aeropostale Procurement Company, Inc. |

WEIL:\95685927\8\11727.0012

Exhibit 4-4 to
Credit Agreement

## US STATE/PUERTO RICO TRADEMARK REGISTRATIONS AND APPLICATIONS

| Trademark | Status | Jurisdiction | Registration Number | Registration Date | Owner |
|---|---|---|---|---|---|
| Design Only | RENEWED FL | U.S. STATE FLORIDA | T05000000906 | 14-JUL-2005 | AEROPOSTALE WEST, INC. |
| Design Only | RENEWED AZ | U.S. STATE ARIZONA | 49822 | 26-AUG-2005 | AEROPOSTALE WEST, INC. |
| Design Only | RENEWED OR | U.S. STATE OREGON | 38558 | 14-JUN-2005 | AEROPOSTALE WEST, INC. |
| Design Only | RENEWED CA | U.S. STATE CALIFORNIA | 110964 | 10-JUN-2005 | AEROPOSTALE WEST, INC. |
| Design Only | RENEWED CT | U.S. STATE CONNECTICUT | 22375 | 09-JUN-2005 | AEROPOSTALE WEST, INC. |
| Design Only | RENEWED NY | U.S. STATE NEW YORK | R30625 | 09-JUN-2005 | AEROPOSTALE WEST, INC. |
| Design Only | RENEWED CO | U.S. STATE COLORADO | 20051220460 | 03-JUN-2005 | AEROPOSTALE WEST, INC. |
| Design Only | RENEWED WA | U.S. STATE WASHINGTON | 33151 | 03-JUN-2005 | AEROPOSTALE WEST, INC. |
| Design Only | REGISTERED NJ | U.S. STATE NEW JERSEY | 22033 | 06-JAN-2005 | AEROPOSTALE WEST, INC. |
| Design Only | REGISTERED NJ | U.S. STATE NEW JERSEY | 22034 | 06-JAN-2005 | AEROPOSTALE WEST, INC. |
| Design Only | RENEWED FL | U.S. STATE FLORIDA | T04000001652 | 28-DEC-2004 | AEROPOSTALE WEST, INC. |

| Trademark | Status | Jurisdiction | Registration Number | Registration Date | Owner |
|---|---|---|---|---|---|
| Design Only | RENEWED FL | U.S. STATE FLORIDA | T04000001653 | 28-DEC-2004 | AEROPOSTALE WEST, INC. |
|  Design Only | RENEWED CA | U.S. STATE CALIFORNIA | 110583 | 15-DEC-2004 | AEROPOSTALE WEST, INC. |
|  Design Only | RENEWED CA | U.S. STATE CALIFORNIA | 110584 | 15-DEC-2004 | AEROPOSTALE WEST, INC. |
| Design Only | REGISTERED CT | U.S. STATE CONNECTICUT | 22221 | 30-NOV-2004 | AEROPOSTALE WEST, INC. |
|  Design Only | RENEWED CO | U.S. STATE COLORADO | 20041410856 | 30-NOV-2004 | AEROPOSTALE WEST, INC. |
|  Design Only | RENEWED OR | U.S. STATE OREGON | 38132 | 30-NOV-2004 | AEROPOSTALE WEST, INC. |
|  Design Only | RENEWED CT | U.S. STATE CONNECTICUT | 22223 | 30-NOV-2004 | AEROPOSTALE WEST, INC. |

30

| Trademark | Status | Jurisdiction | Registration Number | Registration Date | Owner |
|---|---|---|---|---|---|
|  Design Only | RENEWED CT | U.S. STATE CONNECTICUT | 22220 | 30-NOV-2004 | AEROPOSTALE WEST, INC. |
|  Design Only | RENEWED CT | U.S. STATE CONNECTICUT | 22222 | 30-NOV-2004 | AEROPOSTALE WEST, INC. |
|  Design Only | RENEWED WA | U.S. STATE WASHINGTON | 32720 | 30-NOV-2004 | AEROPOSTALE WEST, INC. |
| Design Only | REGISTERED WA | U.S. STATE WASHINGTON | 32724 | 29-NOV-2004 | AEROPOSTALE WEST, INC. |
|  Design Only | RENEWED NY | U.S. STATE NEW YORK | R30524 | 30-NOV-2004 | AEROPOSTALE WEST, INC. |
| Design Only | RENEWED CO | U.S. STATE COLORADO | 20041408364 | 29-NOV-2004 | AEROPOSTALE WEST, INC. |
|  Design Only | RENEWED CO | U.S. STATE COLORADO | 20041408373 | 29-NOV-2004 | AEROPOSTALE WEST, INC. |
|  Design Only | RENEWED WA | U.S. STATE WASHINGTON | 32722 | 29-NOV-2004 | AEROPOSTALE WEST, INC. |
| Design Only | RENEWED OR | U.S. STATE OREGON | 38130 | 26-NOV-2004 | AEROPOSTALE WEST, INC. |

WEIL:\95685927\8\11727.0012

Exhibit 4-4 to
Credit Agreement

| Trademark | Status | Jurisdiction | Registration Number | Registration Date | Owner |
|---|---|---|---|---|---|
|  Design Only | RENEWED WA | U.S. STATE WASHINGTON | 32723 | 29-NOV-2004 | AEROPOSTALE WEST, INC. |
|  Design Only | RENEWED NY | U.S. STATE NEW YORK | R30520 | 26-NOV-2004 | AEROPOSTALE WEST, INC. |
| AEROPOSTALE Word Only | REGISTERED PR | U.S. STATE PUERTO RICO | 72455 | 06-MAR-2007 | AEROPOSTALE WEST, INC. |
| AEROPOSTALE Word Only | REGISTERED PR | U.S. STATE PUERTO RICO | 72454 | 06-MAR-2007 | AEROPOSTALE WEST, INC. |
| AEROPOSTALE Word Only | REGISTERED PR | U.S. STATE PUERTO RICO | 72459 | 06-MAR-2007 | AEROPOSTALE WEST, INC. |
| AEROPOSTALE Word Only | REGISTERED PR | U.S. STATE PUERTO RICO | 72460 | 06-MAR-2007 | AEROPOSTALE WEST, INC. |
| AERO Word Only | REGISTERED PR | U.S. STATE PUERTO RICO | 72461 | 06-MAR-2007 | AEROPOSTALE WEST, INC. |
| AERO Word Only | REGISTERED PR | U.S. STATE PUERTO RICO | 72457 | 06-MAR-2007 | AEROPOSTALE WEST, INC. |
| AERO Word Only | REGISTERED PR | U.S. STATE PUERTO RICO | 72458 | 06-MAR-2007 | AEROPOSTALE WEST, INC. |
| AERO Word Only | REGISTERED PR | U.S. STATE PUERTO RICO | 72456 | 06-MAR-2007 | AEROPOSTALE WEST, INC. |
| 87 Word Only | REGISTERED PR | U.S. STATE PUERTO RICO | 72465 | 06-MAR-2007 | AEROPOSTALE WEST, INC. |

WEIL:\95685927\8\11727.0012

## Copyrights

| | Copyright | Status | Reg. No. | Reg. Date | Claimant |
|---|---|---|---|---|---|
| 1. | AEROPOSTALE FLOWERS | Registered | VA 1-356-708 | 16-Jun-2006 | AEROPOSTALE, INC. |
| 2. | ANGEL MONKEY | Registered | VA 1-286-995 | 24-Nov-2004 | AEROPOSTALE WEST, INC. |
| 3. | AEROPOSTALE BIRDS | Registered | VA 1-356-709 | 16-Jun-2006 | AEROPOSTALE, INC. |
| 4. | BUBBLE MONKEY | Registered | VA 1-286-990 | 24-Nov-2004 | AEROPOSTALE WEST, INC. |
| 5. | BUTTERFLY TURTLE | Registered | VAu 646-523 | 24-Nov-2004 | AEROPOSTALE WEST, INC. |
| 6. | AEROPOSTALE DAY @ BEACH | Registered | VA 1-356-710 | 16-Jun-2006 | AEROPOSTALE, INC. |
| 7. | MONKEY BANANA | Registered | VA 1-286-997 | 24-Nov-2004 | AEROPOSTALE WEST, INC. |
| 8. | MONKEY FACES | Registered | VA 1-286-989 | 24-Nov-2004 | AEROPOSTALE WEST, INC. |
| 9. | MONKEY FLOWER | Registered | VA 1-286-987 | 24-Nov-2004 | AEROPOSTALE WEST, INC. |
| 10. | MONKEY HEAD BANANA | Registered | VA 1-286-993 | 24-Nov-2004 | AEROPOSTALE WEST, INC. |
| 11. | MONKEY HEART BALLOON | Registered | VA 1-286-992 | 24-Nov-2004 | AEROPOSTALE WEST, INC. |
| 12. | MONKEY HEART | Registered | VA 1-286-986 | 24-Nov-2004 | AEROPOSTALE WEST, INC. |
| 13. | MONKEY ICE SKATES | Registered | VA 1-286-998 | 24-Nov-2004 | AEROPOSTALE WEST, INC. |
| 14. | MONKEY NAH NAH | Registered | VA 1-378-471 | 13-Oct-2006 | AEROPOSTALE WEST, INC. |
| 15. | MONKEY PILLOW FIGHT | Registered | VA 1-286-991 | 24-Nov-2004 | AEROPOSTALE WEST, INC. |
| 16. | MONKEY SNOWFLAKE | Registered | VA 1-286-999 | 24-Nov-2004 | AEROPOSTALE WEST, INC. |
| 17. | AEROPOSTALE "MONKEY UNIVERSITY" | Registered | VA 1-356-705 | 16-Jun-2006 | AEROPOSTALE, INC. |
| 18. | AEROPOSTALE "MONKEY UNIVERSITY" | Registered | VA 1-391-181 | 7-Jul-2006 | AEROPOSTALE, INC. |
| 19. | PAJAMA PARTY | Registered | VA 1-286-994 | 24-Nov-2004 | AEROPOSTALE WEST, INC. |

WEIL:\95685927\8\11727.0012

Exhibit 4-4 to
Credit Agreement

| | Copyright | Status | Reg. No. | Reg. Date | Claimant |
|---|---|---|---|---|---|
| 20. | SANTA TURTLE | Registered | VA 1-286-998 | 24-Nov-2004 | AEROPOSTALE WEST, INC. |
| 21. | AEROPOSTALE SPLATTER | Registered | VA 1-356-706 | 16-Jun-2006 | AEROPOSTALE, INC. |
| 22. | SURFING MONKEY | Registered | VAu 646-389 | 24-Nov-2004 | AEROPOSTALE WEST, INC. |
| 23. | TURTLE TOSS | Registered | VA 1-288-996 | 24-Nov-2004 | AEROPOSTALE WEST, INC. |
| 24. | WHALE GRAPHIC | Registered | VA 1-291-513 | 26-Nov-2004 | AEROPOSTALE WEST, INC. |
| 25. | AEROPOSTALE MOUNTAIN DESIGN | Registered | VA 1-356-707 | 16-Jun-2006 | AEROPOSTALE, INC. |

WEIL:\95685927\8\11727.0012

Exhibit 4-5 to
Credit Agreement

**<u>Locations, Leases and Landlords</u>**

(See Attached)

Exhibit 4-5 to
Credit Agreement

| Store # | Mall Name | Leased Space | Location Address | Location City & State | Location Zip | RSF | Landlord | Landlord Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Aero Locations** | | | | | | | | | | | |
| 11 | Franklin Mills Mall | 717A | 1434 Franklin Mills Cir | Philadelphia, PA | 19154 | 4,865 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 19 | Arizona Mills Mall | 184 | 5000 S Arizona Mills Circle | Tempe, AZ | 85282 | 5,474 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 20 | Newport Center | B62 | 30 262 Mall Drive West | Jersey City, NJ | 07307 | 3,392 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 22 | Stoneridge Mall | D-109 | 1120 Stoneridge Mall Dr | Pleasanton, CA | 95466 | 3,709 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 23 | Bridgewater Commons | 279 | 400 Commons Way | Bridgewater, NJ | 08807 | 3,130 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 27 | Great Northern Mall | 782 | Great Northern Blvd | North Olmstead, OH | 44070 | 3,423 | Starwood Retail Property Mgmt, LLC | 1 E Wacker Drive, Suite 3700 | Chicago | IL | 60601 |
| 28 | Woodbridge Center | 2535 | 260 Woodbridge Ctr Dr | Woodbridge, NJ | 07095 | 3,890 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 30 | Staten Island Mall | 247A | 2655 Richmond Ave | Staten Island, NY | 10314 | 3,724 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 31 | Rockaway Townsquare Mall | 2077A | Route 80 & Mt Hope Ave | Rockaway, NJ | 07866 | 6,129 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 34 | The Mall at Greece Ridge | K-013 | Ridge & Long Pond Rd | Rochester, NY | 14626 | 3,139 | Wilmorite | 1265 Scottsville Road | Rochester | NY | 14624 |
| 35 | Ross Park Mall | G04C | 1000 Ross Park Mall Dr | Pittsburgh, PA | 15237 | 4,685 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 36 | The Mall at St Matthews | 1340 | 5000 Shelbyville Rd | Louisville, KY | 40207 | 5,127 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 37 | Cherry Hill Mall | 1265 | 252 Cherry Hill Mall | Cherry Hill, NJ | 08002 | 6,000 | Preit Services LLC | 200 South Broad Street | Philadelphia | PA | 19102 |
| 38 | Valley Fair Shopping Center | B577 | 2855 Stevens Creek Blvd | Santa Clara, CA | 95050 | 2,864 | Westfield | 11601 Wilshire Blvd | Los Angeles | CA | 90025 |
| 41 | River Oaks Center | B06 | River Oaks Dr & Torrance | Calumet City, IL | 60409 | 2,778 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 43 | Lycoming Mall | 812 | 300 Lycoming Mall Cir | Pennsdale, PA | 17756 | 3,519 | Preit Services LLC | 200 South Broad Street | Philadelphia | PA | 19102 |
| 46 | Lehigh Valley Mall | 2096 | 250 Lehigh Valley Mall | Whitehall, PA | 18052 | 4,066 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 49 | Hamilton Mall | 2111 | Black Horse Pike | Mays Landing, NJ | 08330 | 4,221 | Kravco Company LLC | 5 Radnor Corporate Center | Radnor | PA | 19087 |
| 50 | Square One Mall | N219 | 363 Square One Mall | Saugus, MA | 01906 | 3,977 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 51 | Dadeland Mall | 3050A | 7225 Dadeland Mall | Miami, FL | 33156 | 4,674 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 52 | Sunrise Mall | F-5 | Sunrise Hwy & Carmons Rd | Massapequa, NY | 11758 | 3,290 | Westfield | 11601 Wilshire Blvd | Los Angeles | CA | 90025 |

Exhibit 4-5 to
Credit Agreement

| Store # | Mall Name | Leased Space | Location Address | Location City & State | Location Zip | RSF | Landlord | Landlord Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 54 | Manhattan Mall | 160, 162, 164, 166 | 901 Avenue of the America | New York, NY | 10001 | 8,826 | Vornado | 210 Route 4 East | Paramus | NJ | 07652 |
| 57 | Eastview Mall | 131 | 7979 Pittsford-Victor Road | Victor, NY | 14564 | 4,107 | Wilmorite | 1265 Scottsville Road | Rochester | NY | 14624 |
| 58 | Garden State Plaza | L1A | Route 4 & Route 17 | Paramus, NJ | 07652 | 5,903 | Westfield | 11601 Wilshire Blvd | Los Angeles | CA | 90025 |
| 59 | Marketplace Mall | A14 | 3400 W Henrietta Rd | Rochester, NY | 14623 | 3,479 | Wilmorite | 1265 Scottsville Road | Rochester | NY | 14624 |
| 62 | Walden Galleria | L213 | 2000 Walden Ave | Buffalo, NY | 14225 | 7,154 | Pyramid | 4 Clinton Exchange | Syracuse | NY | 13202-1078 |
| 65 | Del Amo Mall | 227A | 21712 Hawthorne Blvd | Torrance, CA | 90503 | 4,710 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 66 | Roosevelt Field Mall | 1036A | 630 Old Country Rd | Garden City, NY | 11530 | 5,377 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 67 | Smith Haven Mall | J03 | 148 Smith Haven Mall | Lake Grove, NY | 11755 | 4,116 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 70 | Emerald Square | W211 | 999 South Washington Southtreet | North Attleboro, MA | 02760 | 2,853 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 71 | Twelve Oaks Mall | D181 | 27688 Novi Rd | Novi, MI | 48377 | 4,573 | Taubman | 200 East Long Lake Road | Bloomfield Hills | MI | 48303-0200 |
| 75 | Poughkeepsie Galleria | A111 | 2001 South Rd | Poughkeepsie, NY | 12601 | 3,409 | Pyramid | 4 Clinton Exchange | Syracuse | NY | 13202-1078 |
| 77 | Hamilton Place | 156 | 2100 Hamilton Place Blvd | Chattanooga, TN | 37421 | 4,014 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |
| 84 | Gwinnett Place | V06 | 2100 Pleasant Hill Rd | Duluth, GA | 30096 | 3,383 | Moonbeam Capital Investment, LLC | 9103 Alta Drive | Las Vegas | NV | 89145 |
| 85 | Castleton Square | 136 | 6020 E 82nd St | Indianapolis, IN | 46250 | 4,030 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 86 | Towne Center At Cobb | U-10 | 400 Earnett Barrett Pkwy | Kennesaw, GA | 30144 | 4,098 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 87 | Crossgates Mall | B118 | 120 Washington Ave Ext | Albany, NY | 12203 | 5,259 | Pyramid | 4 Clinton Exchange | Syracuse | NY | 13202-1078 |
| 88 | Scottsdale Fashion Square | 2129 | 7014 E Camelback Rd | Scottsdale, AZ | 85251 | 3,708 | Macerich | 401 Wilshire Blvd. | Santa Monica | CA | 90407 |
| 89 | Jefferson Valley Mall | F-10 | 650 Lee Blvd | Yorktown Heights, NY | 10598 | 3,384 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 90 | Trumbull Shopping Park | 169 | 5065 Main St | Trumbull, CT | 06611 | 3,500 | Westfield | 11601 Wilshire Blvd | Los Angeles | CA | 90025 |
| 91 | Concord Mall | 670 | 4737 Concord Pike | Wilmington, DE | 19803 | 3,600 | Allied Properties | 4737 Concord Pike | Wilmington | DE | 19803 |

Exhibit 4-5 to
Credit Agreement

| Store # | Mall Name | Leased Space | Location Address | Location City & State | Location Zip | RSF | Landlord | Landlord Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 92 | Oxford Valley Mall | 2025 | 2300 E Lincoln Hwy | Langhorne, PA | 19047 | 3,896 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 93 | Paramus Park Mall | 1675 | 700 Paramus Park | Paramus, NJ | 07652 | 4,414 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 99 | Kings Plaza | 141 | 5240 Kings Plaza | Brooklyn, NY | 11234 | 4,895 | Macerich | 401 Wilshire Blvd. | Santa Monica | CA | 90407 |
| 100 | Willowbrook Mall | 1245 | 1444 Willowbrook Mall | Wayne, NJ | 07470 | 4,296 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 102 | Park City Center | G0711 | 220 Park City Ctr | Lancaster, PA | 17601 | 5,419 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 103 | Ohio Valley Mall | 320 | Unit #295 Mall Road | St Clairsville, OH | 43950 | 3,567 | Cafaro Company | PO Box 2186 | Youngstown | OH | 44504 |
| 104 | Los Cerritos Center | A-17 | 156 Los Cerritos Ctr | Cerritos, CA | 90703 | 3,900 | Macerich | 401 Wilshire Blvd. | Santa Monica | CA | 90407 |
| 105 | Monroeville Mall | 155 | US Rt 22 E | Monroeville, PA | 15146 | 8,577 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421 |
| 106 | Natick Mall | 2184 | 1245 Worcester Rd | Natick, MA | 01760 | 3,726 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 108 | Aventura Mall | 1327 | 19575 Biscayne Blvd | Miami, FL | 33180 | 2,629 | Turnberry Associates | 19501 Biscayne Blvd, Ste 460 | Aventura | FL | 33180 |
| 109 | Belden Village | A-2 | 4381 Belden Village Mall | Canton, OH | 44718 | 3,945 | Starwood Retail Property Mgmt, LLC | 1 E Wacker Drive, Suite 3700 | Chicago | IL | 60601 |
| 110 | Dulles Town Center | 220 | 21100 Dulles Town Cir | Dulles, VA | 20166 | 3,000 | Learner Corp | 2000 Tower Oaks Blvd | Rockville | MD | 20852 |
| 111 | Lakeside Mall | 1450 | 14000 Lakeside Cir | Sterling Heights, MI | 48313 | 5,000 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 112 | Holyoke Mall at Ingleside | A-211 | 50 Holyoke St | Holyoke, MA | 01040 | 3,818 | Pyramid | 4 Clinton Exchange | Syracuse | NY | 13202-1078 |
| 113 | Genesee Valley Center | 465 | 3231 S Linden Rd | Flint, MI | 48507 | 3,500 | Spinoso Management Group LLC | 100 Northern Concourse | North Syracuse | NY | 13212 |
| 114 | Greenwood Park Mall | G-5 | 1251 US 31 N | Indianapolis, IN | 46142 | 3,406 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 116 | University Park Mall | 460 | 6501 N Grape Rd | Mishawaka, IN | 46545 | 3,634 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 117 | Cross County Shopping Center | 5110 | 8000 Mall Walk | Yonkers, NY | 10704 | 5,558 | Macerich | 401 Wilshire Blvd. | Santa Monica | CA | 90407 |
| 120 | St Charles Towne Center | Q08 | 5000 Rt 301 S | Waldorf, MD | 20603 | 3,582 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 123 | Great Lakes Mall | 330A | 7850 Mentor Ave | Mentor, OH | 44060 | 3,482 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 124 | West Town Mall | 1156 | 7600 Kingston Pike | Knoxville, TN | 37919 | 2,990 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |

Exhibit 4-5 to
Credit Agreement

| Store # | Mall Name | Leased Space | Location Address | Location City & State | Location Zip | RSF | Landlord | Landlord Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 127 | Edison Mall | 1460A | 4125 Cleveland Ave | Fort Meyers, FL | 33901 | 3,500 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 129 | Quaker Bridge Mall | 2087B | Rt 1 & Quaker Bridge Rd | Lawrenceville, NJ | 08608 | 3,800 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 130 | Livingston Mall | 1022 | 112 Eisenhower Pkwy | Livingston, NJ | 07039 | 3,503 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 131 | Ocean County Mall | 101L | 1201 Hooper Ave | Toms River, NJ | 08753 | 3,645 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 133 | Tri-County Mall | C-9 | 11700 Princeton Pike | Cincinnati, OH | 45246 | 2,500 | Tri-County Mall Property Mgmt LLC | 11700 Princeton Pike | Springdale | OH | 45246 |
| 134 | Monmouth Mall | 3302 | Rts 35 & 36 | Eatontown, NJ | 07724 | 3,598 | Vornado | 210 Route 4 East | Paramus | NJ | 07652 |
| 136 | White Plains | 489current | 100 Main St | White Plains, NY | 10601 | 3,690 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 137 | Willow Grove Park | 3029 | 2500 Moreland Rd | Willow Grove, PA | 19090 | 3,124 | Preit Services LLC | 200 South Broad Street | Philadelphia | PA | 19102 |
| 139 | Galleria at Crystal Run | D209 | 1 Galleria Dr Ste 111 | Middletown, NY | 10940 | 4,091 | Pyramid | 4 Clinton Exchange | Syracuse | NY | 13202-1078 |
| 140 | Destiny USA | C-108 | 9090 Destiny USA Drive | Syracuse, NY | 13204 | 3,844 | Pyramid | 4 Clinton Exchange | Syracuse | NY | 13202-1078 |
| 141 | Sun Valley Mall | A-127 | 1 Sun Valley Mall | Concord, CA | 94520 | 2,590 | Taubman | 200 East Long Lake Road | Bloomfield Hills | MI | 48303-0200 |
| 142 | Hawthorn Center | G6UL | 707 Hawthorn Ctr | Vernon Hills, IL | 60061 | 3,268 | Westfield | 11601 Wilshire Blvd | Los Angeles | CA | 90025 |
| 143 | Stratford Square Mall | B20 | 220 Stratford Square | Bloomingdale, IL | 60108 | 2,557 | StreetMAC Asset Managers, LLC | 3100 Dundee Road | Northbrook | IL | 60062 |
| 144 | Deptford Mall | 2048 | 300 N Almonession Rd | Deptford, NJ | 08096 | 4,342 | Macerich | 401 Wilshire Blvd. | Santa Monica | CA | 90407 |
| 145 | Stamford Town Center | D113 | 100 Grey Rock Pl | Stamford, CT | 06901 | 3,454 | Taubman | 200 East Long Lake Road | Bloomfield Hills | MI | 48303-0200 |
| 146 | Woodfield Mall | G108 | 5 Woodfield Mall | Schaumburg, IL | 60173 | 5,124 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 147 | Fox Valley Shopping Center | B-8 | 2426 Fox Valley Ctr | Aurora, IL | 60504 | 3,929 | Westfield | 11601 Wilshire Blvd | Los Angeles | CA | 90025 |
| 148 | Danbury Fair Mall | D208 | 7 Backus Ave | Danbury, CT | 06810 | 4,838 | Macerich | 401 Wilshire Blvd. | Santa Monica | CA | 90407 |
| 150 | Freehold Raceway Mall | F-220 | 3710 Rt 9 | Freehold, NJ | 07728 | 3,468 | Macerich | 401 Wilshire Blvd. | Santa Monica | CA | 90407 |
| 152 | Christiana Mall | 307 | 132 Christiana Mall | Newark, DE | 19702 | 4,875 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 153 | Columbia Mall | 1680 | 10300 Little Patuxent Pkwy | Columbia, MD | 21044 | 4,000 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 154 | Menlo Park Mall | 2030 B | 100 Menlo Park Mall Rd | Edison, NJ | 08837 | 4,000 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |

Exhibit 4-5 to
Credit Agreement

| Store # | Mall Name | Leased Space | Location Address | Location City & State | Location Zip | RSF | Landlord | Landlord Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 157 | Southlake Mall | 628 | 2141 Southlake Mall Dr | Merrillville, IN | 46410 | 4,005 | Starwood Retail Property Mgmt, LLC | 1 E Wacker Drive, Suite 3700 | Chicago | IL | 60601 |
| 158 | Boulevard Mall | 655 | 1231 Niagara Falls Blvd | Amherst, NY | 14226 | 4,731 | Forest City Enterprises | 50 Public Square | Cleveland | OH | 44113 |
| 159 | Fairfield Mall | W271 | 2727 Fairfield Mall | Beavercreek, OH | 45432 | 3,731 | Glimcher | 180 E Broad St, 21st Floor | Columbus | OH | 43215 |
| 160 | Lynnhaven Mall | D06A | 701 Lynnhaven Pkwy | Virginia Beach, VA | 23452 | 3,330 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 162 | Seminole Towne Center | H06 | 268 Towne Center Cir | Sanford, FL | 32771 | 3,213 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 164 | Chesterfield Towne Center | 562 | 11500 Midlothian Tpke | Midlothian, VA | 23113 | 3,940 | Rouse Properties, Inc. | 1114 Avenue of the Americas | New York | NY | 10036 |
| 166 | Queens Center | 3021 | 90-15 Queens Blvd | Elmhurst, NY | 11373 | 5,653 | Macerich | 401 Wilshire Blvd. | Santa Monica | CA | 90407 |
| 167 | Great Northern Mall | C-134 | 4081 Rt 31 | Clay, NY | 13041 | 3,090 | Macerich | 401 Wilshire Blvd. | Santa Monica | CA | 90407 |
| 169 | Sangertown Mall | G03 | Rt 5 & 5A | New Hartford, CT | 13413 | 4,098 | Pyramid | 4 Clinton Exchange | Syracuse | NY | 13202-1078 |
| 171 | Westmoreland Mall | 218 | 5256 Rt 30 E | Greensburg, PA | 15601 | 2,838 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |
| 172 | Dover Mall | 3024 | 3024 Dover Mall | Dover, DE | 19901 | 4,274 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 174 | Green Acres Mall | 107 | 1005 Green Acres Mall | Valley Stream, NY | 11581 | 3,624 | Macerich | 401 Wilshire Blvd. | Santa Monica | CA | 90407 |
| 175 | Tippecanoe Mall | C11B | 2415 Sagamore Pkwy S | Lafayette, IN | 47905 | 4,600 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 176 | Fox Run Mall | L7 | 50 Fox Run Rd | Newington, NH | 03801 | 3,670 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 178 | Hudson Valley Mall | H-04 | 1300 Ulster Avenue | Kingston, NY | 12401 | 3,600 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanoogo | TN | 37421 |
| 183 | Metrocenter Mall | 2172A | 9818 Metro Pkwy E | Phoenix, AZ | 85051 | 3,702 | Carlyle Development Group | 2700 Westchester Avenue | Purchase | NY | 10577 |
| 184 | Palisades Center | B203 | 2452 Palisades Center Dr | West Nyack, NY | 10994 | 5,649 | Pyramid | 4 Clinton Exchange | Syracuse | NY | 13202-1078 |
| 185 | South Shore Mall | N23 | 1701 Sunrise Hwy | Bay Shore, NY | 11706 | 3,593 | Westfield | 11601 Wilshire Blvd | Los Angeles | CA | 90025 |
| 188 | Stones River Mall | A160 | 1720 Old Fort Parkway | Murfreesboro, TN | 37129 | 3,000 | Sterling Retail Services Inc | 340 Royal Poinciana Way | Palm Beach | FL | 33480 |
| 189 | Southland Shopping Center | 1290 | 23000 Eureka Rd | Taylor, MI | 48180 | 3,500 | Rouse Properties, Inc. | 1114 Avenue of the Americas | New York | NY | 10036 |

Exhibit 4-5 to
Credit Agreement

| Store # | Mall Name | Leased Space | Location Address | Location City & State | Location Zip | RSF | Landlord | Landlord Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 190 | Dayton Mall | 252 | OH | Dayton, OH | 45459 | 3,720 | Glimcher | 180 E Broad St, 21st Floor | Columbus | OH | 43215 |
| 192 | The Pavillions at Buckland Hills | 1138 | 194 Buckland Hills Dr | Manchester, CT | 06040 | 4,000 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 194 | Mall of New Hampshire | W123 | 1500 S Willow St | Manchester, NH | 03103 | 3,708 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 195 | Crystal Mall | R207 | 850 Hartford Tpke | Waterford, CT | 06385 | 2,842 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 197 | Annapolis Mall | 126 | 1340 Annapolis Mall | Annapolis, MD | 21401 | 3,974 | Westfield | 11601 Wilshire Blvd | Los Angeles | CA | 90025 |
| 198 | Orland Square Shopping Center | B11 | 240 Orland Square | Chicago, IL | 60462 | 3,081 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 200 | Northshore Mall | E155 | 210 Andover St | Peabody, MA | 01960 | 3,467 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 201 | Southern Park Mall | 751 A | 7401 Market St | Youngstown, OH | 44512 | 3,700 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 202 | Great Lakes Crossing | 859 | 4532 Baldwin Rd | Auburn Hills, MI | 48326 | 3,184 | Taubman | 200 East Long Lake Road | Bloomfield Hills | MI | 48303-0200 |
| 203 | Northwoods Mall | G532 | 2150 Northwoods Blvd | Charleston, SC | 29406 | 4,073 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |
| 204 | Mall of America | N267 & N267A | 60 E Broadway | Bloomington, MN | 55425 | 8,027 | Triple Five | 8882-17 Street, | Edmonton | AB | T5T 4M2 |
| 206 | Hanes Mall | AL-120 | 3320 Silas Creek Pkwy | Winston Salem, NC | 27103 | 3,962 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |
| 207 | Rivertown Crossing | 2048 | 3700 Rivertown Pkwy SW | Grandville, MI | 49418 | 5,571 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 208 | Providence Place | 5360 | 118 Providence Pl | Providence, RI | 02903 | 3,090 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 209 | Meriden Square Mall | 4068 | 470 Lewis Ave | Meriden, CT | 06451 | 3,436 | Westfield | 11601 Wilshire Blvd | Los Angeles | CA | 90025 |
| 214 | Southpark Center | DL 408 | 408 Southpark Ctr | Strongsville, OH | 44136 | 3,428 | Starwood Retail Property Mgmt, LLC | 1 E Wacker Drive, Suite 3700 | Chicago | IL | 60601 |
| 215 | Glenbrook Square Mall | L06 | 4201 Coldwater Rd | Fort Wayne, IN | 46805 | 5,500 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 216 | Market Place Shopping Center | 340 | 2000 N Neil St | Champaigne, IL | 61820 | 3,826 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 218 | Summit Mall | 258A | 3265 W Market St | Akron, OH | 44333 | 3,139 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 219 | Eastwood Mall | 652 | 5555 Youngstown-Warren Rd | Niles, OH | 44446 | 3,500 | Cafaro Company | PO Box 2186 | Youngstown | OH | 44504 |

41

Exhibit 4-5 to
Credit Agreement

| Store # | Mall Name | Leased Space | Location Address | Location City & State | Location Zip | RSF | Landlord | Landlord Address | City | State | Zip Code |
|---------|-----------|--------------|------------------|----------------------|--------------|-----|----------|------------------|------|-------|----------|
| 220 | College Mall | M13A | 2918 E Third St | Bloomington, IN | 47401 | 3,523 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 221 | Muncie Mall | LO5 | 3501 N Granville Ave | Muncie, IN | 47303 | 3,698 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 223 | Haywood Mall | 2045 | 700 Haywood Mall | Greenville, SC | 29605 | 3,442 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 224 | Jersey Gardens | 2076 | 651 Kapkowski Rd | Elizabeth, NJ | 07201 | 5,331 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 226 | Meridian Mall | 243 | 1982 E Grand River Ave | Lansing, MI | 48864 | 3,690 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |
| 227 | Franklin Park Mall | 1430 | 5001 Monroe St | Toledo, OH | 43623 | 5,509 | Starwood Retail Property Mgmt, LLC | 1 E Wacker Drive, Suite 3700 | Chicago | IL | 60601 |
| 228 | Potomac Mills Center | 247A | 2700 Potomac Mills Cir | Woodbridge, VA | 22192 | 3,561 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 230 | Coolsprings Galleria | 2140 | 1800 Galleria Blvd | Franklin, TN | 37067 | 3,736 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |
| 231 | Fairlane Town Center | N314 | 18900 Michigan Ave | Dearborn, MI | 48126 | 3,047 | Starwood Retail Property Mgmt, LLC | 1 E Wacker Drive, Suite 3700 | Chicago | IL | 60601 |
| 233 | Colonial Mall Gadsden | 47 | 1001 Rainbow Dr | Gadsden, AL | 35901 | 3,165 | Preit Services LLC | 200 South Broad Street | Philadelphia | PA | 19102 |
| 236 | Pheasant Lane Mall | E139 | 310 Daniel Webster Hwy | Nashua, NH | 03060 | 4,481 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 238 | Honey Creek | B2 | 3401 S US Hwy 41 | Terre Haute, IN | 44310 | 3,667 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |
| 239 | RiverGate Mall | 1040 | 1000 Two Mile Pkwy | Goodlettsville, TN | 37072 | 3,452 | Hendon Properties | 3445 Peachtree Road | Atlanta | GA | 30326 |
| 240 | Cary Town Center | E4428 | 1105 Walmut St | Raleigh, NC | 27511 | 2,567 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |
| 242 | Grand Central Mall | 251 | 100 Grand Central Mall | Vienna, WV | 26105 | 3,808 | Glimcher | 180 E Broad St, 21st Floor | Columbus | OH | 43215 |
| 243 | Mall at Johnson City | 17 | 2011 N Roan St | Johnson City, TN | 37601 | 4,028 | Glimcher | 180 E Broad St, 21st Floor | Columbus | OH | 43215 |
| 244 | Maplewood Mall | 2048B | 3001 White Bear Ave | Maplewood, MN | 55109 | 3,700 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 246 | Chapel Hill Mall | 339 | 2000 Britain Ste 431 | Akron, OH | 44310 | 3,418 | McKinley, INc | 320 N Main St, Suite 200 | Ann Arbor | MI | 48104 |

Exhibit 4-5 to
Credit Agreement

| Store # | Mall Name | Leased Space | Location Address | Location City & State | Location Zip | RSF | Landlord | Landlord Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 247 | Fashion Square Mall | C312 | 4691 Fashion Square Mall | Saginaw, MI | 48604 | 3,009 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |
| 248 | Wilton Mall | F017 | 3065 Rt 50 | Saratoga Springs, NY | 12866 | 3,382 | Macerich | 401 Wilshire Blvd. | Santa Monica | CA | 90407 |
| 249 | Asheville Mall | L42 | 3 S Tunnel Rd | Asheville, NC | 28805 | 3,154 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |
| 250 | Burnsville Center | 1044 | 1178 Burnsville Ctr | Burnsville, MN | 55306 | 3,886 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |
| 251 | Eastland Mall | 414 | 800 N Green River Rd | Evansville, IN | 47715 | 5,198 | Macerich | 401 Wilshire Blvd. | Santa Monica | CA | 90407 |
| 252 | Opry Mills Mall | 306A | 433 Opry Mills Dr | Nashville, TN | 57214 | 4,000 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 257 | Circle Centre Mall | F16 | 49 W Maryland St | Indianapolis, IN | 46225 | 3,632 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 258 | Tysons Corner Center | G005U | 7983 Tysons Corner Ctr | McLean, VA | 22102 | 3,578 | Macerich | 401 Wilshire Blvd. | Santa Monica | CA | 90407 |
| 259 | Arundel Mills | 211 | 7000 Arundel Mills Cir | Hanover, MD | 21076 | 3,088 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 260 | Arnot Mall | N-9 | 3300 Chambers Rd | Horsehead, NY | 14844 | 3,000 | Preit Services LLC | 200 South Broad Street | Philadelphia | PA | 19102 |
| 262 | Arbor Place | 1180 | 6700 Douglas Blvd | Douglassville, GA | 30315 | 3,237 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |
| 263 | Governor's Square | 2170 | 1500 Apalachee Pkwy | Tallahassee, FL | 32301 | 3,024 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 265 | Miller Hill | J08 | 1600 Miller Trunk Hwy | Duluth, MN | 55811 | 2,842 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 268 | Oak Court | 1130 | 4465 Poplar Ave | Memphis, TN | 38117 | 4,876 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 269 | Four Seasons Mall | 209 | 209 Four Seasons Town Ctr | Greensboro, NC | 27427 | 3,585 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 271 | Harford Mall | W4 | 678 Belair Rd | Belair, MD | 21014 | 3,243 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |
| 272 | University Mall | 112 | 1701 McFarlen Blvd E | Tuscaloosa, AL | 35405 | 3,539 | Aronov Realty Management | 3500 Eastern Blvd. | Montgomery | AL | 36116-1781 |

Exhibit 4-5 to
Credit Agreement

| Store # | Mall Name | Leased Space | Location Address | Location City & State | Location Zip | RSF | Landlord | Landlord Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 273 | Meadowbrook Mall | 640 | 2640 Meadowbrook Rd | Bridgeport, WV | 26330 | 3,352 | Cafaro Company | PO Box 2186 | Youngstown | OH | 44504 |
| 274 | Sandusky Mall | 327 | 4314 Milan Rd | Sandusky, OH | 44870 | 3,488 | Cafaro Company | PO Box 2186 | Youngstown | OH | 44504 |
| 275 | Eastland Mall | 1055 | 1615 E Empire St | Bloomington, IL | 61701 | 4,211 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421 |
| 277 | Brass Mill | 1128 | 495 Union St | Waterbury, CT | 06706 | 3,759 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 278 | White Marsh | 2050 | 8200 Perry Hall Blvd | Baltimore, MD | 21236 | 5,273 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 280 | Concord Mills | 658 | 8111 Concord Mills Blvd | Concord, NC | 28027 | 5,100 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 282 | Augusta Mall | 1320 | 3450 Wrightsboro Rd | Augusta, GA | 30909 | 3,242 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 283 | Independence Mall | 1093 | 3500 Oleander Dr | Wilmington, NC | 28403 | 3,216 | Madison Marquette | Independence Mall-DEPT-300260 | Wilmington | NC | 28403 |
| 285 | Colonial Mall Greenville | D4 | 714 SE Greenville Blvd | Greenville, NC | 27858 | 2,895 | Rouse Properties, Inc. | 1114 Avenue of the Americas | New York | NY | 10036 |
| 286 | Richland Mall | A7 | 649 Richland Mall | Mansfield, OH | 44906 | 4,242 | Madison Marquette | 2001Pennsylvania Ave NW | Washington | DC | 20006 |
| 287 | North Dartmouth Mall | 1360 | 137 North Dartmouth Mall | North Dartmouth, MA | 02747 | 3,300 | Preit Services LLC | 200 South Broad Street | Philadelphia | PA | 19102 |
| 288 | Eastland Mall | B8 | 2716 Eastland Mall | Columbus, OH | 43232 | 4,560 | Woodmont Company | Kim Welborn | Fort Worth | TX | 76107 |
| 289 | Woodland Mall | 107 | 3195 28th St | Grand Rapids, MI | 49512 | 3,615 | Preit Services LLC | 200 South Broad Street | Philadelphia | PA | 19102 |
| 290 | Valley Hills Mall | 230 | 1960 Hwy 70 SE | Hickory, NC | 28602 | 3,699 | Valley Hills Mall LLC | 1114 Avenue of the Americas | New York | NY | 10036-7703 |
| 291 | Riverchase Galleria | 221 | 2000 Riverchase Galleria | Hoover, AL | 35244 | 3,089 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 292 | Westroads | 3667 | 10000 California St | Omaha, NE | 68114 | 4,022 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 293 | Tanger Outlets Riverhead (Factory Outlet Center) | 1409A | 1770 W Main St | Riverhead, NY | 11901 | 3,860 | Tanger Properties, L.P. | 3200 Northline Avenue | Greensboro | NC | 27408 |
| 294 | Springfield Mall | U10B | 1250 Baltimore Pkwy | Springfield, PA | 19064 | 3,258 | Preit Services LLC | 200 South Broad Street | Philadelphia | PA | 19102 |
| 297 | Macomb Mall | 240 &250 | 32281 Gratiot Ave | Roseville, MI | 48066 | 3,000 | Lormax Stern Development Co | 38500 Woodward Ave, | Bloomfield Hills | MI | 43804 |
| 299 | Mall of Louisiana | 2186 | 6401 Blue Bonnet Blvd | Central, LA | 70836 | 3,369 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |

WEIL:\95685927\8\11727.0012

Exhibit 4-5 to
Credit Agreement

| Store # | Mall Name | Leased Space | Location Address | Location City & State | Location Zip | RSF | Landlord | Landlord Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 300 | River Hills Mall | 308 | 1850 Adams St | Mankato, MN | 56001 | 3,044 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 301 | Colonial Mall Bel Aire | C19 | 3449 Bel Air Mall | Mobile, AL | 36606 | 2,846 | Rouse Properties, Inc. | 1114 Avenue of the Americas | New York | NY | 10036 |
| 303 | Northtown Mall | H19 | 398 Northtown Dr | Blaine, MN | 55434 | 3,600 | Glimcher | 180 E Broad St, 21st Floor | Columbus | OH | 43215 |
| 304 | Bangor Mall | 1051 | 663 Stillwater Ave | Bangor, ME | 04401 | 3,514 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 305 | Oakdale | 35 | 601-635 Harry L. Drive | Johnson City, NY | 13790 | 4,000 | Vornado | 210 Route 4 East | Paramus | NJ | 07652 |
| 306 | Independence Center | G07 | Independence Center | Independence, MO | 64057 | 4,174 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 307 | Polaris | 2094 | 1500 Polaris Pkwy | Columbus, OH | 43240 | 3,243 | Glimcher | 180 E Broad St, 21st Floor | Columbus | OH | 43215 |
| 308 | South County Mall | 342 | 51 South County Centerway | Koch, MO | 63129 | 3,861 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421 |
| 310 | Valley View Mall | UB 80 | 4802 Valley View Blvd NW | Roanoke, VA | 24012 | 3,866 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |
| 312 | McKinley Mall | 714 | 3701 McKinley Pkwy | Buffalo, NY | 14219-2683 | 3,337 | Stoltz | 725Conshohocken State Road | Bala Cynwyd | PA | 19004 |
| 313 | Maine Mall | N137 | 364 Main Mall Rd | South Portland, ME | 04106 | 3,970 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 314 | CherryVale Mall | F29 | 7200 Harrison Ave | Rockford, IL | 61112 | 3,438 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |
| 315 | St Clair Square | 105 | 134 St Clair Square | Fairview Heights, IL | 62208 | 4,042 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |
| 316 | Cross Creek Mall | TB7 | 443 Cross Creek Mall | Fayetteville, NC | 28303 | 4,599 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |
| 317 | Charleston Town Center | 2105 | 2105 Charleston Town Ctr | Charleston, WV | 25389 | 2,849 | Forest City Enterprises | 50 Public Square | Cleveland | OH | 44113 |
| 319 | White Oaks Mall | c10 | 2501 W Wabash | Springfield, IL | 62704 | 3,623 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 330 | Park Plaza Mall | 3048 | 6000 West Markham Street | Little Rock, AR | 72205 | 2,910 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |

Exhibit 4-5 to
Credit Agreement

| Store # | Mall Name | Leased Space | Location Address | Location City & State | Location Zip | RSF | Landlord | Landlord Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 332 | Chicago Ridge | H-1 | 444 Chicago Ridge Mall Drive | Chicago, IL | 60415 | 4,610 | Starwood Retail Property Mgmt, LLC | 1 E Wacker Drive, Suite 3700 | Chicago | IL | 60601 |
| 333 | Washington Square | 166 | 10202 E Washington St | Indianapolis, IN | 46229 | 3,016 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 334 | Ashland Town Center | 468 | 500 Winchester Ave | Ashland, KY | 41101 | 3,354 | Glimcher | 180 E Broad St, 21st Floor | Columbus | OH | 43215 |
| 335 | River Valley Mall | 317 | 1635 River Valley Circle South | Lancaster, OH | 43130 | 3,740 | Glimcher | 180 E Broad St, 21st Floor | Columbus | OH | 43215 |
| 336 | Logan Valley Mall | A -944 | 5580 Goods Lane | Altoona, PA | 16602 | 3,227 | Preit Services LLC | 200 South Broad Street | Philadelphia | PA | 19102 |
| 337 | Capital City Mall | 230 | 3506 Capital City Mall Dr | Camp Hill, PA | 17011-7003 | 3,603 | Preit Services LLC | 200 South Broad Street | Philadelphia | PA | 19102 |
| 338 | Jefferson Pointe Mall | H10 | 4120 W Jefferson Blvd | Fort Wayne, IN | 46804 | 3,401 | UCR Asset Services | 8080 Park Lane | Dallas | TX | 75231 |
| 339 | The Mall at Whitney Field | 238 | 100 Commercial Road | Leominster, MA | 46804 | 3,548 | Vintage Capital Grp | 100 Commerical Road | Leominster | MA | 01453 |
| 340 | Oakwood Mall | 322 | 4800 Golf Rd | Eau Claire, WI | 54701 | 3,786 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 341 | The Lakes Mall | 1076 | 1740 Mt Garfield Rd | Muskegon, MI | 49444 | 2,928 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |
| 342 | York Galleria | 166 | 2899 Whiteford Road | York, PA | 17402 | 3,055 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |
| 346 | Robinson Town Center | 2490 | Robinson Mall | Robinson Township, PA | 00000 | 3,266 | Forest City Enterprises | 50 Public Square | Cleveland | OH | 44113 |
| 347 | Stroud Mall | 152 | 344 Stroud Mall Rd. | Stroudsburg, PA | 18360 | 2,750 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |
| 348 | Connecticut Post | 2035 | 1201 Boston Post Rd | Milford, CT | 06460 | 4,680 | Westfield | 11601 Wilshire Blvd | Los Angeles | CA | 90025 |
| 349 | Berkshire Mall | 310 | 1665 State Hill Rd | Wyomissing, PA | 19610 | 4,300 | Allied Properties | 4737 Concord Pike | Wilmington | DE | 19803 |
| 351 | The Plaza at King of Prussia | 2035 | 160 N Guloph Rd | King of Prussia, PA | 19406 | 6,306 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 355 | Eastgate Mall | B-344 | 4601 Eastgate Blvd | Cincinnati, OH | 45245 | 3,964 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |

Exhibit 4-5 to
Credit Agreement

| Store # | Mall Name | Leased Space | Location Address | Location City & State | Location Zip | RSF | Landlord | Landlord Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 356 | Southpark | F40 | 224 South Park Cir | Colonial Heights, VA | 23834 | 3,150 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |
| 358 | Gateway Mall | C338 | #5 Gateway | Lincoln, NE | 68505 | 3,728 | Starwood Retail Property Mgmt, LLC | 1 E Wacker Drive, Suite 3700 | Chicago | IL | 60601 |
| 361 | Spring Hill | 1422 | 1072 Spring Hill Mall | West Dundee, IL | 60118 | 3,402 | Rouse Properties, Inc. | 1114 Avenue of the Americas | New York | NY | 10036 |
| 362 | Solomon Pond | N219 | 601 Donald Lynch Blvd | Marlborough, MA | 01752 | 3,208 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 363 | Mall of Georgia | 2025 | 3333 Buford Dr | Buford, GA | 30519 | 3,713 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 364 | Northwoods Mall | BL06 | 2200 West War Memorial Dr. | Peoria, IL | 61613 | 4,281 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 366 | Wausau Center | A124 | 0 | Wausau, WI | 00000 | 3,600 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |
| 367 | Birchwood Mall | 0222 | 4350 24th Avenue#324 | Fort Gratiot, MI | 48059 | 3,199 | Rouse Properties, Inc. | 1114 Avenue of the Americas | New York | NY | 10036 |
| 368 | Susquehanna Valley | F02A | Rtes 11 & 15 | Selinsgrove, PA | 17870 | 3,090 | Preit Services LLC | 200 South Broad Street | Philadelphia | PA | 19102 |
| 371 | Salmon Run Mall | B117 | Interstate Rte 81 | Watertown, NY | 13601 | 2,958 | Pyramid | 4 Clinton Exchange | Syracuse | NY | 13202-1078 |
| 372 | Champlain Center North | C119 | 459 Rte 3 | Plattsburg, NY | 00000 | 3,366 | Pyramid | 4 Clinton Exchange | Syracuse | NY | 13202-1078 |
| 373 | Florence Mall | 2018 | 1132 Florence Mall | Florence, KY | 00000 | 4,000 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 377 | Jefferson Mall | B-312 | 4801 Outer Loop | Louisville, KY | 40219 | 3,139 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |
| 378 | University Mall | H05 | 155 Dorset Street | South Burlington, VT | 05403 | 3,000 | Finard Properties LLC | 419 Boylston St | Boston | MA | 02116 |
| 379 | Rockingham Park Mall | W247 | 99 Rockingham Park Blvd | Salem, NH | 03079 | 3,419 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 380 | Brookfield Square | D-07 | 95 North Moorland Road | Brookfield, WI | 53005-6084 | 3,987 | CBL & Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421 -6000 |
| 381 | Johnstown Galleria | 220 | Galleria Drive | Johnstown, PA | 15901 | 3,250 | Gemini Property Management | 16740 Birkdale Commons Pkwy | Huntersville | NC | 28078 |
| 384 | Kenwood Town Center | L-209 | 7875 Montgomery Road | Cincinnati, OH | 45236 | 3,650 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |

Exhibit 4-5 to
Credit Agreement

| Store # | Mall Name | Leased Space | Location Address | Location City & State | Location Zip | RSF | Landlord | Landlord Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 385 | Kentucky Oaks Mall | 270 | 5101 Hinkleville Road | Paducah, KY | 42001 | 3,651 | Cafaro Company | PO Box 2186 | Youngstown | OH | 44504 |
| 387 | Apple Blossom Mall | S131A | 1850 Apple Blossom Drive | Winchester, VA | 22601 | 3,252 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 389 | Wolfchase Galleria | 1450 | 2760 North Germantown Parkway | Memphis, TN | 38133 | 3,453 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 390 | Magnolia Mall | 1418 | 271 David McLead Boulevard | Florence, SC | 29501 | 3,002 | Preit Services LLC | 200 South Broad Street | Philadelphia | PA | 19102 |
| 392 | West Towne Mall | D8 | 66 West Towne Mall | Madison, WI | 53719-1069 | 3,050 | CBL & Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421 - 6000 |
| 394 | Northgate Mall | 114 | 9501 Colerain Avenue | Cincinnati, OH | 45251 | 3,300 | Tabani Group Inc | 16600 Dallas Parkway | Dallas | TX | 75248 |
| 395 | Brunswick Square | 212 | 755 State Highway 18 | East Brunswick, NJ | 08816 | 3,790 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 396 | Easton Town Center | B206 | 4045 The Strand West | Columbus, OH | 43219 | 3,268 | Steiner and Associates, Inc. | 4016 Townsfair Way | Columbus | OH | 43219 |
| 397 | Indian Mound Mall | 725 | 771 South 30th Street | Heath, OH | 43056 | 3,953 | Glimcher | 180 E Broad St, 21st Floor | Columbus | OH | 43215 |
| 398 | Towne East Square | K06A | 7700 East Kellog Drive | Wichita, KS | 67207 | 4,027 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 399 | Sikes Senter Mall | 490 | 3111 Midwestern Parkway | Wichita Falls, TX | 76308 | 3,500 | Rouse Properties, Inc. | 1114 Avenue of the Americas | New York | NY | 10036 |
| 441 | Georgia Square Mall | 16 | 3700 Atlanta Highway | Athens, GA | 30606-3155 | 3,150 | Hendon Properties | 3445 Peachtree Road | Atlanta | GA | 30326 |
| 442 | Mall of Abilene | 1132 | 4310 Buffalo Gap Rd | Abilene, TX | 79606 | 3,339 | Gregory Greenfield & Assoc Ltd Advisors | 124 Johnson Ferry Road | Atlanta | GA | 30328 |
| 444 | Central Mall | 125 | 5111 Rogers Avenue | Fort Smith, AR | 72903 | 2,920 | Jones Lang LaSalle | 3344 Peachtree Road NE | Atlanta | GA | 30326 |
| 446 | Westwood Mall | 804 | 1850 West Michigan Ave. | Jackson, MI | 49201 | 4,214 | Rouse Properties, Inc. | 1114 Avenue of the Americas | New York | NY | 10036 |
| 448 | Penn Square Mall | 2010 | 1901 Northwest Expressway | Oklahoma City, OK | 73116 | 3,152 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 449 | Louis Joliet Mall | 1118 | 1118 Mall Loop Drive | Joliet, IL | 60431 | 4,281 | Starwood Retail Property Mgmt, LLC | 1 E Wacker Drive, Suite 3700 | Chicago | IL | 60601 |
| 450 | Crossroads Center | E-10 | 4101 West Division Street | St. Cloud, MN | 56301 | 4,021 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |

Exhibit 4-5 to
Credit Agreement

| Store # | Mall Name | Leased Space | Location Address | Location City & State | Location Zip | RSF | Landlord | Landlord Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 451 | University Mall | A16 | 1237 East Main Street PO Box 3187 | Carbondale, IL | 62902 | 3,600 | Urban Retail Properties | 111 East Wacker, Ste 2400 | Chicago | IL | 60611 |
| 453 | Cape Cod Mall | S-119 | Route 132 & Route 28 | Hyannis, MA | 02601 | 3,862 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 454 | Grand Traverse Mall | 208 | 3200 S Airport Road West | Traverse City, MI | 49684 | 3,040 | Rouse Properties, Inc. | 1114 Avenue of the Americas | New York | NY | 10036 |
| 456 | Lakeland Square Mall | 630 | 3800 US HWY 98N. | Lakeland, FL | 33809 | 3,200 | Rouse Properties, Inc. | 1114 Avenue of the Americas | New York | NY | 10036 |
| 457 | Colony Square | 430 | 3575 Maple Ave | Zanesville, OH | 43701 | 2,659 | Rouse Properties, Inc. | 1114 Avenue of the Americas | New York | NY | 10036 |
| 459 | Towne Mall | A-006 | 1704 Dixie Highway | Elizabethtown, KY | 42701 | 3,000 | Macerich | 401 Wilshire Blvd. | Santa Monica | CA | 90407 |
| 462 | Viewmont Mall | 772 | Scranton Carbondale Highway | Scranton, PA | 18508-1305 | 3,300 | Preit Services LLC | 200 South Broad Street | Philadelphia | PA | 19102 |
| 464 | Bay City Mall | E505 | 4101 East Wilder Road | Bay City, MI | 48706 | 3,410 | Lormax Stern Development Co | 38500 Woodward Ave, | Bloomfield Hills | MI | 43804 |
| 465 | Lansing Mall | 174 | 5330 W. Saginaw Hwy | Lansing, MI | 48917 | 3,500 | Rouse Properties, Inc. | 1114 Avenue of the Americas | New York | NY | 10036 |
| 466 | Lakeview Square Mall | 631 | 5775 Beckley Road | Battle Creek, MI | 49015 | 3,500 | GK Development | 257 E. Main Street, Ste 100 | Barrington | IL | 60010 |
| 467 | Governor's Square Mall | 680 | 2801 Wilma-Rudolph Blvd | Clarksville, TN | 37042 | 3,720 | Cafaro Company | PO Box 2186 | Youngstown | OH | 44504 |
| 468 | Eastfield Mall | 129 | 1655 Boston Road | Springfield, MA | 01129 | 3,470 | Mountain Development Corp. | 100 Delawanna Avenue | Clifton | NJ | 07014 |
| 469 | Northpark Mall | 162 | Northpark Mall | Joplin, MO | 64801 | 3,167 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |
| 470 | Northgate Mall (TN) | F020/F0 303 | 203 Northgate Mall | Chattanooga, TN | 37415 | 3,000 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421 |
| 471 | Hulen Mall | 1635 | 1070 Hulen Mall | Fort Worth, TX | 76132 | 2,909 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 474 | Apache Mall | 311 | 333 Apache Mall | Rochester, MN | 55902 | 3,041 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 475 | Anderson Mall | Q-8B | 3101 North Main Street | Anderson, SC | 29621 | 3,848 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 476 | South Shore Plaza | 2067 | 250 Granite Street | Braintree, MA | 02184 | 4,964 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 477 | Northgate Mall (NC) | 410 | 1058 West Club Road | Raleigh, NC | 27701 | 2,747 | Northgate Associates | PO Box 2476 | Durham | NC | 27715 |

Exhibit 4-5 to
Credit Agreement

| Store # | Mall Name | Leased Space | Location Address | Location City & State | Location Zip | RSF | Landlord | Landlord Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 478 | Yorktown Mall | 133 | 133 Yorktown Center | Lombard, IL | 60148 | 2,835 | Collarmele Partners | 2929 East Commercial Blvd | Fort Lauderdale | FL | 33308 |
| 479 | Pecanland Mall | 1412 | 4700 Millhaven Road | Monroe, LA | 71203 | 3,654 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 481 | Park Place Mall | 344 | 5870 East Broadway Blvd | Tucson, AZ | 85711 | 3,918 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 482 | Neshaminy Mall | 622 | 622 Neshaminy Mall | Bensalem, PA | 19020 | 3,175 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 483 | Triangle Town Center | FL1041 | 5950 Triangle Town Blvd. | Raleigh, NC | 27616 | 3,541 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421 |
| 484 | The Oaks Mall | D-5 and D-6 | 6357 West Newberry Road | Gainsville, FL | 32605 | 3,349 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 485 | Collin Creek Mall | 1375 | 811 North Central Expressway | Plano, TX | 75075 | 3,531 | Rouse Properties, Inc. | 1114 Avenue of the Americas | New York | NY | 10036 |
| 487 | Carolina Place Mall | A-08 | 11025 Carolina Place Parkway | Pineville, NC | 28134 | 4,145 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 488 | The Parks at Arlington | 2420 | 3811 South Cooper Street | Arlington, TX | 76015-4194 | 4,313 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 489 | Towne Square Mall | E-5 | 5000 Frederica Street | Owensboro, KY | 42301 | 3,674 | Towne Square Mall, LLC | Towne Sqaure Mall C/O Aronov Realty | Montgomery | AL | 36123-5000 |
| 490 | Grove City Premium Outlets | 1045 | 1911 Leesburg Grove City Road | Grove City, PA | 16127 | 4,749 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 491 | Hagerstown Premium Outlets | 520 | 495 Prime Outlets Blvd. | Hagerstown, MD | 21740 | 5,063 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 492 | San Marcos Outlet Stores | 401 &402 | 3939 South I H 35 | San Marcos, TX | 78666-5957 | 5,764 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 493 | Rehoboth Outlets | 321 | 1600 Ocean Outlets | Rehoboth Beach, DE | 19971 | 5,000 | Tanger Properties, L.P. | 3200 Northline Avenue | Greensboro | NC | 27408 |
| 494 | Valley Mall | 412A | 1925 E. Market Street | Harrisonburg, VA | 22801 | 3,200 | Macerich | 401 Wilshire Blvd. | Santa Monica | CA | 90407 |
| 507 | Greenwood Mall | 516 | 2625 Scottsville Road | Bowling Green, KY | 42104 | 7,168 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 508 | Myrtle Beach Outlet | H100 | 4625 Factory Stores Blvd. | Myrtle Beach, SC | 29579 | 5,040 | Tanger Properties, L.P. | 3200 Northline Avenue | Greensboro | NC | 27408 |
| 509 | Pleasant Prairie Outlets | C050 | 11211 120th Avenue | Kenosha, WI | 53158 | 3,600 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 510 | Jeffersonville | 755 | 8755 Factory Shops Blvd | Jeffersonville, OH | 43128 | 4,976 | Tanger Properties, L.P. | 3200 Northline Avenue | Greensboro | NC | 27408 |
| 511 | Birch Run Premium Outlets | H010 | 12140 South Beyer Road | Birch Run, MI | 48415 | 6,000 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 512 | Prime Outlets Niagara | 20 / 21 | 1672 Military Road | Niagara Falls, NY | 14304 | 5,730 | Macerich | 401 Wilshire Blvd. | Santa Monica | CA | 90407 |

Exhibit 4-5 to
Credit Agreement

| Store # | Mall Name | Leased Space | Location Address | Location City & State | Location Zip | RSF | Landlord | Landlord Address | City | State | Zip Code |
|---------|-----------|--------------|------------------|----------------------|--------------|-----|----------|------------------|------|-------|----------|
| 515 | Waterloo Outlets | C098 | 655 Route 318 | Waterloo, NY | 13165 | 6,000 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 517 | New River Valley Mall | 716 | 782 New River Road | Christiansburg, VA | 24073-6506 | 3,542 | Preit Services LLC | 200 South Broad Street | Philadelphia | PA | 19102 |
| 518 | Crossroads Mall | 120 | 6650 South Westnedge Road | Portage, MI | 49024 | 3,271 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 519 | Wyoming Valley Mall | 338 | 29 Wyoming Valley Mall | Wilkes Barre, PA | 18702 | 3,976 | Preit Services LLC | 200 South Broad Street | Philadelphia | PA | 19102 |
| 521 | Geneva Center Commons | 2200 | 502 Commons Way | Geneva, IL | 60134 | 3,600 | Mid-America | One Parkway Plaza | Oakbrook Terrace | IL | 60181 |
| 522 | Southridge Mall | 1300 | 5300 South 76th Street | Greendale, WI | 53129 | 4,500 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 526 | Grapevine Mills Mall | 526A | 3000 Grapevine Mills Parkway | Grapevine, TX | 76051 | 6,792 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 527 | Golden East Crossing | 1112 | 1100 N. Wesleyan Blvd | Rocky Mount, NC | 27804 | 2,606 | Hendon Properties | 3445 Peachtree Road | Atlanta | GA | 30326 |
| 528 | Sarasota Square | A2 | 8201 South Tamiami Trail | Sarasota, FL | 34238 | 3,389 | Westfield | 11601 Wilshire Blvd | Los Angeles | CA | 90025 |
| 529 | Green Tree Mall | 526 | 757 E. Highway 131 | Clarksville, IN | 47129 | 3,000 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanoogo | TN | 37421 |
| 530 | Columbia Mall (MO) | 318 | 2300 Bernadette Drive | Columbia, MO | 65203 | 3,003 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 531 | Quintard Mall | 72-B | 700 Quintard Drive | Oxford, AL | 36203 | 3,515 | The Woodmont Company | 2100 West 7th Street | Fort Worth | TX | 76107 |
| 532 | Huntington Mall | 760 | Route 60 and Mall Road | Barboursville, WV | 25504 | 3,566 | Cafaro Company | PO Box 2186 | Youngstown | OH | 44504 |
| 535 | Bellis Fair Mall | 604 | 1 Bellis Fair Parkway | Bellingham, WA | 98226 | 3,426 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 536 | Patrick Henry Mall | 413 | 12300 Jefferson Ave. | New Port News, VA | 23602 | 3,434 | Preit Services LLC | 200 South Broad Street | Philadelphia | PA | 19102 |
| 537 | The Citadel Mall | 2392 | 750 Citadel Drive | Colorado Springs, CO | 80909 | 3,914 | Spinoso Management Group LLC | 100 Northern Concourse | North Syracuse | NY | 13212 |
| 538 | North East Mall | D-18B | 1001 Melbourne Street | Hurst, TX | 76053 | 3,199 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 541 | South Hill Mall | 944 | 3500 South Meridian | Puyallup, WA | 98373 | 3,382 | Cafaro Company | PO Box 2186 | Youngstown | OH | 44504 |
| 543 | Vancouver Mall | 246 | 8700 NE Vancouver Mall Drive | Vancouver, WA | 98662 | 3,210 | Westfield | 11601 Wilshire Blvd | Los Angeles | CA | 90025 |
| 544 | Bay Park Square | 985 | 303 Bay Park Square | Green Bay, WI | 54304 | 3,527 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |

WEIL:\95685927\8\11727.0012

Exhibit 4-5 to
Credit Agreement

| Store # | Mall Name | Leased Space | Location Address | Location City & State | Location Zip | RSF | Landlord | Landlord Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 545 | Country Side Mall | 1059 | 27001 US Highway 19 | Clearwater, FL | 33761 | 3,349 | Westfield | 11601 Wilshire Blvd | Los Angeles | CA | 90025 |
| 546 | Fox River Mall | 104 | 4301 West Wisconsin Ave | Appleton, WI | 54913 | 4,000 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 548 | Lima Mall | 542 | 2400 Elida Road | Lima, OH | 45805 | 4,613 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 549 | Valley View Mall-WI | 162 | 3800 State Road 16 | LaCrosse, WI | 54601 | 3,422 | Preit Services LLC | 200 South Broad Street | Philadelphia | PA | 19102 |
| 550 | Post Oak Mall | 4006 | 1500 Harvey Road | College Station, TX | 77840 | 3,785 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |
| 553 | Carolina Mall | 265 | 1408 Concord Parkway N. | Concord, NC | 28025 | 3,418 | Hull Storey Gibson Companies, LLC | 1190 Interstate Parkway | Augusta | GA | 30909 |
| 554 | Valley West Mall | 182 | 1551 Valley West Drive | West DeMoines, IA | 50266 | 3,888 | Watson Centers | 3100 West Lake Street, Ste 420 | Minneapolis | MN | 55416 |
| 555 | Cordova Mall | B-217 | 5100 North Nine Avenue | Pensacola, FL | 32504 | 3,999 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 557 | Quail Springs | 252 | 2501 West Memorial Road | Oklahoma City, OK | 73134 | 3,333 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 558 | Towne West Square | K02A | 4600 West Kellogg | Wichita, KS | 67209 | 3,180 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 561 | Altamonte Mall | 1453 | 451 East Altamonte Drive Suite 1453 | Altamonte Springs, FL | 32701 | 3,552 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 563 | Vista Ridge Mall | 1386 | 2401 South Stemmons Fairway | Lewisville, TX | 75067 | 2,762 | Rouse Properties, Inc. | 1114 Avenue of the Americas | New York | NY | 10036 |
| 565 | North Star Mall | 100 | 7400 San Pedro | San Antonio, TX | 78216 | 4,620 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 566 | Memorial City Mall | 210 | 303 Memorial City Mall | Houston, TX | 77027 | 4,152 | Memorial City Mall Mall, LP | 929 Gessner | Houston | TX | 77024 |
| 567 | Empire Mall | 314 | 1230 Empire Mall | Sioux Falls, SD | 57106 | 3,409 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 568 | Southern Hills Mall | 312 | 4400 Sergeant Road | Sioux City, IA | 51106 | 3,561 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 569 | Oglethorpe Mall | 32 | 7804 Abercorn Street | Savannah, GA | 31406 | 3,580 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 570 | Southlake Mall | 1206 | 1206 Southlake Mall | Morrow, GA | 30260 | 4,121 | Vintange Real Estate LLC | 1000 Southlake Mall | Morrow | GA | 30260 |
| 571 | Millcreek Mall | 250 | 250 Millcreek Mall | Erie, PA | 16565 | 3,708 | Cafaro Company | PO Box 2186 | Youngstown | OH | 44504 |
| 572 | Vintage Faire Mall | Q06 | 3401 Dale Road | Modesto, CA | 95356 | 3,776 | Macerich | 401 Wilshire Blvd. | Santa Monica | CA | 90407 |

Exhibit 4-5 to
Credit Agreement

| Store # | Mall Name | Leased Space | Location Address | Location City & State | Location Zip | RSF | Landlord | Landlord Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 573 | Wiregrass Commons | 95 | 900 Commons Drive | Dothan, AL | 36303 | 3,407 | Preit Services LLC | 200 South Broad Street | Philadelphia | PA | 19102 |
| 574 | Westgate Mall | 370 | 205 West Blackstock Road | Spartanburg, SC | 29301 | 4,191 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |
| 575 | Deerbrook Mall | 1090 | 20131 Highway 59 North | Humble, TX | 77338 | 3,090 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 576 | Colonial Mall Valdosta | 1034 | 1700 Norman Drive | Valdosta, GA | 31601 | 3,371 | Jones Lang LaSalle | 3344 Peachtree Road NE | Atlanta | GA | 30326 |
| 577 | Parkway Place Mall | 242 | 2801 South Memorial Parkway | Huntsville, AL | 35801 | 3,545 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |
| 578 | Francis Scott Key Mall | 660 | 5500 Buckeystown | Frederick, MD | 21703 | 4,089 | Preit Services LLC | 200 South Broad Street | Philadelphia | PA | 19102 |
| 579 | Tanger Five Oaks | 1370 | 1645 Parkway Suite | Sevierville, TN | 37862 | 3,550 | Tanger Properties, L.P. | 3200 Northline Avenue | Greensboro | NC | 27408 |
| 580 | Ellenton Premium Outlets | 905 | 5109 Factory Shops Blvd | Ellenton, FL | 34222 | 4,118 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 581 | Gaffney Premium Outlets | 235 | 235 Factory Shops Blvd. | Gaffney, SC | 29341 | 3,514 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 582 | Tanger Outlet Center in Foley | 422 | 2601Soth McKenzie | Foley, AL | 36535 | 5,240 | Tanger Properties, L.P. | 3200 Northline Avenue | Greensboro | NC | 27408 |
| 583 | Gettysburg Outlet | B-420 | 1863 Gettysburg Village Drive | Gettysburg, PA | 17325 | 3,600 | Horizon Properties Group | 5000 Hakes Drive, Suite 500 | Muskegon | MI | 49441 |
| 584 | Woodland Hills Mall | 244 | 7021 South Memorial Drive | Tulsa, OK | 74133 | 3,531 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 587 | South Plains Mall | B-9 | 6002 Slide Road | Lubbock, TX | 79414 | 3,590 | Macerich | 401 Wilshire Blvd. | Santa Monica | CA | 90407 |
| 588 | Rivercenter Mall | 491 | 849 East Commerce Street | San Antonio, TX | 78205 | 3,558 | River Center Mall | 849 East Commerice Street | San Antonio | TX | 08205 |
| 589 | Lakeline Mall | N10 | 11200 Lakeline Mall Drive | Cedar Park, TX | 78613 | 2,986 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 590 | Tuttle Crossing | 139 | 5043 Tuttle Crossing Blvd | Dublin, OH | 43016 | 3,013 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 591 | Lakeforest Mall | E-115 | 701 Russell Ave | Gaithersburg, MD | 20877 | 3,152 | Urban Retail Properties | 111 East Wacker, Ste 2400 | Chicago | IL | 60611 |
| 592 | Clackamas Town Center | B-209 | 12000 South E. 82nd Ave | Portland, OR | 97086 | 3,390 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 593 | Kingsport Town Center (Fort Henry Mall) | E-39 | 2101 Fort Henry Drive | Kingsport, TN | 37664 | 2,880 | Avison Young | 30 Ivan Allen Jr Blvd | Atlanta | GA | 30308 |

Exhibit 4-5 to
Credit Agreement

| Store # | Mall Name | Leased Space | Location Address | Location City & State | Location Zip | RSF | Landlord | Landlord Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 594 | Regency Square Mall | 1308 | 301 Cox Creek Parkway | Florence, AL | 35630 | 3,500 | Hull Storey Gibson Companies, LLC | 1190 Interstate Parkway | Augusta | GA | 30909 |
| 596 | The Mall of Acadiana | E209 | 5725 Johnston Street | Lafayette, LA | 70503 | 4,653 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421 |
| 597 | Spotsylvania Mall | 305 | 305 Spotsylvania Mall | Fredericksburg, VA | 22407 | 3,575 | Cafaro Company | PO Box 2186 | Youngstown | OH | 44504 |
| 598 | Rushmore Mall | 218 | 2200 North Maple | Rapid City, SD | 57701 | 3,393 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 600 | Castle Rock Outlets | 370 | 5050 Factory Shops Blvd | Castle Rock, CO | 80106 | 4,718 | Craig Realty Group | 4100 Macarthur | Newport Beach | CA | 92660 |
| 602 | Northpark Mall | 216 | 1200 East County Line Road | Ridgeland, MS | 39157 | 3,753 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 603 | Tyrone Square | 672A | 6901 Tyrone Square | St. Petersburg, FL | 33710 | 3,500 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 604 | West Acres | 310 | 3902 13th Ave Southwest | Fargo, ND | 58103 | 3,318 | West Acres Development | 3902 13th Ave S, Suite 3717 | Fargo | ND | 58103-7512 |
| 605 | University Mall | 315/317 | 2205 University Square Mall | Tampa Bay, FL | 33612 | 4,026 | RD Management LLC | 810 Seventh Avenue | New York | NY | 10019 |
| 606 | Oakridge Mall | V-21 | 925 Blossom HIll Road | San Jose, CA | 95123 | 3,065 | Westfield | 11601 Wilshire Blvd | Los Angeles | CA | 90025 |
| 608 | Florida Mall | 1226 | 8001 South Orange Blossom Trail | Orlando, FL | 32809 | 4,485 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 609 | Kittery Premium Outlets (The Maine Mall Outlets) | 17 | 345 US Route 1 | Kittery, ME | 03904 | 3,203 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 612 | Superstition Springs Mall | J14 | 6555 East Southern Ave | Mesa, AZ | 85206 | 3,310 | Macerich | 401 Wilshire Blvd. | Santa Monica | CA | 90407 |
| 614 | Wheaton Mall | 151 | 11160 Veirs Mill Road | Silver Spring, MD | 20902 | 3,650 | Westfield | 11601 Wilshire Blvd | Los Angeles | CA | 90025 |
| 615 | St. Augustine Outlets | O102 | 2700 State Road 16 | St. Augustine, FL | 32092 | 3,900 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 618 | Berkeley Mall | G-9 | 621 A Berkeley Blvd. | Goldsboro, NC | 27534 | 3,782 | Berkeley Mall LLC | 720 S. Lafayette Street | Shelby | NC | 28150 |
| 619 | Center at Salisbury | H121 | 2300 North Salisbury Blvd | Salisbury, MD | 21801 | 3,100 | Rouse Properties, Inc. | 1114 Avenue of the Americas | New York | NY | 10036 |
| 620 | Barton Creek Mall | M05 | 2901 Capital fo TX Highway | Austin, TX | 78746 | 3,615 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 621 | Brandon Town Center | 553 | 553 Brandon Town Center | Brandon, FL | 33510 | 3,081 | Westfield | 11601 Wilshire Blvd | Los Angeles | CA | 90025 |

WEIL:\95685927\8\11727.0012

Exhibit 4-5 to
Credit Agreement

| Store # | Mall Name | Leased Space | Location Address | Location City & State | Location Zip | RSF | Landlord | Landlord Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 623 | Jacksonville Mall | C11 | 342 Jacksonville Mall | Jacksonville, NC | 28546 | 3,015 | Preit Services LLC | 200 South Broad Street | Philadelphia | PA | 19102 |
| 624 | Katy Mills Mall | 675 | 5000 Katy Mills Circle | Katy, TX | 77494 | 5,155 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 625 | Citrus Park Mall | 8081 | 8081 Citrus Park Town Center | Tampa, FL | 33625 | 3,783 | Westfield | 11601 Wilshire Blvd | Los Angeles | CA | 90025 |
| 626 | Westgate Mall | 552 | 7701 W. Interstate 40 | Amarillo, TX | 79121-0140 | 3,500 | Jones Lang LaSalle | 3344 Peachtree Road NE | Atlanta | GA | 30326 |
| 628 | Towson Town Center | 1125 | 825 Dullaney Valley Road | Towson, MD | 21204 | 3,000 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 631 | Southland Mall | 2027 | 5953 West Park Ave. | Houma, LA | 70364 | 3,510 | Morguard Investments Limited | 2542 Williams Blvd | Kenner | LA | 70062-5596 |
| 632 | Belmar Mall | 2M3-R-30 | 7251 West Alaska Drive | Lakewood, CO | 80226 | 3,538 | Belmar Mainstreet Holdings, LLC | 355 S. Teller Street 210 | Lakewood | CO | 80226 |
| 634 | Panama City | 2202 | 2202 Martin Luther King Jr. Blvd | Panama City, FL | 32405 | 2,804 | Hendon Properties | 3445 Peachtree Road | Atlanta | GA | 30326 |
| 635 | Mall St. Vincent | 360 | 1133 St. Vincent Ave | Shreveport, LA | 71104 | 3,214 | Rouse Properties, Inc. | 1114 Avenue of the Americas | New York | NY | 10036 |
| 637 | Chico Mall | C-307 | 1950 East 20th Street | Chico, CA | 95928 | 3,130 | Jones Lang LaSalle | 3344 Peachtree Road NE | Atlanta | GA | 30326 |
| 638 | Battlefield Mall | T18 | 2825 South Glenstone Rd | Springfield, MO | 65804 | 4,568 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 640 | Cumberland Mall | B10 | 3849 South Delsea Drive | Vineland, NJ | 08360 | 2,994 | Preit Services LLC | 200 South Broad Street | Philadelphia | PA | 19102 |
| 641 | Chapel Hills Mall (CO) | 137 | 1710 Briargate Blvd | Colorado Springs, CO | 80920 | 3,547 | Urban Retail Properties | 111 East Wacker, Ste 2400 | Chicago | IL | 60611 |
| 642 | Paddock Mall | 248A | 3100 College Road | Ocala, FL | 34474 | 3,575 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 644 | East Towne Mall | 518 | 21 East Towne Mall | Madison, WI | 53704 | 3,800 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |
| 646 | Markland Mall | H10B | 1114 17th Street | Kokomo, IN | 46902 | 3,480 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 647 | Colorado Mills | 446 | 14500 Colfax Ave. | Lakewood, CO | 80401 | 3,467 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 649 | Jordan Creek Mall | 2334 | 101 Jordan Creek Parkway | Des Moines, IA | 50266 | 3,149 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 650 | Sooner Mall | 321 | 3321 West Main Street | Norman, OK | 73072 | 3,485 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 651 | Albertville Outlets | A010 | 6415 Labeaux Ave | Albertville, MN | 55301 | 4,500 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |

WEIL:\95685927\8\11727.0012

Exhibit 4-5 to
Credit Agreement

| Store # | Mall Name | Leased Space | Location Address | Location City & State | Location Zip | RSF | Landlord | Landlord Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 652 | Arrowhead Town Center | 2112 | 7700 West Arrowhead Town Center | Glendale, AZ | 85038 | 3,013 | Macerich | 401 Wilshire Blvd. | Santa Monica | CA | 90407 |
| 653 | Lighthouse Outlets | 815 | 815 Lighthouse Place | Michigan City, IN | 46360 | 4,879 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 654 | Plaza Bonita | 1155 | 3030 Plaza Bonita Road | National City, CA | 91950 | 6,184 | Westfield | 11601 Wilshire Blvd | Los Angeles | CA | 90025 |
| 657 | Baybrook Mall | 1004 | 1300 Baybrook Mall | Houston, TX | 77546 | 6,002 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 659 | Algonquin Commons | 4190 | 1904 South Randall Road | Algonquin, IL | 60102 | 3,600 | Mid-America | One Parkview Plaza | Oakbrook Terrace | IL | 60181 |
| 660 | Spokane Valley Mall | 1012 | 14700 East Indiana Ave | Spokane, WA | 99216 | 3,891 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 661 | Golden Triangle Mall | 3554 | 2201 I-35 East | Denton, TX | 76205 | 3,142 | MG Herring Group | 5710 LBJ Freeway | Dallas | TX | 75240 |
| 662 | Central Mall (TX) | 23 | 23 Central Mall | Texarkana, TX | 75503 | 3,199 | Jones Lang LaSalle | 3344 Peachtree Road NE | Atlanta | GA | 30326 |
| 663 | Williamsburg Premium Outlets | E080 | 5715 -E080 Richmond Road | Williamsburg, VA | 23188 | 4,118 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 665 | Mall at Wellington Green | 142 | 10300 West Forest Hill Road | Wellington, FL | 33414 | 2,866 | Starwood Retail Property Mgmt, LLC | 1 E Wacker Drive, Suite 3700 | Chicago | IL | 60601 |
| 667 | Victor Valley Mall | 437 | 14400 Bear Valley Road | Victorville, CA | 92393 | 3,165 | Macerich | 401 Wilshire Blvd. | Santa Monica | CA | 90407 |
| 671 | Old Hickory Mall | B4A | 2021 N. Highland Ave. | Jackson, TN | 38305 | 3,928 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |
| 672 | Zona Rosa Mall | 206 | 7116 Northwest 86 Terrace | Kansas City, MO | 64153 | 3,595 | Olshan Properties | 5500 New Albany Road East | New Albany | OH | 43054 |
| 673 | Valley Plaza Mall | 155 | 2701 Ming Ave | Bakersfield, CA | 93304 | 3,570 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 675 | Ingram Park Mall | L-8 | 6301 NW Loop 410 | San Antonio, TX | 78238 | 3,480 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 676 | Richland Mall | 39 | 6001 West Waco Drive | Waco, TX | 76710 | 3,500 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |
| 677 | Broadway Mall | 879 | 462 Broadway Mall | Hicksville, NY | 11801 | 4,014 | Pacific Retail Capital Partners | 100 N. Sepulveda Blvd | El Segundo | CA | 90245 |
| 679 | Melbourne Square Mall | 229A | 1700 W. New Haven | Melbourne, FL | 32904 | 3,000 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 680 | Greenbrier Mall | 2234 | 1401 Greenbrier Parkway | Chesapeake, VA | 23320 | 3,502 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |

Exhibit 4-5 to
Credit Agreement

| Store # | Mall Name | Leased Space | Location Address | Location City & State | Location Zip | RSF | Landlord | Landlord Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 681 | Galleria at Dallas | 3375 | 0 | Dallas, TX | 75240 | 3,200 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 682 | Treasure Coast Mall | 3256 | 3256 NW Federal Highway | Jensen Beach, FL | 34957 | 2,663 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 683 | Tanger Howell | D250 | 1475 North Burkhart Road | Howell, MI | 48855 | 4,500 | Tanger Properties, L.P. | 3200 Northline Avenue | Greensboro | NC | 27408 |
| 684 | Coastland Mall | M0004 | 1912 Tamiami Trail | Naples, FL | 34102 | 3,644 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 685 | Edgewater Mall | 32 | 2600 Beach Blvd. | Biloxi, MS | 39531 | 4,235 | Jim Wilson & Assoc. | 2660 Eastchase Lane | Montgomery | AL | 36117 |
| 686 | Broadway Square | B09A | 4601 S. Broadway | Tyler, TX | 75703 | 3,630 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 687 | Osage Beach Outlets | BB9 | 4540 Highway 54 | Osage Beach, MO | 65065 | 4,518 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 688 | Imperial Valley Mall | 1474 | 3451 South Dogwood Ave | El Centro, CA | 92243 | 6,187 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421 |
| 689 | Mall at Barnes Crossing | 220 | 1001 Barnes Crossing Rd. | Tupelo, MS | 38804 | 3,575 | Rouse Properties, Inc. | 1114 Avenue of the Americas | New York | NY | 10036 |
| 690 | Valley Mall (MD) | 278 | 17301 Valley Mall Road | Hagerstown, MD | 21740 | 3,025 | Preit Services LLC | 200 South Broad Street | Philadelphia | PA | 19102 |
| 691 | Orange Park Mall | C19 | 1910 Wells Road | Orange Park, FL | 32073 | 3,127 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 692 | Sunland Park Mall | E09 | 750 Sunland Park Drive | El Paso, TX | 79912 | 3,407 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 693 | Northwest Arkansas Mall | 1230 | 4201 North Shiloh Drive | Fayetteville, AR | 72703 | 3,536 | Spinoso Management Group LLC | 100 Northern Concourse | North Syracuse | NY | 13212 |
| 694 | Flatiron Crossing | 1116 | 1 West Flat Iron Circle | Broomfield, CO | 80021 | 3,600 | Macerich | 401 Wilshire Blvd. | Santa Monica | CA | 90407 |
| 695 | Parkdale Mall | D412 | 6155 Eastex Freeway | Beaumont, TX | 77706 | 3,004 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |
| 696 | Charlottesville Mall | 1410A | 1558 East Real Road | Charlottesville, VA | 22901 | 2,816 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 697 | Houston Galleria | 6050 | 5085 Westheimer Road | Houston, TX | 77056 | 3,736 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 698 | The Avenues | 1580 | 10300 Southside Blvd. | Jacksonville, FL | 32256 | 3,842 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 699 | Sawgrass Mills Mall | 653A | 12801 W. Sunrise Blvd | Sunrise, FL | 33323 | 7,346 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 700 | Oak View Mall | H02 | 3001 S. 144th Street | Omaha, NE | 68144 | 3,344 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |

Exhibit 4-5 to
Credit Agreement

| Store # | Mall Name | Leased Space | Location Address | Location City & State | Location Zip | RSF | Landlord | Landlord Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 701 | First Colony | 255 | 16535 Southwest Freeway | Sugarland, TX | 77479 | 3,762 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 705 | Coronado Mall | B-4 | 6600 Menual North East | Alburquerque, NM | 87110 | 3,454 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 707 | College Square Mall | 52 | 2550 East Morris Blvd. | Morristown, TN | 37813 | 4,027 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |
| 708 | Boynton Beach | 365A | 801 North Congress Ave. | Boynton Beach, FL | 33426 | 3,314 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 712 | Clinton Crossings Outlet | 110 | 20 A Killingworth Turnpike | Clinton, CT | 06413 | 4,052 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 713 | Edinburgh Outlets | D010 | 11660 N.E. Executive Drive | Edinburgh, IN | 46124 | 6,074 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 716 | Mall of Monroe | 525 | 2121 North Monroe Street | Monroe, MI | 48162 | 2,976 | Cafaro Company | PO Box 2186 | Youngstown | OH | 44504 |
| 717 | Ontario Mills | 404 A | One Mill Circle | Ontario, CA | 91764 | 6,500 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 718 | Montgomery Mall (MD) | 194 | 7101 Democracy Blvd. | Bethesda, MD | 20817 | 3,500 | Westfield | 11601 Wilshire Blvd | Los Angeles | CA | 90025 |
| 719 | Chicago Outlets | 1239 | 1650 Premium Outlets Blvd | Aurora, IL | 60502 | 4,459 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 720 | Wrentham Outlets | 335 | 1 Premium Outlets Blvd. | Wrentham, MA | 02093 | 3,531 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 721 | Desoto Square | 421 | 303 Highway 301 Blvd. West | Bradenton, FL | 34205 | 3,130 | Mason Asset Management | 747 Middle Neck Road | Great Neck | NY | 11024 |
| 722 | The Crossings Outlets | E-02 | 1000 Rt. 611 | Tannersville, PA | 18372 | 3,000 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 723 | Petaluma Outlets | 435 | 2200 Petaluma Blvd. North | Petaluma, CA | 94952 | 4,453 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 724 | Alexandria Mall | 1184 | 3437 Masonic Drive | Alexandria, LA | 71301 | 3,740 | Jones Lang LaSalle | 3344 Peachtree Road NE | Atlanta | GA | 30326 |
| 726 | Aurora Outlets | 160 | 549 S. Chillicothe Road | Aurora, OH | 44202 | 4,043 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 727 | The Woodlands Mall | 1014 | 1201 Lake Woodlands Drive | The Woodlands, TX | 77380 | 3,510 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 728 | LaPlaza Mall | A-5 | 2200 S. 10th Street | McAllen, TX | 78503 | 3,625 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 729 | Fair Oaks Mall | J-119 | 11743L Fair Oaks Mall | Fairfax, VA | 22033 | 3,695 | Taubman | 200 East Long Lake Road | Bloomfield Hills | MI | 48303-0200 |
| 730 | Chula Vista Mall | 1098 | 555 Broadway | Chula Vista, CA | 91910 | 3,040 | Rouse Properties, Inc. | 1114 Avenue of the Americas | New York | NY | 10036 |

Exhibit 4-5 to
Credit Agreement

| Store # | Mall Name | Leased Space | Location Address | Location City & State | Location Zip | RSF | Landlord | Landlord Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 731 | Rogue Valley Mall | 1037 | 1600 N. Riverside Ave. | Medford, OR | 97501 | 2,895 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 732 | Boise Town Square | 2120 | 300 N. Milwaukee | Boise, ID | 83704 | 3,540 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 733 | Lakeside Mall | 54 B | 3301 Veterans Memorial Blvd. | Metairie, LA | 70002 | 3,543 | Lakeside Mall | 3301 Veteran's Memorial Blvd. | Metairie | LA | 70002 |
| 734 | Crabtree Valley Mall | 1086 | 4325 Glenwood Ave. | Raliegh, NC | 27612 | 3,551 | Plaza Associates | 2840 Plaza Place | Raleigh | NC | 27612 |
| 735 | The Meadows Mall | 2170 | 4300 Meadows Lane | Las Vegas, NV | 89107 | 3,690 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 736 | Galleria at Tyler | F210 | 1299 Galleria at Tyler | Riverside, CA | 32503 | 3,403 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 737 | Sunrise Mall (TX) | 1200 | 2370 North Expressway | Brownsville, TX | 78256 | 7,428 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |
| 738 | Peachtree Mall | 38 | 3507 Manchester Expressway | Columbus, GA | 31909 | 3,800 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 739 | Woodbury Commons | 255 | 255 Red Apple Court | Central Valley, NY | 10917 | 4,214 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 740 | Atlantic City Outlets | 160 | 111 B North Michigan Ave | Atlantic City, NJ | 08401 | 5,100 | Tanger Properties, L.P. | 3200 Northline Avenue | Greensboro | NC | 27408 |
| 741 | Las Americas | 473 | 4141 Camino De La Plaza Drive | San Ysidro, CA | 00000 | 8,450 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 742 | Woodbury Lakes Mall | 506 | 9140 Hudson Rd | Woodbury, MN | 55125 | 3,596 | Ramco Gershenson | 31500 Northwest Highway | Farminton Hills | MI | 48334 |
| 744 | University Mall (UT) | B-40 | 575 E. University Parkway | Orem, UT | 84097 | 3,942 | Woodbury Corporation | 2733 E. Parley's Way | Salt Lake City | UT | 84109-1662 |
| 745 | Provo Town Center | 1140 | 1200 Town Centre Blvd. | Provo, UT | 84601 | 3,286 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 746 | Palm Desert Mall | 457 | 72840 Highway 111 | Palm Desert, CA | 92260 | 3,048 | Westfield | 11601 Wilshire Blvd | Los Angeles | CA | 90025 |
| 747 | Camarillo Outlets | 500 | 740 Ventura Blvd. | Camarillo, CA | 93010 | 2,925 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 748 | Cielo Vista Mall | T-6 | 8401 Gateway Blvd | El Paso, TX | 79925 | 3,536 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 749 | Northlake Mall | 181 | 6801 Northlake Mall Drive | Charlotte, NC | 28216 | 3,071 | Starwood Retail Property Mgmt, LLC | 1 E Wacker Drive, Suite 3700 | Chicago | IL | 60601 |
| 750 | Fayette Mall | G718 | 3615 Nicholasville Rd. | Lexington, KY | 40503 | 3,502 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |

Exhibit 4-5 to
Credit Agreement

| Store # | Mall Name | Leased Space | Location Address | Location City & State | Location Zip | RSF | Landlord | Landlord Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 751 | Marley Station | E-217 | 7900 Govenor Ritchie Highway | Glenn Burnie, MD | 21061 | 3,500 | Woodmont Company | Kim Welborn | Fort Worth | TX | 76107 |
| 752 | Shops at Saucon Valley | 420 | 2845 Center Valley Parkway | Bethlehem, PA | 18034 | 3,400 | Poag Shopping Centers LLC | 2650 Thousand Oaks Blvd | Memphis | TN | 38118 |
| 753 | Great Mall Milpitas | 480 | 480 Great Mall Drive | Milpitas, CA | 95035 | 3,800 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 754 | Oakland Mall | 362 | 362 West 14 Mile Rd. | Troy, MI | 48083 | 4,000 | Urban Retail Properties | 111 East Wacker, Ste 2400 | Chicago | IL | 60611 |
| 755 | Albany Mall | C-10 | 2601 Dawson Road | Albany, GA | 31707 | 3,676 | Aronov Realty Management | 3500 Eastern Blvd. | Montgomery | AL | 36116-1781 |
| 756 | Rock Hill Galleria | 825 | 2301 Dave Lyle Blvd. | Rock Hill, SC | 29730 | 3,500 | Cypress Equities | 8343 Douglas Ave | Dallas | TX | 75225 |
| 757 | Lindale Mall | 0110 | 4444 1st Ave. NE | Cedar Rapids, IA | 52402 | 3,668 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 759 | Westgate Mall (MA) | E131 | 200 Westgate Drive | Brockton, MA | 02301 | 2,964 | NED MANAGEMENT LIMITED PARTNERSHIP | 75 PARK PLAZA | BOSTON | MA | 02116 |
| 761 | Eastridge Mall (CA) | 2090 | 2090 Eastridge Loop | San Jose, CA | 95122 | 3,335 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 762 | Uniontown Mall | 332 | 1332 Mall Run Road | Uniontown, PA | 15401 | 3,513 | Preit Services LLC | 200 South Broad Street | Philadelphia | PA | 19102 |
| 763 | Crossroads Mall (WV) | F10 | 2 Crossroads Mall | Breckley, WV | 25800 | 3,620 | Preit Services LLC | 200 South Broad Street | Philadelphia | PA | 19102 |
| 764 | Coral Square Mall | 9501 | 9501 West Atlantic Blvd. | Coral Springs, FL | 33071 | 3,880 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 765 | Turtle Creek Mall | 370 | 1000 Turtle Creek Drive | Hattiesburg, MS | 39402 | 3,430 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |
| 767 | Forest Mall | D01B | 835 West Johnson St. | Fond Du Lac, WI | 54935 | 3,533 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 768 | Tacoma Mall | 432B | 4502 South Stelle Street | Tacoma, WA | 98409 | 3,587 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 770 | Firewheel Town Center | H05 | 365 Cedar Sage Drive | Garland, TX | 75040 | 3,654 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 771 | Newgate Mall | 1064 | 3651 Wall Ave. | Ogden, UT | 84405 | 3,456 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 772 | Legends at Village West | B-5 | 1837 Village West Parkway | Kansas City, KS | 66109 | 3,384 | Red Legacy | 4717 Central | Kansas City | MO | 64112 |
| 773 | Shoppes at La Cantera | 1670 | 15900 LaCantera Parkway | San Antonio, TX | 78256 | 3,246 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |

Exhibit 4-5 to
Credit Agreement

| Store # | Mall Name | Leased Space | Location Address | Location City & State | Location Zip | RSF | Landlord | Landlord Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 775 | Indian River Mall | 686 B | 6200 20th St. | Vero Beach, FL | 32966 | 2,912 | Bayer Properties LLC | Attn: David Silverstein, Reciever | Birmingham | AL | 35205 |
| 776 | Northshore Square Mall | 2035 | 150 North Shore Blvd. | Slidell, LA | 70460 | 3,248 | Morguard Investments Limited | 2542 Williams Blvd | Kenner | LA | 70062-5596 |
| 777 | Northridge Mall | 116 | 9301 Tampa Ave. | Northridge, CA | 91324 | 3,758 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 778 | Montclair Plaza | 2128 | 5060 Montclair Plaza Lane | Montclair, CA | 91763 | 3,501 | 5060 E. Monclair Plaza Lane Owner LLC | 4700 Wilshire Blvd | Los Angeles | CA | 90010 |
| 779 | Piedmont Mall | 122 | 325 Piedmont Drive | Danville, VA | 24540 | 3,500 | Hull Storey Gibson Companies, LLC | 1190 Interstate Parkway | Augusta | GA | 30909 |
| 780 | Santa Rosa Mall | 1012A | Santa Rosa Plaza | Santa Rosa, CA | 95401 | 3,201 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 781 | Irvine Spectrum Center | 826 | 613 Spectrum Center Drive | Irvine, CA | 92618 | 3,430 | Irvine Company | The Irvine Co. Retail Properties | Irvine | CA | 92617 |
| 782 | Layton Hills Mall | 2008 | 1076 Layton HIlls Mall | Layton, UT | 84041 | 3,281 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |
| 783 | Aurora Mall | 1057 | 14200 E. Alameda Ave. | Aurora, CO | 80012 | 3,700 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 784 | Southaven Towne Center | 830 | 6524 Towne Center Loop | Southaven, MS | 38671 | 3,090 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |
| 785 | Eastern Shores | 106 | 30500 State Highway 181 | Spanish Fort, AL | 36527 | 3,500 | Jim Wilson & Assoc. | 2660 Eastchase Lane | Montgomery | AL | 36117 |
| 786 | Mt. Berry Square | 220 | 32 Mt. Berry Square NE | Rome, GA | 30165 | 3,205 | Hull Storey Gibson Companies, LLC | 1190 Interstate Parkway | Augusta | GA | 30909 |
| 787 | Dolphin Mall | 274 | 11401 NW 12 Street | Miami, FL | 33172 | 4,689 | Taubman | 200 East Long Lake Road | Bloomfield Hills | MI | 48303-0200 |
| 788 | Santa Anita Mall | H-11 | 400 South Baldwin Ave. | Arcadia, CA | 91007 | 3,335 | Westfield | 11601 Wilshire Blvd | Los Angeles | CA | 90025 |
| 789 | Fresno Fashion Fair | G-9 | 693 East Shaw Ave | Fresno, CA | 93710 | 3,794 | Macerich | 401 Wilshire Blvd. | Santa Monica | CA | 90407 |
| 790 | Settlers Green | D54 | 2 Commons Court | North Conway, NH | 03860 | 4,171 | OVP Management | 2 Commons Court Unit C13 | North Conway | NH | 03860 |
| 791 | Northridge Mall (CA) | F06 | 674 Northridge Mall | Salinas, CA | 93906 | 3,840 | Starwood Retail Property Mgmt, LLC | 1 E Wacker Drive, Suite 3700 | Chicago | IL | 60601 |

Exhibit 4-5 to
Credit Agreement

| Store # | Mall Name | Leased Space | Location Address | Location City & State | Location Zip | RSF | Landlord | Landlord Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 792 | Newpark Mall | 1047 | 1047 Newpark Mall | Newark, CA | 94560 | 3,012 | Rouse Properties, Inc. | 1114 Avenue of the Americas | New York | NY | 10036 |
| 793 | Las Vegas Fashion Outlets | 100 | 32100 Las Vegas Blvd. | Primm, NV | 89019 | 4,200 | AWE Talisman | 1500 San Remo Ave. | Coral Gables | FL | 33146 |
| 794 | Seattle Premium Outlets | 654 | 10600 Quil Ceda Blvd. | Tulalip, WA | 98271 | 2,935 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 795 | Solano Mall | L-9 | 1350 Travis Blvd. | Fairfield, CA | 94533 | 3,089 | Starwood Retail Property Mgmt, LLC | 1 E Wacker Drive, Suite 3700 | Chicago | IL | 60601 |
| 796 | Weberstown Mall | 429 | 4950 Pacific Ave. | Stockton, CA | 95207 | 3,790 | Glimcher | 180 E Broad St, 21st Floor | Columbus | OH | 43215 |
| 797 | Walnut Square Mall | 55 | 2150 E. Walnut Ave | Dalton, GA | 30721 | 2,901 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |
| 798 | Longview Mall | H05A | 3499 McCann Road | Longview, TX | 75604 | 4,000 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 800 | North Georgia Outlets | 215 | 800 Highway 400 South | Dawsonville, GA | 30534 | 4,014 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 802 | Pittsburgh Mills | 373 | 373 Pittsburgh Mills Circle | Tarentum, PA | 15084 | 3,321 | Zamias | 300 Market Street | Johnstown | PA | 15901 |
| 803 | Prien Lake Mall | B03A | 161 West Prien Lake Road | Lake Charles, LA | 70601 | 3,760 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 804 | Metropolis Mall | 210 | 2498 Futura Parkway | Plainfield, IN | 46168 | 3,300 | Poag & McEwen | 2650 Thousand Oaks Blvd | Memphis | TN | 38118 |
| 805 | Volusia Mall | 123 | 1700 West International Speedway Blvd. | Daytona Beach, FL | 32114 | 2,945 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |
| 806 | Mainplace Mall | 656 | 2800 N. Main Street | Santa Ana, CA | 92705 | 3,100 | Westfield | 11601 Wilshire Blvd | Los Angeles | CA | 90025 |
| 807 | Rolling Oaks Mall | J10A | 6909 North Loop1604 | San Antonio, TX | 78247 | 2,979 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 809 | Bradley Square | 608 | 200 Paul Huff Parkway | Cleveland, TN | 37312 | 3,482 | Morrison Companies | 16851 Jefferson Highway | Baton Rouge | LA | 70817 |
| 810 | Gurnee Mills Mall | 781 | 6170 W. Grand Ave. | Gurnee, IL | 60031 | 4,401 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 811 | Tucson Mall | 289 | 4500 N. Oracle Road | Tucson, AZ | 85705 | 7,195 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 812 | Lakewood Center | 372 | 372 Lakewood Center | Lakewood, CA | 90712 | 3,500 | Macerich | 401 Wilshire Blvd. | Santa Monica | CA | 90407 |
| 813 | South Towne Center | 1250 | 10450 S. State St. | Salt Lake City, UT | 84070 | 3,000 | Pacific Retail Capital Partners | 100 N Speulveda Blvd | El Sagundo | CA | 90245 |
| 814 | Streets at Southpoint | 2150 | 6910 Fayetteville Road | Durham, NC | 27713 | 3,845 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |

Exhibit 4-5 to
Credit Agreement

| Store # | Mall Name | Leased Space | Location Address | Location City & State | Location Zip | RSF | Landlord | Landlord Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 815 | Auburn Mall (MA) | S180 | 385 S. Bridge St. | Auburn, MA | 01501 | 3,510 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 816 | Tanger Park City Outlets | K-110 | 6699 N. Landmark Drive | Park City, UT | 84098 | 4,500 | Tanger Properties, L.P. | 3200 Northline Avenue | Greensboro | NC | 27408 |
| 817 | Tulare Outlet Center (Horizon Outlet Center) | E005 | 1407 Retherford St. | Tulare, CA | 93274 | 4,000 | The Woodmont Company | 2100 West 7th Street | Fort Worth | TX | 76107 |
| 818 | Glendale Galleria | BU03 | 2148 Glendale Galleria | Glendale, CA | 91210 | 2,864 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 819 | Port Charlotte Town Center | 141A | 1441 Tamiami Trail | Port Charlotte, FL | 33948 | 3,457 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 820 | Hot Springs Mall | B-7 | 4501 Central Ave. | Hot Springs, AR | 71913 | 3,849 | Aronov Realty Management | 3500 Eastern Blvd. | Montgomery | AL | 36116-1781 |
| 822 | Regency Square (FL) | 150 | 9501 Arlington Expressway | Jacksonville, FL | 32225 | 2,863 | Namdar Realty Group | 150 Greatneck Road | Great Neck | NY | 11021 |
| 823 | Stonebriar Mall | 2154 | 2601 Preston Road | Frisco, TX | 75034 | 3,242 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 824 | Tanger Locust Grove | 411 | 1000 Tanger Drive | Locust Grove, GA | 30248 | 5,300 | Tanger Properties, L.P. | 3200 Northline Avenue | Greensboro | NC | 27408 |
| 825 | Northpark Mall | 2H2-2264 | 8687 N. Central Expressway | Dallas, TX | 75225 | 3,520 | Nasher | 8080 N. Central Expressway | Dallas | TX | 75206-1807 |
| 826 | Horton Plaza | 49 | 59 Horton Plaza | San Diego, CA | 92101 | 4,000 | Westfield | 11601 Wilshire Blvd | Los Angeles | CA | 90025 |
| 827 | Pierre Bossier | 87 | 2950 E. Texas St. | Bossier, LA | 71111 | 3,412 | Rouse Properties, Inc. | 1114 Avenue of the Americas | New York | NY | 10036 |
| 828 | Mall at Turtle Creek | 405 | 3000 East Highland Drive | Jonesboro, AR | 72401 | 3,500 | Rouse Properties, Inc. | 1114 Avenue of the Americas | New York | NY | 10036 |
| 829 | Tanger Lincoln City | J500 | 1500 SE East Devil's Lake Road | Lincoln City, OR | 97367 | 4,297 | Singerman Real Estate LLC | 980 N. Michigan Ave | Chicago | IL | 60611 |
| 830 | Branson Landing | 409 | 409 Branson Landing | Branson, MO | 65616 | 3,054 | HCW Private Development | 100 Branson Landing | Branson | MO | 65616 |
| 831 | Briarwood Mall | 105-G | 266 Briarwood Circle | Ann Arbor, MI | 48180 | 4,344 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 832 | Shops at Sunset | B01A | 5701 Sunset Drive | Miami, FL | 33143 | 3,116 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 833 | Columbiana Centre | 1460 | 100 Columbiana Circle | Columbia, SC | 29212 | 3,925 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 834 | Westminster Mall | 2044A | 2044 A Westminster Mall | Westminster, CA | 92683 | 3,850 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 835 | West Oaks Mall (FL) | 338 | 9401 West Colonial Drive | Orlando, FL | 34761 | 3,504 | Moonbeam Capital Investment, LLC | 9103 Alta Drive | Las Vegas | NV | 89145 |

Exhibit 4-5 to
Credit Agreement

| Store # | Mall Name | Leased Space | Location Address | Location City & State | Location Zip | RSF | Landlord | Landlord Address | City | State | Zip Code |
|---------|-----------|--------------|------------------|----------------------|--------------|-----|----------|------------------|------|-------|----------|
| 836 | Victoria Mall (TX) | 205 | 7800 North Navarro | Victoria, TX | 77904 | 3,500 | Hull Storey Gibson Companies, LLC | 1190 Interstate Parkway | Augusta | GA | 30909 |
| 837 | Merced Mall | 280 | 280 Merced Mall | Merced, CA | 95348 | 3,446 | Codding Enterprises | PO Box 6655 | Santa Rosa | CA | 95406-0655 |
| 838 | Woodburn Premium Outlet (Woodburn Company Store) | 606 | 1001 Amey Road | Woodburn, OR | 97071 | 4,668 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 839 | Bonita Lakes | 50 | 150 Bonita Lake | Meridian, MS | 39301 | 2,977 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |
| 840 | Carriage Crossing (Avenue Collierville) | 808 | 4650 Merchants Park Circle | Memphis, TN | 38017 | 3,499 | Poag Shopping Centers LLC | 2650 Thousand Oaks Blvd | Memphis | TN | 38118 |
| 841 | Killeen Mall | 1412 | 2100 South W.S. Young Drive | Killeen, TX | 76543 | 3,089 | Jones Lang LaSalle | 3344 Peachtree Road NE | Atlanta | GA | 30326 |
| 842 | Town East (TX) | 1144 | 1238 Town East Mall | Mesquite, TX | 75150 | 4,500 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 843 | Willowbend Mall | C-118 | 6121 West Park Blvd. | Plano, TX | 75093 | 3,416 | Starwood Retail Property Mgmt, LLC | 1 E Wacker Drive, Suite 3700 | Chicago | IL | 60601 |
| 846 | Visalia Mall | 1815 | 2221 S. Mooney Blvd. | Visalia, CA | 93277 | 4,000 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 847 | Tanger Gonzales Outlets | 158 | 2400 Tanger Blvd. | Gonzales, LA | 70737 | 4,000 | Tanger Properties, L.P. | 3200 Northline Avenue | Greensboro | NC | 27408 |
| 848 | Rosedale Center | 840 | 10 Rosedale Center | Roseville, MN | 55113 | 3,390 | Jones Lang LaSalle | 3344 Peachtree Road NE | Atlanta | GA | 30326 |
| 849 | Magic Valley Mall | 263&265 | 1485 Poleline Road East | Twin Falls, ID | 00000 | 3,353 | Woodbury Corporation | 2733 E. Parley's Way | Salt Lake City | UT | 84109 -1662 |
| 850 | Galleria at Sunset | 2725 | 1300 West Sunset Road | Henderson, NV | 89014 | 3,500 | Forest City Enterprises | 50 Public Square | Cleveland | OH | 44113 |
| 852 | Grand Teton Mall | 1229 | 2300 E. 17th Street | Idaho Falls, ID | 83404 | 3,600 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 853 | Mesilla Valley Mall | 1052 | 700 South Telshor Blvd. | Las Cruces, NM | 01502 | 3,968 | Jones Lang LaSalle | 3344 Peachtree Road NE | Atlanta | GA | 30326 |
| 854 | Irving Mall (TX) | E07 | 3732 Irving Mall Drive | Irving, TX | 75062 | 3,974 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 855 | Capitola Mall | G01 | 1855 41st Street | Capitola, CA | 95010 | 3,431 | Macerich | 401 Wilshire Blvd. | Santa Monica | CA | 90407 |
| 856 | Jordan Landing | 110 Pad9 | 7138 South Plaza Center Drive | West Jordan, UT | 84084 | 3,798 | Foursquare Properties | 5850 Avenida Encinas | Carlsbad | CA | 92008 |
| 857 | Red Cliffs Mall | 1113 | 1770 E. Red Cliffs Drive | St. George, UT | 84790 | 3,331 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 859 | Tanger Commerce II | 111 | 800 Steven B. Tanger Blvd. | Commerce, GA | 30529 | 4,000 | Tanger Properties, L.P. | 3200 Northline Avenue | Greensboro | NC | 27408 |

Exhibit 4-5 to
Credit Agreement

| Store # | Mall Name | Leased Space | Location Address | Location City & State | Location Zip | RSF | Landlord | Landlord Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 860 | Fashion Place | 1195 | 6191 S. State Street | Murray, UT | 84107 | 3,671 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 861 | West Oaks (TX) | 321 | 1000 West Oaks Mall | Houston, TX | 77082 | 3,500 | Pacific Retail Capital Partners | 100 N Speulveda Blvd | El Sagundo | CA | 90245 |
| 862 | Waterford Lakes Town Center | P-11 | 653 North Alafaya Trail | Orlando, FL | 32828 | 3,128 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 864 | Lloyd Center | 0G202 | 1225 Lloyd Center | Portland, OR | 97232 | 4,060 | Cypress Equities | 8343 Douglas Ave | Dallas | TX | 75225 |
| 865 | Columbia Center (WA) | 441 | 1321 N. Columbia Center Blvd. | Kennewick, WA | 99336 | 3,361 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 866 | Willowbrook Mall (TX) | 1028 | 1028 Willowbrook Mall | Houston, TX | 77070 | 3,248 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 867 | Oak Park Mall | 43 | 11401 West 95th Street | Overland Park, KS | 66214 | 3,355 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |
| 868 | Merritt Square | F10 | 777 E. Merritt Island Causeway | Merritt Island, FL | 32952 | 3,650 | Glimcher | 180 E Broad St, 21st Floor | Columbus | OH | 43215 |
| 869 | Mall at Stonecrest | 1680 | 2929 Turner Hill Road | Lithonia, GA | 30038 | 3,200 | Forest City Enterprises | 50 Public Square | Cleveland | OH | 44113 |
| 870 | Hershey Outlets | 124 Building C | 124 Outlet Square | Hershey, PA | 17033 | 4,065 | Tanger Properties, L.P. | 3200 Northline Avenue | Greensboro | NC | 27408 |
| 871 | Shoppes at Montage | 315 | 2531 Shoppes Blvd | Moosic, PA | 18507 | 3,500 | USPG Portfolio Five LLC | 3665 Fishinger Blvd | Hilliard | OH | 43026 |
| 872 | Round Rock Outlets | 823 | 4401 North IH 35 | Round Rock, TX | 78664 | 3,800 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 873 | Coconut Point | L15 | 23141 Fashion Drive | Estero, FL | 33928 | 3,175 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 874 | Gulfview Square | 259 | 9409 US Highway 19 | Port Richey, FL | 34668 | 3,650 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 875 | Village at Sandhill | M-105 | 486-5 Town Center Place | Columbia, SC | 29229 | 3,804 | CNL Commerical Real Estate Inc | 201 South College Street | Charlotte | NC | 28244 |
| 876 | Pinnacle Hills | D170 | 2203 S. Promenade Blvd. | Rogers, AR | 72758 | 3,690 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 878 | Shops at Fallen Timbers | 1235 | 3100 Main Street | Maumee, OH | 43537 | 3,545 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 880 | Topanga Plaza | 2004 | 6600 Topanga Canyon Blvd. | Canoga Park, CA | 91303 | 3,907 | Westfield | 11601 Wilshire Blvd | Los Angeles | CA | 90025 |
| 881 | Miromar Outlets | 510 | 10801 Corkscrew Road | Estero, FL | 33928 | 4,000 | Mirormar | 10801 Corkscrew Road | Estero | FL | 33928 |

Exhibit 4-5 to
Credit Agreement

| Store # | Mall Name | Leased Space | Location Address | Location City & State | Location Zip | RSF | Landlord | Landlord Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 882 | Rio Grande Outlets | 0801A | 5001 East Expressway 83 | Mercedes, TX | 78570 | 9,370 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 883 | Southgate Mall | J-3A | 2901 Brooks Street | Missoula, MT | 59801 | 3,057 | Southgate Mall Associates LP | 2901 Brooks Street | Missoula | MT | 59801 |
| 885 | Lake Buena Vista Outlets | D-2 | 15657 Apopka Vineland Road | Orlando, FL | 32821 | 4,000 | Was Group | Ste 305 | North Haledon | NJ | 07508 |
| 886 | Gulfport Premium Outlets | 310/315 | 10260 Factory Shops Blvd. | Gulfport, MS | 39503 | 4,847 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 887 | Hillsboro Outlets | C060 | 0 | Hillsboro, TX | 76645 | 4,015 | Craig Realty Group | 4100 Macarthur | Newport Beach | CA | 92660 |
| 888 | Mall Del Norte | 159 | 5300 San Pario Ave | Laredo, TX | 78041 | 7,924 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |
| 889 | Pinnacle at Tutwiler Farm | 930 | 5048 Pinnacle Square | Birmingham, AL | 35173 | 3,480 | Jones Lang LaSalle | 3344 Peachtree Road NE | Atlanta | GA | 30326 |
| 890 | Leesburg Premium Outlets | 1625 | 241 Fort Evan Rd.NE | Leesburg, VA | 20176 | 3,467 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 891 | Queenstown Premium Outlets | B030/B 031 | 416 Outlet Center Dr. | Queenstown, MD | 21658 | 4,000 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 892 | Arden Fair Mall | 2104 | 1689 Arden Fair Way | Sacramento, CA | 95815 | 2,867 | Macerich | 401 Wilshire Blvd. | Santa Monica | CA | 90407 |
| 895 | Prime Outlets Lebanon | 315 | 315 Outlet Village Way | Lebanon, TN | 37090 | 3,759 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 896 | Tanger Outlet Myrtle Beach | 655 | 10843 Kings Road | Myrtle Beach, SC | 29572 | 3,490 | Tanger Properties, L.P. | 3200 Northline Avenue | Greensboro | NC | 27408 |
| 897 | Galleria at Centerville | 250 | 2922 Watson Blvd. | Centerville, GA | 31028 | 3,056 | Gemini Property Management | 16740 Birkdale Commons Pkwy | Huntersville | NC | 28078 |
| 900 | Town Center at Otay Ranch | 215 | 2015 Birch Road | Chula Vista, CA | 91915 | 3,500 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 901 | Randolph Mall | E8 | 345 Randolph Mall | Asheboro, NC | 27203 | 3,653 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |
| 902 | Brazos Mall | 1544 | 100 Highway 332 West | Lake Jackson, TX | 77566 | 3,537 | StreetMAC Asset Managers, LLC | 3100 Dundee Road | Northbrook | IL | 60062 |
| 903 | Manassas Mall | 19 | 8300 Sudley Road | Manassas, VA | 20109 | 3,400 | Pyramid | 4 Clinton Exchange | Syracuse | NY | 13202-1078 |
| 904 | Promenade at Bolingbrook | 820 | 623 East Boughton Rd. | Bolingbrook, IL | 60440 | 3,600 | Starwood Retail Property Mgmt, LLC | 1 E Wacker Drive, Suite 3700 | Chicago | IL | 60601 |
| 905 | Prime Outlets Oshkosh | C010 | 3001 S. Washburn St. | Oshkosh, WI | 54904 | 3,500 | Horizon Properties Group | 5000 Hakes Drive, Suite 500 | Muskegon | MI | 49441 |

Exhibit 4-5 to
Credit Agreement

| Store # | Mall Name | Leased Space | Location Address | Location City & State | Location Zip | RSF | Landlord | Landlord Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 906 | Supermall of the Great Northwest | 211 | 1101 Outlet Collection Way | Auburn, WA | 98001 | 4,630 | Glimcher | 180 E Broad St, 21st Floor | Columbus | OH | 43215 |
| 907 | Tanger Tilton | 303 | 120 Laconia Rd. | Tilton, NH | 03276 | 3,500 | Tanger Properties, L.P. | 3200 Northline Avenue | Greensboro | NC | 27408 |
| 908 | Pembroke Lakes Mall | 638 | 11401 Pines Blvd | Pembroke Pines, FL | 33026 | 4,064 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 909 | Puente Hills Mall | 145 | 1600 S. Azuza Ave | Industry, CA | 91748 | 3,419 | Newage PHM, LLC | 411 E. Huntington Drive | Arcadia | CA | 91006 |
| 911 | Chesapeake Square Mall | 838 | 4200 Portsmouth Blvd | Chesapeake, VA | 23321 | 3,568 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 912 | Cottonwood Mall | C205B | 1000 Coors Blvd. NW | Alburquerque, NM | 87114 | 3,025 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 913 | Plaza at West Covina | 466 | 466 Plaza Drive | West Covina, CA | 91790 | 3,269 | Starwood Retail Property Mgmt, LLC | 1 E Wacker Drive, Suite 3700 | Chicago | IL | 60601 |
| 914 | Shawnee Mall | 1024 | 4901 North Kickapoo St. | Shawnee, OK | 74804 | 3,946 | StreetMAC Asset Managers, LLC | 3100 Dundee Road | Northbrook | IL | 60062 |
| 915 | Antelope Valley Mall | 133 | 1233 Rancho Vista Blvd. | Palmdale, CA | 93551 | 3,088 | Forest City Enterprises | 50 Public Square | Cleveland | OH | 44113 |
| 917 | Eagle Ridge Mall | 536 | 430 Eagle Ridge Drive | Lake Wales, FL | 33859 | 3,500 | T Eagle Rock FL, LLC | 451 Eagle Ridge Drive | Lake Wales | FL | 33859 |
| 918 | Westside Pavilion | 349 | 10800 W. Pico Blvd | Los Angeles, CA | 90064 | 3,858 | Macerich | 401 Wilshire Blvd. | Santa Monica | CA | 90407 |
| 919 | Valley Mall | B07 | 2529 Main Street | Yakima, WA | 98903 | 3,646 | CenterCal Properties LLC | 7455 SW Bridgeport Road | Tigard | OR | 97224 |
| 920 | Hickory Point Mall | 1145 | 1145 Hickory Point Mall | Forsyth, IL | 62535 | 3,500 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |
| 921 | Orlando Premium Outlets Intl Dr. | A-2 | 5401 W. Oak Ridge Rd. | Orlando, FL | 32819 | 4,500 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 923 | Shops at Wiregrass | 235 | 28210 Paseo Drive | Tampa, FL | 33543 | 3,392 | Forest City Enterprises | 50 Public Square | Cleveland | OH | 44113 |
| 924 | Tanger Outlets Lancaster | 905 | 311 Stanley K. Tanger Blvd. | Lancaster, PA | 17602 | 3,910 | Tanger Properties, L.P. | 3200 Northline Avenue | Greensboro | NC | 27408 |
| 925 | Outlet Shoppes at El Paso | A167 | 7051 South Desert Blvd. | Canutillo, TX | 79835 | 4,400 | Horizon Properties Group | 5000 Hakes Drive, Suite 500 | Muskegon | MI | 49441 |
| 926 | Avenue Webb Gin | 412 | 1350 Scenic Highway | Snellville, GA | 30078 | 3,152 | Olshan Properties | 5500 New Albany Road East | New Albany | OH | 43054 |
| 927 | Town Square Las Vegas | A-146 | 6605 Las Vegas Blvd. South | Las Vegas, NV | 89119 | 3,318 | Forest City Enterprises | 50 Public Square | Cleveland | OH | 44113 |
| 929 | Las Palmas Marketplace | A-2 | 11917 Gateway West | El Paso, TX | 79936 | 3,513 | RioCan (America) Mgmt, Inc. | 5419 W Loop N | San Antonio | TX | 78253 |

Exhibit 4-5 to
Credit Agreement

| Store # | Mall Name | Leased Space | Location Address | Location City & State | Location Zip | RSF | Landlord | Landlord Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 930 | Mesa Mall | 224 | 2424 US Highway 6& 50 | Grand Junction, CO | 81505 | 3,652 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 933 | Hamburg Pavilion | 00933 | 2312 Sir Barton Way | Lexington, KY | 40509 | 4,000 | Fourth Quarter Properties VII | 45 Ansley Drive | Newnan | GA | 30263 |
| 934 | The Loop | B-17 | 3220 N. John Young Pkwy | Kissimmee, FL | 34741 | 3,353 | Wilder | 11601 Wilshire Blvd | Los Angeles | CA | 90025 |
| 935 | Prime Outlets Lee | E250 | 50 Water Street | Lee, MA | 01238 | 4,382 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 936 | Allen Premium Outlets | 208 | 820 West Stacy Road | Allen, TX | 75013 | 4,066 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 937 | The Block at Orange | 121 | 20 City Blvd W. | Orange, CA | 92868 | 3,400 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 938 | Las Vegas Outlet | 015 | 875 S. Grand Central Pkwy | Las Vegas, NV | 89106 | 4,214 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 941 | Gateway Station | M-4 | 12900 South Freeway | Fort Worth, TX | 76028 | 3,225 | Weingarten Realty | 2600 Citadel Plaza Dr #125 | Houston | TX | 77008 |
| 942 | Pacific View Mall | 2367 | 3301 East Main Street | Ventura, CA | 93003 | 3,683 | Macerich | 401 Wilshire Blvd. | Santa Monica | CA | 90407 |
| 943 | Country Club Mall | 444 | 1262 Vocke Road | Cumberland, MD | 21502 | 3,600 | Gumberg Asset Mgmt. Corp. | 3200 North Federal Highway | Ft. Lauderdale | FL | 33306 |
| 944 | Midland Park | F05 | 4511 N. Midkiff Road | Midland, TX | 79705-3256 | 5,672 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 947 | Cumberland Mall | 218 | 1341 Cumberland SE | Atlanta, GA | 30339 | 3,599 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 948 | South Park Mall | 202 | 2310 SW Military Drive | San Antonio, TX | 78224 | 3,500 | Jones Lang LaSalle | 3344 Peachtree Road NE | Atlanta | GA | 30326 |
| 949 | Colonie Center | 433 | 131 Colonie Center | Albany, NY | 12205 | 3,652 | Pacific Retail Capital Partners | 100 N Speulveda Blvd | El Sagundo | CA | 90245 |
| 950 | West County Mall | 1065 | 33 West County Center | Des Peres, MO | 63131 | 4,160 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421 |
| 953 | Prime Outlets Pismo Beach | A017 | 333 Five Cities Drive | Pismo, CA | 93449 | 3,500 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 954 | Meadowood Mall | D108 | 5330 Meadowood Mall | Reno, NV | 89502 | 4,000 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 955 | Riverdale Village | 27 | 12768 Riverdale Blvd | Coon Rapids, MN | 55433 | 3,333 | DDR | 3300 Enterprise Pkway | Beachwood | OH | 44122 |
| 956 | Shops at Centerra | C-260 | 5971 Sky Pond Drive | Loveland, CO | 80538 | 3,960 | Poag & McEwen | 2650 Thousand Oaks Blvd | Memphis | TN | 38118 |
| 957 | Village at Stone Oak | J-5 | 22602 US 281 N | San Antonio, TX | 78259 | 3,400 | DDR | 3300 Enterprise Pkway | Beachwood | OH | 44122 |
| 959 | North Hanover Mall | 526 | 1155 Carlisle Street | Hanover, PA | 17331 | 4,333 | Namdar Realty Group | 150 Greatneck Road | Great Neck | NY | 11021 |
| 960 | Orchard Town Center | 290 | 14697 Delaware St. | Westminster, CO | 80020 | 3,200 | Vestar | 14698 Delaware Street, Ste 850 | Westminster | CO | 80023 |

Exhibit 4-5 to
Credit Agreement

| Store # | Mall Name | Leased Space | Location Address | Location City & State | Location Zip | RSF | Landlord | Landlord Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 961 | Sunset Mall | 1032 | 4001 Sunset Drive | San Angelo, TX | 76904 | 3,716 | Jones Lang LaSalle | 3344 Peachtree Road NE | Atlanta | GA | 30326 |
| 962 | Warwick Mall | B125 | 400 Bald Hill Road | Warwick, RI | 02886 | 5,829 | Warwick Mall LLC | c/o Bliss Properties Inc. | Providence | RI | 02906-0513 |
| 963 | Tanger Barstow | 345 | 2796 Tanger Way | Barstow, CA | 92311 | 4,000 | Tanger Properties, L.P. | 3200 Northline Avenue | Greensboro | NC | 27408 |
| 964 | Hillside Village (Uptown Village at Cedar Hill) | 508 | 305 W. FM 1382 | Cedar Hill, TX | 75106 | 3,550 | MG Herring Group | 5710 LBJ Freeway | Dallas | TX | 75240 |
| 966 | Shoppes at River Crossing | 308 | 5080 Riverside Drive | Macon, GA | 31210 | 3,509 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 970 | La Palmera | 1030 | 5488 South Padre Island | Corpus Christi, TX | 78411 | 3,826 | Trademark Properties | 1701 River Run | Fort Worth | TX | 76107 |
| 972 | Pier Park | G130 | 204 Bluefish Drive | Panama City Beach, FL | 32413 | 3,599 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 973 | Hamilton Town Center | E11 | 13976 Town Center Blvd. | Noblesville, IN | 46060 | 3,500 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 975 | West Shore Plaza | A2 | 250 Westshore Plaza | Tampa, FL | 33609 | 3,402 | Glimcher | 180 E Broad St, 21st Floor | Columbus | OH | 43215 |
| 976 | Chambersburg Mall | 630 | 3055 Black Gap Road | Chambersburg, PA | 17201 | 3,891 | Mason Asset Management | 747 Middle Neck Road | Great Neck | NY | 11024 |
| 977 | Broward Mall | 1717 | 8000 West Broward Blvd. | Plantation, FL | 33388 | 3,700 | Westfield | 11601 Wilshire Blvd | Los Angeles | CA | 90025 |
| 978 | Stonewood Center | B-43 | 251 Stonewood Street | Downey, CA | 90241 | 3,837 | Macerich | 401 Wilshire Blvd. | Santa Monica | CA | 90407 |
| 979 | Southcenter | 2107 | 2826 Southcenter Mall | Tukwila, WA | 98188 | 3,880 | Westfield | 11601 Wilshire Blvd | Los Angeles | CA | 90025 |
| 980 | Pearland Town Center | 310 | 11200 Broadway | Pearland, TX | 77584 | 3,785 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421-6000 |
| 981 | Bay Terrace | 212-01/05 | 212-05 25th Avenue | Bayside, NY | 11360 | 4,050 | Cord Meyer Development | 111-15 Queens Boulevard | Forest Hills | NY | 11375 |
| 982 | Montebello Town Center | CU11 | 2119 Montebello Town Center Drive | Montebello, CA | 90640 | 3,232 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 984 | Streets of Brentwood | 124 | 2535 Sand Creek Road | Brentwood, CA | 94513 | 3,300 | Red Legacy | 4717 Central | Kansas City | MO | 64112 |
| 985 | Galleria at Roseville | 2265 | 1151 Galleria Parkway | Roseville, CA | 95678 | 3,500 | Westfield | 11601 Wilshire Blvd | Los Angeles | CA | 90025 |
| 988 | Dogwood Festival | G-4 | 106 Dogwood Blvd. | Flowood, MS | 39232 | 4,500 | Inland National Real Estate Svcs LLC | Bldg. #75019 | Oak Brook | IL | 60523 |

Exhibit 4-5 to
Credit Agreement

| Store # | Mall Name | Leased Space | Location Address | Location City & State | Location Zip | RSF | Landlord | Landlord Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 989 | Westland Shopping Center | 731 | 35000 West Warren St. | Westland, MI | 48185 | 3,898 | Spinoso Management Group LLC | 100 Northern Concourse | North Syracuse | NY | 13212 |
| 994 | Moreno Valley Mall | 1156 | 22500 Town Circle | Moreno Valley, CA | 92553 | 3,610 | Spinoso Management Group LLC | 100 Northern Concourse | North Syracuse | NY | 13212 |
| 995 | Burbank Town Center | 212 | 201 E. Magnolia Blvd. | Burbank, CA | 91501 | 3,926 | Crown Realty Development | 18201 Von Kamen Ave. #950 | Irvine | CA | 92612 |
| 996 | Water Tower Place | 7020 | 835 North Michigan Avenue | Chicago, IL | 60671 | 4,061 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 997 | The Outlet Shoppes at Oklahoma City | A130 | 7628 W Reno Ave. | Oklahoma City, OK | 73127 | 4,431 | Horizon Properties Group | 5000 Hakes Drive, Suite 500 | Muskegon | MI | 49441 |
| 999 | Oakwood Center | 1075 | 197-33 West Bank Expressway | Gretna, LA | 70056 | 3,052 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 1014 | Eastridge Mall | 1176 | 601 SE Wyoming Rd | Casper, WY | 82609 | 3,431 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 1015 | Ocean City Outlets | 820 | 12741 Ocean Gateway | Ocean City, MD | 21842 | 3,500 | Tanger Properties, L.P. | 3200 Northline Avenue | Greensboro | NC | 27408 |
| 1016 | Carolina Premium Outlets | 550 | 1025 Outlet Center Drive | Smithfield, NC | 27577 | 4,100 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 1017 | Folsom Premium Outlets | 01017 | 1300 Folsom Boulevard | Folsom, CA | 95630 | 3,808 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 1018 | Vacaville Premium Outlets | 331 B | 321 Nut Tree Road | Vacaville, CA | 95687 | 3,500 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 1020 | Greendale Mall | W218 | 7 Neponset Street | Worcester, MA | 01606 | 3,805 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 1022 | Shoppes at Chino Hills | 5060 | 13850 City Center Drive | Chino Hills, CA | 91709 | 3,897 | PM Realty Group | 13920 City Center Drive | Chino Hills | CA | 91709 |
| 1023 | Philadelphia Premium Outlets | 645 | 18 Lightcap Road | Limerick, PA | 19464 | 3,894 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 1024 | Houston Premium Outlets | 0701 | 29300 Hempstead Road | Houston, TX | 77433 | 4,692 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 1025 | McCain Mall | J1F | 3929 McCain Blvd. | North Little Rock, AR | 72116 | 3,395 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 1026 | St. John's Town Center | D31 | 10281 Midtown Parkway | Jacksonville, FL | 32246 | 4,400 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 1028 | Cambridgeside Galleria | E318 | 100 Cambridgeside Place | Cambridge, MA | 02141 | 5,220 | NED MANAGEMENT LIMITED PARTNERSHIP | 75 PARK PLAZA | BOSTON | MA | 02116 |
| 1029 | Valle Vista Mall | B-13A | 2020 South Expressway 83 | Harlingen, TX | 78552 | 4,500 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |

Exhibit 4-5 to
Credit Agreement

| Store # | Mall Name | Leased Space | Location Address | Location City & State | Location Zip | RSF | Landlord | Landlord Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1034 | Northfield Square | 354 A | 1600 North US Route 50 | Bourbonnais, IL | 60914 | 3,356 | Spinoso Management Group LLC | 100 Northern Concourse | North Syracuse | NY | 13212 |
| 1035 | Pine Ridge Mall | 1250 | 4155 Yellowstone Highway | Chubbuck, ID | 83202 | 3,117 | Covington Property Management, LLC | 30 S. Wacker | Chicago | IL | 60606 |
| 1038 | Centralia Outlets | 1322 | 1342 Lum Road | Centralia, WA | 98531 | 5,060 | Prism | 1145 Broadway | Tacoma | WA | 98402 |
| 1039 | Park Meadows | 2340 | 8505 Park Meadows Center Drive | Lone Tree, CO | 80124 | 3,323 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 1040 | Lodi Station Outlets | 480 | 9911 Avon Lake Road | Burbank, OH | 44214 | 4,000 | Gilad Development | 5959 Topanga Canyon Blvd. | Woodland Hill | CA | 91367 |
| 1042 | Premier Center | 01042 | 3424 Highway 190 | Mandeville, LA | 70445 | 5,000 | Stirling Properties | 109 Northpark Blvd. | Covington | LA | 70433 |
| 1043 | Foothills Mall (AZ) | 179 | 7401 N. La Cholla Blvd. | Tucson, AZ | 85741 | 4,000 | Schottenstein Property Group | 4300 East Fifth Ave | Columbus | OH | 43219 |
| 1046 | Jersey Shore Premium Outlets | 211 | One Premium Boulevard | Tinton Falls, NJ | 07753 | 3,499 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 1047 | Tanger Washington | 955 | 2200 Tanger Boulevard | Washington, PA | 15301 | 5,293 | Tanger Properties, L.P. | 3200 Northline Avenue | Greensboro | NC | 27408 |
| 1048 | Ala Moana Center | 3053 | 1450 Ala Moana Boulevard #3053 | Honolulu, HI | 96814 | 4,783 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 1049 | Cincinnati Premium Outlets | 874 | 874 Premium Outlet Drive | Monroe, OH | 45050 | 3,941 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 1051 | Jackson Premium Outlets | 304 | 537 Monmouth Road | Jackson, NJ | 08527 | 3,400 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 1053 | Sunrise Mall | E15 | 6041 Sunrise Mall | Citrus Heights, CA | 95610 | 3,342 | Steadfast | 4343 Von Karman | Newport Beach | CA | 92660 |
| 1054 | Yuba Sutter Mall | 325 | 1215 Colusa Avenue | Yuba City, CA | 95991 | 3,158 | Yuba Sutter Mall Mgmt | 1215 Colusa Ave | Yuba City | CA | 95991 |
| 1055 | Animas Valley | 385 | 4601 East Main | Farmington, NM | 87402 | 4,007 | Rouse Properties, Inc. | 1114 Avenue of the Americas | New York | NY | 10036 |
| 1056 | Tanger Outlet Nags Head | 69 | 7100 S. Croatan Highway | Nags Head, NC | 27959 | 3,312 | Tanger Properties, L.P. | 3200 Northline Avenue | Greensboro | NC | 27408 |
| 1057 | Windward Mall | M-08 | 46-056 Kamehameha Highway | Kaneohe, HI | 96744 | 3,000 | Jones Lang LaSalle | 3344 Peachtree Road NE | Atlanta | GA | 30326 |
| 1059 | Outlets at Anthem | 125 | 4250 West Anthem Way | Phoenix, AZ | 85086 | 4,751 | Craig Realty Group | 4100 Macarthur | Newport Beach | CA | 92660 |
| 1061 | The Gardens | N217 | 3101 PGA Boulevard | Palm Beach Gardens, FL | 33410 | 4,118 | Forbes | 100 Galleria Officentre | Southfield | MI | 48037 |
| 1063 | Culver City | 2220 | 6000 Sepulveda Boulevard | Culver City , CA | 90230 | 3,556 | Westfield | 11601 Wilshire Blvd | Los Angeles | CA | 90025 |

WEIL:\95685927\8\11727.0012

Exhibit 4-5 to
Credit Agreement

| Store # | Mall Name | Leased Space | Location Address | Location City & State | Location Zip | RSF | Landlord | Landlord Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1067 | Dimond Center | 110 | 800 East Dimond Blvd. | Anchorage, AK | 99515 | 3,729 | Dimond Center Holdings | 800 East Dimond Blvd. | Anchorage | AK | 99515 |
| 1068 | Anchorage 5th Avenue | D46A | 320 West 5th Avenue | Anchorage, AK | 99501 | 3,344 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 1070 | Shoppes at North Brunswick | E5 | 541 Shoppes Boulevard | North Brunswick, NJ | 08902 | 3,397 | Levin Mgmt Co. | 1290 Avenue of the Americas, Ste 914 | New York | NY | 10104 |
| 1071 | Outlet Shoppes at Fremont | E090 | 6245 North Old 27 | Fremont, IN | 46737 | 4,000 | Horizon Properties Group | 5000 Hakes Drive, Suite 500 | Muskegon | MI | 49441 |
| 1072 | Lenox Square | 2022A | 3393 Peachtree Road NE | Atlanta, GA | 30326 | 3,987 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 1073 | Tanger Outlet Wisconsin Dells | 391 | 210 Gasser Road | Baraboo, WI | 53913 | 4,566 | Craig Realty Group | 4100 Macarthur | Newport Beach | CA | 92660 |
| 1074 | Outlets at Silverthorne | R310/3 20 | 246-V Rainbow Drive | Silverthorne, CO | 80498 | 4,256 | Craig Realty Group | 4100 Macarthur | Newport Beach | CA | 92660 |
| 1075 | The Falls | 170 | 8888 SW 136thStreet | Miami, FL | 33176 | 4,503 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 1079 | Domain II | V-5 | 11410 Century Oaks Terrace | Austin, TX | 78758 | 3,699 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 1080 | San Francisco Centre | 223 | 865 Market Street | San Francisco, CA | 94103 | 4,187 | Westfield | 11601 Wilshire Blvd | Los Angeles | CA | 90025 |
| 1081 | Pearlridge Shopping Center | 12-22 | 98-1005 Moanalua | Aiea, HI | 96701 | 2,877 | Glimcher | 180 E Broad St, 21st Floor | Columbus | OH | 43215 |
| 1082 | Harlem Irving Plaza | 146 | 4154 East North Harlem Avenue | Norridge, IL | 60706 | 3,535 | Harlem Irving LLC | c/o The Harlem Irving Properties | Norridge | IL | 60706 |
| 1083 | Washington Square | C05 | 9677 SW Washington Square Road | Portland, OR | 97223 | 4,145 | Macerich | 401 Wilshire Blvd. | Santa Monica | CA | 90407 |
| 1085 | Alamance Crossing | N-1 | 3110 Waltham Blvd. | Burlington, NC | 27215 | 3,800 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421 |
| 1086 | Florida City Outlet Center | 210 | 250 E. Palm Drive | Florida City, FL | 33034 | 3,482 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 1087 | Westfarms Mall | F108 | 148 Westfarms Malls | Farmington, CT | 06032 | 4,000 | Taubman | 200 East Long Lake Road | Bloomfield Hills | MI | 48303-0200 |
| 1088 | Westland Mall (FL) | 1116 | 1675 West 49th Street | Hialeah, FL | 33012 | 3,227 | Starwood Retail Property Mgmt, LLC | 1 E Wacker Drive, Suite 3700 | Chicago | IL | 60601 |
| 1089 | Citadel Outlets | 650 | 100 Citadel Drive | Commerce, CA | 90040 | 4,013 | Craig Realty Group | 4100 Macarthur | Newport Beach | CA | 92660 |
| 1090 | Boca Town Center | 1035 | 6000 West Glades Rd. | Boca Raton, FL | 33431 | 3,821 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 1091 | Mercer Mall | 640 +645 | US Hignway 460 and Route 25 | Bluefield , WV | 24701 | 4,493 | Ershig Properties | PO Box 1127 | Henderson | KY | 42419 |

Exhibit 4-5 to
Credit Agreement

| Store # | Mall Name | Leased Space | Location Address | Location City & State | Location Zip | RSF | Landlord | Landlord Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1092 | Perimeter Mall | 1695 | 4400 Ashford Dunwoody Road | Atlanta, GA | 30346 | 3,800 | General Growth | 110 North Wacker Drive | Chicago | IL | 60606 |
| 1093 | Fulton Street | 472-474 | 472-474 Fulton Street | Brooklyn, NY | 00000 | 18,244 | 474 Fulton Owner LLC | 500 FIfth Avenue | New York | NY | 10110 |
| 1094 | Grand Prairie Outlets | 805 | 2950 W. Interstate 20 and Great Northwestern Pkwy | Grand Prarie, TX | 00000 | 4,000 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 1095 | Gilroy Outlets | A054 | 681 Leavesley Road | Gilroy, CA | 95020 | 3,900 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 1096 | Tanger Outlets Tuscola | A11 | D400 Tuscola Blvd | Tuscola, IL | 61953 | 3,500 | Tanger Properties, L.P. | 3200 Northline Avenue | Greensboro | NC | 27408 |
| 1097 | Bellevue Square | 238 | 575 Bellevue Square | Bellevue, WA | 98004 | 3,311 | Kemper Development Company | 575 Bellevue Square | Bellevue | WA | 98004 |
| 1099 | Tanger Outlet Center Charleston | 1036 | 4840 Tanger Outlet Blvd. | North Charleston, SC | 29418 | 4,000 | Tanger Properties, L.P. | 3200 Northline Avenue | Greensboro | NC | 27408 |
| 1101 | North Riverside Park | H3 | 7501 West Cermark | North Riverside Park, IL | 60546 | 3,350 | The Feil Organization | 370 7th Avenue | New York | NY | 10001 |
| 1102 | Promenade at Temecula | 2330 | 40820 Winchester Road | Temecula, CA | 92591 | 3,432 | Forest City Enterprises | 50 Public Square | Cleveland | OH | 44113 |
| 1104 | Southland Mall (FL) | 1155 | 20505 South Dixie Highway | Cutler Bay, FL | 33189 | 3,660 | Gumberg Asset Mgmt. Corp. | 3200 North Federal Highway | Ft. Lauderdale | FL | 33306 |
| 1105 | Fashion Outlets Santa Fe | 448 | 8380 Cerrillos Road | Santa Fe, NM | 85707 | 4,100 | AWE Next | 1801 NE 123rd Street | North Miami | FL | 33181 |
| 1106 | Galveston Outlets LLC | 430 | 5885 Gulf Freeway | Texas City, TX | 77591 | 3,800 | Tanger Properties, L.P. | 3200 Northline Avenue | Greensboro | NC | 27408 |
| 1107 | Merrimack Premium Outlets | 0671 | 80 Premium Outlets Drive | Merrimack, NH | 03054 | 4,980 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 1108 | South Bay Galleria | 204 | 1815 Hawthorn Boulevard | Redondo Beach, CA | 90278 | 3,600 | Forest City Enterprises | 50 Public Square | Cleveland | OH | 44113 |
| 1109 | Outlet Coll at Riverwalk | 257 | 500 Port of N Orleans PL | New Orleans, LA | 70130 | 6,000 | Riverwalk Marketplace NO, LLC | 500 Port of NO Place, Suite 101 | New Orleans | LA | 70130 |
| 1110 | Gran Plaza Outlets | H100, H150 | 888 West 2nd Street | Calexico, CA | 92231 | 9,417 | Charles Company | 9034 West Sunset Blvd | West Hollywood | CA | 90069 |
| 1111 | Outlet Shoppes @ Atlanta | G-710 | 915 Ridgewalk Parkway | Woodstock, GA | 30188 | 4,059 | Horizon Properties Group | 5000 Hakes Drive, Suite 500 | Muskegon | MI | 49441 |
| 1112 | Tanger Outlets Westgate | 785 | 0 | Phoenix, AZ | 00000 | 4,000 | Tanger Properties, L.P. | 3200 Northline Avenue | Greensboro | NC | 27408 |
| 1114 | Panorama Mall | 38 | 8401 Van Nuys Blvd | Panorama City, CA | 91402 | 4,000 | Macerich | 401 Wilshire Blvd. | Santa Monica | CA | 90407 |

Exhibit 4-5 to
Credit Agreement

| Store # | Mall Name | Leased Space | Location Address | Location City & State | Location Zip | RSF | Landlord | Landlord Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1115 | Bentley Mall | 20M | 32 College Road | Faribanks, AK | 99701 | 3,634 | Krausz Companies Inc | 18201 Von Karman Avenue | Irvine | CA | 96212 |
| 1116 | Yuma Palms Shopping Ctr | 22 | 1305 S. Yuma Palms Parkway | Yuma, AZ | 85365 | 5,200 | Yuma Palms 1031, LLC | 2901 Butterfield Road | Oak Brook | IL | 60523 |
| 1118 | Tanger National Harbor Outlets | 460 | 0 | Oxon Hill , MD | 00000 | 4,500 | Tanger Properties, L.P. | 3200 Northline Ave, Suite 360 | Greensboro | NC | 27408 |
| 1120 | Fashion Outlets Chicago | 1173 | 5220 Fashion Outlets Way | Rosemont, IL | 60018 | 4,203 | AWE Talisman | 355 Alhambra Circle | Coral Gables | FL | 33134 |
| 1122 | Outlets of Mississippi | 255 | 200 Bass Pro Drive | Pearl, MS | 39208 | 4,002 | Bloomfield Holdings LLC | 200 Bass Pro Drive, Ste 125 | Jackson | MS | 39208 |
| 1126 | Chimney Rock Shopping Center | 4485 | TX 191 and 338 | Odessa, TX | 79762 | 4,485 | Excel Property Group | 17140 Bernardo Ctr Drive | San Diego | CA | 92128 |
| 1127 | Mariposa Mall | unnamed | West Mariposa Road | Nogales, AZ | 85621 | 10,131 | LAD BACK NOGALES LLC | 6358 E Quail Track Drive | Scottsdale | AZ | 85266 |
| 1128 | Mall at Bay Plaza | 218 | 2100 Bartow Avenue | Bronx, NY | 10475 | 4,510 | Prestige Properties & Dev Inc | 546 5th Avenue, 15th Floor | New York | NY | 10475 |
| 1129 | Outlet Shoppes of the Bluegrass | C310 | I-64, Exit 28 | Simpsonville, KY | 00000 | 3,960 | Horizon Group Properties | 5000 Hakes Drive, Suite 500 | Muskegon | MI | 49441 |
| 1130 | Outlets @ Tejon Ranch | 200 | 5701 Outlets @ Tejon Ranch Pkway | Arvin, CA | 93203 | 4,500 | Tejon Industrial Corporation | 4436 Lebec Road | Lebec | CA | 93243 |
| 1132 | Charlotte Premium Outlets | 980 | 5404 New Fashion Way | Charlotte, NC | 28278 | 4,500 | Simon Premium Outlets | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 1138 | Outlet Mall at Savannah | 445 | 0 | Pooler, GA | 31322 | 3,500 | Tanger Properties, L.P. | 3200 Northline Avenue | Greensboro | NC | 27408 |
| 1515 | Times Square | 1515Broadway | 1515 Broadway | New York, NY | 10032 | 19,487 | 1515 Broadway Fee Owner LLC | 420 Lexington Avenue | New York | NY | 10170 |
| 3011 | Metropolis at Metrotown | M175 | #268-4820 Kingsway | Burnaby, BC | V5H4P1 | 3,524 | Ivanhoe Cambridge | 95 Wellington Street West | Toronto | ON | M5J2 R2 |
| 3012 | Guildford Town Centre | 2608A | Guildford Town Centre | Surrey, BC | V3R7C1 | 3,608 | Ivanhoe Cambridge | 95 Wellington Street West | Toronto | ON | M5J2 R2 |
| 3013 | White Oaks Mall | 491/495 | 1105 Wellington Road | London, ON | N6E 1V4 | 3,376 | Bentall Kennedy | 1055 Dunsmuir Street Suite 1300 | Vancouer | BC | V7X1 B1 |
| 3015 | Fairview Park | E005 | 2960 Kingsway Drive | Kitchener, ON | N2C1X1 | 3,026 | Cadillac Fairview | 250 Yonge Street | Toronto | ON | M5B2 L7 |
| 3016 | Georgian Mall | D016A | 509 Bayfield Street | Barrie, ON | L4M4ZB | 3,384 | RioCan Management Inc | Georgian Mall Admin Office | Barrie | ON | L4M 4Z8 |
| 3018 | Vaughan Mills | 439 | 1 Bass Pro Mills Drive | Vaughn, ON | L4K5W4 | 5,095 | Ivanhoe Cambridge | 95 Wellington Street West | Toronto | ON | M5J2 R2 |
| 3020 | Erin Mills Town Centre | R202A | 5100 Erin Mills Parkway | MIssissauga, ON | L5M4ZS | 3,507 | 20 VIC Management Inc. | One Queen Street East | Toronto | ON | M5C 2W5 |

Exhibit 4-5 to
Credit Agreement

| Store # | Mall Name | Leased Space | Location Address | Location City & State | Location Zip | RSF | Landlord | Landlord Address | City | State | Zip Code |
|---------|-----------|--------------|------------------|------------------------|--------------|-----|----------|-------------------|------|-------|----------|
| 3021 | Square One | 2-305 | 100 City Centre Drive | Mississauga, ON | L5B2C9 | 3,423 | Oxford Properties Group | 130 Adelaide Street West | Toronto | ON | M5H3 P5 |
| 3022 | Lime Ridge Mall | 229B | 999 Upper Wentworth Street | Hamilton, ON | L9A4X5 | 3,135 | Cadillac Fairview | 250 Yonge Street | Toronto | ON | M5B2 L7 |
| 3023 | Scarborough Town Centre | 46/47 | 300 Borough Drive | Scarborough, ON | M1P4P5 | 3,235 | Triple Five | 8882-17 Street, | Edmonton | AB | T5T 4M2 |
| 3024 | The Promenade | 126A | 1 Promenade Circle | Thornhill, ON | L4J4P8 | 3,033 | Cadillac Fairview | 250 Yonge Street | Toronto | ON | M5B2 L7 |
| 3026 | Toronto Eaton Centre | A006 | 220 Yonge Street | Toronto, ON | M5B2H1 | 5,478 | Cadillac Fairview | 250 Yonge Street | Toronto | ON | M5B2 L7 |
| 3027 | Upper Canada Mall | EE9A | 17600 Yonge Street | Newmarket, ON | L3Y4Z1 | 4,177 | Oxford Properties Group | 130 Adelaide Street West | Toronto | ON | M5H3 P5 |
| 3028 | Dixie Outlet Mall | 27 A | 1250 South Service Road | Mississauga, ON | L5E 1V4 | 4,103 | Cominar Real Estate Investment Trust | 2151 Lapiniere Blvd | Brossard | QC | J4W2 T5 |
| 3031 | Mic Mac Mall | 138 | 21 Mic Mac Blvd. | Halifax, NS | B3A4N3 | 3,489 | Ivanhoe Cambridge | 95 Wellington Street West | Toronto | ON | M5J2 R2 |
| 3032 | West Edmonton Mall | K-203 | 8882-170 Street | Edmonton, AB | T5T4M2 | 6,530 | Triple Five | 8882-17 Street, | Edmonton | AB | T5T 4M2 |
| 3033 | Devonshire Mall | N8 | 3100 Howard Avenue | Windsor, ON | N8X3Y8 | 4,254 | 20 VIC Management Inc. | One Queen Street East | Toronto | ON | M5C 2W5 |
| 3034 | Conestoga Mall | H6 | 550 King Street North | Waterloo, ON | N2L 5W6 | 3,834 | Ivanhoe Cambridge | 95 Wellington Street West | Toronto | ON | M5J2 R2 |
| 3038 | Kingsway Garden Mall | 780 | 109 Street and Kingsway | Edmonton, AB | T5G 3A6 | 3,933 | Oxford Properties Group | 130 Adelaide Street West | Toronto | ON | M5H3 P5 |
| 3039 | Fairview Mall | 2061 | 1800 Shepard Avenue East | Toronto, ON | M2J5A7 | 5,410 | Cadillac Fairview | 250 Yonge Street | Toronto | ON | M5B2 L7 |
| 3040 | New Sudbury Centre | 4 | 1349 LaSalle Boulevard | Sudbury, ON | P3A1Z2 | 3,729 | Morguard Investments Limited | 1000 Ft. William Road | Thunder Bay | ON | P7B6 B9 |
| 3043 | South Edmonton Commons | CRU 102 | 1441 99th Street | Edmonton, AB | T6N 0B4 | 3,458 | Cameron Corporation | 10180-111th Street | Edmonton | AB | T5K 1K6 |
| 3044 | CrossIron Mills | 421 | 261005 CrossIron Blvd. | Rocky View, AB | T4A0G3 | 3,984 | Ivanhoe Cambridge | 95 Wellington Street West | Toronto | ON | M5J 2R2 |
| 3046 | Quinte Mall | R3 | 390 North Front Street | Belleville, ON | K8P 3E1 | 3,091 | 20 VIC Management Inc. | One Queen Street East | Toronto | ON | M5C 2W5 |
| 3048 | Richmond Centre | T19 | #1838 (Unit T-19) | Richmond, BC | V6Y 2V7 | 3,154 | Cadillac Fairview | 20 Queen Street West | Toronto | ON | M5H 3R4 |
| 3049 | Bayshore Shopping Centre | T35 | 100 Bayshore Drive | Ottawa, ON | K2B 8C1 | 3,222 | Ivanhoe Cambridge | 95 Wellington Street West | Toronto | ON | M5J 2R2 |

Exhibit 4-5 to
Credit Agreement

| Store # | Mall Name | Leased Space | Location Address | Location City & State | Location Zip | RSF | Landlord | Landlord Address | City | State | Zip Code |
|---------|-----------|--------------|------------------|----------------------|--------------|-----|----------|-------------------|------|-------|----------|
| 3053 | Chinook Centre | 0256 | 6455 Macleod Trail SW | Calgary, AB | T2H0K8 | 3,359 | Cadillac Fairview | 20 Queen Street West | Toronto | ON | M5H 3R4 |
| 3054 | Southcentre Mall | 71 | 100 Anderson Road SE | Calgary, AB | T2J3V1 | 3,317 | Oxford Properties Group | 130 Adelaide Street West | Toronto | ON | M5H3 P5 |
| 3055 | Avalon Mall | 250/260 | 48 Kenmount Road | St. John's , NL | A1B 1W3 | 3,701 | Crombie REIT | 115 King Street | Stellarton | NS | B0K 1S0 |
| 3057 | Pen Centre | 76 | 221 Glendale Avenue | St. Catharine's , ON | L2T2K9 | 3,586 | 20 VIC Management Inc. | One Queen Street East | Toronto | ON | M5C 2W5 |
| 3058 | Champlain Place | H0003 A | 477 Paul Street | Dieppe, NB | E1A4X5 | 3,941 | Cadillac Fairview | 5th floor | Toronto | ON | M5H 3R4 |
| 3062 | Bower Place | 230 | 4900 Molly Bannister Drive | Red Deer, AB | T4R1N9 | 3,090 | Bentall Kennedy | Administration Office, Suite 1000 | Red Deer | AB | T4R 1N9 |
| 3067 | Lansdowne Place | 167 | 645 Lansdowne Street West | Peterborough, ON | K9J7Y5 | 4,002 | 20 VIC Management Inc. | One Queen Street East | Toronto | ON | M5C 2W5 |
| 3068 | Bramalea City Centre | 534 | 25 Peel Centre Drive | Brampton, ON | L6T 3R5 | 3,615 | Morguard Investments Limited | 55 City Centre Drive | Mississauga | ON | L5B 1M3 |
| 3071 | Oshawa Centre | 2211 | 419 King Street W. | Oshawa, ON | L1J2K5 | 3,720 | Ivanhoe Cambridge | 95 Wellington Street West | Toronto | ON | M5J 2R2 |
| 3074 | St. Vital Center | 69/70 | 1225 St. Mary's Road | Winnipeg , MB | R2M5E5 | 3,922 | 20 VIC Management Inc. | One Queen Street East | Toronto | ON | M5C 2W5 |
| 3075 | Queensborough Landing | C2 | 805 Boyd Street | New Westminster, BC | V3M 5X2 | 4,503 | Smart Centres | 11120 Horseshoe Way | Richmond | BC | V7A 5H7 |
| 3078 | Prairie Mall | 238 | c/o Morguard Investments Limited Admin Office | Grand Prairie, AB | T8V 3Y2 | 3,544 | Morguard Investments Limited | 55 City Centre Drive | Mississauga | ON | L5B 1M3 |
| 3079 | Kildonan Place | T18 | 1555 Regent Avenue West | Winnepeg, MB | R2C 4J2 | 3,832 | Ivanhoe Cambridge | 95 Wellington Street West | Toronto | ON | M5J 2R2 |
| 3081 | Midtown Plaza | T002 | 1200A -The Tower as Midtown | Saskatoon, SK | S7K1J5 | 3,872 | 20 VIC Management Inc. | One Queen Street East | Toronto | ON | M5C 2W5 |
| 3091 | Polo Park | 0227B | 1485 Portage Avenue | Winnipeg, MB | R3G OW4 | 3,505 | Cadillac Fairview | 1485 Portage Avnue | Winnipeg | MB | R3G OW4 |
| 3094 | Toronto Premium Outlets | 301 | 13850 Steeles Avenue West | Halton Hills, ON | L7G 0J1 | 4,500 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 3095 | Tanger Outlets Ottawa | 825 | 8555 Campeau Drive | Ottawa, ON | K2T 0K5 | 5,122 | RioCan | 700 Lawrence Avenue, Suite 315 | Toronto | ON | K2T OK5 |
| 4511 | Plaza Carolina | 159 | 65 Infantry & Fragoso | Carolina, PR | 00983 | 4,623 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |

Exhibit 4-5 to
Credit Agreement

| Store # | Mall Name | Leased Space | Location Address | Location City & State | Location Zip | RSF | Landlord | Landlord Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 4512 | Plaza Las Americas | 407-409 | 525 F.D. Roosevelt Avenue | San Juan, PR | 00918 | 4,747 | Plaza Las Americas, Inc. | 525 F. D. Roosevelt Avenue | San Juan | PR | 00918 |
| 4513 | Prime Outlets Puerto Rico | 805 | 1 Premium Outlets Blvd | Barceloneta, PR | 00617 | 4,007 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 4514 | Plaza Del Norte | D-134 | 506 Trucado Street PR-2 km 81.9 | Hatillo, PR | 00659 | 3,399 | DDR | 3300 Enterprise Pkway | Beachwood | OH | 44122 |
| 4515 | Las Catalinas Mall | 0360 | PO Box 362 | Caguas, PR | 00726-0362 | 3,146 | Vornado | 210 Route 4 East | Paramus | NJ | 07652 |
| 4516 | The Outlet at Route 66 Mall | 173 | 18400 State Road #3 | Canovanas, PR | 00729 | 3,903 | FOM Puerto Rico, S.E. | 18400 State Rd 3,Suite 205 | Canovanas | PR | 00729 |
| 4517 | Plaza del Sol | 1840 | Calle Comerio Principal & Principal Oeste | Bayamon, PR | 00961 | 4,600 | DDR | 3300 Enterprise Pkway | Beachwood | OH | 44122 |
| 4518 | Plaza Isabela | A108 | PR 1 & PR 4494 | Isabela, PR | 00000 | 4,500 | DDR | 3300 Enterprise Parkway | Beachwood | OH | 44122 |

## PS Locations

| Store # | Mall Name | Leased Space | Location Address | Location City & State | Location Zip | RSF | Landlord | Landlord Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3215 | P.S. -Las Americas | 473 | 4141 Camino De La Plaza Drive | San Ysidro, CA | 92173 | 4,653 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 3217 | P.S. -Shoppes at North Brunswick | F | 541 Shoppes Boulevard | North Brunswick, NJ | 08902 | 2,825 | Levin Mgmt Co. | 1290 Avenue of the Americas, Ste 914 | New York | NY | 10104 |
| 3224 | P.S. – Manhattan Mall | 160 | 100 W. 33rd St. | New York, NY | 10001 | 4,500 | Vornado | 210 Route 4 East | Paramus | NJ | 07652 |
| 3226 | P.S. -San Marcos Outlets | 870 | 3939 1H 35 South | San Marcos, TX | 78666 | 4,120 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 3248 | P.S. -Rio Grande Outlets | 0801A | 9501 Arlington Expressway | Mercedes, TX | 7570 | 3,675 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 3249 | P.S. -Jersey Gardens | 2074 | 651 Kapowski Road | Elizabeth, NJ | 07201 | 4,377 | Glimcher | 180 E Broad St, 21st Floor | Columbus | OH | 43215 |
| 3250 | P.S. – Grapevine Mills | 526B | 3000 Grapevine Mills Parkway | Grapevine , TX | 76051 | 3,000 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 3254 | P.S. -Tanger Outlets Locust Grove | 405 | 1000 Tanger Drive | Locust Grove, GA | 30248 | 3,000 | Tanger Properties, L.P. | 3200 Northline Avenue | Greensboro | NC | 27408 |
| 3255 | P.S. -Tanger Outlets Riverhead | 1214 | 1770 West Main Street | Riverhead, NY | 11901 | 3,000 | Tanger Properties, L.P. | 3200 Northline Avenue | Greensboro | NC | 27408 |
| 3256 | P.S. -Outlet Shoppes at El Paso | E544 | 7051 South Desert Blvd. | Canutullo, TX | 79835 | 3,996 | Horizon Properties Group | 5000 Hakes Drive, Suite 500 | Muskegon | MI | 49441 |
| 3262 | P.S. – Concord Mills | 699 | 8111 Concord Mills Blvd. | Concord, NC | 28027 | 3,051 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 3264 | P.S. - Orlando Premium Outlets International Drive | 3F.19 | 4951 International Drive | Orlando, FL | 32819 | 3,894 | Simon/Premium Outlets | 105 Eisenhower Parkway | Roseland | NJ | 07068 |
| 3267 | P.S. Tanger Outlet Myrtle Beach | B200 | 4635 Factory Stores Blvd. | Myrtle Beach , SC | 29579 | 2,994 | Tanger Properties, L.P. | 3200 Northline Avenue | Greensboro | NC | 27408 |

WEIL:\95685927\8\11727.0012

Exhibit 4-5 to
Credit Agreement

| Store # | Mall Name | Leased Space | Location Address | Location City & State | Location Zip | RSF | Landlord | Landlord Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3269 | P.S. -Mall del Norte | 132 | 5300 San Dario Avenue | Laredo, TX | 78041 | 3,103 | CBL &Associates Management Inc. | 2030 Hamilton Place Blvd | Chattanooga | TN | 37421 |
| 3279 | P.S. -Arizona Mills Mall | 188 | 5000 S Arizona Mills Circle | Tempe, AZ | 85282 | 3,421 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 3288 | P.S. -Opry Mills Mall | 310 | 433 Opry Mills Drive | Nashville, TN | 37214 | 3,000 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 3292 | P.S. -Katy Mills Mall | 720 | 5000 Katy Mills Circle | Katy, TX | 77494 | 3,213 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 3314 | P.S. – Galveston Outlets | 420 | 5885 Gulf Freeway | Texas City, TX | 77591 | 3,200 | Tanger Properties, L.P. | 3200 Northline Avenue | Greensboro | NC | 27408 |
| 3326 | PS -Foothills | 185 | 7401 N. La Cholla Blvd. | Tucson, AZ | 85741 | 4,487 | Schottenstein Property Group | 4300 East Fifth Ave | Columbus | OH | 43219 |
| 3330 | Gran Plaza Outlets | H100 , H150 | 888 W 2nd Street | Calexico, CA | 92231 | 3,983 | Charles Company | 9034 West Sunset Blvd | West Hollywood | CA | 90069 |
| 3332 | P.S. -Outlet Shoppes At Atlanta | D410 | 915 Ridgewalk Parkway | Woodstock, GA | 30188 | 3,630 | Horizon Properties Group | 5000 Hakes Drive, Suite 500 | Muskegon | MI | 49441 |
| 3371 | P.S. -Central Plaza | BOK | 6221 Slide Road. Unit BOK | Lubbock, TX | 00000 | 3,200 | Dunhill Partners | 3100 Monticello, Suite 300 | Dallas | TX | 75205 |
| 3381 | Chimney Rock Mall | A | TX 191 and 338 | Odessa, TX | 00000 | 3,016 | Excel Property Group | 17410 Bernardo Center Drive, | San Diego | CA | 92198-1324 |
| 3383 | P.S. – Mariposa Mall | unnamed | West Mariposa Road | Nogales , AZ | 85621 | 5,047 | LAD BACK NOGALES LLC | 6358 E Quail Track Drive | Scottsdale | AZ | 85266 |
| 3385 | P.S. -Gurnee Mills Mall | 793 | 6170 W Grand Avenue | Gurnee, IL | 60031 | 2,889 | Simon Property Group | 225 W. Washington St. | Indianapolis | IN | 46204 |
| 3401 | PS National Harbor | 450 | 0 | Oxon Hill, MD | 00000 | 3,100 | Tanger Properties, L.P. | 3200 Northline Ave | Greensboro | NC | 27408 |
| **Corporate Locations** | | | | | | | | | | | |
| 100004 | ADI* | Block 73.01 | 2 Brick Plant Road | South River, NJ | 08810 | 315,000 | LIT-Northend LLC | 2100 McKinney Ave, STE 700 | Dallas | TX | 75201 |
| 101004 | West Coast Distribution Center* | 1004 | 950 N. Barrington Ave | Ontario, CA | 91761 | 359,996 | ProLogis | 2817 E. Cedar Street | Ontairo | CA | 91761 |
| 100014C | Canadian Office | 208 | 6205 B Airport Road | Mississauga, ON | L4V1E3 | 1,391 | Orlando Corporation | 6205 Airport Road | Mississauga | ON | L4V1E3 |
| 100014NJ | NJ Office* | Lyndhurst 3rd, 4th -5th | 125 Chubb Avenue | Lyndhurst, NJ | 07071 | 68,949 | SL Green Realty Corp. | 420 Lexington Ave | New York | NY | 10170 |
| 10014GJ | GoJane | Ste 180 | 777 S. Alameda St | Los Angeles, CA | 90021 | 11,218 | ACG Property Mgmt LLC | 1318 East 7th Street, Ste 200 | Los Angeles | CA | 90021 |
| 200014NY | NYC Office* | 10014 -22nd , 23, 24th Floors | 112 West 34th Street | New York, NY | 10017 | 34,672 | Helmsley Spear | 60 East 42nd Street | New York | NY | 10017 |

Exhibit 4-5 to
Credit Agreement

| Store # | Mall Name | Leased Space | Location Address | Location City & State | Location Zip | RSF | Landlord | Landlord Address | City | State | Zip Code |
|---------|-----------|--------------|------------------|----------------------|--------------|-----|----------|------------------|------|-------|----------|
| 200014NY | NYC Office* | 10015 -22nd Floor Expansion | 112 West 34th Street | New York, NY | 10017 | 4,133 | Helmsley Spear | 60 East 42nd Street | New York | NY | 10017 |
| 200014NY | NYC Office* | 10017 -25th Floor | 112 West 34th Street | New York, NY | 10017 | 10,158 | Helmsley Spear | 60 East 42nd Street | New York | NY | 10017 |
| 200014NY | NYC Office* | 10018 -26th Floor | 112 West 34th Street | New York, NY | 10017 | 10,158 | Helmsley Spear | 60 East 42nd Street | New York | NY | 10017 |
| 200014NY | NYC Office* | 10020 -16th Floor | 112 West 34th Street | New York, NY | 10017 | 29,639 | Helmsley Spear | 60 East 42nd Street | New York | NY | 10017 |
| 200014NY | NYC Office* | 11th Floor | 901 Avenue of the America | New York, NY | 10001 | 32,355 | Vornado | 210 Route 4 East | Paramus | NJ | 07652 |

WEIL:\95685927\8\11727.0012

Exhibit 4-6 to
Credit Agreement

# Encumbrances[1]

| Debtor Name: | State | Level | Secured Party | File Date | File Number |
|---|---|---|---|---|---|
| Aeropostale, Inc. | DE | SOS | Pom-College Station, LLC | 10/12/09 | 20093276844 |
| Aeropostale, Inc. | DE | SOS | IBM Credit LLC | 9/20/11 | 20113611996 |
| Aeropostale, Inc. | DE | SOS | General Electric Capital Corporation | 9/29/11 | 20113740654 |
| Aeropostale, Inc. | DE | SOS | IBM Credit LLC | 10/7/11 | 20113872028 |
| Aeropostale, Inc. | DE | SOS | IBM Credit LLC | 12/16/11 | 20114839984 |
| Aeropostale, Inc. | DE | SOS | General Electric Capital Corporation | 8/7/12 | 20123039908 |
| Aeropostale, Inc. | DE | SOS | IBM Credit LLC | 9/20/12 | 20123633973 |
| Aeropostale, Inc. | DE | SOS | General Electric Capital Corporation | 10/15/12 | 20123956895 |
| Aeropostale, Inc. | DE | SOS | General Electric Capital Corporation | 1/3/13 | 20130026261 |
| Aeropostale, Inc. | DE | SOS | IBM Credit LLC | 1/3/13 | 20130041153 |
| Aeropostale, Inc. | DE | SOS | General Electric Capital Corporation | 4/5/13 | 20131319319 |
| Aeropostale, Inc. | DE | SOS | General Electric Capital Corporation | 4/8/13 | 20131331009 |
| Aeropostale, Inc. | DE | SOS | General Electric Capital Corporation | 5/31/13 | 20132067024 |
| Aeropostale, Inc. | DE | SOS | AT&T Capital Services, Inc. | 6/10/13 | 20132211127 |
| Aeropostale, Inc. | DE | SOS | AT&T Capital Services, Inc. | 12/9/13 | 20134849197 |
| Aeropostale, Inc. | DE | SOS | AT&T Capital Services, Inc. | 12/27/13 | 20135128906 |
| Aeropostale, Inc. | DE | SOS | De Lage Landen Financial Services, Inc. | 4/1/14 | 20141280353 |
| Aeropostale, Inc. | DE | SOS | AT&T Capital Services, Inc. | 5/15/14 | 20141922681 |
| Aeropostale, Inc. | DE | SOS | AT&T Capital Services, Inc. | 6/19/14 | 20142408557 |
| Aeropostale, Inc. | DE | SOS | U.S. Bank Equipment Finance | 7/3/14 | 20142637189 |
| Aeropostale, Inc. | DE | SOS | IBM Credit LLC | 8/8/14 | 20143184504 |
| Aeropostale, Inc. | DE | SOS | AT&T Capital Services, Inc. | 8/19/14 | 20143325875 |
| Aeropostale, Inc. | DE | SOS | AT&T Capital Services, Inc. | 9/18/14 | 20143752599 |
| Aeropostale, Inc. | DE | SOS | AT&T Capital Services, Inc. | 4/9/15 | 20151520658 |
| Aeropostale, Inc. | DE | SOS | People's United Bank / NFS Leasing, Inc. | 8/19/15 | 20153609947 |

[1] Each of the listed Encumbrances relates to leased equipment.

Exhibit 4-6 to
Credit Agreement

| Debtor Name: | State | Level | Secured Party | File Date | File Number |
|---|---|---|---|---|---|
| Aeropostale, Inc. | DE | SOS | AT&T Capital Services, Inc. | 11/13/15 | 20155337414 |
| Aeropostale, Inc. | DE | SOS | AT&T Capital Services, Inc. | 12/17/15 | 20156102031 |
| Aeropostale, Inc. | DE | SOS | AT&T Capital Services, Inc. | 2/24/16 | 20161100922 |

81

Exhibit 4-7 to
Credit Agreement

**<u>Indebtedness</u>**

None.

Exhibit 4-8 to
Credit Agreement

## Insurance Policies

| TYPE | EXP DATE | POLICY NUMBER | BROKER | PREMIUM | Carrier | COMMENTS | LIMITS | COVERAGE/DEDUCTIBLE |
|---|---|---|---|---|---|---|---|---|
| **Auto - Canadian - All Other Provinces** | 8/1/2016 | AH1651291421045 | J. Smith Lanier & Co. | 13,050.00 | Liberty Mutual | BINDER | 1,000,000 | Limit of Liability |
| | | | | Paid to Carrier | | | 1,000 | Deductible |
| | | | | 35% down + 6 installments | | | Ins Com | |
| | | | | | | | Liberty Insurance | |
| | | | | | | | | |
| | | | | | | | LIMITS | COVERAGE/DEDUCTIBLE |
| **Auto - Puerto Rico** | 3/7/2017 | CA 046073 734 | J. Jaramillo Insurance, Inc. | 942.00 | Triple S Propiedad, Inc. | Policy | 1,000,000 | Bodily Injury & Property Damage-CSI |
| | | | | Paid to Broker | | | 5,000 | Medical Payment |
| | | | | Paid in full at renewal | | | 1,000,000 | Non-Owned & Hired |
| | | | | | | | | DEDUCTIBLES |
| | | | | | | | 1,000 | Comp. |
| | | | | | | | 1,000 | Collision |
| | | | | | | | $30/30 days | Rental Reimbursement |
| | | | | | | | Ins Com | |
| | | | | | | | Triple S Propiedad, Inc. | |
| | | | | | | | | |
| | | | | | | | LIMITS | COVERAGE/DEDUCTIBLE |
| **Auto - U.S.** | 8/1/2016 | AC1651291421025 | J. Smith Lanier & Co. | 195,963.00 | Liberty Mutual | BINDER | 1,000,000 | Limit of Liability |
| | | | | Paid to Carrier | | | 1,000 | Deductible |
| | | | | 35% down + 6 installments | | | Ins Com | |
| | | | | | | | Liberty Insurance | |
| | | | | | | | | |

Exhibit 4-8 to
Credit Agreement

| TYPE | EXP DATE | POLICY NUMBER | BROKER | PREMIUM | Carrier | COMMENTS | LIMITS | COVERAGE/DEDUCTIBLE |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | LIMITS | COVERAGE/DEDUCTIBLE |
| Crime | 8/1/2016 | FID2874723-06 | Aon Risk Services | 30,018.00 | Zurich | BINDER Premium Includes NJ Surcharge $268 | 5,000,000 | Employee Theft |
| | | | | Paid to Broker | | | 5,000,000 | Forgery Alteration |
| | | | | Paid in full at renewal | | | 5,000,000 | Computer Fraud |
| | | | | | | | 100,000 | Deductible |
| | | | | | | | 5,000,000 | On Premises |
| | | | | | | | 5,000,000 | In Transit |
| | | | | | | | 5,000,000 | Funds Transfer Fraud |
| | | | | | | | 5,000,000 | Money Orders and Counterfeit Money |
| | | | | | | | 50,000 | Investigative Expenses |
| | | | | | | | Ins Com | |
| | | | | | | | Zurich | |
| | | | | | | | LIMITS | COVERAGE/DEDUCTIBLE |
| Cyber Liability | 5/13/2017 | V188921604 | ARC Excess & Surplus | 306,500.00 | Beazley | POLICY Premium Includes Taxes & Surcharges $2,835.01 | 10,000,000 | Policy Limit |
| | | | | Paid to Broker | | | 10,000,000 | Regulatory Defense & Penalties (Insuring Agreement IC) |
| | | | | Paid in full at renewal | | | 2,500,000 | Crisis Management & Public Relations (Insuring Agreement I.E.) |
| | | | | | | | 2,500,000 | PCI Fines and Costs (Insuring Agreement I.F.) |
| | | | | | | | | |
| | | | | | | | 4,000,000 Individuals | Privacy Breach Response Services. (Insuring Agreement I.B) |
| | | | | | | | 1,000,000 | Legal and Forensic Exp. (Insuring Agreement IB1) |
| | | | | | | | 500,000 | Foreign Notifications |

84

Exhibit 4-8 to
Credit Agreement

| TYPE | EXP DATE | POLICY NUMBER | BROKER | PREMIUM | Carrier | COMMENTS | LIMITS | COVERAGE/DEDUCTIBLE |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | 10,000,000 | Cyber Extortion Loss |
| | | | | | | | 10,000,000 | Data Protection Loss and Bus. Interruption Loss |
| | | | | | | | 500,000 | Hourly Sublimit |
| | | | | | | | 100,000 | Forensic Exp. |
| | | | | | | | 100,000 | Dependent Bus. Interruption |
| | | | | | | | | |
| | | | | | | | 500,000 | Retention: Insuring Agreement IA & IC |
| | | | | | | | 20,000 | Retention: Insuring Agreement IB. |
| | | | | | | | 500,000 | Retention: Insuring Agreement I.D. |
| | | | | | | | 10,000 | Retention: Insuring Agreement I.E. |
| | | | | | | | 500,000 | Retention: Insuring Agreement I.F. |
| | | | | | | | 500,000 | Retention: Extortion Threat |
| | | | | | | | 500,000 | Retention: Security Breach |
| | | | | | | | 10 Hours | Waiting Period |
| | | | | | | | Ins Com | |
| | | | | | | | Beazley | |
| | | | | | | | LIMITS | COVERAGE/DEDUCTIBLE |
| D & O - Primary | 5/15/2017 | 01-245-66-40 | Marsh & McLennan | | Illinois National Insurance Co. | BINDER Premium Includes TRIA - $2,103 | 5,000,000 | Limit of Liability |
| | | | | Paid to Broker | | | 1,000,000 | Securities Retention |
| | | | | Paid in full at renewal | | | 1,000,000 | Employment Practices Retention |
| | | | | | | | 1,000,000 | All Other Loss to which a Retention Applies |
| | | | | | | Ins Com | | |
| | | | | | | Illinois National Insurance Co. | | |
| | | | | | | | | |

85

WEIL:\95685927\8\11727.0012

Exhibit 4-8 to
Credit Agreement

| TYPE | EXP DATE | POLICY NUMBER | BROKER | PREMIUM | Carrier | COMMENTS | LIMITS | COVERAGE/DEDUCTIBLE |
|------|----------|---------------|--------|---------|---------|----------|--------|---------------------|
| | | | | | | | LIMITS | COVERAGE/DEDUCTIBLE |
| D&O - Excess 1st Layer | 5/15/2017 | 596465389 | Marsh & McLennan | | Continental Casualty | BINDER Premium Does Not Include Fees & Surcharges or Taxes | 5,000,000 | XS $5,000,000 |
| | | | | Paid to Broker | | | Ins Com | |
| | | | | Paid in full at renewal | | | Continental Casualty | |
| | | | | | | | | |
| | | | | | | | LIMITS | COVERAGE/DEDUCTIBLE |
| D&O - Excess 2nd Layer | 5/15/2017 | XSP-685724-0515 | Marsh & McLennan | | Caitlin | BINDER | 5,000,000 | XS 10,000,000 |
| | | | | Paid to Broker | | | Ins Com | |
| | | | | Paid in full at renewal | | | Caitlin | |
| | | | | | | | | |
| | | | | | | | LIMITS | COVERAGE/DEDUCTIBLE |
| D&O - Excess 3rd Layer | 5/15/2017 | DOX10004931207 | Marsh & McLennan | | Endurance American Insurance Co. | BINDER | 5,000,000 | XS 15,000,000 |
| | | | | Paid to Broker | | | Ins Com | |
| | | | | Paid in full at renewal | | | Endurance American Insurance Co. | |
| | | | | | | | | |
| | | | | | | | LIMITS | COVERAGE/DEDUCTIBLE |
| D&O - Excess 4th Layer | 5/15/2017 | 515XF62116814 | Marsh & McLennan | | Starr Indemnity & Liability | BINDER | 5,000,000 | XS 20,000,000 |
| | | | | Paid to Broker | | | Ins Com | |
| | | | | Paid in full at renewal | | | Starr Indemnity & Liability | |
| | | | | | | | | |
| | | | | | | | LIMITS | COVERAGE/DEDUCTIBLE |
| D&O - Excess 5th Layer | 5/15/2017 | 14-M60-15-A34562 | Marsh & McLennan | | US Specialty | BINDER | 5,000,000 | XS 25,000,000 |
| | | | | Paid to Broker | | | Ins Com | |
| | | | | Paid in full at renewal | | | US Specialty | |
| | | | | | | | | |

WEIL:\95685927\8\11727.0012

Exhibit 4-8 to
Credit Agreement

| TYPE | EXP DATE | POLICY NUMBER | BROKER | PREMIUM | Carrier | COMMENTS | LIMITS | COVERAGE/DEDUCTIBLE |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | LIMITS | COVERAGE/DEDUCTIBLE |
| D&O - SIDE "A" | 5/15/2017 | 6800-8276 | Marsh & McLennan | | Federal Insurance | BINDER Premium Includes Taxes & Surcharges - $378 | 5,000,000 | XS 30,000,000 |
| | | | | Paid to Broker | | | Ins Com | |
| | | | | Paid in full at renewal | | | Federal Insurance | |
| | | | | | | | | |
| | | | | | | | LIMITS | COVERAGE/DEDUCTIBLE |
| D&O - Side "A" - 1st Excess | 5/15/2017 | 01-245-68-78 | Marsh & McLennan | | Illinois National Insurance Co. | BINDER Premium does not include Taxes & Surcharges Prior & Pending 5/15/2006 | 5,000,00 | XS 35,000,000 |
| | | | | Paid to Broker | | | Ins Com | |
| | | | | Paid in full at renewal | | | Illinois National Insurance Co. | |
| | | | | | | | | |
| | | | | | | | LIMITS | COVERAGE/DEDUCTIBLE |
| D&O - Side "A" - 2nd Excess | 5/15/2017 | U10A55150601 | Marsh & McLennan | | Beazley | BINDER Premium does not include Taxes, Surcharges or Fees | 5,000,000 | Limit XS of 40,000,000 |
| | | | | Paid to Broker | | | Ins Com | |
| | | | | Paid in full at renewal | | | Beazley | |
| | | | | | | | | |
| | | | | | | | LIMITS | COVERAGE/DEDUCTIBLE |
| D&O - SIDE "A" Third Excess | 5/15/2017 | 596465683 | Marsh & McLennan | | Continental Casualty | BINDER | 5,000,000 | XS 45,000,000 |
| | | | | Paid to Broker | | | Ins Com | |
| | | | | Paid in full at renewal | | | Continental Casualty | |
| | | | | | | | | |

87

Exhibit 4-8 to
Credit Agreement

| TYPE | EXP DATE | POLICY NUMBER | BROKER | PREMIUM | Carrier | COMMENTS | LIMITS | COVERAGE/DEDUCTIBLE |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | LIMITS | COVERAGE/DEDUCTIBLE |
| Earthquake-CA - Excess 1st | 8/1/2016 | CFE0966844 | Aon | 43,002.00 | QBE | BINDER | 19,778,000 | Excess of $7,000,000 |
| | | | | Paid to Broker | | | | DEDUCTIBLE |
| | | | | Paid in full at renewal | | | | 5% of Values: $250,000 Minimum |
| | | | | | | | Ins Com | |
| | | | | | | | QBE | |
| | | | | | | | | |
| | | | | | | | LIMITS | COVERAGE/DEDUCTIBLE |
| Earthquake-CA - Excess 2nd | 8/1/2016 | CAT001499 | Aon | 90,729.00 | Lloyds | BINDER | 37,022,000 | Excess of $19,778,000 |
| | | | | Paid to Broker | | | | DEDUCTIBLE |
| | | | | Paid in full at renewal | | | | 5% of Values: $250,000 Minimum |
| | | | | | | | Ins Com | |
| | | | | | | | Lloyds | |
| | | | | | | | | |
| | | | | | | | LIMITS | COVERAGE/DEDUCTIBLE |
| Employment Practices Excess | 5/15/2017 | G2745415A-002 | ARC Excess & Surplus | 50,000.00 | Westchester Fire | BINDER Pending & Prior Date - 08/01/1998 | 5,000,000 | Underlying Limit |
| | | | | Paid to Broker | | | 5,000,000 | Aggregate Limit |
| | | | | Paid in full at renewal | | | | |
| | | | | | | | Ins Com | |
| | | | | | | | Westchester Fire | |
| | | | | | | | | |

88

Exhibit 4-8 to
Credit Agreement

| TYPE | EXP DATE | POLICY NUMBER | BROKER | PREMIUM | Carrier | COMMENTS | LIMITS | COVERAGE/DEDUCTIBLE |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | LIMITS | COVERAGE/DEDUCTIBLE |
| **Employment Practices Liability** | 5/15/2017 | EPLNY799605007 | ARC Excess & Surplus, LLC | 102,460.00 | Liberty Mutual | BINDER Premium Includes NJPLIGA Surcharge $1,125 Extended Reporting Period - 1 year @ 75%. | 5,000,000 | Limit of Liability |
| | | | | Paid to Broker | | | 1,000,000 | Retention - Single Claims |
| | | | | Paid in full at renewal | | | 1,000,000 | Retention - Multi-Party |
| | | | | | | | | Pending & Prior Date 8/1/1998 |
| | | | | | | | | Continuity Date 5/15/2005 |
| | | | | | | | Ins Com | |
| | | | | | | | Liberty Mutual | |
| | | | | | | | | |
| | | | | | | | LIMITS | COVERAGE/DEDUCTIBLE |
| **Fiduciary** | 8/1/2016 | U7155 1780 | CRC Insurance | 9,424.00 | US Specialty | Policy Premium includes NJ PLIGA $84 | 5,000,000 | Limit of Liability |
| | | | | Paid to Broker | | | 10,000 | Deductible - Includes Defense Costs |
| | | | | Paid in full at renewal | | | Ins Com | |
| | | | | | | | US Specialty | |
| | | | | | | | | |
| | | | | | | | LIMITS | COVERAGE/DEDUCTIBLE |
| **Fiduciary - Excess 1st** | 8/1/2016 | FDX6660766 | CRC Insurance | 7,981.00 | Great American | Policy Premium includes NJPLG $71 | 5,000,000 | XS 5,000,000 |
| | | | | Paid to Broker | | | | Prior & Pending Date - 8/1/2008 |
| | | | | Paid in full at renewal | | | Ins Com | |
| | | | | | | | Great American | |
| | | | | | | | | |
| | | | | | | | LIMITS | COVERAGE/DEDUCTIBLE |
| **Fiduciary - Excess 2nd** | 8/1/2016 | EPG0013906 | CRC Insurance | 8,879.00 | RLI Insurance Company | Policy Premium Includes Surcharges $79 | 10,000,000 | XS 10,000,000 |
| | | | | Paid to Broker | | | Ins Com | |
| | | | | Paid in full at renewal | | | RLI Insurance Company | |

Exhibit 4-8 to
Credit Agreement

| TYPE | EXP DATE | POLICY NUMBER | BROKER | PREMIUM | Carrier | COMMENTS | LIMITS | COVERAGE/DEDUCTIBLE |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | LIMITS | COVERAGE/DEDUCTIBLE |
| **Fiduciary - Excess 3rd** | 8/1/2016 | 8235-3003 | CRC Insurance | 8,072.00 | Federal Insurance | Policy Premium Includes NJ Pliga - $72 | 10,000,000 | Excess $20,000,000 |
| | | | | Paid to Broker | | | Ins Com | |
| | | | | Paid in full at renewal | | | Federal Insurance | |
| | | | | | | | LIMITS | COVERAGE/DEDUCTIBLE |
| **General Liability** | 8/1/2016 | KE1651291421015 | J. Smith Lanier & Co. | 856,835.00 | Liberty Mutual | BINDER Premium Includes Taxes & Surcharges - $3,137 | 2,000,000 | General Aggregate - Designated Location |
| | | | | Paid to Carrier | | | 2,000,000 | Products / Completed Operations Aggregate |
| | | | | 35% down + 6 installments | | | 1,000,000 | Each Occurrence |
| | | | | | | | 1,000,000 | Personal / Advertising Injury |
| | | | | | | | 1,000,000 | Employee Benefits - Deductible $0 (Retro 8/1/2004) |
| | | | | | | | 10,000 | Medical Expense |
| | | | | | | | 300,000 | Fire Damage Limit, Any One Fire |
| | | | | | | | 0 | No Deductible |
| | | | | | | | Ins Com | |
| | | | | | | | Liberty Insurance | |
| | | | | | | | LIMITS | COVERAGE/DEDUCTIBLE |
| **General Liability - CANADA** | 8/1/2016 | KE1-651-291421-014 | J. Smith Lanier & Co. | 28,584.00 | Liberty Mutual | BINDER | 2,000,000 | General Aggregate |
| | | | | Paid to Carrier | | | 2,000,000 | Products / Completed Operations Aggregate |
| | | | | 35% down + 6 installments | | | 1,000,000 | Each Occurrence |
| | | | | | | | 1,000,000 | Employee Benefits - Deductible $1,000 (Retro 8/1/2004) |
| | | | | | | | Ins Com | |

| TYPE | EXP DATE | POLICY NUMBER | BROKER | PREMIUM | Carrier | COMMENTS | LIMITS | COVERAGE/DEDUCTIBLE |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | Liberty Insurance | |
| | | | | | | | LIMITS | COVERAGE/DEDUCTIBLE |
| Kidnap & Ransom | 4/19/2017 | SCI-273611045 | AmWins | 14,594.00 | Great American | Policy | 5,000,000 | Limit of Liability |
| | | | | Paid to Broker | | | 0 | Deductible |
| | | | | Paid in full at renewal | | | 5,000,000 | B.I. & E.E. |
| | | | | | | | | Personal Accident |
| | | | | | | | 250,000 | Per Insured Person |
| | | | | | | | 1,250,000 | Per Insured Event |
| | | | | | | Ins Com | | |
| | | | | | | Great American | | |
| | | | | | | | LIMITS | COVERAGE/DEDUCTIBLE |
| Package - International | 8/1/2016 | WP584958700 | J. Smith Lanier & Co. | 9,800.00 | C N A | BINDER Rating Basis - $18,640,000 Sales | | INTERNATIONAL GENERAL LIABILITY |
| | | | | | | | 1,000,000 | Bodily Injury / Property Damage - Ea. Occurrence / 2,000,000 Aggregate |
| | | | | Paid to Broker | | | 1,000,000 | Products / Completed Operations - Ea. Occurrence / 2,000,000 Aggregate |
| | | | | Paid in full at renewal | | | 1,000,000 | Personal & Advertising Injury - Ea. Occurrence / Aggregate |
| | | | | | | | 1,000,000 | Premises Legal Liability  Ea. Occurrence / Aggregate |
| | | | | | | | 10,000 | Medical Expenses per person / 50,000 per accident |
| | | | | | | | | INT'L EMPLOYEE BENEFITS LIAB. |
| | | | | | | | 1,000,000 | Each Employee / Aggregate |
| | | | | | | | | 1,000 Deductible |

WEIL:\95685927\8\11727.0012

Exhibit 4-8 to
Credit Agreement

| TYPE | EXP DATE | POLICY NUMBER | BROKER | PREMIUM | Carrier | COMMENTS | LIMITS | COVERAGE/DEDUCTIBLE |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | INT'L  TRAVEL |
| | | | | | | | 100,000 | Broad Business Trip |
| | | | | | | | 25,000 | Spouse Coverage While on Business or Relocation Trip |
| | | | | | | | 10,000 | Dependent Coverage While on Business or Relocation Trip |
| | | | | | | | 10,000 | Medical Expense |
| | | | | | | | 500,000 | Per Accident / Aggregate |
| | | | | | | | | |
| | | | | | | | | INT'L  AUTO |
| | | | | | | | 1,000,000 | Bodily Injury / Property Damage - per occurrence |
| | | | | | | | 10,000 | Medical Expenses per person / 50,000 per accident |
| | | | | | | Ins Com | | |
| | | | | | | C N A | | |
| | | | | | | | LIMITS | COVERAGE/DEDUCTIBLE |
| | | | | | | | | |
| | | | | | | | | INT'L  FOREIGN VOLUNTARY  WC |
| | | | | | | | 1,000,000 | Bodily Injury / Accident |
| | | | | | | | 1,000,000 | BI by Disease / Policy Limit |
| | | | | | | | 1,000,000 | BI by Disease / Per Person |
| | | | | | | | 1,000,000/1,000,000/Per Employee / Agg. | Excess Repatriation |
| | | | | | | | | INT'L KIDNAP & RANSOM / CONFISCATION |
| | | | | | | | 250,000 | Each Occurrence / Aggregate |
| | | | | | | | | Int'l Confiscation , Expropriation & Nationalization Coverage Form |
| | | | | | | | 50,000 | Each Occurrence |
| | | | | | | | 50,000 | Policy Aggregate Subject to a 120 Day Waiting Period |
| | | | | | | | | |

| TYPE | EXP DATE | POLICY NUMBER | BROKER | PREMIUM | Carrier | COMMENTS | LIMITS | COVERAGE/DEDUCTIBLE |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | LIMITS | COVERAGE/DEDUCTIBLE |
| **Property - Canada** | 8/1/2016 | 5084803807 | J. Smith Lanier & Co. | 24,204.00 | C N A | BINDER Premium includes taxes/surcharges of $1,276 | 28,840,054 | Policy Limit |
| | | | | Paid to Broker | | | 5,000,000 | Accounts Receivable |
| | | | | Paid in full at renewal | | | 75,000,000 | Earthquake - Annual Aggregate |
| | | | | | | | 75,000,000 | Flood - Annual Aggregate |
| | | | | | | | 15,000,000 | Leasehold Interest |
| | | | | | | | 10,000,000 | Extra Expense |
| | | | | | | | 180 Days | Extended Period of Indemnity |
| | | | | | | | 90 Days | Newly Acquired / Constructed Property |
| | | | | | | | | DEDUCTIBLES |
| | | | | | | | 24 Months | Business Interruption |
| | | | | | | | 24 Hours | Service Interruption |
| | | | | | | | 50,000 | Any Loss, Damage or Expense |
| | | | | | | | 10,000 | Retail Store Locations |
| | | | | | | | 100,000 | Flood |
| | | | | | | | 50,000 | Earth Movement |
| | | | | | | | 10,000 | Equipment Breakdown |
| | | | | | | | 24 Hours | Time Element |
| | | | | | | Ins Com | | |
| | | | | | | C N A | | |
| | | | | | | | LIMITS | COVERAGE/DEDUCTIBLE |
| **Property / B&M** | 8/1/2016 | RMP-5084763065 | J. Smith Lanier & Co. | 706,473.00 | C N A | BINDER Terrorism Included - $18,500 Premium Includes Taxes & Surcharges | 150,000,000 | Policy Limit |
| | | | | Paid to Broker | | | 150,000,000 | Blanket Real & Personal Property |

WEIL:\95685927\8\11727.0012

Exhibit 4-8 to
Credit Agreement

| TYPE | EXP DATE | POLICY NUMBER | BROKER | PREMIUM | Carrier | COMMENTS | LIMITS | COVERAGE/DEDUCTIBLE |
|---|---|---|---|---|---|---|---|---|
| | | | | Paid in full at renewal | | | 67,600,929 | Blanket Business Income |
| | | | | | | | 5,000,000 | Accounts Receivable |
| | | | | | | | 5,000,000 | Scheduled Dependent Property |
| | | | | | | | 75,000,000 | Earthquake - Annual Aggregate |
| | | | | | | | 75,000,000 | Critical New Madrid Areas - Annual Aggregate |
| | | | | | | | 50,000,000 | Critical Pacific N.W. - Annual Aggregate |
| | | | | | | | Included | EDP |
| | | | | | | | Included | Equipment Breakdown |
| | | | | | | | Included | Ammonia Contamination |
| | | | | | | | 10,000,000 | Extra Expense |
| | | | | | | | 75,000,000 | Flood - Annual Aggregate |
| | | | | | | | 5,000,000 | Locations Outside 100 Year Flood Plain |
| | | | | | | | 15,000,000 | Leasehold Interest |
| | | | | | | | 150,000,000 | Named Storm |
| | | | | | | | 1,000,000 | Newly Acquired/ Constructed Property |
| | | | | | | | 5,000,000 | Demolition & Cost of Construction |
| | | | | | | | | DEDUCTIBLE |
| | | | | | | | 50,000 | Each Loss |
| | | | | | | | 100,000 | Due to Flood |
| | | | | | | | 50,000 | Due to Earth Movement |
| | | | | | | | 24 Months | Business Interruption |
| | | | | | | | 180 Days | Extended Period of Indemnity |
| | | | | | | | 24 Hours | Service Interruption |
| | | | | | | Ins Com | | |
| | | | | | | C N A | | |
| | | | | | | | | |

94

Exhibit 4-8 to
Credit Agreement

| TYPE | EXP DATE | POLICY NUMBER | BROKER | PREMIUM | Carrier | COMMENTS | LIMITS | COVERAGE/DEDUCTIBLE |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | LIMITS | COVERAGE/DEDUCTIBLE |
| Umbrella | 8/1/2016 | UMB3106312 | Sterling & Sterling | 80,245.00 | Great American | BINDER Part of National Retail Safety Association Premium Includes NJ State Surcharge - $761.44 | 25,000,000 | General Aggregate |
| | | | | Paid to Broker | | | | |
| | | | | Paid in full at renewal | | | 10,000 | SIR |
| | | | | | | | | |
| | | | | | | | Ins Com | |
| | | | | | | | Great American | |
| | | | | | | | LIMITS | COVERAGE/DEDUCTIBLE |
| Umbrella - Excess 1st | 8/1/2016 | SAX00015176779 | Sterling & Sterling | 24,074.00 | Navigators | BINDER Premium Included in Umbrella - $122,407 Part of National Retail Safety Association | 25,000,000 | XS $25,000,000 |
| | | | | Paid to Broker | | | Ins Com | |
| | | | | Paid in full at renewal | | | Navigators | |
| | | | | | | | | |
| | | | | | | | LIMITS | COVERAGE/DEDUCTIBLE |
| Umbrella - Excess 2nd | 8/1/2016 | 01-5375238 | Sterling & Sterling | 12,398.00 | Lexington | BINDER Premium Included in Umbrella - $92,844 Part of National Retail Safety Association | 25,000,000 | XS $50,000,000 |
| | | | | Paid to Broker | | | Ins Com | |
| | | | | Paid in full at renewal | | | Lexington | |
| | | | | | | | | |
| | | | | | | | LIMITS | COVERAGE/DEDUCTIBLE |
| Umbrella - Excess 3rd | 8/1/2016 | ECO(16)55087235 | Sterling & Sterling | 3,611.00 | Ohio Casualty | BINDER Premium Included in Umbrella - $92,844 Part of National Retail Safety Association | 25,000,000 | XS $75,000,000 |
| | | | | Paid to Broker | | | Ins Com | |
| | | | | Paid in full at renewal | | | Ohio Casualty | |
| | | | | | | | | |

Exhibit 4-8 to
Credit Agreement

| TYPE | EXP DATE | POLICY NUMBER | BROKER | PREMIUM | Carrier | COMMENTS | LIMITS | COVERAGE/DEDUCTIBLE |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | LIMITS | COVERAGE/DEDUCTIBLE |
| WC - AOS | 8/1/2016 | TC2JUB-2922B86-5-15 | J. Smith Lanier & Co. | 371,445.00 | Travelers | BINDER Premium Includes: Taxes & Surcharges $32,163 | 1,000,000 | Bodily Injury by Accident, Each Accident |
| | | | | Paid to Carrier | | | 1,000,000 | Bodily Injury by Disease, Policy Limit |
| | | | | 25% down and 9 installments | | | 1,000,000 | Bodily Injury by Disease, Each Employee |
| | | | | Payments include Premium and Deposit Liability based on LDF | | | 250,000 | Deductible |
| | | | | See Below for break out of Premium and Deposit Payments | | | Ins Com | |
| | | | | | | | Travelers | |
| | | | | | | | | |
| | | | | | | | LIMITS | COVERAGE/DEDUCTIBLE |
| WC - AZ, MA, OR, WI | 8/1/2016 | TRJUB-29922889-0-15 | J. Smith Lanier & Co. | | Travelers | BINDER Premium INCLUDED with WC-AOS | 1,000,000 | Bodily Injury by Accident, Each Accident |
| | | | | Paid to Carrier | | | 1,000,000 | Bodily Injury by Disease, Policy Limit |
| | | | | 25% down and 9 installments | | | 1,000,000 | Bodily Injury by Disease , Each Employee |
| | | | | | | | Ins Com | |
| | | | | | | | Travelers | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | AccessTotalsConvPrem1: | 2,999,283.00 | | | |
| | | | | | | | | |

Exhibit 4-10 to
Credit Agreement

## **Capital Leases**

None.

Exhibit 4-13 to
Credit Agreement

## **Taxes**

None.

Exhibit 4-17 to
Credit Agreement

**<u>Litigation</u>**

None.

Exhibit 4-22 to
Credit Agreement

## Affiliated Transactions

| | Aeropostale, Inc. ("Aero Inc.") | Aeropostale West, Inc. ("Aero-West") | Aeropostale Canada, Inc. ("Aero-Canada") | Aero GC Mgmnt LLC ("GC Mgmt") | P.S. from Aeropostale, Inc. ("PS") | Aeropostale Puerto Rico, Inc. (Aero-PR) | PS Store Puerto Rico | Aeropostale Licensing, Inc. ("Licensing") | Aeropostale Procurement Co., Inc. ("Procure-Co") | GoJane, LLC |
|---|---|---|---|---|---|---|---|---|---|---|
| Interest Expense paid by Aero Inc. to Aero-West on interco balances | Liab | Asset | | | | | | | | |
| Royalty paid by Aero-Canada to Procure-Co for trademark use | | | Liab | | | | | | Asset | |
| Interest Expense paid by Aero-Canada to Aero Inc. on interco balances if any | Asset | | Liab | | | | | | | |
| Interest Expense paid by Aero-Canada to Procure-Co on interco balances if any | | | Liab | | | | | | Asset | |
| Sales Commission paid by GC Mgmt to Aero Inc. for sales of gift cards at store level | Asset | | | Liab | | | | | | |
| Redemption Fee paid by Aero Inc. to GC Mgmt for providing gift card services | Liab | | | Asset | | | | | | |
| Interest expense paid by Aero Inc. to GC Mgmt on interco balances if any | Liab | | | Asset | | | | | | |
| Interest Expense paid by PS to Aero Inc. on interco balances if any | Asset | | | | Liab | | | | | |
| Interest Expense paid by Licensing to Aero Inc. on interco balances (if any) | Asset | | | | | | | Liab | | |
| Sourcing Fee paid by Aero Inc. to Procure-Co. for inventory purchases | Liab | | | | | | | | Asset | |
| Sourcing Fee paid by Aero-West to Procure- Co. for inventory purchases | | Liab | | | | | | | Asset | |

Exhibit 4-22 to
Credit Agreement

| | Aeropostale, Inc. ("Aero Inc.") | Aeropostale West, Inc. ("Aero-West") | Aeropostale Canada, Inc. ("Aero-Canada") | Aero GC Mgmnt LLC ("GC Mgmt") | P.S. from Aeropostale, Inc. ("PS") | Aeropostale Puerto Rico, Inc. (Aero-PR") | PS Store Puerto Rico | Aeroposta le Licensing, Inc. ("Licensin g") | Aeropostal e Procureme nt Co., Inc. ("Procure-Co") | GoJ ane, LLC |
|---|---|---|---|---|---|---|---|---|---|---|
| Sourcing Fee paid by PS to Procure-Co for inventory purchases | | | | | Liab | | | | Asset | |

WEIL:\95685927\8\11727.0012

Exhibit 4-23 to
Credit Agreement

## Excluded Assets

None.

Exhibit 4-28 to
Credit Agreement

## **<u>Collective Bargaining Agreements</u>**

None.

Exhibit 4-31 to
Credit Agreement

## **Material Contracts**

1.  GSI Agreement

2.  Mexico License

Exhibit 4-43to
Credit Agreement

**Deposit Accounts**

| Account Holder | Account Bank | Account Number |
|---|---|---|
| Aeropostale, Inc. | Merrill Lynch, Pierce, Fenner & Smith Incorporated | 5X001A13 |
| Aeropostale, Inc. | Merrill Lynch, Piece, Fenner & Smith Incorporated | 5X001A14 |
| Aeropostale, Inc. | Bank of America, N.A. | 89827831 |
| Aeropostale, Inc. | Bank of America, N.A. | 518002421823 |
| Aeropostale, Inc. | Bank of America, N.A. | 5047642031 |
| Aeropostale West, Inc. | Bank of America, N.A. | 5047642358 |
| P.S. by Aeropostale, Inc. | Bank of America, N.A. | 518005775071 |
| Aero GC Management LLC | Wells Fargo Bank National Association | 4043713965 |
| GoJane LLC | Wells Fargo Bank National Association | 4043713973 |
| Aeropostale Licensing, Inc. | Wells Fargo Bank National Association | 4044373744 |
| Aeropostale, Inc. | Wells Fargo Bank National Association | 4044373751 |
| Aeropostale, Inc. | Wells Fargo Bank National Association | 4251770178 |
| Aeropostale, Inc. | Wells Fargo Bank National Association | 9651481641 |
| Aeropostale Procurement Company, Inc. | Wells Fargo Bank National Association | 4120490776 |
| Aeropostale Procurement Company, Inc. | Wells Fargo Bank National Association | 9626000526 |
| Aeropostale, Inc. | CitiBank, N.A. | 30058705 |

Exhibit 4-45 to
Credit Agreement

## **Dormant Subsidiaries**

1.  Jimmy'Z Surf Co., LLC

Exhibit 5-5 to
Credit Agreement

## Form of Borrowing Base Certificate

(See attached)

**AÉROPOSTALE, INC.**
**Borrowing Base Certificate**

E-MAIL TO: xxx

Dated: _____5/2/2016_____

FAX TO: xxx

**Borrowing Base (Revolving Credit)**

**Inventory**

**Continuing Operations**

Stock Ledger Inventory at Cost as of: _____4/30/2016_____

  PLUS: Acceptable In Transit Inventory

  LESS: Inventory Ineligibles

        Puerto Rico locations
        Adjustment locations
        Closed stores
        Damage reserve
        Promotional Special
        Shrink reserve(1.8% of COGS)
        In transit reserve for estimate (36.3% of In Transit)

        TOTAL INVENTORY INELIGIBLES

Eligible Inventory, as of: _____4/30/2016_____

  Effective Inventory Advance Rate

| Appraised NOLV of Eligible Inventory | | | | Advance Percentage |
|---|---|---|---|---|
| Jan | 97.4% | Jul | 107.5% | 90.00% |
| Feb | 99.3% | Aug | 107.2% | 92.50% |
| Mar | 97.1% | Sep | 100.7% | (month end March - June BBCs) |
| Apr | 98.2% | Oct | 105.8% | |
| May | 99.1% | Nov | 120.6% | |
| Jun | 98.2% | Dec | 118.9% | |

**Inventory Availability (Continuing Operations)**

**Liquidating Stores**

Stock Ledger Inventory at Cost as of: _____4/30/2016_____

  Effective Inventory Advance Rate
    Inventory Availabilty
    Prevailing Discount
**Inventory Availability (Liquidating Stores)**

**Inventory Availability**

**Credit Card Receivables**        4/30/2016

Credit Card Receivables
  LESS Ineligibles:

      Amounts over 5 days
      Accrued fees
Eligible Credit Card Receivables
  Advance Rate
**Credit Card Availability**        **(B)**

**Trade Name**

Appraised Value of Eligible Trade Names
  Implied Advance Rate
**Trade Name Availability (Capped at $25M)**        **(C)**

LESS Reserves:

      Gift Certificates (50% of outstanding)
      Landlord reserve (2 months rent PA, VA, WA) & past due rent
      Self insurance reserve (1 month based on 12 months average)
      Texas personal property taxes
      Texas sales tax
      Professional Fee Carve Out

      TOTAL RESERVES        **(D)**

**Gross Borrowing Base Availability (Revolving Credit) (A+B+C+D)**        **(E)**

LESS Crystal Reserve & Cap:

      Availability Reserve (10% of Gross Borrowing Base Availability or $10M min)
      Availability Cap ($100M Availability Cap)

      TOTAL        **(F)**

**Borrowing Base Availability ($100MM Cap) (E+F)**        **(G)**

**AEROPOSTALE, INC.**
**Borrowing Base Certificate**

E-MAIL TO: xxx                                                              Dated:              5/2/2016
FAX TO:  xxx

---

**AVAILABILITY CALCULATION**

**Borrowing Base (Revolving Credit) ($100MM Cap)**                                                    **(H)**

Beginning Principal Balance
                              ADD:                    Prior day's advance
                              LESS:                   Prior day's paydown

Ending principal balance
                    Term Loan
                    Revolver

Total loan balance prior to request                                                                  **(I)**

Availability (Revolving Credit) prior to today's request (H-I)
         ADVANCE REQUEST
**Availability (Revolving Credit) after today's request**

The undersigned, a Responsible Officer of Aeropostale, Inc. (the "Borrower"), represents and warrants that the information set forth above has been prepared in accordance with the requirements of the Secured Superpriority Debtor in Possession Loan, Security and Guaranty Agreement dated as of May 4, 2016 (as amended, restated, supplemented and otherwise in effect from time to time, the "Agreement") among the Borrower, the other Loan Parties, and Crystal Financial, LLC, as Agent for itself and certain other lenders and is complete and correct with respect to the period covered hereby.

Responsible Officer: _____

Print Name: _____

C:\Users\kkhairo\Documents\[ARO - Borrowing Base - 20160503_2020.xlsx]Borrowing Base

Exhibit 6-3 to
Credit Agreement

**Bonds and Deposits**

None.

Exhibit 7-1 to
Credit Agreement

## DDAs

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| 11 | Aero | Citizens Bank eff 8/16/02 | xxxxxx-838-0 aba xxxxx6150 | 195 Franklin Blvd. Philadelphia, PA 19154 Jesse Secunda (484-530-6668) Branch- 215-637-9515 |
| 14 | Aero | Bank of America | xxxxxxxx 1 548 | |
| 19 | Aero W | Bank of America 11/9/2005 Kansas | xxxxxx7090 aba xxxxx0106 | 619 S. Mill Ave. Tempe, AZ 85281 Tel.480-804-9481or 1-888-287- 4637 |
| 20 | Aero | Bank of America 8/4/2014 | xxxxxxxx7098 aba#xxxxx0045 | 125 Town Square Place Jersey City, NJ 07310 Marie Dunn #1-800-715-10000 ext#53224 |
| 22 | Aero | JP Morgan Chase 10/5/2009 | xxxxxx3253 ach#xxxxx1627 deposit routing xxxxx3300 | 5800 Stoneridge Mall Rd. Pleasanton, CA 95466 rep# Ana Reyes ph#212-552-8183 |
| 23 | Aero | PNC Bank NJ 10/3/2011 | xxxxxx7511 deposit routing xxxx-6020 | 1500 Prince Rogers Ave, Bridgewater, NJ 08807 Branch- 908-218-8998 Heather |
| 27 | Aero | Key Bank National Assoc. | xxxxxx6613 ach's# xxxxx1039 deposit routing xxxx0101 | P. O. Box 94825 Cleveland, OH 44101 Tel: 1-888-539-4249 1-800-821-28929 |
| 28 | Aero | Wachovia | xxxxxxxxx3216 aba xxxxx0219 dep.tick aba # xxxxx5258 | Commercial Customer Service 1525 W/T/ Harris Blvd Charlotte, NC 28288-1146 Tel: 800-222-3 862 |
| 29 | Aero | Chase Bank | xxx-xxx5515 ach# xxxxx2337 deposit routing xxxxx1028 | PO Box 6001 Mt. Vernon, NY 10538 Branch-845-623-0469 |
| 30 | Aero | JP Morgan Chase | xxxxxx7917 aba#xxxxx0021 deposit routing xxxxx1028 | Staten Island Mall 2655 Richmond Avenue Staten Island, NY 10314 Tel: 718-761-4105, Kathy Roma |
| 31 | Aero | Bank of America | #xxxxxxxx1722 aba#xxxxx0045 | Rockaway Mall 301 Mt. Hope Ave. Rockaway, NJ 07866 rep# Teresa Duggal 800-699-7188 ext#26143 |
| 34 | Aero | M & T Bank | xxxx3836 ach#xxxx0046 deposit routing xxxxx0020 | 1282 longPond Road Rochester, NY 14626 Main Branch-585-225-9729 Branch- 585-453-9793 |
| 35 | Aero | Citizens Bank Effective 8/46/02 | xxxxxx-585-8 deposit routing xxxxx6150 | Ross Park Mall Office 1000 Ross Park Mall Drive Pittsburgh, PA 15237 Branch- 412-366-9710 Fax: 412-366-9468 |
| 36 | Aero | BB & T Bank | xxxxxxxxx6122 | 4507 Shelbyville Rd |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| | | 2/4/2007 | deposit routing xxxxx0680 tran code (13) | Louisville, KY 40207 Cindy Bettler ph 502-891-2676 fax 502-891-2666 |
| 37 | Aero | TD Banknorth | xxxxxx4826 ach #xxxx1360 deposit routing xxxx0136 | Commerce Atrium 1701 Route 70 East Cherry Hill, NJ 08034-5400 Branch- 856-667-6400 Andrew Krause Branch. Cherry or Frank |
| 38 | Aero | Wells Fargo Bank aba #121000248 to fund acct when store is in debit balance switched account number only 7/3/10 | xxxxxx5860 ach# xxxxx0076 deposit routing xxxxx0392 | 65 N. Winchester Blvd. Santa Clara, CA Patricia Barclay Ph#303-470-8908 |
| 41 | Aero | US Bank 9/2/2014 | xxxxxxxx9814 aba#xxxxx0848 deposit routing xxxxx0032 | 1400 Torrence Ave. Calumet City, IL 60409 Rep, Tarmecia Meeks Ph#513-632-4849 |
| 43 | Aero | M & T Bank | xxxxxx0324 xxxx2955 deposit routing xxxxx0059 | 300 Lycoming Mall Cir., # 2024 Pennsdale. PA 17756 Danielle Ph (570) 546-8303 Fax (570) 546-6852 |
| 46 | Aero | Wachovia 4/15/2003 | xxxxxxxxx3216 aba xxxxx0219 | 1205 Grape Street, PA2006 Whitehall, PA 18052 Nancy Chenoweth Ph 610-264-5505 Fax 610-264- 5269 |
| 49 | Aero | PNC 10/3/2011 | xxxxx7375 deposit routing # xxxx6020 | 312 West Route 38 Morrestown, NJ 08057 Tel: 800-762-3955 -Branch- 609- 272-0748 |
| 50 | Aero | Salem Five Bank | xxxxxx1621 aba#xxxxx0558 | 210 Essex Street Salem, MA 01970 800-322-2265 ext#3500 Nichol #781-231-2153 |
| 51 | Aero | Bank of America 6/29/2007 | xxxxxxxxx0234 xxxxx0045 | 100 N Broadway Wichita, KS 67202 Ph. 888-852-5000 fax. 316-261-4446 |
| 52 | Aero | JP Morgan Chase 10/1/2009 | xxx-xxx682-4 ach#'xxxxx0021 deposit routing xxxxx2305 | 300 Sunrise Mall Shopping Center Sunrise Highway and Carmens Road Massapequa, NY 11758 Nelida, bank rep. Branch- 516-797-5131 -fax 516- 799-1874 |
| 54 | Aero | Citibank, N.A. 6/22/2006 combo store with #3224 | xxxxxx6009 ach & deposit routing xxxxx0089 | PO 5780 Grand Central Sta. New York, NY 10163 Branch- 212-290-7711 Bryan 212-290-7701 Michael Lonecke 212-629-4853 direct phone Leslie Cuzano |
| 57 | Aero | Citizens 1/31/2015 | xxxxxx2691 aba#xxxxx3103 | 5 Eastview Mall Dr. Victor, NY 14564 Lin Boscarino branch#585-223-0110 |
| 58 | Aero | Bank of America 11/9/2005 | xxxxxx4524 aba xxxxx0106 | Route 17 & Route 4 Paramus, NJ 07652 Branch-201-845-5450 fax 201-845-4745 |
| 59 | Aero | M & T Bank store closed | xxxx5537 aba xxxxx0046 | East Henrietta Office 44 Exchange Street |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| | | | deposit routing xxxxx0020 | Rochester, NY 14614-2097 Branch- 585-427-2906 |
| 62 | Aero | Key Bank Tax ID # 13-3354541 | xxxxx1172 deposit routing xxxx3290 | 2000 Walden Ave Suite B-216 Cheektowaga, NY 14225 ph#716-683-0481 1-888-539-4249 |
| 65 | Aero W | Bank of America 11/9/2005 | xxxxxx7100 aba xxxxx0106 | Del Amo Fashion Center Torrance, CA |
| 66 | Aero | TD 7/22/2013 | xxxxxx2879 aba#xxxxx3093 deposit routing xxxx-1020 | 855 Franklin Ave. Garden City, NY 11530 Denise Mc Cabe Ph#603-222-9653 |
| 67 | Aero | Capital One | xxxxxx9283 ach# xxxxx7912 deposit routing xxxx0110 | 2003 Smith Haven Plaza Lake Grove, NY 11755 1-800-655-2265 Usman/Nicole helped me out- melissa |
| 68 | Intentionally omitted | Intentionally omitted | Intentionally omitted | Intentionally omitted |
| 70 | Aero | Bank of America 11/9/2005 | xxxxxx4540 aba xxxxx0106 | 100 Federal Street Boston, MA 02106 Tel: 888-267-2627 |
| 71 | Aero | Bank of America 2/2/2009 | xxxxxxxx2165 ach#xxxxx0045 aba#xxxxx0106 | 4300 West Saginaw Lansing, MI 48917 Jean Pemper Ph#800-654-8506 ext 5760 fax#617-235-2580 |
| 75 | Aero | Wachovia 7/30/2007 | xxxxxxxxx3216 aba xxxxx0219 | Judy Gonsales ph 800-590-7868 team 600 ext 47758 fax 866-842-0585 |
| 77 | Aero | First Tennessee Bank | xxxxx7707 ach & deposit routing# xxxxx0367 | 2221 Hamilton Place Blvd. Chattanooga, TN 37421 Mariam Smith or Alicia Detweiler-Lorenz Branch- 423- 756-1011 |
| 78 | Aero | Pennstar Bank | xxxxx9514 ach's xxxxx2110 deposit routing # xxxx1010 | Financial Center 409 Lackawanna Ave. Suite 201 Scranton , PA 18503-2045 Branch- 570-341-8000 |
| 81 | Aero | First Union National Bank | xxxxxxxxx5435 | Attn: CIC-MC 9288 P.O. Box 740074 Atlanta, GA 30374 Branch- 770-275-3862- 800-222- 3862 |
| 84 | Aero | Wachovia new account as of 6/20/00 | xxxxxxxxx3216 aba xxxxx0219 | 3400 Satellite Boulevard Duluth, Georgia 30096 Velma Warren,Branch-770-813- 4630 1-800-275-3862 -fax 770-813-4639 |
| 85 | Aero | Huntington National Bank | xxxxxxx2032 deposit routing xxxxx0078 | P.O. Box 6054 Indianapolis, IN 46206-6054 Branch- 317-841-0346 Fax #317-841-0348 |
| 86 | Aero | Bank of America | xxxxxxxx3570 open in kansas | P.O. Box 4899 Atlanta, GA 30302-4899 Tel: 800-299-2265 branch- 770-423-5177 Nancy O'Brien |
| 87 | Aero | Key Bank | xxxxxxxx1 130 | Key Bank Branch 563 |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV¹ | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| | | open 4/99 | Aba<br>xxxx8501<br>deposit routing<br>xxxx3290 | 1 Crossgates Mall Road<br>Albany, NY 12203<br>Branch- 518-869-0890 Mary Fax: 518-869-0985 |
| 88 | Aero W | Bank of America | xxxx-xxxx-2390<br>open in kansas | P.O. Box 29966<br>Phoenix, AZ 85038-0966<br>800-432-1000 |
| 89 | Aero | First Niagara previously HSBC | xxx-xx291-0<br>ach#xxxxx0440<br>deposit routing<br>#xxxx-2000 | Route 6 at Lee Boulevard<br>Yorktown Heights, NY 10598 branch #914-962-7283<br>customer service 1-800-421-0004 |
| 90 | Aero | TD Bank | xxxxx6266<br>ach's# xxxxx3093<br>deposit routing<br>xxxx-1020 | Trumbull Branch<br>Trumbull, CT 06601-1899<br>1- 800-526-9846 Branch-203-452-2401, fax 203-365-6574 |
| 91 | Aero | M&T Bank As of 3/29/02 | xxxx2521<br>aba xxxxx0092<br>deposit routing<br>xxxxx0004<br>tran code (97) | 5107 Concord Pike<br>Wilmington, DE 19803 Joyce Worsley<br>800-523-2378, 302-472-3322 |
| 92 | Aero | PNC Bank<br>10/3/2011 | xx-xxxx-8146<br>deposit routing<br>xxxxx0053<br>deposit routing #<br>xxxx-2020 | 3 Oxford Valley Mall<br>Langhorne, PA 19047<br>Branch- 215-750-8600<br>877-287-2654 |
| 93 | Aero | JP Morgan Chase<br>10/28/2013 | xxxxx3591<br>aba#xxxxx0021<br>deposit routing<br>xxxxx1028 | 36 E. Midland Ave. Paramus, N.J. 07652 rep: Tonya Williams ph# 646-582-7278 |
| 99 | Aero | JP Morgan Chase<br>10/30/2009 | xxxxxx5897<br>ach #xxxxx0021<br>deposit routing<br>xxxxx2305 | 5230 Kings Plaza<br>Brooklyn, NY 11234 Maria Prezioso<br>tel: 718-692-5850 |
| 100 | Aero | JP Morgan Chase<br>10/28/2013 | xxxxx0175<br>aba#xxxxx0021<br>deposit routing<br>xxxxx1028 | 387 Passaic Ave.<br>Fairfield, N.J.<br>rep: Tonya Williams ph# 646-582-7278 |
| 102 | Aero | Sovereign<br>8/5/2013 | xxxxxx 1160<br>aba#xxxxx2691<br>deposit routing<br>xxxxx5205 | 576 Park City Center<br>Lancaster, PA 17601-2711 Andrew Eckman or Dolores Williams<br>ph#717-299-3745 |
| 103 | Aero | Huntington National Bank | xxxxxxx5443<br>deposit routing<br>xxxxx5032<br>tran code (920) | 67844 Mall Ring Road<br>St. Clairsville, OH 43950<br>Anita, Carol DeBonis<br>Branch- 740-695-4101<br>Deluxe #1-800-328-7205 deposit slips |
| 104 | Aero W | Bank of America<br>11/9/2005 | xxxxxx7113<br>aba xxxxx0106<br>ACH ABA# xxxxx0045 | P.O. Box 27128<br>Concord, CA 94520<br>800-622-8731 (california business phone # ) |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| | | | | clark american 800-234-6147 |
| 105 | Aero | First Niagara 9/4/2009 | xxxxxx2961 ach#xxxxx0440 deposit routing xxxx-2000 | 711 Mall Circle Drive Monroeville, PA 15146 Diane ph#412-373-8881 |
| 106 | Aero | Bank of America 11/9/2005 | xxxxxx4553 aba xxxxx0106 | Natick mall #4061 Natick Mall ( Rte 9 West ) Natick, MA 01780, Amy ops mgr or Martha Branch 508-653-4044 or 1-800- 767-8637 |
| 108 | Aero | Bank of America 10/25/2013 | xxxxxxxx5398 aba#xxxxx0045 | 1803 Biscayne Blvd. Aventura, FL 33180 rep: Marie Dunn 1-888-715-1000 ext#53224 branch #305-792-4552 |
| 109 | Aero | Key Bank | xxxxx7792 ach# xxxxx1039 deposit routing xxxx0101 | P. O. Box 94825 Cleveland, Oh 44101 1- 800-891-8918 Branch- 216-689-8481 |
| 110 | Aero | Capital One | xxxxx0096 ach & deposits xxxxx1981 tran (01) | 21100 Dulles Town Center Dulles, VA 20166 Linda Howard, Branch- 301-987- 2265 Fax: 703-406-7343 - 800-987- 2265 |
| 111 | Aero | Bank of America 2/2/2009 | xxxxxxxx2097 ach#xxxxx0045 aba#xxxxx0106 | 44100 Schoenherr Rd. Sterling Heights, MI 48313 Jean Pemper Ph#800-654-8503 ext5760 fax#617-235-2580 |
| 112 | Aero | TD Bank 10/13/2012 | xxxxxx2314 ach#xxxxx0545 deposit routing# xxxx-1020 | 50 Holyoke St. Holyoke, MA 01040 Linda Metras (413-532-0156) ext#170 Danielle Bteancur (413-532-0156) ext#171 |
| 113 | Aero | Huntington National Bank 9/15/2014 | xxxxxxxx3725 ach & deposit routing# xxxxx3473 tran code (920) | 4584 Miller Road Flint, MI 48507 Erica Roots Ph#248-320-8975 branch#810-733-1502 |
| 114 | Aero | Huntington National Bank | xxxxxxxx4689 deposit routing xxxxx5032 tran (920) | P. O. Box 6054 Indianapolis, IN 46206-6054 Carla Branch- 317-888-3100 Fax #317-888-2674 1-800-284-4090 |
| 116 | Aero | Key Bank | xxxxx00346 ach#xxxxx1039 deposit routing xxxx-0101 | University Park 525 W. Cleveland Mishawaka, IN 46545 Branch -219-237-5374 Cash management: Tel: 219-296- 2432 Fax: 219-237-5509 |
| 117 | Aero | Wachovia | xxxxxxxxx3216 aba xxxxx0219 | 10 Xavier Dr. Yonkers, NY 10704 Branch#914-963-8705 1-800-222-3 862 |
| 118 | Aero | Citibank, N.A. store closed | xxxx1835 | 123 East 86th Street |

113

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---------|--------|-----------|----------|---------|
| | | | | New York, NY 10028 1-800-627-3999,   Branch 212-348-4866 |
| 120 | Aero | M&T 1/8/2010 | xxxxxx5464 ach #xxxxx0113 deposit routing xxxxx0033 | 11175 Mall Circle Waldorf, MD 20603 ph#301-705-7837 fax#301-932-5188 rep# Sharon Coates ph#410-244-4207 |
| 123 | Aero | JP Morgan Chase | xxxxx9656 deposit routing xxxxx0037 | Great Lakes Mall Branch 0142 7850 Mentor Avenue Mentor, OH 44060 Attn. Venessa, Branch-440-352- 5531 |
| 124 | Aero | First Tennessee | xxxxx2250 ach's & deposits xxxxx7195 | Knoxville Branch 3031-a/13 Mall Road North Knoxville, TN 37924 Sandra Irick, 865-971-2100 Branch phone no. 865-549-1710 |
| 127 | Aero | Wachovia | xxxxxxxxx3216 aba xxxxx0219 | P.O. box 2870 Jacksonville, FL 32231 Branch-239-277-5980 1-800-669-6996 |
| 129 | Aero | PNC Bank 10/3/2011 | xxxxxx2634 deposit routing # xxxx6020 | 2431 Main St. Lawrenceville, NJ 08648 Branch 609-896-2097 or 2081 1-877-287-2654 Money Rm 1- 800-399-2260 1800-762-2265 |
| 130 | Aero | Bank of America 11/9/2005 | xxxxxx4579 aba xxxxx0106 | 186 Columbia Turnpike Florham Park, N.J. 07932 ph# 973-377-2580 |
| 131 | Aero | Wachovia | xxxxxxxxxx3216 aba xxxxx0219 | Branch Address: 1214 Hooper Avenue Toms River, NJ 08753 1-800-566-3862, Branch-732-244- 2000 |
| 132 | Aero | HSBC as of 8/14/00 | xxxxx5930 deposit routing xxxxx1088 | Walt Whitman Mall Huntington Station, NY 11746- 4147 Branch #631-423-7201 Fax #631-423-9847 |
| 133 | Aero | US Bank Dec 05 rolled to TRECS | xxxxxxxx9687 deposit routing xxxxx0032 | 513-632-4141 1-800-627-7827 branch #513-870-0833 |
| 134 | Aero | PNC Bank 10/3/2011 | xxxxxx5846 deposit routing # xxxx6020 | P. O. Box 17700 New Brunswick, NJ 08906-7700 Tel: 877-287-2654 |
| 136 | Aero | Chase Bank | xxxxxx5956 deposit routing xxxx0047 | 235 Main Street White Plains, NY 10601 Branch-914-682-0240 Fax: 914-682-9526 Felicia Etiene |
| 137 | Aero | Bank of America 11/9/2005 | xxxxxx4582 aba xxxxx0106 | One Bethleham Plaza Bethlehem, PA 18018-5781 Branch-'215-659-6101 Debbie 1-800-282-2265 |
| 138 | Aero W | Bank of America | xxxxxx7126 | P.O. Box 27128 Concord, CA 94520 |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| | | 11/9/2004 | aba xxxxx0106 | 1-800-432-1000<br>Maria Rector EXT 7500 |
| 139 | Aero | First Niagara<br>HSBC was bought by First Niagara | xxx-xx850-0<br>ach#xxxxx0440<br>deposit routing<br>xxxx-2000 | 541 Route 211 East<br>Middletown, NY 10940<br>Carmen branch #845-692-4436<br>customer service 1-800-421-0004 |
| 140 | Aero | M&T<br>8/30/2008 | xxxxxx8626<br>ach# xxxxx0046<br>deposit aba# xxxxx0020 | 2100 Park St.<br>Syracuse, NY 13208 ph#315-474-2280 fax# 315-474- 4208 |
| 141 | Aero W | Bank of America Aero West | xxxxxx7139<br>aba xxxxx0106 | P.O. Box 27128<br>Concord, CA 94520<br>Branch #925-692-6351<br>Corporate #800-622-8731 order deposit slips |
| 142 | Aero | First American Bank<br>new bank and new account | xxxxxxx6101 deposit routing<br>xxxxx2777<br>tran code (031) | Kristina Jackson<br>847-403-8307 Personal Banker Branch-847-816-9100<br>Fax #847-816-2193 |
| 143 | Aero | First American Bank | xxxxxxx4502<br>deposit routing<br>xxxxx2777<br>tran code (031) | 80 Stanford Drive<br>Bloomingdale, IL 60108 Paul Gendusa<br>Ph 630-295-6889 x 100 |
| 144 | Aero | TD<br>10/4/2010 | xxxxxx0551<br>aba#xxxxx1360<br>deposit routing<br>xxxx1020 | 1450 Clements Bridge Rd. Deptford, NJ 08096<br>Maria King or Leah Ph#856-845-2059 Fax#856-845- 3475 |
| 145 | Aero | Wachovia | xxxxxxxxx3216<br>aba xxxxx0219 | 18 Gariatt Road<br>Attn: Account Inquiries<br>Upper Darby, PA 19082<br>Tel: 800-222-3 862<br>1-800-473-3862    Fax 800-214-6988 |
| 146 | Aero | JP Morgan Chase | xxxxxxxx6344<br>deposit routing<br>xxxxx013 | Mail Suite 0314<br>Chicago, IL 60670-0314<br>847-240-6450<br>800-404-4111 customer service |
| 147 | Aero | JP Morgan Chase | xxxxxxxxxx1558<br>deposit routing<br>xxxxx1029 | Fox valley - Aurora Branch Lynn Pfieffer - Asst.<br>Branch Manager<br>Branch-630-851-3416 |
| 148 | Aero | Wachovia | xxxxxxxxx3216<br>aba xxxxx0219 | 18 Gariatt Road<br>Attn: Account Inquiries<br>Upper Darby, PA 19082<br>Tel: 800-222-3862, Branch-203- 944-4043 |
| 150 | Aero | Bank of America<br>11/9/2005 | xxxxxx4595<br>aba xxxxx0106 | P.O. Box 6858<br>Freehold, NJ 07728 Tel: 1-800-727-8637 |
| 152 | Aero | PNC Bank<br>10/3/2011 | xx-xxxx-7052<br>deposit routing<br>xxxxx0089<br>Deposit routing #<br>xxxx-8020 | Client Services - Tel: 877-824- 5001<br>222 Delaware Ave.<br>Wilmington, DE 19899<br>Dawn Davis, Eden Square Branch302-292-0864 |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| 153 | Aero | Bank of America | xxxxxxx3583 | P.O. Box 27025<br>Richmond, VA 23261-7025 Tel: 800-432-1000 |
| 154 | Aero | Bank of America<br>2/26/2007 | xxxxx9960<br>xxxx0045 | 100 N Broadway Wichita, KS 67202 Ph. 888-852-5000 fax. 316-261-4446 |
| 157 | Aero | JP Morgan Chase Bank | xxxxxxxx2782<br>deposit routing<br>xxxxx1026 | One Indiana Square MI400 Indianapolis, IN 46206<br>Branch-219-738-4254<br>1-800-433-8248 |
| 158 | Aero | M & T Bank | xxxx7171<br>ach# xxxx0046<br>deposit routing<br>xxxxx0020 | P.O. Box 767 (Boulevard Mall) Buffalo, NY 14240<br>Branch-716-832-4051<br>Fax: 716-834-1476 |
| 159 | Aero | JP Morgan Chase | xxxxx4919<br>deposit routing<br>xxxxx0037 | 2687 Fairfield Commons Beavercreek, OH 45431<br>Angie Owens or Hope Day<br>Ph 937-443-6205 Fax 937-443- 6255 |
| 160 | Aero | Bank of America | xxxxxxx3596<br>xxxxx0045 | Regional Center, VA2-125-04-01 PO Box 27025<br>Richmond, VA 23261-7025 Tel: 800-232-5252 |
| 162 | Aero | Suntrust Bank | xxxxxxxxx3668<br>deposit routing<br>xxxxx2152<br>wires xxxxx0104 | Lake Mary Office - 0039<br>P.O. Box 628096<br>Orlando, FL 32897 Branch-407-850-6591, 1-800-786- 8787 |
| 164 | Aero | BB&T<br>as of 10/14/03 | xxxxxx2814<br>deposit routing<br>xxxxx4260<br>tran code (13) | 11400 Midlothian Turnpike Richmond, VA 23235<br>Branch-804-697-5341, Fax-804- 897-7629<br>Barbara Byrd, mgr |
| 166 | Aero | JP Morgan Chase<br>6/10/2013 | xxxxx9761<br>aba#xxxxx0021<br>deposit routing<br>xxxxx1028 | 8921 Queens Blvd Elmhurst, NY 11373 rep: Joe Opulski<br>646-582-7278 |
| 167 | | First Niagara<br>5/24/2012<br>HSBC was bought by First Niagara | xxxxx6620<br>ach#xxxxx0440<br>deposit routing<br>xxxx-2000 | 3935 Route 31<br>Liverpool, NY 13090<br>David Marchant<br>Ph 315-622-0509 Fax 315-622- 0474 |
| 169 | Aero | M&T<br>as of 12/2007 | 090782624<br>ach# xxxxx0046<br>deposit routing<br>xxxxx0020 | 4630 Commercial Drive<br>P O Box 718<br>New Hartford, NY 13413-0718 Branch: 315-736-0513    Fax: 315-736-1041<br>Francine Butler |
| 171 | Aero | Dollar Bank<br>8/11/2003 | xxxxxx3739<br>ach's & deposits<br>xxxxx4385 | 988 E. Pittsburgh Street Greensburg, PA 15601<br>Cathy Daversa<br>Ph 724-836-7455 Fax 724-836- 8829 |
| 172 | Aero | M&T Bank | xxxx-7342<br>deposit routing<br>xxxxx0004<br>tran code (97) | Rodney Square North<br>1100 North Market St.<br>Wilmington, DE 19890<br>Branch- 302-735-2010 -1800-523- 2378 |
| 174 | Aero | Chase Bank | xxx-xxx8161<br>xxxxx0021<br>deposit routing<br>xxxx0047 | P. O. Box 6001<br>Mt. Vernon, NY 10538<br>Branch- 516-823-3601<br>Fax: 516-872-4240 Louise Borelli |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| 175 | Aero | Lafayette Bank and Trust open 6/23/99 | xxxxxx7729<br>deposit routing<br>xxxxx1009 | 133 North 4th Street<br>Lafayette, IN 47902-1130 Tracey Linder<br>Branch- 765-423-3821 |
| 176 | Aero | TD Banknorth | xxx-xxx8312<br>deposit routing<br>xxxx1020 | Newington Office<br>P. O. Box 4548<br>Postsmouth, NH 03802-4548 Branch- 603-433-2808, 603-430- 3812 |
| 178 | Aero | Citizens Bank<br>6/15/2007 | xxxxxx0078<br>deposit routing<br>xxxxx3103 | 1300 Ulster Ave, Suite 110 Kingston, NY 12401<br>PH: 845-336-7920<br>Fax: 845-336-7922<br>Duane Wolff |
| 183 | AeroW | Bank of America<br>change to aero west August | xxxxxx3567<br>open in kansas | P. O. Box 29966<br>Phoenix, AZ 85038-0966<br>1-800-944-0404<br>1-800-234-6147 Clark American |
| 184 | Aero | Key<br>8/18/2014 | xxxxxxxx4460<br>ach#xxxxx0077<br>deposit routing<br>xxxx-3290 | 388 Route 59<br>Central Nyack, NY 10960<br>rep Alisa Renck #513-830-1039 Christine or Dovy branch 845-826-0517 |
| 185 | Aero | Capital One | xxxxxx 1082<br>deposit routing<br>xxxx0110 | 1701 SUNRISE HWY BAY SHORE, NY 11706<br>PH. 631-665-3500<br>FAX. 631-665-8834 |
| 186 | Aero | M&T Bank<br>Formerly Allfirst effective 7/03<br>same acct # | xxxxxx 1852<br>deposit routing<br>xxxxx0113 | New Town Office<br>9780 Groff Mill Drive<br>Owings Mills, MD 21117<br>Branch Manager: Judith E. Volley Tel: 410-654-8406 Fax: 410-654- 8409<br>Customer Service -800-724-6070 |
| 188 | Aero | Suntrust<br>2/1/2010 | xxxxxxxxx2833<br>ach# xxxxx0104<br>deposit routing<br>xxxxx0046 | 2020 Old Fort Pkwy<br>Murfreesboro, TN 37129<br>Branch ph# 615849.7211<br>Yolanda Greene ph#615-849-7211 Fax# 615-849-7104 |
| 189 | Aero | Comerica<br>10/3/2011 | xxxxxx2356<br>aba#xxxxx0096<br>deposit routing<br>xxxxx7772 | 14700 Pardee<br>Taylor, MI 48180 Gerry Ziemba<br>Ph#734-287-3051<br>customer service #313-564-5717 |
| 190 | Aero | Key Bank Open 4/99 | xxxxxxxx1379<br>deposit routing<br>xxxx0101 | 2950 Miamisburg - Centerville Road<br>Dayton, OH 45459<br>Felicia Paterson Branch 937-439- 0603 |
| 191 | Aero | Wachovia closing on 2/5/07 | xxxxxxxxx3216<br>aba xxxxx0219 | 18 Gariatt Road<br>Attn: Account Inquiries<br>Upper Darby, PA 19082<br>Tel: 800-222-3862, PRESS 706 at recording |
| 192 | Aero | Bank of America 5/1/2011 | xxxxxxxx9569<br>aba#xxxxx0045 | 14 North Main St.<br>Manchester, CT 06042<br>Anute Boonyachai<br>Ph# 1-800-657-9533 ext# 50657 |
| 194 | Aero | Citizens Bank | xxxxxx9286 | Mall of New Hampshire 1500 South Willow Street |

117

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| | | | deposit routing xxxxx1533 | Manchester, NH 03103 Steven Scheiner Tel: 603-634-5550  Fax: 603-634-5551 Carol # 603-770-5975 order deposit slips |
| 195 | Aero | Bank of America 11/9/2005 | xxxxxx4618 aba xxxxx0106 | Mail Stop CT OP 0009 260 US Route 1 New London, CT 06320 Stella Bergeson     860-447-6181 |
| 196 | Aero | Capital One 6/30/1999 | xxxxx 1941 aba#xxxxx1981 deposit routing xxxxx1981 tran code (01) | Springfield Mall Branch 6609 Springfield Mall Springfield, VA 22150 Bob Koehler 703-924-1251 Tel: 800-987-2265 |
| 197 | Aero | Wachovia Open 7/16/99 | xxxxxxxxxx3216 aba xxxxx0219 | 185 Annapolis Mall Annapolis, MD 21401 Jennifer Stumpf Tel: 800-704-0883 |
| 198 | Aero | JP Morgan Chase 8/3/2004 ach incoming wires: 071- 000-013 | xxxxx2627 deposit routing xxxxx1029 | 15100 LaGrange Road Orlando Park, IL 60462 Jane Zabelka Ph 708-873-7701 Fax 708-873- 7748 Corporate #888-434-3030 |
| 200 | Aero | TD Bank | xxxxx3547 ach's #xxxxx0545 deposit routing xxxx1020 | P.O. Box 6159 Peabody, Massachusetts 01961- 6159 Evelyn or Kim 978-531-5414 |
| 201 | Aero | PNC 10/3/2011 | xxxxxx5891 deposit routing xxxxx0096 deposit routing # xxxx-0120 | 7401 Market Street Boardman, OHIO 44512 Fax: 330-726-3362 Karen Pancake Ph 330-742-4083 |
| 202 | Aero | Bank of America 2/2/2009 | xxxxxxxx2107 ach#xxxxx0045 aba#xxxxx0106 | 831 Brown Rd. Lake Orion, MI 48359 Jean Pemper Ph#800-654-8503 ext5760 fax#617-235-2580 |
| 203 | Aero | B B & T Bank open 7/15/99 | xxxxxx 1772 deposit routing xxxxx1607 tran code (13) | 2152 Northwoods Blvd. Charleston, SC 29406 Colleen Hufford Tel: 843-937-6740 Fax: 843-569- 2121 |
| 204 | Aero | US 2/1/2010 | xxxxxxxx8095 ach #xxxxx0848 deposit routing xxxxx0032 | Mall of America 9633 Lyndale Ave. S Bloomington, MN 55420 Diana Vance Ph# 216-623-9248 |
| 206 | Aero | Wachovia Bank 10-Aug BAI in effect 2/1/2005 | xxxxxxxxx3216 aba xxxxx0219 depock tick aba xxxx9527 | Medical Park Office 2000 South Hawthorne Road Winston-Salem, NC 27103 Attn.: Roxanne Nifong-Lackey Ph 336-765-0414- fax 336-768- 9775 |
| 207 | Aero | Chemical 7/30/2010 | xxxx3208 ach & deposit xxxxx0013 | 4495 Wilson Avenue Grandville, MI 49418 Pam Davis ph#616-588-7588 |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| 208 | Aero | Citizens Bank 10-Aug | xxxx5132<br>ach & deposit#<br>xxxxx0120 | 189 Canal Street<br>Providence, RI 02903<br>Tel: 401-282-2523  800-862-6200<br>Michael Gervasini  Fax: 401-455-5508 |
| 209 | Aero | Bank of America<br>9-Nov | xxxxxx4621<br>aba xxxxx0106 | 670 George Washington Highway Route 116N<br>Lincoln, RI 02865<br>400 East Main Street          (Branch)<br>Meriden, CT<br>Shaun Callahan 203-634-7130 Kimberly J. Schwartz - branch manager |
| 214 | Aero | Key Bank effective 3/5/04 | xxxxxxxx6717<br>ach's xxxxx1039<br>deposit routing<br>xxxx0101 | 17333 Southpark Center Strongsville, OH 44136<br>Donna Steinc<br>Ph 440-238-2300 Fax 440-238- 2314 |
| 215 | Aero | PNC Bank<br>10/3/2011 | xxxxxx5131<br>deposit routing<br>xxxx0096<br>new for 2010<br>deposit routing #<br>xxxx0120 | 445 W. Colliseum Blvd. Fort Wayne, IN 46805 Tel. 260-373-0512<br>Reneta Rhurairatnam |
| 216 | Aero | Bank Champaign | xxx0327<br>deposit routing<br>xxxxx4614<br>tran code (41) | South Neil at Devonshire Drive Champaign, IL 61824-1490 Tracy A. Lutz 217-351-2876 |
| 218 | Aero | Chase Bank | xxxxx0265<br>ABA xxxxx0037<br>deposit routing<br>xxxxx1027 | 3265 W. Market Street<br>Summit Mall # 170<br>Akron, OHIO 44333<br>Amy Lorentz Tel: 330-972-1930 |
| 219 | Aero | JP Morgan Chase | xxxxx7890<br>deposit routing<br>xxxxx1027 | Ohio/West Virginia Markets<br>PO Box 260180<br>Baton Rouge, LA 70826-0180 Ph 330-972-9250 |
| 220 | Aero | Old National Bank | xxxxx8151<br>deposit routing<br>xxxxx0012<br>tran code (10) | 2718 E. Third Street<br>Bloomington, IN 47401 Ralph Huestis<br>Branch #812-330-2680 Fax #812-331-4022 |
| 221 | Aero | Old National Bank | xxxxx5829<br>aba xxxxx5829<br>deposit routing<br>xxxxx0012<br>tran code (10) | 1001 McGalliard Road<br>Muncie, IN 47303<br>Leah Beeson<br>Ph 765-284-6191 Fax 765-284- 6209<br>1800-43 1 -Bank |
| 223 | Aero | Wachovia Bank<br>12/11/2003<br>BAI<br>2/1/2005 | xxxxxxxxx3216<br>aba xxxxx0219 | 702 Haywood Road Greenville, SC 29607<br>Ph 864-239-1913 Fax 864-676- 9366 |
| 224 | Aero | Bank of America<br>11 /9/2005 | xxxxxx4634<br>aba xxxxx0106 | BRANCH: 908-351-2270 |
| 226 | Aero | Comerica Bank 12/12 rolled to bai | xxxxxx2356 | Meridian Mall |

WEIL:\95685927\8\11727.0012

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| | | reporting | aba xxxxx0096 deposit routing xxxxxx772 | 1982 East Grand River Ave. Okemis, MI 48864 Ken Pyciak Tel: 517-349-0091 fax 517-349-6340 |
| 227 | Aero | Huntington National Bank | xxxxxxx9046 deposit routing xxxxx5016 tran code (920) | 10 E Main Str Salineville, OH 43945 Jeff Apardian 419 254-7052 ext 3216 419 473-2249 fax Jim 412-227-4862 |
| 228 | Aero | PNC Bank 5/13/2005 10/3/2011 PNC acquired Riggs bank | xxxxxx7025 aba xxx0030 deposit routing xxxx4020 | 2720 Potomac Mills Circle Woodbridge, VA 22192 Ph 877-287-2654 |
| 229 | Aero | Bank of America 11/9/2005 | xxxxxx4647 aba xxxxx0106 | Coventry Mall Route 724 and 100 Pottstown, PA 19465 Linda M Robinson Tel: 610-327- 1110 Fax: 610-970-2197 BRANCH: 610-327-1110 |
| 230 | Aero | First Tennessee | xxxxx7093 deposit routing xxxxx1398 | 7082 Bakersbridge Road Franklin, Tennessee, 37064 Agnes Nichols 615-790-5130 |
| 231 | Aero | Bank of America 2/2/2009 | xxxxxxxx2123 ach#xxxxx0045 aba#xxxxx0106 | 25230 Michigan Avenue Dearborn, MI 48124 Jean Pemper Ph#800-654-8503 ext 5760 fax#617-235-2580 |
| 233 | Aero | Exchange Bank of Alabama | xxxx8345 aba #xxxxx4129 tran code (120) | 3003 Rainbow Drive Gadsen, AL 35901 Joyce Frohock PH 256-442-3003 |
| 235 | Aero | Regions  merged AmSouth 12/7/07 | xxxxxx8065 ach# 'xxxxx0019 deposit routing xxxxx0017 | 5236 Hickory Hollow Parkway Antioch, TN 37013 Sheri Parsons or Lisa Griffith phone 615-736-6130 |
| 236 | Aero | Bank of America 11/9/2005 | xxxxxx4650 aba xxxxx0106 | Pheasant Lane Mall 310 DW Highway Nashua, NH 03060 Joanne Mahoney Tel: 603-888-9952 |
| 238 | Aero | First Financial Bank | xxx1940 aba xxxxx0356 deposit routing xxxx1010 | Honey Creek Mall 3401 S. US Hwy 41 Terre Haute, IN 47802 Brenda Thomson, 812-238-6437 |
| 239 | Aero | Regions merged AmSouth 12/7/07 | xxxxx8902 ach# xxxxx0019 deposit routing xxxxx0017 | 900 Rivergate Parkway Goodlettsville, TN 37072 Karen Wallace phone 615-748-2706 Fax 615- 748-2704 |
| 240 | Aero | Wachovia 5/1/2011 | xxxxxxxxx3216 aba#xxxxx0219 | 1201 Walnut St. Cary, NC 27511 Karen Singletary 404-214-1432 |
| 241 | Aero | Huntington National Bank | xxxxxx5460 aba xxxxx0024 on- line banking pin 3880 last 4 of tax ID | 17 South High Street Attn. MA10 Columbus, OH 43215 Stephanie Schleppi mall booth 614-480-0161, beth4004, sharron 4442 |
| 242 | Aero | United National Bank | xxxx5864 ach & deposit routing# xxxxx0395 | 234 Grand Central Mall Vienna, WV 26105 Michael Sweet or Sheila phone 304-485-3811 |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV¹ | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| | | | | fax#304-485-3824 |
| 243 | Aero | First Tennessee<br>10/17/2014 | xxxxx4848<br>aba#xxxxx1450 | 2112 North Roan St. Johnson City, TN 37601 Adam Snapp<br>Ph#423-461-1733 |
| 244 | Aero | TCF<br>11/24/2008 | xxxxxx4002<br>ach#xxxxx0001<br>deposit routing<br>xxxxx3501 | 2989 White Bear Ave. Maplewood, MN 55109<br>Sarah Wadi<br>ph# 612-460-4616 |
| 246 | Aero | JP Morgan Chase | xxxxx3300<br>ach# xxxxx0037<br>deposit routing<br>xxxxx1027 | Mail Code OH2-5210<br>1805 Brittian Road<br>Akron, OH 44310<br>ph 330-972-1915; fax 330-972- 1390<br>Chastity Booth, Mary Anne Nutter |
| 247 | Aero | Chemical Bank | xxx4431<br>deposit routing<br>xxxxx0013<br>tran code (636) | 333 E. Main Street<br>Midland, MI 48640-0231 Keith A Wenzel<br>Ph 989-790-1202<br>Fax #989-790-9080 |
| 248 | Aero | Trustco Bank | xxxx4510<br>ach# xxxx-x0912<br>deposit routing<br>xxxxx1317 | 3065 Route 50<br>Saratoga Springs, NY 12866 Chris Jordan<br>Ph 518-583-1716 |
| 249 | Aero | Wells Fargo<br>3/11/2012 | xxxxxx0565<br>ach #xxxxx0248<br>deposit routing<br>xxxxx0392 | 912 Tunnel Rd.<br>Asheville, NC 28805 Karen Singletary<br>Ph#404-214-1432 Branch #828-255-2455 |
| 250 | Aero | Wells Fargo | xxxxx6877<br>aba xxxxx0019<br>deposit routing<br>xxxxx0392 | 100 West Burnsville Parkway Burnsville, MN 55337<br>Annette Schilling 612-316-3794, fax 3797<br>Mall branch 90 W. County Highway 42<br>Burnsville, MN 55337 800-225-5935 order slips<br>800-289- 3557 |
| 251 | Aero | Fifth Third Bank<br>12/12/05 rolled to bai reporting | xxxxxx0280<br>deposit routing<br>xxxxx0004 | 1250 North Green River Road<br>Evansville, IN 47715<br>Cindy Lucke<br>Ph 812-474-2745 Fax 812-474- 2746 |
| 252 | Aero | Bank of America<br>11/9/2005<br>combo with #3288 | xxxxxx4663<br>aba xxxxx0106 | 414 Union Street<br>Nashville, TN 37239-1697 Jacqueline J. Wilson<br>Tel: 615-749-3863 Fax: 615-749- 3378 |
| 253 | Aero | Montgomery First National Bank<br>effective 3/24/03 | xxxx9773<br>ach's & deposits<br>xxxxx7761<br>tran code (009) | 180 Crestwood Plaza<br>St. Louis, MO 63126<br>Flery Langholz<br>Ph 314-962-8888 Fax 314-213- 4501 |
| 255 | Aero | Harris Bank St. Charles | xxxxxx7695<br>ach #xxxxx4478<br>deposit routing<br>xxxx0029<br>tran code (20) | 1 East Main Street<br>St. Charles, IL 60174-1981 Charlotte. E. Johnson-Dunlop<br>Ph 630-377-6894 Fax 630-377- 7157<br>1888-489-2265 |
| 257 | Aero | PNC Bank<br>10/3/2011 | xxxxxx1237<br>deposit routing<br>xxxxx0096 | One National City Center, Suite 100<br>Indianapolis, IN 46255<br>317-267-7902 |

WEIL:\95685927\8\11727.0012

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| | | | deposit routing #<br>xxxx0120 | ph; 317-267-7905 fax<br>Amy Fukumoto, Vicki |
| 258 | Aero | Capital One | xxxxxx4530<br>deposit routing<br>xxxxx0001<br>tran code (01) | 7935 Tysons Corner Center Mclean, VA 22102<br>Missa Khatib<br>Ph 703-883-3915 Fax 703-883- 3918 |
| 259 | Aero | Bank of America<br>11/9/2005 | xxxxxx4689<br>aba xxxxx0106 | 7045 Arundel Mills Blvd. Hanover, MD 21076<br>Ph 410-799-4330 |
| 260 | Aero | Chemung Canal<br>3/11/2012 | xxxxx9744<br>ach & deposit routing#<br>xxxxx1115 | 29 Arnot Rd.<br>Horseheads, NY 14845<br>Brenda Radford<br>Ph# 607-739-0373 ext#7503 |
| 262 | Aero | Wachovia | xxxxxxxxx3216<br>aba xxxxx0219 | 6300 Arbor Place Boulevard Douglasville, GA<br>30135 770-920-3700 #4, phone Sherrie Wylie,<br>manager |
| 263 | Aero | Capital City Bank | xxxxxx9901<br>deposit routing<br>xxxxx0688<br>tran code (131) | Governor's Square Mall Office P.O. Box 900<br>Tallahassee, FL 32302-0900 ph 850-402-7500-fax<br>850-878-9120 |
| 265 | Aero | US<br>5/20/2011<br>Bank of America | xxxxxxxx8391<br>ach#xxxxx0848<br>deposit routing#<br>xxxxx0032<br>xxxxxx4702 | 2400 Maple Grove Rd.<br>Duluth, MN 55881<br>Rep: Becky Matthews ph#314- 418-2920<br>branch #218-723-2903 |
| 267 | Aero | Mellon Bank<br>Switched to Aero 267 - June '00<br>CLOSED | xxx-xxx-6816 | 195 Franklin Blvd.<br>Philadelphia, PA 19154<br>Tel: 1-800-362-5510 option #4 Fax: 215-281-1705<br>Ealine |
| 268 | Aero | Magna<br>3/14/2014 | xxx0545<br>aba & deposit routing<br>xxxxx4395 | 4445 Poplar Avenue Memphis, TN 38117 Christie<br>McCormack ph#901-309-4969 |
| 269 | Aero | Bank of America<br>3/21/2006 | xxxxxx0195<br>aba xxxxx0045 | 100 N Broadway Wichita, KS 67202 Ph. 888-852-<br>5000 fax. 316-261-4446 |
| 271 | Aero | Liberty Federal Savings and Loan<br>Association | xxxx0165<br>ach's & deposits<br>xxxxx1146 | 698 Belair Road, Suite h-6<br>Bel Air, MD 21014<br>Amy Chmielewski<br>Ph 410-879-3568 Fax 410-879- 7016 |
| 272 | Aero | Regions Bank<br>merged AmSouth 12/7/07 | xxxxxx1458<br>ach & deposit routing<br>xxxxx0019 | 331 University Boulevard Tuscaloosa, AL 35401<br>Tel: 800-267-6884<br>Patsy Montague Tel 391-5770 |
| 273 | Aero | BB&T | xxxxxxxxxx0094<br>deposit routing<br>xxxxx3394 | Box 2015 Meadowbrook Mall Bridgeport, WV<br>26330<br>ph 304-842-7313, fax 304-842- 5280 Will<br>Charlotte Sidow, Barb Brewer |
| 274 | Aero | PNC<br>10/3/2011 | xxxxxx9728<br>aba#<br>xxxxx0096<br>new for 2010<br>deposit routing # | 3902 Milan Road<br>Sandusky, OH 44870 Judy Edinger<br>Ph 419-621-2980 Fax 419-621- 2986 |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| | | | xxxx0120 | |
| 275 | | Commerce 9/20/2013 | xxxxx3964 ach & deposit routing xxxxx0019 | 1339 E. Empire St. Bloomington, IL 61701 Jamie Czesak Ph# 309-823-3281 |
| 276 | Aero | Riggs National Bank | xxxx9610 | 1201 Wisconsin Ave NW Washington, DC 20007 Tel: 202-835-5591 Mrs. Lyles |
| 277 | Aero | Bank of America 11/9/2005 | xxxxxx4715 aba xxxxx0106 | 495 Union Street Waterbury, CT 06702 Debra Neri Ph 203-757-8404 Fax 203-757- 8442 |
| 278 | Aero | Bank of America 9/25/2006 | xxxxxxxx1378 xxxxx0045 | White Marsh Mall Branch Baltimore, MD 21236 Casey Carrow Ph 410-986-1970 Fax 410-986- 1975 |
| 280 | Aero | First Citizen's Bank | xxxxxx3513 deposit routing xxxxx1007 | 8541 Concord Mills Blvd. Concord, NC 28027 Tracey Jacobs Ph#704-979-3165 Fax#704-979-3166 |
| 282 | Aero | Wachovia | xxxxxxxxx3216 aba xxxxx0219 dep.tick xxxx9527 | 3430 Wrightboro Raod Augusta, GA 30909 Lori Evans Ph 706-667-2256 Fax 706-868- 4640 |
| 283 | Aero | Wachovia | xxxxxxxxx3216 aba xxxxx0219 | Independence Center 3750 Oleander Drive, NC3241 Wilmington, NC 28403 Wally Simpson PH 910-793-3710 Fax 910-793- 3707 |
| 284 | Aero | Conway National 4/4/2010 | xxxxxxxx8301 ach & deposit xxxxx2318 tran (103) | 9726 Highway 17 North Myrtle Beach, SC 29572 Suzette Jackson Ph# 843-449-3373 Fax# 843-449- 9967 |
| 285 | Aero | PNC Bank | xxxxxx7786 deposit routing xxxx-4010 | 611 E. Arlington Blvd. Greenvile, NC 27858 Brian Landreth Ph 252-551-7800 Fax 252-551- 7805 |
| 286 | Aero | Key Bank | xxxxxxxx1 116 ABA xxxxx1039 deposit routing xxxx0101 | 688 N-Lex Springmill Road Mansfield, OH 44906 Sue Schell Ph 419-529-5214 Fax 419-529-9934 |
| 287 | Aero | Sovereign Bank as of 10/18/04 | xxxxxxxx7531 aba xxxx5150 deposit routing xxxxx5203 | 791 Purchase Street New Bedford, MA 02740-6300 Tricia Farrington Ph 508-994-6155 |
| 288 | Aero | Fifth Third Bank 12/12/05 rolled to bai reporting | xxxxxx0280 deposit routing xxxxx0000 checking aba# xxxxx0314 | Eastland Banking Center 2810 S. Hamilton Road Columbus, OH 43232 Judy Holzbacher Ph 614-864-1870 Fax 614-864- 1732 |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV¹ | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| 289 | AERO | Comerica Bank<br>12/12/05 rolled to bai reporting | xxxxxx2356<br>ach# xxxxx0096<br>deposit routing<br>xxxxx7772<br>tran code (36) | 3215 28th Street<br>Grand Rapids, MI 49512<br>Sherrie<br>Ph 616-957-0551 Fax 616-957- 3419 |
| 290 | Aero | First Citizens Bank | xxxxxx8818<br>ach#xxxxx0300<br>deposit routing<br>xxxxx1007 | 1862 Highway 70 South East Hickory, NC 28602<br>Cassie Hensley<br>Ph 828-326-1186<br>branch #828-326-1163 |
| 291 | Aero | Wachovia Bank wachovia acquired<br>Southtrust<br>11/08/05 | xxxxxxxxx3216<br>aba xxxxx0219 | consolidated accounts<br>any questions call Judy Goncalves at 800-590-7868 |
| 292 | Aero | First Westroads Bank | xx8813<br>deposit routing<br>xxxxx1497 | 15750 West Dodge Road Omaha, NE 68118<br>Kathy Hess<br>Ph 402-391-7204 Fax 402-391- 2793 |
| 293 | Aero | Chase Bank<br>10/15/2007 | xxxxx3835<br>xxxxx0021<br>deposit routing<br>#xxxxx1028 | 655 Old Country Rd. Riverhead, NY 11901 Tonya Williams<br>Ph#212-622-6172<br>branch# 631-727-7700 |
| 294 | Aero | Citizens Bank Effective 8/16/02 | xxxxxx9274<br>deposit routing<br>xxxx1155 | 1250 Baltimore Pike<br>Springfield, PA 19064<br>Lisa Carey-Kerr<br>Ph 610-328-2184 Fax 610-328- 3363 |
| 297 | Aero | Comerica Bank<br>12/12/05 rolled to bai reporting | xxxxxx2356<br>aba xxxxx0096<br>deposit routing<br>xxxxx7772 | 35795 Gratiot Avenue<br>Clinton Township, MI 48035 Gwen Rashid, Sharon<br>Ph 586-791-0801<br>fax 586-791-7112 |
| 299 | Aero | Capital One<br>4/5/2009 | xxxxxx5107<br>ach# xxxxx0090<br>deposit routing<br>xxxxx0001<br>tran code (01) | 6920 Bluebonnett Blvd.<br>Baton Rouge, LA 70810<br>Giatana White<br>Ph#504-533-5344 or 504-533- 3016 |
| 300 | Aero | US<br>4/4/2011 | xxxxxxxx7963<br>aba xxxxx0848<br>deposit routing<br>xxxxx0032 | 312 Raintree Rd. Mankato, MN 56001 Mary Kaisershot<br>Ph 507-387-9460<br>Rep Becky Matthews #314-418- 2920 |
| 301 | Aero | Wachovia<br>11/1/2005 | xxxxxxxxx3216<br>aba xxxx0219 | Wachovia consolidated aects<br>any questions call Judy Goncalves at Wachovia<br>800-590-7868 |
| 303 | Aero | TCF National Bank | xxxxxx9511<br>aba xxxxx0001<br>deposit routing<br>xxxxx3501 | 1801 Plymouth Road Minnetonka, MN 55305-1963<br>John D Gahley<br>877-784-8239<br>branch 763-786-9603 |
| 304 | Aero | Bangor Savings Bank 9/12/2007 | xxxxxx5113<br>deposit routing<br>xxxxx4382<br>tran code (20) | 687 Hogan Rd ,Bangor , ME 04401<br>Ph: 207-942-4818<br>Fax: 207-942-4819<br>Cindy Stevens |
| 305 | Aero | Chemung Canal Trust Co.<br>4/30/2012 | xxxxx5979<br>ach & deposit routing# | 601-635 Harry L. Drive Johnson City, NY 13790<br>Dalia Gates |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| | | | xxxxx1115 | ph#607-729-6347<br>fax#607-729-0151 |
| 306 | Aero | US Bank<br>8/22/2007 | xxxxxxxx8316<br>ach# xxxxx0848<br>deposit routing<br>xxxxx0032 | 1350 Euclid Ave, Cleveland , OH 44115<br>Bath Ladd<br>216 902-7858 ph 216 623-9303 fax |
| 307 | Aero | Huntington National Bank | xxxxxxx6170<br>deposit routing<br>xxxxx0024<br>tran code (920) | 2055 Polaris Parkway Columbus, OH 43240 Branch<br>#614-480-0700 Fax #614-480-0706 Bank Officer<br>Usha |
| 308 | Aero | US Bank<br>Dec 05 rolled to TRECS<br>Formerly Firstar Bank | xxxxxxxx9794<br>deposit routing<br>xxxxx0032 | P.O. Box 1800<br>Saint Paul, Minnesota 55101-0800 1-800-872-2657<br>Branch #314-487-6759<br>Fax #314-416-2570 |
| 310 | Aero | First Citizens Bank | xxxxxxxx5791<br>aba# xxxxx1836<br>deposit routing<br>xxxxx1007 | 1959 Valley View Blvd<br>Roanake, VA 24012<br>M. Beth Ruffing<br>PH 540-985-3270 Fax 540-985- 3204 |
| 312 | Aero | Key Bank | xxxxxxxx3243<br>deposit routing<br>xxxx3290 | 1080 McKinley Mall Blasdell, NY 14219 Darlene<br>Ph 716-827-4488<br>Fax 716-824-1419 |
| 313 | Aero | Bank North, N.A.<br>formely known as: Peoples Heritage<br>Bank | xxxxx4427<br>ach #xxxxx4450<br>deposit routing<br>xxxx1020 | 250 Maine Mall<br>So. Portland, ME 04106 Gwen Mercier<br>Ph 207-774-7675<br>Fax 207-828-2991 |
| 314 | Aero | US Bank<br>Dec 05 rolled to TRECS<br>Formerly Firstar Bank | xxxxxxxx9802<br>deposit routing<br>xxxxx0032 | 7200 Harrison Ave.<br>Rockford, IL 61112<br>Ph 815-332-5834   Fax 815-332-<br>4603<br>Rep (Amie Staggs) 513-632-4847 |
| 315 | Aero | Associated Bank | xxxxxx4519<br>aba# '075900575<br>deposit routing<br>xxxxx0202 | 6550 N. Illinois Street<br>Fairview Heights, IL 62208-2028 Joann Blank<br>Ph 618-622-4244 Fax 618-632- 6663 |
| 316 | Aero | Wachovia<br>5/21/2006 | xxxxxxxxx3216<br>aba xxxxx0219 | |
| 317 | Aero | United National Bank | xxxxx9799<br>ach & deposits<br>xxxxx0395 | 1079 Charleston Town Center Mall<br>Charleston, WV 25389<br>Karen Buckley<br>Ph 304-345-8550<br>Fax304-345-7621 |
| 319 | Aero | Town & Country Bank | xxx3614<br>deposit routing<br>xxxxx3262<br>tran (42) | 2501 W. Wabash Ave. Springfield, IL 62704 Attn:<br>Shannon G. Estes Ph (217) 787-3100<br>Fax ( 217) 698-0303 |
| 330 | | US Bank<br>Dec 05 rolled to TRECS | xxxxxxxx9695<br>deposit routing<br>xxxxx0032 | 6320 W. Markham<br>Little Rock, AR 72205<br>Annabelle Cabrera<br>Ph 501-661-0536 Fax 501-661- 1328 |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| 332 | | Bank of America 2/2/2009 | xxxxxxxx2136 aba#xxxxx0106 ach#xxxxx0045 | 6551 West 95th Street Chicago Ridge, IL 60415 Jean Pemper Ph#800-654-8503 ext5760 fax#617-235-2580 |
| 333 | Aero | Huntington National Bank | xxxxxxx8206 deposit routing xxxxx0078 | 4000 Pendleton Way Indianapolis, IN 46226 Chris Shaw Ph 317-269-4648, 800-284-4090 Fax #317-639-7260 |
| 334 | Aero | Citizens National Bank 6/24/2006 | xx2296 aba xxxxx8216 deposit routing xxxxx3253 | One Heritage Center 855 Central Avenue Ashland, KY 41105-2247 Pamela L. Fultz Ph 606-920-7305 Fax 606-920- 7350 |
| 335 | | PNC Bank 10/3/2011 | xxxxxx7409 deposit routing xxxxx0096 new for 2010 deposit routing # xxxx-0120 | 1637 North Memorial Drive Lancaster, OH 43130 Fonda Ph 740-687-1888 Fax 740-681- 4083 |
| 336 | | First Commonwealth | xxxxxx5579 ach# xxxxx6826 deposit routing xxxx-0001 | Logan Valley Mall Route 220 and Plank Road @ Goods Lane Altoona, PA 16602 Karen or Cory Ph 814-947-4904 Fax 814-946- 4723 |
| 337 | Aero | Sovereign Bank 2/14/2005 | aba# xxxxx2691 deposit routing xxxxx5205 | 1-877-768-1145 |
| 338 | Aero | PNC Bank 10/3/2011 | xxxxx8681 ABA xxxx0096 new for 2010 deposit routing # xxxx-0120 | 6020 West Jefferson Boulevard Fort Wayne, IN 46804 Anita Moreno Ph 260-434-0652 McBee 260- 760-8444 Fax 219-434-0673 |
| 339 | | Bank of America 11/9/2005 | xxxxxx4744 aba xxxxx0106 xxxx013 8 | 1 Main Street Leominster, MA 01453 Aphrodite Ph 978-840-8321 Fax 978-537- 2624 |
| 340 | Aero | US Bank Dec 05 rolled to TRECS Formerly Firstar Bank | xxxxxxxx9810 ach# xxxxx0848 deposit routing xxxxx0032 | P.O. Box 1800 Saint Paul, Minnesota 55101-0800 1-800-685-5065 |
| 341 | Aero | Fifth Third Bank | xxxxxx0280 ach's xxxxx0004 deposit routing xxxxx0000 | (Western Michigan) 1850 East Paris Grand Rapids, MI 49546 231-798-4503 ph |
| 342 | Aero | Susquehanna | xxxxxx5201 deposit & ach's xxxxx0318 | 2951 Whiteford Road York, PA 17402 Sue Ellen Ranieri Ph (717) 755-6414 Fax (717) 757-0097 |
| 344 | Aero | Banknorth Massachusetts | xxxxxx5360 | 660 Merrill Road Pittsfield, MA 01201 Robin |

WEIL:\95685927\8\11727.0012

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| | | | xxxxx0545<br>deposit routing<br>xxxx1020 | Sabato<br>Ph 413-499-7687 Fax 413-499-1684 |
| 346 | Aero | PNC Bank<br>10/3/2011 | xxxxxx8938<br>deposit routing<br>xxxxx0096<br>new infor 2010<br>deposit routing #<br>xxx00120 | 6300 Robinson Centre Drive Pittsburgh, PA 15205<br>Ph. 412-787-5700<br>Fax. 412-787-5252<br>Branch Mgr. Janet E. Lipartia |
| 347 | Aero | Wayne Bank | xxxx8627<br>deposit routing<br>xxxxx8548 | 600 Stroud Mall<br>Stroudsburg, PA 18360 Diane Oney<br>Ph 570-424-3330<br>Fax 570-424-3335 |
| 348 | Aero | Bank of America<br>11 /9/2005 | xxxxxx4757<br>aba xxxxx0106 | Mail Stop: CT EH NB00329 1201 Boston Post Road<br>Milford, CT 06460<br>Terry MacPhail<br>Ph 203-882-7050<br>Fax 203-882-7121 |
| 349 | Aero | Sovereign Bank | xxxxxx6156<br>ach's xxxxx2691<br>deposit routing<br>xxxxx5205 | 1665 State Hill Road M3 Wyomissing, PA 19610<br>Attn: Angie Lattanzio Ph (610) 320-7543<br>Fax (610) 375-2244 |
| 351 | Aero | Wells Fargo Bank<br>5/22/2013 | xxxxxx6350<br>aba#xxxxx0248<br>deposit routing#<br>xxxxx0392 | 101 W. Dekalb Pike<br>King of Prussia, PA 19406 Karen Singletary<br>Ph#404-214-1432 |
| 355 | Aero | KeyBank | xxxxxxxx2131<br>bank transit xxxxx0295<br>deposit routing<br>xxxx0101 | 4565 Eastgate Blvd. Cincinnati, OH 45245 Attn:<br>Raylina Lillich Ph ( 513 ) 752-1781 |
| 356 | Aero | BB&T<br>as of 10/14/03 | xxxxxx2575<br>deposit routing<br>xxxxx4260<br>tran code (13) | 497 Southpark Circle<br>Colonial Heights, VA 23834 Attn: Susan B.Webb<br>Ph ( 804 ) 526-0772<br>Fax (804 ) 520-8384 |
| 358 | Aero | Wells Fargo as of 12/08/04 | xxxxxx6885<br>aba xxxxx0058<br>deposit routing<br>xxxxx0392 | 6940 O Street<br>Lincoln, NE 68516<br>Ph. 402-434-6141<br>Fax. 402-434-6151<br>Branch Mgr. Jon Whitmire |
| 361 | Aero | First American Bank | xxxxxxx4101<br>deposit routing<br>xxxxx2777<br>tran code (03 1) | 261 South Western Ave Carpentersville, IL 60110<br>Attn: Erin Caudill<br>Ph (847)551-4416 Ext 103 Fax (847) 426-1066 |
| 362 | Aero | Bank of America<br>11/9/2005 | xxxxxx4760<br>aba xxxxx0106 | 601 Donald Lynch Boulevard Marlboro, MA 01752<br>Attn: Beverly G. Brown<br>Ph (508) 303-0737<br>Fax (508) 303-6501 |
| 363 | Aero | Wachovia | xxxxxxxxx3216<br>aba xxxxx0219 | 3275 Bufford Drive Buford, GA. 30519 Attn:<br>Audrey Thorson Ph (770) 831-2968 |

WEIL:\95685927\8\11727.0012

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| 364 | Aero | Associated Bank | xxxxxx9213<br>aba xxxxx5855<br>deposit routing<br>xxxxx0202 | 201B Northwoods Mall<br>Peoria, IL 61613 Attn: Marva Grant Ph (309) 688-3404 Fax (309) 688-5088 |
| 366 | Aero | M & I Bank | xxxxxx1503<br>deposit routing<br>xxxx0600 | 500 3rd Street<br>Wausau, WI 54402 Attn: Pat Krohn<br>Ph (715)847-4292 Fax (715) 847-4328 |
| 367 | Aero | JP Morgan Chase | xxxxxxxx0876<br>ach#xxxxx0326<br>deposit routing<br>xxxxx1025 | 4512 24th Ave<br>Fort Gratiot, MI 48059<br>Attn: Sandra Varney<br>Ph (810) 385-5311 or 1-800-225- 5623<br>Fax (810) 385-4430 |
| 368 | Aero | M & T Trust Company | xxxxx0138<br>deposit routing<br>xxxxx2955 | Susquehanna Valley Mall A-1 Sellingsgrove, PA 17870 Attn: Sandy Krehel<br>Ph (570) 374-8108<br>Fax: (570) 374-6232 |
| 371 | Aero | Comminity Bank N.A.<br>10/7/2013 | xxxxxx3411<br>ach & deposit routing<br>xxxxx7559<br>tran (20) | 1218 Arsenal St.<br>Watertown, NY 13601 Margaret Farone<br>branch#315-785-3640 fax#315-785-0871 |
| 372 | Aero | Community Bank N.A. | xxxxxx8731<br>ach & deposit routing<br>xxxxx7559<br>tran (20) | Champlain Center<br>60 Smithfield Blvd. Suite 50 Plattsburgh, NY 12901<br>Kathryn Reynolds<br>Ph (518) 561-7490 Fax (518) 561-7583 |
| 373 | | Fifth Third Bank<br>12/12/2005<br>rolled to bai reporting | xxxxxx0280<br>deposit routing<br>xxxx0000 | 7840 Mall Road<br>Florence, KY 41042<br>Nancie Lane<br>Ph 859-371-6626 Fax 859-371- 8140 |
| 374 | Aero | First National Bank<br>STORE CLOSED 2/27/12 | xx4043<br>deposit routing<br>xxxxx2274<br>tran code (009) | 2406 Grand Avenue<br>Ames, IA 50010 Attn: Kathy Dunham<br>Ph #515-232-5569 |
| 377 | Aero | BB&T<br>formerly<br>Bank of Loiusville | xxxxxx6663<br>deposit routing<br>xxxxx0680<br>tran code (13) | Attn: Steven Bartlett Ph (502) 810-0400 Fax (502) 810-0426 |
| 378 | Aero | Peoples United<br>7/16/2010 | xxxxx8133<br>deposit routing<br>xxxxx2186 | University Mall<br>155 Dorset Street<br>South Burlington, VT 05401<br>Ph 802-658-1444 Fax 802-863- 2295 |
| 379 | | Bank of America<br>11/9/2005<br>kansas | xxxxxx4773<br>aba xxxxx0106 | 99 Rockingham Park Blvd. Salem, NH 03079<br>Gary Rockwell<br>Ph 603-894-5882 Fax 603-890- 4935 |
| 380 | | US Bank<br>Dec 05 rolled to TRECS | xxxxxxxx9786<br>deposit routing<br>xxxxx0032 | P.O. Box 1800<br>Saint Paul, Minnesota 55101-0800 1-800-673-3555 |
| 381 | | Ameriserv Financial | xxxx3238<br>deposit routing<br>xxxx0106 | 500 Galleria Drive Suite 100 Johnstown, PA 15904<br>Nanette Richey<br>Ph 814-269-3815 Fax 814-266-2037 |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| 382 | | Regions Bank | xxxxxx9427<br>aba xxxxx2280 | 5901 University Drive<br>Huntsville, AL 35806<br>Beth Carter<br>Ph 256-551-7101 Fax 256-551- 7107 |
| 384 | | US Bank<br>Dec 05 rolled to TRECS Formerly<br>Firstar Bank | xxxxxxxx9778<br>deposit routing<br>xxxxx0032 | P.O. Box 1800<br>Saint Paul, Minnesota 55101-0800 1-800-673-3555 |
| 385 | | Regions Bank | xxxxxx6627<br>aba xxxxx7586<br>deposit routing<br>xxxxx6660 | 5025 Hinkleville Road<br>Paducah, KY 42001<br>Tammy Brasher<br>Ph 270-441-1552 Fax 270-443- 2909 |
| 387 | | BB &T Bank | xxxxxx3341<br>ach & deposit routing#<br>xxxxx4260<br>tran code (13) | 2082 South Pleasant Valley Road Winchester, VA 22601<br>Sandy Hill<br>Ph 540-723-4725<br>apple blossom branch @ mall closed |
| 389 | | First Tennessee Bank | xxxxx6678<br>deposit routing<br>xxxxx0026 | 2750 N. Germantown Pkwy Memphis, TN 38133<br>Joy Panyanouvong<br>Ph 901-3 87-3 800 Fax 901-3 87- 3817 |
| 390 | | Wachovia Bank | xxxxxxxxx3216<br>aba xxxxx0219 | 408 S. Irby Street<br>Florence, SC 29501<br>Larry Welch<br>Ph 843-664-4093 |
| 392 | | Wells Fargo Bank | xxxxxx6893<br>deposit routing<br>xxxxx0392 | 432 South Gammon Road<br>Madison, WI 53719<br>Kevin J. Huff<br>Ph 608-827-2853 Fax 608-833- 6803 |
| 394 | | Fifth Third Bank<br>12/12/05 rolled to bai reporting | xxxxx0280<br>deposit routing<br>xxxxx0000 | 9690 Colerain Avenue<br>Cincinnati, OH 45251<br>Doug Greulich<br>Ph 513-923-4790 Fax 513-245- 1038 |
| 395 | Aero | TD Banknorth merged 11/1/08 | xxxxx0074<br>aba xxxxx1360<br>deposit routing<br>xxxx0136 | 765 Route 18<br>East Brunswick, NJ 08816<br>Erika Shanoff<br>Ph 732-698-1184 Fax 732-698- 1420 |
| 396 | | JP Morgan Chase<br>2/20/2012 | xxxxx3348<br>ach# xxxxx0037<br>deposit routing<br>xxxxx1027 | Easton Town Center<br>4000 Morse Crossing<br>Columbus, OH 43209<br>Branch Jinnie #614-476-1910 Rep Keisha Watkins (212-622- 6172) |
| 397 | | Chase<br>formerly Bank One | xxxxx9489<br>deposit routing<br>xxxxx0037 | 895 Hebron Road Heath, OH 43056 Michael Schenk<br>Ph 740-522-3121 |
| 398 | | Bank of America | xxxxxx3594<br>aba xxxxx0045 | 141 South Rock Road<br>Wichita, KS 67207<br>Vickie Haskell<br>Ph 316-261-2309 Fax 316-683- 2276 |
| 399 | | Bank of America<br>11/9/2005 | xxxxxx4786<br>aba xxxxx0106 | 2733 Midwestern Parkway<br>Wichita Falls, TX 76308 |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| | | | | Michael Hull<br>Ph 940-696-7720 800-432-1000 Fax 940-696-7752 |
| 439 | Aero | Frost<br>9/15/2009<br>temp store | xxxxx0014<br>ach & deposit<br>xxxxx0093<br>tran code (20) | 221 Wonder World Drive San Marcos, TX 78666<br>Barbara Castleberry Ph#512-393-5647 Fax#512-393-5721 |
| 441 | Aero | Athens First Bank & Trust Company<br>12/10/2006 | xxxxxx9382<br>ach# xxxxx0931<br>deposit routing<br>xxxx8888 | 4000 Atlanta Hwy Athens, GA 30622 Eric Quillian<br>706-357-7122<br>706-357-7123 fax |
| 442 | | JP Morgan Chase | xxxxxx6591<br>deposit routing<br>xxxxx1023 | 3250 Rebecca Lane<br>Abilene, TX 79606<br>Josephine Leal<br>Ph 915-674-3900 Fax 915-698- 9266 |
| 444 | | Arvest<br>10/20/2014 | xxxx1650<br>aba#xxxxx0872<br>deposit routing<br>xxxxx0001 | 5000 Rogers Ave. Fort Smith, AR 72903 Donna<br>Ph#479-573-1104<br>Fax#479-573-1114 |
| 445 | | Regions Bank<br>4/4/2011 | xxxxxx6485<br>ach &deposit routing<br>xxxxx4668 | 420 Mary Esther Blvd. Mary Esther, FL 32569<br>Angel Babula<br>Ph 850-833-8222 |
| 446 | | Comerica Bank<br>12/12/05 rolled to bai reporting | xxxxxx2356<br>aba xxxxx0096<br>deposit routing<br>xxxxx7772<br>tran code (36) | 1620 W. Michigan Avenue<br>Jackson, MI 49202<br>Diane Toland<br>Ph 517-788-5144 Fax 517-788- 5363 |
| 448 | Aero | UMB Bank | xxxxx3299<br>deposit routing<br>xxxxx0619<br>tran code (83) | 2079 Penn Square<br>Oklahoma City, OK 73118 Hayley Land<br>Ph 405-239-5800<br>Mary (866-204-3913) |
| 449 | | First American Bank | xxxxxxx9411 deposit routing<br>xxxxx2777<br>tran code (031) | 3205 Mall Loop Drive<br>Joliet, IL 60431<br>Kari Fitzmaurice<br>Ph 815-439-4901 x 103 Fax 815- 439-4910 |
| 450 | | Wells Fargo<br>5/31/10 | xxxxxx5852<br>ach#xxxxx0076<br>deposit routing<br>xxxxx0392 | 200 33rd Ave. S<br>St. Cloud, MN 56301 Pat Barclay<br>Ph#303-470-8908<br>branch #320-203-4200 |
| 451 | | Regions Bank | xxxxxx9632<br>abaxxxxx1387<br>deposit routing<br>xxxxx6660 | 601 East Main Street Carbondale, IL 62901 Paula<br>Buristsch<br>Ph 618-529-2700 |
| 453 | | Bank of America 9-Nov | xxxxxx4809<br>aba xxxxx0106 | 291 Barnstable Road<br>Hyannis, MA 02601<br>Kissi Johnson-Brown<br>Ph 508-790-8124 Fax 508-790- 8125 |
| 454 | | Huntington Bank | xxxxxxx9982<br>deposit routing<br>xxxxx3473 | 3160 S. Airport Road West Traverse City, MI 49684<br>Carol Jenkins<br>Ph 231-922.5760 Fax 231-922- 5774 |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| | | | tran code (920) | banking center 231-922-5607 |
| 455 | | Webster Bank | xxxxxx9681<br>ach# xxxxx0101<br>deposit routing<br>xxxxx0101<br>tran code (012) | 50 Freshwater Blvd.<br>Enfield, CT 06082<br>Amy Trent<br>Ph 860-253-6132 Fax 860-253- 6151<br>1-800-325-2424 |
| 456 | | Bank of America Kansas | xxxxxx2060 | 863-816-1610<br>888-287-4637 |
| 457 | | Huntington Bank | xxxxxx4584<br>deposit routing<br>xxxxx5090<br>tran code (920) | 3573 Maple Avenue<br>Zanesville, OH 43701<br>Tina Dingey<br>Ph 740-455-7059 Fax 740-455- 5707<br>800-480-2001 |
| 459 | | Citizens Union Bank | xxx0000<br>ach 7 deposit routing#<br>xxxxx1854 | 1830 North Dixie Hwy. Elizabethtown, KY 42701<br>Stephanie Hardin<br>Phone: 270-737-4282 (updated 4/19/12)<br>Fax : 270-737-0041 |
| 462 | | PNC Bank<br>10/3/2011 | xxxxxx 1243<br>deposit routing #<br>xxxx-3020 | Route 6 Scranton Carbondale Highway<br>Scranton, PA 18508<br>Carol Milani<br>Ph 570-961-7298 Fax 570-961- 6402 |
| 464 | | Chemical Bank | xxxxxx3303<br>deposit routing<br>xxxxx0013<br>tran code (636) | 3533 E. Wilder Road<br>Bay City, Michigan 48706<br>Barbara Benford<br>Ph 989-894-9898 Fax 989-894- 9895 |
| 465 | | Comerica Bank<br>12/12/05 rolled to bai reporting | xxxxxx2356<br>aba xxxxx0096<br>deposit routing<br>xxxxx7772<br>tran code (36) | 5510 W. Saginaw<br>Lansing, MI 48917 Jennifer Sherwood Ph 517-886-<br>0226 |
| 466 | | Southern Michigan Bank & Trust | xxxxx6634<br>deposit routing<br>xxxxx2283 | 5350 E. Beckley Road Battle Creek, MI 49015 Jean-<br>Marie Warren<br>Ph 517-279-5500 |
| 467 | | Regions<br>merged AmSouth 12/7/07 | xxxxxx7171<br>ach# xxxxx0019<br>deposit routing<br>xxxxx0017 | 128 North 2nd Street Clarksville, TN 37040 Lisa<br>Crabtree<br>Ph 931-553-5201 Ph 931-5201 |
| 468 | | Banknorth | xxxxxx8475<br>aba xxxxx0545<br>deposit routing<br>xxxx1020 | 1800 Boston Road<br>Springfield, MA 01129<br>Diane Ryan<br>Ph 413-748-8525 Fax 413-543- 0714 |
| 469 | | US Bank<br>Dec 05 rolled to TRECS | xxxxxxxx9752<br>deposit routing<br>xxxxx0032 | 105 North Rangeline Road Joplin, MO 64801<br>Chrys Wehmeyer<br>Ph 417-623-5677 Fax 417-623- 5961 |
| 470 | | First Tennessee Bank | xxxxx8628<br>deposit routing<br>xxxxx0367 | 12 Northgate Park<br>Chattanooga,TN 37415<br>Mona Lamb<br>Ph 423-870-3160 Fax 423-870- 3166<br>423-757-4720 order deposit slips |

WEIL:\95685927\8\11727.0012

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| 471 | | Frost Bank | xxxxx6866<br>deposit routing<br>xxxxx0093<br>tran code (20) | 4200 South Hulen Forth Worth, TX 76109<br>Karen Duvall or Roxanne Ph#817-420-5200<br>fax#817-420-5230 |
| 473 | | Bank of America<br>11/9/2005 | xxxxxx4812<br>aba xxxxx0106 | 39 Main Street<br>Watertown, MA 02472<br>Shamci Ghaffari<br>Ph 617-972-1606 Fax 617-923- 4623 |
| 474 | | Associated Bank | xxxxxx5150<br>aba xxxxx1352<br>deposit routing<br>xxxxx0202 | 206 South Broadway Rochester, MN 55904<br>Brenda Schuler, Bernie LeCrone (Contact)<br>Ph 507-285-2626 |
| 475 | Aero | Bank of America open in Kansas | xxxxxxxx9192<br>aba xxxxx0045 | 301 N. Main Street<br>Anderson, SC 29621<br>Diane Smith<br>Ph 864-231-5843<br>Clark American deposit slips 800- 234-6147 |
| 476 | | Bank of America<br>11 /9/2005 | xxxxxx4825<br>aba xxxxx0106 | 1400 Hancock Street Quincy, MA 02169 Kathy<br>Egan-Casy Ph 617-434-7731 |
| 477 | | Bank of America | xxxxxx2044<br>aba xxxxx0045 | |
| 478 | | ColeTaylor Bank | xxxxx7597<br>aba xxxxx0343<br>deposit routing<br>xxxx5999<br>tran (20) | One Yorktown Center<br>Lomboard, IL 60148<br>Barbara Kopp<br>Ph 630-932-3101   Fax 630-629-<br>8338 |
| 479 | Aero | Chase<br>formerly Bank One | xxxxx1313<br>deposit routing<br>xxxxx0137 | 1100 Pecanland Road Monroe, LA 71203 Patsy<br>Schmittzehe<br>Ph 318-345-7710 |
| 481 | Aero W | Bank of America<br>Kansas | xxxxxxxx2361<br>aba xxxxx0045 | 100 N Broadway Wichita, KS 67202<br>Melissa Wolverton<br>888-852-5000<br>800-234-6147 Business Solutions |
| 482 | | Wachovia | xxxxxxxxx3216<br>aba xxxxx0219 | 207 Neshaminy Mall Bensalem, PA 19020 Joseph<br>Knight<br>Ph 215-396-4405 Fax 215-355- 0547 |
| 483 | | Wachovia | xxxxxxxxxx3216<br>aba xxxxx0219 | 4560 Capital Blvd. Raleigh, NC 27604 Melanie<br>919-571-3889 |
| 484 | | Wachovia | xxxxxxxxxxx3216<br>aba xxxxx0219 | 6301 W. New Berry Road Gainsville, FL 32605<br>Ph 352-335-3480 Fax 352-335- 3484 |
| 485 | | Legacy Bank of Texas | xxx3625<br>deposit routing<br>xxxxx1234<br>tran code (03) | 5000 Legacy Drive, Suite 120 Plano, TX 75024<br>Elisa Arellano<br>Ph 972-461-7009 Fax 972-461- 7020 |
| 486 | Aero | PNC Bank merged as of 2012 | xxxxxx0287<br>deposit routing<br>xxxx-5020 | 2085 East University Drive Auburn, AL 36830<br>Lee Oliver<br>Ph 334-826-1150 Fax 334-826- 2064 |
| 487 | | Wachovia | xxxxxxxxx3216 | 9420 Pineville Matthews Road |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| | | | aba xxxxx0219 | Pineville, NC 28134<br>Ph 704-373-6320 Fax 704-383- 5952 |
| 488 | | Comerica Bank<br>12/12/05 rolled to bai reporting | xxxxxx2356<br>aba xxxxx0096<br>deposit tickets routing<br>xxxxx7772<br>tran code (36) | 4200 S. Cooper Street<br>Arlington, TX 76015<br>Karen<br>Ph 817-276-7200 Fax 817-276- 7236 |
| 489 | | US Bank<br>Dec 05 rolled to TRECS | xxxxxxxx9737<br>deposit routing<br>xxxxx0032 | 5000 Frederica Street<br>Owensboro, KY 42301<br>Scott Tucker<br>Ph 270-926-5270 Fax 270-926- 5272 |
| 490 | | PNC Bank<br>10/3/2011 | xxxxx6213<br>deposit routing<br>xxxxx0096<br>deposit routing #<br>xxxx-0110 | 201 South Broad Street<br>Grove City, PA 16127<br>Karen<br>Ph 724-458-9250 Fax 724-458- 0567 |
| 491 | | PNC Bank<br>merged with Fidelity Bank on<br>09/12/07 10/3/2011 | xxxxxx0247<br>ach routing<br>xxxxx0030<br>deposit routing #<br>xxxx-4020 | 1449 S. Potomac Street Hagerstown, MD 21740<br>Shannon Eikelberger<br>Ph 301-745-5833 Fax 301-745- 4952 |
| 492 | | Frost Bank | xxxxx3239<br>deposit routing<br>xxxxx0093<br>tran code (20) | 221 Wonder World Drive<br>San Marcos, TX 78667<br>Barbara Castleberry<br>Ph 512-393-5647 800-562-6732 Fax 512-393-5721 |
| 493 | | The Bank of Delmarva | xxx0810<br>deposit routing<br>xxxxx3065<br>tran code (39) | 4575 Highway 1, Suite 80<br>Rehoboth Beach, DE 19971 Dorene Walton<br>Ph 302-226-8900 Fax 302-226- 8558 |
| 494 | | Suntrust Bank | xxxxxxxxx8002<br>ach# xxxxx0104<br>deposit routing<br>xxxxx0020 | 180 East Market Street Harrisonburg, VA 22801<br>Yvonne Smith<br>Ph 540-568-1015 Fax 540-568- 1099 |
| 505 | Aero | Citizens National Bank 11/4/2005 | xx3546<br>aba xxxxx2255 | 200 Fork at the River Pkwy Sevierville, TN 37862<br>Robin Young<br>Ph. 865-429-7560 or 453-9031 Main<br>Fax 865-429-7906 |
| 507 | | PNC Bank<br>National City Bank<br>10/3/2011 | xxxxxx5504<br>ABA<br>xxxx0096<br>new 2010<br>deposit routing #<br>xxxx0120 | 2629 Scotttsville Road<br>Bowling Green, Ky 42102 Faye Griffith , Kay<br>Madison<br>Ph 270-745-9302 Fax 270-745- 9310 |
| 508 | | Wachovia<br>10/19/2005 | xxxxxxxxx3216<br>aba xxxxx0219 | Caroline Forrest Financial Center 3766 Renee Drive<br>Myrtle Beach, SC 29579<br>Jean Martin<br>Ph. 843-903-5359 |
| 509 | | JP Morgan Chase<br>4/1/2013 | xxxxx3972<br>aba#xxxxx0019 | 9900 39th Ave.<br>Pleasant Prairie, WI 53158 |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| | | | deposit routing xxxxx1028 | Joseph Opulski Ph#212-622-6175 branch#262-697-2280 |
| 510 | | Fifth Third Bank 12/12/05 rolled to bai reporting | xxxxxx0280 deposit routing xxxxx0004 | 1 Fayette Center Washington Court House, OH 43160 Jesse Jamison Ph 740-948-9488 Fax 740-948- 9484 |
| 511 | | PNC Bank 10/3/2011 | xxxxxx4912 ABA xxxx0096 new for 2010 deposit routing # xxxx0120 | 12010 Church Street Birch Run, MI 48415 Connie Tackebury Ph 989-797-9277 Fax 989-797- 9282 |
| 512 | | M & T Bank | xxxxxx0027 ach# xxxxx0046 deposit routing xxxxx0020 | 2443 Military Road Niagara Falls, NY 14304 Kerry White Ph 716-297-1880 Fax 716-290- 1218 1-800-724-2440 |
| 513 | | Queenstown Bank of MD | xxxxx4601 aba xxxxx1957 | 223 Chesapeake Village Road Queenstown, MD 21658 Janet Such Ph 410-827-5101 Fax 410-827- 3370 |
| 514 | Aero | Sun Trust Bank as of 12/08/04 | xxxxxxxxx6145 deposit routing xxxxx2152 | 7677 Dr. Phillips Blvd Orlando, FL 32819 Ph. 407-354-1398 *4 Branch Mgr. Kim Mendel |
| 515 | | Bank of America 5/1/2011 | xxxxxxx1515 aba#xxxxx0045 | 54 Full St. Seneca Falls, NY 13148 Anute Boonyachai Ph# 1-800-657-9533 ext# 50657 |
| 517 | Aero | BB&T as of 10/14/03 | xxxxxxxxx8814 abaxxxxx4260 tran code (13) | 1201 Norwood Street Christiansburg, VA 24073 Rachel Lee Ph 540-381-5710 Fax 540-382- 8813 |
| 518 | Aero | Fifth Third Bank 12/12/05 rolled to bai reporting | xxxxxx0280 xxxxx0004 deposit routing xxxxx0165 | 6488 South Westnedge Avenue Portage, MI 49002 Linda Fricke Ph 269-329-5815 Fax 269-329- 6002 |
| 519 | Aero | M & T Bank 10/19/2007 | xxxxx6485 ach's# xxxx0113 deposit routing xxxxx0059 | 115 J Campbell Collins Dr. Wilkes-Barre, PA 18702 branch#570-823-1067 (Tara) |
| 521 | Aero | Bank of America 5/14/2007 | xxxxxxxx0098 xxxxx0045 | 534 S Kansas Ave Topeka, KS 66603 Kathy Kinsch 888-852-5000 ext 4751 fax 785-295-3433 |
| 522 | Aero | M & I Bank 4/11/2003 | xxxx9987 aba xxxxx0051 deposit routing xxxx0600 | 5454 South 76th Street Greendale, WI 53129 Barbara Manthey Ph 414-423-2380 Fax 414-423- 2387 |
| 526 | Aero | Frost Bank 4/18/2003 | xxxxx8362 deposit routing | 975 William D. Tate Grapevine, TX 76051 |

WEIL:\95685927\8\11727.0012

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| | | | xxxxx0093<br>tran code (20) | Cathy West<br>Ph 817-420-5251 Fax 817-420- 5820 |
| 527 | Aero | Wachovia<br>6/27/2003 | xxxxxxxxx3216<br>aba xxxxx0219 | 1400 Benvenue Road Rocky Mount, NC 27804 Kim Sutton<br>PH 252-972-4238 |
| 528 | Aero | Suntrust Bank<br>7/18/2003 | xxxxxxxxx7124<br>ach# xxxxx0104<br>deposit routing<br>xxxxx2152 | 8055 S. Beneva Road<br>Sarasota, FL 34238<br>Frank Zeckel<br>Ph 941-702-6503 Fax 941-922- 5618 |
| 529 | Aero | JP Morgan Chase | xxxxx4317<br>aba xxxxx0137<br>deposit routing<br>xxxxx1025 | 821 E. Highway 131<br>Clarksville, IN 47129<br>Sherri Coleman<br>Ph 812-284-7550 Fax 812-284- 7553 |
| 530 | Aero | new bank name as of 6/12/15.<br>Central Bank of Boone County | xxx5997<br>deposit routing<br>xxxxx0859 | 720 East Broadway P o Box 678( Mall Facility)<br>Columbia, MO 65205<br>Meredith Imler Ph 573-817-8964 |
| 531 | Aero | Regions Bank<br>4/25/2003 | xxxxxx6237<br>ach# xxxxx5690<br>deposit routing<br>xxxxx6660 | 825 Quintard Drive<br>Oxford, AL 36203<br>Sandy Turner<br>Ph 256-835-6075 Fax 256-831- 1093 |
| 532 | Aero | First Sentry<br>2/2/2009 | xxx2063<br>ach's & deposit<br>xxxxx2476 | P.O. Box 790<br>Barboursville, WV 25504 Cindy Collins<br>Ph 304-399-6401<br>fax# 304-399-6411 |
| 535 | AeroW | Key Bank<br>9/5/2003 | xxxxxxxx6252<br>aba xxxxx0574<br>deposit routing<br>xxxx4731 | 180 Telegraph Road<br>Bellingham, WA 98226<br>Amber Pen<br>360-676-6116 Fax 360-6142 |
| 536 | Aero | Towne Bank<br>3/15/2004 | xxxxxx9631<br>ach's xxxxx8949<br>deposit routing<br>xxx10894 | 1 Old Oyster Point Road Suite 110 Newport News, VA 23602<br>Toni Marshall<br>Ph 757-249-7800 Fax 757-249- 0840 |
| 537 | Aero W | UMB<br>4/17/2009 | xxxxxx2697<br>deposit routing<br>xxxxx1067<br>tran code (83) | 730 Citadel Drive East<br>Colorado Springs, CO 80909 Cheryl Murphy<br>Ph 719-597-0170 Fax 719-597- 0178 |
| 538 | Aero | Bank of America<br>5/16/2003 | xxxxxxxx9244<br>aba xxxxx0045<br>open in kansas | 8625 Bedford-Euless<br>Road Hurst, TX 76053<br>Scot Cowdrey Ph 817-284-5546 |
| 541 | Aero W | Columbia Bank<br>5/30/2003 | xxxxxx3020<br>deposit routing<br>xxxxx8272<br>tran code (201) | 3500 S. Meridian Suite 503 Puyallup. WA 98373<br>Michelle Laborde<br>Ph#253-939-9800<br>fax#253-833-2476 |
| 543 | Aero W | Bank of America<br>7/18/2003 | xxxxxxxx9642 | 3308 N E Auto Mall Drive Vancouver, WA 98662<br>Rita Paulson<br>Ph360-696-5511<br>Marsha, 888-852-5000 ext 4600 |
| 544 | Aero | Associated Bank<br>8/1/2003 | xxxxxx4708<br>ach & deposit routing | 2403 South Oneida Street<br>Green Bay, WI 54304 |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---------|--------|-----------|----------|---------|
| | | | xxxxx0575 | Micah Marshall<br>Ph 920-433-3218 Fax 920-499- 2690 |
| 545 | Aero | Suntrust Bank<br>10/31/2003 | xxxxxxxxx5923<br>ach# xxxxx0104<br>deposit routing<br>xxxxx2152 | 26627 US Hwy 19 N<br>Clearwater, FL 33761<br>Denise Mason<br>Ph 727-791-0224 Fax 727-797- 7557 |
| 546 | Aero | Chase | xxxxx1085<br>deposit routing<br>xxxxx0019 | 4401 W. Wisconsin Avenue Appleton, WI 54913<br>Mary Learman<br>Ph 920-738-9000 Fax 920-738- 9988 |
| 548 | Aero | Huntington National Bank | xxxxxx8064<br>deposit routing<br>xxxxx5016<br>tran code (920) | 2025 N. Cable Road<br>Lima, OH 45805<br>Ginger Gesler<br>Ph 419-227-6504 Fax 419-229- 4574 |
| 549 | Aero | BMO Harris<br>5/23/2003 | xxxxxx8152<br>aba & deposit routing#<br>xxxxx0051 | 3500 State Road 16<br>La Crosse, WI 54601<br>Lori Raabe<br>Ph 608-781-8834 Fax 608-781- 1511 |
| 550 | Aero | Bank of America<br>5/1/2011 | xxxxxxxx1528<br>aba#xxxxx0045 | 111 University Dr. E<br>College Station, TX 77840<br>Anute Boonyachai<br>Ph# 1-800-657-9533 ext# 50657 |
| 553 | Aero | Wachovia<br>6/6/2003 | xxxxxxxxx3216<br>aba xxxxx0219 | 886 Church Street North<br>Concord, NC 28025<br>Kim Overcash<br>Ph 704-793-4830 Fax 704-785- 2059 |
| 554 | Aero | Wells Fargo Bank<br>6/13/2003 | xxxxxx5819<br>deposit routing<br>xxxxx0392 | 9801 University Clive, IA 50265 Rose Hullett<br>Ph 515-237-5809 Fax 515-237- 5855 |
| 555 | Aero | Bank of America<br>5/16/2003 | xxxxxxxx9257<br>aba xxxxx0045 | 5041 Bayou Blvd. Pensacola, FL 32504 Susie<br>Gonzales<br>Ph 850-444-0551 |
| 557 | Aero | IBC Bank<br>4/11/2006 | xxxxxx0177<br>deposit routing<br>xxxxx2793<br>tran code (131) | 2501 W Memorial<br>Oklahoma City, OK 73134<br>Darryl Matthews branch manager (405-841-8952)<br>for change orders (405-775-8059) branch(405-775-<br>1730) fax(405 775-1731) |
| 558 | Aero | Bank of America<br>6/20/2003 | xxxxxxxx9532<br>aba xxxxx0045 | 500 South West Street Wichita, KS 67209 Brenda<br>Dosda<br>Ph 316-261-4242 |
| 561 | Aero | Bank of America<br>11/3/2014 | xxxxxxxx7153<br>aba#xxxxx0045 | 460 E. Altamonte Dr.<br>Altamonte Springs, FL 32701 Marrie Dunn<br>Ph#1-888-715-1000 ext#53224 |
| 563 | Aero | Chase Bank | xxxxx5149<br>deposit routing<br>xxxxx0614 | 1201 West Main Street Lewisville, TX 75067 Anna<br>Dietert<br>Ph 972-221-5017 |
| 565 | Aero | I B C Bank<br>5/9/2003 | xxxx3801<br>deposit routing<br>xxxxx3284<br>tran code (131) | 7400 San Pedro, Suite 608 San Antonio, TX 78216<br>Jesse Monoz<br>Ph 210-369-2940 Fax 210-377- 3579 |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---------|--------|-----------|----------|---------|
| 566 | Aero | Wells Fargo Bank 5/16/2003 | xxxxxx5837 aba xxxxx0659 deposit routing xxxxx0392 | 901 Gessner Road Houston, TX 77024 Erika Cruz Ph 713-463-8044 Fax 713-463- 8258 |
| 567 | Aero | Wells Fargo Bank 5/30/2011 | xxxxxx5805 aba#xxxxx0076 deposit routing xxxxx0392 | 5300 W. 41st St. Sioux Falls SD 57106 Pat Barclay Ph#303-470-8908 Branch #605-575-7466 |
| 568 | Aero | Wells Fargo Bank 5/23/2003 | xxxxxx5862 deposit routing xxxxx0392 | 600 4th Street Sioux City, IA 51102 Eileen Iversen Ph 712-277-7175 Fax 712-277- 7149 |
| 569 | Aero | Bank of America 6/27/2003 | xxxxxxxx9545 aba xxxxx0045 open in kansas | 7802 Abercorn Drive Savannah, GA 31406 Mercy Garcia Ph 912-353-3960 |
| 570 | Aero | Bank of America 6/3/2007 | xxxxxxxx0140 xxxxx0045 | 100 N Broadway Wichita, KS 67202 Ph. 888-852-5000 fax. 316-261-4446 |
| 571 | Aero | Northwest Savings Bank 9/12/2003 | xxxxxx9268 deposit routing xxxxx4218 | 200 Mill Creek Mall Erie, PA 16565 Jennifer D-Annibale Ph 814-868-5161 Fax 814-864- 1917 |
| 572 | Aero W | Bank of America 10/3/2003 | xxxxxx7711 aba xxxxx0045 | 3401 Dale Road Modesto, CA 95356 Peggy Rubio |
| 573 | Aero | Wachovia 11/1/2005 | xxxxxxxxx3216 aba xxxx0219 | Wachovia consolidated accts Any questions call Judy Goncalves at Wachovia 800-590-7868 |
| 574 | Aero | Wachovia 8/22/2003 | xxxxxxxxx3216 aba xxxx0219 | 1495 W. O Ezell Blvd. Spartanburg, SC 29301 Robin Osborne 864-596-4166 Fax 864-587-6275 |
| 575 | Aero | Bank of America 7/25/2003 | xxxxxx9697 aba xxxxx0045 | 9460 FM Road W Humble, TX 77338 Ellen Cooper PH 281-548-3700 |
| 577 | Aero | SouthBank 8/1/2003 | xxxxxx0266 deposit routing xxxxx2670 tran code (41) | 2801 S. Memorial Parkway Ste 102 Huntsville, AL 35801 Jeff Slaten Ph 256-533-2224 Fax 256-533- 0442 |
| 576 | Aero | Bank of America 7/25/2003 | xxxxxx9671 aba xxxxx0045 | 2000 Baytree Valdosta, GA 31601 Susan Harrison |
| 578 | Aero | M&T 10/5/2008 | xxxxxx7079 ach's & deposit routing xxxxx0033 | 5585 Spectrum Dr. Frederick MD 21703 Chip Hess ph# 301-695-0503 fax# 301-698-2643 |
| 579 | Aero | Citizens National Bank 7/25/2003 | xxx9752 ach's & deposit routing xxxx0001 | 200 Forks of the River Parkway Sevierville, TN 37862 865-453-9031 main # Shirley Piniak Ph 865-429-7522 Fax 865-429- 7599 |
| 580 | Aero | Bank of America 7/25/2003 | xxxxxx9684 aba xxxxx0045 | 7008 US Hwy 301 N Ellenton, FL 34222 Kim Wilson |
| 581 | Aero | Bank of America | xxxxxx9888 | 1602 W Floyd Baker Blvd Gaffney, SC 29341 |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---------|--------|-----------|----------|---------|
| | | 9/5/2003 | aba xxxxx0045<br>open in kansas | Lisa Sullivan<br>Ph 864-487-8351 |
| 582 | Aero | Regions Bank<br>merged AmSouth 12/7/07 | xxxxxx7611<br>ach & deposit routing<br>xxxxx0019 | 1301 South Mckenzie Street Foley, AL 36535<br>Victoria Gartments or AndreaWalker<br>Ph 251-943-2265 Fax 251-943- 8029 |
| 583 | Aero | PNC<br>8/11/2008 | xxxxxx3336<br>ach's & deposits<br>xxxx4020<br>deposit routing #<br>xxxx4020 | 1275 York Road<br>Gettysburg, PA 17325<br>Kelly Smarsh<br>Ph 717-337-9333 Fax 717-337- 2489 |
| 584 | Aero | IBC Bank<br>12/5/2005 | xxxxx3124<br>deposit routing<br>xxxxx2793<br>tran code (131) | 7021 S. Memorial Drive, Suite #269<br>Tulsa, OK 74133 Micah Hartwell<br>Ph. 918-497-2812 Fax. 918-497-2813 |
| 587 | Aero | Plains Capital Bank<br>9/19/2003 | xxxxxx0640<br>aba xxxxx2994<br>deposit routing<br>xxxx2299 | 6002 Slide Road<br>Lubbock, TX 79414<br>Jennifer Webb<br>806-785-6255 Fax 806-785-6262 |
| 588 | Aero | BBVA Compass | xxxxxx3012<br>deposit routing<br>xxxxx0547<br>tran code (903) | 849 East Commerce Street, Suite 739<br>San Antonio TX, 78205<br>Irene Flores<br>Ph 210-475-9315 Fax 210-475- 9328 |
| 589 | Aero | Frost<br>10/17/2014 | xxxxx4729<br>aba#xxxxx0093<br>tran code (20) | 10915 Pecan Park Blvd. Austin, TX 78750<br>Barbara Castleberry Ph#512-393-5647 |
| 590 | Aero | Huntington Bank<br>10/20/2003 | xxxxxx7837<br>ach's & deposits<br>xxxx0024<br>tran code (920) | 6340 Frantz Road<br>Dublin, OH 43017<br>Lisa Thomas<br>Ph 614--480-0191 Fax 614-480- 0193 |
| 591 | Aero | Bank of America<br>9/12/2003 | xxxxxx7643<br>aba xxxxx0045 | 474 N. Federick Avenue Gaithersburg, MD 20877<br>Gary Fennington<br>Ph 301-963-5360 |
| 592 | Aero W | US Bank<br>Dec 05 rolled to TRECS | xxxxxxxx9661<br>deposit routing<br>xxxxx0032 | 11333 SE 82nd Avenue (main branch)<br>12000 SE 82nd Avenue Ste 2001 (mall branch)<br>Portland, OR 97266<br>Hannah Brougnoli 503-275-4058 main branch<br>Ph 503-275-5535 mall branch |
| 593 | Aero | First Tennessee open 2/13/2006 | xxxxx2090<br>ach aba#xxxxx0026<br>deposit routing<br>xxxxx8042 | 2400 Memorial Blvd. Kingsport, TN 37664 Ted<br>Palaske<br>fax 423-247-8035<br>423-230-4224 |
| 594 | Aero | Suntrust Bank<br>9/26/2003 | xxxxxxxxx8008<br>ach# xxxxx0104<br>deposit routing<br>xxxxx0046 | 402 Cox Creek Parkway<br>Florence, AL 35630<br>Judy Mcclure<br>256-767-8585 Fax 256-767-8406 |
| 596 | Aero | MidSouth Bank<br>10/31/2003 | xxx9774<br>ach's & deposits<br>xxxxx3431<br>tran code | 3730 Ambassador Caffery Pkwy Lafayette, LA<br>70503<br>Nancy Venable<br>337-291-4903 Fax 337-988-2891 |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| | | | 131 | |
| 597 | Aero | Wachovia<br>9/26/2003 | xxxxx3216<br>aba xxxxx0219 | 4246 Plank Road<br>Fredericksburg, VA 22407 Belinda Walker/Diana<br>Foster branch #540-785-6794 |
| 598 | Aero | US Bank<br>Dec. 05 rolled to TRECS | xxxxxxxx9844<br>deposit routing<br>xxxxx0032 | 701 Saint Joseph Street ( main branch)<br>Rapid City, SD 57701<br>Carol Burgess<br>Ph 605-394-2048<br>605 342-2141 mall branch |
| 600<br>602 | AeroW<br>Aero | Wells Fargo Bank<br>9/19/2003<br>Trust Mark<br>3/4/2013 | xxxxxx5845<br>aba xxxxx0076<br>deposit routing<br>xxxxx0392<br>xxxxxx2528<br>aba & deposit routing#<br>xxxxx0279 | 66 W Springer Drive<br>Highlands Ranch, CO 80129 Pat Barclay<br>Ph 303-470-8908 Fax 303-791- 2558<br>1108 E. County Line Rd. Ridgeland, MS 39157<br>Regina Carr |
| 603 | Aero | Bank of America<br>10/10/2003 | xxxxxx7795<br>aba xxxxx0045 | 1300 66th Street North St. Petersburg, FL 33710<br>Jeffrey Jackson |
| 604 | Aero | Union State Bank<br>10/31/2003 | xxxxx1105<br>deposit routing<br>xxxx0576 | 3902 13th Avenue SW<br>Fargo, ND 58103<br>Missy Strike<br>Ph 701-281-1302 Fax 701-433- 7305 |
| 605 | Aero | Bank of America<br>10/31/2003 | xxxxxx7850<br>aba xxxxx0045 | 1720 East Fowler Avenue Tampa, FL 33612<br>Jack Jones<br>Ph 813-538-4901 |
| 606 | Aero W | Bank of America<br>10/3/2003 | xxxxxx7724<br>aba xxxxx0045<br>open in kansas | 971 Blossom Hill Road San Jose, CA 95123<br>Christine Espinoza<br>Ph. 408-983-0588 |
| 608 | Aero | Suntrust Bank<br>10/31/2003 | xxx-xxxxxx0183<br>ach# xxxxx0104<br>deposit routing<br>xxxxx2152 | 4582 South Kirkman Road<br>Orlando, FL 32811 Stacy Spruce |
| 609 | Aero | Peoples United<br>7/16/2010 | xxxxx8880<br>deposit routing<br>xxxxx2186 | 17 Walker Street<br>Kittery, ME 03904<br>Louise Barsalou<br>Ph 207-439-5020 Fax 207-439- 1571 |
| 611 | Aero | Wachovia Bank<br>3/17/2004 | xxxxxxxxx3216<br>aba xxxxx0219 | 2110 Oak Street<br>Myrtle Beach, SC 29577<br>David Welborn<br>Ph 843-448-2686 Fax 843-448- 6447 |
| 612 | Aero W | Bank of America<br>3/19/2004 | xxxxxx8257<br>aba xxxxx0045 | 1210.S. Power Road<br>Mesa, AZ 85206<br>Tamera Raleigh( branch ) Marsha Byler (national )<br>480-218-5145        888-<br>852-5000 ext 4600 |
| 614 | Aero | Wachovia<br>3/1/2005 | xxxxxxxxx3216<br>aba xxxx9527 | Wachovia Bank<br>2800 West University Blvd Wheaton, MD 20902<br>Attn: Craig Carver<br>Ph. 704-383-1582 |

WEIL:\95685927\8\11727.0012

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| 615 | Aero | Wachovia Bank<br>2/20/2004 | xxxxxxxxx3216<br>aba xxxxx0219 | 1919 US 1 South<br>St. Augustine, FL 32086<br>Linda Wilson(branch) Benjamin Kehoe(biz bnker<br>Ph 904-824-7568<br>704-427-7092 |
| 618 | Aero | Wachovia Bank<br>7/30/2004 | xxxxxxxxx3216<br>aba xxxxx0219 | 605 N. Berkeley Blvd. Goldsboro, NC 27534 Jim<br>Malcolm<br>Ph 919-778-6062 |
| 619 | Aero | BB & T Bank<br>4/9/2004 | xxxxxxxxxx0320<br>deposit routing<br>xxxxx3308 | 2400 N. Salisbury Blvd.<br>Salisbury, MD 21801<br>Lauren Marshall<br>Ph 410-860-0995 Fax 410-546- 1688 |
| 620 | Aero | Compass Bank<br>4/9/2004 | xxxx2706<br>ABA# xxxxx0547<br>deposit tickets<br>xxxxx0547 | 2901 Capital of TX Hwy South Austin, TX 78746<br>Tina Segoviano<br>Ph 512-421-5841 Fax 512-421- 5842 |
| 621 | Aero | Bank of America<br>4/16/2004 | xxxxxxxx6030<br>aba xxxxx0045 | 2105 West Brandon Blvd.<br>Brandon, FL 33511<br>Jennifer Lombard (branch ) Marsha Byler (national )<br>813-653-2235        888-<br>852-5000 ext 4600 |
| 623 | Aero | Bank of America<br>4/16/2004 | xxxxxxxx6043<br>aba xxxxx0045 | 1726 Country Club Road Jacksonville, NC 28546<br>Pamela Dufore (branch ) Marsha Byler (national )<br>910-355-4246        888-<br>852-5000 ext 4600 |
| 624 | Aero | Bank of America<br>4/16/2004 | xxxxxxxx5989<br>aba xxxxx0045 | 20005 Katy Fwy<br>Katy, TX 77450<br>Michael Macias (branch ) Marsha Byler (national )<br>888-<br>852-5000 ext 4600 |
| 625 | Aero | First Citrus Bank<br>4/23/2004 | xxxx5201<br>ach & deposit#<br>xxxxx4577<br>tran code (131) | 13850 Sheldon Road Tampa, FL 33626<br>Karen Kling<br>Ph 813-926-5588 Fax 813-920- 3814 |
| 626 | Aero | Amarillo National<br>2/28/2012 | xxx4957<br>ach & deposits<br>xxxxx0958 | 3390 Soncy<br>Amarillo, TX 79121 Missy Moore<br>Ph# 806-354-4045 Fax#806-354-4043 |
| 627 | Aero W | Bank of America<br>4/23/2004 | xxxxxxxx6072<br>aba xxxxx0045 | 1775 Camino De La Reina<br>San Diego, CA 92108<br>Trisha Phillips (branch ) Marsha Byler (national )<br>619-681-1886        888-<br>852-5000 ext 4600 |
| 628 | Aero | Bank of America<br>4/23/2004 | xxxxxxxx6085<br>aba xxxxx0045 | 825 Dulaney Valley Road, Ste 120 Towson, MD<br>21204<br>Shonga Faust (branch ) Marsha Byler (national )<br>410-828-1668        888-<br>852-5000 ext 4600 |
| 631 | Aero | JP Morgan Chase<br>2/28/2011 | xxxxx0409<br>aba xxxxx0137 | 5977 W. Park Ave. Houma, LA 70364<br>Carlos Santiago |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| | | | deposit routing<br>xxxxx1024 | Ph#212-552-8183<br>branch #985-876-7541 |
| 632 | Aero W | Wells Fargo Bank<br>5/14/2004 | xxxxxx6842<br>aba#xxxxx0076<br>deposit routing<br>xxxxx0392 | 7200 W. Alameda Avenue Lakewood, CO 80226<br>Rhonda Doane<br>Ph 303-937-3365 Fax 303-937- 3390 |
| 634 | Aero | Hancock Bank<br>Previously Peoples First Community<br>Bnk<br>5/7/2004 | xxx8837<br>deposit routing<br>xxxxx0220<br>tran code (20) | 2305 Highway 77<br>Panama City, FL 32405 Brnda Parker<br>Ph 850-770-9060 Fax 850-769- 3603<br>Branch # 850-769-5261 |
| 635 | Aero | Capital One<br>bank name was changed 5/1/2006 | xxxxxx3535<br>deposit routing<br>xxxxx0090 | 814 Jordan Street<br>Shreveport, LA 71104 Beverly(branch) Tammy<br>Ptrats(national)<br>Ph 318-674-2523, 504-533-2905 Fax 504-533-5344 |
| 637 | Aero W | Tri Counties Bank<br>4/30/2004 | xxxxx6746<br>aba xxxxx5045 | 1950 E. 20th Street, Ste 725 Chico, CA 95928<br>Ken Sorbis or Roy Palomino Ph 530-898-0370 Fax<br>530-898- 0375<br>Mgr. Melanie Bassett |
| 638 | Aero W | Bank of America<br>4/17/2012 | xxxxxxxx2773<br>aba# xxxxx0045 | 2940 S. Glenstone Springfield, MO 65804<br>Anute Boonyachai<br>Ph# 1-800-657-9533 ext# 50657 branch#417-227-<br>6118 |
| 640 | Aero | TD Bank | xxxxxx7697<br>aba xxxxx1360<br>deposit routing<br>xxxx0136 | 3850 S. Delsea Drive<br>Vineland, NJ 08360<br>Stephanie Walkman<br>Ph 856-527-5276 Fax 856-327- 6215 |
| 641 | Aeo W | US Bank<br>Dec 05 rolled to TRECS | xxxxxxxx9679<br>deposit routing<br>xxxxx0032 | 1520 Briargate Blvd.<br>Colorado Springs, CO 80920 Mary Koch<br>Ph719-528-3525 Fax 719-531- 6746 |
| 642 | Aero | Regions<br>2/2/2014 | xxxxx2430<br>aba#xxxxx0019 | Paddock Park<br>3232 SW College Rd. Ocala, FL 34470<br>Gracious Washington<br>#205-264-5158 |
| 644 | Aero | Wells Fargo<br>8/8/2011 | xxxxxx5797<br>ach#xxxxx0076<br>deposit routing<br>xxxxx0392 | 4302 E. Towne Blvd. Madison, WI 53704 Pat<br>Barclay<br>Ph#303-470-8908 |
| 646 | Aero | Star Financial<br>3/23/2005 | xxxxx3978<br>deposit routing<br>xxxxx1672<br>tran code (49) | 1708 East Markland Ave Kokomo, IN 46901<br>Amy McKane<br>tel: 765-868-3825 |
| 647 | Aero W | First Bank of Colorado 6/25/2004 | xxxxxx1323<br>deposit routing<br>xxxxx5047 | 10403 W. Colfax Avenue Lakewood, CO 80215<br>Rachael Miller 1193<br>Ph 303-235-1155 Fax 303-235- |
| 649 | Aero | Vantus<br>2/27/2009 | xxxxxx 1161<br>deposit routing<br>xxxxx0640 | 6260 Mills Civic Pkwy<br>West Des Moines, IA 50266<br>Tim #515-422-5138 fax#515-422- 5135<br>branch #515-422-5136 |
| 650 | Aero | Bank of Oklahoma | xxxxx0652 | 3550 West Main Street |

WEIL:\95685927\8\11727.0012

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| | | 10/15/2004 | deposit routing<br>xxxxx0036 | Norman, OK 73072<br>Aaron Greer<br>Ph 405-366-3637, 366-3600 Fax 405-366-3608<br>Direct Pho: 405-272-2495 |
| 651 | Aero | Premier Bank<br>3/19/2004 | xxxxx1121<br>deposit routing<br>xxxxx1018<br>tran code (20) | 11055 61 st Street NE<br>Alberville, MN 55301<br>Deb Hackenmueller<br>Ph 763-497-8224 Fax 763-497- 8048 |
| 652 | Aero W | Chase | xxxxx8851<br>ach#xxxxx0024<br>deposit routing<br>xxxxx1025 | 7675 West Bell Road<br>Peoria, AZ 85382<br>Karen Barnes<br>Ph 602-589-4160 Fax 602-589- 3364 |
| 653 | Aero | PNC Bank<br>10/3/2011 | ABA #<br>xxxx0096<br>new for 2010<br>deposit routing #<br>xxxx0120 | 611 Lighthouse Place<br>Michigan City, IN 46360<br>Kathy Kindelan<br>Ph 219-874-9752 Fax 219-873- 2271 |
| 654 | Aero W | Wells Fargo Bank<br>10/8/2004 | xxxxxx5878<br>deposit routing<br>xxxxx0392 | 4180 Bonita Road Bonita, CA 91902 Chantell<br>Ballesteros Ph 619-479-1756 |
| 657 | Aero | Bank of America<br>4/30/2004 | xxxxxxxx6111<br>aba xxxxx0045 | 1550 W. Bay Area Blvd. Friendswood, TX 77546<br>Rosalyn Dikes (branch ) Marsha Byler (national )<br>888-<br>852-5000 ext 4600 |
| 658 | Aero | Bank of America<br>5/14/2004 | xxxxxxxxx6140<br>aba xxxxx0045<br>kansas | 1410 Parham Road<br>Richmond, VA 23229<br>Pamela Langfitt(branch) Marsha Byler (national )<br>804-754-0760        888-<br>852-5000 ext 4600 |
| 659 | Aero | Bank of America<br>5/20/2005 | xxxxxx6839<br>aba xxxxx0045 | 2450 W. Algonquin Road Lake in the hill, IL 60156 |
| 660 | Aero W | Bank of America<br>5/28/2004 | 5090166195<br>aba 101100045 | 12816 E. Sprague Avenue<br>Spokane, WA 999214<br>Shelley Allen(branch ) Marsha Byler (national )<br>509-353-6026        888-<br>852-5000 ext 4600 |
| 661 | Aero | JP Morgan Chase<br>5/28/2004 | xxxxx5898<br>ach# xxxxx0614<br>deposit routing<br>xxxxx1023 | 2310 Colorado Blvd. Denton, TX 76205<br>Brad Cain<br>Ph 940-3 81-7475 Fax 940-3 81- 7410 |
| 662 | Aero | Regions Bank<br>6/4/2004 | xxxxxx2342<br>aba xxxxx0109<br>deposit routing<br>xxxxx6660 | 2000 Richmond Road<br>Texarkana, TX 75503<br>Pat Son<br>Ph 903-832-2551 Fax 903-223- 5050 |
| 663 | Aero | Bank of America<br>10/1/2004 open in kansas | xxxxxxxx3787<br>aba xxxxx0045<br>deposit slips aba<br>xxxxx0106 | 1801 Richmond Road Williamsburg, VA 23185<br>Stacey Castruita (branch ) Teresa<br>Wallweber(national )<br>757-259-5481        888-852-<br>5000 ext 4601 |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| 665 | Aero | Bank of America 5/58/04 | xxxxxxxx6182 aba xxxxx0045 kansas | 4364 State Road 7 Lake Worth, TX 33467 Dev Bhandary(branch ) Marsha Byler (national ) 561-642-4426       888- 852-5000 ext 4600 clark american 800-355-4691 |
| 667 | Aer W | Bank of America 2/4/2008 | xxxxxxxx7051 ACH ABA# xxxxx0045 deposit routing xxxxx0106 | 12682 Amargosa Rd. Victorville, CA 92392 |
| 671 | Aero | Regions merged AmSouth 12/7/07 | xxxx0930 deposit & ach# routing xxxxx0017 | 1993 N. Highland Ave. Jackson, TN 38305 Terrell Parker Ph. 731-984-6000 Fax. 731-668-4827 |
| 672 | Aero | Citizens Bank & Trust 10/31/2011 | xxx9053 ach & deposit routing xxxxx1396 | 7288 North West 87 Terrace Kansas City, MO 64153 Raquel Leon Johnson Ph#816-505-7001 branch #816-587-4332 |
| 673 | Aero W | Bank of America 6/25/2004 | xxxxxxxx6292 aba xxxxx0045 | 2708 Ming Avenue Bakersfield, CA 93304 Erin Bedford(branch ) Teresa Wallweber(national ) 661-395-2020       888- 852-5000 ext 4601 |
| 675 | Aero | I B C Bank 9/10/2004 | xxxxxx5699 deposit routing xxxxx3284 tran code (13 1) | 6301 NW Loop 14, Ste. Q-14 San Antonio, TX 78238 Isabel Bravo Ph 210-369-2910 Fax 210521- 8044 |
| 676 | Aero | Chase Bank | xxxxx4257 deposit routing xxxxx0614 | 320 N. New Road Waco, TX 76710 Carole Gallagher Ph 254-776-9500 |
| 677 | Aero | Astoria Federal Savings Bank 10/29/2004 | xxxxx7899 deposit routing xxxxx2815 | 102 Broadway Mall Hicksville, NY 11801 Christina Smith Ph 516-681-4000 Fax 516-681- 4017 |
| 679 | Aero | Wachovia 9/24/2004 | xxxxxxxx3216 aba xxxxx0219 | 1970 West New Haven Avenue Melbourne, FL 32904 Charlotte Hutchinson Ph 321-984-7467 Fax 321-984- 3417 |
| 680 | Aero | BB & T Bank 10/1/2004 | xxxxxx0090 deposit routing xxxxx4260 tran code (13) | 1809 Greenbrier Parkway Chesapeake, VA 23320 Crystal Crawford Ph757-523-4462 Fax 757-523- 4469 |
| 681 | Aero | Bank of America 9/24/2004 | xxxxxxxx3745 aba xxxxx0045 | 13355 Noel Road, Ste. 100 Dallas, TX 75240 Conrad Mendoza(branch ) Teresa Wallweber(national ) 972-716-5800       888-852- 5000 ext 4601 |
| 682 | Aero | Bank of America 7/23/2004 | xxxxxxxx6441 aba xxxxx0045 open in kansas | 3321 NW Federal Highway Jensen Beach, FL 34957 Lee Monroe(branch ) Teresa Wallweber(national ) 772-692-7821       888- |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| | | | | 852-5000 ext 4601 |
| 683 | Aero | First National Bank 7/30/2004 | xxx3593 deposit routing xxxxx0550 | 2400 W. Grand River Howell, MI 48843 Kevin Morrow Ph 517-540-6299 Fax 517-548- 7368 Mc Bee deposit slips 248-553- 8134 Nancy |
| 684 | Aero | Bank of America 10/30/2010 | xxxxxxxxx8719 aba#xxxxx0045 | 1901 Tamiami Trail North Naples, FL 34102 Anute Boonyachai Ph# 1-800-657-9533 ext# 50657 branch #239-436-3533 |
| 685 | Aero | First Bank & Trust 3/25/2014 | xxxxx3497 ach & deposit routing# xxxxx2289 | 244 Eisenhower Drive Biloxi, MS 39531 Nancy Hudson Ph# 228-385-3450 |
| 686 | Aero | Chase Bank 3/1/2007 | xxxxx5468 deposit routing xxxxx0614 | Ph 903-534-4231 Fax 903-581-9460 Shauna Pate |
| 687 | Aero | US 11/29/2010 | xxxxxxxx6627 ach#xxxxx0848 deposit routing xxxxx0032 | 4056 Highway 54 Osage Beach, MO 65065 chad Ph 573-348-1705 call account manager Becky Matthews |
| 688 | Aero | Wells Fargo 10/28/2011 combo with #3281 | xxxxx5854 ach# xxxxx0076 deposit routing xxxxx0392 | Pat Barclay Ph# 303-470-8908 fax# 303-791-2558 |
| 689 | Aero | Bancorp South 3/2/2005 | xxxx2781 aba xxxxx1278 deposit routing xxxx0000 | 4359 Mall Drive Tupelo, MS 38802 Britni Beasley Ph. 662-678-8000 |
| 690 | Aero | M & T Bank 10/29/2004 | xxxxx1658 aba xxxxx0113 deposit routing xxxxx0033 | 17301 Valley Mall Drive Hagerstown, MD 21740 Nancy McKenzie Ph 301-790-6916 Fax 301-852- 0213 |
| 691 | Aero | Bank of America 9/10/2004 | xxxxxxxx3651 aba xxxxx0045 | 29 Blanding Blvd. Orange Park, FL 32073 Sharon Davis (branch ) Teresa Wallweber(national ) 904-269-1770      888-852-5000 ext 4601 |
| 692 | Aero | Bank of America 9/17/2004 | xxxxxxxx3716 aba xxxxx0045 kansas | 685 Sunland Park Drive El Paso, TX 79912 Christina Trevizo (branch ) Teresa Wallweber(national ) 915-833-6003      888-852-5000 ext 4601 |
| 693 | Aero | Arvest Bank 7/30/2004 | xxxx2161 xxxxx0872 deposit routing xxxxx0001 | 4201 N. Shailoh Drive Fayetteville, AR 72703 Joe Dimaggio Ph 479-444-5612 Fax 479-444- 5620 |
| 694 | Aero W | First National Bank of Colorado effective 10/1/2004 | xxxxx1617 aba xxxxx1960 | 615 Interlocken Blvd. Broomfield, CO 80021 April Vendegna |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| | | | deposit routing
xxxx1003 | Ph 303-544-7999
Branch 720-566-6060 |
| 695 | Aero | Wachovia
11/1/2005 | xxxxxxxxx3216
xxxx0219 | Wachiova consolidated accts
For questions call Judy Goncalves at Wachovia
800-590-7868 |
| 696 | Aero | BB & T Bank
9/17/2004 | xxxxxx4581
deposit routing
xxxxx4260
tran code (13) | 1425 Seminole Trail
Charlottesville, VA 22901
Tracey Travillian
Ph 434-975-3491 Fax 434-973- 8604 |
| 697 | Aero | I B C Bank
9/17/2004 | xxxxxx6794
ach's & deposit routing
xxxxx0861
tran code (131) | 5085 Westheimer Ste. 4640 Houston, TX 77056
Thomas Frausto
Ph 713-285-2294 Fax 713-439- 0633 |
| 698 | Aero | Bank of America
9/24/2004 | xxxxxxxx3703
aba xxxxx0045 | 9225 Baymeadows Road Jacksonville, FL 32256
James Bridgewater (branch ) Teresa
Wallweber(national )
904-731-4600       888-852-
5000 ext 4601 |
| 699 | Aero | Bank of America
10/1/2004 | xxxxxxxx3693
aba xxxxx0045
kansas | 12381 West Sunrise Blvd. Plantation, FL 33323
Angela Plummer (branch ) Teresa
Wallweber(national )
954-915-0940       888-852-
5000 ext 4601
Clark American 800-234-6147 |
| 700 | Aero | US Bank
Dec 05 rolled to TRECS | xxxxxxxx9869
deposit routing
xxxxx0032 | 3410 S. 143rd Plaza
Omaha, NE 68144
Mary Sumpter
Ph 402-334-3603 Fax 402-334- 3636 |
| 701 | Aero | JP Morgan Chase | xxxxxxxx7365
deposit routing
xxxxx1023 | 2430 Highway 6 South
Sugar Land, TX 77479
Sergio Babba
Ph 281-269-7306 Fax 281-269- 7312 |
| 705 | Aero | Bank of America
9/24/2004 | xxxxxxxx3758
aba xxxxx0045 | 6605 Uptown Blvd.
Albuquerque, NM 87110
Lee Gurule (branch ) Teresa Wallweber(national )
505-282-3030       888-852-
5000 ext 4601 |
| 707 | Aero | First Bank of Tenneessee effective
05/10/05 | xxxxx5526
deposit routing
xxxxx1324 | 2301 E. Andrew Johnson Hwy Morristown, TN
37814
Nancy Carpenter
Tel. 423-586-8021 |
| 708 | Aero | Bank of America
10/1/2004 | xxxxxxxx3774
aba xxxxx0045 | 105 N. Congress Avenue
Boynton Beach, FL 33426
Hazel Scalise (branch ) Teresa Wallweber(national )
561-742-9092       888-852-
5000 ext 4601 |
| 711 | Aero W | Bank of America
10/29/2004 | xxxxxxxx3826
aba xxxxx0045 | 13008 N. Tatum Blvd.
Phoenix, AZ 85032
Bill Coulter (branch ) Teresa Wallweber(national ) |

WEIL:\95685927\8\11727.0012

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---------|--------|-----------|----------|---------|
| | | | | 602-569-4029        888-852-5000 ext 4601 |
| 712 | Aero | Liberty Bank 10/8/2004 | xxxxx7209 deposit routing xxxxx0282 tran (12) | 8 East Main Street Clinton, CT 06413 Heather Downie Ph 860-669-5773 Fax 860-669- 4353 1-888-570-0773 |
| 713 | Aero | Main Source Bank 10/8/2004 | xxxxx1126 deposit routing xxxxx3308 tran code (02) | 3880 West Presidential Way Edinburgh, IN 46124 Elisa Walter Ph 812-526-0551 Fax 812-526- 0581 |
| 716 | Aero | Monroe Bank & Trust 10/29/2004 secret code AERO | xxxxx3284 deposit routing xxxxx2157 | 2121 N. Monroe Street, Ste. 131 Monroe, MI 48162 Stacey Navarre Ph 734-241-3431 Fax 734-242- 5790 |
| 717 | Aero W | Bank of America 3/2/2005 | xxxxxx3457 aba xxxxx0045 | 9717 Foothill Blvd. Rancho Cucamanga, CA 91730 Matt Keever Ph. 909-483-8176 |
| 718 | Aero | Capital One 1/26/2005 | xxxxxx5890 deposit routing xxxxx1981 tran code (01) | 7101 Democracy Blvd. Bethesda, MD 20817 Ph. 301-365-5100 |
| 719 | Aero | Harris merged 10/1/10 | xxxxxx9395 deposit routing xxxx-0029 | 2505 N Farnsworth Ave Aurora, IL 60504 Zach Bebee 630-862-2474 - Branch 312-461- 6730 fax: 630-862-2489 |
| 720 | Aero | Wrentham Cooperative Bank 3/10/2005 | xxxx6470 deposit routing xxxxx1939 | 102 South Street Wrentham, MA 02093 Sarah Giovanucci Ph. 508-384-6101 |
| 721 | Aero | Bank of America 3/23/2005 | xxxxxx6596 aba xxxxx0045 | 4545 14th St. W Bradenton, FL 34205 Kathy Cannavino Ph. 941-751-6595 |
| 722 | Aero | Citizens Bank 3/2/2005 | xxxxxx3674 deposit routing xxxxx6150 | Route 611 & 715 Tannersville, PA 18372 Shawn Ph. 570-629-1631 fax. 570-629-8757 |
| 723 | Aero W | Bank of America 3/9/2005 | xxxxxx3444 aba xxxxx0045 | 200 Kentucky St. Petaluma, CA 94952 Robin Edwards Ph. 707-769-2850 |
| 724 | Aero | JP Morgan Chase | xxxxxx5382 aac# xxxxx0137 deposit routing xxxxx1024 | 2203 Memorial Drive Alexandria, LA 71301 James White Ph. 318-448-6389 |
| 725 | Aero | Wachovia Bank 7/1/2005 | xxxxxxxxx3216 xxxx0219 | |
| 726 | Aero | Chase Bank 3/23/2005 | xxxxx1107 deposit routing xxxxx0037 | 250 W. Garfield Rd Aurora, OH 44202 Stacy Famageltto Ph. 330-562-7115 |
| 727 | Aero | Bank of America | xxxxxx6664 | 1255 Lake Woodland Drive The Woodlands, TX |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| | | 3/30/2005 | aba xxxxx0045 | 77380 Katrina Johnson<br>Ph. 281-362-4200 |
| 728 | Aero | IBC Bank<br>3/23/2005 | xxxxxx9854<br>deposit routing<br>xxxxx7623<br>tran code (13 1) | 2200 S. 10th Street<br>McAllen, TX 78502<br>Jaime Vargas<br>Ph. 956-688-3670<br>aba # for ach's 114-902-528 |
| 729 | Aero | Bank of America<br>3/23/2005 | xxxxxx6583<br>aba xxxxx0045 | 12011 Kee Jackson Hwy Fairfax, VA 2033<br>Eva Seifert<br>Ph. 703-277-3230 |
| 730 | Aero W | Wells Fargo Bank<br>3/23/2005 | xxxxxx6798<br>ach#xxxxx0247<br>deposit routing<br>xxxxx0392 | 826 3rd Avenue<br>Chula Vista, CA 91910 Luis Lopez<br>619-426-0622 |
| 731 | Aero W | Bank of America<br>3/23/2005 | xxxxxx6648<br>aba xxxxx0045 | 222 W. Main Street Medford, OR 97501 Maria<br>Holloway<br>Ph. 541-722-3384 |
| 732 | Aero W | Washington Federal<br>12/13/2013 | xxxxxx0368<br>aba#xxxxx0980<br>deposit routing<br>xxxxx0085 | 421 North Cole Rd. Boise, ID 83704 Kristin Mower<br>Ph#208-323-8700 |
| 733 | Aero | Capital One | xxxxxx8054<br>deposit routing<br>xxxxx0090 | 3050 Severn Ave.<br>Metairie, LA 70002 Tammy or Drew Booth<br>Tel. 504-533-2905 Fax. 504-533-5344 |
| 734 | Aero | Wachovia<br>10/7/2007 | xxxxxxxxx3216<br>xxxxx0219 | 4325 Glenwood Ave Raleigh, NC 27612 Alicia<br>Keisler<br>Ph. 919-829-6657 |
| 735 | Aero W | Bank of America<br>3/23/2005 | xxxxx6635<br>aba xxxxx0045 | 4801 W. Charleston Blvd Las Vegas, NV 89107<br>Merling Arias<br>Ph. 702-654-4310 |
| 736 | Aero W | Wells Fargo Bank<br>3/23/2005 | xxxxxx6780<br>ach#xxxxx0247<br>deposit routing<br>xxxxx0392 | Galleria at Tyler Mall 3765 Tyler Street<br>Riverside, CA 92503 JP Bouchereau<br>951-343-3860 |
| 737 | Aero | IBC Bank<br>6/24/2005 | xxxxxx6711<br>ach & deposit<br>xxxxx1580<br>tran (131) | 2370 N. Expressway, Ste. 7222 Brownsville, TX<br>78526<br>Ruth Parga de Arguello or Melissa Tel. 956-547-<br>1382 or 1380<br>Fax. 956-574-9596 |
| 738 | Aero | Columbus Bank & Trust 3/23/2005 | xxxxxx7596<br>ach# xxxxx0606<br>deposit routing<br>xxxx8888 | 3261 Manchester Expressway Columbus, GA 31909<br>Sandra Wilkoff<br>Ph. 706-649-2715 fax#706-649-4800- #706-644-<br>4800 |
| 739 | Aero | M & T Bank<br>7/15/2005 | xxxxxx4164<br>xxxx0046<br>deposit routing<br>xxxxx0020 | 23 Lake Street<br>Monroe, NY 10950 Maribel<br>845-782-8101 |
| 740 | Aero | PNC Bank<br>5/11/2005 | xxxxxx2365<br>aba xxxxx7607 | 3400 Atlantic Ave.<br>Atlantic City, NJ 08401 |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| | | 10/3/2011 | deposit routing # xxxx-6020 | Tel. 609-343-6702 (updated 4/19/12) |
| 741 | Aero W | Bank of America 4/27/2005 combo store with P.S. #3215 same account | xxxxxx6716 aba xxxxx0045 | 201 E. San Ysidro Blvd. San Ysidro, CA 92173 Tel. 619-662-6423 |
| 742 | Aero | Wells Fargo 9/15/2005 | xxxxxx6919 ach# xxxxx0247 deposit routing 518200392 | I-94 Woodbury 9882 Norma Lane Woodbury, MN 55125 Ph. 651-205-8310 Christina Skar |
| 744 | Aero W | Wells Fargo Bank 5/2/2005 | xxxxxx6800 deposit routing xxxxx0392 | 1175 S. State St. Orem, UT 84097 Daron Stealey Ph. 801-426-5529 Fax. 801-226-0734 |
| 745 | Aero W | Wells Fargo Bank 5/2/2005 | xxxxxx6826 deposit routing xxxxx0392 | 66 W. 1200 S. Provo, UT 84601 Tel. 801-377-1397 |
| 746 | Aero W | Citibank 3/30/2005 | xxxxx8483 deposit routing xxxx1028 tran code (28) | 44480 Town Center Way Palm Desert, CA 92260 Angel Mendez Ph. 760-346-4128 |
| 747 | Aero W | Wells Fargo 8/8/2011 | xxxxxx5789 ach#xxxxx0076 deposit routing xxxxx0392 | 11 E. Ponderosa Dr. Camarillo, CA 93010 Pat Barclay Ph#303-470-8908 |
| 748 | Aero | Wells Fargo 8/30/2009 | xxxxxx5886 ach#xxxxx0076 deposit routing xxxxx0392 | 6175 Gateway West El Paso, TX 79925 Pat Barclay Ph#303-470-8908 |
| 749 | Aero | Wachovia 12/9/2005 | xxxxxxxxx3216 vcb?` | 8300 Medical Plaza Dr. Charlotte, NC 28216 |
| 750 | Aero | PNC Bank 10/3/2011 | xxxxxx2151 deposit routing xxxxx0096 deposit routing # xxxx0120 | 3517 Nicholasville Road Lexington, KY 40503 Aakesh Patel Ph. 859-281-5456 Fax. 859-281-5459 800-669-1518 Treasury Erica (valid.dep.tick) |
| 751 | Aero | Bank of America 11/30/2009 | xxxxxxxx7095 ach#xxxxx0045 | 80 Mountain Rd. Glen Burnie, MD 21060 Tracey Popoola Ph# 800-657-9533 ext#53553 |
| 752 | Aero | Wachovia Bank 10/27/2006 | xxxxxxxxxx3216 xxxxx0219 | Four S. Main Str Coopersburg, PA 610-282-3012 |
| 753 | Aero W | Wells Fargo Bank 3/9/2005 | xxxxxx6869 aba# xxxxx2882 deposit routing xxxxx0392 | 140 Great Mall Drive Milpitas, CA 95035 Bree Philpott Ph. 408-934-9625 |
| 754 | Aero | Bank of America 2/2/2009 | xxxxxxxx2149 aba#xxxxx0106 ach#xxxxx0045 | 2600 W. Bigbeaver Troy, MI 48084 Jean Pemper Ph#800-654-8503 ext 5760 fax#617-235-2580 |

WEIL:\95685927\8\11727.0012

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---------|------|-----------|----------|---------|
| 755 | Aero | Ameris<br>6/15/2015 | xxxxxx4841<br>aba#xxxxx1754 | 2627 Dawson Road<br>Albany, GA 31707<br>Debbie Dominey<br>Ph. 229-616-6167<br>Kathy Turner #229-446-2564 |
| 756 | Aero | BB & T Bank<br>3/23/2005 | xxxxxx7282<br>deposit routing<br>xxxxx1607<br>tran code (13) | 2286 N. Dave Lyle Blvd Rock Hill, SC 29730 Eric Bowers<br>Ph. 803-366-3144 |
| 757 | Aero W | Farmers' State Bank 9/30/2005 | xx4978<br>deposit routing<br>xxxxx1676<br>tran code (0 10) | 4444 1 st Ave.<br>Cedar Rapids, IA 52402 Joan Ironside<br>Ph. 319-395-0201<br>Fax. 319-294-6679 |
| 758 | Aero | Wachovia Bank<br>3/16/2005 | xxxxxxxxx3216<br>aba xxxxx0219 | Citadel Mall Financial Center 828 Orleans Rd<br>Charleston, SC 29407<br>Craig Carver<br>Ph. 843-724-5184 |
| 759 | Aero | Bank of America<br>4/27/2005 | xxxxxx6703<br>aba xxxxx0045 | 826 Belmont St.<br>Brockton, MA 02301 Tel. 800-841-4000 |
| 760 | Aero W | Wells Fargo Bank<br>3/23/2005<br>store closed 6/30/15 need to reconcile before<br>closing | xxxxxx2028<br>aba xxxxx0247<br>deposit routing<br>xxxxx0394 | 2334 Central Ave.<br>Billings, MT 59102 JP Bouchereau<br>Ph. 406-652-8288 |
| 761 | Aero W | Bank of America<br>9/9/2005 | xxxxxx6143<br>aba xxxxx0045 | 2225 Quimby Road<br>San Jose, CA 95122<br>Veronica Rubio or Mary Diaz 408-223-4481 fax.<br>408-971-5396 |
| 762 | Aero | PNC<br>10/3/2011 | xxxxxx2886<br>aba#xxxxx0096<br>deposit routing #<br>xxxx0120 | 1366 Mall Run Road Uniontown, PA 15401 Suan Lee<br>tel: 724-438-3400 |
| 763 | Aero | United Bank<br>3/23/2005 | xxxxx04419<br>deposit routing<br>xxxxx0395 | 84 Crossroads Mall Mt. Hope, WV 25880 Matthew Whitener Ph. 304-256-7280 |
| 764 | Aero | Bank of America<br>3/23/2005 | xxxxxx6619<br>aba xxxxx0045 | 1401 N. University Drive Coral Springs, FL 33071<br>Sonia Canova<br>Ph. 954-341-0104 |
| 765 | Aero | Regions<br>merged AmSouth 12/7/07 | xxxx7865<br>ach# xxxxx5690<br>deposit routing<br>xxxxx5436 | 1000 Turtle Creek Drive Hattiesburg, MS 39402<br>Tel. 601-261-4270<br>Hunter Russum |
| 767 | Aero | American Bank<br>3/23/2005 | xxxx7630<br>ach & deposit routing<br>xxxxx1768 | 676 W. Johnson St<br>Fond Due Lac, WI 54935 Diana Dehnel<br>Ph. 920-922-9292 |
| 768 | Aero W | Bank of America<br>9/9/2005 | xxxxxx6130<br>aba xxxxx0045 | 4002 Tacoma Mall Blvd. Tacoma, WA 98409<br>Susan Bungert or Rowena Ly Ph. 253-305-3145<br>Fax. 253-305-3148 |
| 770 | Aero | Chase Bank | xxxxx9154 | 4430 Labon Drive, Suite 346 Garland, TX 75040 |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---------|--------|-----------|----------|---------|
| | | 9/30/2005 | deposit routing xxxxx1023 | James W. Jennings Ph. 972-530-3449 or 877-226- 5663 Fax. 972-530-4194 |
| 771 | Aero W | Wells Fargo Bank 5/2/2005 | xxxxxx6818 aba# xxxxx2971 deposit routing xxxxx0392 | 890 W. Riverdale Rd Ogden, UT 84405 tel. 801-626-9761 |
| 772 | Aero | US Bank Dec 05 rolled to TRECS | xxxxxxxx0469 deposit routing xxxxx0032 | 10959 Parallel Ave. Kansas City, KS 66109 Amy Hrabe Ph. 913-334-9811 Fax. 913-334-9163 |
| 773 | Aero | IBC Bank 9/29/2005 | xxxxxx6791 deposit routing xxxxx3284 tran code (131) | 130 East Travis St. San Antonio, TX 78205 David Solis 210-369-2943 |
| 775 | Aero | Bank of America 6/10/2005 | xxxxxx6842 aba xxxxx0045 | 5780 20th Street Vero Beach, FL 32966 Soula Planker Ph. 772-564-8181 Fax. 772-569-2014 |
| 776 | Aero | Chase Bank 7/29/2005 | xxxxx1133 ach's & deposits xxxxx1024 tran code (20) | 350 Gause Blvd. Slidell, lA 70458 Michelle Lingston Ph. 985-847-0501 Fax. 985-649-6451 |
| 777 | Aero W | Bank of America 10/28/2005 | xxxxxx6318 aba xxxxx0045 | 19240 Northhoff St. Northridge, CA 91324 Dennis Mata Ph. 818-885-4052 Fax. 818-885-4128 |
| 778 | Aero W | Wells Fargo Bank 23-Mar | xxxxxx6814 aba xxxxx0247 deposit routing xxxxx0392 | 5120 Moreno St Montclair, CA 91763 JP Bouchereau Ph. 909-621-2900 |
| 779 | Aero | American National Bank 9/9/2005 | xxxxxx9901 aba xxxxx1027 deposit routing xxxx1010 | 628 Main Street Danville, VA 24541 Linda Moore Ph. 434-773-2219 or 2298 Fax. 434-799-3368 |
| 780 | Aero W | Wells Fargo Bank | xxxxxx6822 deposit routing xxxxx0392 | 200 B. Street Santa Rosa, CA 95401 JP Bouchereau Ph. 707-584-3114 |
| 781 | Aero W | Bank of America 4/21/2006 | xxxxxx4964 aba xxxxx0045 | 100 N Broadway Wichita, KS 67202 Ph. 888-852-5000 fax. 316-261-4446 |
| 782 | Aero W | Key Bank 5/11/2005 | xxxxxxxx7483 ach & deposit routing xxxxx0737 | 999 N. Hill Field Rd Layton, UT 84041 Tel. 801-544-2834 Tiffany Gilbraith |
| 783 | | US Bank 7/29/2005 | xxxxxxxx0477 aba#xxxx0021 deposit routing xxxxx0032 | 14111 E Alameda Ave Aurora, CO 80012 Clara Gonzalez 303-344-1331 |
| 784 | Aero | Bancorp South | xxxx7379 deposit routing | 7125 Airways Blvd. Southaven, MS 38671 Patricia Faught |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| | | | xxxx-0000 | (662) 349-5516 |
| 785 | Aero | REGIONS BANK 2/3/2006 | xxxxxx4580<br>aba xxxxx5690<br>deposit routing<br>xxxxx6660 | 30083 Woodrow Lane Daphne, AL 36527 Contina Woods<br>Ph. 251-431-8114<br>Fax. 251-431-8115 |
| 786 | Aero | United Community Bank | xxxxxx9603<br>deposit routing<br>xxxxx2843<br>tran code (009) | Tiffany Jeannette<br>706-378-2225 (fax 706-378-2295) |
| 787 | Aero | Bank of America | xxxxxx0072<br>aba xxxxx0045 | 100 N Broadway Wichita, KS 67202 Ph. 888-852-5000 fax. 316-261-4446 |
| 788 | Aero W | Bank of America<br>9/23/2005 | xxxxxx6334<br>aba xxxxx0045 | 1234 So. Baldwin Ave. Arcadia, CA 91007<br>Edgar Chacon or Sylvia Evans<br>Ph. 626-578-5898 Fax. 626-578-5500 |
| 789 | Aero W | Bank of America | xxxxxx0069 | 100 N Broadway Wichita, KS 67202 Ph. 888-852-5000 |
| 790 | Aero | BankNorth, NA<br>Bank of New Hampshire<br>5/11/2005 | xxxxxx3937<br>aba xxxxx0071<br>deposit routing<br>xxxx1020 | Bank of New Hampshire 1249 Eastman Road North Conway, NH 03860 Tel. 603-356-6397<br>Chriss Butts |
| 791 | AeroW | Bank of America<br>5/23/2006 | xxxxxx0357<br>aba xxxxx0045 | 100 N Broadway Wichita, KS 67202 Ph. 888-852-5000 |
| 792 | Aero W | Bank of America<br>4/27/2005 | xxxxxx6729<br>aba xxxxx0045 | 36900 Newark Blvd. Newark, CA 94560 Tel. 510-226-2780 |
| 793 | Aero W | Bank of America | xxxxxx6871<br>aba xxxxx0045 | 2200 W. Warm Springs Road Las Vegas, NV 89019 Tel. 702-654-6339 |
| 794 | Aero W | Bank of America 7/22/2005 changed to 07/08/05 | xxxxxx6910<br>xxxxx0045 | 8815 Quil Ceda Blvd<br>Tulalip, WA 98271<br>Angela Gothard/ Mike Peek<br>360-653-3467 |
| 795 | Aero W | Bank of America | xxxxxx6855<br>aba xxxxx0045 | 1120 Texas Street Fairfield, CA 94533 Tel. 707-438-2604 |
| 796 | Aero W | Bank of America<br>1/30/2012 | xxxxxxxx2359<br>aba#xxxxx0045 | 503 W. Benjamin Holt Dr.<br>Stockton, CA 95207<br>Anute Boonyachai<br>Ph# 1-800-657-9533 ext# 50657 |
| 797 | Aero | BB & T Bank<br>6/24/2005 | xxxxxx3508<br>ach & deposit routing<br>xxxxx3415 | 2500 E. Walnut Ave. Dalton, GA 30721 Rebecca Hudson<br>ph# 706-217-3931 fax# 706-217-3939 |
| 798 | Aero | Texas Bank & Trust 6/24/2005 | xx3825<br>deposit routing<br>xxxxx3238<br>tran code (39) | 3622 McCann<br>Longview, TX 75605 Tammy Gage<br>Ph. 903-237-5500 Fax. 903-234-4620 |
| 800 | Aero | United Community Bank | xxxxxx6916<br>deposit routing<br>xxxxx2843<br>tran code (009) | Hwy 53 West<br>Dawsonville, GA 30534 Tel. 706-265-3232 |
| 801 | Aero | IBC Bank | xxxxxx3098 | 10 Central Mall |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| | | 7/1/2005 store closed 6/30/15 need to reconcile before closing | deposit routing xxxxx2793 | Lawton, OK 73501 Lawrell Sparkman 580-250-4127 |
| 802 | Aero | PNC Bank 11/23/2005 10/3/2011 | xxxxxx 1912 aba xxxxx0012 dep tickets aba xxxx3020 deposit routing # xxxx-3020 | 2010 Pitsburgh Blvd. Tarentu, PA 15084 Tel. 724-274-1100 |
| 803 | Aero | Capital One bank name was changed 5/1/2006 | xxxxxx7880 aba xxxx0090 deposit routing xxxxx0001 | 313 corondelet St., 6th fl New Orleans, LA 70130 Tammy W. Prats 504-533-2905 800-562-9007 x 32905 |
| 804 | Aero | Harris Bank 5/12/2007 | xxxxxx7924 deposit routing xxxxx3233 | 2609 East Main Street Plainfield, IN 46168 Jim O' Bold Ph 317 839-3501 Ex 34 Fax 317-839-3944 |
| 805 | Aero | Bank of America 10/28/2005 | xxxxxx6305 aba xxxxx0045 | 1550 S. Clyde Morris Blvd Daytona Beach, FL Brian Hills or Debbie Long Ph. 3 86-23 8-0079 Fax. 386-239-0859 |
| 806 | Aero W | Wells Fargo 1/11/2013 | xxxxxx5667 aba xxxxx0248 checking routing# xxxxx0392 | 2700 North Main St. Santa Ana, CA 92705 Karen Singletary Ph#404-214-1432 |
| 807 | Aero | IBC, Inc. 9/16/2005 | xxxxxx7115 ach's & deposit routing xxxxx3284 tran code (131) | 6909 NE Loop 1604, Suite 01 San Antonio, TX 78247 Christina Hernandez Ph. 210-369-2922 Fax. 210-651-3462 |
| 808 | Aero | South Carolina Bank & Trust 10/5/2005 | xxxxx2685 aba xxxxx0983 | 1328 Fording Island Road Bluffton, SC 29910 Attn: Jenette Ariyibi Ph. 843-837-2100 |
| 809 | Aero | Regions merged AmSouth 12/7/07 | xxxxxx5439 ach# xxxxx0019 deposit routing xxxxx0017 | 178 Paul Huff Pkwy Cleveland, TN 37312 LeeAnn Owenby Ph. 423-479-9661 Fax. 423-472-2572 |
| 810 | Aero | Chase Bank 10/28/2005 | xxxxx3964 deposit routing xxx xx0013 | 6400 Grand Ave Gurnee, IL 60031 Ph. 847-782-3680 Fax. 847-855-0279 Nanette Brown |
| 811 | Aero W | Bank of America 9/30/2005 | xxxxxx6350 aba xxxxx0045 | 4201 N. Oracle Road Tucson, AZ 85705 Cecilla Johnson or Andy Chasteen PH. 520-408-6550 Fax. 520-690-1521 |
| 812 | Aero W | Bank of America 10/28/2005 | xxxxxx6363 aba xxxxx0045 | 18641 S. Gridley Road Cerritos, CA Rod Hernandez or Snny Chauhan Ph. 562-403-6252 Fax. 562-403-6254 |
| 813 | Aero W | Chase Bank 12/20/2005 | xxxxx9479 aba# xxxxx1545 deposit routing | 10620 South State Street Sandy, UT 84070 Ph. 801-481-5551 |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| | | | xxxxx1027 | |
| 814 | Aero | Bank of America 4/3/2012 | xxxxxxxx2605 aba#xxxxx0045 | 4811 Hope Valley Rd. Durham, NC 27713 Anute Boonyachai Ph# 1-800-657-9533 ext# 50657 |
| 815 | Aero | Sovereign Bank 10/21/2005 | xxxxxxx9787 aba xxxxx5150 deposit routing xxxxx5203 | 376 Southbridge St. Auburn, MA 01501 Patrick Royce Ph. 508-721-2540 1-877-768-1145 business |
| 816 | Aero W | Wells Fargo Bank 10/28/2005 | xxxxxx6909 ach routing xxxxx0247 deposit routing xxxxx0392 | 6699 N. Landmark Drive Park City, UT 84098 Ph. 800-869-3557 |
| 817 | Aero W | Union Bank of California 6/7/2006 | xxxxxx8442 aba xxxxx0497 deposit routing xxxxx0412 | 801 East Prosperity,Tulare CA 93274 LeeAnn Martinho 559-688-2812 |
| 818 | Aero W | Bank of America 3/10/2006 | xxxxxx0014 aba xxxxx0045 | 100 N Broadway Wichita, KS 67202 Ph. 888-852-5000 fax. 316-261-4446 |
| 819 | Aero | Bank of America 5/23/2006 | xxxxxx0315 aba xxxxx0045 | 100 N Broadway Wichita, KS 67202 Ph. 888-852-5000 fax. 316-261-4446 |
| 820 | Aero | Regions bank 3/3/2006 | xxxxxx4714 deposit routing xxxxx6660 | 4441 Central Ave Hot Springs, AR 71913 ph. 501-624-8860 fax. 501-624-8969 |
| 822 | Aero W | Bank of America 3/24/2006 | xxxxxx4935 aba xxxxx0045 | 100 N Broadway Wichita, KS 67202 Ph. 888-852-5000 fax. 316-261-4446 |
| 823 | Aero | Bank of America 6/14/2006 | xxxxxx0386 xxxxx0045 | 100 N Broadway Wichita, KS 67202 Ph. 888-852-5000 fax. 316-261-4446 |
| 824 | Aero | Hamilton State 3/17/2006 | xxxx1244 ach's & deposits xxxxx1171 | 4979 Bill Gardner Pkwy. Locust Grove, GA 30248 Bonnie ph. 770-507-9502 FAX. 770-914-2873 |
| 825 | Aero | Comerica Bank 4/7/2006 consold account since 10/19/06 | xxxxxx2356 ach's #xxxxx0753 deposit routing xxxxx7772 | 8850 Boedeker Str Dallas,TX fax 214 890-0848 ph. 214-890-5106 ext 5136 Linda Burns |
| 826 | Aero W | Bank of America 4/7/2006 | xxxxxx4951 aba xxxxx0045 | 100 N Broadway Wichita, KS 67202 Ph. 888-852-5000 fax. 316-261-4446 |
| 827 | Aero | Regions merged AmSouth 12/7/2007 | xxxx5890 ach# xxxxx0019 deposit routing xxxxx3875 | 2948 East Texas Str Bossier LA 71111 Ph 318- 674-3536 Sheren White |
| 828 | Aero | Centennial Liberty Bank 3/29/2006-2014 | xxxxxx3420 aba xxxxx8795 deposit routing xxxx0879 | 2901 East Highland Drive Jonesboro , AR 72403 Wayne Wolfe fax. 870-931-0916 870-268-2318 |
| 829 | Aero W | Bank of America 3/31/2006 | xxxxxx0182 aba xxxxx0045 | 100 N Broadway Wichita, KS 67202 Ph. 888-852-5000 fax. 316-261-4446 |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| 830 | Aero | Arvest Bank 5/8/2006 | xxxx3634 aba xxxxx0872 deposit routing xxxxx0000 | 401 N.Walnut PO BOX 160 Harrison, AR 72601 Laura Shaw 870-391-5613       fax-870-391-5620 |
| 831 | Aero | Bank of America 2/2/2009 | xxxxxxxx2152 ach#xxxxx0045 aba#xxxxx0106 | 395 Briarwood Cercle Ann Arbor MI 48108 Jean Pemper Ph#800-654-8503 ext5760 fax#617-235-2580 |
| 832 | Aero | JP Morgan Chase 12/17/2011 | xxxxx7697 aba # xxx-xxx-131 both deposits & ach's | 5801 Sunset Drive South Miami, FL 33143 Carlos Santiago rep#212-622-4366 Annette Harper rep#212-622-6326 Francisco Ph # 305-740-0618 business banker |
| 833 | Aero | Wachovia bank 4/7/2006 | xxxxxxxxx3216 deposit routing xxxxx0219 | Columbiana Center 333 Harbison Blvd. Columbia , SC 29212 Leo Crumper ph. 877-394-9089 fax. 803-253-6781 |
| 834 | Aero W | JP Morgan Chase 12/3/2007 | xxxxxx3538 ach #xxxxx1627 deposit routing#xxxxx1022 | 6951 Bolsa Ave. Westminster, CA 92683 Rain Urcia Ph#714-934-2112 Fax#714-898- 8573 |
| 835 | Aero | Bank of America 4/7/2006 | xxxxxx4977 aba xxxxx0045 | 100 N Broadway Wichita, KS 67202 Ph. 888-852-5000 fax. 316-261-4446 |
| 836 | Aero | Bank of America 4/14/2006 open in kansas | xxxxxx0218 aba xxxxx0045 | 100 N Broadway Wichita, KS 67202 Ph. 888-852-5000 fax. 316-261-4446 |
| 837 | Aero | Bank of America 4/14/2006 | xxxxxx0221 aba xxxxx0045 | 100 N Broadway Wichita, KS 67202 Ph. 888-852-5000 fax. 316-261-4446 |
| 838 | Aero W | Wells Fargo 4/14/2006 | xxxxxx5844 deposit routing xxxxx0390 | 2600 Newberg Hwy Woodburn, OR 97071 Brian Speer fax 503-982-9922 ph.503-982-9922 |
| 839 | Aero | Citizens National Bank 4/14/2006 | xxxxx2059 deposit routing xxxxx0211 | 1199 Bonita Lakes Circle Meridian, MS 39301 Regina Tims 601-484-5337 601-484-5341 |
| 840 | Aero | Regions Bank 3/31/2006 | xxxxxx3212 ach# xxxxx0084 deposit routing xxxxx0017 | 1300 W Poplar Ave Collerville , TN Bridget Ely ph 901 853-7980 ex 22 fax 901 853 7987 |
| 841 | Aero | First National Bank 3/31/2006 | xxxx9163 deposit routing xxxxx6271 tran code (30) | 2511 Trimmier Road Killeen , TX 76543 Ph. 254-554-4254 Fax. 254-634-2661 Shirley Tolliver |
| 842 | Aero | Chase Bank 2/4/2007 | xxxxx5396 deposit routing xxxxx0614 | 1345 N.Town East Blvd Mesquite, TX 75150 Erika Dunham 972-270-2067 fax 972-681-0326 |
| 843 | Aero | Bank of America | xxxxxx0263 | 100 N Broadway |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV¹ | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| | | 4/28/2006 | aba xxxxx0045 | Wichita, KS 67202 Ph. 888-852-5000 fax. 316-261-4446 |
| 846 | AeroW | Bank of America 4/28/2006 | xxxxxx0276 aba xxxxx0045 | 100 N Broadway Wichita, KS 67202 Ph. 888-852-5000 fax. 316-261-4446 |
| 847 | Aero | American Gateway 4/28/2006 | xx2948 ach & deposit routing #xxxxx2290 | 2020 South Burnfide Gonzales, LA 70737 Nicolle Theel 225-647-4921 fax 225 644 6411 |
| 848 | Aero | Bremer Bank 6/23/2006 | xxx6755 deposit routing xxxxx0415 tran code (012) | 1715 W County Rd B2 Roseville, MN 55113 Matt Flannery ph 651 288-3885 fax 651 288-3896 |
| 849 | Aero W | Wells Fargo Bank 5/12/2006 | xxxxxx9952 ach aba xxxxx0076 deposit routing xxxxx0391 | 1864 Blue Lakes Blvd Twin Falls , ID 83301 Path Barcley fax 303 791-2558 ph 303 470-8908 |
| 850 | Aero W | Bank of America 5/24/2006 | xxxxxx0289 xxxxx0045 | 100 N Broadway Wichita, KS 67202 Ph. 888-852-5000 fax. 316-261-4446 |
| 852 | Aero W | Wells Fargo Bank 5/5/2006 | xxxxxx9419 aba xxxxx3799 deposit routing xxxxx0396 | 1798 Hitt Road Idaho, ID 83404 Pat Barcley fax 303 791-2558 ph 303 470-8908 |
| 853 | Aero | Bank of America 6/30/2006 | xxxxxx0399 xxxxx0045 | 100 N Broadway Wichita, KS 67202 Ph. 888-852-5000 fax. 316-261-4446 |
| 854 | Aero | Chase Bank 6/15/2006 | xxxxx1740 aba xxxxx0614 deposit routing xxxxx1023 | 3732 Irving Mall Irving , TX 75062 Kenard 972-255-8556 fax 972-258-4040 |
| 855 | Aero W | Bank of America 4/21/2006 | xxxxxx0043 aba xxxxx0045 | 100 N Broadway Wichita, KS 67202 Ph. 888-852-5000 fax. 316-261-4446 |
| 856 | Aero W | Chase Bank 6/16/2006 | xxxxx0265 ach# xxxxx1545 deposit routing xxxxx1020 | 7352 South Plaza Center Drive West Jordan, UT 84084 Trevor Weeks fax 801-280-6815 ph 801-280-6763 |
| 857 | Aero W | Wells Fargo Bank 5/26/2006 | xxxxxx8218 xxxxx2971 deposit routing xxxxx0398 | 100 West Burnsville Parkway Burnsville, MN 55337 Ann Wood 612 316-1534 ph 612 316-3797 fax |
| 858 | Aero | US Bank 11/2/2006 | xxxxxxxx3934 aba# xxxxx0848 deposit routing xxxxx0032 | 1350 Euclid Ave, Cleveland , OH 44115 Bath Ladd,        Diane 216 902-7858 ph   216-623-9248 216 623-9303 fax |
| 859 | Aero | South State name changed in March from Community Store opened 2006 | xxxx8997 deposit routing xxxxx3852 | 800 Steven B.Tanger Blvd Commerce,GA 30529 Ashley Angel (head teller) ph#706-336-7975 fax#706-335- 7141 |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| 860 | Aero W | Wells Fargo 8/8/2006 | xxxxxx9880 aba# xxxxx2971 deposit routing xxxxx0398 | Beau Jeppesen 4920 South State Str Murray, UT 84107 801-293-9470 801-263-2075 FAX |
| 861 | Aero | Bank of America 4/21/2006 | xxxxxx0247 aba xxxxx0045 | 100 N Broadway Wichita, KS 67202 Ph. 888-852-5000 fax. 316-261-4446 |
| 862 | Aero | Bank of America 5/30/2006 | xxxxxx0373 xxxxx0045 | 100 N Broadway Wichita, KS 67202 Ph. 888-852-5000 fax. 316-261-4446 |
| 864 | Aero W | Bank of America 5/23/2006 | xxxxxx0344 aba xxxxx0045 | Lloyd Banking Center 1200 NE Broadway ste#50 Portland, OR 97232 Anute #1-800-657-9533 ext#50657 branch #503-528-2080 |
| 865 | Aero W | Bank of America 5/23/2006 | xxxxxx0331 aba xxxxx0045 | 100 N Broadway Wichita, KS 67202 Ph. 888-852-5000 fax. 316-261-4446 |
| 866 | Aero | Bank of America 4/28/2006 | xxxxxx0234 aba xxxxx0045 | 100 N Broadway Wichita, KS 67202 Ph. 888-852-5000 fax. 316-261-4446 |
| 867 | Aero | Bank Midwest 6/30/2006 | xxxx0970 deposit routing xxxxx2949 | 1 1 1 1 1 W 95th Str, Overland Park, KS 66214 Brandon PH 913-324-6121 fax 913 324-6191 |
| 868 | Aero | SunTrust Bank 7/28/2006 | xxxxxxxxx1600 ach# xxxxx0104 deposit routing xxxxx2152 | 775 E Merritt Island Causeway Suite 100 Merritt Island, FL 32952 Ann Prince ph. 321-459-3315 fax 321-452-8907 |
| 869 | Aero | Bank of America 6/30/2006 | xxxxx0483 xxxx00045 | 100 N Broadway Wichita, KS 67202 Ph. 888-852-5000 fax. 316-261-4446 |
| 870 | Aero | PNC Bank 10/3/2011 | xxxxxx6995 deposit routing xxxxx2738 deposit routing # xxxx-4020 | 9W. Chocolate Ave. Hershey, PA 17033 Karen Prickett ph.717-534-3201 fax.717-534-3231 |
| 871 | Aero | Fidelity Deposit & Discount Bank 3/29/2007 | xxxxxx 1714 ach# xxxxx3129 deposit routing xxxx0103 tran code (103) | 4010 Birney Ave Moosic, PA 18507 Phone: 570-504-0790 Fax: 570-504-0793 Casey Egan |
| 872 | Aero | Chase Bank 8/3/2006 | xxxxx8319 ach's & deposit routing xxxxx0614 | 1111 N IH-35 Round Rock, TX 78664 Peggy Smith ph 512-244-8550 fax 512-218-8830 |
| 873 | Aero | Wachovia Bank 11/10/2006 | xxxxxxxxx3216 xxxxx0219 | 9700 Corckscrow Rd Estero, FL 33928 Joann 239-495-5240 |
| 874 | Aero | Bank of America 7/14/2006 | xxxxx 1213 xxxxx0045 | 100 N Broadway Wichita, KS 67202 Ph. 888-852-5000 fax. 316-261-4446 |
| 875 | Aero | First Citizens Bank 2/1/2007 | xxxxxxxx 1801 ach & deposit routing | 131 Forum Driva Columbia, SC 29229 Adam Kreswell |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| | | | xxxxx6041 | 803-788-8815 |
| 876 | Aero | Metropolitan Bank 10/4/2006 merged with Simmoms Bank March 2014 | xxx6604 deposit routing xxxxx1247 | 3701 Pinnocall Hill Parkway Rogers, AR 72758 Ph 479-845-4740,Lyn Mick Fax 479-845-4790 |
| 878 | Aero | Fifth Third Bank 10/3/2007 | xxxxxx0280 xxxxx0004 ach aba# xxxxx0314 | 1365 Michigan , WaterVill, OH 43566 Donald Firsdon ph:419-878-9015 fax: 419-878-3682 |
| 880 | Aero W | Bank of America 10/6/2006 | xxxxxxxx1404 xxxxx0045 | 100 N Broadway Wichita, KS 67202 Ph. 888-852-5000 fax. 316-261-4446 |
| 881 | Aero | Bank of America 11/17/2006 open in kansas | xxxxxxxx4584 xxxxx0045 | 100 N Broadway Wichita, KS 67202 Ph. 888-852-5000 fax. 316-261-4446 |
| 882 | Aero | Lone Star National Bank 11/2/2006 | xxxxxx3368 deposit routing xxxxx1687 | 214 South Texas Blvd. Weslaco, Texas 78596 Mary Shamlian ph. (956-973-7700) fax. 956-973-7707 |
| 883 | Aero | First Interstate 1/25/2011 | xxxxxx6353 ach & deposit routing# xxxxx1683 | 3502 Brooks St. Missoula, MT 59801 Maureen Graham Phone# 406-523-4475 or 4476 Fax NO. 406-523-4276 - Laurie |
| 885 | Aero | BB & T Bank Previously Colonial Bank merged (2010) | xxxxxxxxx4920 ach & deposit routing# xxxxx1387 tran code (13) | Mary Brannigan 2941 N Poinciana Blvd Kissimmee, FL 34746 FAX: 407-397-7500 PH: 407-397-7400 |
| 886 | Aero | Hancock Bank 9/8/2006 | xxxxx4399 deposit routing xxxxx681 | 10496 Hwy. 49 Gulfport, MS 39503 ph. 228-831-2143 fax. 228-328-2360 Terry Waldrop |
| 887 | Aero | Wells Fargo 6/27/2012 | xxxxxx2463 ach#xxxxx0248 deposit routing xxxxx0392 | 1400 Corsicana Highway Hillsboro, TX 76645 Karen Singletary Ph#404-214-1432 |
| 888 | Aero | IBC Bank 3/16/2007 | xxxxxx3546 deposit routing xxxxx2528 tran code (131) | 1200 San Bernardo Ave Laredo, Texas Andreana Huddleston ph 956-422- 7611 fax 956-726-6660 |
| 889 | Aero | Regions Bank 3/1/2007 | xxxxxx4522 xxxxx5690 dep.tick aba xxxxx6660 | 429 Main Str. Trussville, AL. 35173 Lisa Baker ph: 205-326-7546 fax 205-326-7743 |
| 890 | Aero | Capital One 5/4/2007 | xxxxxx1453 aba#xxxxx1981 deposit routing xxxxx0001 | 604 Potomac Station Drive Leesburg, VA 20176 Salma Azhar ph : 703-669-2209 fax : 703-669-2218 |
| 891 | Aero | Queenstown Bank of Maryland 3/30/2007 | xxxxxx6901 deposit routing xxxxx1957 | P.O. Box 120 Queenstown, MD 21658 Phone: 410-827-8881 fax: 410-827-8190 Janet Such |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| 892 | Aero W | Wells Fargo Bank 4/6/2007 | xxxxxx3630<br>ach# xxxxx0076<br>deposit routing<br>xxxxx0393 | 1578 Howe Ave<br>Sacramento, CA<br>Kappie<br>fax 916-564-7648<br>ph: 916-565-4904 |
| 895 | Aero | Wilson Bank & Trust 4/13/2007 | xxxx3866<br>deposit routing<br>xxxxx3529 | 200 Tennessee Blvd Lebanon, TN 37087 Katha<br>Wrye ph: 615-443-6178<br>fax 615-443-6284 |
| 896 | Aero | Bank of America<br>4/6/2007 | xxxxxxxx0014<br>xxxxx0045 | 534 S Kansas Ave<br>Topeka, KS 66603<br>Kathy Kinsch<br>888-852-5000 ext 4751 fax 785-295-3433 |
| 897 | Aero | BB&T Bank<br>4/13/2007 | xxxxxxxxx0788<br>deposit routing<br>xxxxx415<br>tran code (13) | 3001 Watson Blvd.<br>Warner Robins, GA 31093<br>Michelle Britt ph: 478-953-8251 fax: 478-971-1063 |
| 900 | Aero West | Bank of America<br>5/18/2007 | xxxxxxxx0056<br>xxxxx0045 | 534 S Kansas Ave<br>Topeka, KS 66603<br>Kathy Kinsch<br>888-852-5000 ext 4751 fax 785-295-3433 |
| 901 | Aero | PNC Bank<br>1/3/2011 | xxxxxx2849<br>deposit routing<br>xxxx-4020 | 1427 E. Dixie Dr.<br>Asheboro, NC 27203 Candy McReynolds<br>branch ph#336-626-8683 |
| 902 | Aero | Wells Fargo<br>8/8/2011 | xxxxxx8505<br>ach's #xxxxx0076<br>deposit routing<br>xxxxx0391 | 110 Hwy 332 West<br>Lake Jackson, TX 77566 Pat Barclay<br>Ph#303-470-8908 |
| 903 | Aero | Wachovia<br>5/25/2007 | xxxxxxxxx3216<br>xxxxx0219 | Judy Gonsales<br>ph 800-590-7868 team 600 ext 47758<br>fax 866-842-0585 |
| 904 | Aero | JP Morgan Chase<br>8/30/2008 | xxxxx0211<br>ach# xxxxx0013<br>deposit routing<br>xxxxx1029 | 700 N. Janes Ave.<br>Bolingbrook, IL 60440 ph# 630-783-9240 |
| 905 | Aero | Chase Bank<br>4/20/2007 | xxxxx6436<br>deposit routing<br>xxxxx0019 | 2280 Str Rd 44<br>Osh Kosh, WI 54904 Sonia 920-236-3900 fax 920-231-7818 |
| 906 | Aero | Wells Fargo<br>8/8/2011 | xxxxxx8513<br>ach#xxxxx0076<br>deposit routing<br>xxxxx0391 | 105 1st. NE<br>Auburn, WA 98002 Pat Barclay<br>Ph#303-470-8908 |
| 907 | Aero | Northway Bank<br>4/20/2007 | xxx1445<br>ach & deposit routing<br>xxxxx0425<br>tran code (50) | 5 Market Str.<br>Tilton, NH 03276<br>Jenny Williams 603-286-4344<br>fax 603-286-4151 |
| 908 | Aero | Bank of America<br>5/18/2007 | xxxxxxxx5810<br>xxxxx0045 | 534 S Kansas Ave<br>Topeka, KS 66603<br>Kathy Kinsch<br>888-852-5000 ext 4751 |

WEIL:\95685927\8\11727.0012

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| 909 | Aero | Bank of America 5/11/2007 | 518000410108 101100045 | 534 S Kansas Ave Topeka, KS 66603 Kathy Kinsch 888-852-5000 ext 4751 fax 785-295-3433 |
| 911 | Aero | SunTrust Bank 4/13/2007 | xxxxxxxxx8401 ach# xxxxx0104 deposit routing xxxxx0020 | branch#757-465-1387 fax: 757-465-1449 4113 Portsmouth Blvd Chesapeake, VA 23321 |
| 912 | Aero | Bank of the West 5/18/2007 | xxxxx5244 ach# xxxxx6813 deposit routing xxxxx0015 | 10050 CoorsBy Pass Albauquerque, NM 87114 Heisel or Shain Whitlock ph:505-792-0726 fax: 505-792-0781 |
| 913 | Aero West | Bank of America 6/1/2007 | xxxxxxxx0111 xxxxx0045 | 534 S Kansas Ave Topeka, KS 66603 Kathy Kinsch 888-852-5000 ext 4751 |
| 914 | Aero | Arvest Bank 9/7/2007 | xxxx7744 ach & deposit routing xxxxx2976 | 4500 N Harrison Shawnee , OK 74804 Sonia Ryan 405-214-1355, fax 405-214-1289 |
| 915 | Aero W | JP Morgan Chase 2/8/2013 | 181026682 ach#xxxxx0021 deposit routing xxxxx1028 | 1261 W. Rancho Vista Blvd. Palmdale, CA 93551 rep Keisha Watkins, 212-622-6172 |
| 916 | Aero W | Bank of America 6/15/2007 | xxxxxxxx0221 xxxxx0045 | 534 S Kansas Ave Topeka, KS 66603 Kathy Kinsch 888-852-5000 ext 4751 |
| 917 | Aero | Citizens Bank & Trust 5/25/2007 | xxxxxx3201 deposit routing xxxxx3407 tran code (13 1) | Highway 27, Lake Wales, FL 33859 Carlie Cosce ph: 863-676-7631 fax: 863-676-1734 |
| 918 | Aero | Bank of America 1/18/2008 | xxxxxxxx5182 ach aba# xxxxx0045 aba# xxxxx0106 | 10731 West Pico Blvd. Los Angeles, CA 90064 Ph# 310-996-7846 |
| 919 | Aero | Bank of America 6/8/2007 | xxxxxxxx0153 xxxxx0045 | 534 S Kansas Ave Topeka, KS 66603 Kathy Kinsch 888-852-5000 ext 4751 |
| 920 | Aero | Hickory Point Bank 6/8/2007 | x9381 deposit routing xxxxx4805 | 1401 W hickory Point Drive Forsyth, IL 62535 Misty Lee, ph:217-875-3131 fax: 217-872-3904 |
| 921 | Aero | SunTrust Bank 8/10/2007 | xxxxxxxxxx9016 ach# xxxxx0104 deposit routing xxxxx2152 | 11200 South Orange Blossom Trail Orlando, FL 32837 fax: 407-851-8249 |
| 922 | Aero | Bank of America open 10/25/07 | xxxxx0341 aba # xxxxx0045 | 50 Morrissey Blvd. Dorchester, MA 02125 Frank W. Tarara 1-800-654-8503 ext.5630 |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| 923 | Aero | Bank of America<br>10/30/2008 | xxxxxxxx 1713<br>aba# xxxxx0045 | 1910 Bruce B. Downs Blvd. Wesley Chapel, FL 33543 Jean Pemper<br>Ph# 800-654-8503 ext# 5760 Fax# 617-235-2580 |
| 924 | Aero | Susquehanna Bank<br>11/18/2007 | xxxxxxx7912<br>ach's# xxxxx9123<br>deposit routing<br>xxxxx0318<br>tran code (31) | 366 Hartman Bridge Rd.<br>Ronks, PA 17572<br>Rina Coulter (717-687-8454) anything with armored car service Lisa Trinkley (717-625-6613) |
| 925 | Aero | Wells Fargo<br>10/11/2007 | xxxxxx5471<br>xxxxx0076<br>deposit routing<br>xxxxx0391 | 66 West Springer Drive<br>Highlands Ranch, CO 80129 Pat Barclay 303-470-8908 |
| 926 | Aero | Wachovia<br>5/11/2007 | xxxxxxxxx3216<br>053000219 | Judy Gonsales<br>ph 800-590-7868 team 600 ext 47758<br>fax 866-842-0585 |
| 927 | Aero | Wells Fargo<br>10/5/2008 | xxxxxx4889<br>ach & deposit<br>xxxxx0391 | 3800 Howard Hughes Las Vegas, Nevada Pat Barclay<br>Ph# 303-470-8908 fax# 303-791- 2558 |
| 929 | Aero | Wells Fargo<br>7/27/2007 | xxxxxx3902<br>deposit routing<br>xxxxx0391 | 66 West Springer Drive<br>Highlands Ranch, CO 80129 Pat Barclay 303-470-8908 |
| 930 | Aero | Wells Fargo<br>10/12/2007 | xxxxxx5273<br>ach's# xxxxx0076<br>deposit routing<br>xxxxx0391 | 66 West Springer Drive<br>Highlands Ranch, CO 80129 Pat Barclay 303-470-8908 |
| 931 | Aero | 1/2/2010 | xxxxxx 1150<br>ach# xxxxx6183<br>deposit routing<br>xxxxx3502 | 11 S. McClintock Drive.<br>Tempe, AZ 85281<br>Mely Torres<br>ph#602-716-8975 fax#480-921- 3355 |
| 933 | Aero | Chase Bank<br>3/31/2007 | xxxxx9926<br>deposit routing<br>xxxxx0137 | 201 East Main Street Lexington, KY 40507 Phone: 859-231-2696 Fax: 859-231-2917 Matthew Orr |
| 934 | Aero | Bank of America<br>4/27/2007 | xxxxxxxx0069<br>xxxxx0045 | 534 S Kansas Ave<br>Topeka, KS 66603<br>Kathy Kinsch<br>888-852-5000 ext 4751 fax 785-295-3433 |
| 935 | Aero | NBT<br>merged in October 2011 Legacy Bank<br>5/4/2007 | xxxxxx0647<br>ach# xxxxx 3618<br>deposit routing<br>xxxx-1010<br>tran code#10 | 76 Park Street, Lee, MA 01238 Louise Lucchese<br>ph 413-243-4126<br>fax: 413-243-4813 |
| 936 | Aero | JP Morgan Chase<br>3/1/2010 | xxxxx4033<br>ach# xxxxx0614<br>deposit routing<br>xxxxx1023 | 190 E. Stacy Rd. Building #600 Allen, TX 75002<br>Ana Reyes<br>212-552-8183 |
| 937 | Aero W | CitiBank<br>8/24/2007 | xxxxx7098<br>deposit routing<br>xxxxx1724 | 4050 W.Metropolitan Dr Orange, CA 92868<br>Juana Rivero 714-938-0379 fax 714-938-0379 |
| 938 | Aero | Bank of America | xxxxxxxx0124 | 534 S Kansas Ave |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| | | 5/25/2007 | xxxxx0045 | Topeka, KS 66603<br>Kathy Kinsch<br>888-852-5000 ext 4751 fax 785-295-3433 |
| 940 | Aero | Commerce Bank<br>6/8/2007 | xxxxx0969<br>deposit routing<br>xxxxx0019 | 114 th &Nall , Leawood, KS 66211<br>Ph: 816-234-1760<br>Fax: 417-837-5289<br>Alyssa Blackwell |
| 941 | Aero | Bank of America<br>4/27/2007 | xxxxxxxx0072<br>xxxxx0045 | 534 S Kansas Ave<br>Topeka, KS 66603<br>Kathy Kinsch<br>888-852-5000 ext 4751 fax 785-295-3433 |
| 942 | Aero | JP Morgan Chase<br>8/30/2009 | xxxxx1778<br>ach & deposit<br>xxxxx1627 | 3498 Telegraph Rd. Ventura, CA 93003 Deanna Hyde<br>ph# 805-650-3110<br>fax#805-644-6217 |
| 943 | Aero | PNC<br>10/4/2013 | xxxxx5802<br>ach# xxxxx0030<br>deposit routing<br>xxxx-4010 | 12500 Coutry Club Mall La Valle, MD 21502<br>Joan O'Kelly<br>Ph#732-220-3598 |
| 944 | Aero | BB&T<br>3/30/2015 | xxxxxxxxxx5639<br>ach& deposit routing#<br>xxxxx3308<br>tran code #13 | 4715 North Midland Dr.<br>Midland, TX 79705<br>rep. Mary Elaine Long #410-860- 1904 branch#432-848-4513 |
| 945 | Aero | Chase Bank<br>9/28/2007 | xxxxx3454<br>deposit routing<br>xxxxx0614 | 2370 Justin Road , Lewisville TX 972-966-2756<br>fax: 972-966-2209 Ammy Shults |
| 947 | Aero | Wachovia Bank<br>9/27/2007 | xxxxxxxxx3216<br>xxxxx0219 | 3351 Riverwood Pkwy<br>Atlanta, GA 30339<br>Karen Singletary #404-214-1432 branch 404-865-3520 |
| 948 | Aero | IBC Bank<br>10/12/2007 | xxxxxx0152<br>ach's & deposit routing<br>xxxxx3284<br>tran code (13 1) | 2310 SW Military Dr Ste 216 San Antonio, TX 78224<br>Isabel Bravo 210-518-2558 fax 210-927-3374 |
| 949 | Aero | Trustco Bank<br>9/28/2007 | xxxx8312<br>ach's & deposit routing<br>xxxx0912 | 34 Wolf Road<br>Albany, NY 12205<br>518-458-7761, FAX 518-458-8779 Jacky Dushensky |
| 950 | Aero | US Bank<br>5/25/2007 | xxxxxxxx4158<br>ach# xxxxx0848<br>deposit routing<br>xxxxx0032 | 1350 Euclid Ave, Cleveland , OH 44115<br>Bath Ladd<br>216 902-7858 ph 216 623-9303 fax |
| 953 | Aero | Wells Fargo<br>9/28/2007 | xxxxxx5232<br>ach's# xxxxx0076<br>deposit routing<br>xxxxx0391 | 66 West Springer Drive<br>Highlands Ranch, CO 80129 Pat Barclay 303-470-8908 |
| 954 | Aero | Wells Fargo<br>7/20/2007 | xxxxxx4066<br>ach# xxxxx0076<br>deposit routing | 66 West Springer Drive<br>Highlands Ranch, CO 80129 Pat Barclay 303-470-8908 |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---------|--------|-----------|----------|---------|
| | | | xxxxx0391 | |
| 955 | Aero | US Bank<br>11/1/2008 | xxxxxxxx9908<br>ach# xxxxx0848<br>deposit routing<br>xxxxx0032 | 121 E. Main St.<br>Anoka, MN 55303<br>Diana Vance<br>ph#216-623-9248, branch 763-576-1060 |
| 956 | Aero | Bank of Colorado<br>8/17/2007 | xxxxxx0864<br>deposit routing<br>xxxxx2448 | 4848 Thompson Prky Suite 100 Johnstown, CO 80534<br>Sandra Chapman ph: 970-679- 7405<br>fax: 970-663-7601,main number# 970-663-7600 |
| 957 | Aero | Wachovia<br>10/24/2007 | xxxxxxxx3216<br>xxxxx0219 | Jennifer Daley<br>1-800-590-7868 Team 600 ext 85743<br>fax: 866-842-0585 |
| 959 | Aero | Wachovia Bank<br>9/21/2007 | xxxxxxxx3216<br>xxxxx0219 | Judy Gonsales<br>ph 800-590-7868 team 600 ext 47758<br>fax 866-842-0585 |
| 960 | Aero | Key Bank<br>5/14/2012 | xxxxxxxx5661<br>ach# xxxxx0267<br>deposit routing<br>051430618 | 14412 Orchard Pkwy<br>Westminster, CO 80023<br>rep Dennis White #216-813-5822 Dawn #216-813-6818 |
| 961 | Aero | Wells Fargo<br>3/21/2008 | xxxxx5554<br>ach# xxxxx0076<br>deposit routing<br>xxxxx0391 | Pat Barclay<br>66 W Springer Drive<br>Highlands Ranch, CO 80129 Ph 303-470-8908 Fax 303-791- 2558<br>branch# 806-324-5033 |
| 962 | Aero | Citizens Bank<br>10/3/2007 | xxxx2210<br>ach & deposit routing<br>xxxxx0120 | 965 Oaklawn Ave<br>Granston, RI<br>Marlin Volino ph: 401-275-6491 fax: 401-275-6494 |
| 963 | Aero | Bank of America<br>4/25/2008 | xxxxxxxx5292<br>ach# xxxxx0045 | 524 East Main St.<br>Barstow, CA 92311<br>Jean Pemper<br>Ph# 800-654-8503 ext# 5760 Fax# 617-235-2580 |
| 964 | Aero | Prosperity Bank<br>2/13/2009 | xxx7691<br>ach&deposits<br>xxxxx2655 | 217 E. FM 1382<br>Cedar Hill, TX 75104 Tonya Walker<br>ph#972-291-6246<br>fax#972-291-8682 |
| 966 | Aero | Capital City<br>11/29/2010 | xxxxx0401<br>ach & deposit routing#<br>xxxxx0688<br>tran code (131) | 1701 Bass Road<br>Macon, GA 31210<br>Eddie Cutchens or Jackie Ph. 478-474-2110 |
| 967 | Aero | Bank of America<br>4/11/2008 | xxxxxxxx5250<br>aba# xxxxx0045 | 32011 Pacific Highway South Federal Way, WA 98003<br>Ph# 206-358-2750 |
| 968 | Aero | JP Morgan Chase<br>6/30/2012 | xxxxx7904<br>ach# xxxxx0024<br>deposit routing<br>xxxxx1028 | 2437 E. Florence Blvd. Casa Grande, AZ 85194<br>branch ph# 520-421-1215 rep Keisha Watkins<br>ph#212-622-6172 |
| 969 | Aero | Suntrust<br>4/30/2008 | xxxxxxxxx2159<br>ach & deposit<br>xxxxx0104 | 1170 Buford Highway Cumming, GA 30041 Diana Hull<br>Ph# 770-205-2105 |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV¹ | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| | | | | Fax# 770-205-2116 |
| 971 | Aero<br>pet: chippy<br>sibling: John<br>Gf: Maria | First National www.firstnational.com<br>4/25/2008<br>online banking:<br>username: aeropostale971 password:<br>Aero1234 | xxxxx4545<br>www.firstnational.com<br>ach# xxxxx0016 | 7960 Towne Center Papillion, NE 65048 Chris<br>Roorda<br>Ph# 402-341-0500 Fax# 402-885-2518 |
| 972 | Aero | Regions<br>5/1/2008 | xxxxxx 1465<br>deposit routing<br>xxxxx4668 | 17900 Panama City Beach Pkwy Panama City<br>Beach, FL 32413 Darren<br>Ph# 850-235-4014<br>Fax# 850-236-7260 |
| 973 | Aero | JP Morgan Chase 5/2/2008 | xxxxx0899<br>ach# xxxxx0010<br>deposit routing<br>xxxxx1026 | 11610 Olio Rd.<br>Fishers, IN 46037 Ben Lawless<br>Ph# 317-579-0681 Fax# 317-579-0643 |
| 975 | Aero | Bank of America<br>5/9/2008 | xxxxxxxx3993<br>ach# xxxxx0045 | 100 N. Westshore Blvd.<br>Tampa, FL 3609<br>Jean Pemper<br>Ph# 800-654-8503 ext# 5760 Fax# 617-235-2580 |
| 976 | Aero | First National of Mercerburg<br>5/14/2012 | xxx0672<br>ach & deposit routing<br>xxxxx9851<br>tran code (051) | 3141 Black Gap Rd.<br>Chambersburg, PA 17202 Danielle Barto<br>ph. 717-262-4243<br>fax. 717-264-5951 |
| 970 | Aero | American Bank<br>4/1/2008 | xxxxx3894<br>deposits & ach's<br>xxxxx3284<br>tran code (101) | 800 North Shoreline<br>Suite 100 Southtower Corpus Christi, TX 78401<br>Kendra Milete<br>Ph: 361-653-5251 fax: 361-888- 7200 |
| 977 | Aero | Bank of America 7/11/08 | xxxxxxxx8739<br>aba# xxxxx0045 | 8000 West Broward Blvd. Plantation, FL 33388<br>Jean Pemper<br>Ph# 800-654-8503 ext#5760<br>Fax# 617-235-2580 |
| 978 | Aero W | Citibank<br>7/4/2008 | xxxxx2859<br>ach & deposit<br>xxxxx1724 | 121 Stonewood St. Downey, CA 90241 Ivy Smith<br>ph# 562-861-0702 fax# 562-861-8431 |
| 979 | Aero | Bank of America<br>7/25/2008 | xxxxxxxx8771<br>aba# xxxxx0045 | 225 Tukwila Parkway<br>Tukwila, WA 98188<br>Jean Pemper<br>Ph# 800-654-8503 ext#5760 Fax# 617-235-2580 |
| 980 | Aero | Wachovia<br>7/30/2008 | xxxxxxxxx3216<br>aba# xxxxx0219 | 2821 Business Center Drive. Pearland, TX 77584<br>Karen Singletary ph# 404-214- 1432<br>Juakeisha Coles<br>800-590-7868 team 600 ext# 85789 |
| 981 | Aero | Capital One<br>11/5/2010 | xxxxxx6529<br>aba# xxxx0090<br>deposit routing<br>xxxxx0001 | 21147 26th Ave.<br>Bayside, NY 11360 Tammy Prats<br>Ph#504-533-2905 |
| 982 | Aero | Bank of America<br>11/14/2008 | xxx-xxx-7316<br>aba# xxxxx0045 | 700 W. Whittier Blvd.<br>Montebello, CA 90640<br>Jean Pemper<br>Ph# 800-654-8503 ext#5760 Fax# 617-235-2580 |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| 983 | Aero | Bank of America 8/8/2008 | xxxxxx1450 aba# xxxxx0045 | 16 School St. Foxboro, MA 02035 Jean Pemper Ph# 800-654-8503 ext#5760 Fax# 617-235-2580 |
| 984 | Aero | Bank of America 10/24/2008 | xxxxxxx7303 aba# xxxxx0045 | 6261 Lone Tree Way Brentwood, CA 94513 Jean Pemper Ph# 800-654-8503 ext#5760 Fax# 617-235-2580 |
| 985 | Aero | Bank of America 11/13/2008 | xxxxxxxx0608 aba# xxxxx0045 | 1188 Galleria Blvd. Roseville, CA 95678 Jean Pemper Ph# 800-654-8503 ext#5760 Fax# 617-235-2580 |
| 988 | Aero | Regions 8/29/2008 | xxxxx5830 ach & deposit routing xxxxx5690 | 280 Dogwood Blvd. Flowwod, MS 39232 Sandra Harris #423-752-1585 Felicia Johnson branch# 601-960-6531 |
| 989 | Aero | Citizens Bank 4/25/2008 | xxxxx3890 deposit & ach# xxxxx0417 | 7205 Wayne Rd. Westland, MI 48185 Gary Gaspas Ph# 734-425-7200 Fax# 734-425-9503 |
| 993 | Aero | Bank of America 5/9/2008 | xxxxxxxx3980 ach# xxxxx0045 | 555 Capitol Mall Sacramento, CA 95814 Jean Pemper Ph# 800-654-8503 ext# 5760 Fax# 617-235-2580 |
| 994 | Aero | Bank of America 7/18/2008 | xxxxxxxx8784 aba# xxxxx0045 | Towngate Plaza 22900 Centerpoint Drive Moreno Valley, CA 92553 Jean Pemper Ph: 303-470-8908 Fax# 303-791- 2558 |
| 995 | Aero | Bank of America 11/14/2008 | xxxxx7329 aba# xxxxx0045 | 142 E. Olive Ave. Burbank, CA 91501 Jean Pemper Ph# 800-654-8503 ext# 5760 Fax# 617-235-2580 |
| 996 | Aero | JP Morgan Chase 9/12/2008 | xxxxx8620 ach# xxxxx0013 deposit routing xxxxx1029 | 875 N. Michigan Ave. Chicago, IL 60611 Wanda Rosario ph# 312-664-4600 |
| 997 | Aero | Arvest 8/4/2011 | xxxx3395 aba# xxxxx2976 deposit routing# xxxxx0001 | 6100 W. Reno Ave. Oklahoma City, OK 73127 Kendra Noble Ph#405-677-8711 |
| 999 | Aero | Bank of Louisiana 9/5/2008 | xx4051 ach & deposit xxxxx0731 | 197 W. Bank Expressway Ste. #8000 Gretna, LA 70053 Oral Kennedy ph# 504-362-8305 fax# 504-368-3537 |
| 1013 | Aero | US Bank 8/1/2008 | xxxxxxxx4131 aba# xxxxx0549 deposit routing | 181 West Mineral Ave. Littleton, CO 80120 Diana Vance Rep #216-623-9248 |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| | | | xxxxxx032 | |
| 1014 | Aero | First Interstate<br>7/4/2008 | xxxxxx6359<br>ach# xxxxx 1683<br>deposit aba#<br>xxxxx0129 | Laurie Anderson<br>521 SE Wyoming Blvd. Casper, Wyoming 82609<br>ph# 307-235-4384<br>fax# 307-234-9426 |
| 1015 | Aero | Bank of Ocean City<br>5/16/2008 | xxxxx1650<br>ach & deposit #<br>#xxxxx2312 | 10005 Golfcourse Rd. Ocean city, MD 21842 Will Mumford<br>Ph# 410-213-0173 Fax# 410-213-1473 |
| 1016 | Aero | First Citizens<br>8/1/2008 | xxxxxxxx6881<br>ach's & deposits<br>xxxxx0300 | 409 East Market St.<br>Smithfield, NC 27577 branch ph# 919-989-3200<br>fax: 919-989-3290<br>Hilary #919-989-3249 |
| 1017 | Aero | Wells Fargo<br>8/8/2008 | xxxxxx4699<br>ach# xxxxx0076<br>deposit routing<br>xxxxx0391 | 1113 East Bidwell St. Folsom, CA 95630 Pat Barclay<br>Ph# 303-470-8908 Fax# 303-791-2558 |
| 1018 | Aero | JP Morgan Chase<br>1/11/2013 | xxxxx9550<br>ach# xxxxx1627<br>deposit routing<br>xxxxx1022 | 2011 Harbison Dr. Vacaville, CA 95687 Keisha Watkins rep#212-622-6172 branch#707-451-6640 |
| 1020 | Aero | Bank of America<br>8/1/2008 | xxxxxx1418<br>aba# xxxxx0045 | 29 West Boylston St.<br>Worcester, MA 01605<br>Jean Pemper<br>Ph: 303-470-8908 Fax# 303-791- 2558 |
| 1021 | Aero | Regions<br>8/22/2008 | xxxxxx8595<br>ach & deposit<br>xxxxx0109 | 2200 N. Rodney Parham Little Rock, AR 72212 Sandra Harris #423-752-1585 Adrian Jackson branch# 501-224-2497 |
| 1022 | Aero | Comerica<br>5/20/08 | xxxxxx2356<br>ach #'072000096<br>deposit routing<br>xxxxx7772 | 13920 City Center Ste# 4000 Chino Hills, CA 61709 Shawn<br>Ph# 909-393-3001<br>fax# 909-364-9193 |
| 1023 | Aero | Citizens Bank<br>5/23/2008 | xxxxxx4310<br>ach xxxxx6150<br>deposit routing<br>xxxx1155 | 429 W. Ridge Pike 19B-6769 Limerick, PA 19468 Bill Vitiello<br>Ph# 610-495-2699<br>fax# 610-495-2691 |
| 1024 | Aero | Wachovia<br>5/30/2008 | xxxxxxxxx3216<br>aba# xxxxx0219 | 17802 Spring Cypress RD. Cypress, TX 77429 Jennifer Daley<br>800-590-7868 team 600 ext# 85743<br>Karen Singletary ph# 404-214- 1432 |
| 1025 | Aero | US Bank<br>6/13/2008 | xxxxxxxx2440<br>ach's & deposit<br>xxxxx0032 | 3703 MC Cain Blvd.<br>North little Rock, AR 72116 Diana Vance Rep #216-623-9248 Will (branch #501-758-6640 fax# 501-753-6432 |
| 1026 | Aero | Wachovia<br>6/13/2008 | xxxxxxxxx3216<br>aba# xxxxxx219 | 4715 Town Center<br>Jacksonville, FL 32246<br>Jennifer Daley<br>800-590-7868 team 600 ext# 85743<br>Karen Singletary ph# 404-214- 1432 |
| 1028 | Aero | Bank of America | xxxxxx1421 | 100 Cambridge Side Place Cambridge, MA 02141 |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
|  |  | 8/1/2008 | aba# xxxxx0045 | Jean Pemper<br>Ph: 303-470-8908 Fax# 303-791- 2558 |
| 1029 | Aero | IBC<br>7/25/2008 | xxxxxx2090<br>ach's & deposits<br>xxxxx1580 | 501 South Dixieland Rd. Harlingen, TX 78552<br>Martin Zarate<br>ph: 956-428-6902 fax: 956-423-4490 |
| 1034 | Aero | Centrue<br>9/19/2008<br>order deposit tickets from the bank | xxxxxx4061<br>ach's & deposit<br>xxxxx1837<br>tran code #41 | 980 N. Kinzie Ave. Bradley, IL 60915 Jennifer Voss<br>ph# 815-937-3681<br>fax# 815-937-3684 |
| 1035 | Aero | Wells Fargo<br>10/17/2008 | xxxxxx4897<br>ach# xxxxx0076<br>deposit routing<br>xxxxx0391 | 4195 Yellowstone Chubbuck, ID 83202 Pat Barclay<br>Ph# 303-470-8908 Fax# 303-791-2558 |
| 1036 | Aero | Bank of America<br>11/7/2008 | xxxxxxxx0183<br>aba# xxxxx0045 | 7450 170th Ave. NE<br>Redmond, WA 98052<br>Jean Pemper<br>Ph: 303-470-8908 Fax# 303-791- 2558 |
| 1038 | Aero | Wells Fargo<br>10/10/2008 | xxxxxx4987<br>ach's# xxxxx0076<br>deposit routing<br>xxxxx0391 | 1116 Harrison Ave. Centralia, WA 98531 Pat<br>Barclay<br>Ph# 303-470-8908 Fax# 303-791-2558 |
| 1039 | Aero | Bank of the West<br>11/6/2008 | xxxxx1387<br>ach"s & deposits<br>xxxxx2147 | 9335 East County Line Rd. Centenial, CO 80112<br>Jason Dickens<br>ph# 303-792-2265 |
| 1040 | Aero | FirstMerit<br>10/17/2008 | xxxxxxxxxx5243<br>ach's & deposits<br>xxxxx0555 | Lodi Station Outlet<br>9911 Avon Lake Rd.<br>Burbank, OH 44214<br>Christina Miller<br>ph# 330-948-1002 fax# 330-948- 3297 |
| 1042 | Aero | JP Morgan Chase<br>11/1/2008 | xxxxx2105<br>ach# xxxxx0137<br>deposit routing<br>xxxxx1024<br>tran code (20) | 3500 Hwy 190<br>Mandeville, LA 70448 Sherry<br>ph# 985-674-8700 or 8709 |
| 1043 | Aero | Bank of Ameica<br>11/14/2008 | xxxxxx7332<br>aba# xxxxx0045 | 2080 W. Ina Rd.<br>Tucson, AZ 85741<br>Jean Pemper<br>Ph# 800-654-8503 ext# 5760 Fax# 617-235-2580 |
| 1046 | Aero | JP Morgan Chase<br>11/13/2008 | xxxxx4777<br>aba# xxxxx0021<br>deposit routing<br>xxxxx1028 | 3550 Route 66<br>Neptune, NJ 07753 Stephanie Serratelli ph# 732-922-0797 |
| 1047 | Aero | Huntington<br>11/14/2008 | xxxxxxxx4219<br>ach & deposits<br>xxxxx5032 | 590 Washington Rd. Washington, PA 15301 Kelly<br>Faure<br>ph# 724-225-9800 |
| 1048 | Aero | Bank of Hawaii<br>5/22/2009 | xxxxxx9500<br>ach & deposit<br>xxxxx1028 | 1441 Kapiolani Blvd.<br>Honolulu, HI 96814<br>James Chong ph#808-694-6628 Sandy ph#808-694-6627 |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---------|--------|-----------|----------|---------|
| 1049 | Aero | JP Morgan Chase 8/6/2009 | xxxxx1864 ach# xxxxx0037 deposit routing xxxxx1027 | One East Ave. Monroe, OH 45050 Peggy Swanson ph# 513-425-8504 fax# 513-539-4615 |
| 1051 | Aero | Wachovia 10/30/09 | xxxxxxxxx3216 aba# xxxxx0219 | 800 W. Main St. Freehold, NJ 07728 Karen Singletary Juakeisha coles |
| 1053 | Aero | US 9/18/2009 | xxxxxx3724 ach#xxxxx0848 deposit routing xxxxx0032 | 6199 Sunrise Mall Citrus Heights, CA 95610 rep. Diana Vance Ph#216-623-9248 |
| 1054 | Aero | Wells Fargo 6/3/2011 | xxxxxx8810 aba#xxxxx0076 deposit routing xxxxx0391 | 900 Colusa Ave. Yuba City, CA 95991 Pat Barclay Ph#303-470-8908 Fax#303-791- 2558 Branch# 530-751-9102 |
| 1055 | Aero | Wells Fargo 4/15/2011 | xxxxxx5290 aba#xxxxx0076 deposit routing xxxxx0391 | 4601 East Main Farmington, NM 87402 Pat Barclay Ph#303-470-8908 Fax#303-791- 2558 Carma Slim branch# 505-566-2583 |
| 1056 | Aero | BB&T 8/5/2013 | xxxxxxxxx5701 aba & deposit routing xxxxx3308 tran code (13) | 105 W. Seachase Dr. Nags Head, NC 27959 Elaine Long ph#410-860-1904 branch #252 489-0808 |
| 1057 | Aero | Bank of Hawaii 5/29/2009 | xxxxxx9519 ach's & deposits xxxxx1028 | 45-001 Kamehameha Hwy Kaneohe, HI 96744 Kule Brockett Ph#808-694-6132 |
| 1059 | Aero | JP Morgan Chase 4/3/2009 | xxxxx3242 ach#xxxxx0024 deposit routing xxxxx1025 | 4311 W. Anthem Way Phoenix, AZ 85086 Paula Tressalr or Asst. manager Vedrana Ph#623-465-7115 or #623-465- 9854 |
| 1061 | Aero | Wachovia 4/9/2010 | xxxxxxxxxx3216 aba#xxxxx0219 | 2989 PGA Blvd. Palm Beach, FL 33410 Karen Singletary 404-214-1432 |
| 1063 | Aero | Bank of America 10/8/2009 | xxxxxxx2864 ach# xxxxx0045 | 5541 Sepulveda Blvd. Culver City, CA 90230 Rep. Tracey Popoola Ph# 800-657-9533 |
| 1064 | Aero | Citibank 11/17/2009 | xxxxxx7740 ach & deposit routing xxxxx0089 | 34th St. 7 7th Ave. New York, NY 10001 Bryan Swan Ph# 212-290-7711 |
| 1067 | Aero | Wells Fargo 9/23/2011 | xxxxxx8174 aba#xxxxx0076 deposit routing# xxxxx0391 | 800 E. Dimond Blvd. Ste#116 Anchorage, AK 99515 Pat Barclay Ph#303-470-8908 Fax#303-791- 2558 branch #907-341-5512 |
| 1068 | Aero | Wells Fargo 9/30/2011 | xxxxxx8349 aba#xxxxx0076 deposit routing# | 320 W. 5th Ave. Anchorage, AK 99501 Pat Barclay |

167

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| | | | xxxxx0391 | Ph#303-470-8908 Fax#303-791- 2558 branch #907-265-2732 |
| 1070 | Aero | Wachovia 8/21/2009 | xxxxxxxxx3216 aba#xxxxxx0219 | 775 George Rd. North Brunswick, NJ 08902 Rep. Karen Singletary Ph# 404-214-1432 Juakeisha 1-800-590-7868 team #600 ext#85789 |
| 1071 | Aero | Wells Fargo 10/30/2009 | xxxxxx6641 ach# xxxxx0248 deposit routing xxxxx0392 | 2204 North Wayne St. Angola, IN 46703 Patricia Barclay Ph#303-470-8908 |
| 1072 | Aero | Bank of America 7/3/2009 | xxxxxxxx2547 aba# xxxxx0045 | 3414 Peachtree Rd. Atlanta, GA 30326 Rep. Tracey Popoola Ph# 800-657-9533 |
| 1073 | Aero | BMO Harris 5/8/2009 | xxxxxx0604 ach & deposits xxxxx5661 | 31 Meadow View Drive. Lake Delton,Wisconsin 53940 Ph#608-253-8425 Fax#608-253-8436 |
| 1074 | Aero | US 2/13/2009 | xxxxxxxx7050 ach#xxxxx0848 deposit routing xxxxx0032 | 704 E. Anemone Trail Dillon, CO 80435 Rep. Diana Vance 216-623-9248 |
| 1075 | Aero | Suntrust 4/9/2010 | xxxxxxxxx7300 ach# xxxxx0104 deposit routing xxxxx0020 | 8820 SW 136th St. Miami, FL 33176 Sean Link Ph# 804-363-4860 |
| 1079 | Aero | Wachovia 2/26/2010 | xxxxxxxxxx3216 aba# xxxxx0219 | 3216 West Braker Lane Austin, TX 78758 Karen Singletary 404-214-1432 |
| 1080 | Aero | Bank of America 11/2/2010 | xxxxxxxx1324 aba#xxxxx0045 | One Powell St. San Francisco, CA 94102 Anute Boonyachai Ph# 1-800-657-9533 ext# 50657 |
| 1081 | Aero | American Savings Bank 10/31/2011 | xxxxxx8787 ach & deposit routing# xxxxx0765 | 98-200 Kamehameha Highway Aiea, HI 96701 Tess Jacinto Ph#808-541-8600 Fax#808-483-4675 |
| 1082 | Aero | PNC Bank 10/3/2011 | xxxxxx6928 ach's & deposits xxxxx0096 new for 2010 deposit routing # xxxx-0120 | 4120 North Harlem Ave. Norridge, IL 60706 Krystyna Lewandowski Ph#708-452-2370 ext#21336 fax#708-453-8929 |
| 1083 | Aero | Bank of America 3/11/2010 | xxxxxxxx7558 aba#xxxxx0045 | 10101 SW Washington Square Rd. Portland, OR 97223 Rep. Tracey Popoola Ph# 800-657-9533 |
| 1085 | Aero | Bank of America 3/4/2011 | xxxxxxxx5386 aba#xxxxx0045 | 1688 Glide Well Drive Burlington, NC 27215 branch #336-290-8924 or 8912 Stacey Warner Anute Boonyachai Ph# 1-800-657-9533 ext# 50657 |
| 1086 | Aero | Bank of America | xxxxxxxx7574 | 850 N. Homestead Blvd. Homestead, Fl. 33030 Rep. |

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---------|--------|-----------|----------|---------|
| | | 3/26/2010 | aba# xxxxx0045 | Tracey Popoola Ph# 800-657-9533 |
| 1087 | Aero | Farmington<br>7/30/2010 | xxxx8798<br>ach & deposit routing<br>xxxxx0347 | 439 Westfarms Mall ste#B103 Farmington, CT 06032<br>Roshan Patel<br>Ph#860-284-6302 Fax#860-561-6103 |
| 1088 | Aero | Wachovia<br>4/30/2010 | xxxxxxxxx3216<br>aba# xxxxx0219 | 1900 West 49th St.<br>Hialeah, FL 33012<br>Karen Singletary<br>404-214-1432<br>Branch# 305-820-6440 |
| 1089 | Aero | Wells Fargo<br>10/16/2010 | xxxxx8208<br>aba#xxxxx0076<br>deposit routing#<br>xxxxx0391 | 5458 Whittier Blvd. Commerce, CA 90040 Patricia Barclay<br>Ph#303-470-8908 |
| 1090 | Aero | Bank of America<br>6/18/2010 | xxxxxxxx8049<br>aba#xxxxx0045 | 21060 St Andrews Blvd.<br>Boca Raton, FL 33433<br>Anute Boonyachai<br>Ph# 1-800-657-9533 ext# 50657 |
| 1091 | Aero | First Community Bank 6/25/10 | xxxx6504<br>ach & deposit routing#<br>xxxxx1299<br>tran code 10 | Rt 460 Mercer Mall Bluefield, WV 24701 Pamela Nuckols<br>Ph# 304-327-0437 |
| 1092 | Aero | Bank of America<br>4/29/2011 | xxxxxxx1463<br>aba#xxxxx0045 | 1 Perimeter Center East NE Atlanta, GA 30346<br>Anute Boonyachai<br>Ph# 1-800-657-9533 ext# 50657 branch #770-392-5059 |
| 1093 | Aero | Bank of America<br>11/18/2010 | xxxxxxxx1298<br>aba#xxxxx0045 | 350 Fulton Street<br>Brooklyn, NY 11201<br>Anute Boonyachai<br>Ph# 1-800-657-9533 ext# 50657 |
| 1094 | Aero | Bank of America<br>8/16/2012 | xxxxxxxx3303<br>aba#xxxxx0045 | 2405 W. Interstate 20<br>Grand Prairie, TX 75052<br>rep Donna Davis ph#1-888-715-1000 ext#53224 branch#972-343-5750 |
| 1095 | Aero | Bank of America<br>6/18/2010 | xxxxxxxx8065<br>aba#xxxxx0045 | 7825 Monterey St.<br>Gilroy, CA 95020<br>Anute Boonyachai<br>Ph# 1-800-657-9533 ext# 50657 |
| 1096 | Aero | Tuscola National<br>7/23/2010 | x3541<br>ach & deposit<br>xxxxx5798<br>tran code (20) | 900 S. Progress Blvd. Tuscola, IL 61953 Kim Martin<br>Ph# 217-253-4711 |
| 1097 | Aero | Bank of America<br>9/17/2010 | xxxxxxxxx8463<br>aba#xxxxx0045 | 1055 NE 8th St.<br>Bellevue, WA 98004<br>dedicated central one<br>Anute #888-715-1000 ext#50657 branch #206-358-5112 |
| 1099 | Aero | First Federal Savings<br>4/6/2012 | xxxxxx9001<br>ach & deposit routing# | 4962 Centre Pointe Drive. North Charleston, SC 29418 Pat Healey |

WEIL:\95685927\8\11727.0012

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---------|--------|-----------|----------|---------|
| | | | xxxxx1945 | Ph#843-744-6868 Fax#843-747-0824 |
| 1101 | Aero | MB Financial 3/25/2011 | xxxxxx7345 ach & deposit routing xxxxx1737 | 7222 West Cermak North Riverside, IL 60546 Alek Savic #630-203-2724 Sharon Vaugh branch# 708-442-3531 |
| 1102 | Aero | Bank of America 3/18/2011 | xxxxxxxx9420 aba#xxxxx0045 | 27489 Ynez Rd. Temecula, CA 92591 Anute Boonyachai Ph# 1-800-657-9533 ext# 50567 branch #951-676-4114 |
| 1104 | Aero | Suntrust combo with PS #3291 4/1/2011 | xxxxxxxxx2175 aba#xxxxx0104 deposit routing xxxxx0020 | 20295 South Dixie Highway Cutler Bay, FL 33189 Rep James Fields #804-264-4077 |
| 1105 | Aero | Wells Fargo 3/25/2011 | xxxxxx5225 aba#xxxxx0076 deposit routing xxxxx0391 | 4384 West Rodeo Rd. Santa Fe, NM 87505 Pat Barclay Ph#303-470-8908 Fax#303-791- 2558 branch #505-424-3882 |
| 1106 | Aero | Regions 10/18/2012 combo with PS #3314 same account number | xxxxxx7869 ach & deposit routing# xxxxxx0019 | 6408 Interstate 45 LaMarque, TX 77568 Rep (Juanita Green) ph#205-264-5239 |
| 1107 | Aero | Citizens 6/14/2012 | xxxxxx5497 ach & deposit routing# xxxxx1533 | 268 Daniel Webster Highway Merrimack, NH 03054 Christine Malloy Ph#603-851-0707 |
| 1108 | Aero | Bank of America 5/24/2013 | xxxxxxxx4920 aba# xxxxx0045 | 1603 Hawthorne Blvd. Redondo Beach, CA 90278 Rep Donna Davis Ph# 1-888-715-1000 ext#53224 |
| 1109 | Aero | Capital One 5/22/2014 | xxxxxx0735 aba# xxxxx0090 deposit routing xxxxx0001 | Capital One French Quarter 137 Royal St. New Orleans, LA 70130 Rep: Tammy Pratts -504-533-2905 branch# 504-533-3586 |
| 1110 | Aero | Bank of America 11/15/2013 combo with PS #3330 same account number | xxxxxxxxx5563 aba# xxxxx0045 | 37 E. 2nd St. Calexico, CA 92231 Rep: Marie Dunn #1-888-715-1000 ext#53224 |
| 1111 | Aero | Bank of America 7/17/2013 | xxxxxxxxx5039 #xxxxx0045 | 1550 Town Lake Pkwy Woodstock, GA 30188 Rep: Marie Dunn #1-888-715-1000 ext#53224 |
| 1112 | Aero | Wells Fargo 11/15/2012 | xxxxxx5966 ach#xxxxx0248 deposit routing xxxxx0392 | 9082 West Glendale Ave. Glendale, AZ 85305 Karen Singletary #404-214-1432 branch# 623-772-7420 or 602-528- 7367 |
| 1114 | Aero | JP Morgan Chase 8/16/2013 | xxxxx5361 aba#xxxxx0021 | 8450 Van Nuys Blvd. Panorama City, CA 91402 Joe Opulski |

WEIL:\95685927\8\11727.0012

Exhibit 7-1 to
Credit Agreement

| STORE # | DIV[1] | BANK NAME | ACCOUNT# | ADDRESS |
|---|---|---|---|---|
| | | combo with PS #3353 same account number | deposit routing xxxxx1028 | Ph#646-582-7278 branch#818-892-1171 |
| 1115 | Aero | Wells Fargo 3/22/2013 | xxxxxx7225 aba#xxxxx0248 deposit routing xxxxx0392 | 40 College Rd. Fairbanks, AK 99701 Karen Singletary #404-214-1432 branch# 907-459-4361 |
| 1116 | Aero | Wells Fargo 11/16/2012 | xxxxxx5958 ach#xxxxx0248 deposit routing xxxxx0392 | 1 East 16th St. Yuma, AZ 85365 Karen Singletary #404-214-1432 branch# 480-612-6171 |
| 1118 | Aero | M&T 11/21/2013 combo with PS #3401 same account number | xxxxxx9239 ach#xxxxx0113 deposit routing# xxxxx0033 | 6262 Oxon Hill Rd. Oxon Hill, MD 20745 rep: Sharon Coates #410-244-4207 |
| 1120 | Aero | First American 8/1/2013 | xxxxxxx9702 aba & deposit routing xxxxx2777 tran code#031 | 7747 Waukegan Rd. Niles, IL 60714 Anu or Goldie Ph#847-663-6000 |
| 1122 | Aero | Trustmark 11/14/2013 | xxxxxx8300 aba#xxxxx0279 | 2425 Highway 80 East Pearl, MS 39208 Bradley Knight #601-939-1571 (Pearl branch) Pam Ingram #601-932-0270 (Flowood branch) |
| 1126 | Aero | BB&T 3/30/2015 combo with PS #3381 same account number | xxxxxxxxx5647 ach & deposit routing# xxxxx3308 tran code#13 | 4900 E. 42nd St. Odessa, TX 79762 rep. Mary Elaine Long #410-860- 1904 branch#432-272-8321 |
| 1127 | Aero | JP Morgan Chase 6/13/2014 combo with PS #3383 same account number | xxxxx0708 aba#xxxxx0024 deposit routing xxxxx1025 | 420 W. Mariposa Rd. Nogales, AZ 85621 branch#520-281-3242 Tonya Williams ph#646-582-7283 |
| 1128 | Aero | JP Morgan Chase 9/12/2014 | xxxxx5118 ach#xxxxx0021 deposit routing xxxxx1028 | 2130 Bartow Ave. Bronx, NY 10475 Tonya Williams ph#646-582-7283 branch#718-862-9480 |
| 1129 | Aero | Citizens National 7/31 /2014 | xxx8521 aba#xxxxx1621 | 100 Citizens Blvd. Simpsonville, KY 40067 Simeon Phillips #502-722-2257 |
| 1130 | Aero | Bank of America 8/7/2014 | xxxxxxxx7124 aba#xxxxx0045 | 500 Bear Mountain Blvd. Arvin, CA 93203 Marie Dunn #1-800-715-10000 ext#53224 |
| 1132 | Aero | Bank of America 7/31 /2014 | xxxxxxxx7111 aba#xxxxx0045 | 4433 South Tryon St. Charlotte, NC 28217 Marie Dunn #1-800-715-10000 ext#53224 |
| 1138 | Aero | Sun Trust 7/13/2015 | xxxxxxxxx3523 deposit & ach routing xxxxx0104 | 140 Pooler Parkway Pooler, GA 31322 Tracy Fleming branch#912-348-6094 #912-348-6056 |
| 1515 | Aero | Bank of America 10/22/2010 | xxxxxxxxx8654 aba# xxxxx0045 | 1140 Ave. of The Americas New York, NY 10036 Anute #888-715-1000 ext#50657 branch #206-358-5112 |

Exhibit 7-2 to
Credit Agreement

## **Credit Card Arrangements**

The Loan Parties have the following credit card agreements in place:

1. Aéropostale, Inc.: First Data Merchant Services (merchant # XXX5712)

2. PS from Aéropostale, Inc.: First Data Merchant Services (merchant # XX0974)

3. Aéropostale, Inc. and PS from Aéropostale, Inc.: American Express (merchant # XXXXXX1516)

4. Aéropostale, Inc.: Discover Card (merchant # XXXX XXXX XXX0 028)

5. PS from Aéropostale, Inc.: Discover Card (merchant #XXXX XXXX XXX7 907)

6. Aéropostale, Inc.: First Data Merchant Services (merchant # XX0972)

Exhibit 8-1(K) to
Credit Agreement

### Commercial Tort Claims

None.

Exhibit 18-1 to
Credit Agreement

## Form of Assignment and Acceptance

      This Assignment and Acceptance (the "Assignment and Acceptance") is dated as of the Effective Date set forth below and is entered into by and between each Assignor identified in item 1 below (each, an "Assignor") and the Assignee identified in item 2 below (the "Assignee"). It is understood and agreed that the rights and obligations of the Assignors hereunder are several and not joint. Capitalized terms used but not defined herein shall have the meanings given to them in the Secured Superpriority Debtor in Possession Loan, Security and Guaranty Agreement identified below (as amended, the "Loan Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Acceptance as if set forth herein in full.

      For good and valuable consideration, receipt of which is hereby acknowledged, each Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the respective Assignors, subject to and in accordance with the Standard Terms and Conditions and the Loan Agreement, as of the Effective Date inserted by the Agent as contemplated below, all of the respective Assignors' rights and obligations in their respective capacities as Lenders under the Loan Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the respective Assignors under the respective facilities identified below (the rights and obligations sold and assigned by any Assignor to the Assignee being referred to herein collectively as an "Assigned Interest"). Each such sale and assignment is without recourse to any Assignor and, except as expressly provided in this Assignment and Acceptance, without representation or warranty by any Assignor.

1.      Assignors:      _____

2.      Assignee:      _____ [2]

3.      Borrower:      Aeropostale, Inc.

4.      Administrative      Crystal Financial LLC, as the agent under the
      Agent:      Loan Agreement

---

[2] To be completed by Assignee.

Exhibit 18-1 to
Credit Agreement

5.      Loan Agreement:        That certain $160,000,000 Secured Superpriority Debtor in Possession Loan, Security and Guaranty Agreement, dated as of May 3, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) among Aeropostale, Inc., the Guarantors party thereto, the Lenders parties thereto, and Crystal Financial LLC, as Agent, as amended from time to time

6.      Assigned Interests:

| Assignor | Assignee[3] | Facility Assigned[4] | Aggregate Amount of [Interim][Final] Loans/Commitment for all Lenders | Amount of [Interim][Final] Loans/Commitment Assigned | Percentage Assigned of [Interim][Final] Loans/Commitment |
|---|---|---|---|---|---|
|  |  |  |  |  |  |

7.      Effective Date:   May [___], 2016


[Remainder of Page Intentionally Left Blank]

---

[3] To be completed by Assignee.
[4] Term Loan or Revolving Loan

WEIL:\95685927\8\11727.0012

Exhibit 18-1 to
Credit Agreement

The terms set forth in this Assignment and Acceptance are hereby agreed to:

ASSIGNORS

**[NAME OF ASSIGNOR]**

By:_____
Name:
Title:


ASSIGNEE

**[NAME OF ASSIGNEE]**[5]


By:_____
Name:
Title:


Consented to and Accepted:

**CRYSTAL FINANCIAL LLC**, as
Agent

By:_____
Name:
Title:

[Consented to and Accepted:

**AEROPOSTALE, INC.**, as
Borrower

By:_____
Name:
Title:][6]

---

[5] To be completed by Assignee.
[6] To the extent required by Section 2-23.

176

Exhibit 18-1 to
Credit Agreement

ANNEX 1

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ACCEPTANCE

1.      Representations and Warranties.

1.1     Assignors.  Each Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the relevant Assigned Interest, and (ii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Acceptance and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Loan Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any of their respective Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document, or (iv) the performance or observance by the Borrower, any of their respective Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2.    Assignee.  The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Acceptance and to consummate the transactions contemplated hereby and to become a Lender under the Loan Agreement, (ii) it meets all the requirements to be an assignee under Sections 2-23 and 18-1of the Loan Agreement (subject to such consents, if any, as may be required thereunder), (iii) from and after the Effective Date, it shall be bound by the provisions of the Loan Agreement as a Lender thereunder and, to the extent of the relevant Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the Loan Agreement, and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant to Section 5.6 thereof, as applicable, and such other documents and information as it deems appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and Acceptance and to purchase such Assigned Interest, and (vii) if it is a Foreign Lender, attached to the Assignment and Acceptance is any documentation required to be delivered by it pursuant to the terms of the Loan Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the Agent, any Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

Exhibit 18-1 to
Credit Agreement

2.    <u>Payments</u>.    From and after the Effective Date, the Agent shall make all payments in respect of each Assigned Interest (including payments of principal, interest, fees and other amounts) to the relevant Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date. Notwithstanding the foregoing, the Agent shall make all payments of interest, fees or other amounts paid or payable in kind from and after the Effective Date to the Assignee.

3.    <u>General Provisions</u>.    This Assignment and Acceptance shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment and Acceptance may be executed in any number of counterparts, which together shall constitute one instrument.   Delivery of an executed counterpart of a signature page of this Assignment and Acceptance by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Acceptance.   This Assignment and Acceptance shall be governed by, and construed in accordance with, the law of the State of New York.

178

**<u>Exhibit C</u>**

**Intercreditor Agreement**

INTERCREDITOR AGREEMENT

by and between

BANK OF AMERICA, N.A.

as ABL Agent,

and

AERO INVESTORS LLC

as Term Agent

Dated as of  May 23, 2014

Table of Contents

Page

ARTICLE 1 DEFINITIONS ................................................................................................ 2

    Section 1.1    UCC Definitions ............................................................................. 2
    Section 1.2    Other Definitions ........................................................................... 2
    Section 1.3    Rules of Construction .................................................................. 16

ARTICLE 2 LIEN PRIORITY ......................................................................................... 17

    Section 2.1    Priority of Liens. ......................................................................... 17
    Section 2.2    Waiver of Right to Contest Liens. ............................................... 19
    Section 2.3    Remedies Standstill...................................................................... 20
    Section 2.4    Exercise of Rights. ....................................................................... 21
    Section 2.5    No New Liens. .............................................................................. 23
    Section 2.6    Waiver of Marshalling. ............................................................... 24

ARTICLE 3 ACTIONS OF THE PARTIES ..................................................................... 24

    Section 3.1    Certain Actions Permitted............................................................ 24
    Section 3.2    Agent for Perfection..................................................................... 25
    Section 3.3    Sharing of Information and Access............................................... 27
    Section 3.4    Insurance...................................................................................... 27
    Section 3.5    No Additional Rights For the Credit Parties Hereunder ............... 27
    Section 3.6    Inspection and Access Rights. ..................................................... 27
    Section 3.7    Tracing of and Priorities in Proceeds........................................... 29
    Section 3.8    Purchase Right.............................................................................. 29
    Section 3.9    Payments Over.............................................................................. 32

ARTICLE 4 APPLICATION OF PROCEEDS .................................................................. 32

    Section 4.1    Application of Proceeds................................................................ 32
    Section 4.2    Specific Performance .................................................................. 34

ARTICLE 5 INTERCREDITOR ACKNOWLEDGEMENTS AND WAIVERS............... 35

    Section 5.1    Notice of Acceptance and Other Waivers..................................... 35
    Section 5.2    Modifications to ABL Documents and Term Documents. ............ 36
    Section 5.3    Reinstatement and Continuation of Agreement. ........................... 39

ARTICLE 6 INSOLVENCY PROCEEDINGS ................................................................. 40

    Section 6.1    DIP Financing. ............................................................................. 40
    Section 6.2    Relief From Stay .......................................................................... 42
    Section 6.3    No Contest; Adequate Protection.................................................. 42
    Section 6.4    Asset Sales ................................................................................... 43
    Section 6.5    Separate Grants of Security and Separate Classification .............. 44
    Section 6.6    Enforceability............................................................................... 45
    Section 6.7    ABL Obligations Unconditional .................................................. 45
    Section 6.8    Term Obligations Unconditional ................................................. 45

ARTICLE 7 MISCELLANEOUS ................................................................................... 46

    Section 7.1    Rights of Subrogation .................................................................. 46
    Section 7.2    Further Assurances ...................................................................... 46
    Section 7.3    Representations ............................................................................ 46
    Section 7.4    Amendments ................................................................................ 47
    Section 7.5    Addresses for Notices .................................................................. 47

i

Table of Contents

Page

| | | |
|---|---|---|
| Section 7.6 | No Waiver; Remedies | 48 |
| Section 7.7 | Continuing Agreement, Transfer of Secured Obligations | 48 |
| Section 7.8 | GOVERNING LAW; ENTIRE AGREEMENT | 48 |
| Section 7.9 | Counterparts | 48 |
| Section 7.10 | No Third Party Beneficiaries | 48 |
| Section 7.11 | Headings | 49 |
| Section 7.12 | Severability | 49 |
| Section 7.13 | Attorneys' Fees | 49 |
| Section 7.14 | VENUE; JURY TRIAL WAIVER. | 49 |
| Section 7.15 | Intercreditor Agreement | 50 |
| Section 7.16 | No Warranties or Liability | 50 |
| Section 7.17 | Conflicts | 50 |
| Section 7.18 | Costs and Expenses | 50 |
| Section 7.19 | Information Concerning Financial Condition of the Credit Parties. | 50 |
| Section 7.20 | Additional Credit Parties | 51 |

## INTERCREDITOR AGREEMENT

THIS INTERCREDITOR AGREEMENT (as amended, supplemented, restated, amended and restated or otherwise modified from time to time pursuant to the terms hereof, this "**Agreement**") is entered into as of May 23, 2014 between **BANK OF AMERICA, N.A.** ("**BofA**"), in its capacities as administrative agent and collateral agent (together with its successors and assigns in such capacities, the "**Initial ABL Agent**") for (i) the financial institutions, lenders and investors party from time to time to the Initial ABL Credit Agreement referred to below (such financial institutions, lenders and investors together with their respective successors, assigns and transferees, including any letter of credit issuers under the ABL Credit Agreement, the "**Initial ABL Lenders**"), (ii) any ABL Cash Management Bank (as defined below), and (iv) any ABL Bank Product Providers (as defined below) (such ABL Cash Management Bank, and ABL Bank Product Providers, together with the Initial ABL Agent, and the Initial ABL Lenders and any other secured parties under the ABL Credit Agreement, the "**Initial ABL Secured Parties**") and **AERO INVESTORS LLC**, a Delaware limited liability company, in its capacities as administrative agent and collateral agent (together with its successors and assigns in such capacities, the "**Initial Term Agent**") for the financial institutions, lenders and investors party from time to time to the Term Credit Agreement referred to below (such financial institutions, lenders and investors, together with their respective successors, assigns and transferees, the "**Initial Term Lenders**"), (such Term Agent and the Term Lenders and any other secured parties under the Term Credit Agreement, the "**Initial Term Secured Parties**").

## RECITALS

A.    Pursuant to that certain Third Amended and Restated Loan and Security Agreement dated as of September 22, 2011 by and among Aeropostale, Inc., as Borrower, the ABL Guarantors (as hereinafter defined), the Initial ABL Lenders, and the Initial ABL Agent (as such agreement may be amended, supplemented, restated, amended and restated, extended, renewed, replaced, refinanced and/or otherwise modified from time to time, the "**Initial ABL Credit Agreement**"), the Initial ABL Secured Parties have agreed to make certain loans and other financial accommodations to or for the benefit of the Borrower and ABL Guarantors.

B.    Pursuant to certain Amended and Restated Guaranty dated November 13, 2007 (as the same has been amended, amended and restated, supplemented, restated and/or otherwise modified, (collectively, the "**Initial ABL Guaranty**") by each of the ABL Guarantors in favor of the Initial ABL Secured Parties, the ABL Guarantors have agreed to guarantee, inter alia, the payment and performance of the ABL Obligations (as hereinafter defined).

C.    As a condition to the effectiveness of the Initial ABL Credit Agreement and to secure the obligations of the ABL Credit Parties (as hereinafter defined) under and in connection with the ABL Documents, ABL Bank Product Documents, and ABL Cash Management Documents, the ABL Credit Parties have granted to the Initial ABL Agent (for the benefit of the Initial ABL Secured Parties) Liens (as hereinafter defined) on the Collateral (as hereinafter defined).

D.    Pursuant to that certain Term Loan Credit Agreement dated as of the date hereof by and among the Borrower, the Term Guarantors (as hereinafter defined), the Initial Term Lenders and the Initial Term Agent (as such agreement may be amended, supplemented, restated, amended and restated, extended, renewed, replaced, refinanced and/or otherwise modified from time to time, the "**Initial Term Credit Agreement**"), the Initial Term Lenders have agreed to make term loans to the Borrower.

E.    Pursuant to certain guaranties each dated as of the date hereof (as the same may be amended, amended and restated, supplemented, restated and/or otherwise modified, (collectively, the

"**Initial Term Guaranty**") by each of the Term Guarantors in favor of the Initial Term Secured Parties, the Term Guarantors have agreed to guarantee, inter alia, the payment and performance of the Term Obligations (as hereinafter defined).

F.      As a condition to the effectiveness of the Initial Term Credit Agreement and to secure the obligations of the Term Credit Parties (as hereinafter defined) under and in connection with the Term Documents, the Term Credit Parties have granted to the Initial Term Agent (for the benefit of the Initial Term Secured Parties) Liens (as hereinafter defined) on the Collateral.

G.      Each of the Initial ABL Agent (on behalf of the Initial ABL Secured Parties) and the Initial Term Agent (on behalf of the Initial Term Secured Parties) and, by their acknowledgment hereof, the ABL Credit Parties and the Term Credit Parties, desire to agree to the relative priority of Liens on the Collateral and certain other rights, priorities and interests as provided herein.

**NOW THEREFORE**, in consideration of the foregoing and for other good and valuable consideration, receipt of which is hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

**Section 1.1     UCC Definitions**. The following terms which are defined in the Uniform Commercial Code are used herein as so defined: Account, Chattel Paper, Commercial Tort Claim, Commodity Account, Commodity Contract, Deposit Account, Document, Electronic Chattel Paper, Equipment, Financial Asset, Fixtures, General Intangible, Instrument, Inventory, Investment Property, Letter-of-Credit Right, Money, Payment Intangible, Promissory Note, Records, Security, Securities Account, Security Entitlement, Supporting Obligation and Tangible Chattel Paper.

**Section 1.2     Other Definitions**. Subject to Section 1.1, as used in this Agreement, the following terms shall have the meanings set forth below:

"**ABL Agent**" means (i) the Initial ABL Agent (or its successor) or (ii) in the event there is more than one ABL Credit Agreement, the Person designated as the ABL Agent for purposes of this Agreement pursuant to Section 5.2(d).

"**ABL Bank Product Documents**" shall mean all agreements regarding ABL Bank Products in respect of ABL Bank Product Obligations between any ABL Credit Party or any Subsidiary thereof and any ABL Bank Product Provider.

"**ABL Bank Product Obligations**" shall mean obligations owed by any ABL Credit Party or any Subsidiary to any ABL Bank Product Provider in respect of or in connection with any ABL Bank Products.

"**ABL Bank Product Provider**" shall mean, as of any date of determination, ABL Agent, any ABL Lender or any of their respective Affiliates that is owed ABL Bank Product Obligations by an ABL Credit Party or any Subsidiary and which ABL Bank Product Obligations are secured by one or more ABL Collateral Documents, together with their respective successors, assigns and transferees.

"**ABL Bank Products**" shall mean "Bank Products" as defined in the ABL Credit Agreement as in effect on the date hereof.

2

"**ABL Borrower**" shall mean collectively (i) Aeropostale, Inc., (ii) any other Person who becomes a "Borrower" pursuant to the ABL Credit Agreement, and (iii) all "Borrowers" under and as defined in the ABL Credit Agreement.

"**ABL Cap Amount**" shall mean (i) for all purposes other than section 6.1(a), 110% of the principal amount equal to $230,000,000 minus the aggregate amount of permanent commitment reductions under the ABL Credit Agreement or (ii) solely for purposes of section 6.1(a), 115% of the principal amount equal to $230,000,000 minus the aggregate amount of permanent commitment reductions under the ABL Credit Agreement after date of the commencement of the Insolvency Proceeding.

"**ABL Cash Management Bank**" shall mean, as of any date of determination, ABL Agent, any ABL Lender or any of their respective Affiliates that is owed ABL Cash Management Obligations by any ABL Credit Party or any Subsidiary and which ABL Cash Management Obligations are secured by one or more ABL Collateral Documents, together with their respective successors, assigns and transferees.

"**ABL Cash Management Documents**" shall mean all agreements regarding ABL Cash Management Services in respect of ABL Cash Management Obligations between any ABL Credit Party or Subsidiary thereof and any ABL Cash Management Bank.

"**ABL Cash Management Obligations**" shall mean obligations owed by any ABL Credit Party or any Subsidiary to any ABL Cash Management Bank in respect of or in connection with any ABL Cash Management Services.

"**ABL Cash Management Services**" shall mean "Cash Management Services" as defined in the ABL Credit Agreement.

"**ABL Collateral Documents**" shall mean all security agreements, mortgages, deeds of trust, account control agreements, customs brokers agreements, collateral access agreements, and other collateral documents executed and delivered in connection with the ABL Credit Agreement, in each case as the same may be amended, amended and restated, supplemented, restated or otherwise modified from time to time.

"**ABL Credit Agreement**" shall mean collectively (i) the Initial ABL Credit Agreement and (ii) any one or more other agreements, indentures or facilities extending the maturity of, consolidating, restructuring, refunding, replacing or refinancing all or any portion of the ABL Obligations, whether by the same or any other agent, trustee, lender, group of lenders, creditor or group of creditors and whether or not increasing the amount of any Indebtedness that may be incurred thereunder (so long as any such increase is permitted by section 5.2(a) hereof). For clarity, the term "ABL Credit Agreement" shall include, without limitation, an agreement pursuant to which the ABL Agent or any ABL Secured Party provides ABL Secured Party DIP Financing to any of the Credit Parties pursuant to the provisions of this Agreement.

"**ABL Credit Parties**" shall mean, collectively, the ABL Borrower, the ABL Guarantors and each other direct or indirect subsidiary or parent of the Borrower or any of their affiliates that is now or hereafter becomes a party to any ABL Document.

"**ABL Deposit and Securities Accounts**" shall mean all Deposit Accounts, Securities Accounts, collection accounts and lockbox accounts (and all related lockboxes) of the Credit Parties (other than the Term Loan Priority Accounts).

"**ABL Documents**" shall mean the ABL Credit Agreement, each ABL Guaranty, each ABL Collateral Document and any other ancillary agreement, instruments, documents and certificates, now or hereafter executed by or on behalf of any ABL Credit Party or any of its respective Subsidiaries or Affiliates, and delivered to the ABL Agent or any other ABL Secured Party, in connection with any of the foregoing, in each case as the same may be amended, amended and restated, supplemented, restated, replaced or otherwise modified from time to time.

"**ABL Enforcement Date**" shall mean the date which is 180 days after the Term Agent's receipt of an Enforcement Notice from the ABL Agent.

"**ABL Excess Amount**" shall mean an amount equal to the sum of (A) the amount by which the sum of (i) the principal amount of all Revolving Credit Loans *plus* (ii) the aggregate face amount of any letters of credit issued but not reimbursed under the ABL Documents *exceeds* the ABL Cap Amount (the amount of such excess being the "ABL Principal Excess"), *plus* (B) any interest earned on the ABL Principal Excess, *plus* (C) any commitment or other fees paid by the ABL Credit Parties, if any , which are calculated as a percentage of, or by other reference to, the amount of any ABL Principal Excess.

For sake of clarity, the Term Agent and the other Term Secured Parties acknowledge and agree that the calculation of ABL Excess Amount excludes ABL Bank Product Obligations, ABL Cash Management Obligations, Enforcement Expenses, and any fees and expenses for which the ABL Secured Parties are entitled to be reimbursed pursuant to the ABL Credit Agreement (other than those fees referenced in subpart (C) of the definition of ABL Excess Amount) and that such amounts shall constitute ABL Priority Obligations.

"**ABL Guarantors**" shall mean the collective reference to (i) Aeropostale West, Inc., a Delaware corporation, Jimmy'z Surf Co., LLC, a Delaware limited liability company, Aero CG Management LLC, a Virginia limited liability company, Aeropostale Procurement Company, Inc., a Delaware corporation, Aeropostale Licensing, Inc., a Delaware corporation, P.S. From Aeropostale, Inc., a Delaware corporation, and GoJane LLC, a Delaware limited liability company, and (ii) any other Person who becomes a guarantor under any ABL Guaranty. The term "ABL Guarantors" shall include all "Guarantors" under and as defined in the ABL Credit Agreement.

"**ABL Guaranty**" shall mean, collectively, (i) the Initial ABL Guaranty and any joinder by any Person thereto and (ii) any other guaranty made by an ABL Guarantor guaranteeing, inter alia, the payment and performance of any ABL Obligations.

"**ABL Lenders**" shall mean the Initial ABL Lenders and any other Person that extends credit under any ABL Credit Agreement.

"**ABL Obligations**" shall mean any and all ABL Bank Product Obligations, ABL Cash Management Obligations and obligations of every nature of each ABL Credit Party from time to time owed to the ABL Secured Parties, or any of them, under, in connection with, or evidenced or secured by any ABL Document, including, without limitation, all Enforcement Expenses and all other "Liabilities" or "Obligations" or similar terms as defined in the ABL Credit Agreement and whether for principal, interest, reimbursement of amounts drawn under letters of credit, payments for early termination of any Swap Obligations (as defined in the ABL Credit Agreement), fees, expenses, indemnification or otherwise, and all other amounts owing or due under the terms of any ABL Document, ABL Bank Product Document and ABL Cash Management Document (including interest, fees, expenses and indemnifications which, but for the filing of or the commencement of an Insolvency Proceeding with respect to such ABL Credit Party, would have become due or accrued on any ABL Obligation, whether or not a claim is allowed against such ABL Credit Party for such interest, fees, expenses and

4

indemnifications in the related Insolvency Proceeding), as amended, restated, amended and restated, modified, renewed, refunded, replaced or refinanced in whole or in part from time to time in accordance with the provisions of this Agreement. For clarity, the term "ABL Obligations" shall include, without limitation, all obligations on account of any ABL Secured Party DIP Financing provided by the ABL Agent or any ABL Secured Party to any of the Credit Parties pursuant to the provisions of this Agreement.

"**ABL Priority Collateral**" shall mean all Collateral consisting of the following (including for the avoidance of doubt, any such assets that, but for the application of Section 552 of the Bankruptcy Code (or any similar provision of any foreign Debtor Relief Laws), would be ABL Priority Collateral):

       (1)     all Accounts, other than Accounts which constitute identifiable proceeds of Term Priority Collateral;

       (2)     all Intellectual Property;

       (3)     cash, money and cash equivalents, other than (i) identifiable net cash proceeds from the sale or disposition of Term Priority Collateral or (ii) proceeds of the Term Loan held in the Term Loan Proceeds Account;

       (4)     all (x) Deposit Accounts (other than Term Loan Priority Accounts) (y) Securities Accounts (other than Term Loan Priority Accounts), Security Entitlements and Securities credited to such a Securities Account (other than Equity Interests in any Credit Party or their Affiliates), (z) all Commodity Accounts (other than Term Loan Priority Accounts) and commodity contracts and, in each case, subject to Section 3.7, all cash, money, cash equivalents, checks and other property held therein or credited thereto (other than Equity Interests);

       (5)     all Inventory;

       (6)     to the extent relating to, arising from, evidencing or governing any of the items referred to in the preceding clauses (1) through (5) constituting ABL Priority Collateral, all Documents, General Intangibles (including all Payment Intangibles arising from Accounts and all rights under contracts but excluding any Intellectual Property, as to which clause (2) above shall govern), Instruments (including Promissory Notes), Chattel Paper (including Tangible Chattel Paper and Electronic Chattel Paper), and Commercial Tort Claims; provided that to the extent any of the foregoing also relates to Term Priority Collateral, only that portion related to the items referred to in the preceding clauses (1) through (5) shall be included in the ABL Priority Collateral;

       (7)     to the extent relating to, arising from, evidencing or governing any of the items referred to in the preceding clauses (1) through (6) constituting ABL Priority Collateral, all Supporting Obligations and Letter-of-Credit Rights; provided that to the extent any of the foregoing also relates to Term Priority Collateral only that portion related to the items referred to in the preceding clauses (1) through (6) shall be included in the ABL Priority Collateral;

       (8)     all books and Records relating to, arising from, evidencing or governing the items referred to in the preceding clauses (1) through (7) constituting ABL Priority Collateral (including all books, databases, customer lists, engineer drawings, and Records, whether tangible or electronic, which contain any information relating to any of the items referred to in the preceding clauses (1) through (7) constituting ABL Priority Collateral);

(9)     all collateral security and guarantees with respect to any of the foregoing and all cash, money, cash equivalents, insurance proceeds (but excluding proceeds of business interruption insurance), Instruments, Securities and Financial Assets received as proceeds of any of the foregoing; and

(10)     subject to Section 3.7, all Proceeds of any of the items referred to in the preceding clauses (1) through (9).

"**ABL Priority Obligations**" shall mean all ABL Obligations, other than the ABL Excess Amount.

"**ABL Recovery**" shall have the meaning set forth in Section 5.3(a).

"**ABL Secured Party DIP Financing**" shall have the meaning set forth in Section 6.1(a).

"**ABL Secured Parties**" shall mean the Initial ABL Secured Parties, any other holder of any ABL Obligations that are secured by a Lien on the Collateral, and any agent, trustee or other representative under any ABL Document.

"**ABL Standstill Period**" shall have the meaning set forth in Section 2.3(b).

"**Affiliate**" shall mean, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. "Control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"**Agent(s)**" shall mean individually the ABL Agent or the Term Agent and collectively shall mean both the ABL Agent and the Term Agent.

"**Agreement**" shall have the meaning assigned to that term in the introduction to this Agreement.

"**Asset Sale Proceeds Pledged Account**" shall mean a Deposit Account subject to a deposit account control agreement in favor of the Term Agent in which solely the proceeds from any disposition of Term Priority Collateral is held pending reinvestment pursuant to the Term Credit Agreement. For clarity, the amounts on deposit in such Asset Sale Proceeds Pledged Account shall constitute Collateral and Term Priority Collateral.

"**Bankruptcy Code**" shall mean Title 11 of the United States Code, as now or hereafter in effect or any successor thereto.

"**BofA**" shall have the meaning assigned to that term in the introduction to this Agreement.

"**Borrower**" shall mean any ABL Borrower or Term Borrower, as applicable.

"**Business Day**" shall mean any day that is not a Saturday, Sunday or other day on which commercial banks in the Commonwealth of Massachusetts or State of New York are authorized or required by law to remain closed (or are in fact closed).

"**Capitalized Leases**" shall mean all leases that have been or are required to be, in accordance with GAAP, recorded as capitalized leases; provided that for all purposes hereunder the amount of obligations under any Capitalized Lease shall be the amount thereof accounted for as a liability in accordance with GAAP.

"**Closing Date**" shall mean the date of this Agreement.

"**Collateral**" shall mean all Property now owned or hereafter acquired by the Borrower or any Guarantor in or upon which a Lien is granted or purported to be granted to both (i) any ABL Secured Party under any of the ABL Collateral Documents and (ii) any Term Secured Party under any of the or the Term Collateral Documents, together with all rents, issues, profits, products and Proceeds thereof.

"**Control**" shall have the meaning specified in the definition of "Affiliate".

"**Control Collateral**" shall mean any Collateral consisting of any Certificated Security (as defined in Section 8-102 of the Uniform Commercial Code), Investment Property, Deposit Account, Instruments and any other Collateral as to which a Lien may be perfected through possession or control by the secured party, or any agent therefor.

"**Copyright Licenses**" shall mean any written agreement, now or hereafter in effect, granting any right to any third party under any Copyright now or hereafter owned by any Credit Party or that such Credit Party otherwise has the right to license, or granting any right to any Credit Party under any Copyright now or hereafter owned by any third party, and all rights of such Credit Party under any such agreement.

"**Copyrights**" shall mean all of the following now owned or hereafter acquired by or assigned to any Credit Party: (a) all copyright rights in any work subject to the copyright laws of the United States or any other country, whether as author, assignee, transferee or otherwise, whether registered or unregistered and whether published or unpublished, (b) all registrations and applications for registration of any such copyright in the United States or any other country, including registrations, recordings, supplemental registrations and pending applications for registration in the United States Copyright Office, and all: (i) rights and privileges arising under applicable law with respect to such Credit Party's use of such copyrights, (ii) reissues, renewals and extensions thereof and amendments thereto, (iii) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect thereto, including damages and payments for past, present or future infringements thereof, (iv) rights corresponding thereto throughout the world and (v) rights to sue for past, present or future infringements thereof.

"**Credit Documents**" shall mean the ABL Documents and the Term Documents.

"**Credit Parties**" shall mean the ABL Credit Parties and the Term Credit Parties.

"**Credit Party Term Proceeds Notice**" shall mean a written notice delivered by a Credit Party to the ABL Agent stating that certain identifiable cash proceeds which may be deposited in an ABL Deposit and Securities Account constitute Term Priority Collateral and reasonably identifying the amount of such proceeds and specifying the origin thereof.

"**Debtor Relief Laws**" shall mean the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Discharge of ABL Obligations**" shall mean (a)(i) the payment in full in cash of all outstanding ABL Priority Obligations (excluding (w) contingent indemnification obligations for which no claim has been asserted, (x) contingent indemnification obligations with respect to claims that have been threatened or asserted in writing (which are provided for in clause (ii) below), (y) LC Obligations (as defined below) (which are provided for in clause (iii) below), and (z) obligations with respect to ABL Bank Product Obligations and ABL Cash Management Obligations (which are provided for in clause (iv) below)), (ii) with respect to contingent indemnification obligations with respect to known or anticipated claims threatened or asserted in writing, provision of cash collateral in an amount reasonably determined by the ABL Agent, (iii) with respect to amounts available to be drawn under outstanding letters of credit issued under the ABL Credit Agreement (or indemnities or other undertakings issued pursuant thereto in respect of outstanding letters of credit) (collectively, the "**LC Obligations**"), the cancellation of such letters of credit or the delivery or provision of cash collateral in respect thereof in compliance with the terms of the ABL Credit Agreement (which shall not exceed an amount equal to 103% of the aggregate undrawn amount of such letters of credit) and (iv) with respect to ABL Bank Product Obligations and ABL Cash Management Obligations (or indemnities or other undertakings issued pursuant thereto in respect of outstanding ABL Bank Product Obligations and ABL Cash Management Obligations) the termination thereof and payment in full in cash of all ABL Obligations (other than contingent indemnification obligations for which no claim has been asserted) with respect thereto or the delivery or provision of cash collateral in an amount reasonably determined by the applicable ABL Bank Product Provider or ABL Cash Management Bank based upon reasonably estimated credit exposure with respect thereto, and (b) the termination of all commitments to extend credit under the ABL Documents, ABL Bank Product Documents, and ABL Cash Management Documents. If the Credit Parties enter into any refinancing of the ABL Obligations (including, without limitation by the provision of DIP Financing in any Insolvency Proceeding of the Credit Parties), then the Discharge of ABL Obligations shall automatically be deemed not to have occurred for all purposes of this Agreement.

"**Discharge of Term Obligations**" shall mean (i) the payment in full in cash of all outstanding Term Priority Obligations (other than contingent indemnification obligations for which no claim has been asserted) and (ii) with respect to contingent indemnification obligations with respect to known or anticipated claims threatened or asserted in writing, provision of cash collateral in an amount reasonably determined by the Term Agent. If the Credit Parties enter into any refinancing of the Term Obligations, then the Discharge of Term Obligations shall automatically be deemed not to have occurred for all purposes of this Agreement.

"**Domain Names**" shall mean all Internet domain names and associated URL addresses in or to which any Credit Party now or hereafter has any right, title or interest.

"**Enforcement Expenses**" shall mean all costs, expenses or fees (including fees incurred by any Agent or any attorneys, appraisers, collection agents or other agents or consultants retained by such Agent) that any Agent or any other Secured Party (in the case of any other Secured Party, to the extent such costs, expenses or fees are reimbursable under the terms of the ABL Credit Agreement or the Term Credit Agreement, as applicable) may suffer or incur after the occurrence of an Event of Default on account or in connection with (a) the repossession, storage, repair, appraisal, insuring, completion of the manufacture of, preparing for sale, advertising for sale, selling, collecting or otherwise preserving or realizing upon any Collateral, (b) the settlement or satisfaction of any prior Lien or other encumbrance upon any Collateral or (c) the enforcement of any of the ABL Documents or any of the Term Documents, as the case may be.

"**Enforcement Notice**" shall mean a written notice delivered by either the ABL Agent or the Term Agent to the other announcing that an Enforcement Period has commenced.

8

"**Enforcement Period**" shall mean the period of time following the receipt by either the ABL Agent or the Term Agent of an Enforcement Notice from the other and continuing until the earliest of (a) in the case of an Enforcement Period commenced by the Term Agent, the Discharge of Term Obligations, (b) in the case of an Enforcement Period commenced by the ABL Agent, the Discharge of ABL Obligations, (c) the ABL Agent or the Term Agent (as applicable) terminates, or agrees in writing to terminate, the Enforcement Period, or (d) the date on which the Event of Default that was the subject of the Enforcement Notice relating to such Enforcement Period has been cured to the satisfaction of the ABL Agent or Term Agent, as applicable, or waived in writing by the ABL Agent or Term Agent, as applicable.

"**Equity Interest**" shall mean, with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership or profit interests or units in, including any limited or general partnership interest and any limited liability company membership interest in) such Person and all of the warrants, options or other rights for the purchase, acquisition or exchange from such Person of any of the foregoing (including through convertible securities).

"**Event of Default**" shall mean an "Event of Default" or similar term under and as defined in the ABL Credit Agreement or the Term Credit Agreement, as applicable.

"**Exercise of Any Secured Creditor Remedies**" or "**Exercise of Secured Creditor Remedies**" shall mean, except as otherwise provided in the final sentence of this definition:

      (a)    the taking by any Secured Party of any action to enforce or realize upon any Lien, including the institution of any foreclosure proceedings or the noticing of any public or private sale pursuant to Article 9 of the Uniform Commercial Code or other applicable law;

      (b)    the exercise by any Secured Party of any right or remedy provided to a secured creditor on account of a Lien under any of the Credit Documents, under applicable law, in an Insolvency Proceeding or otherwise, including the election to retain any of the Collateral in satisfaction of a Lien;

      (c)    the taking of any action by any Secured Party or the exercise of any right or remedy by any Secured Party in respect of the collection on, set off against, marshaling of, injunction respecting or foreclosure on the Collateral or the Proceeds thereof;

      (d)    the appointment on the application of a Secured Party, of a receiver, receiver and manager or interim receiver of all or part of the Collateral;

      (e)    the sale, lease, license or other disposition of all or any portion of the Collateral by private or public sale conducted by any Secured Party or any other means at the direction or with the consent of any Secured Party permissible under applicable law;

      (f)    the exercise of any other right of a secured creditor under Part 6 of Article 9 of the Uniform Commercial Code or under provisions of similar effect under other applicable law; and

      (g)    the exercise by any Secured Party of any voting rights relating to any Equity Interest included in the Collateral.

For the avoidance of doubt, none of the following shall be deemed to constitute an Exercise of Any Secured Creditor Remedies or Exercise of Secured Creditor Remedies: (i) the filing of a proof of claim in any Insolvency Proceeding or the seeking of adequate protection in accordance with and subject to the

provisions of Article VI hereof, (ii) so long as the commitments under the ABL Documents have not been terminated as a result of the existence of an Event of Default, the exercise of rights by the ABL Agent in connection with cash dominion during the continuance of a Cash Dominion Event (as defined in the ABL Credit Agreement), including, without limitation, the notification of account debtors, depository institutions or any other Person to deliver proceeds of ABL Priority Collateral to the ABL Agent, (iii) the consent by the ABL Agent or  the requisite ABL Lenders to a store closing sale, going out of business sale or other disposition by any Credit Party of any of the ABL Priority Collateral, (iv) the reduction of advance rates or sub-limits or change in borrowing base components or eligibility criteria by the ABL Agent, and the requisite ABL Lenders, or (v) the imposition of Reserves (as defined in the ABL Credit Agreement) by the ABL Agent.

"**Exigent Circumstances**" means an event or circumstance that threatens the ability of ABL Agent to realize upon the ABL Priority Collateral, such as, without limitation, fraudulent removal, concealment, destruction, material waste or abscondment thereof, the failure of any Credit Party after demand to maintain or reinstate adequate casualty insurance coverage with respect thereto, the attachment or foreclosure thereon by any Person (other than the ABL Agent), or the diminution in value of the ABL Priority Collateral or the rights and interests of the ABL Agent therein (including any loss of priority of the Liens of the ABL Agent).

"**GAAP**" shall mean generally accepted accounting principles in the United States, as in effect from time to time.

"**Governmental Authority**" shall mean the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Guarantor**" shall mean any of the ABL Guarantors or Term Guarantors.

"**Indebtedness**" shall have the meaning set forth in either the ABL Credit Agreement and the Term Credit Agreement as of the date hereof.

"**Initial ABL Agent**" shall have the meaning assigned to that term in the introduction to this Agreement.

"**Initial ABL Credit Agreement**" shall have the meaning assigned to such term in the recitals to this Agreement.

"**Initial ABL Guaranty**" shall have the meaning assigned to such term in the recitals to this Agreement.

"**Initial ABL Lenders**" shall have the meaning assigned to that term in the introduction to this Agreement.

"**Initial ABL Secured Parties**" shall have the meaning assigned to that term in the introduction to this Agreement.

"**Initial Term Agent**" shall have the meaning assigned to that term in the introduction to this Agreement.

10

"**Initial Term Credit Agreement**" shall have the meaning assigned to such term in the recitals to this Agreement.

"**Initial Term Guaranty**" shall have the meaning assigned to such term in the recitals to this Agreement.

"**Initial Term Lenders**" shall have the meaning assigned to that term in the introduction to this Agreement.

"**Initial Term Secured Parties**" shall have the meaning assigned to that term in the introduction to this Agreement.

"**Insolvency Proceeding**" shall mean (a) any case, action or proceeding before any court or other Governmental Authority relating to bankruptcy, reorganization, insolvency, liquidation, receivership, dissolution, winding-up or relief of debtors, or (b) any general assignment for the benefit of creditors, composition, marshalling of assets for creditors or other similar arrangement in respect of a Person's creditors generally or any substantial portion of a Person's creditors; in each case covered by clauses (a) and (b) undertaken under any Debtor Relief Laws.

"**Intellectual Property**" shall mean all intellectual and similar property of every kind and nature now owned, licensed or hereafter acquired by any Credit Party that is subject to a security interest under any ABL Documents or any Term Documents, including inventions, designs, Patents, Copyrights, Licenses, Trademarks, Domain Names, trade secrets, confidential or proprietary technical and business information, know how, show how or other data or information, software, databases, all other proprietary information and all embodiments or fixations thereof and related documentation and registrations and all additions, improvements and accessions to, and books and records describing or used in connection with, any of the foregoing.

"**Intellectual Property Collateral**" shall mean Collateral consisting of Intellectual Property.

"**Intercreditor Agreement Joinder**" shall mean an agreement substantially in the form of Exhibit A.

"**LC Obligations**" is defined in definition of Discharge of ABL Obligations.

"**Lenders**" shall mean, collectively, all of the ABL Lenders and the Term Lenders.

"**License**" shall mean any Patent License, Trademark License, Copyright License, or other license or sublicense agreement granting rights under Intellectual Property to which any Credit Party is a party.

"**Lien**" shall mean any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, encumbrance, collateral assignment, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any Capitalized Lease having substantially the same economic effect as any of the foregoing); provided that in no event shall an operating lease in and of itself be deemed a Lien.

"**Lien Priority**" shall mean with respect to any Lien of the ABL Secured Parties or the Term Secured Parties in the Collateral, the order of priority of such Lien as specified in Section 2.1.

11

"**Party**" shall mean the ABL Agent or the Term Agent, and "**Parties**" shall mean both the ABL Agent and the Term Agent.

"**Patent License**" shall mean any written agreement, now or hereafter in effect, granting to any third party any right to develop, commercialize, import, make, have made, offer for sale, use or sell any invention on which a Patent, now or hereafter owned by any Credit Party or that any Credit Party otherwise has the right to license, is in existence, or granting to any Credit Party any such right with respect to any invention on which a Patent, now or hereafter owned by any third party, is in existence, and all rights of any Credit Party under any such agreement.

"**Patents**" shall mean all of the following now owned or hereafter acquired by any Credit Party: (a) all letters patent of the United States or the equivalent thereof in any other country, all registrations and recordings thereof, and all applications for letters patent of the United States or the equivalent thereof in any other country, including registrations, recordings and pending applications in the United States Patent and Trademark Office or any similar offices in any other country, and (b) all (i) rights and privileges arising under applicable law with respect to such Credit Party's use of any patents, (ii) inventions and improvements described and claimed therein, (iii) reissues, divisions, continuations, renewals, extensions and continuations-in-part thereof and amendments thereto, (iv) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable respect to any of the foregoing, including damages and payments for past, present or future infringements thereof, (v) rights corresponding thereto throughout the world and (vi) rights to sue for past, present or future infringements thereof.

"**Person**" shall mean any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**PIK Interest**" shall mean "PIK Interest" as defined in the Term Credit Agreement as in effect on the date hereof.

"**Priority Agent**" shall mean (a) with respect to the ABL Priority Collateral, the ABL Agent, and (b) with respect to the Term Priority Collateral, the Term Agent.

"**Priority Collateral**" shall mean the ABL Priority Collateral or the Term Priority Collateral, as applicable.

"**Proceeds**" shall mean (a) all "proceeds," as defined in Article 9 of the Uniform Commercial Code, with respect to the Collateral, and (b) whatever is recoverable or recovered when any Collateral is sold, exchanged, collected, or disposed of, whether voluntarily or involuntarily.

"**Property**" shall mean any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible.

"**Purchase Date**" shall have the meaning set forth in Section 3.8(a).

"**Purchase Notice**" shall have the meaning set forth in Section 3.8(a).

"**Purchase Option Event**" shall have the meaning set forth in Section 3.8(a).

"**Purchasing Creditors**" shall have the meaning set forth in Section 3.8(a).

"**Replacement Agent**" shall have the meaning set forth in Section 3.8(d).

12

"**Revolving Credit Loans**" shall have the meaning set forth in the ABL Credit Agreement in effect as of the date hereof.

"**Secured Parties**" shall mean the ABL Secured Parties and the Term Secured Parties.

"**Subsidiary**" of a Person shall mean a corporation, partnership, joint venture, limited liability company or other business entity (excluding, for the avoidance of doubt, charitable foundations) of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person.

"**Term Agent**" shall mean (i) the Initial Term Agent (or its successor) or (ii) in the event there is more than one Term Credit Agreement, the Person designated as the Term Agent for purposes of this Agreement pursuant to Section 5.2(d).

"**Term Borrower**" shall mean collectively (i) Aeropostale, Inc., (ii) any other Person who becomes a "Borrower" pursuant to the Term Credit Agreement, and (iii) all "Borrowers" under and as defined in the Term Credit Agreement.

"**Term Cash Collateral**" shall have the meaning set forth in Section 6.1(b).

"**Term Cash Proceeds Notice**" shall mean a written notice delivered by the Term Agent to the ABL Agent stating that certain identifiable cash proceeds which may be deposited in an ABL Deposit and Securities Account constitute Term Priority Collateral, and reasonably identifying the amount of such proceeds and specifying the origin thereof.

"**Term Collateral Documents**" shall mean all security agreements, mortgages, deeds of trust and other collateral documents executed and delivered by the Term Credit Parties, their Subsidiaries or their Affiliates in connection with the Term Credit Agreement, in each case as the same may be amended, amended and restated, supplemented, restated or otherwise modified from time to time.

"**Term Credit Agreement**" shall mean collectively (i) the Initial Term Credit Agreement and (ii) any one or more other agreements, indentures or facilities extending the maturity of, consolidating, restructuring, refunding, replacing or refinancing all or any portion of the Term Obligations, whether by the same or any other agent, trustee, lender, group of lenders, creditor or group of creditors, and whether or not increasing the amount of any Indebtedness that may be incurred thereunder, but any increase shall be subject to the terms of this Agreement. For clarity, the term "Term Credit Agreement" shall include, without limitation, an agreement pursuant to which the Term Agent or any Term Secured Party provides Term Secured Party DIP Financing to any of the Credit Parties pursuant to the provisions of this Agreement.

"**Term Credit Parties**" shall mean, collectively, the Borrower, the Term Guarantors and each other direct or indirect subsidiary or parent of the Borrower or any of its affiliates that is now or hereafter becomes a party to any Term Document.

"**Term Documents**" shall mean the Term Credit Agreement, any Term Guaranty, any Term Collateral Document, any other ancillary agreement, instruments, documents and certificates, now or hereafter executed by or on behalf of any Term Credit Party or any of its respective Subsidiaries or Affiliates, and delivered to the Term Agent or any other Term Secured Party, in connection with any of

the foregoing, in each case as the same may be amended, amended and restated, supplemented, restated, replaced or otherwise modified from time to time.

"**Term Enforcement Date**" shall mean the date which is 180 days after the ABL Agent's receipt of an Enforcement Notice from the Term Agent.

"**Term Guarantors**" shall mean the collective reference to (i) Aeropostale West, Inc., a Delaware corporation, Jimmy'z Surf Co., LLC, a Delaware limited liability company, Aero CG Management LLC, a Virginia limited liability company, Aeropostale Procurement Company, Inc., a Delaware corporation, Aeropostale Licensing, Inc., a Delaware corporation, P.S. From Aeropostale, Inc., a Delaware corporation, and GoJane LLC, a Delaware limited liability company, and (ii) any other Person who becomes a guarantor pursuant to the Term Credit Agreement. The term "Term Guarantors" shall include all "Guarantors" under and as defined in the Term Credit Agreement.

"**Term Guaranty**" shall mean, collectively, (i) the Initial Term Guaranty and any joinder by any Person thereto and (ii) any other guaranty made by a Term Guarantor guaranteeing, inter alia, the payment and performance of any Term Obligations.

"**Term Lenders**" shall mean the Initial Term Lenders and any other Person that extends credit under any Term Credit Agreement.

"**Term Loans**" shall mean the Tranche A Term Loans and the Tranche B Term Loans and any loans made to refinance such loans pursuant to Section 5.2 hereof.

"**Term Loan Cap Amount**" shall mean (a) for all purposes other than section 6.1(b), 110% of the Term Loan Principal Obligations or (b) solely for purposes of section 6.1(b), 115% of the Term Loan Principal Obligations.

"**Term Loan Excess Amount**" shall mean an amount equal to the sum of (A) the amount by which the principal amount of all Term Loans exceeds the Term Loan Cap Amount (the amount of such excess being the "Term Principal Excess"), *plus* (B) any interest earned on the Term Principal Excess, *plus* (C) any commitment or other fees owed by the Term Credit Parties, if any, which are calculated as a percentage of, or by other reference to, the amount of any Term Loan Excess. For sake of clarity, the principal amount of all Term Loans for purposes of clause (A) of the foregoing sentence shall exclude Enforcement Expenses regardless of whether such Enforcement Expenses are added to the principal balance of the Term Loans pursuant to the Term Documents.

"**Term Loan Principal Obligations**" shall mean, at any time of determination, the amount equal to (i) $150,000,000 plus (ii) any PIK Interest minus (iii) the aggregate amount of principal payments made on the Term Loan, including for sake of clarity, payments made on account of PIK Interest (other than payments in connection with a refinancing permitted by Section 5.2(c)).

"**Term Loan Priority Accounts**" shall mean the Asset Sale Proceeds Pledged Account, the Term Loan Proceeds Account, and any other Deposit Accounts, Securities Accounts or Commodity Accounts, in each case that are intended to solely contain Term Priority Collateral or identifiable proceeds thereof (it being understood that any property in such Deposit Accounts, Securities Accounts or Commodities Accounts which is not Term Priority Collateral or identifiable proceeds thereof shall not be Term Priority Collateral solely by virtue of being on deposit in the Asset Sale Proceeds Pledged Account or, any such Deposit Account, Securities Account or Commodity Account).

14

"**Term Loan Proceeds Account**" shall mean a Deposit Account maintained with BofA which is subject to a blocked account agreement among BofA, the Term Borrower and the Term Agent (as the "first lien holder") and the ABL Agent (as the "junior lien holder"), into which the proceeds of the Term Loan shall be deposited on the Closing Date.

"**Term Obligations**" shall mean any and all obligations of every nature of each Term Credit Party from time to time owed to the Term Secured Parties or any of them, under, in connection with, or evidenced or secured by any Term Document, including, without limitation, all Enforcement Expenses and all other "Obligations" or similar term as defined in the Term Credit Agreement and whether for principal, interest, fees, expenses, indemnification or otherwise, and all other amounts owing or due under the terms of any Term Document (including interest, fees, expenses and indemnifications which, but for the filing or the commencement of an Insolvency Proceeding with respect to such Term Credit Party, would have become due or accrued on any Term Obligation, whether or not a claim is allowed against such Term Credit Party for such interest, fees, expenses and indemnifications in the related Insolvency Proceeding), as amended, restated, amended and restated, modified, renewed, refunded, replaced or refinanced in whole or in part from time to time in accordance with the provisions of this Agreement. For clarity, the term "Term Obligations" shall include, without limitation, all obligations on account of any Term Secured Party DIP Financing provided by the Term Agent or any Term Secured Party to any of the Credit Parties pursuant to the provisions of this Agreement.

"**Term Priority Collateral**" shall mean all Collateral (including for the avoidance of doubt, any such assets that, but for the application of Section 552 of the Bankruptcy Code (or any similar provision of any foreign Debtor Relief Laws) would be Term Priority Collateral) other than ABL Priority Collateral.

"**Term Priority Obligations**" shall mean all Term Obligations, other than the Term Loan Excess Amount.

"**Term Recovery**" shall have the meaning set forth in Section 5.3(b).

"**Term Secured Party DIP Financing**" shall have the meaning set forth in Section 6.1(b).

"**Term Secured Parties**" shall mean the Initial Term Secured Parties and any other holder of any Term Obligations that are secured by a Lien on the Collateral, and any agent, trustee or other representative under any Term Document.

"**Term Standstill Period**" shall have the meaning set forth in Section 2.3(a).

"**Tranche A Term Loans**" shall have the meaning set forth in the Term Credit Agreement in effect as of the date hereof.

"**Tranche B Term Loans**" shall have the meaning set forth in the Term Credit Agreement in effect as of the date hereof.

"**Trademark License**" shall mean any written agreement, now or hereafter in effect, granting to any third party any right to use any Trademark now or hereafter owned by any Credit Party or that any Credit Party otherwise has the right to license, or granting to any Credit Party any right to use any Trademark now or hereafter owned by any third party, and all rights of any Credit Party under any such agreement (not including vendor or distribution agreements that allow incidental use of intellectual property rights in connection with the sale or distribution of such products or services).

15

"**Trademarks**" shall mean all of the following now owned or hereafter acquired by any Credit Party: (a) all trademarks, service marks, trade names, corporate names, company names, business names, fictitious business names, trade styles, trade dress, logos, other source or business identifiers, designs and general intangibles of like nature, the goodwill of the business symbolized thereby or associated therewith, all registrations and recordings thereof, and all registration and recording applications filed in connection therewith, including registrations and registration applications in the United States Patent and Trademark Office or any similar offices in any State of the United States or any other country or any political subdivision thereof, and all extensions or renewals thereof, (b) any and all rights and privileges arising under applicable law with respect to such Credit Party's use of any trademarks, (c) all extensions and renewals thereof and amendments thereto, (d) all income, fees, royalties, damages and payments now and hereafter due and/or payable with respect to any of the foregoing, including damages, claims and payments for past, present or future infringements thereof, (e) all rights corresponding thereto throughout the world and (f) all rights to sue for past, present and future infringements or dilution thereof or other injuries thereto.

"**Uniform Commercial Code**" shall mean the Uniform Commercial Code as in effect from time to time in the State of New York; provided that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection or the priority of a security interest in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect in a jurisdiction other than New York, "Uniform Commercial Code" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or priority or availability of such remedy, as the case may be.

"**Use Period**" shall mean the period commencing on the earlier of (x) the date which is identified in an Enforcement Notice that the ABL Agent has provided to the Term Agent as the date on which (i) the ABL Agent intends to commence, or (ii) an agent acting on its behalf (or an ABL Credit Party acting with the consent of the ABL Agent) intends to commence, Exercise of Secured Creditor Remedies in connection with the ABL Priority Collateral, or (y) the third Business Day after the Term Agent has provided the ABL Agent with notice that the Term Agent has obtained possession or control of an item of Term Priority Collateral in connection with an Exercise of Secured Creditor Remedies (the earlier of the dates in subsections (x) and (y) being the "Use Period Commencement Date") and ending on the earlier of (i) 180 days after the Use Period Commencement Date, or (ii) Discharge of ABL Obligations. If any stay or other order that prohibits any of the ABL Agent, the other ABL Secured Parties or any ABL Credit Party (with the consent of the ABL Agent) from commencing and continuing to Exercise Any Secured Creditor Remedies or from liquidating and selling the ABL Priority Collateral has been entered by a court of competent jurisdiction, such 180-day period shall be tolled during the pendency of any such stay or other order and the Use Period shall be so extended.

**Section 1.3**   **Rules of Construction**. Unless the context of this Agreement clearly requires otherwise:

(a)   references to the plural include the singular, references to the singular include the plural;

(b)   the term "including" is not limiting and shall be deemed to be followed by the phrase "without limitation," and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or;"

(c)   the words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement;

16

(d)      article, section, subsection, clause, schedule and exhibit references herein are to this Agreement unless otherwise specified;

(e)      any reference in this Agreement to any agreement, instrument, or document shall include all alterations, amendments, changes, restatements, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, restatements, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein);

(f)      any reference herein to any Person shall be construed to include such Person's successors and assigns;

(g)      any reference herein to the repayment in full of an obligation shall mean the payment in full in cash of such obligation, or in such other manner as may be approved in writing by the requisite holders or representatives in respect of such obligation;

(h)      any reference herein to any Lien of the ABL Agent shall be understood to include a reference to any Lien of the ABL Secured Parties, and any reference herein to any Lien of the Term Loan Agent shall be deemed to include a reference to any Lien of the Term Loan Secured Parties;

(i)      any reference herein to the ABL Agent shall be interpreted to mean the ABL Agent on behalf of itself and the other ABL Secured Parties; and,

(j)      any reference herein to the Term Agent shall be interpreted to mean the Term Agent on behalf of itself and the other Term Secured Parties.

## ARTICLE 2
## LIEN PRIORITY

### Section 2.1    Priority of Liens.

(a)      Notwithstanding (i) the date, time, method, manner, or order of grant, attachment or perfection (including any defect or deficiency or alleged defect or deficiency in any of the foregoing) of any Liens granted to the ABL Secured Parties in respect of all or any portion of the Collateral or of any Liens granted to the Term Secured Parties in respect of all or any portion of the Collateral and regardless of how any such Lien was acquired (whether by grant, statute, operation of law, subrogation or otherwise), (ii) the order or time of filing or recordation of any document or instrument for perfecting the Liens in favor of the ABL Agent or the Term Agent (or ABL Secured Parties or Term Secured Parties) in any Collateral, (iii) any provision of the Uniform Commercial Code, Debtor Relief Laws or any other applicable law, or of the ABL Documents or the Term Documents, (iv) whether the ABL Agent or the Term Agent, in each case, either directly or through agents, holds possession of, or has control over, all or any part of the Collateral, (v) the date on which the ABL Obligations or the Term Obligations are advanced or made available to the Credit Parties, (vi) the fact that any such Liens in favor of the ABL Agent or the ABL Lenders or the Term Agent or the Term Lenders securing any of the ABL Obligations or Term Obligations, respectively, are (x) subordinated to any Lien securing any obligation of any Credit Party other than the Term Obligations or the ABL Obligations, respectively, or (y) otherwise subordinated, voided, avoided, invalidated or lapsed, or (vii) any other circumstance of any kind or nature whatsoever, the ABL Agent, on behalf of itself and the ABL Secured Parties, and the Term Agent, on behalf of itself and the Term Secured Parties, hereby agree that:

17

(i)    any Lien on the ABL Priority Collateral held by or on behalf of any ABL Secured Party or any Term Secured Party shall have the following priority:

A.    any Lien on the ABL Priority Collateral securing the ABL Priority Obligations, whether such Lien is now or hereafter held by or on behalf of any ABL Agent or any other ABL Secured Party or any other agent or trustee therefor, regardless of how or when acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be senior in all respects and prior to any Lien on the ABL Priority Collateral securing any Term Obligations;

B.    any Lien on the ABL Priority Collateral securing the Term Priority Obligations, whether such Lien is now or hereafter held by or on behalf of any Term Loan Agent or any other Term Loan Secured Party or any other agent or trustee therefor, regardless of how or when acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be junior in all respects to any Lien on the ABL Priority Collateral securing the ABL Priority Obligations but shall be senior in all respects and prior to any Lien on the ABL Priority Collateral securing the ABL Excess Amount;

C.    any Lien on the ABL Priority Collateral securing the ABL Excess Amount, whether such Lien is now or hereafter held by or on behalf of any ABL Agent or any other ABL Secured Party or any other agent or trustee therefor, regardless of how or when acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be junior in all respects to any Lien on the ABL Priority Collateral securing the Term Priority Obligations but shall be senior in all respects and prior to any Lien on the ABL Priority Collateral securing the Term Loan Excess Amount; and

D.    any Lien on the ABL Priority Collateral securing the Term Loan Excess Amount whether such Lien is now or hereafter held by or on behalf of any Term Loan Agent or any other Term Loan Claimholder or any other agent or trustee therefor, regardless of how or when acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be junior in all respects to any Lien on the ABL Priority Collateral securing the ABL Obligations.

(ii)    any Lien on the Term Priority Collateral held by or on behalf of any Term Secured Party or any ABL Secured Party shall have the following priority:

A.    any Lien on the Term Priority Collateral securing the Term Priority Obligations, whether such Lien is now or hereafter held by or on behalf of any Term Loan Agent or any other Term Loan Secured party or any other agent or trustee therefor, regardless of how or when acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be senior in all respects and prior to any Lien on the Term Priority Collateral securing any ABL Obligations;

B.    any Lien on the Term Priority Collateral securing the ABL Priority Obligations, whether such Lien is now or hereafter held by or on behalf of any ABL Agent or any other ABL Secured Party or any other agent or trustee therefor, regardless of how or when acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be junior in all respects to any Lien on the Term Priority Collateral securing the Term Priority Obligations but shall be senior in all respects and prior to any Lien on the Term Priority Collateral securing the Term Loan Excess Amount;

C.    any Lien on the Term Priority Collateral securing the Term Loan Excess Amount whether such Lien is now or hereafter held by or on behalf of any Term Loan Agent or any other Term Loan Secured Party or any other agent or trustee therefor, regardless of how or when acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be junior in all respects to any Lien on the Term Loan Priority Collateral securing the ABL Priority Obligations but shall be senior

18

in all respects and prior to any Lien on the Term Priority Collateral securing the ABL Excess Amount; and

D.    any Lien on the Term Priority Collateral securing the ABL Excess Amount whether such Lien is now or hereafter held by or on behalf of any ABL Agent or any other ABL Secured Party or any other agent or trustee therefor, regardless of how or when acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be junior in all respects to any Lien on the Term Priority Collateral securing the Term Obligations.

(b)    Notwithstanding any failure by any ABL Secured Party or Term Secured Party to perfect its security interests in the Collateral or any avoidance, invalidation, priming or subordination by any third party or court of competent jurisdiction of the security interests in the Collateral granted to the ABL Secured Parties or the Term Secured Parties, the priority and rights as between the ABL Secured Parties and the Term Secured Parties with respect to the Collateral shall be as set forth herein.

(c)    The Term Agent, for and on behalf of itself and the Term Secured Parties, acknowledges and agrees that, concurrently herewith, the ABL Agent, for the benefit of itself and the ABL Secured Parties, has been, or may be, granted Liens upon all of the Collateral in which the Term Agent has been granted Liens and the Term Agent, for and on behalf of itself and the Term Secured Parties, hereby consents thereto. The ABL Agent, for and on behalf of itself and the ABL Secured Parties, acknowledges and agrees that, concurrently herewith, the Term Agent, for the benefit of itself and the Term Secured Parties, has been, or may be, granted Liens upon all of the Collateral in which the ABL Agent has been granted Liens and the ABL Agent, for and on behalf of itself and the ABL Secured Parties, hereby consents thereto. The subordination of Liens by the Term Agent and the ABL Agent in favor of one another as set forth herein shall not be deemed to subordinate the Term Agent's Liens or the ABL Agent's Liens to the Liens of any other Person, nor shall such subordination be affected by the subordination of such Liens to any Lien of any other Person.

### Section 2.2    Waiver of Right to Contest Liens.

(a)    The Term Agent, for and on behalf of itself and the Term Secured Parties, agrees that it and they shall not (and hereby waives any right to) take any action to contest or challenge (or assist or support any other Person in contesting or challenging), directly or indirectly, whether or not in any proceeding (including in any Insolvency Proceeding), the validity, priority, enforceability, or perfection of the ABL Obligations or the Liens of the ABL Agent and the ABL Secured Parties in respect of any of the Collateral or the provisions of this Agreement. The Term Agent, for itself and on behalf of the Term Secured Parties, agrees that none of the Term Agent or the Term Secured Parties will take any action that would interfere with any Exercise of Secured Creditor Remedies undertaken by the ABL Agent or any ABL Secured Party under the ABL Documents with respect to the ABL Priority Collateral so long as such Exercise of Secured Creditor Remedies complies with the terms of this Agreement. The Term Agent, for itself and on behalf of the Term Secured Parties, hereby waives any and all rights it or the Term Secured Parties may have as a junior lien creditor or otherwise to contest, protest, object to, or interfere with the manner in which the ABL Agent or any ABL Lender seeks to enforce its Liens in any ABL Priority Collateral so long as such enforcement complies with the terms of this Agreement. The foregoing shall not be construed to prohibit the Term Agent from enforcing the provisions of this Agreement or otherwise acting in accordance with this Agreement.

(b)    The ABL Agent, for and on behalf of itself and the ABL Secured Parties, agrees that it and they shall not (and hereby waives any right to) take any action to contest or challenge (or assist or support any other Person in contesting or challenging), directly or indirectly, whether or not in any proceeding (including in any Insolvency Proceeding), the validity, priority, enforceability, or perfection of

19

the Term Obligations or the Liens of the Term Agent or the Term Secured Parties in respect of the Collateral or the provisions of this Agreement. Except to the extent expressly set forth in Section 3.6 of this Agreement, the ABL Agent, for itself and on behalf of the ABL Secured Parties, agrees that none of the ABL Agent or the ABL Secured Parties will take any action that would interfere with any Exercise of Secured Creditor Remedies undertaken by the Term Agent or any Term Secured Party under the Term Documents with respect to the Term Priority Collateral so long as such Exercise of Secured Creditor Remedies complies with the terms of this Agreement. The ABL Agent, for itself and on behalf of the ABL Secured Parties, hereby waives any and all rights it or the ABL Secured Parties may have as a junior lien creditor or otherwise to contest, protest, object to, or interfere with the manner in which the Term Agent or any Term Secured Party seeks to enforce its Liens in any Term Priority Collateral so long as such enforcement complies with the terms of this Agreement. The foregoing shall not be construed to prohibit the ABL Agent from enforcing the provisions of this Agreement or otherwise acting in accordance with this Agreement.

**Section 2.3    Remedies Standstill.**

(a)    The Term Agent, on behalf of itself and the Term Secured Parties, agrees that, from the date hereof until the earlier of (A) the Term Enforcement Date, or (B) the date upon which the Discharge of ABL Obligations shall have occurred (the "Term Standstill Period"), neither the Term Agent nor any Term Secured Party will Exercise Any Secured Creditor Remedies with respect to any of the ABL Priority Collateral without the written consent of the ABL Agent, and will not take, receive or accept any Proceeds of ABL Priority Collateral, it being understood and agreed that the temporary deposit of Proceeds of ABL Priority Collateral in a Deposit Account controlled by the Term Agent shall not constitute a breach of this Agreement so long as such Proceeds are promptly (but in no event later than five Business Days after receipt) remitted to the ABL Agent. From and after the date upon which the Discharge of ABL Obligations shall have occurred (or prior thereto upon the occurrence of the Term Enforcement Date), the Term Agent or any Term Secured Party may Exercise Any Secured Creditor Remedies under the Term Documents or applicable law as to any ABL Priority Collateral; *provided*, however, that any Exercise of Secured Creditor Remedies with respect to any Collateral by the Term Agent or the Term Secured Parties is at all times subject to the provisions of this Agreement, *provided* further that the Term Agent shall not Exercise Any Secured Parties' Remedies against the ABL Priority Collateral after the Term Enforcement Date and prior to Discharge of ABL Obligations (x) at any time the ABL Agent or the ABL Lenders have commenced and are diligently pursuing an Exercise of Secured Creditor Remedies against any of the ABL Priority Collateral, (y) subject to Article 6 hereof, at any time that any Credit Party is then a debtor under or with respect to (or otherwise subject to) any Insolvency Proceeding, or (z) if the Event of Default under the Term Credit Agreement is waived in accordance with the terms of the Term Credit Agreement. The Term Standstill Period shall be tolled for any period that the ABL Agent or the ABL Secured Parties are stayed or otherwise prohibited by law or court order from exercising remedies with respect to the ABL Priority Collateral

(b)    The ABL Agent, on behalf of itself and the ABL Secured Parties, agrees that, from the date hereof until the earlier of (i) the ABL Enforcement Date, or (ii) date upon which the Discharge of Term Obligations shall have occurred (the "ABL Standstill Period"), neither the ABL Agent nor any ABL Secured Party will Exercise Any Secured Creditor Remedies with respect to the Term Priority Collateral without the written consent of the Term Agent, and will not take, receive or accept any Proceeds of the Term Priority Collateral, it being understood and agreed that the temporary deposit of Proceeds of Term Priority Collateral in a Deposit Account controlled by the ABL Agent shall not constitute a breach of this Agreement so long as such Proceeds are remitted to the Term Agent in accordance with Section 3.7 or Section 4.1(a). From and after the date upon which the Discharge of Term Obligations shall have occurred (or prior thereto upon the occurrence of the ABL Enforcement Date), the ABL Agent or any ABL Secured Party may Exercise Any Secured Creditor Remedies under the ABL

Documents or applicable law as to any Term Priority Collateral; *provided*, however, that any Exercise of Secured Creditor Remedies with respect to any Collateral by the ABL Agent or the ABL Secured Parties is at all times subject to the provisions of this Agreement, *provided* further that the ABL Agent shall not Exercise Any Secured Parties' Remedies with respect to the Term Priority Collateral after the ABL Enforcement Date and prior to the Discharge of Term Obligations (x) at any time the Term Agent or the Term Lenders have commenced and are diligently pursuing an Exercise of Secured Creditor Remedies against any of the Term Priority Collateral, (y) subject to Article 6 hereof, at any time that any Credit Party is then a debtor under or with respect to (or otherwise subject to) any Insolvency Proceeding or (z) if the Event of Default under the ABL Credit Agreement is waived in accordance with the terms of the ABL Credit Agreement. The ABL Standstill Period shall be tolled for any period that the Term Agent or the Term Secured Parties are stayed or otherwise prohibited by law or court order from exercising remedies with respect to the Term Priority Collateral.

(c)     Notwithstanding the provisions of Section 2.3(a), 2.3(b) or any other provision of this Agreement, nothing contained herein shall be construed to prevent any Agent or any Secured Party from (i) filing a claim or statement of interest with respect to the ABL Obligations or Term Obligations owed to it in any Insolvency Proceeding commenced by or against any Credit Party, (ii) taking any action (not adverse to the priority status of the Liens of the other Agent or other Secured Parties on the Collateral in which such other Agent or other Secured Party has a priority Lien or the rights of the other Agent or any of the other Secured Parties to Exercise Any Secured Creditor Remedies in respect thereof) in order to create, perfect, preserve or protect (but not enforce its Lien) on any Collateral, (iii) filing any necessary or responsive pleadings in opposition to any motion, adversary proceeding or other pleading filed by any Person objecting to or otherwise seeking disallowance of the claim or Lien of such Agent or Secured Party, (iv) voting on any plan of reorganization or file any proof of claim in any Insolvency Proceeding of any Credit Party, (v) joining (but not exercising any control or approval with respect to) any judicial foreclosure proceeding or other enforcement proceeding asserted by a Priority Agent in connection with an Exercise of Secured Creditor Remedies to the extent that any such action could not reasonably be expected, in any respect, to restrain, hinder, limit, delay for any material period or otherwise interfere with such Exercise of Secured Creditor Remedies by the Priority Agent, (vi) bidding for or purchasing any Priority Collateral at any public, private or judicial foreclosure sale commenced by a Priority Agent provided that such bid may not include a credit bid unless the cash proceeds of such bid are otherwise sufficient to Discharge the ABL Obligations (in the case of any credit bid submitted by a Term Secured Party in connection with the sale of any ABL Priority Collateral) or Discharge the Term Obligations (in the case of any credit bid submitted by an ABL Secured Party in connection with the sale of any Term Priority Collateral), or (vii) exercising rights and remedies as unsecured creditors against any Credit Party provided that in the event that any Secured Party becomes a judgment Lien creditor in respect of Collateral as a result of its enforcement of its rights as an unsecured creditor, such judgment Lien and any rights afforded thereunder shall be subject to the terms of this Agreement for all purposes as the other Liens securing such ABL Obligations or Term Loan Obligations, as applicable, in each case (i) through (vii) above, to the extent not inconsistent with the express terms of this Agreement.

## Section 2.4   **Exercise of Rights.**

(a)     <u>No Other Restrictions</u>. Except as expressly set forth in this Agreement, each Term Secured Party and each ABL Secured Party shall have any and all rights and remedies it may have as a creditor under applicable law, including the right to the Exercise of Secured Creditor Remedies; provided, <u>however</u>, that the Exercise of Secured Creditor Remedies with respect to the Collateral shall be subject to the Lien Priority and to the provisions of this Agreement. The ABL Agent may enforce the provisions of the ABL Documents, the Term Agent may enforce the provisions of the Term Documents and each may Exercise Any Secured Creditor Remedies, all in such order and in such manner as each may determine in the exercise of its sole discretion, consistent with the terms of this Agreement and

21

mandatory provisions of applicable law; provided, however, that each of the ABL Agent and the Term Agent agrees to provide to the other (x) an Enforcement Notice prior to the commencement of an Exercise of Any Secured Creditor Remedies and (y) copies of any notices that it is required under applicable law to deliver to any Credit Party; provided further, however, that the ABL Agent's failure to provide the Enforcement Notice (other than in connection with Section 3.6 or Section 3.8) or any such copies to the Term Agent shall not impair any of the ABL Agent's rights hereunder or under any of the ABL Documents and the Term Agent's failure to provide the Enforcement Notice or any such copies to the ABL Agent shall not impair any of the Term Agent's rights hereunder or under any of the Term Documents. Each of the Term Agent, each Term Secured Party, the ABL Agent and each ABL Secured Party agrees that it will not institute any suit or other proceeding or assert in any suit, Insolvency Proceeding or other proceeding any claim, in the case of the Term Agent and each Term Secured Party, against either the ABL Agent or any other ABL Secured Party, and in the case of the ABL Agent and each other ABL Secured Party, against either the Term Agent or any other Term Secured Party, seeking damages from or other relief by way of specific performance, instructions or otherwise, with respect to any action taken or omitted to be taken by such Person with respect to the Collateral which is consistent with the terms of this Agreement, and none of such Parties shall be liable for any such action taken or omitted to be taken.

(b)     Insolvency Proceedings. None of the ABL Agent, any other ABL Secured Party, the Term Agent or any other Term Secured Party shall be a petitioning creditor or otherwise assist in the filing of an involuntary Insolvency Proceeding against any Credit Party.

(c)     Release of Liens.

(i)     (A) In the event of any private or public sale of all or any portion of the ABL Priority Collateral in connection with any Exercise of Secured Creditor Remedies by the ABL Agent or any sale by a Credit Party after the occurrence and during the continuation of an Event of Default with the consent of the ABL Agent, or (B) in any circumstance not included in clause (A), any sale, transfer or other disposition of all or any portion of the ABL Priority Collateral (other than in connection with a refinancing as described in Section 5.2(c)) or with the consent of the ABL Agent, including by any Credit Party, so long as such sale, transfer or other disposition under this clause (B) is then permitted by the ABL Documents and the Term  Documents, each as in effect on the Closing Date (or is consented to by the requisite ABL Lenders and the requisite Term Lenders), the Term Agent agrees, on behalf of itself and the Term Secured Parties that, so long as the Term Agent, for the benefit of the Term Secured Parties, shall retain a Lien on the proceeds of such sale, transfer or other disposition (to the extent that such proceeds are not applied to the ABL Obligations as provided in Section 4.1(b) hereof), such sale, transfer or other disposition will be free and clear of the Liens on such ABL Priority Collateral (but not the proceeds thereof) securing the Term Obligations, and the Term Agent's and the Term Secured Parties' Liens with respect to the ABL Priority Collateral (but not the proceeds thereof) so sold, transferred, or disposed shall terminate and be automatically released without further action concurrently with, and to the same extent as, the release of the ABL Secured Parties' Liens on such ABL Priority Collateral. In furtherance of, and subject to, the foregoing, the Term Agent agrees that it will promptly execute any and all Lien releases or other documents reasonably requested by the ABL Agent in connection therewith. The Term Agent hereby appoints the ABL Agent and any officer or duly authorized person of the ABL Agent, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power of attorney in the place and stead of the Term Agent and in the name of the Term Agent or in the ABL Agent's own name, from time to time, in the ABL Agent's sole discretion, for the purposes of carrying out the terms of this paragraph, to take any and all appropriate action and to execute and deliver any and all documents and instruments as may be necessary or desirable to accomplish the purposes of this paragraph, including any financing statements, endorsements, assignments, releases or

22

other documents or instruments of transfer (which appointment, being coupled with an interest, is irrevocable).

(ii)     (A) In the event of any private or public sale of all or any portion of the Term Priority Collateral in connection with any Exercise of Secured Creditor Remedies by the Term Agent or any sale by a Credit Party after the occurrence and during the continuation of an Event of Default with the consent of the Term Agent, or (B) in any circumstance not included in clause (A), any sale, transfer or other disposition of all or any portion of the Term Priority Collateral or with the consent of the Term Agent, including any Credit Party, so long as such sale, transfer or other disposition under this clause (B) is then permitted by the Term Documents and ABL Documents, each as in effect on the Closing Date (or is consented to by the requisite Term Lenders and the requisite ABL Lenders), the ABL Agent agrees, on behalf of itself and the ABL Secured Parties that, so long as the ABL Agent, for the benefit of the ABL Secured Parties, shall retain a Lien on the proceeds of such sale, transfer or other disposition (to the extent that such proceeds are not applied to the Term Obligations as provided in Section 4.1(c) hereof), such sale, transfer or disposition will be free and clear of the Liens on such Term Priority Collateral (but not the proceeds thereof) securing the ABL Obligations and the ABL Agent's and the ABL Secured Parties' Liens with respect to the Term Priority Collateral (but not the proceeds thereof) so sold, transferred, or disposed shall terminate and be automatically released without further action concurrently with, and to the same extent as, the release of the Term Secured Parties' Liens on such Term Priority Collateral. In furtherance of, and subject to, the foregoing, the ABL Agent agrees that it will promptly execute any and all Lien releases or other documents reasonably requested by the Term Agent in connection therewith. The ABL Agent hereby appoints the Term Agent and any officer or duly authorized person of the Term Agent, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power of attorney in the place and stead of the ABL Agent and in the name of the ABL Agent or in the Term Agent's own name, from time to time, in the Term Agent's sole discretion, for the purposes of carrying out the terms of this paragraph, to take any and all appropriate action and to execute and deliver any and all documents and instruments as may be necessary or desirable to accomplish the purposes of this paragraph, including any financing statements, endorsements, assignments, releases or other documents or instruments of transfer (which appointment, being coupled with an interest, is irrevocable).

**Section 2.5   Scope of Liens.**

(a)     It is the anticipation of the parties, that until the date upon which the Discharge of ABL Obligations shall have occurred, no Term Secured Party shall acquire or hold any Lien on any assets securing any Term Obligation which assets are not also subject to the Lien of the ABL Agent under the ABL Documents. If any Term Secured Party shall acquire or hold any Lien on any assets of any Credit Party securing any Term Obligation which assets are not also subject to the Lien of the ABL Agent under the ABL Documents, then the Term Agent (or the relevant Term Secured Party) shall, without the need for any further consent of any other Term Secured Party, the Borrower or any Term Guarantor and notwithstanding anything to the contrary in any other Term Document, be deemed to also hold and have held such Lien as agent or bailee for the benefit of the ABL Agent as security for the ABL Obligations (subject to the Lien Priority and other terms hereof) and shall promptly notify the ABL Agent in writing of the existence of such Lien upon becoming aware thereof.

(b)     It is the anticipation of the parties, that until the date upon which the Discharge of Term Obligations shall have occurred, no ABL Secured Party shall acquire or hold any Lien on any assets securing any ABL Obligation which assets are not also subject to the Lien of the Term Agent under the Term Documents. If any ABL Secured Party shall acquire or hold any Lien on any assets of any Credit Party securing any ABL Obligation which assets are not also subject to the Lien of the Term Agent under the Term Documents, then the ABL Agent (or the relevant ABL Secured Party) shall, without the need

23

for any further consent of any other ABL Secured Party, the Borrower or any ABL Guarantor and notwithstanding anything to the contrary in any other ABL Document be deemed to also hold and have held such Lien as agent or bailee for the benefit of the Term Agent as security for the Term Obligations (subject to the Lien Priority and other terms hereof) and shall promptly notify the Term Agent in writing of the existence of such Lien upon becoming aware thereof.

### Section 2.6    Waiver of Marshalling.

(a)    Until the Discharge of ABL Obligations, the Term Agent, on behalf of itself and the Term Secured Parties, agrees not to assert and hereby waives, to the fullest extent permitted by law, any right to demand, request, plead or otherwise assert or otherwise claim the benefit of, any marshalling, appraisal, valuation or other similar right that may otherwise be available under applicable law with respect to the ABL Priority Collateral or any other similar rights a junior secured creditor may have under applicable law.

(b)    Until the Discharge of Term Obligations, the ABL Agent, on behalf of itself and the ABL Secured Parties, agrees not to assert and hereby waives, to the fullest extent permitted by law, any right to demand, request, plead or otherwise assert or otherwise claim the benefit of, any marshalling, appraisal, valuation or other similar right that may otherwise be available under applicable law with respect to the Term Priority Collateral or any other similar rights a junior secured creditor may have under applicable law.

## ARTICLE 3
## ACTIONS OF THE PARTIES

### Section 3.1    Certain Actions Permitted.

(a)    The Term Agent and the ABL Agent hereby acknowledge and agree that (i) on the Closing Date, all of the proceeds of the Tranche A Term Loans shall be deposited by the Term Agent into the Term Loan Proceeds Account, and (ii) when the Tranche B Term Loans are funded in accordance with the provisions of the Term Credit Agreement (which may be on the Closing Date or thereafter), the proceeds thereof shall be deposited by the Term Agent into the Term Loan Proceeds Account. The Term Agent acknowledges and agrees that pursuant to the terms and conditions of the ABL Credit Agreement, (i) on the Closing Date, the Borrower shall utilize a portion of the Tranche A Term Loans to repay all outstanding Revolving Credit Loans, and (ii) for the period beginning on the Closing Date and continuing until the proceeds of the Term Loans have been used by the Borrower for the purposes set forth in the Term Credit Agreement and have been fully disbursed from the Term Loan Proceeds Account, the Borrower may not request, and the ABL Lenders shall have no obligation to fund, Revolving Credit Loans (such period, the "No ABL Borrowing Period"). Notwithstanding the foregoing, subject to compliance with the terms and conditions of the ABL Credit Agreement, letters of credit will be issued pursuant to the provisions of the ABL Credit Agreement during the No ABL Borrowing Period. Upon the expiration of the No ABL Borrowing Period, Revolving Credit Loans will be advanced in accordance with the provisions of the ABL Credit Agreement.

The Term Agent and the ABL Agent hereby agree that during the No ABL Borrowing Period, with respect to any provision in this Agreement that limits or restricts the ability of the Term Agent to take any action until the Discharge of ABL Obligations, the Term Agent may take any such action during the No ABL Borrowing Period, so long as the following conditions are satisfied at all times: (i) there are no outstanding Revolving Credit Loans, (ii) all LC Obligations have been cash collateralized in an amount equal to 103% of the aggregate undrawn amount of such letters of credit, (iii) all ABL Bank Product Obligations and ABL Cash Management Obligations have been cash collateralized in an amount

24

reasonably determined by the applicable ABL Bank Product Provider or ABL Cash Management Bank based upon reasonably estimated credit exposure with respect thereto, (iv) the ABL Agent has been provided cash collateral with respect to contingent indemnification obligations with respect to known or anticipated claims threatened or asserted in writing, in an amount reasonably determined by the ABL Agent, and (v) any proceeds of ABL Priority Collateral shall be applied in accordance with the provisions of Section 4.1(b) to the extent any ABL Obligation remains outstanding for any reason (after giving effect to any then existing cash collateralization).   Without limiting the generality of the foregoing, during the No ABL Borrowing Period, and provided that the conditions set forth in the preceding sentence are satisfied, (i) the Term Secured Parties shall not be bound by the standstill provisions of Section 2.3(a) (Remedies Standstill), (ii) the terms of Section 2.4(c)(i)(Release of Liens) shall not apply, and the Term Agent shall not be deemed to have agreed to the release of any Lien upon the Collateral except as provided in the Term Documents (other than this Agreement), (iii) the limitation imposed by Section 3.1(b) upon the Term Agent's ability to Exercise Any Secured Creditor Remedies with respect to ABL Priority Collateral shall not apply, (iv) notwithstanding the terms of Section 6.1(a), the Term Secured Parties shall not be deemed to have consented to the use of any cash collateral under Section 363 of the Bankruptcy Code (or any similar provision under the law applicable to any Insolvency Proceeding) or the provision of any financing under section 364 of the Bankruptcy Code (or any similar provision under the law applicable to any Insolvency Proceeding), and (v) notwithstanding the terms of Section 6.4, the Term Secured Parties shall not be deemed to have consented to any sale of Collateral under Section 363 of the Bankruptcy Code (or any similar provision under the law applicable to any Insolvency Proceeding). Notwithstanding the foregoing, upon the expiration of the No ABL Borrowing Period, the Term Agent shall be bound by all provisions of this Agreement, and the rights afforded to the Term Agent pursuant to this paragraph shall be of no force or effect.

(b)     The Term Agent and the ABL Agent may make such demands or file such claims in respect of the Term Obligations or the ABL Obligations, as applicable, as are necessary to prevent the waiver or bar of such claims under applicable statutes of limitations or other statutes, court orders, or rules of procedure at any time. Nothing in this Agreement shall prohibit the receipt by the Term Agent or any Term Secured Party of the required payments of interest, principal and other amounts owed in respect of the Term Obligations so long as such receipt is not, prior to the Discharge of ABL Obligations, the direct or indirect result of the Exercise of any Secured Creditor Remedies by the Term Agent or any Term Secured Party with respect to any of the ABL Priority Collateral or enforcement in contravention of this Agreement of any Lien held by any of them. Nothing in this Agreement shall prohibit the receipt by the ABL Agent or any ABL Secured Party of the required payments of interest, principal and other amounts owed in respect of the ABL Obligations so long as such receipt is not, prior to the Discharge of Term Obligations, the direct or indirect result of the Exercise of any Secured Creditor Remedies by the ABL Agent or any ABL Secured Party with respect to any of the Term Priority Collateral or enforcement in contravention of this Agreement of any Lien held by any of them. None of the Term Agent, Term Secured Parties, ABL Agent or ABL Secured Parties shall take any other action in connection with the Term Obligations or the ABL Obligations in contravention of the terms of this Agreement (including if for any reason such party is deemed an unsecured or undersecured creditor with respect to such Term Obligations or ABL Obligations, as applicable).

## Section 3.2     <u>Agent for Perfection</u>.

(a)     The ABL Agent, for and on behalf of itself and each ABL Secured Party, and the Term Agent, for and on behalf of itself and each Term Secured Party, as applicable, each agree to hold all Collateral in their respective possession, custody, or control (including as defined in Sections 9-104, 9-105, 9-106, 9-107 and 8-106 of the UCC) (or in the possession, custody, or control of agents or bailees for either) as gratuitous bailee for the other solely for the purpose of perfecting the security interest granted to each in such Collateral, subject to the terms and conditions of this Section 3.2.  Solely with respect to any

25

Control Collateral under the control (within the meaning of Section 9-104 of the UCC) of the ABL Agent or the Term Agent, the ABL Agent and the Term Agent, respectively, agrees to also hold control over such Control Collateral as gratuitous agent for the Term Secured Parties and the ABL Secured Parties, subject to the terms and conditions of this Section 3.2. None of the ABL Agent, the ABL Secured Parties, the Term Agent, or the Term Secured Parties, as applicable, shall have any obligation whatsoever to the others to assure that the Collateral is genuine or owned by the Borrower, any Guarantor, or any other Person or to preserve rights or benefits of any Person. The duties or responsibilities of the ABL Agent and the Term Agent under this Section 3.2 are and shall be limited solely to holding or maintaining control of the Control Collateral as gratuitous bailee for the other Party for purposes of perfecting the Lien held by the Term Agent or the ABL Agent, as applicable. The ABL Agent is not and shall not be deemed to be a fiduciary of any kind for the Term Secured Parties or any other Person. Without limiting the generality of the foregoing, except as expressly provided herein, the ABL Secured Parties shall not be obligated to see to the application of any Proceeds of the Term Priority Collateral deposited into any Deposit Account or be answerable in any way for the misapplication thereof. The Term Agent is not and shall not be deemed to be a fiduciary of any kind for the ABL Secured Parties, or any other Person. Without limiting the generality of the foregoing, except as expressly provided herein, the Term Secured Parties shall not be obligated to see to the application of any Proceeds of the ABL Priority Collateral deposited into any Deposit Account or be answerable in any way for the misapplication thereof.  In addition, the Term Agent, on behalf of the Term Secured Parties, hereby agrees and acknowledges that other than with respect to ABL Priority Collateral that may be perfected through the filing of a UCC financing statement, the ABL Agent's Liens may be perfected on certain items of ABL Priority Collateral with respect to which the Term Agent's Liens would not be perfected but for the provisions of this Section 3.2, and the Term Agent, on behalf of the Term Secured Parties, hereby further agrees that the foregoing described in this sentence shall not be deemed a breach of this Agreement. In addition, the ABL Agent, on behalf of the ABL Secured Parties, hereby agrees and acknowledges that other than with respect to Term Priority Collateral that may be perfected through the filing of a UCC financing statement, the Term Agent's Liens may be perfected on certain items of Term Priority Collateral with respect to which the ABL Agent's Liens would not be perfected but for the provisions of this Section 3.2, and the ABL Agent, on behalf of the ABL Secured Parties, hereby further agrees that the foregoing described in this sentence shall not be deemed a breach of this Agreement.

      (b)     Notwithstanding anything in this Agreement to the contrary:

      (1)     the ABL Agent, for itself and on behalf of the ABL Secured Parties, agrees that any requirement under any ABL Document that any Credit Party deliver any Collateral that constitutes Term Priority Collateral to the ABL Agent, or that requires any Credit Party to vest the ABL Agent with possession or "control" (as defined in the UCC) of any Collateral that constitutes Term Priority Collateral, in each case, shall be deemed satisfied to the extent that, prior to the Discharge of Term Obligations, such Collateral is delivered to the Term Agent, or the Term Agent shall have been vested with such possession or (unless "control" may be given concurrently to the ABL Agent and the Term Agent) "control"; and

      (2)     the Term Agent, for itself and on behalf of the related Term Secured Parties, agrees that any requirement under any Term Document that any Credit Party deliver any Collateral that constitutes ABL Priority Collateral to such Term Agent, or that requires any Credit Party to vest such Term Agent with possession or "control" (as defined in the UCC) of any Collateral that constitutes ABL Priority Collateral, in each case, shall be deemed satisfied to the extent that, prior to the Discharge of ABL Obligations, such Collateral is delivered to the ABL Agent, or the ABL Agent shall have

been vested with such possession or (unless "control" may be given concurrently to the Term Agent and the ABL Agent) "control."

**Section 3.3**   **Sharing of Information and Access.**

(a)   In the event that the ABL Agent shall, in the exercise of its rights under the ABL Collateral Documents or otherwise, receive possession or control of any books and records of any Term Credit Party which contain information identifying or pertaining to the Term Priority Collateral, the ABL Agent shall, upon request from the Term Agent and as promptly as practicable thereafter, either make available to the Term Agent such books and records for inspection and duplication or provide to the Term Agent copies thereof. In the event that the Term Agent shall, in the exercise of its rights under the Term Collateral Documents or otherwise, receive possession or control of any books and records of any ABL Credit Party which contain information identifying or pertaining to any of the ABL Priority Collateral, the Term Agent shall, upon request from the ABL Agent and as promptly as practicable thereafter, either make available to the ABL Agent such books and records for inspection and duplication or provide the ABL Agent copies thereof.

(b)   Each Agent upon the written request of the other Agent shall, upon prior written notice to a Borrower, provide such Agent with copies of Credit Documents, other than any fee letters and all amendments thereto, provided that the failure to provide such Credit Documents or amendments shall impose no liability on any Agent.

**Section 3.4**   **Insurance**. Proceeds of Collateral include insurance proceeds and, therefore, the Lien Priority shall govern the ultimate disposition of casualty insurance proceeds. The ABL Agent and the Term Agent shall each be named as additional insured, mortgagee or lenders' loss payee, as applicable, with respect to all insurance policies relating to the Collateral in the manner required in the Term Credit Agreement or the ABL Credit Agreement, as applicable. The ABL Agent shall have the sole and exclusive right, as against the Term Agent, to adjust settlement of insurance claims in the event of any covered loss, theft or destruction of any of the ABL Priority Collateral, subject to the rights of the ABL Credit Parties under the ABL Documents. The Term Agent shall have the sole and exclusive right, as against the ABL Agent, to adjust settlement of insurance claims in the event of any covered loss, theft or destruction of any of the Term Priority Collateral, subject to the rights of the Term Credit Parties under the Term Documents.   Subject to the rights of the Credit Parties under the Credit Documents, if any insurance claim includes both ABL Priority Collateral and Term Priority Collateral, the insurer will not settle such claim separately with respect to ABL Priority Collateral and Term Priority Collateral, and if the Parties are unable after negotiating in good faith to agree on the settlement for such claim, either Party may apply to a court of competent jurisdiction to make a determination as to the settlement of such claim, and the court's determination shall be binding upon the Parties. All proceeds of such insurance shall be remitted to the ABL Agent or the Term Agent, as the case may be, subject, in each case, to the terms of their respective Credit Documents, and each of the Term Agent and ABL Agent shall cooperate (if necessary) in a reasonable manner in effecting the payment of insurance proceeds in accordance with Section 4.1 hereof.

**Section 3.5**   **No Additional Rights For the Credit Parties Hereunder**. If any ABL Secured Party or Term Secured Party shall enforce its rights or remedies in violation of the terms of this Agreement, the Credit Parties shall not be entitled to use such violation as a defense to any action by any ABL Secured Party or Term Secured Party, nor to assert such violation as a counterclaim or basis for set off or recoupment against any ABL Secured Party or Term Secured Party.

**Section 3.6**   **Inspection and Access Rights.**

(a)    Without limiting any rights the ABL Agent or any other ABL Secured Party may otherwise have under applicable law or by agreement, in the event of any Exercise of Any Secured Creditor Remedies by the ABL Agent, and whether or not the Term Agent or any other Term Secured Party has commenced and is continuing to Exercise Any Secured Creditor Remedies of the Term Agent with respect to the Term Priority Collateral or otherwise, the ABL Agent or any other Person (including any ABL Credit Party) acting with the consent, or on behalf, of the ABL Agent, shall have the right (a) during the Use Period during normal business hours on any Business Day, to access ABL Priority Collateral that (i) is stored or located in or on, (ii) has become an accession with respect to (within the meaning of Section 9-335 of the Uniform Commercial Code), or (iii) has been commingled with (within the meaning of Section 9-336 of the Uniform Commercial Code) Term Priority Collateral, and (b) during the Use Period, shall have the irrevocable right to use the Term Priority Collateral (including, without limitation, Equipment, and General Intangibles arising out of Term Priority Collateral, Real Property) on a rent-free, royalty-free basis, each of the foregoing solely for the limited purposes of assembling, inspecting, copying or downloading information stored on, taking actions to perfect its Lien on, completing a production run of Inventory involving, taking possession of, moving, preparing and advertising for sale, selling (by public auction, private sale or a "store closing", "going out of business" or similar sale, whether in bulk, in lots or to customers in the ordinary course of business or otherwise and which sale may include augmented Inventory of the same type sold in any ABL Credit Party's business), storing or otherwise dealing with the ABL Priority Collateral, in each case without notice to (other than an initial Enforcement Notice), the involvement of or interference by any Term Secured Party (and whether or not the Term Agent or any Term Secured Party has commenced and is continuing to Exercise any Secured Creditor Remedies) or liability to any Term Secured Party; provided, however, that the expiration of the Use Period shall be without prejudice to the sale or other disposition of the ABL Priority Collateral in accordance with this Agreement and applicable law. In the event that any ABL Secured Party has commenced and is continuing the Exercise of Any Secured Creditor Remedies with respect to any ABL Priority Collateral or any other sale or liquidation of the ABL Priority Collateral has been commenced by an ABL Credit Party (with the consent of the ABL Agent), the Term Agent may not sell, assign or otherwise transfer the related Term Priority Collateral prior to the expiration of the Use Period, unless the purchaser, assignee or transferee thereof agrees in writing to be bound by the provisions of this Section 3.6. Notwithstanding the foregoing, it is understood and agreed that to the extent that any Term Priority Collateral is in the possession of a receiver or other third party not under the control of the Term Agent, no Term Secured Party shall have any obligation to ensure that any ABL Secured Party has access to such Term Priority Collateral (but no Term Secured Party will oppose any action by an ABL Secured Party to obtain such access).

(b)    Except as provided for in Section 3.6(c), (i) the ABL Agent and the ABL Secured Parties shall not be obligated to pay any amounts to the Term Agent or the Term Secured Parties (or any person claiming by, through or under the Term Secured Parties, including any purchaser of the Term Priority Collateral) or to the ABL Credit Parties, for or in respect of the use by the ABL Agent and the ABL Secured Parties of the Term Priority Collateral, and (ii) none of the ABL Agent or the ABL Secured Parties shall be obligated to secure, protect, insure or repair any such Term Priority Collateral (other than for damages caused by the ABL Agent, the ABL Secured Parties or their respective employees, agents and representatives). The ABL Agent and the ABL Secured Parties shall not have any liability to the Term Agent or the Term Secured Parties (or any person claiming by, through or under the Term Agent or the Term Secured Parties, including any purchaser of the Term Priority Collateral) as a result of any condition (including environmental condition, claim or liability) with respect to the Term Priority Collateral in existence prior to the date that the ABL Agent first uses the Term Priority Collateral, and the ABL Agent and the ABL Secured Parties shall have no duty or liability (i) to maintain the Term Priority Collateral in a condition or manner better than that in which it was maintained prior to the date of the exercise by an ABL Secured Party of its rights under this Section 3.6, and (ii) for any acts or omissions of any Credit Party with respect to any Term Priority Collateral.

(c)     The ABL Secured Parties shall (i) use the Term Priority Collateral in accordance with applicable law; (ii) insure or cause to be insured for damage to property and liability to persons, including property and liability insurance for the benefit of the Term Secured Parties; and (iii) reimburse the Term Secured Parties for any injury or damage to Persons or property (ordinary wear-and-tear excepted) caused by the acts or omissions of Persons under their control; provided, however, that the ABL Secured Parties will not be liable for any diminution in the value of the Term Priority Collateral caused by the absence of the ABL Priority Collateral therefrom or from ordinary wear-and-tear from the use of the Term Priority Collateral. The Term Agent and the other Term Secured Parties shall have no obligation to pay any utility, rental, lease or other charges owed to any third parties during the Use Period.

(d)     The Term Agent and the other Term Secured Parties shall use commercially reasonable efforts to not hinder or obstruct the ABL Agent and the other ABL Secured Parties from exercising the rights described in Section 3.6(a) hereof. The ABL Agent and Term Agent shall cooperate and use reasonable efforts to ensure that the activities of the ABL Agent during the Use Period as described above do no interfere materially with the rights of the Term Secured Parties including, without limitation, the right of the Term Agent to show the Term Priority Collateral to prospective purchases and to prepare the Term Collateral for sale.

(e)     Subject to the terms hereof, the Term Agent may advertise and conduct public auctions or private sales of the Term Priority Collateral without notice (except as required by applicable law or this Agreement) to any ABL Secured Party, the involvement of or interference by any ABL Secured Party or liability to any ABL Secured Party as long as, in the case of an actual sale, the respective purchaser assumes and agrees in writing to the obligations of the Term Agent and the Term Secured Parties under this Section 3.6.

**Section 3.7     <u>Tracing of and Priorities in Proceeds</u>.**

(a)     The ABL Agent, for itself and on behalf of the ABL Secured Parties, and the Term Agent, for itself and on behalf of the Term Secured Parties, further agree that prior to an issuance of any notice of Exercise of Any Secured Creditor Remedies by such Secured Party (unless a bankruptcy or insolvency Event of Default then exists), any proceeds of Collateral, whether or not deposited under control agreements, which are used by any Credit Party to acquire other property which is Collateral shall not (solely as between the Agents and the Lenders) be treated as Proceeds of Collateral for purposes of determining the relative priorities in the Collateral which was so acquired.

(b)     Notwithstanding anything to the contrary contained in this Agreement or any Term Document, unless and until the Discharge of the ABL Obligations, the ABL Agent is hereby permitted to deem all collections and payments deposited in any ABL Deposit and Securities Account (for the avoidance of doubt other than Term Loan Priority Account) or the Concentration Account (as defined in the ABL Credit Agreement) to be proceeds of ABL Priority Collateral, and the Term Agent and the other Term Secured Parties each consents to the application of such funds to the ABL Obligations, and no such funds credited to such account shall be subject to disgorgement or be deemed to be held in trust by the ABL Agent for the benefit of the Term Agent and other Term Credit Parties; *provided* that with respect to any such funds that are identifiable proceeds of Term Priority Collateral credited to any such account, if the ABL Agent has received (x) a Credit Party Term Proceeds Notice or (y) a Term Cash Proceeds Notice, in both instances prior to the application of such funds by the ABL Agent to the ABL Obligations and a subsequent credit extension under the ABL Credit Agreement, then the ABL Agent shall turn over any misdirected proceeds of the Term Priority Collateral to the Term Agent to the extent permitted by applicable law.

**Section 3.8     <u>Purchase Right.</u>**

29

(a)     If (i) after the occurrence and during the continuation of an Event of Default, the ABL Agent shall sell, lease, license or dispose of all or substantially all of the ABL Priority Collateral by private or public sale, (ii) an Insolvency Proceeding with respect to a Credit Party shall have occurred or shall have been commenced, or (iii) the ABL Obligations under the ABL Credit Agreement shall have been accelerated (including as a result of any automatic acceleration), a copy of which acceleration notice ABL Agent agrees to provide to Term Agent contemporaneously with delivery of same to Borrower, or shall remain unpaid following the latest stated maturity date therefor (as determined by reference to the ABL Credit Agreement), (each such event described in clauses (i) through (iii) herein above, a "**Purchase Option Event**"), the Term Secured Parties, or any of them, shall have the opportunity to purchase (at par and without premium) all (but not less than all) of the ABL Obligations pursuant to this Section 3.8; *provided*, that such option shall expire if the applicable Term Secured Parties fail to deliver a written notice (a "**Purchase Notice**") to the ABL Agent with a copy to the Borrower within ten (10) Business Days following the first date the Term Agent obtains actual knowledge of the occurrence of the earliest Purchase Option Event which Purchase Notice shall (A) be signed by the applicable Term Secured Parties committing to such purchase (the "**Purchasing Creditors**") and indicate the percentage of the ABL Obligations to be purchased by each Purchasing Creditor (which aggregate commitments must add up to 100% of the ABL Obligations) and (B) state that (1) it is a Purchase Notice delivered pursuant to Section 3.8 of this Agreement and (2) the offer contained therein is irrevocable. Upon receipt of such Purchase Notice by the ABL Agent, the Purchasing Creditors shall have from the date of delivery thereof to and including the date that is ten (10) Business Days after the Purchase Notice was received by the ABL Agent to purchase all (but not less than all) of the ABL Obligations pursuant to this Section 3.8 (the date of such purchase, the "**Purchase Date**"). In the event the ABL Agent shall receive from the Term Agent a Purchase Notice, the ABL Agent and ABL Lenders shall not, in the absence of Exigent Circumstances, commence any foreclosure or other action to sell or otherwise realize upon the Collateral, provided, that, the purchase and sale with respect to the ABL Obligations provided for herein shall have closed in accordance with this Section 3.8.

(b)     On the Purchase Date, the ABL Agent and the other ABL Secured Parties shall, subject to any required approval of any Governmental Authority and any limitation in the ABL Credit Agreement, in each case then in effect, if any, sell to the Purchasing Creditors all (but not less than all) of the ABL Obligations. On such Purchase Date, the Purchasing Creditors shall (i) pay to the ABL Agent, for the benefit of the ABL Secured Parties, as directed by the ABL Agent, in immediately available funds the full amount (at par and without premium) of all ABL Obligations then outstanding, including all accrued and unpaid interest and fees thereon, all in the amounts specified by the ABL Agent and determined in accordance with the applicable ABL Documents, (ii) furnish such amount of cash collateral in immediately available funds as the ABL Agent determines is reasonably necessary to secure ABL Secured Parties in connection with any (x) indemnification obligations of the ABL Credit Parties under the ABL Documents (other than on account of indemnification obligations as to which no claim has been asserted), (y) ABL Cash Management Obligations and ABL Bank Product Obligations, or (z) issued and outstanding letters of credit issued under the ABL Credit Agreement but, with respect to this clause (z), not in any event in an amount greater than 103% of the aggregate undrawn amount of all such outstanding letters of credit issued in US Dollars and 103% of the aggregate undrawn amount of such letters of credit issued in a currency other than US Dollars (and in the case of clauses (x), (y) and (z) herein above, any excess of such cash collateral for such indemnification obligations, ABL Cash Management Obligations, ABL Bank Product Obligations or letters of credit remaining at such time when there are no longer any such indemnification obligations, ABL Cash Management Obligations, ABL Bank Product Obligations or letters of credit outstanding and there are no unreimbursed amounts then owing in respect of such indemnification obligations, ABL Cash Management Obligations, ABL Bank Product Obligations or drawings under such letters of credit shall be promptly paid over to the Term Agent) and (iii) agree to reimburse the ABL Secured Parties for any loss, cost, damage or expense (A) resulting from the granting of provisional credit for any checks, wire or ACH transfers that are reversed or not final or other

payments provisionally credited to the ABL Obligations under the ABL Credit Agreement and as to which the ABL Agent and ABL Secured Parties have not yet received final payment as of the Purchase Date, or (B) for any indemnification obligations (other than on account of indemnification obligations for unasserted claims as of the Purchase Date), ABL Cash Management Obligations, ABL Bank Product Obligations or letters of credit, to the extent that the cash collateral delivered pursuant to clauses (x), (y) and (z), above, are insufficient to pay such ABL Obligations in full, and (iv) assume the remaining commitments (if any) of the ABL Secured Parties to extend credit under the ABL Credit Agreement. Such purchase price shall be remitted by wire transfer in immediately available funds to such bank account of the ABL Agent (for the benefit of the ABL Secured Parties) as the ABL Agent shall have specified in writing to the Term Agent. Interest and fees shall be calculated to but excluding the Purchase Date if the amounts so paid by the applicable Term Lenders to the bank account designated by the ABL Agent are received in such bank account prior to 1:00 p.m., New York time, and interest shall be calculated to and including such Purchase Date if the amounts so paid by the applicable Term Lenders to the bank account designated by the ABL Agent are received in such bank account after 1:00 p.m., New York time.

(c)     Any purchase pursuant to the purchase option set forth in this Section 3.8 shall, except as provided below, be expressly made without representation or warranty of any kind by the ABL Agent or the other ABL Secured Parties as to the ABL Obligations, the Collateral or otherwise, and without recourse to the ABL Agent and the other ABL Secured Parties as to the ABL Obligations, the collateral or otherwise, except that the ABL Agent and each of the ABL Secured Parties, as to itself only, shall represent and warrant only (i) the principal amount of, and a reasonably detailed description of the other amounts that compromise, the ABL Obligations being sold by it, (ii) that such Person has not created any Lien on any ABL Obligations being sold by it, and (iii) that such Person has the right to assign the ABL Obligations being assigned by it and its entering into any assignment agreement in respect of the applicable Purchase Option Event and its assignment of the ABL Obligations pursuant thereto have been duly authorized and delivered.

(d)     Upon notice to the Credit Parties by the Term Agent that the purchase of ABL Obligations pursuant to this Section 3.8 has been consummated by delivery of the purchase price to the ABL Agent, the Credit Parties shall treat the applicable Term Lenders as holders of the ABL Obligations and the Term Agent shall be deemed appointed to act in such capacity as the "agent" or "administrative agent" (or analogous capacity) (the "**Replacement Agent**") under the ABL Documents, for all purposes hereunder and under each ABL Document (it being agreed that the ABL Agent shall have no obligation to act as such replacement "agent" or "administrative agent" (or analogous capacity)). In connection with any purchase of ABL Obligations pursuant to this Section 3.8, each ABL Lender and ABL Agent agrees to enter into and deliver to the applicable Term Lenders on the Purchase Date, as a condition to closing, an assignment agreement customarily used by the ABL Agent in connection with the ABL Credit Agreement and the ABL Agent and each other ABL Lender shall deliver all possessory collateral (if any), together with any necessary endorsements and other documents (including any applicable stock powers or bond powers), then in its possession or in the possession of its agent or bailee, or turn over control as to any pledged collateral, deposit accounts or securities accounts of which it or its agent or bailee then has control, as the case may be, to the Replacement Agent, and deliver the loan register and participant register, if applicable and all other records pertaining to the ABL Obligations to the Replacement Agent and otherwise take such actions as may be reasonably appropriate to effect an orderly transition to the Replacement Agent. Upon the consummation of the purchase of the ABL Obligations pursuant to this Section 3.8, the ABL Agent (and all other agents under the ABL Credit Agreement) shall be deemed to have resigned as an "agent" or "administrative agent" for the ABL Secured Parties under the ABL Documents; *provided* that the ABL Agent (and all other agents under the ABL Credit Agreement) shall be entitled to all of the rights and benefits of a former "agent" or "administrative agent" under the ABL Credit Agreement.

31

(e)    Notwithstanding the foregoing purchase of the ABL Obligations by the Purchasing Creditors, the ABL Secured Parties shall retain those contingent indemnification obligations and other obligations owing or to be owing to them under the ABL Documents which by their express terms would survive any repayment of the ABL Obligations pursuant to this Section 3.8.

### Section 3.9    Payments Over.

(a)    So long as the Discharge of Term Obligations has not occurred, any Term Priority Collateral or Proceeds thereof received by the ABL Agent or any other ABL Secured Party in connection with the Exercise of Any Secured Creditor Remedies (including set off) relating to the Term Priority Collateral in contravention of this Agreement (it being understood that the application of proceeds from any ABL Deposit and Securities Account prior to the delivery of a Term Cash Proceeds Notice or Credit Party Term Proceeds Notice shall not be deemed in contravention of this Agreement) shall be segregated and held in trust and forthwith paid over to the Term Agent for the benefit of the Term Secured Parties in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct. The Term Agent is hereby authorized to make any such endorsements as agent for the ABL Agent or any such other ABL Secured Parties. This authorization is coupled with an interest and is irrevocable until such time as this Agreement is terminated in accordance with its terms.

(b)    So long as the Discharge of ABL Obligations has not occurred, any ABL Priority Collateral or Proceeds thereof received by the Term Agent or any Term Secured Parties in connection with the Exercise of Any Secured Creditor (including set off) relating to the ABL Priority Collateral in contravention of this Agreement shall be segregated and held in trust and forthwith paid over to the ABL Agent for the benefit of the ABL Secured Parties in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct. The ABL Agent is hereby authorized to make any such endorsements as agent for the Term Agent or any such Term Secured Parties. This authorization is coupled with an interest and is irrevocable until such time as this Agreement is terminated in accordance with its terms.

### ARTICLE 4
### APPLICATION OF PROCEEDS

### Section 4.1    Application of Proceeds.

(a)    Revolving Nature of ABL Obligations. The Term Agent, for and on behalf of itself and the Term Secured Parties, expressly acknowledges and agrees that (i) the ABL Credit Agreement includes a revolving commitment; (ii) in the ordinary course of business the ABL Agent and the ABL Lenders will apply payments and make advances under the ABL Credit Agreement; (iii) no application of any funds on deposit in any ABL Deposit and Security Account shall constitute the Exercise of Secured Creditor Remedies under this Agreement (except as provided in subsection (ii) of the definition of Exercise of Any Secured Creditor Remedies); (iv) the release of any Lien by the ABL Agent upon any portion of the Collateral in connection with a permitted disposition by the ABL Credit Parties under the ABL Credit Agreement shall not constitute an Exercise of Secured Creditor Remedies under this Agreement; (v) the amount of the ABL Obligations that may be outstanding at any time or from time to time may be increased (subject to section 5.2) or reduced and subsequently reborrowed, and that, subject to Section 5.2, the terms of the ABL Obligations may be modified, amended and restated, extended or amended from time to time, and that, subject to section 5.2, the aggregate amount of the ABL Obligations may be increased, replaced or refinanced, in each event, without notice to or consent by the Term Secured Parties and without affecting the provisions hereof (provided, however, that nothing in this clause (v) shall affect the determination as to which ABL Obligations constitute ABL Priority Obligations); and (vi) all ABL Priority Collateral (including any Collateral that is deemed to be ABL

Priority Collateral pursuant to section 3.7) received by the ABL Agent may be applied, reversed, reapplied, credited, or reborrowed, in whole or in part, to the ABL Obligations at any time; provided, however, all amounts received by the ABL Agent or any ABL Lender in connection with the Exercise of Any Secured Creditor Remedies shall be applied as specified in this Section 4.1. The ABL Agent, for itself and on behalf of the ABL Secured Parties, expressly acknowledges and agrees that any Term Priority Collateral received by any Term Agent may be applied, reversed, reapplied or credited, in whole or in part, to the Term Obligations at any time; provided, however, all amounts received by the Term Agent or any Term Lender in connection with the Exercise of Any Secured Creditor Remedies shall be applied as specified in this Section 4.1. Subject to Section 5.2, the Lien Priority shall not be altered or otherwise affected by any such amendment, modification, supplement, extension, repayment, reborrowing, increase, replacement, renewal, restatement or refinancing of either the ABL Obligations or the Term Obligations, or any portion thereof. Notwithstanding anything to the contrary contained in this Agreement, any Term Document or any ABL Document, each Credit Party and the Term Agent, for itself and on behalf of the Term Secured Parties, agrees that (i) only Term Priority Collateral or proceeds of the Term Priority Collateral shall be deposited in the Term Loan Priority Accounts (except to the limited extent permitted by Section 2.3 (a)), and (ii) subject to Section 3.7, the ABL Secured Parties are hereby permitted to treat all cash, cash equivalents, money, collections and payments deposited in any ABL Deposit and Securities Account or otherwise received by any ABL Secured Parties as ABL Priority Collateral, and no such amounts credited to any such ABL Deposit and Securities Account or received by any ABL Secured Parties or applied to the ABL Obligations shall be subject to disgorgement or deemed to be held in trust for the benefit of the Term Secured Parties (and all claims of the Term Agent or any other Term Secured Party to such amounts are hereby waived).

(b)    Application of Proceeds of ABL Priority Collateral. The ABL Agent and the Term Agent hereby agree that all ABL Priority Collateral and all Proceeds thereof, received by either of them in connection with any Exercise of Secured Creditor Remedies with respect to the ABL Priority Collateral shall be applied,

first, to the payment of costs and expenses of the ABL Agent in connection with such Exercise of Secured Creditor Remedies,

second, to the payment or discharge or cash collateralization of the ABL Priority Obligations in accordance with the ABL Documents until the Discharge of ABL Obligations shall have occurred,

third, to the payment of the Term Priority Obligations in accordance with the Term Documents until the Discharge of Term Obligations shall have occurred,

fourth, to the payment in full of the ABL Excess Amount,

fifth, to the payment in full of the Term Loan Excess Amount; and

sixth, the balance, if any, to the Credit Parties or as a court of competent jurisdiction may direct.

(c)    Application of Proceeds of Term Priority Collateral. The ABL Agent and the Term Agent hereby agree that all Term Priority Collateral, Term Priority Proceeds and all other Proceeds thereof, received by either of them in connection with any Exercise of Secured Creditor Remedies with respect to the Term Priority Collateral shall be applied,

33

<u>first</u>, to the payment of costs and expenses of the Term Agent in connection with such Exercise of Secured Creditor Remedies,

<u>second</u>, to the payment of the Term Priority Obligations in accordance with the Term Documents until the Discharge of Term Obligations shall have occurred,

<u>third</u>, to the payment, discharge or cash collateralization of the ABL Priority Obligations in accordance with the ABL Documents until the Discharge of ABL Obligations shall have occurred;

<u>fourth</u>, to the payment in full of the Term Loan Excess Amount,

<u>fifth</u>, to the payment in full of the ABL Excess Amount; and

<u>sixth</u>, the balance, if any, to the Credit Parties or as a court of competent jurisdiction may direct.

(d)   <u>Limited Obligation or Liability</u>. In exercising remedies, whether as a secured creditor or otherwise, the ABL Agent shall have no obligation or liability to the Term Agent or to any Term Secured Party, and the Term Agent shall have no obligation or liability to the ABL Agent or any ABL Secured Party, regarding the adequacy of any Proceeds or for any action or omission, except solely for an action or omission that breaches the express obligations undertaken by each Party under the terms of this Agreement. Notwithstanding anything to the contrary herein contained, none of the Parties hereto waives any claim that it may have against a Secured Party on the grounds that any sale, transfer or other disposition by the Secured Party was not commercially reasonable in every respect as required by the Uniform Commercial Code.

(e)   <u>Turnover of Collateral After Discharge</u>. Upon the Discharge of ABL Obligations, the ABL Agent shall, at  the expense of the Term Borrower, (i) deliver to the Term Agent or shall execute such documents as the Term Agent may reasonably request (A) in order to enable the Term Agent to have control over any Control Collateral still in the ABL Agent's possession, custody, or control in the same form as received with any necessary endorsements (in each case, subject to the reinstatement provisions of Section 5.3), or (B) in order to advise any landlord, processor, warehouseman or other third party which is party to any access or processor agreement with the ABL Agent and the Term Agent,  that ABL Agent has ceased to be the "controlling agent" under such agreement and that the Term Agent shall thereafter be the "controlling agent" under such agreement, or (ii) as a court of competent jurisdiction may otherwise direct. Upon the Discharge of Term Obligations, the Term Agent shall deliver to the ABL Agent or shall execute such documents as the ABL Agent may reasonably request (at the expense of the ABL Borrower) to enable the ABL Agent to have control over any Control Collateral still in the Term Agent's possession, custody or control in the same form as received with any necessary endorsements (in each case, subject to the reinstatement provisions of Section 5.3), or as a court of competent jurisdiction may otherwise direct.

**Section 4.2**   **Specific Performance**. Each of the ABL Agent and the Term Agent is hereby authorized to demand specific performance of this Agreement, whether or not the Borrower or any Guarantor shall have complied with any of the provisions of any of the Credit Documents, at any time when the other Party shall have failed to comply with any of the provisions of this Agreement applicable to it. Each of the ABL Agent, for and on behalf of itself and the ABL Secured Parties, and the Term Agent, for and on behalf of itself and the Term Secured Parties, hereby irrevocably waives any defense based on the adequacy of a remedy at law that might be asserted as a bar to such remedy of specific performance.

## ARTICLE 5
## INTERCREDITOR ACKNOWLEDGEMENTS AND WAIVERS

**Section 5.1    Notice of Acceptance and Other Waivers.**

(a)    All ABL Obligations at any time made or incurred by the Borrower or any Guarantor shall be deemed to have been made or incurred in reliance upon this Agreement, and the Term Agent, on behalf of itself and the Term Secured Parties, hereby waives notice of acceptance, or proof of reliance by the ABL Agent or any ABL Secured Party of this Agreement, and notice of the existence, increase, renewal, extension, accrual, creation, or non-payment of all or any part of the ABL Obligations. All Term Obligations at any time made or incurred by the Borrower or any Guarantor shall be deemed to have been made or incurred in reliance upon this Agreement, and the ABL Agent, on behalf of itself and the ABL Secured Parties, hereby waives notice of acceptance, or proof of reliance, by the Term Agent or any Term Secured Party of this Agreement, and notice of the existence, increase, renewal, extension, accrual, creation, or non-payment of all or any part of the Term Obligations.

(b)    None of the ABL Agent, any ABL Secured Party, or any of their respective Affiliates, directors, officers, employees, or agents shall be liable for failure to demand, collect, or realize upon any of the Collateral or any Proceeds, or for any delay in doing so, or shall be under any obligation to sell or otherwise dispose of any Collateral or Proceeds thereof or to take any other action whatsoever with regard to the Collateral or any part or Proceeds thereof, except as specifically provided in this Agreement.  If the ABL Agent or any ABL Secured Party honors (or fails to honor) a request by the Borrower for an extension of credit pursuant to the ABL Credit Agreement, any of the other ABL Documents, ABL Bank Product Documents or ABL Cash Management Documents, whether the ABL Agent or any ABL Secured Party has knowledge that the honoring of (or failure to honor) any such request would constitute a default under the terms of the Term Credit Agreement or any other Term Document or an act, condition, or event that, with the giving of notice or the passage of time, or both, would constitute such a default, or if the ABL Agent or any ABL Secured Party otherwise should exercise any of its contractual rights or remedies under any ABL Documents (subject to the express terms and conditions hereof), neither the ABL Agent nor any ABL Secured Party shall have any liability whatsoever to the Term Agent or any Term Secured Party as a result of such action, omission, or exercise (so long as any such exercise does not breach the express terms and provisions of this Agreement); provided, however, that nothing in this sentence shall affect the determination as to which ABL Obligations constitute ABL Priority Obligations. The ABL Agent and the ABL Secured Parties shall be entitled to manage and supervise their loans and extensions of credit under the ABL Credit Agreement and any of the other ABL Documents, ABL Bank Product Documents or ABL Cash Management Documents, as they may, in their sole discretion, deem appropriate, and may manage their loans and extensions of credit without regard to any rights or interests that the Term Agent or any of the Term Secured Parties have in the Collateral, except as otherwise expressly set forth in this Agreement. The Term Agent, on behalf of itself and the Term Secured Parties, agrees that neither the ABL Agent nor any ABL Secured Party shall incur any liability as a result of a sale, lease, license, application, or other disposition of all or any portion of the Collateral or Proceeds thereof, pursuant to the ABL Documents, so long as such disposition is conducted in accordance with mandatory provisions of applicable law and does not breach the provisions of this Agreement.

(c)    None of the Term Agent, any Term Secured Party or any of their respective Affiliates, directors, officers, employees, or agents shall be liable for failure to demand, collect, or realize upon any of the Collateral or any Proceeds, or for any delay in doing so, or shall be under any obligation to sell or otherwise dispose of any Collateral or Proceeds thereof or to take any other action whatsoever with regard to the Collateral or any part or Proceeds thereof, except as specifically provided in this Agreement.  If the Term Agent or any Term Secured Party honors (or fails to honor) a request by the

35

Borrower for an extension of credit pursuant to the Term Credit Agreement, or any of the other Term Documents, whether the Term Agent or any Term Secured Party has knowledge that the honoring of (or failure to honor) any such request would constitute a default under the terms of the ABL Credit Agreement or any other ABL Document or an act, condition, or event that, with the giving of notice or the passage of time, or both, would constitute such a default, or if the Term Agent or any Term Secured Party otherwise should exercise any of its contractual rights or remedies under the Term Documents (subject to the express terms and conditions hereof), neither the Term Agent nor any Term Secured Party shall have any liability whatsoever to the ABL Agent or any ABL Secured Party as a result of such action, omission, or exercise (so long as any such exercise does not breach the express terms and provisions of this Agreement) provided, however, that nothing in this sentence shall affect the determination as to which Term Obligations constitute Term Priority Obligations. The Term Agent and the Term Secured Parties shall be entitled to manage and supervise their loans and extensions of credit under the Term Documents, as they may, in their sole discretion, deem appropriate, and may manage their loans and extensions of credit without regard to any rights or interests that the ABL Agent or any ABL Secured Party has in the Collateral, except as otherwise expressly set forth in this Agreement. The ABL Agent, on behalf of itself and the ABL Secured Parties, agrees that none of the Term Agent or the Term Secured Parties shall incur any liability as a result of a sale, lease, license, application, or other disposition of the Collateral or any part or Proceeds thereof, pursuant to the Term Documents, so long as such disposition is conducted in accordance with mandatory provisions of applicable law and does not breach the provisions of this Agreement.

**Section 5.2**    **Modifications to ABL Documents and Term Documents.**

(a)    The Term Agent, on behalf of itself and the Term Secured Parties, hereby agrees that, without affecting the obligations of the Term Agent and the Term Secured Parties hereunder, the ABL Agent and the ABL Secured Parties may, at any time and from time to time, in their sole discretion without the consent of or notice to the Term Agent or any Term Secured Party, and without incurring any liability to the Term Agent or any Term Secured Party or impairing or releasing the subordination of Lien Priority provided for herein, amend, restate, supplement, replace, refinance, extend, consolidate, restructure, or otherwise modify any of the ABL Documents in any manner whatsoever (other than in a manner which would contravene the provisions of this Agreement), including, without limitation, to:

(i)    change the manner, place, time, or terms of payment or renew, alter or increase, all or any of the ABL Obligations or otherwise amend, restate, supplement, or otherwise modify in any manner, or grant any waiver or release with respect to, all or any part of the ABL Obligations or any of the ABL Documents;

(ii)    subject to Section 2.5, retain or obtain a Lien on any Property of any Person to secure any of the ABL Obligations, and in connection therewith to enter into any additional ABL Documents;

(iii)    amend, or grant any waiver, compromise, or release with respect to, or consent to any departure from, any guaranty or other obligations of any Person obligated in any manner under or in respect of the ABL Obligations;

(iv)    release its Lien on any Collateral or other Property;

(v)    exercise or refrain from exercising any rights against the Borrower, any Guarantor, or any other Person;

36

(vi)     subject to Section 2.5, retain or obtain the primary or secondary obligation of any other Person with respect to any of the ABL Obligations; and

(vii)     otherwise manage and supervise the ABL Obligations as the ABL Agent shall deem appropriate;

provided, however, unless consented to by the Term Agent (or a majority interest of Term Lenders), no such amendment, restatement, supplement, replacement, refinancing, extension, consolidation, restructuring, or modification shall:

(i)     contravene the provisions of this Agreement;

(ii)     increase the aggregate principal amount of the commitments under the ABL Credit Agreement (assuming for this purpose, that all amounts have been drawn under such commitments) to an amount in excess of the ABL Cap Amount;

(iii)     increase the "Applicable Margin" or similar component of the interest rate or yield provisions applicable to the Indebtedness outstanding under the ABL Documents in a manner that would result in the total yield thereon exceeding by more than 3.0% per annum the total yield on Indebtedness thereunder as in effect on the date hereof (excluding increases resulting from (A) application of any pricing grid set forth in the ABL Documents as in effect on the date hereof, (B) the accrual of interest at the default rate, and (C) payment of any underwriting or arrangement fees that are not payable to all holders of the ABL Obligations);

(iv)     change the definition of Borrowing Base (FILO) or Borrowing Base (Revolving Credit) or any of the defined terms that are used in such definitions to the extent that any such change would result in more credit being made available to Borrower; provided, that the foregoing shall not be construed to limit, restrict, or otherwise prohibit or impair the ability of the ABL Agent to (A) increase any of the advance rates for the Collateral included in the Borrowing Base (FILO) or Borrowing Base (Revolving Credit) so long as the increase of any advance rate does not exceed 5% of such advance rate as set forth in the ABL Credit Agreement in effect as of the date hereof; (B) modify, reduce, increase or eliminate any and all reserves, (C) modify the eligibility of collateral (i.e., "acceptable eligible inventory" or "eligible credit card receivables", etc.) for inclusion in the calculation of the Borrowing Base, or (D) modify availability in connection with changes in appraisal values or other mechanics with respect to calculation of the Borrowing Base (FILO) or Borrowing Base (Revolving Credit)as set forth in the ABL Credit Agreement;

(v)     shorten the maturity date of any ABL Obligations (other than any acceleration of the maturity date as the result of any Event of Default);

(vi)     other than any mandatory prepayments required by the ABL Loan Documents (as in effect on the date hereof) require any amortization of the ABL Obligations prior to maturity date for such ABL Obligations under the applicable ABL Loan Documents (as in effect on the date hereof); or,

(vii)     modify or add any covenant or event of default under the ABL Documents which restricts one or more obligors from making payments under the Term Documents which would otherwise be permitted under the ABL Loan Documents as in effect on the date hereof.

(b)     The ABL Agent, on behalf of itself and the ABL Secured Parties, hereby agrees that, without affecting the obligations of the ABL Agent and the ABL Secured Parties hereunder, the

37

Term Agent and the Term Secured Parties may, at any time and from time to time, in their sole discretion without the consent of or notice to the ABL Agent or any ABL Secured Party, and without incurring any liability to the ABL Agent or any ABL Secured Party or impairing or releasing the subordination of Lien Priority provided for herein, amend, restate, supplement, replace, refinance, extend, consolidate, restructure, or otherwise modify any of the Term Documents in any manner whatsoever (other than in a manner which would contravene the provisions of this Agreement), including, without limitation, to:

  (i)  change the manner, place, time, or terms of payment or renew, alter or increase, all or any of the Term Obligations or otherwise amend, restate, supplement, or otherwise modify in any manner, or grant any waiver or release with respect to, all or any part of the Term Obligations or any of the Term Documents;

  (ii)  subject to Section 2.5, retain or obtain a Lien on any Property of any Person to secure any of the Term Obligations, and in connection therewith to enter into any additional Term Documents;

  (iii)  amend, or grant any waiver, compromise, or release with respect to, or consent to any departure from, any guaranty or other obligations of any Person obligated in any manner under or in respect of the Term Obligations;

  (iv)  release its Lien on any Collateral or other Property;

  (v)  exercise or refrain from exercising any rights against the Borrower, any Guarantor, or any other Person;

  (vi)  subject to Section 2.5, retain or obtain the primary or secondary obligation of any other Person with respect to any of the Term Obligations; and

  (vii)  otherwise manage and supervise the Term Obligations as the Term Agent shall deem appropriate;

provided, however, unless consented to by the ABL Agent (or a majority interest of ABL Lenders), no such amendment, restatement, supplement, replacement, refinancing, extension, consolidation, restructuring, or modification shall:

  (i)  contravene the provisions of this Agreement;

  (ii)  increase the aggregate principal amount of the commitments under the Term Credit Agreement (assuming for this purpose, that all amounts have been drawn under such commitments), other than the capitalization of PIK Interest in accordance with the provisions of the Term Credit Agreement, to an amount in excess of the Term Loan Cap Amount;

  (iii)  increase the "Applicable Margin" or similar component of the interest rate or yield provisions applicable to the Indebtedness outstanding under the Term Documents in a manner that would result in the total yield thereon exceeding by more than 3.0% per annum the total yield on Indebtedness thereunder as in effect on the date hereof (excluding increases resulting from (A) application of any pricing grid set forth in the Term Documents as in effect on the date hereof, (B) the accrual of interest at the default rate and (C) payment of any underwriting or arrangement fees that are not payable to all holders of the Term Obligations)

(iv)    shorten the maturity date of any Term Obligations (other than any acceleration of the maturity date as the result of any Event of Default); or,

(v)     modify or add any covenant or event of default under the Term Documents which restricts one or more obligors from making payments under the ABL Documents which would otherwise be permitted under the Term Documents as in effect on the date hereof.

(c)     The ABL Obligations and the Term Obligations may be refinanced, in whole or in part, from time to time, in each case, without notice to, or the consent of the ABL Agent, the ABL Secured Parties, the Term Agent or the Term Secured Parties, as the case may be, all without affecting the Lien Priorities provided for herein or the other provisions hereof, provided, however, that the holders of any class or series of such refinancing Indebtedness (or an authorized agent or trustee on their behalf) shall enter into an intercreditor agreement on terms no less favorable to the non-refinancing Term Secured Parties or non-refinancing ABL Secured Parties, as applicable, than this Agreement or execute an Intercreditor Agreement Joinder, and any such refinancing transaction shall be in accordance with any applicable provisions of both the ABL Documents and the Term Documents (to the extent such documents survive the refinancing) provided, further, that any such refinancing may not contain any modifications to the ABL Documents or Term Documents governing the Indebtedness being refinanced that would be prohibited by Section 5.2(a) or Section 5.2(b).

(d)     If there is more than one administrative agent, collateral agent or trustee (or other Person performing a similar function) pursuant to the Term Credit Agreement following the full or partial refinancing or replacement of the Initial Term Credit Agreement, the ABL Agent may treat the Initial Term Agent as the Term Loan Agent hereunder until such time as the Initial Term Agent notifies the ABL Agent in writing that a different agent has been designated as the "Term Agent" for purposes of this Agreement pursuant to the Term Documents. The Initial Term Agent hereby agrees to promptly so notify the ABL Agent of any such designation. If there is more than one administrative agent, collateral agent or trustee (or other Person performing a similar function) pursuant to the ABL Credit Agreement following the full or partial refinancing or replacement of the Initial ABL Credit Agreement, the Term Agent may treat the Initial ABL Agent as the ABL Agent hereunder until such time as the Initial ABL Agent notifies the Term Agent in writing that a different agent has been designated as the "ABL Agent" for purposes of this Agreement pursuant to the ABL Documents. The Initial ABL Agent hereby agrees to promptly so notify the Term Agent of any such designation.

**Section 5.3**    **Reinstatement and Continuation of Agreement.**

(a)     If the ABL Agent or any ABL Secured Party is required in any Insolvency Proceeding or otherwise to turn over or otherwise pay to the estate of the Borrower, any Guarantor, or any other Person any payment made in satisfaction of all or any portion of the ABL Obligations (an "**ABL Recovery**"), then the ABL Obligations shall be reinstated to the extent of such ABL Recovery. If this Agreement shall have been terminated prior to such ABL Recovery, this Agreement shall be reinstated in full force and effect in the event of such ABL Recovery, and such prior termination shall not diminish, release, discharge, impair, or otherwise affect the obligations of the Parties from such date of reinstatement. All rights, interests, agreements, and obligations of the ABL Agent, the Term Agent, the ABL Secured Parties, and the Term Secured Parties under this Agreement shall remain in full force and effect and shall continue irrespective of the commencement of, or any discharge, confirmation, conversion, or dismissal of, any Insolvency Proceeding by or against the Borrower or any Guarantor or any other circumstance which otherwise might constitute a defense available to, or a discharge of the Borrower or any Guarantor in respect of the ABL Obligations or the Term Obligations. No priority or right of the ABL Agent or any ABL Secured Party shall at any time be prejudiced or impaired in any way by any act or failure to act on the part of the Borrower or any Guarantor or by the noncompliance by any

Person with the terms, provisions, or covenants of any of the ABL Documents, regardless of any knowledge thereof which the ABL Agent or any ABL Secured Party may have.

(b)     If the Term Agent or any Term Secured Party is required in any Insolvency Proceeding or otherwise to turn over or otherwise pay to the estate of the Borrower, any Guarantor, or any other Person any payment made in satisfaction of all or any portion of the Term Obligations (a "**Term Recovery**"), then the Term Obligations shall be reinstated to the extent of such Term Recovery. If this Agreement shall have been terminated prior to such Term Recovery, this Agreement shall be reinstated in full force and effect in the event of such Term Recovery, and such prior termination shall not diminish, release, discharge, impair, or otherwise affect the obligations of the Parties from such date of reinstatement. All rights, interests, agreements, and obligations of the ABL Agent, the Term Agent, the ABL Secured Parties, and the Term Secured Parties under this Agreement shall remain in full force and effect and shall continue irrespective of the commencement of, or any discharge, confirmation, conversion, or dismissal of, any Insolvency Proceeding by or against the Borrower or any Guarantor or any other circumstance which otherwise might constitute a defense available to, or a discharge of the Borrower or any Guarantor in respect of the ABL Obligations or the Term Obligations. No priority or right of the Term Agent or any Term Secured Party shall at any time be prejudiced or impaired in any way by any act or failure to act on the part of the Borrower or any Guarantor or by the noncompliance by any Person with the terms, provisions, or covenants of any of the Term Documents, regardless of any knowledge thereof which the Term Agent or any Term Secured Party may have.

## ARTICLE 6
## INSOLVENCY PROCEEDINGS

### Section 6.1    **DIP Financing.**

(a)     If any Credit Party shall be subject to any Insolvency Proceeding at any time prior to the Discharge of ABL Obligations, and if the ABL Agent or the ABL Secured Parties shall seek to provide the Credit Parties with, or consent to a third party providing, any financing under Section 364 of the Bankruptcy Code or consent to any order for the use of cash collateral constituting ABL Priority Collateral ("**ABL Cash Collateral**") under Section 363 of the Bankruptcy Code (or any similar provision of any foreign Debtor Relief Laws or under a court order in respect of measures granted with similar effect under any foreign Debtor Relief Laws) (each, an "**ABL Secured Party DIP Financing**"), with such ABL Secured Party DIP Financing to be secured by all or any portion of the Collateral (including ABL Cash Collateral and assets that, but for the application of Section 552 of the Bankruptcy Code (or any similar provision of any foreign Debtor Relief Laws) would be Collateral), then the Term Agent, on behalf of itself and the Term Secured Parties, agrees that it (i) will raise no objection and will not support any objection to such ABL Secured Party DIP Financing or use of ABL Cash Collateral or to the Liens securing the same on the grounds of a failure to provide "adequate protection" for the Liens of the Term Agent securing the Term Obligations or on any other grounds; (ii) will not request any adequate protection as a result of such ABL Secured Party DIP Financing or use of ABL Cash Collateral; and (iii) will not, subject to Section 6.1(b) below, propose any or support any other debtor in possession financing, so long as (w) without the consent of the Term Agent, the aggregate principal amount of the loans to be made under the ABL Secured DIP Financing (assuming full drawing of the commitments thereunder) plus the aggregate outstanding principal balance of the Revolving Credit Loans under the ABL Credit Agreement not refinanced with the ABL Secured DIP Financing (assuming full drawing of the commitments thereunder) plus the aggregate face amount of any letters of credit issued and not reimbursed under the ABL Credit Agreement, will not exceed the ABL Cap Amount, (x) the Term Agent retains its Lien on the Collateral to secure the Term Obligations (in each case, including Proceeds thereof arising after the commencement of any Insolvency Proceeding under any Debtor Relief Laws) and, as to the Term Priority Collateral only, such Lien has the same priority as existed prior to the commencement

of any Insolvency Proceeding under the subject Debtor Relief Laws and any Lien on the Term Priority Collateral securing such ABL Secured Party DIP Financing or ABL Cash Collateral is junior and subordinate to the Lien of the Term Agent on the Term Priority Collateral, (y) all Liens on ABL Priority Collateral securing any such ABL Secured Party DIP Financing or ABL Cash Collateral shall be senior to or on a parity with the Liens of the ABL Agent and the ABL Secured Parties securing the ABL Obligations on ABL Priority Collateral, and (z) the foregoing provisions of this Section 6.1(a) shall not prevent the Term Agent and the Term Secured Parties from objecting to any provision in any ABL Secured Party DIP Financing or ABL Cash Collateral relating to any provision or content of a plan of reorganization or other plan of similar effect under any Debtor Relief Laws.

(b)     If any Credit Party shall be subject to any Insolvency Proceeding at any time prior to the Discharge of Term Obligations, and if the Term Agent or the Term Secured Parties shall seek to provide the Credit Parties with, or shall consent to a third party providing, any financing under Section 364 of the Bankruptcy Code or consent to any order for the use of cash collateral constituting Term Priority Collateral ("**Term Cash Collateral**") under Section 363 of the Bankruptcy Code (or any similar provision of any foreign Debtor Relief Laws or under a court order in respect of measures granted with similar effect under any foreign Debtor Relief Laws) (each, a "**Term Secured Party DIP Financing**"), with such Term Secured Party DIP Financing to be secured by all or any portion of the Collateral (including Term Cash Collateral and assets that, but for the application of Section 552 of the Bankruptcy Code (or any similar provision of any foreign Debtor Relief Laws) would be Collateral), then the ABL Agent, on behalf of itself and the ABL Secured Parties, agrees that it (i) will raise no objection and will not support any objection to such Term Secured Party DIP Financing or use of Term Cash Collateral or to the Liens securing the same on the grounds of a failure to provide "adequate protection" for the Liens of the ABL Agent securing the ABL Obligations or on any other grounds; (ii) will not request any adequate protection as a result of such Term Secured Party DIP Financing or use of Term Cash Collateral; and (iii) will not propose any Term Secured Party DIP Financing secured by a Lien senior to or on parity with the Lien of the Term Agent on the Term Priority Collateral, so long as (w) without the consent of the ABL Agent, the aggregate principal amount of the loans to be made under the Term Secured Party DIP Financing (assuming full drawing of the commitments thereunder)  plus the aggregate outstanding principal amount under the Term Loans  not refinanced with the Term Secured Party DIP Financing will not exceed the Term Loan Cap Amount,  (x) the ABL Agent retains its Lien on the Collateral to secure the ABL Obligations (in each case, including Proceeds thereof arising after the commencement of the Insolvency Proceeding under any Debtor Relief Law) and, as to the ABL Priority Collateral only, such Lien has the same priority as existed prior to the commencement of the Insolvency Proceeding under the subject Debtor Relief Laws and any Lien on ABL Priority Collateral securing such Term Secured Party DIP Financing or Term Cash Collateral is junior and subordinate to the Lien of the ABL Agent on the ABL Priority Collateral, (y) all Liens on Term Priority Collateral securing any such Term Secured Party DIP Financing or Term Cash Collateral shall be senior to or on a parity with the Liens of the Term Agent and the Term Secured Parties securing the Term Obligations on Term Priority Collateral, and (z) the foregoing provisions of this Section 6.1(b) shall not prevent the ABL Agent and the ABL Secured Parties from objecting to any provision in any Term Secured Party DIP Financing or Term Cash Collateral relating to any provision or content of a plan of reorganization or other plan of similar effect under any Debtor Relief Laws.

(c)     All Liens granted to the ABL Agent or the Term Agent in any Insolvency Proceeding, whether as adequate protection or otherwise, are intended by the Parties to be and shall be deemed to be subject to the Lien Priority and the other terms and conditions of this Agreement.  For clarity, the Term Agent and the Term Secured Parties shall not seek to "prime" the Lien of the ABL Agent and the ABL Secured Parties on the ABL Priority Collateral or request, seek or receive a Lien on the ABL Priority Collateral pursuant to Section 364(d) or 363(c)(4) of the Bankruptcy Code on the ABL Priority Collateral.  For clarity, the ABL Agent and the ABL Secured Parties shall not seek to "prime" the

41

Lien of the Term Agent and the Term Secured Parties on the Term Priority Collateral or request, seek or receive a Lien on the Term Priority Collateral pursuant to Section 364(d) or 363(c)(4) of the Bankruptcy Code on the Term Priority Collateral.

**Section 6.2    Relief From Stay**. Until the Discharge of ABL Obligations has occurred, the Term Agent, on behalf of itself and the Term Secured Parties, agrees not to seek relief from the automatic stay or any other stay in any Insolvency Proceeding in respect of any portion of the ABL Priority Collateral without the ABL Agent's express written consent unless the ABL Agent already has filed a motion (which remains pending) for such relief. Until the Discharge of Term Obligations has occurred, the ABL Agent, on behalf of itself and the ABL Secured Parties, agrees not to seek relief from the automatic stay or any other stay in any Insolvency Proceeding in respect of any portion of the Term Priority Collateral without the Term Agent's express written consent unless the Term Agent already has filed a motion (which remains pending) for such relief. In addition, neither the Term Agent nor the ABL Agent shall seek any relief from the automatic stay with respect to any Collateral without providing three (3) days' prior written notice to the other, unless such period is agreed by both the ABL Agent and the Term Agent to be modified or unless the ABL Agent or Term Agent, as applicable, makes a good faith determination that either (A) the ABL Priority Collateral or the Term Priority Collateral, as applicable, will decline speedily in value or (B) the failure to take any action will have a reasonable likelihood of endangering the ABL Agent's or the Term Agent's ability to realize upon its Collateral. It is acknowledged and agreed that the terms of this Agreement will continue to apply to any Exercise of Secured Creditor Remedies that may be conducted after a Secured Party obtains relief from the automatic stay.

**Section 6.3    No Contest; Adequate Protection**. (a)  The Term Agent, on behalf of itself and the Term Secured Parties, agrees that, prior to the Discharge of ABL Obligations, none of them shall seek or accept any form of adequate protection under any or all of §361, §362, §363 or §364 of the Bankruptcy Code with respect to the ABL Priority Collateral, except as allowed in Section 6.1 or as set forth in this Section 6.3 or as may otherwise be consented to in writing by the ABL Agent in its sole and absolute discretion. The Term Agent, on behalf of itself and the Term Secured Parties, agrees that, prior to the Discharge of ABL Obligations, subject to Section 6.3(c) below none of them shall contest (or support any other Person contesting) (i) any request by the ABL Agent or any ABL Secured Party for adequate protection of its interest in the Collateral (unless in contravention of Section 6.1 above), (ii) any proposed provision of any  ABL Secured Party DIP Financing (or any other Person proposing to provide debtor in possession financing with the consent of the ABL Agent) (unless in contravention of  Section 6.1 above) or (iii) any objection by the ABL Agent or any ABL Secured Party to any motion, relief, action, or proceeding based on a claim by the ABL Agent or any ABL Secured Party that its interests in the Collateral (unless in contravention of Section 6.1 above) are not adequately protected (or any other similar request under any law applicable to an Insolvency Proceeding), so long as any Liens granted to the ABL Agent as adequate protection of its interests are subject to this Agreement.

(b)    The ABL Agent, on behalf of itself and the ABL Secured Parties, agrees that, prior to the Discharge of Term Obligations, none of them shall seek or accept any form of adequate protection under any or all of §361, §362, §363 or §364 of the Bankruptcy Code with respect to the Term Priority Collateral, except as allowed in Section 6.1 or as set forth in this Section 6.3 or as may otherwise be consented to in writing by the Term Agent in its sole and absolute discretion. The ABL Agent, on behalf of itself and the ABL Secured Parties, agrees that, prior to the Discharge of Term Obligations, subject to Section 6.3(c) below none of them shall contest (or support any other Person contesting) (i) any request by the Term Agent or any Term Secured Party for adequate protection of its interest in the Collateral (unless in contravention of Section 6.1 above), or (ii) any objection by the Term Agent or any Term Secured Party to any motion, relief, action or proceeding based on a claim by the Term Agent or any Term Secured Party that its interests in the Collateral (unless in contravention of Section 6.1 above)

42

are not adequately protected (or any other similar request under any law applicable to an Insolvency Proceeding), so long as any Liens granted to the Term Agent as adequate protection of its interests are subject to this Agreement.

        (c)      Notwithstanding the foregoing provisions in this Section 6.3, in any Insolvency Proceeding:

        (i)      if the ABL Secured Parties (or any subset thereof) are granted adequate protection with respect to the ABL Priority Collateral in the form of additional collateral (even if such collateral is not of a type which would otherwise have constituted ABL Priority Collateral), then the ABL Agent, on behalf of itself and the ABL Secured Parties, agrees that the Term Agent, on behalf of itself or any of the Term Secured Parties, may seek or request (and the ABL Secured Parties will not oppose such request unless in contravention of Section 6.1(a)) adequate protection with respect to its interests in such Collateral in the form of a Lien on the same additional collateral, which Lien will be subordinated to the Liens securing the ABL Obligations on the same basis as the other Liens of the Term Agent on ABL Priority Collateral; and

        (ii)      in the event the Term Secured Parties (or any subset thereof) are granted adequate protection in respect of Term Priority Collateral in the form of additional collateral (even if such collateral is not of a type which would otherwise have constituted Term Priority Collateral), then the Term Agent, on behalf of itself and any of the Term Secured Parties, agrees that the ABL Agent on behalf of itself or any of the ABL Secured Parties, may seek or request (and the Term Secured Parties will not oppose such request) adequate protection with respect to its interests in such Collateral in the form of a Lien on the same additional collateral, which Lien will be subordinated to the Liens securing the Term Obligations on the same basis as the other Liens of the ABL Agent on Term Priority Collateral.

        (iii)      Except as otherwise expressly set forth in Section 6.1(a) or in connection with the Exercise of Secured Creditor Remedies with respect to the ABL Priority Collateral, nothing herein shall limit the rights of the Term Agent or the Term Secured Parties from seeking adequate protection with respect to their rights in the Term Priority Collateral in any Insolvency Proceeding, other than adequate protection in the form of cash payments except from Proceeds of Term Priority Collateral. Except in connection with the Exercise of Secured Creditor Remedies with respect to the Term Priority Collateral, nothing herein shall limit the rights of the ABL Agent or the ABL Secured Parties from seeking adequate protection with respect to their rights in the ABL Priority Collateral in any Insolvency, other than adequate protection in the form of cash payments, except Proceeds of ABL Priority Collateral.

**Section 6.4**    <u>**Asset Sales**</u>.

        (a)      The Term Agent agrees, on behalf of itself and the Term Secured Parties, that it will not oppose and shall be deemed to have consented to any sale consented to by the ABL Agent of any ABL Priority Collateral pursuant to Section 363(f) of the Bankruptcy Code (or any similar provision under the law applicable to any Insolvency Proceeding or under a court order in respect of measures granted with similar effect under any foreign Debtor Relief Laws) so long as the Term Agent, for the benefit of the Term Secured Parties, shall retain a Lien on the proceeds of such sale (to the extent such proceeds are not applied to the ABL Obligations in accordance with Section 4.1(b)). The ABL Agent agrees, on behalf of itself and the ABL Secured Parties, that it will not oppose and shall be deemed to have consented to any sale consented to by the Term Agent of any Term Priority Collateral pursuant to Section 363(f) of the Bankruptcy Code (or any similar provision under the law applicable to any Insolvency Proceeding or under a court order in respect of measures granted with similar effect under any foreign Debtor Relief Laws) so long as (i) any such sale is made in accordance with Section 3.6 and (ii) the ABL Agent, for the benefit of the ABL Secured Parties, shall retain a Lien on the proceeds of such

sale (to the extent such proceeds are not applied to the Term Obligations in accordance with Section 4.1(c)). If such sale of Collateral includes both ABL Priority Collateral and Term Priority Collateral and the Parties are unable after negotiating in good faith to agree on the allocation of the purchase price between the ABL Priority Collateral and Term Priority Collateral, either Party may apply to the court in such Insolvency Proceeding to make a determination of such allocation, and the court's determination shall be binding upon the Parties; provided, however, that nothing contained in this sentence shall constitute consent by any ABL Secured Party to the sale of any ABL Priority Collateral or the consent of any Term Secured Party to the sale of any Term Priority Collateral. For the avoidance of doubt, (i) until the occurrence of the Discharge or Term Obligations, the Term Secured Parties may object to any sale pursuant to Section 363 of the Bankruptcy Code (or any similar provision under the law applicable to any Insolvency Proceeding or under a court order in respect of measures granted with similar effect under any foreign Debtor Relief Laws) that includes a sale of Term Priority Collateral regardless of whether such sale is a sale of Term Priority Collateral only or is a combined sale of Term Priority Collateral and ABL Priority Collateral, and (ii) until the occurrence of the Discharge of ABL Obligations, the ABL Secured Parties may object to any sale pursuant to Section 363 of the Bankruptcy Code (or any similar provision under the law applicable to any Insolvency Proceeding or under a court order in respect of measures granted with similar effect under any foreign Debtor Relief Laws) that includes a sale of ABL Priority Collateral regardless of whether such sale is a sale of ABL Priority Collateral only or is a combined sale of Term Priority Collateral and ABL Priority Collateral.

(b)     The Term Secured Parties agree that the ABL Secured Parties shall have the right to credit bid under Section 363(k) of the Bankruptcy Code (or any other similar provision of any Debtor Relief Law) with respect to any sale of the ABL Priority Collateral and the ABL Secured Parties agree that the Term Secured Parties shall have the right to credit bid under Section 363(k) of the Bankruptcy Code (or any other similar provision of any Debtor Relief Law) with respect to any sale of the Term Priority Collateral; provided that the Secured Parties shall not be deemed to have agreed to any credit bid by other Secured Parties in connection with the sale of Collateral consisting of both Term Priority Collateral and ABL Priority Collateral except as may be allowed pursuant to this Section. The Term Agent, for itself and on behalf of the other Term Secured Parties, agrees that, so long as the Discharge of ABL Obligations has not occurred (or will not occur immediately upon consummation of such sale), no Term Secured Party shall, without the prior written consent of the ABL Agent, credit bid under Section 363(k) of the Bankruptcy Code with respect to any sale of ABL Priority Collateral or any sale consisting of both Term Priority Collateral and ABL Priority Collateral. The ABL Agent, for itself and on behalf of the other ABL Secured Parties, agrees that, so long as the Discharge of Term Obligations has not occurred (or will not occur immediately upon consummation of such Disposition), no ABL Secured Party shall, without the prior written consent of the Term Agent, credit bid under Section 363(k) of the Bankruptcy Code with respect to any sale of the Term Priority Collateral or any sale consisting of both Term Priority Collateral and ABL Priority Collateral.

**Section 6.5     Separate Grants of Security and Separate Classification**. Each Term Secured Party and each ABL Secured Party acknowledges and agrees that (i) the grants of Liens pursuant to the ABL Collateral Documents and the Term Collateral Documents constitute two separate and distinct grants of Liens and (ii) because of, among other things, their differing rights in the Collateral, the Term Obligations are fundamentally different from the ABL Obligations and must be separately classified in any plan of reorganization (or other plan of similar effect under any Debtor Relief Laws) proposed or adopted in an Insolvency Proceeding. To further effectuate the intent of the parties as provided in the immediately preceding sentence, if it is held that the claims of the ABL Secured Parties and the Term Secured Parties in respect of the Collateral constitute only one secured claim (rather than separate classes of senior and junior secured claims), then the ABL Secured Parties and the Term Secured Parties hereby acknowledge and agree that all distributions shall be made as if there were separate classes of ABL Obligation claims and Term Obligation claims against the Credit Parties, with the effect being that, to the

44

extent that the aggregate value of the ABL Priority Collateral or Term Priority Collateral, as applicable, is sufficient (for this purpose ignoring all claims held by the other Secured Parties), the ABL Secured Parties or the Term Secured Parties, respectively, shall be entitled to receive, in addition to amounts distributed to them in respect of principal, pre-petition interest and other claims, all amounts owing in respect of post-petition interest that is available from each pool of Priority Collateral for each of the ABL Secured Parties and the Term Secured Parties, respectively, before any distribution is made in respect of the claims held by the other Secured Parties from such Collateral, with the other Secured Parties hereby acknowledging and agreeing to turn over to the respective other Secured Parties amounts otherwise received or receivable by them to the extent necessary to effectuate the intent of this sentence, even if such turnover has the effect of reducing the aggregate recoveries.

**Section 6.6      Enforceability**. The provisions of this Agreement are intended to be and shall be enforceable under Section 510(a) of the Bankruptcy Code.

**Section 6.7      ABL Obligations Unconditional**. All rights of the ABL Agent hereunder, and all agreements and obligations of the Term Agent and the Credit Parties (to the extent applicable) hereunder, shall remain in full force and effect irrespective of:

A.      any lack of validity or enforceability of any ABL Document;

B.      any change in the time, place or manner of payment of, or in any other term of, all or any portion of the ABL Obligations, or any amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of any ABL Document (but solely to the extent permitted pursuant to Section 5.2(a) hereof);

C.      any exchange, release, voiding, avoidance or non-perfection of any security interest in any Collateral or any other collateral, or any release, amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding, restatement or increase of all or any portion of the ABL Obligations or any guarantee or guaranty thereof; or

D.      any other circumstances that otherwise might constitute a defense available to, or a discharge of, any Credit Party in respect of the ABL Obligations (other than Discharge of ABL Obligations), or of any of the Term Agent or any Credit Party, to the extent applicable, in respect of this Agreement.

**Section 6.8      Term Obligations Unconditional**. All rights of the Term Agent hereunder, and all agreements and obligations of the ABL Agent and the Credit Parties (to the extent applicable) hereunder, shall remain in full force and effect irrespective of:

A.      any lack of validity or enforceability of any Term Document;

B.      any change in the time, place or manner of payment of, or in any other term of, all or any portion of the Term Obligations, or any amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of any Term Document (but solely to the extent permitted pursuant to Section 5.2(b) hereof);

C.      any exchange, release, voiding, avoidance or non-perfection of any security interest in any Collateral, or any other collateral, or any release, amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding, restatement or increase of all or any portion of the Term Obligations or any guarantee or guaranty thereof; or

45

D.      any other circumstances that otherwise might constitute a defense available to, or a discharge of, any Credit Party in respect of the Term Obligations (other than Discharge of Term Obligations), or of any of the ABL Agent or any Credit Party, to the extent applicable, in respect of this Agreement.

## ARTICLE 7
## MISCELLANEOUS

**Section 7.1      Rights of Subrogation**. The Term Agent, for and on behalf of itself and the Term Secured Parties, agrees that no payment to the ABL Agent or any ABL Secured Party pursuant to the provisions of this Agreement shall entitle the Term Agent or any Term Secured Party to exercise any rights of subrogation in respect thereof until the Discharge of ABL Obligations shall have occurred. Following the Discharge of ABL Obligations, the ABL Agent agrees to execute such documents, agreements, and instruments as the Term Agent or any Term Secured Party may reasonably request to evidence the transfer by subrogation to any such Person of an interest in the ABL Obligations resulting from payments to the ABL Agent by such Person, so long as all costs and expenses (including all reasonable legal fees and disbursements) incurred in connection therewith by the ABL Agent are paid by such Person upon request for payment thereof. The ABL Agent, for and on behalf of itself and the ABL Secured Parties, agrees that no payment to the Term Agent or any Term Secured Party pursuant to the provisions of this Agreement shall entitle the ABL Agent or any ABL Secured Party to exercise any rights of subrogation in respect thereof until the Discharge of Term Obligations shall have occurred. Following the Discharge of Term Obligations, the Term Agent agrees to execute such documents, agreements, and instruments as the ABL Agent or any ABL Secured Party may reasonably request to evidence the transfer by subrogation to any such Person of an interest in the Term Obligations resulting from payments to the Term Agent by such Person, so long as all costs and expenses (including all reasonable legal fees and disbursements) incurred in connection therewith by the Term Agent are paid by such Person upon request for payment thereof.

**Section 7.2      Further Assurances**. The Parties will, at their own expense and at any time and from time to time, promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or desirable, or that either Party may reasonably request, in order to protect any right or interest granted or purported to be granted hereby or to enable the ABL Agent or the Term Agent to exercise and enforce its rights and remedies hereunder; provided, however, that no Party shall be required to pay over any payment or distribution, execute any instruments or documents, or take any other action referred to in this Section 7.2, to the extent that such action would contravene any law, order or other legal requirement or any of the terms or provisions of this Agreement, and in the event of a controversy or dispute, such Party may interplead any payment or distribution in any court of competent jurisdiction, without further responsibility in respect of such payment or distribution under this Section 7.2.

**Section 7.3      Representations**. The Term Agent represents and warrants to the ABL Agent that it has the requisite power and authority under the Term Documents to enter into, execute, deliver, and carry out the terms of this Agreement on behalf of itself and the Term Secured Parties and that this Agreement shall be binding obligations of the Term Agent and the Term Secured Parties, enforceable against the Term Agent and the Term Secured Parties in accordance with its terms. The ABL Agent represents and warrants to the Term Agent that it has the requisite power and authority under the ABL Documents to enter into, execute, deliver, and carry out the terms of this Agreement on behalf of itself and the ABL Secured Parties and that this Agreement shall be binding obligations of the ABL Agent and the ABL Secured Parties, enforceable against the ABL Agent and the ABL Secured Parties in accordance with its terms.

**Section 7.4    Amendments**.  No amendment or waiver of any provision of this Agreement nor consent to any departure by any Party hereto shall be effective unless it is in a written agreement executed by the Term Agent and the ABL Agent, and, in the case of any amendment or waiver that would be materially adverse to a Credit Party, the Borrowers (it being understood that any amendments that impose additional obligations on any Borrower or Guarantor shall be deemed materially adverse to the Credit Parties), and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

**Section 7.5    Addresses for Notices**. Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given shall be in writing and may be personally served, telecopied, emailed, or sent by overnight express courier service or United States mail and shall be deemed to have been given when delivered in person or by courier service, upon receipt of an email or telecopy or three (3) days after deposit in the United States mail (certified, with postage prepaid and properly addressed). For the purposes hereof, the addresses of the Parties hereto (until notice of a change thereof is delivered as provided in this Section) shall be as set forth below or, as to each Party, at such other address as may be designated by such Party in a written notice to all of the other Parties.

| | |
|---|---|
| ABL Agent: | Bank of America, N.A.<br>100 Federal Street, 9th Floor<br>Boston, MA 02110<br>Attention:  Ms. Christine Hutchinson<br>Telecopier:  (617) 434-4131<br>E-mail:  Christine.Hutchinson@baml.com |

With a copy to (which copy shall not constitute notice):

> Kevin M. Murtagh, Esq.
> Riemer & Braunstein LLP
> Three Center Plaza
> Boston, MA 02108
> Telecopier:  (617) 880-3456
> E-mail:  KMurtagh@riemerlaw.com

| | |
|---|---|
| Term Agent: | c/o Sycamore Partners<br>9 West 57th Street<br>New York, NY 10019<br>Attention: Stefan Kaluzny<br>             John Woodworth<br>Telecopier: (212) 796-8560<br>Email:   skaluzny@sycamorepartners.com<br>             jwoodworth@sycamorepartners.com |

With a copy to (which copy shall not constitute notice):
> Law Offices of Gary M. Holihan, P.C.
> 2345 Larkdale Drive
> Glenview, IL 60025
> Email:  garyholihan@gmail.com

And:

> Winston & Strawn LLP

35 W. Wacker Drive
Chicago, IL 60601-9703
Attention:      Gregory S. Murray
Telecopier:    (312) 558-5700
Email:  gmurray@winston.com

**Section 7.6    No Waiver; Remedies**. No failure on the part of any Party to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

**Section 7.7    Continuing Agreement, Transfer of Secured Obligations**. This Agreement is a continuing agreement and shall (a) remain in full force and effect until the Discharge of ABL Obligations or the Discharge of Term Obligations shall have occurred (but subject to reinstatement pursuant to Section 5.3), (b) be binding upon the Parties and their successors and assigns, and (c) inure to the benefit of and be enforceable by the Parties and their respective successors, transferees and permitted assigns. Except as set forth in Section 7.4, nothing herein is intended, or shall be construed to give, any other Person any right, remedy or claim under, to or in respect of this Agreement or any Collateral. All references to any Credit Party shall include any Credit Party as debtor-in-possession and any receiver or trustee for such Credit Party in any Insolvency Proceeding. Without limiting the generality of the foregoing clause (c), the ABL Agent, any ABL Secured Party, the Term Agent, or any Term Secured Party may assign or otherwise transfer all or any portion of the ABL Obligations or the Term Obligations in accordance with the ABL Credit Agreement or the Term Credit Agreement, in each case, as applicable, to any other Person (other than the Borrower, any Guarantor or any Affiliate of the Borrower or any Guarantor and any Subsidiary of the Borrower or any Guarantor), and such other Person shall thereupon become vested with all the rights and obligations in respect thereof granted to the ABL Agent, the Term Agent, any ABL Secured Party, or any Term Secured Party, as the case may be, herein or otherwise. The ABL Secured Parties and the Term Secured Parties may continue, at any time and without notice to the other parties hereto, to extend credit and other financial accommodations, lend monies and provide Indebtedness to, or for the benefit of, any Credit Party on the faith hereof.

**Section 7.8    GOVERNING LAW; ENTIRE AGREEMENT**. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK. This Agreement constitutes the entire agreement and understanding among the Parties with respect to the subject matter hereof and supersedes any prior agreements, written or oral, with respect thereto.

**Section 7.9    Counterparts**. This Agreement may be executed in any number of counterparts, and it is not necessary that the signatures of all Parties be contained on any one counterpart hereof, each counterpart will be deemed to be an original, and all together shall constitute one and the same document. Delivery of an executed signature page to this Agreement by facsimile or other electronic transmission (in .pdf or similar format) shall be as effective as delivery of a manually signed counterpart of this Agreement.

**Section 7.10    No Third Party Beneficiaries**. This Agreement is solely for the benefit of the ABL Agent, ABL Secured Parties, Term Agent and Term Secured Parties; provided, however, that notwithstanding the foregoing, the Credit Parties shall be deemed to be a third party beneficiary solely with respect to the amendments and waivers requiring the consent of the Credit Parties pursuant to Section 7.4 hereof and this Section 7.10.

48

**Section 7.11    Headings**. The headings of the articles and sections of this Agreement are inserted for purposes of convenience only and shall not be construed to affect the meaning or construction of any of the provisions hereof.

**Section 7.12    Severability**. If any of the provisions in this Agreement shall, for any reason, be held invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Agreement and shall not invalidate the Lien Priority or the application of Proceeds and other priorities set forth in this Agreement. The Parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**Section 7.13    Attorneys' Fees**. The Parties agree that if any dispute, arbitration, litigation, or other proceeding is brought with respect to the enforcement of this Agreement or any provision hereof, the prevailing party in such dispute, arbitration, litigation, or other proceeding shall be entitled to recover its reasonable attorneys' fees and all other costs and expenses incurred in the enforcement of this Agreement, irrespective of whether suit is brought.

**Section 7.14    VENUE; JURY TRIAL WAIVER.**

(a)    EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK CITY IN THE BOROUGH OF MANHATTAN AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING SHALL BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT SHALL AFFECT ANY RIGHT THAT ANY ABL SECURED PARTY OR ANY TERM SECURED PARTY MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT, ANY TERM DOCUMENTS, OR ANY ABL DOCUMENTS AGAINST ANY CREDIT PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(b)    EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT IN ANY COURT REFERRED TO IN PARAGRAPH (a) OF THIS SECTION. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

49

(c)    EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION. EACH PARTY HERETO REPRESENTS THAT IT HAS REVIEWED THIS WAIVER AND IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

(d)    EACH PARTY TO THIS AGREEMENT IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 7.5. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS AGREEMENT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

**Section 7.15    Intercreditor Agreement**. This Agreement is the "Intercreditor Agreement" referred to in the ABL Credit Agreement and this Agreement is the "ABL Intercreditor Agreement" referred to in the Term Credit Agreement. Nothing in this Agreement shall be deemed to subordinate the obligations due to (i) any ABL Secured Party to the obligations due to any Term Secured Party or (ii) any Term Secured Party to the obligations due to any ABL Secured Party (in each case, whether before or after the occurrence of an Insolvency Proceeding), it being the intent of the Parties that this Agreement shall effectuate a subordination of Liens but not a subordination of Indebtedness.

**Section 7.16    No Warranties or Liability**. The Term Agent and the ABL Agent acknowledge and agree that neither has made any representation or warranty with respect to the execution, validity, legality, completeness, collectability or enforceability of any other ABL Document or any Term Document. Except as otherwise provided in this Agreement, the Term Agent and the ABL Agent will be entitled to manage and supervise their respective extensions of credit to any Credit Party in accordance with law and their usual practices, modified from time to time as they deem appropriate.

**Section 7.17    Conflicts**. In the event of any conflict between the provisions of this Agreement and the provisions of any ABL Document or any Term Document, the provisions of this Agreement shall govern.

**Section 7.18    Costs and Expenses**. All costs and expenses incurred by the Term Agent and the ABL Agent, including, without limitation pursuant to Section 3.8(d) and Section 4.1(e) hereunder shall be reimbursed by the Borrower and the Credit Parties as provided in Section 14-7 (or any similar provision) of the Term Credit Agreement and Section 14-7 (or any similar provision) of the ABL Credit Agreement.

**Section 7.19    Information Concerning Financial Condition of the Credit Parties.**

(a)    Each of the Term Agent and the ABL Agent hereby assumes responsibility for keeping itself informed of the financial condition of the Credit Parties and all other circumstances bearing

upon the risk of nonpayment of the ABL Obligations or the Term Obligations. The Term Agent and the ABL Agent hereby agree that no Party shall have any duty to advise any other Party of information known to it regarding such condition or any such circumstances. In the event the Term Agent or the ABL Agent, in its sole discretion, undertakes at any time or from time to time to provide any information to any other Party to this Agreement, (a) it shall be under no obligation (i) to provide any such information to such other Party or any other Party on any subsequent occasion, (ii) to undertake any investigation not a part of its regular business routine, or (iii) to disclose any other information, (b) it makes no representation as to the accuracy or completeness of any such information and shall not be liable for any information contained therein, and (c) the Party receiving such information hereby agrees to hold the other Party harmless from any action the receiving Party may take or conclusion the receiving Party may reach or draw from any such information, as well as from and against any and all losses, claims, damages, liabilities, and expenses to which such receiving Party may become subject arising out of or in connection with the use of such information.

(b)     The Credit Parties agree that any information provided to the ABL Agent, the Term Agent, any ABL Secured Party or any Term Secured Party may be shared by such Person with any ABL Secured Party, any Term Secured Party, the ABL Agent or the Term Agent, subject to the respective confidentiality provisions in the ABL Credit Agreement and the Term Credit Agreement, as applicable.

**Section 7.20**   **Additional Credit Parties**. The Borrower will promptly cause each Person that becomes a Credit Party to execute and deliver to the parties hereto an acknowledgment to this Agreement, whereupon such Person will be bound by the terms hereof to the same extent as if it had executed and delivered this Agreement as of the date hereof.   The parties and the Credit Parties hereto further agree that, notwithstanding any failure to take the actions required by the immediately preceding sentence, each Person which becomes a Credit Party at any time (and any security granted by any such Person) shall be subject to the provisions hereof as fully as if the same constituted a Credit Party party hereto and had complied with the requirements of the immediately preceding sentence.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the ABL Agent, for and on behalf of itself and the ABL Secured Parties, and the Term Agent, for and on behalf of itself and the Term Secured Parties, have caused this Agreement to be duly executed and delivered as of the date first above written.

**BANK OF AMERICA, N.A.**, in its capacity as the ABL Agent

By: _Christine Hutchinson_

Name:  Christine Hutchinson

Title:    Director

[Signature Page to Intercreditor Agreement]

AERO INVESTORS LLC, in its capacity as the Term Agent

By:
Name: Stefan Kaluzny
Title: CEO and President

[Signature Page to Intercreditor Agreement]

## ACKNOWLEDGMENT
May 23, 2014

The Borrower and each Guarantor hereby acknowledges that it has received a copy of this Agreement as in effect on the date hereof and consents thereto, agrees to recognize all rights granted thereby to the ABL Agent, the ABL Secured Parties, the Term Agent, and the Term Secured Parties (including pursuant to Section 7.18), and will not do any act or perform any obligation which is not in accordance with the agreements set forth in this Agreement as in effect on the date hereof (and, to the extent the Borrower receives a copy of any amendment hereto and to the extent the Borrower and other Credit Parties have consented (to the extent consent is required pursuant to Section 7.4), as amended and in effect from time to time). The Borrower and each Guarantor further acknowledges and agrees that, except for amendments for which their consent is required pursuant to Section 7.4, it is not an intended beneficiary or third party beneficiary under this Agreement and (i) as between the ABL Secured Parties, the Borrower and Guarantors, the ABL Documents remain in full force and effect as written and are in no way modified hereby, and (ii) as between the Term Secured Parties, the Borrower and Guarantors, the Term Documents remain in full force and effect as written and are in no way modified hereby.

Without limiting the foregoing or any rights or remedies the Borrower and the other Credit Parties may have, the Borrower and the other Credit Parties consent to the rights granted to the ABL Secured Parties, and the performance by the Term Agent of the obligations, set forth in Section 3.6 of this Agreement and acknowledge and agree that neither the Term Agent nor any other Term Secured Party shall ever be accountable or liable for any action taken or omitted by the ABL Agent or any other ABL Secured Party or its or any of their officers, employees, agents successors or assigns in connection therewith or incidental thereto or in consequence thereof, including any improper use or disclosure of any proprietary information or other Intellectual Property by the ABL Agent or any other ABL Secured Party or its or any of their officers, employees, agents, successors or assigns or any other damage to or misuse or loss of any property of the Credit Parties as a result of any action taken or omitted by the ABL Agent or its officers, employees, agents, successors or assigns pursuant to, and in accordance with, Section 3.6 of this Agreement; provided nothing herein shall waive any claim under the ABL Credit Agreement that any Credit Party may have against the ABL Agent or any other ABL Secured Parties.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, each of the undersigned has have caused this Acknowledgment to be duly executed and delivered as of the date first above written.

**AEROPOSTALE, INC.**, as the Borrower

By: _____

Name: Marc D. Miller

Title:   Executive Vice President and Chief Financial
Officer

**GUARANTORS**

AEROPOSTALE WEST, INC
JIMMY'Z SURF CO., LLC
AERO GC MANAGEMENT LLC
AEROPOSTALE PROCUREMENT COMPANY, INC.
AEROPOSTALE LICENSING, INC.
P.S. FROM AEROPOSTALE, INC.
GOJANE LLC,
each as a "**Guarantor**"

By: _____

Name: Marc D. Miller

Title:   Executive Vice President and Chief Financial
Officer

FORM OF INTERCREDITOR AGREEMENT JOINDER

Reference is made to Intercreditor Agreement (as amended, supplemented, restated, amended and restated or otherwise modified from time to time pursuant to the terms thereof, the "Intercreditor Agreement") dated as of May 23, 2014 (the "Closing Date") between ABL Agent and the Term Agent (each as defined therein), and acknowledged, and consented to, by the Borrower pursuant to the Acknowledgement attached thereto.

In connection with the refinancing of the [ABL Obligations][Term Obligations] on [_____] [__], 20[__], the undersigned, [_____], a [_____], hereby agrees to become a party to the Intercreditor Agreement as the new [ABL Agent] [Term Agent], for all purposes thereof and on the terms set forth therein, and to be bound by the terms of the Intercreditor Agreement as fully as if the undersigned had executed and delivered the Intercreditor Agreement on the Closing Date. All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Intercreditor Agreement.

The undersigned, on behalf of itself and the holders it acts as an agent for, agrees to be bound by the terms of the Intercreditor Agreement applicable to them.

The undersigned represents and warrants to [_____][1] (the "Continuing Agent") that it is authorized under the new [ABL Documents] [Term Documents] to enter into this Intercreditor Joinder Agreement.

The provisions of Sections 7.8 and 7.13 of the Intercreditor Agreement shall apply with like effect to this Intercreditor Agreement Joinder.

The effectiveness of this Intercreditor Agreement Joinder is conditioned upon the delivery of a New Debt Notice to the Continuing Agent in the form attached hereto as Exhibit 1.

[Signature Page to Follow]

---

[1] Insert agent's name that was not subject to the refinancing

IN WITNESS WHEREOF, the undersigned has caused this Intercreditor Agreement Joinder to be executed by its respective officer or representative as of [_____] [__], 20[__].

[_____]

By:_____
     Name:
     Title:

[Signature Page to New Debt Notice – Aeropostale Intercreditor Agreement Joinder]

Exhibit 1 to Intercreditor Agreement Joinder

<u>New Debt Notice</u>

In connection with the delivery of the Intercreditor Agreement Joinder to the Intercreditor Agreement dated as of May 23, 2014 (the "<u>Intercreditor Agreement</u>") among ABL Agent and the Term Agent (each as defined therein), and acknowledged, and consented to, by the Borrower pursuant to the Acknowledgement to Intercreditor Agreement attached thereto, the Credit Parties have entered into new [ABL Documents] [Term Documents].

Enclosed is a complete copy of the relevant new [ABL Documents] [Term Documents].  The New Agent is [_____], a [_____].

Date:

AEROPOSTALE, INC.

By:_____
Name: _____
Title:_____

1670923.14

[Signature Page to New Debt Notice – Aeropostale Intercreditor Agreement Joinder]

**<u>Exhibit D</u>**

**Fee Letter**

# CRYSTAL FINANCIAL LLC

Two International Place, 17th Floor
Boston, MA 02110

May 4, 2016

Aéropostale, Inc.
201 Willowbrook Blvd.
Wayne, NJ 07470
Attention: Joseph Pachella
Facsimile: 973-872-5650
Email: jpachella@aeropostale.com

Ladies and Gentlemen:

This letter (this "**Fee Letter**") sets forth the fees and other amounts payable in connection with a debtor in possession credit facility in an aggregate principal amount not to exceed $160,000,000 (the "DIP Facility"), as described in that certain Secured Superpriority Debtor in Possession Loan, Security and Guaranty Agreement of even date herewith (as amended, restated, supplemented or modified from time to time, the "Agreement") by and among **AÉROPOSTALE, INC.**, a Delaware corporation (the "Borrower"), the Guarantors party thereto, the financial institutions which are now or which hereafter become a party thereto (collectively, the "Lenders") and **CRYSTAL FINANCIAL LLC**, as Agent for the Lenders (in such capacity, the "Agent"). Capitalized terms not otherwise defined herein shall have the same meanings as set forth in the Agreement.

As consideration to the Agent and the Lenders to enter into the DIP Facility, the Borrower hereby agrees as follows:

Fees.  In connection with the DIP Facility, the Borrower agrees to pay the following fees at the following times:

1.   Interim Commitment Fee. Borrower shall pay to Agent, for pro rata distribution to the Lenders, an interim commitment fee with respect to the Interim Term Loan Commitment and the Interim Revolving Credit Commitment (the "Interim Commitment Fee") in an amount equal to 5.00% of the aggregate Interim Term Loan Commitment and the Interim Revolving Credit Commitment as of the Effective Date.  The Interim Commitment Fee shall be nonrefundable and fully earned and payable on the Effective Date. The Interim Commitment Fee shall be credited towards the Underwriting Fee (as defined below) only upon the entry of the Final DIP Order.

2.   Work Fee. Borrower shall pay to Agent, for its own account, a work fee equal to SIX HUNDRED FIFTY THOUSAND DOLLARS ($650,000) with (i) 75% fully earned and paid on April 22, 2016 (the "Step 1 Work Fee") and (ii) 25% fully earned and payable when the Borrower has confirmed in writing that it has agreed to the Agent's proposed

financial covenants under the Agreement (the "Step 2 Work Fee"; together with the Step 1 Work Fee, the "Work Fee"). The Work Fee shall be nonrefundable and deemed earned in full on the date when the same is due and payable hereunder. The Work Fee will be credited first towards the Final Arrangement Fee (as defined below) and then towards the Underwriting Fee (as defined below), in each case, only upon entry of the Final DIP Order. Agent acknowledges and agrees that the Step 1 Work Fee was paid on April 22, 2016 and the Step 2 Work Fee was paid on May 2, 2016.

3.    Underwriting Fee.  Borrower shall pay to Agent, for pro rata distribution to the Lenders, an underwriting fee with respect to the Commitments (the "Underwriting Fee") in an amount equal to 5.00% of the Commitments, which shall be nonrefundable and fully earned upon the entry of the Final DIP Order, of which (a) 3.25% will be nonrefundable and payable upon the entry of the Final DIP Order and (b) 1.75% will be nonrefundable and payable upon the Termination Date; provided, however, that to the extent that any of the Term Loans are prepaid or repaid, or the Commitments are reduced in accordance with the Agreement prior to the Termination Date, the corresponding portion of the Underwriting Fee shall be paid on the date of such repayment, prepayment or reduction, as the case may be. The Work Fee and the Interim Commitment Fee shall be credited first, towards the portion of the Underwriting Fee in clause (a) payable upon entry of the Final DIP Order and thereafter, to the portion of the Underwriting Fee payable under clause (b).

4.    Interim Arrangement Fee.  Borrower shall pay to Agent for its own account, an interim arrangement fee with respect to the Interim Term Loan Commitment and the Interim Revolving Credit Commitment (the "Interim Arrangement Fee"), in an amount equal to 0.25% of the aggregate Interim Term Loan Commitment and the Interim Revolving Credit Commitment as of the Effective Date, which shall be nonrefundable and fully earned and payable on the Effective Date.  The Interim Arrangement Fee shall be credited towards the Final Arrangement Fee (as defined below), only upon the entry of the Final DIP Order.

5.    Final Arrangement Fee.  Borrower shall pay to Agent for its own account, a final arrangement fee with respect to the Commitments (the "Final Arrangement Fee" and, together with the Interim Arrangement Fee, the "Arrangement Fee") in an amount equal to 0.25% of the aggregate Commitments upon entry of the Final DIP Order, which shall be nonrefundable and fully earned and payable upon entry of the Final DIP Order.

6.    Agency Fee.  Borrower shall pay to Agent, for its own account, an agency fee ("Agency Fee", and together with the Interim Commitment Fee, the Work Fee, the Underwriting Fee and the Arrangement Fee, the "Fees") in an amount equal to $7,500 per month.  The Agency Fee shall be nonrefundable and fully earned and payable once paid and shall be paid on the Effective Date and in advance on the first day of each month thereafter until the Termination Date.

The Fees set forth above shall be solely in consideration of the provision of services and extensions of credit and shall be deemed earned in full on the applicable date as set forth above and shall not be subject to rebate or proration upon termination of the Agreement for any reason.

-2-

9953/21798-046 current/55896980v8

The Fees shall be paid without set-off, counterclaim or deduction. The Fees described above shall be in addition to, and not creditable against, any other fee, cost or expense payable under the Agreement or any other Loan Document other than as expressly set forth herein. The Agent reserves the right to allocate, in whole or in part, to one or more of its affiliates, any portion of the fees payable to the Agent hereunder in such manner as Agent determines in its sole discretion.

This Fee Letter is the Fee Letter referred to in the Agreement and is a Loan Document under and as defined in the Agreement.

All fees and other amounts shall be payable in U.S. dollars in immediately available funds to Agent as set forth in the Agreement.

The Borrower further agrees that failure of Borrower to make any payments as required herein shall constitute an Event of Default under Section 10.2 of the Agreement. Upon the occurrence of an Event of Default hereunder, the Agent and the Lenders shall have all rights and remedies afforded to them under the Agreement.

This Fee Letter may be executed in counterparts which, taken together, shall constitute an original. This Fee Letter may be delivered by facsimile or electronic (e.g., .pdf or .tif file) transmission with the same effect as if an originally executed version of this Fee Letter had been personally delivered to each of the parties hereto. This Fee Letter may not be assigned by the Borrower without the prior written consent of Agent.

This Fee Letter shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York without regard to conflict of law principles that would result in the application of any law other than the laws of the State of New York. With respect to any legal action or proceeding arising under this Fee Letter, each party hereto (i) waives its right to trial by jury and (ii) submits to the non-exclusive jurisdiction of federal and state courts sitting in New York.

If the above is acceptable to you, please sign and return this Fee Letter to us.

[SIGNATURES TO APPEAR ON FOLLOWING PAGE]

-3-

Very truly yours,

**CRYSTAL FINANCIAL LLC,**
as Agent, on behalf of itself and the Lenders

By:
Name:
Title:

Evren Ozargun
Managing Director

*[Signature Page to Fee Letter]*

ACCEPTED AND AGREED:

**AÉROPOSTALE, INC.**

By: _____

Name:    David Dick
Title:    Senior Vice President and Chief Financial
          Officer

*[Signature Page to Fee Letter]*