WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail

*Proposed Attorneys for Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------x
                                     :

| | | |
|---|---|---|
| **In re** | : | **Chapter 11** |
| | : | |
| **AÉROPOSTALE, INC.,** *et al.*, | : | **Case No. 16-_____ (___)** |
| | : | |
| **Debtors.**[1] | : | **Joint Administration Requested** |
| | : | |

-------------------------------------------------------x

**DECLARATION OF TIMOTHY MCDONAGH IN SUPPORT OF (I) MOTION OF
DEBTORS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 503(b)(9) FOR INTERIM
AND FINAL AUTHORITY TO PAY CERTAIN PREPETITION OBLIGATIONS TO
CRITICAL VENDORS, APPROVAL OF RELATED PROCEDURES, AND RELATED
RELIEF AND (II) MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105, 363,
AND 365 FOR APPROVAL OF (I) PROCEDURES FOR STORE CLOSING SALES,
AND (II) THE ASSUMPTION OF THE LIQUIDATION CONSULTING AGREEMENTS**

I, Timothy McDonagh, make this declaration pursuant to 28 U.S.C. § 1746:

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal tax identification number, as applicable, are as follows:  Aéropostale, Inc. (3880); Aéropostale West, Inc. (7013); Jimmy'Z Surf Co., LLC (0461); Aero GC Management LLC (4257); Aeropostale Procurement Company, Inc. (8518); Aeropostale Licensing, Inc. (8124); P.S. from Aeropostale, Inc. (5900); GoJane LLC (4923); Aeropostale Canada Corp. (N/A); Aeropostale Holdings, Inc. (7729); and Aeropostale Puerto Rico, Inc. (6477).  The Debtors' corporate headquarters is located at 112 West 34th Street, 22nd Floor, New York, NY 10120.

1.      I am a Managing Director at FTI Consulting, Inc. ("*FTI*"), which currently serves as financial advisor to Aéropostale, Inc. and its subsidiaries, the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "*Debtors*").

2.      FTI is a global business advisory firm that provides multidisciplinary solutions to complex challenges and opportunities.  The restructuring and turnaround experts at FTI help management stabilize finances and operations to reassure all parties-in-interest that proactive steps are being taken to enhance value.  FTI's professionals have a deep expertise across many industries, allowing them to quickly ascertain key issues and react immediately on behalf of their clients.  For clients in crisis, FTI professionals develop liquidity forecasts, improve cash flow management, obtain and consult regarding additional financing, and guide complex debt restructuring, among other services.

3.      I have over 10 years of financial consulting experience, with a focus on liquidity and working capital management, identification of reorganization alternatives, and managing processes to sell businesses or underperforming assets and secure financing.  My industry experience includes retail, automotive, media, utilities, financial services, and manufacturing.  I have significant experience assisting distressed companies with day-to-day management activities, including development of business plans, cash flow management, and implementation of liquidity and cost saving strategies.

4.      In February 2016, FTI was retained to serve as financial advisor for the Debtors.  Since that time, I have overseen a team of individuals that has assisted the Debtors' management team with, among other things, managing and forecasting the Debtors' liquidity position, evaluating store profitability on a 4-wall basis, assessing business performance and EBITDA by business segment and geography, identifying cost-saving strategies, and other

WEIL:\95641342\5\11727.0012

financial analysis and planning.   Accordingly, I am knowledgeable and familiar with the Debtors' day-to-day operations, business and financial affairs, cash flow needs and projections, and books and records.  I am also familiar with the Debtors' supply chain and the status of the Debtors' relationships with various vendors, suppliers, and service-providers.

5.      I submit this declaration (the "***Declaration***") in support of (a) the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 503(b)(9) for Interim and Final Authority to Pay Certain Prepetition Obligations to Critical Vendors, Approval of Related Procedures, and Related Relief*, filed contemporaneously herewith (the "***Critical Vendor Motion***") and (b) the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 363, and 365 for Approval of (I) Procedures for Store Closing Sales and (II) the Assumption of the Liquidation Consulting Agreements* ("***Store Closings Motion***").[2]

6.      Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by the Debtors' employees or FTI employees working with the Debtors, or my opinion based upon experience, knowledge, and information concerning the Debtors' operations and the retail clothing industry.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

### Critical Vendor Motion

A.      **The Debtors' Supply Chain**

7.      To successfully operate their business, the Debtors must ensure that their stores and distribution centers are continuously replenished with a supply of goods for sale to the

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Critical Vendor Motion or the Store Closings Motion, as applicable.

WEIL:\95641342\5\11727.0012

Debtors' customers. The Debtors do not manufacture their own merchandise and, therefore, they are entirely dependent upon their vendors to ensure a continuous supply of goods.

8.      The filing of these chapter 11 cases has the potential to cause a disruption in the flow of necessary goods, as vendors may attempt to contract trade terms, particularly those vendors that do not have executed supply agreements with the Debtors. A contraction in trade terms, in turn, has the potential to impact the Debtors' liquidity. Any disruption to the flow of goods, and any significant contraction in trade terms, could prove devastating to the Debtors' operations and their efforts to restructure.

9.      I have reviewed the Critical Vendor Motion and, to the best of my knowledge, insofar as I have been able to ascertain after reasonable inquiry, I believe that the approval of the relief requested therein, including the Critical Vendor Payment Protocol, is necessary to minimize disruption to the Debtors' business operations during the transition into chapter 11 and to maximize the value of the Debtors' estates.

**B.      Critical Vendor Pre-Screening Process**

10.      The Debtors and their advisors engaged in a process (the "*Critical Vendor Pre-Screening Process*") to identify those vendors, suppliers, and/or service-providers that are likely "critical" to the Debtors' businesses in order to estimate the aggregate amounts owed to such vendors as of the Commencement Date to establish the Critical Vendor Cap.

11.      More specifically, the Debtors and their advisors, at my direction, spent significant time and effort reviewing and analyzing the Debtors' books and records, consulting operations, management, and purchasing personnel, reviewing contracts and supply agreements, and analyzing applicable laws, regulations, and historical practices to identify business relationships which, if lost, could materially harm the Debtors' businesses, shrink their market

4

share, reduce their enterprise value, and/or impair their reorganization efforts.  In this Critical

Vendor Pre-Screening Process, the Debtors and their advisors, including FTI, considered a

variety of factors, including the following:

- General

    o  the goods or services provided;

    o  general terms of vendor performance within the past year;

    o  the Debtors' business needs for the goods or services provided;

- Consequences of Non-Payment

    o  whether goods or services are provided pursuant to a contract or on a purchase order basis;

    o  whether failure to pay all or part of a particular vendor's claim could cause the vendor to refuse to ship inventory or provide critical services on a postpetition basis;

    o  whether failure to pay a particular vendor could result in contraction of trade terms as a matter of applicable non-bankruptcy law or regulation;

    o  whether a particular vendor is a foreign creditor that has little or no connection to the United State or that may attach, seize, or otherwise pursue self-help or legal remedies against the Debtors in violation of the automatic stay.

- Potential to Move to Alternative Vendor

    o  whether alternative vendors are available that could provide requisite volumes of similar goods or services on equal (or better) terms and, if so, whether the Debtors would be able to continue operating while transitioning business thereto;

    o  the degree to which replacement costs (including, pricing, transition expenses, professional fees and lost sales or future revenue) would exceed the amount of vendor's prepetition claim; and

    o  whether the Debtors' inability to pay all or part of the vendor's prepetition claim could trigger financial distress for the applicable vendor.

5

After considering the above factors, I anticipate that most Critical Vendors will be clothing and accessories vendors that (i) do not have a contractual relationship with the Debtors and (ii) are either (a) sole-source providers or (b) cannot be replaced in a cost-efficient manner or without causing irreparable harm to the Debtors' operations.

12.     Through the Critical Vendor Pre-Screening Process, the Debtors and FTI reviewed a universe of approximately 5,700 separate accounts in the Debtors' accounts payable system.  Based on this review, I believe that a $4 million Critical Vendor Cap will enable the Debtors to satisfy the prepetition claims of Critical Vendors.  The Critical Vendor Cap is 13.3 percent of the Debtors' total accrued payables of approximately $30 million, and approximately eight percent of the Debtors' average monthly disbursements to vendors over the last ten weeks. I anticipate that approximately twenty percent of the Critical Vendor Cap will be used to pay claims that may be entitled to priority pursuant to 503(b)(9) of the Bankruptcy Code.

## C.      Critical Vendor Payment Protocol

13.     Given the size, scope, and nature of their operations, it is essential that the Debtors implement a process for assessing each request for treatment as a Critical Vendor and payment of a Critical Vendor Claim on a case-by-case basis.  To that end, the Debtors and their professionals developed the Critical Vendor Payment Protocol – a comprehensive postpetition process to examine, review, and challenge any request for a payment of a Critical Vendor Claim. The Critical Vendor Payment Protocol is described in the Critical Vendor Motion and is set forth on Exhibit C attached thereto.

14.     The Critical Vendor Payment Protocol will ensure that the Debtors make payments with respect to Critical Vendor Claims only to the extent necessary to preserve

6

business stability during these chapter 11 cases and maintain liquidity or access to essential goods or services.

15.     The Debtors and their advisors have already taken steps to ensure a seamless implementation of the Critical Vendor Payment Protocol, subject to the Court's approval.  Specifically, the Debtors' advisors have begun educating the Debtors' personnel on critical vendor issues to ensure compliance with the Critical Vendor Payment Protocol.

16.     To assist in the implementation and execution of the Critical Vendor Payment Protocol, the Debtors and their advisors prepared the Critical Vendor Notice and the Vendor Agreement.  Based on my experience advising distressed companies in the retail industry, I believe the terms of the proposed Vendor Agreement are reasonable and likely to assist in the implementation and execution of the Critical Vendor Payment protocol.

## D.     Repudiating Vendor Procedures

17.     Certain of the Debtors' suppliers and most of the Debtors' service-providers are parties to contracts with the Debtors.  It is my understanding that the Bankruptcy Code requires such parties to perform their postpetition contractual obligations to the Debtors and prohibits them from ceasing performance or threatening to do so, based on the Debtors' failure to pay prepetition claims, or to alter or contract payment terms.

18.     I anticipate that, notwithstanding these clear Bankruptcy Code provisions, some contract counterparties may threaten or refuse to perform their postpetition contractual obligations unless the Debtors pay their prepetition claims or will seek to alter or contract payment terms (any such counterparty, a "*Repudiating Vendor*").  It is my understanding that the Debtors intend to resist these threats and take actions to enforce their rights under the

WEIL:\95641342\5\11727.0012

Bankruptcy Code to require any such Repudiating Vendors to continue providing goods and services to the Debtors in accordance with their contractual commitments.

19.     A Repudiating Vendor's refusal to provide goods or services to the Debtors or to restrict payment terms could be devastating to the Debtors' business.  Given the severity of disruptions to the Debtors' businesses that could be caused by certain Repudiating Vendors, the Debtors seek the authority to implement the Repudiating Vendor Procedures described in the Critical Vendor Motion.

**E.     Basis for Relief Requested Pursuant to the Critical Vendor Motion**

20.     As noted above and in the Critical Vendor Motion, the Debtors' ongoing ability to obtain goods and services from their Critical Vendors is necessary to preserve the value of their estates.  Absent payment of the Critical Vendor Claims the Debtors could be unable to maintain sufficient levels of inventory with the variety and quality their customers have come to expect.  Similarly, a Repudiating Vendor's refusal to provide goods or services to the Debtors could be devastating to the Debtors' business.  The Debtors must be able to continue to operate their stores in the ordinary course of business in order to maximize the value available for distribution to creditors, which requires cooperation from certain key vendors.  In addition, vendors who attempt to change or alter the payment terms could have an adverse impact on the Debtors' liquidity.  Consequently, I believe that it is essential that the Debtors be granted the authority to honor the Critical Vendor Claims pursuant to the Critical Vendor Payment Protocol and implement the Repudiating Vendor Procedures at the outset of these chapter 11 cases.

21.     The Debtors' authority to address their Critical Vendor Claims and implement the Repudiating Vendor Procedures in the initial days of these cases will send a clear signal to their suppliers *and* customers that the Debtors are both willing and, importantly, able to

WEIL:\95641342\5\11727.0012

conduct business as usual after the Commencement Date. Absent such relief, Critical Vendors may have no incentive to continue to provide the Debtors with trade credit. The preservation of working capital through the retention of trade credit in sufficient amounts and on favorable terms will conserve liquidity and facilitate the Debtors' ability to reorganize.

### Store Closings Motion

**A.      The Closing Stores**

22.      A key component of the Debtors' restructuring strategy is to right-size their operations by closing unprofitable stores. Such closures will help stem the Debtors' significant cash burn, increase the Debtors' liquidity, and allow the Debtors to focus their reorganization efforts around a smaller footprint of more profitable stores.

23.      The Debtors and their advisors have identified 154 stores that require prompt closure (the "*Closing Stores*"). A list of the Closing Stores is attached as Exhibit A to the Store Closings Motion. The Closing Stores include 113 of the Debtors' approximately 770 stores operating in the United States and all 41 of the Debtors' stores operating in Canada.

24.      In formulating the list of Closing Stores, the Debtors considered, among other factors, historical store profitability, recent sales trends, the geographic market in which the store is located, the potential to realize negotiated rent reductions with applicable landlords, and specific circumstances related to a store's performance. One hundred seventeen of the Closing Stores were unprofitable in fiscal year 2015. Each of the remaining 37 Closing Stores produced flat or marginal profit in fiscal year 2015. Many of these 37 stores are located in geographic markets that the Debtors have made a strategic decision to exit, such as Canada, Alaska, and Hawaii. The remainder experienced poor or negative sales trends and no longer fit within the Debtors' business plan.

WEIL:\95641342\5\11727.0012

25.    The Debtors have decided to exit Canada due to significant overhead costs that make most Canadian stores unprofitable, including separate accounts payable systems, a separate distribution facility, and separate tax and payroll requirements.  In fiscal year 2015, the Debtors' Canadian stores generated negative EBITDA of $6.8 million.

26.    Collectively, the 117 unprofitable Closing Stores generated approximately $17 million in losses for fiscal year 2015, which represents 56% of the Debtors' total losses from stores with negative pro forma EBITDA.[3]  The liquidation of the assets in the Closing Stores is expected to yield approximately $21 million in net proceeds, which the Debtors will use to repay their postpetition debtor-in-possession financing and reduce their costs and expenses in these chapter 11 cases.  To the extent that assets at the Closed Stores constitute Prepetition Term Loan Collateral, net proceeds thereof shall be paid to the Term Loan Agent.

27.    In order to maximize value for their creditors, the Debtors may need to close additional stores during these chapter 11 cases (such stores, the "***Additional Closing Stores***," and together with the Closing Stores, the "***Stores***").

## B.    Store Closing Procedures

28.    Based on my experience with other retail chapter 11 debtors, I believe that implementing the Store Closing Procedures attached as Exhibit B to the Store Closings Motion will provide the best and most efficient means for the Debtors to sell the assets in the Stores (the "***Store Closing Assets***") to maximize their value to the estates (such sales, the "***Store Closing Sales***").  The Store Closing Sales will take approximately six to eight weeks.  I understand that

---

[3] Pro Forma EBITDA adjusts the earnings before interest, taxes, depreciation, and amortization measured on a store-by-store basis to include certain adjustments for non-cash rent and allocated corporate expenses such as District Manager costs, in-store marketing costs, and telephone / data charges.

WEIL:\95641342\5\11727.0012

the Debtors intend to market the leases for the Closing Stores during that time, and, therefore, the Debtors have not yet made a determination whether to reject the leases for the Closing Stores.

29.    Any interruption or delay in the Debtors' ability to implement the Store Closing Procedures at the Closing Stores will have serious negative consequences for the Debtors' estates.  As noted, the Closing Stores are a significant financial drain on the Debtors estates in the aggregate.  The sooner the Closing Stores are closed and the inventory at the Closing Stores liquidated, the more cash the Debtors will save for the benefit of all creditors. For this reason, the Debtors' proposed postpetition financing agreement includes a budget that assumes the prompt commencement of store closing sales at the Closing Stores.  Failure to obtain interim relief for the commencement of Store Closing Sales places the Debtors at risk of defaulting on their obligations to their proposed postpetition lenders.  In addition, immediate approval of the Store Closing Procedures and the assumption of the Liquidation Consulting Agreements is required so that the Liquidation Consultant can immediately begin preparations and advertisements for the Store Closing Sales, with the aim of maximizing the value of the inventory in the Stores.  Indeed, to take advantage of higher weekend traffic, I understand that the Liquidation Consultant intends to commence the Store Closing Sales for a majority of the stores on or about Friday, May 6, 2016.[4]  Any delay in the commencement of the Store Closing Sales will cause the Debtors additional losses of approximately $300,000 to $400,000 per week. More importantly, the Debtors expect that the announcement of a Store Closing Sale will result in difficulty retaining employees at those stores.[5]  In short, the longer the delay in commencing

---

[4] The Debtors do not intend to commence Store Closing Sales at their Canadian locations until a Canadian court recognizes the Proposed Interim Order under the Companies' Creditors Arrangement Act.

[5] The announcement of these chapter 11 cases is also expected to cause increased customer interest in attending the Store Closing Sales during the first week of these chapter 11 cases, although the impact of any sales increase caused by the filing of these chapter 11 cases is difficult to quantify or predict.

WEIL:\95641342\5\11727.0012

the Store Closing Sales, the more difficult it will be for the Debtors to maximize the results of the Store Closing Sales.

30.    The relief requested in this Motion is integral to maximizing the value of the Debtors' estates and, based on my prior experience, is a routine part of chapter 11 cases involving retail debtors.  It will permit the Debtors to immediately advertise and commence the store closing sales at the Closing Stores, resulting in a helpful boost to the Debtors' liquidity, and it will establish fair and uniform store closing procedures to assist the Debtors and their creditors through the Debtors' transition to a smaller, more profitable enterprise.

**C.    Liquidation Consultant and Liquidation Consulting Agreements**

31.    Prior to the Commencement Date, the Debtors ran a request-for-proposal process for a liquidation consultant to assist with the Store Closing Sales.  To facilitate a competitive process, the Debtors contacted five nationally recognized liquidation consulting firms.  The Debtors provided each of the firms with a solicitation package containing (i) a list of potential closing stores, (ii) store-level profit-and-loss data for the past fiscal year, and (iii) store-level inventory and fixed asset data.  The Debtors received three bids from the firms approached.  Each bid involved a proposed partnership between two firms, with one of the firms electing to partner with a liquidation consultant which the Debtors had not previously contacted.

32.    After considering each of the bids received, and after further negotiations with the bidders, the Debtors determined that the Liquidation Consultant had proposed the most favorable terms and was capable of performing all required tasks.  Accordingly, the Debtors and the Liquidation Consultant entered into the Liquidation Consulting Agreements attached as Exhibit C to the Store Closings Motion, which will govern the terms of the Liquidation Consultant's engagement.

WEIL:\95641342\5\11727.0012

33.    The Liquidation Consulting Agreements generally provide that the Liquidation Consultant will advise the Debtors with respect to the sale of their Store Closing Assets.    Specifically, the Liquidation Consultant will, among other things, (i) provide the Debtors with qualified supervisors as independent contractors to oversee the management of the Closing Stores, (ii) determine the appropriate pricing for the Store Closing Assets, staffing levels for the Closing Stores, and advertising for the Store Closing Sales, (iii) coordinate with the landlords and any other tenants or subtenants, as necessary, (iv) maintain housekeeping standards, including safekeeping and oversight of the stores, and (vi) clean the premises to "broom clean" condition at the conclusion of the store closing process.

34.    Under the terms of the Liquidation Consultant Agreements, in consideration of the services to be rendered, the Debtors will provide the Liquidation Consultant with a fee equal to a percentage of the gross sale proceeds related to inventory, capped at .75 percent of sales (the "*Inventory Fee*").    The Liquidation Consultant may also sell furniture, fixtures, and equipment ("*FF&E*") in the Closing Stores at the direction of the Debtors, and will receive a commission equal to 15 percent of the gross receipts from all sales or other dispositions of FF&E at the Closing Stores (the "*FF&E Commission*").    In addition, the Debtors will reimburse the Liquidation Consultant for certain reasonable out-of-pocket expenses incurred in connection with the sale or other disposition of the Store Closing Assets, subject to a cap.

35.    Based on my experience with liquidation consultants and liquidation consulting agreements approved in other retail chapter 11 cases, I believe the terms proposed under the Liquidation Consulting Agreements are reasonable.    I believe the Debtors' selection process has ensured that the Inventory Fee, FF&E Commission, and any other fees agreed to by the Debtors are reasonable and market based.

13

**D.**     **Basis for Assumption of the Liquidation Consultant Agreements**

36.     Given the number of Closing Stores that need to be simultaneously closed, only national liquidators, such as the Liquidation Consultant, with significant experience with large-scale liquidations can ensure a smooth liquidation process that will maximize the value of the Store Closing Assets.  The Liquidation Consulting Agreements will enable the Debtors to utilize the experience, skills, and resources of the Liquidation Consultant to effectively and efficiently conduct the Store Closing Sales and, thus, significantly improve the potential value to be received through the Store Closing Sales for the benefit of all stakeholders.  Value realized in such transactions will inure to the benefit of the Debtors' estates, which will more than offset any expenses incurred by reason of the assumption of the Liquidation Consulting Agreements. Further, the Liquidation Consultant's fees will be based on the successful sale of the Store Closing Assets.

<u>Conclusion</u>

37.     Based on the foregoing, I submit that the relief requested in the Critical Vendor Motion and the Store Closings Motion is necessary and should be granted.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.


Dated:  May 4, 2016                          */s/ Timothy McDonagh*
New York, New York                        Timothy McDonagh

WEIL:\95641342\5\11727.0012