WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Richard W. Slack
Jacqueline Marcus
Garrett A. Fail

*Proposed Attorneys for Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x
                                                            :
In re                                                       :        **Chapter 11**
                                                            :
**AÉROPOSTALE, INC.,** *et al.*,                            :        **Case No. 16-_____ (___)**
                                                            :
        Debtors.[1]                                         :        **Joint Administration Requested**
                                                            :
-----------------------------------------------------------x

**DEBTORS' MOTION PURSUANT TO SECTIONS 105(a), 362, AND 365
OF THE BANKRUPTCY CODE FOR INTERIM AND FINAL RELIEF AND TO
COMPEL PERFORMANCE OF MGF SOURCING US, LLC'S OBLIGATIONS UNDER
EXECUTORY CONTRACT AND TO ENFORCE THE AUTOMATIC STAY**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

        Aéropostale, Inc. ("*Aéropostale*" or the "*Company*") and its subsidiaries, as

debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the

"*Debtors*") respectfully represent as follows:

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal tax identification number, as applicable, are as follows: Aéropostale, Inc. (3880); Aéropostale West, Inc. (7013); Jimmy'Z Surf Co., LLC (0461); Aero GC Management LLC (4257); Aeropostale Procurement Company, Inc. (8518); Aeropostale Licensing, Inc. (8124); P.S. from Aeropostale, Inc. (5900); GoJane LLC (4923); Aeropostale Canada Corp. (N/A); Aeropostale Holdings Inc. (7729); and Aeropostale Puerto Rico, Inc. (6477). The Debtors' corporate headquarters is located at 112 West 34th Street, 22nd Floor, New York, NY 10120.

## Preliminary Statement

1.      This motion (the "***Motion***") seeks to enforce the most basic protections afforded by the automatic stay and to require one of Debtors' most important suppliers to perform under the terms of its executory supply contract.   Absent interim and final relief, Debtors will be unable to effectively continue to provide customers with an adequate supply of goods or will have to agree to payment terms that would hamper the financial ability of the Debtors to adequately reorganize.   As described more fully below, just prior to the bankruptcy, this supplier, TSAM (Delaware) LLC (d/b/a MGF Sourcing US, LLC) ("***MGF***"), attempted to unilaterally and retroactively impose the harshest payment terms that a supplier could possibly impose: payment in full at the time goods are ordered.   This meant that the Company would have to pay for goods at least 90 days before those goods were received by the Debtors at their distribution center.   Indeed, the unreasonableness of these onerous terms is highlighted by the fact that the Company's other major supplier has continued to manufacture and deliver goods on reasonable "net 20" terms—20 days after those goods are delivered.

2.      MGF is owned by a private equity firm, Sycamore Partners ("***Sycamore***"). Sycamore also owns Aero Investors LLC, which is the Debtors' largest secured creditor.   The credit agreement with Aero Investors LLC has a $70 million minimum liquidity covenant.   Aero Investors LLC, MGF, and Sycamore are sometimes collectively referred to herein as the "***Sycamore Parties***."   In addition, until February 2016, an affiliate of Sycamore owned a significant amount of Aéropostale's common stock and appointed representatives to serve on Aéropostale's board of directors.

3.      The executory contract between MGF and the Debtors, dated as of May 23, 2014 (the "***Sourcing Agreement***," a copy of which is annexed hereto as "**Exhibit A**"), provides for "net 30" payment terms—the ability for the Company to pay for goods within 30

2

days after they have been delivered to the Debtors' distribution centers.  In the event that the

Company's liquidity drops below a $150 million threshold, however, MGF is allowed to require

different payment terms, but only if such terms are objectively "prudent" in the exercise of

"reasonable credit judgment."  Sourcing Agreement, § 4(b)(ii).  Importantly, nothing in the

Sourcing Agreement allows MGF to retroactively apply new payment terms to purchase orders

already placed by Debtors based on existing payment terms.

        4.     In February 2016, MGF notified the Company that it believed the

Company had fallen below $150 million in liquidity and sought to impose the onerous payment

terms set forth above.  MGF sought to unilaterally and improperly apply those new payment

terms to new orders and further require that goods that had already been ordered pursuant to the

"net 30" terms be subject to full cash payment before delivery for finished goods and full cash

payment before production with respect to other goods.  MGF refused to ship any goods unless

the Debtors' acquiesced to these demands.  By imposing patently unreasonable payment terms—

indeed, the harshest and most onerous payment terms possible—it appears that Sycamore was

attempting to use its position as a supplier to drive the Company's liquidity below the $70

million minimum liquidity requirement in Aero Investor LLC's credit agreement.

        5.     MGF continues to insist on these oppressive payment terms.  As a result,

Debtors are already suffering inventory shortages that have had an adverse impact on the

Company's business, and if not remedied, will have an even greater impact.  Moreover, the

ability of the Company to reorganize depends on its ability to maintain adequate liquidity

through the bankruptcy.  If MGF is allowed to impose these onerous and unreasonable terms, the

Company will not have sufficient liquidity to reorganize effectively.  Indeed, absent interim

WEIL:\95703393\2\11727.0012

relief, the Company risks not having sufficient product for the critical back-to-school period or the liquidity necessary to reorganize (if the Company accedes to MGF's demands).

6.    Moreover, given the liquidity projections of the Debtors, and the fact that MGF will be a priority administrative creditor, the terms it seeks to impose—full payment at the time an order is placed—are egregious and unnecessary.

7.    Thus, this Motion seeks both as interim and final relief to require MGF to perform under its contract.  First, the Motion seeks to require MGF to comply with the purchase orders placed based on "net 30" terms prior to February 24, 2016 (the "*Original Orders*"), the date of the notification by MGF that liquidity had fallen below $150 million.  There are nearly $82 million in Original Orders for which the Company is prepared to adhere to the "net 30" terms that were the basis upon which the orders were placed.

8.    Second, the Motion seeks to have the Court require that any orders placed after February 24, 2016 (the "*Post-Feb. 24 Orders*") be on reasonable payment terms.  The Company does not currently anticipate any orders being placed with MGF after the date hereof, so the relief sought only applies to the very small number of Post-Feb. 24 Orders.  The Debtors request that the Court compel payment on no fewer than 20 days after delivery to the Debtors' distribution centers for the Post-Feb. 24 Orders, the same reasonable payment terms that are sufficient for the Company's other major supplier, LF Sourcing (Millwork) LLC ("*L&F*").

## Jurisdiction and Venue

9.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the *Amended Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4

## Relief Requested

10.     Pursuant to sections 105(a), 362, and 365 of the Bankruptcy Code, the Debtors respectfully request that this Court enforce the automatic stay and compel MGF to perform under and comply with the Sourcing Agreement.

11.     A proposed form of order granting the relief requested herein on an interim basis is annexed hereto as **Exhibit B** (the "***Proposed Interim Order***") and, pending a final hearing on the relief requested herein, on a final basis is annexed hereto as **Exhibit C** (the "***Proposed Final Order***").

## Interim Relief

12.     Interim relief is warranted under the circumstances.  The Company's 17-week cash flow demonstrates that it will have adequate liquidity to pay MGF for merchandise delivered on the terms requested in this Motion upon approval of the Debtors' motion for a first lien and superpriority debtor-in-possession financing facility (the "***DIP Facility***") in the amount of $160 million.  These terms will ensure the Company has adequate liquidity to complete its reorganization.  To the extent the Debtors are forced to adhere to the payment terms that MGF seeks to impose, the Debtors will have insufficient liquidity to be able to conduct their business in the ordinary course and pursue their reorganization strategy.  *Id.*

13.     The Debtors have already suffered inventory shortages as a result of MGF's actions.  *See* First Day Declaration (as defined herein after), ¶ 66.  If MGF continues to delay the delivery of product to the Debtors, the Debtors expect to suffer further losses in sales, especially in the crucial back-to-school season, which accounts for approximately 18% of the Debtors' yearly sales.  *Id.*, ¶¶ 25, 66.

14.     MGF will not be injured by this interim relief.  It will have an administrative expense claim for all merchandise delivered postpetition and the liquidity

5

projections in connection with the DIP Facility demonstrate that Debtors will have more than sufficient liquidity to pay MGF (and other vendors) on the payment terms requested herein.

## Background

*General Background*

15.    Aéropostale is a well-known retailer of casual apparel and accessories for young women and men that operates stores in all 50 states, Puerto Rico, and Canada, as well as through licensing arrangements in Mexico, the Middle East, Asia, and Europe.  The Debtors depend on a constantly changing inventory in their retail stores to attract their core customers. The Debtors have approximately 14,500 employees.

16.    The predictable flow of merchandise is critical to the Debtors' operations, and in particular, their ability to meet sales targets during the key back-to-school sales season.

17.    On the date hereof, each of the Debtors commenced with this Court a voluntary case under Chapter 11 of the Bankruptcy Code (the "***Chapter 11 Cases***").  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

18.    Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).

19.    Information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these Chapter 11 Cases is set forth in the *Declaration of David J. Dick Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York*, sworn to on the date hereof (the "***First Day Decl.***"), and the *Declaration of Robert J. Duffy in Support of (I) Motion of Debtors for Interim and Final Authority to (A) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e), (B) Use Cash Collateral Pursuant to 11*

WEIL:\95703393\2\11727.0012

*U.S.C. § 363(c)(2), (C) Grant Certain Protections to Prepetition Secured Parties Pursuant to 11*

*U.S.C. §§ 361, 362, 363, and 364, and (D) Schedule a Final Hearing Pursuant to Fed. R. Bankr.*

*P. 4001(b) and (c) and (II) Motion of Debtors Pursuant to Sections 105(a), 362, and 365 of the*

*Bankruptcy Code for Interim and Final Relief and to Compel Performance of MGF Sourcing US,*

*LLC's Obligations Under Executory Contract and to Enforce the Automatic Stay*, sworn to on

the date hereof (the "***Duffy Decl.***"), which have been filed with the Court contemporaneously

herewith.  The First Day Declaration and the Duffy Declaration support the relief sought in this

Motion.

*The Sourcing Agreement with MGF*

20.    Sycamore, through its affiliates, is also a critical lender of the Debtors.  On

May 23, 2014, Aéropostale entered into a Loan and Security Agreement (the "***Prepetition Term***

***Loan Agreement***") with Aero Investors LLC and another Sycamore-owned entity named TSAM

Holdings, Limited.  The Prepetition Term Loan Agreement made term loans available to the

Debtors in the principal amount of $150 million, consisting of two tranches: a five-year, $100

million term loan facility, and a 10-year, $50 million term loan facility (the "***Tranche B Loan***").

First Day Decl., ¶ 33, 38.

21.    As part of the Prepetition Term Loan Agreement, Sycamore affiliates were

issued convertible preferred stock giving them the right to acquire another 5% of Aéropostale's

common stock, increasing Sycamore's effective ownership on an as-converted basis to

approximately 12.3% of Aéropostale's common stock.  *Id.*, ¶ 49.

22.    The Prepetition Term Loan Agreement also contains a $70,000,000

minimum liquidity covenant.  A breach of that covenant would lead to an event of default,

whereby outstanding principal, interest, and fees under both the Prepetition Term Loan

Agreement and the Debtors' prepetition revolving credit agreement with Bank of America (the

"BofA Credit Agreement") would become due and payable.  The violation of the $70,000,000 minimum liquidity covenant would have almost certainly led the Company to file for bankruptcy.  *Id*., ¶ 38

23.    As a condition to funding the Tranche B Loan in the Prepetition Term Loan Agreement, the Debtors were required to enter into the Sourcing Agreement with the Sycamore-owned MGF.  The Sourcing Agreement requires the Debtors to complete minimum merchandise purchases of $240,000,000 in years one and two of the contract (2016 and 2017) and $280,000,000 per annum in years three through ten.  *See* Exhibit A to Sourcing Agreement. As noted above, based on the minimum purchases in 2016, MGF would provide about 30% of the product used by the Company.  *Id*., ¶ 23.

24.    The Sourcing Agreement provides for "net 30" payment terms—the ability to pay for goods within 30 days after they have been delivered to Debtors' distribution centers.  *See* Sourcing Agreement, § 4(b)(ii).  In the event that Debtors' liquidity drops below a $150 million threshold, a "Credit Review Period" ("***Credit Review Period***") is triggered under the Sourcing Agreement and payment terms may be changed by MGF, but only if objectively those new terms are "prudent" in the exercise of "reasonable credit judgment."  The Sourcing Agreement does not authorize MGF to retroactively apply new terms to purchase orders already placed by Debtors prior to the start of a Credit Review Period.

25.    Liquidity for purposes of meeting the $150 million threshold is calculated on the basis of (a) Debtors' borrowing availability under the BofA Credit Agreement, which provided for a $215 million revolving credit line available to Debtors for working capital and general corporate purposes, plus (b) Debtors' cash on hand. Sourcing Agreement, § 1(x); Term Loan Agreement, Article 1.

8

_MGF Attempts to Impose Onerous and Unreasonable Payment Terms_

26.    On February 24, 2016, MGF sent a letter (the "**February 24, 2016 Letter**")
to the Debtors unilaterally declaring that, "upon information and belief," a Credit Review Period
had been triggered under the Sourcing Agreement.[2]    First Day Decl., ¶ 58.    MGF, however,
provided no basis for its unsupported assertion that a Credit Review Period had been triggered,
did not identify how far below the $150,00,000 liquidity threshold Aéropostale had supposedly
fallen, and did not provide a date on which the Credit Review Period had supposedly started.
Nevertheless, based on its assertion that a Credit Review Period had been triggered, MGF stated
that it was immediately refusing to accept orders for merchandise—which is necessary for
Debtors' retail sales and vital to the Debtors' business—unless the Debtors agreed to pay for
such goods at the time an order was placed.    _Id._    The conditions MGF sought to unilaterally
impose on Debtors were the most onerous payment terms possible—full payment at the time of
placement of an order, or based on typical lead time for manufacturing and delivering goods, at
least 90 days before the goods are received by the Debtors at their distribution center.    _Id._

27.    Moreover, MGF sought to impose these onerous terms not only on future
orders, but also sought to retroactively change the terms on purchase orders that were already
placed and accepted by MGF based on "net 30" terms.    MGF pointed to no language (and there
is none) that allows it to retroactively apply new terms to orders already placed and accepted by
MGF.    Indeed, from that point forward, MGF refused to deliver goods already ordered under
"net 30" terms unless the Company acceded to new payment terms.

28.    In response to the February 24, 2016 Letter, the Debtors requested, among
other things, that MGF provide "information evidencing your conclusions that a Credit Review

---

[2] The relevant correspondence is attached hereto as **Exhibit D**.

Period has been triggered as well as identifying the source(s) of such information." *Id.*, ¶ 59. MGF never responded to this request. *Id.*

29.     On February 29, 2016, MGF sent a second letter to the Debtors asserting again that the Debtors were operating in a Credit Review Period under the Sourcing Agreement and stating that MGF was immediately suspending performance on pending orders without payment in advance (seeking to change terms from payment 30 days *after* delivery to Debtors' distribution center to well in advance of delivery to the Debtors' distribution center). *Id.*  The terms that MGF sought to impose would have a huge impact on the liquidity of the Company, jeopardize Aéropostale's ability to comply with the $70 million minimum liquidity covenant in the Prepetition Term Loan Agreement and the BofA Credit Agreement, and make it impossible for Aéropostale to address its financial issues in any way other than by filing for relief under chapter 11 of the Bankruptcy Code. *Id.* at ¶ 67.  By withholding shipment of goods and attempting to impose new and improper terms through MGF, Sycamore attempted to increase the financial pressure on Aéropostale to hasten a potential default under Aéropostale's Prepetition Term Loan Agreement with Sycamore's affiliates and the BofA Credit Agreement.

30.     In response to the Debtors' February 24, 2016 and February 29, 2016 letters, the Debtors informed MGF that Aéropostale had access to a revolving credit line well in excess of $100 million, as well as additional cash on hand. *Id.*, ¶¶ 4, 59.  Under these circumstances, the Debtors stated that MGF's new and onerous terms were not reasonable under any standard.  MGF did not reconsider its position.

31.     On March 18, 2016, MGF sought to ratchet up the stakes by delivering a notice of default under the Sourcing Agreement to the Debtors, wrongly asserting that the Debtors' refusal to accept delivery or pay for orders under the onerous terms unilaterally set

forth in MGF's previous letters constituted a material breach of the terms and conditions of the

Sourcing Agreement. *Id.*, ¶ 63. MGF further reserved its right to terminate the Sourcing

Agreement following the fifteenth business day after the delivery of the notice of default. Given

that MGF's unilateral imposition of new credit terms for both new and already-contracted and

placed orders was a breach of the Sourcing Agreement by MGF, Debtors obviously dispute the

allegations contained in the notice of default.

32.    Between April 1, 2016 and April 8, 2016, due to an immediate need for

inventory, the Debtors made preferential payments to MGF of approximately $15.8 million in

order to induce MGF to ship goods that were past due. MGF delivered some, but not all, of the

outstanding inventory of the Debtors. *Id.*, ¶ 64.

33.    On April 20, 2016, MGF delivered a second notice of default under the

Sourcing Agreement to the Debtors, again asserting that the Debtors' refusal to accept delivery

or pay for orders under the terms set forth in MGF's previous communications constituted a

material breach of the terms and conditions of the Sourcing Agreement. *Id.*, ¶ 65. Under

extreme duress due to their critical needs for inventory, on April 22, 2016, the Debtors made an

additional preferential payment to MGF of approximately $10.1 million and MGF delivered

additional merchandise. *Id.*

34.    In contrast to the onerous terms imposed by MGF, the other major

supplier of the Company has continued to manufacture and deliver goods based on reasonable

terms. Although it is the Debtors' largest unsecured creditor, L&F has agreed to payment terms

of "net 20"—which means that Aéropostale has 20 days after delivery to Debtors' distribution

center to make payment. *Id.*, ¶ 62. MGF sought terms whereby Aéropostale would pay for

goods at the time an order was placed—or approximately 110-170 days earlier than L&F. *Id.* It

11

is thus clear that MGF's insistence on the most onerous terms possible was almost certainly in furtherance of its efforts to drive the Company into a chapter 11 proceeding.

35.    Despite the fact that the Debtors' largest supplier, L&F has agreed to "net 20" payment terms, MGF has continued to refuse to ship additional orders to the Debtors, including product for the Debtors' critical back-to-school season, unless the Debtors agree to their extreme payment terms.  Moreover, the vast majority of goods currently at issue relate to purchase orders placed and accepted by MGF under the original "net 30" terms.  Currently, approximately $82 million of merchandise ordered by the Debtors pursuant to the Original Orders, and accepted by MGF under the original terms of the Sourcing Agreement, remains undelivered.  Duffy Decl., ¶ 16.

*The Impact on the Company if MGF is Permitted to Impose these Onerous Terms*

36.    Given the important role of MGF as a supplier, the onerous terms imposed by MGF, if permitted to be implemented, would present the Company with an untenable Hobson's choice: either run low on goods necessary to operate the stores or agree to terms that will essentially make it impossible to reorganize given the liquidity issues it will cause for the Company.

37.    It is not possible for the Debtors to adequately stock the stores absent the goods already ordered.

38.    On the other hand, if the terms imposed by MGF are permitted to be implemented, the impact on the Company's liquidity will essentially make reorganization impossible.  The DIP Facility reasonably assumes as a base case that MGF and L&F both manufacture and deliver based on at least "net 14" terms.  Duffy Decl., ¶¶ 13, 14.  In fact, L&F has agreed to provide better terms after the commencement of the Chapter 11 Cases, thereby

12

enhancing the Debtors' prospects. Thus, the "net 20" payment terms sought from MGF will ensure the Company has adequate liquidity to both complete its reorganization and satisfy its obligations to MGF.

39.     To the extent MGF insists on cash in advance or on delivery, the Debtors' liquidity provides very little cushion and could drop below the Excess Availability requirements. This in turn would lead to a default under the DIP Facility and would severely limit the Debtors' ability to reorganize. *Id., ¶ 13.*

*Based on the DIP Financing and the Projections, the Onerous Terms are Neither Prudent nor Reasonable*

40.     During the Chapter 11 Cases, amounts owed to MGF for merchandise delivered postpetition will be treated as administrative claims subject to priority and therefore, even if the onerous terms were somehow reasonable before the Company filed (which they were not), those terms are certainly not reasonable now. Indeed, FTI Consulting, Inc.'s projections of the Company's liquidity show that the Company is more than able to pay MGF for goods ordered on reasonable "net 20" terms during the cases. In short, MGF will suffer no harm by the imposition of reasonable payment terms consistent with the payment terms under which the Company's other large supplier, L&F, has agreed to perform.

**Basis For Relief Requested**

41.     By this Motion, the Debtors request this Court to compel MGF to comply with the terms of the Sourcing Agreement. The Debtors request relief on an interim and final basis to ensure that MGF: (1) continues to source, manufacture and deliver goods already ordered in the ordinary course; (2) delivers Original Orders on "net 30" payment terms and as provided for in the Sourcing Agreement (on an expedited basis if necessary to ensure delivery in accordance with the contract); and (2) delivers the limited number of Post-Feb. 24 Orders to

Debtors on "net 20" payment terms as the "reasonable" and "prudent" terms applicable pursuant to the Sourcing Agreement during a Credit Review Period.

**A.      The Sourcing Agreement Is An Executory Contract Under Which MGF Must Continue To Perform**

**1.      The Sourcing Agreement Is An Enforceable Executory Contract**

42.      The Sourcing Agreement is a prepetition, executory contract under which MGF is obligated to continue performing.

43.      An executory contract is a contract "on which performance remains due to some extent on both sides." *In re Bradlees Stores, Inc.*, No. 00-16033 (BRL), 2001 WL 1112308, at *6 (S.D.N.Y. Sept. 20, 2001) (citation omitted); *see also In re Ionosphere Clubs*, 85 F.3d 992, 998-999 (2d Cir.1996) (citation omitted).

44.      The Sourcing Agreement is an executory contract because material performance still remains due on both sides—the Debtors still have payment obligations as well as the obligation to meet certain volume commitments, and MGF has an obligation to produce and deliver goods. *See, e.g.*, *In re Bradlees Stores, Inc.*, 2001 WL 1112308, at *10; *In re Teligent, Inc.*, 268 B.R. 723, 730 (Bankr. S.D.N.Y. 2001) (citing Vern Countryman, *Executory Contracts in Bankruptcy: Part 1*, 57 Minn. L. Rev. 439, 460 (1973)).

**2.      A Non-Debtor Counterparty Must Continue To Perform Under An Executory Contract Until the Debtor Decides Whether To Assume or Reject**

45.      Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a); *see also N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 521 (1984); *In re Lavigne*, 114 F.3d 379, 386 (2d Cir. 1997).

46.      "The purpose behind allowing the assumption or rejection of executory contracts is to permit the trustee or debtor-in-possession to use valuable property of the estate

14

and to renounce title to and abandon burdensome property." *In re Orion Pictures Corp.*, 4 F.3d 1095, 1098 (2d Cir. 1993) (citation omitted); *In re The Great Atl. & Pac. Tea Co., Inc.*, 544 B.R. 43, 48 (Bankr. S.D.N.Y. 2016).

47.    A counterparty to an executory contract must perform its obligations under the contract while the debtor determines whether to assume or reject such agreement. *See N.L.R.B.*, 465 U.S. at 531. Until the executory contract is assumed by the debtor, it is not enforceable against the debtor, but it is still enforceable *by* the debtor against the counterparty. *See, e.g., id.*; *see also In re Lyondell Chem. Co.*, No. 13 CIV. 3881 (RA), 2014 WL 975507, at *4 (S.D.N.Y. Mar. 11, 2014) (quoting *In re Chateaugay Corp.*, 10 F.3d 944, 954–55 (2d Cir.1993)) ("[t]he purpose of this provision [section 365], the Second Circuit has explained, is 'to allow a debtor to reject executory contracts in order to relieve the estate of burdensome obligations while at the same time providing a means whereby a debtor can force others to continue to do business with it when the bankruptcy filing might otherwise make them reluctant to do so.'"); *In re Penn Traffic Co.*, 524 F.3d 373, 382 (2d Cir. 2008) (quoting *In re Pub. Serv. Co. of New Hampshire*, 884 F.2d 11, 14 (1st Cir. 1989)) ("Ordinarily, the [Chapter 11] debtor need not commit itself to assumption or rejection of such a contract until a reorganization plan is confirmed. In the meantime, the executory contract remains in effect and creditors are bound to honor it."); *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sept. 17, 2009) [Docket No. 5209] (Order Pursuant to Sections 105(a), 362 and 365 of the Bankruptcy Code to Compel Performance of Contract and to Enforce the Automatic Stay) (enforcing swap agreement because that agreement was an executory contract that had not yet been assumed or rejected); *In re McLean Indus., Inc.*, 96 B.R. 440, 449 (Bankr. S.D.N.Y. 1989) ("a debtor-in-

WEIL:\95703393\2\11727.0012

possession's ability to continue to perform and to compel performance with respect to assumable executory contracts is usually the life blood of its reorganization").

48.    As such, MGF must continue to perform under the Sourcing Agreement while the Debtors ascertain whether to assume or reject the contract.  *See, e.g.*, *In re Lyondell Chem. Co.*, 2014 WL 975507, at *4; *see also In re Penn Traffic Co.*, 524 F.3d at 382.

49.    Of course, the Debtors will comply with their payment obligations to MGF for any merchandise delivered to the Debtors subsequent to the Commencement Date and MGF will have an administrative expense claim.[3]  Consequently, MGF will be fully paid for the goods it manufactures and delivers (and will make millions of dollars) if the Court grants the relief requested.

50.    Even if the Debtors were in default under the Sourcing Agreement — which they are not—MGF would still be required to perform under the Sourcing Agreement. *See, e.g.*, *U.S. v. Dewey Freight Sys. Inc.*, 31 F.3d 620, 625 (8th Cir. 1994) (holding that an unassumed executory contract is not enforceable against the debtor, notwithstanding debtor's default thereunder); *In re Monarch Capital Corp.*, 163 B.R. 899, 906 (Bankr. D. Mass. 1994) (same); *In re Whitcomb & Keller Mortg. Co.*, 715 F.2d 375, 378-79 (7th Cir. 1983) (affirming bankruptcy court's entry of a restraining order that prohibited non-debtor counterparty from ceasing to provide essential services to debtor pending debtor's determination to assume or reject agreement and notwithstanding debtor's pre-petition arrearage); *In re Kemeta, LLC*, 470 B.R.

---

[3] Under the *Motion of Debtors Pursuant to 11 U.S.C. §§ 363 and 503 for Interim and Final Orders: (I) Authorizing Payment of Prepetition Claims of Shippers, Warehousemen and Miscellaneous Lien Claimants, and (II) Confirming Administrative Expense Priority of Undisputed Pre-Commencement Date Orders and Authorizing Payment of Such Obligations in the Ordinary Course of Business*, the Debtors have sought an order (i) confirming administrative expense priority under section 503(b) of the Bankruptcy Code for all undisputed obligations of the Debtors arising from the acceptance of merchandise subject to Pre-Commencement Date orders and (ii) authorizing the Debtors to satisfy such obligations in the ordinary course of business.

304, 324 (Bankr. D. Del. 2012) (holding that section 365 assumes the debtor has defaulted and then provides the debtor with a statutory right to cure with no limitation related to the passage of time).

51.      Further, pursuant to section 365 of the Bankruptcy Code, a debtor's executory contract may not be terminated or modified solely because of the debtor's financial condition or bankruptcy case.  Section 365(e) of the Bankruptcy Code provides:

> Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on—
>
> (A) the insolvency or financial condition of the debtor at any time before the closing of the case;
>
> (B) the commencement of a case under this title; or
>
> (C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement.

11 U.S.C. § 365(e)(1).

52.      As such, MGF must continue honoring its obligations under the Sourcing Agreement, notwithstanding any allegation that the Debtors are in breach of such agreement, and MGF cannot terminate or modify the Sourcing Agreement (*i.e.*, alter the delivery or payment terms provided for therein) because of the commencement of the bankruptcy cases, or based on the Debtors' financial condition.

**B.      The Court Has The Authority To Compel MGF's Performance And Enforce The Automatic Stay**

53.      Section 362(a) of the Bankruptcy Code provides, in pertinent part, that commencement of a bankruptcy case under the Bankruptcy Code "operates as a stay, applicable to all entities, of . . . any act to obtain possession of property of the estate . . . or to exercise

17

control over property of the estate." 11 U.S.C. § 362. The scope of the automatic stay is broad and bars "any action which would inevitably have an adverse impact on the property of the . . . estate." *In re Prudential Lines, Inc.*, 119 B.R. 430, 432 (S.D.N.Y. 1990), *aff'd*, 928 F.2d 565 (2d Cir. 1991) (citation omitted).

      54.    Bankruptcy courts consistently compel performance by contract counterparties under executory contracts when those counterparties have interfered with a debtor's property by failing to perform contractual obligations, and thus violated the automatic stay. *See, e.g.*, *In re Broadstripe,* LLC, 402 B.R. 646, 657 (Bankr. D. Del. 2009) (finding that, by refusing to perform its obligations under an executory contract, counterparty interfered with debtor's property rights in such contract and violated the automatic stay); *see also In re Ernie Haire Ford, Inc.*, 403 B.R. 750, 760 (Bankr. M.D. Fla. 2009) ("[The debtor's] rights under these executory contracts are property of the bankruptcy estate, and, therefore, exercising a terminable-at-will provision is not permitted without relief from [the] stay."); *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sept. 17, 2009) [Docket No. 5209] (Order Pursuant to Sections 105(a), 362 and 365 of the Bankruptcy Code to Compel Performance of Contract and to Enforce the Automatic Stay) (enforcing swap agreement because that agreement was an executory contract that had not yet been assumed or rejected); *In re Baltimore Marine Indus.*, 476 F.3d 238, 240 (4th Cir. 2007) ("Amounts owed to the debtor under existing contracts are included within the estate."); *In re Enron Corp.*, 300 B.R. 201, 212 (Bankr. S.D.N.Y. 2003) ("Courts have consistently held that contract rights are property of the estate, and that therefore those rights are protected by the automatic stay.") (citations and internal quotations omitted); *In re Albion Disposal, Inc.*, 152 B.R. 794, 798 (Bankr. W.D.N.Y. 1993) (debtors' "rights under an executory contract are property of the estate, protected by the automatic stay").

55.    To the extent MGF continues to refuse to supply Debtors with merchandise under the terms of the Sourcing Agreement (and MGF has given no indication that it intends to change its behavior), such course of conduct would constitute a violation of the automatic stay.  *See*, e.g., *In re Broadstripe, LLC*, 402 B.R. at 657 ("By refusing to perform its obligations under the Member Agreement, NCTC is interfering with Broadstripe's property rights under the Member Agreement and acting in violation of the automatic stay.").

## C.    Section 105(a) Provides Additional Support For The Relief Requested

56.    The Court's general equitable power, codified in section 105(a) of the Bankruptcy Code, provides additional support for the relief requested herein.  Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a); *see also United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990); *In re Continental Airlines*, 203 F.3d 203, 211 (3d Cir. 2000) ("Section 105(a) of the Bankruptcy Code supplements courts' specifically enumerated bankruptcy powers by authorizing orders necessary or appropriate to carry out provisions of the Bankruptcy Code"); *Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*, 321 B.R. 147, 166 (D.N.J. 2005) (reciting the power of the bankruptcy court to "issue any order . . . that is necessary or appropriate to carry out the provisions of . . . [title 11]").

57.    Here, section 105(a) supports entry of the Proposed Interim Order and Proposed Final Order, which will ensure MGF's compliance with sections 365 and 362 of the Bankruptcy Code and provide the Debtors with a meaningful opportunity to decide whether to assume or reject the Sourcing Agreement.  By its terms, the Sourcing Agreement obligates MGF to supply merchandise to the Debtors up through at least May 23, 2024.  MGF has refused to honor its obligations by improperly refusing to deliver goods unless Debtors agree to

19

unreasonable payment terms not authorized by the Sourcing Agreement, thus, effectively depriving the Debtors of the time afforded to debtors in possession to evaluate their operations and make prudent business judgments regarding assumption or rejection of executory contracts. If the relief requested herein is not granted, the Debtors will suffer severe adverse consequences, including potentially irreparable damage to their business. Under these circumstances, the Court should enter an order under section 105(a) compelling MGF to perform.

### Bankruptcy Rule 6003 Has Been Satisfied

58.    Immediate interim relief is permitted and warranted. Bankruptcy Rule 6003(b) provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" before twenty-one (21) days after filing of the petition. Fed. R. Bankr. P. 6003(b).

59.    Performance under the Sourcing Agreement is necessary to maintain the Debtors' operations. Failure to obtain the relief during the first 21 days of these Chapter 11 Cases will jeopardize value for the Debtors' estates and creditors. Accordingly, the Debtors have satisfied the requirements of Bankruptcy Rule 6003.

### Request for Bankruptcy Rule 6004 Waivers

60.    To implement the foregoing successfully, the Debtors request a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent such stay applies.

### Notice

61.    Notice of this Motion has been provided to (i) the Office of the United States Trustee for Region 2; (ii) the holders of the forty(40) largest unsecured claims against the

20

Debtors (on a consolidated basis); (iii) the holders of the five (5) largest secured claims against the Debtors (on a consolidated basis); (iv) the attorneys for Aero Investors LLC, as agent under the Loan and Security Agreement, dated May 23, 2014; (v) the attorneys for Bank of America, N.A., as agent under the Third Amended and Restated Loan and Security Agreement, as amended on August 18, 2015; (vi) the Securities and Exchange Commission; (vii) the Internal Revenue Service; (viii) the United States Attorney's Office for the Southern District of New York; (ix) the attorneys for Sycamore; and (x) the attorneys for MGF.  The Debtors submit that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

62.    No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of an order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: May 4, 2016
      New York, New York

                                /s/ Jacqueline Marcus
                                WEIL, GOTSHAL & MANGES LLP
                                767 Fifth Avenue
                                New York, New York  10153
                                Telephone:  (212) 310-8000
                                Facsimile:  (212) 310-8007
                                Ray C. Schrock, P.C.
                                Richard W. Slack
                                Jacqueline Marcus
                                Garrett A. Fail

                                *Proposed Attorneys for Debtors*
                                *and Debtors in Possession*

WEIL:\95703393\2\11727.0012

**<u>Exhibit A</u>**

**Sourcing Agreement**

<u>SOURCING AGREEMENT</u>

    This Sourcing Agreement (this "<u>Agreement</u>"), dated as of May 23 2014 (the "<u>Effective Date</u>") is entered into by and among Aéropostale Procurement Company, Inc., a Delaware corporation, having an address at 112 West 34th Street, New York, New York 10120 (hereinafter "<u>Aéropostale</u>"), Aéropostale, Inc., a Delaware corporation, having an address at 112 West 34th Street, New York, New York 10120 (hereinafter "<u>Guarantor</u>"), and TSAM (Delaware) LLC (d/b/a MGF Sourcing US, LLC), a Delaware limited liability company, having an address at 4200 Regent St., Suite 205, Columbus Ohio 43219 ("<u>Vendor</u>").

    **WHEREAS**, TSAM Holdings, Limited, a Cayman Islands company ("<u>Lender</u>"), and an affiliate of Vendor, has agreed to provide a tranche B term loan credit facility (the "<u>Term B Loan</u>") to Guarantor on the terms and conditions set forth in the Loan and Security Agreement dated as of the date hereof, among Aero Investors LLC, a Delaware limited liability company, in its capacity as agent, the lenders from time to time party thereto and Guarantor, as borrower (as hereafter amended, restated or otherwise modified from time to time in accordance with the terms thereof, the "<u>Credit Agreement</u>"); and

    **WHEREAS**, in connection with and as a condition to funding of the Term B Loan under the Credit Agreement, Aéropostale has agreed to contract with Vendor for the sourcing and manufacture of certain Products (as hereinafter defined) on the terms and conditions set forth herein.

    **NOW THEREFORE**, in consideration of the foregoing and the mutual covenants contained herein, and intending to be legally bound, the parties hereto agree as follows:

1.    **<u>Definitions</u>**.  The following terms shall have the following meanings when used in this Agreement:

    (a)    <u>Aéropostale</u> has the meaning set forth in the Preamble.

    (b)    <u>Aéropostale Designs</u> means designs, construction, patterns, styles, trim, buttons, patches and overall appearance thereof, in all mediums including screens, CAD and artwork, and all other embodiments such as files on hard drives, flash drives, CDs and electronic media, which have been supplied by Aéropostale to Vendor or which have been created, modified or developed exclusively for Aéropostale by Vendor.

    (c)    <u>Aéropostale Products</u> means products manufactured by or on behalf of Vendor exclusively for Aéropostale which encompass Aéropostale Designs and bear Aéropostale Trademarks (hereinafter defined) on labels, tags, trim or packaging.

    (d)    <u>Aéropostale Trademarks</u> means AEROPOSTALE®, AERO®, 87®, A87®, P.S. FROM AEROPOSTALE®, PS4U®, PS09®, LIVE LOVE DREAM™ and other marks or brands that may be created by Aéropostale and related logos, crests,

emblems, symbols, graphics, designs or trim, including combinations, forms and derivatives thereof as are from time to time created, used or developed for use by Aéropostale or any of its affiliates or subsidiaries, whether registered or unregistered.

(e)     Agreement has the meaning set forth in the Preamble and includes all Exhibits hereto.

(f)     Annual True Up Date has the meaning set forth in Section 2(b)(iii).

(g)     Branded Products means products manufactured by or on behalf of Vendor for Aéropostale which bear Aéropostale Trademarks on labels, tags, trim or packaging.

(h)     CA means a CA Identification Number issued by the Canadian Competition Bureau.

(i)     Carryover Amount has the meaning set forth in Section 2(b)(iv).

(j)     Carryover Amount Entitlement has the meaning set forth in Section 2(b)(iv).

(k)     Credit Agreement has the meaning set forth in the Recitals.

(l)     Credit Cost has the meaning set forth in Section 4(b)(i).

(m)     Credit Review Period means each period beginning on the date that Liquidity shall have been less than $150,000,000, and ending on the date Liquidity shall have been equal to or greater than $150,000,000 for forty five (45) consecutive calendar days; *provided* that a Credit Review Period shall not be deemed to have ended under this definition on more than two (2) occasions in any period of 365 consecutive days. The termination of a Credit Review Period as provided herein shall in no way limit, waive or delay the occurrence of a subsequent Credit Review Period in the event that the conditions set forth in this definition again arise.

(n)     EDI has the meaning set forth in Section 4(a).

(o)     Effective Date has the meaning set forth in the Preamble.

(p)     Fiscal Year means each United States retail 4-5-4 twelve-month fiscal year commencing on the fifth Sunday of the calendar year.

(q)     GCC has the meaning set forth in Section 3(a).

(r)     Guarantor has the meaning set forth in the Preamble.

(s)     Guaranty has the meaning set forth in Section 31(a).

US_ACTIVE:\44445086\12\11727.0008

(t)     Laboratory means an independent, third party laboratory accredited by the U.S. Consumer Product Safety Commission to perform product and material testing.

(u)     Landed Duty Price has the meaning set forth in Section 4(b)(i).

(v)     Lender has the meaning set forth in the Recitals.

(w)     Liabilities has the meaning set forth in Section 31(a).

(x)     Liquidity has the meaning ascribed thereto in the Credit Agreement.

(y)     Manufacturer has the meaning set forth in Section 3(a).

(z)     Manufacturing Policies and Procedures has the meaning set forth in Section 6(e).

(aa)     Minimum Volume Commitment has the meaning set forth in Section 2(b)(i).

(bb)     Minimum Volume Commitment Period has the meaning set forth in Section 2(b)(i).

(cc)     No Termination For Convenience Period means the period commencing at the end of the Start-Up Period and ending three (3) years thereafter.

(dd)     Order has the meaning set forth in Section 4(a).

(ee)     PO T&C has the meaning set forth in Section 4(a).

(ff)     Products means Aéropostale Products and/or Branded Products, as applicable, which are subject to one or more Orders and includes completed Products and all components of the Products.

(gg)     Product Cost has the meaning set forth in Section 4(b)(i).

(hh)     Rebate has the meaning set forth in Exhibit A.

(ii)     Rebate Percentage has the meaning set forth in Exhibit A.

(jj)     Required Insurance has the meaning set forth in Section 20(a).

(kk)     RN means a registered identification number issued by the Federal Trade Commission.

(ll)     Shortfall has the meaning set forth in Section 2(b)(iii).

(mm)     Shortfall Commission has the meaning set forth in Section 2(b)(iii).

(nn)     Specifications means the specifications as may be provided by Aéropostale to Vendor, from time to time, for each applicable Product and/or Order hereunder.

(oo)     Start-Up Period means the period from the Effective Date through to the end of the fourth quarter of Aéropostale's 2015 Fiscal Year, provided that Aéropostale may, in its sole discretion, shorten the Start-Up Period by providing not less than 30 days' advance written notice to Vendor at any time prior to the end of such period, and provided further, that, Aéropostale may extend the Start-Up Period with Vendor's prior written consent, which consent may be granted or withheld in Vendor's sole and absolute discretion.

(pp)     Term has the meaning set forth in Section 2(a)(i).

(qq)     Term B Loan has the meaning set forth in the Recitals.

(rr)     Termination Fee has the meaning set forth in Section 12(d).

(ss)     U.S. Customs has the meaning set forth in Section 7.

(tt)     Vendor has the meaning set forth in the Preamble.

(uu)     Work Product has the meaning set forth in Section 9(a)(vii).

2.    **Term; Start-Up Period; Minimum Volume Commitment; No Exclusivity**.

(a)     Term; Start-Up Period.

i.      The term of this Agreement shall commence as of the Effective Date and continue for a period of ten (10) years from the end of the Start-Up Period (the "Term"). Thereafter, the Term shall automatically renew for additional one (1) year periods until terminated by either party upon ninety (90) days' advance written notice to the other party prior to the expiration of the initial Term or any renewal thereof.

ii.     Aéropostale's forecast of Product purchases (based on Landed Duty Price), for each fiscal quarter of Aéropostale's Fiscal Years during the Start-Up Period is set forth on **Exhibit D** annexed hereto. To the extent that Aéropostale's Product purchases for any such fiscal quarter are 90% or less of the forecasted amounts thereof set forth on **Exhibit D** annexed hereto, Aéropostale and Vendor shall promptly confer and develop a mutually agreeable remediation plan to ensure that Aéropostale's Product purchases for the remainder of the Start-Up Period equal or exceed the amounts set forth on **Exhibit D** annexed hereto.

(b)     Minimum Volume Commitment.

i.      Aéropostale agrees to purchase a minimum volume of Product (such minimum volume of Product being on Product typically sourced by Vendor, including, but not limited to, apparel, lingerie and accessories) under this Agreement for a period of ten (10) years from the end of the Start-Up Period (the "Minimum Volume Commitment Period") pursuant

4

to the "Minimum Volume Commitment" definition set forth in **Exhibit A** annexed hereto.

ii.     The Minimum Volume Commitment shall be based on the total actual invoice price paid by Aéropostale to Vendor and measured on an annual basis based upon Aéropostale's Fiscal Year.

iii.    If Aéropostale purchases a volume of Product which is less than the Minimum Volume Commitment in any given Aéropostale Fiscal Year during the Minimum Volume Commitment Period (the "Shortfall"), Aéropostale shall pay to Vendor a shortfall commission in the amount provided for in the "Shortfall Commission" definition set forth in **Exhibit A** annexed hereto; which payment shall be Vendor's sole and exclusive remedy for such Shortfall and shall be payable on or before thirty (30) days after the end of Aéropostale's Fiscal Year (the "Annual True Up Date"). Once paid, the Shortfall Commission shall be fully earned and non-refundable, and will not be subject to future reduction or recoupment.

iv.     If Aéropostale purchases a volume of Product which is greater than the Minimum Volume Commitment in any given Aéropostale Fiscal Year during the Minimum Volume Commitment Period (such excess amount, the "Carryover Amount"), then Aéropostale shall be entitled to carry forward such Carryover Amount pursuant to the "Carryover Amount Entitlement" definition set forth in **Exhibit A** annexed hereto.

v.      Aéropostale agrees that it shall provide to Vendor forecast, budget, planning and other guidance by Product type and season on a quarterly basis to enable Vendor to appropriately manage strategic sourcing and planning therefor.

(c)     No Exclusivity. The parties acknowledge and agree that they are not entering into an exclusive sourcing arrangement, and Aéropostale shall (without limitation of or detraction from its obligations under Section 2(b)) at all times retain the right, without restriction whatsoever, to source and import products from any third party.

(d)     Rebate. Vendor acknowledges and agrees that no later than the Annual True Up Date following the completion of each Fiscal Year during the Minimum Volume Commitment Period, Vendor shall pay to Aéropostale an annual Rebate (as defined in **Exhibit A** annexed hereto) to be immediately applied towards the payment of the required amortization on the Term B Loan pursuant to the terms of the Credit Agreement.

(e)     Setoff. Vendor is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to setoff and apply all or any portion of the Rebate against any and all of the obligations of Aéropostale then due and owing under this Agreement to Vendor (including, without limitation, all or any

portion of the Shortfall Commission), irrespective of whether or not Vendor shall have made any demand under this Agreement. The rights of Vendor under this Section 2(e) are in addition to other rights and remedies (including other rights of setoff) that Vendor may have. Vendor agrees to notify Aéropostale promptly after any such setoff and application, *provided* that the failure to give such notice shall not affect the validity of such setoff and application. If any Shortfall Commission is due and owing to Vendor for the applicable Aéropostale Fiscal Year of the Minimum Volume Commitment Period, Aéropostale hereby unconditionally and irrevocably directs Vendor to deduct up to the first $5,000,000 of the Shortfall Commission so payable from the amount of the Rebate that would have otherwise been payable by Vendor to Aéropostale for such Aéropostale Fiscal Year.

3.    **Manufacture of Products**.

    (a)    General. During the Term of this Agreement, Vendor shall cause Products to be manufactured and supplied to Aéropostale by one or more manufacturers (each a "Manufacturer"), as Aéropostale may specifically direct and instruct and in accordance with samples which are produced by Manufacturer and approved in advance by Aéropostale. Vendor shall ensure that the quality of all the Products meets or exceeds all Specifications and standards provided by Aéropostale, which Specifications and standards shall be in conformity with or at least as high as products historically sold by Aéropostale (including with respect to workmanship, fit, design and materials used therein). Vendor shall also ensure that the quality of all the Products meets or exceeds all government requirements for the Products (including, but not limited to, labor standards, workplace safety, testing and flammability requirements, restricted substance requirements, origin of materials regulations and all other applicable standards, statutes and requirements of federal, state, local and foreign laws). In addition, in accordance with U.S. law, a general certificate of conformity ("GCC") must be made available by Vendor, upon request by Aéropostale, for all applicable Products.

    (b)    Aéropostale Products. Aéropostale Products manufactured hereunder shall be manufactured and/or sold solely for the account of Aéropostale and may not be offered for sale, sold, transferred, distributed, shipped or disposed of in any way or to any person or entity without the prior written instruction, direction and authorization of Aéropostale. Any violation of this provision shall be deemed to be a material breach of this Agreement.

        i.    Vendor shall ensure that the Aéropostale Trademarks appear on all of the Aéropostale Products and all tags, trim and packaging in the manner set forth in the Order. Except as otherwise provided herein, no other trademarks or notices shall appear on the Aéropostale Products or tags, trim or packaging without Aéropostale's prior written consent in each instance.

6

ii.    Vendor shall cause each Aéropostale Product to be labeled with the Aéropostale Trademarks in accordance with Aéropostale's labeling requirements, including, but not limited to, each Aéropostale Product bearing Aéropostale's RN and CA numbers. Vendor agrees to purchase labels bearing Aéropostale Trademarks only from label suppliers approved in writing by Aéropostale.

iii.    All Aéropostale Designs embodied in the Aéropostale Products are proprietary to and confidential information of Aéropostale and are the exclusive property of Aéropostale. Vendor shall not duplicate or copy or grant others the right or provide materials to duplicate or copy the Aéropostale Designs for any purpose other than the manufacture and delivery of the Products in accordance with the terms hereof. The Aéropostale Designs shall be retained by Vendor in accordance with Aéropostale's instructions and utilized by Vendor solely and exclusively for the account and benefit of Aéropostale. Upon the expiration or termination of this Agreement or at any time in Aéropostale's sole discretion, all Aéropostale Designs shall be returned to Aéropostale in accordance with Aéropostale's written instructions. Vendor shall have no right whatsoever to retain any Aéropostale Designs or any copies, derivatives or information relating thereto for itself or for the benefit of others.

iv.    Vendor shall only manufacture the specific number of Aéropostale Products as ordered by Aéropostale pursuant to an Order and shall not manufacture any excess goods or overruns, subject to usual and customary industry practices with respect to overage or underage allowances of +/- 3% on an Order (or more or less than 3% of an Order with the prior written consent of Aéropostale). In furtherance (and without limitation) of the provisions set forth in Section 3(b), Vendor has no right to market or sell for its own account any of the Aéropostale Products, including, but not limited to, those which have been rejected by Aéropostale and those Aéropostale Products which may be characterized as overruns, excess goods, seconds and/or irregulars without the prior written instruction, direction and authorization of Aéropostale and in any case subject to the condition that the Aéropostale Designs and the Aéropostale Trademarks are first removed or obliterated therefrom.

v.    All Aéropostale Products shall be deemed to be the sole and exclusive property of Aéropostale and, at Aéropostale's option, Aéropostale Products which have been rejected by Aéropostale or which may be characterized as overruns, excess goods, seconds and/or irregulars, shall (i) be returned and delivered to Aéropostale or its designee (at a price to be mutually agreed upon by the parties hereto, but in no event greater than the applicable Product Cost), or (ii) be destroyed in accordance with Aéropostale's written directions, or (iii) with the prior written consent of Aéropostale, marketed or sold by Vendor so long as the Aéropostale

7

Designs and the Aéropostale Trademarks are first removed or obliterated therefrom. All labels, trim and tags (which are deemed to be included in the Aéropostale Products) are and remain the sole and exclusive property of Aéropostale and may not be used by Vendor for any purpose other than for the account and benefit of Aéropostale. Any used labels, tags, trim and the like shall, at Aéropostale's option, (i) be returned and shipped to Aéropostale or its designee at Aéropostale's cost and expense for shipping or (ii) be destroyed by Vendor in accordance with Aéropostale's written directions.

(c)    <u>Branded Products</u>.    Branded Products manufactured hereunder shall be manufactured and/or sold solely for the account of Aéropostale and may not be offered for sale, sold, transferred, distributed, shipped or disposed of in any way or to any person or entity without the prior written instruction, direction and authorization of Aéropostale. Any violation of this provision shall be deemed to be a material breach of this Agreement.

i.    Vendor shall ensure that the Aéropostale Trademarks appear on all of the Branded Products and all tags, trim and packaging in the manner set forth in the Order. Except as otherwise provided herein, no other trademarks or notices shall appear on the Branded Products or tags, trim and packaging without Aéropostale's prior written consent in each instance.

ii.    Vendor shall cause each Branded Product to be labeled with the Aéropostale Trademarks in accordance with Aéropostale's labeling requirements, including, but not limited to, each Branded Product bearing Aéropostale's RN and CA numbers. Vendor agrees to purchase labels bearing Aéropostale Trademarks only from the label suppliers approved in writing by Aéropostale.

iii.    Vendor shall only manufacture the specific number of Branded Products as ordered by Aéropostale pursuant to an Order and shall not manufacture any excess goods or overruns, subject to usual and customary industry practices with respect to overage or underage allowances of +/- 3% on an Order (or more or less than 3% of an Order with the prior written consent of Aéropostale). In furtherance (and without limitation) of the provisions set forth in Section 3(c), Vendor has no right to market or sell for its own account any of the Branded Products, including, but not limited to, those which have been rejected by Aéropostale and those Branded Products which may be characterized as overruns, excess goods, seconds and/or irregulars without the prior written instruction, direction and authorization of Aéropostale and in any case subject to the condition that the Aéropostale Trademarks are first removed or obliterated therefrom.

iv.    All Branded Products shall be deemed to be the sole and exclusive property of Aéropostale and, at Aéropostale's option, Branded Products which have been rejected by Aéropostale or which may be characterized

8

as overruns, excess goods, seconds and/or irregulars, shall (i) be returned and delivered to Aéropostale or its designee (at a price to be mutually agreed upon by the parties hereto, but in no event greater than the applicable Product Cost), or (ii) be destroyed in accordance with Aéropostale's written directions, or (iii) with the prior written consent of Aéropostale, marketed or sold by Vendor so long as the Aéropostale Trademarks are first removed or obliterated therefrom. All labels, trim and tags used in connection with Branded Products (which are deemed to be included in the Branded Products) are and remain the sole and exclusive property of Aéropostale and may not be used by Vendor for any purpose other than for the account and benefit of Aéropostale. Any used labels, trim, tags and the like shall, at Aéropostale's option, (i) be returned and shipped to Aéropostale or its designee at Aéropostale's cost and expense for shipping or (ii) be destroyed by Vendor in accordance with Aéropostale's written directions.

4.   **Orders and Pricing**.

   (a)   Orders. Aéropostale will submit orders for Products to Vendor by exchanging one or more written or electronic (including by electronic mail in the form mutually agreed by the parties) purchase authorizations followed by a purchase order issued by Aéropostale (collectively, an "Order"). The terms of any such Order are governed by Aéropostale's Purchase Order Terms and Conditions set forth in **Exhibit B** annexed hereto, as may be amended in writing from time to time by the mutual agreement of Aéropostale and Vendor ("PO T&C"). Vendor acknowledges and agrees that the standard form purchase order terms and conditions issued by Aéropostale for each Order may differ from the terms and conditions contained in the PO T&C, however the terms of the PO T&C shall govern and control for all purposes and Aéropostale covenants and agrees that it shall not seek to enforce (nor shall Vendor have any obligation under) its standard purchase order terms and conditions to the extent that such terms and conditions conflict with, add to or alter in any way the obligations of Vendor (or the rights of Aéropostale and/or Guarantor) under the PO T&C or this Agreement. With respect to any Order, the parties shall only be bound by this Agreement, the purchase authorization(s), the applicable issued purchase order(s) and the PO T&C (provided that in the event of any conflict between the PO T&C, the applicable purchase order or purchase authorization and this Agreement, the terms of this Agreement shall govern, unless otherwise agreed between the parties in writing). No telephone or other non-written or non-electronic communication shall be binding upon the parties with respect to any Order, provided that the parties may transmit purchase authorization(s) and purchase orders electronically (including by electronic mail in the form mutually agreed by the parties). No Order shall be binding upon Aéropostale unless and until a purchase authorization is issued by Aéropostale; it being agreed that in addition to any other rights of cancellation, rejection or return set forth herein, Aéropostale may cancel an Order at any time, without cause, prior to Aéropostale's receipt of the Products, it being agreed and understood that within thirty (30) days of any such cancellation,

Aéropostale shall reimburse Vendor for any and all costs incurred by Vendor (on or prior to the effectiveness of any such cancellation) described in clause (1) and clause (3) of the definition of Landed Duty Price. Each Order shall be deemed separate and severable, and not part of one or more installment contracts. Neither party will be responsible for an electronic communication received from the other party in unintelligible or garbled form, provided the receiving party gives prompt notice to the originating party (if identifiable from the received document) of any such occurrence. Vendor agrees to acquire and use the order processing system designated by Aéropostale to process Orders. With respect to each Order, the terms identified in this Section 4(a) will constitute the complete and exclusive statement of the terms and conditions between the parties, and supersede and merge all prior proposals, understandings and all other agreements, oral and written, between the parties relating to such Order. With respect to electronic communications under this Section 4(a), each party may electronically transmit to or receive from the other those electronic data interchange ("EDI") transaction sets on which they agree in writing and any other transmission of data shall have no force or effect between the parties unless justifiably relied upon by the receiving party. In connection with such electronic communications, each party will adopt, and the other will keep confidential, an electronic identification consisting of symbols or codes to be contained in or affixed to each such transmission for purposes of authentication, and each transmission so authenticated shall be deemed to be signed and in writing. Further, each party will implement security procedures reasonably sufficient to verify that communications between the parties are authentic and authorized, to detect errors in transmission or content, and to provide for protection against improper disclosure or access. With respect to any Order evidenced in an electronic manner contemplated by this Agreement, the parties expressly waive any defense they may have under any law requiring contracts to be evidenced by a signed writing.

(b)     Pricing.

    i.      The prices charged by Vendor for Products under this Agreement shall be the landed duty price thereof, DDP Aéropostale's distribution center (or other location specified by Aéropostale in writing), and shall include without limitation: (1) Vendor's actual, direct cost charged by third party Manufacturers for the manufacture of the relevant Products, including but not limited to any quality control or testing costs (the "Product Cost", which shall exclude the cost of any letter of credit or other credit support required for Vendor to purchase products on Aéropostale's behalf ("Credit Cost")), (2) Vendor's profit on the sale of the Products, and (3) all costs associated with importing the relevant Products into the United States, Canada or other location, including without limitation the costs of duties, taxes, warehousing, assessments, freight, inland transportation, insurance, consolidation and deconsolidation and actual out-of-pocket administrative costs and expenses paid to third parties in connection with the importation of the Products (but excluding Credit Cost, which shall be borne by

Vendor) (collectively, the "Landed Duty Price"). Vendor will use commercially reasonable efforts to obtain the most favorable rates for the foregoing third party costs. The invoices delivered by Vendor to Aéropostale will show the total Landed Duty Price of the Products purchased by Aéropostale.

ii.    Unless another payment schedule is expressly contained in an Order created under this Agreement, Vendor's standard payment terms will apply (i.e., U.S. Dollars, immediately available funds, net 30 days, or, during a Credit Review Period, such other shorter number of days or up-front terms as deemed prudent by Vendor in the exercise of it reasonable credit judgment). Any non-payment by Aéropostale of any undisputed payment amount owed by Aéropostale to Vendor hereunder shall bear interest at a rate of 10% per annum, compounded monthly, from and after the latest date on which such undisputed payment amount would otherwise be required to be paid by Aéropostale to Vender hereunder (i.e., from and after the 31st day following delivery of the Products to Aéropostale's distribution center (or other location specified by Aéropostale in writing)). All dating begins on delivery of the Products into Aéropostale's distribution center (or other location specified by Aéropostale in writing).

iii.    Vendor represents and warrants that it shall maintain competitive prices for the Products. Unless otherwise agreed by Vendor and Aéropostale with respect to mutually agreed key purchasing programs, Vendor shall have no obligation to provide Aéropostale and its advisors with any information or assistance with respect to Aéropostale's determination of whether such prices are competitive in the marketplace, which shall be undertaken by Aéropostale on its own behalf on an independent basis by Aéropostale and its advisors. In no case will the prices charged by Vendor be unlawfully discriminatory under any applicable laws.

iv.    At least three (3) members of the senior management teams of each of the parties shall meet in person at least once every six (6) months during the Term to review: (a) Vendor's performance of its obligations under this Agreement, including, without limitation, with respect to pricing and competitiveness, Product quality and service standards, and (b) Aéropostale's sourcing requirements hereunder for the immediately succeeding Fiscal Year (including review of Aéropostale's projections (by department and category) on at least a 12 month roll forward basis). If the parties identify and mutually agree upon, during such performance review meeting, any deficiencies in either party's performance hereunder, the parties shall use their respective commercially reasonable efforts to prepare a mutually agreeable remediation plan to attempt to correct such deficiencies; it being understood and agreed that no party shall be required to take any action as a result of any such performance review and/or remediation plan unless it has so agreed to do so in writing.

5.    **Quality Control and Testing**.

    (a)    <u>General</u>. Vendor shall cause each Manufacturer to submit production samples of Products to Aéropostale for Aéropostale's review and approval.  Vendor will ensure that the Products are at least equal in quality, workmanship, appearance, fit, design and material to the production samples approved by Aéropostale.

    (b)    <u>Aéropostale Products</u>.  Prior to the shipment of Aéropostale Products pursuant to an Order, Vendor shall submit production samples of the Aéropostale Products for testing to the Laboratory designated by Aéropostale.  In the event that the Laboratory tests determine that any production sample does not meet or comply with applicable laws, regulations, government standards or Aéropostale's Specifications, Aéropostale shall so notify Vendor and/or Manufacturer, and Vendor shall cease all production then in progress relating to the sample until the discrepancies are remedied.  Aéropostale may refuse shipment of any such Aéropostale Product until such discrepancies are remedied and Aéropostale receives a test report from the Laboratory confirming that the applicable Aéropostale Product meets or complies with applicable laws, regulations, government standards or Aéropostale's Specifications.

    (c)    <u>Branded Products</u>.  Prior to the shipment of Branded Products pursuant to an Order, Vendor shall submit production samples of the Branded Products for testing to the Laboratory designated by Aéropostale.  In the event that the Laboratory tests determine that any production sample does not meet or comply with applicable laws, regulations, government standards or Aéropostale's Specifications, Aéropostale shall so notify Vendor and/or Manufacturer, and Vendor shall cease all production then in progress relating to the sample until the discrepancies are remedied.  Aéropostale may refuse shipment of any such Branded Product until such discrepancies are remedied and Aéropostale receives a test report from the Laboratory confirming that the applicable Branded Product meets or complies with applicable laws, regulations, government standards or Aéropostale's Specifications.

    (d)    Non-conforming deliveries of Products, if any, shall be handled as set forth in Section 8.  Aéropostale shall rely on Vendor's representations and warranties with respect to the Products and will not be obligated to unpack and inspect any Products before resale.

    (e)    Aéropostale's payment for, retention, use, sale or acceptance of any Product shall not be deemed a waiver of Aéropostale's rights to inspect the Product at any reasonable time or place and in any reasonable manner, nor shall the payment for, retention, use, sale or acceptance of any Product by Aéropostale be deemed a waiver of any breach of any representation or warranty of Vendor relating to the Product.

6.    **Monitoring and Social Compliance**.

US_ACTIVE:\44445086\12\11727.0008

(a)     General. Vendor represents, warrants and certifies that it has developed a program of inspecting and monitoring its Manufacturers.

(b)     Factory Registration. Prior to utilizing a Manufacturer for an Order, Vendor will provide to Aéropostale, for Aéropostale's review and approval, all of the following information regarding such Manufacturer:

      i.     the name and address of the Manufacturer;

      ii.     the type of Products to be manufactured by the Manufacturer;

      iii.     quantity of Products to be manufactured by the Manufacturer; and

      iv.     any other relevant information regarding the Manufacturer as may be required or reasonably requested by Aéropostale.

(c)     Subcontractors. Vendor shall not utilize subcontractors for the production of Products or components thereof without written approval and authorization of Aéropostale, and only after the subcontractor has agreed to comply with the Manufacturing Policies and Procedures (as defined below).

(d)     Change of Manufacturer. Vendor shall not change an approved Manufacturer (or an approved subcontractor if applicable) for the production of Products pursuant to an Order without written approval and authorization from Aéropostale.

(e)     Aéropostale Product and Branded Product Manufacturers.

      i.     Prior to utilizing a Manufacturer to produce Aéropostale Products or Branded Products: (1) Vendor shall ensure that each such Manufacturer complies with Aéropostale's Code of Conduct, social responsibility manual and other written policies for the manufacture of Products, as may be amended, to the extent Aéropostale provides Vendor with written copies of each of the foregoing as in effect from time to time, (2) Vendor will distribute to each such Manufacturer the Aéropostale Manufacturing Policies and Procedures, in the form of **Exhibit C** attached hereto ("Manufacturing Policies and Procedures") and such other written policies that may be provided by Aéropostale to Vendor for distribution to Manufacturers, and (3) upon written request by Aéropostale, Vendor will obtain and provide to Aéropostale the signature of an authorized representative from each such Manufacturer, in form and substance reasonably approved by Aéropostale, acknowledging receipt of the Manufacturing Policies and Procedures and agreeing to comply with all of the terms and conditions therein. Vendor will also promptly deliver to each Manufacturer any updates or amendments to the Manufacturing Policies and Procedures that may be provided in writing by Aéropostale to Vendor from time to time.

US_ACTIVE:\44445086\12\11727.0008

ii.  Prior to utilizing a Manufacturer to produce Aéropostale Products or Branded Products, Vendor shall deliver to Aéropostale a social compliance audit report from an audit conducted within the preceding twelve (12) months at such Manufacturer's facilities by an independent third party social compliance auditor reasonably acceptable to Aéropostale, and in form reasonably satisfactory to Aéropostale, which demonstrates that the Manufacturer has been inspected for compliance with all applicable federal, state, local and foreign laws and regulations pertaining to wages, overtime compensation, benefits, hours, hiring and employment (including the prohibited use of child (persons younger than the national minimum for employment, younger than the age for completing compulsory education, the age of any other specified exceptions or the age of 15, whichever of these is highest), prison, indentured, exploited, bonded, forced or human trafficked labor), workplace conditions and safety, the environment, collective bargaining and freedom of association.  In the event that Vendor does not provide such audit report or the report provided is not reasonably satisfactory to Aéropostale, Vendor shall cause the Manufacturer to submit to a social compliance audit conducted by Aéropostale's designated third party social compliance auditor.

iii.  In addition to Aéropostale's inspection rights set forth in Section 13 below, Vendor agrees that Aéropostale has the right at any time throughout the Term, through its designated third party social compliance auditor, to complete a social compliance audit for each Aéropostale Product or Branded Product Manufacturer, and Vendor shall, and shall cause each such Manufacturer to, cooperate with any such audit.

iv.  Vendor acknowledges and agrees that no Aéropostale Product or Branded Product may be produced by a Manufacturer unless and until that Manufacturer has received, in Aéropostale's sole judgment, a social compliance audit reasonably acceptable to Aéropostale.

(f)  Social Compliance Violation.  In the event Vendor has actual knowledge of sufficient facts to establish a reasonable belief that any Manufacturer is in violation of the Manufacturing Policies and Procedures and/or any applicable federal, state, local or foreign laws or regulations pertaining to wages, overtime compensation, benefits, hours, hiring and employment (including the prohibited use of child (persons younger than the national minimum for employment, younger than the age for completing compulsory education, the age of any other specified exceptions or the age of 15, whichever of these is highest), prison, indentured, exploited, bonded, forced or human trafficked labor), workplace conditions and safety, the environment, collective bargaining or freedom of association, Vendor must immediately notify Aéropostale in writing of the violation, and Vendor shall, at its sole expense, take prompt action to rectify the violation, including, where Aéropostale deems it necessary, the immediate termination of Vendor's relationship with the Manufacturer with respect to all

14

Products. Notwithstanding the foregoing, Vendor acknowledges and agrees that it will remain liable under all of the provisions of this Agreement with respect to the manufacture of the Products, and nothing contained in this Section 6(f) is intended to or shall diminish Vendor's obligations under this Agreement in any respect.

7.    **Delivery**.  Vendor shall ensure that each Order received from Aéropostale is timely filled and that the Products are delivered within the delivery schedule agreed upon in the Order. A delivery will not be considered nonconforming solely for early delivery.  Vendor shall ensure that all Products delivered to Aéropostale are invoiced and packaged in accordance with the applicable Order and all applicable federal, state, local and foreign laws and regulations. Vendor shall ensure that all such Products fully comply with all systems and documentation requirements that may be imposed by Vendor's designated carriers or by any applicable laws or regulations in order to ensure the timely shipment and delivery of the Products to Aéropostale.  Vendor shall bear the risk of loss of, or damage to, the Products until delivery DDP Aéropostale's distribution center (or other location specified by Aéropostale in writing).  Vendor acknowledges that Aéropostale participates in the worldwide supply chain security initiative ("C-TPAT") established by the U.S. Customs and Border Protection Agency ("U.S. Customs"), and Vendor agrees that it shall comply, and ensure that each Manufacturer complies, with the minimum security procedures and guidelines established by U.S. Customs, as may be amended from time to time.

8.    **Non-conforming Delivery**.  With respect to any delivery of Products, in the event that any of the Products (a) do not meet Aéropostale's Specifications, (b) are delivered late, (c) are not in compliance with the applicable Order, or (d) are not in compliance with applicable laws or regulations, Aéropostale may, at its option, after using good faith efforts to negotiate a reasonable settlement with Vendor with respect thereto: (i) reject or revoke acceptance of the entire shipment; (ii) accept the entire shipment; or (iii) accept any number of commercial units (i.e., an item of the Products that can be sold at retail) and reject (or revoke acceptance of) the balance of the shipment.  If Aéropostale elects to reject any or all of the shipment, the applicable Products shall be returned to Vendor for full-credit and stored for a commercially reasonable period of time (not to exceed fifteen (15) days) pending Vendor's receipt of instructions from Aéropostale in accordance with Section 3 hereof as to their disposition.  In the event a non-conforming delivery of Products is discovered upon receipt of Products, Aéropostale shall notify Vendor of the non-conformity and its election hereinabove within fifteen (15) days following receipt of the Products.  In the event Aéropostale does not discover the non-conformity until the Products are already in the stores of Aéropostale, to the extent not related to Products being "shop worn" as such term is used in the industry, and to the extent the non-conformity is not related to normal wear and tear of the Products, Aéropostale shall notify Vendor of the non-conformity and its election hereinabove upon discovery of the defect. Vendor shall have no right whatsoever to market, offer for sale or sell non-conforming Products bearing Aéropostale Designs or Aéropostale Trademarks for its own account or for the account of others without the prior written instruction, direction and authorization of Aéropostale and in any case subject to the condition that the Aéropostale Designs and the Aéropostale Trademarks are first removed or obliterated therefrom.

US_ACTIVE:\44445086\12\11727.0008

Notwithstanding the foregoing, nothing in this Agreement shall limit or otherwise impair Vendor's rights to re-use fabric in the case of any non-conforming Order that is rejected or revoked by Aéropostale subject to the condition that the Aéropostale Designs and the Aéropostale Trademarks, if any, are first removed or obliterated therefrom.

9.    **Intellectual Property Use and Protection.**

    (a)    <u>Aéropostale Intellectual Property</u>.

        i.    Except to the extent necessary for Vendor to manufacture and deliver the Products to Aéropostale under this Agreement, Vendor shall not at any time use, copy, promote, advertise, display or otherwise commercialize the Aéropostale Trademarks, or any material utilizing or reproducing the Aéropostale Trademarks, in any manner.  Without limitation of the foregoing, Vendor shall not (1) use the Aéropostale Trademarks, in whole or in part, or any trademark similar to the Aéropostale Trademarks, as a corporate or tradename, or (2) join any name or names with the Aéropostale Trademarks so as to form a new trademark; provided that Vendor may make reference in its business materials and client pitch materials to the fact that Vendor is being contracted by Aéropostale to manufacture the Products (so long as Vendor does not disclose any of the terms and conditions of this Agreement in connection therewith).  Any permitted use by Vendor of the Aéropostale Trademarks shall inure solely to the benefit of Aéropostale.  To the extent any rights in and to the Aéropostale Trademarks are deemed to accrue to Vendor, Vendor hereby assigns any and all such rights, at such time as they may be deemed to accrue, including the related goodwill, to Aéropostale.

        ii.    Vendor agrees not to register, or attempt to register, the Aéropostale Trademarks or any trademark similar to the Aéropostale Trademarks in its own name or any other name, anywhere in the world, or challenge the validity of Aéropostale's ownership in or rights to use the Aéropostale Trademarks or any application for the registration thereof anywhere in the world.

        iii.    In the event that Vendor learns of any infringement or imitation of the Aéropostale Trademarks or of any use by any person or entity of a trademark similar to the Aéropostale Trademarks, it shall promptly notify Aéropostale in writing.  Aéropostale shall, in its sole discretion, take such action as it deems advisable for the protection of its rights in and to the Aéropostale Trademarks and, if requested to do so by Aéropostale, Vendor shall cooperate fully with Aéropostale, at Aéropostale's sole cost and expense, in all respects in connection with such action.  In no event shall Aéropostale be required to take any action if it deems it inadvisable to do so.

US_ACTIVE:\44445086\12\11727.0008

iv.    Vendor recognizes the great value of the goodwill associated with the Aéropostale Trademarks and the identification of the Products with the Aéropostale Trademarks and acknowledges that the Aéropostale Trademarks and all rights therein and goodwill pertaining thereto, as between Vendor and Aéropostale, belong exclusively to Aéropostale.

v.    Vendor recognizes and acknowledges that a breach by Vendor of any of its covenants, agreements or other undertakings under this Section 9(a) will cause Aéropostale irreparable damage, which cannot be adequately remedied by damages in an action at law, and may entitle Aéropostale to equitable remedies, including injunction (without the need to post any bond) and reasonable and documented attorneys' fees.

vi.    Aéropostale shall defend, at its cost and expense, and with counsel of its own choice, any action or proceeding brought against Vendor for alleged trademark infringement arising out of Vendor's use of the Aéropostale Trademarks in accordance with the provisions of this Agreement.

vii.    Vendor irrevocably acknowledges and agrees that Aéropostale owns all worldwide rights, title, and interest in, to, and under all Aéropostale Designs and all other materials or works provided by Aéropostale to Vendor (subject to any pre-existing third party rights therein or thereto) and all other materials or works created, developed, or modified by Vendor for Aéropostale in connection with the Products ("Work Product"). Vendor agrees that, as between Vendor and Aéropostale, Aéropostale shall be the sole and exclusive owner of the Work Product, and Vendor hereby irrevocably assigns to Aéropostale, and will cause its personnel to irrevocably assign to Aéropostale, any and all rights, title, and interest throughout the world in and to all Work Product. Vendor agrees, and Vendor will cause its personnel to agree, that, to the fullest extent permitted under the United States Copyright Act or other applicable copyright law, Aéropostale shall be the sole owner of all copyrights in and to the Work Product, and that Vendor shall develop such Work Product as "work made for hire" (as defined in 17 U.S.C. §101). If deemed not to be "work made for hire" for any reason, upon creation of such Work Product Vendor hereby automatically irrevocably assigns, and agrees to assign without further consideration, all of Vendor's copyrights in and to all such Work Product, including any renewal rights therein and any and all moral rights therein. All uses of any trademarks, service marks, and trade names in the Work Product, and the goodwill associated therewith, whether by Vendor or third parties, inures and shall inure to the benefit of Aéropostale. Vendor has acquired or will promptly acquire from each of its personnel all necessary rights to enable Vendor to fulfill its obligations under this Section, including all rights to Work Product produced by such personnel within the scope of their employment or engagement by Vendor.

US_ACTIVE:\44445086\12\11727.0008

(b)    All provisions of this Section 9 shall survive the expiration or termination of this Agreement.

10.    **Transshipment**.  The term "transshipment" as used in this Agreement refers to the illegal practice of falsely documenting and/or labeling the raw materials used to manufacture the Products shipped to the United States in order to evade quota restraints on the country of actual production and/or the shipment of products under counterfeit export licenses or visas.  Vendor acknowledges and agrees that (i) transshipment, in any form, violates U.S. federal law; (ii) Aéropostale may and will review all documents received from Vendor to assure the veracity and the authenticity of the sources of Products; and (iii) upon indication based upon reasonable evidence that Vendor has knowingly and intentionally engaged in transshipment of Products on at least two (2) occasions, Aéropostale reserves the right to immediately terminate this Agreement without further obligation or liability and pursue available remedies against Vendor.   Where processing in more than one country is contemplated to produce an Order, Vendor must obtain binding rulings from U.S. Customs regarding the proper country of origin for quota and labeling purposes.  In addition, Aéropostale reserves the right to immediately terminate or cancel this Agreement, or any Order, without further obligation or liability, upon the occurrence of any of the following events: (1) the appearance (other than by mistake) of Vendor on any of U.S. Customs' lists of transshippers (including, without limitation, the 592A List and the Convicted Factories List TBT 99 008); or (2) the exclusion of Products from entry into the United States or the seizure of Products by U.S. Customs due to the failure of the documentary proof of production to satisfy U.S. Customs as to country of origin (whether or not Vendor appears on a U.S. Customs list of transshippers) on at least two (2) occasions.  In the event of termination pursuant to this Section 10, Aéropostale will not be responsible for any uncompleted Orders or for future production commitments, including without limitation the Minimum Volume Commitment.  Vendor shall ensure that records and documents relating to the movement of raw materials and components, bills of lading, customs clearance records, cutting tickets, payment records, time cards and other related production records necessary to verify compliance with the obligations set forth in this Section 10 are promptly available for review by Aéropostale or by its representative(s) upon reasonable advance notice at Vendor's offices and those of its Manufacturers.

11.    **Representations and Warranties**.

(a)    Mutual Representations and Warranties.  Each party hereby represents and warrants to the others that:

i.    it has and will have throughout the Term, the full power, authority and legal right to execute and deliver, and to perform fully and in accordance with all of the terms of, this Agreement; and

ii.    the entering into of this Agreement by such party does not violate any binding agreements, rights or obligations existing between such party and any other third party or any law, regulation or order applicable to such

party or such party's certificate of incorporation, bylaws or other governing documents; and

iii.  any and all necessary consents, approvals and authorizations of all governmental authorities and agencies and other persons required to be obtained by such party in connection with this Agreement have been obtained; and

iv.  it has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the transactions contemplated hereby; and

v.  this Agreement and each Order issued pursuant hereto is the legal, valid and binding obligation of such party enforceable against such party in accordance with their terms, except to the extent that enforcement may be limited by applicable bankruptcy, insolvency and other similar laws affecting creditors' rights generally.

(b)  <u>Vendor's Representations and Warranties</u>. Vendor hereby represents and warrants to Aéropostale that:

i.  it has fully disclosed and will disclose, throughout the Term, to Aéropostale any and all relationships it has with any director, officer, or employee of Aéropostale or any person or entity having an equity ownership of more than three (3%) percent of Aéropostale;

ii.  it is not engaged in and will not engage in any activities (including fraud or undue influence) which are in violation of any applicable domestic, foreign or international laws, rules or regulations, including without limitation laws, rules or regulations governing labor, the environment, the manufacture, testing and sale of goods, U.S. Customs laws or illegal transshipment;

iii.  the Products and all elements and components thereof (excluding any such components or elements provided by Aéropostale to Vendor, which components or elements provided by Aéropostale to Vendor include the Aéropostale Designs and the Aéropostale Trademarks), the manufacturing process used by Vendor and its Manufacturers to produce such Products, and the use, distribution and sale of such Products, do not and will not infringe upon the patent, copyright, trademark, trade dress or other intellectual property rights of any third party;

iv.  it will ensure that all Products delivered to Aéropostale are free from defects in materials, workmanship and fabrication and fit; are fit for their particular purposes and uses; conform to Aéropostale's Specifications, descriptions, approved samples and prototypes with respect to quality, size, description, color and dimensions; and are tested, produced, labeled, packaged, shipped, handled and invoiced in compliance with this

19

Agreement, Aéropostale's standards, guidelines and other instructions provided to Vendor (including GCC requirements) and applicable laws and regulations;

v.    it has in effect a program of monitoring the Manufacturers which Vendor utilizes to manufacture the Products, which program is sufficient to ensure that each Manufacturer complies with all applicable federal, state, local and foreign laws and regulations pertaining to wages, overtime compensation, benefits, hours, hiring and employment, workplace conditions and safety, the environment, collective bargaining and freedom of association, and further that the Products, including each of the components of such Products, are made without the use of child labor (persons younger than the national minimum for employment, younger than the age for completing compulsory education, the age of any other specified exceptions or the age of 15, whichever of these is highest), prison, indentured, exploited, bonded, forced or human trafficked labor;

vi.    it accurately states the country of origin on all Products, it does not and will not transship, and it will act to stop or prevent any known illegal transshipment activity with respect to the Products;

vii.    all information provided to Aéropostale by Vendor in connection with the Products and the performance of Vendor's obligations hereunder is and will be true and correct in all material respects; and

viii.    at the time of transfer to Aéropostale of the Products (DDP Aéropostale's distribution center or other location specified by Aéropostale in writing), Vendor shall have good title to such Products, and transfer to Aéropostale of such Products shall convey title to such Products to Aéropostale free and clear of all liens, claims, encumbrances, debts and rights of third parties of any nature, other than those created by Aéropostale or any of its affiliates.

12.    **Termination or Expiration**.

(a)    Termination by Either Party. This Agreement may be terminated by either party at any time during the Term if:

i.    the other party materially breaches any of the terms or conditions of this Agreement, and (1) such breach is not cured to the non-breaching party's satisfaction within fifteen (15) business days following delivery of written notice of the breach to the breaching party; or (2) the breach is not capable of being cured; or

ii.    the other party becomes insolvent, makes a general assignment for the benefit of creditors, suffers or permits the appointment of a receiver for its business or assets, becomes subject to any proceeding under any

US_ACTIVE:\44445086\12\11727.0008

bankruptcy or insolvency law whether domestic or foreign, or has wound up or liquidated, voluntarily or otherwise.

(b)     Termination by Aéropostale For Cause. This Agreement may be terminated by Aéropostale at any time during the Term (1) in accordance with Section 10 hereof, or (2) on thirty (30) days' advance written notice to Vendor (without any right to cure by Vendor) for any of the following reasons:

   i.      a breach by Vendor of Section 16(d) of this Agreement;

   ii.     the unauthorized sale, use or disposition by or on behalf of Vendor of Aéropostale Products or Branded Products, including trim, labels, tags or Aéropostale Designs; or

   iii.    the unauthorized use or misuse of any Aéropostale Trademarks by or on behalf of Vendor.

(c)     Termination by Aéropostale For Convenience. This Agreement may be terminated by Aéropostale at any time following the expiration of the No Termination for Convenience Period upon nine (9) months' advance written notice to Vendor (which notice will specify the intended effective date of the termination of this Agreement, which may not be prior to the expiration of the No Termination for Convenience Period), subject to payment by Aéropostale of the Termination Fee.

(d)     Termination Fee. After the No Termination for Convenience Period and prior to the end of the Minimum Volume Commitment Period, if Aéropostale elects to terminate this Agreement for convenience pursuant to Section 12(c), then Aéropostale shall pay a termination fee to Vendor in the amount provided for in the "Termination Fee" definition set forth in **Exhibit A** annexed hereto. The parties agree that the losses suffered by Vendor in the event Aéropostale elects to terminate this Agreement for convenience pursuant to Section 12(c) would be impossible to accurately estimate, and the parties agree that the payment of the Termination Fee represents the parties' good faith estimate of the liquidated damages that would be suffered by Vendor in such circumstances, and that the Termination Fee does not constitute a penalty. Payment of the Termination Fee shall not limit or otherwise impair in any respect the Guarantor's obligation to repay the unpaid balance of the Term B Loan in accordance with the terms and conditions of the Credit Agreement (it being understood and agreed that upon payment of the Termination Fee and the unpaid balance of the Term B Loan, Guarantor's obligations with respect to the Term B Loan shall terminate in accordance with the terms of the Credit Agreement).

(e)     Effect of Termination.

   i.      In the event of any termination of this Agreement by Aéropostale pursuant to Section 12(a) i. or pursuant to Section 12(b), Aéropostale shall have, solely at its option, the right to purchase Vendor's remaining inventory of

US_ACTIVE:\44445086\12\11727.0008

Products, at a cost which is the lower of (i) Vendor's cost of the applicable Products, at the cost the Products are carried on Vendor's books of account, or (ii) the value of Vendor's inventory of Products (including, but not limited to, finished goods, work in process, and labels and trim, including those containing the Aéropostale Trademarks) manufactured in accordance with the applicable Orders. In the event that Aéropostale does not exercise its option to purchase Vendor's remaining inventory of Products, Vendor shall destroy the inventory of Products pursuant to Aéropostale's written instructions and provide certified proof of destruction to Aéropostale.

    ii.     In the event of any termination of this Agreement by Vendor pursuant to Section 12(a) i. or Section 12(a) ii. or by Aéropostale pursuant to Section 12(c), or upon the expiration of this Agreement in accordance with its terms, Aéropostale shall be obligated to purchase Vendor's inventory of Products manufactured pursuant to pending Orders (including fabric and works in process), at the Landed Duty Price thereof, including, for the avoidance of doubt, any Orders then in process of completion.

    iii.    For the avoidance of doubt, the Minimum Volume Commitment shall be of no further force or effect upon termination of this Agreement in accordance with its terms.

13.   **Inspection**. Aéropostale and/or its agents, representatives or independent contractors may, from time to time and at any time during the Term, during regular business hours, inspect the manufacture of Products and conduct related quality control and social compliance inspection reviews of the manufacture of the Products and Product assortment and delivery. In connection with any such inspection, Vendor shall provide full and complete assistance and access to Vendor's and each Manufacturer's facilities, offices, personnel and materials. Vendor shall cooperate fully, and shall cause each Manufacturer to cooperate fully, with Aéropostale and its agents, representatives and independent contractors, to ensure quality, completeness and thoroughness of the inspection process, including, but not limited to, permitting a person or persons designated by Aéropostale to be on the premises at any Vendor or Manufacturer location at any given time to the extent reasonably related to the inspection of the manufacture of Products and the conduct of related quality control and/or social compliance inspection reviews. Vendor shall comply, and Vendor shall cause each Manufacturer to comply, with Aéropostale's reasonably established quality and inspection procedures during production and after shipment of Products, and Vendor shall maintain, and cause each Manufacturer to maintain, all books and records relating to the activities governed by this Agreement for two (2) years after the expiration or termination of this Agreement.

14.   **Continuous Improvements**. Vendor agrees to actively pursue a program of continuous improvement with respect to the Products, including with respect to improvements in quality. Vendor shall promptly advise Aéropostale of any changes to materials, manufacturing, processes, or any other reasonably available technological advances of which Vendor becomes aware and which may result in quality or other improvements to

22

or cost reductions in connection with the supply of the Products. Vendor's implementation of any of the foregoing shall be subject to Aéropostale's prior written approval, and if such approval is granted, Vendor shall use its commercially reasonable efforts to implement such Product improvement or cost-reducing measures throughout the Term of this Agreement, and to reflect any such cost-reducing measures in the prices charged to Aéropostale hereunder.

15. **Further Assurances**. Vendor agrees to do all things reasonably necessary, or as may be reasonably requested by Aéropostale, to ensure that the Products are manufactured, shipped and delivered to Aéropostale in accordance with all applicable Specifications, Aéropostale guidelines and policies provided by Aéropostale to Vendor and all applicable laws (U.S. and international) and to ensure that Vendor complies with its other obligations hereunder (including, without limitation, the timely payment of the Rebate) and to otherwise carry out the purposes and intent of this Agreement. Aéropostale agrees to do all things reasonably necessary, or as may be reasonably requested by Vendor, to ensure that Aéropostale complies with each of its obligations set forth in this Agreement, including without limitation, its obligations with respect to the Minimum Volume Commitment and with respect to the timely payment for the Products and any Shortfall Commission.

16. **Assignment, Etc**.

    (a)    Except as otherwise provided in this Section 16, neither party may assign any of its rights or delegate any of its obligations under this Agreement (whether directly or indirectly, by transfer or assignment of assets, by operation of law, or otherwise), except with prior written consent of the other party.

    (b)    The Products (so long as such party has legal title to the Products), and the rights under this Agreement, may be hypothecated, pledged or pledged as security for any indebtedness or obligation assumed by or on behalf of either Vendor or Aéropostale. In addition, for the avoidance of doubt, Vendor shall be permitted to hypothecate or pledge the right to receive payments from Aéropostale under this Agreement.

    (c)    Notwithstanding anything to the contrary in the foregoing, in the event that any party shall seek to exercise the right of a debtor under applicable bankruptcy law to assume and assign this Agreement, such assumption and assignment shall be conditioned upon a demonstration of adequate assurances of performance by the assignee (including, as applicable, assurance that the assignee is able to maintain the quality and integrity of the Products and the Aéropostale Trademarks or satisfy its obligations to maintain the Minimum Volume Commitment and make timely payment for the Products in accordance with this Agreement).

    (d)    Notwithstanding anything to the contrary contained in this Agreement, each of the parties hereto shall be permitted to assign any of its rights or delegate any of its obligations under this Agreement without the consent of any other party to this Agreement in connection with the direct or indirect sale or disposition (including

US_ACTIVE:\44445086\12\11727.0008

by way of merger or otherwise) of all or substantially all of such party's capital stock, assets or business; *provided, that,* (i) in the case of any such assignment or delegation by Vendor, such sale, disposition or merger is not to or with any of Abercrombie, American Eagle, Forever 21, H&M or Urban Outfitters, and (ii) such assignee or successor of the assigning party agrees in writing to be bound by and perform all of the assigning party's obligations under this Agreement.

17.    **Governing Law and Exclusive Forum; Waiver of Jury Trial**.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable principles of conflicts of law of such or any other jurisdiction.    All disputes between or among the parties not resolved amicably or informally between them, shall be heard and determined exclusively in the federal or state courts sitting in the Borough of Manhattan, which courts shall have exclusive jurisdiction over the parties with respect to the subject matter hereof.  The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such courts or any defense of inconvenient forum for the maintenance of such dispute. The parties each and all acknowledge and agree that all judgments and directions by such courts, including but not limited to all temporary, preliminary and permanent injunctions and all damages awards and assessments, shall be complied with by and enforceable against the parties, wherever they may be located.  The parties shall each accept service of process, and service of process shall be deemed properly served, by service to the applicable addresses specified in Section 23, or as the parties shall advise each other from time to time in accordance with Section 23.   EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

18.    **Confidentiality**.

(a)    Each party hereto acknowledges that, during the Term of this Agreement, such party may have access to, have disclosed to it, or otherwise obtain, information concerning the other party's trade secrets, activities, plans, finances, operations, methods and/or other information relating to the past, present or future business activities of the other party (collectively, the "Confidential Information").  Each party shall use Confidential Information solely in the performance and enforcement of its obligations under this Agreement. Each party shall regard and preserve all Confidential Information in trust and confidence for the other party

US_ACTIVE:\44445086\12\11727.0008

and agrees not to disclose Confidential Information in any manner to any person or entity, or use the same for its own benefit or the benefit of any other person or entity, without obtaining the other party's prior written consent. Information shall not be deemed confidential to the extent, but only to the extent, that the information is: (i) already known free of any restriction at the time it is obtained or disclosed; (ii) subsequently learned from an independent third party free of any restriction and without violation of any obligation of confidentiality of such third party; (iii) available publicly without dissemination by or on behalf of the party with the duty of confidentiality to the other party or (iv) independently created by the party with the duty of confidentiality to the other party without reference to the other party's Confidential Information. The obligations of confidentiality set forth in this Section 18 shall remain in full force and effect for a period of two (2) years following the expiration or termination of this Agreement.

(b)     If any of the parties is required to publicly file (or otherwise disclose this Agreement in a manner that it becomes generally available to the public) pursuant to regulatory requirements or applicable law, the parties agree to work together to redact the terms hereof in order to preserve the confidentiality of all sensitive business information contained herein.

19.    **Indemnification**.

(a)     Vendor shall indemnify, defend and hold Aéropostale and its directors, officers, employees, agents, affiliates and licensees (as applicable) harmless from and against any and all claims, damages, costs, losses, penalties, fines, expenses and liabilities of any nature whatsoever (including reasonably incurred and documented attorneys' fees) arising from or in connection with (i) any breach of Vendor's representations, warranties or covenants set forth in this Agreement or any Order hereunder; (ii) any actual or alleged violation of any applicable law or regulation (including any investigation with respect thereto) by (1) the Products, (2) the manufacture, use, or sale of the Products, or (3) Vendor or any Manufacturer in the performance of this Agreement; (iii) any actual or alleged death of or injury to any person, damage to any property, or any other damage or loss, by whomever suffered, resulting or claimed to result, in whole or in part, from any actual or alleged defect in the Products, whether latent or patent, including actual or alleged improper manufacture or design of such Products, or the failure of such Products to conform to Specifications or to comply with any express or implied warranties; (iv) Vendor's negligence or willful misconduct in performing its obligations under this Agreement or any Order; (v) Vendor's unauthorized use of Aéropostale Trademarks or Aéropostale Designs; (vi) any claim or allegation of infringement or violation of a third party's copyright, trademark, patent, trade secret or other intellectual property rights relating to the Products or the manufacture thereof (other than any such claim or allegation arising to the extent caused by materials supplied by Aéropostale, including without limitation the Aéropostale Trademarks and Aéropostale Designs); (vii) Vendor's unauthorized ordering, use or shipment of Products; (viii) any recall of

the Products, whether voluntary or involuntary; and (ix) claims by Vendor's employees, agents or representatives.

(b)     Aéropostale shall indemnify, defend and hold Vendor and its directors, officers, employees, agents, affiliates and, with respect to subsection (iv) of this Section 19(b) only, Vendor's Manufacturers (as applicable), harmless from and against any and all claims, damages, costs, losses, penalties, fines, expenses and liabilities of any nature whatsoever (including reasonably incurred and documented attorneys' fees) arising from or in connection with (i) any breach of Aéropostale's representations, warranties or covenants set forth in this Agreement or any Order; (ii) any actual or alleged violation of any applicable law or regulation (including any investigation with respect thereto) by Aéropostale in the performance of this Agreement; (iii) Aéropostale's negligence or willful misconduct in performing its obligations under this Agreement or any Order; (iv) any claim or allegation of infringement or violation of a third party's copyright, trademark, patent, trade secret or other intellectual property rights relating to the Products or the manufacture thereof to the extent caused by materials supplied by Aéropostale, including without limitation the Aéropostale Trademarks and Aéropostale Designs; and (v) claims by Aéropostale's employees, agents or representatives.

(c)     The indemnified party shall have the right, at its expense, to participate in the defense of any claim subject to indemnification pursuant to this Section 19, and no settlement of any such claim which would impose any obligation upon or otherwise adversely affect the indemnified party shall be made without the indemnified party's prior written consent. The indemnified party will take all commercially reasonable steps to mitigate its damages which may comprise indemnifiable losses pursuant to this Section 19.

(d)     The parties acknowledge and agree that Aéropostale's rights under this Section 19 shall be Aéropostale's exclusive rights to indemnification under this Agreement and any Order placed pursuant hereto.

(e)     All provisions of this Section 19 shall survive the expiration or termination of this Agreement.

20.     **Insurance.**

(a)     Required Vendor Insurance. Vendor shall, during the Term of this Agreement and for three (3) years thereafter, maintain the insurance coverage set forth below ("Required Insurance"), at its sole cost and expense, written by and secured from companies that are licensed, approved, and admitted to do business and issue insurance in whichever state, territory, or country where Products are manufactured and which have worldwide territory and worldwide jurisdiction and must be rated no less than "A-" "Class VIII" as to strength, in accordance with the latest edition of Best's Insurance Guide, published by A. M. Best Company, Inc. or an equivalent rating agency. All Required Insurance must be written for not

26

less than the limits specified below, or as required by applicable law, whichever is greater:

| Coverage | Limits |
| --- | --- |
| Statutory Worker's Compensation and Employer's Liability Insurance | $1,000,000 |
| Comprehensive general and product liability including but not limited to personal injury, property damage, products/completed operations, and contractual liability with the elimination of the care, custody, and control exclusion. | $2,000,000 Combined Single Limit, for bodily injury (including personal injury) or property damage, each occurrence |
| Umbrella Liability in excess of general liability, product liability, employer liability, and automobile liability. | $10,000,000 Bodily Injury and Property Damage, Combined Single Limit, each occurrence |

(b)     Additional Insureds.  Vendor shall include Aéropostale as an additional insured under such liability policies, including the provisions of such policies insuring Vendor's obligations under the indemnity provisions of this Agreement.

(c)     Certificates of Insurance.   Upon Aéropostale's request Vendor shall provide evidence of such insurance in the form of certificates of insurance which shall include provision for thirty (30) days prior notice to Aéropostale of change or cancellation of the policy.

(d)     No Limitation by Insurance.  Each party's indemnities and obligations under this Agreement shall not be limited or defined in any fashion whatsoever by the amount or type of Required Insurance or any other insurance maintained by any party.  All policies required hereunder shall be written as primary policies not contributing with and not in excess of any coverage which Aéropostale may carry.

(e)     No Waiver of Subrogation.  With respect to all Required Insurance, Vendor does not and shall not be required to agree to waive any rights of subrogation against Aéropostale, Aéropostale's affiliates, and any of their respective representatives, employees, officers, and directors.

21.    **Binding Agreement**.  This Agreement shall inure to the benefit of and shall be binding upon the parties, and their respective permitted successors, heirs, transferees and assigns. Any attempted transfer or assignment of this Agreement by any party in violation of the terms of this Agreement shall be null and void and of no force or effect.

27

22. **No Third Party Beneficiaries**. There are and shall be no third party beneficiaries of this Agreement unless expressly identified as such herein (such as, for example, the indemnified parties expressly identified in Section 19 hereof).

23. **Notices**. All notices, demands, or other communications given or delivered under this Agreement shall be sent by electronic communication (which produces a record of transmission) such as electronic mail or similar means of communication, by registered courier, or by certified mail, return receipt requested, to the recipient at the address specified below (or at such other address as is notified in writing by the applicable party to the other party in accordance with this Section 23):

If to Aéropostale or Guarantor:

112 West 34th Street
New York, New York 10120
      Telephone: 646-452-1851
         Email: mschuback@aeropostale.com
Attention: General Counsel

If to Vendor:

4200 Regent St., Suite 205
Columbus, Ohio 43219
Telephone: 614-904-3250
Email: jschwartz@mgfsourcing.com
Attention: James Schwartz, CEO

24. **Entire Understanding; Amendment**.  This Agreement (including the Exhibits hereto) represents the entire understanding between the parties hereto with respect to the subject matter hereof and supersedes all previous representations, understandings and agreements, oral or written, between the parties with respect to the subject matter hereof. This Agreement cannot be altered, amended or modified except by a written instrument signed by the duly authorized officers or representatives of each party.

25. **Section Headings**. All section headings contained in this Agreement are for convenience of reference only, do not form a part of this Agreement and will not affect in any way the meaning or interpretation of this Agreement.

26. **Waivers.** The failure of either party to enforce at any time or for any period of time any provision of this Agreement shall not be construed as a waiver of such provision or of the right of such party thereafter to enforce such provision.  In addition, no terms or provisions of this Agreement may be waived by either party except by an instrument in writing signed by the party against whom the enforcement of such waiver is sought.

27. **Severability.** If any provision of this Agreement shall be held by a court of competent jurisdiction to be unenforceable, then both parties shall be relieved of all obligations arising under such provision but only to the extent that such provision is illegal,

US_ACTIVE:\44445086\12\11727.0008

unenforceable or void.   The remainder of such provision and the remainder of this Agreement shall not be affected by such declaration or finding and each provision not so affected shall remain in full force and effect.   It is the intention of the parties that the provisions of this Agreement be carried out to the fullest extent permitted by law.

28.    **Relationship of the Parties.**   Nothing contained herein is intended or shall be deemed to make any party the agent, employee, partner or joint venturer of the other party or to provide any party with the power or authority to act on behalf of the other party or to bind the other party to any contract, agreement or arrangement with any other individual or entity.

29.    **Survival.**   The following provisions shall survive expiration or termination of this Agreement: Section 2(b) iii. (Shortfall Commission); Section 2(d) (Rebate); Section 2(e) (Setoff); Section 4(b) ii. (Payment); Section 9 (Intellectual Property Use and Protection); Section 12(d) (Termination Fee); Section 12(e) (Effect of Termination); Section 13 (Inspection); Section 17 (Governing Law and Exclusive Forum; Waiver of Jury Trial); Section 18 (Confidentiality); Section 19 (Indemnification); Section 20 (Insurance); Section 21 (Binding Agreement); Section 22 (No Third Party Beneficiaries); Section 23 (Notices); Section 24 (Entire Understanding; Amendment); Section 28 (Relationship of the Parties); Section 29 (Survival); Section 31 (Guaranty);  all definitions contained in this Agreement and all Exhibits to this Agreement, in each case, to the extent related to any of the foregoing; and all obligations on the part of any party to this Agreement to pay any sum of money or other obligation arising prior to the effectiveness of any such expiration or termination shall survive until full satisfaction thereof.

30.    **Execution in Counterparts.**   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which, when taken together, shall constitute one and the same instrument.   The parties may exchange signature pages via facsimile or e-mail transmission, which execution in counterparts or otherwise, shall be deemed equivalent to the original and binding upon the parties hereto.

31.    **Guaranty.**

(a)    **Guaranty.**   Guarantor hereby absolutely, unconditionally and irrevocably guarantees to Vendor the punctual payment and performance of all obligations and liabilities (collectively, the "Liabilities") now owing or which may in the future be owing by Aéropostale under this Agreement or any Order with respect to this Agreement, when the same are due and payable. This guaranty (the "Guaranty") is a guaranty of payment and not of collection only. Vendor shall not be required to exhaust any right or remedy or take any action against Aéropostale or any other person or entity or any collateral.

(b)    **Guaranty Absolute.**   Guarantor guarantees that the Liabilities shall be paid and performed strictly in accordance with the terms of the Agreement. The liability of Guarantor under this Guaranty is absolute and unconditional irrespective of: (i) any change in the time, manner or place of payment or performance of, or in any other term of, this Agreement, any Order or the Liabilities, or any other

US_ACTIVE:\44445086\12\11727.0008

amendment or waiver of or any consent to departure from any of the terms of this Agreement, any Order or the Liabilities; (ii) any present or future law, regulation or order of any jurisdiction (whether of right or in fact) or of any agency thereof purporting to reduce, amend, restructure or otherwise affect any term of this Agreement, any Order or the Liabilities; (iii) without being limited by the foregoing, any lack of validity or enforceability of the Agreement, any Order or the Liabilities; or (iv) any other setoff, defense or counterclaim whatsoever (in any case, whether based on contract, tort or any other theory) with respect to the Agreement, any Order or the transactions contemplated hereby or thereby which might constitute a legal or equitable defense available to, or discharge of, Aéropostale or a guarantor (other than indefeasible payment in full of the Liabilities in accordance with their terms) and, to the greatest extent permitted by law, Guarantor waives any and all such setoffs, defenses and counterclaims.

(c)     **Guaranty Irrevocable**. This Guaranty is a continuing guaranty of all Liabilities now or hereafter existing and shall remain in full force and effect until the indefeasible payment in full of all Liabilities and other amounts payable under this Guaranty.

(d)     **Reinstatement**. This Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Liabilities is rescinded or must otherwise be returned by Vendor on the insolvency, bankruptcy or reorganization of Aéropostale or otherwise, all as though the payment had not been made.

(e)     **Subrogation**.  Guarantor shall not exercise any rights which it may acquire by way of subrogation, by any payment made under this Guaranty or otherwise, until all the Liabilities have been paid in full and no longer subject to rescission or revival.  If any amount is paid to the Guarantor on account of subrogation rights under this Guaranty at any time when all the Liabilities have not been paid in full, the amount shall be held in trust for the benefit of Vendor and shall be promptly paid to Vendor to be credited and applied to the Liabilities, whether matured or unmatured or absolute or contingent, in accordance with the terms of the Agreement.  If the Guarantor makes payment to Vendor of all or any part of the Liabilities and all the Liabilities are paid in full and no longer subject to rescission or revival, Vendor shall, at the Guarantor's request, execute and deliver to the Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to the Guarantor of an interest in the Liabilities resulting from the payment thereof.

(f)     **Subordination**. Without limiting Vendor's rights under any other agreement, any liabilities owed by Aéropostale to the Guarantor in connection with any extension of credit or financial accommodation by the Guarantor to or for the account of Aéropostale are hereby subordinated to the Liabilities, and such liabilities of Aéropostale to the Guarantor, if Vendor so requests, shall be collected, enforced and received by the Guarantor as trustee for Vendor and shall be paid over to

US_ACTIVE:\44445086\12\11727.0008

Vendor on account of the Liabilities but without reducing or affecting in any manner the liability of the Guarantor under the other provisions of this Guaranty.

(g)     **Representations and Warranties**.  The Guarantor represents and warrants that in executing and delivering this Guaranty, the Guarantor has without reliance on Vendor or any information received from Vendor and based upon such documents and information it deems appropriate: (i) made an independent investigation of the transactions contemplated hereby and Aéropostale, Aéropostale's business, assets, operations, prospects and condition, financial or otherwise, and any circumstances which may bear upon such transactions, Aéropostale or the obligations and risks undertaken herein with respect to the Liabilities; (ii) determined that it has adequate means to obtain from Aéropostale on a continuing basis information concerning Aéropostale; and (iii) has not relied and will not rely upon any representations or warranties of Vendor not embodied herein or any acts heretofore or hereafter taken by Vendor (including but not limited to any review by Vendor of the affairs of Aéropostale).

(h)     **Remedies Generally**.  The remedies provided in this Guaranty are cumulative and not exclusive of any remedies provided by law, contract or otherwise.

(i)     **Formalities**.  The Guarantor waives presentment, notice of dishonor, protest, notice of acceptance of this Guaranty or incurrence of any Liability and any other formality with respect to any of the Liabilities or this Guaranty.

32.     **Force Majeure**.  Neither party will be liable for failure to perform under this Agreement or any Order created under this Agreement to the extent such failure is caused by any fire, strike, act of God, war, authorization of law, embargo, accident or other cause beyond the reasonable control of the affected party and not correctable or avoidable through exercise of commercially reasonable means.

US_ACTIVE:\44445086\12\11727.0008

**IN WITNESS WHEREOF**, the parties, through their duly appointed and authorized representatives, have executed this Sourcing Agreement as of the day and year first written above.

Aéropostale Procurement Company, Inc.

By:_____

Name: Marc D. Miller
Title: Executive Vice President and Chief Financial Officer

TSAM (Delaware) LLC (d/b/a MGF Sourcing US, LLC)

By:_____
Name:_____
Title:_____

Aéropostale, Inc.

By:_____

Name: Marc D. Miller
Title: Executive Vice President and Chief Financial Officer

IN WITNESS WHEREOF, the parties, through their duly appointed and authorized representatives, have executed this Sourcing Agreement as of the day and year first written above.

Aéropostale Procurement Company, Inc.

By:_____
Name:_____
Title:_____


TSAM (Delaware) LLC (d/b/a MGF Sourcing US, LLC)

By: _____
Name: _____James Schwartz_____
Title: _____President and CEO_____


Aéropostale, Inc.

By:_____
Name:_____
Title:_____

EXHIBIT A

Confidential Pricing and Other Terms and Information

**THE PARTIES ACKNOWLEDGE AND AGREE THAT THE PRICING AND OTHER TERMS AND INFORMATION SET FORTH ON THIS EXHIBIT A REPRESENTS SENSITIVE AND CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO THE TERMS AND CONDITIONS OF SECTION 18 OF THE AGREEMENT TO WHICH THIS EXHIBIT A IS ATTACHED AND AGREE THAT ANY TERM OR INFORMATION SET FORTH ON THIS EXHIBIT A SHALL NOT BE DISCLOSED IN ANY MANNER TO ANY PERSON WITHOUT COMPLYING WITH THE REQUIREMENTS OF SECTION 18 OF THE AGREEMENT TO WHICH THIS EXHIBIT A IS ATTACHED. CAPITALIZED TERMS USED IN THIS EXHIBIT A WITHOUT DEFINITION SHALL HAVE THE MEANINGS ASCRIBED THERETO IN THE AGREEMENT TO WHICH THIS EXHIBIT A IS ATTACHED.**

"Carryover Amount Entitlement" means (i) with respect to any Carryover Amount generated in years one (1) or two (2) of the Minimum Volume Commitment Period, up to $24 million of the Carryover Amount, and (ii) with respect to any Carryover Amount generated in years three (3) through nine (9) of the Minimum Volume Commitment Period, up to $28 million of the Carryover Amount, which Carryover Amount shall be carried forward to the immediately succeeding Aéropostale Fiscal Year only (and may not be carried back to any preceding Aéropostale Fiscal Year and may not be carried forward beyond the immediately succeeding Aéropostale Fiscal Year), and shall be applied against Aéropostale's Minimum Volume Commitment in such immediately succeeding Aéropostale Fiscal Year of the Minimum Volume Commitment Period for purposes of calculating (1) the Rebate, and (2) the Shortfall Commission, if any.

"Minimum Volume Commitment" means collectively: (i) $240 million per annum in years one (1) and two (2) of the Minimum Volume Commitment Period; and (ii) $280 million per annum in years three (3) through ten (10) of the Minimum Volume Commitment Period.

"Rebate" shall be equal to the amount of (i) the Rebate Percentage, *multiplied by* (ii) $5,000,000. For the avoidance of doubt, in no event shall (i) the Rebate in any particular Aéropostale Fiscal Year of the Minimum Volume Commitment Period exceed $5,000,000 or (ii) the aggregate Rebate exceed $50 million.

"Rebate Percentage" means the percentage of (x) the total actual invoice price paid for purchases of Product by Aéropostale (or Guarantor, pursuant to the Guaranty) in the applicable Aéropostale Fiscal Year of the Minimum Volume Commitment Period (which purchases shall include, for the avoidance of doubt, the amount of Product deemed to be purchased by reason of Aéropostale's payment (or Guarantor's payment, pursuant to the Guaranty) of the Shortfall Commission for the applicable Aéropostale Fiscal Year of the Minimum Volume Commitment Period), to (y) the Minimum Volume Commitment; provided that in no event shall the Rebate Percentage exceed 100%.

"Shortfall Commission" means collectively: (i) with respect to any Shortfall occurring during year one (1) or year two (2) of the Minimum Volume Commitment Period, (A) three percent (3%) of each $1 of Shortfall for the first $50 million of Shortfall, (B) four percent (4%) of each $1 of Shortfall for the next $50 million of Shortfall, and (C) eight percent (8%) of each $1 on any remaining Shortfall; and (ii) with respect to any Shortfall occurring during any of years three (3) through ten (10) of the Minimum Volume Commitment Period, (A) four percent (4%) of each $1 of Shortfall for the first $100 million of Shortfall, and (B) eight percent (8%) of each $1 on any remaining Shortfall.  For example, (i) if the Shortfall in year two (2) of the Minimum Volume Commitment Period is exactly $150 million, then Aéropostale shall pay to Vendor $7.5 million as the Shortfall Commission (three percent (3%) of the first $50 million of Shortfall, plus four percent (4%) of the next $50 million of Shortfall, plus eight percent (8%) of the next $50 million of Shortfall) and (ii) if the Shortfall in year three (3) of the Minimum Volume Commitment Period is exactly $150 million, then Aéropostale shall pay to Vendor $8 million as the Shortfall Commission (four percent (4%) of the first $100 million of Shortfall and eight percent (8%) of the next $50 million of Shortfall).

"Termination Fee" shall be equal to $5 million, *plus* the amount of: $1 million *multiplied* by the number of years, including partial years expressed as a decimal, measured from the effective date of termination (which may not be prior to the expiration of the No Termination for Convenience Period) through and including the 10th anniversary of the end of the Start-Up Period.

US_ACTIVE\44445086\12\11727.0008

EXHIBIT B

AEROPOSTALE PURCHASE ORDER TERMS AND CONDITIONS

1.      Aéropostale shall be obligated to determine that every order shall be signed by an "Authorized Signatory", and Vendor shall have no duty or obligation to determine whether or not an order has been signed by an "Authorized Signatory". The prices herein shall not be increased and the quantities and shipment dates shall not be changed without Aéropostale's written consent.

2.      Any terms or conditions set forth on Vendor's invoices, billing statements, acknowledgement forms, or any other documents which are inconsistent with this order shall be of no force or effect without Aéropostale's written consent.

3.      In addition to any other rights of cancellation, rejection or return set forth herein, this order may be cancelled by Aéropostale at any time, without cause, prior to Aéropostale's receipt of the merchandise, it being agreed and understood that within thirty (30) days of any such cancellation, Aéropostale shall reimburse Vendor for any and all costs incurred by Vendor (on or prior to the effectiveness of any such cancellation) described in clause (1) and clause (3) of the definition of "Landed Duty Price" in the Agreement to which this Exhibit B is attached.

4.      Vendor represents, warrants and agrees that the merchandise ordered by this Purchase Order (as used throughout this purchase order "merchandise" includes the merchandise ordered herein and all related packaging, invoicing, labeling and printed matter of any kind) when delivered to and paid for by Aéropostale, will be free and clear of any and all liens and encumbrances of any kind, and that no third party will have any claim or right in the merchandise and that Aéropostale will receive clear title thereto, other than, in any such case, any lien, encumbrance, claim, right or failure to have clear title as a result of any action or inaction on the part of Aéropostale or any of its affiliates. Vendor also represents, warrants and agrees that each item of merchandise will: (a) be merchantable and fit for its intended use and will be free from defects in design, workmanship, or materials, including but not limited to such defects as could create a risk of injury to person or property; (b) conform to all specifications or descriptions set forth in the order and/or any merchandise samples accepted by Aéropostale; (c) conform to the specifications supplied by Aéropostale and to applicable industry standards; (d) not be misbranded or falsely or improperly labeled, tagged, invoiced, packaged, produced or advertised and will comply with all applicable federal, state and local laws, rules, regulations, codes, orders, ordinances, guides, standards and testing requirements thereunder (including without limitation, The Federal Trade Commission Act, Wool Products Labeling Act, Textile Fiber Products Identification Act, Fur Products Labeling Act, Hazardous Substances Act, Toy Safety Act, Consumer Products Safety Act, Consumer Products Safety Improvement Act of 2008, Flammable Fabrics Act, Fair Packaging and Labeling Act and Food, Drug and Cosmetics Act); and (e) not infringe or encroach upon any third party's personal, contractual or property rights, including without limitation; patents, trademarks, trade names, copyrights, trade dress, rights of privacy or publicity, trade secrets, nor constitute unfair competition (it being agreed that Vendor makes no representation, warranty or agreement with respect to any claim or allegation of infringement or violation of a third party's personal, contractual or property rights, including without limitation; patents, trademarks, trade names, copyrights, trade dress, rights of privacy or publicity, trade secrets, nor duties prohibiting unfair competition, in any such case, to the extent related to materials supplied by Aéropostale, including without limitation the Aéropostale Trademarks and Aéropostale Designs). Vendor also

represents, warrants and agrees that the merchandise has been manufactured and imported in accordance with all applicable laws, including without limitation, all laws governing wages and working hours, child labor laws, and export restrictions.

5.   Within ten (10) days of receipt of this order, Vendor shall inform Aéropostale of the 'Country of Origin" of merchandise which Vendor is required to disclose on the merchandise in compliance with federal laws and rules and regulations thereunder, including without limitation the Wool Products Labeling Act and the Textile Fiber Products Identification Act (hereinafter "Country of Origin"), and Vendor shall thereafter continually inform Aéropostale of any and all changes to the Country of Origin as soon as Vendor becomes aware of any such changes or modifications as are required to comply with such laws or regulations. Vendor shall, within ten (10) days of Aéropostale's request, provide Aéropostale with documentation substantiating the Country of Origin disclosed by the Vendor.  Aéropostale reserves the right to cancel any order if the actual Country of Origin is found to be inconsistent with Vendor's disclosure of such Country of Origin pursuant to this Section 5.

6.   Vendor represents and warrants that it has filed continuing guarantees covering the merchandise with all appropriate federal agencies under all applicable federal statutes, including but not limited to the Fur Products Labeling Act, Textile Fiber Products Identification Act, Flammable Fabrics Act, Wool Products Labeling Act, Fair Packaging and Labeling Act, the Consumer Products Safety Improvement Act of 2008, Environmental Protection Act, and Food, Drug and Cosmetic Act and any standards, regulations and guides thereunder.  In addition, Vendor agrees that the following shall constitute its guaranty and shall have the same force and effect as though it were properly signed, executed and delivered by Vendor to Aéropostale.  Vendor hereby guarantees that each item of merchandise delivered under this order which is covered by or subject to the hereinafter specified laws:

(a)   is stamped, tagged, labeled or marked with the fiber content and other information as required by the Textile Fiber Products Identification Act, the Fur Products Labeling Act, the Federal Hazardous Substances Act and/or the Wool Products Labeling Act and that the products specified herein are not misbranded nor deceptively advertised or invoiced under the provisions of any such Acts and the Rules and Regulations promulgated thereunder and all amendments thereto.

(b)   Was subjected to reasonable and representative tests, made in accordance with procedures prescribed and applicable standards or regulations issued, amended or continued in effect under the Consumer Products Safety Improvement Act of 2008 and the Flammable Fabrics Act, as amended, which show that the products, fabric, or related material covered and identified by, and in the form delivered under this document, conforms to the applicable standard or regulation issued, amended, or continued in effect; and

(c)   Is not and contains no article which is adulterated or misbranded within the meaning of the Federal Food, Drug and Cosmetic Act as amended, and neither is nor contains an article which is an article that may not, under the provisions of Sections 404, 505 or 512 of such Act as amended, be introduced into interstate commerce, and all color additives (where color additive regulations require certification) are from batches certified in accordance with the applicable regulations promulgated under the Federal Food, Drug and Cosmetic Act as amended; and if the same are to be processed, labeled or prepacked, the Vendor further agrees to furnish specifications for the same and guarantees to Aéropostale that if such specifications are followed, that the product will not be

US_ACTIVE:\44445086\12\11727.0008

adulterated or misbranded within the meaning of the Federal Food, Drug and Cosmetic Act, as amended.

7.  If Aéropostale has reasonable cause at any time to believe that any item of merchandise ordered hereunder contains defects or hazards which could create a risk of injury to any person or property, upon Aéropostale's request Vendor shall, at Vendor's expense, locate, identify and recall such items whether in the possession of Aéropostale or Aéropostale's customers. Upon recalling such items, Vendor shall, at Aéropostale's option, repair or replace such items or refund to retail purchasers their full retail price less a reasonable allowance for use. Vendor shall reimburse Aéropostale for any direct and actual losses incurred by Aéropostale, any amounts paid by Aéropostale to consumers (which, absent injury to person or property, will not exceed the full retail price thereof), plus all directly incurred and actual charges, costs and expenses incurred by Aéropostale in respect thereof, including without limitation, expenses incurred in warehousing, destroying or in otherwise handling and shipping such merchandise to Vendor and/or repairing such merchandise.

8.  With respect to any delivery of merchandise, in the event that any of the merchandise (a) does not meet Aéropostale's Specifications, (b) is delivered late, (c) is not in compliance with the applicable Order, or (d) is not in compliance with applicable laws or regulations, Aéropostale may, at its option, after using good faith efforts to negotiate a reasonable settlement with Vendor with respect thereto: (i) reject or revoke acceptance of the entire shipment; (ii) accept the entire shipment; or (iii) accept any number of commercial units (i.e., an item of the Products that can be sold at retail) and reject (or revoke acceptance of) the balance of the shipment. If Aéropostale elects to reject any or all of the shipment, the applicable merchandise shall be returned to Vendor for full-credit and stored for a commercially reasonable period of time (not to exceed fifteen (15) days) pending Vendor's receipt of instructions from Aéropostale in accordance with Section 3 of the Agreement to which this Exhibit B is attached as to their disposition. Vendor shall have no right whatsoever to market, offer for sale or sell non-conforming merchandise bearing Aéropostale Designs or Aéropostale Trademarks for its own account or for the account of others without the prior written instruction, direction and authorization of Aéropostale and in any case subject to the condition that the Aéropostale Designs and the Aéropostale Trademarks are first removed or obliterated therefrom. Notwithstanding the foregoing, nothing in this Agreement shall limit or otherwise impair Vendor's rights to re-use fabric in the case of any non-conforming order that is rejected or revoked by Aéropostale subject to the condition that the Aéropostale Designs and the Aéropostale Trademarks are first removed or obliterated therefrom.

9.  Aéropostale shall be under no duty to inspect goods before resale and all Vendor's obligations under this order and these terms and conditions (including but not limited to Vendor's representations and warranties and guarantees), express and implied, shall survive delivery, any inspection, retention, payment by Aéropostale, resale, repacking, and repackaging, and Aéropostale shall have continuing rights to reject them or revoke any acceptance that may have been made in accordance with Paragraph 8 immediately above. Complaints or notices of defects in the merchandise (which, for the avoidance of doubt, will be limited to defects that make the Products unmerchantable, not fit for their intended use and/or not free from defects in design, workmanship, or materials, including but not limited to such defects as could create a risk of injury to person or property) or any other breach will be considered made within a reasonable time by Aéropostale if made within a reasonable time after discovery of the same by Aéropostale. Failure of Aéropostale to state a particular defect or ground upon rejection or return of merchandise shall not preclude Aéropostale from relying on any unstated defect or ground to establish a breach by Vendor. In the event Aéropostale discovers a defect in, or receives numerous complaints about, a given item of merchandise such that Aéropostale determines to

37

remove the item from its stores, then in addition to refunding Aéropostale for the amount paid for such merchandise and to fulfilling its other obligations herein, Vendor will pay Aéropostale's actual and direct expenses in consolidating from its stores and returning the item of merchandise to Vendor.

10.    Nothing in this Exhibit B shall limit or impair any party's rights to indemnification set forth in Section 19 of the Agreement to which this Exhibit B is attached.

11.    If Vendor's supplier(s) violate any Federal or State antitrust laws in respect of the merchandise or any component thereof, under such circumstances that Aéropostale's costs or expenses for or in respect of the merchandise are affected, or such that Aéropostale incurs actual and direct damages, and Aéropostale is precluded from suing such supplier(s) of Vendor, then Vendor shall nonetheless be liable to Aéropostale for the amount of such increased costs or expenses, and/or damages, as the case may be, and (a) if Aéropostale shall so request Vendor to do so, Vendor shall pursue diligently and in good faith an appropriate action at law to recover Aéropostale's costs, expenses and damages (which action may, at Vendor's discretion, include as well a claim for damages in respect of such supplier(s) activities sustained by Vendor and/or other customers of Vendor), and (b) whether or not so requested, Aéropostale may recover from Vendor's actual recovery in any such action (after deduction of reasonable attorney's fees and other costs directly attributable thereto (including taxes), if applicable, in achieving such recovery, fairly proportioned to the recovery by Aéropostale) the damages sustained by Aéropostale as the result of such activity by Vendor's supplier(s). If the amount allocated to Aéropostale is insufficient to cover Aéropostale's damages, costs and/or expenses, Vendor will reimburse Aéropostale for the deficiency.

12.    Invoices, bill of lading, receipts, and like documents covering the merchandise must be consistent with the Agreement to which this Exhibit B is attached. The provisions regarding F.O.B. point or for payment of transportation charges relate to the price only and have no effect on risk of loss unless otherwise agreed by the parties in writing. Unless otherwise mutually agreed in writing by Aéropostale and Vendor, all deliveries shall be DDP to Aéropostale's United States distribution center. Until the merchandise shall have actually been delivered to Aéropostale, delivery thereof shall not be deemed completed nor shall title thereof or risk of loss pass to Aéropostale. VENDOR IS RESPONSIBLE FOR MAINTAINING INSURANCE ON ALL MERCHANDISE WHILE IN TRANSIT AND UNTIL DELIVERED TO AEROPOSTALE.

13.    Any claims for non-payment of an invoice or non-receipt of merchandise returned to Vendor by Aéropostale which involve a carrier loss will be deemed waived by Vendor unless sent to Aéropostale in writing at least ninety (90) days prior to the expiration of the applicable carrier time limitation on filing proof of loss claims.

14.    (a) All rights and remedies granted to Aéropostale under this order and these terms and conditions are cumulative and shall be in addition to any further rights or remedies which Aéropostale would otherwise be entitled in law or equity, and the exercise by Aéropostale of any right or remedy herein provided shall be without prejudice to the exercise of any other right or remedy. (b) Should any provision of this Purchase Order be declared by any court of competent jurisdiction to be invalid, such decision shall not affect the validity of any remaining provisions. (c) This order shall be construed and enforced under and in accordance with the laws of the State of New York. Any and all disputes or claims relating to this order shall be filed, determined, handled and adjudicated in the federal or state courts sitting in the Borough of Manhattan. Each of Vendor and Aéropostale hereby consents to the personal jurisdiction of such Courts over it in any such matter.

15.    As used herein, the term "Aéropostale" means Aéropostale Procurement Company, Inc.

US_ACTIVE:\44445086\12\11727.0008

EXHIBIT C

AÉROPOSTALE MANUFACTURING POLICIES AND PROCEDURES

The Aéropostale Manufacturing Policies and Procedures (the "Policies and Procedures") apply to all vendors and factories that manufacture products (each a "Manufacturer") for Aeropostale, Inc. ("Aéropostale"), including its parents, affiliates, subsidiaries and licensees. Aéropostale recognizes that the Policies and Procedures are not all inclusive, but Aéropostale will only do business with vendors and manufacturers that certify to it that their business practices are lawful, ethical and in compliance with the principles set forth in these Policies and Procedures. Furthermore, Aéropostale will only do business with Manufacturers that obey the laws of the country or countries in which they operate. Moreover, these Policies and Procedures will serve as the basis of Aéropostale's inspection and evaluation of Manufacturers.

1.    Manufacturer's Code of Conduct.

    (a)    Manufacturer will not use forced labor, prison labor, indentured labor, exploited labor, bonded labor or human trafficked labor, or permit their suppliers to do so.

    (b)    Manufacturer will not use child labor in the manufacturing of any Aéropostale products, including their components. Child labor means any person younger than:

        (i)    the national minimum age for employment;

        (ii)    the age of completion of compulsory education;

        (iii)    the age of any other specified exceptions; or

        (iv)    the age of 15,

whichever of these is highest.

    (c)    Manufacturer will treat its employees with respect and dignity. No employee shall be subject to physical, sexual or psychological harassment, verbal harassment, intimidation, bullying or abuse.

    (d)    Manufacturer will not discriminate against any person in employment, including hiring, salary, benefits, advancement, discipline, termination or retirement, on the basis of gender, race, religion, age, disability, sexual orientation, nationality, political opinion, or social or ethnic origin.

    (e)    Manufacturer will provide a safe and healthy working environment for its employees to prevent accidents and injury to health arising out of, linked with, or occurring in the course of work or as a result of the operation of Manufacturer's facilities. Manufacturer will fully comply with all applicable workplace conditions, safety and environmental laws, and ensure all appropriate controls are in place for water discharge, water disposal, waste disposal and air emissions.

    (f)    Manufacturer will recognize and respect the right of employees to freely associate in accordance with the laws of the countries in which they are employed.

US_ACTIVE\44445086\12\11727.0008

(g)     Manufacturer will pay its employees at least the minimum wage required by local law regardless of whether they pay by the piece or by the hour and shall provide legally mandated benefits.

(h)     Manufacturer will not require its employees to work more than the limits on regular and overtime hours allowed by the law of the country of manufacture. Employees shall be entitled to one (1) day off in every seven (7) day period. Manufacturer will inform its employees at the time of hiring if mandatory overtime is a condition of employment. Manufacturer will not compel its workers to work excessive overtime hours.

(i)     Manufacturer will compensate its employees for overtime hours at such premium rate as is legally required in the country of manufacture or, in countries where such laws do not exist, at a rate at least equal to its employees' regular hourly compensation rate.

(j)     Manufacturer will not use workers obligated under contracts which exploit them, which deny them the basic legal rights available to people and to workers within the countries in which they work or which are inconsistent with the principles set forth in these Policies and Procedures.

2.     <u>Quality Control</u>.  Manufacturer will ensure that all products manufactured for Aéropostale are free from defects in materials, workmanship and fabrication and fit, and that all products are fit for their particular purposes or uses; conform to Aéropostale's specifications, descriptions, approved sample or prototypes with respect to quality, size, description, color and dimensions; and are tested, produced, labeled, packaged, shipped, handled and invoiced in compliance with Aéropostale's purchase orders, standards, guidelines and other instructions.

3.     <u>Use of Aéropostale Trademarks</u>.  Manufacturer will not at any time use, promote, advertise, display or otherwise commercialize the Trademarks, or any products or material utilizing or reproducing the Trademarks in any manner.  Any permitted use by Manufacturer of the Trademarks shall inure solely to the benefit of Aéropostale.  To the extent any rights in and to the Trademarks are deemed to accrue to Manufacturer, Manufacturer hereby assigns any and all such rights, at such time as they may be deemed to accrue, including the related goodwill, to Aéropostale.  Manufacturer will not register, or attempt to register, the Trademarks or any trademarks similar to the Trademarks in its own name or any other name, anywhere in the world, or challenge the validity of Aéropostale's ownership in and to or rights to use the Trademarks or any application for the registration thereof anywhere in the world.  The "Trademarks" are the marks AEROPOSTALE®, AERO®, 87®, A87®, P.S. FROM AEROPOSTALE®, PS4U®, PS09®, LIVE LOVE DREAM™ and other marks or brands created by Aéropostale and related logos, crests, emblems, symbols, graphics, designs or trim, including combinations, forms and derivatives thereof as are from time to time created, used or developed for use by Aéropostale or any of its affiliates or subsidiaries, whether registered or unregistered, and all other trademarks, service marks, logos, crests, emblems, symbols, graphics, designs or trim, whether registered or unregistered, owned by, licensed to or authorized for Aéropostale to use in connection with products or merchandise.

4.     <u>Business Practices.</u>

(a)     Manufacturer will only manufacture the products for the account of Aéropostale and the products will not be offered for sale, sold, transferred, distributed, shipped or disposed of in any way or to any person or entity without the prior written instruction, direction and authorization of Aéropostale.  Furthermore, Manufacturer will not market or sell for its

US_ACTIVE:\44445086\12\11727.0008

own account any of the products bearing the Trademarks, including those which have been rejected by Aéropostale, and also including but not limited to all those products which may be characterized as overruns, excess goods, seconds and/or irregulars. All such products shall be deemed to be the sole and exclusive property of Aéropostale.

(b)    Manufacturer has, or will acquire, the ordering processing system designated by Aéropostale in order to process Aéropostale's purchase orders.

(c)    Manufacturer will fully comply with all applicable local, state, federal, national and international laws, rules and regulations including, but not limited to, those relating to wages, hours, labor, health and safety, and immigration.

(d)    Manufacturer will not engage in any activities which are in violation of any applicable domestic, foreign or international laws, rules or regulations, including without limitation laws, rules or regulations governing labor, the environment, the manufacture, testing and sale of goods including U.S. general certificate of conformity requirements, U.S. Customs laws or illegal transshipment. Manufacturer acknowledges that Aéropostale participates in the worldwide supply chain security initiative ("C-TPAT") established by the U.S. Customs and Border Protection Agency ("CBP"), and Manufacturer will comply with the minimum security procedures and guidelines established by CBP, as may be amended.

(e)    Manufacturer will provide full and complete assistance and access to Manufacturer's facilities, offices, personnel and materials for purposes of review, inspection and copying of all books and records of Manufacturer relating to the manufacture and shipping of Aéropostale products. Manufacturer will cooperate fully with Aéropostale to ensure quality and thoroughness of Aéropostale's inspection and audit process, and will maintain all such books and records for two (2) years after the expiration or termination of the business relationship with Manufacturer.

(f)    All Aéropostale designs, screens and artwork (and all other embodiments such as files on hard drives, computer disks and electronic media) (collectively referred to herein as "Aéropostale Designs") shall be deemed to be the exclusive property of Aéropostale and shall be utilized by Manufacturer solely and exclusively for the use and benefit of Aéropostale. Upon the expiration or termination of the manufacturing arrangement or at any time in Aéropostale's sole discretion, all Aéropostale Designs shall be returned to Aéropostale in accordance with Aéropostale's written instructions. Manufacturer shall have no right whatsoever to retain any Aéropostale Designs or any copies, derivatives or information relating thereto for itself or for the benefit of others.

5.    Penalties.    Aéropostale will, directly or through its agents, representatives or independent contractors, monitor Manufacturer's compliance with these Policies and Procedures. If Aéropostale discovers any non-compliance, Aéropostale reserves the right to take such action as it deems appropriate, including cancellation of purchase orders, imposition of fines and penalties and termination of its business relationship with Manufacturer.

US_ACTIVE:\44445086\12\11727.0008

EXHIBIT D

AÉROPOSTALE START-UP PERIOD PRODUCT PURCHASES FORECASTED BY FISCAL
QUARTER

| QUARTER | LANDED DUTY PAID AMOUNT (IN MILLIONS) |
| --- | --- |
| Q4 2014 | $10.0 |
| Q1 2015 | $20.0 |
| Q2 2015 | $30.0 |
| Q3 2015 | $40.0 |
| Q4 2015 | $60.0 |

43

**<u>Exhibit B</u>**

**Proposed Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x
:
In re                                                 :          **Chapter 11**
:
AÉROPOSTALE, INC., *et al.*,                          :          **Case No. 16-_____ (___)**
:
Debtors.[1]                                     :          **Joint Administration Requested**
:
---------------------------------------------------------x

### INTERIM ORDER PURSUANT TO SECTIONS 105(a), 362, AND 365 OF THE BANKRUPTCY CODE COMPELLING PERFORMANCE OF EXECUTORY CONTRACT AND ENFORCING THE AUTOMATIC STAY

Upon the motion [ECF No. __] (the "***Motion***")[2] of Aéropostale, Inc. and its subsidiaries, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "***Debtors***"), pursuant to sections 105(a), 362, and 365 of the Bankruptcy Code for an order to compel performance of the obligations of TSAM (Delaware) LLC (d/b/a MGF US, LLC) ("***MGF***") under the Sourcing Agreement, dated as of May 23, 2014, by and between certain of the Debtors and MGF (the "***Sourcing Agreement***"), and to enforce the automatic stay, all as more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the *Amended Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the relief requested therein being a core proceeding pursuant to

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal tax identification number, as applicable, are as follows: Aéropostale, Inc. (3880); Aéropostale West, Inc. (7013); Jimmy'Z Surf Co., LLC (0461); Aero GC Management LLC (4257); Aeropostale Procurement Company, Inc. (8518); Aeropostale Licensing, Inc. (8124); P.S. from Aeropostale, Inc. (5900); GoJane LLC (4923); Aeropostale Canada Corp. (N/A); Aeropostale Holdings Inc. (7729); and Aeropostale Puerto Rico, Inc. (6477). The Debtors' corporate headquarters is located at 112 West 34th Street, 22nd Floor, New York, NY 10120.

[2] Capitalized terms not otherwise herein defined shall have the meanings ascribed to such terms in the Motion.

28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and notice of the Motion having been given as provided in the Motion, and such notice having been adequate and appropriate under the circumstances; and it appearing that no other or further notice of the Motion need be provided; and the Court having held a hearing to consider the relief requested in the Motion (the "***Hearing***"); and upon the *Declaration of David J. Dick Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York*, and the *Declaration of Robert J. Duffy in Support of (I) Motion of Debtors for Interim and Final Authority to (A) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e), (B) Use Cash Collateral Pursuant to 11 U.S.C. § 363(c)(2), (C) Grant Certain Protections to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364, and (D) Schedule a Final Hearing Pursuant to Fed. R. Bankr. P. 4001(b) and (c) and (II) Motion of Debtors Pursuant to Sections 105(a), 362, and 365 of the Bankruptcy Code for Interim and Final Relief and to Compel Performance of MGF Sourcing US, LLC's Obligations Under Executory Contract and to Enforce the Automatic Stay*, filed contemporaneously with the Motion, the record of the Hearing, and all of the proceedings had before the Court; and the Court having found and determined that the relief sought in the Motion and granted herein is in the best interests of the Debtors, their respective estates and creditors, and all parties in interest, and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

### IT IS HEREBY ORDERED THAT:

1.    The Motion is granted on an interim basis.

2.       Pursuant to sections 105(a), 362, and 365 of the Bankruptcy Code, and effective as the date hereof, MGF is ordered to perform under and comply with the terms of the Sourcing Agreement**,** including, without limitation, MGF's obligations to continue to source, manufacture, and deliver goods already ordered under the Sourcing Agreement in the ordinary course of business, to deliver Original Orders (as defined in the Motion) to the Debtors on 30 day credit terms; and to deliver Post-Feb. 24 Orders (as defined in the Motion) to the Debtors on 20 day credit terms.

3.       Nothing in this Interim Order or the Motion shall be deemed to constitute assumption or rejection of the Sourcing Agreement pursuant to section 365 of the Bankruptcy Code, all of which rights are preserved.

4.       The Final Hearing on the Motion shall be held on _____, **2016, at** _____ **(Eastern Time)** and any objections or responses to the Motion shall be in writing, filed with the Court, with a copy to chambers, and served upon (i) the proposed attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153 (Attn: Ray C. Schrock, P.C., Richard W. Slack, Esq., Jacqueline Marcus, Esq., and Garrett A. Fail, Esq.); (ii) the attorneys for Aero Investors LLC, as agent under the Loan and Security Agreement, dated May 23, 2014; (iii) the attorneys for Bank of America, N.A., as agent under the Third Amended and Restated Loan and Security Agreement, as amended on August 18, 2015;  (iv) the attorneys for MGF; and (v) attorneys for the DIP Agent, in each case so as to be received no later than 4:00 p.m. (Eastern Time) on _____, 2016.

5.       This Interim Order is effective only from the date of entry through this Court's disposition of the Motion on a final basis; provided that the Court's ultimate disposition

3

of the Motion on a final basis shall not impair or otherwise affect any action taken pursuant to this Interim Order.

6.      Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order shall be immediately effective and enforceable upon its entry.

7.      The Debtors are authorized to take all action necessary to carry out this Interim Order.

8.      This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Interim Order.

Dated:  [_____], 2016
         New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

4

**<u>Exhibit C</u>**

**Proposed Final Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------x
                                     :

In re                             :       **Chapter 11**
                                       :

**AÉROPOSTALE, INC.,** *et al.*,    :       **Case No. 16-_____ (___)**
                                       :

    **Debtors.**[1]              :       **Joint Administration Requested**
                                       :
----------------------------------------------------------x

### FINAL ORDER PURSUANT TO SECTIONS 105(a), 362, AND 365 OF THE BANKRUPTCY CODE COMPELLING PERFORMANCE OF EXECUTORY CONTRACT AND ENFORCING THE AUTOMATIC STAY

Upon the motion [ECF No. __] (the "***Motion***")[2] of Aéropostale, Inc. and its

subsidiaries, as debtors and debtors in possession in the above-captioned chapter 11 cases

(collectively, the "***Debtors***"), pursuant to sections 105(a), 362, and 365 of the Bankruptcy Code

for an order to compel performance of the obligations of TSAM (Delaware) LLC (d/b/a MGF

US, LLC) ("***MGF***") under the Sourcing Agreement, dated as of May 23, 2014, by and between

certain of the Debtors and MGF (the "***Sourcing Agreement***"), and to enforce the automatic stay,

all as more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion

and the relief requested therein in accordance with 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the

*Amended Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.); and

consideration of the Motion and the relief requested therein being a core proceeding pursuant to

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal tax identification number, as applicable, are as follows:  Aéropostale, Inc. (3880); Aéropostale West, Inc. (7013); Jimmy'Z Surf Co., LLC (0461); Aero GC Management LLC (4257); Aeropostale Procurement Company, Inc. (8518); Aeropostale Licensing, Inc. (8124); P.S. from Aeropostale, Inc. (5900); GoJane LLC (4923); Aeropostale Canada Corp. (N/A); Aeropostale Holdings Inc. (7729); and Aeropostale Puerto Rico, Inc. (6477).  The Debtors' corporate headquarters is located at 112 West 34th Street, 22nd Floor, New York, NY 10120.

[2] Capitalized terms not otherwise herein defined shall have the meanings ascribed to such terms in the Motion.

28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and

1409; and notice of the Motion having been given as provided in the Motion, and such notice

having been adequate and appropriate under the circumstances; and it appearing that no other or

further notice of the Motion need be provided; and the Court having held an interim hearing and

a final hearing  to consider the relief requested in the Motion (the "***Hearings***"); and upon the

*Declaration of David J. Dick Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the*

*Southern District of New York*, and the *Declaration of Robert J. Duffy in Support of (I) Motion of*

*Debtors for Interim and Final Authority to (A) Obtain Postpetition Financing Pursuant to 11*

*U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e), (B) Use Cash*

*Collateral Pursuant to 11 U.S.C. § 363(c)(2), (C) Grant Certain Protections to Prepetition*

*Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364, and (D) Schedule a Final*

*Hearing Pursuant to Fed. R. Bankr. P. 4001(b) and (c) and (II) Motion of Debtors Pursuant to*

*Sections 105(a), 362, and 365 of the Bankruptcy Code for Interim and Final Relief and to*

*Compel Performance of MGF Sourcing US, LLC's Obligations Under Executory Contract and*

*to Enforce the Automatic Stay*, filed contemporaneously with the Motion, the record of the

Hearings, and all of the proceedings had before the Court; and the Court having found and

determined that the relief sought in the Motion and granted herein is in the best interests of the

Debtors, their respective estates and creditors, and all parties in interest, and that the legal and

factual bases set forth in the Motion establish just cause for the relief granted herein; and after

due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.    The Motion is granted on a final basis.

2

2.      Pursuant to sections 105(a), 362, and 365 of the Bankruptcy Code, and effective as the date hereof, MGF is ordered to perform under and comply with the terms of the Sourcing Agreement, including, without limitation, MGF's obligations to continue to source, manufacture, and deliver goods already ordered under the Sourcing Agreement in the ordinary course of business, to deliver Original Orders (as defined in the Motion) on an expedited basis to the Debtors on 30 day credit terms; and to deliver Post-Feb. 24 Orders (as defined in the Motion) to the Debtors on 20 day credit terms.

3.      Nothing in this Final Order or the Motion shall be deemed to constitute assumption or rejection of the Sourcing Agreement pursuant to section 365 of the Bankruptcy Code, all of which rights are preserved.

4.      The Debtors are authorized to take all action necessary to carry out this Final Order.

5.      This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Final Order.

Dated:  [_____], 2016
        New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

WEIL:\95703393\2\11727.0012

**<u>Exhibit D</u>**

**Correspondence**

**MGF Sourcing US, LLC**
**4200 Regent St., Suite 205**
**Columbus, Ohio 43219**

February 24, 2016

Aéropostale, Inc.
112 West 34th Street
New York, New York 10120
Attention: Marc Schuback, General Counsel
Email: mschuback@aeropostale.com

Dear Mr. Schuback:

Reference is made to that certain Sourcing Agreement dated as of May 23, 2014 (as amended, restated or otherwise modified from time to time in accordance with its terms, the "Sourcing Agreement"), by and among Aéropostale Procurement Company, Inc., Aéropostale, Inc., and MGF Sourcing US, LLC.  Capitalized terms used herein without definition shall have the meanings ascribed thereto in the Sourcing Agreement.

Pursuant to Section 4(b)(ii) of the Sourcing Agreement, Vendor hereby notifies Aéropostale and Guarantor that, upon information and belief, a Credit Review Period has been triggered, as Aéropostale's Liquidity is less than $150,000,000.  In accordance with Section 4(b)(ii) of the Sourcing Agreement, Vendor hereby notifies Aéropostale and Guarantor that Vendor has elected to adjust the payment terms on all future Orders.  Accordingly, no future Orders will be accepted by Vendor unless and until Aéropostale either (at Vendor's election at the time of placement of the Order) (i) delivers to Vendor (concurrently with the placement of the relevant Order) a satisfactory irrevocable standby letter of credit for Vendor's benefit in the amount of each such relevant Order or (ii) delivers immediately available funds to Vendor concurrently with the placement of the Order.

Please feel free to contact me should you have any questions regarding this matter.

Sincerely,

MGF Sourcing US, LLC

By: James Schwartz
James Schwartz, its President and CEO

**INTENTIONALLY LEFT BLANK**

# AÉROPOSTALE, INC.

112 West 34th Street • New York, NY  10120 • (646) 485-5410

Marc G. Schuback
Senior Vice President, General Counsel
and Secretary
Phone: 646-452-1851
Email: mschuback@aeropostale.com

February 26, 2016

**VIA EMAIL**
MGF Sourcing US, Inc.
4200 Regent St., Suite 205
Columbus, Ohio 43219
Attention:  James Schwartz, President and CEO

Dear Mr. Schwartz:

I am writing in response to your letter to me dated February 24, 2016.  We disagree with the conclusion set forth in the letter that a Credit Review Period has been triggered.

Your letter provides absolutely no basis for your conclusion and only states that it is written on "information and belief."  We request that you provide us with information evidencing your conclusion that a Credit Review Period has been triggered as well as identifying the source(s) of such information.  Given your letter, we assume that you should have no problem easily furnishing this information.

We await the requested information as your allegation would cause significant harm to Aéropostale and its shareholders.  This letter is written without prejudice or waiver of any rights of Aéropostale, and the company reserves all of its rights.

Sincerely,

Marc G. Schuback

**INTENTIONALLY LEFT BLANK**

**MGF Sourcing US, LLC**
**4200 Regent St., Suite 205**
**Columbus, Ohio 43219**

February 29, 2016

Aéropostale, Inc.
112 West 34th Street
New York, New York 10120
Attention: Marc Schuback, General Counsel
Email: mschuback@aeropostale.com

Dear Mr. Schuback:

Reference is made to each of (i) our letter dated February 24, 2016 addressed to you (the "February 24th Letter") and (ii) that certain Sourcing Agreement dated as of May 23, 2014 (as amended, restated or otherwise modified from time to time in accordance with its terms, the "Sourcing Agreement"), by and among Aéropostale Procurement Company, Inc., Aéropostale, Inc., and MGF Sourcing US, LLC. Capitalized terms used herein without definition shall have the meanings ascribed thereto in the Sourcing Agreement.

In addition to the matters addressed in the February 24th Letter, in accordance with rights and remedies afforded to Vendor pursuant to Section 4(b)(ii) of the Sourcing Agreement during a Credit Review Period, Vendor hereby notifies Aéropostale and Guarantor that no pending Orders will be delivered by Vendor to Aéropostale unless and until Aéropostale pays Vendor, by wire transfer in U.S. Dollars in immediately available funds, the full amount of such relevant Order prior to the date such Order is to be shipped by Vendor's third party logistics provider from the U.S. port to Aéropostale.

Please feel free to contact me should you have any questions regarding this matter.

Sincerely,

MGF Sourcing US, LLC

By: _____
Jennie Wilson, its CFO

**INTENTIONALLY LEFT BLANK**

**Weil, Gotshal & Manges LLP**

767 Fifth Avenue
New York, NY 10153-0119
+1 212 310 8000 tel
+1 212 310 8007 fax


Joseph S. Allerhand
+1 (212) 310-8725
joseph.allerhand@weil.com

<u>BY E-MAIL AND FED EX</u>

March 1, 2016

MGF Sourcing US, Inc.
4200 Regent St., Suite 205
Columbus, Ohio 43219

Attention: Jennie Wilson

Dear Ms. Wilson:

I am writing in response to your letter, dated February 29, 2016, to Marc Schuback. As you know, we represent Aeropostale, Inc. Please direct all further correspondence to my attention.

Mr. Schuback sent a letter to Mr. James Schwartz on February 26, 2016 (in response to Mr. Schwartz's February 24th letter). In his letter, Mr. Schuback requested, among other things, that MGF provide "information evidencing your conclusion that a Credit Review Period has been triggered as well as identifying the sources(s) of such information." We have yet even to receive a response from Mr. Schwartz, and your letter completely ignores this request and is not at all responsive to Mr. Schuback's letter. We have to assume, therefore, either that you have no basis for the conclusion that a Credit Review Period has been triggered and/or that any information that you might have with respect to the Credit Review Period - the completeness and accuracy of which Aeropostale challenges - was obtained unlawfully from a source that had a duty to Aeropostale not to disclose such information. Your unwillingness to disclose the information requested by Aeropostale requires us to assume no other conclusion.

In any event, I direct your attention to Section 4(b)(ii) of the Sourcing Agreement referenced in your letter. The Sourcing Agreement requires that any change in the payment schedule be made in the exercise of reasonable credit judgment. Imposing cash in advance terms here is neither prudent nor reasonable and threatens to cause significant harm to Aeropostale, its business and its shareholders. (In fact, in Mr. Schwartz's letter, you indicated that you were proposing to change trade terms going forward; however, your letter indicates that MGF is changing payment terms with respect to pending orders, as well.) This is hardly the type behavior that would be expected of a critical supplier with a long-term sourcing agreement that required the exercise of reasonable credit judgment – your actions are completely unreasonable under the circumstances. In short, your actions (which have been confirmed in your letter) constitute a breach of the Sourcing Agreement and will cause significant harm to the company.

Ms. Jennie Wilson
March 1, 2016
Page 2

**Weil, Gotshal & Manges LLP**

We demand that you retract your letter immediately and confirm that MGF will resume shipments in the ordinary course in compliance with the Sourcing Agreement.  Aeropostale and MGF can then meet among to discuss any concerns that you may have and how to move forward in a reasonable manner and in compliance with the terms of the Sourcing Agreement.  We will hold MGF Sourcing and its affiliates responsible for the full extent of any resulting damages and loss should you fail to take that action today.  We also are evaluating any other actions that should be taken to protect Aeropostale based on the conduct of MGF and its affiliates.  We look forward to your confirmation.

This letter is written without prejudice or waiver of any rights of Aeropostale, and the company reserves all of its rights.

Sincerely,

Joseph S. Allerhand

cc:  Marc Schuback
     James Stempel

**INTENTIONALLY LEFT BLANK**

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

|                                                              |                                         |                                  |
| ------------------------------------------------------------ | --------------------------------------- | -------------------------------- |
|                                                              | 300 North LaSalle                       |                                  |
|                                                              | Chicago, Illinois  60654                |                                  |
| James A. Stempel                                             |                                         |                                  |
| To Call Writer Directly:                                     | (312) 862-2000                          | Facsimile:                       |
| (312) 862-2440                                               |                                         | (312) 862-2200                   |
| jstempel@kirkland.com                                        | www.kirkland.com                        |                                  |

March 3, 2016

**By E-mail and Express Mail**

Joseph S. Allerhand, Esq.
Weil, Gotshal & Manges LLP
757 Fifth Avenue
New York, NY 10153-0119

Re:  Aéropostale, Inc.

Dear Mr. Allerhand:

Your letter dated March 1, 2016 to Jennie Wilson is replete with inappropriate assumptions and inaccurate allegations. In reaching its conclusion that a Credit Review Period has been triggered, MGF has not used any information obtained unlawfully or otherwise from a source that had a duty to Aéropostale not to disclose such information.

You continue to make the bare assertion that Aéropostale will be significantly harmed by MGF's COD requirement.  However, Aéropostale has not attempted to demonstrate to MGF that Aéropostale has not in fact triggered a Credit Review Period, opting instead to make baseless threats against MGF and its affiliates.  Aéropostale's failure to demonstrate that a Credit Review Period has not in fact been triggered demonstrates that MGF's conclusion is accurate and that Aéropostale has no reasonable basis to contest the fact that a Credit Review Period has been triggered.  Accordingly, MGF has instructed us to reaffirm its position articulated in its February 29, 2016 letter that no further product deliveries will be made to Aéropostale other than on a COD basis.

MGF reserves all of its rights.

Sincerely,

James A. Stempel

James A. Stempel

cc:    Mark G. Schuback, Esq.

Beijing    Hong Kong    Houston    London    Los Angeles    Munich    New York    Palo Alto    San Francisco    Shanghai    Washington, D.C.

# INTENTIONALLY LEFT BLANK

**Weil, Gotshal & Manges LLP**

767 Fifth Avenue
New York, NY 10153-0119
+1 212 310 8000 tel
+1 212 310 8007 fax

**Joseph S. Allerhand**
+1 (212) 310-8725
joseph.allerhand@weil.com

BY E-MAIL

March 7, 2016

James A. Stempel
Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
jstempel@kirkland.com

Re: Aéropostale Inc.

Dear James:

I write in response to your March 3, 2016, letter and the February 24, 2016, and February 29, 2016, letters from your client MGF Sourcing US, LLC to Aéropostale Inc.

Setting aside disputes as to whether Aéropostale is operating in a Credit Review Period while reserving all arguments, rights and defenses in connection therewith, MGF's actions are nonetheless in bad faith and in violation of the terms of the May 23, 2014 Sourcing Agreement.

First, Aéropostale remains confused as to what your client is in fact demanding as the pre-condition for shipping goods. In its February 24, 2016, letter, MGF stated it was immediately suspending performance on *future* orders without payment or delivery by Aéropostale of a letter of credit contemporaneously with such orders, constricting payment terms by several months. Then, less than a week later, in its February 29, 2016, letter, MGF stated that it was immediately suspending performance of *pending* orders without payment in advance of shipping, shortening terms on those orders by approximately 75 days. Your March 3, 2016, letter states that MGF is now demanding payment upon delivery for *all* orders, shortening terms by at least 30 days. Like MGF's previous demands, this latest constitutes a breach of the Sourcing Agreement, as Section 4(b)(ii) of the Sourcing Agreement upon which you rely requires any alternate payment schedule to be prudent and reasonable. MGF's continuing and conflicting demands are entirely unreasonable (not to mention confusing) under all of the circumstances.

Second, Section 4(b)(ii) merely reflects a contractual right to demand adequate assurance of performance consistent with Article 2-609 of the Uniform Commercial Code. Aéropostale has offered to meet with MGF personally at Weil's offices to discuss the situation. As I am sure your client knows, Aéropostale has cash on hand as well as access to a revolving credit line well in excess of $100 million. Demanding cash prior to shipment or cash on delivery under these facts is simply not prudent or

James A. Stempel                                                **Weil, Gotshal & Manges LLP**
March 7, 2016
Page 2

reasonable under any standard, and constitutes bad faith conduct given Aeropostale's immediate access to liquidity under its credit line.  Aéropostale also has up to 30 days to provide such adequate assurance. MGF's demands are further a violation of MGF's commercial contractual duty of good faith and fair dealing.

As your client undoubtedly has intended, MGF's actions are causing Aéropostale to undergo a significant level of systemic distress and may well cause the very financial result about which MGF says it is concerned.  Aéropostale again demands that MGF resume delivery on standard terms to avoid irreparable injury to the company and MGF's liability for same.

Rather than continue to engage in letter writing, and in a final effort to avoid more extreme measures, Aéropostale again offers to meet with MGF.  Please let me know if you are available for such a meeting at our offices on Wednesday, March 9, 2016, at 9:00 a.m.

This letter is written without prejudice or waiver of any rights of Aéropostale, and Aéropostale reserves all of its rights, claims and defenses.

Sincerely,

Joseph S. Allerhand


cc:  Marc Schuback

**INTENTIONALLY LEFT BLANK**

**MGF Sourcing US, LLC**
**4200 Regent St., Suite 205**
**Columbus, Ohio 43219**

March 18, 2016

Aéropostale, Inc.
112 West 34th Street
New York, New York 10120
Attention: Marc Schuback, General Counsel
Email: mschuback@aeropostale.com

## NOTICE OF DEFAULT

Dear Mr. Schuback:

Reference is made to each of (i) that certain Sourcing Agreement dated as of May 23, 2014 (as amended, restated or otherwise modified from time to time in accordance with its terms, the "Sourcing Agreement"), by and among Aéropostale Procurement Company, Inc., Aéropostale, Inc., and MGF Sourcing US, LLC, (ii) our prior letters addressed to you dated February 24, 2016 and February 29, 2016, and (iii) the e-mails dated March 2, 2016 and March 10, 2016 from Ms. Jennie Wilson of MGF Sourcing addressed to Mssrs. Miller and Dick of Aéropostale tendering delivery of approximately $12.9 million of inventory produced by MGF Sourcing for Aéropostale. Capitalized terms used herein without definition shall have the meanings ascribed thereto in the Sourcing Agreement.

Vendor hereby reiterates that Vendor is ready, willing and able to deliver the Orders referred to in our March 2, 2016 and March 10, 2016 e-mails upon Aéropostale's compliance with the payment terms set forth in those emails. Vendor hereby notifies each of Aéropostale and Guarantor that their refusal to accept delivery of and pay for such Orders under the terms set forth in the March 2, 2016 and March 10, 2016 e-mails is a material breach of the terms and conditions of the Sourcing Agreement, and Vendor reserves each of its rights and remedies in accordance with applicable law and contract, including without limitation, those set forth in the Sourcing Agreement and the Credit Agreement. Without in any way limiting the foregoing, Vendor reserves all of its rights to (i) collect any and all carrying costs incurred by Vendor arising as a result of Aéropostale's failure to accept delivery and pay for such Orders under the terms set forth in the March 2, 2016 and March 10, 2016 e-mails, (ii) suspend performance of any pending Orders (including any work in progress), and (iii) terminate the Sourcing Agreement in accordance with Section 12(a)(i) thereof on or following the 15th business day following the delivery of this Notice of Default if Aéropostale does not cure the breach described herein on or prior to such date.

We look forward to your immediate payment for the Orders referred to above to promptly resolve this situation.

Sincerely,

MGF Sourcing US, LLC

By: _James Schwartz_____
    James Schwartz, its CEO

**INTENTIONALLY LEFT BLANK**

# AÉROPOSTALE, INC.

112 West 34th Street • New York, NY 10120 • (646) 485-5410

Marc G. Schuback
Senior Vice President, General Counsel
and Secretary
Phone: 646-452-1851
Email: mschuback@aeropostale.com

March 21, 2016

**VIA EMAIL**

MGF Sourcing US, LLC
4200 Regent St., Suite 205
Columbus, Ohio 43219
Attention: James Schwartz (jschwartz@mgfsourcing.com)

Dear Mr. Schwartz:

I write in response to your March 18, 2016 letter stating that Aéropostale is in material breach of the May 23, 2014 Sourcing Agreement between Aéropostale and MGF Sourcing. You are dead wrong. Aéropostale has not breached the Sourcing Agreement in any way much less committed a material breach. I suppose you believe the best defense is an offense given that MGF has materially breached the agreement in a variety of ways including by refusing to ship goods previously ordered and on terms previously agreed to, and by demanding new and unreasonable terms. We intend to hold MFG fully liable for all the damage it is causing by its bad faith conduct.

MGF Sourcing has claimed that a Credit Review Period has been triggered, thereby allowing MGF Sourcing to refuse to ship goods unless Aéropostale agrees to "pay in advance" or "pay as we go." Yet, even if a Credit Review Period had been triggered at the time you sent the notice, that does not impact the payment terms for existing purchase orders based on terms at that time. Nothing in the Sourcing Agreement allows you to unilaterally and retroactively alter the terms of orders already placed. Thus, orders before you sent your February 24, 2016 letter claiming a Credit Review Period must be immediately shipped and delivered pursuant to the terms (*i.e.*, "net 30 days") on which those orders were based. Aéropostale stands ready to continue to abide by the terms agreed to by the parties with respect to existing orders. MGF Sourcing's failure to deliver these goods on the terms set at the time of the orders is a breach of the Sourcing Agreement.

In addition, even if a Credit Review Period has been triggered, the Sourcing Agreement requires that any change in payment terms be made in the exercise of reasonable credit judgment. There is nothing reasonable about imposing cash in advance terms here where our business has shown significant improvement as a result of our two chain strategy and continues to have over $100

million in liquidity.  MGF Sourcing's actions are in bad faith and are in clear violation of the terms of the Sourcing Agreement.

We demand that you retract your void and improper notice of default immediately and resume shipment and delivery in compliance with the standard payments terms set out in Section 4(b)(ii) of the Sourcing Agreement (*i.e.* "net 30 days").

This letter is written without prejudice or waiver of any rights of Aéropostale, and the Company reserves all of its rights.

Sincerely,

cc:  James A. Stempel (jstempel@kirkland.com)

    Joseph Allerhand (joseph.allerhand@weil.com)

NOTHING CONTAINED IN THIS LETTER SHALL BE CONSTRUED AS A WAIVER OR RELINQUISHMENT OF ANY RIGHT
OR REMEDY TO WHICH AÉROPOSTALE, INC. IS ENTITLED, ALL OF WHICH ARE HEREBY EXPRESSLY RESERVED.

**INTENTIONALLY LEFT BLANK**

**MGF Sourcing US, LLC**
**4200 Regent St., Suite 205**
**Columbus, Ohio 43219**

April 20, 2016

Aéropostale, Inc.
112 West 34th Street
New York, New York 10120
Attention: Marc Schuback, General Counsel
Email: mschuback@aeropostale.com

<u>**NOTICE OF DEFAULT**</u>

Dear Mr. Schuback:

Reference is made to each of (i) that certain Sourcing Agreement dated as of May 23, 2014 (as amended, restated or otherwise modified from time to time in accordance with its terms, the "Sourcing Agreement"), by and among Aéropostale Procurement Company, Inc., Aéropostale, Inc., and MGF Sourcing US, LLC, and (ii) the e-mail dated April 15, 2016 from Ms. Jennie Wilson at Aéropostale addressed to Mssrs. Miller and Dick of Aéropostale and the e-mail dated April 19, 2016 from our counsel at Kirkland & Ellis LLP addressed to Mr. Ray Schrock of Weil, Gotshal & Manges LLP (collectively, the "Payment Demands") demanding payment of $658,457.13 of past due accounts receivable and tendering delivery of $9,691,114.46 of inventory produced by MGF Sourcing for Aéropostale. Capitalized terms used herein without definition shall have the meanings ascribed thereto in the Sourcing Agreement.

Vendor hereby reiterates (i) its demand for immediate payment of the $658,457.13 of past due accounts receivable, and (ii) that Vendor is ready, willing and able to deliver the Orders totaling $9,691,114.46 referred to above upon Aéropostale's compliance with the cash-in-advance payment terms set forth in the Payment Demands. Vendor hereby notifies each of Aéropostale and Guarantor that their (i) non-payment of the aforementioned $658,457.13 in past due accounts receivable, and (ii) refusal to accept delivery of and pay for the aforementioned $9,691,114.46 in Orders in accordance with the terms of the Payment Demands is a material breach of the terms and conditions of the Sourcing Agreement, and Vendor reserves each of its rights and remedies in accordance with applicable law and contract, including without limitation, those set forth in the Sourcing Agreement and the Credit Agreement. Without in any way limiting the foregoing, Vendor reserves all of its rights to (i) collect any and all carrying costs incurred by Vendor arising as a result of Aéropostale's failure to accept delivery and pay for such Orders under the terms set forth in the Payment Demands, (ii) suspend performance of any pending Orders (including any work in progress), (iii) permanently cancel performance of any pending Orders (including any work in progress), and (iv) terminate the Sourcing Agreement in accordance with Section 12(a)(i) thereof on or following the 15th business day following the delivery of this

Notice of Default if Aéropostale does not cure the breaches described herein on or prior to such date.

Sincerely,

MGF Sourcing US, LLC

By: _____

James Schwartz, its CEO

# INTENTIONALLY LEFT BLANK

# AÉROPOSTALE, INC.

112 West 34th Street • New York, NY  10120 • (646) 452-1851

Marc G. Schuback
Senior Vice President, General Counsel
and Secretary
Phone:  646-452-1851
Email:  mschuback@aeropostale.com

May 2, 2016

**VIA EMAIL**

MGF Sourcing US, LLC
4200 Regent St., Suite 205
Columbus, Ohio 43219
Attention:  James Schwartz (jschwartz@mgfsourcing.com)

Dear Mr. Schwartz:

Consistent with my letter of March 21, 2016, I write to inform you that MGF Sourcing continues
to be in breach of the May 23, 2014 Sourcing Agreement between Aéropostale (the "Company")
and MGF Sourcing by (1) refusing to deliver goods on the "net 30" terms that were the basis of
placing those purchase orders; and (2) seeking to impose onerous and preferential payment terms
with respect to new purchase orders that are neither prudent nor reasonable. MGF Sourcing's
breaches have harmed the Company and the Company will hold MGF Sourcing accountable for
this harm.  We demand that you cease your conduct and deliver goods based on the terms that
were agreed to when those orders were purchased.  We also demand that MGF Sourcing adhere
to the terms of the Sourcing Agreement and reconsider its imposition of onerous and
unreasonable terms on new purchase orders. We remain ready and willing to sit down and
discuss mutually beneficial and reasonable payment terms for new orders.

This letter is also sent in response to (i) MGF Sourcing's April 20, 2016 letter improperly
contending that Aéropostale is somehow in default of the May 23, 2014 Sourcing Agreement
between Aéropostale and MGF Sourcing and (ii) Ms. Wilson's April 29, 2016 email to Marc
Miller and David Dick (on which you are copied) demanding cash in advance payment for all
remaining inventory deliveries.  The Company is not in breach of the Sourcing Agreement.  As it
is MGF Sourcing that is in breach of the Sourcing Agreement by refusing to ship goods ordered
on terms previously agreed to and by demanding new, unreasonable and preferential payment
terms for new orders, no additional response is required.

James Schwartz
May 2, 2016
Page 2 of 2


Perhaps your improper conduct is guided by a misperception.  In Ms. Wilson's April 29, 2016 email, she states that she believes that Aéropostale's largest supplier, LF Sourcing (Millwork) LLC ("L&F") "has moved Aéropostale to cash up front payments."  This is not true.  To the contrary, L&F has continued to manufacture and ship goods on payment terms of "net 20"— which means that Aéropostale has 20 days after delivery to Aéropostale's distribution center to make payment.  Given this error, MGF Sourcing should re-assess its position.

This letter is written without prejudice or waiver of any rights of Aéropostale, and it reserves all of its rights, claims and defenses.

Sincerely,