WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Richard W. Slack
Jacqueline Marcus
Garrett A. Fail

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
:
In re                                    :    Chapter 11
:
AÉROPOSTALE, INC., *et al.*,             :    Case No. 16-11275 (SHL)
:
Debtors.[1]                              :    (Jointly Administered)
:
------------------------------------------------------------x

**DECLARATION OF ROBERT J. DUFFY IN SUPPORT OF MOTION
OF DEBTORS FOR FINAL AUTHORITY TO (A) OBTAIN POSTPETITION
FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2),
364(c)(3), 364(d)(1), AND 364(e), (B) USE CASH COLLATERAL PURSUANT TO 11
U.S.C. § 363(c)(2), AND (C) GRANT CERTAIN PROTECTIONS TO PREPETITION
SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363, AND 364**

I, Robert J. Duffy, make this declaration pursuant to 28 U.S.C. § 1746:

1.  I am currently a Managing Director at Berkeley Research Group, LLC

("**BRG**"), a professional services firm with offices located at 104 West 40th Street, 16th Floor

New York, NY 10018. BRG's practice consists of senior financial, management consulting,

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal tax identification number, as applicable, are as follows: Aéropostale, Inc. (3880); Aéropostale West, Inc. (7013); Jimmy'Z Surf Co., LLC (0461); Aero GC Management LLC (4257); Aeropostale Procurement Company, Inc. (8518); Aeropostale Licensing, Inc. (8124); P.S. from Aeropostale, Inc. (5900); GoJane LLC (4923); Aeropostale Canada Corp. (N/A); Aeropostale Holdings, Inc. (7729); and Aeropostale Puerto Rico, Inc. (6477). The Debtors' corporate headquarters is located at 112 West 34th Street, 22nd Floor, New York, NY 10120.

accounting, and other professionals who specialize in providing financial, business, and strategic assistance typically in distressed business settings. BRG serves troubled companies, debtors, secured and unsecured creditors, equity holders, and other parties in both in-court and out-of-court engagements.

2.     Previously, I was a Global Segment Leader with FTI Consulting, Inc. (together with its affiliates, its wholly-owned subsidiaries, and independent contractors, "**FTI**"), serving as the Global Leader of FTI's Corporate Finance/Restructuring Segment. FTI is a global business advisory firm that provides multidisciplinary solutions to complex challenges and opportunities. The restructuring and turnaround experts at FTI help management stabilize finances and operations to reassure all parties-in-interest that proactive steps are being taken to enhance value. FTI's professionals have a deep expertise across many industries, allowing them to quickly ascertain key issues and react immediately on behalf of their clients. For clients in crisis, FTI professionals develop liquidity forecasts, improve cash flow management, obtain and consult regarding additional financing, and guide complex debt restructuring, among other services.

3.     I have over 30 years of experience, including more than 26 years serving as an advisor to private equity firms, corporations, lenders, and boards of directors of under-performing businesses and companies in transition. I have previously served as the national leader for FTI's Retail and Consumer Products practice. I have substantial experience in a number of industries as a result of leading successful engagements both in the United States and throughout the world. In such roles, I have led projects on more than 100 engagements to help my clients revitalize operations, implement operational improvements, and reposition businesses

2

for future growth. The assignments I have led have included both public and private companies ranging in size from $50 million to more than $12 billion in annual revenue.

4. Some of my retail engagements over recent years include the Debtors,[2] Vestis Retail Group, The Sports Authority, Radio Shack, Circuit City, Ritz Camera, Fortunoff, Bob's Stores, Goody's Family Clothing, and Mervyn's. I have also advised on numerous private company matters involving middle market and large companies. I joined FTI in connection with its acquisition of PricewaterhouseCoopers' Business Recovery Services group. During my 14 years at that firm, I held key roles in the turnaround and/or restructuring of companies in many different industries around the globe. In 2010, I was inducted as a fellow in to the American College of Bankruptcy. I hold an MBA in finance, management policy, and marketing from the J.L Kellogg Graduate School of Management at Northwestern University and a B.S. in finance from Boston College.

5. In February 2016, FTI was retained to serve as financial advisor for the Debtors. Since that time, including after my departure from FTI, I have overseen a team of individuals that has assisted the Debtors' management team with, among other things, managing and forecasting the Debtors' liquidity position, evaluating store profitability on a 4-wall basis, assessing business performance and EBITDA by business segment and geography, identifying cost-saving strategies, and other financial analysis and planning. Accordingly, I am knowledgeable and familiar with the Debtors' day-to-day operations, business and financial affairs, cash flow needs and projections, and books and records. I am also familiar with the Debtors' supply chain and the status of the Debtors' relationships with various vendors, suppliers, and service-providers.

---

[2] Capitalized terms used but not defined herein shall have the meanings set forth in the Motion (as hereinafter defined).

3

6. Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by the Debtors' employees or FTI employees working with the Debtors, or my opinion based upon experience, knowledge, and information concerning the Debtors' operations and the retail industry. If called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

7. I submit this declaration ("**Declaration**") in further support of the *Motion of Debtors for Interim and Final Authority to (A) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e), (B) Use Cash Collateral Pursuant to 11 U.S.C. § 363(c)(2), (C) Grant Certain Protections to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364, and (D) Schedule a Final Hearing Pursuant to Fed. R. Bankr. P. 4001(b) and (c)* [ECF No. 5] (the "***Motion***").[3] The Debtors and their counsel, Weil, Gotshal & Manges LLP, have asked me to provide my opinion concerning whether the Prepetition Term Loan Secured Parties are protected from a diminution in the value of their collateral on account of the DIP Facility or the Debtors' use of cash collateral under the circumstances here.

8. Based on my knowledge of the Debtors' operations and the strategy being employed by the Debtors in these chapter 11 cases, I have reached three conclusions with respect to whether the Prepetition Term Loan Secured Parties are adequately protected:

a. **First**, based on FTI's most recent analysis of the Debtors' borrowing base, which acts as a proxy for the value of the Debtors' inventory collateral, between the end of the Interim Period and the end of September, the Company's liquidity does not

---

[3] Capitalized terms used but not defined herein shall have the meanings assigned to them in the Motion.

ultimately diminish. On the contrary, based on the FTI's projections, while liquidity fluctuates, liquidity is projected to increase and will be greater at the end of September than at the end of the Interim Period. Moreover, liquidity is greater if this analysis accounts for the cost of preserving and disposing of the Prepetition Term Loan Secured Parties' collateral – charges that would be borne by the Prepetition Term Loan Secured Parties even if the DIP Motion is not approved.

b.  **Second**, the forced liquidation path that the Prepetition Term Loan Secured Parties seek here is almost certainly a recipe for significantly diminishing the value of the collateral. There is little question that a forced liquidation as sought by the Prepetition Term Loan Secured Parties will destroy the value of the Debtors' crown jewel, the international licensing business, which is valued at approximately twice as much if it is sold with an operating U.S. – based retail brand.

c.  **Third**, if one considers the proposal proffered by the Prepetition Term Loan Secured Parties in their Objection[4] the difference between the Debtors' and the Prepetition Term Loan Secured Parties' preferred course of action appears to be a mere seventeen days. In paragraph 40 of their Objection, the Prepetition Term Loan Secured Parties propose a timeline that would require the Debtors to select a stalking horse on or about July 1, 2016. The Milestones already require the Debtors to file a motion seeking approval of their bidding procedures by July 18, 2016. As a practical matter, if by July 18, 2016, the Debtors determine, in an exercise of their fiduciary duties, that liquidation is the value-maximizing

---

[4]   *Supplemental Objection of Aero Investors LLC and MGF Sourcing Holdings, Limited (F/K/A Tsam Holdings, Limited) to Motion of Debtors for Interim and Final Authority to (A) Obtain Post Petition Financing Pursuant to 11 U.S.C. Sections 105, 361, 362, and 364(c)(1), 364(c)(2), 364 (c)(3), 364(d)(1) and 364 (e), (B) Use Cash Collateral Pursuant to 11 U.S.C. Sections 361, 362, 363 and 364 (C) Grant Certain Protections to Prepetition Secured Parties Pursuant to 11 U.S.C. Sections 361, 362, 363 and 364, and (D) Schedule a Final Hearing Pursuant to Fed. R. Bankr. P. 4001(b) and (c)* [ECF No. 214].

5

course, the Debtors will have ample time to commence liquidation by the end of July. Such liquidation could occur during the back-to-school season. The Debtors are only seeking an additional *seventeen days* for an opportunity to allow their dual tracked plan and sale process to develop. The Prepetition Term Loan Secured Parties will not be prejudiced by this seventeen day difference. Both timelines preserve the option of capturing the back-to-school season. But only the Debtors' proposed plan and sale process preserves the possibility of capturing the full going-concern value of the Debtors' businesses.

**The Debtors' Process**

9.      As described in the *Declaration of David J. Dick Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York* [ECF No. 4] which was filed on the Commencement Date, the Debtors intend to follow a dual-track strategy that would result either in a going concern sale of their business pursuant to an asset sale under section 363 of the Bankruptcy Code, or a stand-alone reorganization pursuant to a chapter 11 plan. The DIP Facility provides the timeframe for the Debtors to achieve these goals:

| **Date** | **Plan or Sale** | **Milestone** |
| --- | --- | --- |
| July 3, 2016 | Plan | File Plan of Reorganization |
| July 18, 2016 | Sale | File Motion to Approve Bid Procedures ( including form of a stalking horse sale and purchase agreement) and Establish Auction Date |
| July 18, 2016 | Sale | Forward Bid Packages to Potential Bidders |
| August 7, 2016 | Plan | Obtain Order Approving Disclosure Statement |
| August 12, 2016 | Plan | Commence Solicitation on Plan of Reorganization |
| August 17, 2016 | Sale | Obtain Order Approving Stalking Horse Purchase Agreement and Bid Procedures Motion |
| September 11, 2016 | Plan | Commence Hearing to Consider Confirmation of Plan of Reorganization |
| September 21, 2016 | Plan | Obtain Order Confirming Plan of Reorganization |
| September 22, 2016 | Sale | Conduct Auction |
| September 24, 2016 | Sale | Obtain Sale Order |
| September 26, 2016 | Plan | Consummate Plan of Reorganization |

6

September 26, 2016      Sale            Consummate Sale

The key dates in this timetable are July 3, 2016, the date by which the Debtors must file their standalone chapter 11 plan, and July 18, 2016, the date by which the Debtors must file a motion to approve bidding procedures and, most importantly, a form of stalking horse asset purchase agreement.  If the Debtors decide by July 18, 2016 to change course and pursue a liquidation strategy, it is my opinion, based on my experience negotiating many liquidation sales for other clients, that the Debtors could take the necessary steps to commence liquidation by the end of July and in time for the "back to school" season.

**The Value of The Lenders' Collateral**

10.    On May 4, 2016, I submitted a supplemental declaration in support the Motion[5] that demonstrated that ultimately there was no diminution in the value of the Prepetition Term Loan Secured Parties' collateral between the Commencement Date and June 2, 2016, the date originally scheduled for the final hearing on the Motion.  The premise of my testimony at the Interim Hearing was that this liquidity analysis can serve as credible proxy for the value of the Prepetition Term Loan Secured Parties' collateral because it is based on the Debtors' available cash plus the availability under the Debtors' borrowing base, which itself is based on the value of the Debtors' inventory – *i.e.*, the bulk of the Prepetition Term Loan Secured Parties' non-cash collateral – and accounts for seasonality and prospective margins.  Using this as a proxy, one can infer that the Debtors' total liquidity at any given point in time is indicative of the

---

[5] *Supplemental Declaration of Robert J. Duffy in Support of Motion of Debtors for Interim and Final Authority to (A) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e), (B) Use Cash Collateral Pursuant to 11 U.S.C. § 363(c)(2), (C) Grant Certain Protections to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364, and (D) Schedule a Final Hearing Pursuant to Fed. R. Bankr. P. 4001(b) and (c)* [ECF No. 62].

relative cash recovery that would be achievable if the Prepetition Term Loan Secured Parties' collateral were liquidated on that date.

11.     Looking ahead from the date of the Final Hearing, the collateral securing the claims of the Prepetition Term Loan Secured Parties will be greater by the end of September than it is at the end of the Interim Period.  Even if one looks at the liquidity analysis prepared by the Prepetition Term Loan Secured Parties and included in their Objection at paragraph 23, it is clear that the Debtors' total liquidity from the date of the Final Hearing into the month of September trends upward, not downward, particularly as it coincides with the peak back-to-school season.

12.     Attached to this Declaration as **Exhibit A** is a liquidity projection that was prepared by FTI during the Interim Period (the "*Interim Analysis*").  Based on the Interim Analysis, the Debtors' total liquidity, including cash, as of June 9, 2016 is approximately $60 million (as compared with approximately $55 million as was projected at the Interim Hearing).

13.     As noted in paragraph 23 of the Objection, the Interim Budget did not include a deduction for merchandise accounts payable.  This is because the Interim Budget reflected the Debtors' liquidity profile from the Commencement Date to the Final Hearing.  The Debtors would not have considered their accounts payable outstanding after the date of the Final Hearing because, absent final approval of the DIP Facility and authority to use Cash Collateral, those payments could actually not be made.  I would agree, however, that it may be appropriate to deduct accounts payable for merchandise now that the projection period includes a period of time when such payments will become due.

14.     There are three "Liquidity Comparisons" presented on Exhibit A.  To better serve as a proxy for the fluctuations in the Prepetition Term Loan Secured Parties'

8

collateral from the date of the Final Hearing into late September (i.e. to the end of the Debtors' Milestones), FTI has made several adjustments to the analysis that is presented on Exhibit A. The top Liquidity Comparison is FTI's liquidity forecast absent any adjustments. The middle and bottom Liquidity Comparison reflect FTI's adjustments.

15.     Perhaps the most significant adjustment is set forth in the middle chart that has the header "Liquidity Comparison – Removal of One Week Lag on Borrowing Base." In this chart, FTI has accounted for the fact that the Debtors' borrowing base, in practice, is measured each week based on the inventory in the Debtors' possession the prior week. Because of this retrospective measurement, the Liquidity Comparison at the top of Exhibit A is slightly skewed in that it presents the Debtors' cash position on a given date but accounts for the inventory values from the prior week. In the middle Liquidity Comparison, FTI has adjusted for the one week "lag" on the borrowing base to match up inventory with the debt, cash, and payables for each given day. With this adjustment, the value of the Prepetition Term Loan Secured Parties' collateral is projected to fluctuate significantly less and, in fact, remains relatively steady throughout the course of these chapter 11 cases, ultimately trending above the value as of the date of the Final Hearing.[6]

16.     One final adjustment is illustrated in the bottom Liquidity Comparison under the header "Liquidity Comparison – Removal of One Week Lag on Borrowing Base, No Cap on Borrowing Base." In this Liquidity Comparison, FTI has removed the borrowing cap from the Debtors' borrowing base calculation, thus making the borrowing base a more accurate

---

[6] For example, for the column with the heading week ending June 18th, the borrowing base is inventory as of June 11th, but the cash and debt balances are as of June 18th, reflecting all receipts and disbursements through June 18th. The reason for this lag is the time it takes the Debtors to report their collateral values to lenders, and is customary in retail asset based lending.

proxy for the value of the Prepetition Term Loan Secured Parties' collateral at each date. With this last adjustment, the fluctuations in collateral value decrease even further.[7]

17. As these charts demonstrate, the value of the Prepetition Term Loan Secured Parties' collateral is not projected to undergo significant fluctuation during the life of these chapter 11 cases and ultimately trends upward, not downward, even rising above the value as of the date of the Final Hearing. In addition to this, FTI's analysis does *not* add back in any of the expenses incurred during the chapter 11 cases for preserving or disposing of the Prepetition Term Loan Secured Parties' collateral. It is my understanding, however, that the Debtors may surcharge the Prepetition Term Loan Secured Parties' collateral for such costs and expenses under section 506(c) of the Bankruptcy Code. To the extent that there were any diminution in the value of the Prepetition Term Loan Secured Parties' collateral, any diminution would be offset by such 506(c) surcharges.

18. And even if the Court does not take into account the surcharges that should be made to the Prepetition Term Loan Secured Parties' collateral under section 506(c) of the Bankruptcy Code, the Debtors have made great strides during the Interim Period towards reducing their cash needs. For example, the Debtors have materially reduced the size of their work force, obtained rent concessions from landlords, and are in the process of closing underperforming stores. In addition, although the Debtors are now seeking authority to borrow an additional $60 million (in addition to the $100 million that was drawn pursuant to the Interim DIP Order), the Debtors currently do not anticipate that they would ever borrow the full amount of the Commitment (as shown in the line item entitled "Less: DIP Outstanding" in the forecasts

---

[7] For example, for the column with the heading week ending July 30th, the borrowing base (when adjusted for the one week reporting lag) is $176 million, however, because the DIP facility is limited to $160 million, the excess $16 million of collateral is not counted in the final borrowing base.

set forth under the three Liquidity Comparisons, which never increases by the full $60 million). Moreover, most of the proceeds of the DIP Facility would be applied to the purchase of new inventory which retains its value and, in the event of a liquidation, would convert to cash.

**The Debtors' Business**

19.     As long as the Debtors are able to continue operating their stores, replenishing their inventory, and managing their operating expenses through the chapter 11 process, while keeping the prospect of a going concern sale or reorganization alive, the Prepetition Term Loan Secured Parties will remain adequately protected.  In addition to there being little likelihood of a diminution in the value of the Prepetition Term Loan Secured Parties' collateral during these cases, it is my opinion, based on my familiarity with the Debtors' business, that a reasonable prospect exists that the Debtors can reorganize and that their businesses could remain intact as a going concern.  On the other hand, if the DIP Facility is not approved, the Debtors would be forced to abandon their proposed strategy and instead, pursue an immediate liquidation of their businesses.

20.     As explained in the *Supplemental Declaration of James Doak* that has been filed concurrently herewith (the "***Doak Supplemental Declaration***"), and consistent with my experience in other cases, the orderly liquidation value of the Debtors' businesses is substantially less than the going concern value.  This is especially true when one considers the going concern value of Debtors' international licensing business, which is heavily dependent on various forms of support from the U.S. business, such as branding, designing, marketing, sourcing, and manufacturing, among other support services.  As the Doak Supplemental Declaration notes, an appraisal was conducted by Hilco Enterprise Valuation Services LLC ("***Hilco***") for Bank of America in connection with the Debtors' Prepetition ABL Facility which

11

corroborates the conclusion that the Debtors' intellectual property portfolio is worth approximately ▒▒▒▒▒ more in an orderly sale process in which the U.S. business is preserved as a going concern. In effect, the Hilco appraisal shows that the Debtors' chapter 11 strategy, which would preserve the U.S. business as a going concern, would result in capturing at least ▒▒▒▒▒ more in value than the forced liquidation that would inevitably follow if the DIP Facility is not approved.

21. For all these reasons, it is highly unlikely that approval of the DIP Facility would result in a diminution in value of the Prepetition Term Loan Secured Parties' collateral. On the other hand, authorizing the Debtors to draw an additional $60 million under the DIP Facility would greatly increase the likelihood that the Debtors can preserve the U.S. businesses and in turn, the international licensing business as a going concern, thus realizing a value for the international licensing business that is at least ▒▒▒▒▒ greater than in a forced liquidation. Approval of the DIP Facility is essential to enable the Debtors to pursue their proposed strategy for these chapter 11 cases and to enable them to maximize value for all creditors beyond an immediate shutdown and forced liquidation.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: June 7, 2016
    New York, New York

                                               /s/ Robert J. Duffy
                                               Robert J. Duffy

# EXHIBIT A

## Liquidity Projection

Project ARO
Liquidity Comparison - Removal of One Week Lag on Borrowing Base, No Cap on Borrowing Base
($ thousands)







| | 11-Jun | 18-Jun | 25-Jun | 2-Jul | 9-Jul | 16-Jul | 23-Jul | 30-Jul | 6-Aug | 13-Aug | 20-Aug | 27-Aug | 3-Sep | 10-Sep | 17-Sep | 24-Sep |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Latest Forecast** | | | | | | | | | | | | | | | | |
| Borrowing Base Avail. | 111,597 | 115,409 | 116,723 | 126,795 | 151,602 | 146,780 | 141,433 | 157,289 | 160,000 | 160,000 | 143,612 | 131,330 | 118,044 | 121,156 | 111,386 | 102,800 |
| Less: DIP Outstanding | (75,000) | (75,000) | (76,638) | (75,000) | (103,303) | (109,931) | (122,533) | (121,490) | (134,471) | (124,109) | (121,275) | (104,050) | (101,658) | (93,896) | (90,948) | (91,320) |
| Gross Remaining Availability | 36,597 | 40,409 | 40,085 | 51,795 | 48,298 | 36,849 | 18,900 | 35,800 | 25,529 | 35,891 | 22,337 | 27,280 | 16,385 | 27,260 | 20,438 | 11,479 |
| Plus: Cash (Incl. In-Transit) | 17,765 | 21,205 | 17,000 | 19,570 | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 |
| Total Liquidity Including Cash (Adjusted) | 54,362 | 61,614 | 57,085 | 71,365 | 65,298 | 53,849 | 35,900 | 52,800 | 42,529 | 52,891 | 39,337 | 44,280 | 33,385 | 44,260 | 37,438 | 28,479 |
| Stub Rent | (13,600) | (13,600) | (12,500) | (12,500) | (12,500) | (12,500) | (12,500) | - | - | - | - | - | - | - | - | - |
| Merch AP | (29,593) | (28,761) | (46,200) | (67,068) | (46,072) | (26,760) | (36,985) | (63,154) | (39,739) | (17,560) | (2,090) | (6,281) | (19,354) | (14,019) | (7,771) | (10,036) |
| Accrued Payroll (1) | (3,856) | (7,711) | (3,747) | (8,843) | (3,588) | (7,176) | (3,659) | (7,467) | (3,609) | (7,218) | (3,723) | (7,447) | (3,457) | (6,913) | (3,457) | (6,913) |
| Accrued Sales Tax (2) | (4,251) | (5,014) | (2,834) | (3,758) | (4,563) | (5,598) | (1,975) | (3,362) | (5,392) | (7,260) | (8,724) | (5,621) | (6,494) | (7,471) | (8,162) | (2,353) |
| Adjusted Total Liquidity   A | 3,063 | 6,527 | (8,196) | (20,804) | (1,424) | 1,816 | (19,219) | (21,184) | (6,211) | 20,852 | 24,800 | 24,931 | 4,081 | 15,857 | 18,049 | 9,177 |
| Impact of One Week Lag Removal | 3,811 | 1,314 | 10,072 | 24,807 | (4,822) | (5,347) | 15,856 | 2,711 | - | (16,388) | (12,283) | (13,286) | 3,112 | (9,769) | (8,587) | (1,064) |
| Adjusted Total Liquidity (Adj. for Lag)   B | 6,874 | 7,841 | 1,876 | 4,003 | (6,246) | (3,531) | (3,362) | (18,473) | (6,211) | 4,465 | 12,518 | 11,645 | 7,194 | 6,088 | 9,462 | 8,113 |
| Impact of Cap Removal | - | - | - | - | - | - | - | 16,021 | 629 | - | - | - | - | - | - | - |
| Adjusted Total Liquidity (Adj. for Lag + Cap)   C | 6,874 | 7,841 | 1,876 | 4,003 | (6,246) | (3,531) | (3,362) | (2,452) | (5,582) | 4,465 | 12,518 | 11,645 | 7,194 | 6,088 | 9,462 | 8,113 |

(1) Accrued payroll is estimated at 2 weeks of payroll in non-payroll payment weeks and 1 week in payroll payment weeks, adjusted for payments for store retention programs for GOB stores.
(2) Beginning balance for accrued sales tax is estimated.