Hearing Date and Time: July 13, 2016 at 11:00 a.m. (Eastern Time)
Objection Deadline: July 1, 2016 at 4:00 p.m. (Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------x

| | | |
|---|---|---|
| | : | |
| In re | : | **Chapter 11** |
| | : | |
| AÉROPOSTALE, INC., *et al.*, | : | **Case No. 16-11275 (SHL)** |
| | : | |
| Debtors.[1] | : | **Jointly Administered** |
| | : | |

--------------------------------------------------------x

<div align="center">

**NOTICE OF MOTION OF DEBTORS**
**PURSUANT TO 11 U.S.C. §§ 503(c) AND 363(b)(1)**
**FOR ENTRY OF AN ORDER APPROVING THE DEBTORS' (I) KEY**
**EMPLOYEE INCENTIVE PLAN AND (II) KEY EMPLOYEE RETENTION PLAN**

</div>

**PLEASE TAKE NOTICE** that a hearing on the annexed motion (the "***Motion***")

of Aéropostale, Inc. and its subsidiaries, as debtors and debtors in possession in the above-

captioned chapter 11 cases (collectively, the "***Debtors***"), for entry of an order approving the

Debtors' (i) key employee incentive plan and (ii) key employee retention plan, pursuant to 11

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal tax identification number, as applicable, are as follows:  Aéropostale, Inc. (3880); Aéropostale West, Inc. (7013); Jimmy'Z Surf Co., LLC (0461); Aero GC Management LLC (4257); Aeropostale Procurement Company, Inc. (8518); Aeropostale Licensing, Inc. (8124); P.S. from Aeropostale, Inc. (5900); GoJane LLC (4923); Aeropostale Canada Corp. (N/A); Aeropostale Holdings, Inc. (7729); and Aeropostale Puerto Rico, Inc. (6477).  The Debtors' corporate headquarters is located at 112 West 34th Street, 22nd Floor, New York, NY 10120.

U.S.C. §§ 503(c) and 363(b)(1), will be held before the Honorable Sean H. Lane, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, NY 10004, Courtroom 701 (the "**Bankruptcy Court**"), on **July 13, 2016** at **11:00 a.m. (Eastern Time)** (the "**Hearing**").

PLEASE TAKE FURTHER NOTICE that any responses or objections ("**Objections**") to the Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of New York, shall be filed with the Bankruptcy Court (a) by attorneys practicing in the Bankruptcy Court, including attorneys admitted *pro hac vice*, electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov), and (b) by all other parties in interest, on a CD-ROM, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable, and shall be served in accordance with General Order M-399 and the *Order Pursuant to 11 U.S.C. § 105(a) and (d) and Fed. R. Bankr. P. 1015(c), 2002(m), and 9007 Implementing Certain Notice and Case Management Procedures*, entered on June 3, 2016 [ECF No. 255], so as to be so filed and received no later than **July 1, 2016** at **4:00 p.m. (Eastern Time)** (the "**Objection Deadline**").

PLEASE TAKE FURTHER NOTICE that if an Objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

**PLEASE TAKE FURTHER NOTICE** that objecting parties are required to

attend the Hearing, and failure to appear may result in relief being granted upon default.

Dated:  June 22, 2016
       New York, New York

<div style="margin-left:40%">

/s/ Garrett A. Fail
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail

*Attorneys for Debtors
and Debtors in Possession*

</div>

3

**Hearing Date and Time: July 13, 2016 at 11:00 a.m. (Eastern Time)**
**Objection Deadline: July 1, 2016 at 4:00 p.m. (Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x
                                                         :
In re                                                    :          **Chapter 11**
                                                         :
AÉROPOSTALE, INC., *et al.*,                             :          **Case No. 16-11275 (SHL)**
                                                         :
        Debtors.[1]                                      :          **Jointly Administered**
                                                         :
---------------------------------------------------------x

<div align="center">

**MOTION OF DEBTORS PURSUANT
TO 11 U.S.C. §§ 503(c) AND 363(b)(1) FOR ENTRY
OF AN ORDER APPROVING THE DEBTORS' (I) KEY
EMPLOYEE INCENTIVE PLAN AND (II) KEY EMPLOYEE RETENTION PLAN**

</div>

TO THE HONORABLE SEAN H. LANE
UNITED STATES BANKRUPTCY JUDGE:

Aéropostale, Inc. and its subsidiaries, as debtors and debtors in possession in the

above-captioned chapter 11 cases (collectively, the "***Debtors***"), respectfully represent as follows:

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal tax identification number, as applicable, are as follows:  Aéropostale, Inc. (3880); Aéropostale West, Inc. (7013); Jimmy'Z Surf Co., LLC (0461); Aero GC Management LLC (4257); Aeropostale Procurement Company, Inc. (8518); Aeropostale Licensing, Inc. (8124); P.S. from Aeropostale, Inc. (5900); GoJane LLC (4923); Aeropostale Canada Corp. (N/A); Aeropostale Holdings, Inc. (7729); and Aeropostale Puerto Rico, Inc. (6477).  The Debtors' corporate headquarters is located at 112 West 34th Street, 22nd Floor, New York, NY 10120.

## Relief Requested

1.      By this Motion, the Debtors request entry of an order, pursuant to sections 503(c) and 363(b)(1) of title 11 of the United States Code (the "**Bankruptcy Code**"), approving the Debtors' (i) key employee incentive plan (the "**KEIP**") and (ii) key employee retention plan (the "**KERP**").  In support of the Motion, the Debtors submit the declaration and expert report of Dewey Imhoff (the "**Imhoff Declaration**"), a Senior Managing Director at FTI Consulting, Inc. ("**FTI**"), a copy of which is annexed hereto as **Exhibit A**.  The Debtors also submit the declaration of Robin Sepe (the "**Sepe Declaration**"), the Debtors' Senior Vice President of Human Resources, in further support of the relief requested herein, a copy of which is annexed hereto as **Exhibit B**.  A proposed form of order granting the relief requested herein is annexed hereto as **Exhibit C** (the "**Proposed Order**").

## Background

2.      On May 4, 2016 (the "**Commencement Date**"), each of the Debtors commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11 cases.

3.      The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b).

4.      On May 11, 2016, the United States Trustee for Region 2 appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "**Creditors' Committee**").

2

5.     Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of David J. Dick Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York*, sworn to and filed on the Commencement Date [ECF No. 4].

## Jurisdiction

6.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the *Amended Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Necessity and Development of the KEIP and KERP

7.     Prior to the Commencement Date, the Debtors began to implement their publicly-announced comprehensive strategic review and restructuring of their retail operations and store profile.  Sepe Decl. ¶ 6.  During this process, the Debtors started experiencing the loss of some of their highly valuable employees throughout critical areas of their businesses.  *Id.*  These voluntary resignations included members of the Debtors' leadership team and other employees that performed critical functions, including the Debtors' director of tax, director of strategy and customer insights, senior director of social media, senior director of operations procurement, and various regional managers.  *Id.*

8.     In light of these voluntary departures and the additional pressures that would be brought on by the Debtors' chapter 11 cases, the Debtors recognized a need to address the concerns of their employees and their creditors and to align the interests of these respective constituencies.  *Id.* at ¶ 7.  Accordingly, the Debtors initiated a review of their employment and

3

compensation packages and assessed ways to improve and tailor them to prevent further employee departures. *Id*.

9.      In this context, the Debtors worked extensively with FTI to assist in the development of the KEIP and KERP, which apply to 10 executive employees (the "***KEIP Participants***") and 41 non-insider employees (the "***KERP Participants***").  Collectively, these employees have an in-depth knowledge of the Debtors' prepetition businesses, assets, liabilities, counterparties, and operations and are absolutely essential for the Debtors to maximize the value of their estates during these chapter 11 cases.  *Id*. at ¶ 8.  Given the challenges posed by the highly-competitive industry in which the Debtors operate, the Debtors and FTI developed the KEIP and KERP with the goals of (i) incentivizing the KEIP Participants to create value for the benefit of all stakeholders, (ii) motivating and retaining the KERP Participants throughout the Debtors' restructuring process, and (iii) rewarding the KEIP and KERP Participants at market level compensation.  Imhoff Decl. ¶ 8.

10.      The Debtors also designed the KEIP and KERP to ensure that their terms were reasonable when compared with plans in other recent chapter 11 cases.  In this regard, FTI prepared a benchmarking study against 13 other recent chapter 11 cases to evaluate the reasonableness of the KEIP and against 12 other recent chapter 11 cases to evaluate the reasonableness of the KERP.  *Id*. at ¶ 9.  FTI determined that the KEIP and KERP were within the range of other incentive and retention plans offered in similar chapter 11 cases and were reasonable in terms of their objectives and costs.  *Id*.

11.      The Debtors submit that implementation of the KEIP and KERP is a sound and necessary exercise of their business judgment.  The applicable statutory requirements under the Bankruptcy Code are satisfied, and the KEIP and KERP have been reviewed and approved

WEIL:\95753203\7\11727.0013

by the compensation committee of the Debtors' board of directors. The KEIP and KERP are a reasonable, cost-effective way to provide the appropriate incentives to executives and to retain "rank and file" employees during these chapter 11 cases. Additionally, the aggregate payouts under the KEIP and KERP are well within the budget previously submitted by the Debtors under the terms of their debtor-in-possession financing facility. The costs associated with the KEIP and KERP are significantly outweighed by the benefits that will be realized by encouraging participants to stay focused on the Debtors' operations and to facilitate a smooth reorganization or sale process.

12.     Therefore, the Debtors respectfully request that the Court approve the terms of the KEIP and KERP as set forth below.

## The KEIP

A.     Description of the KEIP

13.     The KEIP was developed to properly incentivize the KEIP Participants in pursuing a timely and successful reorganization or sale. In particular, the KEIP Participants are all irreplaceable members of the Debtors' executive committee who have, and will continue to, play a central role in the Debtors' chapter 11 cases. Sepe Decl. ¶ 9. Most importantly, the KEIP Participants have been intimately involved with and have a clear ability to influence the Debtors' ongoing efforts to pursue a dual track of negotiating a plan of reorganization and marketing the Debtors' assets. *Id.* Accordingly, incentivizing the KEIP Participants and leveraging their talents and corporate knowledge is critical for the Debtors to maximize value for the benefit of all stakeholders and parties in interest. *Id.*

14.     In light of the Debtors' dual-track bankruptcy process, the KEIP offers two mutually-exclusive paths for awarding variable payouts to the KEIP Participants depending

5

on whether the Debtors consummate a standalone reorganization or a sale transaction. Imhoff Decl. ¶ 10. Accordingly, the metrics developed for the KEIP are linked to value creation and have a significant performance or "at risk" component. *Id.*

15.    The key terms of the KEIP are as follows:

(a)    <u>KEIP Participants</u>: Limited to the following 10 employees who all possess a strong line of sight to successfully execute either a reorganization or a sale:

1.    Chief Financial Officer
2.    Chief Operating Officer
3.    General Counsel and Secretary
4.    SVP of Design
5.    SVP of Human Resources
6.    SVP of Global Licensing
7.    SVP of Logistics, Construction, and Real Estate
8.    SVP of Store Operations
9.    SVP of Production and Technical Design
10.    SVP of Merchandise Planning and Allocations

(b)    <u>Form of Payout</u>: Cash.

(c)    <u>Standalone Plan Metrics</u>: 60% of payment under the KEIP is achieved upon consummation of a plan of reorganization. The remaining 40% of payment under the KEIP is tied to EBITDA performance based on the Debtors' 2016 budget. A target payout is earned if EBITDA performance at 100% of the Debtors' 2016 budget is achieved, and a threshold payout is earned if EBITDA performance at 90-99.9% of the Debtors' 2016 budget is achieved. EBITDA performance will be measured during the period of January 31, 2016 to the emergence date.

(d)    <u>Sale Transaction Metrics</u>: If a going concern sale transaction occurs at a valuation to be later agreed upon by the Debtors and the Creditors' Committee, a maximum payout is earned and the standalone metrics will not apply. If a sale transaction results in a going concern sale of substantial assets, a target payout is earned and the standalone metrics will not apply.

(e)    <u>Payout Frequency</u>: Payout under a standalone reorganization will be made in two equal payments with the first payment no later than 15 days after emergence from chapter 11 and the second payment no later than 60 days after emergence. Payout under a sale transaction

6

for substantially all of the Debtors' assets will be made in one payment no later than 15 days after closing of the sale.

(f)    <u>Separation Provisions</u>: The KEIP includes a claw-back provision if any of the KEIP Participants voluntarily leave or are terminated for cause within 60 days of earning the payouts under the KEIP. KEIP Participants terminated without cause prior to the emergence date will receive their KEIP Payment on a pro rata basis based on the percentage of the amount of time from the date of the chapter 11 filing to the date payouts under the KEIP are earned.

(g)    <u>Maximum Amount of KEIP</u>: The aggregate maximum amount of the KEIP is $3,406,900, with individual proposed maximum payouts ranging from 75% to 112.4% of base compensation.

16.    It is important to note that the KEIP is not a "pay to stay" retention plan. The KEIP utilizes metrics to ensure that the KEIP Participants are incentivized to complete either a restructuring or a sale in an efficient manner. *Id*. at ¶ 12. The KEIP, therefore, successfully aligns the interests of the Debtors, their employees, and their creditors and is a true incentive plan.

B.    <u>Reasonableness of the KEIP</u>

17.    As stated above, FTI undertook to define a set of relevant market comparables and benchmarked comparable incentive plans from select chapter 11 cases of 13 different companies that filed petitions from 2012-2015 with total assets valued between $250 million and $5 billion. *Id*. at ¶ 14. Based on this review of market comparable incentive plans, FTI observed a number of key common design themes, including:

- Awards tend to be paid in cash;

- Prevalent performance metrics include critical milestones related to financial performance, compliance with cash flow budgets, achievement of personal goals, sale of assets, and timely emergence from bankruptcy;

- Participation tends to be limited to those with critical roles that will provide the most impact on maximizing value for the estate;

7

- Participants generally ranged from a low of 3 to a high of 15 participants, with a median of 8 participants;

- Similarly-situated company plans ranged from 35.3% to 394.6% of base salary, with a median of 50.0% to 155.0% of base salary for threshold and maximum, respectively;

- The total cost of comparable incentive plans ranged from $540,000 to $8.6 million at target, with opportunities to earn more under certain circumstances and the possibility of earning less if all targets were not achieved; and

- On a percentage of assets basis, similarly-situated companies ranged from 0.06% to 0.72% at target.

18.    Based on the above factors, FTI found the design and cost of the KEIP to be within the range of market practice as compared to incentive plans proposed and approved at similarly-situated companies. *Id.* at ¶ 15. Specifically, the KEIP represents 54.0% of base compensation, where the average range in the comparative set is between 58.1% and 163.7% and the median range is between 50.0% and 155.0%. The KEIP also includes a total target cost per participant of $227,100, where the average in the comparative set is $385,400 and the median is $333,000. Finally, the KEIP represents 0.52% on a percentage of assets basis, where the average in the comparative set is 0.28% and the median is 0.22%. Therefore, the cost of the KEIP is reasonable as it falls below the median and average range when compared to base compensation levels and total cost per person and is only higher on a percentage of assets basis. *Id.*

## The KERP

A.    Description of the KERP

19.    In addition to the KEIP, the Debtors seek to implement the KERP to motivate certain non-senior management personnel to remain employed with the Debtors during the chapter 11 process and to ensure that they do not suffer significant and costly key employee

8

turnover.  The KERP Participants have been faced with significant pressure to leave the Debtors'

employ during the pendency of these chapter 11 cases due to, among other things, the Debtors'

staff reductions, which included reductions in force both before and after the Commencement

Date, and uncertain job prospects following the completion of a reorganization or sale

transaction.  Sepe Decl. ¶ 10.

20.     Accordingly, the Debtors, together with their advisors, analyzed their

workforce to determine which non-insiders were critical to a successful restructuring and sale

process and should be covered by the KERP.  *Id.* at ¶ 11.  The Debtors selected the 41 KERP

Participants based on their status as critical, hard-to-replace, non-senior management employees.

*Id.*  Many of the KERP participants have developed valuable institutional knowledge regarding

the Debtors' ongoing business operations that would be difficult and expensive to replace.  *Id.*

Preserving this institutional knowledge is crucial to the successful completion and efficient

administration of the Debtors' chapter 11 cases.  The KERP is, therefore, designed and expected

to maximize retention throughout the post-petition and the post emergence 60-day tail periods.

21.     The key terms of the KERP are as follow:

(a)     <u>KERP Participants</u>: Limited to 41 of the more than 500 non-senior management employees who are not eligible to participate in other post-petition incentive plans, such as the KEIP.

(b)     <u>Form of Payout</u>: Cash.

(c)     <u>Performance Metric</u>: KERP Participants will receive and keep 100% payout under the KERP if they remain employed with the Debtors through October 25, 2016.  Individual payouts under the KERP range from 6.6% to 23.5% of base salary.

(d)     <u>Payout Frequency</u>: Payouts under the KERP will be made no later than September 10, 2016.

(e)     <u>Separation Provisions</u>: The KERP includes a claw-back provision to the extent KERP Participants voluntarily leave or are terminated for

cause during the period between September 10, 2016 and October 25, 2016. If a KERP Participant is terminated without cause, the KERP Participant will receive payouts under the KERP in full.

(f)     Maximum Amount of KEIP: The total maximum amount of the KERP is $1,445,000, including $150,000 for a discretionary pool set up for additional participants.

(g)     The Discretionary Pool: The discretionary pool provides the Debtors with resources for future allocations to non-senior management deemed to be critical to the reorganization process that were not included with the original KERP Participants. The Debtors' Chief Executive Officer will determine which, if any, critical non-senior management employees will participate in the discretionary pool.

B.     Reasonableness of the KERP

22.     As mentioned above, FTI undertook to define a set of relevant market comparables and benchmarked comparable retention plans from select chapter 11 cases of 12 different companies that filed petitions from 2012-2015 with total assets valued between $250 million and $5 billion. Imhoff Decl. ¶ 19. Based on this review of market comparable retention plans, FTI observed a number of key common design themes, including:

- Participation generally ranged from a low of 12 participants to a high of 69 participants, with a median of 31 participants;

- Similarly-situated company plans ranged from 12.5% to 33.5% of base compensation, with a median of 29.8%;

- 8 out of the 12 plans identified as benchmarks contained discretionary pools ranging from a low of $75,000 to a high of $750,000;

- When a discretionary pool is included, comparable case costs ranged from $619,000 to $2.73 million, with a median of $1.258 million; and

- On a percentage of assets basis, the discretionary pools for similarly-situated companies ranged from 0.025% to 0.594%, with a median rate of 0.090%.

23.     Based on the above factors, FTI found the design and the cost of the KERP to be within the range of market practice as compared to retention plans proposed and

approved at similarly-situated companies. *Id.* at ¶ 20. Specifically, the KERP (excluding the discretionary pool) represents 16.7% of base compensation, where the average in the comparative set is 29.8% and the median is 26.8%. The KERP includes a target total cost per participant of $31,585, where the average in the comparative set is $36,100 and the median is $35,200. The KERP also represents 0.333% on a percentage of assets basis, where the average in the comparative set is 0.198% and the median is 0.09%. Finally, the discretionary pool of $150,000 also falls below the average in the comparative set of $275,100 and the median of $237,500. Therefore, the cost of the KERP is reasonable as it falls below the median and average range when compared to base compensation levels and total cost per person and is only higher on a percentage of assets basis. *Id.*

### The KEIP and KERP Satisfy the
### Requirements of Section 503(c) of the Bankruptcy Code

24.     The KEIP and KERP should be approved pursuant to section 503(c)(3) of the Bankruptcy Code. For the reasons stated herein, these plans are justified by the facts and circumstances of this case.

A.     Sections 503(c)(1) and 503(c)(2) Do Not Apply to the KEIP

25.     Sections 503(c)(1) and 503(c)(2) of the Bankruptcy Code govern retention and severance payments to insiders. These sections, however, are not applicable in evaluating the KEIP because the KEIP is incentivizing.

26.     By its plain language, section 503(c)(1) of the Bankruptcy Code pertains solely to retention payments to insiders, and section 503(c)(2) of the Bankruptcy Code addresses only the requirements for severance payments to insiders. Neither provision, however, applies to performance based incentive plans such as the KEIP. *See, e.g.*, *In re Dana Corp.*, 358 B.R. 567,

11

576 (Bankr. S.D.N.Y. 2006) (applying section 503(c)(3) of the Bankruptcy Code to evaluate management incentive plan in absence of applicability of sections 503(c)(1) or 503(c)(2)); *In re Alpha Natural Resources, Inc.*, 546 B.R. 348, 355-56 (Bankr. E.D. Va. 2016) ("[T]he analysis under § 503(c) changes when a debtor purports to make a payment not to retain an insider, but primarily to incentivize the insider to achieve certain goals[, and] [o]n its face, § 503(c)(1) does not apply to the KEIP because the payments thereunder are incentive and not purely retentive."); *In re Musicland Holding Corp.*, No. 06-10064 (SMB) (Bankr. S.D.N.Y. Feb. 1, 2006) (finding that incentive-based compensation under management incentive plan did not violate section 503(c) of the Bankruptcy Code).

27.    The KEIP does not provide benefits to the KEIP Participants upon termination of their employment or provide bonuses for retention. *See In re Dana Corp.*, 358 B.R. at 575 (applying section 503(c)(3) of the Bankruptcy Code to evaluate management incentive plan in absence of applicability of sections 503(c)(1) or 503(c)(2) of the Bankruptcy Code). Rather, the KEIP only allots payments based on the successful achievement of certain targeted metrics to the Debtors' employees who are the most critical to maximizing the value of the Debtors' businesses as aligned with the restructuring and sale process. Although certain of the KEIP Participants are "insiders" within the meaning of the Bankruptcy Code, the KEIP has been crafted with great care to ensure the metrics directly incentivize participants to meet the objectives set forth therein. Imhoff Decl. ¶¶ 9, 13.

28.    Moreover, although the KEIP was not designed with the goal of retaining the KEIP Participants, the fact that the KEIP may encourage the KEIP Participants to remain employed with the Debtors throughout the chapter 11 cases should not bar implementation of the KEIP. Indeed, all successful incentive programs have the indirect benefit of incentivizing an

employee to remain with the company. *See In re Alpha Natural Resources, Inc.*, 546 B.R. at 356 ("[A] KEIP that merely has some retentive effect should not be analyzed under § 503(c)(1)."). Additionally, payouts under the KEIP require a far higher threshold than merely remaining employed and there is no guarantee that the KEIP Participants will receive any payouts. Imhoff Decl. ¶ 13.

29.     Because the primary purpose of the KEIP is to maximize value for the benefit of the Debtors' estates, the Debtors respectfully submit that sections 503(c)(1) and 503(c)(2) of the Bankruptcy Code do not apply to the KEIP.

B.     Sections 503(c)(1) and 503(c)(2) Do Not Apply to the KERP

30.     The prohibitions and restrictions under sections 503(c)(1) and 503(c)(2) equally do not apply to the KERP.  As noted above, sections 503(c)(1) and 503(c)(2) of the Bankruptcy Code restrict the ability of "insiders" to receive payments as part of a retention or severance plan.  None of the KERP Participants, however, are "insiders" as such term is defined by section 101(31) of the Bankruptcy Code.

31.     The Bankruptcy Code defines an "insider" to include, among other things, "an officer of the debtor" and a "person in control of the debtor."  11 U.S.C. § 101(31).  Courts have also concluded that an employee may be an "insider" if such employee has "at least a controlling interest in the debtor or . . . exercise[s] sufficient authority over the debtor so as to unqualifiably dictate corporate policy and the disposition of corporate assets."  *In re Velo Holdings, Inc.*, 472 B.R. 201, 208 (Bankr. S.D.N.Y. 2012) (citations omitted).  It is well-established that an employee's job title, alone, does not make such employee an "insider" as defined by the Bankruptcy Code.  *See In re Borders Grp. Inc.*, 453 B.R. 459, 469 (Bankr. S.D.N.Y. 2011)  (nothing that "[c]ompanies often give employees the title 'director' or 'director-

13

level,' but do not give them decision-making authority akin to an executive" and concluding that certain "director level" employees in that case were not insiders).

32.     None of the KERP Participants are "insiders," as such term is defined by section 101(31) of the Bankruptcy Code.   First, none of the KERP Participants have discretionary control over substantial budgetary amounts.   Sepe Decl. ¶ 12.   Second, although certain of the KERP Participants hold titles such as "director" or "manager," such employees must obtain approval from an appropriate senior manager before taking any significant action with respect to the Debtors' corporate policies or the disposition of significant assets.   *Id*.   Third, none of the KERP Participants are the Debtors' executives, members of the Debtors' board of directors, or participate in the Debtors' corporate governance.   *Id*.   Finally, none of the KERP Participants had any say or input whatsoever on any aspect of the KERP.   *Id*.   Therefore, the Debtors respectfully submit that none of the KERP Participants constitute "insiders" of the Debtors, and the restrictions of section 503(c)(1) and section 503(c)(2) of the Bankruptcy Code are inapplicable to the KERP.

C.     The KEIP and KERP Satisfy Section 503(c)(3)

33.     Section 503(c)(3) of the Bankruptcy Code permits payments to a debtor's employees outside the ordinary course of business if such payments are justified by "the facts and circumstances of the case."   11 U.S.C. § 503(c)(3).   In this and other districts, courts have concluded that whether payments to employees are justified by the "facts and circumstances" of a case is to be determined by application of the business judgment rule.   *See In re Velo Holdings, Inc.*, 472 B.R. at 209 ("[The] facts and circumstances language of 503(c)(3) creates a standard no different than the business judgment standard under section 363(b)."); *In re Borders Grp. Inc.*, 453 B.R. at 473-74 (evaluating debtors' KERP under business judgment rule); *In re Dana Corp.*,

14

358 B.R. at 576-77 (describing six factors that courts may consider when determining whether the structure of a compensation proposal meets the "sound business judgment test" in accordance with section 503(c)(3) of the Bankruptcy Code). Accordingly, the determination of whether an incentive or retention plan is justified by the facts and circumstances of the case and the analysis of whether the approval of such plan is a sound exercise of the debtor's business judgment remain the same.

34.    Courts within the Second Circuit have generally utilized the factors identified in *In re Dana Corp.* when determining if the structure of a compensation proposal and the process for its development meet the business judgment test. *See, e.g.*, *In re Residential Capital, LLC*, 491 B.R. 73, 85-86 (Bankr. S.D.N.Y. 2013) (applying the *Dana* factors to the debtors' retention plan for non-insiders and approving the plan as an exercise of sound business judgment); *In re Borders Grp. Inc.*, 453 B.R. at 473-74 (same). In *In re Dana Corp.*, the bankruptcy court set forth the following six factors for evaluating whether a debtor has satisfied the "sound business judgment" test for purposes of the approval of a compensation plan under section 503(c)(3) of the Bankruptcy Code:

> - Is there a reasonable relationship between the plan proposed and the results to be obtained, *i.e.*, will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of a performance incentive, is the plan calculated to achieve the desired performance?
>
> - Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?
>
> - Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?
>
> - Is the plan or proposal consistent with industry standards?
>
> - What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?

15

- Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

*In re Dana Corp.*, 358 B.R. at 576-77.  As set forth below, all of these factors are satisfied as to the KEIP and KERP.

35.    First, the Debtors, in consultation with FTI, designed the KEIP and KERP to motivate and reward the KEIP and KERP Participants for their significant efforts given the increased demands placed upon them in connection with the chapter 11 process.  Additionally, the KEIP and KERP will ensure that the Debtors have the appropriate staff on hand to facilitate a speedy exit from these chapter 11 cases, thereby maximizing value for the Debtors' estates.  Specifically, the Debtors established the KEIP to incentivize the KEIP Participants, who will have the greatest influence upon these chapter 11 cases, to maximize value for the Debtors' estates.  Sepe Decl. ¶ 9.  If the KEIP Participants merely show up for work, there is a real and material likelihood that they will not receive payouts under the KEIP.  Similarly, the Debtors designed the KERP to ensure that the KERP Participants remain employed with the Debtors through this chapter 11 process.  *Id.* at ¶ 10.  A failure to retain the KERP Participants would cause the Debtors to incur significant time and money to hire and train replacement employees, which would, in turn, hinder and/or significantly delay their reorganization and sale efforts to the detriment of all parties in interest.  *Id.*

36.    Second, as discussed above, FTI engaged in an extensive benchmarking analysis to assist the Debtors with the design of the KEIP and KERP.  Imhoff Decl. ¶¶ 9, 13-15, 18-20.  The costs associated with the KEIP and KERP are within the range of market practice as compared to plans proposed and approved at similarly-situated companies.  *Id.* at ¶¶ 9, 15, 20.  Specifically, the costs of the KEIP and KERP fall below the median and average range when

16

compared to base compensation levels and total cost per person of plans approved at similarly-situated companies. *Id*. at ¶¶ 15, 20. Accordingly, the costs are reasonable and well-justified given the size of the Debtors' business and the value that achievement of the metrics would bring to the estates.

37.     Third, the scope of the KEIP and KERP are fair and reasonable. As noted herein, the Debtors undertook a careful selection process and received input from the Debtors' professionals in determining the specific employees that should be eligible. Sepe Decl. ¶ 8. In fact, the KEIP is limited to 10 participants who were identified as having the most control over the Debtors' businesses and, therefore, will be the persons effectively guiding the Debtors through bankruptcy. *Id*. at ¶ 9. Additionally, the 41 KERP Participants selected out of the Debtors' total employee base of approximately 500 are essential to the Debtors' chapter 11 efforts and continued efficient operation. *Id*. at ¶ 10.

38.     Fourth, the KEIP and KERP are consistent with industry standards with respect to eligibility, total cost, metrics, and payout timing. Imhoff Decl. ¶ 9.

39.     Accordingly, the Debtors respectfully submit that the KEIP and KERP satisfy section 503(c)(3) of the Bankruptcy Code and should be approved.

**The Implementation of the KEIP and KERP is a
Valid Exercise of the Debtors' Business Judgment**

40.     To the extent applicable, the KEIP and KERP should also be approved under section 363(b)(1) of the Bankruptcy Code. *See In re Alpha Natural Resources, Inc.*, 546 B.R. at 356 ("Incentive payments under a KEIP are governed by the more general provisions of § 363(b)(1) . . . .").

41.     Section 363(b)(1) provides that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Use of estate property outside the ordinary course of business is entrusted to the sound business judgment of a debtor.  *See, e.g.*, *Official Comm. of Unsecured Creditors v. LTV Corp. (In re Chateaugay)*, 973 F.2d 141, 143 (2d Cir. 1992) (affirming the bankruptcy court's approval of debtors' asset sale pursuant to section 363(b) as a reasonable exercise of business judgment); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1072 (2d Cir. 1983) (holding that the application of section 363(b) must be supported by "some articulated business justification, other than appeasement of major creditors"); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003) (emphasizing the business judgment rule); *In re Borders Grp., Inc.*, 453 B.R. at 473 ("In approving a transaction conducted pursuant to section 363(b)(1), courts consider whether the debtor exercised sound business judgment.").

42.     As noted above, the business judgment rule is the standard courts use to evaluate whether a compensation plan meets the "facts and circumstances" standard set forth in section 503(c)(3) of the Bankruptcy Code.  *In re Borders Grp., Inc.*, 453 B.R. at 474 ("[T]he legal standard under § 363(b) is no different than section 503(c)(3) . . . .").  Accordingly, the Debtors' decision to implement the KEIP and KERP is a valid exercise of business judgment.  In regards to the KEIP, the Debtors have determined that its implementation will enhance the value of the Debtors' estates and accordingly, is in the best interests of the Debtors' estates and the stakeholders in these chapter 11 cases.   Sepe Decl. ¶¶ 8-9.  In regards to the KERP, the KERP Participants possess the special knowledge and expertise necessary to stabilize the Debtors'

18

operations. *Id.* at ¶¶ 8, 10-11. The loss of critical employees has and likely will continue to have a severe adverse impact on the Debtors' businesses.

43.     Additionally, as set forth above and more fully in the Imhoff Declaration, payment levels under the KEIP and KERP are reasonable and were determined based on a thorough analysis of benchmarks performed by FTI. Imhoff Decl. ¶¶ 9, 13-15, 18-20. The overall costs of the KEIP and KERP are reasonable in light of the size of the Debtors' estates and the benefits that will be realized from a successful reorganization or sale process. *Id.* at ¶ 9.

## Waiver of Bankruptcy Rule 6004(h)

44.     To implement the foregoing immediately, the Debtors seek a waiver, to the extent required, of the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## Notice

45.     Notice of this Motion has been provided to all parties in interest in accordance with the procedures set forth in the *Order Pursuant to 11 U.S.C. § 105(a) and (d) and Fed. R. Bankr. P. 1015(c), 2002(m), and 9007 Implementing Certain Notice and Case Management Procedures*, entered on June 3, 2016 [ECF No. 255]. The Debtors submit that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

46.     No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

WEIL:\95753203\7\11727.0013

WHEREFORE the Debtors respectfully request entry of the Proposed Order and such other and further relief as the Court may deem just and appropriate.

Dated: June 22, 2016
   New York, New York

       /s/ Garrett A. Fail
       WEIL, GOTSHAL & MANGES LLP
       767 Fifth Avenue
       New York, New York  10153
       Telephone:  (212) 310-8000
       Facsimile:  (212) 310-8007
       Ray C. Schrock, P.C.
       Jacqueline Marcus
       Garrett A. Fail

       *Attorneys for Debtors*
       *and Debtors in Possession*

**<u>Exhibit A</u>**

**Imhoff Declaration**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail

*Attorneys for Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x
|  |  |
| :--- | :--- |
|  : |  |
| In re  : | **Chapter 11** |
|  : |  |
| **AÉROPOSTALE, INC.,** *et al.,*  : | **Case No. 16-11275 (SHL)** |
|  : |  |
| **Debtors.**[1]  : | **Jointly Administered** |
|  : |  |
---------------------------------------------------------x

**DECLARATION AND EXPERT REPORT OF DEWEY IMHOFF
IN SUPPORT OF MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 503(c)
AND 363(b)(1) FOR ENTRY OF AN ORDER APPROVING THE DEBTORS' (I)
KEY EMPLOYEE INCENTIVE PLAN AND (II) KEY EMPLOYEE RETENTION PLAN**

I, Dewey Imhoff, declare under penalty of perjury as follows, pursuant to the

provisions of 28 U.S.C. § 1746:

1.      I submit this Declaration and Expert Report in support of the *Motion of*

*Debtors Pursuant to 11 U.S.C. §§ 503(c) and 363(b)(1) of the Bankruptcy Code for Entry of an*

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal tax identification number, as applicable, are as follows:  Aéropostale, Inc. (3880); Aéropostale West, Inc. (7013); Jimmy'Z Surf Co., LLC (0461); Aero GC Management LLC (4257); Aeropostale Procurement Company, Inc. (8518); Aeropostale Licensing, Inc. (8124); P.S. from Aeropostale, Inc. (5900); GoJane LLC (4923); Aeropostale Canada Corp. (N/A); Aeropostale Holdings, Inc. (7729); and Aeropostale Puerto Rico, Inc. (6477).  The Debtors' corporate headquarters is located at 112 West 34th Street, 22nd Floor, New York, NY 10120.

*Order Approving the Debtor' (I) Key Employee Incentive Plan and (II) Key Employee Retention Plan* (the "**Motion**").[2]

2.      Except as otherwise indicated, all statements in this Declaration and Expert Report are based on my personal experience and knowledge, my opinion, my discussions with the Debtors' management and professionals and/or my review of relevant documents or matters within the personal knowledge of other professionals at FTI Consulting, Inc. ("**FTI**") working under my supervision or the Debtors' employees and are based on information provided by them.  If called to testify, I could and would testify to each of the facts and opinions set forth herein.

## Qualifications

3.      I am a Senior Managing Director at FTI.  Prior to joining FTI, I was a partner at PricewaterhouseCoopers.  Prior to that, I was a senior manager at a prominent nationally recognized crisis management and turnaround boutique firm and a vice president of the Special Assets group at Prudential Capital.

4.      I received my MBA in accounting from Rutgers University and a B.A. from William Paterson University.  I am a certified insolvency and restructuring advisor and a certified public accountant (retired).  I am a member of the Association of Insolvency & Restructuring Advisors, the American Bankruptcy Institute, the New Jersey Society of Certified Public Accountants, the American Institute of Certified Public Accountants, and the Turnaround Management Association.

5.      I have more than 30 years of advisory and management experience in the financial services, retail, healthcare, manufacturing, forest products, professional sports and

---

[2] Capitalized terms not otherwise defined herein have the meanings given to them in the Motion.

WEIL:\95753203\7\11727.0013

sporting venues, real estate and energy sectors. I have worked in positions with responsibility for financial and statutory reporting, troubled loans, asset sales, fraud auditing, strategic planning and administrative and operational management. In addition, I have developed or consulted on more than 30 employee retention plans and employee incentive plans, representing creditors with respect to certain plans and representing debtors on other plans.

6.    In connection with that work, I have performed numerous comparative studies of employee retention plans and employee incentive plans similar to the comparisons described below. I previously testified as an expert witness on employee retention plans and employee incentive plans in the following matters: *In re Fibermark, Inc.*, Case No. 04-10463 (Bankr. D. Vt. 2004), *In re Nelson Nutraceutical, Inc.*, Case No. 06-10072-CSS (Bankr. D. Del. 2006), *In re Old HB, Inc.*, Case No. 12-22052 (Bankr. S.D.N.Y. 2012); *In re The Great Atlantic & Pacific Tea Company, Inc.*, Case No. 15-23007 (Bankr. S.D.N.Y. 2015); *In re Quicksilver, Inc.*, Case No. 15-11880 (Bankr. D. Del. 2015); *In re Pacific Sunwear of California, Inc.*, Case No. 16-10882 (Bankr. D. Del. 2016). I was also retained to testify as an expert witness about employee retention plans, although ultimately was not required to provide any testimony, in *In re Cornerstone Propane, L.P.*, Case No. 04-3856 (Bankr. S.D.N.Y. June 3, 2004), and was retained to testify, but never admitted as an expert witness, in *In re Chassix Holdings, Inc.*, Case No. 15-10578 (Bankr. S.D.N.Y. 2015) and *In re Fleming Co., Inc.*, Case No. 03-10945 (Bankr. D. Del. Apr. 1, 2003). I was the co-editor of *The Credit Executive's Guide to Business Restructuring* (Dewey Imhoff and Elliot Fuhr eds., FTI Consulting 2006) and collaborated on *The Practical Guide to Corporate Restructuring* (Cooper & Lybrand L.L.P. 1997).

7.      I am not being compensated specifically for this testimony other than indirectly through the payments received by FTI for my services.

### Necessity and Development of the KEIP and KERP

8.      Prior to the Commencement Date, the Debtors initiated a review of their employment and compensation packages and assessed ways to improve and tailor them to prevent further employee departures.  In this context, FTI worked extensively with the Debtors to develop the KEIP and KERP, which apply to 10 executive employees (the "**KEIP Participants**") and 41 non-insider employees (the "**KERP Participants**").  Given the challenges posed by the highly-competitive industry in which the Debtors operate, the Debtors and FTI developed the KEIP and KERP with the goals of (i) incentivizing the KEIP Participants to create value for the benefit of all stakeholders, (ii) motivating and retaining the KERP Participants throughout the Debtors' restructuring process, and (iii) rewarding the KEIP and KERP Participants at market level compensation.

9.      FTI has reviewed the KEIP and KERP and prepared a report regarding the evaluation of the same (the "**Report**"), a copy of which is annexed hereto as **Exhibit 1.**  As discussed in more detail below, FTI prepared a benchmarking study against 13 other recent chapter 11 cases to evaluate the reasonableness of the KEIP and 12 other recent chapter 11 cases to evaluate the reasonableness of the KERP.  Based on its review and the Report, FTI determined that the KEIP and KERP were within the range of other incentive and retention plans offered in similar chapter 11 cases and were reasonable in terms of their objectives and costs.

## The KEIP

A.    Description of the KEIP

10.    The KEIP was developed to properly incentivize the KEIP Participants in pursuing a timely and successful reorganization or sale.  In light of the Debtors' dual-track bankruptcy process, the KEIP offers two mutually-exclusive paths for awarding variable payouts to the KEIP Participants depending on whether the Debtors consummate a standalone reorganization or a sale transaction.  Accordingly, the metrics developed for the KEIP are linked to value creation and have a significant performance or "at risk" component.

11.    The key terms of the KEIP are as follows:

(a)    KEIP Participants: Limited to the following 10 employees who all possess a strong line of sight to successfully execute either a reorganization or a sale:

1.    Chief Financial Officer
2.    Chief Operating Officer
3.    General Counsel and Secretary
4.    SVP of Design
5.    SVP of Human Resources
6.    SVP of Global Licensing
7.    SVP of Logistics, Construction, and Real Estate
8.    SVP of Store Operations
9.    SVP of Production and Technical Design
10.    SVP of Merchandise Planning and Allocations

(b)    Form of Payout: Cash.

(c)    Standalone Plan Metrics: 60% of payment under the KEIP is achieved upon consummation of a plan of reorganization.  The remaining 40% of payment under the KEIP is tied to EBITDA performance based on the Debtors' 2016 budget.  A target payout is earned if EBITDA performance at 100% of the Debtors' 2016 budget is achieved, and a threshold payout is earned if EBITDA performance at 90-99.9% of the Debtors' 2016 budget is achieved.  EBITDA performance will be measured during the period of January 31, 2016 to the emergence date.

(d)    Sale Transaction Metrics: If a going concern sale transaction occurs at a valuation to be later agreed upon by the Debtors and the Creditors'

6

Committee, a maximum payout is earned and the standalone metrics will not apply. If a sale transaction results in a going concern sale of substantial assets, a target payout is earned and the standalone metrics will not apply.

(e)   <u>Payout Frequency</u>: Payout under a standalone reorganization will be made in two equal payments with the first payment no later than 15 days after emergence from chapter 11 and the second payment no later than 60 days after emergence. Payout under a sale transaction for substantially all of the Debtors' assets will be made in one payment no later than 15 days after closing of the sale.

(f)   <u>Separation Provisions</u>: The KEIP includes a claw-back provision if any of the KEIP Participants voluntarily leave or are terminated for cause within 60 days of earning the payouts under the KEIP. KEIP Participants terminated without cause prior to the emergence date will receive their KEIP Payment on a pro rata basis based on the percentage of the amount of time from the date of the chapter 11 filing to the date payouts under the KEIP are earned.

(g)   <u>Maximum Amount of KEIP</u>: The aggregate maximum amount of the KEIP is $3,406,900, with individual proposed maximum payouts ranging from 75% to 112.4% of base compensation.

12.    It is important to note that the KEIP is not a "pay to stay" retention plan. The KEIP utilizes metrics to ensure that the KEIP Participants are incentivized to complete either a restructuring or a sale in an efficient manner. The KEIP, therefore, successfully aligns the interests of the Debtors, their employees, and their creditors and is a true incentive plan.

B.    <u>Reasonableness of the KEIP</u>

13.    Based on my experience and the work I have done on this matter, it is my opinion that the KEIP is designed to be consistent with market practice, is reasonable given the facts and circumstances, provides anticipated value that is appropriate to competitively motivate talented staff and is required to maximize the value of the Debtors' estates for all parties in interest.

14.    In connection with FTI's work on the KEIP structure generally, FTI undertook to define a set of relevant market comparables and benchmarked comparable

7

incentive plans from select chapter 11 cases of 13 different companies that filed petitions from 2012-2015 with total assets valued between $250 million and $5 billion. Based on this review of market comparable incentive plans, FTI observed a number of key common design themes, including:

- Awards tend to be paid in cash;

- Prevalent performance metrics include critical milestones related to financial performance, compliance with cash flow budgets, achievement of personal goals, sale of assets, and timely emergence from bankruptcy;

- Participation tends to be limited to those with critical roles that will provide the most impact on maximizing value for the estate;

- Participants generally ranged from a low of 3 to a high of 15 participants, with a median of 8 participants;

- Similarly-situated company plans ranged from 35.3% to 394.6% of base salary, with a median of 50.0% to 155.0% of base salary for threshold and maximum, respectively;

- The total cost of comparable incentive plans ranged from $540,000 to $8.6 million at target, with opportunities to earn more under certain circumstances and the possibility of earning less if all targets were not achieved; and

- On a percentage of assets basis, similarly-situated companies ranged from 0.06% to 0.72% at target.

15.    Based on the above factors, FTI found the design and cost of the KEIP to be within the range of market practice as compared to incentive plans proposed and approved at similarly-situated companies. Specifically, the KEIP represents 54.0% of base compensation, where the average range in the comparative set is between 58.1% and 163.7% and the median range is between 50.0% and 155.0%. The KEIP also includes a total target cost per participant of $227,100, where the average in the comparative set is $385,400 and the median is $333,000. Finally, the KEIP represents 0.52% on a percentage of assets basis, where the average in the comparative set is 0.28% and the median is 0.22%. Therefore, the cost of the KEIP is

8

reasonable as it falls below the median and average range when compared to base compensation levels and total cost per person and is only higher on a percentage of assets basis.

## The KERP

A.    Description of the KERP

16.    In addition to the KEIP, the Debtors seek to implement the KERP to motivate certain non-senior management personnel to remain employed with the Debtors during the chapter 11 process and to ensure that they do not suffer significant and costly key employee turnover during the chapter 11 process.

17.    The key terms of the KERP are as follows:

(a)    KERP Participants: Limited to 41 of the more than 500 non-senior management employees who are not eligible to participate in other post-petition incentive plans, such as the KEIP.

(b)    Form of Payout: Cash.

(c)    Performance Metric: KERP Participants will receive and keep 100% payout under the KERP if they remain employed with the Debtors through October 25, 2016. Individual payouts under the KERP range from 6.6% to 23.5% of base salary.

(d)    Payout Frequency: Payouts under the KERP will be made no later than September 10, 2016.

(e)    Separation Provisions: The KERP includes a claw-back provision to the extent KERP Participants voluntarily leave or are terminated for cause during the period between September 10, 2016 and October 25, 2016. If a KERP Participant is terminated without cause, the KERP Participant will receive payouts under the KERP in full.

(f)    Maximum Amount of KEIP: The total maximum amount of the KERP is $1,445,000, including $150,000 for a discretionary pool set up for additional participants.

(g)    The Discretionary Pool: The discretionary pool provides the Debtors with resources for future allocations to non-senior management deemed to be critical to the reorganization process that were not included with the original KERP Participants. The Debtors' Chief

9

Executive Officer will determine which, if any, critical non-senior management employees will participate in the discretionary pool.

B.    Reasonableness of the KERP

18.    Based on my experience and the work I have done on this matter, it is my opinion that the KERP is designed to be consistent with market practice, is reasonable given the facts and circumstances, provides anticipated value that is appropriate to competitively motivate talented staff and is required to maximize the value of the Debtors' estates for all parties in interest.

19.    In connection with FTI's work on the KERP structure generally, FTI undertook to define a set of relevant market comparables and benchmarked comparable retention plans from select chapter 11 cases of 12 different companies that filed petitions from 2012-2015 with total assets valued between $250 million and $5 billion.  Based on this review of market comparable retention plans, FTI observed a number of key common design themes, including:

- Participation generally ranged from a low of 12 participants to a high of 69 participants, with a median of 31 participants;

- Similarly-situated company plans ranged from 12.5% to 33.5% of base compensation, with a median of 29.8%;

- 8 out of the 12 plans identified as benchmarks contained discretionary pools ranging from a low of $75,000 to a high of $750,000;

- When a discretionary pool is included, comparable case costs ranged from $619,000 to $2.73 million, with a median of $1.258 million; and

- On a percentage of assets basis, the discretionary pools for similarly-situated companies ranged from 0.025% to 0.594%, with a median rate of 0.090%.

20.    Based on the above factors, FTI found the design and the cost of the KERP to be within the range of market practice as compared to retention plans proposed and

10

approved at similarly-situated companies. Specifically, the KERP (excluding the discretionary pool) represents 16.7% of base compensation, where the average in the comparative set is 29.8% and the median is 26.8%. The KERP includes a target total cost per participant of $31,585, where the average in the comparative set is $36,100 and the median is $35,200. The KERP also represents 0.333% on a percentage of assets basis, where the average in the comparative set is 0.198% and the median is 0.09%. Finally, the discretionary pool of $150,000 also falls below the average in the comparative set of $275,100 and the median of $237,500. Therefore, the cost of the KERP is reasonable as it falls below the median and average range when compared to base compensation levels and total cost per person and is only higher on a percentage of assets basis.

## Conclusion

21.    Based on the foregoing, and on the findings set forth in the Report, I believe that the KEIP and KERP will provide necessary incentives and inducement to the participants thereunder to either achieve a successful plan of reorganization or complete a sale transaction or to remain employed with the Debtors while their services are needed through the chapter 11 process. Additionally, the cost and scope of the KEIP and KERP are reasonable in the aggregate and are consistent with plans approved in similar chapter 11 cases.

I, the undersigned, declare under penalty of perjury that the foregoing is true and correct.

Executed on June 22, 2016                    By:  /s/ Dewey Imhoff
                                                  Dewey Imhoff

## Exhibit 1



# Aéropostale, Inc.

*Overview and Analysis of Key Employee Incentive ("KEIP") and Retention ("KERP") Programs*

*June 22, 2016*

# Table of Contents

| | | |
|---|---|---|
| I. | Executive Summary | 3 |
| II. | Key Employee Incentive Plan (KEIP) | 8 |
| III. | Key Employee Retention Plan (KERP) | 12 |
| IV. | Appendix | 16 |





# Executive Summary

# Background

Aéropostale, Inc. (the "Company") filed for Chapter 11 bankruptcy protection on May 4, 2016.

- FTI Consulting assisted the Company to design two postpetition compensation plans for the Company's key employees.
  - Key Employee Incentive Plan ("KEIP")
  - Key Employee Retention Plan ("KERP")

- This document is intended to:
  - Outline plan development assumptions.
  - Summarize relevant market KEIP and KERP practices based on plans approved by U.S. Bankruptcy Courts for similarly-situated companies.



# Plan Development Assumptions

FTI analyzed proposed levels of compensation to certain insiders ("Senior Management") as well as non-insiders ("Non-senior Management") and developed reasonable, market consistent, post-petition compensation plans with the following attributes:

- Incentivize Senior Management to create value for stakeholders via a KEIP.
  - Rewards designed to be performance based (at risk) and not intended as a retention plan for Senior Management or severance plan.
- Motivate and incentivize Non-senior Management throughout the restructuring process via a KERP.
- Reward Senior Management and Non-senior Management at market level compensation.



5

# Plan Development Benchmarking

FTI benchmarked comparable plans from select Chapter 11 cases.

- Benchmarking of comparable plans filed in similar Chapter 11 cases with the following criteria resulted in a "comp set" of 13 companies:
  - Chapter 11 cases filed from 2012 – 2015
  - Case filed in Delaware or Southern District of NY
  - Assets in range of $250M – $5B
  - Cost of the KEIP is below the median and average range of "comp set" when compared to base compensation levels and total cost per person but higher as a percentage of assets due to the higher number of participants and an asset base that is lower than the average or median asset bases
  - Cost of the KERP is within average/median range of "comp set" when compared to base compensation levels, but higher as a percentage of assets due to the higher number of participants and an asset base that is lower than the average or median asset bases



# Plan Summary & Benchmark Summary

The proposed KEIP and KERP plans encompass 52 US employees deemed critical to the restructuring process. The plans are within market both when compared to other Chapter 11 cases and market compensation levels.

| USD in $000s | # of Participants | Base Comp | Cost of of KEIP / KERP Threshold | Cost of of KEIP / KERP Target | Cost of of KEIP / KERP Max | # of Participants | Target Cost / Person | Target As % of Assets[3] | Target As % of Base Comp. | | Discretionary Pool |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **KEIP** | | | | | | | | | | | |
| **Total - Proposed Aéropostale, Inc.** | **10** | **$ 4,205.0** | **$ 1,135.6** | **$ 2,271.3** | **$ 3,406.9** | **10** | **$ 227.1** | **0.52%** | **54.0%** | | |
| | | | | | | | | | Low | High | |
| *Average - Comp. Set (13)* | *7* | | *$ 1,615.1* | *$ 2,907.3* | *$ 4,093.4* | *7* | *$ 385.4* | *0.28%* | *58.1%* | *163.7%* | |
| *Median - Comp. Set (13)* | *8* | | *$ 1,166.6* | *$ 2,664.0* | *$ 3,500.0* | *8* | *$ 333.0* | *0.22%* | *50.0%* | *155.0%* | |
| | | | | | | | | | | | |
| **KERP** | | | | | | | | | | | |
| **Total - Proposed Aéropostale, Inc. w/o Discretionary** | **41** | **$ 7,739.3** | **NA** | **$ 1,295.0** | **NA** | **41** | **$ 31.6** | **0.30%** | **16.7%** | | |
| **Total - Proposed Aéropostale, Inc. with Discretionary** | | | | **$ 1,445.0** | | | | **0.33%** | | | **$ 150.0** |
| | | | | | | | | | | | |
| *Average - Comp. Set (13)* | *36* | | *NA* | *$ 1,412.0* | *NA* | *36* | *$ 36.1* | *0.20%* | *29.8%* | | *$ 275.1* |
| *Median - Comp. Set (13)* | *31* | | *NA* | *$ 1,257.7* | *NA* | *31* | *$ 35.2* | *0.09%* | *26.8%* | | *$ 237.5* |
| **Total Cost of KEIP & KERP[1,2]** | | | **$ 2,430.6** | **$ 3,566.3** | **$ 4,701.9** | | | | | | |

[1] Cost of KERP does not include proposed $150K discretionary bonus pool

[2] KERP included in Threshold and Max KEIP scenarios

[3] Reflects asset values as sourced from Aéropostale, Inc. 10-Q as of 10/31/15





# Key Employee Incentive Plan (KEIP)

# Key Employee Incentive Plan
## Proposed Design

Participation in the KEIP is limited to those employees likely to have the most impact on maximizing value for the estate. Metrics are linked with value creation.

- Achieving milestones relating to timing of consummation of the Plan of Reorganization.
- Payouts/performance periods reflect the anticipated duration of the case.
- Individual award sizes take into account the overall cost of the program.

| Element | Proposed Aeropostale, Inc. KEIP |
|---|---|
| Participation | ▪ 10 US employees with strong line of sight to successfully execute the reorganization plan. |
| Payout Determination | <u>Standalone Reorganization</u>:<br>▪ Achieving milestones relating to (i) EBITDA performance based on the Company's 2016 Budget and (ii) timing of Plan of Reorganization consummation.<br>▪ Each performance criteria is weighted appropriately and is tied to specific goals.<br><u>M&A Transaction</u>:<br>▪ If a sale transaction results in a going concern sale of substantial assets, a target payout is earned and the standalone metrics will not apply.<br>▪ If a going concern sale transaction occurs at a valuation to be later agreed upon by the Debtors and the Creditors' Committee, a maximum payout is earned and the standalone metrics will not apply. |
| Payout Frequency | ▪ Payout under a stand alone reorganization will be made in two (2) equal cash payments with the first (1) payment no later than 15 days after emergence from Chapter 11, the second (2) payment no later than 60 days after emergence.<br>▪ Payout under an M&A transaction for a going concern sale of substantial assets will be made in one cash payment with the payment no later than 15 days after closing otherwise payout will be made under the stand alone reorganization schedule. |
| Separation Provisions | ▪ If a participant is terminated without cause prior to the emergence date they will receive their KEIP bonus on a pro rata basis based on the percentage of the amount of time from the date of the Chapter 11 filing to the date KEIP awards are earned. |



# Key Employee Incentive Plan
## Proposed Design (Cont'd)

| Element | Proposed Aéropostale, Inc. KEIP | | | | | | | |
|---------|---------|---------------|---------------|---------------|-----------------|----------------|-----------------|----------------|
| | Title | Salary | Revised Threshold Bonus Rate | Revised Target Bonus Rate | Revised Max Bonus Rate | Revised Threshold | Revised Target | Revised Max |
| Individual Payout Levels and Target KEIP Cost | EVP-Chief Operating Officer | $675,000 | 37.5% | 75.0% | 112.5% | $253,125 | $506,250 | $759,375 |
| | SVP-Design Aeropostale | $530,000 | 25.0% | 50.0% | 75.0% | $132,500 | $265,000 | $397,500 |
| | SVP-Production & Technical Design | $420,000 | 25.0% | 50.0% | 75.0% | $105,000 | $210,000 | $315,000 |
| | SVP-Logistics Construction & Real Estate | $415,000 | 25.0% | 50.0% | 75.0% | $103,750 | $207,500 | $311,250 |
| | SVP-Chief Financial Officer | $405,000 | 25.0% | 50.0% | 75.0% | $101,250 | $202,500 | $303,750 |
| | SVP-General Counsel & Secretary | $405,000 | 25.0% | 50.0% | 75.0% | $101,250 | $202,500 | $303,750 |
| | SVP-Store Operations | $350,000 | 25.0% | 50.0% | 75.0% | $87,500 | $175,000 | $262,500 |
| | SVP-Human Resources | $325,000 | 25.0% | 50.0% | 75.0% | $81,250 | $162,500 | $243,750 |
| | SVP-Global Licensing | $310,000 | 25.0% | 50.0% | 75.0% | $77,500 | $155,000 | $232,500 |
| | SVP-Merchandise Planning and Allocation | $370,000 | 25.0% | 50.0% | 75.0% | $92,500 | $185,000 | $277,500 |



# Key Employee Incentive Plan
## Metrics for KEIP Payment

The metrics developed for the KEIP plan are linked to value creation and have a significant "at risk" component.

Standalone Reorganization
- 60% of payment tied to consummation of Plan of Reorganization.
- 40% of payment tied to EBITDA performance based on 2016 Budget.
  - Target payout if EBITDA performance is at 100% of Budgeted EBITDA is achieved
  - Threshold payout if EBITDA performance is at 90% - 99.9% of Budgeted EBITDA is achieved

M&A Sale Transaction
- If a sale transaction results in a going concern sale of substantial assets, a target payout is earned and the standalone metrics will not apply.
- If a going concern sale transaction occurs at a valuation to be later agreed upon by the Debtors and the Creditors' Committee, a maximum payout is earned and the standalone metrics will not apply.



# Key Employee Incentive Plan
## Summary of Market Practice

The design and plan cost is consistent with comparable Chapter 11 companies. See the Appendix for additional detail.

Below is a summary of market practice:

| Element | Summary of Market Practice for Comparable KEIPs |
|---|---|
| Performance Award Type | ▪ KEIP awards tend to be paid in cash |
| Performance Measure | ▪ Prevalent performance metrics include critical milestones such as achieving financial performance, compliance with cash flow budgets, and achievement of personal goals |
| Participation | ▪ Participation tends to be limited to those with critical roles that will provide the most impact on maximizing value for the estate<br>▪ Participation generally ranged from a low of 3 to a high of 15 participants with a median of 8 participants |
| Cash Award Opportunities | ▪ Similarly situated company plans ranged from 35.3% to 394.6% of base salary with a median of 50.0% to 155.0% of base salary for threshold and maximum, respectively |
| Cost | ▪ The total cost of comparable KEIPs ranged from $540K to $8.6M at target, with opportunities to earn more under certain circumstances and the possibility of earning less if all targets were not achieved<br>▪ On a percentage of assets basis, similarly situated companies ranged from 0.06% to 0.72% at target |



12



# Key Employee Retention Plan (KERP)

# Key Employee Retention Plan
## Proposed Design

Participation in the KERP program supports the operating characteristics of the company, though generally limited to critical, hard to replace, Non-senior Management employees.

- Plan design is expected to incentivize retention throughout the anticipated post-petition period and the post emergence 60 day tail period.
- Plan participation and award amounts reflective of observed Chapter 11 market practices in terms of design and program cost.
- Form of award is cash.

*$ in thousands*

| KERP Level (%)[1] | KERP Participants | Average Salary | Average Proposed KERP $ Opportunity | Total Proposed KERP $ Opportunity |
|---|---|---|---|---|
| 6.6%-23.5% | 41 | $ 188.8 | $31.6 | $1,295.0 |
| *Discretionary Pool* | | | | *$150.00* |



(1) KERP level based on % of base salary.
(2) KERP amounts will change as participants are added and discretionary pool is distributed.

# Key Employee Retention Plan
## Proposed Design (Cont.)

| Element | Proposed Aeropostale, Inc. KERP |
|---|---|
| Participation | ▪ Up to 41 Non-senior Management (from Managers to Vice Presidents) would be eligible to receive an award<br>▪ KERP employees would not participate in other post-petition incentive plans, such as the KEIP. |
| Payout Determination | ▪ 100% to participants remaining employed with the Debtors through October 25, 2016. |
| Payout Frequency | ▪ Payout will be made in cash no later than September 10, 2016. |
| Separation Provisions | ▪ The plan includes a claw-back provision if any of the participants voluntarily leave or are terminated for cause between payment of the award and date which the award is fully earned.<br>▪ If a participant is terminated without cause they will receive their KERP bonus in full. |
| Maximum KERP Cost and Individual Payout Levels | ▪ Cost of plan is $1,445.0K including $150.0K for the discretionary pool[1]<br>▪ Cash awards range from 6.6% to 23.5% of base salary. |

*(1) The discretionary pool provides the Debtors resources for future allocations to certain Non-senior Management deemed to be critical to the reorganization process that were not included with the original KERP participants. The Chief Executive Officer will determine which, if any, critical Non-senior Management will participate in the discretionary pool. The addition of future participants through the discretionary pool could increase the number of KERP participants above 41.*



# Key Employee Retention Plan
## Summary of Market Practice

The design and plan cost is consistent with comparable Chapter 11 companies. See the Appendix for additional detail.

Below is a summary of market practice:

| Element | Summary of Market Practice for Comparable KERPs |
|---------|------------------------------------------------|
| Participation | ▪ Ranged from a low of 12 to a high of 69 with a median of 31 participants |
| Cash Award Opportunities | ▪ Ranged from 12.5% to 33.5% of base salary with a median of 29.8% of base salary |
| Cost | ▪ Discretionary pools were part of 8 of the 12 plans identified as benchmarks and ranged from a low of $75K to a high of $750K<br>▪ Including the discretionary pool, comparable cases costs ranged from $619K to $2.730M with a median of $1.258M<br>▪ On a percentage of assets basis, similarly situated companies ranged from 0.025% to 0.594% with a median rate of 0.090% |





# Appendix

# Key Employee Incentive Plan
## Comparable KEIPs Detail

| | Debtor | Industry | Assets ($ in mns) | Liabilities ($ in mns) | Filing Date | Court | No. of Participants | Total Cost Low | Total Cost Target | Total Cost High | Cost / Person Low | Cost / Person Target | Cost / Person High | As % of Assets Low | As % of Assets Target | As % of Assets High | As % of Liabilities Low | As % of Liabilities Target | As % of Liabilities High | Target Pay as % of Base Salary Low | Target Pay as % of Base Salary Target | Target Pay as % of Base Salary High | KEIP Metrics | Payout Range Duration | Payout Range Threshold | Payout Range Max | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | A123 Systems Inc. | Energy | $ 460 | $ 376 | 10/16/2012 | DE | 10 | $ 2,400,000 | $ 3,300,000 | $ 4,200,000 | $ 240,000 | $ 330,000 | $ 420,000 | 0.52% | 0.72% | 0.91% | 0.64% | 0.88% | 1.12% | N/D | N/D | N/A | (i) 60% proceeds from asset sale, (ii) 40% cash flow targets from DIP budget | ~7 mths | 46.3% | N/A | 2 3 4 |
| 2 | Allied Nevada Gold Corp. | Metals | 941 | 664 | 3/10/2015 | DE | 4 | 121,500 | 540,000 | 540,000 | 30,375 | 135,000 | 135,000 | 0.01% | 0.06% | 0.06% | 0.02% | 0.08% | 0.08% | 35.3% | 46.2% | (i) 15% tied to safety (lost time accidents) (ii) 15% related to environmental incidents resulting in fines, (iii) 25% tied to hitting target revenues, (iv) 20% tied to achieving forecasted cost reductions and (v) 25% tied to completion of mill demonstration plan by end of Q3 2015 | ~13 mths | 22.5% | 100.0% | 5 6 |
| 3 | Borders Group Inc. | Retail | 1,275 | 1,293 | 2/16/2011 | SDNY | 15 | N/A | 4,736,000 | 7,104,000 | N/D | 315,733 | 473,600 | N/D | 0.37% | 0.56% | N/D | 0.37% | 0.55% | 40.0% | 200.0% | Management: 40% of base salary for (i) cost reductions and (ii) asset sale. Senior Management: (i) 75% of base for Management's objectives by 8/15/11 or 55% for Management's objectives by 11/16/11 and (ii) 75% – 125% of base for transaction resulting in value available for distribution to unsecured creditors | ~11 mths | | 150.0% | |
| 4 | Brookstone Holdings Corp. | Retail | 388 | 332 | 4/3/2014 | DE | 4 | 231,866 | 843,150 | 1,507,131 | 57,967 | 210,788 | 376,783 | 0.06% | 0.22% | 0.39% | 0.07% | 0.25% | 0.45% | N/D | N/D | (i) 75% proceeds from asset sale, (ii) 25% cash flow targets from DIP budget. 50% paid at consummation of asset sale and 50% paid 60 days following consummation of asset sale. | ~9 mths | 27.5% | 178.8% | 7 |
| 5 | Coldwater Creek Inc. | Retail | 278 | 361 | 4/11/2014 | DE | 4 | N/A | 1,700,000 | 1,700,000 | N/D | 425,000 | 425,000 | N/D | 0.61% | 0.61% | N/D | 0.47% | 0.47% | N/D | N/A | Achieving levels of net cash flow against DIP budget – at least 95% must be achieved. | ~6 mths | N/A | N/A | |
| 6 | Eastman Kodak Co. | Technology | 5,102 | 6,751 | 1/19/2012 | SDNY | 11 | N/A | 4,500,000 | 4,500,000 | N/A | 409,091 | 409,091 | N/D | 0.09% | 0.09% | N/D | 0.07% | 0.07% | 50.0% | 155.0% | Existing plan based on achievement of corporate segment and strategic product group performance metrics. | ~20 mths | N/A | N/A | 8 |
| 7 | Hawker Beechcraft Inc. | Aerospace | 2,778 | 2,334 | 5/4/2012 | SDNY | 8 | 1,332,000 | 2,664,000 | 5,328,000 | 166,500 | 333,000 | 666,000 | 0.05% | 0.10% | 0.19% | 0.06% | 0.11% | 0.23% | 50.0% | 200.0% | Consists of two awards: (a) a standalone transaction incentive and (b) consummation of a third-party transaction. The standalone transaction is based on a (i) sliding payment scale for achieving a plan of consummation on or before 11/17/12 and (ii) meeting a targeted cumulative net cash flow. The third-party transaction award is based on a sliding payment scale for achieving an asset sale that occurs prior to 12/15/2012 and results in a purchase price of at least $1.79 billion. | ~10 mths | N/A | N/A | |
| 8 | Furniture Brands International Inc. | Consumer Products | 547 | 550 | 9/9/2013 | DE | 7 | N/A | 2,888,000 | 3,500,000 | N/D | 412,571 | 500,000 | N/D | 0.53% | 0.64% | N/D | 0.52% | 0.64% | N/D | N/A | 1% of proceeds of asset sale, capped at $3.5M | ~11 mths | N/A | 121.2% | |
| 9 | Nii Holdings Inc. | Telecommunication | 2,243 | 3,518 | 9/15/2014 | SDNY | 8 | 4,393,995 | 8,618,630 | 15,396,774 | 549,249 | 1,077,329 | 1,924,597 | 0.20% | 0.38% | 0.69% | 0.12% | 0.24% | 0.44% | 112.6% | 394.6% | (i) quarterly performance portion based on cash flow, revenue and subscriber additions – 67% of target and (ii) restructuring metrics tied to reorganization timing and asset sale price – 33% of target | ~9 mths | 51.0% | 178.8% | 9 10 |
| 10 | Overseas Shipholding Group Inc. | Transportation | 4,151 | 2,674 | 11/14/2012 | DE | 8 | 2,940,000 | 4,200,000 | 4,800,000 | 367,500 | 525,000 | 600,000 | 0.07% | 0.10% | 0.12% | 0.11% | 0.16% | 0.18% | N/A | N/A | Consummation of merger employees: (i) 50% corporate target – OSG level financial performance target and (ii) 50% individual objective target – varies by employee. SBU employees: (i) 25% OSG overall performance, (ii) 50% SBU target and (iii) 25% individual objective target | ~21 mths | 70.0% | 120.0% | 8 |
| 11 | RadioShack Corp. | Retail | 1,200 | 1,387 | 2/5/2015 | DE | 8 | 500,000 | 1,000,000 | 1,500,000 | 62,500 | 125,000 | 187,500 | 0.04% | 0.08% | 0.12% | 0.04% | 0.07% | 0.11% | 40.0% | 65.0% | 3 possible payments of $500K tied to price of 363 sale – (i) first payment for going concern bid equal to or greater than stalking horse bid, (ii) second payment for $5M – $25M greater than stalking horse bid and (iii) third payment for 25% more than $25M greater than stalking horse bid | ~14 mths | 50.0% | 150.0% | 3 |
| 12 | Sbarro Inc. | Retail – Restaurant | 471 | 487 | 4/4/2011 | SDNY | 6 | 1,001,250 | 1,335,000 | 1,668,750 | 166,875 | 222,500 | 278,125 | 0.21% | 0.28% | 0.35% | 0.21% | 0.27% | 0.34% | 50.0% | 65.0% | (i) 40% achieving target LTM EBITDA at 9/30/11 and (ii) 60% achieving target LTM EBITDA at 12/31/11 | ~8 mths | 75.0% | 125.0% | |
| 13 | Quicksilver | Retail | 1,032 | 1,191 | 9/92015 | DE | 8 | N/A | 1,469,500 | 1,469,500 | N/D | 489,833 | 489,833 | N/A | 0.14% | 0.14% | N/A | 0.12% | 0.12% | N/A | 87.2% | Critical milestones such as achieving cash flow budgets in the Debtor in possession ("DIP") budget (33%), the date the plan of reorganization goes effective (33% reducing for each month that passes (sliding scale), and personal goals (33%) | From reorg plan to emergence | | | |

Cases: 13, Plans: 13     N/D = Not Disclosed, N/A = Not Applicable

**By Case Statistics**

| | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Max | | | $ 5,102 | $ 6,751 | | | 15 | $ 4,393,995 | $ 8,618,630 | $ 15,396,774 | $ 549,249 | $ 1,077,329 | $ 1,924,597 | 0.52% | 0.72% | 0.91% | 0.64% | 0.88% | 1.12% | 112.6% | 394.6% | ~21 mths | 75.0% | 178.8% |
| Median | | | 1,032 | 1,191 | | | 8 | 1,166,625 | 2,664,000 | 3,500,000 | 166,688 | 333,000 | 425,000 | 0.07% | 0.22% | 0.39% | 0.07% | 0.25% | 0.44% | 50.0% | 155.0% | ~10 mths | 50.0% | 137.5% |
| Average | | | 1,605 | 1,686 | | | 7 | 1,615,076 | 2,907,252 | 4,093,297 | 205,121 | 385,450 | 529,656 | 0.15% | 0.28% | 0.37% | 0.16% | 0.28% | 0.37% | 58.1% | 163.7% | ~12 mths | 48.3% | 140.4% |
| Min | | | 278 | 332 | | | 3 | 121,500 | 540,000 | 540,000 | 30,375 | 135,000 | 135,000 | 0.01% | 0.06% | 0.06% | 0.02% | 0.07% | 0.08% | 35.3% | 46.2% | ~6 mths | 22.5% | 100.0% |

| Aéropostale, Inc. Total | Retail | 434 | 450 | | | 10 | 1,135,625 | 2,271,250 | 3,406,875 | 113,563 | 227,125 | 340,688 | 0.26% | 0.52% | 0.78% | | 0.50% | | 0.54% | | | | | |



18



# Key Employee Incentive Plan
## Footnotes to Comparable KEIPs Detail

**Footnotes to KEIP:**

1. Reflects asset values as of Petition Date when information was available.  Otherwise, reflects the most recent information available prior to filing.
2. KEIP Motion lists 9 participants for a total payout of $2.4M – $4.2M. KEIP Order lists 10 participants, but not the total cost of the plan. FTI assumed the cost of the 10th participant was negligible and used the payout range from the KEIP Motion.
3. Target bonus shown as midpoint of payout range.
4. Target bonus divided into two segments, both of which allow participants to achieve partial rewards. Threshold reflects the sum of minimum possible bonus from these two segments.
5. Target bonus divided into five segments. Participants are eligible for partial reward of two of the segments. Threshold reflects the sum of minimum possible bonus from these two segments.
6. The Company also had a non-insider KEIP approved by the Court in May 2015.
7. Threshold is the weighted average of minimum possible payments from the two components of the bonus.
8. The approved motion includes the Company's annual incentive program, EXCEL. The total payout of the EXCEL incentive program, if target metrics are achieved in full, will equal approximately $4.5 million.
9. Plan had 11 participants, 3 of whom were non-insiders. FTI excluded the 3 non-insiders.
10. Target bonus as % of base salary reflects blended rate based on 2013 salaries of the 8 insider participants.



# Key Employee Retention Plan
## Comparable KERPs Detail

| | Company | Filing Date | Assets ($ in mms)[1] | Prepetition Employees | Plan Name | Approval Date | Number of Participants | % of Prepetition Employees | Total Cost of Plan[2] | As % of Assets | Avg Cost Per Participant[3] | % of Base Salary[4] | Discretionary Pool | Payout Structure | New or Existing Plan | Payout Timing | Retention Period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | A123 Systems Inc. | 10/16/12 | $ 460 | 1,763 | Key Employee Retention Plan | 11/08/12 | 66 | 3.74% | $ 2,730,000 | 0.594% | $ 36,818 | 22.5% | $ 300,000 | Lump Sum | New Plan | The later of 1/15/13 or the Asset Sale Date | ~ 3 mths |
| 2 | Allied Nevada Gold Corp. | 03/10/15 | 941 | 439 | Non-Insider Key Employee Retention Plan | 08/19/15 | 51 | 11.62% | 682,276 | 0.072% | 13,378 | 12.5%[5] | None | Lump Sum | New Plan | The effective date of the plan of reorganization | N/D |
| 3 | Borders Group, Inc. | 02/16/11 | 1,275 | 6,100[5] | Key Employee Retention Plan | 04/22/11 | 25 | 0.41% | 1,233,000 | 0.097% | 37,320 | 30.0% | 300,000 | Lump Sum | New Plan | 30 days after either the effective date of a POR or the closing of a going concern sale | N/D |
| 4 | Brookstone Holdings Corp. | 04/03/14 | 388 | 3,200 | Key Employee Retention Plan | 05/12/14 | 33 | 1.03% | 1,282,429 | 0.330% | 38,861 | 33.5% | None | Multiple Installments | New Plan | 50% upon consummation of sale and 50% 60 days after consummation | N/D |
| 5 | Chassix Holdings Inc. | 03/12/15 | 833 | 3,500 | Key Employee Retention Plan | 04/24/15 | 69 | 1.97% | 2,371,258 | 0.285% | 33,677 | 29.8% | 750,000 | Multiple Installments | New Plan | 4 equal quarterly installments beginning on 12/31/14 and ending on 9/30/15 | ~ 10 mths |
| 6 | Coldwater Creek Inc. | 04/11/14 | 278 | 6,600 | Key Employee Retention Program | 06/06/14 | 28 | 0.42% | 800,000 | 0.288% | 28,571 | 21.0% | None | Lump Sum | New Plan | Upon satisfaction of specific milestone | N/D |
| 7 | Furniture Brands International Inc. | 09/09/13 | 547 | 5,400[6] | Modified Key Employee Retention Program | 10/11/13 | 48 | 0.89% | 2,174,747 | 0.398% | 40,620 | 26.0% | 225,000 | Lump Sum | New Plan | Lump sum upon closing of a transaction | 6 mths |
| 8 | Hawker Beechcraft | 05/04/12 | 2,778 | 5,420 | Key Employee Retention Plan | 07/30/12 | 31 | 0.57% | 1,900,000 | 0.068% | 61,290 | N/D | None | Lump Sum | New Plan | Lump sum upon emergence or consummation of a transaction | Unclear |
| 9 | Molycorp Inc. | 06/25/15 | 2,495 | 2,530 | Key Employee Retention Plan | 09/11/15 | 19 | 0.75% | 619,000 | 0.025% | 28,632 | 25.0% | 75,000 | Lump Sum | New Plan | Lump sum upon the effective date of a chapter 11 plan, the closing of sale(s) of substantially all of the Debtors' assets or an employee's involuntary termination, other than for cause | N/D |
| 10 | NII Holdings Inc. | 09/15/14 | 2,243 | 70 | Key Employee Retention Plan | 12/10/14 | 12 | 17.14% | 1,491,366 | 0.066% | 51,724[7] | 31.0% | 250,000 | Multiple Installments | Existing Plan | 2 installments over a 2-year period | ~ 24 mths |
| 11 | RadioShack Corporation | 02/05/15 | 1,200 | 21,000 | Key Employee Retention Program | 03/04/15 | 30 | 0.14% | 1,000,000 | 0.083% | 29,983 | 33.0% | 100,500 | Multiple Installments | New Plan | 30% paid upon the earlier of a 363 sale or 3/31/15, 30% paid upon the earlier of 2 months after the 363 sale or 5/31/15 and 40% paid upon the earlier of 6 months after the 363 sale or 9/30/15 | ~ 8 mths |
| 12 | Quicksilver | 09/09/15 | 1,032 | 3,816 | Key Employee Retention Program | 12/01/15 | 14 | 0.37% | 659,556 | 0.064% | 32,825 | 30.0% | 200,000 | Lump Sum | New Plan | Payout will be made in cash no later than 15 days after emergence from Chapter 11 | |

Cases: 12, Plans: 12          N/D = Not Disclosed, N/A = Not Applicable

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| High | | $ 2,778 | 21,000 | | | 69 | 17.14% | $ 2,730,000 | 0.594% | $ 61,290 | 33.5% | $ 750,000 | | | | ~ 24 mths |
| Median | | 987 | 3,658 | | | 31 | 0.82% | 1,257,715 | 0.090% | 35,248 | 29.8% | 237,500 | | | | ~ 9 mths |
| Average | | 1,206 | 4,987 | | | 36 | 3.26% | 1,411,969 | 0.198% | 36,142 | 26.8% | 275,063 | | | | ~ 11 mths |
| Low | | 278 | 70 | | | 12 | 0.14% | 619,000 | 0.025% | 13,378 | 12.5% | 75,000 | | | | ~ 3 mths |
| Aéropostale, Inc. Total | | $ 434 | 17,530 | Key Employee Retention Plan | TBD | 41 | 0.23% | $ 1,445,000 | 0.333% | $ 31,585 | 16.7% | $ 150,000 | | | | TBD |



20



# Key Employee Retention Plan
## Footnotes to Comparable KERPs Detail

**Footnotes  to KERP:**

1. Reflects asset values as of Petition Date when information was available.  Otherwise, reflects the most recent information available prior to filing.
2. Includes the discretionary pool.
3. Excludes the discretionary pool.
4. Shown as a median of payout ranges, unless otherwise noted.
5. Includes only full-time employees.
6. Includes US employees only. The Company also employed 3,500 employees abroad.
7. This is a 2 year KERP.  The amount shown above is for one year.



**<u>Exhibit B</u>**

**Sepe Declaration**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x
:
**In re**                                                      :          **Chapter 11**
:
**AÉROPOSTALE, INC.,** *et al.,*              :          **Case No. 16-11275 (SHL)**
:
**Debtors.**[1]                                           :          **Jointly Administered**
:
---------------------------------------------------------x

**DECLARATION OF ROBIN SEPE IN SUPPORT OF THE
DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 503(c) AND
363(b)(1) FOR ENTRY OF AN ORDER APPROVING THE DEBTORS' (I) KEY
EMPLOYEE INCENTIVE PLAN AND (II) KEY EMPLOYEE RETENTION PLAN**

     I, Robin Sepe, make this declaration under 28 U.S.C. § 1746:

     1.     I submit this Declaration in support of the *Motion of Debtors Pursuant to*

*11 U.S.C. §§ 503(c) and 363(b)(1) for Entry of an Order Approving the Debtors' (I) Key*

*Employee Incentive Plan and (II) Key Employee Retention Plan* (the "**_Motion_**").[2]

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal tax identification number, as applicable, are as follows: Aéropostale, Inc. (3880); Aéropostale West, Inc. (7013); Jimmy'Z Surf Co., LLC (0461); Aero GC Management LLC (4257); Aeropostale Procurement Company, Inc. (8518); Aeropostale Licensing, Inc. (8124); P.S. from Aeropostale, Inc. (5900); GoJane LLC (4923); Aeropostale Canada Corp. (N/A); Aeropostale Holdings, Inc. (7729); and Aeropostale Puerto Rico, Inc. (6477). The Debtors' corporate headquarters is located at 112 West 34th Street, 22nd Floor, New York, NY 10120.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

2.      Except as otherwise indicated, all statements in this Declaration are based on my personal experience and knowledge, my opinions, my discussions with the Debtors' management and professionals, and my review of the relevant documents.  If called to testify, I could and would testify to each of the facts and opinions set forth herein.

### Qualifications

3.      I am the Senior Vice President of Human Resources at Aéropostale, Inc. and its subsidiaries, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**").  I have been the Debtors' Senior Vice President of Human Resources since June 2015.  I have over 20 years of experience in human resources, including organizational development, leadership, succession planning, legal compliance, and talent acquisition.  I previously served as Senior Vice President of Human Resources at Crumbs Bake Shop, Inc. from February 2012 until June 2015 and as Senior Vice President of Human Resources and Chief People Officer at Modell's Sporting Goods from 2010 until 2012.  Prior to Modell's Sporting Goods, I worked at Aéropostale as Vice President of Human Resources from 1996 until 2010.  During my tenure at Aéropostale, I have developed innovative incentive programs that resulted in high retention levels of top tier managers and instituted key succession planning and development programs.

4.      On May 4, 2016 (the "**Commencement Date**"), each of the Debtors commenced with this court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  I am knowledgeable and familiar with the Debtors' day-to-day operations, business and financial affairs, books and records, and the circumstances leading to the commencement of these chapter 11 cases.

5.      I have reviewed the Motion and the documents identified therein, including FTI's Report, and believe that they accurately reflect the circumstances leading to the

WEIL:\95753203\7\11727.0013

development of the KEIP and KERP and the justifications and immediate need for relief.  I firmly believe – and it is the view of the compensation committee of the Debtors' board of directors – that approval of the KEIP and KERP is absolutely essential to maximize the value of the Debtors' estates and minimize disruption to the Debtors' business operations.

### The KEIP and KERP Participants

6.      Prior to the Commencement Date, the Debtors began to implement their publicly-announced comprehensive strategic review and restructuring of their retail operations and store profile.  During this process, the Debtors started experiencing the loss of some of their highly valuable employees throughout critical areas of their businesses.  These voluntary resignations included members of the Debtors' leadership team and other employees that performed critical functions, including the Debtors' director of tax, director of strategy and customer insights, senior director of social media, senior director of operations procurement, and various regional managers.

7.      In light of these voluntary departures and the additional pressures that would be brought on by the Debtors' chapter 11 cases, the Debtors recognized a need to address the concerns of their employees and their creditors and to align the interests of these respective constituencies.   Accordingly,   the  Debtors  initiated  a  review  of  their  employment  and compensation packages and assessed ways to improve and tailor them to prevent further employee departures.

8.      In this context, the Debtors worked extensively with FTI  to assist in the development of the KEIP and KERP, which apply to 10 executive employees (the "***KEIP Participants***") and 41 non-insider employees (the "***KERP Participants***").  Collectively, these employees have an in-depth knowledge of the Debtors' prepetition businesses, assets, liabilities,

counterparties, and operations and are absolutely essential for the Debtors to maximize the value of their estates during these chapter 11 cases.

9.        Pursuant to the Motion, the Debtors seek authority to implement the KEIP, which was developed to properly incentivize the KEIP Participants in pursuing a timely and successful reorganization or sale. In particular, the KEIP Participants are all irreplaceable members of the Debtors' executive committee who have, and will continue to, play a central role in the Debtors' chapter 11 cases. Most importantly, the KEIP Participants have been intimately involved and have a clear ability to influence the Debtors' ongoing efforts to pursue a dual track of marketing the Debtors' assets and negotiating a chapter 11 plan of reorganization. Accordingly, incentivizing the KEIP Participants and leveraging their talents and corporate knowledge is critical for the Debtors to maximize value for the benefit of all stakeholders and parties in interest.

10.       In addition to the KEIP, the Debtors also seek authority to implement the KERP, which was designed to motivate certain non-senior management personnel to remain employed with the Debtors during the chapter 11 process and to ensure that they do not suffer significant and costly key employee turnover. The KERP Participants have been faced with significant pressure to leave the Debtors' employ during the pendency of these chapter 11 cases due to, among other things, the Debtors' staff reductions, which included reductions in force both before and after the Commencement Date, and uncertain job prospects following the completion of a reorganization or sale transaction.

11.       Accordingly, the Debtors, together with their advisors, analyzed their workforce to determine which non-insiders were critical to a successful restructuring and sale process and should be covered by the KERP. The Debtors selected the 41 KERP Participants based on their status as critical, hard-to-replace, non-senior management employees. Many of

4

the KERP participants have developed valuable institutional knowledge regarding the Debtors' ongoing business operations that would be difficult and expensive to replace.

12.    Although certain of the KERP Participants hold titles such as "director" or "manager," each such employee must obtain approval from an appropriate senior manager before taking any significant action relating to strategic decision-making or corporate policy and asset disposition.  Although the KERP Participants are important to the Debtors' businesses and are particularly vital during these chapter 11 cases, their titles are only representative of the participants' importance in their roles.  Further, none of the KERP Participants receive equity of the Debtors as part of their compensation structure or are members of the Debtors' board of directors or participate in the Debtors' corporate governance.  Based on my discussions with the Debtors' outside counsel and my review of the plan materials, none of the KERP Participants are executive officers of the Debtors.  Based on the foregoing, I believe that none of the KERP Participants are "insiders" of the Debtors (as such term is defined in the Bankruptcy Code) who exercise meaningful control of the Debtors' day-to-day operations.

13.    I, therefore, believe that approval of the KEIP and KERP is necessary to maximize the value of the Debtors' estates and to minimize disruption to the Debtors' business operations.

I, the undersigned, declare under penalty of perjury that the foregoing is true and correct.

Dated: June 22, 2016                  /s/ Robin Sepe
       New York, New York             By: Robin Sepe
                                      Title: Senior Vice President, Human Resources

WEIL:\95753203\7\11727.0013

**<u>Exhibit C</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                          :
In re                          :        **Chapter 11**
                          :
**AÉROPOSTALE, INC.,** *et al.*,    :        **Case No. 16-11275 (SHL)**
                          :
        **Debtors.**[1]        :        **Jointly Administered**
                          :
------------------------------------------------------------x

**ORDER PURSUANT TO 11 U.S.C. §§ 503(c)**
**AND 363(b)(1) APPROVING DEBTORS' (I) KEY EMPLOYEE**
**INCENTIVE PLAN AND (II) KEY EMPLOYEE RETENTION PLAN**

Upon the motion (the "***Motion***")[2] of Aéropostale, Inc. and its subsidiaries, as

debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the

"***Debtors***"), pursuant to sections 503(c) and 363(b)(1) of the Bankruptcy Code, for entry of an

order approving the Debtors' KEIP and KERP, all as more fully described in the Motion; and

the Court having jurisdiction to consider the Motion and the relief requested therein in

accordance with 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference M-*

*431*, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the relief

requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and notice of the Motion

having been given as provided in the Motion; and such notice having been adequate and

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal tax identification number, as applicable, are as follows: Aéropostale, Inc. (3880); Aéropostale West, Inc. (7013); Jimmy'Z Surf Co., LLC (0461); Aero GC Management LLC (4257); Aeropostale Procurement Company, Inc. (8518); Aeropostale Licensing, Inc. (8124); P.S. from Aeropostale, Inc. (5900); GoJane LLC (4923); Aeropostale Canada Corp. (N/A); Aeropostale Holdings, Inc. (7729); and Aeropostale Puerto Rico, Inc. (6477). The Debtors' corporate headquarters is located at 112 West 34th Street, 22nd Floor, New York, NY 10120.

[2] Capitalized terms not otherwise herein defined shall have the meanings ascribed to such terms in the Motion.

appropriate under the circumstances; and it appearing that no other or further notice need be provided; and a hearing having been held to consider the relief requested in the Motion (the "*Hearing*"); and upon the declarations of Dewey Imhoff, a Senior Managing Director at FTI, and Robin Sepe, the Debtors' Senior Vice President of Human Resources, each filed contemporaneously with the Motion; and upon the record of the Hearing and all of the proceedings had before the Court; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their respective estates and creditors, and all parties in interest, and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

### IT IS HEREBY ORDERED THAT:

1.      The Motion is granted as set forth herein.

2.      Pursuant to sections 503(c) and 363(b)(1) of the Bankruptcy Code, the KEIP and KERP are approved.

3.      The Debtors are authorized, but not directed, to implement the KEIP and KERP and make the payments contemplated thereunder.

4.      Pursuant to Bankruptcy Rule 6004(h), the terms and provisions of this Order shall be immediately effective and enforceable upon its entry.

5.      The Debtors are authorized to take all steps reasonable and necessary to carry out this Order.

WEIL:\95753203\7\11727.0013

6.      This Court shall retain jurisdiction to hear and determine all matters

arising from or related to the implementation, interpretation and/or enforcement of this Order.

Dated: June ___, 2016
       New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

WEIL:\95753203\7\11727.0013