> THIS PROPOSED DISCLOSURE STATEMENT IS NOT A SOLICITATION OF VOTES ON THE PLAN. ACCEPTANCES AND REJECTIONS OF THE PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE PROPOSED DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THE DEBTORS RESERVE THE RIGHT TO AMEND, SUPPLEMENT, OR OTHERWISE MODIFY THIS DISCLOSURE STATEMENT PRIOR AND UP TO THE DISCLOSURE STATEMENT HEARING.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                                    :

| | | |
|---|---|---|
| In re | : | **Chapter 11 Case No.** |
| | : | |
| **AÉROPOSTALE, INC.**, *et al.*, | : | **16-11275 (SHL)** |
| | : | |
| Debtors.[1] | : | |
| | : | |

------------------------------------------------------------x

**PROPOSED DISCLOSURE STATEMENT FOR JOINT PLAN OF REORGANIZATION OF AÉROPOSTALE, INC. AND ITS AFFILIATED DEBTORS**

**WEIL, GOTSHAL & MANGES LLP**
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Debtor*
*and Debtor in Possession*

Dated: July 15, 2016
       New York, New York

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal tax identification number, as applicable, are as follows: Aéropostale, Inc. (3880); Aéropostale West, Inc. (7013); Jimmy'Z Surf Co., LLC (0461); Aero GC Management LLC (4257); Aeropostale Procurement Company, Inc. (8518); Aeropostale Licensing, Inc. (8124); P.S. from Aeropostale, Inc. (5900); GoJane LLC (4923); Aeropostale Holdings, Inc. (7729); and Aeropostale Puerto Rico, Inc. (6477). The Debtors' corporate headquarters is located at 112 West 34th Street, 22nd Floor, New York, NY 10120.

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ............................................................................................................ 3

    A.      VOTING PROCEDURES ................................................................................ 4

    B.      DISCLOSURE STATEMENT EXHIBITS .................................................... 4

    C.      THE DEBTORS' PROFESSIONALS ............................................................ 4

    D.      IMPORTANT DATES ..................................................................................... 5

    E.      BRIEF OVERVIEW OF THE PLAN ............................................................ 6

    F.      SUMMARY OF DISTRIBUTIONS AND VOTING ELIGIBILITY ........... 6

    G.      CONFIRMATION UNDER SECTION 1129(b) .......................................... 10

    H.      CONFIRMATION HEARING ..................................................................... 10

II.     OVERVIEW OF THE DEBTORS' OPERATIONS ................................................. 11

    A.      THE DEBTORS' BUSINESSES .................................................................. 11

        1.      *The Debtors' Operations* ................................................................ 11

        2.      *Cost Structure* ................................................................................ 11

            a.      Trade Costs ........................................................................ 12

            b.      Lease Obligations .............................................................. 13

    B.      PREPETITION CAPITAL STRUCTURE .................................................. 13

        1.      *Prepetition ABL Facility* ............................................................... 13

        2.      *Prepetition Term Loan Facility* ..................................................... 13

        3.      *The Security and Intercreditor Agreement* ..................................... 14

        4.      *General Unsecured Creditors* ........................................................ 15

        5.      *Series B Convertible Preferred Stock* ............................................ 15

    C.      PENDING LITIGATION .............................................................................. 15

III.    KEY EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11
       CASES ...................................................................................................................... 15

IV.     THE CHAPTER 11 CASES ...................................................................................... 18

    A.      FIRST DAY PLEADINGS ........................................................................... 18

    B.      DEBTOR-IN-POSSESSION FINANCING ................................................. 18

    C.      MOTION TO COMPEL ............................................................................... 19

    D.      RULE 2004 MOTION AND DISCOVERY ................................................ 20

    E.      STORE CLOSING MOTION ....................................................................... 20

    F.      AEROPOSTALE CANADA CORPORATION ............................................ 21

TABLE OF CONTENTS
(continued)

Page

| | | | |
|---|---|---|---|
| **G.** | **FORMATION OF THE CREDITORS' COMMITTEE** | | 21 |
| **H.** | **SCHEDULES AND BAR DATES** | | 21 |
| **V.** | **THE PLAN** | | 22 |
| **A.** | **INTRODUCTION** | | 22 |
| **B.** | **CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN** | | 22 |
| **C.** | **UNCLASSIFIED CLAIMS** | | 23 |
| | 1. | *Administrative Claims* | 23 |
| | 2. | *Fee Claims* | 24 |
| | 3. | *Priority Tax Claims* | 24 |
| | 4. | *DIP Claims* | 25 |
| **D.** | **CLASSIFICATION OF CLAIMS AND INTERESTS** | | 25 |
| | 1. | *Class 1 – Other Priority Claims* | 25 |
| | 2. | *Class 2 – Other Secured Claims* | 25 |
| | 3. | *Class 3 – Term Loan Secured Claims* | 26 |
| | 4. | *Class 4 –Term Loan Deficiency Claims* | 26 |
| | 5. | *Class 5 – General Unsecured Claims* | 27 |
| | 6. | *Class 6 – Intercompany Claims* | 27 |
| | 7. | *Class 7 -- Existing Aéropostale Interests* | 27 |
| | 8. | *Class 8 – Other Equity Interests* | 28 |
| **E.** | **MEANS FOR IMPLEMENTATION** | | 28 |
| | 1. | *Joint Chapter 11 Plan* | 28 |
| | 2. | *The Sale* | 28 |
| | 3. | *Plan Administrator* | 28 |
| | 4. | *Other Transactions* | 29 |
| | 5. | *Corporate Action* | 30 |
| | 6. | *Withholding and Reporting Requirements* | 30 |
| | 7. | *Exemption from Certain Transfer Taxes* | 30 |
| | 8. | *Effectuating Documents; Further Transactions* | 31 |
| | 9. | *Preservation of Rights of Action* | 31 |
| | 10. | *Closing of the Chapter 11 Cases* | 31 |
| **F.** | **CORPORATE GOVERNANCE** | | 31 |
| | 1. | *Corporate Form* | 31 |
| | 2. | *Aéropostale Board of Directors and Officers* | 31 |
| | 3. | *Corporate Existence* | 32 |

ii

**TABLE OF CONTENTS**
**(continued)**

**Page**

| | | | |
|---|---|---|---|
| | 4. | *Wind Down* | 32 |
| | 5. | *Certificate of Incorporation and By-Laws* | 32 |
| | 6. | *Stock Restrictions* | 32 |
| **G.** | **DISTRIBUTIONS** | | 32 |
| | 1. | *Distribution Record Date* | 32 |
| | 2. | *Date of Distributions* | 33 |
| | 3. | *Delivery of Distributions* | 33 |
| | 4. | *Manner of Payment Under Plan* | 33 |
| | 5. | *Minimum Cash Distributions* | 33 |
| | 6. | *Setoffs* | 34 |
| | 7. | *Distributions After Effective Date* | 34 |
| | 8. | *Allocation of Distributions Between Principal and Interest* | 34 |
| | 9. | *Payment of Disputed Claims* | 34 |
| **H.** | **PROCEDURES FOR DISPUTED CLAIMS** | | 34 |
| | 1. | *Allowance of Claims* | 34 |
| | 2. | *Objections to Claims* | 34 |
| | 3. | *Estimation of Claims* | 35 |
| | 4. | *No Distributions Pending Allowance* | 35 |
| | 5. | *Resolution of Claims* | 35 |
| | 6. | *Disallowed Claims* | 35 |
| **I.** | **EXECUTORY CONTRACTS AND UNEXPIRED LEASES** | | 36 |
| | 1. | *Assumption and Assignment of Executory Contracts and Unexpired Leases* | 36 |
| | 2. | *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases* | 36 |
| | 3. | *Claims Based on Rejection of Executory Contracts and Unexpired Leases* | 37 |
| | 4. | *Purchase Agreement* | 37 |
| | 5. | *Modifications, Amendments, Supplements, Restatements, or Other Agreements* | 37 |
| | 6. | *Insurance Policies* | 38 |
| | 7. | *Reservation of Rights* | 38 |
| **J.** | **LIQUIDATING TRUST** | | 38 |
| | 1. | *Execution of Liquidating Trust Agreement* | 38 |
| | 2. | *Purpose of the Liquidating Trust* | 38 |
| | 3. | *Liquidating Trust Assets* | 38 |

TABLE OF CONTENTS
(continued)

|  | | | Page |
|---|---|---|---|
| | 4. | Administration of the Liquidating Trust | 39 |
| | 5. | Liquidating Trustee's Tax Power for Debtors | 39 |
| | 6. | Cash Investments | 39 |
| | 7. | Distribution of Liquidating Trust Interests | 39 |
| | 8. | Federal Income Tax Treatment of Liquidating Trust | 39 |
| | 9. | Tax Reporting | 40 |
| | 10. | Dissolution | 41 |
| K. | | CONDITIONS PRECEDENT TO THE EFFECTIVE DATE | 41 |
| | 1. | Conditions Precedent to the Effective Date | 41 |
| | 2. | Waiver of Conditions Precedent | 42 |
| | 3. | Effect of Failure of Conditions to Effective Date | 42 |
| L. | | EFFECT OF CONFIRMATION | 42 |
| | 1. | Vesting of Assets | 42 |
| | 2. | Release of Liens | 42 |
| | 3. | Subordinated Claims | 42 |
| | 4. | Binding Effect | 43 |
| | 5. | Discharge of Claims and Termination of Interests | 43 |
| | 6. | Term of Injunctions or Stays | 43 |
| | 7. | Releases by the Debtors | 43 |
| | 8. | Releases By Holders of Claims and Interests | 44 |
| | 9. | Exculpation | 45 |
| | 10. | Injunction | 45 |
| | 11. | Waiver of Statutory Limitation on Releases | 46 |
| | 12. | Solicitation of the Plan | 47 |
| | 13. | Plan Supplement | 47 |
| | 14. | Corporate Action | 47 |
| M. | | RETENTION OF JURISDICTION | 47 |
| N. | | MISCELLANEOUS PROVISIONS | 49 |
| | 1. | Payment of Statutory Fees | 49 |
| | 2. | Substantial Contribution | 49 |
| | 3. | Dissolution of the Creditors' Committee | 49 |
| | 4. | Amendments | 49 |
| | 5. | Revocation or Withdrawal of the Plan | 50 |
| | 6. | Severability of Plan Provisions upon Confirmation | 50 |
| | 7. | Governing Law | 50 |

**TABLE OF CONTENTS**
**(continued)**

<b>Page</b>

| | | | |
|---|---|---|---|
| | 8. | *Time* | 50 |
| | 9. | *Additional Documents* | 50 |
| | 10. | *Immediate Binding Effect* | 51 |
| | 11. | *Successors and Assigns* | 51 |
| | 12. | *Entire Agreement* | 51 |
| | 13. | *Notices* | 51 |
| **VI.** | **CERTAIN RISK FACTORS AFFECTING THE DEBTORS** | | 52 |
| | **A.** | **CERTAIN BANKRUPTCY LAW CONSIDERATIONS** | 52 |
| | | 1. *Risk of Non-Confirmation of the Plan* | 52 |
| | | 2. *Non-Consensual Confirmation* | 52 |
| | | 3. *Risk Related to DIP Credit Facility* | 52 |
| | | 4. *Risk Related to Auction* | 52 |
| | **B.** | **ADDITIONAL FACTORS TO BE CONSIDERED** | 53 |
| | | 1. *The Debtors Have No Duty to Update* | 53 |
| | | 2. *No Representation Outside This Disclosure Statement Are Authorized* | 53 |
| | | 3. *No Legal or Tax Advice Is Provided to You by This Disclosure Statement* | 53 |
| | | 4. *No Admission Made* | 53 |
| | | 5. *Failure to Identify Litigation Claims or Projected Objections* | 53 |
| | | 6. *No Waiver of Right to Object or Right to Recover Transfers and Assets* | 53 |
| | | 7. *Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors* | 54 |
| **VII.** | **CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES** | | 54 |
| | **A.** | **CONSEQUENCES TO THE DEBTORS** | 55 |
| | | 1. *Sale and Other Dispositions of Assets* | 55 |
| | | 2. *Alternative Minimum Tax* | 56 |
| | **B.** | **CONSEQUENCES TO HOLDERS OF ALLOWED TERM LOAN DEFICIENCY CLAIMS AND GENERAL UNSECURED CLAIMS** | 56 |
| | | 1. *Recognition of Gain or Loss* | 57 |
| | | 2. *Allocation of Consideration to Interest* | 58 |
| | **C.** | **TAX TREATMENT OF A LIQUIDATING TRUST AND HOLDERS OF BENEFICIAL INTERESTS** | 58 |
| | | 1. *Classification of a Liquidating Trust* | 58 |
| | | 2. *General Tax Reporting by a Liquidating Trust and Beneficiaries* | 59 |
| | | 3. *Tax Reporting for Assets Allocable to Disputed Claims* | 60 |

**TABLE OF CONTENTS**
**(continued)**

**Page**

| | | |
|---|---|---|
| **D.** | **WITHHOLDING ON DISTRIBUTIONS AND INFORMATION REPORTING** .................................................................... 60 | |

**VIII.** **CONFIRMATION OF THE PLAN** ..................................................... 61

    **A.** **CONFIRMATION HEARING** ................................................. 61

    **B.** **OBJECTIONS** ............................................................. 61

    **C.** **REQUIREMENTS FOR CONFIRMATION OF THE PLAN** ................ 62

        1.  *Requirements of Section 1129(a) of the Bankruptcy Code* ................ 62

            a.  General Requirements .................................... 62

            b.  Best Interests Test ....................................... 63

            c.  Feasibility Analysis ...................................... 64

        2.  *Requirements of Section 1129(b) of the Bankruptcy Code* ................ 64

            a.  No Unfair Discrimination ................................ 64

            b.  Fair and Equitable Test ................................... 64

            c.  Application to the Plan ................................... 65

        3.  *Alternative to Confirmation and Consummation of the Plan* ............ 66

            a.  Section 363 Sale ........................................ 66

            b.  Liquidation Under Chapter 7 ............................. 66

            c.  Alternative Plans ....................................... 67

        4.  *Nonconsensual Confirmation* ................................. 67

**IX.** **CONCLUSION** ........................................................... 68

**DISCLAIMER**

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT (THE "***DISCLOSURE STATEMENT***") IS INCLUDED HEREIN FOR THE PURPOSES OF SOLICITING ACCEPTANCES OF THE *JOINT CHAPTER 11 PLAN OF REORGANIZATION OF AÉROPOSTALE, INC. AND ITS AFFILIATED DEBTORS*, DATED JULY 15, 2016 (AS MAY BE AMENDED, MODIFIED, OR SUPPLEMENTED FROM TIME TO TIME, THE "***PLAN***"), AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.[2] A COPY OF THE PLAN IS ANNEXED HERETO AS EXHIBIT A. NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE.

**ALL HOLDERS OF CLAIMS ARE ADVISED AND ENCOURAGED TO READ THE DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. IN PARTICULAR, ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN SECTION VI (CERTAIN OTHER FACTORS) OF THIS DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. THE PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT. IN THE EVENT OF ANY CONFLICTS BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN GOVERN**.

THE DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT NECESSARILY IN ACCORDANCE WITH OTHER NON-BANKRUPTCY LAW.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING WITH RESPECT TO PROJECTED CREDITOR RECOVERIES AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBE HEREIN.

AS TO CONTESTED MATTERS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT ALSO WILL NOT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS AND DEBTORS IN POSSESSION IN THE CHAPTER 11 CASES. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS

---

[2] Unless otherwise expressly set forth herein, capitalized terms used but not otherwise herein defined have the same meanings ascribed to such terms in the Plan.

OWN ADVISORS WITH RESPECT TO ANY TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN ON SUCH HOLDER'S CLAIM OR INTEREST.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF.

# I.

# INTRODUCTION

On May 4, 2016 (the "*Commencement Date*"), Aéropostale, Inc. and its subsidiaries ("*Aéropostale*" or the "*Debtors*") commenced with the United States Bankruptcy Court for the Southern District of New York (the "*Bankruptcy Court*") voluntary cases pursuant to chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*"). The Debtors' chapter 11 cases (the "*Chapter 11 Cases*") are being administered under the caption *In re Aéropostale, Inc.*, Case No. 16-11275 (SHL).

On July __, 2016, the Bankruptcy Court approved this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable a hypothetical holder of an Allowed Claim to make an informed judgment whether to accept or reject the Plan. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.

The purpose of this Disclosure Statement is to provide holders of Claims entitled to vote to accept or reject the Plan with adequate information about (i) the Debtors' businesses and certain historical events, (ii) the Chapter 11 Cases, (iii) the Plan, (iv) the rights of holders of Claims and Interests under the Plan, and (v) other information necessary to enable each Holder of a Claim entitled to vote on the Plan to make an informed judgment as to whether to vote to accept or reject the Plan. Holders of Interests are not entitled to vote on the Plan (*see* discussion at Section V of the Disclosure Statement).

Pursuant to section 1125 of the Bankruptcy Code, the Debtors submit this Disclosure Statement to all holders of Claims against the Debtors entitled to vote on the Plan to provide information in connection with the solicitation of votes to accept or reject the Plan. The Disclosure Statement is also available to all holders of Claims against and Interests in the Debtors for informational purposes, including to detail the impact the Plan will have on such holders' Claims and Interests. The Disclosure Statement is organized as follows:

- Section I includes certain general information.

- Section II provides an overview of the Debtors' businesses.

- Section III sets forth key events leading to the Chapter 11 Cases.

- Section IV discusses the Chapter 11 Cases.

- Section V contains a summary of the Plan.

- Section VI describes certain factors affecting the Debtors.

- Section VII discusses certain U.S. federal income tax consequences of the Plan.

- Section VIII addresses confirmation of the Plan.

- Section IX concludes this Disclosure Statement and recommends that eligible creditors vote to accept the Plan.

## A.    VOTING PROCEDURES

As set forth in more detail in Section V.B of this Disclosure Statement, certain holders of Claims are entitled to vote to accept or reject the Plan.  For each holder of a Claim entitled to vote, the Debtors have enclosed, along with a copy of the Disclosure Statement, among other things, a ballot and voting instructions regarding how to properly complete the ballot and submit a vote with respect to the Plan.  Holders of more than one Claim will receive an individual ballot for each Claim.  The individual ballots must be used to vote each individual Claim.  For detailed voting instructions, please refer to the specific voting instructions and the ballot enclosed with this Disclosure Statement.

All completed ballots must be actually received by Prime Clerk at the following address no later than **4:00 p.m. (Eastern Time) on August 16, 2016** (the "*Voting Deadline*").

Via Regular Mail, Overnight Couriers, or Hand Delivery:

Aéropostale, Inc.
Ballot Processing Center
c/o Prime Clerk LLC
830 3rd Avenue, 9th Floor
New York, New York 10022

If you are holder of a Claim that is entitled to vote on the Plan and you did not receive a ballot, received a damaged ballot or lost your ballot, or if you have any questions concerning the Disclosure Statement, the Plan, or the procedures for voting with respect to the Plan, please contact Prime Clerk at (855)-360-2999 (domestic toll-free) or (917)-877-5966 (international) or email (aeropostaleballots@primeclerk.com).

The Debtors will also be accepting ballots via electronic, online transmission through an E-Ballot platform available on Prime Clerk's website at https://cases.primeclerk.con/aeropostale.  Holders of Claims and Interests may cast an E-Ballot and electronically sign and submit such ballot via the platform.  Instructions for casting an electronic ballot are available on Prime Clerk's website.

> **THE VOTING AGENT WILL NOT COUNT**
> **ANY BALLOTS RECEIVED AFTER THE VOTING DEADLINE.**

## B.    DISCLOSURE STATEMENT EXHIBITS

The following exhibits are annexed to this Disclosure Statement:

- EXHIBIT A – The Plan (with exhibits)

- EXHIBIT B – Debtors' Prepetition Organizational Structure

- EXHIBIT C – Form of Asset Purchase Agreement

- EXHIBIT D – Liquidation Analysis

## C.    THE DEBTORS' PROFESSIONALS

The Debtors have retained, or will retain, the following professionals pursuant to separate orders of the Bankruptcy Court: (i) Weil, Gotshal & Manges LLP ("*Weil*"), as their legal advisors: (ii) Stifel, Nicolaus & Co., Inc., and Miller Buckfire & Co., LLC (collectively, "*Stifel*") as their investment

bankers; (iii) FTI Consulting, Inc. ("**FTI**") and Berkeley Research Group ("**BRG**") as their financial advisors; (iv) Prime Clerk LLC ("**Prime Clerk**"), as claims agent and administrative advisor; and (v) RCS Real Estate Advisors ("**RCS**") as real estate advisors.  The contact information for these professionals is set forth below:

| | |
|---|---|
| **Weil, Gotshal & Manges LLP**<br>767 Fifth Avenue<br>New York, NY 10153<br>Attn:    Ray C. Schrock, P.C.<br>         Jacqueline Marcus, Esq.<br>         Garrett A. Fail, Esq.<br>Tel: (212) 310-8000 | **Stifel, Nicolaus & Co., Inc.**<br>787 Seventh Avenue<br>New York, NY 10019<br>Attn: Michael J. Kollender<br>Tel: (212) 847-6448 |
| **FTI Consulting Inc.**<br>3 Times Square, 9th Floor<br>New York, NY 10036<br>Attn: Tim McDonagh<br>Tel: (212) 247-1010 | **Berkeley Research Group**<br>810 Seventh Avenue<br>Suite 4100<br>New York, NY 10019<br>Attn: Robert Duffy<br>(Tel:) 646-205-9320 |
| **RCS Real Estate Advisors**<br>400 West 34th Street<br>New York, NY 10001<br>Attn: Mark Dorwart<br>Tel: (212) 239-1100 | **Prime Clerk LLC**<br>830 3rd Avenue, 9th Floor<br>New York, NY 10022<br>Attn: Shai Waisman<br>Tel: (212) 257-5450 |

## D.    IMPORTANT DATES

Please take note of the following important dates and deadlines:

| | |
|---|---|
| Deadline to file and serve any objection or response to the Plan (the "**Plan Objection Deadline**") | August 12, 2016 at 12:00 p.m. (prevailing Eastern Time) |
| Deadline for completed ballots to be received by the Voting Agent (the "**Voting Deadline**") | August 16, 2016 at 4:00 p.m. (prevailing Eastern Time) |
| Deadline to submit bids in connection with the Sale Transaction (the "**Bid Deadline**") | August 18, 2016 at 5:00 p.m. (prevailing Eastern Time) |
| Scheduled date and time for the auction, if necessary, in connection with the Sale Transaction (the "**Auction**") | August 22, 2016 at 9:00 a.m. (prevailing Eastern Time) |
| Scheduled date and time for the commencement of the hearing to consider confirmation of the Plan (the "**Confirmation Hearing**") | August 23, 2016 at 11:00 a.m. (prevailing Eastern Time) |

## E.    BRIEF OVERVIEW OF THE PLAN[3]

The Plan described in this Disclosure Statement provides for the sale of substantially all of the Debtors' assets (the "**Sale Transaction**") pursuant to the terms of one or more asset purchase agreements submitted at or prior to the Bid Deadline and subsequently determined by the Debtors pursuant to the Bid Procedures to be the highest or otherwise best offer for such assets, subject to Bankruptcy Court approval of the Debtors' entry into an alternative transaction with a potential plan sponsor in connection with the Auction.  A form of asset purchase agreement to be utilized in connection with the Sale Transaction is attached hereto as **Exhibit C**.

The proceeds from the Sale Transaction will be used, to the extent available, to fund the ongoing wind-down costs of the Chapter 11 Cases and Distributions under the Plan.

The proposed procedures (the "**Bid Procedures**") are outlined in the *Debtors' Motion for an Order (i) Approving Disclosure Statement; (ii) Approving Notice of Disclosure Statement Hearing; (iii) Shortening Notice for Disclosure Statement Hearing; (iv) Establishing a Record Date; (v) Establishing Notice and Objection Procedures for Confirmation of the Plan; (vi) Approving Solicitation Packages and Procedures for Distribution Thereof; (vii) Approving the Form of Ballot and Establishing Procedures for Voting on the Plan; (viii) Approving the Form of Notice to Non-Voting Classes Under the Plan; (ix) Approving Sale and Bidding Procedures for Sale of Substantially All of Debtors' Assets Pursuant to the Plan; (x) Approving Procedures for Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (xi) Approving Related Notices; and (xii) Granting Related Relief* (the "**Disclosure Statement and Bid Procedures Motion**") filed contemporaneously herewith.  Upon the closing of the proposed Sale Transaction, the Plan provides that the proceeds will be distributed to holders of Claims and Interests in accordance with their relative priority as set forth in the Bankruptcy Code.  The Debtors retain the right, in their sole discretion and subject only to their business judgment to enter into any alternative restructuring transaction that is inconsistent with a Sale Transaction, including (i) a merger, consolidation, business combination, recapitalization, or refinancing of any of the Debtors (in one or a series of related transactions) on terms other than as set forth in the Asset Purchase Agreement, (ii) the issuance, sale, transfer, exchange, or other disposition by any of the Debtors of any equity interests (other than common stock or equity interests issued in respect of any employee stock or unit options), or all or substantially all of its assets, on terms other than as set forth in the Asset Purchase Agreement, or (iii) a plan of reorganization that does not contemplate a Sale Transaction.

Under the Plan, Aéropostale shall serve as Plan Administrator of each of the Debtors and shall, among other things, pursue Causes of Action and facilitate Distributions under the Plan until the Chapter 11 Cases of all of the Debtors have been fully administered.

Section V of this Disclosure Statement provides a more detailed description of the Plan.

## F.    SUMMARY OF DISTRIBUTIONS AND VOTING ELIGIBILITY

The following summary table briefly outlines the classification and treatment of Claims against and Interests in the Debtors under the Plan, and the voting eligibility of the holders of such Claims and Interests.  As set forth in the Plan, the classification of Claims and Interests set forth herein will apply

---

[3] This summary is qualified in its entirety by reference to the Plan.  Statements as to the rationale underlying the treatment of Claims and Equity Interests under the Plan are not intended to, and will not, waive, compromise or limit any rights, claims, defenses, or causes of action in the event that the Plan is not confirmed.  You should read the Plan in its entirety before voting to accept or reject the Plan.

separately to each of the Debtors.  The following summary table is qualified in its entirety by reference to the full text of the Plan.

| Class | Designation | Treatment | Approx. Allowed Amount[4] | Approximate Percentage Recovery[5] | Entitled to Vote |
|-------|-------------|-----------|---------------------------|------------------------------------|------------------|
| 1 | Other Priority Claims | Unimpaired | $6.2 million to $7.9 million | 100%<br><br>Except to the extent that a holder of an Allowed Other Priority Claim against any of the Debtors agrees to less favorable treatment of such Claim, each such holder shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or as soon as reasonably practical thereafter. | No (presumed to accept) |
| 2 | Other Secured Claims | Unimpaired | $0-5 million | 100%<br><br>Except to the extent that a holder of an Allowed Other Secured Claim against any of the Debtors agrees to less favorable treatment of such Claim, each holder of an Allowed Other Secured Claim shall receive, at the option of the Debtors or the Plan Administrator, (i) payment in full in Cash in full and final satisfaction of such Claim, payable on the later of the Effective Date and the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon as reasonably practical thereafter, (ii) delivery of the collateral securing such Allowed Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code, or (iii) such other treatment necessary to satisfy section 1129 of the Bankruptcy Code. | No (presumed to accept) |

---

[4] The amounts set forth herein are estimates based upon the Debtors' books and records as of the Commencement Date.  Actual allowed amounts will depend on, among other things, final reconciliation and resolution of all Claims, and the negotiation of cure amounts.  Consequently, the actual allowed amounts may vary from the approximate amounts set forth herein.

[5] The approximate percentage recovery for each Class set forth in this Disclosure Statement is based upon certain assumptions that are subject to change, including completion of the Auction.  A detailed discussion of the analysis underlying the estimated recoveries, including the assumptions underlying such analysis, is set forth in the Liquidation Analysis annexed to this Disclosure Statement as <u>Exhibit D</u>.

| Class | Designation | Treatment | Approx. Allowed Amount[4] | Approximate Percentage Recovery[5] | Entitled to Vote |
|---|---|---|---|---|---|
| 3 | Term Loan Secured Claims | Unimpaired | $0 to $150 million | 100%<br><br>If the Debtors bring a Cause of Action or Claim against the Term Loan Agent or the Term Loan Lenders seeking entry of a Sycamore Order, and to the extent that a Sycamore Order provides that the Term Loan Secured Claim shall be disallowed, subordinated, or recharacterized as Existing Aéropostale Interests, the holder of the Term Loan Secured Claim shall not receive or retain any property under the Plan on account of such Claim. To the extent that a Sycamore Order provides that the Term Loan Secured Claim shall be recharacterized as a General Unsecured Claim, such claim shall receive the same treatment as the Term Loan Deficiency Claim pursuant to Section 4.4 of the Plan. To the extent that a Sycamore Order provides that the Term Loan Secured Claim is Allowed and is not subject to subordination or recharacterization, or if the Debtors do not bring a Cause of Action or Claim against the Term Loan Agent or the Term Loan Lenders seeking entry of the Sycamore Order, the holder of the Term Loan Secured Claim shall receive, at the option of the Plan Administrator, (i) payment in full in Cash in full and final satisfaction of such Claim, payable on the later of the Effective Date and the date on which such Term Loan Secured Claim becomes Allowed, or as soon as reasonably practical thereafter or (ii) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code. | No (presumed to accept) |
| 4 | Term Loan Deficiency Claims | Impaired | $0 to $150 million | 0-100%<br><br>If the Debtors bring a Cause of Action or Claim against the Term Loan Agent or the Term Loan Lenders seeking entry of a Sycamore Order, and to the extent that a Sycamore Order provides that the Term Loan Deficiency Claim shall be disallowed, subordinated, or recharacterized as Existing Aéropostale Interests, the holders of Term Loan Deficiency Claim shall not receive or retain any property under the Plan on account of such Claims. To the extent that a Sycamore Order provides that the Term Loan Deficiency Claim shall be Allowed and is not subject to subordination or recharacterization as Existing Aéropostale Interests, or if the Debtors do not bring a Cause of Action or Claim against the Term Loan Agent or the Term Loan Lenders seeking entry of the Sycamore Order, the holder of the Term Loan Deficiency Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata | Yes |

| Class | Designation | Treatment | Approx. Allowed Amount[4] | Approximate Percentage Recovery[5] | Entitled to Vote |
|---|---|---|---|---|---|
| | | | | share of Available Cash *excluding* any proceeds of any Causes of Action against the Term Loan Agent, the Term Loan Lenders, or certain of their affiliates, which proceeds shall revert back to the Debtors and be available for distribution to Class 5 pursuant to Section 4.5 of the Plan. | |
| 5 | General Unsecured Claims | Impaired | $110 to $340 million[6] | 0%<br><br>On the Effective Date, or as soon thereafter as is reasonably practicable, except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Allowed General Unsecured Claim or has been paid before the Effective Date, each holder of a General Unsecured Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of Available Cash; *provided* that if the Debtors elect to pursue an Alternative Transaction, each holder of an Allowed General Unsecured Claim shall receive the treatment provided such claims in such Alternative Transaction. | Yes |
| 6 | Intercompany Claims | Impaired | | 0%<br><br>All Intercompany Claims shall not receive or retain any property under the Plan on account of such Claims. | No (Plan proponents deemed to accept) |
| 7 | Existing Aéropostale Interests | Impaired | | 0%<br><br>On the Effective Date, all Existing Aéropostale Interests shall be deemed cancelled. The holders of such Interests will not receive any distribution of property under the Plan. | No (presumed to reject) |

---

[6] Estimate of General Unsecured Claims does not include potential rejection damage claims arising from rejection of Executory Contracts and Unexpired Leases of personal property.

| Class | Designation | Treatment | Approx. Allowed Amount[4] | Approximate Percentage Recovery[5] | Entitled to Vote |
|-------|-------------|-----------|---------------------------|-----------------------------------|------------------|
| 8 | Other Equity Interests | Impaired | | 0%<br><br>Other Equity Interests of any Debtor shall be cancelled if and when such Debtor is dissolved in accordance with Section 6.3 of the Plan. No holder of an Other Equity Interest shall receive or retain any property of the Estate or direct interest in property of the Estate of the Debtor on account of such Other Equity Interest thereafter; provided, however, that in the event that all Allowed Claims against such Debtor have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Other Equity Interest in such Debtor may receive its Pro Rata Share of any remaining assets of such Debtor. | No (presumed to reject) |

Section V.B of this Disclosure Statement provides a more detailed description of the treatment of Claims and Interests under the Plan.

Pursuant to the provisions of the Bankruptcy Code, only those holders of Claims or Interests in Classes that are impaired under a plan of reorganization and that are not deemed to have rejected the plan are entitled to vote to accept or reject such proposed plan. Classes of Claims or Interests in which the holders of Claims are unimpaired under a proposed plan are deemed to have accepted such proposed plan and are not entitled to vote to accept or reject the Plan. Classes of Claims or Interests in which the holders of Claims receive no distribution under a proposed plan are deemed to have rejected such proposed plan and are not entitled to vote to accept or reject the Plan.

## G.    CONFIRMATION UNDER SECTION 1129(B)

If a Class of Claims entitled to vote on the Plan rejects the Plan, the Debtors reserve the right to amend the Plan or request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code or both. In addition, with respect to the Classes that are deemed to have rejected the Plan, the Debtors intend to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code. Section 1129(b) permits the confirmation of a chapter 11 plan notwithstanding the rejection of such plan by one or more impaired classes of claims or interests. Under section 1129(b), a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and reasonable" with respect to each rejecting class. A more detailed description of the requirements for confirmation of a nonconsensual plan is set forth in Section X of this Disclosure Statement.

## H.    CONFIRMATION HEARING

Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on **August 23, 2016 at 11:00 a.m. (Eastern Time)** before the Honorable Sean H. Lane at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, NY 10004-1408.

Objections and responses to confirmation of the Plan, if any, must be served and filed as to be received on or before the Plan Objection Deadline **August 12, 2016 at 12:00 p.m. (Eastern Time)**, in the manner described in the order approving this Disclosure Statement (the "***Disclosure Statement***

*Order*") and Section X.B of this Disclosure Statement.  The Confirmation Hearing may be adjourned from time to time without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

II.

**OVERVIEW OF THE DEBTORS' OPERATIONS**

**A.    THE DEBTORS' BUSINESSES**

1.    *The Debtors' Operations*

Aéropostale is a specialty retailer of casual apparel and accessories, principally serving young women and men through its Aéropostale stores and website.  The Debtors provide customers with a focused selection of high quality fashion and fashion-basic merchandise at compelling values through its retail stores and e-commerce business.  The Debtors also operate GoJane.com, Inc., an online women's fashion footwear and apparel retailer acquired in November 2012.

Aéropostale maintains control over its proprietary brands by designing, sourcing, marketing, and selling all of its own merchandise, other than in licensed stores outside the United States.  As of April 30, 2016, the Debtors operated 805 stores, consisting of 739 Aéropostale stores in all 50 states and Puerto Rico, 41 Aéropostale stores in Canada, and 25 P.S. from Aéropostale stores in 12 states.  In addition, the Debtors have license agreements with unaffiliated third party operators located outside of the United States.  These agreements are generally structured with royalty income paid as a percentage of inventory purchases or sales, for the use of the Debtors' trademarks, trade name and branding, and/or income from buying commissions for inventory purchased by the international licensees from the Debtors' vendors.  Pursuant to these licensing agreements, the Debtors' licensees operate over 300 Aéropostale and P.S. from Aéropostale locations in the Middle East, Asia, Europe, and Latin America.

The Debtors' peak sales seasons are the December holiday and the back-to-school seasons.  The back-to-school season typically begins in mid-July and lasts until early September.  The Debtors estimate that approximately 18% of their yearly sales are attributable to the back-to-school season.

Aéropostale, Inc. was a publicly-traded company and, until recently, its equity securities traded on the New York Stock Exchange under the symbol "ARO."  On April 22, 2016, Aéropostale, Inc.'s equity was delisted from the New York Stock Exchange, and began trading on the OTCQX Best Market under the symbol "AROP."  After the Commencement Date, Aéropostale, Inc.'s equity was transferred to the Pink market operated by OTC Markets Group, Inc., under the symbol "AROPQ."

Aéropostale, Inc. is the direct or indirect corporate parents of each of the other Debtors.  A summary of the Debtors' organizational structure as of the Commencement Date is attached hereto as **Exhibit B**.

2.    *Cost Structure*

The Debtors maintain two distribution centers to process merchandise and warehouse inventory and to support the Debtors' stores in the United States and Puerto Rico.  The Debtors lease a 315,000 square foot distribution center facility in South River, New Jersey, and a 360,000 square foot distribution center facility in Ontario, California.  The staffing of these distribution centers is outsourced to a third party provider that operates each facility and processes the Debtors' merchandise while the

Debtors manage each facility. Prior to the Commencement Date, the Debtors had an agreement with another third party to provide distribution services for their Canadian stores. In addition, a third party provides fulfillment and shipment services in Kentucky for the Aéropostale e-commerce business, including warehousing inventory and fulfilling and shipping customers' sales orders.

The Debtors' prepetition cost structure included certain fixed and variable costs, including employee related costs, workers' compensation liabilities, costs associated with the Debtors' sourcing arrangements, and real estate leases and related costs. The cost of doing business for the Debtors also included, without limitation, costs pertaining to purchasing, receiving, warehousing, shipping, advertising and other related items.

     a.    <u>Trade Costs</u>

In 2015, the Debtors sourced approximately 80% of their merchandise from their top five merchandise suppliers. Although the Debtors design the products sold in their stores and on-line retail operations, the Debtors' merchandise suppliers manufacture the products. The Debtors' top two merchandise suppliers are an affiliate of Li & Fung Limited ("*Li & Fung*") and MGF Sourcing LLC ("*MGF*").

For 2016, MGF was planned to be the Debtors' second largest merchandise supplier, supplying approximately 30% of the Debtors' goods. MGF is an affiliate of Sycamore Partners, which is also an affiliate of Aero Investors LLC ("*Aero Investors*"), the Debtors' largest prepetition secured creditor. In May 2014, as a condition to Aero Investors providing financing to the Debtors, one of the Debtors, Aéropostale Procurement Company, Inc. ("*Aero Procurement*") entered into a non-exclusive sourcing agreement (the "*Sourcing Agreement*") with MGF. Aéropostale Inc. guaranteed the obligations of Aero Procurement under the Sourcing Agreement. The Sourcing Agreement required the Debtors to purchase a minimum volume of product for a period of 10 years commencing in the first fiscal quarter of 2016 of between $240 million and $280 million per annum depending on the year. If the Debtors failed to purchase the applicable minimum volume of product in any given year, the Debtors were required to pay a shortfall commission to MGF, based on a scaled percentage of the applicable shortfall during the applicable period. Under the Sourcing Agreement, MGF was obligated to pay the Debtors an annual rebate based on the volume of annual purchases made by the Debtors in any given year. The Sourcing Agreement required the annual rebate to be applied towards the payment of the required amortization on the Tranche B Loan provided by Aero Investors. As discussed further in Section IV.C of this Disclosure Statement, the Sourcing Agreement will be terminated pursuant to a Settlement Agreement between the Debtors and MGF.

The Debtors are also parties to a master sourcing agreement with their largest merchandise supplier, LF Sourcing (Millwork) LLC ("*L&F*"), and affiliate of Li & Fung, dated as of February 2, 2015 (as amended, the "*L&F Agreement*"). The L&F Agreement had an initial term of ten years. The L&F Agreement requires that the Debtors purchase a minimum volume of product of $350 million each year. If the Debtors fail to purchase the applicable minimum volume of product in any given year, the Debtors are required to pay a shortfall commission to L&F, based on a percentage of the applicable shortfall during the relevant period. The Debtors are also entitled to certain rebates under the L&F Agreement. Effective as of April 1, 2016, the Debtors entered into an amended and restated master sourcing agreement with LF Sourcing (the "*Amended L&F Agreement*") which also has a term of ten years. Under the Amended L&F Agreement, the Debtors are required to purchase a minimum volume of product of $175 million each year. Similar to the L&F Agreement, under the Amended L&F Agreement, if the Debtors fail to purchase the applicable minimum volume of product in any given year, the Debtors are required to pay a shortfall commission to L&F, based on a percentage of the applicable shortfall during the relevant period. The Debtors are also entitled to certain rebates under the Amended L&F

Agreement. The Debtors obtain the remainder of their merchandise from approximately 100 other suppliers.

      b.      <u>Lease Obligations</u>

      The Debtors lease all of their store locations.  Most of the Debtors' stores are located in shopping malls throughout the United States and, prior to the Commencement Date, Canada.  Most of the Debtors' store leases have a fixed rental payment due in advance and also require the Debtors to pay additional rent based on specified percentages of sales after the Debtors achieve specified annual sales thresholds.  Percentage rent is generally due on the first day of each month.  The incurred actual costs for the Debtors' stores are estimated to be approximately $200-225 million for fiscal year 2016.

      The Debtors lease 121,000 square feet of office space in New York, New York for corporate headquarters and for the Debtors' design, sourcing, and production teams.  The Debtors also lease 69,000 square feet of office space in Lyndhurst, New Jersey for administrative offices for finance, operations, and information systems personnel.  The Debtors lease office space in Los Angeles, California as the administrative offices for GoJane.  Additionally, as mentioned above, the Debtors lease a 315,000 square foot distribution center facility in South River, New Jersey, and a 360,000 square foot distribution center in Ontario, California.

## B.     PREPETITION CAPITAL STRUCTURE

      As of the Commencement Date, the Debtors had outstanding funded debt obligations in the aggregate amount of approximately $223 million (the "*Prepetition Debt Obligations*") which were comprised of (i) approximately $73 million in borrowings under an asset-based revolving credit facility in an amount up to $215 million, and (ii) a $100 million "Tranche A" term loan and a $50 million "Tranche B" term loan.  The Debtors granted security interests in and liens on all or substantially all of their assets to secure the Prepetition Debt Obligations.

      1.     *Prepetition ABL Facility*

      Aéropostale and certain of the Debtors were parties to that certain Third Amended and Restated Loan and Security Agreement, dated September 22, 2011 (as amended, modified, or otherwise supplemented from time to time, the "*Prepetition ABL Agreement*," and together with all agreements and documents delivered pursuant thereto or in connection therewith, the "*Prepetition ABL Documents*"), by and among Aéropostale as borrower, each Debtor-guarantor named therein, the various financial institutions and other persons party thereto from time to time (the "*Prepetition ABL Lenders*"), and Bank of America, N.A. as administrative agent and collateral agent (in such capacities, the "Prepetition ABL Agent," and together with the Prepetition ABL Lenders, the "*Prepetition ABL Secured Parties*"). Pursuant to the Prepetition ABL Agreement, the Prepetition ABL Lenders provided revolving credit commitments in an aggregate principal amount of up to $215 million, with a $40 million sublimit for the issuance of letters of credit (the "*Prepetition ABL Facility*").  As of the Commencement Date, the aggregate amount outstanding in connection with the Prepetition ABL Facility was approximately $73 million in unpaid principal and approximately $240,000 in an undrawn letter of credit.  These amounts were subsequently paid down with the proceeds of the debtor-in-possession facility, as discussed in further detail below.

      2.     *Prepetition Term Loan Facility*

      Aéropostale and certain of the Debtors are party to that certain Loan and Security Agreement, dated May 23, 2014 (as amended, modified, or otherwise supplemented from time to time,

the "***Prepetition Term Loan Agreement***," and together with all agreements and documents delivered pursuant thereto or in connection therewith, the "***Prepetition Term Loan Documents***"), by and among Aéropostale as borrower, each Debtor-guarantor named therein, the various financial institutions and other persons party thereto from time to time (the "***Prepetition Term Loan Lenders***"), and Aero Investors as administrative agent and collateral agent (in such capacities, the "***Prepetition Term Loan Agent***," and together with the Prepetition Term Loan Lenders, the "***Prepetition Term Loan Secured Parties***"). The Prepetition ABL Secured Parties and the Prepetition Term Loan Secured Parties are collectively referred to as the "***Prepetition Secured Parties***."

Pursuant to the Prepetition Term Loan Agreement, the Prepetition Term Loan Lenders provided term loans in the aggregate principal amount of $150 million, split among two tranches: $100 million in Tranche A and $50 million in Tranche B (collectively, the "***Prepetition Term Loan Facility***"). The Tranche A loan was scheduled to mature on May 23, 2019. The Tranche B Loan was included by Sycamore Partners as a way to secure the Debtors' obligations to MGF under the Sourcing Agreement. The Tranche B loan was scheduled to mature on the earlier of (i) the tenth anniversary of the end of the Start-Up Period (as defined in the Sourcing Agreement) and (ii) the expiration or termination of the Sourcing Agreement. The Prepetition Term Loan Facility contained a $70 million minimum liquidity covenant.[7]

3.    *The Security and Intercreditor Agreement*

To secure prompt, punctual, and faithful performance of all of the obligations under the Prepetition ABL Documents, each of Aéropostale and the Debtor-guarantors (collectively, the "***Grantors***") granted to the Prepetition ABL Agent, for the ratable benefit of the Prepetition ABL Secured Parties, a continuing security interest in and to, all of the assets of the Grantor, subject to certain exceptions (the "***Prepetition ABL Collateral***").

To secure prompt, punctual, and faithful performance of all of the obligations under the Prepetition Term Loan Documents, each Grantor granted to the Prepetition Term Loan Agent, for the ratable benefit of the Prepetition Term Loan Secured Parties, a continuing security interest in and to, all of the assets of the Grantor, subject to certain exceptions (the "***Prepetition Term Loan Collateral***").

There is significant overlap between the Prepetition ABL Collateral and the Prepetition Term Loan Collateral. The relative priorities of the liens held by the Prepetition ABL Secured Parties and the Prepetition Term Loan Secured Parties and the restrictions on the respective parties' ability to exercise remedies against collateral were governed by that certain Intercreditor Agreement, dated as of May 23, 2014, by and among the Prepetition ABL Agent and the Prepetition Term Loan Agent (as may be amended, supplemented, restated, amended or otherwise modified from time to time, the "***Intercreditor Agreement***").

The Intercreditor Agreement defines "ABL Priority Collateral" to include substantially all of the Debtors' assets. The Intercreditor Agreement defines "Term Priority Collateral" to include all common collateral other than the ABL Priority Collateral.

Pursuant to the Intercreditor Agreement, the Prepetition ABL Secured Parties and the Prepetition Term Loan Secured Parties agreed that the Prepetition ABL Secured Parties would be senior

---

[7] The Prepetition Term Loan Facility is subject to ongoing investigation by the Debtors as part of the Rule 2004 discovery discussed herein. Any characterization of the Prepetition Term Loan Facility, the Term Loan Secured Claim or the Term Loan Deficiency Claim contained in this Disclosure Statement should not be deemed an admission by the Debtors as to allowance, disallowance, validity or otherwise.

to the ABL Priority Collateral and the Prepetition Term Loan Secured Parties would be senior as to the Term Priority Collateral.

    4.    *General Unsecured Creditors*

In addition to the Debtors' outstanding obligations under the Prepetition ABL Facility and the Prepetition Term Loan Facility, on the Commencement Date the Debtors also had significant unsecured debt including amounts owed to trade vendors and landlords.

The Debtors rely on a broad network of hundreds of individual vendors to supply merchandise for their stores, including clothing, shoes, and accessories. A majority of the vendors conduct business with the Debtors on an invoice-by-invoice basis and are paid on prearranged terms. As of the Commencement Date, the Debtors estimate that approximately $23 million of merchandise trade debt was due and outstanding, of which $2.5 million related to goods provided to the Debtors in the 20 days immediately prior to the Commencement Date.

    5.    *Series B Convertible Preferred Stock*

Concurrent with, and as a condition to, entering into the Prepetition Term Loan Facility, the Debtors issued 1,000 shares of the Series B Preferred Stock to affiliates of Sycamore Partners at an aggregate offer price of $100,000. Each share of Series B Preferred Stock is convertible at any time at the option of the holder exercised on or prior to May 23, 2024 into shares of common stock at an initial conversion rate of 3,932.018 for each share of Series B Preferred Stock. The common stock underlying the Series B Preferred Stock represents 5% of the Debtors' issued and outstanding common stock as of May 23, 2014. The Series B Preferred Stock is convertible into shares of the common stock at an initial cash conversion price of $7.25 per share of the underlying common stock. Inasmuch as Aéropostale's common stock currently trades at under five cents per share, it is not expected that Sycamore Partners would exercise its conversion option.

## C.    PENDING LITIGATION

A list of current litigation involving the Debtors is listed on the Debtors' schedules of assets and liabilities and statements of financial affairs.

### III.

### KEY EVENTS LEADING TO THE COMMENCEMENT
### OF THE CHAPTER 11 CASES

The Debtors' operations have generally been profitable during the past thirty years; however, declining mall traffic, a highly promotional and competitive teen retail environment, and a shift in customer demand away from apparel to technology and personal experiences all contributed to the Debtors' declining financial performance. These pressures were not unique to the Debtors; a number of other retailers, including competitors such as American Apparel, Caché, Wet Seal, Quiksilver, and Pacific Sun, have all recently filed for bankruptcy after facing similar market conditions.

In response to their declining revenues and continued financial difficulties, the Debtors embarked on a series of initiatives to restructure and streamline their businesses. Since early 2014, the Debtors have engaged in a comprehensive effort to restructure the P.S. from Aéropostale business, closing 126 P.S. from Aéropostale stores primarily located in shopping malls, to focus on P.S. from Aéropostale stores in off-mall locations. In an effort to right-size the Debtors' Aéropostale store base and

optimize their real estate portfolio, the Debtors embarked on a review of their lease terms and retained a real estate consulting firm to investigate the economics of accelerated lease buyouts, as well as to identify opportunities for negotiating more competitive rents across the Debtors' real estate portfolio. The Debtors closed 122 Aéropostale stores in the United States and Canada during fiscal year 2014. The Debtors closed an additional 50 stores in fiscal year 2015.

Another initiative on which the Debtors embarked in 2016 was the creation of a two-store format, splitting the Debtors' stores between a factory format and a traditional mall format. The factory stores were geographically positioned to capture broader and growing demographics and appeal to the Debtors' most loyal customer base. They are located primarily at outlet malls and more value focused B and C mall locations and predominately offer the Debtors' core merchandise, including logo-bearing merchandise. The mall format stores are located primarily in higher-end, or A and B, malls and are focused on more updated, classic merchandise with fewer logo-bearing products. The mall stores will serve as a showcase for the Debtors' brands and products and will serve as a feeder of merchandise for the factory stores and the Debtors' online retail operation. The Debtors implemented the factory store model in 460 stores and experienced strong initial results, while trends in the Debtors' mall format stores also improved as a result of the repositioned merchandise assortment. Additionally, the Debtors developed additional brands for the 2016 back-to-school season that they anticipated would perform strongly in mall stores. The Debtors also reduced corporate headcount and took various other strategic actions geared toward improving profitability, generating approximately $35 to $40 million in estimated annualized pre-tax savings for fiscal 2016.

The Debtors' strategic initiatives and cost cutting measures resulted in significant operational improvements. The Debtors, however, were unable to realize the full benefit of these measures due to a disruption of their supply chain that resulted from the precipitous actions taken by Sycamore through its affiliate, MGF.

Specifically, by letter, dated February 24, 2016 (the *February 24th Letter*), MGF unilaterally declared that, "upon information and belief," a Credit Review Period had been triggered under the Sourcing Agreement. MGF provided no other basis for its unsupported assertion that a Credit Review Period had been triggered, did not identify how far below the $150 million liquidity threshold Aéropostale had supposedly fallen, and did not provide a date on which the Credit Review Period had supposedly started. Based on its assertion that a Credit Review Period had been triggered, MGF stated that it was immediately refusing to accept orders for merchandise—which were necessary for the Debtors' retail sales and vital to the Debtors' business—unless the Debtors delivered concurrently cash or "an irrevocable standby letter of credit." The conditions unilaterally sought to be imposed by MGF were onerous—full payment at the time of placement of an order, or based on the typical lead time for manufacturing and delivering goods, at least 90 days before the goods are received by the Debtors at their distribution center.

In response to the February 24th Letter, the Debtors requested, among other things, that MGF provide "information evidencing your conclusions that a Credit Review Period has been triggered as well as identifying the source(s) of such information." MGF never responded to this request. By letter, dated February 29, 2016, MGF again asserted that the Debtors were operating in a Credit Review Period under the Sourcing Agreement and stated that MGF was immediately suspending performance on pending orders without payment in advance (seeking to change terms from payment 30 days after delivery to the Debtors' distribution center to well in advance of delivery to the Debtors' distribution center). The effect of this notice was that MGF would immediately halt delivery on all pending orders for merchandise unless the Debtors paid in full prior to shipment. These goods were necessary for the Debtors' retail sales and, in particular, their spring break and Easter season.

It is the Debtors' position that the payment terms that MGF unilaterally sought to impose were unreasonable. The Debtors had well over $100 million in liquidity and had continued to make every payment to MGF on a timely basis. Throughout this period the Debtors informed MGF that they had excess liquidity. Nonetheless, MGF continuously refused to ship goods to the Debtors absent payment in advance—even though orders had been previously accepted on normal terms.

MGF's actions also affected L&F. In February 2016, L&F was required, pursuant to the terms of the L&F Agreement, to pay the Debtors a rebate of approximately $9 million. L&F refused to make the rebate payment as required and by letter, dated March 4, 2016, L&F contacted the Debtors regarding L&F's supply agreement with the Debtors. The Debtors believed that Sycamore contacted L&F and this led to L&F taking the position that it was entitled to shortened payment terms for any goods shipped to the Debtors. Ultimately, the Debtors and L&F agreed to payment terms of essentially "net 20"—which means that Aéropostale has 20 days after delivery to make payment. As of the Commencement Date, MGF was the only significant supplier that cut off the Debtors' supply and demanded cash in advance terms.

On March 18, 2016, MGF delivered a purported notice of default under the Sourcing Agreement to the Debtors asserting that the Debtors' refusal to accept delivery or pay for orders under the terms unilaterally set forth in MGF's previous letters constituted a material breach of the terms and conditions of the Sourcing Agreement. MGF reserved its right to terminate the Sourcing Agreement following the fifteenth business day after the delivery of the notice of default. Although the Debtors disputed the allegations contained in the notice of default, as well as MGF's right to terminate the Sourcing Agreement based on those allegations, the notice was another act that hastened the commencement of these cases by the Debtors. MGF subsequently withdrew the notice of default.

The Debtors engaged in settlement discussions with Sycamore and MGF on April 8, 2016. Subsequently, on April 20, 2016, MGF delivered a second notice of default under the Sourcing Agreement again asserting that the Debtors' refusal to accept delivery or pay for orders under the terms set forth in MGF's previous communications constituted a material breach of the terms and conditions of the Sourcing Agreement.

The significant delays by MGF and L&F in shipping product to the Debtors resulted in less product being available in the Debtors' stores for the peak spring break and Easter break sales period. The actions of MGF caused a disruption in the Debtors' supply chain and a corresponding negative impact on the Debtors' liquidity.

The MGF actions also placed the Debtors at risk of violating the $70 million minimum liquidity covenant in the Prepetition Term Loan Agreement, which was provided by a different affiliated of Sycamore. A default under the Prepetition Term Loan Agreement would have triggered a cross-default under the Prepetition ABL Agreement, and defaults under both agreements would have jeopardized the Debtors' ability to obtain inventory for their stores and otherwise operate their businesses. To restore access to inventory, which is the lifeblood of any retail business, and to otherwise maintain the ability to operate their businesses, the Debtors commenced the Chapter 11 Cases.

# IV.

# THE CHAPTER 11 CASES

## A.    FIRST DAY PLEADINGS

On the Commencement Date, the Debtors filed various "first-day" motions (collectively, the "*First Day Pleadings*") seeking certain immediate relief from the Bankruptcy Court designed to allow the Debtors to continue to operate in chapter 11 and avoid irreparable harm due to the commencement of the Chapter 11 Cases.  A description of the First Day Pleadings is set forth in the *Declaration of David J. Dick Pursuant to Bankruptcy Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York* [ECF No. 4].  The Bankruptcy Court granted substantially all of the relief requested in the First Day Pleadings and entered various orders authorizing the Debtors to, among other things:

- Continue the use of the Debtors' cash management system, bank accounts, and business forms;
- Continue paying employee wages and benefits;
- Continue customer programs;
- Pay prepetition claims of shippers, warehousemen, and miscellaneous lien claimants;
- Pay certain critical vendors and obligations with respect to prepetition orders of goods to be delivered postpetition;
- Pay certain prepetition taxes and assessments;
- Establish procedures for utility companies to request adequate assurance of payment and to prohibit utility companies from altering or discontinuing service; and
- Continue insurance programs and modify the automatic stay as to workers' compensation claims.

## B.    DEBTOR-IN-POSSESSION FINANCING

On the Commencement Date, the Debtors filed a motion (the "*DIP Motion*") to obtain debtor-in-possession financing, use cash collateral, and provide adequate protection to the Prepetition Term Loan Secured Parties in connection with a $160 million debtor-in-possession facility (the "*DIP Facility*") comprised of a new money term loan facility and an asset-based revolving credit facility.

The DIP Facility is a senior superpriority facility provided by Crystal Financial LLC as agent (the "*DIP Agent*"), for itself and for a syndicate of financial institutions.  The DIP Facility is secured by, among other things, a first priority lien on the assets securing the Prepetition ABL Facility, and a junior lien on the assets securing the Prepetition Term Loan Facility.  The DIP Facility also contains milestones that established a dual-track process for the Debtors' to pursue a plan of reorganization and a sale process.

Aero Investors and MGF filed objections to approval of the DIP Facility.  After lengthy negotiations, the Debtors, the DIP Agent, Aero Investors, and MGF reached a resolution of the objections, which modified the milestones as provided below:

**Plan Milestones**:

| Milestone | Date |
|---|---|
| File Plan of Reorganization | July 15, 2016 |
| Obtain Order Approving Disclosure Statement | July 26, 2016 |
| Commence Solicitation on Plan of Reorganization | Seven (7) Days after Entry of Order Approving Disclosure |

| Milestone | Date |
|---|---|
|  | Statement |
| Commence Hearing to Consider Confirmation of Plan of Reorganization | August 23, 2016 |
| Obtain Order Confirming Plan of Reorganization | August 24, 2016 |
| Consummate Plan of Reorganization | August 25, 2016 |

**Sale Milestones**:

| Milestone | Date |
|---|---|
| File Motion to Approve Bid Procedures and Establish Auction Date | August 1, 2016 |
| Forward Bid Procedures to Potential Bidders | Two (2) Days after Entry of Order Approving Bid Procedures |
| Obtain Order Approving Stalking Horse Purchase Agreement and Bid Procedures Motion | August 15, 2016 |
| Conduct Auction | August 25, 2016 |
| Obtain Sale Order | August 26, 2016 |
| Consummate Sale | August 26, 2016 |

The DIP Facility was approved on an interim basis on May 6, 2016. Upon interim approval of the DIP Facility, The proceeds of the DIP Facility were used to pay all obligations and claims in respect of or arising under the Prepetition ABL Facility. The DIP Motion was approved on a final basis by order of the Bankruptcy Court dated June 13, 2016 [ECF No. 298] and provides the Debtors with the working capital necessary to operate their businesses during the Chapter 11 Cases.

C.    **MOTION TO COMPEL**

        On the Commencement Date, the Debtors filed the *Debtors' Motion Pursuant to Sections 105(a), 362, and 365 of the Bankruptcy Code for Interim and Final Relief and to Compel Performance of MGF Sourcing US, LLC's Obligations Under Executory Contract and to Enforce the Automatic Stay* [ECF No. 22] (the "***Motion to Compel***") seeking to require MGF to (a) continue to source, manufacture, and deliver goods already ordered in the ordinary course of business, (b) comply with the purchase orders placed and accepted prior to February 24, 2016, and (c) deliver the orders placed after February 24, 2016 on "net 20" payment terms.

        MGF filed an objection to the Motion to Compel. On May 5, 2016, the Bankruptcy Court held a status conference on the Motion to Compel. At the conference, the Debtors and MGF reached an interim agreement that enabled the Debtors to obtain additional merchandise from MGF on 14-day payment terms, pending a final hearing on the Motion to Compel. The parties also agreed to meet to try to reconcile their differences. That same day, MGF filed *MGF Sourcing US, LLC's (f/k/a TSAM (Delaware) LLC) Motion for an Order under Sourcing Agreement § 4(b)(ii), New York Uniform Commercial Code §§ 2-609 and 2-702 and 11 U.S.C. § 105(a) (i) Compelling the Debtors to Pay Cash in Advance and Provide Letter of Credit Support Relating to Postpetition Deliveries of Goods; and (ii) Authorizing Suspension of Performance Under Sourcing Agreement* [ECF No. 84] seeking an order requiring the Debtors to pay cash in advance and provide letter of credit support to MGF under the Sourcing Agreement and authorizing MGF's suspension of performance under the Sourcing Agreement pending provision of such relief.

        For several days beginning on May 9, 2016, the Debtors and MGF met to discuss their dispute regarding the Sourcing Agreement, to reconcile the status of the Debtors' pending purchase

orders, and to attempt to reach a mutually satisfactory resolution of their disputes. The Debtors and MGF were ultimately able to reach an agreement to resolve the dispute (the "**Settlement Agreement**") and restore the Debtors' access to much-needed inventory while winding down the parties' business relationship. The Settlement Agreement included the following provisions:

- MGF would deliver goods as provided in an agreed-upon delivery schedule
- The Debtors would pay for all goods delivered at full contract price, subject to an aggregate discount. The Debtors' international licensees would receive a 10% discount on orders that were not ready to be picked up within two weeks of the original delivery date.
- The Debtors would pay for all goods in immediately available funds no later than 14 calendar days after delivery.
- The Debtors will not place any new orders with MGF and the Sourcing Agreement will terminate after the last delivery and MGF's receipt of all payments contemplated in the Settlement Agreement.
- Exchange of mutual general releases.

The Bankruptcy Court entered an order approving the Settlement Agreement on May 24, 2016.

## D.    RULE 2004 MOTION AND DISCOVERY

On the Commencement Date, the Debtors filed the *Debtors' Ex Parte Motion for Entry of an Order Pursuant to Bankruptcy Rule 2004, Authorizing Discovery Examinations of Sycamore Partners, Stefan Kaluzny, Kent Kleeberger, Aero Investors LLC, and Other Related Discovery* [ECF No. 25] (the "**Rule 2004 Motion**") seeking entry of an order authorizing discovery pursuant to Rule 2004 of the Bankruptcy Rules from Sycamore Partners, Stefan Kaluzny, Kent Kleeberger, and Aero Investors LLC, as well as procedures to take related discovery from other parties.

The Bankruptcy Court entered an order granting the Rule 2004 Motion on June 2, 2016 [ECF No. 230]. Sycamore produced approximately 11,000 pages of documents in connection with the Rule 2004 Motion and the Debtors conducted depositions of Stefan Kaluzny, Kent Kleeberger, Kevin Burke, and Bank of America.

The Debtors and their professionals are reviewing the results of the Rule 2004 discovery and, in consultation with the Creditors' Committee, are evaluating whether to pursue any claims or causes of action against Sycamore and/or its affiliates.

## E.    STORE CLOSING MOTION

On the Commencement Date, the Debtors filed the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 363, 365, and 554 for Approval of (i) Procedures for (a) Store closings, and (b) the Expedited Sale, Transfer, or Abandonment of De Minimis Assets, and (iii) Entry Into a Liquidation Consulting Agreement* [ECF No. 10] (the "**GOB Motion**") seeking to implement a key component of their initial restructuring strategy and right-size their operations by closing underperforming or geographically undesirable stores.

The Debtors and their advisors identified 154 stores that required prompt closure, including all 41 of the Debtors' stores operating in Canada.

The GOB Motion set out streamlined procedures to sell the inventory, furniture, fixtures, and equipment at any store scheduled for closure, in each case free and clear of liens, claims and

encumbrances.  The Bankruptcy Court approved the GOB Motion and the closing of the initial 154 stores on May 6, 2016 [ECF No. 100] (the "**GOB Order**").  The Debtors completed an initial round of sales under the terms of the GOB Order on June 30, 2016.

## F.    AEROPOSTALE CANADA CORPORATION

On the Commencement Date, Aeropostale Canada Corporation ("**Aero Canada**") commenced a case under chapter 11.  Although Aero Canada's principal place of business is located at the Debtors' headquarters in the New York, Aero Canada is incorporated under the laws of the Canadian Province of Nova Scotia.

Due to Aero Canada's substantial assets in Canada, and the related need to ensure that the Chapter 11 Cases and the orders of the Bankruptcy Court, including relief pursuant to the GOB Motion, were recognized and respected in Canada, on the Commencement Date, Aéropostale, Inc. commenced an ancillary proceeding in Canada (the "**Recognition Proceeding**") on behalf of the Aero Canada pursuant to Part IV, section 46 of the Companies' Creditors Arrangement Act (Canada), R.S.C. 1985, c. C-36 as amended in the Ontario Superior Court of Justice (Commercial List) in Toronto, Ontario, Canada.  The Debtors obtained an interim stay from the Canadian Court and a hearing on the recognition relief was scheduled for May 12, 2016 (the "**Recognition Hearing**").

Prior to the Recognition Hearing, the landlords for 31 of the 41 Canadian Stores (collectively, the "**Canadian Landlords**") informed the Debtors that they would object to recognition of the Chapter 11 Cases and the recognition of the GOB Order, unless the Debtors replaced the Recognition Proceeding with a standalone Canadian proceeding.  To preserve estate value and avoid a potentially protracted dispute with the Debtors' main creditor group in Canada, on May 12, 2017, Aero Canada filed a Notice of Intention to make a Proposal under Part III, Division I of the Bankruptcy and Insolvency Act (Canada), R.S.C. 1985, c. B-3 as amended, commencing a plenary Canadian proceeding and withdrawing the Recognition Proceeding.

Subsequently, the Debtors determined that the administration of Aero Canada's estate should continue solely under the Canadian proceeding and sought to dismiss Aero Canada's chapter 11 case.  On July __, 2016, the Bankruptcy Court granted the Debtors' motion to dismiss Aero Canada's chapter 11 case.  All of Aero Canada's stores in Canada have been closed.  The Debtors expect that when the Canadian proceeding is concluded, Aeropostale Holdings, Inc. will recover approximately $3-5 million in respect of its interest in Aero Canada.

## G.    FORMATION OF THE CREDITORS' COMMITTEE

On May 16, 2016, the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") appointed the Creditors' Committee pursuant to section 1102 of the Bankruptcy Code. The Creditors' Committee retained Pachulski Stang Ziehl & Jones LLP as its attorneys and Province, Inc. as its financial advisor.  The members of the Creditors' Committee are L&F, Hansae Co. Ltd., R.R. Donnelly & Sons Co., AT&T, GGP Limited Partnership, Simon Property Group, Inc. and WP Glimcher, Inc.

## H.    SCHEDULES AND BAR DATES

On June 17, 2016, the Debtors filed their schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs.

On June 22, 2016, the Bankruptcy Court entered an order establishing (i) July 25, 2016 at 5:00 p.m. (Eastern Time) as the Deadline for each person or entity, not including governmental units to file proofs of claim in respect of any prepetition claims against any of the Debtors, and (ii) October 31, 2016 at 5:00 p.m. (Eastern Time) as the deadline for governmental units to file proofs of claim in respect of any prepetition claims against any of the Debtors [ECF No. 357] (the "*Bar Date*").

V.

**THE PLAN**

A.    **INTRODUCTION**

This section of the Disclosure Statement summarized the Plan, a copy of which is annexed as **Exhibit A** hereto. This summary is qualified in its entirety by reference to the provisions of the Plan, which provisions shall control in the event of any discrepancy with the descriptions contained in the Disclosure Statement.

In general, a chapter 11 plan divides claims and equity interests into separate classes, specifies the property that each class is to receive under the Plan, and contains other provisions necessary to implement the Plan.

Under the Bankruptcy Code, "claims" and "equity interests," rather than "creditors" and "equity holders," are classified because creditors and equity holders may hold claims and equity interests in more than one class.

Statements as to the rationale underlying the treatment of claims and equity interests under the Plan are not intended to, and will not, waive, compromise or limit any rights, claims or causes of action in the event the Plan is not confirmed.

**THE DEBTORS URGE YOU TO READ THE PLAN IN ITS ENTIRETY
BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

B.    **CLASSIFICATION AND TREATMENT OF CLAIMS AND
INTERESTS UNDER THE PLAN**

One of the key concepts under the Bankruptcy Code is that only claims that are "allowed" may receive distributions under a chapter 11 plan. This term is used throughout the Plan and the descriptions below.

In general, an "allowed" claim or an "allowed" equity interest simply means that the debtor agrees, or in the event of a dispute, that the Bankruptcy Court determines, that the claim or equity interest, and the amount thereof, is in fact a valid obligation of the debtor. Section 502(a) of the Bankruptcy Code provides that a timely filed claim or equity interest is automatically "allowed" unless the debtor or other party in interest objects. However, section 502(b) of the Bankruptcy Code specifies certain claims that may not be "allowed" in bankruptcy even if a proof of claim is filed. These include, but are not limited to, claims that are unenforceable under the governing agreement between a debtor and the claimant or under applicable non-bankruptcy law, claims for unmatured interest, property tax claims in excess of the debtor's equity in the property, claims for services that exceed their reasonable value, real property lease and employment contract rejection damages in excess of specified amounts, late-filed claims, and contingent claims for contribution and reimbursement. In addition, Bankruptcy Rule 3003(c)(2) prohibits the allowance of any claim or equity interest that either is not listed on the debtor's

22

schedules or is listed as disputed, contingent or unliquidated, if the holder has not filed a proof of claim or equity interest before the established deadline.

The Bankruptcy Code requires, for purposes of treatment and voting, that a chapter 11 plan divide the different claims against, and equity interests in, the debtor into separate classes based upon their legal nature. Claims of a substantially similar legal nature are not necessarily classified together, nor are equity interests of a substantially similar legal nature necessarily classified together. Because an entity may hold multiple claims and/or equity interests which give rise to different legal rights, the "claims" and "equity interests" themselves, rather than their holders, are classified.

Under a chapter 11 plan, the separate classes of claims and equity interests must be designated either as "impaired" (affected by the Plan) or "unimpaired" (unaffected by the Plan). If a class of claims is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims, such as the right to vote on the Plan, and the right to receive, under the chapter 11 plan, no less value than the holder would receive if the debtor were liquidated in a case under chapter 7 of the Bankruptcy Code. Under section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless the Plan (i) does not alter the legal, equitable and contractual rights of the holders, or (ii) irrespective of the holders' acceleration rights, cures all defaults (other than those arising from the debtor's insolvency, the commencement of the case or nonperformance of a nonmonetary obligation), reinstates the maturity of the claims or interests in the class, compensates the holders for actual damages incurred as a result of their reasonable reliance upon any acceleration rights, and does not otherwise alter their legal, equitable, and contractual rights.

Pursuant to section 1126(f) of the Bankruptcy Code, holders of unimpaired claims or interests are "conclusively presumed" to have accepted the Plan. Accordingly, their votes are not solicited. Under the Plan, the following classes are unimpaired, and therefore, the holders of such Claims are "conclusively presumed" to have voted to accept the Plan: Class 1 (Other Priority Claims), Class 2 (Other Secured claims), and Class 3 (Term Loan Secured Claim).

Under certain circumstances, a class of claims or equity interests may be deemed to reject a plan. For example, a class is deemed to reject a plan under section 1126(g) of the Bankruptcy Code if the holders of claims or equity interests in such class do not receive or retain property under the Plan on account of their claims or equity interests. Under this provision of the Bankruptcy Code, Class 7 (Existing Aéropostale Interests) and Class 8 (Other Equity Interests) are deemed to reject the Plan because, under the Plan, members of Classes 7 and 8 will receive no distribution and retain no property interest on account of their Interests. Since Classes 7 and 8 are deemed to reject the Plan, the Debtors are required to demonstrate that the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to such Class. Among these are the requirements that the Plan be "fair and equitable" with respect to, and not "discriminate unfairly" against, Classes 7 and 8.

Class 4 (Term Loan Deficiency Claim), Class 5 (General Unsecured Claims), and Class 6 (Intercompany Claims) are impaired under the Plan and, therefore, the holders with respect thereto are entitled to vote to accept or reject the Plan.

## C.    UNCLASSIFIED CLAIMS

1.    *Administrative Claims*

Administrative Claims are the actual and necessary costs and expenses of administration during the Chapter 11 Cases pursuant to sections 328, 330, 363, 364(c)(1), 365, 503(b) or 507(a)(2) of the Bankruptcy Code.

Except to the extent that a holder of an Allowed Administrative Expense Claim and the Debtors or the Plan Administrator agree to different treatment, the Debtors (or the Plan Administrator, as the case may be) shall pay to each holder of an Allowed Administrative Expense Claim Cash in an amount equal to such Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date and (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; *provided*, *that*, the DIP Claims shall receive the treatment provided in Section 2.4 of the Plan; *provided, further,* that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors shall be paid by the Debtors in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions.

Except as otherwise provided by a Final Order previously entered by the Bankruptcy Court (including the Bar Date Order) or as provided by Section 2.4 of the Plan, requests for payment of Administrative Expense Claims, other than requests for payment of Fee Claims, must be filed and served on the Debtors no later than the Administrative Expense Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order.

Holders of Administrative Expense Claims that are required to file and serve a request for payment of such Administrative Expense Claims and that do not file and serve such a request by the Administrative Expense Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Debtors or their property, and such Administrative Expense Claims shall be deemed compromised, settled, and released as of the Effective Date.  The Plan Administrator must file and serve objections to Administrative Expense Claims on or before the Administrative Expense Claims Objection Bar Date.  For the avoidance of doubt, the Administrative Expense Claims Bar Date shall not apply to any DIP Claims.

2.  *Fee Claims*

All entities seeking an award by the Bankruptcy Court of Fee Claims (a) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is thirty (30) days after the Effective Date, and (b) subject to the terms of the Final DIP Order, shall be paid in full from the Estimated Professional Fee Escrow Deposits (as such term is defined in the Final DIP Order) in such amounts as are Allowed by the Bankruptcy Court (i) upon the later of (A) the Effective Date and (B) the date upon which the order relating to any such Allowed Fee Claim is entered or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Plan Administrator.  The Plan Administrator is authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

3.  *Priority Tax Claims*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of the Effective Date, the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and the date such Allowed Priority Tax Claim is due and payable in the ordinary course.

4.    *DIP Claims*

The DIP Claims shall be Allowed in the full amount due and owing under the DIP Financing Documents and the Final DIP Order.  Except to the extent that a holder of a DIP Claim agrees in writing to a different treatment, each holder of an Allowed DIP Claim shall receive Cash in an amount equal to the full amount of such Claim on the earlier of the Effective Date or the date of the closing of the Sale Transaction; *provided* that all proceeds of any Sale Transaction or other disposition of the DIP Collateral (as defined in the Final DIP Order) shall be applied to reduce the DIP Claims as and when such proceeds are received by the Debtors, pursuant and subject to the provisions of the Final DIP Order and the DIP Loan Agreement.  Upon the indefeasible payment in full in cash of all DIP Claims in accordance with the preceding sentence, all Liens and security interests granted pursuant to the DIP Credit Agreement shall be deemed cancelled and shall be of no further force and effect and each Allowed DIP Claim shall be deemed to be fully satisfied, settled, released, and compromised.  Pursuant to the DIP Financing Documents, all payments pursuant to Section 2.4 of the Plan shall be made to the DIP Agent for distribution to the DIP Lenders in accordance with the DIP Financing Documents.

## D.    CLASSIFICATION OF CLAIMS AND INTERESTS

As set forth in Section 3 of the Plan, the classification of Claims and Interests in the Plan will apply separately to each of the Debtors.  All of the potential classes for the Debtors are set forth in the Plan.  Certain of the Debtors may not have holders of Claims or Interests in a particular Class or Classes; such Classes will be treated as set forth in Section 3.3 of the Plan.

1.    *Class 1 – Other Priority Claims*

Class 1 is Unimpaired by the Plan.  Each holder of an Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and is, therefore, not entitled to vote to accept or reject the Plan.

Except to the extent that a holder of an Allowed Other Priority Claim against any of the Debtors has agreed to less favorable treatment of such Claim, each such holder shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or as soon as reasonably practical thereafter.

2.    *Class 2 – Other Secured Claims*

Class 2 is Unimpaired by the Plan.  Each holder of an Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and is, therefore, not entitled to vote to accept or reject the Plan.

Except to the extent that a holder of an Allowed Other Secured Claim against any of the Debtors has agreed to less favorable treatment of such Claim, each holder of an Allowed Other Secured Claim shall receive, at the option of the Debtors or the Plan Administrator, (i) payment in full in Cash in full and final satisfaction of such Claim, payable on the later of the Effective Date and the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon as reasonably practical thereafter, (ii) delivery of the collateral securing such Allowed Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code, or (iii) such other treatment necessary to satisfy section 1129 of the Bankruptcy Code.  For the avoidance of doubt, the Allowed amount of any Other Secured Claim shall be reduced if, and to the extent that any portion of such Claim is offset against

the purchase price for the sale of any of the Debtors' assets either pursuant to section 363(k) of the Bankruptcy Code or otherwise.

3.    *Class 3 – Term Loan Secured Claims*

Class 3 is Unimpaired by the Plan.  Each holder of a Term Loan Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and is, therefore, not entitled to vote to accept or reject the Plan.

If the Debtors bring a Cause of Action against the Term Loan Agent or the Term Loan Lenders seeking entry of a Sycamore Order, and to the extent that the Sycamore Order provides that the Term Loan Secured Claim shall be disallowed, subordinated, or recharacterized as Existing Aéropostale Interests, the holder of the Term Loan Secured Claim shall not receive or retain any property under the Plan on account of such Claim.  To the extent that a Sycamore Order provides that the Term Loan Secured Claim shall be recharacterized as a General Unsecured Claim, such claim shall receive the same treatment as the Term Loan Deficiency Claim pursuant to Section 4.4 of the Plan.  To the extent that a Sycamore Order provides that the Term Loan Secured Claim is Allowed and is not subject to subordination or recharacterization, or if the Debtors do not bring a Cause of Action or Claim against the Term Loan Agent or the Term Loan Lenders seeking entry of the Sycamore Order, the holder of the Term Loan Secured Claim shall receive, at the option of the Plan Administrator, (i) payment in full in Cash in full and final satisfaction of such Claim, payable on the later of the Effective Date and the date on which such Term Loan Secured Claim becomes Allowed, or as soon as reasonably practical thereafter, or (ii) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code.  For the avoidance of doubt, the Allowed amount of the Term Loan Secured Claim shall be reduced if, and to the extent that any portion of such Claim is offset against the purchase price for the sale of any of the Debtors' assets either pursuant to section 363(k) of the Bankruptcy Code or otherwise.

4.    *Class 4 –Term Loan Deficiency Claims*

Class 4 is Impaired by the Plan.  The holder of the Term Loan Deficiency Claim is entitled to vote to accept or reject the Plan.

If the Debtors bring a Cause of Action or Claim against the Term Loan Agent or the Term Loan Lenders seeking entry of a Sycamore Order, and to the extent that the Sycamore Order provides that the Term Loan Deficiency Claim shall be disallowed, subordinated, or recharacterized as Existing Aéropostale Interests, the holders of Term Loan Deficiency Claim shall not receive or retain any property under the Plan on account of such Claims.  To the extent that the Sycamore Order provides that the Term Loan Secured Claim shall be Allowed and are not subject to subordination or recharacterization as Existing Aéropostale Interests, or if the Debtors do not bring a Cause of Action or Claim against the Term Loan Agent or the Term Loan Lenders seeking entry of the Sycamore Order, the holder of the Term Loan Deficiency Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of Available Cash *excluding* any proceeds of any Causes of Action against the Term Loan Agent, the Term Loan Lenders, or such entities' predecessors, successors and assigns, subsidiaries, affiliates, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, and other professionals, and such persons' respective heirs, executors, Estates, servants and nominees, in each case in their capacity as such, which proceeds shall revert back to the Debtors and be available for distribution to Class 5 pursuant to Section 4.5 of the Plan; *provided* that if the Debtors elect prior to the Effective Date to pursue an Alternative Transaction, the holder of the Term Loan Deficiency Claim shall receive the treatment provided for such claims in such Alternative Transaction.  In no event shall the holder of the Term Loan Deficiency Claim receive Distributions on

account of such Claim in excess of the Allowed amount of such Claim plus accrued post-petition interest, if any.

5.      *Class 5 – General Unsecured Claims*

Class 5 is Impaired by the Plan.  Each holder of an General Unsecured Claim is entitled to vote to accept or reject the Plan.

On the Effective Date, or as soon thereafter as is reasonably practicable, except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Allowed General Unsecured Claim or has been paid before the Effective Date, each holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of Available Cash; *provided* that if the Debtors elect prior to the Effective Date to pursue an Alternative Transaction, as defined in the Plan, each holder of an Allowed General Unsecured Claim shall receive the treatment provided for such claims in such Alternative Transaction.  In no event shall the holder of a General Unsecured Claim receive Distributions on account of such Claim in excess of the Allowed amount of such Claim plus accrued post-petition interest, if any.

6.      *Class 6 – Intercompany Claims*

Class 6 is Impaired by the Plan.  As proponents of the Plan, the Holders of Class 6 Claims are conclusively presumed to accept the Plan.

All Intercompany Claims shall not receive or retain any property under the Plan on account of such Claims.

7.      *Class 7 -- Existing Aéropostale Interests*

Class 7 is Impaired by the Plan.  Each holder of an Allowed Existing Aéropostale Interest is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of Existing Aéropostale Interests are not entitled to vote to accept or reject the Plan.

On the Effective Date, all Existing Aéropostale Interests shall be deemed canceled and the Aéropostale Plan Stock shall be issued to the Plan Administrator which will hold such share for the benefit of the holders of such former Existing Aéropostale Interests consistent with their former relative priority and economic entitlements; *provided*, *however*, that the Plan Administrator may not exercise any voting rights appurtenant thereto in conflict with Section 6 of the Plan.  On or promptly after the Effective Date, the Plan Administrator shall file with the Securities and Exchange Commission a Form 15 for the purpose of terminating the registration of any of Aéropostale's publicly traded securities.  The holders of Existing Aéropostale Interests shall not receive or retain any property under the Plan on account of such Interests; *provided* that, to the extent that (i) all Allowed General Unsecured Claims and (ii) to the extent that the Sycamore Order provides that the Term Loan Secured Claim shall be Allowed and are not subject to subordination or recharacterization, the Term Loan Deficiency Claim, have been satisfied in full, each holder of an Existing Aéropostale Interest shall receive its Pro Rata share of any remaining Available Cash.  Unless otherwise determined by the Plan Administrator, on the date that the Aéropostale Case is closed in accordance with Section 5.10 of the Plan, the Aéropostale Plan Stock issued pursuant to the Plan shall be deemed cancelled and of no further force and effect *provided* that such cancellation does not adversely impact the Debtors' Estates.

8.      *Class 8 – Other Equity Interests*

Class 8 is Impaired by the Plan.  As proponents of the Plan, the Holders of Class 8 Interests are conclusively presumed to accept the Plan.

Other Equity Interests of any Debtor shall be cancelled if and when such Debtor is dissolved in accordance with Section 6.3 of the Plan.  Each holder of an Other Equity Interest shall neither receive nor retain any property of the Estate or direct interest in property of the Estate of the Debtor on account of such Other Equity Interest thereafter; provided, however, that in the event that all Allowed Claims against such Debtor have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Other Equity Interest in such Debtor may receive its Pro Rata Share of any remaining assets of such Debtor.

E.    **MEANS FOR IMPLEMENTATION**

1.      *Joint Chapter 11 Plan*

The Plan is a joint chapter 11 plan for each of the Debtors, with the Plan for each Debtor being non-severable and mutually dependent on the Plan for each other Debtor.

2.      *The Sale*

The Confirmation Order shall authorize the Sale Transaction under sections 363, 365, 1123(b)(4), 1129(b)(2)(A)(iii), 1145, and 1146(a) of the Bankruptcy Code under the terms and conditions of the Purchase Agreement.  Upon Confirmation, the Debtors shall be authorized to take any and all actions necessary to consummate the Sale Transaction.  Notwithstanding the foregoing, as provided in the Sale and Bid Procedures Order, the Debtors may elect at any time prior to the Effective Date to pursue an Alternative Transaction if such a transaction is determined by the Debtors to be in the best interests of their Estates.

3.      *Plan Administrator*

(a)      *Appointment*.  Aéropostale shall serve as Plan Administrator for each of the Debtors.

(b)      *Authority*.  Subject to Section 6.2 of the Plan, the Plan Administrator shall have the authority and right on behalf of each of the Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to:

(i)      except to the extent Claims have been previously Allowed, control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors;

(ii)      make Distributions to holders of Allowed Claims in accordance with the Plan;

(iii)      exercise its reasonable business judgment to direct and control the wind down, liquidation, sale and/or abandoning of the remaining assets of the Debtors under the Plan and in accordance with applicable law as necessary to maximize Distributions to holders of Allowed Claims;

(iv)    prosecute all Causes of Action on behalf of the Debtors, elect not to pursue any Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the Plan Administrator may determine is in the best interests of the Debtors;

(v)    make payments to existing professionals who will continue to perform in their current capacities;

(vi)    retain professionals to assist in performing its duties under the Plan;

(vii)    maintain the books and records and accounts of the Debtors;

(viii)    invest Cash of the Debtors, including any Cash proceeds realized from the liquidation of any assets of the Debtors, including any Causes of Action, and any income earned thereon;

(ix)    incur and pay reasonable and necessary expenses in connection with the performance of duties under the Plan, including the reasonable fees and expenses of professionals retained by the Plan Administrator;

(x)    administer each Debtor's tax obligations, including (i) filing tax returns and paying tax obligations, (ii) requesting, if necessary, an expedited determination of any unpaid tax liability of each Debtor or its estate under Bankruptcy Code section 505(b) for all taxable periods of such Debtor ending after the Commencement Date through the liquidation of such Debtor as determined under applicable tax laws and (iii) representing the interest and account of each Debtor or its estate before any taxing authority in all matters including, without limitation, any action, suit, proceeding or audit;

(xi)    prepare and file any and all informational returns, reports, statements, returns or disclosures relating to the Debtors that are required hereunder, by any Governmental Unit or applicable law;

(xii)    determine whether to create a Liquidating Trust for the assets of a Debtor pursuant to Section 14.1 of the Plan and which assets to transfer to such Liquidating Trust;

(xiii)    pay statutory fees in accordance with Section 14.1 of the Plan; and

(xiv)    perform other duties and functions that are consistent with the implementation of the Plan.

(c)    *Indemnification*.    Each of the Debtors shall indemnify and hold harmless Aéropostale solely in its capacity as the Plan Administrator for any losses incurred in such capacity, except to the extent such losses were the result of the Plan Administrator's gross negligence, willful misconduct or criminal conduct.

4.    *Other Transactions*

In the discretion of the Debtors, after the Effective Date, the Debtors may (a) cause any or all of the Debtor Affiliates to be liquidated or merged into one or more of the other Debtor Affiliates or any other subsidiaries of the Debtors or dissolved all as more specifically described in the Plan Supplement, (b) cause the transfer of assets between or among the Debtor Affiliates, (c) engage in any other transaction in furtherance of the Plan.  Any such transactions may be effective as of the Effective

Date pursuant to the Confirmation Order without any further action by the stockholders, members, general or limited partners, or directors of any of the Debtors.

5.    *Corporate Action*

Upon the Effective Date, by virtue of the solicitation of votes in favor of this Plan and entry of the Confirmation Order, all actions contemplated by the Plan (including any action to be undertaken by the Plan Administrator) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by holders of Claims or Interests, the Debtors, or any other Entity or Person.  All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Debtors' Estates.

6.    *Withholding and Reporting Requirements*

(a)    *Withholding Rights*.  In connection with the Plan, any party issuing any instrument or making any distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such distribution.  Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b)    *Forms*.  Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the Disbursing Agent or such other Person designated by the Plan Administrator (which entity shall subsequently deliver to the Disbursing Agent any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Person) Form W-8, unless such Person is exempt under the Tax Code and so notifies the Disbursing Agent.  If such request is made by the Plan Administrator or such other Person designated by the Plan Administrator and the holder fails to comply before the date that is 180 days after the request is made, the amount of such distribution shall irrevocably revert to the Debtors and any Claim in respect of such distribution shall be discharged and forever barred from assertion against any Debtor and its respective property.

7.    *Exemption from Certain Transfer Taxes*

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, any post-Confirmation sale by any Debtor, or any transfer from any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors; or (2) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or

governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

8.      *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Plan Administrator is authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan in the name of and on behalf of the Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

9.      *Preservation of Rights of Action*

Other than Causes of Action against an Entity that are waived, relinquished, exculpated, released, compromised, or settled in the Plan or by a Bankruptcy Court order, the Debtors reserve any and all Causes of Action.  On and after the Effective Date, the Plan Administrator may pursue such Causes of Action in its sole discretion.  No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Plan Administrator will not pursue any and all available Causes of Action against them. No preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.   Prior to the Effective Date, the Debtors, and on and after the Effective Date, the Plan Administrator, shall retain and shall have, including through its authorized agents or representatives, the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. Notwithstanding anything contained herein to the contrary, the settlement of any Claims and Causes of Action which are expressly to be settled by Confirmation of the Plan itself shall be resolved only by Confirmation of the Plan itself.

10.     *Closing of the Chapter 11 Cases*

After the Chapter 11 Case of a Debtor has been fully administered, the Plan Administrator shall seek authority from the Bankruptcy Court to close such Debtor's Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

F.      **CORPORATE GOVERNANCE**

1.      *Corporate Form*

On the Effective Date, each of the Debtors shall maintain its current corporate form.

2.      *Aéropostale Board of Directors and Officers*

Aéropostale or the Debtor Affiliate that is the sole shareholder of the relevant Debtor Affiliate shall elect successors of the then serving members of the board of directors for such Debtor Affiliate at each annual meeting or upon the removal or resignation of such individuals.  Aéropostale or the Debtor Affiliate that is the sole shareholder of the relevant Debtor Affiliate shall also have the power

31

to act by written consent to remove any director or officer of such Debtor Affiliate at any time with or without cause.

3. *Corporate Existence*

After the Effective Date, the Plan Administrator may decide to (a) maintain each Debtor as a corporation in good standing until such time as all aspects of the Plan pertaining to such Debtor have been completed, or (b) at such time as the Plan Administrator considers appropriate and consistent with the implementation of the Plan pertaining to such Debtor, dissolve such Debtor and complete the winding up of such Debtor without the necessity for any other or further actions to be taken by or on behalf of such dissolving Debtor or its shareholder or any payments to be made in connection therewith subject to the filing of a certificate of dissolution with the appropriate governmental authorities (including, without limitation, the transfer of all or part of the assets of such Debtor to a Liquidating Trust in accordance with Section 10 of the Plan); provided, however, that the foregoing does not limit the Plan Administrator's ability to otherwise abandon an interest in a Debtor Affiliate.

4. *Wind Down*

After the Effective Date, pursuant to the Plan, the Plan Administrator shall wind-down, sell and otherwise liquidate assets of the Debtors in accordance with Section 5.3(b)(iii) of the Plan. The wind-down, sale and liquidation of each such Debtor's assets (as determined for federal income tax purposes) shall occur over a period of three years after the Effective Date (it being understood that such liquidation may include the transfer of all or part of the assets of such Debtor to one or more Liquidating Trusts within the meaning of Treas. Reg. § 301.7701-4); provided, however, that the wind-down and liquidation may extend over a longer period of time if the Debtors receive a private letter ruling or other equivalent guidance from the IRS from which the Plan Administrator reasonably concludes that the continued wind-down and liquidation should not result in a reduction or limitation of the Debtors' tax attributes for federal income tax purposes that materially impairs the expected actual use of such tax attributes.

5. *Certificate of Incorporation and By-Laws*

As of the Effective Date, the certificate of incorporation and by-laws of each Debtors shall be amended to the extent necessary to carry out the provisions of the Plan. The amended certificate and by-laws of such Debtor (if any) shall be contained in the Plan Supplement.

6. *Stock Restrictions*

The restrictions imposed by the *Final Order Pursuant to 11 U.S.C. §§ 105(a) and 362 of the Bankruptcy Code Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Claims Against and Interests in the Debtors* [ECF No. 240], as the same may be amended from time to time, shall remain effective and binding through the closing of the Aéropostale Case.

## G. **DISTRIBUTIONS**

1. *Distribution Record Date*

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors or their respective agents, shall be deemed closed, and there shall be no further changes in the record of holders of any of the Claims or

Interests.  The Debtors or the Plan Administrator shall have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Distribution Record Date.

2.      *Date of Distributions*

Except as otherwise provided herein, the Debtors shall make the Initial Distribution to holders of Allowed Claims no later than the Initial Distribution Date and thereafter, the Debtors shall from time to time determine the subsequent Distribution Dates.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

The Plan Administrator shall reserve an amount sufficient to pay holders of Disputed Claims the amount such holders would be entitled to receive under the Plan if such Claims were to become Allowed Claims.  In the event the holders of Allowed Claims have not received payment in full on account of their Claims after the resolution of all Disputed Claims, then the Plan Administrator shall make a final distribution to all holders of Allowed Claims.

Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution in excess of the Allowed amount of such Claim plus any interest accruing on such Claim that is actually payable in accordance with the Plan.

3.      *Delivery of Distributions*

In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Debtors or the Plan Administrator, as applicable, has determined the then current address of such holder, at which time such distribution shall be made to such holder without interest; provided, however, such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the date the Initial Distribution is made.  After such date, all unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the Debtors automatically and without need for a further order by the Bankruptcy Court for distribution in accordance with the Plan and the Claim of any such holder to such property or interest in property shall be released, settled, compromised, and forever barred.

4.      *Manner of Payment Under Plan*

At the option of the Debtors or the Plan Administrator, any Cash payment to be made hereunder may be made by a check or wire transfer.

5.      *Minimum Cash Distributions*

The Plan Administrator shall not be required to make any payment to any holder of an Allowed Claim on any Distribution Date of Cash less than $100; provided, however, that if any distribution is not made pursuant to Section 7.5 of the Plan, such distribution shall be added to any subsequent distribution to be made on behalf of the holder's Allowed Claim.  The Plan Administrator shall not be required to make any final distributions of Cash less than $50 to any holder of an Allowed Claim.  If either (a) all Allowed Claims (other than those whose distributions are deemed undeliverable hereunder) have been paid in full or (b) the amount of any final distributions to holders of Allowed Claims would be $50 or less and the aggregate amount of Cash available for distributions to holders of

Allowed General Unsecured Claims is less than $25,000, then no further distribution shall be made by the Plan Administrator and any surplus Cash shall be donated and distributed to an I.R.C. § 501(c)(3) tax-exempt organization selected by the Plan Administrator.

6.    *Setoffs*

The Debtors and the Plan Administrator may, but shall not be required to, set off against any Claim, any Claims of any nature whatsoever that the Debtors or the Plan Administrator may have against the holder of such Claim; *provided* that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Plan Administrator of any such Claim the Debtors or the Plan Administrator may have against the holder of such Claim.

7.    *Distributions After Effective Date*

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

8.    *Allocation of Distributions Between Principal and Interest*

Except as otherwise provided in this Plan, to the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated to the principal amount (as determined for U.S. federal income tax purposes) of the Claim first, and then to accrued but unpaid interest.

9.    *Payment of Disputed Claims*

As Disputed Claims are resolved pursuant to Section 8 of the Plan, the Plan Administrator shall make distributions on account of such Disputed Claims as if such Disputed Claims were Allowed Claims as of the Effective Date.  Such distributions shall be made on the first Distribution Date that is at least forty-five (45) days after the date on which a Disputed Claim becomes an Allowed Claim, or on an earlier date selected by the Plan Administrator in the Plan Administrator's sole discretion.

**H.    PROCEDURES FOR DISPUTED CLAIMS**

1.    *Allowance of Claims*

After the Effective Date, the Debtors or the Plan Administrator shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim, except with respect to any Claim deemed Allowed under this Plan.  Except as expressly provided in this Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Cases allowing such Claim.

2.    *Objections to Claims*

As of the Effective Date, objections to, and requests for estimation of, Claims against the Debtors may be interposed and prosecuted only by the Plan Administrator.  Such objections and requests for estimation shall be served and filed (a) on or before the 60th day following the later of (i) the Effective Date and (ii) the date that a proof of Claim is filed or amended or a Claim is otherwise asserted or

amended in writing by or on behalf of a holder of such Claim, or (b) such later date as ordered by the Bankruptcy Court upon motion filed by the Plan Admin.

3.    *Estimation of Claims*

The Plan Administrator may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or Plan Administrator previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or Plan Administrator, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

4.    *No Distributions Pending Allowance*

If an objection to a Claim is filed as set forth in Section 8 of the Plan, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

5.    *Resolution of Claims*

Except as otherwise provided herein, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Plan Administrator shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all Claims, Disputed Claims, rights, Causes of Action, suits and proceedings, whether in law or in equity, whether known or unknown, that the Debtors or their estates may hold against any Person, without the approval of the Bankruptcy Court, the Confirmation Order, and any contract, instrument, release, indenture, or other agreement entered into in connection herewith.  The Plan Administrator or its successor may pursue such retained Claims, rights, Causes of Action, suits or proceedings, as appropriate, in accordance with the best interests of the Debtors.

6.    *Disallowed Claims*

All Claims held by persons or entities against whom or which any of the Debtors or the Plan Administrator has commenced a proceeding asserting a Cause of Action under sections 542, 543, 544, 545, 547, 548, 549 and/or 550 of the Bankruptcy Code shall be deemed "disallowed" Claims pursuant to section 502(d) of the Bankruptcy Code and holders of such Claims shall not be entitled to vote to accept or reject the Plan.  Claims that are deemed disallowed pursuant to this section shall continue to be disallowed for all purposes until the Avoidance Action against such party has been settled or resolved by Final Order and any sums due to the Debtors or the Plan Administrator from such party have been paid.

## I.   EXECUTORY CONTRACTS AND UNEXPIRED LEASES

1.   *Assumption and Assignment of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is specifically described in the Asset Purchase Agreement as to be assumed in connection with Confirmation of the Plan; (2) as of the Effective Date is subject to a pending motion to assume such Unexpired Lease or Executory Contract; (3) was previously assumed or assumed and assigned to a third party during the pendency of the Chapter 11 Cases; (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; (5) is a D&O Policy or an insurance policy; or (6) is asset purchase agreement of any Successful Bidder(s) as set forth in the Bid Procedures.

2.   *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any Cure Obligation due under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment in Cash on the Effective Date, subject to the limitation described below, by the Debtors as an Administrative Claim or by the Purchaser in accordance with the Purchase Agreement, as applicable, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of the Cure Obligation, (2) the ability of the Debtors' Estates or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the Cure Obligations required by section 365(b)(1) of the Bankruptcy Code shall be satisfied following the entry of a Final Order or orders resolving the dispute and approving the assumption; *provided* that, depending on whether the Plan Administrator or the Purchaser has the obligation to pay the Cure Obligation, such party may settle any dispute regarding the amount of any Cure Obligation without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

At least fourteen (14) days before the Confirmation Hearing, the Debtors shall cause notice of proposed Cure Obligations to be sent to applicable counterparties to the Executory Contracts and Unexpired Leases. Any objection by such counterparty must be filed, served, and actually received by the Debtors not later than ten (10) days after service of notice of the Debtors' proposed assumption and associated Cure Obligation. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed cure amount will be deemed to have assented to such Cure Obligation.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Obligations, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the Effective Date of assumption and/or assignment. **Any prepetition default amount set forth in the Schedules and/or any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity**.

3.      *Claims Based on Rejection of Executory Contracts and Unexpired Leases*

Unless otherwise provided by an order of the Bankruptcy Court, any Proofs of Claim based on the rejection of the Debtors' Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise, must be filed with Bankruptcy Court and served on the Plan Administrator no later than fourteen (14) days after the earlier of the Effective Date or the effective date of rejection of such Executory Contract or Unexpired Lease.  In addition, any objection to the rejection of an Executory Contract or Unexpired Lease must be filed with the Bankruptcy Court and served on the Debtors, no later than fourteen (14) days after service of the Debtors' proposed rejection of such Executory Contract or Unexpired Lease.

**Any holders of Claims arising from the rejection of an Executory Contract or Unexpired Lease for which Proofs of Claims were not timely filed as set forth in the paragraph above shall not (1) be treated as a creditor with respect to such Claim, (2) be permitted to vote to accept or reject the Plan on account of any Claim arising from such rejection, or (3) participate in any distribution in the Chapter 11 Cases on account of such Claim, and any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Plan Administrator, the Debtors' Estates, or the property for any of the foregoing without the need for any objection by the Plan Administrator or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.**  All Allowed Claims arising from the rejection of the Debtors' prepetition Executory Contracts or prepetition Unexpired Leases shall be classified as General Unsecured Claims, except as otherwise provided by order of the Bankruptcy Court.

4.      *Purchase Agreement*

The Debtors' assumption or rejection of any Executory Contract or Unexpired Lease pursuant to the Plan shall be subject in all respects to the Successful Bidder(s)', as defined in the Bid Procedures, rights and obligations, including any Cure Obligations assumed by any Purchaser in accordance with an Asset Purchase Agreement, with respect to any such Executory Contracts or Unexpired Leases assigned to the Successful Bidder(s) pursuant to the terms of an Asset Purchase Agreement.

5.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

6.      *Insurance Policies*

Each insurance policy, including the D&O Policy, shall be assumed by the Debtors on behalf of the applicable Debtor effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code, to the extent such insurance policy is executory, unless such insurance policy previously was rejected by the Debtors pursuant to a Bankruptcy Court order or is the subject of a motion to reject pending on the Effective Date, and coverage for defense and indemnity under the D&O Policy shall remain available to all individuals within the definition of "Insured" in the D&O Policy.

7.      *Reservation of Rights*

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors' Estates have any liability thereunder. In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Plan Administrator, as applicable, shall have 60 days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided in the Plan.

## J.      LIQUIDATING TRUST

1.      *Execution of Liquidating Trust Agreement*

After the Effective Date, and only if the Plan Administrator determines that one or more Liquidating Trusts are in the best interests of one or more Debtors and holders of Allowed Claims against and Interests in such Debtors, the Plan Administrator and a Liquidating Trustee shall execute a Liquidating Trust Agreement, and shall take all other necessary steps to establish a Liquidating Trust and Liquidating Trust Interests therein, which shall be for the benefit of Liquidating Trust Beneficiaries. In the event of any conflict between the terms of Section 10 of the Plan and the terms of a Liquidating Trust Agreement as such conflict relates to the establishment of a Liquidating Trust, the terms of Section 10 of the Plan shall govern.  A Liquidating Trust Agreement may provide powers, duties and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities do not affect the status of a Liquidating Trust as a "liquidating trust" for United States federal income tax purposes.

2.      *Purpose of the Liquidating Trust*

Each Liquidating Trust shall be established for the sole purpose of liquidating and distributing the assets of the Debtor contributed to such Liquidating Trust in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

3.      *Liquidating Trust Assets*

Each Liquidating Trust shall consist of Liquidating Trust Assets.  After the creation of a Liquidating Trust pursuant to Section 10 of the Plan, the Plan Administrator shall transfer all of the allocable Liquidating Trust Assets to the relevant Liquidating Trust.  Liquidating Trust Assets may be transferred subject to certain liabilities, as provided in a Liquidating Trust Agreement.  Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting or other similar tax to which the exemption under section 1146 of the Bankruptcy Code applies.

38

4.    *Administration of the Liquidating Trust*

Each Liquidating Trust shall be administered by a Liquidating Trustee pursuant to a Liquidating Trust Agreement and the Plan. In the event of an inconsistency between the Plan and a Liquidating Trust Agreement as such conflict relates to anything other than the establishment of a Liquidating Trust, the Liquidating Trust Agreement shall control.

5.    *Liquidating Trustee's Tax Power for Debtors*

A Liquidating Trustee shall have the same authority in respect of all taxes of the Debtors, and to the same extent, as if the Liquidating Trustee were the Debtor.

6.    *Cash Investments*

A Liquidating Trustee may invest Cash (including any earnings thereon or proceeds therefrom); *provided*, *however*, that such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treas. Reg. § 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

7.    *Distribution of Liquidating Trust Interests*

A Liquidating Trustee is required to distribute to the holders of Allowed Claims on account of their Liquidating Trust Interests, on a semi-annual basis, all available cash (including any Cash received from the Debtors and treating any permissible investment as Cash for purposes of Section 10.7 of the Plan), less such amounts that may be reasonably necessary to (a) meet contingent liabilities and to maintain the value of the Liquidating Trust Assets during liquidation, (b) pay reasonably incurred or anticipated expenses (including, without limitation, any taxes imposed on or payable by the Debtors or Liquidating Trust or in respect of the Liquidating Trust Assets), or (c) satisfy other liabilities incurred or anticipated by such Liquidating Trust in accordance with the Plan or Liquidating Trust Agreement; *provided*, *however*, that such Liquidating Trustee shall not be required to make a Distribution pursuant to Section 10.7 of the Plan if such Liquidating Trustee determines that the expense associated with making the Distribution would likely utilize a substantial portion of the amount to be distributed, thus making the Distribution impracticable.

8.    *Federal Income Tax Treatment of Liquidating Trust*

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by such Liquidating Trustee), for all United States federal income tax purposes, all parties (including, without limitation, the Debtors, a Liquidating Trustee and Liquidating Trust Beneficiaries) shall treat the transfer of Liquidating Trust Assets to a Liquidating Trust as (1) a transfer of Liquidating Trust Assets (subject to any obligations relating to those assets) directly to Liquidating Trust Beneficiaries (other than to the extent Liquidating Trust Assets are allocable to Disputed Claims), followed by (2) the transfer by such beneficiaries to a Liquidating Trust of Liquidating Trust Assets in exchange for the related Liquidating Trust Interests. Accordingly, except in the event of contrary definitive guidance, Liquidating Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of Liquidating Trust Assets (other than such Liquidating Trust Assets as are allocable to Disputed Claims). The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes. For the purpose of Section 10.8 of the Plan, the terms "party" and "Liquidating Trust Beneficiary" shall not include the United States or any agency or department thereof, or any officer or employee thereof acting in such capacity.

9. *Tax Reporting*

(a)    A Liquidating Trustee shall file tax returns for a Liquidating Trust treating such Liquidating Trust as a grantor trust pursuant to Treas. Reg. § 1.671-4(a) and in accordance with Section 10.9 of the Plan.  A Liquidating Trustee also shall annually send to each holder of a Liquidating Trust Interest a separate statement regarding the receipts and expenditures of the Liquidating Trust as relevant for U.S. federal income tax purposes.

(b)    Allocations of Liquidating Trust taxable income among Liquidating Trust Beneficiaries (other than taxable income allocable to any assets allocable to, or retained on account of, Disputed Claims, if such income is otherwise taxable at the Liquidating Trust) shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed Distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value, and if applicable, other than assets allocable to Disputed Claims) to the holders of Liquidating Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent Distributions from a Liquidating Trust.  Similarly, taxable loss of a Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Liquidating Trust Assets.  The tax book value of Liquidating Trust to a Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the IRC, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(c)    As soon as reasonably practicable after Liquidating Trust Assets are transferred to a Liquidating Trust, a Liquidating Trustee shall make a good faith valuation of Liquidating Trust Assets.  Such valuation shall be made available from time to time to all parties to the Liquidating Trust (including, without limitation, the Debtors and Liquidating Trust Beneficiaries), to the extent relevant to such parties for tax purposes, and shall be used consistently by such parties for all United States federal income tax purposes.

(d)    Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by a Liquidating Trustee of a private letter ruling if such Liquidating Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by such Liquidating Trustee), such Liquidating Trustee (i) may timely elect to treat any Liquidating Trust Assets allocable to Disputed Claims as a "disputed ownership fund" governed by Treas. Reg. § 1.468B-9, and (ii) to the extent permitted by applicable law, shall report consistently for state and local income tax purposes.  If a "disputed ownership fund" election is made, all parties (including such Liquidating Trustee, the Debtors and Liquidating Trust Beneficiaries) shall report for United States federal, state and local income tax purposes consistently with the foregoing.

(e)    A Liquidating Trustee shall be responsible for payment, out of the respective Liquidating Trust Assets, of any taxes imposed on the respective Liquidating Trust or its assets.

(f)    A Liquidating Trustee may request an expedited determination of taxes of a Liquidating Trust, including any reserve for Disputed Claims, or of the Debtor as to whom the Liquidating Trust was established, under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, such Liquidating Trust or the Debtor for all taxable periods through the dissolution of such Liquidating Trust.

10.    *Dissolution*

(a)    A Liquidating Trustee and Liquidating Trust shall be discharged or dissolved, as the case may be, at such time as (i) all of the Liquidating Trust Assets have been distributed pursuant to the Plan and a Liquidating Trust Agreement, (ii) a Liquidating Trustee determines, in its sole discretion, that the administration of any remaining Liquidating Trust Assets is not likely to yield sufficient additional Liquidating Trust proceeds to justify further pursuit, or (iii) all Distributions required to be made by a Liquidating Trustee under the Plan and a Liquidating Trust Agreement have been made; *provided*, *however*, that in no event shall a Liquidating Trust be dissolved later than three (3) years from the creation of such Liquidating Trust pursuant to Section 10 of the Plan unless the Bankruptcy Court, upon motion within the six-month period prior to the third (3rd) anniversary (or within the six-month period prior to the end of an extension period), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Liquidating Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

(b)    If at any time a Liquidating Trustee determines, in reliance upon such professionals as a Liquidating Trustee may retain, that the expense of administering a Liquidating Trust so as to make a final Distribution to Liquidating Trust Beneficiaries is likely to exceed the value of the assets remaining in such Liquidating Trust, such Liquidating Trustee may apply to the Bankruptcy Court for authority to (i) reserve any amount necessary to dissolve such Liquidating Trust, (ii) donate any balance to a charitable organization (A) described in section 501(c)(3) of the IRC, (B) exempt from United States federal income tax under section 501(a) of the IRC, (C) not a "private foundation", as defined in section 509(a) of the IRC, and (D) that is unrelated to the Debtors, such Liquidating Trust, and any insider of such Liquidating Trustee, and (iii) dissolve such Liquidating Trust.

## K.    CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

1.    *Conditions Precedent to the Effective Date*

The occurrence of the Effective Date of the Plan is subject to the following conditions precedent:

(a)    the Bankruptcy Court shall have entered the Confirmation Order, the Confirmation Date shall have occurred and the Confirmation Order shall not be subject to any stay;

(b)    all conditions precedent to the effectiveness of the Asset Purchase Agreement have occurred or been waived and the Sale Transaction has been consummated;

(c)    all actions, documents and agreements necessary to implement and consummate the Plan, including, without limitation, entry into the documents contained in the Plan Supplement, each in form and substance reasonably satisfactory to the Debtors, and the transactions and other matters contemplated thereby, shall have been effected or executed;

(d)    all governmental and third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Plan and the Sale Transaction shall have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions; and

(e)    all documents and agreements necessary to implement the Plan and the consummation of the Sale Transaction shall have (a) been tendered for delivery and (b) been effected or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

2.    *Waiver of Conditions Precedent*

Each of the conditions precedent in Section K.1 above other than the condition set forth in Section K.1(a) above may be waived in writing by the Debtors and the Successful Bidder.

3.    *Effect of Failure of Conditions to Effective Date*

Unless otherwise extended by the Debtors and the DIP Lenders, if the Effective Date does not occur on or before August 29, 2016 or if the Confirmation Order is vacated, (i) no distributions under the Plan shall be made, (ii) the Debtors and all holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (iii) all the Debtors' obligations with respect to the Claims and the Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any other entity in any further proceedings involving the Debtors or otherwise.

## L.    **EFFECT OF CONFIRMATION**

1.    *Vesting of Assets*

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Debtors' Estates shall vest in the Debtors free and clear of all Claims, liens, encumbrances, charges and other interests, except as provided pursuant to this Plan and the Confirmation Order.

2.    *Release of Liens*

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised and all rights, titles, and interests of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Debtors, unless sold to the Successful Bidder pursuant to the Sale Transaction.

3.    *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right for the Plan Administrator to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

4.    *Binding Effect*

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Effective Date, the provisions of the Plan shall bind any holder of a Claim against, or Interest in, the Debtors, and such holder's respective successors and assigns, whether or not the Claim or Interest of such holder is Impaired under the Plan and whether or not such holder has accepted the Plan.

5.    *Discharge of Claims and Termination of Interests*

Except as otherwise provided in the Plan, effective as of the Effective Date: (a) the rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge and release of all Claims and Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their assets, property or Estates; (b) all Claims and Interests shall be satisfied, discharged and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (c) all Entities shall be precluded from asserting against the Debtors, the Debtors' Estates, the Plan Administrator, the Purchaser, their successors and assigns and their assets and properties any other Claims or Interests based upon any documents, instruments or any act or omission, transaction or other activity of any kind or nature that occurred before the Effective Date.

6.    *Term of Injunctions or Stays*

Unless otherwise provided, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

7.    ***Releases by the Debtors***

**EFFECTIVE AS OF THE EFFECTIVE DATE, WITHOUT IN ANY MANNER LIMITING OR ALTERING ANY RELEASES GRANTED TO THE DIP SECURED PARTIES (AS DEFINED IN THE FINAL DIP ORDER) PURSUANT TO THE DIP FINANCING DOCUMENTS AND/OR THE FINAL DIP ORDER, EACH DEBTOR ON BEHALF OF ITSELF AND ITS ESTATE, FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE RELEASED PARTIES, SHALL BE DEEMED TO PROVIDE A FULL RELEASE TO EACH OF THE RELEASED PARTIES (AND EACH SUCH RELEASED PARTY SHALL BE DEEMED RELEASED BY EACH DEBTOR AND ITS ESTATE) AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CAUSES OF ACTION AND ANY OTHER DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, ACTIONS, DERIVATIVE CLAIMS, REMEDIES, AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING AS OF THE EFFECTIVE DATE, IN LAW, AT EQUITY, OR OTHERWISE, WHETHER FOR TORT, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, OR OTHER OCCURRENCE OR CIRCUMSTANCES EXISTING OR TAKING PLACE PRIOR TO OR ON THE EFFECTIVE DATE ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, THE PLAN, OR THESE CHAPTER 11 CASES, INCLUDING THOSE THAT THE DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT OR THAT ANY HOLDER OF A CLAIM AGAINST OR INTEREST IN THE DEBTORS OR ANY OTHER ENTITY COULD HAVE BEEN**

LEGALLY ENTITLED TO ASSERT DERIVATIVELY OR ON BEHALF OF THE DEBTORS OR THEIR ESTATES; PROVIDED, HOWEVER, THAT THE FOREGOING "DEBTOR RELEASE" SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS OR CAUSES OF ACTION OF THE DEBTORS OR THEIR RESPECTIVE CHAPTER 11 ESTATES AGAINST A RELEASED PARTY (1) ARISING UNDER ANY CONTRACTUAL OBLIGATION OWED TO THE DEBTORS THAT IS ENTERED INTO OR ASSUMED PURSUANT TO THE PLAN OR (2) ARISING UNDER THE PURCHASE AGREEMENT.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTOR RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (2) A GOOD-FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTOR RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS' ESTATES AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY OF THE DEBTORS' ESTATES, THE LITIGATION TRUSTEE, OR THE LITIGATION TRUST ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE.

8.    *Releases By Holders of Claims and Interests*

EFFECTIVE AS OF THE EFFECTIVE DATE, THE RELEASING PARTIES SHALL BE DEEMED TO PROVIDE A FULL RELEASE TO THE RELEASED PARTIES AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CAUSES OF ACTION AND ANY OTHER DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, ACTIONS, DERIVATIVE CLAIMS, REMEDIES, AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING AS OF THE EFFECTIVE DATE, IN LAW, AT EQUITY, OR OTHERWISE, WHETHER FOR TORT, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, OR OTHER OCCURRENCE OR CIRCUMSTANCES EXISTING OR TAKING PLACE PRIOR TO OR ON THE EFFECTIVE DATE ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, THE PLAN, OR THESE CHAPTER 11 CASES, INCLUDING THOSE THAT THE DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT OR THAT ANY HOLDER OF A CLAIM AGAINST OR INTEREST IN THE DEBTORS OR ANY OTHER ENTITY COULD HAVE BEEN LEGALLY ENTITLED TO ASSERT DERIVATIVELY OR ON BEHALF OF THE DEBTORS OR THEIR ESTATES.  NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, THE THIRD PARTY RELEASE SHALL NOT (1) OPERATE TO RELEASE ANY CLAIMS OR CAUSES OF ACTION HELD DIRECTLY (BUT NOT DERIVATIVELY) BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION AGAINST ANY NON-DEBTOR OR (2) PRECLUDE THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION FROM ENFORCING ITS REGULATORY OR POLICE POWERS.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD PARTY

**RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (2) A GOOD-FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD PARTY RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM RELEASED PURSUANT TO THE THIRD PARTY RELEASE.**

9.    *Exculpation*

The Exculpated Parties shall neither have, nor incur any liability to any Entity for any prepetition or postpetition act taken or omitted to be taken in connection with the Chapter 11 Cases, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, or implementing the Plan or consummating the Plan, the Disclosure Statement, the Asset Purchase Agreement, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring or liquidation of the Debtors; *provided* that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her, or its duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement.  Without limiting the foregoing "Exculpation" provided under Section 12.9 of the Plan, the rights of any holder of a Claim or Interest to enforce rights arising under this Plan shall be preserved, including the right to compel payment of distributions in accordance with the Plan.

10.    *Injunction*

**EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES THAT: (1) ARE SUBJECT TO COMPROMISE AND SETTLEMENT PURSUANT TO THE TERMS OF THE PLAN; (2) HAVE BEEN RELEASED PURSUANT TO SECTION 12.7 OF THE PLAN; (3) HAVE BEEN RELEASED PURSUANT TO SECTION 12.8 OF THE PLAN; (4) ARE SUBJECT TO EXCULPATION PURSUANT TO SECTION 12.9 OF THE PLAN (BUT ONLY TO THE EXTENT OF THE EXCULPATION PROVIDED IN SECTION 12.9 OF THE PLAN); OR (5) ARE OTHERWISE STAYED OR TERMINATED PURSUANT TO THE TERMS OF THE PLAN, ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM: (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND, INCLUDING ON ACCOUNT OF ANY CLAIMS, INTERESTS, CAUSES OF ACTIONS, OR LIABILITIES THAT HAVE BEEN COMPROMISED OR SETTLED AGAINST THE DEBTORS, THE PURCHASER, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY ENTITY, DIRECTLY OR INDIRECTLY, SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE DEBTORS, THE PURCHASER, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (C) CREATING, PERFECTING, OR**

ENFORCING ANY LIEN, CLAIM, OR ENCUMBRANCE OF ANY KIND AGAINST THE DEBTORS, THE PURCHASER, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (D) ASSERTING ANY RIGHT OF SETOFF OR SUBROGATION OF ANY KIND AGAINST ANY OBLIGATION DUE TO THE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT PRIOR TO CONFIRMATION IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF OR SUBROGATION, AND NOTWITHSTANDING AN INDICATION IN A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF OR SUBROGATION PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (E) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST THE DEBTORS, THE PURCHASER, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES RELEASED, SETTLED, OR COMPROMISED PURSUANT TO THE PLAN; PROVIDED THAT NOTHING CONTAINED IN THE PLAN SHALL PRECLUDE AN ENTITY FROM OBTAINING BENEFITS DIRECTLY AND EXPRESSLY PROVIDED TO SUCH ENTITY PURSUANT TO THE TERMS OF THE PLAN; PROVIDED, FURTHER, THAT NOTHING CONTAINED IN THE PLAN SHALL BE CONSTRUED TO PREVENT ANY ENTITY FROM DEFENDING AGAINST CLAIMS OBJECTIONS OR COLLECTION ACTIONS WHETHER BY ASSERTING A RIGHT OF SETOFF OR OTHERWISE TO THE EXTENT PERMITTED BY LAW.

11.    *Waiver of Statutory Limitation on Releases*

EACH RELEASING PARTY IN EACH OF THE RELEASES CONTAINED IN THE PLAN (INCLUDING UNDER SECTION 12 OF THE PLAN) EXPRESSLY ACKNOWLEDGES THAT ALTHOUGH ORDINARILY A GENERAL RELEASE MAY NOT EXTEND TO CLAIMS WHICH THE RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE PARTY RELEASED, IT HAS CAREFULLY CONSIDERED AND TAKEN INTO ACCOUNT IN DETERMINING TO ENTER INTO THE ABOVE RELEASES THE POSSIBLE EXISTENCE OF SUCH UNKNOWN LOSSES OR CLAIMS.   WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EACH RELEASING PARTY EXPRESSLY WAIVES ANY AND ALL RIGHTS CONFERRED UPON IT BY ANY STATUTE OR RULE OF LAW WHICH PROVIDES THAT A RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CLAIMANT DOES NOT KNOW OR SUSPECT TO EXIST IN ITS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE RELEASED PARTY, INCLUDING THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542. THE RELEASES CONTAINED IN SECTION 11 OF THE PLAN ARE EFFECTIVE

**REGARDLESS OF WHETHER THOSE RELEASED MATTERS ARE PRESENTLY KNOWN, UNKNOWN, SUSPECTED OR UNSUSPECTED, FORESEEN OR UNFORESEEN**.

12.    *Solicitation of the Plan*

As of and subject to the occurrence of the Confirmation Date:  (a) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation and (b) the Debtors and each of their respective directors, officers, employees, Affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore, are not, and on account of such offer, issuance and solicitation will not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

13.    *Plan Supplement*

The Plan Supplement shall be filed with the Clerk of the Bankruptcy Court by no later than August 9, 2016.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.  Documents to be included in the Plan Supplement will be posted at the website of court-appointed claims and noticing agent as they become available.

14.    *Corporate Action*

Upon the Effective Date, by virtue of the solicitation of votes in favor of the Plan and entry of the Confirmation Order, all actions contemplated by the Plan (including any action to be undertaken by the Plan Administrator) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by holders of Claims or Interests, the Debtors, or any other Entity or Person.  All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred on the Effective Date and shall be in effect, without any requirement of further action by the Debtors or the Debtors' Estates.

**M.    RETENTION OF JURISDICTION**

On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things, the following purposes:

(a)    to hear and determine motions and/or applications for the assumption or rejection of Executory Contracts or Unexpired Leases and the allowance, classification, priority, compromise, estimation or payment of Claims resulting therefrom;

(b)    to determine any motion, adversary proceeding, application, contested matter, or other litigated matter pending on or commenced after the Confirmation Date;

(c)    to ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

(d)    to consider Claims or the allowance, classification, priority, compromise, estimation or payment of any Claim;

(e)    to enter, implement or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

(f)    to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the Consummation, implementation or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(g)    to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)    to hear and determine all applications under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred before the Confirmation Date;

(i)    to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Purchase Agreement, or the Confirmation Order or any agreement, instrument, or other document governing or relating to any of the foregoing;

(j)    to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following Consummation;

(k)    to hear any disputes arising out of, and to enforce, any order approving alternative dispute resolution procedures to resolve personal injury, employment litigation and similar Claims pursuant to section 105(a) of the Bankruptcy Code;

(l)    to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)    to hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(n)    to adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(o)    to adjudicate any and all disputes arising from or relating to distributions under the Plan;

(p)    to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(q)    to enter a final decree closing the Chapter 11 Cases;

(r)    to enforce all orders previously entered by the Bankruptcy Court;

(s)        to recover all assets of the Debtors and property of the Debtors' Estates, wherever located; and

(t)        to hear and determine any rights, Claims or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory.

## N.        MISCELLANEOUS PROVISIONS

1.        *Payment of Statutory Fees*

On the Effective Date and thereafter as may be required, the Debtors or the Plan Administrator shall pay all fees incurred pursuant to § 1930 of title 28 of the United States Code, together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for each Debtor's case; provided, however, that after the Effective Date such fees shall only be payable with respect to the Aeropostale Case until such time as a final decree is entered closing a the Aeropostale Case, a Final Order converting such  case to a case under chapter 7 of the Bankruptcy Code is entered or a Final Order dismissing the Aeropostale Case is entered.

2.        *Substantial Contribution*

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

3.        *Dissolution of the Creditors' Committee*

On the Effective Date, the Creditors' Committee shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; *provided, however,* that after the Effective Date, the Creditors' Committee shall exist and its professionals shall continue to be retained and shall continue to be entitled to reasonable compensation by the Debtors without the need for further application to the Bankruptcy Court with respect to (a) all applications filed pursuant to sections 330 and 331 of the Bankruptcy Code and any related hearings; and (b) pending appeals of the Confirmation Order; *provided further, however*, that the Bankruptcy Court shall retain jurisdiction with respect to any disputes over the reasonableness of fees.

4.        Amendments

(a)        *Plan Modifications*.  The Plan may be amended, modified or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code; *provided* that such amendments, modifications, or supplements shall be satisfactory in all respects to the Debtors and the Creditors' Committee.  In addition, after the Confirmation Date, the Debtors may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.

(b)        *Other Amendments*.   Before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court.

5.      *Revocation or Withdrawal of the Plan*

The Debtors reserve the right, after good-faith consultation with the Creditors' Committee and the DIP Agent, to revoke or withdraw the Plan, including the right to revoke or withdraw the Plan for any Debtor or all Debtors, prior to the Confirmation Date.  If the Debtors, in good-faith consultation with the Creditors' Committee and the DIP Agent, revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtors, the Debtors' Estates, or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors, the Debtors' Estates, or any other Entity.

6.      *Severability of Plan Provisions upon Confirmation*

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Plan Administrator (as the case may be); and (3) nonseverable and mutually dependent.

7.      *Governing Law*

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement provides otherwise, the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

8.      *Time*

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

9.      *Additional Documents*

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

10.     *Immediate Binding Effect*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Successful Bidder, the holders of Claims and Interests, the Released Parties, the Exculpated Parties, and each of their respective successors and assigns, including, without limitation, the Plan Administrator.

11.     *Successors and Assigns*

The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall insure to the benefit of any heir, executor, administrator, successor or permitted assign, if any, of each Entity.

12.     *Entire Agreement*

On the Effective Date, the Plan, the Plan Supplement, the Asset Purchase Agreement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Plan.

13.     *Notices*

All notices, requests and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

> (i)     if to the Debtors or the Plan Administrator:
>
> Aéropostale, Inc.
> 112 West 34th Street, 22nd Floor
> New York, New York 10120
> Attention: Marc G. Schuback
> Telephone: (646) 485-5410
> Facsimile: (646) 619-4873
>
> - and -
>
> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, NY 10153
> Attn:    Ray C. Schrock, P.C.
> Jacqueline Marcus
> Garrett A. Fail
> Telephone:  (212) 310-8000
> Facsimile:  (212) 310-8007
>
> (ii)    if to the Creditors Committee:

Pachulski Stang Ziehl & Jones LLP
780 Third Avenue
34th Floor
New York, New York 10017
Attn:    Robert J. Feinstein
Bradford J. Sandler
Telephone: (212) 561-7700
Facsimile: (212) 561-7777

After the Effective Date, the Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.   After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

# VI.

## CERTAIN RISK FACTORS AFFECTING THE DEBTORS

A.    **CERTAIN BANKRUPTCY LAW CONSIDERATIONS**

1.    *Risk of Non-Confirmation of the Plan*

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate resolicitation of votes.

2.    *Non-Consensual Confirmation*

In the event any impaired class of claims or interests entitled to vote on a plan of reorganization does not accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.

3.    *Risk Related to DIP Credit Facility*

In the event of a breach of one of the milestones or another event of default under the DIP Facility, the DIP Lenders may seek, among other things, to exercise certain remedies with respect to the collateral securing the DIP Facility, and to take certain other actions against the Debtors.

4.    *Risk Related to Auction*

Although the Debtors believe that they will be able to obtain competitive bids for all or substantially all of their Assets at the Auction, the Debtors are not certain whether offers will be made, what the content of those offers will be, or whether any Purchaser will enter into an Asset Purchase Agreement.   Accordingly, the Debtors are not certain what proceeds, if any, will be available for distribution under this Plan.

## B.    ADDITIONAL FACTORS TO BE CONSIDERED

### 1.    *The Debtors Have No Duty to Update*

The statements contained in this Disclosure Statement are made by the Debtors as of the Commencement Date, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### 2.    *No Representation Outside This Disclosure Statement Are Authorized*

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

### 3.    *No Legal or Tax Advice Is Provided to You by This Disclosure Statement*

The contents of this Disclosure Statement should **not** be construed as legal, business, or tax advice.  Each holder of a Claim or Interests should consult his, her, or its own legal counsel and accountant as to legal, tax, and other matters concerning his, her, or its Claim or Interest.

This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### 4.    *No Admission Made*

Nothing contained in the Plan will constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or on holders of Claims or Interests.

### 5.    *Failure to Identify Litigation Claims or Projected Objections*

No reliance should be placed on the fact that particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement.  The Debtors may seek to investigate, file, and prosecute Claims and Interests and may object to Claims or Interests after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

### 6.    *No Waiver of Right to Object or Right to Recover Transfers and Assets*

The vote by a holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors (or any entity, as the case may be) to object to that holder's Claim or Interest, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any claims or causes of action of the Debtors or their respective Estates are specifically or generally identified in this Disclosure Statement.

7.      *Information Was Provided by the Debtors and Was Relied Upon by the Debtors'*
        *Advisors*

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.   Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have no independently verified the information contained in this Disclosure Statement.

## VII.

## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to certain holders of Allowed Claims. This summary does not address the U.S. federal income tax consequences to holders of Claims whose Claims are entitled to payment in full in Cash, holders of Secured Claims or holders of Claims or Interests who are deemed to have rejected the Plan.   Moreover, the following summary does not discuss the U.S. federal income tax consequences of the Plan if the Debtors elect prior to the Effective Date to pursue an Alternative Transaction.

This summary is based on the U.S. Internal Revenue Code of 1986, as amended (the "*Tax Code*"), existing and proposed U.S. Treasury regulations thereunder (the "*Treasury Regulations*"), judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "*IRS*") as in effect on the date hereof, all of which are subject to change, possibly on a retroactive basis. Any such change could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and subject to significant uncertainties. The Debtors have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the Plan. This summary does not address state, local or foreign income or other tax consequences of the Plan, nor does it purport to address the U.S. federal income tax consequences of the Plan to special classes of taxpayers (such as non-U.S. persons, broker-dealers, banks, mutual funds, insurance companies, financial institutions, thrifts, small business investment companies, regulated investment companies, real estate investment trusts, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, any other Debtor entity, persons holding securities as part of a hedging, straddle, conversion or constructive sale transaction or other integrated investment, traders in securities that elect to use a mark-to-market method of accounting for their security holding, dealers in securities or foreign currencies, persons whose functional currency is not the U.S. dollar, certain expatriates or former long term residents of the United States, persons who received their Claim as compensation or who acquired their Claim in the secondary market, and persons subject to the alternative minimum tax or the "Medicare" tax on net investment income). Additionally, this discussion does not address the Foreign Account Tax Compliance Act.

The following discussion generally assumes that, the various debt and other arrangements to which the Debtors are parties will be respected for U.S. federal income tax purposes in accordance with their form, that the Plan will be treated as a plan of liquidation of the Debtors for U.S. federal income tax purposes (and thus that the Debtors will not elect to pursue an Alternative Transaction), and that all distributions to holders of Claims and Interests will be taxed accordingly.

> **ACCORDINGLY, THE FOLLOWING SUMMARY IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING OR FOR ADVICE BASED UPON THE PARTICULAR CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES APPLICABLE TO IT UNDER THE PLAN..**

## A.    CONSEQUENCES TO THE DEBTORS

Each of the Debtors (other than Aéropostale Puerto Rico, Inc., a Puerto Rico corporation) is a member of an affiliated group of corporations that files a consolidated federal income tax returns with Aéropostale as the common parent (the "***Aéropostale U.S. Tax Group***") or an entity disregarded as separate from its owner for U.S. federal income tax purposes whose business activities and operations are reflected on the consolidated U.S. federal income tax returns of the Aéropostale U.S. Tax Group. The Debtors estimate that, as of the Commencement Date, the Aéropostale U.S. Tax Group had consolidated NOL carryforwards of approximately $250 million, among other tax attributes (including tax basis in assets). However, the amount of any NOLs and other tax attributes, as well as the application of any limitations, remain subject to review and adjustment by the IRS. Aéropostale Puerto Rico, Inc. is solely subject to Puerto Rico income tax.

As indicated above, the Debtors intend to treat the Plan as a plan of liquidation for U.S. federal income tax purposes (assuming that the Debtors will not elect to pursue an Alternative Transaction), in that the Debtors will remain in existence following the Effective Date solely for the purpose of winding up their affairs including, but not limited to, resolving outstanding Claims, selling their assets and distributing the proceeds and any remaining property to or for the benefit of holders of Allowed Claims and Interests. The U.S. federal income tax impact of the Plan on the NOLs and other tax attributes of the Debtors is further discussed below.

1.    *Sale and Other Dispositions of Assets*

The Plan authorizes the Debtors to take any and all actions necessary to consummate the sale of all or substantially all of the Debtors' assets. Moreover, if at any time the Plan Administrator determines it would be in the best interests of a Debtor and the holders of Allowed Claims against and Interests in such Debtor to establish a Liquidating Trust, the Plan Administrator may transfer some or all of the Debtor's assets to a Liquidating Trust on behalf of all or a portion of the respective claimants and/or holders of Interests of the Debtor. For U.S. federal income tax purposes, the transfer of assets to a Liquidating Trust generally is treated equivalent to a sale of the assets at then fair market value. Although the Debtors may recognize taxable income in connection with the liquidation or transfer of the remaining assets (including upon a distribution of such assets to a Liquidating Trust) ,as discussed below, the Debtors expect to have sufficient available NOL carryforwards and/or other tax attributes to avoid any meaningful U.S. federal, state, local or foreign income tax liability.

The Tax Code provides that a debtor must recognize taxable income, generally referred to as cancellation of debt income ("***CODI***"), upon the elimination or reduction of debt for insufficient consideration. The Tax Code provides an exception to such income recognition treatment for any CODI arising in bankruptcy, but generally requires the debtor to reduce certain of its tax attributes – such as current year NOLs, NOL carryforwards, tax credits, capital losses and tax basis in assets – by the amount of any such CODI that arises by reason of the discharge of the debtor's indebtedness in the bankruptcy case. Under applicable Treasury Regulations, the reduction in certain tax attributes (such as NOL carryforwards) occurs under consolidated return principles, as in the case of the Debtors who are members of the Aéropostale U.S. Tax Group. CODI is generally the amount by which the adjusted issue

price of indebtedness discharged exceeds the sum of the amount of cash and the fair market value of any other property given in exchange therefor. Any reduction in tax attributes under the CODI rules does not occur until the end of the tax year after such attributes have been applied to determine the tax in the year of discharge or, in the case of asset basis reduction, the first day of the taxable year following the tax year in which the CODI occurs. Accordingly, consistent with the intended treatment of the Plan as a plan of liquidation for U.S. federal income tax purposes, the Debtors expect that no CODI should be incurred by a Debtor as a result of the implementation of the Plan prior to the disposition by such Debtor of all or substantially all of its assets. In such case, the reduction of tax attributes resulting from such CODI (which, as indicated above, only occurs as of the end of the tax year in which the CODI occurs) generally should not have a material impact on the Debtors.

The Aéropostale U.S. Tax Group's ability to utilize its NOL carryforwards and certain other tax attributes could be subject to limitation if the Aéropostale U.S. Tax Group underwent or were to undergo an ownership change within the meaning of section 382 of the Tax Code by reason of the implementation of the Plan or otherwise. The Bankruptcy Court entered an order effective as of the Commencement Date imposing certain restrictions on the trading of Aéropostale Stock so as to avoid such an ownership change occuring. Moreover, effective as of the Effective Date, the Plan provides that the continuing rights of holders of Existing Aéropostale Interests (including through their interest in the Aéropostale Plan Stock or otherwise) will be nontransferable except by operation of law. Accordingly, the Debtors believe that no ownership change under section 382 of the Tax Code has occurred to date and, consistent with the intended treatment of the Plan as a plan of liquidation for U.S. federal income tax purposes, that no ownership change should occur as a result of the implementation of the Plan.

Nevertheless, there can be no assurance that the IRS will not successfully take a contrary position and thus that all or a substantial amount of the CODI will not be incurred prior to the disposition of all of the Debtors' assets, or that an ownership change will not occur upon consummation of the Plan due to, among other things, a lack of authoritative IRS guidance as to when CODI occurs in the context of a liquidating Chapter 11 plan. In such event, the Debtors could incur a material amount of U.S. federal income tax in respect of the sale or other disposition of their assets depending, in part, on the amount realized upon the disposition of such assets and the then tax basis of the assets.

2. *Alternative Minimum Tax*

In general, a U.S. federal alternative minimum tax ("**AMT**") is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent that such tax exceeds the corporation's regular U.S. federal income tax. For purposes of computing AMT taxable income, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, only 90% of a corporation's taxable income for AMT purposes may be offset by available NOL carryforwards (as computed for AMT purposes).

**B.    CONSEQUENCES TO HOLDERS OF ALLOWED TERM LOAN DEFICIENCY CLAIM AND GENERAL UNSECURED CLAIMS**

Pursuant to the Plan, (i) to the extent that the Sycamore Order is sought and provides that the Term Loan Secured Claim shall be Allowed and is not subject to subordination or recharacterization, the holder will receive, in full and final satisfaction of the Term Loan Secured Claim, its Pro Rata share of Available Cash not to exceed the Allowed amount of the Term Loan Secured Claim plus any accrued post-petition interest, and (ii) each holder of a General Unsecured Claim will receive, in full and final satisfaction of such Claim and unless otherwise agreed, its Pro Rata share of Available Cash not to exceed the Allowed amount of such General Unsecured Claim plus any accrued post-petition interest. As

indicated, this discussion assumes that the Debtors do not elect, prior to the Effective Date, to pursue an Alternative Transaction.

The following discussion does not necessarily apply to holders who have Claims in more than one class relating to the same underlying obligation (such as where the underlying obligation is classified as partially secured and partially unsecured). Such holders should consult their tax advisor regarding the effect of such dual status obligations on the U.S. federal income tax consequences of the Plan to them.

1.    *Recognition of Gain or Loss*

The U.S. federal income tax consequences of the implementation of the Plan to a holder of a Claim will depend, among other things, upon the origin of the holder's Claim, when the holder receives payment in respect of such Claim, whether the holder reports income using the accrual or cash method of tax accounting, whether the holder acquired its Claim at a discount, whether the holder has taken a bad debt deduction or worthless security deduction with respect to such Claim, and/or whether (as intended and herein assumed) the Plan is treated as a plan of liquidation for U.S. federal income tax purposes. A holder of a Claim should consult its tax advisor regarding the timing and amount of any potential bad debt deduction.

Generally, a holder of an Allowed Claim will recognize gain or loss with respect to its Allowed Claim) in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value of any other property received by the holder, including, as discussed below, any beneficial interests in a Liquidating Trust (other than any consideration attributable to a Claim for accrued but unpaid interest) and (ii) the adjusted tax basis of the Allowed Claim exchanged therefor (other than basis attributable to accrued but unpaid interest previously included in the holder's taxable income). As discussed below, the amount of Cash or other property received in respect of Claims for accrued but unpaid interest will be taxed as ordinary income, except to the extent previously included in income by a holder under its method of accounting. See Section B.2.— "Allocation of Consideration to Interest." Consistent with the treatment of the Plan as a plan of liquidation, any loss realized by a holder of a Claim may not be recognizable until all of the distributions to such holder are received.

When gain or loss is recognized, such gain or loss may be long-term capital gain or loss if the Claim disposed of is a capital asset in the hands of the holder and has been held for more than one year. Each holder of an Allowed Claim should consult its tax advisor to determine whether gain or loss recognized by such holder will be long-term capital gain or loss and the specific tax effect thereof on such holder.

As discussed below (*see* Section C.— "Tax Treatment of a Liquidating Trust and Holders of Beneficial Interests"), each holder of an Allowed Term Loan Deficiency Claim and General Unsecured Claim that receives a beneficial interest in the Liquidating Trust (if and when established) will be treated for U.S. federal income tax purposes as directly receiving, and as a direct owner of, its respective share of the Liquidating Trust Assets (consistent with its economic rights in the trust). Pursuant to the Plan, the Liquidating Trustee will in good faith value the assets transferred to the Liquidating Trust, and all parties to the Liquidating Trust (including holders of Claims receiving Liquidating Trust Interests) must consistently use such valuation for all U.S. federal income tax purposes.

A holder's share of any proceeds received by a Liquidating Trust upon the sale or other disposition of the assets of the Liquidating Trust (other than any such amounts received as a result of the subsequent disallowance of Disputed Claims or the reallocation among holders of Allowed Claims of undeliverable Plan distributions) should not be included, for U.S. federal income tax purposes, in the

holder's amount realized in respect of its Allowed Claim but should be separately treated as amounts realized in respect of such holder's ownership interest in the underlying assets of the Liquidating Trust. *See* Section C.— "Tax Treatment of a Liquidating Trust and Holders of Beneficial Interests," below.

A holder's aggregate tax basis in its respective share of the Liquidating Trust Assets will equal the fair market value of its interest in the Liquidating Trust increased by its share of the Debtors' liabilities to which the underlying assets remain subject upon transfer to the Liquidating Trust, and the holder's holding period generally will begin the day following establishment of the Liquidating Trust.

2.    *Allocation of Consideration to Interest*

Pursuant to section 7.8 of the Plan, all distributions in respect of Allowed Claims will be allocated first to the principal amount of the Allowed Claim (as determined for U.S. federal income tax purposes), with any excess allocated to accrued but unpaid interest. However, there is no assurance that such allocation would be respected by the IRS for U.S. federal income tax purposes. In general, to the extent any amount received (whether stock, cash, or other property) by a holder of a debt instrument is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the holder as ordinary interest income (if not previously included in the holder's gross income under the holder's normal method of accounting). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full. Each holder of an Allowed Claim is urged to consult its own tax advisors regarding the allocation of consideration and the taxation or deductibility of unpaid interest for tax purposes.

## C.    TAX TREATMENT OF A LIQUIDATING TRUST AND HOLDERS OF BENEFICIAL INTERESTS

As indicated above, if at any time the Plan Administrator determines it would be in the best interests of a Debtor and the holders of Allowed Claims against and Interests in such Debtor to establish a Liquidating Trust, the Plan Administrator may transfer some or all of such Debtor's assets to a Liquidating Trust on behalf of all or a portion of the respective claimants and/or holders of Interests of such Debtor.

1.    *Classification of a Liquidating Trust*

If established, such liquidating trust will be intended to qualify as a "liquidating trust" for U.S. federal income tax purposes (other than in respect of any portion of the Liquidating Trust Assets allocable to, or retained on account of, Disputed Claims, as discussed below). In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor" trust (i.e., a pass-through entity). The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. Any liquidating trust will be structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45 all parties (including, without limitation, the Debtors, the Liquidating Trustee and Liquidating Trust Beneficiaries) shall treat the transfer of Liquidating Trust Assets to a Liquidating Trust as (1) a transfer of Liquidating Trust Assets (subject to any obligations relating to those assets) directly to Liquidating Trust Beneficiaries (other than to the extent Liquidating Trust Assets are allocable to Disputed Claims), followed by (2) the transfer by such beneficiaries to a Liquidating Trust of Liquidating Trust Assets in exchange for Liquidating Trust Interests. Accordingly, except in the event of contrary definitive guidance, Liquidating Trust Beneficiaries shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of Liquidating Trust Assets (other than such Liquidating Trust Assets as are allocable to Disputed Claims).

While the following discussion assumes that the Liquidating Trust would be so treated for U.S. federal income tax purposes, no ruling will be requested from the IRS concerning the tax status of the Liquidating Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust as a grantor trust. If the IRS were to challenge successfully such classification, the U.S. federal income tax consequences to the Liquidating Trust and the holders of Claims could vary from those discussed herein.

2.      *General Tax Reporting by a Liquidating Trust and Beneficiaries*

For all U.S. federal income tax purposes, all parties must treat the Liquidating Trust as a grantor trust of which the holders of Liquidating Trust Interests are the owners and grantors, and treat the Liquidating Trust Beneficiaries as the direct owners of an undivided interest in the Liquidating Trust Assets (other than any assets allocable to Disputed Claims), consistent with their economic interests therein. The Liquidating Trustee will file tax returns for a Liquidating Trust treating such Liquidating Trust as a grantor trust pursuant to section 1.671-4(a) of the Treasury Regulations. The Liquidating Trustee also shall annually send to each holder of a Liquidating Trust Interest a separate statement regarding the receipts and expenditures of the Liquidating Trust as relevant for U.S. federal income tax purposes.

Allocations of taxable income of the Liquidating Trust (other than taxable income allocable to any assets allocable to, or retained on account of, Disputed Claims, if such income is otherwise taxable at the Liquidated Trust) among the Liquidating Trust Beneficiaries shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value, and, if applicable, other than assets allocable to Disputed Claims) to the Liquidating Trust Beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust. Similarly, taxable loss of the Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Liquidating Trust Assets. The tax book value of the Liquidating Trust Assets for purposes of allocating taxable income and loss shall equal their fair market value on the date of the transfer of the Liquidating Trust Assets to the Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

As soon as reasonably practicable after the transfer of the Liquidating Trust Assets to the Liquidating Trust, the Liquidating Trustee shall make a good faith valuation of the Liquidating Trust Assets. All parties to the Liquidating Trust (including, without limitation, the Debtors, holders of Allowed Claims and Equity Interests, and the Liquidating Trust Beneficiaries) must consistently use such valuation for all U.S. federal income tax purposes. The valuation will be made available, from time to time, as relevant for tax reporting purposes.

Taxable income or loss allocated to a Liquidating Trust Beneficiary will be treated as income or loss with respect to such Liquidating Trust Beneficiary's undivided interest in the Liquidating Trust Assets, and not as income or loss with respect to its prior Allowed Claim or Equity Interest. The character of any income and the character and ability to use any loss will depend on the particular situation of the Liquidating Trust Beneficiary. It is currently unknown whether and to what extent the Liquidating Trust Interests will be transferable.

The U.S. federal income tax obligations of a holder with respect to its Liquidating Trust Interest are not dependent on the Liquidating Trust distributing any cash or other proceeds. Thus, a

holder may incur a U.S. federal income tax liability with respect to its allocable share of Liquidating Trust income even if the Liquidating Trust does not make a concurrent distribution to the holder. In general, other than in respect of cash retained on account of Disputed Claims and distributions resulting from undeliverable distributions (the subsequent distribution of which still relates to a holder's Allowed Claim), a distribution of cash by the Liquidating Trust will not be separately taxable to a Liquidating Trust Beneficiary since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the cash was earned or received by the Liquidating Trust). Holders are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of any subsequent distributions of cash originally retained by the Liquidating Trust on account of Disputed Claims.

The Liquidating Trustee will comply with all applicable governmental withholding requirements (*see* section 5.6 of the Plan). Thus, in the case of any Liquidating Trust Beneficiaries that are not U.S. persons, the Liquidating Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate). As indicated above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. holders; accordingly, such holders should consult their tax advisors with respect to the U.S. federal income tax consequences of the Plan, including owning an interest in the Liquidating Trust.

3.    *Tax Reporting for Assets Allocable to Disputed Claims*

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Liquidating Trustee of an IRS private letter ruling if the Liquidating Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trustee), the Liquidating Trustee (A) may elect to treat any Liquidating Trust Assets allocable to, or retained on account of, Disputed Claims as a "disputed ownership fund" governed by section 1.468B-9 of the Treasury Regulations, and (B) to the extent permitted by applicable law, will report consistently for state and local income tax purposes.

Accordingly, if a "disputed ownership fund" election is made, any amounts allocable to, or retained on account of, Disputed Claims will be subject to tax annually on a separate entity basis on any net income earned with respect to the Liquidating Trust Assets in such reserves (including any gain recognized upon the disposition of such assets). All distributions from such assets (which distributions will be net of the expenses, including taxes, relating to the retention or disposition of such assets) will be treated as received by holders in respect of their Claims as if distributed by the Debtors. All parties (including, without limitation, the Debtors, the Liquidating Trustee and the Liquidating Trust Beneficiaries) will be required to report for tax purposes consistently with the foregoing.

D.    **WITHHOLDING ON DISTRIBUTIONS AND INFORMATION REPORTING**

All distributions to holders of Allowed Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 28%). Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from

backup withholding, including, in certain circumstances, corporations and financial institutions. Holders of Allowed Claims are urged to consult their tax advisors regarding the Treasury Regulations governing backup withholding and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations.

In addition, a holder of an Allowed Claim or a Liquidating Trust Beneficiary that is a not a U.S. person may be subject to up to 30% withholding, depending on, among other things, the particular type of income and whether the type of income is subject to a lower treaty rate. As to certain Claims, it is possible that withholding may be required with respect to Distributions by the Debtors even if no withholding would have been required if payment was made prior to the Chapter 11 Cases. A non-U.S. holder may also be subject to other adverse consequences in connection with the implementation of the Plan. As discussed above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. holders. Non-U.S. holders are urged to consult their tax advisors regarding potential withholding on Distributions by the Debtors or payments from the Liquidating Trust.

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these Treasury Regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the holder's tax returns.

## VIII.

## CONFIRMATION OF THE PLAN

### A.     CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a chapter 11 plan. The Bankruptcy Court has scheduled the Confirmation Hearing to commence on August 23, 2016 at 11:00 a.m. (Eastern Time). The Confirmation Hearing may be adjourned from time-to-time by the Debtors or the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

### B.     OBJECTIONS

Section 1128 of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan. Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.

Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Bankruptcy Rules for the Bankruptcy Court, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the Debtors' estates or property, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, with a copy to the chambers of The Honorable Sean H. Lane, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York, together with proof of service thereof, and served upon the parties listed below so as to be received no later than the Plan Objection Deadline of **August 12, 2016 at 12:00 p.m. (Eastern Time)**:

| *Debtors* | *Counsel to the Debtors* |
|---|---|
| Aéropostale, Inc.<br>112 W. 34th Street<br>New York, NY 10120<br>Attn: Marc G. Schuback | Weil, Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, NY 10153<br>Attn: Ray C. Schrock, P.C.<br>        Jacqueline Marcus<br>        Garrett A. Fail |
| *Office of the United States Trustee* | *Counsel to the Creditors' Committee* |
| 201 Varick Street<br>Suite 1006<br>New York, NY 10014<br>Attn: Brian Masumoto<br>        Susan Arbeit | Pachulski Stang Ziehl & Jones LLP<br>780 Third Avenue<br>34th Floor<br>New York, New York 10017<br>Attn:  Robert J. Feinstein<br>        Bradford J. Sandler |
| *Counsel to the DIP Lenders* | *Counsel to the Prepetition Term Loan Lenders* |
| Proskauer Rose LLP<br>Eleven Times Square<br>New York, NY 10036<br>Attn: Scott Rutsky<br>        Jared Zajac | Kirkland & Ellis LLP<br>300 North LaSalle Street<br>Chicago, IL 60654<br>Attn: James A. Stempel |

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

**C.     REQUIREMENTS FOR CONFIRMATION OF THE PLAN**

1.     *Requirements of Section 1129(a) of the Bankruptcy Code*

a.     General Requirements

At the Confirmation Hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

(i)     The Plan complies with the applicable provisions of the Bankruptcy Code.

(ii)     The Debtors have complied with the applicable provisions of the Bankruptcy Code.

(iii)     The Plan has been proposed in good faith and not by any means proscribed by law.

(iv)     Any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been approved or is subject to the approval of the Bankruptcy Court as reasonable.

(v)     The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtors, an affiliate of the Debtors participating in a joint plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy.

(vi)     With respect to each Class of Claims or Interests, each holder of an Impaired Claim or Impaired Interest either has accepted the Plan or will receive or retain under the Plan on account of such holder's Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. *See* discussion of "Best Interests Test" below.

(vii)     Except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (discussed below), each class of Claims or Interests has either accepted the Plan or is not impaired under the Plan.

(viii)     Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan provides that administrative expenses and priority claims will be paid in full on the Effective Date.

(ix)     At least one class of impaired claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a claim in such class.

(x)     Confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan. *See* "Feasibility Analysis" below.

(xi)     All fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the hearing on confirmation of the Plan, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

b.     Best Interests Test

As noted above, the Bankruptcy Code requires that each holder of an impaired Claim or Interest either (i) accepts the Plan or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date. This requirement is referred to as the "best interests test."

The best interests test requires the Bankruptcy Court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

The Debtors believe that under the Plan all holders of impaired Claims and Interests will receive property with a value not less than the value such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code. The Debtors' belief is based primarily on (i) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to

63

holders of impaired Claims and Interests and (ii) the Liquidation Analysis prepared by the Debtors' financial advisor, FTI, that is annexed as **Exhibit D** hereto.

The Liquidation Analysis is a comparison of (i) the estimated recoveries for creditors and equity holders of the Debtors that may result from the Plan and (ii) an estimate of the recoveries that may result from a hypothetical chapter 7 liquidation. The Liquidation Analysis is based upon a number of significant assumptions which are described therein. The Liquidation Analysis is solely for the purpose of disclosing to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein. There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that the Bankruptcy Court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

      c.      <u>Feasibility Analysis</u>

The Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization unless contemplated by the Plan. The Plan provides for the sale of substantially all of the Debtors' assets and the distribution of the proceeds of such sale. Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

      2.      *Requirements of Section 1129(b) of the Bankruptcy Code*

The Bankruptcy Court may confirm the Plan over the rejection or deemed rejection of the Plan by a class of Claims or Interests if the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

      a.      <u>No Unfair Discrimination</u>

The "no unfair discrimination" test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under a plan. A chapter 11 plan of reorganization does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or equity interests receives more than it legally is entitled to receive for its claims or equity interests. This test does not require that the treatment be the same or equivalent, but that such treatment is "fair."

The Debtors believe that, under the Plan, all impaired classes of Claims and Interests are treated in a manner that is fair and consistent with the treatment of other classes of Claims and Interests having the same priority. Accordingly, the Debtors believe the Plan does not discriminate unfairly as to any impaired class of Claims or Interests.

      b.      <u>Fair and Equitable Test</u>

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. The test sets forth different standards for what is fair and equitable, depending on the type of claims or interests in such class. In order to demonstrate that a plan is "fair and equitable," the plan proponent must demonstrate the following:

        (i)      *Secured Creditors*.  With respect to a class of impaired secured claims, a proposed plan must provide the following: (a) that the holders of secured claims retain their liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the Plan, of at least the value of such holder's interest in the estates' interest in such property, or (b) for the sale, subject to section 363 of the Bankruptcy Code, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (a) or (c) of this paragraph, or (c) that the holders of secured claims receive the "indubitable equivalent" of their allowed secured claim.  There are no impaired classes of creditors holding Secured Claims under the Plan.

        (ii)      *Unsecured Creditors*.  With respect to a class of impaired unsecured claims, a proposed plan must provide the following: either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

        To the extent that the Sycamore Order provides that the Term Loan Deficiency Claim shall be Allowed and not subject to subordination or recharacterization as Existing Aéropostale Interests, the holder of the Term Loan Deficiency Claim shall receive, in full and final satisfaction of such Claim, its *pro rata* share of Available Cash, *excluding* any proceeds of Causes of Action against the Prepetition Term Loan Agent and the Prepetition Term Loan Lenders, and/or their affiliates.  Holders of Allowed General Unsecured Claims will receive their *pro rata* share of Available Cash.  In such circumstances, Classes 4 (Term Loan Deficiency Claim) and 5 (General Unsecured Claims) will both be Unsecured Claims having the same priority.

        Inasmuch as the Plan provides that no holder of Claims or Interests in any Class junior in priority to the holders of Claims in Classes 4 and 5 will receive or retain any property under the Plan, the Plan satisfies the "fair and equitable" test with respect to all Impaired Unsecured Claims.

        (b)      *Holders of Equity Interests*.  With respect to a class of equity interests, a proposed plan must provide the following: (i) that each holder of an equity interest receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest or (ii) that the holder of any interest that is junior to the interests of the class of equity interests will not receive or retain under the Plan on account of such junior interest any property.

        Pursuant to the Plan, unless Claims in Class 5 (General Unsecured Claims) are satisfied in full, all Existing Aéropostale Interests (Class 7) and all Other Equity Interests (Class 8) including all equity, warrants, common stock, and preferred stock, will be cancelled and the holders of Existing Aéropostale Interests and Intercompany Interests will not receive or retain property on account of their Interests.  Accordingly, the Plan meets the "fair and equitable" test with respect to all Interests.

        c.      <u>Application to the Plan</u>

        As to any Class that may reject the Plan, the Debtors believe the Plan will satisfy both the "no unfair discrimination" requirement and the "fair and equitable" requirements, because, as to any such dissenting Class, there is no Class of equal priority receiving more favorable treatment, and such Class

will either be paid in full, or no Class that is junior to such a dissenting Class will receive or retain any property on account of the Claims or Interests in such Class.

    3.    *Alternative to Confirmation and Consummation of the Plan*

        The Debtors have evaluated several alternatives to the Plan. After studying these alternatives, the Debtors have concluded that the Plan is the best option for the Debtors and their estates and will maximize recoveries to parties-in-interest—assuming confirmation and consummation of the Plan. If the Plan is not confirmed and consummated, the alternatives to the Plan include a sale of the Debtors' assets under section 363 of the Bankruptcy Code or a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

    a.    <u>Section 363 Sale</u>

        If the Plan is not confirmed, the Debtors could seek from the Bankruptcy Court, after notice and a hearing, authorization to sell their Assets under section 363 of the Bankruptcy Code. Indeed, the form of Asset Purchase Agreement will require any Purchaser to consummate a sale under section 363 in the event that the Plan is not confirmed. Holders of Claims in Classes 2 and 3 would be entitled to credit bid, subject to the Sycamore Order, on any property to which their security interests are attached, and to offset their Claims against the purchase price of the property. In addition, the security interests in the Debtors' assets held by holders of Claims in Classes 2 (Other Secured Claims) and 3 (Term Loan Secured Claim), and by the DIP Lenders, would attach to the proceeds of any sale of the Debtors' assets. After these Claims are satisfied, any remaining funds could be used to pay holders of Claims in Class 4 (Term Loan Deficiency Claim) and Class 5 (General Unsecured Claims). The Debtors would need to file a plan of liquidation or convert the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code in order to distribute any proceeds from a sale. Upon analysis and consideration of this alternative, the Debtors do not believe a sale of their assets under section 363 of the Bankruptcy Code would yield a higher recovery than treatment under the Plan for holders of Claims and Interests.

    b.    <u>Liquidation Under Chapter 7</u>

        In a chapter 7 case, a trustee is appointed to liquidate a debtor's assets and not make distributions to creditors in accordance with the priorities established in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of their collateral. If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid. Unsecured creditors are paid from any remaining sale proceeds, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

        Substantially all of the Debtors' assets are being sold through the Debtors' proposed Sale Transaction under the Plan. The Debtors believe that the Plan provides a greater recovery to Holders of Allowed Other General Unsecured Claims than would a chapter 7 liquidation for several reasons. First, liquidation under chapter 7 of the Bankruptcy Code would both decrease the aggregate proceeds available to holders of Claims and Interests and increase the magnitude of claims to those proceeds. Specifically, the Plan contemplates that the Debtors will conduct a controlled auction process designed to maximize the going concern value of the Debtors' assets. A liquidation of the Debtors' assets under chapter 7 would be less orderly and would yield only a liquidation value that does not account for the value of the Debtors' business as a going concern. Crucially, the auction process contemplated by the Plan would enable the Debtors to capture the going concern value of their international licensing business, the value

of which is heavily dependent on the preservation of the Debtors' U.S. operations. In a chapter 7 liquidation, the value of the Debtors' international licensing business would likely be destroyed.

Second, liquidating the Debtors' Estates under the Plan likely provides Holders of Allowed General Unsecured Claims with a larger, more timely recovery because of the fees and expenses that would be incurred in a chapter 7 liquidation, including the potential added time and expense incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the Debtors and their estates. The Debtors believe that in liquidation under chapter 7, before creditors received any distribution, additional administrative expenses involved in the appointment of a chapter 7 trustee and its retained professionals would cause a substantial diminution in the value of the Debtors' assets. The assets available for distribution to creditors would be reduced by such additional expenses and by the Claims, some of which would be entitled to priority, which would arise by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of operations.

Based on the Debtors' analysis, it is possible that a liquidation of the Debtors' assets under a chapter 7 liquidation would result in smaller distributions being made to creditors than those provided for under the Plan because of (i) the likelihood that the assets of the Debtors would have to be sold or otherwise disposed of in a less orderly fashion over a short period of time, and (ii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation. Accordingly, the Debtors believe that the Plan is in the best interests of creditors.

c.    Alternative Plans

The Debtors do not believe that there are any alternative plans for the reorganization or liquidation of the Debtors' Estates. The Debtors believe that the Plan, as described herein, enables Holders of Claims and Interests to realize the greatest possible value under the circumstances and that, compared to any alternative plan, the Plan has the greatest chance to be confirmed and consummated.

4.    *Nonconsensual Confirmation*

If any impaired Class of Claims entitled to vote will not accept the Plan by the requisite statutory majority provided in section 1126(c) of the Bankruptcy Code, the Debtors reserve the right to amend the Plan or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code or both. With respect to impaired Classes of Claims that are deemed to reject the Plan, the Debtors will request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

## IX.

## CONCLUSION

The Debtors believe that confirmation and implementation of the Plan is in the best interests of all creditors, and urges holders of impaired Claims in Class 4 (Term Loan Deficiency Claims), Class 5 (General Unsecured Claims) and Class 6 (Intercompany Claims) to vote to accept the Plan and to evidence such acceptance by returning their ballots so that they will be received no later than the Voting Deadline, **August 16, 2016 at 4:00 p.m. (Eastern Time)**.

Dated:  July 15, 2016
        New York, New York

Respectfully submitted,

By:  _____
        Name: David J. Dick
        Title: Chief Financial Officer

## Exhibit A

**Plan of Reorganization**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| AÉROPOSTALE, INC., *et al.*, | ) | Case No. 16-11275 (SHL) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## JOINT PLAN OF REORGANIZATION OF
## AÉROPOSTALE, INC. AND ITS AFFILIATED DEBTORS

**WEIL, GOTSHAL & MANGES LLP**

Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

Attorneys for Debtors and
Debtors in Possession

Dated:  July 15, 2016
        New York, New York

# TABLE OF CONTENTS

SECTION 1.    DEFINITIONS AND INTERPRETATION. .................................................1

SECTION 2.    ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS. ....................10

    2.1.    Administrative Expense Claims. ..............................................................10
    2.2.    Fee Claims. ..............................................................................................10
    2.3.    Priority Tax Claims. .................................................................................11
    2.4.    DIP Claims................................................................................................11

SECTION 3.    CLASSIFICATION OF CLAIMS AND INTERESTS. ...............................11

    3.1.    Classification in General...........................................................................11
    3.2.    Formation of Debtor Groups for Convenience Only..................................11
    3.3.    Summary of Classification.........................................................................12
    3.4.    Special Provision Governing Unimpaired Claims. ....................................12
    3.5.    Elimination of Vacant Classes..................................................................12
    3.6.    Voting Classes; Presumed Acceptance by Non-Voting Classes .................13
    3.7.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy
        Code ........................................................................................................13

SECTION 4.    TREATMENT OF CLAIMS AND INTERESTS.........................................13

    4.1.    Other Priority Claims (Class 1)................................................................13
    4.2.    Other Secured Claims (Class 2). ...............................................................13
    4.3.    Term Loan Secured Claim (Class 3) .........................................................14
    4.4.    Term Loan Deficiency Claim (Class 4) .....................................................14
    4.5.    General Unsecured Claims (Class 5)..........................................................15
    4.6.    Intercompany Claims (Class 6)..................................................................15
    4.7.    Existing Aéropostale Interests (Class 7).....................................................15
    4.8.    Other Equity Interests (Class 8). ...............................................................16

SECTION 5.    MEANS FOR IMPLEMENTATION........................................................16

    5.1.    Joint Chapter 11 Plan................................................................................16
    5.2.    The Sale ...................................................................................................16
    5.3.    Plan Administrator ...................................................................................17
    5.4.    Other Transactions. ..................................................................................18
    5.5.    Corporate Action ......................................................................................18
    5.6.    Withholding and Reporting Requirements. ...............................................18
    5.7.    Exemption From Certain Transfer Taxes. ..................................................19
    5.8.    Effectuating Documents; Further Transactions...........................................19
    5.9.    Preservation of Rights of Action. ..............................................................19
    5.10.   Closing of the Chapter 11 Cases. ..............................................................20

SECTION 6.    CORPORATE GOVERNANCE ...............................................................20

    6.1.    Corporate Form ........................................................................................20
    6.2.    Boards of Directors and Officers................................................................20
    6.3.    Corporate Existence ..................................................................................20
    6.4.    Wind Down ..............................................................................................20
    6.5.    Certificate of Incorporation and By-Laws. ................................................21
    6.6.    Stock Restrictions.....................................................................................21

i

SECTION 7.    DISTRIBUTIONS. ...................................................................................21

7.1.    Distribution Record Date. ..............................................................................21
7.2.    Date of Distributions. ....................................................................................21
7.3.    Delivery of Distributions. ..............................................................................22
7.4.    Manner of Payment Under Plan. ....................................................................22
7.5.    Minimum Cash Distributions. ........................................................................22
7.6.    Setoffs. ..........................................................................................................22
7.7.    Distributions After Effective Date. ................................................................22
7.8.    Allocation of Distributions Between Principal and Interest ...........................22
7.9.    Payment of Disputed Claims. ........................................................................23

SECTION 8.    PROCEDURES FOR DISPUTED CLAIMS .................................................23

8.1.    Allowance of Claims. ....................................................................................23
8.2.    Objections to Claims. ....................................................................................23
8.3.    Estimation of Claims. ....................................................................................23
8.4.    No Distributions Pending Allowance. ............................................................24
8.5.    Resolution of Claims. ....................................................................................24
8.6.    Disallowed Claims. ........................................................................................24

SECTION 9.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES. ...................24

9.1.    Assumption and Assignment of Executory Contracts and Unexpired Leases ...............24
9.2.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases .................24
9.3.    Claims Based on Rejection of Executory Contracts and Unexpired Leases ..................25
9.4.    Purchase Agreement ......................................................................................26
9.5.    Modifications, Amendments, Supplements, Restatements, or Other Agreements ..........26
9.6.    Insurance Policies ..........................................................................................26
9.7.    Reservation of Rights .....................................................................................26

SECTION 10.    LIQUIDATING TRUST .........................................................................26

10.1.    Execution of Liquidating Trust Agreement. ...................................................26
10.2.    Purpose of the Liquidating Trust ...................................................................27
10.3.    Liquidating Trust Assets ................................................................................27
10.4.    Administration of the Liquidating Trust. ........................................................27
10.5.    Liquidating Trustee's Tax Power for Debtors .................................................27
10.6.    Cash Investments ...........................................................................................27
10.7.    Distribution of Liquidating Trust Interests .....................................................27
10.8.    Federal Income Tax Treatment of Liquidating Trust ......................................28
10.9.    Tax Reporting ................................................................................................28
10.10.    Dissolution. ...................................................................................................29

SECTION 11.    CONDITIONS PRECEDENT TO THE EFFECTIVE DATE .........................30

11.1.    Conditions Precedent to the Effective Date. ..................................................30
11.2.    Waiver of Conditions Precedent. ...................................................................30
11.3.    Effect of Failure of Conditions to Effective Date. ..........................................30

SECTION 12.    EFFECT OF CONFIRMATION .............................................................31

12.1.    Vesting of Assets. ..........................................................................................31
12.2.    Release of Liens .............................................................................................31
12.3.    Subordinated Claims ......................................................................................31
12.4.    Binding Effect. ...............................................................................................31
12.5.    Discharge of Claims and Termination of Interests. .........................................31

ii

12.6.    Term of Injunctions or Stays...............................................................32

12.7.    Releases by the Debtors..................................................................32

12.8.    Releases By holders of Claims and Interests. ...............................................33

12.9.    Exculpation. ..........................................................................33

12.10.   Injunction ............................................................................34

12.11.   Waiver of Statutory Limitation on Releases ...............................................35

12.12.   Solicitation of the Plan. ................................................................35

12.13.   Plan Supplement.......................................................................35

12.14.   Corporate Action. .....................................................................36

SECTION 13.    RETENTION OF JURISDICTION. ...................................................36

SECTION 14.    MISCELLANEOUS PROVISIONS. ...................................................37

14.1.    Payment of Statutory Fees. .............................................................37

14.2.    Substantial Consummation. .............................................................37

14.3.    Dissolution of Creditors' Committee. ....................................................38

14.4.    Amendments............................................................................38

14.5.    Revocation or Withdrawal of the Plan....................................................38

14.6.    Severability of Plan Provisions upon Confirmation. .......................................38

14.7.    Governing Law. .......................................................................39

14.8.    Time...................................................................................39

14.9.    Additional Documents ..................................................................39

14.10.   Immediate Binding Effect. ..............................................................39

14.11.   Successor and Assigns. .................................................................39

14.12.   Entire Agreement. .....................................................................39

14.13.   Notices. ..............................................................................39

Each of the Debtors proposes the following joint chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code.  Capitalized terms used herein shall have the meanings set forth in Section 1.A.

SECTION 1.    **DEFINITIONS AND INTERPRETATION.**

A.    **Definitions.**

1.1    ***Administrative Expense Claim*** means any Claim for costs and expenses of administration during the Chapter 11 Cases pursuant to sections 328, 330, 363, 364(c)(1), 365, 503(b) or 507(a)(2) of the Bankruptcy Code, including, (a) the actual and necessary costs and expenses incurred after the Commencement Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries or commissions for services and payments for good and other services and leased premises); (b) Fee Claims; (c) DIP Claims; and (d) all fees and charges assessed against the Estates pursuant to section 1911 through 1930 of chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1-1401.

1.2    ***Administrative Expense Claims Bar Date*** means the first Business Day that is 30 days following the Effective Date, except as otherwise specifically set forth in the Plan.

1.3    ***Administrative Expense Claims Objection Bar Date*** means the first Business Day that is 120 days following the Effective Date, except as otherwise specifically set forth in the Plan; *provided that* the Administrative Claims Objection Bar Date may be extended pursuant to an order of the Bankruptcy Court upon a motion filed by the Plan Administrator after notice and a hearing

1.4    ***Aéropostale*** means Aéropostale, Inc.

1.5    ***Aéropostale Case*** means the Chapter 11 Case of Aéropostale, styled *In re Aéropostale, Inc.*, Case No. 16-11275 (SHL).

1.6    ***Aéropostale Plan Stock*** means one new share of *Aéropostale* common stock to be issued to the Plan Administrator (as custodian for the benefit of the former holders of Aéropostale Stock) upon cancellation of Aéropostale Stock in accordance with Section 4.7(b) of the Plan.

1.7    ***Aéropostale Stock*** means the common or preferred stock of Aéropostale outstanding on the Effective Date.

1.8    ***Affiliate*** has the meaning set forth in section 101(2) of the Bankruptcy Code.

1.9    ***Allowed*** means, (i) with reference to any Claim (other than the Term Loan Secured Claim) (a) any Claim against the Debtors that has been listed by the Debtors in the Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of Claim has been filed, (b) any Claim listed on the Schedules or included in a timely filed proof of Claim, as to which no objection to allowance has been, or subsequently is, interposed in accordance with 7.9 hereof or prior to the expiration of such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or as to which any objection has been determined by a Final Order to the extent such Final Order is in favor of the respective holder, or (c) any Claim expressly allowed by a Final Order; and (ii) with reference to the Term Loan Secured Claim and the Term Loan Deficiency Claim only, if the Debtors seek entry of a Sycamore Order, then "Allowed" means to the extent allowed therein.

1.10    ***Alternative Transaction*** means any restructuring transaction that is inconsistent with a Sale Transaction, including (i) a merger, consolidation, business combination, recapitalization, or refinancing of any of the Debtors (in one or a series of related transactions) on terms other than as set forth in the Purchase Agreement, (ii) the issuance, sale, transfer, exchange or other disposition by any of the Debtors of any equity interests (other than common stock or equity interests issued in respect of any employee stock or unit options), or all or substantially all of its assets, on terms other than as set forth in Purchase Agreement, or (iii) a plan of reorganization that does not contemplate a Sale Transaction.

1.11    ***Auction*** means the auction for the sale of the Debtors' assets to be held in accordance with the Sale and Bid Procedures.

1.12    ***Available Cash*** means (a) all Cash of a Debtor realized from its business operations, the Sale Proceeds, the sale or other disposition (other than the Sale Transaction) of its assets, the interest earned on its invested funds, recoveries from Causes of Action or from any other source or otherwise less (b) the amount of Cash (i) necessary to pay holders of DIP Claims, Allowed Administrative Expense Claims, Priority Tax Claims, Other Priority Claims, Other Secured Claims, and the Term Loan Secured Claim (to the extent provided in Section 4.3 of the Plan) against such Debtor in accordance with the Plan, and (ii) estimated and reserved by such Debtor to (A) adequately fund the reasonable and necessary projected costs to carry out the provisions of the Plan with respect to such Debtor on and after the Effective Date, (B) pay all fees payable under section 1930 of chapter 123 of title 28 of the United States Code and (C) fund and maintain any postpetition reserve requirements in connection with any agreements or otherwise.  Available Cash shall include the applicable portions of (i) excess amounts retained for Disputed Claims that become available in accordance with Section 7.9 of the Plan or (ii) amounts represented by undeliverable Distributions in accordance with Section 7.3 of the Plan.

1.13    ***Avoidance Action*** means any action commenced, or that may be commenced, before or after the Effective Date pursuant to section 544, 545, 547, 548, 549, 550, or 551 of the Bankruptcy Code.

1.14    ***Bankruptcy Code*** means title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended from time to time, as applicable to the Chapter 11 Cases.

1.15    ***Bankruptcy Court*** means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

1.16    ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Chapter 11 Cases, and any Local Rules of the Bankruptcy Court.

1.17    ***Bar Date Order*** means that certain *Order Pursuant To 11 U.S.C. § 502(b)(9), Fed. R. Bankr. P. 2002 And 3003(c)(3), And Local Rule 3003-2 For Entry of Order (I) Establishing Deadline For Filing Proofs Of Claim And (II) Approving The Form And Manner Of Notice Thereof*, entered by the Bankruptcy Court in the Chapter 11 Cases on June 22, 2016 at ECF No. 357.

1.18    ***Business Day*** means any day other than a Saturday, a Sunday or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

2

1.19    ***Cash*** means legal tender of the United States of America.

1.20    ***Causes of Action*** means any action, Claim, cause of action, controversy, demand, right, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Commencement Date, in contract or in tort, in law or in equity or pursuant to any other theory of law.   Cause of Action also includes: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any Avoidance Action; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim.

1.21    ***Chapter 11 Cases*** means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on May 4, 2016, and styled *In re Aéropostale, Inc.*, Case No. 16-11275 (SHL).

1.22    ***Claim*** has the meaning set forth in section 101(5) of the Bankruptcy Code.

1.23    ***Claims Objection Bar Date*** means the first Business Day that is 120 days after the Effective Date; provided that the Claims Objection Bar Date may be extended pursuant to an order of the Bankruptcy Court upon a motion filed by the Plan Administrator.

1.24    ***Class*** means any group of Claims or Interests classified pursuant to Section 3.1 of the Plan.

1.25    ***Commencement Date*** means May 4, 2016.

1.26    ***Confirmation*** means the entry on the docket of the Chapter 11 Cases of the Confirmation Order.

1.27    ***Confirmation Date*** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

1.28    ***Confirmation Hearing*** means the hearing to be held by the Bankruptcy Court regarding Confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.29    ***Confirmation Order*** means an order of the Bankruptcy Court in form and substance reasonably acceptable to the Debtors, the DIP Agent, the Required Lenders, and the Purchaser (a) confirming the Plan; (b) approving the Sale Transaction; (c) determining that Purchaser is a good faith purchaser; and (d) providing that the closing of the Sale Transaction will occur in accordance with the terms and conditions of the Purchase Agreement.

1.30    ***Consummation*** means the occurrence of the Effective Date of the Plan.

1.31    ***Creditors' Committee*** means the statutory committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, as the same may be constituted from time to time.

1.32    ***Cure Obligation*** means all (a) amounts (or such other amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) required to cure any monetary defaults; and (b) other obligations required to cure any non-monetary defaults under any Executory Contract or Unexpired Lease that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

1.33    ***D&O Policy*** means any insurance policy for directors, members, trustees, and officers liability maintained by the Debtors' Estates as of the Effective Date.

1.34    ***Debtor Affiliates*** means the Debtors, other than Aéropostale, Inc.

1.35    ***Debtors*** means Aéropostale, Inc.; Aéropostale West, Inc.; Jimmy'Z Surf Co., LLC; Aero GC Management LLC; Aeropostale Procurement Company, Inc.; Aeropostale Licensing, Inc.; P.S. from Aeropostale, Inc; GoJane LLC; Aeropostale Holdings, Inc.; and Aeropostale Puerto Rico, Inc.

1.36    ***DIP Agent*** means Crystal Financial LLC, as administrative agent for the DIP Lenders under the DIP Loan Agreement, and its permitted successors and assigns.

1.37    ***DIP Claim*** means any Claim of the DIP Lenders or DIP Agent arising under the DIP Loan Agreement, the DIP Financing Documents, or the Final DIP Order.

1.38    ***DIP Financing Documents*** has the  meaning set forth in the Final DIP Order.

1.39    ***DIP Lenders*** means the lenders that are or become parties to the DIP Loan Agreement from time to time.

1.40    ***DIP Loan Agreement*** means that certain Secured Superpriority Debtor In Possession Loan, Security and Guaranty Agreement, as amended, supplemented, or otherwise modified, by and among, Aéropostale, as borrower, each Debtor guarantor referenced therein, the DIP Agent and DIP Lenders.

1.41    ***Disclosure Statement*** means the Disclosure Statement for the Plan which is prepared and distributed in accordance with sections 1125, 1126(b) and/or 1145 of the Bankruptcy Code, Bankruptcy Rule 3018 and/or other applicable law.

1.42    ***Disputed Claim*** means with respect to a Claim or Interest, any such Claim or Interest (a) to the extent neither Allowed nor disallowed under the Plan or a Final Order nor deemed Allowed under section 502, 503 or 1111 of the Bankruptcy Code, or (b) for which a Proof of Claim or Interest has been filed, to the extent the Debtors or any party in interest has interposed a timely objection or request for estimation before the Confirmation Date in accordance with the Plan, which objection or request for estimation has not been withdrawn or determined by a Final Order.

1.43    ***Distribution Date*** means a date or dates, including the Initial Distribution Date, as determined by the Disbursing Agent in accordance with the terms of the Plan, on which the Disbursing Agent makes a distribution to holders of Allowed Claims.

1.44    ***Distribution Record Date*** means the Effective Date of the Plan.

1.45    ***Effective Date*** means the date on which all conditions to the effectiveness of the Plan set forth in Section 9 hereof have been satisfied or waived in accordance with the terms of the Plan.

1.46    **Entity** has the meaning set forth in section 101(15) of the Bankruptcy Code.

1.47    **Estate or Estates** means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

1.48    **Excluded Assets** shall have the meaning ascribed to it in the Purchase Agreement.

1.49    **Exculpated Parties** means collectively: (a) the Debtors; (b) the Purchaser; (c) the DIP Lender, (d) the DIP Agent, (e) the members of the Creditors' Committee, and (f) with respect to each of the foregoing entities in clauses (a) through (e), such entities' predecessors, successors and assigns, subsidiaries, affiliates, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, and other professionals, and such persons' respective heirs, executors, Estates, servants and nominees, in each case in their capacity as such.

1.50    **Executory Contract** means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

1.51    **Existing Aéropostale Interests** means all Interests in Aéropostale, including common stock, preferred stock and any options, warrants or rights to acquire any such Interests.

1.52    **Fee Claim** means a Claim for professional services rendered or costs incurred on or after the Commencement Date through the Effective Date by professional persons retained by the Debtors or the Creditors' Committee pursuant to sections 327, 328, 329, 330, 331, 503(b) or 1103 of the Bankruptcy Code in the Chapter 11 Cases.

1.53    **Final DIP Order** means that certain *Final Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, And 364 And Rules 2002, 4001, And 9014 Of The Federal Rules Of Bankruptcy Procedure (I) Authorizing Incurrence By The Debtors Of Postpetition Secured Indebtedness, (II) Granting Liens, (III) Authorizing Use Of Cash Collateral By The Debtors And Providing For Adequate Protection, And (IV) Modifying The Automatic Stay*, entered by the Bankruptcy Court in the Chapter 11 Cases on June 13, 2016 at ECF No. 298.

1.54    **Final Order** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending, or (b) if an appeal, writ of *certiorari*, new trial, reargument or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have expired; *provided, however*, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or under Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 has been or may be filed with respect to such order or judgment.

1.55    **General Unsecured Claim** means any unsecured Claim against any Debtor, other than an Intercompany Claim, that is not entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court.

1.56    **Governmental Unit** has the meaning set forth in section 101(27) of the Bankruptcy Code.

1.57    **Impaired** means, with respect to a Claim, Interest or Class of Claims or Interests, "impaired" within the meaning of section 1124 of the Bankruptcy Code.

1.58    **Initial Distribution** means the first distribution that either the Debtors or the Plan Administrator, as applicable, makes to holders of Allowed Claims.

1.59    **Initial Distribution Date** means the date selected by the Debtors on or as soon as reasonably practicable after the Effective Date.

1.60    **Intercompany Claim** means a Claim against any Debtor by an Affiliate of such Debtor, which Affiliate may be another Debtor.

1.61    **Interests** means any equity security in a Debtor as defined in section 101(16) of the Bankruptcy Code, including all common stock, preferred stock or other instruments evidencing an ownership interest in any of the Debtors, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interests in a Debtor that existed immediately before the Effective Date.

1.62    **Lien** has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.63    **Liquidating Trust** means a trust that may be created after the Effective Date in accordance with the provisions of Section 10 of the Plan and a Liquidating Trust Agreement, for the benefit of holders of Allowed Claims or Interests, as determined by the Plan Administrator consistent with the purposes of any such Liquidating Trust pursuant to Section 10.2 of the Plan.

1.64    **Liquidating Trust Agreement** means an agreement evidencing the terms and provisions governing a Liquidating Trust that shall be entered into prior to the establishment of such Liquidating Trust and pursuant to which a Liquidating Trustee shall manage and administer Liquidating Trust Assets.

1.65    **Liquidating Trust Assets** means the assets of a Debtor to be transferred to a Liquidating Trust as may be determined by the Plan Administrator, which shall be described in a Liquidating Trust Agreement.

1.66    **Liquidating Trust Beneficiaries** means those holders of Allowed Claims against or Interests in a Debtor to the extent such holders receive Liquidating Trust Interests.

1.67    **Liquidating Trust Interests** means the non-certificated beneficial interests of a Liquidating Trust allocable to holders of Allowed Claims and/or Interests in accordance with the terms and conditions of a Liquidating Trust Agreement, which may or may not be transferable.

1.68    **Liquidating Trustee** means the person or entity appointed by the Plan Administrator prior to the creation of a Liquidating Trust to administer such Liquidating Trust in accordance with the provisions of Section 10 of the Plan and a Liquidating Trust Agreement; provided,

6

however, that under no circumstance shall a Liquidating Trustee be a director or officer with respect to any entity over which the Liquidating Trust has control.

1.69    ***Other Equity Interest*** means an Interest in a Debtor, other than Aéropostale.

1.70    ***Other General Unsecured Claim*** means a General Unsecured Claim other than a Term Loan Deficiency Claim.

1.71    ***Other Priority Claim*** means any Claim against any of the Debtors entitled to priority in payment as specified in section 507(a)(3), (4), (5), (6), (7) or (9) of the Bankruptcy Code, other than an Administrative Expense Claim or a Priority Tax Claim.

1.72    ***Other Secured Claim*** means a Secured Claim, other than the DIP Claims and the Term Loan Secured Claim.

1.73    ***Person*** means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, Governmental Unit or other entity.

1.74    ***Plan*** means this joint chapter 11 plan of reorganization, including the exhibits hereto and the Plan Supplement, as the same may be amended or modified from time to time in accordance with Section 12.5 herein.

1.75    ***Plan Supplement*** means the compilation of documents, in form and substance reasonably acceptable to the Debtors, the DIP Agent, and the Required Lenders, containing, among other things, the Schedule of Cure Costs, the Purchase Agreement, and information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; *provided that*, through the Effective Date, the Debtors shall have the right to amend any schedules, exhibits or amendments to the Purchase Agreement, and the other documents contained in, and exhibits to, the Plan Supplement.  The Plan Supplement shall be filed with the Bankruptcy Court no later than August 9, 2016.

1.76    ***Priority Tax Claim*** means any secured or unsecured Claim of a Governmental Unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.77    ***Pro Rata*** means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims and Disputed Claims within such Class.

1.78    ***Proof of Claim*** means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

1.79    ***Purchase Agreement*** means one or more Asset Purchase Agreements, in form and substance reasonably acceptable to the Debtors, the DIP Agent, and the Required Lenders, by and among one or more of the Debtors, as seller, and the Purchaser, as buyer, which provides for the sale of certain or substantially all of the Debtors' assets, or such other asset purchase agreement submitted at or prior to the Auction and determined by the Debtors pursuant to the Sale and Bid Procedures to reflect the highest or otherwise best offer for such assets.

1.80    ***Purchaser*** means one or more purchasers under a Purchase Agreement.

7

1.81    ***Released Parties*** means collectively and in each case in their capacity as such: (a) the Debtors, (b) the members of the Creditors' Committee, but solely in their capacities as such, and not individually, (c) the Purchaser, (d) the DIP Lenders, (e) the DIP Agent, and (f) with respect to each of the foregoing entities in clauses (a) through (e), such entities' predecessors, successors and assigns, subsidiaries, Affiliates, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, and other professionals, and such persons' respective heirs, executors, estates, servants and nominees.

1.82    ***Releasing Parties*** means collectively and in each case in their capacity as such: each holder of a Claim or an Interest (including the DIP Lenders and the DIP Agent), and with respect to each of the foregoing entities, such entities' predecessors, successors and assigns, subsidiaries, Affiliates, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, and other professionals, and such persons' respective heirs, executors, estates, servants and nominees.

1.83    ***Required Lenders*** has the meaning set forth in the Final DIP Order.

1.84    ***Sale and Bid Procedures*** means the sale, bid and Auction procedures set forth and described in the Sale and Bid Procedures Order.

1.85    ***Sale and Bid Procedures Order*** means an order of the Bankruptcy Court, in form and substance reasonably acceptable to the Debtors, the DIP Agent, and the Required Lenders, that, among other things establishes procedures for the Auction and a date for the Confirmation Hearing, including the hearing on the Sale Transaction.

1.86    ***Sale Proceeds*** means all proceeds from the Sale Transaction.

1.87    ***Sale Transaction*** means the sales of certain or all or substantially all of the Debtors' assets pursuant to the Plan and the Purchase Agreement.

1.88    ***Schedule of Cure Costs*** means the schedule of Executory Contracts and Unexpired Leases to be assumed by the Debtors, to be filed with the Plan Supplement.

1.89    ***Schedules*** means the schedules of assets and liabilities and the statement of financial affairs filed by the Debtors under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements have been or may be supplemented or amended from time to time.

1.90    ***Secured Claim*** means a Claim (not including the Term Loan Secured Claims) to the extent (i) secured by property of the Estate, the amount of which is equal to or less than the value of such property (A) as set forth in the Plan, (B) as agreed to by the holder of such Claim and the Debtors or (C) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (ii) secured by the amount of any rights of setoff of the holder thereof under section 553 of the Bankruptcy Code.

1.91    ***Sycamore Order*** means, to the extent that the Debtors determine to bring a Cause of Action or Claim against the Term Loan Agent or the Term Loan Lenders, a judgment or order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Chapter 11 Cases (or the docket of such other court)

disallowing, recharacterizing, estimating, and/or equitably subordinating the Term Loan Secured Claim and/or the Term Loan Deficiency Claim, which order has not been modified, amended, reversed, vacated or stayed.

1.92    ***Term Loan Agent*** means Aero Investors LLC.

1.93    ***Term Loan Agreement*** means that certain Loan and Security Agreement, dated as of May 23, 2014 by and among the borrower and guarantors listed therein, and the Term Loan Agent, as agent and the Term Loan Lenders.

1.94    ***Term Loan Collateral*** means any property or interest in property of the Estate of the Debtors subject to a Lien, charge, or other encumbrance to secure the payment or performance of a Term Loan Secured Claim, which Lien, charge, or other encumbrance is not avoided under the Bankruptcy Code.

1.95    ***Term Loan Deficiency Claim*** means a General Unsecured Claim arising under the Term Loan Agreement to the extent that the value of the Term Loan Lenders' interests in the Term Loan Collateral is found by the Bankruptcy Court, or stipulated to be less than the amount of the Term Loan Secured Claim**.**

1.96    ***Term Loan Lenders*** means the lender parties to the Term Loan Agreement.

1.97    ***Term Loan Secured Claim*** means the Secured Claim arising under the Term Loan Agreement, but only to the extent of the value of the Term Loan Collateral securing such Secured Claim.

1.98    ***Unexpired Lease*** means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

1.99    ***Unimpaired*** means, with respect to a Claim, Interest or Class of Claims or Interests, not "impaired" within the meaning of section 1123(a)(4) and 1124 of the Bankruptcy Code.

B.    **Interpretation; Application of Definitions and Rules of Construction.**

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in, or exhibit to, the Plan, as the same may be amended, waived or modified from time to time. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection or clause contained therein. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, all references herein to "Sections" are references to Sections hereof or hereto; (4) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (5) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

C.      **Controlling Document**

Except as otherwise set forth in the Final DIP Order, in the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document). The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each; *provided* that, if there is determined to be any inconsistency between any Plan provision and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern and any such provision of the Confirmation Order shall be deemed a modification of the Plan and shall control and take precedence.

SECTION 2.      **ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS.**

2.1.    ***Administrative Expense Claims.***

Except to the extent that a holder of an Allowed Administrative Expense Claim and the Debtors or the Plan Administrator agree to different treatment, the Debtors (or the Plan Administrator, as the case may be) shall pay to each holder of an Allowed Administrative Expense Claim Cash in an amount equal to such Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date and (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; *provided* that, the DIP Claims shall receive the treatment provided in 2.4 below; *provided, further*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors shall be paid by the Debtors in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions.

Except as otherwise provided by a Final Order previously entered by the Bankruptcy Court (including the Bar Date Order) or as provided by Section 2.4 hereof, requests for payment of Administrative Expense Claims, other than requests for payment of Fee Claims, must be filed and served on the Debtors no later than the Administrative Expense Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order.

Holders of Administrative Expense Claims that are required to file and serve a request for payment of such Administrative Expense Claims and that do not file and serve such a request by the Administrative Expense Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Debtors or their property, and such Administrative Expense Claims shall be deemed compromised, settled, and released as of the Effective Date. The Plan Administrator must file and serve objections to Administrative Expense Claims on or before the Administrative Expense Claims Objection Bar Date. For the avoidance of doubt, the Administrative Expense Claims Bar Date shall not apply to any DIP Claims.

2.2.    ***Fee Claims.***

10

All entities seeking an award by the Bankruptcy Court of Fee Claims (a) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is thirty (30) days after the Effective Date, and (b) subject to the terms of the Final DIP Order, shall be paid in full from the Estimated Professional Fee Escrow Deposits (as such term is defined in the Final DIP Order) in such amounts as are Allowed by the Bankruptcy Court (i) upon the later of (A) the Effective Date and (B) the date upon which the order relating to any such Allowed Fee Claim is entered or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Plan Administrator. The Plan Administrator is authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

### 2.3.    *Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of the Effective Date, the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and the date such Allowed Priority Tax Claim is due and payable in the ordinary course.

### 2.4.    *DIP Claims.*

The DIP Claims shall be Allowed in the full amount due and owing under the DIP Financing Documents and the Final DIP Order. Except to the extent that a holder of a DIP Claim agrees in writing to a different treatment, each holder of a DIP Claim shall receive Cash in an amount equal to the full amount of such Claim on the earlier of the Effective Date or the date of the closing of the Sale Transaction, *provided* that all proceeds of any Sale Transaction or other disposition of the DIP Collateral (as defined in the Final DIP Order) shall be applied to reduce the DIP Claims as and when such proceeds are received by the Debtors, pursuant and subject to the provisions of the Final DIP Order and the DIP Loan Agreement. Upon the indefeasible payment in full in cash of all DIP Claims in accordance with the preceding sentence, all Liens and security interests granted pursuant to the DIP Credit Agreement shall be deemed cancelled and shall be of no further force and effect and each Allowed DIP Claim shall be deemed to be fully satisfied, settled, released, and compromised. Pursuant to the DIP Financing Documents, all payments pursuant to this Section 2.4 shall be made to the DIP Agent for distribution to the DIP Lenders in accordance with the DIP Financing Documents.

### SECTION 3.    **CLASSIFICATION OF CLAIMS AND INTERESTS.**

### 3.1.    *Classification in General.*

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; provided that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

### 3.2.    *Formation of Debtor Groups for Convenience Only.*

This Plan (including, but not limited to, Sections 2 and 3 of the Plan) groups the Debtors together solely for the purpose of describing treatment under this Plan, confirmation of this Plan, Plan

11

Distributions to be made in respect of Claims against and Interests in the Debtors under this Plan. Such groupings shall not affect each Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal entities, or cause the transfer of any assets.  Except as otherwise provided by or permitted under this Plan, all Debtors shall continue to exist as separate legal entities.

3.3.    *Summary of Classification.*

The following table designates the Classes of Claims against and Interests in each of the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code and (c) deemed to reject the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in this Section 3.  All of the potential Classes for the Debtors are set forth herein.  Certain of the Debtors may not have holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Section 3.5.

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Other Priority Claims | Unimpaired | No (presumed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (presumed to accept) |
| 3 | Term Loan Secured Claim | Unimpaired | No (presumed to accept) |
| 4 | Term Loan Deficiency Claim | Impaired | Yes |
| 5 | General Unsecured Claims | Impaired | Yes |
| 6 | Intercompany Claims | Impaired | Yes |
| 7 | Existing Aéropostale Interests | Impaired | No (presumed to reject) |
| 8 | Other Equity Interests | Impaired | No (presumed to reject) |

3.4.    *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Plan Administrator, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

3.5.    *Elimination of Vacant Classes.*

Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

12

3.6.    ***Voting Classes; Presumed Acceptance by Non-Voting Classes***

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Debtors shall request the Bankruptcy Court at the Confirmation Hearing to deem the Plan accepted by the holders of such Claims or Interests in such Class.

3.7.    ***Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code***

The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Plan, with the reasonable consent of the Creditors' Committee, in accordance with Article XI hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

SECTION 4.    **TREATMENT OF CLAIMS AND INTERESTS.**

4.1.    ***Other Priority Claims (Class 1).***

(a)    *Classification*: Class 1 consists of Allowed Other Priority Claims against the Debtors.

(b)    *Treatment*: Except to the extent that a holder of an Allowed Other Priority Claim against any of the Debtors has agreed to less favorable treatment of such Claim, each such holder shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or as soon as reasonably practical thereafter.

(c)    *Voting*: Class 1 is Unimpaired, and the holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Priority Claims are not entitled to vote to accept or reject the Plan.

4.2.    ***Other Secured Claims (Class 2).***

(a)    *Classification*: Class 2 consists of the Other Secured Claims. To the extent that Other Secured Claims are secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 2.

(b)    *Treatment*: Except to the extent that a holder of an Allowed Other Secured Claim against any of the Debtors has agreed to less favorable treatment of such Claim, each holder of an Allowed Other Secured Claim shall receive, at the option of the Debtors or the Plan Administrator, (i) payment in full in Cash in full and final satisfaction of such Claim, payable on the later of the Effective Date and the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon as reasonably practical thereafter, (ii) delivery of the collateral securing such Allowed Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code, or (iii) such other treatment necessary to satisfy section 1129 of the Bankruptcy Code. For the avoidance of doubt, the Allowed amount of any Other Secured Claim shall be reduced if, and to

13

the extent that any portion of such Claim is offset against the purchase price for the sale of any of the Debtors' assets either pursuant to section 363(k) of the Bankruptcy Code or otherwise.

        (c)     *Voting*: Class 2 is Unimpaired, and the holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Priority Claims are not entitled to vote to accept or reject the Plan.

### 4.3. *Term Loan Secured Claim (Class 3)*

        (a)     *Classification*: Class 3 consists of the Term Loan Secured Claim.

        (b)     *Treatment*: If the Debtors bring a Cause of Action or Claim against the Term Loan Agent or the Term Loan Lenders seeking entry of a Sycamore Order, and to the extent that a Sycamore Order provides that the Term Loan Secured Claim shall be disallowed, subordinated, or recharacterized as Existing Aéropostale Interests, the holder of the Term Loan Secured Claim shall not receive or retain any property under the Plan on account of such Claim. To the extent that a Sycamore Order provides that the Term Loan Secured Claim shall be recharacterized as a General Unsecured Claim, such claim shall receive the same treatment as the Term Loan Deficiency Claim pursuant to Section 4.4 of the Plan. To the extent that a Sycamore Order provides that the Term Loan Secured Claim is Allowed and is not subject to subordination or recharacterization, or if the Debtors do not bring a Cause of Action or Claim against the Term Loan Agent or the Term Loan Lenders seeking entry of the Sycamore Order, the holder of the Term Loan Secured Claim shall receive, at the option of the Plan Administrator, (i) payment in full in Cash in full and final satisfaction of such Claim, payable on the later of the Effective Date and the date on which such Term Loan Secured Claim becomes Allowed, or as soon as reasonably practical thereafter or (ii) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code. For the avoidance of doubt, the Allowed amount of the Term Loan Secured Claim shall be reduced if, and to the extent that any portion of such Claim is offset against the purchase price for the sale of any of the Debtors' assets either pursuant to section 363(k) of the Bankruptcy Code or otherwise.

        (c)     *Voting*: Class 3 is Unimpaired, and the holder of Term Loan Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the holder of the Term Loan Secured Claim is not entitled to vote to accept or reject the Plan.

### 4.4. *Term Loan Deficiency Claim (Class 4)*

        (a)     *Classification*: Class 4 consists of the Term Loan Deficiency Claim.

        (b)     *Treatment*: If the Debtors bring a Cause of Action or Claim against the Term Loan Agent or Term Loan Lenders seeking entry of a Sycamore Order, and to the extent that the Sycamore Order provides that the Term Loan Deficiency Claim shall be disallowed, subordinated, or recharacterized as Existing Aéropostale Interests, the holders of Term Loan Deficiency Claim shall not receive or retain any property under the Plan on account of such Claims. To the extent that the Sycamore Order provides that the Term Loan Deficiency Claim shall be Allowed and is not subject to subordination or recharacterization as Existing Aéropostale Interests, or if the Debtors do not bring a Cause of Action or Claim against the Term Loan Agent or the Term Loan Lenders seeking entry of the Sycamore Order, the holder of the Term Loan Deficiency Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of Available Cash *excluding* any proceeds of any Causes of Action against the Term Loan Agent, the Term Loan Lenders, or such entities' predecessors, successors and assigns, subsidiaries, affiliates, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers,

consultants, representatives, management companies, and other professionals, and such persons' respective heirs, executors, Estates, servants and nominees, in each case in their capacity as such, which proceeds shall revert back to the Debtors and be available for distribution to Class 5 pursuant to Section 4.5 of the Plan; *provided that* if the Debtors elect prior to the Effective Date to pursue an Alternative Transaction, the holders of the Term Loan Deficiency Claim shall receive the treatment provided for such claims in such Alternative Transaction.  In no event shall the holders of the Term Loan Deficiency Claim receive Distributions on account of such Claim in excess of the Allowed amount of such Claim plus accrued post-petition interest, if any.

(c)    *Voting*:  Class 4 is Impaired, and the holder of the Term Loan Deficiency Claim is entitled to vote to accept or reject the Plan.

4.5.    ***General Unsecured Claims (Class 5).***

(a)    *Classification*:  Class 5 consists of General Unsecured Claims against the Debtors.

(b)    *Treatment*:  On the Effective Date, or as soon thereafter as is reasonably practicable, except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Allowed General Unsecured Claim or has been paid before the Effective Date, each holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of Available Cash; *provided that* if the Debtors elect prior to the Effective Date to pursue an Alternative Transaction, each holder of an Allowed General Unsecured Claim shall receive the treatment provided for such claims in such Alternative Transaction.  In no event shall the holder of a General Unsecured Claim receive Distributions on account of such Claim in excess of the Allowed amount of such Claim plus accrued post-petition interest, if any.

(c)    *Voting*:  Class 5 is Impaired, and holders of General Unsecured Claims in Class 5 are entitled to vote to accept or reject the Plan.

4.6.    ***Intercompany Claims (Class 6).***

(a)    *Classification*:  Class 6 consists of Intercompany Claims against the Debtors.

(b)    *Treatment*:  All Intercompany Claims shall not receive or retain any property under the Plan on account of such Claims.

(c)    *Voting*:  Class 6 is Impaired by the Plan.  As proponents of the Plan, the Holders of Intercompany Claims in Class 6 are conclusively presumed to accept the Plan.

4.7.    ***Existing Aéropostale Interests (Class 7).***

(a)    *Classification*:  Class 7 consists of Existing Aéropostale Interests.

(b)    *Stock Exchange*:  On the Effective Date, all Aéropostale Stock shall be deemed cancelled and the Aéropostale Plan Stock shall be issued to the Plan Administrator which will hold such share for the benefit of the holders of such former Aéropostale Stock consistent with their former relative priority and economic entitlements; *provided*, *however*, that the Plan Administrator may not exercise any voting rights appurtenant thereto in conflict with Section 6 of the Plan.  On or promptly

15

after the Effective Date, the Plan Administrator shall file with the Securities and Exchange Commission a Form 15 for the purpose of terminating the registration of any of Aéropostale's publicly traded securities.

(c)     *Treatment:*   The holders of Existing Aéropostale Interests shall not receive or retain any property under the Plan on account of such Interests; provided, however, that to the extent that (i) all Allowed General Unsecured Claims and (ii) to the extent that the Sycamore Order provides that the Term Loan Secured Claim shall be Allowed and are not subject to subordination or recharacterization, the Term Loan Deficiency Claim, have been satisfied in full, each holder of an Existing Aéropostale Interest shall receive its Pro Rata share of any remaining Available Cash. Unless otherwise determined by the Plan Administrator, on the date that the Aéropostale Case is closed in accordance with Section 5.10 of the Plan, the Aéropostale Plan Stock issued pursuant to section (b) above shall be deemed cancelled and of no further force and effect provided that such cancellation does not adversely impact the Debtors' Estates.

(d)     *Voting*:  Class 7 is Impaired by the Plan, and the holders of the Allowed Existing Aéropostale Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. The holders of Existing Aéropostale Interests are not entitled to vote to accept or reject the Plan.

(e)     *Non-Transferable*.   The continuing rights of the holders of Existing Aéropostale Interests (including through their interest in the Aéropostale Plan Stock or otherwise) shall be non-transferable except by operation by law.

### 4.8.    *Other Equity Interests (Class 8).*

(a)     *Classification*:   Class 8 consists of Other Equity Interests except for Existing Aéropostale Interests.

(b)     *Treatment*:  Other Equity Interests of any Debtor shall be cancelled if and when such Debtor is dissolved in accordance with Section 6.3 of the Plan. Each holder of an Other Equity Interest shall neither receive nor retain any property of the Estate or direct interest in property of the Estate of the Debtor on account of such Other Equity Interest thereafter; provided, however, that in the event that all Allowed Claims against such Debtor have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Other Equity Interest in such Debtor may receive its Pro Rata Share of any remaining assets of such Debtor.

(c)     *Voting*:  Class 8 is Impaired by the Plan. As proponents of the Plan, the Holders of Other Equity Interests in Class 8 are conclusively presumed to accept the Plan.

### SECTION 5.    **MEANS FOR IMPLEMENTATION.**

### 5.1.    *Joint Chapter 11 Plan*

The Plan is a joint chapter 11 plan for each of the Debtors, with the Plan for each Debtor being non-severable and mutually dependent on the Plan for each other Debtor.

### 5.2.    *The Sale*

The Confirmation Order shall authorize the Sale Transaction under sections 363, 365, 1123(b)(4), 1129(b)(2)(A)(iii), 1145, and 1146(a) of the Bankruptcy Code under the terms and conditions of the Purchase Agreement. Upon Confirmation, the Debtors shall be authorized to take any and all

16

actions necessary to consummate the Sale Transaction.  Notwithstanding the foregoing, as provided in the Sale and Bid Procedures Order, the Debtors may elect at any time prior to the Effective Date to pursue an Alternative Transaction if such a transaction is determined by the Debtors to be in the best interests of their Estates.

      5.3.    ***Plan Administrator***

      (a)    *Appointment*.  Aéropostale shall serve as Plan Administrator for each of the Debtors.

      (b)    *Authority*.   Subject to <u>Section 6.2</u> of the Plan, the Plan Administrator shall have the authority and right on behalf of each of the Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to:

      (i)    except to the extent Claims have been previously Allowed, control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors;

      (ii)    make Distributions to holders of Allowed Claims in accordance with the Plan;

      (iii)    exercise its reasonable business judgment to direct and control the wind down, liquidation, sale and/or abandoning of the remaining assets of the Debtors under the Plan and in accordance with applicable law as necessary to maximize Distributions to holders of Allowed Claims;

      (iv)    prosecute all Causes of Action on behalf of the Debtors, elect not to pursue any Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the Plan Administrator may determine is in the best interests of the Debtors;

      (v)    make payments to existing professionals who will continue to perform in their current capacities;

      (vi)    retain professionals to assist in performing its duties under the Plan;

      (vii)    maintain the books and records and accounts of the Debtors;

      (viii)    invest Cash of the Debtors, including any Cash proceeds realized from the liquidation of any assets of the Debtors, including any Causes of Action, and any income earned thereon;

      (ix)    incur and pay reasonable and necessary expenses in connection with the performance of duties under the Plan, including the reasonable fees and expenses of professionals retained by the Plan Administrator;

      (x)    administer each Debtor's tax obligations, including (i) filing tax returns and paying tax obligations, (ii) requesting, if necessary, an expedited determination of any unpaid tax liability of each Debtor or its estate under Bankruptcy Code section 505(b) for all taxable periods of

17

such Debtor ending after the Commencement Date through the liquidation of such Debtor as determined under applicable tax laws and (iii) representing the interest and account of each Debtor or its estate before any taxing authority in all matters including, without limitation, any action, suit, proceeding or audit;

(xi)    prepare and file any and all informational returns, reports, statements, returns or disclosures relating to the Debtors that are required hereunder, by any Governmental Unit or applicable law;

(xii)    determine whether to create a Liquidating Trust for the assets of a Debtor pursuant to Section 10 of the Plan and which assets to transfer to such Liquidating Trust;

(xiii)    pay statutory fees in accordance with Section 14.1 of the Plan; and

(xiv)    perform other duties and functions that are consistent with the implementation of the Plan.

(c)    *Indemnification.*  Each of the Debtors shall indemnify and hold harmless Aéropostale solely in its capacity as the Plan Administrator for any losses incurred in such capacity, except to the extent such losses were the result of the Plan Administrator's gross negligence, willful misconduct or criminal conduct.

### 5.4.    *Other Transactions.*

In the discretion of the Debtors, after the Effective Date, the Debtors may (a) cause any or all of the Debtor Affiliates to be liquidated or merged into one or more of the other Debtor Affiliates or any other subsidiaries of the Debtors or dissolved all as more specifically described in the Plan Supplement, (b) cause the transfer of assets between or among the Debtor Affiliates, (c) engage in any other transaction in furtherance of the Plan.  Any such transactions may be effective as of the Effective Date pursuant to the Confirmation Order without any further action by the stockholders, members, general or limited partners, or directors of any of the Debtors.

### 5.5.    *Corporate Action*

Upon the Effective Date, by virtue of the solicitation of votes in favor of this Plan and entry of the Confirmation Order, all actions contemplated by the Plan (including any action to be undertaken by the Plan Administrator) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by holders of Claims or Interests, the Debtors, or any other Entity or Person.  All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Debtors' Estates.

### 5.6.    *Withholding and Reporting Requirements.*

(a)    *Withholding Rights.*  In connection with the Plan, any party issuing any instrument or making any distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any

Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such distribution. Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b)    *Forms*.  Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the Disbursing Agent or such other Person designated by the Plan Administrator (which entity shall subsequently deliver to the Disbursing Agent any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Person) Form W-8, unless such Person is exempt under the tax Code and so notifies the Disbursing Agent.  If such request is made by the Plan Administrator or such other Person designated by the Plan Administrator and the holder fails to comply before the date that is 180 days after the request is made, the amount of such distribution shall irrevocably revert to the Debtors and any Claim in respect of such distribution shall be discharged and forever barred from assertion against any Debtor and its respective property.

## 5.7.    *Exemption From Certain Transfer Taxes.*

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, any post-Confirmation sale by any Debtor, or any transfer from any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors; or (2) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## 5.8.    *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Plan Administrator is authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan in the name of and on behalf of the Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

## 5.9.    *Preservation of Rights of Action.*

(a)    Other than Causes of Action against an Entity that are waived, relinquished, exculpated, released, compromised, or settled in the Plan or by a Bankruptcy Court order, the Debtors reserve any and all Causes of Action. On and after the Effective Date, the Plan Administrator may pursue such Causes of Action in its sole discretion. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Plan Administrator will not pursue any and all available Causes of Action against them. No preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to

19

such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. Prior to the Effective Date, the Debtors, and on and after the Effective Date, the Plan Administrator, shall retain and shall have, including through its authorized agents or representatives, the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. Notwithstanding anything contained herein to the contrary, the settlement of any Claims and Causes of Action which are expressly to be settled by Confirmation of the Plan itself shall be resolved only by Confirmation of the Plan itself.

5.10.    *Closing of the Chapter 11 Cases.*

After the Chapter 11 Case of a Debtor has been fully administered, the Plan Administrator shall seek authority from the Bankruptcy Court to close such Debtor's Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

SECTION 6.    **CORPORATE GOVERNANCE**

6.1.    *Corporate Form*

On the Effective Date, each of the Debtors shall maintain its current corporate form.

6.2.    *Boards of Directors and Officers.*

Aéropostale or the Debtor Affiliate that is the sole shareholder of the relevant Debtor Affiliate shall elect successors of the then serving members of the board of directors for such Debtor Affiliate at each annual meeting or upon the removal or resignation of such individuals. Aéropostale or the Debtor Affiliate that is the sole shareholder of the relevant Debtor Affiliate shall also have the power to act by written consent to remove any director or officer of such Debtor Affiliate at any time with or without cause.

6.3.    *Corporate Existence*

After the Effective Date, the Plan Administrator may decide to (a) maintain each Debtor as a corporation in good standing until such time as all aspects of the Plan pertaining to such Debtor have been completed, or (b) at such time as the Plan Administrator considers appropriate and consistent with the implementation of the Plan pertaining to such Debtor, dissolve such Debtor and complete the winding up of such Debtor without the necessity for any other or further actions to be taken by or on behalf of such dissolving Debtor or its shareholder or any payments to be made in connection therewith subject to the filing of a certificate of dissolution with the appropriate governmental authorities (including, without limitation, the transfer of all or part of the assets of such Debtor to a Liquidating Trust in accordance with Section 10 of the Plan); provided, however, that the foregoing does not limit the Plan Administrator's ability to otherwise abandon an interest in a Debtor Affiliate.

6.4.    *Wind Down*

After the Effective Date, pursuant to the Plan, the Plan Administrator shall wind-down, sell and otherwise liquidate assets of the Debtors in accordance with Section 5.3(b)(iii) of the Plan. The wind-down, sale and liquidation of each such Debtor's assets (as determined for federal income tax purposes) shall occur over a period of three years after the Effective Date (it being understood that such liquidation may include the transfer of all or part of the assets of such Debtor to one or more Liquidating

Trusts within the meaning of Treas. Reg. § 301.7701-4); provided, however, that the wind-down and liquidation may extend over a longer period of time if the Debtors receive a private letter ruling or other equivalent guidance from the IRS from which the Plan Administrator reasonably concludes that the continued wind-down and liquidation should not result in a reduction or limitation of the Debtors' tax attributes for federal income tax purposes that materially impairs the expected actual use of such tax attributes.

### 6.5.    *Certificate of Incorporation and By-Laws.*

As of the Effective Date, the certificate of incorporation and by-laws of each Debtor shall be amended to the extent necessary to carry out the provisions of the Plan.  The amended certificate and by-laws of such Debtor (if any) shall be contained in the Plan Supplement.

### 6.6.    *Stock Restrictions*

The restrictions imposed by the *Final Order Pursuant To 11 U.S.C. §§ 105(a) And 362 Of The Bankruptcy Code Establishing Notification Procedures And Approving Restrictions On Certain Transfers Of Claims Against And Interests In The Debtors* [ECF No. 240], as the same may be amended from time to time, shall remain effective and binding through the closing of the Aéropostale Case.

## SECTION 7.    **DISTRIBUTIONS**.

### 7.1.    *Distribution Record Date.*

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors or their respective agents, shall be deemed closed, and there shall be no further changes in the record of holders of any of the Claims or Interests.  The Debtors or the Plan Administrator shall have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Distribution Record Date.

### 7.2.    *Date of Distributions.*

Except as otherwise provided herein, the Debtors shall make the Initial Distribution to holders of Allowed Claims no later than the Initial Distribution Date and thereafter, the Debtors shall from time to time determine the subsequent Distribution Dates.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

The Plan Administrator shall reserve an amount sufficient to pay holders of Disputed Claims the amount such holders would be entitled to receive under the Plan if such Claims were to become Allowed Claims.  In the event the holders of Allowed Claims have not received payment in full on account of their Claims after the resolution of all Disputed Claims, then the Plan Administrator shall make a final distribution to all holders of Allowed Claims.

Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution in excess of the Allowed amount of such Claim plus any interest accruing on such Claim that is actually payable in accordance with the Plan.

7.3.    ***Delivery of Distributions.***

In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Debtors or the Plan Administrator, as applicable, has determined the then current address of such holder, at which time such distribution shall be made to such holder without interest; provided, however, such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the date the Initial Distribution is made. After such date, all unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the Debtors automatically and without need for a further order by the Bankruptcy Court for distribution in accordance with the Plan and the Claim of any such holder to such property or interest in property shall be released, settled, compromised, and forever barred.

7.4.    ***Manner of Payment Under Plan.***

At the option of the Debtors or the Plan Administrator, any Cash payment to be made hereunder may be made by a check or wire transfer.

7.5.    ***Minimum Cash Distributions.***

The Plan Administrator shall not be required to make any payment to any holder of an Allowed Claim on any Distribution Date of Cash less than $100; provided, however, that if any distribution is not made pursuant to this Section 7.5, such distribution shall be added to any subsequent distribution to be made on behalf of the holder's Allowed Claim. The Plan Administrator shall not be required to make any final distributions of Cash less than $50 to any holder of an Allowed Claim. If either (a) all Allowed Claims (other than those whose distributions are deemed undeliverable hereunder) have been paid in full or (b) the amount of any final distributions to holders of Allowed Claims would be $50 or less and the aggregate amount of Cash available for distributions to holders of Allowed General Unsecured Claims is less than $25,000, then no further distribution shall be made by the Plan Administrator and any surplus Cash shall be donated and distributed to an I.R.C. § 501(c)(3) tax-exempt organization selected by the Plan Administrator.

7.6.    ***Setoffs.***

The Debtors and the Plan Administrator may, but shall not be required to, set off against any Claim, any Claims of any nature whatsoever that the Debtors or the Plan Administrator may have against the holder of such Claim; *provided* that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Plan Administrator of any such Claim the Debtors or the Plan Administrator may have against the holder of such Claim.

7.7.    ***Distributions After Effective Date.***

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

7.8.    ***Allocation of Distributions Between Principal and Interest.***

Except as otherwise provided in this Plan, to the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such

22

distribution shall be allocated to the principal amount (as determined for U.S. federal income tax purposes) of the Claim first, and then to accrued but unpaid interest.

### 7.9.    *Payment of Disputed Claims*

As Disputed Claims are resolved pursuant to Section 8 hereof,  the Plan Administrator shall  make distributions on account of such Disputed Claims as if such Disputed Claims were Allowed Claims as of the Effective Date.  Such distributions shall be made on the first Distribution Date that is at least forty-five (45) days after the date on which a Disputed Claim becomes an Allowed Claim, or on an earlier date selected by the Plan Administrator in the Plan Administrator's sole discretion.

## SECTION 8.    **PROCEDURES FOR DISPUTED CLAIMS.**

### 8.1.    *Allowance of Claims.*

After the Effective Date, the Debtors or the Plan Administrator shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim, except with respect to any Claim deemed Allowed under this Plan.  Except as expressly provided in this Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Cases allowing such Claim.

### 8.2.    *Objections to Claims.*

As of the Effective Date, objections to, and requests for estimation of, Claims against the Debtors may be interposed and prosecuted only by the Plan Administrator.  Such objections and requests for estimation shall be served and filed (a) on or before the 60th day following the later of (i) the Effective Date and (ii) the date that a proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim, or (b) such later date as ordered by the Bankruptcy Court upon motion filed by the Plan Administrator.

### 8.3.    *Estimation of Claims.*

The Plan Administrator may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or Plan Administrator previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or Plan Administrator, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

8.4.     ***No Distributions Pending Allowance.***

If an objection to a Claim is filed as set forth in Section 8, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

8.5.     ***Resolution of Claims.***

Except as otherwise provided herein, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with this Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Plan Administrator shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all Claims, Disputed Claims, rights, Causes of Action, suits and proceedings, whether in law or in equity, whether known or unknown, that the Debtors or their estates may hold against any Person, without the approval of the Bankruptcy Court, the Confirmation Order, and any contract, instrument, release, indenture, or other agreement entered into in connection herewith.  The Plan Administrator or its successor may pursue such retained Claims, rights, Causes of Action, suits or proceedings, as appropriate, in accordance with the best interests of the Debtors.

8.6.     ***Disallowed Claims.***

All Claims held by persons or entities against whom or which any of the Debtors or the Plan Administrator has commenced a proceeding asserting a Cause of Action under sections 542, 543, 544, 545, 547, 548, 549 and/or 550 of the Bankruptcy Code shall be deemed "disallowed" Claims pursuant to section 502(d) of the Bankruptcy Code and holders of such Claims shall not be entitled to vote to accept or reject the Plan.  Claims that are deemed disallowed pursuant to this section shall continue to be disallowed for all purposes until the Avoidance Action against such party has been settled or resolved by Final Order and any sums due to the Debtors or the Plan Administrator from such party have been paid.

SECTION 9.     **EXECUTORY CONTRACTS AND UNEXPIRED LEASES**.

9.1.     ***Assumption and Assignment of Executory Contracts and Unexpired Leases***

On the Effective Date, except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is specifically described in the Purchase Agreement as to be assumed in connection with Confirmation of the Plan; (2) as of the Effective Date is subject to a pending motion to assume such Unexpired Lease or Executory Contract; (3) was previously assumed or assumed and assigned to a third party during the pendency of the Chapter 11 Cases; (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; (5) is a D&O Policy or an insurance policy; or (6) is the Purchase Agreement.

9.2.     ***Cure of Defaults for Assumed Executory Contracts and Unexpired Leases***

Any Cure Obligation due under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment in Cash on the Effective Date, subject to the limitation described below, by the Debtors as an Administrative Claim or by the Purchaser in accordance with the Purchase Agreement, as applicable, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of the Cure Obligation, (2) the ability of the Debtors'

24

Estates or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the Cure Obligations required by section 365(b)(1) of the Bankruptcy Code shall be satisfied following the entry of a Final Order or orders resolving the dispute and approving the assumption; provided that, depending on whether the Plan Administrator or the Purchaser has the obligation to pay the Cure Obligation, such party may settle any dispute regarding the amount of any Cure Obligation without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

At least fourteen (14) days before the Confirmation Hearing, the Debtors shall cause notice of proposed Cure Obligations to be sent to applicable counterparties to the Executory Contracts and Unexpired Leases. Any objection by such counterparty must be filed, served, and actually received by the Debtors not later than ten (10) days after service of notice of the Debtors' proposed assumption and associated Cure Obligation. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed cure amount will be deemed to have assented to such Cure Obligation.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Obligations, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the Effective Date of assumption and/or assignment. **Any prepetition default amount set forth in the Schedules and/or any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity**.

9.3.    ***Claims Based on Rejection of Executory Contracts and Unexpired Leases***

Unless otherwise provided by an order of the Bankruptcy Court, any Proofs of Claim based on the rejection of the Debtors' Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise, must be filed with Bankruptcy Court and served on the Plan Administrator no later than fourteen (14) days after the earlier of the Effective Date or the effective date of rejection of such Executory Contract or Unexpired Lease. In addition, any objection to the rejection of an Executory Contract or Unexpired Lease must be filed with the Bankruptcy Court and served on the Debtors, no later than fourteen (14) days after service of the Debtors' proposed rejection of such Executory Contract or Unexpired Lease.

**Any holders of Claims arising from the rejection of an Executory Contract or Unexpired Lease for which Proofs of Claims were not timely filed as set forth in the paragraph above shall not (1) be treated as a creditor with respect to such Claim, (2) be permitted to vote to accept or reject the Plan on account of any Claim arising from such rejection, or (3) participate in any distribution in the Chapter 11 Cases on account of such Claim, and any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Plan Administrator, the Debtors' Estates, or the property for any of the foregoing without the need for any objection by the Plan Administrator or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' prepetition Executory

25

Contracts or prepetition Unexpired Leases shall be classified as General Unsecured Claims, except as otherwise provided by order of the Bankruptcy Court.

### 9.4. *Purchase Agreement*

The Debtors' assumption or rejection of any Executory Contract or Unexpired Lease pursuant to the Plan shall be subject in all respects to the Purchaser's rights and obligations, including any Cure Obligations assumed by the Purchaser in accordance with the Purchase Agreement, with respect to any such Executory Contracts or Unexpired Leases assigned to the Purchaser pursuant to the terms of the Purchase Agreement.

### 9.5. *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

### 9.6. *Insurance Policies*

Each insurance policy, including the D&O Policy, shall be assumed by the Debtors on behalf of the applicable Debtor effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code, to the extent such insurance policy is executory, unless such insurance policy previously was rejected by the Debtors pursuant to a Bankruptcy Court order or is the subject of a motion to reject pending on the Effective Date, and coverage for defense and indemnity under the D&O Policy shall remain available to all individuals within the definition of "Insured" in the D&O Policy.

### 9.7. *Reservation of Rights*

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors' Estates have any liability thereunder. In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Plan Administrator, as applicable, shall have 60 days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided in the Plan.

## SECTION 10.  **LIQUIDATING TRUST**

### 10.1. *Execution of Liquidating Trust Agreement.*

After the Effective Date, and only if the Plan Administrator determines that one or more Liquidating Trusts are in the best interests of one or more Debtors and holders of Allowed Claims against and Interests in such Debtors, the Plan Administrator and a Liquidating Trustee shall execute a

26

Liquidating Trust Agreement, and shall take all other necessary steps to establish a Liquidating Trust and Liquidating Trust Interests therein, which shall be for the benefit of Liquidating Trust Beneficiaries. In the event of any conflict between the terms of this Section 10 and the terms of a Liquidating Trust Agreement as such conflict relates to the establishment of a Liquidating Trust, the terms of this Section 10 shall govern. A Liquidating Trust Agreement may provide powers, duties and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities do not affect the status of a Liquidating Trust as a "liquidating trust" for United States federal income tax purposes.

10.2.    *Purpose of the Liquidating Trust*

Each Liquidating Trust shall be established for the sole purpose of liquidating and distributing the assets of the Debtor contributed to such Liquidating Trust in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

10.3.    *Liquidating Trust Assets*

Each Liquidating Trust shall consist of Liquidating Trust Assets. After the creation of a Liquidating Trust pursuant to Section 10 of the Plan, the Plan Administrator shall transfer all of the allocable Liquidating Trust Assets to the relevant Liquidating Trust. Liquidating Trust Assets may be transferred subject to certain liabilities, as provided in a Liquidating Trust Agreement. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting or other similar tax to which the exemption under section 1146 of the Bankruptcy Code applies.

10.4.    *Administration of the Liquidating Trust*

Each Liquidating Trust shall be administered by a Liquidating Trustee pursuant to a Liquidating Trust Agreement and the Plan. In the event of an inconsistency between the Plan and a Liquidating Trust Agreement as such conflict relates to anything other than the establishment of a Liquidating Trust, the Liquidating Trust Agreement shall control.

10.5.    *Liquidating Trustee's Tax Power for Debtors*

A Liquidating Trustee shall have the same authority in respect of all taxes of the Debtors, and to the same extent, as if the Liquidating Trustee were the Debtor.

10.6.    *Cash Investments*

A Liquidating Trustee may invest Cash (including any earnings thereon or proceeds therefrom); *provided*, *however*, that such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treas. Reg. § 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

10.7.    *Distribution of Liquidating Trust Interests*

A Liquidating Trustee is required to distribute to the holders of Allowed Claims on account of their Liquidating Trust Interests, on a semi-annual basis, all available cash (including any Cash received from the Debtors and treating any permissible investment as Cash for purposes of this Section 10.7), less such amounts that may be reasonably necessary to (a) meet contingent liabilities and to maintain the value of the Liquidating Trust Assets during liquidation, (b) pay reasonably incurred or anticipated expenses (including, without limitation, any taxes imposed on or payable by the Debtors or Liquidating Trust or in respect of the Liquidating Trust Assets), or (c) satisfy other liabilities incurred or

27

anticipated by such Liquidating Trust in accordance with the Plan or Liquidating Trust Agreement; *provided*, *however*, that such Liquidating Trustee shall not be required to make a Distribution pursuant to this Section 10.7 of the Plan if such Liquidating Trustee determines that the expense associated with making the Distribution would likely utilize a substantial portion of the amount to be distributed, thus making the Distribution impracticable.

### 10.8.    *Federal Income Tax Treatment of Liquidating Trust*

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by such Liquidatee), for all United States federal income tax purposes, all parties (including, without limitation, the Debtors, a Liquidating Trustee and Liquidating Trust Beneficiaries) shall treat the transfer of Liquidating Trust Assets to a Liquidating Trust as (1) a transfer of Liquidating Trust Assets (subject to any obligations relating to those assets) directly to Liquidating Trust Beneficiaries (other than to the extent Liquidating Trust Assets are allocable to Disputed Claims), followed by (2) the transfer by such beneficiaries to a Liquidating Trust of Liquidating Trust Assets in exchange for the related Liquidating Trust Interests.  Accordingly, except in the event of contrary definitive guidance, Liquidating Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of Liquidating Trust Assets (other than such Liquidating Trust Assets as are allocable to Disputed Claims).  The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.  For the purpose of this Section 10.8, the terms "party" and "Liquidating Trust Beneficiary" shall not include the United States or any agency or department thereof, or any officer or employee thereof acting in such capacity.

### 10.9.    *Tax Reporting*

(a)    A Liquidating Trustee shall file tax returns for a Liquidating Trust treating such Liquidating Trust as a grantor trust pursuant to Treas. Reg. § 1.671-4(a) and in accordance with this Section 10.9.  A Liquidating Trustee also shall annually send to each holder of a Liquidating Trust Interest a separate statement regarding the receipts and expenditures of the Liquidating Trust as relevant for U.S. federal income tax purposes.

(b)    Allocations of Liquidating Trust taxable income among Liquidating Trust Beneficiaries (other than taxable income allocable to any assets allocable to, or retained on account of, Disputed Claims, if such income is otherwise taxable at the Liquidating Trust) shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed Distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value, other than, if applicable, assets allocable to Disputed Claims) to the holders of Liquidating Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent Distributions from a Liquidating Trust.  Similarly, taxable loss of a Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Liquidating Trust Assets.  The tax book value of Liquidating Trust Assets for purpose of this paragraph shall equal their fair market value on the date Liquidating Trust Assets are transferred to a Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the IRC, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(c)    As soon as reasonably practicable after Liquidating Trust Assets are transferred to a Liquidating Trust, a Liquidating Trustee shall make a good faith valuation of Liquidating Trust Assets.  Such valuation shall be made available from time to time to all parties to the Liquidating

28

Trust (including, without limitation, the Debtors and Liquidating Trust Beneficiaries), to the extent relevant to such parties for tax purposes, and shall be used consistently by such parties for all United States federal income tax purposes.

(d)       Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by a Liquidating Trustee of a private letter ruling if such Liquidating Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by such Liquidating Trustee), such Liquidating Trustee (i) may timely elect to treat any Liquidating Trust Assets allocable to Disputed Claims as a "disputed ownership fund" governed by Treas. Reg. § 1.468B-9, and (ii) to the extent permitted by applicable law, shall report consistently for state and local income tax purposes.  If a "disputed ownership fund" election is made, all parties (including such Liquidating Trustee, the Debtors and Liquidating Trust Beneficiaries) shall report for United States federal, state and local income tax purposes consistently with the foregoing.

(e)       A Liquidating Trustee shall be responsible for payment, out of the respective Liquidating Trust Assets, of any taxes imposed on the respective Liquidating Trust or its assets.

(f)       A Liquidating Trustee may request an expedited determination of taxes of a Liquidating Trust, including any reserve for Disputed Claims, or of the Debtor as to whom the Liquidating Trust was established, under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, such Liquidating Trust or the Debtor for all taxable periods through the dissolution of such Liquidating Trust.

10.10.    ***Dissolution.***

(a)       A Liquidating Trustee and Liquidating Trust shall be discharged or dissolved, as the case may be, at such time as (i) all of the Liquidating Trust Assets have been distributed pursuant to the Plan and a Liquidating Trust Agreement, (ii) a Liquidating Trustee determines, in its sole discretion, that the administration of any remaining Liquidating Trust Assets is not likely to yield sufficient additional Liquidating Trust proceeds to justify further pursuit, or (iii) all Distributions required to be made by a Liquidating Trustee under the Plan and a Liquidating Trust Agreement have been made; *provided*, *however*, that in no event shall a Liquidating Trust be dissolved later than three (3) years from the creation of such Liquidating Trust pursuant to Section 10 of the Plan unless the Bankruptcy Court, upon motion within the six-month period prior to the third (3rd) anniversary (or within the six-month period prior to the end of an extension period), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Liquidating Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

(b)       If at any time a Liquidating Trustee determines, in reliance upon such professionals as a Liquidating Trustee may retain, that the expense of administering a Liquidating Trust so as to make a final Distribution to Liquidating Trust Beneficiaries is likely to exceed the value of the assets remaining in such Liquidating Trust, such Liquidating Trustee may apply to the Bankruptcy Court for authority to (i) reserve any amount necessary to dissolve such Liquidating Trust, (ii) donate any balance to a charitable organization (A) described in section 501(c)(3) of the IRC, (B) exempt from United States federal income tax under section 501(a) of the IRC, (C) not a "private foundation", as defined in section 509(a) of the IRC, and (D) that is unrelated to the Debtors, such Liquidating Trust, and any insider of such Liquidating Trustee, and (iii) dissolve such Liquidating Trust.

SECTION 11.    **CONDITIONS PRECEDENT TO THE EFFECTIVE DATE.**

11.1.    ***Conditions Precedent to the Effective Date.***

The occurrence of the Effective Date of the Plan is subject to the following conditions precedent:

(a)    the Bankruptcy Court shall have entered the Confirmation Order, the Confirmation Date shall have occurred and the Confirmation Order shall not be subject to any stay;

(b)    all conditions precedent to the effectiveness of the Purchase Agreement have occurred or been waived and the Sale Transaction has been consummated.

(c)    all actions, documents and agreements necessary to implement and consummate the Plan, including, without limitation, entry into the documents contained in the Plan Supplement, each in form and substance reasonably satisfactory to the Debtors, and the transactions and other matters contemplated thereby, shall have been effected or executed;

(d)    all governmental and third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Plan and the Sale Transaction shall have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions;

(e)    all documents and agreements necessary to implement the Plan and the consummation of the Sale Transaction shall have (a) been tendered for delivery and (b) been effected or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements; and

11.2.    ***Waiver of Conditions Precedent.***

Each of the conditions precedent in Section 11.1 other than the condition set forth in section 11.1(a) may be waived in writing by the Debtors and the Purchaser.

11.3.    ***Effect of Failure of Conditions to Effective Date.***

Unless otherwise extended by the Debtors and the DIP Lenders, if the Effective Date does not occur on or before August 29, 2016 or if the Confirmation Order is vacated, (i) no distributions under the Plan shall be made, (ii) the Debtors and all holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (iii) all the Debtors' obligations with respect to the Claims and the Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any other entity in any further proceedings involving the Debtors or otherwise.

SECTION 12.    **EFFECT OF CONFIRMATION.**

12.1.    *Vesting of Assets.*

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Debtors' Estates shall vest in the Debtors free and clear of all Claims, liens, encumbrances, charges and other interests, except as provided pursuant to this Plan and the Confirmation Order.

12.2.    *Release of Liens*

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised and all rights, titles, and interests of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Debtors, unless sold to the Purchaser pursuant to the Sale Transaction.

12.3.    *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right for the Plan Administrator to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

12.4.    *Binding Effect.*

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Effective Date, the provisions of the Plan shall bind any holder of a Claim against, or Interest in, the Debtors, and such holder's respective successors and assigns, whether or not the Claim or Interest of such holder is Impaired under the Plan and whether or not such holder has accepted the Plan.

12.5.    *Discharge of Claims and Termination of Interests.*

Except as otherwise provided in the Plan, effective as of the Effective Date: (a) the rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge and release of all Claims and Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their assets, property or Estates; (b) all Claims and Interests shall be satisfied, discharged and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (c) all Entities shall be precluded from asserting against the Debtors, the Debtors' Estates, the Plan Administrator, the Purchaser, their successors and assigns and their assets and properties any other Claims or Interests based upon any documents, instruments or any act or omission, transaction or other activity of any kind or nature that occurred before the Effective Date.

31

12.6.    *Term of Injunctions or Stays.*

Unless otherwise provided, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

12.7.    *Releases by the Debtors.*

**EFFECTIVE AS OF THE EFFECTIVE DATE, WITHOUT IN ANY MANNER LIMITING OR ALTERING ANY RELEASES GRANTED TO THE DIP SECURED PARTIES (AS DEFINED IN THE FINAL DIP ORDER) PURSUANT TO THE DIP FINANCING DOCUMENTS AND/OR THE FINAL DIP ORDER, EACH DEBTOR ON BEHALF OF ITSELF AND ITS ESTATE, FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE RELEASED PARTIES, SHALL BE DEEMED TO PROVIDE A FULL RELEASE TO EACH OF THE RELEASED PARTIES (AND EACH SUCH RELEASED PARTY SHALL BE DEEMED RELEASED BY EACH DEBTOR AND ITS ESTATE) AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CAUSES OF ACTION AND ANY OTHER DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, ACTIONS, DERIVATIVE CLAIMS, REMEDIES, AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING AS OF THE EFFECTIVE DATE, IN LAW, AT EQUITY, OR OTHERWISE, WHETHER FOR TORT, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, OR OTHER OCCURRENCE OR CIRCUMSTANCES EXISTING OR TAKING PLACE PRIOR TO OR ON THE EFFECTIVE DATE ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, THE PLAN, OR THESE CHAPTER 11 CASES, INCLUDING THOSE THAT THE DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT OR THAT ANY HOLDER OF A CLAIM AGAINST OR INTEREST IN THE DEBTORS OR ANY OTHER ENTITY COULD HAVE BEEN LEGALLY ENTITLED TO ASSERT DERIVATIVELY OR ON BEHALF OF THE DEBTORS OR THEIR ESTATES; PROVIDED, HOWEVER, THAT THE FOREGOING "DEBTOR RELEASE" SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS OR CAUSES OF ACTION OF THE DEBTORS OR THEIR RESPECTIVE CHAPTER 11 ESTATES AGAINST A RELEASED PARTY (1) ARISING UNDER ANY CONTRACTUAL OBLIGATION OWED TO THE DEBTORS THAT IS ENTERED INTO OR ASSUMED PURSUANT TO THE PLAN OR (2) ARISING UNDER THE PURCHASE AGREEMENT.**

**ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTOR RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (2) A GOOD-FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTOR RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS' ESTATES AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY OF THE DEBTORS' ESTATES, THE LITIGATION TRUSTEE, OR THE LITIGATION TRUST ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE.**

12.8.    *Releases By holders of Claims and Interests.*

EFFECTIVE AS OF THE EFFECTIVE DATE, THE RELEASING PARTIES SHALL BE DEEMED TO PROVIDE A FULL RELEASE TO THE RELEASED PARTIES AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CAUSES OF ACTION AND ANY OTHER DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, ACTIONS, DERIVATIVE CLAIMS, REMEDIES, AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING AS OF THE EFFECTIVE DATE, IN LAW, AT EQUITY, OR OTHERWISE, WHETHER FOR TORT, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, OR OTHER OCCURRENCE OR CIRCUMSTANCES EXISTING OR TAKING PLACE PRIOR TO OR ON THE EFFECTIVE DATE ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, THE PLAN, OR THESE CHAPTER 11 CASES, INCLUDING THOSE THAT THE DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT OR THAT ANY HOLDER OF A CLAIM AGAINST OR INTEREST IN THE DEBTORS OR ANY OTHER ENTITY COULD HAVE BEEN LEGALLY ENTITLED TO ASSERT DERIVATIVELY OR ON BEHALF OF THE DEBTORS OR THEIR ESTATES. NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, THE THIRD PARTY RELEASE SHALL NOT (1) OPERATE TO RELEASE ANY CLAIMS OR CAUSES OF ACTION HELD DIRECTLY (BUT NOT DERIVATIVELY) BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION AGAINST ANY NON-DEBTOR OR (2) PRECLUDE THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION FROM ENFORCING ITS REGULATORY OR POLICE POWERS.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD PARTY RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (2) A GOOD-FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD PARTY RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM RELEASED PURSUANT TO THE THIRD PARTY RELEASE.

12.9.    *Exculpation.*

The Exculpated Parties shall neither have, nor incur any liability to any Entity for any prepetition or postpetition act taken or omitted to be taken in connection with the Chapter 11 Cases, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, or implementing the Plan or consummating the Plan, the Disclosure Statement, the Sale Agreement, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring or liquidation of the Debtors; provided that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her, or its duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement. Without limiting the foregoing "Exculpation" provided under this Section 12.9, the rights of any holder of a Claim or Interest

to enforce rights arising under this Plan shall be preserved, including the right to compel payment of distributions in accordance with the Plan.

12.10. *Injunction*

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES THAT: (1) ARE SUBJECT TO COMPROMISE AND SETTLEMENT PURSUANT TO THE TERMS OF THE PLAN; (2) HAVE BEEN RELEASED PURSUANT TO SECTION 12.7 HEREOF; (3) HAVE BEEN RELEASED PURSUANT TO SECTION 12.8 HEREOF; (4) ARE SUBJECT TO EXCULPATION PURSUANT TO SECTION 12.9 HEREOF (BUT ONLY TO THE EXTENT OF THE EXCULPATION PROVIDED IN SECTION 12.9); OR (5) ARE OTHERWISE STAYED OR TERMINATED PURSUANT TO THE TERMS OF THE PLAN, ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM: (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND, INCLUDING ON ACCOUNT OF ANY CLAIMS, INTERESTS, CAUSES OF ACTIONS, OR LIABILITIES THAT HAVE BEEN COMPROMISED OR SETTLED AGAINST THE DEBTORS, THE PURCHASER, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY ENTITY, DIRECTLY OR INDIRECTLY, SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE DEBTORS, THE PURCHASER, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (C) CREATING, PERFECTING, OR ENFORCING ANY LIEN, CLAIM, OR ENCUMBRANCE OF ANY KIND AGAINST THE DEBTORS, THE PURCHASER, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (D) ASSERTING ANY RIGHT OF SETOFF OR SUBROGATION OF ANY KIND AGAINST ANY OBLIGATION DUE TOTHE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT PRIOR TO CONFIRMATION IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF OR SUBROGATION, AND NOTWITHSTANDING AN INDICATION IN A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF OR SUBROGATION PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (E) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST THE DEBTORS, THE PURCHASER, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTORS OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES RELEASED, SETTLED, OR

34

COMPROMISED PURSUANT TO THE PLAN; PROVIDED THAT NOTHING CONTAINED IN THE PLAN SHALL PRECLUDE AN ENTITY FROM OBTAINING BENEFITS DIRECTLY AND EXPRESSLY PROVIDED TO SUCH ENTITY PURSUANT TO THE TERMS OF THE PLAN; PROVIDED, FURTHER, THAT NOTHING CONTAINED IN THE PLAN SHALL BE CONSTRUED TO PREVENT ANY ENTITY FROM DEFENDING AGAINST CLAIMS OBJECTIONS OR COLLECTION ACTIONS WHETHER BY ASSERTING A RIGHT OF SETOFF OR OTHERWISE TO THE EXTENT PERMITTED BY LAW.

### 12.11.   *Waiver of Statutory Limitation on Releases*

EACH RELEASING PARTY IN EACH OF THE RELEASES CONTAINED IN THE PLAN (INCLUDING UNDER THIS SECTION 12 OF THE PLAN) EXPRESSLY ACKNOWLEDGES THAT ALTHOUGH ORDINARILY A GENERAL RELEASE MAY NOT EXTEND TO CLAIMS WHICH THE RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE PARTY RELEASED, IT HAS CAREFULLY CONSIDERED AND TAKEN INTO ACCOUNT IN DETERMINING TO ENTER INTO THE ABOVE RELEASES THE POSSIBLE EXISTENCE OF SUCH UNKNOWN LOSSES OR CLAIMS.  WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EACH RELEASING PARTY EXPRESSLY WAIVES ANY AND ALL RIGHTS CONFERRED UPON IT BY ANY STATUTE OR RULE OF LAW WHICH PROVIDES THAT A RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CLAIMANT DOES NOT KNOW OR SUSPECT TO EXIST IN ITS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE RELEASED PARTY, INCLUDING THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542. THE RELEASES CONTAINED IN ARTICLE 11OF THE PLAN ARE EFFECTIVE REGARDLESS OF WHETHER THOSE RELEASED MATTERS ARE PRESENTLY KNOWN, UNKNOWN, SUSPECTED OR UNSUSPECTED, FORESEEN OR UNFORESEEN.

### 12.12.   *Solicitation of the Plan.*

As of and subject to the occurrence of the Confirmation Date:  (a) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation and (b) the Debtors and each of their respective directors, officers, employees, Affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore, are not, and on account of such offer, issuance and solicitation will not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

### 12.13.   *Plan Supplement.*

The Plan Supplement shall be filed with the Clerk of the Bankruptcy Court by no later than the August 9, 2016.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.  Documents to be included in the Plan Supplement will be posted at the website of court-appointed claims and noticing agent as they become available.

12.14.  *Corporate Action.*

Upon the Effective Date, by virtue of the solicitation of votes in favor of this Plan and entry of the Confirmation Order, all actions contemplated by the Plan (including any action to be undertaken by the Plan Administrator) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by holders of Claims or Interests, the Debtors, or any other Entity or Person.  All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred on the Effective Date and shall be in effect, without any requirement of further action by the Debtors or the Debtors' Estates.

SECTION 13.  **RETENTION OF JURISDICTION.**

On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things, the following purposes:

(a)    to hear and determine motions and/or applications for the assumption or rejection of Executory Contracts or Unexpired Leases and the allowance, classification, priority, compromise, estimation or payment of Claims resulting therefrom;

(b)    to determine any motion, adversary proceeding, application, contested matter, or other litigated matter pending on or commenced after the Confirmation Date;

(c)    to ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

(d)    to consider Claims or the allowance, classification, priority, compromise, estimation or payment of any Claim;

(e)    to enter, implement or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

(f)    to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the Consummation, implementation or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(g)    to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)    to hear and determine all applications under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred before the Confirmation Date;

(i)    to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Purchase Agreement, or the Confirmation Order or any agreement, instrument, or other document governing or relating to any of the foregoing;

36

(j)        to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following Consummation;

(k)        to hear any disputes arising out of, and to enforce, any order approving alternative dispute resolution procedures to resolve personal injury, employment litigation and similar Claims pursuant to section 105(a) of the Bankruptcy Code;

(l)        to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)        to hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(n)        to adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(o)        to adjudicate any and all disputes arising from or relating to distributions under the Plan;

(p)        to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(q)        to enter a final decree closing the Chapter 11 Cases;

(r)        to enforce all orders previously entered by the Bankruptcy Court;

(s)        to recover all assets of the Debtors and property of the Debtors' Estates, wherever located; and

(t)        to hear and determine any rights, Claims or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory.

SECTION 14.    **MISCELLANEOUS PROVISIONS.**

14.1.    ***Payment of Statutory Fees.***

On the Effective Date and thereafter as may be required, the Debtors or the Plan Administrator shall pay all fees incurred pursuant to § 1930 of title 28 of the United States Code, together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for each Debtor's case; provided, however, that after the Effective Date such fees shall only be payable with respect to the Aeropostale Case until such time as a final decree is entered closing a the Aeropostale Case, a Final Order converting such  case to a case under chapter 7 of the Bankruptcy Code is entered or a Final Order dismissing the Aeropostale Case is entered.

14.2.    ***Substantial Consummation.***

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

37

14.3.    *Dissolution of Creditors' Committee.*

On the Effective Date, the Creditors' Committee shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; *provided, however,* that after the Effective Date, the Creditors' Committee shall exist and its professionals shall continue to be retained and shall continue to be entitled to reasonable compensation by the Debtors without the need for further application to the Bankruptcy Court with respect to (a) all applications filed pursuant to sections 330 and 331 of the Bankruptcy Code and any related hearings; and (b) pending appeals of the Confirmation Order; *provided further, however*, that the Bankruptcy Court shall retain jurisdiction with respect to any disputes over the reasonableness of fees.

14.4.    *Amendments.*

(a)    *Plan Modifications.*    The Plan may be amended, modified or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code; *provided* that such amendments, modifications, or supplements shall be satisfactory in all respects to the Debtors and the Creditors' Committee. In addition, after the Confirmation Date, the Debtors may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.

(b)    *Other Amendments.*    Before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court.

14.5.    *Revocation or Withdrawal of the Plan.*

The Debtors reserve the right, after good-faith consultation with the Creditors' Committee and the DIP Agent, to revoke or withdraw the Plan, including the right to revoke or withdraw the Plan for any Debtor or all Debtors, prior to the Confirmation Date. If the Debtors, in good-faith consultation with the Creditors' Committee and the DIP Agent, revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtors, the Debtors' Estates, or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors, the Debtors' Estates, or any other Entity.

14.6.    *Severability of Plan Provisions upon Confirmation.*

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a

38

judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Plan Administrator (as the case may be); and (3) nonseverable and mutually dependent.

### 14.7. *Governing Law.*

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement provides otherwise, the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

### 14.8. *Time.*

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 14.9. *Additional Documents*

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### 14.10. *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Purchaser, the holders of Claims and Interests, the Released Parties, the Exculpated Parties, and each of their respective successors and assigns, including, without limitation, the Plan Administrator.

### 14.11. *Successor and Assigns.*

The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or permitted assign, if any, of each Entity.

### 14.12. *Entire Agreement.*

On the Effective Date, the Plan, the Plan Supplement, the Sale Agreement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Plan.

### 14.13. *Notices.*

All notices, requests and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be

deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

(i) if to the Debtors or Plan Administrator:

Aéropostale, Inc.
112 West 34th Street, 22nd Floor
New York, New York 10120
Attention: Marc G. Schuback
Telephone: (646) 485-5410
Facsimile: (646) 619-4873

- and –

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attn:   Ray C. Schrock, P.C.
        Jacqueline Marcus
        Garrett A. Fail
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

(ii) if to the Creditors' Committee:

Pachulski Stang Ziehl & Jones LLP
780 Third Avenue
34th Floor
New York, New York 10017
Attn:    Robert J. Feinstein
         Bradford J. Sandler
Telephone: (212) 561-7700
Facsimile: (212) 561-7777

After the Effective Date, the Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.   After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

Dated:  July 15, 2016
        New York, New York

Respectfully submitted,

By: _____

Name: David J. Dick
Title: Chief Financial Officer

**<u>Exhibit B</u>**

**Corporate Organization Chart**

# Corporate Organization Chart



## Exhibit C

**Form of Asset Purchase Agreement**

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**AÉROPOSTALE, INC.,**

**[SELLERS],**

**AND**

**[BUYER][1]**

**[●], 2016**

---

[1] <u>NTD</u>: If any Buyer is proposing to buy solely Sellers' intellectual property, appropriate third-party licensing arrangements to be discussed.

Table of Contents

ARTICLE I        DEFINITIONS .......................................................................................... 1

    Section 1.1    Definitions .................................................................................. 1
    Section 1.2    Interpretations ......................................................................... 11

ARTICLE II        PURCHASE AND SALE ......................................................................... 12

    Section 2.1    Purchase and Sale of Assets .................................................... 12
    Section 2.2    Assumed Liabilities ................................................................. 12
    Section 2.3    Consideration; Deposit; Escrow Amount ................................ 12
    Section 2.4    Closing ..................................................................................... 13
    Section 2.5    Closing Payments and Deliveries ............................................ 13
    Section 2.6    Inventory .................................................................................. 14
    Section 2.7    Allocation ................................................................................. 14
    Section 2.8    Proration .................................................................................. 15
    Section 2.9    Removal of Excluded Assets ................................................... 16

ARTICLE III        SELLERS' REPRESENTATIONS AND WARRANTIES ............................. 16

    Section 3.1    Organization of Sellers; Good Standing .................................. 16
    Section 3.2    Authorization of Transaction ................................................... 16
    Section 3.3    Noncontravention; Government Filings ................................... 16
    Section 3.4    Title to Assets .......................................................................... 17
    Section 3.5    Transferred Contracts .............................................................. 17
    Section 3.6    Real Property ........................................................................... 17
    Section 3.7    Litigation; Decrees .................................................................. 18
    Section 3.8    Labor Relations ....................................................................... 18
    Section 3.9    Brokers' Fees ........................................................................... 18
    Section 3.10    Taxes ........................................................................................ 18
    Section 3.11    Tangible Personal Property ...................................................... 18
    Section 3.12    Employee Benefits ................................................................... 18
    Section 3.13    Intellectual Property ................................................................ 19
    Section 3.14    Compliance with Laws; Permits .............................................. 19
    Section 3.15    Environmental Matters ............................................................ 20
    Section 3.16    Disclaimer of Other Representations and Warranties .............. 20

ARTICLE IV        BUYER'S REPRESENTATIONS AND WARRANTIES .............................. 21

    Section 4.1    Organization of Buyer; Good Standing ................................... 21
    Section 4.2    Authorization of Transaction ................................................... 21
    Section 4.3    Noncontravention ..................................................................... 21
    Section 4.4    Litigation; Decrees .................................................................. 21
    Section 4.5    Brokers' Fees ........................................................................... 22
    Section 4.6    Sufficient Funds; Adequate Assurances .................................. 22
    Section 4.7    Buyer Information .................................................................... 22

ARTICLE V        PRE-CLOSING COVENANTS ................................................................ 22

    Section 5.1    Efforts; Cooperation ................................................................ 22
    Section 5.2    Conduct of the Business Pending the Closing ......................... 23

i

Section 5.3    Regulatory Approvals ................................................................ 23
Section 5.4    Bankruptcy Court Matters ......................................................... 26
Section 5.5    Notices and Consents................................................................. 27
Section 5.6    Notice of Developments ............................................................ 28
Section 5.7    Access; No Contact ................................................................... 28
Section 5.8    Bulk Transfer Laws ................................................................... 28
Section 5.9    [Replacement Bonding Requirements ........................................ 28

ARTICLE VI    OTHER COVENANTS.................................................................. 28

Section 6.1    Further Assurances .................................................................... 28
Section 6.2    Access; Enforcement; Record Retention .................................... 29
Section 6.3    Covered Employees ................................................................... 29
Section 6.4    Certain Tax Matters................................................................... 32
Section 6.5    Insurance Matters ...................................................................... 33
Section 6.6    Acknowledgements .................................................................... 33
Section 6.7    Press Releases and Public Announcements ................................ 34

ARTICLE VII    CONDITIONS TO OBLIGATION TO CLOSE ............................. 34

Section 7.1    Conditions to Buyer's Obligations ............................................ 34
Section 7.2    Conditions to Sellers' Obligations ............................................ 35
Section 7.3    No Frustration of Closing Conditions ........................................ 35

ARTICLE VIII    TERMINATION ........................................................................ 36

Section 8.1    Termination of Agreement......................................................... 36
Section 8.2    Effect of Termination ................................................................ 37
Section 8.3    Lease Indemnity ........................................................................ 37

ARTICLE IX    MISCELLANEOUS ...................................................................... 37

Section 9.1    Survival...................................................................................... 37
Section 9.2    Expenses .................................................................................... 37
Section 9.3    Entire Agreement ....................................................................... 37
Section 9.4    Incorporation of Exhibits and Disclosure Schedule ................... 38
Section 9.5    Amendments and Waivers.......................................................... 38
Section 9.6    Succession and Assignment ....................................................... 38
Section 9.7    Notices ....................................................................................... 38
Section 9.8    Governing Law........................................................................... 39
Section 9.9    Submission to Jurisdiction; Service of Process........................... 39
Section 9.10   Waiver of Jury Trial .................................................................. 40
Section 9.11   Specific Performance ................................................................. 40
Section 9.12   Severability ............................................................................... 40
Section 9.13   No Third Party Beneficiaries ..................................................... 40
Section 9.14   Non-Recourse............................................................................ 40
Section 9.15   Mutual Drafting......................................................................... 41
Section 9.16   Disclosure Schedule .................................................................. 41
Section 9.17   Headings; Table of Contents...................................................... 41

ii

Section 9.18    Counterparts; Facsimile and Electronic Signatures......................................41

Exhibit A – Bidding Procedures Order
Exhibit B – Escrow Agreement
Exhibit C – Form of Bill of Sale
Exhibit D – Form of Assignment and Assumption Agreement

<u>ASSET PURCHASE AGREEMENT</u>

This Asset Purchase Agreement (this "<u>Agreement</u>") is entered into as of [●], 2016 by and among [Aéropostale, Inc., a Delaware corporation ("<u>Aéropostale</u>") and the other [direct and indirect] wholly-owned Subsidiaries of Aéropostale signatory hereto (together with Aéropostale, each, a "<u>Seller</u>" and, collectively, the "<u>Sellers</u>")][2], and [Buyer], a [●] ("<u>Buyer</u>").[3]  Sellers and Buyer are referred to collectively herein as the "<u>Parties</u>".

WITNESSETH

WHEREAS, on May 4, 2016, Sellers and certain of their affiliates filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>");

WHEREAS, Sellers engage in (a) the business of designing, manufacturing, marketing, licensing, distributing and selling apparel and accessories, (b) the operation of stores and the retail sale of clothing and accessories at such stores, and (c) the Sellers' international licensing business (collectively, the "<u>Business</u>").[4]

WHEREAS, Sellers operate those retail clothing stores set forth on <u>Section 3.6</u> of the Disclosure Schedule (as defined below) under the names "Aéropostale" and/or "Aéropostale Factory Store" (each a "<u>Store</u>" and, collectively, the "<u>Stores</u>"); and

WHEREAS, Sellers desire to sell, transfer and assign to Buyer, and Buyer desires to purchase, acquire and assume from Sellers, all of the Acquired Assets (as defined below) and Assumed Liabilities (as defined below), all as more specifically provided herein.

NOW, THEREFORE, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the Parties hereby agree as follows:

**ARTICLE I**
**DEFINITIONS**

Section 1.1    <u>Definitions</u>.  For purposes of this Agreement:

"<u>363 Triggering Event</u>" has the meaning set forth in <u>Section 5.4(e)</u>.

---

[2] <u>NTD</u>: Sellers TBD.

[3] <u>NTD</u>: If Buyer is a shell company or otherwise does not have sufficient assets to stand behind the obligations hereunder including adequate assurance of future performance under Transferred Contracts (as determined by Aéropostale), Aéropostale will require a guarantee from a creditworthy entity of all of Buyer's obligations hereunder.

[4] <u>NTD</u>: Backoffice and other head office services to be discussed.

"Acquired Assets"[5] means all of Sellers' right, title, and interest in and to all of the following assets of Sellers used or held for use exclusively in the operation of the Stores and (to the extent applicable) located at the Stores on the Closing Date:

      (a)     the Inventory;

      (b)     the Furnishings and Equipment owned by Sellers (other than Excluded Furnishings and Equipment);

      (c)     the Leases, together with (to the extent of the Sellers' interest therein) the buildings, fixtures and improvements located on or attached to such real property, and all rights arising therefrom, and all tenements, hereditaments, appurtenances and other real property rights appertaining thereto, subject to the rights of the applicable landlord (including rights to ownership or use of such property) under such Leases;

      (d)     all rights under those Contracts set forth on Schedule 1.1(a), other than those Contracts that expire or that are terminated prior to the Closing (such Contracts, together with the Leases and Intellectual Property Licenses (other than off-the-shelf, commercially available software costing or having an annual fee of less than $10,000), the "Transferred Contracts"), together with any Contracts added to Schedule 1.1(a) by Buyer by notice delivered to Sellers at any time during the period from and after the date hereof until [●]; *provided* that Buyer shall not be permitted to add any Contracts previously rejected in the Bankruptcy Cases;

      (e)     all of Sellers' security deposits, prepaid rent, and prepaid expenses previously paid by Sellers to fulfill Sellers' obligations under the Leases and, to the extent transferable, other deposits relating to the Stores under any of the Transferred Contracts (collectively, the "Prepaid Expenses");

      (f)     all Intellectual Property owned by the Sellers;

      (g)     all Intellectual Property Licenses; and

      (h)     to the extent transferable, all warranties related to any of the foregoing;

provided, however, notwithstanding anything to the contrary set forth in this definition, the Acquired Assets shall not include any Excluded Assets.

"Aéropostale" has the meaning set forth in the preamble.

"Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person, where "control" means the power, directly or indirectly, to direct or cause the direction of the management and policies of another Person, whether through the ownership of voting securities, by contract, or otherwise.

---

[5] NTD: Buyer to revise definition of "Acquired Assets" to reflect assets proposed to be acquired. Scope of Acquired Assets, including assets related to Sellers' corporate offices and distribution centers, subject to confirmation.

"<u>Agreement</u>" has the meaning set forth in the preamble.

"<u>Allocation Principles</u>" has the meaning set forth in <u>Section 2.7</u>.

"<u>Antitrust Law</u>" means the Sherman Act, the Clayton Act, the HSR Act, the Federal Trade Commission Act, and all other laws and orders that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition, whether in the United States or elsewhere.

"<u>Assignment and Assumption Agreement</u>" has the meaning set forth in Section 2.5(b).

"<u>Assumed Liabilities</u>" means all liabilities of each of the Sellers incurred exclusively in the operation of the Stores as of the Closing, including:

        (a)     all Liabilities under the Transferred Contracts (including all Cure Costs);

        (b)     all amounts allocated to Buyer under <u>Section 2.8</u> and all Transfer Taxes and other Taxes allocated to Buyer pursuant to <u>Section 6.4</u>;

        (c)     all Liabilities relating to or arising out of the ownership or operation of the Stores or any Acquired Asset from and after the Closing Date;

        (d)     all accounts payable; and

        (e)     all payments relating to any key employee incentive program and any key employee retention plan and any Liabilities assumed pursuant to <u>Section 6.3</u>;

<u>provided</u>, <u>however</u>, that notwithstanding anything to the contrary set forth in this definition, the Assumed Liabilities shall not include any Excluded Liabilities.

"<u>Auction</u>" means the auction undertaken pursuant to the Bidding Procedures Order.

"<u>Back-up Termination Date</u>" means the first to occur of (a) [●] days after the entry of the Confirmation Order (or, in the event of a 363 Triggering Event, the Sale Order), (b) consummation of the transaction with the winning bidder at the Auction, (c) Buyer's receipt of notice from Sellers of the release by Sellers of Buyer's obligations under <u>Section 5.4(c)</u>, and (d) [●], 2016.

"<u>Bankruptcy Cases</u>" means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Sellers and certain of their Affiliates on May 4, 2016, and continuing immediately thereafter, in the Bankruptcy Court and styled *In re Aéropostale, Inc, et al.*, Case No. 16-11275 (SHL).

"<u>Bankruptcy Code</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Court</u>" has the meaning set forth in the recitals.

"Bidding Procedures Order" means that certain order of the Bankruptcy Court that, among other things, establishes (a) the procedures for the Auction process, the form of which is attached hereto as Exhibit A, and (b) the date for the Auction, if necessary, and the Sale Hearing.

"Bill of Sale" has the meaning set forth in Section 2.5(b).

"Bonding Requirements" means standby letters of credit, guarantees, indemnity bonds and other financial commitment credit support instruments issued by third parties on behalf of Sellers or any of their respective Subsidiaries or Affiliates regarding any of the Acquired Assets.

"Business" has the meaning set forth in the recitals.

"Business Day" means any day, other than a Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in the State of New York are authorized or required by Law or other governmental action to close.

"Buyer Proration Amount" has the meaning set forth in Section 2.8(a).

"CAM Charges" has the meaning set forth in Section 2.8(a).

"Cash Equivalents" means cash, checks, money orders, funds in time and demand deposits or similar accounts, marketable securities, short-term investments, and other cash equivalents and liquid investments.

"Cash Purchase Price" has the meaning set forth in Section 2.3(a).

"Closing" has the meaning set forth in Section 2.4.

"Closing Date" has the meaning set forth in Section 2.4.

"COBRA" has the meaning set forth in Section 6.3(g).

"Competing Bid" has the meaning set forth in Section 5.4(a).

"Confidentiality Agreement" means the confidentiality agreement, dated as of [●], 2016, by and between Aéropostale and [●].

"Confirmation Order" means an order of the Bankruptcy Court in form and substance reasonably satisfactory to the Parties (a) confirming the Plan; (b) approving (i) this Agreement and the execution, delivery, and performance by Sellers of this Agreement and the other instruments and agreements contemplated hereby; (ii) the sale of the Acquired Assets to Buyer free and clear of all Liens, other than any Permitted Liens or any Assumed Liabilities; (iii) the assumption of the Assumed Liabilities by Buyer on the terms set forth herein; and (iv) the assumption and assignment to Buyer of the Transferred Contracts on the terms set forth herein; (c) determining that Buyer is a good faith purchaser; and (d) providing that the Closing will occur in accordance with the terms and conditions hereof.

4

"Contract" means any agreement, contract, arrangement, commitment, promise, obligation, right, instrument, document or other similar understanding, which in each case is in writing and signed by parties intending to be bound thereby.

"Contracting Parties" has the meaning set forth in Section 9.14.

"Covered Employee" means an employee of Aéropostale or any of its Subsidiaries at the Closing whose duties relate primarily to the operation of any of the [Business] [Stores], including such employees who are on short-term disability, long-term disability or any other approved leave of absence as of the Closing.

"Cure Costs" means all amounts payable in order to cure any monetary defaults required to be cured under section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the assumption by the applicable Seller and assignment to Buyer of the Transferred Contracts.

"Damages" means any actual losses, claims, liabilities, debts, damages, fines, penalties, or costs (in each case, including reasonable out-of-pocket expenses (including reasonable fees and expenses of counsel)).

"Decree" means any judgment, decree, ruling, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, administrative order, or any other order of any Governmental Authority.

"Disclosure Schedule" has the meaning set forth in Article III.

"Employee Benefit Plan" has the meaning set forth in Section 3.12(a).

"Environmental Law" means any federal, state, local or foreign law, statute, code, ordinance, rule or regulation relating to the protection of the environment or natural resources.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Escrow Agent" means [●].

"Escrow Agreement" means that certain Escrow Agreement, dated as of the date hereof, by and among Sellers, Buyer, and the Escrow Agent, a copy of which is attached hereto as Exhibit B.

"Escrow Amount" has the meaning set forth in Section 2.3(b).

"Estimated Prorated Charges" has the meaning set forth in Section 2.8(a).

"Excluded Assets" means all assets of Sellers as of the Closing that are not expressly included in the Acquired Assets, including:

> (a)     any asset of Sellers that is (i) not located in the Stores and/or used or held for use exclusively in the operation of the Business or (ii) inseparable from any other

business of Sellers or any of their Affiliates (other than the operation of the Stores), in each case, including (A) organizational documents, qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates, and other documents relating to Sellers' organization, maintenance, existence, and operation; (B) books and records related to (1) Taxes paid or payable by Sellers or (2) any claims, obligations or liabilities not included in Assumed Liabilities; (C) any Tax refund, deposit, prepayment, credit, attribute, or other Tax asset of or with respect to either of the Sellers; and (D) any assets not customarily based or located at the Stores;

(b)    capital stock of any of Aéropostale's Subsidiaries;

(c)    all Cash Equivalents and accounts receivable;

(d)    all Permits;

(e)    all insurance policies and binders and all claims, refunds and credits from insurance policies or binders due or to become due with respect to such policies or binders;

(f)    all of Sellers' rights under this Agreement or any Related Agreement;

(g)    all of Sellers' rights under any Contracts primarily related to any Excluded Asset;

(h)    any and all automobiles, trucks, tractors, and trailers;

(i)    any other rebate or refund arising from the operation of the Stores prior to the Closing;

(j)    to the extent not leased pursuant to a Transferred Contract, all leased equipment located at or used in the Stores and all in-store processors, direct access storage devices, and electronic funds transfer devices;

(k)    all Contracts other than the Transferred Contracts;

(l)    all causes of action, suits, judgments, claims, rights and demands of any nature arising prior to the Closing out of or related to the Business or the Stores;

(m)    all customer data and information derived from branded loyalty promotion programs and other similar information related to customer purchases at the Stores; and

(n)    those items set forth on Schedule 1.1(b).

"Excluded Liabilities" means the following Liabilities of Sellers:

(a)    any Liability not relating to or arising out of the Stores or the Acquired Assets, including any Liability exclusively relating to or exclusively arising out of the Excluded Assets;

(b)    any Liability of Sellers for Taxes (except as provided for in <u>Section 2.8</u> and <u>Section 6.4</u>); and

(c)    all Liabilities of Sellers under this Agreement or any Related Agreement and the transactions contemplated hereby or thereby.

"<u>Furnishings and Equipment</u>" means all fixtures, trade fixtures, store models, and shelving owned by Sellers and located at the Stores [or at other real property leased by Sellers].

"<u>GAAP</u>" means United States generally accepted accounting principles consistently applied.

"<u>Governmental Authority</u>" means any federal, state, local, or foreign government or governmental or regulatory authority, agency, board, bureau, commission, court, department, or other governmental entity.

"<u>HSR Act</u>" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"<u>Intellectual Property</u>" means (a) all issued patents and patent applications, together with all reissuances, continuations, continuations-in-part, divisionals, extensions and reexaminations thereof; (b) all trademarks, service marks, trade dress, logos, trade names, and Internet domain names, together with all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith; (c) all copyrights, together with all registrations and applications for registration therefor and renewals in connection therewith; and (d) all trade secrets and know-how.

"<u>Intellectual Property Licenses</u>" means (i) any grant to a third Person of any right to use any Intellectual Property owned by the Sellers and (ii) any grant to the Sellers of a right to use a third Person's Intellectual Property rights.

"<u>Inventory</u>" means all of Sellers' now owned or hereafter acquired inventory and goods wherever located, relating to the [Business] [Stores] including without limitation, all inventory and goods that (a) are held by Seller for sale or to be furnished by Seller under a Contract of service, or (b) consist of raw materials, work in process, finished goods or material used or consumed in connection with the [Business] [Stores].

"<u>Inventory Date</u>" has the meaning set forth in <u>Section 2.6(a)</u>.

"<u>Inventory Purchase Price</u>" has the meaning set forth in <u>Section 2.6(a)</u>.

"<u>Inventory Taker</u>" has the meaning set forth in <u>Section 2.6(a)</u>.

"<u>Inventory Value</u>" has the meaning set forth in <u>Section 2.6(a)</u>.

7

"IRC" means the Internal Revenue Code of 1986, as amended.

"IRS" means the Internal Revenue Service.

"Knowledge" of Sellers (and other words of similar import) means the actual knowledge of [●].  "Knowledge" of Buyer (and other words of similar import) means the actual knowledge of [●].

"Law" means any constitution applicable to, and any statute, treaty, code, rule, regulation, ordinance, or requirement of any kind of, any Governmental Authority.

"Leases" means all leases, subleases, licenses, concessions, options, contracts, extension letters, easements, reciprocal easements, assignments, termination agreements, subordination agreements, nondisturbance agreements, estoppel certificates and other agreements (written or oral), and any amendments or supplements to the foregoing, and recorded memoranda of any of the foregoing, pursuant to which any Seller holds any leasehold or subleasehold estates and other rights in respect of any Store.

"Liability" means any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due) regardless of when arising.

"Lien" means any mortgage, pledge, lien, charge, security interest, option, right of first refusal, easement, security agreement or other encumbrance or restriction on the use or transfer of any property; provided, however, that "Lien" shall not be deemed to include any license of Intellectual Property.

"Litigation" means any action, cause of action, suit, claim, investigation, audit, demand, hearing or proceeding, whether civil, criminal, administrative, or arbitral, whether at law or in equity and whether before any Governmental Authority.

"Material Adverse Effect" means any effect or change that has a material adverse effect on the condition of the Acquired Assets, taken as a whole, other than any effects or changes arising from or related to: (a) general business or economic conditions in any of the geographical areas in which the Stores operate; (b) any condition or occurrence affecting retail clothing stores generally; (c) national or international political or social conditions, including the engagement by any country in hostilities, whether commenced before or after the date hereof and whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack; (d) financial, banking, or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index); (e) the occurrence of any act of God or other calamity or force majeure events (whether or not declared as such), including any strike, labor dispute, civil disturbance, embargo, natural disaster, fire, flood, hurricane, tornado, or other weather event; (f) changes in Law or accounting rules; (g) the taking of any action contemplated by this Agreement or any Related Agreement or taken with the consent of the other Party; (h) any effects or changes as a result of the announcement or pendency of this Agreement; (i) any filing or motion made under sections 1113 or 1114 of the Bankruptcy Code; (j) the closing of any stores not acquired by Buyer or the sale of any other assets or stores to any

third parties by any Seller or any of its Affiliates; (k) any effects or changes arising from or related to the breach of the Agreement by Buyer; (l) the failure of Sellers to obtain any consent, permit, authorization, waiver or approval required in connection with the transactions contemplated hereby; (m) any items set forth in the Disclosure Schedule; (n) any effect resulting from the filing of the Bankruptcy Cases; or (o) any matter of which Buyer is aware on the date hereof.

"Non-Party Affiliates" has the meaning set forth in Section 9.14.

"Ordinary Course of Business" means the ordinary and usual course of normal day to day operations of the Business through the date hereof consistent with past practice.

"Outside Date" has the meaning set forth in Section 8.1(b)(ii).

"Parties" has the meaning set forth in the preamble.

"Permit" means any franchise, approval, permit, license, order, registration, certificate, variance or similar right obtained from any Governmental Authority.

"Permitted Lien" means (a) Liens for Taxes not yet delinquent or which are being contested in good faith by appropriate proceedings; (b) mechanic's, workmen's, repairmen's, warehousemen's, carrier's or other similar Liens, including all statutory liens, arising or incurred in the Ordinary Course of Business; (c) with respect to leased or licensed real or personal property, the terms and conditions of the lease, license, sublease or other occupancy agreement applicable thereto; (d) with respect to real property, zoning, building codes and other land use laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over such real property; (e) easements, covenants, conditions, restrictions and other similar matters affecting title to real property and other encroachments and title and survey defects that do not or would not reasonably be expected to have a Material Adverse Effect; (f) matters that would be disclosed on an accurate survey of the real property; (g) any liens shown in any title commitment, report or policy, or otherwise of record; and (h) other Liens, none of which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or any other entity, including any Governmental Authority or any group of any of the foregoing.

"Personal Property Leases" has the meaning set forth in Section 3.11.

"Plan" means the joint chapter 11 plan of reorganization of Aéropostale and its affiliated debtors.

"Pre-Closing Period" has the meaning set forth in Section 6.4(c).

"Prepaid Expenses" has the meaning set forth in the definition of Acquired Assets.

"Prepaid Expenses Amount" has the meaning set forth in Section 2.3(a).

"Prorated Charges" has the meaning set forth in Section 2.8(a).

"Proration Period" has the meaning set forth in Section 6.4(b).

"Purchase Price" has the meaning set forth in Section 2.3(a).

"Purchase Price Allocation" has the meaning set forth in Section 2.7.

"Related Agreements" means the Bill of Sale and the Assignment and Assumption Agreement.

"Representative" means, when used with respect to a Person, the Person's controlled Affiliates (including Subsidiaries) and such Person's and any of the foregoing Persons' respective officers, directors, managers, members, shareholders, partners, employees, agents, representatives, advisors (including financial advisors, bankers, consultants, legal counsel, and accountants), and financing sources.

"Sale Hearing" means a hearing before the Bankruptcy Court to approve this Agreement and the Confirmation Order.

"Sale Order" means an order or orders of the Bankruptcy Court in form and substance reasonably acceptable to Buyer and Sellers approving this Agreement and all of the terms and conditions hereof, and approving and authorizing Sellers to consummate the transactions contemplated hereby, which order may be the Confirmation Order.

"Seller Proration Amount" has the meaning set forth in Section 2.8(a).

"Sellers" has the meaning set forth in the preamble.

"Stores" has the meaning set forth in the recitals.

"Subsidiary" means, with respect to any Person, means, on any date, any Person (a) the accounts of which would be consolidated with and into those of the applicable Person in such Person's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date or (b) of which securities or other ownership interests representing more than fifty percent of the equity or more than fifty percent (50%) of the ordinary voting power or, in the case of a partnership, more than fifty percent (50%) of the general partnership interests or more than fifty percent of the profits or losses of which are, as of such date, owned, controlled or held by the applicable Person or one or more subsidiaries of such Person.

"Tax" or "Taxes" means any United States federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, stamp, occupation, premium, windfall profits, environmental (including taxes under section 59A of the IRC), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or

consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether disputed or not.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Transfer Tax" has the meaning set forth in Section 6.4(a).

"Transferred Contracts" has the meaning set forth in the definition of Acquired Assets.

"WARN Act" means, collectively, the Worker Adjustment and Retraining Notification Act of 1989 and any similar state or local law.

Section 1.2    Interpretations.  Unless otherwise indicated herein to the contrary:

(a)    When a reference is made in this Agreement to an Article, Section, Exhibit, Schedule, clause or subclause, such reference shall be to an Article, Section, Exhibit, Schedule, clause or subclause of this Agreement.

(b)    The words "include," "includes" or "including" and other words or phrases of similar import, when used in this Agreement, shall be deemed to be followed by the words "without limitation."

(c)    The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement.

(d)    The word "if" and other words of similar import shall be deemed, in each case, to be followed by the phrase "and only if."

(e)    The use of "or" herein is not intended to be exclusive.

(f)    The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa.

(g)    All terms defined in this Agreement have their defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein.

(h)    References herein to a Person are also to its successors and permitted assigns.  Any reference herein to a Governmental Authority shall be deemed to include reference to any successor thereto.

(i)    Any reference herein to "Dollars" or "$" shall mean United States dollars.

11

(j)    Buyer acknowledges and agrees that the specification of any dollar amount in the representations, warranties, or covenants contained in this Agreement is not intended to imply that such amounts or higher or lower amounts are or are not material, and Buyer shall not use the fact of the setting of such amounts in any dispute or controversy between the Parties as to whether any obligation, item, or matter is or is not material.

(k)    References in this Agreement to materials or information "furnished to Buyer" and other phrases of similar import include all materials or information made available to Buyer or its Representatives in the data room prepared by Sellers or provided to Buyer or its Representatives in response to requests for materials or information.

## ARTICLE II
## PURCHASE AND SALE

Section 2.1    Purchase and Sale of Assets.    On the terms and subject to the conditions set forth in this Agreement, Buyer will purchase from Sellers, and Sellers will sell, transfer, assign, convey, and deliver to Buyer at the Closing all of the Acquired Assets.

Section 2.2    Assumed Liabilities.    On the terms and subject to the conditions set forth in this Agreement, Buyer will assume and become responsible for the Assumed Liabilities at the Closing.    Buyer agrees to pay, perform, honor, and discharge, or cause to be paid, performed, honored and discharged, all Assumed Liabilities in a timely manner in accordance with the terms thereof, including paying or causing to be paid, at or prior to the Closing, all Cure Costs.    For the avoidance of doubt, Sellers shall not be liable for, and shall have no obligation to pay or cause to be paid, any Cure Costs.

Section 2.3    Consideration; Deposit; Escrow Amount.[6]

(a)    The consideration for the Acquired Assets shall be (i) an aggregate Dollar amount equal to the sum of (A) $[●] (the "Cash Purchase Price"), *plus* (B) the amount of the Inventory Purchase Price, *plus* (C) the amount of the Prepaid Expenses (the "Prepaid Expenses Amount"), *plus* (D) the Seller Proration Amount, if any, *minus* (E) the Buyer Proration Amount, if any (such sum, the "Purchase Price") and (ii) Buyer's assumption of the Assumed Liabilities.

(b)    Upon the execution of this Agreement, pursuant to the terms of the Escrow Agreement, Buyer shall immediately deposit with the Escrow Agent the sum of $[●][7] by wire transfer of immediately available funds (the "Escrow Amount"), to be released by the Escrow Agent and delivered to either Buyer or Sellers, in accordance with the provisions of the Escrow Agreement.    Pursuant to the Escrow Agreement, the Escrow Amount (together with all accrued investment income thereon, if any) shall be distributed as follows:

---

[6] NTD: Buyer to provide proposal re: security regarding WARN Act liability.

[7] NTD: Amount to be equal to 10% of the Cash Purchase Price.

(i)      if the Closing shall occur, the Escrow Amount and all accrued investment income thereon, if any, shall be applied towards the Purchase Price payable by Buyer to Sellers under Section 2.3(a) and the Escrow Amount, together with all accrued investment income thereon, if any, shall be delivered to Sellers at the Closing;

(ii)      if this Agreement is terminated by Sellers pursuant to Section 8.1(d), the Escrow Amount, together with all accrued investment income thereon, if any, shall be delivered to Sellers; or

(iii)      if this Agreement is terminated for any reason other than by a Seller pursuant to Section 8.1(d), the Escrow Amount, together with all accrued investment income thereon, shall in each case be returned to Buyer.

Section 2.4      Closing.   The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Weil, Gotshal & Manges LLP located at 767 Fifth Avenue, New York, New York (or such other location as shall be mutually agreed upon by Sellers and Buyer) commencing at [●] local time on a date (the "Closing Date") that is the first (1st) Business Day following the date upon which all of the conditions to the obligations of Sellers and Buyer to consummate the transactions contemplated hereby set forth in Article VII (other than conditions that by their nature are to be satisfied at the Closing itself, but subject to the satisfaction or waiver of those conditions) have been satisfied or waived, or on such other date as shall be mutually agreed upon by Sellers and Buyer prior thereto.   For purposes of this Agreement and the transactions contemplated hereby, the Closing will be deemed to occur and be effective, and title to and risk of loss associated with the Acquired Assets, shall be deemed to occur at 12:01 am, New York City time, on the Closing Date.

Section 2.5      Closing Payments and Deliveries.

(a)      On the Closing Date, Buyer shall pay the Purchase Price (less the Escrow Amount and all accrued investment income thereon, if any, which shall be released to Sellers by the Escrow Agent) to Sellers, which shall be paid by wire transfer of immediately available funds into an account designated by Sellers.

(b)      At the Closing, Sellers will deliver to Buyer (i) a duly executed Bill of Sale substantially in the form of Exhibit C (the "Bill of Sale"); (ii) a duly executed Assignment and Assumption Agreement substantially in the form of Exhibit D (the "Assignment and Assumption Agreement"); and (iii) a duly executed certificate from an officer of each Seller to the effect that each of the conditions specified in Section 7.1(a) and Section 7.1(b) is satisfied.

(c)      At the Closing, Buyer will deliver to Sellers (i) the Bill of Sale duly executed by Buyer; (ii) the Assignment and Assumption Agreement duly executed by Buyer; and (iii) a duly executed certificate from an officer of Buyer to the effect that each of the conditions specified in Section 7.2(a) and Section 7.2(b) are satisfied.

Section 2.6    Inventory.

(a)    [A physical count of the Inventory, and calculation of the value thereof, at each of the Stores and each of the distribution centers utilized by Sellers shall be made by a nationally-recognized inventory service (the "Inventory Taker") selected and engaged by Sellers, in their sole discretion, two (2) days prior to the anticipated Closing Date, or on such other date as the Parties may mutually agree (the date of such inventory being the "Inventory Date").    The Inventory Taker will conduct the physical inventory in accordance with instructions set forth in Schedule 2.6(a) and otherwise in accordance with the terms and conditions of this Section 2.6.  Each Party shall be entitled to have a Representative present during the inventory and the fees and expenses of the Inventory Taker shall be borne fifty percent (50%) by Buyer and fifty percent (50%) by Sellers. The Inventory Taker shall value all Inventory carried in the Stores on the Inventory Date at [1.08 percent of] cost based on Sellers' books and records maintained in the Ordinary Course of Business (without GAAP adjustment) (such value, the "Inventory Value").  If the Inventory Value is greater than $125,000,000, then the Buyer shall pay to the Sellers the amount of such excess in accordance with Section 2.3(a) (such value, the "Inventory Purchase Price").

(b)    The complete inventory prepared by the Inventory Taker shall be prepared in accordance with the usual and customary practices of the industry and shall show the total cost of the Inventory for each Store determined in the manner provided above.  In the event that the Parties do not agree on the value of the Inventory for any Store because the Parties disagree as to Sellers' cost of Inventory, the opinion of the Inventory Taker shall be final and binding.][8]

Section 2.7    Allocation.  Buyer and Sellers agree to allocate the Purchase Price (as finally determined hereunder), the Assumed Liabilities, and all other relevant items among the Acquired Assets in accordance with section 1060 of the IRC and the Treasury Regulations thereunder (the "Allocation Principles").  No later than [●] days after the Closing Date, Sellers shall deliver to Buyer an allocation of the Purchase Price and the Assumed Liabilities (and all other relevant items) as of the Closing Date among the Acquired Assets determined in a manner consistent with the Allocation Principles (the "Purchase Price Allocation") for Buyer's review and comment. Any reasonable comments provided by Buyer to the Sellers under this Section 2.7 shall be considered by the Sellers in good faith.  The Purchase Price Allocation (inclusive of any reasonable comments accepted by the Sellers) shall be conclusive and binding on the parties, and Buyer and Sellers agree (and agree to cause their respective subsidiaries and Affiliate) to prepare, execute, and file IRS Form 8594 and all Tax Returns on a basis consistent with the Purchase Price Allocation.  None of the Parties will take any position inconsistent with the Purchase Price Allocation on any Tax Return or in any audit or Tax proceeding, unless otherwise required by a final determination by a Governmental Authority.  Notwithstanding any other provision of this Agreement, the terms and provisions of this Section 2.7 shall survive the Closing without limitation.

---

[8] NTD: Inventory taking procedures to be discussed.

14

Section 2.8      Proration.

(a)      On the Closing Date all monthly payments or estimated payments for the month in which the Closing occurs (including base rent, common area maintenance and similar charges ("CAM Charges"), and utility charges) under the Leases transferred at the Closing (the "Prorated Charges") shall be apportioned and prorated between Sellers and Buyer as of the Closing Date. To the extent any of the Prorated Charges is based on estimated payments (including CAM Charges) or there is otherwise insufficient information to compute the amount of any such Prorated Charge as of the Closing Date, the amount of the applicable Prorated Charge shall be estimated by Sellers based on the fees incurred by Sellers in respect of such Prorated Charge under the applicable Lease during the immediately preceding Lease year (the "Estimated Prorated Charges"). Buyer shall bear the expense of Buyer's proportionate share of such Prorated Charges that shall be equal to the product obtained by multiplying (i) a fraction, the numerator being the amount of the Prorated Charges under the applicable Lease and the denominator being the total number of days in the calendar month in which the Closing occurs, times (ii) the number of days in such calendar month following the day that immediately precedes the Closing Date and shall pay such amount to Sellers to the extent payment for such Prorated Charges has been made by Sellers prior to the Closing. Sellers shall bear the remaining portion of such Prorated Charges (and shall pay the amounts thereof to Buyer to the extent payment for such Prorated Charges has not been previously made by Sellers).  The net amount of all Prorated Charges owed to Buyer and Sellers under this shall be referred to as the "Buyer Proration Amount" if owed to Buyer or the "Seller Proration Amount" if owed to Sellers.  Except as set forth in this Section 2.8 and in Section 6.4, no amounts paid or payable under or in respect of any Acquired Asset or group of Acquired Assets shall be apportioned and prorated between Sellers and Buyer and there shall be no re-apportionment or re-computation of any Estimated Prorated Charges following the Closing as a result of any error, omission, true-up, recalculation or other change therein.

(b)      As to all non-monthly real estate related payments, the same shall be apportioned between Sellers and Buyer as of 12:01 a.m. on the Closing Date.  If any amounts are payable in installments, all installments due through the Closing together with the accrued but unpaid portion of any other installments not yet due as of the Closing shall be prorated based on the periods of time covered by such installments occurring before and after the Closing Date.

(c)      As to real estate Taxes and assessments, if the Closing shall occur before a new real estate or personal property tax rate is fixed for the applicable property, the apportionment of such Taxes for such property at the Closing shall be calculated by Sellers upon the basis of the old tax rate for the preceding fiscal year applied to the latest assessed valuation; provided, however, that there will be no re-apportionment or re-computation of such Taxes for any property following the Closing as a result of any error, omission, recalculation or other change in any applicable real estate or personal property tax rate or otherwise.

15

Section 2.9    <u>Removal of Excluded Assets</u>.    As promptly as practicable following the Closing Date (and in any event within ten (10) Business Days), Buyer shall remove at its expense all of the Excluded Assets that are located at the Stores and, if requested by Sellers, Buyer shall arrange transportation of such Excluded Assets to a location designated by Sellers at Sellers' expense.

**ARTICLE III**
**SELLERS' REPRESENTATIONS AND WARRANTIES**

Sellers represent and warrant to Buyer that the statements contained in this <u>Article III</u> are true and correct as of the date of this Agreement, except as (i) set forth in the disclosure schedule accompanying this Agreement (the "<u>Disclosure Schedule</u>"), (ii) disclosed in any forms, statements, or other documents filed with the Bankruptcy Court, or (iii) disclosed in any documents filed by or on behalf of Sellers with the SEC between December 31, 2014 and the date hereof and publicly available prior to the date of this Agreement (excluding any disclosures in any risk factors section, in any section related to forward-looking statements, and any other disclosures that are predictive or forward-looking in nature).

Section 3.1    <u>Organization of Sellers; Good Standing</u>.    Each Seller is a corporation duly organized, validly existing and in good standing under the laws of the state of its incorporation and has, subject to the necessary authority from the Bankruptcy Court, all requisite corporate power and authority to own, lease and operate its assets and to carry on its business as now being conducted, except where the failure to be so organized, existing, or in good standing or have such power and authority would not reasonably be expected to have a Material Adverse Effect.

Section 3.2    <u>Authorization of Transaction</u>.    Subject to the Bankruptcy Court's entry of the Confirmation Order (or, in the event of a 363 Triggering Event, the Sale Order), each Seller has full power and authority (including full corporate power and authority) to execute and deliver this Agreement and all other agreements contemplated hereby to which it is a party and to perform its obligations hereunder and thereunder. The execution, delivery, and performance of this Agreement and all other agreements contemplated hereby to which each Seller is a party have been duly authorized by such Seller. Upon due execution hereof by each Seller, this Agreement (assuming due authorization and delivery by Buyer) shall constitute, subject to the Bankruptcy Court's entry of the Confirmation Order (or, in the event of a 363 Triggering Event, the Sale Order), the valid and legally binding obligation of such Seller, enforceable against such Seller in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar laws relating to creditors' rights and general principles of equity.

Section 3.3    <u>Noncontravention; Government Filings</u>.    Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in <u>Article II</u>), will (a) conflict with or result in a breach of the organizational documents of any Seller, (b) subject to the entry of the Confirmation Order (or, in the event of a 363 Triggering Event, the Sale Order), violate any law or Decree to which any Seller is subject in respect of the Acquired Assets, or (c) subject to the entry of the Confirmation Order (or, in the event of a 363 Triggering Event, the Sale Order), result in a breach of, constitute a default under, result in the acceleration of, create in any party

16

the right to accelerate, terminate, modify or cancel, or require any notice under any material Contract to which any Seller is a party or to which any of the Acquired Assets is subject, except, in the case of either clause (b) or (c), for such conflicts, violations, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.   Other than (x) the applicable requirements of the HSR Act, and (y) as required or pursuant to the Bankruptcy Code, the Bidding Procedures Order, or the Confirmation Order (or, in the event of a 363 Triggering Event, the Sale Order), no Seller is required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Authority in order for the Parties to consummate the transactions contemplated by this Agreement or any Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or prevent or materially impair or delay any Seller's ability to consummate the transactions contemplated hereby or perform its obligations hereunder on a timely basis.

Section 3.4    Title to Assets.   At the Closing, subject to any Permitted Liens, Sellers will have good and valid title to, or the right to use, the tangible Acquired Assets except to the extent the failure to have such title or right to use would not be expected to have a Material Adverse Effect. Pursuant to the Confirmation Order (or, in the event of a 363 Triggering Event, the Sale Order), Sellers will convey such title to or rights to use, all of the tangible Acquired Assets, free and clear of all Liens (other than Permitted Liens).

Section 3.5    Transferred Contracts.

(a)    True and complete copies of all Transferred Contracts have either been (i) publicly filed with the United States Securities and Exchange Commission and are publicly available as of the date hereof, or (ii) made available to Buyer.

(b)    The Sellers have not received any written notice of any default or event that with notice or lapse of time or both would constitute a default by Sellers under any Transferred Contract, except for defaults that would not be reasonably likely to result in a Material Adverse Effect.

Section 3.6    Real Property.   Section 3.6 of the Disclosure Schedule sets forth the location of each Store, each of which is leased to a Seller by a third party, and a list of all Leases.   Sellers have made available to Buyer a true and complete copy of each Lease to the extent in their possession.   With respect to each Lease, (a) assuming due authorization and delivery by the other party thereto, such Lease constitutes the valid and legally binding obligation of the Seller party thereto and, to Sellers' Knowledge, the counterparty thereto, enforceable against such Seller and, to Sellers' Knowledge, the counterparty thereto in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar laws relating to creditors' rights and general principles of equity, and (b) neither such Seller nor, to Sellers' Knowledge, the counterparty thereto is in breach or default under such Lease, except (i) for those defaults that will be cured in accordance with the Confirmation Order (or, in the event of a 363 Triggering Event, the Sale Order) or waived in accordance with section 365 of the Bankruptcy Code (or that need not be cured under the

17

Bankruptcy Code to permit the assumption and assignment of the Leases) or (ii) to the extent such breach or default would not reasonably be expected to have a Material Adverse Effect.

Section 3.7    Litigation; Decrees.    Except as set forth in Section 3.7 of the Disclosure Schedule and other than the Bankruptcy Case, there is no Litigation pending that (a) would reasonably be expected to have a Material Adverse Effect or (b) challenges the validity or enforceability of this Agreement or seeks to enjoin or prohibit consummation of the transactions contemplated hereby.    Other than the Bankruptcy Case, no Seller is subject to any outstanding Decree that would (a) reasonably be expected to have a Material Adverse Effect or (b) prevent or materially delay such Seller's ability to consummate the transactions contemplated hereby or perform in any material respect its obligations hereunder.

Section 3.8    Labor Relations.    Except as set forth in Section 3.8 of the Disclosure Schedule, no Seller is a party to or bound by any collective bargaining agreement covering the Covered Employees.

Section 3.9    Brokers' Fees.    Other than the fees and expenses payable to Stifel Financial Corp. in connection with the transactions contemplated hereby, which shall be borne by Sellers, no Seller has entered into any Contract to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated hereby for which Buyer could become liable or obligated to pay.

Section 3.10    Taxes.

(a)    Except for matters that would not be reasonably expected to result in a Material Adverse Effect, (i) Sellers have timely filed all Tax Returns required to be filed with the appropriate Governmental Authorities in all jurisdictions in which such Tax Returns are required to be filed (taking into account any extension of time to file granted or to be obtained on behalf of Sellers); and (ii) all Taxes shown as due on such Tax Returns have been paid (other than any Taxes not due as of the date of the filing of the Bankruptcy Cases as to which subsequent payment was prohibited by reason of the Bankruptcy Cases).

(b)    Sellers are not foreign persons within the meaning of section 1445 of the IRC.

Section 3.11    Tangible Personal Property.    Section 3.11 of the Disclosure Schedule sets forth all Transferred Contracts that constitute leases of personal property ("Personal Property Leases") involving annual payments in excess of $[●] relating to personal property used by Sellers in the Business.    To the Knowledge of Sellers, Sellers have not received any written notice of any default or event that with notice or lapse of time or both would constitute a default by Sellers under any of the Personal Property Leases.

Section 3.12    Employee Benefits.

(a)    Section 3.12(a) of the Disclosure Schedule lists all "employee benefit plans," as defined in section 3(3) of ERISA, including any multiemployer plans as defined in section 3(37) of ERISA, and all other material employee benefit plans or

18

arrangements (other than governmental plans and statutorily required benefit arrangements), including bonus or incentive plans, deferred compensation arrangements, severance pay, sick leave, vacation pay, disability, medical insurance and life insurance maintained or contributed to by Sellers and their Subsidiaries with respect to Covered Employees (the "Employee Benefit Plans").

(b)    True, correct and complete copies of the following documents, with respect to each of the Employee Benefit Plans, have been made available to Buyer (A) any plan documents, and all material amendments thereto, (B) the most recent Forms 5500 and (C) the most recent summary plan descriptions (including letters or other documents updating such descriptions).

(c)    Each of the Employee Benefit Plans sponsored by Sellers and its Subsidiaries that is intended to qualify under section 401 of the IRC has been determined by the IRS to be so qualified, and, except as disclosed on Section 3.12(c) of the Disclosure Schedule, to the Knowledge of Sellers, nothing has occurred with respect to the operation of any such plan which could reasonably be expected to result in the revocation of such favorable determination.

(d)    Each of the Employee Benefit Plans has been maintained, in all material respects, in accordance with its terms and all provisions of applicable Law.

Section 3.13    Intellectual Property.    Section 3.13 of the Disclosure Schedule sets forth all material registered Intellectual Property and material applications for registration of Intellectual Property in each case owned by the Sellers as of the date hereof.    Except as disclosed on Section 3.13 of the Disclosure Schedule or as would not, individually or in the aggregate, be reasonably likely to result in a Material Adverse Effect: (a) the Sellers own or have rights to use all material Intellectual Property included in the Acquired Assets; (b) no action is pending or, to the Knowledge of the Sellers, has been threatened in writing, against the Sellers (i) alleging infringement or misappropriation of the Intellectual Property of any third party or (ii) challenging the validity of any material Intellectual Property owned by the Sellers; (c) to the Knowledge of the Sellers, none of the Sellers are infringing or misappropriating the Intellectual Property of any third party; and (d) to the Knowledge of the Sellers, no third party is infringing or misappropriating any Intellectual Property owned by the Sellers.

Section 3.14    Compliance with Laws; Permits.

(a)    Sellers are in compliance with all Laws applicable to the Business, except where the failure to be in compliance would not be reasonably expected to result in a Material Adverse Effect.    Sellers have not received any written notice of or been charged with the violation of any Laws, except where such violation would not be reasonably expected to result in a Material Adverse Effect.

(b)    Sellers have all Permits which are required for the operation of the Business as presently conducted, except where the absence of which would not be reasonably expected to result in a Material Adverse Effect.    Sellers are not in default or violation (and no event has occurred which, with notice or the lapse of time or both,

19

would constitute a default or violation) of any term, condition or provision of any Permit to which they are parties, except where such default or violation would not be reasonably expected to result in a Material Adverse Effect.

Section 3.15    Environmental Matters.    The representations and warranties contained in this Section 3.15 are the sole and exclusive representations and warranties of the Sellers and their Subsidiaries with respect to environmental matters, including matters relating to Environmental Laws.  Except as would not be reasonably likely to result in a Material Adverse Effect:

(a)    the operations of the Sellers and their Subsidiaries are in compliance with all applicable Environmental Laws, which compliance includes obtaining, maintaining and complying with all Permits issued pursuant to Environmental Laws necessary to operate the Business;

(b)    neither the Sellers nor any of their Subsidiaries is the subject of any outstanding Litigation with any Governmental Authority with respect to Environmental Laws;

(c)    neither the Sellers nor any of their Subsidiaries is the subject of any pending, or to the Knowledge of the Sellers, threatened Litigation alleging that the Sellers or any of their Subsidiaries may (i) be in violation of any Environmental Law, or any Permit issued pursuant to Environmental Law, or (ii) have any liability under any Environmental Law; and

(d)    to the Knowledge of the Sellers, there are no pending or threatened investigations of the Sellers or their Subsidiaries, or currently or previously owned, operated or leased property of the Sellers or their Subsidiaries, which would reasonably be expected to result in the Sellers or their Subsidiaries incurring liability pursuant to any Environmental Law.

Section 3.16    Disclaimer of Other Representations and Warranties.  Except for the representations and warranties contained in this Article III (as modified by the Disclosure Schedule) or expressly contained in any Related Agreement, no Seller nor any other Person makes, or shall be deemed to have made, any representation or warranty, express or implied, including as to the accuracy or completeness of any information regarding any of the Sellers, any Acquired Assets, any Assumed Liabilities or any other matter.  Notwithstanding anything herein to the contrary, but without limitation of any representation or warranty expressly contained in this Article III or any Related Agreement, NO SELLER MAKES ANY OTHER (AND HEREBY DISCLAIMS EACH OTHER) REPRESENTATION, WARRANTY, OR GUARANTY WITH RESPECT TO THE VALUE, CONDITION, OR USE OF THE ACQUIRED ASSETS, WHETHER EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. Sellers disclaim all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Buyer or its Affiliates or representatives (including any opinion, information, projection, or

advice that may have been or may be provided to Buyer by any director, officer, employee, agent, consultant, or representative of Sellers or any of their Affiliates).

## ARTICLE IV
## BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to each Seller that the statements contained in this Article IV are true and correct as of the date of this Agreement.

Section 4.1    <u>Organization of Buyer; Good Standing</u>.    Buyer is a [●] duly organized, validly existing, and in good standing under the laws of the State of [●] and has all requisite corporate or similar power and authority to own, lease, and operate its assets and to carry on its business as now being conducted.

Section 4.2    <u>Authorization of Transaction</u>.    Buyer has full power and authority (including full corporate or other entity power and authority) to execute and deliver this Agreement and all other agreements contemplated hereby to which it is a party and to perform its obligations hereunder and thereunder.    The execution, delivery, and performance of this Agreement and all other agreements contemplated hereby to which Buyer is a party (a) have been duly authorized by Buyer and (b) do not require the consent of any other Person.    This Agreement (assuming due authorization and delivery by Sellers) constitutes the valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar laws relating to creditors' rights and general principles of equity.

Section 4.3    <u>Noncontravention</u>.    Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in Article II) will (a) conflict with or result in a breach of the certificate of incorporation or bylaws, or other organizational documents, of Buyer, (b) violate any law or Decree to which Buyer is, or its assets or properties are, subject or (c) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any Contract to which Buyer is a party or by which it is bound, except, in the case of either clause (b) or (c), for such conflicts, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, have a material adverse effect on Buyer.    Other than the applicable requirements of the HSR Act, Buyer is not required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Authority in order for the Parties to consummate the transactions contemplated by this Agreement or any Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, prevent or materially impair or delay Buyer's ability to consummate the transactions contemplated hereby or perform its obligations hereunder on a timely basis.

Section 4.4    <u>Litigation; Decrees</u>.    There is no Litigation pending or, to Buyer's Knowledge, threatened in writing that challenges the validity or enforceability of this Agreement or seeks to enjoin or prohibit consummation of the transactions contemplated hereby.    Neither Buyer nor any of its Subsidiaries is subject to any outstanding Decree that would prevent or

21

materially impair or delay Buyer's ability to consummate the transactions contemplated hereby or perform its obligations hereunder on a timely basis.

Section 4.5    Brokers' Fees.  Buyer has not entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Sellers or any of their Affiliates could become liable or obligated to pay.

Section 4.6    Sufficient Funds; Adequate Assurances.  Buyer has, and upon the Closing will have, immediately available funds sufficient for the satisfaction of all of Buyer's obligations under this Agreement, including the payment of the Purchase Price and all fees, expenses of, and other amounts required to be paid by, Buyer in connection with the transactions contemplated hereby.  Buyer is and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Transferred Contracts and the related Assumed Liabilities.

Section 4.7    Buyer Information.  As of the date hereof, Buyer has disclosed to Sellers any and all potential issues under any Antitrust Law that may be credibly raised about the transactions contemplated hereby.  As of the date hereof, Buyer has provided to Sellers true, correct, and complete information relating to the businesses and sales of Buyer and its Subsidiaries and joint ventures upon which Sellers can reasonably determine whether any objections to the transactions contemplated hereby may be credibly asserted under any Antitrust Law.

## ARTICLE V
## PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing (except as otherwise expressly stated to apply to a different period):

Section 5.1    Efforts; Cooperation.

(a)    Upon the terms and subject to the conditions set forth in this Agreement (including Section 5.5), each of the Parties shall use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper, or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated hereby, except as otherwise specifically provided in Section 5.5(a).  Without limiting the generality of the foregoing, (i) each Seller shall use its commercially reasonable efforts to cause the conditions set forth in Section 7.1 that are within its control or influence to be satisfied or fulfilled, and (ii) Buyer shall use its commercially reasonable efforts to cause the conditions set forth in Section 7.2 that are within its control or influence to be satisfied or fulfilled.

(b)    Without limiting the generality of Section 5.1(a), Buyer shall not take any action, or permit any of its Subsidiaries to take any action, to materially diminish the ability of any Party to consummate, or materially delay any Party's ability to consummate, the transactions contemplated hereby, including any action that is intended

or would reasonably be expected to result in any of the conditions to any Party's obligations to consummate the transactions contemplated hereby set forth in <u>Article VII</u> to not be satisfied.

Section 5.2    <u>Conduct of the Business Pending the Closing</u>.

(a)    Prior to the Closing, except (i) as set forth on <u>Section 5.2(a)</u> of the Disclosure Schedule, (ii) as required by applicable Law or by order of the Bankruptcy Court, (iii) as otherwise expressly contemplated by this Agreement or (iv) with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), each Seller shall (A) conduct the Business only in the Ordinary Course of Business and (B) use its commercially reasonable efforts to (1) preserve the present business operations, organization and goodwill of the Business, and (2) preserve the present relationships with material vendors and suppliers of the Business.

(b)    Except (i) as set forth on <u>Section 5.2(b)</u> of the Disclosure Schedule, (ii) as required by applicable Law or by order of the Bankruptcy Court, (iii) as otherwise contemplated by this Agreement or (iv) with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), no Seller shall, solely as it relates to the Business:

(i)    other than in the Ordinary Course of Business or as required by any applicable collective bargaining agreement or Law, (A) materially increase the annual level of compensation of any Covered Employee or (B) materially increase the coverage or benefits available under any (or create any new) Employee Benefit Plan;

(ii)    subject any of the Acquired Assets to any Lien, except for Permitted Liens and any Lien securing any debtor in possession loan facility or granted in an order authorizing use of cash collateral;

(iii)    agree to do anything prohibited by this <u>Section 5.2</u>.

Section 5.3    <u>Regulatory Approvals</u>.

(a)    Each of the Parties hereto shall promptly (and in no event later than five (5) Business Days following the date that this Agreement is executed) make to the extent required its respective filing under the HSR Act with respect to the transactions contemplated hereby.  In addition, the Parties shall mutually agree to make any and all other filings required pursuant to other Antitrust Laws as promptly as reasonably practicable following the date that this Agreement is executed.  Further, Buyer shall use its best efforts to (i) supply as promptly as practicable any additional information and documentary material that may be requested or required pursuant to any Antitrust Law, including the HSR Act; and (ii) cause the expiration or termination of any applicable waiting periods under the HSR Act or any other Antitrust Law as soon as practicable.

(b)    In connection with the efforts referenced in <u>Section 5.1</u> and this <u>Section 5.3</u> to obtain all requisite approvals and authorizations for the transactions contemplated

by this Agreement under any Antitrust Law or any state law, Buyer shall use its best efforts to (i) cooperate with Sellers in connection with any filing or submission and in connection with any investigation or other inquiry, including any proceeding initiated by a private party; (ii) keep Sellers informed in all material respects of any material communication received by Buyer from, or given by Buyer to, any Governmental Authority and of any material communication received or given in connection with any proceeding by a private party, in each case, regarding any of the transactions contemplated hereby; and (iii) permit Sellers to review any material communication given to it by, and consult with Buyer in advance of any meeting or conference with, any Governmental Authority, including in connection with any proceeding by a private party, and, unless prohibited by an applicable Governmental Authority, provide the opportunity to attend or participate in such meeting, conference, or proceeding.  The foregoing obligations in this Section 5.3(b) shall be subject to the Confidentiality Agreement and any attorney-client, work product, or other privilege.  The Parties expect their outside counsel to enter into a joint defense agreement or common interest agreement to allow for the exchange of such privileged materials without waiving any such privilege.

(c)     In furtherance of and without limiting the generality of Section 5.3(b), if any objections are asserted with respect to the transactions contemplated hereby under any Antitrust Law or if any suit is threatened or instituted by any Governmental Authority or any private party challenging any of the transactions contemplated hereby as violative of any Antitrust Law, Buyer shall use its best efforts to resolve such objections or challenges as such Governmental Authority or private party may have to such transactions, including to vacate, lift, reverse, or overturn any order, whether temporary, preliminary, or permanent, so as to permit consummation of the transactions contemplated by this Agreement as soon as practicable and in any event on or prior to the Outside Date.  Notwithstanding anything in this Agreement to the contrary, and without limiting the generality of the foregoing, Buyer shall promptly take and diligently pursue any or all of the following actions to the extent necessary to eliminate any concerns on the part of, or to satisfy any conditions imposed by, any Governmental Authority with jurisdiction over the enforcement of any applicable law, including any Antitrust Law, regarding the legality of Buyer's acquisition of any portion of the Acquired Assets or the Assumed Liabilities:

(i)     using its best efforts to prevent the entry in a judicial or administrative proceeding brought under any law, including any Antitrust Law, by any Governmental Authority or any other Person of any permanent, temporary, or preliminary injunction or other order that would make consummation of the acquisition of the Acquired Assets or the Assumed Liabilities in accordance with the terms of this Agreement unlawful or that would prevent or delay such consummation;

(ii)     taking promptly and diligently pursuing, in the event that an injunction or order has been issued as referred to in this Section 5.3, any and all steps, including the appeal thereof, the posting of a bond, or the steps contemplated by this Section 5.3, necessary to vacate, modify, or suspend such

injunction or order so as to permit such consummation as promptly as possible; and

(iii)    taking promptly and diligently pursuing any and all other actions and doing any and all other things necessary to avoid or eliminate each and every impediment under any law, including any Antitrust Law, that may be asserted by any Governmental Authority or any other Person in opposition to the consummation of any transaction contemplated hereby, so as to enable the Parties to consummate the transactions contemplated by this Agreement as soon as practicable after the date of this Agreement (but in any event not later than the Outside Date), including, without limitation, offering, negotiating, effecting, and agreeing to, by consent decree, hold separate order or otherwise, any sale, divestiture, license, or other disposition of or restriction on, any or all of Sellers' or Buyer's respective businesses, divisions, assets (including the Acquired Assets), Stores, or interests therein; provided, however, that any such sale, divestiture, license, disposition, restriction on, holding separate, or other similar arrangement or action is conditioned on the occurrence of, and shall become effective only from and after, the Closing Date.

(d)    In furtherance of and without limiting the generality of Section 5.3(c), if necessary to obtain any regulatory actions or non-actions, orders, waivers, consents, clearances, extensions and approvals necessary to consummate the transactions contemplated by this Agreement, or if any suit or other action is threatened or instituted by any Person challenging the transactions contemplated by this Agreement as violative of any applicable law, Buyer shall, and shall cause its respective Subsidiaries to, hold separate or dispose of any portion of their assets or businesses or otherwise conduct their businesses or any portion of their businesses in a specified manner as soon as practicable and in any event on or prior to the Outside Date.

(e)    Buyer shall reimburse Sellers for the reasonable costs and expenses of Sellers and their respective Representatives, including reasonable fees and disbursements of legal counsel and other consultants and advisors, incurred from and after the date hereof in connection with preparing for, responding to, defending against, or participating in the defense of any objection asserted with respect to the transactions contemplated hereby under any Antitrust Law or if any suit is instituted or threatened by any Governmental Authority or any private party challenging any of the transactions contemplated hereby as violative of any Antitrust Law, which shall be payable promptly following request therefor; provided, however, that nothing in this Section 5.3(e) shall entitle Buyer to dictate or control, directly or indirectly, Sellers' choice of counsel or such counsel's conduct in connection with the transactions contemplated hereby.

(f)    Actions or agreements required of Buyer pursuant to this Section 5.3 shall under no circumstances be considered a Material Adverse Effect.  For the avoidance of doubt, Buyer must take any and all steps necessary to consummate the transactions contemplated hereby, including divesting or agreeing to divest assets (including those of Buyer and those to be acquired by Buyer in the transactions contemplated hereby) to third parties in a manner acceptable to the Federal Trade Commission and United States

Department of Justice, Antitrust Division, and any other applicable Governmental Authority.

Section 5.4    Bankruptcy Court Matters.

(a)    Bidding Procedures Order. This Agreement is subject to procedures set forth in the Bidding Procedures Order and the consideration by Sellers of higher or better competing bids in respect of all or any part of the Acquired Assets (whether in combination with other assets of the Sellers or their Affiliates or otherwise) (each a "Competing Bid"). From the date hereof (and any prior time) and until the transactions contemplated hereby are consummated, Sellers are permitted to and to cause their Representatives and Affiliates to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Buyer and its Affiliates and Representatives) in connection with any sale or other disposition of the Acquired Assets. In addition, Sellers shall have the authority to respond to any inquiries or offers to purchase all or any part of the Acquired Assets (whether in combination with other assets of the Sellers or their Affiliates or otherwise) and perform any and all other acts related thereto which are required under the Bankruptcy Code, the Bidding Procedures Order or other applicable Law, including supplying information relating to the Business and the assets of Sellers to prospective purchasers.

(b)    Bankruptcy Court Filings.

(i)    Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Confirmation Order (or, in the event of a 363 Triggering Event, the Sale Order), including a finding of adequate assurance of future performance by Buyer, including by furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code. Buyer shall not, without the prior written consent of Sellers, file, join in, or otherwise support in any manner whatsoever any motion or other pleading relating to (i) the sale of the Acquired Assets hereunder or (ii) the confirmation of the Plan.

(ii)    Sellers shall file such motions or pleadings as may be appropriate or necessary to assume and assign the Transferred Contracts and to determine the amount of the Cure Costs; provided, that nothing herein shall preclude Sellers from filing one or more motions to reject any Contracts that are not Transferred Contracts.

(c)    Back-up Bidder. Buyer agrees that, in the event that Buyer is not the winning bidder at the Auction, if and only if (i) Buyer submits the second highest or second best bid at the Auction or the terms of this Agreement constitute the second highest or best bid, and (ii) Sellers give written notice to Buyer on or before the Back-up Termination Date, stating that Sellers (A) failed to consummate the sale of the Acquired

Assets with the winning bidder, and (B) terminated the purchase agreement with the winning bidder, Buyer shall consummate the transactions contemplated hereby upon the terms and conditions as set forth herein, including the Purchase Price, as the same may be increased by Buyer at the Auction.

(d)    <u>Confirmation Order</u>.  Provided Buyer is selected as the winning bidder in respect of the Acquired Assets at the Auction, Sellers shall seek entry of the Confirmation Order (or, in the event of a 363 Triggering Event, the Sale Order) and any other necessary orders to close the sale by the Bankruptcy Court as soon as reasonably practicable following the closing of the Auction in accordance with the terms and conditions of the Bidding Procedures Order.  Buyer and Sellers understand and agree that the transactions contemplated by this Agreement are subject to approval by the Bankruptcy Court.  Subject to <u>Section 5.4(e)</u>, in the event the entry of the Confirmation Order (or, in the event of a 363 Triggering Event, the Sale Order) shall be appealed, Sellers shall use commercially reasonable efforts to defend such appeal.

(e)    In the event the Confirmation Order is not obtained or the Bankruptcy Court otherwise denies confirmation of the Plan (a "<u>363 Triggering Event</u>"), the Parties agree to effect the Closing pursuant to Section 363 of the Bankruptcy Code.

Section 5.5    <u>Notices and Consents</u>.

(a)    Prior to the Closing and as necessary following the Closing, Sellers will give, or will cause to be given, any notices to third parties, and each of the Parties will use its commercially reasonable efforts to obtain any third party consents or sublicenses, in connection with the matters referred to in <u>Section 5.5(a)</u> of the Disclosure Schedule or as are otherwise necessary and appropriate to consummate the transactions contemplated hereby; <u>provided</u>, <u>however</u>, that (i) Sellers shall control all correspondence and negotiations with third parties regarding any such matters, (ii) neither Aéropostale nor any Subsidiary of Aéropostale shall be required to pay any consideration therefor or incur any expenses in connection therewith, (iii) Sellers shall not be obligated to initiate any Litigation to obtain such consent or approval, and (iv) Buyer shall pay any reasonable costs, or bear any reasonable effects as a result of amendments or modifications to any Transferred Contract, in either case as is necessary to obtain such consent or sublicense, and if Buyer refuses to pay such costs, such Acquired Asset shall be excluded from the transactions hereunder and there shall be no adjustment to the Purchase Price on account of such exclusion and Buyer will indemnify Sellers for any Damages as a result thereof, including any Damages from any inability of any Seller (including any Subsidiary of any Seller) to perform under a Contract that otherwise would be a Transferred Contract as a result of the other transactions contemplated hereby.

(b)    Without limiting <u>Section 5.3</u>, each of the Parties will give any notices to, make any filings with, and use its commercially reasonable efforts to obtain any authorizations, consents, and approvals of Governmental Authorities as are necessary and appropriate to consummate the transactions contemplated hereby.

Section 5.6    Notice of Developments.  Each Seller and Buyer will give prompt written notice to the other Parties of (a) the existence of any fact or circumstance, or the occurrence of any event, of which it has Knowledge that would reasonably be likely to cause a condition to a Party's obligations to consummate the transactions contemplated hereby set forth in Article VII not to be satisfied as of a reasonably foreseeable Closing Date, or (b) the receipt of any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement; provided, however, that the delivery of any such notice pursuant to this Section 5.6 shall not be deemed to amend or supplement this Agreement and the failure to deliver any such notice shall not constitute a waiver of any right or condition to the consummation of the transactions contemplated hereby by any Party.

Section 5.7    Access; No Contact.  Upon the reasonable request of Buyer, Sellers will permit Buyer and its Representatives to have, upon reasonable advance written notice, reasonable access to all premises, properties, books and records and Transferred Contracts included in the Acquired Assets during normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of any Seller; provided, however, that, for avoidance of doubt, the foregoing shall not require any Person to waive, or take any action with the effect of waiving, its attorney-client privilege with respect thereto.  Prior to the Closing, Buyer shall not, and shall cause its Representatives not to, contact any employees, vendors, suppliers, landlords, or licensors of any Seller in connection with or pertaining to any subject matter of this Agreement except with the prior written consent of each Seller.

Section 5.8    Bulk Transfer Laws.  Buyer acknowledges that Sellers will not comply with the provisions of any bulk transfer laws or similar laws of any jurisdiction in connection with the transactions contemplated by this Agreement, including the United Nations Convention on the Sale of Goods, and hereby waives all claims related to the non-compliance therewith.

Section 5.9    [Replacement Bonding Requirements.  On or prior to the Closing Date, Buyer shall provide replacement guarantees, standby letters of credit or other assurances of payment with respect to all Bonding Requirements, in form and substance satisfactory to Sellers and any banks or other counterparty thereto, and, both prior to and following the Closing Date, Buyer and Sellers shall cooperate to obtain a release in form and substance reasonably satisfactory to Buyer and Sellers with respect to all Bonding Requirements.  To the extent Buyer is unable to make such arrangements with respect to any Bonding Requirements prior to the Closing, with Sellers' consent in lieu thereof, Buyer shall deliver to Sellers an irrevocable, unconditional standby letter of credit in favor of Sellers in an amount equal to the amount of such Bonding Requirements, issued by a bank rated "A" or better by Standard and Poor's, in form and substance reasonably satisfactory to Sellers.]

## ARTICLE VI
## OTHER COVENANTS

The Parties agree as follows with respect to the period from and after the Closing:

Section 6.1    Further Assurances.  In case at any time after the Closing any further action is necessary to carry out the purposes of this Agreement, each of the Parties will, at

the requesting Party's sole cost and expense, take such further action (including the execution and delivery of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption and confirmation, providing materials and information) as the other Party may reasonably request which actions shall be reasonably necessary to transfer, convey or assign to Buyer all of the Acquired Assets or to confirm Buyer's assumption of the Assumed Liabilities.

Section 6.2    Access; Enforcement; Record Retention.    From and after the Closing, upon request by any Seller, Buyer will permit Sellers and their Representatives to have reasonable access during normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of Buyer, to all premises, properties, personnel, books and records, and Contracts of or related to the Acquired Assets or the Assumed Liabilities for the purposes of (a) preparing Tax Returns, (b) monitoring or enforcing rights or obligations of any Seller under this Agreement or any of the Related Agreements, or (c) complying with the requirements of any Governmental Authority; provided, however, that, for avoidance of doubt, the foregoing shall not require Buyer to take any such action if (i) such action may result in a waiver or breach of any attorney/client privilege, (ii) such action could reasonably be expected to result in violation of applicable law, or (iii) providing such access or information would be reasonably expected to be disruptive to its normal business operations. Buyer agrees to maintain the files or records which are contemplated by the first sentence of this Section 6.2 in a manner consistent in all material respects with its document retention and destruction policies, as in effect from time to time, for six (6) years following the Closing.

Section 6.3    Covered Employees.

(a)    Offer of Employment.    At least [●] days prior to the Closing Date, Buyer shall make an offer of employment, effective as of the Closing Date and contingent upon the Closing, to each of the Covered Employees who is then employed by Sellers or their respective Subsidiaries (at the same location, at the same base wage or hourly rate and on the same terms and conditions of employment as in effect immediately prior to the Closing). With respect to any Covered Employee who is on a long-term disability leave of absence as of the Closing Date, such offer shall be contingent upon such Covered Employee returning to active status.  Notwithstanding the foregoing, nothing herein shall be construed as to prevent Buyer from terminating the employment of any Covered Employee, consistent with applicable law, at any time following the Closing Date.

(b)    Compensation and Benefits.

(i)    Commencing on the Closing Date and continuing through the first anniversary of the Closing Date, Buyer or its Affiliates shall provide or cause to be provided to the Covered Employees compensation and employee benefits that are in the aggregate (including base salary and incentive bonus opportunities) substantially comparable to the compensation and employee benefits provided by Sellers and their Subsidiaries to such Covered Employees immediately prior to the Closing.

(ii)    Buyer or its Affiliates shall provide each Covered Employee with the severance benefits applicable to each such Covered Employee in accordance

with the applicable underlying plans or agreements as in effect immediately prior to the Closing Date.

(c)    <u>Service Credit</u>.    Each Covered Employee shall be given credit for all service with Sellers and their Subsidiaries, and their respective predecessors under any employee benefit plans or arrangements of Buyer and its Affiliates maintained by Buyer or its Affiliates in which such Covered Employees participate following the Closing Date, for purposes of eligibility, vesting, and entitlement to benefits, including for severance benefits and vacation entitlement (but not for accrual of pension benefits). Notwithstanding the foregoing, nothing in this <u>Section 6.3(c)</u> shall be construed to require crediting of service that would result in a duplication of benefits.

(d)    <u>Waiver of Pre-Existing Conditions; Crediting of Deductibles</u>.    No later than the Closing Date, Buyer or its Affiliates shall establish or cause to be established, at its own expense, benefit plans that provide life insurance, health care, dental care, accidental death and dismemberment insurance, disability and other group welfare benefits for Covered Employees.    Buyer or its Affiliates shall cause (i) the waiver of all limitations as to pre-existing conditions, exclusions and waiting periods with respect to participation and coverage requirements applicable to the Covered Employees under any such welfare benefit plans to the extent that such conditions, exclusions or waiting periods would not apply under the Employee Benefit Plans, and (ii) for the plan year in which the Closing Date occurs (or, if later, in the calendar year in which Covered Employees and their dependents commence participation in the applicable welfare plans), the crediting of each Covered Employee with any co-payments and deductibles paid prior to participation in such welfare plans in satisfying any applicable deductible or out-of-pocket requirements thereunder.

(e)    <u>401(k) Plan Rollovers</u>.    Buyer agrees to cause the Buyer's 401(k) plan to accept a "direct rollover" to Buyer's 401(k) plan of each Covered Employee's account balances (including promissory notes evidencing all outstanding loans) under Sellers' 401(k) plans if such rollover is elected in accordance with applicable Law by such Covered Employee.

(f)    <u>Accrued Vacation</u>.    Buyer or its Affiliates shall provide each Covered Employee with credit for the same number of vacation and sickness benefit days such Covered Employee has accrued but not used in the calendar year in which the Closing Date occurs, <u>provided</u> that, to the extent required by applicable law, such amount shall be paid by Buyer or its Affiliates to the applicable Covered Employee in cash.    In the event that a Covered Employee is unable to use such carried over vacation and sickness days within the calendar year in which the Closing Date occurs, Buyer or its Affiliates shall allow such Covered Employee to carry over such vacation and sickness days to be used in the subsequent calendar year unless such Covered Employee requests payout at the end of the current calendar year or such payout is required by applicable law, in either of which events Buyer or its Affiliates will timely make such payments to such Covered Employee.

30

(g)    Welfare Benefit Claims; COBRA.  On the Closing Date, Sellers and their Subsidiaries shall cease to provide welfare coverage to each Covered Employee and his or her covered dependents, and Buyer or its Affiliates shall commence providing such coverage to such individuals. Sellers shall be responsible in accordance with its applicable welfare plans (and the applicable welfare plans of their Subsidiaries) in effect prior to the Closing Date for all reimbursement claims (such as medical and dental claims) for expenses incurred, and for all non-reimbursement claims (such as life insurance claims) incurred, under Sellers' or their Subsidiaries' Employee Benefit Plans that are welfare benefit plans prior to the Closing Date by the Covered Employees and their dependents.  Buyer or its Affiliates shall be responsible in accordance with the applicable welfare plans of Buyer or its Affiliates for all reimbursement claims (such as medical and dental claims) for expenses incurred, and for all non-reimbursement claims (such as life insurance claims) incurred, on or after the Closing Date (or the date of commencement of employment with Buyer, if later) by Covered Employees and their dependents.  For purposes of this Section 6.3(g), a claim shall be deemed to have been incurred as follows: (i) for health, dental and prescription drug benefits, upon provision of such services, (ii) for life, accidental death and dismemberment and business travel accident insurance benefits, upon the death, disability or accident giving rise to such benefits, and (iii) for hospital-provided health, dental, prescription drug or the benefits that become payable with respect to any hospital confinement, pro-rata based upon the number of days of such confinement occurring before and after the Closing Date.  Sellers or their Subsidiaries shall provide coverage required by the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") under Sellers' or their Subsidiaries' Employee Benefit Plans that are group health plans with respect to qualifying events occurring prior to the Closing Date; provided, however, that to the extent that a dependent of a Covered Employee is receiving continuation coverage under COBRA as of the Closing Date, Buyer or its Affiliates shall be obligated to continue to provide COBRA continuation coverage to such dependent on and following the Closing Date for the period required under applicable law.  Buyer and its Affiliates shall provide coverage required by COBRA to Covered Employees and their eligible dependents or beneficiaries under Buyer's group health plans with respect to qualifying events occurring on and after the Closing Date.

(h)    WARN Act.  Provided that on or before the Closing Date Aéropostale provides Buyer with a list, by date and location, of employee layoffs implemented by Sellers with respect to employees of the Business in the ninety (90) day period preceding the Closing Date, Buyer shall indemnify and hold harmless each Seller and its Affiliates and their respective Representatives with respect to any Liability arising under the WARN Act with respect to employees of the Business arising in whole or part from the actions or omissions of Buyer from and after the Closing Date.

(i)    Tax Reporting.  Buyer shall adopt the "alternate procedure" for preparing and filing Internal Revenue Service Forms W-2 (Wage and Tax Statements), as described in Revenue Procedure 2004-53.  Under this procedure, Buyer as the successor employer shall provide Forms W-2 to Covered Employees reflecting all wages paid and Taxes withheld with respect to such Covered Employees for the calendar year in which the Closing Date occurs.  Sellers as the predecessor employers shall have no employment tax

31

reporting responsibilities for the Covered Employees following the Closing Date. Buyer shall also adopt the "alternate procedure" of Revenue Procedure 2004-53 for purposes of Internal Revenue Service Forms W-4 (Employee's Withholding Allowance Certificate) and W-5 (Earned Income Credit Advance Payment Certificate).

(j)     No Third Party Beneficiary Rights. The Parties agree that nothing in this Section 6.3, whether express or implied, is intended to create any third party beneficiary rights in any Covered Employee.

(k)     Cooperation. After the Closing Date, Buyer shall, and shall cause its Affiliates to, cooperate with Sellers to provide such current information regarding the Covered Employees on an ongoing basis as may be necessary to facilitate determinations of eligibility for, and payments of benefits to, the Covered Employees under any applicable employee benefit that continues to be maintained by Aéropostale or its Affiliates. Buyer shall, and shall cause its Affiliates to, permit Covered Employees to provide such assistance to Aéropostale as may be required in respect of claims against Aéropostale or its Affiliates, whether asserted or threatened, to the extent that, in Aéropostale's opinion, (i) a Covered Employee has knowledge of relevant facts or issues, or (ii) a Covered Employee's assistance is reasonably necessary in respect of any such claim.

Section 6.4     Certain Tax Matters.

(a)     Transfer Taxes. Buyer shall pay any stamp, documentary, filing, recording, registration, sales, use, transfer, added-value or other non-income Tax, fee or governmental charge (a "Transfer Tax") imposed under applicable Law in connection with the transactions contemplated hereby. Accordingly, if any Seller is required by Law to pay any such Transfer Taxes, Buyer shall promptly reimburse such Seller for the amount of such Transfer Taxes actually paid by such Seller (including any additional Transfer Taxes resulting from such reimbursement). Buyer shall be entitled to receive such Tax Returns and other documentation reasonably in advance of filing by such Seller, but not less than ten (10) Business Days prior to the due date of such Tax Returns, and such Tax Returns and other documentation shall be subject to Buyer's approval, which shall not be unreasonably withheld, delayed, or conditioned. The party that is required by applicable Law to file any Tax Returns in connection with Transfer Taxes described in the immediately preceding sentence shall prepare and timely file such Tax Returns. The Parties shall cooperate to permit the filing party to prepare and timely file any such Tax Returns.

(b)     Tax Adjustments. Taxes (other than Transfer Taxes) imposed upon or assessed directly against the Acquired Assets (including real estate Taxes (other than those subsumed in Section 2.8), personal property Taxes and similar Taxes) for the Tax period in which the Closing occurs (the "Proration Period") will be apportioned and prorated between Sellers and Buyer as of the Closing Date with Buyer bearing the expense of Buyer's proportionate share of such Taxes which shall be equal to the product obtained by multiplying (i) a fraction, the numerator being the amount of the Taxes and the denominator being the total number of days in the Proration Period, times (ii) the

32

number of days in the Proration Period following the Closing Date, and Sellers shall bear the remaining portion of such Taxes. If the precise amount of any such Tax cannot be ascertained on the Closing Date, apportionment and proration shall be computed on the basis of the amount payable for each respective item during the Tax period immediately preceding the Proration Period and any proration shall be adjusted thereafter on the basis of the actual charges for such items in the Proration Period. When the actual amounts become known, such proration shall be recalculated by Buyer and Sellers, and Buyer or Sellers, as the case may be, promptly (but not later than ten (10) calendar days after notice of payment due and delivery of reasonable supporting documentation with respect to such amounts) shall make any additional payment or refund so that the correct prorated amount is paid by each of Buyer and Sellers.

(c)    Tax Refunds.    In furtherance of Sellers' right to retain those assets described in section (a)(C) of the definition of Excluded Assets, Sellers shall be entitled to receive from Buyer all refunds (or credits for overpayments) of Taxes, including any interest paid thereon, by a Governmental Authority, attributable to any Tax period ending on or prior to the Closing Date (a "Pre-Closing Period") or the portion of any Proration Period ending on and including the Closing Date, net of any costs, fees, expenses or Taxes incurred in obtaining such refunds (or credits). Buyer and Sellers shall execute all documents, take reasonable additional actions and otherwise reasonably cooperate as may be necessary to obtain the Tax refunds (or credits) contemplated by this Section 6.4(c). Buyer shall pay any such Tax refund (or the amount of any such credit) to the Sellers within five (5) calendar days after Buyer receives such Tax refund from a Governmental Authority or files a Tax Return claiming such credit.

Section 6.5    Insurance Matters.    Buyer acknowledges that, upon Closing, all insurance coverage provided in relation to Sellers, the Stores, or the Acquired Assets that is maintained by any Seller or its Affiliates (whether such policies are maintained with third party insurers or with such Seller or its Affiliates) shall cease to provide any coverage to Buyer, the Stores, or the Acquired Assets and no further coverage shall be available to Buyer, the Stores, or the Acquired Assets under any such policies.

Section 6.6    Acknowledgements.

(a)    Buyer acknowledges that it has received from Sellers certain projections, forecasts, and prospective or third party information relating to Sellers, the Stores, the Acquired Assets, the Assumed Liabilities, and other related topics. Buyer acknowledges that (i) there are uncertainties inherent in attempting to make such projections and forecasts and in such information; (ii) Buyer is familiar with such uncertainties and is taking full responsibility for making its own evaluation of the adequacy and accuracy of all projections, forecasts, and information so furnished; and (iii) neither Buyer nor any other Person shall have any claim against any Seller or any of their Affiliates or any of their respective directors, officers, employees, stockholders, members, managers, partners, Affiliates, agents, or other Representatives with respect thereto. Accordingly, without limiting the generality of Section 3.16 or Section 9.1, Buyer acknowledges that none of the Sellers nor any other Person makes any representations or warranties with respect to such projections, forecasts, or information.

33

(b)    Buyer acknowledges that, except for the representations and warranties expressly set forth in Article III, as modified by the Disclosure Schedule (which representations and warranties shall terminate and be of no further force or effect as of the Closing), or expressly contained in any Related Agreement, and without limiting the generality of Section 3.16, none of the Sellers nor any other Person has made, or shall be deemed to have made, any representation or warranty, express or implied, including as to the accuracy or completeness of any information regarding any of the Sellers, the Stores, any Acquired Assets, any Assumed Liabilities or any other matter, and no Seller nor any other Person will be subject to any Liability to Buyer or any other Person resulting from such matters or the distribution to Buyer, or the use of, any such information.  BUYER ACKNOWLEDGES THAT, SHOULD THE CLOSING OCCUR, BUYER WILL ACQUIRE THE ACQUIRED ASSETS AND ASSUME THE ASSUMED LIABILITIES IN AN "AS IS" CONDITION AND ON A "WHERE IS" BASIS, WITHOUT ANY REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED (INCLUDING ANY WITH RESPECT TO ENVIRONMENTAL, HEALTH OR SAFETY MATTERS).    Further, without limiting any representation, warranty, or covenant of any Seller expressly set forth herein, Buyer acknowledges that it has waived and hereby waives, as a condition to the Closing, any further due diligence reviews, inspections, or examinations with respect to any Seller, the Stores, the Acquired Assets, the Assumed Liabilities, or any other matter, including with respect to engineering, environmental, title, survey, financial, operational, regulatory, and legal compliance matters.

Section 6.7    Press Releases and Public Announcements.  No Party shall issue any press release or make any public announcement relating to the existence or subject matter of this Agreement without the prior written approval of the other Parties, unless a press release or public announcement is required by applicable Law or a Decree of the Bankruptcy Court.  If any such announcement or other disclosure is required by applicable Law or a Decree of the Bankruptcy Court, the disclosing Party shall give the nondisclosing Parties prior notice of, and an opportunity to comment on, the proposed disclosure.  The Parties acknowledge that Sellers shall file this Agreement with the Bankruptcy Court in connection with obtaining the Bidding Procedures Order and/or Confirmation Order (or, in the event of a 363 Triggering Event, the Sale Order).

**ARTICLE VII**
**CONDITIONS TO OBLIGATION TO CLOSE**

Section 7.1    Conditions to Buyer's Obligations.    Buyer's obligation to consummate the transactions contemplated hereby in connection with the Closing is subject to satisfaction or waiver of the following conditions:

(a)    the representations and warranties set forth in Article III shall have been true and correct on the date hereof and as of the Closing (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date), except where the failure of such representations and warranties to be so true and correct (without giving effect to any limitation as to "material" or "Material Adverse Effect" set forth therein) has not resulted in a Material Adverse Effect;

34

(b)    Sellers shall have performed and complied with its covenants and agreements hereunder through the Closing in all material respects;

(c)    the Bankruptcy Court shall have entered the Confirmation Order or the Sale Order, and no order staying, reversing, modifying or amending the Confirmation Order or the Sale Order, as applicable, shall be in effect on the Closing Date;

(d)    all applicable waiting periods under any Antitrust Law shall have expired or otherwise been terminated;

(e)    no material Decree shall be in effect that prohibits consummation of the transactions contemplated by this Agreement; and

(f)    each delivery contemplated by Section 2.5(b) to be delivered to Buyer shall have been delivered.

Section 7.2    Conditions to Sellers' Obligations.    Sellers' obligations to consummate the transactions contemplated hereby in connection with the Closing are subject to satisfaction or waiver of the following conditions:

(a)    the representations and warranties set forth in Article IV shall have been true and correct in all material respects (except that any representation or warranty that is qualified by materiality shall have been true and correct in all respects) on the date hereof and as of the Closing (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date);

(b)    Buyer shall have performed and complied with its covenants and agreements hereunder through the Closing in all material respects;

(c)    the Bankruptcy Court shall have entered the Confirmation Order or the Sale Order, and no order staying, reversing, modifying or amending the Confirmation Order or the Sale Order, as applicable, shall be in effect on the Closing Date;

(d)    all applicable waiting periods under any Antitrust Law shall have expired or otherwise been terminated;

(e)    no material Decree shall be in effect that prohibits consummation of any of the transactions contemplated by this Agreement; and

(f)    each payment contemplated by Section 2.5(a) to be made to Sellers shall have been made, and each delivery contemplated by Section 2.5(c) to be delivered to Sellers shall have been delivered.

Section 7.3    No Frustration of Closing Conditions.    Neither Buyer nor Sellers may rely on the failure of any condition to their respective obligations to consummate the transactions contemplated hereby set forth in Section 7.1 or Section 7.2, as the case may be, to be satisfied if such failure was caused by such Party's or its Affiliates' failure to use its reasonable best efforts (or best efforts or commercially reasonable efforts, with respect to those matters

35

contemplated by Section 5.3 or Section 5.5, respectively, as applicable) to satisfy the conditions to the consummation of the transactions contemplated hereby or by any other breach of a representation, warranty, or covenant hereunder.

## ARTICLE VIII
## TERMINATION

Section 8.1    Termination of Agreement.    The Parties may terminate this Agreement at any time prior to the Closing as provided below:

(a)    by the mutual written consent of the Parties;

(b)    by any Party by giving written notice to the other Parties if:

(i)    any court of competent jurisdiction or other competent Governmental Authority shall have enacted or issued a Law or Decree or taken any other action permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement and such Law or Decree or other action shall have become final and non-appealable; provided, however, that the right to terminate this Agreement under this Section 8.1(b)(i) shall not be available to Buyer if the failure to consummate the Closing because of such action by a Governmental Authority shall be due to the failure of Buyer to have fulfilled any of its obligations under this Agreement; or

(ii)    the Closing shall not have occurred prior to the [●] calendar day following the date hereof (the "Outside Date"); provided, however, that if the Closing shall not have occurred due to the failure of the Bankruptcy Court to enter the Confirmation Order or the condition to Closing set forth in Section 7.1(d) remains unsatisfied or not waived and if all other conditions to the respective obligations of the Parties to close hereunder that are capable of being fulfilled by the Outside Date shall have been so fulfilled or waived, then no Party may terminate this Agreement prior to [DATE]; provided, further, that if the Closing shall not have occurred on or before the Outside Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Buyer or Sellers, then the breaching Party may not terminate this Agreement pursuant to this Section 8.1(b)(ii).

(c)    by Buyer by giving written notice to each Seller if there has been a breach by any Seller of any representation, warranty, covenant, or agreement contained in this Agreement that has prevented the satisfaction of the conditions to the obligations of Buyer at Closing set forth in Section 7.1(a) and Section 7.1(b), and such breach has not been waived by Buyer, or, if such breach is curable, cured by such Seller prior to the earlier to occur of (A) ten (10) days after receipt of Buyer's notice of intent to terminate and (B) the Outside Date;

(d)    by any Seller by giving written notice to Buyer and the other Seller if there has been a breach by Buyer of any representation, warranty, covenant, or agreement contained in this Agreement that has prevented the satisfaction of the conditions to the

36

obligations of Sellers at Closing set forth in Section 7.2(a) and Section 7.2(b), and such breach has not been waived by such Seller, or, if such breach is curable, cured by Buyer prior to the earlier to occur of (A) ten (10) days after receipt of such Seller's notice of intent to terminate and (B) the Outside Date; or

(e)    by Sellers or Buyer, if (i) (x) Sellers enter into a definitive agreement with respect to a Competing Bid, (y) the Bankruptcy Court enters an order approving a Competing Bid and (z) the Person making the Competing Bid consummates the Competing Bid or (ii) the Bankruptcy Court enters an order that precludes the consummation of the transactions contemplated hereby on the terms and conditions set forth in this Agreement.

Section 8.2    Effect of Termination.    If any Party terminates this Agreement pursuant to Section 8.1, all rights and obligations of the Parties hereunder shall terminate upon such termination and shall become null and void (except that Article I, Section 3.16, Section 6.6, Section 8.3, Article IX, and this Section 8.2 shall survive any such termination) and no Party shall have any Liability (except as set forth in Section 5.4 and Section 8.3) to the other Party hereunder; provided, however, that nothing in this Section 8.2 shall relieve any Party from Liability for any breach occurring prior to any such termination (but solely to the extent such breach was willful, grossly negligent, or fraudulent) set forth in this Agreement; provided, further, that the maximum Liability of Sellers under this Agreement shall not exceed Buyer's reasonable and documented out-of-pocket expenses up to an aggregate amount of $[●].

Section 8.3    Lease Indemnity.    If this Agreement is terminated pursuant to Section 8.1(b) or Section 8.1(d), Buyer shall indemnify Sellers for all Liabilities and Damages arising out of any Lease assumed by Sellers pursuant to section 365(k) of the Bankruptcy Code.

# ARTICLE IX
# MISCELLANEOUS

Section 9.1    Survival.    Except for any covenant that by its terms is to be performed (in whole or in part) by any Party following the Closing, none of the representations, warranties, or covenants of any Party set forth in this Agreement or in any certificate delivered pursuant to Section 2.5(b) or Section 2.5(c) shall survive, and each of the same shall terminate and be of no further force or effect as of, the Closing.

Section 9.2    Expenses.    Except as otherwise expressly set forth herein, each Party will bear its own costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby, including all fees of law firms, commercial banks, investment banks, accountants, public relations firms, experts and consultants.  For the avoidance of doubt, Buyer shall pay all recording fees arising from the transfer of the Acquired Assets.

Section 9.3    Entire Agreement.    This Agreement, the Related Agreements and the Confidentiality Agreement constitute the entire agreement between the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or between the Parties to the extent they relate in any way to the subject matter hereof.

Section 9.4    <u>Incorporation of Exhibits and Disclosure Schedule</u>.  The Exhibits to this Agreement and the Disclosure Schedule are incorporated herein by reference and made a part hereof.

Section 9.5    <u>Amendments and Waivers</u>.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein.  No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement.  No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant.  No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain, or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this <u>Section 9.5</u> except as expressly provided herein.  Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

Section 9.6    <u>Succession and Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written consent of the other Parties.

Section 9.7    <u>Notices</u>.    All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (a) when delivered personally to the recipient; (b) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (c) upon receipt of confirmation of receipt if sent by facsimile transmission; (d) on the day such communication was sent by e-mail; or (e) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to any Seller:        Aéropostale, Inc.
                         112 West 34th Street
                         22nd Floor
                         New York, NY 10120
                         Attention: Marc Schuback
                         Facsimile: (646) 619-4873
                         E-mail: mschuback@aeropostale.com

                         With a copy (which shall not constitute notice to Sellers) to:

                         Weil, Gotshal & Manges LLP
                         767 Fifth Avenue
                         New York, New York 10153

Attention: Michael J. Aiello; Ray C. Schrock, P.C.; and Gavin
Westerman
Facsimile: (212) 310-8007
E-mail:  michael.aiello@weil.com; ray.schrock@weil.com;
gavin.westerman@weil.com

If to Buyer:            [Buyer]
                        [Street Address]
                        [City, State, Zip Code]
                        Attention: [Contact]
                        Facsimile: [Facsimile Number]
                        E-mail: [E-mail address]

                        With a copy (which shall not constitute notice to Buyer) to:

                        [Firm]
                        [Street Address]
                        [City, State, Zip Code]
                        Attention: [Contact]
                        Facsimile: [Facsimile Number]
                        E-mail: [E-mail address]

Any Party may change the address to which notices, requests, demands, claims and other
communications hereunder are to be delivered by giving the other Parties notice in the manner
set forth in this Section 9.7.

        Section 9.8    Governing Law.  This Agreement shall be governed by and
construed in accordance with the internal laws of the State of New York (without giving effect to
the principles of conflict of Laws thereof), except to the extent that the Laws of such state are
superseded by the Bankruptcy Code.

        Section 9.9    Submission to Jurisdiction; Service of Process.  Each of the Parties
irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in
any Litigation arising out of or relating to this Agreement or any Related Agreement or the
transactions contemplated hereby or thereby and agrees that all claims in respect of such
Litigation may be heard and determined in any such court.  Each Party also agrees not to (a)
attempt to deny or defeat such exclusive jurisdiction by motion or other request for leave from
the Bankruptcy Court or (b) bring any action or proceeding arising out of or relating to this
Agreement or any Related Agreement or the transactions contemplated hereby or thereby in any
other court.  Each of the Parties irrevocably and unconditionally waives any objection to the
laying of venue in, and any defense of inconvenient forum to the maintenance of, any Litigation
so brought and waives any bond, surety or other security that might be required of any other
Party with respect thereto.  Any Party may make service on any other Party by sending or
delivering a copy of the process to the Party to be served at the address and in the manner
provided for the giving of notices in Section 9.7; provided, however, that nothing in this Section
9.9 shall affect the right of any Party to serve legal process in any other manner permitted by law

39

or in equity. Each Party agrees that a final judgment in any Litigation so brought shall be conclusive and may be enforced by Litigation or in any other manner provided by law or in equity. The Parties intend that all foreign jurisdictions will enforce any Decree of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby.

Section 9.10    <u>Waiver of Jury Trial</u>.  EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY RELATED AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

Section 9.11    <u>Specific Performance</u>.  Buyer acknowledges and agrees that Sellers and their respective estates would be damaged irreparably in the event Buyer does not perform its obligations under this Agreement in accordance with its specific terms or otherwise breaches this Agreement, so that, in addition to any other remedy that Sellers may have under law or equity, each Seller shall be entitled, without the requirement of posting a bond or other security, to injunctive relief to prevent any breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof.

Section 9.12    <u>Severability</u>.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement.  In the event that any of the provisions of this Agreement shall be held by any Governmental Authority to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

Section 9.13    <u>No Third Party Beneficiaries</u>.  Except as otherwise expressly provided in <u>Section 9.14</u>, this Agreement shall not confer any rights or remedies upon any Person other than Buyer, each Seller, and their respective successors and permitted assigns.

Section 9.14    <u>Non-Recourse</u>.  All claims or causes of action (whether in contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or related in any manner to this Agreement or the Related Agreements may be made only against (and are expressly limited to) the Persons that are expressly identified as parties hereto or thereto (the "<u>Contracting Parties</u>").  In no event shall any Contracting Party have any shared or vicarious Liability for the actions or omissions of any other Person.  No Person who is not a Contracting Party, including any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney or representative of, and any financial advisor or lender to, any of the foregoing ("<u>Non-Party Affiliates</u>"), shall have any Liability (whether in contract or in tort, in law or in equity, or granted by statute or based upon any theory that seeks to impose Liability of an entity party against its owners or affiliates) for any claims, causes of action, obligations or Liabilities arising under, out of, in connection with or related in any manner to this Agreement or the Related Agreements or based on, in respect of, or by reason of this Agreement or the Related Agreements or their negotiation, execution, performance or breach; and, to the maximum extent permitted by Law, each Contracting Party waives and releases all such Liabilities, claims and obligations against any

40

such Non-Party Affiliates.  Without limiting the foregoing, to the maximum extent permitted by Law, (a) each Contracting Party hereby waives and releases any and all rights, claims, demands, or causes of action that may otherwise be available at law or in equity, or granted by statute, to avoid or disregard the entity form of a Contracting Party or otherwise impose Liability of a Contracting Party on any Non-Party Affiliate, whether granted by statute or based on theories of equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization, or otherwise; and (b) each Contracting Party disclaims any reliance upon any Non-Party Affiliates with respect to the performance of this Agreement or the Related Agreements or any representation or warranty made in, in connection with, or as an inducement to this Agreement or the Related Agreements.  The Parties acknowledge and agree that the Non-Party Affiliates are intended third-party beneficiaries of this Section 9.14.

Section 9.15  Mutual Drafting.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Section 9.16  Disclosure Schedule.  All capitalized terms not defined in the Disclosure Schedule shall have the meanings ascribed to them in this Agreement.  The representations and warranties of Sellers in this Agreement are made and given, and the covenants are agreed to, subject to the disclosures and exceptions set forth in the Disclosure Schedule.  The disclosure of any matter in any section of the Disclosure Schedule shall be deemed to be a disclosure for all purposes of this Agreement and all other sections of the Disclosure Schedule to which such matter relates.  The listing of any matter shall expressly not be deemed to constitute an admission by Sellers, or to otherwise imply, that any such matter is material, is required to be disclosed under this Agreement or falls within relevant minimum thresholds or materiality standards set forth in this Agreement.  No disclosure in the Disclosure Schedule relating to any possible breach or violation of any Contract or law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.  In no event shall the listing of any matter in the Disclosure Schedule be deemed or interpreted to expand the scope of Sellers' representations, warranties, or covenants set forth in this Agreement.  All attachments to the Disclosure Schedule are incorporated by reference into the applicable section of the Disclosure Schedule in which they are directly or indirectly referenced.  The information contained in the Disclosure Schedule is in all respects provided subject to the Confidentiality Agreement.

Section 9.17  Headings; Table of Contents.  The section headings and the table of contents contained in this Agreement and the Disclosure Schedule are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 9.18  Counterparts; Facsimile and Electronic Signatures.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  This Agreement

41

or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original.

[Remainder of page intentionally left blank.]

42

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

AÉROPOSTALE, INC.

By: _____
Name:
Title:


[OTHER SELLERS]


By: _____
Name:
Title:


[BUYER]


By: _____
Name:
Title:

**Exhibit D**

**Liquidation Analysis**

## LIQUIDATION ANALYSIS

### General Assumptions

Hypothetical Chapter 7 recoveries were determined through multiple steps, as set forth below. The basis of the Liquidation Analysis is the Debtors' projected cash balance and assets as of August 27, 2016 (the "Conversion Date") and the net costs to execute the administration of the wind-down of the Estates. The Liquidation Analysis assumes that the Debtors would commence a Chapter 7 liquidation on or about the Conversion Date under the supervision of a court-appointed Chapter 7 trustee. The Liquidation Analysis reflects the wind-down and liquidation of substantially all of the Debtors' remaining assets; a quick sale of their non-Debtor subsidiaries; and the distribution of available proceeds to Holders of Allowed Claims during the period after the Conversion Date.

THE DEBTORS BELIEVE THAT ANY ANALYSIS OF A HYPOTHETICAL LIQUIDATION IS NECESSARILY SPECULATIVE. THERE ARE A NUMBER OF ESTIMATES AND ASSUMPTIONS UNDERLYING THE LIQUIDATION ANALYSIS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS OR A CHAPTER 7 TRUSTEE. NEITHER THE ANALYSIS, NOR THE FINANCIAL INFORMATION ON WHICH IT IS BASED, HAS BEEN EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS IN ACCORDANCE WITH STANDARDS PROMULGATED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. THERE CAN BE NO ASSURANCE THAT ACTUAL RESULTS WOULD NOT VARY MATERIALLY FROM THE HYPOTHETICAL RESULTS PRESENTED IN THE LIQUIDATION ANALYSIS.

### Summary Notes to Liquidation Analysis

1. *Dependence on assumptions*. The Liquidation Analysis depends on a number of estimates and assumptions. Although developed and considered reasonable by the management and the advisors of the Debtors, the assumptions are inherently subject to significant economic, business, regulatory and competitive uncertainties and contingencies beyond the control of the Debtors or their management. The Liquidation Analysis is also based on the Debtors' best judgment of how numerous decisions in the liquidation process would be resolved. Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation and actual results could vary materially and adversely from those contained herein.

2. *Dependence on a forecasted balance sheet.* This Liquidation Analysis contains numerous estimates that are still under review and it remains subject to further legal and accounting analysis.

3. *DIP Facility Recovery Assumptions.* The Liquidation Analysis assumes that upon conversion of the Chapter 11 case to Chapter 7, the DIP Agents will seek relief from the automatic stay to foreclose on Debtor assets under the jurisdiction of the Bankruptcy Court to recover on the outstanding DIP Claims. For purposes of this analysis, it is assumed that the conversion from Chapter 11 to Chapter 7 would take place on the Conversion Date. The DIP Agents, on behalf of the DIP Lenders, would have the ability to recover on the DIP Facilities' first lien position on all Debtor assets.

4. *Chapter 7 liquidation process*. The liquidation of the Debtors' U.S. assets is assumed to be completed over a twelve-month period. During the first two months, the Debtors would complete going-out-of-business sales for all remaining U.S. store inventory, furniture, fixtures, and equipment, along with the sale of all intellectual property. During months 3 – 6, the Debtors would primarily focus on collecting other assets while throughout the 12 month period the Debtors would also be working on administrative activities, such as final creditor distributions needed to complete the wind-down of the Estates. The Debtors have assumed that the disruption to their operations occasioned by the conversion of the cases to Chapter 7, and in particular the Chapter 7 trustee's inability to provide design and procurement services to international licensees, will result in the termination of most of their international license agreements.

5. *Claims Estimates*.  In preparing this Liquidation Analysis, the Debtors have preliminarily estimated an amount of Allowed Claims for each Class based upon a review of the Debtors' estimated balance sheet. DIP Claims were estimated based on the Revised DIP Budget as of the Conversion Date.  Additional Claims were

estimated to include certain Chapter 7 administrative obligations incurred after the Conversion Date. The estimate of all allowed claims in this Liquidation Analysis is based on the book value of those claims. No order or finding has been entered or made by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in this Liquidation Analysis. The estimate of the amount of Allowed Claims set forth in this Liquidation Analysis should not be relied upon for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims under the Plan. The actual amount of Allowed Claims could be materially different from the amount of Claims estimated in this Liquidation Analysis.

**Project Aviator**
Recovery Analysis - Forecasted 8/27/16
($ in millions)

| | Asset Value | Value Realization | | Note |
|---|---|---|---|---|
| | | Low | High | |
| **Summary of Assets & Gross Liquidation Proceeds** | | | | |
| **Assets Excluding Term Loan Priority Collateral & Unencumbered Assets** | | | | |
| Cash on Hand | $ 17 | $ 17 | $ 17 | [1] |
| Credit Card A/R | 8 | 7 | 8 | [2] |
| Licensing A/R | 8 | - | - | [3] |
| Inventory | 125 | 127 | 134 | [4] |
| IP | - | 23 | 35 | [5] |
| Other (Deposits, Prepaid Rent, Tax, Other) | | 4 | 6 | [6] |
| **Subtotal Recovery on DIP Collateral** | | **179** | **199** | |
| **Term Loan Priority Collateral** | | | | |
| FF&E Proceeds (Including Realized) | | 2 | 3 | [7] |
| **Unencumbered Assets (Subject to Dimunition Claims)** | | | | |
| Proceeds from Litigation | | 5 | 14 | [8] |
| Recovery from Canada / Puerto Rico | | 6 | 7 | [9] |
| Preference/Avoidance Actions | | - | - | [10] |
| **Subtotal Recovery on Unencumbered Assets** | | **11** | **21** | |
| **Total Asset Recovery** | | $ **191** | $ **223** | |
| **Summary of Recoveries** | | | | |
| **Proceeds Available for DIP Facility Claim** | | | | |
| Recovery on DIP Collateral | | 179 | 199 | |
| Less: Chapter 7 Liquidation Costs | | | | |
| Wind Down | | (30) | (20) | [11] |
| Severance / PTO / KERP | | (12) | (12) | [11] |
| Payroll / Benefits in Arrears | | (9) | (9) | [11] |
| Sales Tax Payable | | (6) | (6) | [11] |
| 503(b)(9) | | (4) | (3) | [11] |
| Chapter 7 Trustee Fees | | (6) | (7) | [11] |
| Total Chapter 7 Liquidation Costs | | (67) | (57) | |
| **Total Proceeds Available for DIP Facility Claim** | | **112** | **142** | |
| **DIP Facility Claims** | | | | |
| DIP Balance & Accrued Interest | | 106 | 106 | [12] |
| Deferred DIP Fees & Pro Fees | | 3 | 3 | [12] |
| **Total DIP Facility Claims** | | **109** | **109** | |
| *Recovery %* | | *100%* | *100%* | |
| **Proceeds Available for Term Loan** | | | | |
| Excess DIP Proceeds Available for Term Loan | | 2 | 33 | |
| Term Loan Priority Collateral Proceeds | | 2 | 3 | |
| Less: L&F Post Petition Merch AP | | (1) | (1) | |
| **Total Proceeds Available for Term Loan** | | **3** | **35** | |
| **Term Loan Claims** | | **152** | **152** | [13] |
| *Recovery %* | | *2%* | *23%* | |
| **Proceeds Available for Admin/Priority Claims** | | | | |
| Excess Proceeds Available for Admin/Priority Claims | | - | - | |
| Unencumbered Assets | | 11 | 21 | |
| **Total Proceeds Available for Admin/Priority Claims** | | **11** | **21** | |
| **Total Admin and Priority Claims** | | **151** | **93** | [14] |
| *Recovery %* | | *7%* | *22%* | |
| **Proceeds Available for Unsecured Claims** | | **-** | **-** | |
| **Total Unsecured Claims** | | **489** | **457** | [15] |
| *Recovery %* | | *0%* | *0%* | |

**Specific Assumptions and Notes**

*Note 1*

The Debtors' estimated bank cash as of the Conversion Date is approximately $17M per the latest DIP Budget. In liquidation, the estimated recovery on the balance of cash is 100%.

*Note 2*

The Debtors' estimated credit card receivables as of the Conversion Date are approximately $8M. It is assumed that a Chapter 7 trustee would retain certain existing staff of the Debtors to lead an aggressive collection effort for outstanding accounts receivable. This analysis assumes that in a Chapter 7 liquidation, the recovery on credit card receivables will be between 90% and 95%.

*Note 3*

The Debtors' licensing A/R is estimated at $8M, net of reserves. This analysis assumes that in a Chapter 7 liquidation, the Debtors would not be able to comply with the terms of the international licensing agreements. Having to collect on the licensing receivables in international jurisdictions while in default of the licensing agreements would lead to significant difficulty in collecting on these receivables. No value is included in the liquidation analysis for these receivables.

*Note 4*

The Debtors estimate that there would be eligible U.S. inventory of approximately $125M (excluding Puerto Rico), based on the DIP Budget. The Liquidation Analysis assumes inventory is sold "as is, where is" as of the Conversion Date. Recovery assumptions are based on a third party inventory appraisal, which reflects the net orderly liquidation value ("NOLV"). NOLV includes selling costs such as liquidator fees, payroll, occupancy, freight, and other store and distribution operating expenses. Total inventory is assumed to have a recovery rate of 102.2% to 107.2%.

*Note 5*

Intellectual property owned by the Debtors is comprised of trademark portfolio, design library, internet intellectual property assets, customer data, trade secrets and proprietary content, and licensing assets (collectively the "Debtors' IP"). Net recoverable liquidation value of the Debtors' IP is assumed to be realized in expedited sales to one or more third party buyers by a chapter 7 trustee. In estimating the range of the Debtors' IP liquidation value, the Debtors and their advisors considered a third party appraisal report as well as interest received in the international licensing business, which is supported by the Debtor' IP, from potential acquirors. Additionally, the Debtors and their advisors considered the significant disruption to international licensees' operations and relationships under a pre-holiday chapter 7 liquidation scenario due to the likely inability of the chapter 7 trustee to comply with the Debtors' obligations under many of the licensing agreements that may result in the termination of the licenses, as well as recent significant retail bankruptcy cases with intellectual property liquidation sales.

*Note 6*

The other assets primarily consisting of prepaid rent, tax receivable, deposits, restricted cash and deferred financing fees. For the purposes of the Liquidation analysis, the Debtors assume a recovery range of $4 - $6M.

*Note 7*

Property, plant & equipment ("PP&E") primarily consists of leasehold improvements, computer software, computer equipment, and furniture and fixtures. The liquidation analysis assumes a recovery of approximately $2K per store with an additional $750K in corporate and distribution center FF&E.

*Note 8*

One of the Debtors' former executives and a third party have been ordered to pay restitution of approximately $25M, which is supported by approximately $14M in funds seized by the government. The individuals have appealed the decision. For purposes of the Liquidation Analysis a range of $5 - $14M has been used to reflect risk of appeal and reduced recovery if the claim is sold.

**Note 9**

The Debtors' Canadian operations have been wound down and the Canadian entity is currently in proceedings under the Bankruptcy and Insolvency Act. Based on discussions with the Trustee this liquidation analysis assumes intercompany and equity recovery from Canada between $4 - $5M.

In the event of a Chapter 7 liquidation the Debtors' stores in Puerto Rico would also undergo a GOB sale. The liquidation analysis estimates a recovery on inventory located in Puerto Rico of $2M.

**Note 10**

No recovery or related litigation costs have been attributed to any potential avoidance actions under the Bankruptcy Code, including potential preference or fraudulent transfer actions due to, among other issues, the costs of such litigation, the uncertainty of the outcome, and anticipated disputes regarding those matters.

**Note 11**

- Wind down expenses reflect a 12 month budget, including 2 month sale period, 4 month wind down, and 6 month tail period. Expenses are mainly comprised of corporate salaries and wages, IT costs, and facility costs, not considered in the liquidation of inventory, as discussed in Note 4 regarding NOLV. In addition, wind down expenses include professional fees for legal and financial advisor costs in connection with the wind down of the Estates; and transaction fees for the sale of FF&E and the IP. In the context of a Chapter 7 conversion, it is assumed there would be significant litigation.
- Severance/PTO/KERP are related to critical employees for the wind down of the Estate. Severance and PTO include amounts for store employees to retain them for the GOB sales.
- Payroll/benefits in arrears and sales tax payable are pre-conversion claims but are included in wind down expenses because if they are not paid can have significant additional destabilizing effects on the Estates.
- 503(b)(9) claims which in connection with approval of DIP financing, the Debtors agreed to pay.
- Chapter 7 trustee fees were estimated at 3% of gross liquidation proceeds.

**Note 12**

The Debtors estimate the DIP balance of $106M as of the Conversion Date per the latest DIP Budget. The estimate also includes Crystal DIP fees to be paid at termination of DIP facility (1.75% of $160M), accrued/unpaid interest and accrued/unpaid professional fees per DIP budget.

**Note 13**

Secured claims include balances outstanding on the Term Loan claims as of the Conversion Date including PIK interest.

**Note 14**

Administrative and priority claims include Chapter 11 post-petition trade payables outstanding as of the Conversion Date, gift card claims, outstanding checks, potential WARN liabilities, and other admin claims estimated as of the Conversion Date.

Included in this amount, Debtors estimate approximately $240M in outstanding purchase orders as of the liquidation date. Vendors may be entitled to an administrative expense claim to the extent they suffer damages from the cancellation of these orders. The Debtors estimate potential damages of $72 - $120M related to these orders.

**Note 15**

General unsecured claims include the deficiency claims of the Holders of the Term Loan, trade claims, lease rejection claims, non-priority gift card claims, and other unsecured claims estimated as of the Conversion Date.

In the event of a Chapter 7 liquidation, the aggregate amount of general unsecured claims and priority claims will likely increase significantly. For instance this analysis does not include estimates for damage claims for the rejection of executory contracts.