Robert A. Britton
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

*James A. Stempel (admitted pro hac vice)*
*Robert B. Ellis, P.C. (admitted pro hac vice)*
*Stephen C. Hackney (admitted pro hac vice)*
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Sycamore Parties*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Aéropostale, Inc., *et al.*,[1] | ) | Case No. 16-11275  (shl) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |
| | ) | **RE: Docket Nos. 437, 438** |
| | ) | |

**OBJECTION OF THE TERM LOAN LENDERS AND MGF**
**TO DEBTORS' MOTION FOR AN ORDER (I) APPROVING DISCLOSURE**
**STATEMENT; (II) APPROVING NOTICE OF DISCLOSURE STATEMENT**
**HEARING; (III) SHORTENING NOTICE FOR DISCLOSURE STATEMENT**
**OBJECTION DEADLINE, DISCLOSURE STATEMENT HEARING AND PLAN**
**OBJECTION DEADLINE; (IV) ESTABLISHING A RECORD DATE;**
**(V) ESTABLISHING NOTICE AND OBJECTION PROCEDURES FOR**
**CONFIRMATION OF THE PLAN; (VI) APPROVING SOLICITATION PACKAGES**
**AND PROCEDURES FOR DISTRIBUTION THEREOF; (VII) APPROVING THE**
**FORM OF BALLOT AND ESTABLISHING PROCEDURES FOR VOTING ON THE**
**PLAN; (VIII) APPROVING THE FORM OF NOTICE TO NON-VOTING CLASSES**
**UNDER THE PLAN; (IX) APPROVING SALE AND BIDDING PROCEDURES FOR**
**SALE OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS PURSUANT TO THE**
**PLAN; (X) APPROVING PROCEDURES FOR ASSUMPTION AND ASSIGNMENT OF**
**CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (XI)**
**APPROVING RELATED NOTICES; AND (XII) GRANTING RELATED RELIEF**

---

[1]    The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses):  Aéropostale, Inc. (3880), Aéropostale Procurement Company, Inc. (8518), Aéropostale West, Inc. (7013), Jimmy'Z Surf Co., LLC (0461), Aero GC Management LLC (4257), Aéropostale Puerto Rico, Inc. (6477), P.S. from Aéropostale, Inc. (5900), Aéropostale Licensing, Inc. (8124), PS Store Puerto Rico LLC (9715), GoJane LLC (4923), and Aéropostale Holdings, Inc. (7729).  Aéropostale's United States headquarters is located at 112 West 34th Street, 22nd Floor, New York, New York 10120.

Aero Investors LLC ("Aero Investors"), in its capacities as the administrative agent, collateral agent and lender under the Prepetition Term Loan Agreement, MGF Sourcing Holdings, Limited ("Holdings"; and together with Aero Investors, the "Term Loan Lenders"), and MGF Sourcing US, LLC ("MGF"; and together with the Term Loan Lenders, the "Sycamore Parties") hereby submit this objection (this "Objection") to the *Debtors' Motion for an Order (I) Approving Disclosure Statement; (II) Approving Notice of Disclosure Statement Hearing; (III) Shortening Notice for Disclosure Statement Objection Deadline, Disclosure Statement Hearing and Plan Objection Deadline; (IV) Establishing a Record Date; (V) Establishing Notice and Objection Procedures for Confirmation of the Plan; (VI) Approving Solicitation Packages and Procedures for Distribution Thereof; (VII) Approving the Form of Ballot and Establishing Procedures for Voting on the Plan; (VIII) Approving the Form of Notice to Non-Voting Classes Under the Plan; (IX) Approving Sale and Bidding Procedures for Sale of Substantially All of Debtors' Assets Pursuant to the Plan; (X) Approving Procedures for Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (XI) Approving Related Notices; and (XII) Granting Related Relief*, dated July 15, 2016 [Docket No. 438] (the "Disclosure Statement Motion").[2] In support of this Objection, the Sycamore Parties respectfully state as follows:

## BACKGROUND

1.      The Debtors' Disclosure Statement Motion asks the Court to approve (i) a flawed Disclosure Statement that fails to provide anything approaching adequate information regarding an unconfirmable Plan and (ii) bidding procedures for the sale of substantially all of their assets pursuant to a sale process that deprives the Term Loan Lenders of their legal right to credit bid

---

[2]    Capitalized terms used and not defined herein shall have the meanings ascribed to them in the Disclosure Statement Motion or the *Proposed Disclosure Statement for Joint Plan of Reorganization of Aéropostale, Inc. and its Affiliated Debtors* [Docket No. 437] (the "Disclosure Statement").

their claims and all creditors of any remaining chance to achieve the highest and best offer for the Debtors' assets.

2.       The proposed Disclosure Statement, at best, leaves the Term Loan Lenders, MGF and the Debtors' other creditors with no ability to make an informed judgment to accept or reject the Plan.  Its deficiencies are both basic and numerous, leaving voting creditors with more questions than answers.  For example, after touting their dual track stand-alone plan and going concern sale process, the Debtors now base their liquidating Plan on a sale without a stalking horse bidder with a proposed August 22, 2016 auction.  Consequently, creditors are required to vote (the proposed deadline is August 16, 2016) before having any information on whether (i) the Debtors' received any qualified bids or (ii) the successful bidder or bidders agreed to pay more than the proceeds estimated for recovery under the Debtors' hypothetical liquidation analysis.  Moreover, the Debtors fail to describe in any meaningful way their marketing efforts and the status thereof.

3.       The Disclosure Statement is otherwise devoid of the necessary information to make an informed choice on the Debtors' proposed Plan, including any information regarding the value of the Debtors' business assets, the value of their unencumbered assets that might otherwise be available to pay allowed administrative and priority claims, the risks that those assets will be subject to the Term Loan Lenders' superpriority diminution claim, the value range for their causes of action and the contemplated wind-down costs associated with the Plan.  All these facts are critical to a creditor's understanding of its potential recoveries.  Their absence underscores the Debtors' lack of success in pursuing their failed exit strategies.

4.       Conversely, the limited areas where the Debtors do provide detailed information demonstrate the penchant that the Debtors' management team, led by its Chief Executive

Officer, possesses for (i) blaming the Sycamore Parties for years of self-serving, value-destroying decisions made by the Debtors' management and board of directors that ultimately led to the Debtors' chapter 11 filing and unconfirmable Chapter 11 Plan of Liquidation and (ii) taking steps to ensure their continued employment and bonus payments, including imposing as a condition to their newest exit strategy, employment offers and the assumption of more than $3.4 million in proposed KEIP bonuses.  As with so many of the papers filed by the Debtors in these cases, the Disclosure Statement is rife with unsubstantiated and false invectives against MGF, the Term Loan Lenders and Sycamore personnel that will mislead many of the Debtors' creditors regarding the merits of claims that the Debtors purport to have against the Term Loan Lenders.  This attempt by the Debtors' management to "shift the blame" is a key issue in these cases and its generalized and misleading description in the Disclosure Statement will cause unsecured creditors to erroneously believe that they can recover far more than they are actually entitled to under the terms of the Debtors' Plan.  To provide appropriate disclosure on this issue, the Debtors must revise the Disclosure Statement to, among other things, present their allegations in an objective, neutral and factual manner that acknowledges that there is little likelihood of success on the merits of any alleged claims against the Term Loan Lenders or any of their affiliates.  The Debtors should also provide a reasonable and objective recitation of the requirements to successfully prosecute an equitable subordination claim, including binding precedent to the effect that (1) equitable subordination is an extraordinary remedy to be used sparingly; and (2) it is even less likely, if not unprecedented, for a court to equitably subordinate a claim held by non-insider, non-fiduciary creditors like the Term Loan Lenders.

5.     In the Disclosure Statement, the Debtors allege that they "were unable to realize the full benefit of [strategic initiatives and cost cutting] measures due to a disruption of their

4

supply chain that resulted from the precipitous actions taken by Sycamore . . . ." *Disclosure Statement,* p. 16.  The Debtors further allege that MGF, a subsidiary of one of the Term Loan Lenders, imposed "onerous" payment terms on the Debtors following the occurrence of a Credit Review Period under the Sourcing Agreement between MGF and the Debtors, and state that:

> It is the Debtors' position that the payment terms that MGF unilaterally sought to impose were unreasonable . . . .  Nonetheless, MGF continuously refused to ship goods to the Debtors absent payment in advance—even though orders had been previously accepted on normal terms.

*Disclosure Statement*, pp. 16–17.

6.       The Debtors also suggest, without any proof, that Sycamore personnel somehow purposefully interfered with their other supplier relationships, caused the Debtors to experience significant liquidity issues, and put the Debtors at risk of violating their Prepetition Term Loan Agreement and Prepetition ABL Agreement.  Ultimately, the Debtors lay the blame for their chapter 11 filing squarely upon the "Sycamore Parties." *Disclosure Statement*, p. 17.  As a result of these allegations, the Debtors indicate that they may bring causes of action against the Term Loan Lenders that, if successful (which they will not be), would have the effect of disallowing or subordinating the Term Loan Lenders' claims to the status of equity or general unsecured claims, which would result in a materially greater recovery for the Debtors' unsecured creditors.  The lack of specific fact allegations supporting an equitable subordination claim is especially glaring in light of the fact that the Debtors recently completed a Rule 2004 examination intended to develop the "facts" supporting their equitable subordination claim.

7.       The Debtors' self-serving and one-sided recitation of their prepetition dealings with the Sycamore Parties is materially misleading, and will cause creditors to vote based on anticipated Plan recoveries that are illusory.  In reality, MGF delivered a letter to the Debtors on February 24, 2016 in which MGF stated its good faith belief that the Debtors' liquidity had

5

dropped below $150 million, thus triggering a Credit Review Period under the Sourcing Agreement. This good faith belief was subsequently confirmed by documentary evidence provided by the Debtors only weeks later indicating that their actual liquidity as of the end of February 2016 was in fact only $129.3 million, substantially less than the $150 million liquidity requirement set forth in the Sourcing Agreement. Under the clear terms of the Sourcing Agreement, this event gave MGF the right to reduce payment terms, including to "up-front terms as deemed prudent by [MGF] in the exercise of its reasonable credit judgment." *Sourcing Agreement* § 4(b)(ii).

8.      The Disclosure Statement is misleading. Rather than admit that a Credit Review Period had been triggered (which it obviously had, given the documentary evidence provided to the Term Loan Lenders in March), the Debtors state only that they had "well over $100 million in liquidity" at that time, a threshold far below the $150 million Credit Review Period trigger. *Disclosure Statement*, p. 17. The Debtors do not and cannot dispute that their liquidity was substantially less than the $150 million required pursuant to the terms of the Sourcing Agreement, yet they hid this critical fact from all creditors.

9.      On February 26, 2016, the Debtors sent MGF a letter demanding to know what information MGF used to reach its conclusion that a Credit Review Period was triggered and asked MGF to submit proof that a Credit Review Period had occurred. Because the Debtors did not deny the existence of the Credit Review Period, in accordance with the terms of the Sourcing Agreement, MGF contacted the Debtors again and notified them that it would require cash in advance before deliveries of existing orders and that it would not take new orders without payment of cash in advance or the posting of an acceptable letter of credit.

10.     In MGF's view, if a Credit Review Period had not in fact been triggered, the Debtors would have surely offered proof of their liquidity or otherwise sought to enjoin the exercise of MGF's contractual rights.  The Debtors did neither.  Instead, on March 1, 2016 the Debtors responded, this time through outside counsel at Weil, Gotshal & Manges LLP, by again questioning how MGF had determined a Credit Review Period was triggered and asserting it was based on information obtained "unlawfully," claiming cash in advance was an unreasonable exercise of credit judgment in breach of the Sourcing Agreement, and threatening legal action if MGF did not retract its cash in advance request.  MGF responded two days later by denying it had obtained information unlawfully and reiterating its request to reduce payment terms in accordance with its contractually bargained for rights set forth in the Sourcing Agreement.

11.     On March 7, 2016, the Debtors' attorneys contacted Kirkland & Ellis LLP to again take issue with MGF's demand for shorter payment terms and to state their view that, assuming a Credit Review Period did exist, the contract only allowed MGF to receive adequate assurances under the UCC—despite the Sourcing Agreement's clear language permitting MGF to demand "up-front terms as deemed prudent by [MGF] in the exercise of its reasonable credit judgment." *Sourcing Agreement* §4(b)(ii).  Subsequently, the parties reached only a very short-term agreement pursuant to which the Debtors agreed to pay up front for certain goods and seven-day terms for additional goods.  The parties finally settled their supply dispute only after the commencement of these cases pursuant to a Settlement Agreement that was approved by the Court on May 24, 2016 [Docket No. 189].

12.     It appears to the Sycamore Parties that the Debtors' management (and potentially board members) intentionally and fraudulently concealed their liquidity position from MGF and the Term Loan Lenders in an attempt to prevent MGF and the Term Loan Lenders from

exercising their respective rights under the Sourcing Agreement and the Term Loan Agreement. Yet, the Debtors' challenges to the Term Loan Lenders' secured claims and right to credit bid rests almost entirely on the Term Loan Lenders' and MGF's conduct relating to the Credit Review Period. In fact, MGF did nothing other than act in its reasonable and prudent credit judgment in accordance with its contractual and state law rights. While the Debtors may characterize the import of these events differently, it would be inappropriate to solicit votes on the Plan based on the description of events (and related disclosure of potential disallowance or subordination of the Term Loan Lenders' claims) that is currently contained in the Disclosure Statement. Moreover, even if the Debtors had a credible claim that MGF violated the Sourcing Agreement by reducing payment terms at a time when the entire industry knew that Aéropostale was in deep financial distress, the Debtors offer no credible theory for how that reduction of payment terms caused their bankruptcy filing. Even the Debtors' CFO, David Dick, estimated the cost of the alleged supply disruptions at roughly $5 million.[3] In contrast, Aéropostale burned approximately $300 million in cash over the three-year period preceding its bankruptcy, as sales declined rapidly and management's unsuccessful cost-cutting measures failed to keep up with the company's shrinking revenues. An accurate disclosure statement must acknowledge the limited effect of the dispute on Debtors.

13.    The Disclosure Statement certainly raises many questions, but it does answer one question in particular. Although voting creditors cannot glean from the disclosure what recoveries they may obtain, the Disclosure Statement makes clear that the Debtors' board members and management will be protected. The specific provisions protecting these insiders include: the releases, exculpations, and injunctions provided in Sections 12.7, 12.8, 12.9, and

---

[3]    *See Declaration of David J. Dick Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York*, ¶ 66 [Docket No. 4].

12.10 of the Plan, the requirement in the Purchase Agreement that any Qualified Bidder must

offer "Covered Employees" an offer of employment, and the requirement in the Purchase

Agreement that any Qualified Bidder must assume all of the Debtors' obligations in connection

with any key employee incentive or retention plan.

14.    For years, the Debtors' management team has eschewed "Retail 101" cost-cutting

measures (i.e., closing money-losing stores in an expedited manner) in favor of a "turnaround"

strategy involving enormous costs in excess merchandise, rents, payroll, financings, and

professional expenses with the sole goal of maintaining control of Aéropostale.    Even in

bankruptcy, Geiger, together with his board and management, have refused to consider

liquidating transactions that would have resulted in the loss of Geiger's employment and future

ability to operate any potential remaining Aéropostale business.

15.



16.     Now, in the context of a Plan predicated on a theoretical sale that has no stalking horse bidder and no potential value attributed to it, the Debtors' management continues to act in their own self-interest at the expense of the Debtors and the constituents to whom they owe fiduciary duties.  The proposed sale process requires as an express condition of the Purchase Agreement that any Qualified Bidder must extend an employment offer (together with substantial salaries, benefits and other perquisites) to an unidentified list of "Covered Employees" and requires any potential bidder to assume all of the Debtors' liabilities in connection with any KEIP or KERP—facts that are not disclosed by the Disclosure Statement and that will potentially substantially chill bidding for the Debtors' assets (or at least lesson the cash consideration to be received by the estates).  *Purchase Agreement § 6.3, definition of "Assumed Liabilities*."

17.     In short, Geiger, together with his board and management, have irreparably harmed Aéropostale's creditors by wasting hundreds of millions of dollars operating for their own personal gain a business that was obviously in need of restructuring.  Once in bankruptcy, the same management team imperiled (and may have irreparably damaged) the Debtors' prospects for a successful and value-maximizing solution—or even a meaningful creditor recovery— ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████  Under the circumstances, these actions leave the Term Loan Lenders questioning whether the board and

---

██████████

[6]   █████████████████████████████████████████████████████████
████████████████████████

management have fulfilled their respective fiduciary duties.  Yet pursuant to the Plan, Geiger and his team would receive the benefit of broad third party releases and injunctions that would provide them with material benefits and leave the Debtors' creditors holding the bag. Unsurprisingly, the Disclosure Statement fails to disclose any consideration provided for those releases, or the existence or estimated value of the claims against the Debtors' officers and directors that would be released and enjoined by the Plan.

18.    In addition to the foregoing, and as demonstrated herein, the proposed Disclosure Statement fails to provide adequate information on several basic and critical matters, and the Disclosure Statement Motion seeks approval of fundamentally flawed bidding procedures.  For these and other reasons set forth below, (1) the Disclosure Statement cannot be approved, and the Debtors should not be permitted to proceed with solicitation of the Plan at this time; and (2) the proposed bidding procedures should be modified.

## LEGAL STANDARD

19.    Section 1125(b) of the Bankruptcy Code requires a plan proponent to furnish creditors with "a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information" in order to solicit acceptances or rejections of a proposed chapter 11 plan.  11 U.S.C. § 1125(b).  "[A]dequate information" is defined in the Bankruptcy Code as:

> Information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan[.]

11 U.S.C. § 1125(a)(1).

20.    As the Second Circuit has stated, "[o]f prime importance in the reorganization process is the principle of disclosure." *Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re*

*Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994); *see also Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court. Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of 'adequate information.'"); *Galerie Des Monnaies of Geneva, Ltd. v. Deutsche Bank, A.G., N.Y. Branch (In re Galerie Des Monnaies, Ltd.)*, 55 B.R. 253, 259 (Bankr. S.D.N.Y. 1985) ("The preparing and filing of a disclosure statement is a most important step in the reorganization of a Chapter 11 debtor.").

21.    The plan proponent has the burden of proof regarding the adequacy of a disclosure statement, *see, e.g., In re Alaska Fur Gallery, Inc.*, No. A09-00196-DMD, 2011 WL 4904425, at *2 (Bankr. D. Alaska Apr. 29, 2011), once objectors have identified issues. *See In re McGee*, No. 09-11860, 2010 WL 9463258, at *1 (Bankr. N.D. Ind. Apr. 21, 2010). To be approved, a disclosure statement must "contain simple and clear language delineating the consequences of the proposed plan on [creditors'] claims and the possible [Bankruptcy] Code alternatives . . . ." *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988); *see In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991) (disclosure statement must "clearly and succinctly inform the average . . . creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution."). In particular, a disclosure statement must provide enough information for creditors to understand the financial ramifications of acceptance or rejection of the relevant plan. *See In re McLean Indus., Inc.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987). Courts determine the adequacy of information in a disclosure statement based on the facts and circumstances of each case. *See Abel v. Shugrue (In re Ionosphere Clubs, Inc.)*, 179 B.R. 24, 29 (S.D.N.Y. 1995).

22.      Even if a creditor could find additional information through formal discovery, the availability of such information through discovery does not render a plan proponent's disclosure adequate. *Official Comm. of Unsecured Creditors v. Michelson*, 141 B.R. 715, 719 (Bankr. E.D. Cal. 1992) (citing *In re Braten Apparel Corp.*, 21 B.R. 239, 259–60 (Bankr. S.D.N.Y. 1982), *aff'd*, 26 B.R. 1009 (S.D.N.Y. 1983), *aff'd mem.*, 742 F.2d 1435 (2d Cir. 1983).  Instead, the Bankruptcy Code expressly provides that prior to solicitation of a plan, the solicited holders receive a written disclosure statement containing "information of a kind, and in sufficient detail . . . that would enable [a] hypothetical investor of the relevant class to make an informed judgment about the plan."  11 U.S.C. 1125(a)(1).  A disclosure statement is not meant to be initially opaque only to have the full picture and basis of the plan revealed by later supplements and modifications or through creditors undertaking expert analysis and taking extensive discovery in connection with confirmation proceedings.  Rather, the plan proponent has an obligation in the first instance to set forth information sufficient to allow creditors to make informed determinations as to whether to accept or reject the plan.  This is a matter of statute, congressionally-enabled rulemaking and due process.

## OBJECTION

**I.      The Proposed Disclosure Statement Does Not Contain Adequate Information for Creditors to Determine Whether to Accept or Reject the Plan**

23.      The proposed Disclosure Statement lacks adequate information in the following critical areas, each of which is necessary for creditors to make an informed decision as to whether to accept or reject the Plan:

*A.      The Proposed Disclosure Statement Does Not Contain Adequate Information regarding the Proposed Sale Transaction*

24.      The Debtors' Disclosure Statement raises more questions than it answers with respect to the most fundamental aspect of the Plan—the proposed sale.  It is axiomatic that a

successful sale process is a gating issue to the confirmability and effectiveness of the Plan. Nevertheless, the Debtors have not provided any meaningful information regarding the marketing process for their assets or the potential value ranges and related recoveries that should be expected under the Plan.  Indeed, the Debtors are unable to confirm in their Disclosure Statement whether the proposed sale is even possible, because they have not signed an agreement with any stalking horse bidder.

25.    The Disclosure Statement fails to provide creditors with any estimated price ranges, asset valuations, sale process risks, or even an identification of which assets might be included or excluded from the proposed sale.  The Debtors admit that they are unable to provide this information because they "are not certain whether offers will be made, what the content of those offers will be, or whether any Purchaser will enter into an Asset Purchase Agreement. Accordingly, the Debtors are not certain what proceeds, if any, will be available for distribution under this Plan." *Disclosure Statement*, p. 52.  This failure to provide any meaningful basis for creditors to evaluate or otherwise understand any potential recoveries under the Plan, or how those recoveries relate to a hypothetical chapter 7 liquidation of the Debtors' assets, is fatal to the Debtors' Disclosure Statement.

B.    *The Proposed Disclosure Statement Does Not Contain Adequate Information as to Plan Effectuation and Feasibility*

26.    As a general matter, the Debtors fail to identify or otherwise explain any costs of effectuating the Plan.  It is clear that to consummate the Plan and otherwise exit these bankruptcy proceedings, the Debtors will need to pay a substantial amount of money to satisfy DIP Claims, Unclassified Claims (including the Term Loan Lenders' superpriority adequate protection administrative claim), Other Secured Claims and the Term Loan Claim, and reserve amounts necessary to administer the Plan, pay fees owed to the United States Trustee, and fund any other

postpetition reserve requirements. However, the Debtors do not provide any information regarding what these amounts might be or what other funds might be recovered or expected to augment these amounts after the closing of any Sale Transaction. In the absence of this information, which will dictate creditors' recoveries in these cases (if any), parties entitled to vote on the Plan have nothing upon which to base a determination as to whether they should vote for or against the Plan or whether they will receive more or less under the Plan than they would if the Debtors were liquidated.

27.    Of primary importance in any plan of reorganization is the means by which the reorganization will be implemented. *See* 11 U.S.C. § 1123(a)(5) (setting forth the requirement that a plan shall "provide adequate means for the plan's implementation," including, *inter alia*, the transfer of estate property to other entities, sale of estate property, and issuance of securities); *In re Walker*, 165 B.R. 994, 1004 (E.D. Va. 1994) ("[I]t is important for a plan of reorganization to make reasonably specific  provisions for an adequate means of implementation because speculative, indefinite plans will necessitate objections by the creditors who have no reasonable means by which to assess whether a plan can achieve the results contemplated by the Code, and because the courts will have no objective criteria by which to make confirmation judgments."). The Disclosure Statement does not describe how the Plan will be implemented or what the costs attendant to that implementation might be, because it is not at all certain that the plan *can* be implemented.

28.    Instead, the Disclosure Statement attempts to do the impossible:  describe a transaction and its attendant consequences when the Debtors have no certain transaction to pursue and have not yet decided whether they will even pursue the transaction that they describe. Indeed, the Disclosure Statement informs creditors that rather than pursuing the "naked auction"

Plan described in the Disclosure Statement, the Debtors may decide to pursue an "Alternative Transaction" without providing any details or parameters regarding the terms of such a transaction. As a result, the Disclosure Statement is full of statements that are the equivalent of "maybe this, maybe that." While that is not necessarily uncommon in disclosure statements when the consequences of *identified* transactions might be uncertain, what is uncommon and improper is that the Debtors have not identified in their Disclosure Statement *any* binding transaction that will be pursued by the Plan or *any* value that may be achieved in any transaction.

    C.     *The Proposed Disclosure Statement Does Not Contain Adequate Information as to the Claim Details or Resulting Recoveries*

29.     The Disclosure Statement fails to provide any material information regarding the number or amount of claims in any particular class or any information regarding the creditors that are in any particular class. There is not any information, let alone "adequate information" provided in the Disclosure Statement that would allow creditors to determine what the universe of claims against the pool of Available Cash will be, or what amount will be available to any class of creditors—nor can there be any such disclosure until a purchaser submits a binding purchase agreement. Strikingly, the Debtors misleadingly indicate in the Disclosure Statement, without providing any detail, that administrative claims will be paid in full when it is uncertain that recoveries will clear the Term Loan Lenders' secured and superpriority administrative claims. Moreover, despite admitting that the Term Loan Lenders have blanket liens over substantially all of the Debtors' assets, the Liquidation Analysis appears to indicate that the Debtors have unencumbered assets available to pay administrative claims, without providing any details regarding why or whether such assets are actually unencumbered.

30.     Creditors have a right to know, at the time they are solicited, what class they are in and what their actual potential recoveries may be.  There is a strong interest in having a proper solicitation, to avoid the need for additional voting later, at the Term Loan Lenders' expense.

        D.     *The Proposed Disclosure Statement Does Not Contain Adequate Information as to the Plan Administrator, Liquidating Trusts, or Insider Benefits*

31.     Notably, there is no disclosure in the Disclosure Statement as to who the officers, directors, and employees of the Plan Administrator or any Liquidating Trust will be or the amount of compensation that they will receive.  Nor is there disclosure of the identity of employees that any purchaser will be required to extend offers of employment to or the benefits packages that the winning purchaser will have to assume in connection with such offers.

32.     Similarly, the Disclosure Statement is devoid of any information that would enable a creditor to form an independent, informed view regarding the Liquidating Trusts.  The Liquidating Trusts appear to be a central component of the Plan, as the mechanism designed to resolve pending litigation, claims, and disputes and to distribute value to creditors after the Effective Date.  The terms of the Liquidating Trusts are undisclosed, yet the Plan provides that those terms will prevail over the terms of the Plan.  *Disclosure Statement*, p. 39.  In other words, creditors are being asked to vote on a Plan that, in addition to being completely illusory, may be overridden by the Debtors in their discretion through the terms of a document that has not been disclosed.

33.     There is also no disclosure regarding the manner or procedure by which the Trustees of the Liquidating Trusts will be selected, or what insiders of the Debtors may be employed by the Liquidating Trusts and what benefits they may receive.  These are vital pieces of information, and creditors have the right to full disclosure of how the Debtors' insiders will be treated under the Plan prior to any voting thereon.

34.     Finally, there is no disclosure regarding any causes of action that may be pursued by the Liquidating Trusts, such as the identity of the target defendants, the nature of any claim, the estimated range of value of any of the Trust Causes of Action, the risks of pursuit thereof, any potential defenses thereto, or the likely litigation outcomes.  Nor is there an explanation regarding whether and how the releases set forth in the Plan could potentially affect recoveries therefrom.

E.     *The Proposed Disclosure Statement Does Not Contain Adequate Information as to Releases and Injunctions*

35.     The proposed Disclosure Statement contains no discussion of any consideration the Released Parties are providing in exchange for third-party releases.  Indeed, it is clear that the Debtors' entrenched management team and its board has done nothing to earn releases from the potentially significant claims that the estate and/or Term Loan Lenders and MGF may have against them for fraudulent concealment, self-dealing and breaches of their fiduciary duties.  The Debtors' creditors are not in a position to approve or disapprove of any releases when the consideration being provided in exchange for those releases is not disclosed. This lack of disclosure infects both the mandatory and optional proposed third-party releases.

36.     Finally, the Debtors must disclose the identity and potential value of any claims that would be released or enjoined by the Plan's third party release and injunction provisions. Without this information, creditors cannot possibly make an informed decision on the Plan— especially in a case where, as here, the Sycamore Parties believe that they have claims against officers and directors.

F.     *The Proposed Disclosure Statement Does not Adequately Describe the Classification of Classes 4 and 5*

37.     The Plan appears to impermissibly gerrymander an impaired accepting class by separating the Term Loan Lenders' deficiency claim from the general unsecured creditor class,

18

notwithstanding their identical status and recoveries.  The Disclosure Statement provides no details regarding the Debtors' justification for the Plan classifications of Class 4, the Term Loan Deficiency Claim, from Class 5, the General Unsecured Claims.  To the extent that creditors in each of those classes actually will be treated differently, it appears that the Plan unfairly discriminates among identically situated creditors.  Without clear disclosure explaining the Debtors' justification for these classifications, it is not possible for creditors to make an informed decision regarding the Plan and the risks associated with confirmation.

G.      *The Proposed Disclosure Statement Misleadingly Describes Alleged Claims Against the Sycamore Parties*

38.      Finally, and as noted above, the Debtors' misleading and one-sided description of their alleged claims against the Sycamore Parties is likely to cause unsecured creditors to vote in favor of the Plan based on anticipated recoveries that are illusory.  The Debtors must describe any alleged claims that they believe they may have in an objective manner, and provide a realistic assessment of the risks of success in any such litigation.

H.      *The Proposed Disclosure Statement Requires Additional Miscellaneous Disclosure*

39.      In addition to the inadequate disclosure describe above, to properly assess whether to vote to accept or reject the Plan, creditors require the following additional information:

- an indication of any assets that are likely to remain with the Debtor's estates following the closing of the proposed sale, and the estimated value of such assets;

- an indication of what executory contracts are likely to be assumed and assigned or rejected in connection with the closing of the proposed sale, and any related cure costs and rejection damages;

- an explanation of the "alternative transaction with a potential plan sponsor in connection with the auction" referenced in the Disclosure Statement;

- the identity of the "Covered Employees" referenced in Section 6.3 of the Purchase Agreement, and their anticipated salary and benefits in connection with any employment offer that must be extended to them by Qualified Bidders;

- projections of cash necessary to consummate the plan, including the payment of UST fees, professional fees, Plan Administrator costs, wind-down costs[7] and any other post-effective date reserve requirements;

- an explanation of the the the range of Approximate Allowed Amounts and Recoveries in the Distribution Summary, including an explanation of the seemingly large range for such amounts and a reconciliation of such amounts to the Liquidation Analysis;

- an explanation of the effect of the treatment of Class 6 Intercreditor Claims on each individual Debtor entity;

- a clear explanation of whether the estates will be substantively consolidated for purposes of voting *or* distribution, and the justification for any such consolidation;

- an explanation of why costs such as KEIP payments, KERP payments, and severance payments are reflected in the liquidation analysis;

- a comparison of the liquidation analysis to proposed recoveries for creditors under the Plan;

- an explanation of the dramatically reduced valuation of the Debtors' intellectual property versus previous estimates, including those in the Debtors' recent appraisals;

- a detailed explanation of the liquidation timeline described in the Liquidation Analysis;

- information regarding all other material assumptions in the Liquidation Analysis; and

- disclosure in reasonable detail of the results of (including proceeds derived from) GOB sales to date, together with a forecast of future potential GOB proceeds.

40.    The Sycamore Parties are prepared to engage the Debtors regarding proposed amendments to the Disclosure Statement to remedy this shortfall (though it does not appear that such Amendments alone would save the Debtors' otherwise inadequate Disclosure Statement).

---

[7]    The Liquidation Analysis lists, without explanation, wind-down expenses that appear to be extraordinarily high and appear designed to benefit only the entrenched management team (*e.g.*, $20 million - $30 million of advisor expenses, $12 million of severance, KEIP and KERP expenses and $9 million of "payments/benefits in arrears").

## II.    The Debtors' Proposed Bidding Procedures Are Fundamentally Flawed

### A.    *The Proposed Bidding Procedures Block Credit Bidding in Violation of the Bankruptcy Code*

41.    Pursuant to section 363 of the Bankruptcy Code, a secured creditor has the right to credit bid the value of its allowed claim.  11 U.S.C. § 363(k) ("At a sale under [section 363(b)] of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise, the holder of such may offset such claim against the purchase price of such property.").  The Supreme Court of the United States has confirmed that this right applies in a sale pursuant to a Plan.  *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S.Ct. 2065, 2071 (2012) (holding that a debtor may not confirm a plan that provides for the sale of collateral free and clear of existing liens without allowing a secured creditor to credit bid at the sale). Indeed, the right to credit bid in bankruptcy auctions preserves secured creditors' fundamental contractual and state law rights to credit bid their claims for their collateral in any commercially reasonable manner following a borrower's default.  The Debtors' proposed bidding procedures contemplate that "Qualified Bids must be made in all cash."  *Disclosure Statement Motion*, p. 29. Such terms violate the Term Loan Lenders' statutory rights to credit bid their claims in full at any sale of their collateral.

### B.    *A Cash Deposit for a Potential Credit Bid is Unjustified*

42.    Pursuant to the proposed bidding procedures, a bidder must deposit 10% of its proposed purchase price for the Debtors' assets in the form of a certified or bank check into an escrow account.  However, the deposit requirement is unfair with respect to the Term Loan Lenders, who would be credit bidding an amount that is undisputed and allowed at any potential sale of the Debtors' assets.  The good faith deposit, as it relates to credit bidders, is unjustified and should be stricken from the proposed bidding procedures.

C.    *The Bidding Procedures and Auction Requirements are Illusory and Provide the Debtors Unfettered Discretion without Input from the Term Loan Lenders*

43.    The proposed bidding procedures provide the Debtors with significant discretion that allows them to manipulate the sale process at will.  The Debtors have the ability to alter bidding qualification requirements and asset packages, select a stalking horse bidder at any point, and modify auction procedures at will.  Indeed, under the terms of the proposed Plan, the Debtors have the ability to abandon the sale process altogether in favor of an undefined Alternative Transaction at any time.  All stakeholders must be provided with the ability to fully understand the sale process, including the identity of potential bidders and the method and manner in which the Debtors' assets will be sold, especially when the recoveries of all parties in interest hinge entirely on the amount of proceeds generated from the sale. In addition, if the Term Loan Lenders are not participating in the auction, the Debtors should be required to consult with them on all material decisions and determinations, as they are, according to the Debtors, the fulcrum security in these cases.

D.    *The Proposed Purchase Agreement will Chill Bidding*

44.    The bidding process will be chilled by the requirement that any Qualified Bidder offer employment to the Debtors' management team and assume the Debtors' obligations in connection with any KEIP and KERP.  In order to maximize the value of their assets for the benefit of their creditors (not their management team), the Debtors must remove these requirements from their proposed form of Purchase Agreement.

45.    In their current form, the proposed bidding procedures and auction requirements fail to establish a definite sale process that has the potential to maximize the value of the Debtors' estates.  Accordingly, approval of the proposed bidding procedures and auction requirements must be conditioned on the incorporation of revisions to address each of the points

22

raised by this Objection. The Sycamore Parties are willing and available to discuss appropriate changes to the Disclosure Statement and Bidding Procedures with the Debtors to the extent that it is possible to rectify the currently fatal flaws contained therein.

## **RESERVATION OF RIGHTS**

46.     The Sycamore Parties reserve the right to amend or supplement this Objection based upon any facts or arguments that come to light prior to the hearing on these issues.

*[Remainder of page intentionally left blank]*

WHEREFORE, for all of the foregoing reasons, the Sycamore Parties respectfully request that this Court deny approval of the Disclosure Statement unless the deficiencies identified above are remedied through the inclusion of adequate information and appropriate modifications to the Disclosure Statement, solicitation materials and Plan as set forth herein.

Dated: July 22, 2016          Respectfully Submitted,
      New York, New York

      */s/  Robert A. Britton*
      Robert A. Britton
      **KIRKLAND & ELLIS LLP**
      **KIRKLAND & ELLIS INTERNATIONAL LLP**
      601 Lexington Avenue
      New York, New York 10022
      Telephone:     (212) 446-4800
      Facsimile:     (212) 446-4900
      Email:          robert.britton@kirkland.com


      - and -

      James A. Stempel (admitted *pro hac vice*)
      Robert B. Ellis, P.C. (admitted *pro hac vice*)
      Stephen C. Hackney (admitted *pro hac vice*)
      **KIRKLAND & ELLIS LLP**
      **KIRKLAND & ELLIS INTERNATIONAL LLP**
      300 North LaSalle
      Chicago, Illinois 60654
      Telephone:     (312) 862-2000
      Facsimile:     (312) 862-2200
      Email:          jstempel@kirkland.com
                    rellis@kirkland.com
                    stephen.hackney@kirkland.com