**UNITED STATES BANKRUPTCY COURT**          <u>**FOR PUBLICATION**</u>
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
In re:                                      Chapter 11

AÉROPOSTALE, INC., *et al.*,                Case No. 16-11275 (SHL)

                        Debtors.          (Jointly Administered)
-----------------------------------------------------------------x


<u>**MEMORANDUM OF DECISION**</u>


**A P P E A R A N C E S :**

**WEIL, GOTSHAL & MANGES LLP**
*Counsel for the Debtors*
767 Fifth Avenue
New York, New York 10153
By:    Ray C. Schrock, Esq.
        Richard W. Slack, Esq.
        Patrick O'Toole, Jr., Esq.
        Jacqueline Marcus, Esq.
        Garrett A. Fail, Esq.
        Layne S.R. Behrens, Esq.

**KIRKLAND & ELLIS LLP**
*Counsel for the Term Lenders*
601 Lexington Avenue
New York, New York 10022
By:    Robert A. Britton, Esq.


-and-


300 North LaSalle Street
Chicago, Illinois 60654
By:    James A. Stempel, Esq.
        Robert B. Ellis, Esq.
        Stephen C. Hackney, Esq.
        Martin L. Roth, Esq.
        Alec Solotorovsky, Esq.
        Jeffrey Lula, Esq.

**PACHULSKI STANG ZIEHL & JONES LLP**
*Counsel for the Official Committee of Unsecured Creditors*
780 Third Avenue, 34th Floor
New York, New York 10017
By:    Robert J. Feinstein, Esq.
       Bradford J. Sandler, Esq.

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is a motion by the above-captioned debtors and debtors-in-possession
(collectively, the "Debtors") seeking to (i) equitably subordinate the claims of Aero Investors
LLC ("Aero Investors") and MGF Sourcing Holdings, Limited ("MGF Holdings" and, together
with Aero Investors, the "Term Lenders"), pursuant to Section 510(c) of the Bankruptcy Code,
(ii) disqualify the Term Lenders from credit bidding in a sale of the Debtors' assets, pursuant to
Section 363(k) of the Bankruptcy Code, and (iii) recharacterize the Term Lenders' claims,
pursuant to Section 105 of the Bankruptcy Code (the "Motion") [ECF No. 496].  The Debtors
seek this relief based on their allegations of inequitable conduct by the Term Lenders and certain
of their affiliates and the impact on this case of a credit bid by the Term Lenders.

The Court held a trial with fourteen live witnesses from August 15, 2012 to August 23,
2012 (the "Trial").  In support of its case, the Debtors filed declarations in lieu of direct
testimony for six witnesses, together with over 400 accompanying exhibits.  Those same six
witnesses also presented extensive live testimony: Julian R. Geiger (Chief Executive Officer of
Aéropostale, Inc.); David J. Dick (Chief Financial Officer of Aéropostale, Inc.); Robert J. Duffy
(managing director at Berkeley Research Group, LLC); Deborah Palmer Keiser (founding owner
of Rituel Inc. and president of Alabama Chanin); James Doak (managing director at Miller
Buckfire & Co., LLC); and Allen Ferrell (economist and Greenfield Professor of Securities Law
at Harvard Law School).

2

In response to the Debtors' case, the Term Lenders presented declarations for seven witnesses, along with some 500 accompanying exhibits. All of these witnesses also presented live testimony: Stefan Kaluzny (co-founder and managing director of Sycamore Partners); James Schwartz (Chief Executive Officer of MGF Sourcing US, LLC, and member of the board of directors of MGF Sourcing Holdings, Limited); Peter Morrow (co-founder and managing director of Sycamore Partners); Joseph J. Sciametta (managing director at Alvarez & Marsal North America, LLC); Alan D. Bell (certified public accountant and retired Ernst & Young LLP audit partner); Holly Felder Etlin (managing director at AlixPartners, LLP); and Adam C. Pritchard (Frances and George Skestos Professor of Law at the University of Michigan).

The parties also submitted deposition designations of an additional six individuals who did not appear as live witnesses: Mark D. Miller (Chief Operating Officer of Aéropostale, Inc.); Elizabeth Ratto (head of the retail finance group at Bank of America, N.A.); Karin Hirtler-Garvey (chairman of the Aéropostale, Inc. board of directors); Kent Kleeberger (former member of the Aéropostale, Inc. board of directors); Dary Kopelioff (principal of Sycamore Partners); Kevin Burke (senior associate at Sycamore Partners); and Jennie Wilson (Chief Financial Officer of MGF Sourcing US, LLC and MGF Sourcing Holdings, Limited).

Given the extensive trial record and the applicable law, the Court must deny the Debtors' Motion. The Court concludes that there is not a basis to equitably subordinate the Term Lenders' claims, limit their ability to credit bid, or recharacterize their loans. The Court is mindful of the high stakes in this case for Aéropostale. But the Court is duty bound to apply the applicable law to the facts of the case, and the Court's equitable powers are not boundless. This opinion constitutes the Court's findings of fact and conclusions of law.[1]

---

[1]    Certain information relevant to a determination of this Motion is confidential business information of the parties. Therefore, a copy of the full Opinion in this case was filed under seal. [ECF No. 723]. To avoid divulging

## BACKGROUND

### I.   The Parties

Aéropostale, Inc. ("Aéropostale" or the "Company") is a retailer of casual apparel and accessories, serving children and young adults through its stores and website. (Dick First Day Affidavit ¶ 12).[2] Aéropostale, Inc. is a publicly traded company, and was until recently listed on the New York Stock Exchange. (Dick First Day Affidavit ¶ 29). Aéropostale, Inc. is the direct or indirect corporate parent of each of the other Debtors. (Dick First Day Affidavit ¶ 30). As of the end of fiscal year 2015, the Debtors operated 811 stores in all 50 states and Puerto Rico and 41 stores in Canada. (Dick First Day Affidavit ¶ 13). The Debtors also have license agreements with unaffiliated third-party operators outside of the United States, under which the Debtors receive a percentage of inventory purchases or sales as royalty income, in return for the use of their trademarks, trade name and branding. (Dick First Day Affidavit ¶ 13). The Debtors receive buying commissions for inventory purchases made by these international licensees from the Debtors' vendors. (Dick First Day Affidavit ¶ 13). While the Debtors design the products sold in their stores, these products are manufactured by the Debtors' merchandise suppliers. (Dick First Day Affidavit ¶ 22). As of the Debtors' bankruptcy filing, their two largest

---

this confidential information, the Court requested that the parties identify any confidential information in that sealed version of the Opinion. A very small amount of information was identified. This subsequent public version of the Opinion has been edited only to the extent necessary to avoid disclosing this confidential information but also to make public the basis of the Court's decision to the greatest extent possible. For the sake of readability, the Court has edited the text rather than merely redacting the confidential information at issue.

[2]     There is an extensive evidentiary record in this proceeding. Trial testimony is cited as "Trial Tr. [page:line] [date] [Witness]." Testimony provided by written declaration is cited as "[Witness] Decl. ¶ ___ ." Exhibits are cited as "CEX ___ " for the Term Lenders' exhibits and "DX ___" for the Debtors' exhibits. This Opinion also includes some references to the briefs filed by the parties. The Debtors' initial Motion and related memoranda of law are cited as "Motion __ ." The parties' trial brief is cited as "[Party] Trial Brief __ ." The parties' proposed findings of fact and conclusions of law are cited as "[Party] Proposed Findings __ ."

merchandise suppliers were LF Sourcing (Millwork) LLC ("Li & Fung") and TSAM (Delaware) LLC (d/b/a/ MGF Sourcing US LLC) ("MGF").  (Dick First Day Affidavit ¶ 22).

Sycamore Partners is a private equity firm specializing in retail and consumer investments.  (Kaluzny Decl. ¶ 2).  Stefan Kaluzny and Peter Morrow are Co-Founders and Managing Directors of Sycamore Partners.  (Kaluzny Decl. ¶¶ 1-2; Morrow Decl. ¶ 3).  In 2013, Sycamore Partners created Hummingbird LLC (later renamed Lemur LLC ("Lemur")), to purchase stock in Aéropostale.  (Kaluzny Decl. ¶ 10).  In the summer and fall of 2013, Lemur acquired approximately 8% of Aéropostale's common stock in the open market.  (Dick First Day Affidavit ¶ 29).  Lemur paid roughly $8.00 per share, for an approximate total cost of $54 million.  (Kaluzny Decl. ¶¶ 9, 10).  The purchase did not provide Sycamore Partners or Lemur with any rights to name board members or otherwise participate in Aéropostale management.  (Kaluzny Decl. ¶ 11).

MGF is a global sourcing company that specializes in apparel and accessories.  (Schwartz Decl. ¶ 2).  It has relationships with more than 100 factory organizations, mainly in Asia and Central and South America.  (Schwartz Decl. ¶ 2).  Customers place orders with MGF, which then arranges for factories to manufacture the merchandise.  (Schwartz Decl. ¶ 2).  MGF oversees the manufacturing process to ensure that merchandise conforms to a customer's specifications and then arranges shipment of the merchandise to its customer's U.S. distribution centers.  (Schwartz Decl. ¶ 2).  MGF and its predecessors have been in business for over 40 years and it employs over 750 people in 13 countries.  (Schwartz Decl. ¶ 3).  Since November 1, 2011, MGF has been indirectly majority-owned by an affiliate of Sycamore Partners.  (Schwartz Decl. ¶ 3).  The managing member of MGF—MGF Holdings—maintains a board of directors (the "MGF Board") that monitors performance, sets strategic direction and approves budgets, and

provides input to management regarding significant decisions to be made with respect to MGF. (Schwartz Decl. ¶ 4). MGF Holdings is, in turn, majority-owned by an investment fund affiliated with Sycamore Partners and Sycamore Partners therefore has the power to elect the MGF Board. (Schwartz Decl. ¶ 6). James Schwartz is the Chief Executive Officer and President of MGF and the President of MGF Holdings and has been employed by MGF and its predecessors for more than 33 years. (Trial Tr. 99:8-19, Aug. 16, 2016 (Schwartz)). Jennie Wilson is Chief Financial Officer of MGF and MGF Holdings and reports to Mr. Schwartz. (DX 407, Wilson Dep. Tr. 9:8-10:4.)

As of their bankruptcy filing, the Debtors had outstanding debt obligations of around $223 million, which were secured by substantially all of the Debtors' assets. (Dick First Day Affidavit ¶ 33). This debt was comprised of (i) an asset-based revolving credit facility (the "Prepetition ABL Agreement") with Bank of America, N.A., and (ii) a term loan (the "Prepetition Term Loan Agreement") with the Term Lenders. (Dick First Day Affidavit ¶¶ 33, 37). The two Term Lenders are both affiliates of Sycamore Partners. The first, Aero Investors, is an investment vehicle that was formed by Sycamore Partners' domestic investment funds for the purpose of funding the Prepetition Term Loan transaction. (Kaluzny Decl. ¶ 24). The second, MGF Holdings, is indirectly majority-owned by Sycamore Partners' offshore investment funds. (Kaluzny Decl. ¶ 24). MGF Holdings is the direct parent of MGF. (Kaluzny Decl. ¶ 24).[3]

---

[3]    References to the "Sycamore Parties" includes Sycamore Partners, MGF Holdings, Aero Investors, MGF, Lemur, and Sycamore Partners MM.

II.    **The Term Loan, the Sourcing Agreement, and the Credit Review Provision**

In fiscal year 2013, the company had negative earnings before interest, taxes,

depreciation, and amortization ("EBITDA") of $69.1 million.  (Trial Tr. 19:21-23, Aug. 17, 2016

(Dick)).  Additionally, in fiscal year 2013 there was a decline in Aéropostale's working capital of

$100 million and a loss of $185.2 million.  (CEX 509, Miller Dep. Tr. 35:21-36:14).  In January

2014, therefore, the Debtors hired Barclays to provide advice on transactions to provide liquidity

and aid in turnaround efforts at Aéropostale.  (CEX 054 at AERO_0050314).  Barclays and

Aéropostale received financing proposals from several entities, including Advent International

and Li & Fung.  (CEX 061 at 0050421-25; CEX 509, Miller Dep. Tr. 44:2-45:10, 54:23-56:9.)

As part of this process, Aéropostale's then-Chief Executive Officer Tom Johnson reached out to

Stefan Kaluzny at Sycamore Partners about the possibility of financing, resulting in Sycamore

Partners and Aéropostale negotiating a multi-faceted transaction over the next several months.

(Kaluzny Decl. ¶¶ 13-16).

Sycamore Partners offered several different proposals to the Debtors, including loans

from Sycamore Partners at 10% interest, loans from MGF Holdings at 0.00% interest coupled

with a sourcing agreement rebate mechanism that could be used as the source of cash to repay

the loan, and loans that combined both concepts.  (CEX 061 at AERO_0050423-25; CEX 509,

Miller Dep. Tr. 53:16-54:2, 56:10-57:21; Kaluzny Decl. ¶ 14).  The Debtors also considered

financing proposals from parties other than Sycamore Partners.  (CEX 061 at AERO_0050421-

25; CEX 509, Miller Dep. Tr. 44:2-45:10, 54:23-56:9).  Aéropostale's board ultimately chose

Sycamore's $150 million financing package, which included a sourcing agreement with MGF,

over several other third-party proposals.  (CEX 509, Miller Dep. Tr. 57:22-59:12).  Aéropostale's

former Chief Financial Officer and current Chief Operations Officer Mark Miller testified that

the board selected this option in part based on "a hope that the MGF aspect of the arrangement would open up a new source of production for us that could be mutually beneficial." (CEX 509, Miller Dep. Tr. 58:16-19). The $150 million in liquidity provided was also "an important factor." (CEX 509, Miller Dep. Tr. 59:8-12).

The Debtors and the Term Lenders entered into the Prepetition Term Loan Agreement in May 2014. (DX 005). The loan is split into two tranches: (i) $100 million in Tranche A, funded by Aero Investors with an interest rate of 10%, a five-year maturity and all principal due at maturity, and (ii) $50 million in Tranche B, funded by MGF Holdings with an interest rate of 0.00%, a ten-year maturity and annual required principal payments of $5 million. (Dick First Day Affidavit ¶ 38; Kaluzny Decl. ¶ 24). The Prepetition Term Loan Agreement contains a $70 million minimum liquidity covenant. (Dick First Day Affidavit ¶ 38; DX 005 at § 5-12). This liquidity threshold is measured by taking the sum of (a) the Debtors' unused revolving borrowing capacity under the revolving loan tranche of the Prepetition ABL Agreement (excluding the FILO Facility),[4] and (b) the Debtors' cash and cash equivalents. (Dick Decl. ¶ 34; DX 005 at § 5-12). The cash component includes cash on hand and cash in corporate accounts, as well as cash in transit. (Dick Decl. ¶ 34).

The Prepetition Term Loan Agreement requires Aéropostale to provide financial reporting to the Term Lenders, such as borrowing base certificates, financial statements, and certified compliance certificates, "including a calculation of Liquidity." (DX 005 at §§ 5-5, 5-6, 5-7, 5-8). This reporting includes: monthly reports of the Debtors' financial condition and the results of operations, which attach a balance sheet, income statement, cash flow, and

---

[4]       The Prepetition ABL Agreement consists of both a revolving credit facility and a "First-In, Last-Out" or "FILO" facility (the "FILO Facility"). (DX 005). Availability under the FILO Facility is not included in the calculation of liquidity under the $70 million minimum liquidity threshold. (DX 005 at § 5-12).

comparisons of store sales for the corresponding month of the then immediately previous year, as well as to the Debtors' business plan, and the Debtors' analysis and discussions of the results; regular quarterly reporting including the same information as the monthly reports but on a quarterly basis; and annual reporting including forecasts of operations for the subsequent fiscal year. (Dick Decl. ¶ 29). The Prepetition Term Loan Agreement contains a provision requiring that any information received pursuant to the agreement be kept confidential. (DX 005 at § 5-11(d)).[5] The Term Lenders are, however, permitted to share these reports with their affiliates, including MGF. (CEX 509, Miller Dep. Tr. 96:5-15, 97:16-98:18).

Additionally, an Investor Rights Agreement entered into in connection with the Prepetition Term Loan Agreement gave Aero Investors the right to nominate two directors to the Aéropostale board and to select a third independent director jointly with Aéropostale. (CEX 091 at § 3). Stefan Kaluzny and Julian Geiger, Aéropostale's current Chief Executive Officer, were appointed by Aero Investors to the board in May 2014. (Kaluzny Decl. ¶ 28). That same month, Kenneth Gilman was jointly selected to be an independent director. (Kaluzny Decl. ¶ 28). Mr. Geiger had previously been the Chief Executive Officer of Aéropostale from August 1998 to February 2010 and was reappointed to that position by Aéropostale's board of directors in August 2014. (Kaluzny Decl. ¶ 34; Geiger Decl. ¶ 4). Mr. Kaluzny resigned from the

---

[5]    Section 5-11(d) of the Prepetition Term Loan Agreement provides:

The Loan Parties each recognize that all appraisals, inventories, analyses, financial information, and other materials which the Agent may obtain, develop, or receive with respect to the Loan Parties is confidential to the Agent and that, except as otherwise provided herein, no Loan Party is entitled to receipt of any of such appraisals, inventories, analyses, financial information, and other materials, nor copies or extracts thereof or therefrom.

(DX 005 at § 5-11(d)).

Aéropostale board in April 2015.  (Kaluzny Decl. ¶ 39).  He was replaced as the Sycamore-

designated director by Kent Kleeberger.  (Trial Tr. 69:24-70:1, Aug. 17, 2016 (Dick)).

The Prepetition Term Loan financing package also required that one of the Debtors

would enter into a "sourcing agreement" to purchase merchandise from MGF.  In May 2014,

therefore, Aéropostale Procurement Company, Inc. ("Aéro Procurement") entered into a non-

exclusive sourcing agreement with MGF (the "Sourcing Agreement").  (Dick First Day Affidavit

¶ 23; Dick Decl. ¶ 6; Schwartz Decl. ¶ 33).  The Tranche B loan was used to secure obligations

to MGF under the Sourcing Agreement.  (Dick First Day Decl. ¶ 38).  The obligations of Aéro

Procurement under the Sourcing Agreement were guaranteed by Aéropostale.  (Dick Decl. ¶ 6).

In exchange for a 0.00% interest rate on the $50 million Tranche B portion of the loan, the

Sourcing Agreement required the Debtors to purchase from MGF a minimum volume of $240

million of product for the first two years of the agreement and $280 million for the third through

the tenth year.  (DX 006; Dick Decl. ¶ 6; Schwartz Decl. ¶ 34, Morrow Decl. ¶¶ 11–12).  If the

Debtors failed to meet the minimum volume requirement in any given year, they were required

to pay a shortfall commission to MGF, which was based on a scaled percentage of the shortfall

during the applicable period.  (Dick Decl. ¶ 6; Schwartz Decl. ¶ 34).  The minimum volume

requirement and shortfall commission were to begin in 2016, with the Sourcing Agreement

remaining in effect for 10 years.  (Dick Decl. ¶ 6; Schwartz Decl. ¶ 34).  The Sourcing

Agreement also required MGF to pay the Debtors an annual rebate of up to $5 million based on

the volume of annual purchases made by the Debtors in a given year.  (Dick Decl. ¶ 6; Schwartz

Decl. ¶ 35).  The rebate was to be applied towards the payment of the required amortization

under the Tranche B loan provided by MGF Holdings.  (Dick Decl. ¶ 6; Morrow Decl. ¶ 11).

Important for the present dispute, the Sourcing Agreement gave MGF the right to declare a "Credit Review Period" if the Debtors' liquidity dropped below $150 million (the "Credit Review Period").[6]  (Dick Decl. ¶ 7; DX 006 at 2).  The $150 million liquidity trigger under the Sourcing Agreement was measured in the same manner as the $70 million liquidity measurement in the Prepetition Term Loan Agreement: basically revolving borrowing base (excluding the FILO Facility), plus available cash.  (Dick Decl. ¶ 34; DX 005 at § 5-12).

Outside of a Credit Review Period, payment by the Debtors under the Sourcing Agreement was due to MGF 30 days after delivery of the order to the Debtors' distribution center.  (Dick Decl. ¶ 44; Schwartz Decl. ¶ 36).  But if a Credit Review Period was declared, MGF had the ability to adjust payment terms.  (DX 006).  Specifically, Section 4(b)(ii) of the Sourcing Agreement provided that:

> Unless another payment schedule is expressly contained in an Order created under this Agreement, Vendor's standard payment terms will apply (i.e., U.S. Dollars, immediately available funds, net 30 days, or, *during a Credit Review Period such other shorter number of days or up-front terms as deemed prudent by [MGF] in the exercise of it [sic] reasonable credit judgment*).

(DX 006 at 11) (emphasis added).  This Credit Review Period provision was an important term to MGF and Sycamore Partners, and negotiations on it continued until shortly before signing the transaction.  (Kaluzny Decl. ¶¶ 20–22; Morrow Decl. ¶¶ 13–22; Schwartz Decl. ¶¶ 36–40; CEX

---

[6]    "Credit Review Period" is defined under the Sourcing Agreement as:

each period beginning on the date that Liquidity shall have been less than $150,000,000, and ending on the date Liquidity shall have been equal to or greater than $150,000,000 for forty five (45) consecutive calendar days; *provided* that a Credit Review Period shall not be deemed to have ended under this definition on more than two (2) occasions in any period of 365 consecutive days. The termination of a Credit Review Period as provided herein shall in no way limit, waive or delay the occurrence of a subsequent Credit Review Period in the event that the conditions set forth in this definition again arise.

(DX 006 at 2) (emphasis in original).

082).  The purpose of this provision was to protect MGF from Aéropostale's declining liquidity.

(Trial Tr. 76:13-18, Aug. 17, 2016 (Dick)).

Although the liquidity threshold was in the Sourcing Agreement, the top Aéropostale executives were unaware of it or how it was properly calculated.  Mr. Dick, the Chief Financial Officer, was not aware until January 2016 that the Sourcing Agreement had a $150 million liquidity threshold.  (Trial Tr. 58:22-59:8, Aug. 17, 2016 (Dick); Dick Decl. ¶ 23).  The Debtors' Chief Executive Officer, Julian Geiger, never saw the Prepetition Term Loan Agreement, did not learn of the $150 million liquidity threshold until February 24, 2016, was "surprised" when he learned of it, and did not know whether Debtors' liquidity calculations were consistent with the contract.  (Trial Tr. 18:20-25, 19:12-15, 63:5-64:3, Aug. 16, 2016 (Geiger)).  When Mr. Geiger learned of the liquidity threshold, he asked Mr. Miller, the Chief Operating Officer, whether he was aware of the provision, and Mr. Miller informed him that he was only "vaguely" aware of it.  (Trial Tr. 63:14-23, Aug. 16, 2016 (Geiger)).

Attached as Exhibit B to the Sourcing Agreement is a document entitled "Aéropostale's Purchase Order Terms and Conditions."  (Dick Decl. ¶ 9; DX 006 at 35-39).  It provides that: "[t]he prices herein shall not be increased and the quantities and shipment dates shall not be changed without Aéropostale's written consent."  (Dick Decl. ¶ 9; DX 006 at 35).  It also states that:

> Any terms or conditions set forth on Vendor's invoices, billing statements, acknowledgment forms, or any other documents which are inconsistent with this order shall be of no force or effect without Aéropostale's written consent.

(Dick Decl. ¶ 10; DX 006 at 35).

### III.    Aéropostale's Declining Business Performance

The Debtors' operations were profitable for many years, but declining mall traffic, a highly competitive retail environment, and a shift in customer demand from apparel to technology and personal experiences began to contribute to the Debtors' declining financial performance.  (Dick Decl. ¶ 13).  Already declining in 2013, Aéropostale's financial results and performance continued to deteriorate throughout 2014 and 2015.  (CEX 142).  Fiscal year 2014 saw a negative EBITDA of $63.5 million.  (Trial Tr. 19:24-20:5, Aug. 17, 2016 (Dick)).  And in fiscal year 2015, there was negative EBITDA of $69.5 million, despite the company previously projecting that it would break even.  (Trial Tr. 20:6-18, Aug. 17, 2016 (Dick)).  In fiscal 2015, Aéropostale announced a net loss in the fourth quarter of $21.7 million.  (CEX 425, Ex. 99.1 at 1; Trial Tr. 46:3-5, Aug. 17, 2016 (Dick)).  This was 50% larger than the fourth quarter loss from 2014, which was $13.5 million.  (CEX 425, Ex. 99.1 at 1; Trial Tr. 46:6-8, Aug. 17, 2016 (Dick)).  For fiscal 2015, comparable sales decreased 8.6% and net sales decreased 18% from the year before. (CEX 425, Ex. 99.1 at 1; Trial Tr. 226:6–17, Aug. 17, 2016 (Ferrell)).  In fiscal 2015, there was a net loss $136.9 million and an operating loss of $119.4 million.  (CEX 425, Ex. 99.1 at 2; Trial Tr. 226:18-25, Aug. 17, 2016 (Ferrell)).

In response to declining revenues and continued financial troubles, the Debtors began to restructure and streamline their businesses. (Dick Decl. ¶ 13).  Initiatives to this effect included beginning to right-size the Debtors' store base in early 2014 through lease buyouts, negotiating more competitive rents and closing underperforming stores.  (Dick First Day Affidavit ¶¶ 51, 52; Dick Decl. ¶ 14).  Beginning in 2016, the Debtors also created a two-store format, which split the Debtors' stores between a factory format and a traditional mall format.  (Dick Decl. ¶ 15). Factory stores were located primarily in outlet malls and value focused B and C mall locations

and offered the Debtors' core merchandise, including logo-bearing merchandise.  (Dick Decl. ¶ 15).  Mall format stores were located in higher-end A and B malls and focused on updated, classic merchandise, while de-emphasizing logo-bearing products.  (Dick Decl. ¶ 15).  The factory store model was rolled out in 460 stores.  (Dick Decl. ¶ 15).  Thus far, in fiscal year 2016, the factory stores are achieving 4.1% sales comparables over the same stores last year while also increasing the merchandise margin, which is the sale price of goods less the cost of goods.  (Dick Decl. ¶ 16; DX 046).  As a result, the Debtors did not have to provide greater discounts in order to drive increased sales at the factory stores.  (Dick Decl. ¶ 16).  The Debtors provided confidential data about the preliminary results in the second quarter of 2016, for both factory stores and mall stores in year over year same store comparables.  (Dick Decl. ¶ 18; DX 046).  They also provided confidential data about actual results in mall stores for year over year sales.  The actual results in mall stores also showed significantly increasing merchandise margin dollars by 6.5% over the prior year.  (Dick Decl. ¶ 18).  In 2016, the Debtors also developed new brands for the 2016 back-to-school season, reduced their corporate payroll to approximately 100 employees, and pursued various other initiatives.  (Dick Decl. ¶ 15).

In January 2016, concerns regarding liquidity and their financial future prompted the Debtors to hire Stifel to explore strategic alternatives.  (Trial Tr. 84:4-10, Aug. 17, 2016 (Dick); Trial Tr. 31:22-24, Aug. 16, 2016 (Geiger); Trial Tr. 199:10-12, Aug. 16, 2016 (Doak)).  At the end of that same month, the Debtors' board of directors held a meeting where it decided that at the March board meeting, "there will be a presentation on bankruptcy and the checklist/timeline will be reviewed."  (CEX 242 at 7; Trial Tr. 35:5-12, Aug. 16, 2016 (Geiger); Trial Tr. 102:23-103:7, Aug. 17, 2016 (Dick)).  That meeting occurred sooner than planned.  On February 11, 2016, a banruptcy attorney from the law firm Weil Gotshal & Manges LLP attended a telephonic

board of directors' call on February 11, 2016. (CEX 256 at 1; Trial Tr. 36:6-8, Aug. 16, 2016

(Geiger)). On that call, "a discussion . . . occurred regarding starting a process to market the

company." (CEX 256 at 2; Trial Tr. 35:19-36:5, Aug. 16, 2016 (Geiger)). On February 25,

2016, Debtors' board held another telephonic board meeting where they discussed disputes with

Li & Fung and MGF—its two largest suppliers—and David Dick "discussed his upcoming

'going concern' discussions with [accounting firm] BDO as part of the 10-K process." (CEX

271 at 2). Mr. Dick agreed that by February 24, 2016, Aéropostale could reasonably be

described as a distressed company, with its stock at risk of being de-listed and bankruptcy

advisors in place. (Trial Tr. 111:19-112:3, Aug. 17, 2016 (Dick)).

## IV.    Problems Between the Debtors and MGF and the Term Lenders

MGF was aware of the Debtors' weak sales trends and financial condition at the start of

the relationship in May 2014, but believed that MGF could do business with the Debtors on 30-

day terms. (Schwartz Decl. ¶ 50). But throughout 2014 and 2015, the Debtors continued their

sales declines and high rate of cash burn. (Schwartz Decl. ¶ 51). In the third quarter of 2014, the

quarterly credit review report produced by MGF's finance staff stated on its "Recommendations

Summary" page with respect to Aéropostale that "[t]he Company has declining sales, earnings,

and bottom line income during Q2-FY14 compared to last year and prior quarter. . . . However,

the Company maintains a fairly strong balance sheet with sufficient assets to cover their

obligations." (CX 346 at 2; Schwartz Decl. ¶ 59). But MGF continued to plan and budget for an

ongoing sourcing relationship, with Aéropostale's sales growth as one of four key initiatives

MGF set for 2015. (Schwartz Decl. ¶ 53).

The quarterly credit review reports produced by MGF's finance staff reflected increasing

concern throughout the sourcing relationship. Aéropostale's overall credit score on those reports

ranged between 1.21 and 2.29, below the average of its other customers and well below the

"fair" credit threshold of 3.0.  (CEX 346; CEX 347; CEX 348; Schwartz Decl. ¶ 59).

Throughout 2015, MGF was concerned about the risk posed by the Debtors and believed that the

Debtors might fall below the $150 million liquidity threshold in the Sourcing Agreement.

(Schwartz Decl. ¶ 52).  These concerns were magnified by the broadly struggling teen retailer

market, as well as questions received by MGF from its factories regarding the Debtors' financial

condition and their expressed worry that they might not be paid.  (Schwartz Decl. ¶¶ 52, 54).  In

the first quarter of 2015, the quarterly review report's "Recommendations Summary" page stated

that "[w]hile the Company maintains a fairly strong balance sheet with sufficient assets to cover

its current obligations, its cash flow is still negative, despite reduced CapEx spends, and debt is

steadily increasing.  It has an unused credit line of $116M, but this should not be relied upon for

backup."  (CEX 347 at 3; Schwartz Decl. ¶ 59).  In the third quarter of 2015, the report's

"Recommendations Summary" page noted "we should continue to monitor their financial

performance as they show signs of financial struggle."  (CEX 348 at 3; Schwartz Decl. ¶ 59).  In

late 2015, MGF began to closely monitor Aéropostale's performance.  (Schwartz Decl. ¶ 58;

CEX 200 at 20).

MGF monitored the Debtors' liquidity through the monthly financial reports that the

Debtors were required to provide the Term Lenders and through the Debtors' quarterly earnings

releases.  (Schwartz Decl. ¶ 40).  MGF also monitored the Debtors' quarterly financials and

earnings conference calls.   (Schwartz Decl. ¶ 51).  MGF periodically received information about

the Debtors' financial situation from employees of Sycamore Partners. (Schwartz Decl. ¶ 40).

The information provided to Sycamore in its capacity as a lender under the Prepetition Term

Loan Agreement disclosed the Debtors' internal financial information, including a balance sheet,

Aéropostale's liquidity position, including its availability under Aéropostale's revolving line of credit which was part of the Prepetition ABL Agreement, and available cash. (Dick Decl. ¶ 30).

In December 2015, the Debtors provided certain projections for the 2016 fiscal year to the Term Lenders, including borrowing base certificates, preliminary cash flow projections, and consolidated balance sheet preliminary projections. (Dick Decl. ¶ 31; DX 051). At a meeting on December 7, 2015, the MGF Board discussed Aéropostale credit risk. (Schwartz Decl. ¶ 55). In its presentation, management reported that "Aéropostale is current on existing A/R balance (30 day payment terms), but could burn through existing cash and available credit by Q2 2016 based on existing loss and declining sales trends." (Schwartz Decl. ¶ 55; CEX 200 at 20). Management reported that MGF had $34.9 million in total exposure to the Debtors at that time, approximately half of which was accounts receivable for merchandise delivered on 30-day payment terms. (Schwartz Decl. ¶ 55; CEX 200 at 20). The other half was based on orders in process, including "fabric liability" incurred at the first step in the production process. (Schwartz Decl. ¶ 55; CEX 200 at 20). Management reported that MGF's exposure to the Debtors "could double at peak volume in 2016 with the sales budget at the MVC [minimum volume commitment] ($240MM)." (Schwartz Decl. ¶ 55; CEX 200 at 20). This $34.9 million in existing exposure was already approaching the amount of MGF's EBITDA cushion for maintaining compliance with the covenants in its credit agreements (although the amounts of its leverage ratio and fixed charge coverage ratio are confidential), so that non-payment by the Debtors could wipe out the liquidity that MGF needed to avoid defaulting on its own loans. (Schwartz Decl. ¶ 56; CEX 200 at 36).[7] But MGF, at that time, did not believe that a Credit Review Period had been triggered. (Schwartz Decl. ¶ 57).

---

[7]    Mr. Schwartz provided the confidential amount of MGF's EBITDA cushion for its leverage ratio covenants and its consolidated fixed charge coverage ratio covenants as of year end 2015. (Schwartz Decl. ¶ 24; CEX 269 at

In January 2016, the Term Lenders analyzed the 2016 financial projections the Debtors had sent in late December and calculated that the Debtors would fall $15 million below the Sourcing Agreement's $150 million threshold in April 2016, $50 million below in May 2016, and come within $5 million in February 2016.  (DX 016; CEX  018; Morrow Decl. ¶ 39; DX 404, Burke Dep. Tr. 165:11-16, 166:24-167:19, 168:8-169:5).  This analysis based on the Debtors' financial projections caused concern, especially considering the Debtors' history of underperforming on their projections.  (Kaluzny Decl. ¶¶ 40-41, 43-44; Morrow Decl. ¶¶ 37-42).

On January 29, 2016, the Debtors provided a package (the "January Package") to the Term Lenders that included a borrowing base certificate, and a variety of additional financial information.  (Dick Decl. ¶ 30; DX 050).  The borrowing base certificate provided a calculation of availability under the revolving credit facility.  (Dick Decl. ¶ 30; DX 050).[8]  The January Package reflected the Debtors' view that the availability under the revolving credit facility was $103,876,000 and that it had a borrowing base of $143,633,000.  (Dick Decl. ¶ 30; DX 050).  The January Package also reflected availability under the FILO Facility of $40,000,000.  (Dick Decl. ¶ 35; DX 050).

Executives from the Debtors and MGF met on February 2, 2016, to discuss the status of the parties' relationship.  (Dick Decl. ¶ 42; Schwartz Decl. ¶ 61).  MGF states that it requested the meeting to better understand the Debtors' financial condition and liquidity position, in order to determine the risk posed by Aéropostale to MGF.  (Schwartz Decl. ¶ 61).  At the meeting,

---

19).  The loss at that time period of an amount equal to its EBITDA cushion for its leverage ratio covenants would have caused a default under MGF's credit agreements.  (Schwartz Decl. ¶ 24).  The $240 million relationship with the Debtors could have $50 to $100 million in unsecured credit exposure for MGF, taking into account merchandise delivered but not yet paid for, plus merchandise in various stages of production and shipment.  (Schwartz Decl. ¶ 38).

[8]      In January 2016, the borrowing base certificate also provided information about the availability under the FILO Facility and available cash and cash equivalents.  (Dick Decl. ¶ 33; DX 050 at lines (D), Availability (FILO)).

MGF inquired about increasing the number of orders the Debtors placed with MGF and actions MGF could take to reduce lead times on product and streamline the delivery of goods. (Dick Decl. ¶ 42). But MGF's concerns also were heightened by information the Debtors' management presented, which showed that Aéropostale's financial condition was actually worse than MGF had believed based on MGF's own analysis of Aéropostale's quarterly financials and monthly financial reports to the Term Lenders. (Schwartz Decl. ¶ 61; DX 407, Wilson Dep. Tr. 71:4-72:2; 88:14-25). MGF did not mention the Credit Review Period or the $150 million liquidity threshold. (Dick Decl. ¶ 42).

By February 2016, Aéropostale's stock price fell to $0.26 per share. (Kaluzny Decl. ¶ 48). Lemur sold the entirety of its Aéropostale stock between February 3 and February 8, 2016, resulting in proceeds of approximately $1 million. (Kaluzny Decl. ¶ 49). This was approximately $53 million less than what Lemur initially paid for the shares. (Kaluzny Decl. ¶ 49).

After analyzing the January month-end borrowing base certificate, financial statements, Aéropostale's projections and publicly available information, the Term Lenders concluded in mid-February that Aéropostale was below $150 million in liquidity. (Morrow Decl. ¶¶ 40-41; DX 404, Burke Dep. Tr. 190:14-21).

Pursuant to the Prepetition Term Loan Agreement, the Debtors provided the Term Lenders with another borrowing base certificate on February 11, 2016 (the "February Package") reflecting the Debtors' view of a borrowing base of $130,823,000 consisting of Availability (Revolving Credit) of $96,355,000 and Borrowing Base (FILO) of $34,468,000. (Dick Decl. ¶ 36; DX 052). The February Package was the last financial document provided by Debtors prior

to MGF asserting in the February 24th letter that the $150,000,000 liquidity threshold had been breached.  (Dick Decl. ¶ 36).

On February 24, 2016, the MGF Board held a regularly-scheduled board meeting. (Schwartz Decl. ¶ 62).  According to Messrs. Kaluzny, Morrow, and Schwartz, the Debtors' poor performance and liquidity were discussed among the board members both before and during the meeting.  (Kaluzny Decl. ¶ 45; Morrow Decl. ¶¶ 41-42; Schwartz Decl. ¶¶ 62-66).  At the meeting, the MGF Board discussed the risk Aéropostale posed to MGF, with all present agreeing that Aéropostale had dropped below the $150 million liquidity threshold in the Sourcing Agreement based on available information.  (Schwartz Decl. ¶ 63).  They all expressed doubts about Aéropostale's ability to survive and pay MGF what it was owed.  (Schwartz Decl. ¶ 63). The MGF Board decided to continue doing business with Aéropostale, but to revise payment terms.  (Schwartz Decl. ¶ 65).

On February 24, 2016, Mr. Schwartz called Mr. Miller to inform him that MGF was declaring a Credit Review Period and seeking cash in advance terms on future orders.  (Trial Tr. 110:18-23, Aug. 17, 2016 (Dick)).  That same day, MGF sent a letter signed by Mr. Schwartz to the Debtors (the "February 24 Letter").  (DX 024).  The February 24 Letter notified the Debtors that "upon information and belief, a Credit Review Period has been triggered, as Aéropostale's Liquidity is less than $150,000,000."  (DX 024).  Citing to Section 4(b)(ii) of the Sourcing Agreement, MGF stated that they were adjusting the payment terms and that for future orders, the Debtors must either provide "an irrevocable standby letter of credit" in the amount of such orders or deliver funds concurrent with the placement of the order.  (DX 024).  Thus, full payment was due at the time of placement of an order or, based on the typical lead time for manufacturing and delivering goods, at least 90 days before the goods were received by the

Debtors at their distribution center.  (Dick Decl. ¶ 41).  By the time the February 24 Letter,

MGF's exposure to Aéropostale had grown to approximately $50-60 million and MGF believed

that exposure would increase to approximately $80-100 million as new orders came in.

(Schwartz Decl. ¶ 67).

Aéropostale responded with a letter signed by Marc Schuback, Aéropostale's General

Counsel, dated February 26, 2016.  (CEX 489).  The letter stated that the Debtors disagreed with

the assertion that a Credit Review Period had been triggered.  (CEX 489).  It noted that MGF's

letter "provides absolutely no basis for your conclusion and only states that it is written on

'information and belief.'"  (CEX 489).  It went on to "request that you provide us with

information evidencing your conclusion that a Credit Review Period has been triggered as well

as identifying the source(s) of such information.  Given your letter, we assume that you should

have no problem easily furnishing this information."  (CEX 489).  The letter did not attempt to

demonstrate that the Debtors were above $150 million in liquidity.  (CEX 489).

On February 29, 2016, MGF sent a second letter signed by Jennie Wilson, MGF's Chief

Financial Officer (the "February 29 Letter").  (DX 025).  This letter notified the Debtors that

pursuant to Section 4(b)(ii) of the Sourcing Agreement, no pending orders would be delivered

unless the Debtors paid MGF the full amount of such order prior to the date the order was to be

shipped by MGF's third party logistics provider from the U.S. port to the Debtors.  (DX 025).

This immediately halted delivery of all pending orders for merchandise by MGF unless the

Debtors paid in full prior to shipment.  (Dick Decl. ¶ 44).

On March 1, 2016, the Debtors responded with a letter signed by outside counsel at Weil,

Gotshal & Manges LLP.  (CEX 491).  The letter again questioned how MGF had determined that

a Credit Review Period was triggered and asserted that MGF's conclusion was based on

information obtained "unlawfully." (CEX 491). The letter further asserted that cash in advance

terms were "neither prudent nor reasonable and threatens to cause significant harm to

Aéropostale, its business and its shareholders." (CEX 491). The letter asserted that MGF's

actions were a breach of the Sourcing Agreement and

> demand[ed] that you retract your letter immediately and confirm that MGF will
> resume shipments in the ordinary course in compliance with the Sourcing
> Agreement. Aéropstale and MGF can then meet among [sic] to discuss any
> concerns that you may have and how to move forward in a reasonable manner and
> in compliance with the terms of the Sourcing Agreement.

(CX 491). The letter stated that it would hold MGF and its affiliates responsible for damages

and loss if MGF did not rescind its requirements, and noted that the Debtors were evaluating

other actions to protect Aéropostale. (CEX 491). Soon thereafter, Mr. Schwartz called Mr.

Miller to discuss how to operationalize a process for the new payment terms MGF had

demanded. (CEX 509, Miller Dep. Tr. 268:25–269:7). Mr. Miller responded that the Debtors

had not breached the liquidity threshold, so there was "nothing really to talk about." (Trial Tr.

158:19-159:3, Aug. 16, 2016 (Schwartz)).

The Debtors concede that they did drop below the $150 million liquidity threshold under

the Sourcing Agreement by the last day of February 2016, though they learned this information

after the fact. (Dick Decl. ¶ 40). As of February 27, 2016, Aéropostale's month-end financials

indicated that the Debtors' liquidity would be approximately $129 million. (Trial Tr. 67:8–11,

Aug. 17, 2016 (Dick)). Mr. Dick, the Debtors' CFO, now has no reason to believe that the

Debtors' liquidity was above the $150 million threshold three days earlier on February 24, 2016.

(Trial Tr. 67:15-23, Aug. 17, 2016 (Dick)). In fact, the Debtors had unknowingly been

incorrectly calculating the liquidity threshold by including FILO in the borrowing capacity and

by double counting credit card receivables. (Trial Tr. 64:7-66:6, 68:10-69:3, 73:3-76:12, 93:12-

20, 96:4-12, Aug. 17, 2016 (Dick)).  Mr. Dick did not realize this until months after the fact.

(Trial Tr. 96:10-12, Aug. 17, 2016 (Dick)).  As a result of their incorrect inclusion of FILO

availability, the Debtors systematically overstated their own liquidity by between $34 and $40

million, depending on the month forecasted.  (Trial Tr. 93:17-94:25, Aug. 17, 2016 (Dick)).  This

led the Debtors to overstate their liquidity on numerous occasions, including: (a) throughout

January and February 2016, when they began to monitor it, and (b) after February 24, 2016,

when denying they were in a Credit Review Period. (CEX 318; Debtors' Trial Brief ¶ 38; Trial

Tr. 143:11-144:23, Aug. 17, 2016 (Dick)).

    Between April 1, 2016, and April 8, 2016, the Debtors and MGF came to interim

agreements with respect to certain shipments.  (Trial Tr. 127:15-24, Aug. 17, 2016 (Dick); Dick

Decl. ¶ 52)).  The Debtors ultimately paid MGF approximately $15.8 million to ship goods and

MGF delivered some, but not all, of the outstanding inventory of the Debtors.  (Dick Decl. ¶ 52).

Subsequent to the Debtors' bankruptcy filing on May 4, 2016, the Debtors and MGF settled the

rest of their supply dispute.  The Debtors released their claims against MGF in exchange for

other consideration, including MGF's agreement to ship.  (Trial Tr. 129:7-14, Aug. 17, 2016

(Dick)).  On May 24, 2016, this Court entered an order pursuant to Bankruptcy Rule 9019

approving a separate settlement agreement between Debtors and MGF resolving all disputes

regarding the Credit Review Period as between MGF and Debtors.  [ECF Nos. 168, 189].

    MGF suffered consequences upon the post-bankruptcy termination of its relationship

with the Debtors, including reduced sales, expense leverage, and leverage with logistics

providers, and through what MGF characterizes as the waste of the management time and

attention that went into developing the relationship with the Debtors.  (Schwartz Decl. ¶ 74).

MGF ultimately laid off approximately half of the employees it hired or transferred to service the

Debtors' account.  (Schwartz Decl. ¶ 75).

## V.    **Aéropostale's Vendors**

It is impossible to understand the dispute before the Court without some additional

background about how MGF conducts its business.  Entering into a new customer relationship—

like the one with Aéropostale in 2014—requires significant effort and expense for MGF upfront

and throughout the relationship and may require the hiring of dozens of people specifically for

that relationship.  (Schwartz Decl. ¶ 14).  MGF must first work with the customer to understand

the merchandise to be manufactured, including price, design, technical, merchandising and

logistical matters.  (Schwartz Decl. ¶ 13).  MGF must also identify appropriate factories for

manufacturing the merchandise and work with those factories to ensure that the products meet

customer specifications, price targets and production timelines.  (Schwartz Decl. ¶ 13).[9]  Because

of this process, the first year or two of a new customer relationship may involve errors and

misunderstandings regarding pricing, product specifications, sampling, logistics and other issues.

(Schwartz Decl. ¶ 15).  These problems typically become fewer as the relationship continues and

the parties become accustomed to working together.  (Schwartz Decl. ¶ 15).

MGF's margins on sales to new customers are lower than those to established customers,

because of the time and expense necessary to develop an efficient sourcing system, combined

with customers that often demand low pricing immediately.  (Schwartz Decl. ¶ 16).  MGF

---

[9]      For example, in the first year of the Sourcing Agreement, MGF hired or internally transferred roughly 50
people to service the Debtors, at a cost of $2.4 million for 2015.  (Schwartz Decl. ¶ 41; CEX 269).  Effort and
expense was spent training this team to service the Debtors, arranging for factories to produce merchandise for the
Debtors and making logistics arrangements for shipping merchandise from the factories to the Debtors' distribution
centers in the United States.  (Schwartz Decl. ¶ 41).  MGF spent time meeting with the Debtors to understand their
designs, technical requirements, budgeting process, and requirements regarding ordering, shipping, invoicing, and
payments.  (Schwartz Decl. ¶ 41).  MGF and the Aéropostale team participated in weekly conference calls about
how to service the Debtors.  (Schwartz Decl. ¶ 41).

therefore takes a long-term view of its customer relationships, expecting to make little profit early for the sake of building the relationship with the understanding that increased profits will follow as that relationship progresses. (Schwartz Decl. ¶¶ 16-17). MGF believes that a sourcing relationship lasting only a year or two would generally not be worth the trouble and expense. (Schwartz Decl. ¶ 17).

One of the biggest risks to MGF's business is customer credit risk, specifically, that customers will not be able to pay for merchandise that MGF has spent money to source for them. (Schwartz Decl. ¶ 18). MGF incurs increased financial exposure to the credit of its customers at each step in the production process, and that exposure is not eliminated until the customer pays for the merchandise at the end of the order cycle. (Schwartz Decl. ¶ 19). For instance, fabric dyed to a customer's specifications cannot easily be used for other orders and MGF is obligated to pay the factories for it pursuant to their contracts, even if MGF's customer fails to pay MGF for the finished apparel. (Schwartz Decl. ¶ 19). Likewise, once the dyed fabric is cut into the shapes and sizes required for the customer's order, it is impossible to use it for any other order and MGF is obligated to pay the factory for both the fabric and the effort and expense involved in cutting it. (Schwartz Decl. ¶ 20). When the garments are complete and trucked to the customer's distribution centers, MGF is committed to the factories and the logistics providers for additional expenses, plus import duties payable upon landing goods in the United States. (Schwartz Decl. ¶ 20).

MGF's options are limited if a customer fails to pay. (Schwartz Decl. ¶ 22). If the merchandise is already delivered to the customer, then MGF must seek payment through the legal process. (Schwartz Decl. ¶ 22). If MGF has not yet delivered the merchandise, and the order is halted mid-stream, then MGF Sourcing must sell the merchandise to liquidators, which

results in a significantly lower dollar amount because the merchandise may be unfinished or may be located in a foreign country where its style and branding do not appeal to local consumers. (Schwartz Decl. ¶ 22). MGF's ability to liquidate merchandise is often further restricted by provisions in sourcing contracts that prevent MGF from selling products with the customer's branding. (Schwartz Decl. ¶ 22).

MGF depends on timely payments by its customers to finance its operations and to meet financial covenants in its own credit agreements, including staying below a maximum leverage ratio (net debt divided by adjusted EBITDA) and above a minimum consolidated fixed charge coverage ratio (free cash flow divided by debt service charges). (Schwartz Decl. ¶ 23). Violation of these covenants would allow MGF's lenders to exercise their contractual remedies, thereby disrupting MGF's business and threatening its survival. (Schwartz Decl. ¶ 23). MGF monitors its compliance with its financial covenants and its EBITDA cushion—the amount of EBITDA above the minimum amount required to remain in compliance. (Schwartz Decl. ¶ 24).

Because of the importance of its customers' creditworthiness, MGF monitors the performance and financial condition of its customers. (Schwartz Decl. ¶ 25). Additionally, factory owners in other countries often monitor press coverage of the MGF customers for whom their products are destined, and seek assurance from MGF when negative reports cause them concern about the ability of the customer to pay. (Schwartz Decl. ¶ 25). MGF has declined new business because of doubts about the customer's liquidity and ability to pay and in one case stopped doing business with a large existing customer due to persistent unresolved liquidity problems that caused MGF to doubt whether the customer could continue to pay for its merchandise. (Schwartz Decl. ¶ 26).

MGF produces weekly reports tracking the performance of accounts receivable, which show, by customer, the percentage of available credit used and the aging of accounts receivable and are reviewed by MFG senior officers and directors.  (Schwartz Decl. ¶ 27).  MGF also prepares quarterly credit review reports that discuss the financial condition and performance of each of its customers, including analyzing each customer's credit profile based on publicly available information, plus whatever financial information MGF receives from its customers in the course of the sourcing relationship.  (Schwartz Decl. ¶ 28).  The reports include recommendations about whether to increase, decrease, or maintain current credit terms for each customer, a detailed presentation of their financials, and the calculation of financial ratios relevant to the customer's creditworthiness.  (Schwartz Decl. ¶ 28).  The reports assign an overall credit score to each customer based on earnings, balance sheet, growth, cash generation, and penetration risk, which refers to the risk that MGF share of the customer's overall sourcing volume may drop.  (Schwartz Decl. ¶ 28).

Shortly after the quarterly credit review reports are issued, Mr. Schwartz, MGF's CEO, meets with the CFO, the controller, and their managers, to discuss the reports, including any threats posed by particular customers and how to protect against them.  (Schwartz Decl. ¶ 29).  Representatives of Sycamore Partners do not attend these meetings.  (Schwartz Decl. ¶ 29).  The discussion at these meetings typically covers each customer's financial condition, the financial ratios and their implications for credit risk, and MGF's own financial condition and liquidity requirements.  (Schwartz Decl. ¶ 29).  On occasion, a customer presenting a particular credit risk to MGF will be discussed by the MGF Board and a board decision may be made about how to address the risk.  (Schwartz Decl. ¶ 30).

The majority of MGF customers (including eight customers that totaled a significant, but confidential, amount of MGF's net sales for 2015) are not owned or affiliated with Sycamore Partners. (Schwartz Decl. ¶ 10). Additionally, MGF maintains its own offices, bank accounts, phone numbers, technology systems and email addresses separate from Sycamore Partners. (Schwartz Decl. ¶ 11). MGF does business in its own name and generally does not refer to Sycamore Partners in its marketing. (Schwartz Decl. ¶ 11). MGF also maintains financing separate from Sycamore Partners, which consists of a revolving credit facility with Bank of America and a term loan facility with KKR Financial, both of which were entered into by MGF under its own name. (Schwartz Decl. ¶ 11).

Since November 1, 2011, MGF has been indirectly majority-owned by an affiliate of Sycamore Partners. (Schwartz Decl. ¶ 3). At the time that MGF and the Debtors entered into the Sourcing Agreement, MGF was also owned in party by a company called L Brands. (Schwartz Decl. ¶ 6). During the period of time that L Brands was a minority owner of MGF Holdings, the MGF Board had five members that included two Sycamore representatives, two L Brands representatives, and James Schwartz, the Chief Executive Officer of MGF. (Schwartz Decl. ¶ 6). This was the composition of the MGF Board at the time that it approved the Sourcing Agreement. Later, L Brands sold its remaining interest in MGF Holdings to Sycamore. (Schwartz Decl. ¶ 6).

The MGF Board currently consists of Mr. Schwartz, as well as Stefan Kaluzny and Peter Morrow, who are both managing directors of Sycamore Partners. (Schwartz Decl. ¶ 6). The MGF Board meets quarterly. (Schwartz Decl. ¶ 8). At these meetings, MGF management makes a presentation regarding the company's performance for the prior quarter and the forecast for future periods, and the MGF Board discusses strategic issues facing the company. (Schwartz

28

Decl. ¶ 8). MGF has a management services contract with an affiliate of Sycamore Partners, the details of which are confidential. (Schwartz Decl. ¶ 9). These personnel include retail specialists with extensive experience in strategic and financial issues relevant to MGF's business. (Schwartz Decl. ¶ 9). In between MGF Board meetings, management of MGF will occasionally discuss the company's business with individuals at Sycamore Partners. (Schwartz Decl. ¶ 9).

To understand the parties' dispute, it is also necessary to know something about the difficulties eluded to earlier between Aéropostale and its largest prepetition merchandise supplier, Li & Fung. The Debtors were party to a master sourcing agreement with Li & Fung, dated February 2, 2015 (the "L&F Agreement"). (Dick Decl. ¶ 59; DX 055). The L&F Agreement had an initial term of 10 years, with a minimum volume requirement of $350 million per year. (Dick Decl. ¶ 59; DX 055). Similar to the Sourcing Agreement, a failure of the Debtors to meet the minimum volume requirement results in a shortfall commission to Li & Fung, and the Debtors were also entitled to rebates under the L&F Agreement. (Dick First Day Affidavit ¶ 24; Dick Decl. ¶ 59; DX 055). Unlike the Sourcing Agreement, the L&F Agreement did not have a liquidity threshold allowing it to adjust payment terms. (DX 055; CEX 509, Miller Dep. Tr. 232:12-20). It contained no basis for allowing Li & Fung to suspend shipping other than late payment by the Debtors. (Trial Tr. 25:8-20, Aug. 17, 2016 (Dick)).

As early as November 2015, Li & Fung expressed concerns about the Debtors' finances and liquidity and subsequently took actions to reduce their exposure. (Dick Decl. ¶ 60; CEX 188; Trial Tr. 48:1-49:13, Aug 16, 2016 (Geiger); Trial Tr. 27:3-17, Aug. 17, 2016 (Dick)). For instance, internal Aéropostale communications during this time period noted Li & Fung was "freaking out" over Aéropostale's financial performance and gross margin on sales. (CEX 188; Trial Tr. 48:1-49:10, Aug. 16, 2016 (Geiger); Trial Tr. 27:3-17, Aug. 17, 2016 (Dick)). In

December 2015, the Debtors and Li & Fung held a meeting at Li & Fung's request to address
concerns that Li & Fung had expressed to Julian Geiger. (Dick Decl. ¶ 61; Trial Tr. 28:7-14,
29:1-4, Aug. 17, 2016 (Dick); Trial Tr. 49:11-16, Aug. 16, 2016 (Geiger)). At the meeting, there
was a broad discussion regarding the Debtors' business performance, including regarding the
Debtors' liquidity, and Li & Fung was provided with financial information in an attempt to ease
their concerns, with Li & Fung being walked through a liquidity sensitivity analysis. (Trial Tr.
29:5-14, Aug. 17, 2016 (Dick); Trial Tr. 49:14-50:5, Aug 16, 2016 (Geiger)).

The Debtors ultimately agreed to grant Li & Fung a license to re-sell certain goods that
the Debtors elected not to purchase, in the event the Debtors filed for bankruptcy and did not pay
for or accept those goods. (Dick Decl. ¶ 64; Trial Tr. 50:17-22, Aug. 16, 2016 (Geiger); Trial Tr.
31:4-32:19, Aug. 17, 2016 (Dick); CEX 193; CEX 217; CEX 218). The Debtors also agreed to
grant Li & Fung critical vendor status in the event of a bankruptcy. (CEX 193; CEX 217; CEX
218). In January 2016, Li & Fung and the Debtors spoke again to discuss the relationship,
specifically amounts owed to Li & Fung under the L&F Agreement, potential trade terms on a
go-forward basis, and the overall state of the Debtors' business. (Dick Decl. ¶ 62; Trial Tr. 36:8-
15, Aug. 17, 2016 (Dick)). Li & Fung was provided with an update about the Debtors'
performance in the fourth quarter of 2015 and provided a preview of performance for the first
quarter of 2016. (Dick Decl. ¶ 62). Also at that time, the Debtors requested the acceleration of a
$9.3 million refund payment that was due later in February. (Trial Tr. 36:16-37:2, Aug. 17, 2016
(Dick)).

On February 25, 2016, the Debtors and Li & Fung held a videoconference, during which
Li & Fung requested additional assurances about the Debtors' performance and ways to manage
Li & Fung's exposure to Aéropostale. (Dick Decl. ¶ 63; Trial Tr. 39:5-18, Aug. 17, 2016

(Dick)).  Li & Fung stated that they would like to limit their exposure to Aéropostale to $100

million.  (Trial Tr. 54:4-13, Aug 16, 2016 (Geiger)).  The Debtors considered several steps

during this time period, such as reducing Li & Fung's volume commitment by $100 million to

limit its credit exposure and reducing Li & Fung's payment terms from net 40 days to net 20

days.  (CEX 240; Trial Tr. 55:10-56:24, Aug. 16, 2016 (Geiger)).

      In February 2016, Li & Fung was required under the L&F Agreement to pay the Debtors

a rebate of $9.3 million, but Li & Fung unilaterally chose not to make the rebate payment as

required.  (Dick Decl. ¶ 65; Trial Tr. 38:11-40:10, 41:22-23, Aug. 17, 2016 (Dick)).  On March

4, 2016, Li & Fung sent the Debtors a letter seeking shortened payment terms for any goods

shipped to the Debtors under L&F's supply agreement.  (Dick Decl. ¶ 65).  Li & Fung also held

certain shipments and required payment before taking new orders.  (Trial Tr. 41:19-21, 43:8-44;

52:5-8, Aug. 17, 2016 (Dick); CEX 509, Miller Dep. Tr. 206:5-10).  They also unilaterally

accelerated payment terms on existing orders that had already been placed, using the shipments

they were holding as leverage.  (CEX 478; Trial Tr. 52:5-21, Aug. 17, 2016 (Dick); CEX 509,

Miller Dep. Tr. 210:2-17.)  Ultimately, the Debtors and Li & Fung renegotiated the payment

terms in their agreement, agreeing to net-20 payment terms on certain orders and net-7 on others.

(Dick Decl. ¶ 65; CEX 322).  In consideration for reducing payment terms, Li & Fung provided a

5% rebate on certain orders.  (Dick Decl. ¶ 65; CEX 322).

      Prior to contracting with Li & Fung, Aéropostale had a longstanding sourcing

arrangement with a sourcing company named MMG, which was the sourcing arm of Federated

Department Stores.  (DX 042 at 37; Trial Tr. 40:3-9, Aug 16, 2016 (Geiger)).  In 2014, MMG

was Aéropostale's second largest supplier.  (DX 042 at 36).  In approximately March 2015, the

relationship with MMG ended because MMG also requested collateral, which Aéropostale refused to provide. (DX 042 at 37; Trial Tr. 40:10-13, Aug 16, 2016 (Geiger)).

## VI.   Expert Witness Testimony

In addition to the historical facts presented at Trial, the parties presented an array of expert testimony in four general areas. First, the parties offered expert testimony about the Sourcing Agreement and whether the new payment terms imposed during the Credit Review Period were reasonable. The Debtor's sourcing expert, Deborah Palmer Keiser, opined that MGF's conduct with respect to the Sourcing Agreement is "inconsistent with generally accepted standards of reasonable credit judgment within the retail industry." (Keiser Decl. ¶¶ 15, 52, 59). Specifically, Ms. Keiser opined that it is rare in the retail industry "to permit a single party to unilaterally alter the terms of an order once a valid purchase order has been placed and for which there is no evidence of failure to meet the terms of the purchase order." (Keiser Decl. ¶¶ 53, 54, 55) (citing Sourcing Agreement, DX 006). Ms. Keiser defines "unilateral" action narrowly, stating it constitutes "shutting down the supply chains, shutting down the supply of product" whereas, she defines parties withholding payments as "industry sparring." (Trial Tr. 194:10–22, Aug. 16, 2016 (Keiser)).

Ms. Keiser testified that in her thirty years working with sourcing agents, she has never seen terms that demand payment in full upon placement of a purchase order. (Keiser Decl. ¶¶ 58, 63). Rather, the most extreme terms she has encountered were 50% due upon order placement, with ordinary terms applied for the remaining 50%. (Keiser Decl. ¶¶ 58, 64). According to Ms. Keiser, such terms are applied in the cases of start-ups with no prior payment history and little credit history. (Keiser Decl. ¶¶ 58, 64).

Ms. Keiser opined that MGF's refusal to ship products already ordered is inconsistent with reasonable credit judgment because in the industry "a reasonable vendor would not seek to adjust purchase order terms retroactively while withholding inventory as leverage." (Keiser Decl. ¶ 60). In fact, Ms. Keiser opined, it would be in the sourcing agent's best interest to ship inventory. (Keiser Decl. ¶ 61). Ms. Keiser testified that it is common for sourcing agents to ease payment terms with brands experiencing financial difficulty. (Keiser Decl. ¶ 65). Rather than impose payable upon order terms, Ms. Keiser testified that there were other "more reasonable payment terms and strategies" MGF could have imposed, including for example, "net-20" terms and amending the Sourcing Agreement to include a provision for a rebate or discount. (Keiser Decl. ¶¶ 68, 69). But she conceded that, before this case, she had never heard of a credit review provision like that in the Sourcing Agreement. (Trial Tr. 169:6–19, Aug. 16, 2016 (Keiser)).

Ms. Keiser expressed no opinion on whether it was reasonable for MGF to attempt to control its credit risk with respect to Aéropostale. (Trial Tr. 179:16–21, Aug. 16, 2016 (Keiser)). She compared the acts of MGF to those of Li & Fung and opined that the amendment made to the L&F Agreement, which imposed new payment terms on existing orders, is consistent with industry custom for a company in Li & Fung's position. (Trial Tr. 176:20–177:6, Aug. 16, 2016 (Keiser); CEX 193). Yet she offered no opinion on whether Li & Fung's decision to limit its credit exposure was reasonable. (Trial Tr. 177:13–16, August 16, 2016 (Keiser)). Ms. Keiser also conceded that the L&F Amendment permitted L&F to make a unilateral change in that they could exercise their right to "sell off" without conferring with Aéropostale. (Trial Tr. 189:22–25, 192:5–13, Aug. 16, 2016 (Keiser)).

The Term Lenders' expert on the subject, Holly Felder Etlin, had a different take. She opined that MGF's decision to require cash in advance for new and existing purchase orders was

"reasonable under common industry factors for assessing credit."  (Etlin Decl. ¶¶ 12, 53).

Specifically, Ms. Etlin concluded MGF's decision was reasonable because, among other factors,

it had significant credit exposure to the Debtors and the financial circumstances of the Debtors

was deteriorating.  (Etlin Decl. ¶ 12).  Additionally, Ms. Etlin found the actions that Li & Fung

took to protect its own credit exposure to the Debtors supported her conclusion.  (Etlin Decl. ¶¶

13).  Ms. Etlin analyzed MGF's credit risk as related to the Debtors and concluded that it had

significant credit exposure to the Debtors in January and February 2016.  (Etlin Decl. ¶ 36, 38).

She noted/relied upon the fact that, as of February 12, 2016, MGF forecasted its credit exposure

to $45.7 million in February 2016 and $50.3 million in March 2016 and would be over $60

million in June 2016.  (Etlin Decl. ¶ 38).  Based on the Debtors' financial condition, liquidity

position and its strained relationship with Li & Fung, Ms. Etlin concluded that MGF's change in

payment terms did not cause Aéropostale's bankruptcy.  (Etlin Decl. ¶ 67, 68).

According to Ms. Etlin, MGF had several options that it could have used to mitigate its

credit risk.  (Trial Tr. 134:2–5, 135:7–10, Aug. 18, 2016 (Etlin)).  These options included

imposing a credit limit, withholding rebates, requiring cash in advance or partial cash payments,

or an "insolvency rider" that would permit the vendor to be deemed a "critical vendor" and give

them a "sell-up rate."  (Trial Tr. 135:11–24, Aug. 18, 2016 (Etlin)).  Some of these options

would have had a less severe impact on Aéropostale's ability to conduct business.  (Trial Tr.

137:12–16, Aug. 18, 2016 (Etlin)).  She conceded that there are instances where a sourcing agent

may extend payment terms for a retailer.  (Trial Tr. 139:10–140:5, Aug. 18, 2016 (Etlin)).  She

also noted that MGF has in the past extended payment terms to its customers, including for a

company whose identity is confidential.  (Trial Tr. Under Seal 1, 6:4–10, Aug. 18, 2016 (Etlin)).

Ms. Etlin also noted that MGF used a monthly risk tracking tool for all their customers.  (Trial

Tr. Under Seal 1, 8:20–25, Aug. 18, 2016 (Etlin)).  For example, according to a third quarter

2015 review, MGF's credit exposure to Aéropostale was approximately $34.8 million as of

December 7, 2015.  (Trial Tr. Under Seal 1, 9:21–24, Aug. 18, 2016 (Etlin); DX 28 at 20).  By

comparison for the same period, MGF's credit exposure to the confidential company identified

above was approximately $36 million.  (Trial Tr. Under Seal 1, 9:1–4, Aug. 18, 2016 (Etlin); DX

28 at 22).  MGF assessed both Aéropostale and the confidential company identified above as a

"poor" credit risk.  (Trial Tr. Under Seal 1, 11:15–17, Aug. 18, 2016 (Etlin); DX 26 at Score

Summary).  But Ms. Etlin identified distinctions between the two companies that explained

MGF's different treatment for each company.  (Trial Tr. Under Seal 1, 11:5–14, Aug. 18, 2016

(Etlin)).

　　　　The second area of expert testimony related to the significance in the market of certain

information about Aéropostale.  Based on two "event studies," Allen Ferrell concluded on behalf

of the Debtors that information reflecting a significant increased risk of Aéropostale's bankruptcy

was of market significance.  (Trial Tr. 220:9-22, Aug. 17, 2016 (Ferrell)).  He assumed that

information that the $150 million liquidity threshold would be crossed would significantly

increase the likelihood of an Aéropostale bankruptcy.  (Ferrell Decl. ¶ 13).  He further assumed

that the December 2015 projections—prepared by Debtors and shared with the Term Lenders—

reflected that the $150 million liquidity threshold would be breached on or around April.  (*See*

Ferrell Decl. ¶ 13).  Based on these two assumptions, he then concluded that the Term Lenders

were in possession of information that reflected a significant increased risk of bankruptcy and,

therefore, that this in fact was of market significance.  (Ferrell Decl. ¶¶ 13, 21).  Professor Ferrell

did not, however, calculate the probability of Aéropostale filing for bankruptcy at any given

point in time.   (Trial Tr. Aug. 17, 2016, 235:11-18).  Professor Ferrell also did not analyze

whether any information that the Term Lenders received showed a significant increase in

Aéropostale's risk of filing for bankruptcy.  (Trial Tr. Aug. 17, 2016, 224:23–225:5 (Ferrell)).

On the other side of this issue, the Term Lenders' expert, Adam Pritchard, opined that it

is substantially unlikely that a reasonable shareholder would consider the information that the

Term Lenders possessed to be important in deciding whether to buy or sell Aéropostale stock.

(Pritchard Decl. ¶¶ 5, 5). Specifically, Professor Pritchard testified that this information "would

not have altered the total mix of information that a reasonable investor would have considered

important to deciding whether to buy or sell" Aéropostale's stock.  (Pritchard Decl. ¶ 6).

Professor Pritchard concluded that by the end of 2015, the market had concluded that

Aéropostale's turn-around plan, announced in May 2014, was unsuccessful.  (Pritchard Decl.¶

14).  Professor Pritchard opined that based on his review, Aéropostale's stock had only option

value by December 2015 and needed "a miracle to turn it around."  (Pritchard Decl. ¶ 38).

Professor Pritchard considered a wide variety of stock analysts' reports and news articles in

evaluating the information available to the market.  (Pritchard Decl. ¶¶15, 16, 18, 19, 20, 21).

Professor Pritchard relied on stock prices in rendering his opinion.  In May 2014,

Aéropostale's shares were trading above $4.00, but the stock's price was at $.28 per share by the

end of December 2015.  (Pritchard Decl. ¶ 14).  Professor Pritchard testified that from that point

until it was de-listed on April 22, 2016, the stock price remained relatively stable in response to

new developments at the Company.  (Pritchard Decl. ¶¶ 25, 29, 31, 33, 34).  On March 17, 2016,

the Company announced its net loss of $.27 per share for the fourth quarter of 2015, that it was

considering "strategic alternatives," and had hired Stifel to assist in that process.  (Pritchard

Decl. ¶ 31).  After the March 17, 2016 disclosures, Aéropostale's stock price declined from $.48

on March 17, 2016, to $.26 the next day with over 12 million shares trading.  (Pritchard Decl. ¶

33).  The stock price fell throughout March and traded in the low $.20s for most of April.

(Pritchard Decl. ¶ 34).  In his view the market's reactions to various disclosures in early 2016

demonstrated that it was "impervious" to bad news.  (Pritchard Decl. ¶¶ 24, 27, 28, 40).

On cross-examination, Professor Pritchard conceded that information that Aéropostale

was going to be delisted or that it is "virtually certain to file for bankruptcy" could have moved

the company's stock price.  (Trial Tr. 179:24–180:6, Aug. 18, 2016 (Pritchard)).  He also

conceded that there was a great deal of trading volume immediately after an April 21, 2016

report that Aéropostale was said to be preparing for bankruptcy by the end of the month, and that

in fact, the market reacted strongly to that report.  (Trial Tr. 188:3–17, Aug. 18, 2016

(Pritchard)).  That April 21, 2016 report was also considered by Professor Ferrell in rendering his

analysis.  (Ferrell Decl. ¶¶ 14, 15, 16).

The third area of expert testimony related to Aéropostale's economic situation in 2016.

The Debtors offered Robert Duffy to opine that if MGF had not imposed new credit terms,

Aéropostale likely would have avoided or significantly delayed tripping the $70 million liquidity

covenant and any attendant Chapter 11 filing.  (Duffy Decl. ¶ 2).  Specifically, Mr. Duffy opined

that the payment terms demanded in the February 24, 2016 and February 29, 2016 letters would

have impacted the Debtors' liquidity by $80 million–$120 million.  (Dufy Decl. ¶ 13).  Further,

Mr. Duffy concluded that if Debtors had agreed to the terms in the February 24th and February

29th letters, they would have tripped the $70 million liquidity covenant.  (Duffy Decl. ¶ 13).  In

conjunction with FTI, Mr. Duffy prepared a liquidity projection to demonstrate the Debtors'

liquidity, assuming that standard credit terms would be used from April 30, 2016 through

December 3, 2016 (the "Liquidity Projection").  (Duffy Decl. ¶¶ 14, 16; DX 41)  Thus, the

model assumes no changes to MGF's payment terms until August 20, 2016.  (Trial Tr. 63:21–25,

Aug. 18, 2016 (Duffy)).  The Liquidity Projection assumes that: "all amounts due and owing between the Debtors and its vendors would have been paid in the ordinary course; . . . Debtors would not have incurred the costs associated with a chapter 11 filing[;] . . . [and] through July 2016, the Debtors would have realized the same margins and level of comparable same-store sales that the Debtors actually realized[.]"  (Duffy Decl. ¶ 17).  Except for five or six stores that would have closed absent a bankruptcy, Mr. Duffy's analysis assumed that Aéropostale would not close any stores. (Trial Tr. 60:21–61:8, Aug. 18, 2016 (Duffy)).  Even with these assumptions, the Liquidity Projection indicates that the Debtors would trip the $70 million liquidity covenant in July 2016.  (Duffy Decl. ¶ 21; DX 41).  However, Mr. Duffy opined that that Debtors would have been able to "manage through such period" because the Debtors could have managed liquidity through other means.  (Duffy Decl. ¶ 21).  Further, Mr. Duffy explains that the Liquidity Projection assumes "net 20" payment terms for L&F, which is more onerous than the "net 40" provided for in the L&F Agreement.  (Duffy Decl. ¶ 22).

While Mr. Duffy relied on the Liquidity Projection, he had no role in creating the model but he had a role in the assumptions, the presentation, and inputs.  (Trial Tr. 21:15–21, Aug. 18, 2016 (Duffy)).  On cross-examination, the Term Lenders' counsel ran through various scenarios with Mr. Duffy that would potentially impact Aéropostale's liquidity.  (See, e.g., Trial Tr. 79:13–24, 81:18–22, 86:1–87:5, Aug. 18, 2016 (Duffy)).  The scenarios included removing the $9 million payment by Li & Fung and previously paid provisional fees in the amount of $7.445 million, as well as applying 20-day terms to MGF orders for the entirety of the projection.  (See Trial Tr. 79:14–18, 86:1–87:5, 94:3–15, Aug. 18, 2016 (Duffy)).  These scenarios demonstrated that Aéropostale would dip below the $70 million Liquidity Covenant at various points.  (Trial Tr. 79:19–80:10, 86:1–87:5, 94:11–95:3, Aug. 18, 2016 (Duffy)).

38

On this same issue of Aéropostale's economic situation in 2016, the Term Lenders offered Adam Bell. He opined that, as of February 24, 2016, an audit opinion of Aéropostale would have included an explanatory paragraph indicating substantial doubt that the company could continue as a going concern for a reasonable period of time. (Bell Decl. ¶¶ 10, 14, 28). Mr. Bell concluded that Aéropostale faced significant financial risks as identified in the company's fiscal 2014 audit. (Bell Decl. ¶¶ 32–33). Mr. Bell evaluated Aéropostale's 2014 and 2015 Form 10-Ks and found that the Company's financial performance did not improve from 2014 to 2015. (Bell Decl. ¶ 36). In addition, he noted that Aéropostale's liquidity calculation in its 2015 Form 10-K was overstated by approximately $37.4 million. (Bell Decl. ¶ 37). He further relied on the fact that net sales decreased in each quarter in fiscal 2015 from the prior year, both in gross terms and on a comparable store basis. (Bell Decl. ¶ 39).

Mr. Bell acknowledged that losses from operations and net losses in fiscal 2015 improved compared to 2014, yet he opined that this was due at least in part to "one-time items" such as store closings. (Bell Decl. ¶ 40). Nevertheless, he noted that Aéropostale still suffered losses exceeding $100 million in fiscal 2015. (Bell Decl. ¶ 40). Mr. Bell observed that continued declines in net sales and additional cash outflows from operations, combined with capital expenditures, would further reduce Aéropostale's liquidity in fiscal 2016. (Bell Decl. ¶ 43). If he were to plan a fiscal 2015 audit of Aéropostale, Mr. Bell would have considered the notices from the NYSE in September and October 2015 indicating that the company was not in compliance with the NYSE's continued listing requirements. (Bell Decl. ¶ 44). Mr. Bell also identified the amendment to the L&F Agreement, which added an "insolvency event" provision on December 21, 2015, and Aéropostale's engagement of Stifel as an indicators of Aéropostale's

financial difficulties. (Bell Decl. ¶¶ 46, 47). In reaching his conclusion, Mr. Bell also relied on numerous documents and analyses relating to liquidity. (Bell Decl. ¶¶ 51, 54, 68, 70, 73, 73).

Mr. Bell did not consider the impact of the Debtors' turnaround plan or MGF's revised payment terms on the company's performance. (Trial Tr. 148:17–21, 149:5–8, Aug. 18, 2016 (Bell)). Mr. Bell conceded that an audit is a subjective assessment subject to many variables. (Trial Tr. 151:21–152:1, 153:8–22, Aug. 18, 2016 (Bell)). He also conceded that, as of March 7, 2016, Natalie Kotlyar, Aéropostale's audit partner had reviewed "going concern assumptions and stated there is no significant change to analysis from the fourth quarter of 2014. Ms. Kotlyar added that BDO has not identified any corrected or uncorrected misstatements during its third quarter 2015 review." (DX 246 at 69; Trial Tr. 160:2-15, Aug. 18, 2016 (Bell)).

Fourth and finally, the Debtors offered expert James Doak to opine that the Term Lenders' potential credit bid has had a chilling effect on the Debtors' ongoing sale process in bankruptcy. (Doak Decl. ¶ 3, 10). He further stated that "to the extent that the actions of the Sycamore Parties precipitated the Debtors' [C]hapter 11 filing, the Sycamore Parties' actions resulted in substantial damages to the Debtors' stakeholders," particularly general unsecured creditors. (Doak Decl. ¶ 3). Specifically, Mr. Doak's testimony focused on the ongoing sale process. (Doak Decl. ¶¶ 5–10). Mr. Doak testified that potentially interested buyers are concerned that it may not be worth the time and resources to pursue the necessary due diligence involved in submitting a bid if the Term Lenders are permitted to credit bid the full amount of the Debtors' obligations under the Term Loan Agreement. (Doak Decl. ¶ 9; Trial Tr. Under Seal 2 29:6–30:1, Aug. 16, 2016 (Doak)). Some potential bidders have "indicated that they may withdraw from the [s]ale [p]rocess" if the Term Lenders are authorized to credit bid the full

obligations under the Term Loan Agreement.  (Doak Decl. ¶ 10; Trial Tr. Under Seal 2 19:4–24, Aug. 16, 2016 (Doak)).

Four specific parties have indicated concern, each of whom has submitted a non-binding indication of interest.  (Trial Tr. Under Seal 2 (7:02PM) 6:5–25, Aug.16, 2016 (Doak)).  Roughly fifteen parties that stepped away from the sale process indicated that Sycamore's "participation in the process" was an element of their decision.  (Trial Tr. Under Seal 2 20:3–9, Aug. 16, 2016 (Doak)).  Yet, there remain interested parties at this time, (Trial Tr. Under Seal 2 24:3–21, Aug. 16, 2016 (Doak)), and Mr. Doak testified that he believes the sale could realize between $200 million to $300 million in proceeds.  (Doak Decl. ¶ 8).  The Debtors provided on a confidential basis the dollar amount of the highest indication of interest offered thus far.  (Trial Tr. Under Seal 2 24:23–24, Aug. 16, 2016 (Doak)).  On cross-examination, Mr. Doak testified that the Term Lenders have not interfered with the sale process.  (Trial Tr. 204:2–205:6, Aug. 16, 2016 (Doak)).[10]

## DISCUSSION

### I.  Equitable Subordination

#### A.  The Legal Standard

Bankruptcy courts "have broad equitable powers and the ability to invoke equitable principles to achieve fairness and justice in the reorganization process."  *LightSquared LP v. SP Special Opportunities LLC* (*In re LightSquared Inc.*), 511 B.R. 253, 346 (Bankr. S.D.N.Y. 2014); *see also Pepper v. Litton*, 308 U.S. 295, 308 (1939) ("[T]he bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not

---

[10]    The Background section includes those facts central to understanding the parties' dispute.  But to avoid undue repetition, the Court does not recount all the communications between and among the parties.  These communications are addressed in the Discussion section below as necessary.

done in administration of the bankrupt estate."); 11 U.S.C. § 105(a).  The doctrine of equitable

subordination, codified in Section 510(c) of the Bankruptcy Code, is one such example of a

bankruptcy court's equitable powers.  11 U.S.C. § 510(c).  Section 510(c) authorizes a

bankruptcy court to, "under principles of equitable subordination, subordinate for purposes of

distribution all or part of an allowed claim to all or part of another allowed claim or all or part of

an allowed interest to all or part of another allowed interest . . . ."  11 U.S.C. § 510(c).  The

equitable subordination doctrine "empowers the bankruptcy court to consider whether

'notwithstanding the apparent legal validity of a particular claim, the conduct of the claimant in

relation to other creditors is or was such that it would be unjust or unfair to permit the claimant

to share *pro rata* with the other claimants of equal status.'"  *Mishkin v. Siclari* (*In re Adler,

Coleman Clearing Corp.),* 277 B.R. 520, 563 (Bankr. S.D.N.Y. 2002) (quoting *80 Nassau

Assocs. v. Crossland Fed. Sav. Bank* (*In re 80 Nassau Assocs.*)*,* 169 B.R. 832, 837 (Bankr.

S.D.N.Y. 1994)); *see also Enron Corp. v. Ave. Special Situations Fund II, LP* (*In re Enron

Corp.*), 333 B.R. 205, 221–22 (Bankr. S.D.N.Y. 2005) (stating bankruptcy courts may equitably

subordinate a claim in order to "promote a just and equitable distribution of the bankruptcy

estate.").  The doctrine is considered an "extraordinary remedy that is to be used sparingly."  *In

re Sabine Oil & Gas Corp.*, 547 B.R. 503, 564 (Bankr. S.D.N.Y. 2016) (quoting *Kalisch v.

Maple Trade Fin. Co. (In re Kalisch)*, 413 B.R. 115, 133 (Bankr. S.D.N.Y. 2008)).

        In determining whether to apply equitable subordination, bankruptcy courts have looked

to the test articulated in *Benjamin v. Diamond* (*In re Mobile Steel Corp.*), 563 F.2d 692 (5th Cir.

1977).  *See, e.g., In re LightSquared*, 511 B.R. at 347; *Official Comm. of Unsecured Creditors of

Sunbeam Corp. v. Morgan Stanley & Co.* (*In re Sunbeam Corp.*), 284 B.R. 355, 363 (Bankr.

S.D.N.Y. 2002).  The three factors of the *Mobile Steel* test are: "(i) [t]he claimant must have

engaged in some type of inequitable conduct; (ii) [t]he misconduct must have resulted in injury

to the creditors of the bankrupt or conferred an unfair advantage on the claimant; [and] (iii)

[e]quitable subordination of the claim must not be inconsistent with the provisions of the

Bankruptcy Act." *Mobile Steel*, 563 F.2d at 699–700 (citations omitted).  In thinking about these

factors, the *Mobile Steel* court counsels that three principles be borne in mind.  *See id.* at 700.

First, "inequitable conduct directed against the bankrupt or its creditors may be sufficient to

warrant subordination of a claim irrespective of whether it was related to the acquisition or

assertion of that claim." *Id.*  Second, "a claim or claims should be subordinated only to the

extent necessary to offset the harm which the bankrupt and its creditors suffered on account of

the inequitable conduct." *Id.* at 701.  Third, relating to the burden of proof, "an objection resting

on equitable grounds cannot be merely formal, but rather must contain some substantial factual

basis to support its allegation of impropriety." *Id.*  The party seeking equitable subordination

bears the burden of proof "because there is a presumption of the validity of the proof of claim."

*In re Kelton Motors, Inc.*, 121 B.R. 166, 190 (Bankr. D. Vt. 1990); *see* Fed. R. Bankr. P. 3001(f).

        As to the first factor, inequitable conduct "is not limited to fraud, but includes even

lawful conduct that shocks one's good conscience[.]" *In re Adler, Coleman Clearing Corp.*, 277

B.R. at 563 (citing *80 Nassau Assocs.*, 169 B.R. at 837).  Such conduct includes "a secret or open

fraud, lack of faith or guardianship by a fiduciary; an unjust enrichment, not enrichment by bon

chance, astuteness or business acumen, but enrichment through another's loss brought about by

one's own unconscionable, unjust, unfair, close or double dealing or foul conduct." *80 Nassau

Assocs.*, 169 B.R. at 837 (quoting *In re Tampa Chain Co.*, 53 B.R. 772, 779 (Bankr. S.D.N.Y.

1985)).  The inequitable conduct "need not . . . be specifically related to the creditor's claim,

either in its origin or its acquisition, but it may equally arise out of any unfair act on the part of

43

the creditor, which affects the bankruptcy results to other creditors . . . ." *Id.* at 838 (citation

omitted).

It is well-settled that the doctrine of equitable subordination applies to "general creditors"

or "'non-insiders,' though the circumstances warranting equitable subordination of a non-

insider's claim arise less frequently . . . ." *In re LightSquared*, 511 B.R. at 348; *Official Comm.*

*of Unsecured Creditors of Lois/USA, Inc. v. Conseco Fin. Servicing Corp.* (*In re Lois/USA, Inc.*),

264 B.R. 69, 134–35 (Bankr. S.D.N.Y. 2001) (noting equitable subordination was traditionally

limited to three circumstances: "(1) fraud, illegality or breach of a fiduciary duty; (2)

undercapitalization; (3) control of use of the debtor as an alter ego for the benefit of the

claimant[.]"); *80 Nassau Assocs.*, 169 B.R. at 838. "Unless the non-insider has dominated or

controlled the debtor to gain an unfair advantage, the type of inequitable conduct that justifies

subordination of a non-insider's claim is 'breach of an existing, legally recognized duty arising

under contract, tort or other area of law.'" *In re LightSquared*, 511 B.R. at 348 (quoting *80*

*Nassau Assocs.*, 169 B.R. at 840). "In commercial cases, the proponent must demonstrate a

substantial breach of contract and advantage-taking by the creditor." *80 Nassau Assocs.*, 169

B.R. at 840. Absent a contractual breach, "the proponent must demonstrate fraud,

misrepresentation, estoppel or similar conduct that justifies the intervention of equity." *Id.*; *see*

*also In re LightSquared*, 511 B.R. at 348; *In re Kalisch*, 413 B.R. at 133 ("In cases of non-insider

equitable subordination . . . the proponent of subordination has the burden of proving, among

other things, that the claimant engaged in egregious, improper or wrongful conduct that damages

creditors."). "[C]reditor misconduct in connection with the chapter 11 process itself . . . provides

an appropriate predicate for equitable subordination of such creditor's claim." *In re*

*LightSquared*, 511 B.R. at 349.

As to the second factor, the claimant's conduct must cause injury "to the debtor or its creditors, or result[] in an unfair advantage to the claimant." *Id.* (citing *Mobile Steel*, 563 F.2d at 700–01). While this prong is stated in the disjunctive, some courts have required that both injury *and* an unfair advantage to the claimant be shown. *See id.* at 347 n.152 (citing *Nisselson v. Softbank AM Corp.* (*In re MarketXT Holdings Corp.*), 361 B.R. 369, 388 (Bankr. S.D.N.Y. 2007); *see also In re Mr. R's Prepared Foods, Inc.* 251 B.R. 24, 29 (Bankr. D. Conn. 2000)). Requiring injury is appropriate considering the nature of equitable subordination, which is "a remedial measure designed to offset harm" and "is not penal in nature." *In re LightSquared Inc.*, 511 B.R. at 348. For a creditor to have received an unfair advantage, it must have received a benefit. *See id.* at 349. A claim should be subordinated "only to the extent necessary to offset the harm which the bankruptcy and its creditors suffered on account of the inequitable conduct." *In re Sunbeam Corp.*, 284 B.R. at 364.

As to the third and final prong of the *Mobile Steel* test, it requires that equitable subordination of the claim be consistent with the Bankruptcy Code. *See Mobile Steel*, 563 F.2d at 700. Courts have noted that the codification of the doctrine in Section 510(c) limits the attention due this third factor. *See In re LightSquared*, 511 B.R. at 352; *80 Nassau Assocs.*, 169 B.R. at 841. This factor acknowledges that a bankruptcy court's equitable powers are "not boundless" and cannot be used "to disregard unambiguous statutory language of the Bankruptcy Code." *In re Enron*, 333 B.R. at 218–19. Applying "the *Mobile Steel* test ensures that the full breath of the remedy of equitable subordination is available while ensuring that its reach does not violate any provision of the Bankruptcy Code or become punitive as opposed to remedial." *Id.* at 219.

45

**B. The Debtors' Claims**

The Debtors make three allegations of inequitable conduct.  First, they allege that MGF breached the Sourcing Agreement because MGF's new terms violated an objective reasonableness standard in the Sourcing Agreement and because MGF "retroactively" imposed new payment terms for orders already made but not yet delivered.  Second, they claim that the Sycamore Parties' overall conduct was part of a secret and improper plan to buy Aéropostale at a discount.  Third, the Debtors allege that the Sycamore Parties improperly traded stock while in possession of Aéropostale's material non-public information.  But the record here does not establish a claim for equitable subordination based on these three theories.

1.   <u>Allegations of a Breach of the Sourcing Agreement</u>

The Court turns first to allegations relating to the Sourcing Agreement.  It is important to note from the outset that the Debtors do not dispute that they fell below the $150 million liquidity trigger when MGF declared a Credit Review Period.  (Trial Tr. 24:21-25:6, Aug. 16, 2016 (Geiger); Trial Tr. 63:15-25, 66:20-67:14, Aug. 17, 2016 (Dick); CEX 318 (Debtors' compliance certificate of February 27, 2016 reflecting liquidity of $129.3 million)).[11]  This is true notwithstanding Aéropostale's vehement protests to the contrary at the time.  (CEX 489; CEX 491).  The Debtors appear to have taken that position at the end of February 2016 because they repeatedly overstated their liquidity for purposes of the Sourcing Agreement by $34 to $40

---

[11]     There is some confusion about the Sycamore Parties' process in reaching the conclusion that the $150 million liquidity floor had been breached, particularly in light of the misdated and incomplete minutes of the February 24, 2016, MGF Holdings' board meeting where this issue was purportedly addressed.  (DX 231; Trial Tr. 177:13-178:13, 182:5–14, Aug. 17, 2016 (Kaluzny); Trial Tr. Under Seal 2 8:8-9:13, Aug. 18, 2016 (Morrow); Trial Tr. 110:3-112:15, 114:12-115:18, Aug. 16, 2015 (Schwartz)).  But there is no such confusion over MGF's process for determining that the Credit Review Period was triggered, (Schwartz Decl. ¶ 63; Trial Tr. 112:16-25, Aug. 16, 2016 (Schwartz)), which is more important given that it was MGF's right to declare a Credit Review period under the Sourcing Agreement.

million.  (Trial Tr. 93:17-94:25, 143:11-144:23, Aug. 17, 2016 (Dick)).  This miscalculation was

the result of incorrectly including assets, most notably the FILO Facility, that should not have

been counted as part of liquidity under the Sourcing Agreement and the Prepetition Term Loan

Agreement.  (Trial Tr. 64:7-66:6, 68:10-69:3, 73:3-76:12, 93:12-20, 96:4-12, Aug. 17, 2016

(Dick)).  Almost as surprising, the Debtors' management was not even aware of the liquidity

trigger in the Sourcing Agreement until it was flagged by Sycamore-designated board member

Kent Kleeberger in 2016.  (Trial Tr. 58:22-59:8, 69:16-70:6, Aug. 17, 2016 (Dick); Dick Decl. ¶

23) (Mr. Dick testifying that he was not aware of the $150 million liquidity threshold until

informed by Kent Kleeberger in January 2016); (Trial Tr. 63:5-64:3, Aug. 16, 2016 (Geiger)

(Mr. Geiger testifying that he was not aware of the $150 million liquidity threshold until

February 24, 2016)).  These two deficiencies undermine the credibility of the Debtors'

management.

Given the undisputed fact that a Credit Review Period was properly invoked by MGF, the

question becomes the scope of MGF's rights under the Sourcing Agreement to change payment

terms during a Credit Review Period.  Under New York law,[12] "when parties set down their

agreement in a clear, complete document, their writing should as a rule be enforced according to

its terms.  Evidence outside the four corners of the document as to what was really intended but

unstated or misstated is generally inadmissible to add to or vary the writing."  *W.W.W. Assocs. v.*

*Giancontieri*, 77 N.Y.2d 157, 162 (1990).  "Whether or not a writing is ambiguous is a question

of law to be resolved by the courts. . . . It is well settled that extrinsic and parol evidence is not

---

[12]     The Sourcing Agreement provides that it "shall be governed by and construed in accordance with the laws
of the State of New York . . . ."  (DX 006 at 24).

admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face." *Id*. at 162-63 (citations and quotations omitted).

"A contract should be read as a whole to ensure that undue emphasis is not placed upon particular words and phrases. . . . Courts 'may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.'" *Consedine v. Portville Cent. Sch. Dist.*, 12 N.Y.3d 286, 293 (2009) (citations omitted). "[S]pecific clauses of a contract are to be read consistently with the over-all manifest purpose of the parties' agreement. Contracts are also to be interpreted to avoid inconsistencies and to give meaning to all of its terms." *Barrow v. Lawrence United Corp.*, 538 N.Y.S.2d 363, 365 (3d Dep't App. Div. 1989) (citations omitted).

The Debtors first argue that the terms imposed by MGF were unreasonable and therefore a breach of the Sourcing Agreement. Section 4(b)(ii) of the Sourcing Agreement provided that:

> Unless another payment schedule is expressly contained in an Order created under this Agreement, Vendor's standard payment terms will apply (<u>i.e.,</u> U.S. Dollars, immediately available funds, net 30 days, or, during a Credit Review Period such other shorter number of days or up-front terms *as deemed prudent by Vendor in the exercise of it [sic] reasonable credit judgment*).

(DX 006 at 11) (emphasis added). The Debtors contend that this language limited MGF to imposing only payment terms during a Credit Review Period that were *prudent* and an exercise of *reasonable credit judgment*, but that the terms in both the February 24 Letter and the February 29 Letter were neither.

The Court agrees that MGF was limited in its ability to apply payment terms under Section 4(b)(ii) of the Sourcing Agreement. The Debtors, however, attempt to impose an objective reasonableness standard on MGF that is not present in the language of the Sourcing Agreement. For instance, the Debtors state that "MGF may require different payment terms, but

only if such terms are *objectively* 'prudent' in the exercise of 'reasonable credit judgment.'"
(Motion ¶ 4) [ECF No. 496] (emphasis added).  But that is not what the Sourcing Agreement
says.  Instead, it explicitly allows MGF to impose "such other shorter number of days or *upfront*
*terms* as deemed prudent *by Vendor* in the exercise of *it[s]* reasonable credit judgment."  (DX
006 at 11) (emphasis added).  Thus, the Term Lenders correctly note that "MGF had the right to
apply *its* reasonable credit judgment in light of *its* determination of what was prudent for *it*."
(Term Lenders' Trial Brief ¶ 61).  Furthermore, the Sourcing Agreement explicitly contemplates
the application of "up-front terms" during a Credit Review Period.  (DX 006 at 11).

The Debtors next argue that MGF breached the Sourcing Agreement by retroactively
applying new payment terms to purchase orders that had already been placed before the start of
the Credit Review Period.  The Debtors rely on the "Aéropostale Purchase Order Terms and
Conditions" attached to the Sourcing Agreement.  (DX 006 at 35-39).[13]  It provides that "[t]he
prices herein shall not be increased and the quantities and shipment dates shall not be changed
without Aéropostale's written consent."  (DX 006 at 35).  It further states that "[a]ny terms or
conditions set forth on Vendor's invoices, billing statements, acknowledgment forms, or any
other documents which are inconsistent with this order shall be of no force or effect without
Aéropostale's written consent."  (DX 006 at 35).  Based on these provisions, the Debtors contend
that the net 30 day payment terms applicable to already placed purchase orders were frozen at the
time the orders were placed and that MGF did not have the right to change the payment terms on
these orders without first obtaining Aéropostale's written approval.

---

[13]     The Sourcing Agreement provides that "[t]he terms of any . . . Order are governed by Aéropostale's
Purchase Order Terms and Conditions set forth in Exhibit B annexed hereto, as may be amended in writing from
time to time by the mutual agreement of Aéropostale and the Vendor."  (DX 006 at 9).

But the Debtors' interpretation is at odds with the language of Section 4(b)(ii).  That

section identifies the "standard payment terms" applicable to all orders.[14]  More specifically,

Section 4(b)(ii) provides that the "standard payment terms" of MGF "will apply" to "an Order

created under this Agreement."  (DX 006 at 11).  It goes on to define standard payment terms as

"U.S. Dollars, immediately available funds, net 30 days, or, during a Credit Review Period such

other shorter number of days or up-front terms as deemed prudent by Vendor in the exercise of it

[sic] reasonable credit judgment."  (DX 006 at 11).  Thus, Section 4(b)(ii) specifically

contemplates payment terms "during a Credit Review Period" to include a "shorter number of

days or up-front terms."[15]  Thus, there is a specific grant of rights to MGF in Section 4(b)(ii)

during a Credit Preview Period, notwithstanding the general terms and conditions found

elsewhere in Exhibit B.  It is a basic principal of contract interpretation that specific terms in a

contract will override the general.  *See Bowmer v. Bowmer*, 50 N.Y.2d 288, 294 (1980); *John

Hancock Mut. Life Ins. Co. v. Carolina Power & Light Co.*, 717 F.2d 664, 669 n.8 (2d Cir. 1983)

("New York law recognizes that definitive, particularized contract language takes precedence

over expressions of intent that are general, summary, or preliminary."); Restatement (Second) of

Contracts § 203 (1981) ("In the interpretation of a promise or agreement or a term thereof, . . .

specific terms and exact terms are given greater weight than general language.").  When general

and specific provisions of a contract are inconsistent, "the specific provision controls."  *Muzak

Corp. v. Hotel Taft Corp.*, 1 N.Y.2d 42, 46 (1956); *Israel v. Chabra*, 12 N.Y.3d 158, 168 n.3

(2009) (stating that if contractual provisions are irreconcilable, "the more specific clause controls

---

[14]     The only qualification in the language of Section 4(b)(ii) is if "another payment schedule is expressly contained" in an order, but the Debtors do not argue that there is another payment schedule contained in the purchase orders at issue.  (DX 006 at 11).

[15]     The Debtors understood that "up-front terms" meant "CIA or COD"—that is, cash in advance or cash on delivery.  (CEX 509, Miller Dep. Tr. 83:20-84:8).

the more general.") (quoting 11 Samuel Williston & Richard A. Lord, A Treatise on the Law of

Contracts § 32:15 (4th ed. 1999 & Supp. 2010)).[16]

Nothing in Section 4(b)(ii) limits the language "an Order created under this Agreement"

to certain orders.  Both orders made prior to and subsequent to a Credit Review Period are

"Orders created under" the Sourcing Agreement and both also exist "during" the Credit Review

Period.  Once made, therefore, an order remains open until delivery and thus is subject to any

changes permitted by the contract.  (Term Lenders' Trial Brief ¶ 67; *c.f.* CEX 509, Miller Dep.

Tr. 86:4-13 (agreeing there is no language in the provision saying that a vendor is restricted in its

ability to shorten the number of days or demand up front payment terms only for future orders)).

Therefore, the Court rejects the Debtors' position that MGF could not impose new terms during

the Credit Review Period for existing orders.  This conclusion is consistent with other terms in

the Sourcing Agreement, which indicate that an "Order" is a process that starts with a purchase

authorization and ends with delivery of the product and payment.  For instance, Section 4(a)

states that Aéropostale can "cancel an Order at any time, without cause, prior to receipt of the

Products" so long as Aéropostale reimburses MGF's costs.  (DX 006 at 9-10).[17]

But even if the purchase order provisions were interpreted as conflicting with MGF's

rights under the Sourcing Agreement to shorten terms during a Credit Review Period, the

---

[16]     The Debtors rely on the headings "Pricing" and "Orders" to support their interpretation of the Sourcing Agreement.  (*See* Debtors' Proposed Findings ¶ 46).  But Section 25 of the Sourcing Agreement provides that "[a]ll section headings contained in this Agreement are for convenience of reference only, do not form a part of this Agreement and will not affect in any way the meaning or interpretation of this Agreement."  (DX 006 at 28).

[17]     Similarly the price of product ordered under the Sourcing Agreement depended on the actual cost charged by third-party manufacturers, as well as "costs associated with importing the relevant Products into the United States, Canada, or other locations."  (DX 006 at 10).  Both amounts could not be determined until after the order had been procured and delivered.

payment terms in Section 4(b)(ii) of the Sourcing Agreement would control.  That is made clear

in Section 4(a) of the Sourcing Agreement, which provides that "in the event of any conflict

between the PO [terms and conditions], the applicable purchase order or purchase authorization

and this Agreement, the terms of this agreement shall govern, unless otherwise agreed between

the parties in writing."  (DX 006 at 9).

This conclusion is also supported in both the commercial and statutory context.  The

Debtors' interpretation would eviscerate the protections afforded to MGF through the liquidity

threshold of Section 4(b)(ii).  It would permit the Debtors, foreseeing a liquidity crisis, to

frontload millions of dollars in orders prior to the beginning of a Credit Review Period, thereby

eliminating MGF's ability to protect itself from that exposure.  Indeed, Li & Fung took exactly

the same type of retroactive action by shortening payment terms to net 20 days and net 7 days on

pre-existing orders and refusing to ship pre-existing orders until payment was made.  (CEX 322;

CEX 509, Miller Dep. Tr. 224:12-227:21; CEX 478; Trial Tr. 52:6-53:15, Aug. 17, 2016 (Dick)).

Moreover, similar protections are afforded under the law, even absent contractual language

providing for them.  Courts have acknowledged demands for adequate assurance under Section

2-609[18] of the Uniform Commercial Code in the form of cash-in-advance or letters of credit as

reasonable in spite of pending purchase orders.  *See, e.g., In re JW Aluminum Co.*, 200 B.R. 64,

67 (Bankr. M.D. Fla. 1996) (finding that "[t]his Court is satisfied and there is no question under

---

[18]    Section 2-609(1) of the Uniform Commercial Code provides, in part:

A contract for sale imposes an obligation on each party that the other's expectation of receiving
due performance will not be impaired. When reasonable grounds for insecurity arise with respect
to the performance of either party the other may in writing demand adequate assurance of due
performance and until he receives such assurance may if commercially reasonable suspend any
performance for which he has not already received the agreed return.

U.C.C. § 2-609(1).

the circumstances presented that [supplier] was entitled to demand adequate assurance of payment" under Section 2-609, where the vendor had requested adequate assurance in the form of "posting a letter of credit, making cash payments in advance, or shipping on a COD basis" with respect to certain previously placed purchase orders).

Moreover, the Court rejects the Debtors' claim that MGF acted unreasonably in imposing all these new terms. It was undisputed that, for its business, MGF depended upon a $235 million revolver and a $220 million term loan, which had its own financial covenants, including leverage and coverage ratios. (Schwartz Decl. ¶ 24). It was also undisputed that MGF had substantial exposure to Debtors as an unsecured creditor based on its accounts receivable, and orders in process where MGF incurred costs for production and transport. (Schwartz Decl. ¶¶ 25, 58, 69.) Based on its exposure, MGF concluded that an Aéropostale default could cause a default on MGF's *own* debt instruments. (Schwartz Decl. ¶¶ 56, 57, 67). The CEO of MGF, who has been at the company for some 33 years, credibly testified that imposing cash in advance terms was critical for MGF to ensure its own survival. (Schwartz Decl ¶¶ 39, 67, 70). This conclusion was echoed by the Term Lenders' expert, Ms. Etlin. Moreover, MGF had acted on such concerns before with other customers; it had stopped doing business with other customers in the past when their financial condition became bad enough to pose a threat to MGF. (Trial Tr. 159:4-160:1, Aug. 16, 2016 (Schwartz)). And while MGF's poor credit score for Aéropostale was similar to some other MGF customers, MGF reasonably considered other information in assessing each customer's situation, such as that customer's future prospects and its ability to generate positive earnings. (Schwartz Decl. ¶¶ 28-29, Trial Tr. Under Seal 1 28:3-10, 33:22-34:14, Aug. 16, 2016 (Schwartz)).

The reasonableness of MGF's actions is also confirmed by events involving the Debtors' largest supplier, Li & Fung. Like MGF, Li & Fung was concerned about the Debtors' economic performance and wanted to limit its exposure. Starting in November 2015, it repeatedly expressed concern about the Debtors situation. (CEX 188; Trial Tr. 48:1–23, Aug. 16, 2016 (Geiger)). Li & Fung also took aggressive and unilateral action to protect itself. For example, Li & Fung withheld a $9.3 million rebate payment due in February 2016 and, in fact, never made that payment. (Trial Tr. 38:11-40:10, 41:22-23, Aug. 17, 2016 (Dick)). It also held shipments and required payment before taking new orders. (Trial Tr. 41:19-21, 43:8-44:14, 52:5-8, Aug. 17, 2016 (Dick))). Li & Fung took these significant unilateral actions even though none of these actions were expressly permitted by its agreement with the Debtors.[19]

Rather than cry foul as the Debtors did with MGF—which had acted pursuant to rights it bargained for under the Sourcing Agreement—the Debtor twice choose to amend its agreement with Li & Fung to provide more advantageous terms. The first amendment in December 2015 granted key rights to Li & Fung if Debtors filed for bankruptcy, such as a sell-off right, and an agreement for critical vendor status in any bankruptcy. The second amendment in April 2016 shortened payment terms on certain existing orders down to 20 days or 7 days. (CEX 322; Trial Tr. 55:1-7, Aug. 17, 2016 (Dick); CEX 509, Miller Dep. Tr. 206:5-10, 223:19-227:21; Trial Tr. 59:8-62:5, Aug. 16, 2016 (Geiger)). But there is also no evidence that the Debtors offered any of these same concessions to MGF.

---

[19]    The L&F Agreement did not contain a liquidity threshold permitting it to adjust payment terms. (DX 055; Trial Tr. 47:6-47:14, 56:6-57:3, Aug. 16, 2016 (Geiger); Trial Tr. 24:20-23, 42:2-4, Aug. 17, 2016 (Dick); CEX 509, Miller Dep. Tr. 232:12-20). It also contained no basis for allowing Li & Fung to suspend shipping other than late payment by the Debtors, something that no one has alleged occurred. (Trial Tr. 25:17-20, Aug. 17, 2016 (Dick)).

The Debtors point to MGF's failure to consult with them about imposing the new terms as evidence of bad faith. But Li & Fung did not give notice when it declined to make the $9.3 million rebate payment. (Dick Decl. ¶ 65; Trial Tr. 38:11-39:4, Aug. 17, 2016 (Dick)). By contrast, MGF sent its two letters imposing the new terms. (DX 024; DX 025). No discussion among the principals at MGF and Aéropostale ever happened, as the Debtors instead had their lawyers provide a written response to MGF's letters. (*See* Trial Tr. 158:19-159:3, Aug. 16, 2016 (Schwartz) (Miller telling Schwartz that Debtors had not breached the liquidity threshold so there was nothing really to talk about); *see also* Morrow Decl. ¶ 44; CEX 314). In one of those written responses, the Debtors' lawyers went so far as to insist upon an immediate retraction of MGF's letter and resumption of shipments as a condition to any meeting among the parties. (DX 238).[20] This again stands in marked contrast to the Debtors' more cooperative approach with Li & Fung. As Debtors' expert Robert Duffy candidly stated, "the company had two vendors, which made up 70, 75 percent of its purchases and had to come to an agreement with one of those two. And it picked Li & Fung or Li and Fung picked it." (Trial Tr. 77:18-21, Aug. 18, 2016 (Duffy)).

Notably, the Debtors' problems with suppliers extended beyond even MGF and Li & Fung. In 2015, the Debtors ended their relationship with what was then their second largest supplier MMG. (DX 042). While details in the record are sketchy about exactly how the relationship ended, it is undisputed that it ended because MMG wanted additional collateral and the Debtors were unable or unwilling to provide such additional protection. (DX 042 at 37; Trial Tr. 40:10-13, Aug 16, 2016 (Geiger)).

---

[20] Indeed, the Debtors had already hired lawyers in anticipation of possible litigation with the Sycamore Parties or individuals as to various claims, including the breach of the Sourcing Agreement. (Trial Tr. 7:16-8:9, Aug. 18, 2016 (proffer of evidence)).

Given their difficulties with the two suppliers who provided almost three quarters of Debtors goods, the Court rejects the Debtors' characterization of their supplier relationships as smooth sailing partnerships.  (*See* Trial Tr. 52:3-6, Aug. 16, 2016 (Geiger) ("The collaborative discussions we've had with our vendors for many years is well documented.  And we've always tried to be very good partners with our vendors. . . ."); *but see* Trial Tr. 78:1-23, Aug. 17, 2016 (Dick) (conceding that he wanted to send Sycamore only what was owed to them under the agreement)).  It may well be that Aéropostale's relations with vendors were much smoother during Mr. Geiger's first as Chief Executive Officer the company from August 1998 to February 2010.  But this was clearly not the case upon his return when the Debtors were in financial distress and were struggling to satisfy the vendors' concerns given the Debtors' poor economic performance.[21]

Each side called experts to address the reasonableness of the new terms imposed by MGF.  Nothing in that testimony changes the result here.  The Term Lenders' expert conceded that she had not previously seen a credit review period clause like the one in the Sourcing Agreement.  (Trial Tr. 132:10–20, Aug. 18, 2016 (Etlin)).  And for the reasons stated above, that clause grants MGF significant rights.  Given that clause and the other facts here, Ms. Etlin credibly concluded that MGF's decision to demand cash in advance on all orders was a reasonable credit judgment particularly given Aéropostale's financial condition, MGF's exposure to credit risk from that condition, and the lack of communication from Aéropostale, which led to

---

[21]    The Debtors complain that MGF's prices were too high under the Sourcing Agreement.  (Trial Tr. 37:12-38:9, 40:18-41:8, Aug. 16, 2016 (Geiger)).  But at one point, the Debtors nonetheless considered using MGF to replace business that would otherwise be done by Li & Fung.  (CEX 240; Trial Tr. 37:25-38:10, Aug. 17, 2016 (Dick); CEX 509, Miller Dep. Tr. 198:25-199:25, 201:2-15).  For its part, MGF claims that Aéropostale wanted extremely low prices—lower, on average, than any of MGF's other customers—and that its relationship with the Debtor was not profitable because the poor margins and volume.  (Schwartz Decl. ¶¶ 47-49).  In any event, the issue of price is not relevant to the dispute before the Court as no party has contended that the prices charged were in violation of the Sourcing Agreement.

a deterioration of the customer relationship. (Etlin Decl. ¶¶ 12–13, 53). On the retroactivity

point, she also credibly testified that "in managing credit risk, vendors do not make a significant

distinction between in process orders, delivered orders and future orders." (Etlin Decl. ¶ 63). On

the other hand, the Debtors' expert opined that MGF imposed the most onerous terms available,

deeming it impermissible unilateral action. (Keiser Decl. ¶¶ 58, 63). But Ms. Keiser's

conclusion was problematic because she could not satisfactorily explain why that same label did

not also apply to Li & Fung's actions, including most notably its withholding of the $9.3 million

rebate payment. (Trial Tr. 194:10-17, Aug. 16, 2016 (Keiser) (characterizing Li & Fung action

as mere "industry sparring")).[22] She seemed to accord no weight to the fact that Li & Fung had

no contractual provision permitting such unilateral actions, in contrast to MGF. While

withholding a $9.3 million payment is not the same as refusing to ship goods without upfront

payment, both actions had the same effect of significantly and adversely impacting the Debtors'

liquidity and ability to operate. In the end, Ms. Keiser conceded that she "can't answer and . . .

won't answer whether MGF exercised prudent reasonable credit judgment in taking the steps that

it did in February of 2016." (Trial Tr. 182:7-13, Aug. 16, 2016 (Keiser)).

The Debtors' expert, Robert Duffy, also does not alter the Court's conclusion. He opined

that, if MGF had not imposed the new payment terms, the "Debtors likely would have avoided—

or at the very least, significantly delayed" tripping the $70 million liquidity covenant "and any

attendant commencement of chapter 11 cases." (Duffy Decl. ¶ 16). But, Mr. Duffy's analysis is

based on a series of assumptions, many of which are problematic. For example, he assumed that

MGF's standard payment terms would not be adjusted until the week ending August 20, 2016, an

---

[22]        Her opinion about Li & Fung was carefully qualified: she conceded that "[w]ithout knowing the story and
without [knowing the judgment], Li & Fung's decision is more consistent with what a vendor or an agent would do
when they have concerns." (Trial Tr. 186:23-25, Aug. 16, 2016 (Keiser)).

assumption that cannot be reconciled with the undisputed fact that the liquidity threshold of $150

million was hit in February.  (Trial Tr. 55:5–56:6, Aug. 18, 2016 (Duffy)).   Mr. Duffy's analysis

is similarly dependent on the Prepetition Term Loan Agreement and Prepetition ABL Agreement

remaining in place and does not take into account any potential default of those agreements,

again a problematic conclusion given all the evidence about liquidity and other financial

problems.  (Duffy Decl. ¶ 17; Trial Tr. 56:23–57:15, Aug. 18, 2016 (Duffy)).  Indeed, Mr.

Duffy's testimony is based on not less than nine assumptions that are embedded in the Liquidity

Projection, as well as the assumed vendor payment terms.  (*See* Duffy Decl. ¶¶ 17, 18).

When some of those assumptions are removed, it is evident that Aéropostale would have

tripped the $70 million liquidity trigger at several points in June and July 2016, and in one

instance as early as May.  (*See, e.g.*, Trial Tr. 79:13–24, 81:18–22, 86:1–87:5, 94:20-23, 95:4-24,

Aug. 18, 2016 (Duffy); CEX 507).  For example, on cross-examination, the Term Lenders

manipulated the model relied on by Mr. Duffy in conducting his Liquidity Projection to, among

other things, remove the $9.3 million payment by Li & Fung and apply 20-day terms to MGF

orders for the entirety of the projection.  (*See* Trial Tr. 79:14–18, 86:1–87:5, 94:3–15, Aug. 18,

2016 (Duffy)).  With these adjustments, Aéropostale was expected to drop below the $70 million

liquidity covenant at various points.  (Trial Tr. 79:19–80:10, 86:1–87:5, 94:11–95:3, Aug. 18,

2016 (Duffy)).  Even without removing the assumptions, the Liquidity Projection shows the

Debtors dropping below $70 million in liquidity in July 2016.  (Duffy Decl. ¶ 20).

The Debtors' position on the likelihood of filing bankruptcy is further undermined by

contemporaneous events.  The Debtors themselves were considering the possibility of filing for

bankruptcy before MGF altered its payment terms.  In January 2016, the Debtors planned to have

a board presentation about bankruptcy in March 2016.  (DEX 242; Trial Tr. 35:5–12, Aug. 16,

2016 (Geiger); Trial Tr. 102:23–103:7, Aug. 17, 2016 (Dick)).  But that discussion was moved

up to a telephonic board of directors' call on February 11, 2016, where the board discussed

starting a process to market the company and the board meeting included the participation of

bankruptcy counsel.  (CEX 256; Trial Tr. 35:19–36:8, Aug 16, 2016 (Geiger)).  Also in January

2016, the Debtor hired Stifel to explore "strategic alternatives."  (Trial Tr. 199:10–12, Aug. 16,

2016 (Doak)).  Taken together, all the evidence severely undermines the Debtors' contention that

everything clearly would have been fine but for MGF.[23]

       The Debtors rely on the testimony of James Doak, that "to the extent that the actions of

the Sycamore Parties precipitated the Debtors' Chapter 11 filing, the Sycamore Parties' actions

resulted in substantial damages to the Debtors' stakeholders," particularly, "the Debtors' general

unsecured creditors."  (Doak Decl. ¶ 3(ii)). However, the Court finds Mr. Doak's testimony to be

conclusory.  For instance, while he states that absent a bankruptcy the Debtors would have

"continued to honor their obligations to general unsecured creditors," no evidence on this subject

is provided. (Doak Decl. ¶¶ 12, 13).  And the mere filing of a bankruptcy is insufficient to allege

injury in the context of an equitable subordination analysis.  *See 80 Nassau Assocs.*, 169 B.R. at

843 ("The filing of a bankruptcy petition, without more, is a legally insufficient allegation of

injury to satisfy the requirements of equitable subordination."); *see also Kham & Nate's Shoes

No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1358 (7th Cir. 1990) (allegation that creditor

forced debtor into bankruptcy is not sufficient by itself for equitable subordination because

"filing for bankruptcy often helps rather than injures the firm"); *see also In re Kalisch*, 413 B.R.

---

[23]      On the same issue, the Court finds credible the testimony of the Term Lenders' expert, Mr. Bell, who opined that as of February 24, 2016, Aéropostale's 2015 audit would have indicated substantial doubt that the company could continue as a going concern for the period from January 31, 2016, to January 28, 2017.  (Bell Decl. ¶ 15).  This further supports that Aéropostale was suffering from a pattern of declining performance—with the attendant consequences—regardless of the new payment terms imposed on February 24, 2016.  (*See* Bell Decl. ¶ 28).

at 133 ("In all cases concerning equitable subordination actual harm to creditors is a necessary

component to application of the doctrine.").

    2.  <u>Allegations about Sycamore's "Secret Plan"</u>

The Debtors fare no better on their allegation about a conspiracy to push them into

bankruptcy and thus buy Aéropostale on the cheap.  In support of this theory, the Debtors point

first to an alleged conversation between Mr. Geiger and Mr. Kaluzny in the fall of 2013 where

Mr. Kaluzny stated that he expected to make an additional investment in Aéropostale and that he

would like Geiger to sit on the board and "do nothing" as a Sycamore appointed board member.

(Geiger Decl. ¶ 10).  The Debtors also cite to the Sycamore Parties' multiple roles as

stockholder, lender with board designations, and majority-owner of supplier MGF.  Finally, the

Debtors cite to various communications—primarily emails—where the Sycamore Parties track

the Aéropostale situation, provide direction to MGF on the situation, and express a willingness to

own the Company.

But simply put, the Debtors' allegation of a secret plan hatched in the fall of 2013 is not

credible.  No one can dispute that the Sycamore Parties actively tracked and managed their

interest in Aeorpostale.  The Sycamore Parties had invested $54 million in equity in the

Company and loaned another $150 million.  It also had a majority ownership stake in an entity

with significant monetary exposure to Aéropostale through the Sourcing Agreement.  Given this

large economic stake and Aéropostale's continuing and significant losses in 2013, 2014, and

2015, one can easily understand why the Sycamore Parties were closely watching Aéropostale's

situation.  But in the fall of 2013, the future of Aéropostale had yet to be written and Mr.

Kaluzny had just bet $54 million on the upside by purchasing Aéropostale's stock.  This was

months before Aéropostale sought financing from the Sycamore Parties, who were merely 8%

equity holders in the fall of 2013 and had no other role.  Even at the time MGF entered the

Sourcing Agreement in 2014, the Sycamore Parties only had two of the five MGF Board

members.  (Schwartz Decl. ¶ 6).   Thus, the evidence does not support a plot to subvert the

company in the fall of 2013.

Subsequent events further undermine the Debtors' theory.  In addition to the 8% of

Aéropostale common stock that Lemur bought on the open market, in connection with the

Prepetition Term Loan transaction Aéropostale also issued 1,000 shares of Series B Preferred

Stock to affiliates of Sycamore Partners at an aggregate offer price of $100,000.  (Dick First Day

Affidavit ¶ 49).  The common stock underlying the Series B Preferred Stock represented another

5% of the Aeropostale's issued and outstanding common stock as of May 23, 2014.  (Dick First

Day Affidavit ¶ 49).[24]  These equity interests were more valuable if the Company survived.

Furthermore, a plan to destroy the value of Aéropostale would place in jeopardy the Sycamore

Parties' eventual investment in MGF, a long-established company in the business of supplying

product to retailers like Aéropostale.  The credible evidence shows that MGF and Aéropostale

tried to make the parties' Sourcing Agreement work successfully from its start in 2014 until

Aéropostale's liquidity issues forced MGF to act in February 2016.  And why wouldn't MGF try

to make it work?  The Sourcing Agreement was a long term proposition involving more than one

quarter of a billion dollars.  MGF had front loaded most of its investment by establishing new

relationships with factories in Asia that were better suited to Aéropostale's needs than MGF's

existing relationships.  (Schwartz Decl. ¶ 41).  MGF needed the Sourcing Agreement to succeed

long-term in order to recoup MGF's upfront investment.  The evidence demonstrates that the

---

[24]        Each share of Series B Preferred Stock was convertible to shares of common stock at in initial conversion
rate of 3,932.018 for each share of Series B Preferred Stock.  (Dick First Day Affidavit ¶ 49).

relationship was progressing until the liquidity trigger was hit in February 2016.  (*See* CEX 509,

Miller Dep. Tr. 233:16–236:5).  Further undermining the Debtors' theory is the lack of credible

evidence that the Sycamore Parties caused MGF to take any improper action in connection with

the Sourcing Agreement or the invocation of a Credit Review Period.  Indeed, it would be

exceedingly odd for the Sycamore Parties' board member, Kent Kleeberger to tell Aéropostale

management about the $150 million liquidity threshold if the Sycamore Parties had a secret plan

to destroy Aéropostale.  (Trial Tr. 70:17-23, Aug. 17, 2016 (Dick)).[25]

The Sycamore Parties' multiple roles in their relationship with Aéropostale is also an

insufficient basis for relief in this case.  Sycamore Partners started out as an equity holder, via

Lemur, and subsequently expanded its role.  But its role as lender and MGF's role as supplier

were not forced upon the Debtors.  They were agreements negotiated at arms-length with the

Debtors, who concluded that they were the best available options.  These agreements provided

each of the parties with a variety of rights and the Sycamore Parties' rights included the ability to

appoint Aéropostale board members.  The Debtors cannot rely on the existence of these rights—

agreed to by the Debtors in exchange for consideration, including a $150 million loan—as a

basis for relief here.

The Debtors point to a variety of communications, mostly emails, to argue that the

Sycamore Parties used their various hats to further the secret plan.  But these documents do not

establish inequitable conduct.  For example, the Debtors cite to emails where someone at the

Sycamore Parties mentions the possibility of an Aéropostale bankruptcy.  (DX 097).  But these

emails related to the possibility of Sycamore refinancing its loan to Aéropostale.  (Trial Tr.

200:4–8, Aug. 18, 2016 (Morrow)).  Sycamore had discussions with at least two other parties on

---

[25]        On cross-examination, the Debtors failed to directly question Mr. Kaluzny about the secret plan.

that issue.  In those discussions, Sycamore considered how its position would be effected by a

bankruptcy.  As Mr. Morrow, a Sycamore Partners' principal credibly explained that Sycamore

would normally consider the possibility of a bankruptcy when considering whether to add debt in

front of it in a capital structure.  (*See* Trial Tr. 201:13–23, Aug. 18, 2016 (Morrow)).  One of

these same emails also reflect the Sycamore Parties' view that they "would happily own the

company through [its] loan."  (DX 96).  Discussions about the possibility of bankruptcy and

related contingency planning are not surprising given Aéropostale's distressed financial

condition.  Nothing about such discussions was impermissible.  *See cf. In re Lehman Bros.*

*Holdings Inc.,* 541 B.R. 551, 583 (S.D.N.Y. 2015) ("'[T]here is generally no objection to a

creditor's using his bargaining position, including his ability to refuse to make further loans

needed by the debtor, to improve the status of his existing claims.'") (quoting *In re W.T. Grant*

*Co.,* 699 F.2d 599, 610 (2d Cir. 1983)).  Rather, the question is whether a party planning to

exercise its rights as a creditor takes actions that step over the line into impermissible conduct to

further its interest in a way that damages a debtor or the bankruptcy estate.  The Court does not

find such conduct here.  Instead, the totality of the credible evidence at trial demonstrates that the

Sycamore Parties did not take actions beyond what was proper to protect their interests.  *See In*

*re Lehman Bros.,* 541 B.R. at 583 (a creditor can even "us[e] his bargaining position . . . to

improve the status of his existing claims" without triggering a claim for equitable subordination)

(citation omitted).

Given these facts, an equitable subordination claim cannot succeed, particularly given

that the Sycamore Parties were not an insider.  In such circumstances, the bar for equitable

subordination is exceedingly high:

> When a non-insider or non-fiduciary is involved, courts have
> required that a claimant's conduct be egregious and severely unfair

> to other creditors before its claim will be equitably subordinated. . .
> The conduct required has been described as "substantial misconduct
> tantamount to fraud, misrepresentation, overreaching or spoilation."
> . . . Few cases find that non-insider, non-fiduciary claimants meet
> this standard.

*In re Sunbeam Corp.,* 284 B.R. at 364 (quoting *80 Nassau Assocs.,* 169 B.R. at 838); *see also In re Dreier LLP,* 453 B.R. 499, 517 (Bankr. S.D.N.Y. 2011) ("Although equitable subordination can apply to an ordinary creditor, the circumstances are few and far between.") (quotation omitted); *In re Lehman Bros.,* 541 B.R. at 583.[26]

3.   Allegations as to the Improper Trading of Stock

The Debtors also seek equitable subordination based on allegations that Mr. Kaluzny and the Sycamore Parties traded Aéropostale stock while in possession of material non-public information. (Debtors' Trial Brief ¶¶ 4, 91, 133). The Debtors note that Mr. Kaluzny and the Sycamore Parties owed a duty of confidentiality to the Debtors because the Prepetition Term Loan Agreement contained a confidentiality provision requiring the Term Lenders to keep confidential certain information they received from Aéropostale. (Debtors' Trial Brief ¶¶ 96, 97; DX 005 at § 5-11(d)). In fact, the Term Lenders were provided with information about Aéropostale's liquidity and financial condition, including its borrowing base availability and cash on hand, monthly projections for 2016 and the knowledge that Aéropostale had hired restructuring advisors. (Debtors' Trial Brief ¶¶ 98, 99, 101, 103). It is undisputed that the public did not have this information.

In support of its position, the Debtors cite to criminal cases involving insider trading. For example, the Debtors cite *United States v. O'Hagan*, 521 U.S. 642 (1997), for the proposition

---

[26]    In a slide presentation during the closing argument, the Debtors' counsel suggested that the Sycamore Parties should be treated as insiders. The Court does not remember seeing that argument earlier in the case. In any event, the Court rejects that suggestion as unsupported by the credible evidence.

that an individual violates Section 10(b) and Rule 10b-5 of securities laws "when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information." (Debtors' Trial Brief ¶ 95) (quoting *O'Hagan*, 521 U.S. at 652). The Debtors quote *United States v. Rajaratnam*, 719 F.3d 139, 158 (2d Cir. 2013) for the notion that "securities fraud occurs when a trade is conducted in 'knowing possession' of material nonpublic information obtained in breach of a fiduciary duty." (Debtors' Trial Brief ¶ 93) (quoting *Rajaratnam*, 719 F.3d at 158). The Debtors also cite *United States v. Falcone*, 257 F.3d 226 (2d Cir. 2001), for the proposition that "[v]iolation of a duty of confidentiality sufficient to state a claim exists 'where there is an explicit acceptance of a duty of confidentiality or where such acceptance may be implied from a similar relationship of trust and confidence between the parties.'" (Debtors' Trial Brief ¶ 94) (quoting *Falcone*, 257 F.3d at 234); (*see also* Debtors' Trial Brief ¶ 95) (a breach of duty of confidence could constitute a misappropriation of confidential information) (citing 17 C.F.R. § 240.10b5-2).

But the Debtors' theory around the stock trade fails because it does not satisfy the requirements for equitable subordination. First and foremost, the Debtors have failed to demonstrate harm to the creditors or the Debtors, or that the Sycamore Parties obtained an unfair advantage. *See Mobile Steel*, 563 F.2d at 700. There is simply no evidence in the record to establish tangible harm to the Debtors or creditors sufficient for equitable subordination.

Moreover, the theory is undercut by the evidence about the stock price and the information that was publicly available. The evidence presented demonstrates that as a result of the trading, Lemur suffered a loss of approximately $53 million. (Kaluzny Decl. ¶ 49). The Court credits the testimony of the Term Lenders' expert, Professor Pritchard, that there was essentially a floor to Aéropostale's stock price and that its price remained steady for much of

65

February 2016 to April 2016.  (Pritchard Decl. ¶¶ 26, 29, 33, 34).  During February 3, 2016, to

February 8, 2016, the time period in which Lemur sold its shares, the weighted average of

Aéropostale's stock price was $.17.  (Pritchard Decl. ¶ 26).  The stock price remained effectively

unchanged for the remainder of February 2016 and traded in the low $.20s for most of April

2016.  (Pritchard Decl. ¶¶ 29, 34).  With the exception of one hiccup in trading following a

disclosure on March 17, 2016, the stock's price remained steady until April 22, 2016 at which

point the shares were de-listed from the New York Stock Exchange.  (Pritchard Decl. ¶¶ 31, 34).

Lemur did not avoid any losses or make any money on its trades.  Nor does the evidence

demonstrate that the market was affected in any meaningful way by the selling of Lemur's

shares.  (Pritchard Decl. ¶¶ 25–29).

The Debtors argue that Lemur's trading caused significant harm to the Debtors because:

(1) the sell-off sent a negative message to the market; and (2) trading the shares was part of an

overall scheme by the Sycamore Parties to push the Debtors into bankruptcy.  (Debtors' Trial

Brief ¶ 118).  To support their allegations of harm, the Debtors cite *Carpenter v. United States*,

484 U.S. 19 (1987), and *FMC Corp. v. Boesky*, 852 F.2d 981 (7th Cir. 1988).  The Debtors assert

that "[c]onfidential information acquired or computed by a corporation in the course and conduct

of its business is 'a species of property to which the corporation has the exclusive right and

benefit.'"  (Debtors' Trial Brief ¶ 119) (quoting *Carpenter*, 484 U.S. at 26).  The Debtors argue

that misappropriation of confidential information causes a distinct injury to the company by

stripping it of its exclusive right to use the information."  (Debtors' Trial Brief ¶ 119) (citing

*Boesky*, 852 F.2d at 990–91).  The Court does not disagree that, as these cases acknowledge, a

company has an interest in its confidential information.  *See Carpenter*, 484 U.S. at 26; *Boesky*,

852 F.2d at 990 (concurring with ruling in *Carpenter* that "[c]onfidential business information,

even though intangible in nature, is corporate property."). However, neither of these cases are applicable here. They do not address the type of harm that bankruptcy courts consider in an equitable subordination analysis—whether the misconduct "resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant." *See Mobile Steel*, 563 F.2d at 700.

Additionally, the Debtors urge the Court to find that the Debtors were harmed because an insider's unauthorized use of information to trade "sends a signal to the world that something important (albeit unknown to the general public) is happening at the company, harming the company by artificially manipulating its financial condition." (Debtors' Trial Brief ¶ 120) (citing *LaSala v. Bordier et Cie*, 519 F.3d 121, 131–32 (3d Cir. 2008)). The Debtors argue that by selling their stock in Aéropostale, Mr. Kaluzny and the Sycamore Parties undermined the integrity and public's regard of the Debtors. (Debtors' Trial Brief ¶ 122). But this is not the type of harm that courts are concerned about when determining whether to equitably subordinate a claim. The cases cited by the Debtors are inapposite because they do not consider whether there has been harm to the bankrupt estate or the debtors' creditors. In *Diamond v. Oreamuno*, 24 N.Y.2d 494 (1969), the court stated that an enterprise has a "great interest in maintaining a reputation of integrity, an image of probity, for its management and in insuring the continued public acceptance and marketability of its stock." *Id.* at 499 (observing that damages could be inferred where officers and directors used material inside information to reap personal profits). Similarly, in *Happ v. Corning, Inc.*, 466 F.3d 41 (1st Cir. 2006), the court stated that "one could also argue that insider trading inherently damages a company by poisoning relations with current and prospective shareholders who supply the capital." *Id.* at 44. These cases focus on the integrity of the marketplace and whether there has been harm from a public policy point of view

67

and are thus, not relevant to the inquiry before this Court. Once again, there has been no evidence of a harm here that could serve as a basis for relief in this bankruptcy case.

The Debtors contend that "numerous courts have held that misappropriation of inside information constitutes the requisite inequitable conduct necessary for equitable subordination." (Debtors' Trial Brief ¶ 131) (citing *In re Papercraft Corp.*, 211 B.R. 813, 824 (W.D. Pa. 1997), *aff'd and remanded sub nom.*, *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982 (3d Cir. 1998); *In re USDigital, Inc.*, 443 B.R. 22, 50 (Bankr. D. Del. 2011); *In re Joy Recovery Tech. Corp.*, 286 B.R. 54, 84 (Bankr. N.D. Ill. 2009); *In re Kreisler*, 331 B.R. 364, 384 (Bankr. N.D. Ill. 2009); *In re Herby's Foods, Inc.*, 2 F.3d 128, 134 (5th Cir. 1993); *In re Otis & Edwards, P.C.*, 115 B.R. 900, 921 (Bankr. E.D. Mich. 1990)). The Debtors further state that courts have "acknowledged that mis-use of material, nonpublic information by an insider creditor" is a basis for equitable subordination. (Debtors' Trial Brief ¶ 132) (citing *Citicorp Venture Capital, Ltd.*, 160 F.3d at 982). But the cases cited by the Debtors are distinguishable.

In *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982 (3d Cir. 1998), the claimant, while a fiduciary of the debtor secretly purchased millions of claims against the debtor at a discount and sought to control the debtor's assets and make a profit. *See id.* at 984. In that case, the bankruptcy court had found that the claimant's conduct resulted in at least three adverse effects and conferred an unfair advantage on itself. *Id.* at 986. These adverse effects were: (1) selling noteholders "were deprived of an ability to make a fully informed decision concerning the sale of their claims"; (2) dilution of the voting rights of prepetition creditors; and (3) creating a conflict of interest. *Id.* Additionally, the claimant had "engaged in a comprehensive information collection effort made possible by its position on" the

68

debtor's board of directors and used this information to prepare its own asset purchase offer. *Id.* at 989–90. The other cases cited by the Debtors on this point are similarly distinguishable. *See, e.g., In re USDigital, Inc.*, 443 B.R. at 22 (denying motion to dismiss claim for equitable subordination because facts alleged demonstrate claimants "had an advantage over other creditors because of their insider access to [debtor's] financial condition.").

Moreover, the Debtors' insider trading argument is also undermined by the scope of the ban on stock trading imposed on Aéropostale employees. Between December 4, 2015, and January 22, 2016, employees and members of Aéropostale's Board were permitted to trade in Aéropostale's stock. (CEX 442). The trading window closed again on January 25, 2016. (CEX 442). The period that Aéropostale employees and board members could not trade is referred to as the "Black Out Period." (CEX 442; Dick Decl. ¶ 38). In late December 2015, the Debtors provided the Term Lenders with financial information and projections for the 2016 fiscal year, including projected borrowing base calculations, preliminary cash flow projections, and consolidated balance sheet preliminary projections. (*See* Dick Decl. ¶ 31; CEX 018). The projections were based off of a presentation the Debtors provided to the Term Lenders in October 2015. (*See* DEX 012). The Debtors' employees had this information but were permitted to trade.[27]

Lemur sold its shares of stock in Aéropostale between February 3 and February 8, 2016. (Kaluzny Decl. ¶ 49). When Lemur traded its stocks in early February it did not yet have the February Package, including the borrowing base certificate that was the last information provided to MGF and the Term Lenders before the Credit Review Period was declared.

---

[27]    Notably, it was the December 15, 2016 projections that were central to the opinions of Debtors' expert, Professor Ferrell.

The Court's conclusion on the stock trades is not altered by the testimony of the Debtors'

expert, Professor Ferrell. He assessed the significance to the market of certain non-public

information, and assumed that the $150 million liquidity trigger would be tripped in April 2016.

(Ferrell Decl. ¶ 13). In conducting his analysis, Professor Ferrell assumed that if the $150

million liquidity trigger was tripped, there would be a significantly increased risk that the

Debtors would file for bankruptcy. (Ferrell Decl. ¶ 13). At its core, Professor Ferrell's

conclusion is the non-controversial notion that a significant increase in the likelihood of

bankruptcy would be significant information to the market. (Trial Tr. 220:14–22, Aug. 17, 2016

(Ferrell)). But he did not independently assess the significance of the December 2015

projections upon which he relied. (Trial Tr. 219:20–25, Aug. 17, 2016 (Ferrell); *see* Trial Tr.

224:23–225:5, Aug. 17, 2016 (Ferrell) ("I assume that the calculation that liquidity trip would

occur would result in a significant increase in bankruptcy risk.")).[28] Professor Ferrell did not

make a factual determination that the December 2015 projections show an increased probability

of bankruptcy. (Trial Tr. 234:2–8, Aug. 17, 2016 (Ferrell)). Professor Ferrell's numerous

assumptions are also inconsistent with the views of the Debtors' expert, Mr. Duffy, who testified

that he believed "the Debtors could have avoided bankruptcy even after the $150 million

Sourcing Agreement Liquidity Trigger was tripped[,]" and that the Debtors could have

"managed through" a period in which liquidity was close to the $70 million trigger. (Duffy Decl.

¶¶ 20, 21).

There are also questions about whether the information in question is material. The

Debtors argue that a company's liquidity projections "are exactly the type of material non-public

information upon which insider trading liability can be based." (Debtors' Trial Brief ¶ 106)

---

[28]        *See supra* note 27.

(citing *S.E.C. v. Bauer*, 2012 WL 2217045 (E.D. Wisc. June 15, 2012); *Arnlund v. Smith*, 210 F.

Supp. 2d 755 (E.D. Va. 2002)).  The Debtors further argue that the fact that the media was

speculating about Aéropostale's financial condition does not prevent a finding that the non-

public information was material.  (Debtors' Trial Brief ¶ 111–12) (citing *S.E.C. v. Mayhew*, 121

F.3d 44 (2d Cir. 1997); *U.S. v. Mylett*, 97 F.3d 663 (2d Cir. 1996)).

     The Court does not doubt that information relating to a company's liquidity can be

significant.  But it does not follow, nor do the cases cited by the Debtors suggest, that this is

always the case.  *See, e.g., Arnlund*, 210 F. Supp. 2d at 765 (stating "the [c]ourt cannot find that

the possibility of bankruptcy and a liquidity crisis would be of no import to a reasonable

investor.").  For example, in *SEC v. Bauer*, 2012 WL 2217045, the court found that the

defendant "'had intimate knowledge' of the Fund's ongoing credit, liquidity, and redemption

issues," and was "privy to details regarding defaulted and watch list securities . . . ."  *Id.* at *1

(citation omitted).  The court made no ruling as to whether information of the company's

liquidity, in and of itself, was sufficient to find the defendant had committed insider trading.  *See

id.*  Both *S.E.C. v. Mayhew*, 121 F.3d 44, and *U.S. v. Mylett*, 97 F.3d 663, deal with nonpublic

information relating to proposed mergers.  Finally, *U.S. v. Rajaratnam*, 802 F. Supp. 2d 491

(S.D.N.Y. 2011), is cited by the Debtors for the notion that information concerning a company's

internal projections can be a basis for a securities claim notwithstanding that the public knew

some of the information upon which the trades were based.  *Id.* at 514.  Yet none of these cases

set forth an absolute rule regarding materiality of a company's liquidity projections or the

knowledge that a company has hired strategic advisors.  And the materiality of this information

is subject to debate given the analysis presented by the Term Lenders' expert about the stock

price and the information already available about Aéropostale's poor performance.  But given its

conclusions above, the Court does not need to resolve these questions.[29]

## II.   **Credit Bidding**

### A.  **The Legal Standard**

 "Credit bidding 'allows the secured creditor to bid for its collateral using the debt it is

owed to offset the purchase price[,]' which 'ensures that, if the bidding at the sale is less than the

amount of the claim the collateral secures, the secured creditor can, if it chooses, bid up the price

to as high as the amount of its claim.'"  *In re Free Lance-Star Publishing Co. of Fredericksburg,*

*VA*, 512 B.R. 798, 805 (Bankr. E.D. Va. 2014) (quoting *Quality Props. Asset Mgmt. Co. v.*

*Trump Va. Acquisitions, LLC*, 2012 U.S. Dist. LEXIS 115225 (W.D. Va. Aug. 16, 2012)).  It

therefore provides a safeguard for secured creditors, by insuring against the undervaluation of

their collateral at an asset sale.  *See RadLax Gateway Hotel, LLC v. Amalgamated Bank*, 132 S.

Ct. 2065, 2070 (2012) ("The ability to credit-bid helps to protect a creditor against the risk that

its collateral will be sold at a depressed price.  It enables the creditor to purchase the collateral

for what it considers the fair market price (up to the amount of its security interest) without

committing additional cash to protect the loan.").

But the right to credit bid is not absolute.  *See In re Free Lance-Star*, 512 B.R. at 808; *In*

*re Fisker Auto. Holdings, Inc.*, 510 B.R. 55, 59 (Bankr. D. Del. 2014).  Specifically, Section

363(k) of the Bankruptcy Code provides that a party may credit bid "unless the court for cause

orders otherwise . . . ."  11 U.S.C. § 363(k).  The term "cause" is not defined by the Bankruptcy

---

[29]       Finally, the Court notes that the Debtors appear to seek equitable subordination of the Term Lenders'
claims in their entirety.  But this seems inconsistent with the doctrine.  It is well established that equitable
subordination is an equitable remedy and that a claim should be should be subordinated "only to the extent
necessary to offset the harm which the bankruptcy and its creditors suffered on account of the inequitable conduct."
*In re Sunbeam Corp.*, 284 B.R. at 364; *see also In re LightSquared Inc.*, 511 B.R. at 348.

Code, and it is left to the court to determine whether cause exists on a case-by-case basis. *See In re Olde Prairie Block Owner, LLC*, 464 B.R. 337, 348 (Bankr. N.D. Ill. 2011) (citing *In re N.J. Affordable Homes Corp.*, 2006 WL 2128624, at *16 (Bankr. D. N.J. June 29, 2006 )(stating that cause is "intended to be a flexible concept enabling a court to fashion an appropriate remedy on a case-by-case basis"); *In re River Road Hotel Partners, LLC*, 2010 WL 6634603, at *1 (Bankr. N.D. Ill. Oct. 5, 2010) ("Section 363 gives courts the discretion to decide what constitutes 'cause' and the flexibility to fashion an appropriate remedy by conditioning credit bidding on a case-by-case basis."), *aff'd, River Road Hotel Partners, LLC v. Amalgamated Bank*, 651 F.3d 642 (7th Cir. 2011)).

The decision of whether to deny credit bidding based on cause is within the discretion of the court. *See In re Olde Prairie*, 464 B.R. at 348. But this "discretion does not give the bankruptcy court the authority to act arbitrarily or to be freewheeling. In other words, the standard is not standardless." *In re RML Dev., Inc.*, 528 B.R. 150, 155 (Bankr. W.D. Tenn. 2014) (quoting *In re Davis*, 237 B.R. 177, 182 (M. D. Ala. 1999)). "Intrinsically, acting 'for cause' looks to the court's equity powers that allow the court to balance the interests of the debtor, its creditors, and the other parties of interests in order to achieve the maximization of the estate and an equitable distribution to all creditors." *In re RML*, 528 B.R. at 155 (citations omitted). But "whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code." *Id.* (quoting *Law v. Siegel*, 134 S. Ct. 1188, 1194-95 (2014)). The "modification or denial of credit bid rights should be the extraordinary exception and not the norm." *In re RML*, 528 B.R. at 156.

Courts will deny a secured creditor's right to credit bid due to inequitable conduct. *See, e.g., In re Free Lance-Star Publishing*, 512 B.R. at 804–06. These cases often feature conduct

that also directly impacts the estate or the bidding process.  For instance, in the case of *In re Aloha Airlines, Inc.*, 2009 WL 1371950 (Bankr. D. Haw. May 14, 2009), a secured creditor was denied the right to credit bid because of its undisclosed sponsorship of a third party's acquisition of the debtor's assets through that bid.  *See id.* at *8.  Prior to the petition date, the third party, Mesa Air Group ("Mesa"), had entered into the Hawaii air market with the intention of forcing the debtor out of business through the misuse of information obtained through confidential agreements with the debtor and others.  *See id.* at *9.  In subsequent litigation regarding the issue, Mesa made sworn misstatements to cover the truth regarding its dishonesty and destroyed records.  *See id.*  The debtor was subsequently forced to file bankruptcy.  During the bankruptcy process, the credit bidder had reached an agreement, initially undisclosed to the court, to grant a license in the debtor's intellectual property to Mesa.  *See id.* at *4.  When the agreement was made public, the court denied the secured creditor's right to credit bid.

Courts have also limited the right to credit bid when the validity of a creditor's lien is in dispute.  *See In re Daufuskie Islands Props.*, LLC, 441 B.R. 60, 64 (Bankr. D.S.C. 2010); *Nat'l Bank of Commerce v. McMullan (In re McMullan)*, 196 B.R. 818, 835 (Bankr. W.D. Ark. 1996), aff'd, 162 F.3d 1164 (8th Cir. 1998)).  Other cases look to whether the party seeking to credit bid has failed to comply with the procedural requirements established by the court for the sale of the collateral.  *See Greenblatt v. Steinberg*, 339 B.R. 458, 463 (N.D. Ill. 2006) (denying right to credit bid due to failure to comply with sale procedures order**).**

### B.  The Debtors' Allegations as to Credit Bidding

Relying upon the same allegations asserted for their equitable subordination claim, the Debtors seek to limit the Term Lenders' ability to credit bid at any sale auction.  But for the same reasons set forth above, the Court does not find inequitable conduct that would justify limiting a

74

credit bid by the Term Lenders in this case. Moreover, there is no evidence of inappropriate

behavior by the Term Lenders in the bankruptcy. The Term Lenders hold a secured claim in the

amount of some $151,250,000[30] and therefore have a statutory right to credit bid the full amount

of their claim. *See* 11 U.S.C. § 363(k); *RadLAX*, 132 S. Ct. at 2071. There are no allegations of

collusion, undisclosed agreements, or any other actions designed to chill the bidding or unfairly

distort the sale process. Consistent with the exercise of their own legal rights, the Term Lenders

have been relatively cooperative with the process by, among other things, agreeing to the

payment of an expense reimbursement request to a potentially interested bidder and agreeing to a

one-week extension of the sale process. *See* Order Authorizing Expense Reimbursement in

Connection with the Auction and Sale [ECF No. 587]; Transcript of Hearing Held on August 8,

2016 at 5:10–24, 9:21–25 [ECF No. 639]. Moreover, no party has challenged the validity or

extent of the Term Lenders' liens.

Moreover, the Court rejects the Debtors' reliance on cases offered in support of

restricting credit bidding based on the trading of Aéropostale stock. For example, the Debtors

rely on *Sec. & Exch. Comm'n v. Capital Cove Bancorp LLC*, 2015 WL 9701154 (C.D. Cal. Oct.

13, 2015). But that case is clearly distinguishable. In that case, the court noted "[a] number of

inequitable considerations" not present here, including:

> the SEC's prima facie case of Defendants' securities fraud, the Receiver's
> evidence of a Ponzi scheme, the numerous investors and creditors that were
> defrauded by the Defendants, the Receiver's finding that Defendants' collective
> assets will be insufficient to pay 100% of all amounts claimed, and the Receiver's
> intent to equitably distribute recovery among all those who were harmed.

---

[30]     The proofs of claim filed by Aero Investors LLC and MGF Sourcing Holdings, Limited against each of the
Debtors are for amounts not less than $151,250,000. (*See* Claim Nos. 265-80).

*Id.* at *9.  The court also noted that a bona fide dispute existed as to the secured creditor's liens

against the properties at issue, a common fact in credit bidding cases that is also not present here.

*See id.*

Similarly, the Debtors' mistakenly rely on *In re Family Christian, LLC*, 533 B.R. 600,

631 (Bankr. W.D. Mich. 2015).  In that case, the court did not hold that evidence of insider

trading satisfied the "for cause" standard in Section 363(k).  *See id.* at 631.  Rather, the court

refused to approve a sale to a party that had been privy to certain information as a "consultation

party" to the auction and noted that it "must infer that [the party] gained an unfair advantage by

initially participating as one of the [c]onsultation [p]arties and thereafter submitting a bid.  This

conduct is similar to insider trading . . . ."  *Id.*  Here, there are no allegations that the Term

Lenders have engaged in any unfair advantage over the sale process and in fact, the evidence

reflects that the Term Lenders have not interfered in the sale process.  (Trial Tr. 204:2–24, Aug.

17, 2016 (Doak)).

Putting aside the allegations of inequitable conduct then, the Court is left with the

Debtors' allegations that bidding on the sale of their assets will be chilled by the Term Lenders

ability to credit bid.  But there are two problems with this argument.  The first is the case law.  In

considering whether to limit the ability to credit bid, it is true that courts will sometimes refer to

concerns about the chilling of bidding as a factor.[31]  But cases that cite concerns about chilling a

---

[31]      The Third Circuit has rejected the notion that limiting a credit bid for cause must always involve
inequitable conduct by the creditor:

That argument has no basis in the statute.  A court may deny a lender the right to credit bid in the interest of
any policy advanced by the Code, such as to ensure the success of the reorganization or to foster a
competitive bidding environment.  *See, e.g.*, 3 Collier on Bankruptcy 363.09[1] ("The Court might [deny
credit bidding] if permitting the lienholder would chill the bid process.")

*In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 316 n.14 (3d Cir. 2010).  Of course, that decision must be
understood in light of the Supreme Court's more recent decision in *RadLax Gateway Hotel, LLC v. Amalgamated
Bank*, 132 S. Ct. 2065 (2012) .  In that case, the Supreme Court concluded that a debtor may not confirm a Chapter

bid almost invariably also feature some other factor that supports a limitation on the creditor.

Indeed, the Court is unaware of any cases where the chilling of bidding alone is sufficient to

justify a limit on a credit bid.  For instance, the court in *In re Fisker Auto. Holdings, Inc.*, 510

B.R. 55 (Bankr. D. Del. 2014), found that "[t]he evidence in this case is express and unrebutted

that there will be *no* bidding—not just the chilling of bidding—if the Court does not limit the

credit bid."  *Id.* at 60 (noting that without cap on credit bidding "bidding will not only be chilled .

. . ; bidding will be frozen.").  But the *Fisker* court also relied on other problematic conduct

present in that case, observing that the creditor "as the proposed sale purchaser insisted on an

unfair process, i.e., a hurried process, and the validity of its secured status has not been

determined." *Id.* at 61.  Even with all these considerations, the *Fisker* court ultimately did not

deny the right to credit bid in its entirety, but rather limited the amount to the price that the

creditor has paid to purchase the claim.  *See id.* at 59 n.2, 61.

Similarly, the court in *Free Lance-Star Publishing* references a concern about chilling

bidding, but the case also involved inequitable conduct.  In that case, the creditor initially worked

with the debtor prepetition to purchase the debtor's assets in bankruptcy.  But at the same time,

the same creditor was unilaterally filing financing statements on certain of the debtors' assets.

*See In re Free Lance-Star Publishing*, 512 B.R. at 802-04.  The court stated that it was troubled

by the recordation of the financing statements, noting that the creditor had made "the unilateral

decision to expand the scope of its security interest when [its] overt request for the Debtors to

grant such liens . . . failed" and that the creditor "knew it did not have a valid lien on the [assets]

when it filed the [f]inancing [s]tatements." *Id.* at 806.  It was "equally troubled by [the

---

11 cramdown plan that provides for the sale of the collateral free and clear of the a lien but does not permit the
secured creditor to credit bid at the sale. *Id.* at 2073 (noting that "the pros and cons of credit bidding are for the
consideration of Congress, not the courts.").

creditor's] efforts to frustrate the competitive bidding process," citing to the creditor's pressure

on the debtors to shorten the marketing period for the assets and to conspicuously advertise the

creditor's credit bidding rights. *Id.* Thus, while the court cited to bid chilling, it also specifically

concluded that the creditor explicitly "tried to depress the sale price of the Debtors' assets, not to

maximize the value of those assets." *Id.* at 806. Like *Fisker*, the court did not extinguish the

right to credit bid, but limited it to those assets in which the creditor had a valid, properly

perfected lien. *See id.* at 808.

In the same vein, the American Bankruptcy Institute Commission to Study the Reform of

Chapter 11 recently released its Final Report and Recommendations in which it noted "the

fundamental role of credit bidding under state law and section 363(k)" and that "all credit

bidding chills an auction process to some extent." American Bankruptcy Institute Commission

to Study the Reform of Chapter 11, 2012-2014 Final Report and Recommendations 147 (2014),

*available at* hhtp://commission.abi.org/full-report. The Commission "did not believe that the

chilling effect of credit bids alone should suffice as cause under section 363(k)." *Id.*

The second problem with the Debtors' argument about bid chilling is the factual record in

this case. That record demonstrates an active interest in the Debtors' assets. This includes

parties interested in acquiring the business as a going concern and parties interested in

liquidating the assets. As of June 16, 2016, the Debtors had contacted 99 parties, which

consisted of both strategic and financial buyers. (Sciametta Decl. ¶ 5). In mid-June, twenty-one

parties were still interested in pursuing a transaction with the Debtors. (Sciametta Decl. ¶ 5). On

or around August 7, 2016, liquidators were invited to participate in the sale process, and all but

one of those liquidators contacted are reviewing documents in the Debtors' data room. (Trial Tr.

Under Seal 2 9:8–12, 11:4–13, Aug. 16, 2016 (Doak)). The Debtors have received a number of

indications of interest from parties interested in purchasing the Debtors' assets and have been in

ongoing discussions with one party about negotiating a stalking horse bid. (Doak Decl. ¶ 8).

Mr. Doak testified that he believes there is the potential for the Debtors to realize between $200

million and $300 million in proceeds. (Doak Decl. ¶ 8). The Debtors have been working with

several parties in the sale process and those parties are conducting due diligence and working on

proposed asset purchase agreements. (Trial Tr. Under Seal 2 24:3–21, Aug. 16, 2016 (Doak)).

Mr. Doak testified that he expects other parties, including two specifically identified, to

participate in the auction and submit a bid. (Trial Tr. Under Seal 2 24:17–21, Aug. 16, 2016

(Doak)).

Of course, there are no guarantees going forward and the Court is mindful that the

Debtors have been unable to find an acceptable stalking horse bidder to date. But the record here

is different than in a case like *Fisker*, where there would be no bidding—not just the chilling of

bidding—if the Court did not limit the credit bid. *Fisker*, 510 B.R. at 60.

## III.    <u>Alter Ego</u>

Debtors seek relief against the Term Lenders for alleged inequitable conduct by other

corporations—specifically MGF and Lemur—as to the imposition of new payment terms and for

the sale of the stock. Thus, the Debtors must demonstrate an alter ego relationship between

MGF and Lemur, on the one hand, and the Term Lenders, on the other hand. *See In re Sunbeam

Corp.*, 284 B.R. at 367–69 (dismissing equitable subordination claim where alleged inequitable

conduct was committed by affiliate of targeted creditor and the unsecured creditors committee

failed to adequately allege an alter ego relationship).[32]

---

[32]    At closing argument, the Debtors suggested that it did not need to pierce the corporate veil to prevail on
their claim. But they did not offer legal authority to demonstrate how else to attribute the conduct of these otherwise
separate corporate entities to the Term Lenders.

In determining whether to disregard the corporate form and pierce the corporate veil, the

law of the state of incorporation is applied.  *See In re Sunbeam Corp.*, 284 B.R. at 364.[33]  It is

well-settled that ownership and control are not enough for alter ego liability.  *See, e.g., id.* at 366.

Rather, the "high standard" of alter ego liability requires that there "must be such complete

domination and control that the controlled entity is a mere shell."  *Id.* at 365, 367; *see also Mobil

Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 266–67 (D. Del. 1989) (finding no alter ego

relationship where the plaintiff alleged the parent "held all of the stock" of the subsidiary,

"guaranteed certain debts" of the subsidiary, and "shared common officers and directors" with

the subsidiary).  "[C]ourts have recognized that the existence of common directors and officer is

a normal business practice . . .  and that a showing of mere corporate ownership or common

management will not be sufficient to justify veil piercing." *Weisfelner v. Blavatnik* (*In re

Lyondell Chem. Co.*), 543 B.R. 127, 145 (Bankr. S.D.N.Y. 2016) (quotation omitted); *see also In

re Sunbeam Corp.*, 284 B.R. at 366; *Marnavi S.p.A. v. Keehan*, 900 F. Supp. 2d 377, 392 (D.

Del. 2012) ("[I]t is well established that mere ownership or direction of a corporate entity,

without more, is not sufficient to establish that the corporate form should be disregarded.")

(quotation and citation omitted).

To succeed on a claim based on MGF's alleged inequitable conduct, the Debtors must

establish that MGF is the alter ego of one the Term Lenders.  This is so particularly because the

Debtors and MGF entered into a settlement agreement whereby they resolved all disputes

regarding the Credit Review Period as between MGF and the Debtors.  (*See* Order Pursuant to

---

[33]     Here, the parties cite to Delaware law, which is not surprising given that Lemur, Sycamore Partners, and
MGF are incorporated and/or formed in Delaware.  (DX 062; DX 066; DX 113).  To the extent the parties cite to
cases that apply Delaware or New York law, the Court finds the standard to disregard corporate separateness
remains essentially the same.  *See, e.g., In re Sunbeam Corp.*, 284 B.R. at 365; *Network Enters., Inc. v. APBA
Offshore Prods., Inc.*, 427 F. Supp. 2d 463, 489 (S.D.N.Y. 2006).

Rule 9019 of the Federal Rules of Bankruptcy Procedure Approving Settlement Agreement

Between MGF and Debtors [ECF No. 189]).  But the Debtors have failed to do so.  MGF and its

predecessors have been in business for over forty years and for the majority of that time it was

owned by someone other than Sycamore Partners.  (Schwartz Decl. ¶ 3).  MGF is managed on a

day-to-day basis by Mr. Schwartz, the CEO, the CFO and her finance staff, and the COO and his

operations staff.  (Schwartz Decl. ¶ 5).  While MGF has a management services contract with an

affiliate of Sycamore Partners, (Schwartz Decl. ¶ 9), MGF has its own offices, phone numbers,

technology systems, bank accounts, and e-mail addresses, separate from those of Sycamore

Partners.  (Schwartz Decl. ¶ 11).  Additionally, it also has financing in its own name, consisting

of a revolving credit facility with Bank of America and a term loan with KKR Financial.

(Schwartz Decl. ¶ 11).

The Debtors presented several e-mail communications to support their allegations that

Mr. Kaluzny exerted control over MGF.  For example, in one e-mail Mr. Kaluzny directed

MGF's CEO, Mr. Schwartz, to call "the purchasing gal at Aero" and "[a]sk point blank whether

there is something going on.  Ask point blank what they are doing w li and fung." (DX 56).  Mr.

Kaluzny also directed Mr. Schwartz to "[f]eign being super alarmed" and states "[a]ll tone is nice

and personally friendly, but 'hurt.'"  (DX 56; *see also* DX 161 (e-mail from Jennie Wilson to

James Schwartz, stating "I think we should talk with Dary and see if they want us to engage with

Aero on liquidity and ultimately payment terms.").  Additionally, Mr. Kaluzny was involved in

negotiating the Sourcing Agreement between MGF and Aéropostale.  (Trial Tr. 193:13–25, Aug.

18, 2016 (Morrow)).  But MGF's CEO, CFO, and other members of the MGF management team

were also involved in the discussions of the Sourcing Agreement.  (Trial Tr. 193:13–25, Aug. 18,

2016 (Morrow); CEX 509, Miller Dep. Tr. 23:19–25)).  The fact that the Sycamore Parties'

personnel was involved in these discussions is not surprising given that MGF and the Sycamore Partners were parties to an advisory agreement, under which the Sycamore Parties provided certain services to MGF.  (DX 060; *see also* DX 014 (e-mail from Dary Kopelioff to Daniel Bloch, at MGF stating they "have been tracking liquidity" and will "share with you now and on a go-forward basis.").  In any event, the Debtors have failed to demonstrate that MGF was a "mere shell" and that it was completely dominated by Mr. Kaluzny or one of his other entities to justify piercing the corporate veil.  *See In re Sunbeam Corp.*, 284 B.R. at 367.

With respect to Lemur, the alter ego issue is a closer question.  In summer 2013, Sycamore's investment committee, consisting of Messrs. Kaluzny and Morrow, decided to invest in Aéropostale and to that end, in late August and September 2013, through an entity named Hummingbird LLC (later renamed Lemur LLC), they purchased approximately $54 million of Aéropostale's common stock.  (Morrow ¶ 8; Kaluzny Decl. ¶ 10).  Mr. Kaluzny is the President, CEO, Vice President and Secretary of Lemur.  (DX 61; DX 66).  Between February 3 and February 8, 2016, Mr. Kaluzny directed Lemur to sell its entire equity stake in Aéropostale.  (Kaluzny ¶¶ 49–50; Trial Tr. 188:22–24, Aug. 17, 2016 (Kaluzny)).  As a practical matter, Mr. Kaluzny exercised control over Lemur as it had no other officers and indeed no other function other than to invest in Aéropostale.  (Kaluzny Decl. ¶¶ 10–11, 49).  There is no doubt that Mr. Kaluzny wore different hats with respect to the various Sycamore Parties.  (Kaluzny Decl. ¶¶ 1, 5, 6; DX 61; DX 62; DX 66; DX 86; DX 112; DX 113).  Yet this alone is insufficient to pierce the corporate veil.  *See In re Lyondell Chem. Co.*, 543 B.R. at 145.  The parties have not provided sufficient factual or legal information to determine the corporate separateness of Lemur with respect to the other Sycamore Parties or MGF.  But the Court does not need to resolve this

question as to Lemur given the Court's other rulings on the merits of the claims for equitable

subordination and a limitation on credit bidding.

## IV.    <u>Recharacterization</u>

In determining whether to recharacterize the Tranche B facility of the Prepetition Term

Loan Agreement as equity, the Court considers the factors set out in *Bayer Corp. v. MascoTech,*

*Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726 (6th Cir. 2001), along with the facts and

circumstances surrounding the transaction.  *See AutoStyle Plastics*, 269 F.3d at 750; *In re*

*Lyondell Chem.*, 544 B.R. at 93.  The *AutoStyle* factors are:

> (1) the names given to the instruments, if any, evidencing the indebtedness; (2)
> the presence or absence of a fixed maturity date and schedule of payments; (3) the
> presence or absence of a fixed rate of interest and interest payments; (4) the
> source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the
> identity of interest between the creditor and the stockholder; (7) the security, if
> any, for the advances; (8) the corporation's ability to obtain financing from
> outside lending institutions; (9) the extent to which the advances were
> subordinated to the claims of outside creditors; (10) the extent to which the
> advances were used to acquire capital assets; and (11) the presence or absence of
> a sinking fund to provide repayments.

*AutoStyle Plastics*, 269 F.3d at 750; *see In re Lyondell Chem.*, 544 B.R. at 93 (applying the

*AutoStyle* factors); *Adelphia Commc'ns Corp. v. Bank of Am. (In re Adelphia Commc'ns Corp.)*,

365 B.R. 24, 74 (Bankr. S.D.N.Y. 2007).  Considering these factors and the evidence presented

at trial, the Court concludes that the Debtors have failed to establish the vast majority of the

*AutoStyle* factors, each of which is discussed below.  *See Adelphia Commc'ns Corp.*, 365 B.R. at

74; *In re SubMicron Sys. Corp.*, 432 F.3d at 456.[34]

---

[34]    The Court notes that the Debtors did not address recharacterization in its Trial Brief.  (*See* Debtors' Trial
Brief [ECF No. 660]).  Thus, references to the Debtors' argument on the recharacterization issue are to the Debtors'
Motion.

As for the first factor—the names given to the instruments—the Tranche B facility was documented as a loan. (DX 005). Indeed, the Debtors refer to it as a loan. (Motion ¶ 7; Dick First Day Affidavit ¶ 38). This factor weighs against recharacterization. *See AutoStyle Plastics*, 269 F.3d at 750.

With respect to the second factor—the presence of a fixed maturity date and repayment schedule—the Tranche B facility had a fixed maturity date, and a required schedule of annual amortization payments. (DX 005 at AI-MGF 0071388, *id.* § 2-9; Trial Tr. 206:25–207:3, Aug. 17, 2016 (Kaluzny)). This factor weighs against recharacterization.

As for the third factor—the presence of a fixed rate of interest and interest payments—the Tranche B facility does not bear interest, which weighs in favor of recharacterization. (DX 005 § 2-10(b)). However, this factor is not dispositive. Additionally, the evidence presented establishes that the loan was structured to create economic returns and ultimate repayment through the MGF Sourcing Agreement. (Morrow Decl. ¶¶ 11–12; *see also* CEX 010).

With respect to the fourth factor—the source of repayments—the Tranche B facility was fully secured by a blanket lien on substantially all of the Debtors' assets. (*See* Dick First Day Affidavit ¶¶ 33, 37–38; Morrow Decl. ¶ 11; DX 005 § 8-1). Repayment of the Tranche B facility is thus not dependent on the success of the Debtors' business, which weighs against recharacterization. *See AutoStyle Plastics*, 269 F.2d at 751; *In re Lyondell Chem.*, 544 B.R. at 96; *see also Seaver v. Ashenfelter (In re MSP Aviation, LLC)*, 531 B.R. 795, 807 (Bankr. D. Minn. 2015) ("[W]hen the creditor has secured the transaction with a lien, courts will generally find in favor of a loan."). As to this factor, the Debtors contend that "the Tranche B Facility does not have a fixed amortization schedule. Instead, repayment is effectively dependent on the continued demand for merchandise from MGF and the application of rebates under the Sourcing

Agreement." (*See* Motion ¶ 97(iv)). But this is incorrect. The Prepetition Term Loan Agreement provides "[t]he Borrower shall repay the aggregate outstanding principal amount of the Tranche B Term Loans installments of $5,000,000.00 on each Annual True Up Date . . . ." (DX 005 § 2.9(b)). Furthermore, the Debtors contemplated repaying the loan. (CEX 107 (e-mail from Marc Miller to Julian Geiger stating that additional liquidity "would allow us to pay back our Sycamore loan more quickly."); CEX 61 at AERO_0050423).

As for the fifth factor—the adequacy or inadequacy of capitalization—the Debtors argue they were "inadequately capitalized at the time the Tranche B Facility was advanced." (Motion ¶ 97(v)). However, while courts have stated that "inadequate capitalization is strong evidence that the advances are capital contributions" the Court gives this factor modest weight. *See In re Lyondell Chem.*, 544 B.R. at 97; *see also Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S & B Holdings LLC)*, 420 B.R. 112, 159 (Bankr. S.D.N.Y. 2009) (stating "[c]ourts should not put too much emphasis on this factor, in any event, because all companies in bankruptcy are in some sense undercapitalized."). Here, the Debtors sought out financing to fund its turnaround—it would thus be inappropriate to penalize the Term Lenders for lending to a distressed company. (CEX 061; Morrow Decl. ¶ 10; Kaluzny ¶¶ 13, 15).

With respect to the sixth factor—the identity of interest between the creditor and the stockholder—MGF Holdings advanced 100% of the Tranche B facility but owned no equity in the Debtors. Thus, this factor weighs against recharacterization. *See AutoStyle Plastics*, 269 F.3d at 751. The Court acknowledges that an affiliate of MGF Holdings, Lemur, owned approximately 8% of the Debtors common stock at the time the Tranche B facility was made but finds that does not change its consideration of this factor.

The seventh factor is security, if any, for the advances.  As noted above, the Tranche B facility was secured by liens on substantially all of the Debtors' assets.  (DX 005 § 8-1; *see also* Kaluzny Decl. ¶¶ 20–26; Morrow Decl. ¶¶ 14–20; Motion ¶ 97(vii)).  Thus, this factor weighs against recharacterization. *See S & B Holdings*, 420 B.R. at 159.

The eighth factor is the corporation's ability to obtain outside financing.  As previously noted, the Debtors sought out proposals for financing and in fact received financing proposals from other potential lenders at or about the time they accepted the Term Lenders' proposal. (Morrow Decl. ¶ 10; Kaluzny ¶¶ 13, 15; CEX 061 at 0050421-25)).  The Court finds this factor weighs against recharacterization. *See cf. In re Lyondell Chem.*, 544 B.R. at 98–99 ("The fact that no reasonable creditor would have acted in the same manner is strong evidence that the advances were capital contributions rather than loans.").

The ninth factor is the extent to which advances were subordinated to claims of outside creditors.  The Tranche B facility was structured to be senior to the majority of claims against the Debtors, except for the pre-petition asset based lenders.  (CEX 031; Motion ¶ 97(ix)).

As to the tenth factor—the extent to which the advances were used to acquire capital assets—the terms of the Tranche B facility state that the "proceeds of the Tranche B Term Loans shall be used solely for working capital and general corporate purposes of the Borrower . . . ." (DX 005 § 2-1(b)(ii)).  Additionally, Debtors concede that that Term Loans were not used to purchase capital assets.  (*See* Motion ¶ 97(x)).  This factor weighs against recharacterization.

The eleventh and final factor is the presence or absence of a sinking fund.  Here, the Tranche B facility is secured by liens over substantially all of the Debtors' assets and thus, there is no need for a sinking fund. *See S & B Holdings*, 420 B.R. at 158, 160.  The Court finds this factor is irrelevant to its analysis.

Based on the *AutoStyle* factors and the surrounding facts and circumstances, the Court finds that the parties intended the Tranche B facility to be a loan. Accordingly, the Court denies the Debtors' request to recharacterize it as equity.

## CONCLUSION

For the reasons set forth above, the Court denies the Motion. The Term Lenders shall submit a proposed order on three days' notice.

Dated: New York, New York
      August 26, 2016

                                       */s/ Sean H. Lane*
                                       UNITED STATES BANKRUPTCY JUDGE