**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
:
In re                                                                    :   Chapter 11 Case No.
:
ARO LIQUIDATION, INC., *et al.,*                     :   16-11275 (SHL)
:
Debtors.[1]                                                        :
:
-----------------------------------------------------------------x

**REVISED DISCLOSURE STATEMENT FOR REVISED THIRD AMENDED JOINT**
**CHAPTER 11 PLAN OF ARO LIQUIDATION, INC. AND ITS AFFILIATED DEBTORS**

**WEIL, GOTSHAL & MANGES LLP**
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Debtor*
*and Debtor in Possession*

Dated: February 9, 2018
        New York, New York

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal tax identification number, as applicable, are as follows: ARO Liquidation, Inc. (3880); ARO Liquidation West, Inc. (7013); Jimmy'Z Surf Co., LLC (0461); Aero GC Management LLC (4257); ARO Liquidation Procurement Company, Inc. (8518); ARO Liquidation Licensing, Inc. (8124); P.S. from ARO Liquidation, Inc. (5900); GoJane LLC (4923); ARO Liquidation Holdings, Inc. (7729); and ARO Liquidation Puerto Rico, Inc. (6477). The Debtors' corporate headquarters is located at 125 Chubb Avenue, Lyndhurst, NJ 07071.

**DISCLAIMER**

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT (THE "***DISCLOSURE STATEMENT***") IS INCLUDED HEREIN FOR THE PURPOSES OF DESCRIBING THE *THIRD AMENDED JOINT CHAPTER 11 PLAN OF ARO LIQUIDATION, INC. AND ITS AFFILIATED DEBTORS*, DATED DECEMBER 14, 2017 (AS MAY BE AMENDED, MODIFIED, OR SUPPLEMENTED FROM TIME TO TIME, THE "***PLAN***"), AND MAY NOT BE RELIED UPON FOR ANY OTHER PURPOSE.[2]  A COPY OF THE PLAN IS AVAILABLE AT HTTPS://CASES.PRIMECLERK.COM/AEROPOSTALE/.

**ALL HOLDERS OF CLAIMS ARE ADVISED AND ENCOURAGED TO READ THE DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY.  STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN.  IN THE EVENT OF ANY CONFLICTS BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN**.

THE DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT NECESSARILY IN ACCORDANCE WITH OTHER NON-BANKRUPTCY LAW.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING WITH RESPECT TO PROJECTED CREDITOR RECOVERIES AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.  FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

THIS DISCLOSURE STATEMENT WILL NOT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS AND DEBTORS IN POSSESSION IN THE CHAPTER 11 CASES.  THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN ON SUCH HOLDER'S CLAIM OR INTEREST.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF.

---

[2] Unless otherwise expressly set forth herein, capitalized terms used but not otherwise herein defined have the same meanings ascribed to such terms in the Plan.

I.

INTRODUCTION

On May 4, 2016 (the "*Commencement Date*"), ARO Liquidation, Inc. and its subsidiaries ("*ARO*" or the "*Debtors*") commenced with the United States Bankruptcy Court for the Southern District of New York (the "*Bankruptcy Court*") voluntary cases pursuant to chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*"). The Debtors' chapter 11 cases (the "*Chapter 11 Cases*") are being administered under the caption *In re ARO Liquidation, Inc.,*[3] Case No. 16-11275 (SHL).

On July 15, 2016, the Debtors filed the *Joint Plan of Reorganization of Aéropostale, Inc. and its Affiliated Debtors* [ECF No. 436] (the "*First Plan*") and the related *Proposed Disclosure Statement for Joint Plan of Reorganization of Aéropostale, Inc. and its Affiliated Debtors* [ECF No. 437] (the "*First Disclosure Statement*"). The First Plan contemplated a sale of all or substantially all of the Debtors' assets, which included the sale of unencumbered avoidance actions (the "*Sale Transaction*"). The Debtors amended the First Plan and the First Disclosure Statement. Pursuant to order dated July 29, 2016 [ECF No. 527] (the *"Original Disclosure Statement Order"),* the Bankruptcy Court approved the *Second Amended Disclosure Statement For Amended Joint Plan of Reorganization of Aeropostale Inc. and its Affiliated Debtors* (the "*Second Disclosure Statement*") [ECF No. 526]. The Second Disclosure Statement is available at https://cases.primeclerk.com/aeropostale/.

Consistent with the schedule set forth in the Original Disclosure Statement Order, the Debtors solicited votes on the Plan described in the Second Disclosure Statement (the "*Second Plan*"). In conjunction with that solicitation, certain holders of Claims and Interests who rejected the Second Plan opted out of certain releases granted pursuant to section 12.8 of the Second Plan (the "*Opt Outs*").

Confirmation of the Second Plan was delayed indefinitely, pending completion of the Sale Transaction and further negotiations among the Debtors and their main creditor constituencies. Those negotiations have been successful and, on December 14, 2017, the Debtors filed the *Third Amended Joint Chapter 11 Plan of ARO Liquidation, Inc. and Its Affiliated Debtor*s [ECF No. 1569] and the *Third Amended Disclosure Statement for Amended Joint Chapter 11 Plan of ARO Liquidation, Inc. and Its Affiliated Debtors* [ECF No. 1570]. On January 23, 2018, the Debtors filed the *Revised Third Amended Joint Chapter 11 Plan of ARO Liquidation, Inc. and Its Affiliated Debtor*s [ECF No. 1615] and the *Revised Third Amended Disclosure Statement for Amended Joint Chapter 11 Plan of ARO Liquidation, Inc. and Its Affiliated Debtors* [ECF No. 1616]. On February 9, 2018, the Debtors filed the *Revised Third Amended Joint Chapter 11 Plan of ARO Liquidation, Inc. and Its Affiliated Debtors* [ECF No. [__]] (the "*Plan*") and the *Revised Disclosure Statement for Revised Third Amended Joint Chapter 11 Plan of ARO Liquidation, Inc. and Its Affiliated Debtors]* [ECF No. [__]] (the "*Disclosure Statement*").

On February [9], 2018, the Bankruptcy Court approved this Disclosure Statement as containing adequate information of a kind and in sufficient detail to inform general unsecured creditors about the latest developments in the Chapter 11 Cases and the terms of the Plan. **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

---

[3] Pursuant to the *Order Authorizing and Directing Debtors to Change their Corporate Names and Granting Related Relief*, dated June 29, 2017 [ECF No. 1322], the names of the Debtors were changed; Aeropostale, Inc. is now known as ARO Liquidation, Inc.

Inasmuch as the only holders of Claims entitled to vote on the Plan are the Term Loan Lenders, who have indicated that they will vote in favor of the Plan, the Bankruptcy Court has approved this Disclosure Statement in condensed format.

The purpose of this Disclosure Statement is to provide holders of General Unsecured Claims with adequate information about (i) the Plan, and (ii) their rights under the Plan. The Second Disclosure Statement should be consulted for an overview of the Debtors' businesses (Section II), key events leading to the Chapter 11 Cases (Section III), events during the Chapter 11 Cases (Section IV), the effects of confirmation of the Plan, including a summary of release and exculpation provisions (Section V.K), certain risk factors affecting the Debtors (Section VI), certain U.S. federal income tax consequences of the Plan (Section VII), and standards for confirmation of the Plan (Section VIII).

A. **BRIEF OVERVIEW OF THE PLAN**[4]

The Plan provides for distribution of proceeds from the Sale Transaction, pursuant to which the Debtors sold substantially all of their assets to Aero OpCo LLC. The asset purchase agreement approved in connection with the Sale Transaction (the "***Asset Purchase Agreement***") is attached to the order approving the Asset Purchase Agreement [ECF No. 809] (the "***Sale Order***") as Exhibit A.

The proceeds from the Sale Transaction have been and will continue to be used to fund the ongoing wind-down costs of the Chapter 11 Cases and will be used to fund Distributions under the Plan. The wind-down of the Debtors' estates has cost approximately $7 million to date. The Debtors estimate that the ongoing wind-down costs of the Chapter 11 Cases will amount to approximately $2 million.

B. **SUMMARY OF CHANGES TO PLAN TREATMENT**

The following summary outlines the treatment of Claims against the Debtors under the Plan, and the voting eligibility of the holders of such Claims, but only to the extent that it is different from the terms of the Second Plan described in the Second Disclosure Statement.

1. *Class 3 – Term Loan Secured Claims*

Class 3 is Impaired by the Plan. Each holder of a Term Loan Secured Claim is entitled to vote to accept or reject the Plan.

The Plan and the treatment of the Term Loan Secured Claim provided for therein, incorporates the terms of a settlement between the Term Loan Lenders and the Debtors. Confirmation of the Plan shall constitute approval of such settlement in accordance with Bankruptcy Rule 9019. The Term Loan Secured Claim shall be an Allowed Claim in the amount of $150 million, plus accrued and unpaid interest in the amount of $10,359,927, plus all fees and costs recoverable under the Term Loan Agreement, minus any amounts the Debtors pay to the Term Loan Lenders before Confirmation of the Plan. Pursuant to the Cash Collateral Orders, the Term Loan Lenders have received an interim distribution in the amount of $130,000,000. The Term Loan Lenders shall be entitled to retain all Cash previously received from the Debtors through the Effective Date. In addition, the Term Loan Lenders shall receive payment of all Available Cash, up to a total amount of the Allowed Term Loan Secured Claim in full and final satisfaction of such Claim, payable on the Initial Distribution Date and from time

---

[4] This summary is qualified in its entirety by reference to the Plan. Statements as to the rationale underlying the treatment of Claims and Equity Interests under the Plan are not intended to, and will not, waive, compromise or limit any rights, claims, defenses, or causes of action in the event that the Plan is not confirmed.

to time thereafter and otherwise in accordance with the Cash Collateral Orders. In no event shall the holders of the Term Loan Secured Claim receive Distributions on account of such Claim in excess of the Allowed amount of such Claim.

The holders of the Term Loan Claims are the only parties entitled to vote on the Plan.

2.    *Class 5 – General Unsecured Claims*

Class 5 is Impaired by the Plan. In light of the fact that the Term Loan Secured Claim and the Term Loan Diminution Claim are not anticipated to be satisfied in full, Holders of General Unsecured Claims shall not receive or retain any property under the Plan on account of such Claims.

Pursuant to the provisions of the Bankruptcy Code, Classes of Claims in which the holders of Claims receive no distribution under a proposed plan are deemed to have rejected such proposed plan and are not entitled to vote on the Plan. Consequently, holders of General Unsecured Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

Despite the fact that there will be no distributions to holders of General Unsecured Claims, the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases supports confirmation of the Plan. Attached hereto as Exhibit A is a letter from the Committee's professionals that explains the reasons for the Committee's support.

C.    **ADMINISTRATIVE EXPENSE AND PROFESSIONAL FEE CLAIMS**

The Bankruptcy Court established December 13, 2016 as the bar date for the filing of Administrative Expense Claims. As of such date, Administrative Expenses Claims in the aggregate amount of $76.3 million had been filed. Over the past year, DSI has negotiated with all holders of Administrative Expense Claims. The aggregate amount of Allowed Administrative Expense Claims that remain unpaid is estimated to be approximately $2.5 million.

Holders of Administrative Expense Claims that were required to file and serve a request for payment of such Administrative Expense Claims and that did not file and serve such a request by the Administrative Expense Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Debtors or their property, and such Administrative Expense Claims shall be deemed compromised, settled, and released as of the Effective Date. The Plan Administrator must file and serve objections to Administrative Expense Claims on or before the Administrative Expense Claims Objection Bar Date.

4

All entities seeking an award by the Bankruptcy Court of Fee Claims (a) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is thirty (30) days after the Effective Date, and (b) shall be paid in full from the Estimated Professional Fee Escrow Deposits (as such term is defined in the Cash Collateral Orders) in such amounts as are Allowed by the Bankruptcy Court (i) upon the later of the Effective Date and the date upon which the order relating to any such Allowed Fee Claim is entered or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Plan Administrator. The Plan Administrator is authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

The Term Loan Diminution Claim shall be an Allowed Claim in the amount of the greater of (i) $25,000,000 and (ii) the Allowed Term Loan Secured Claim minus the aggregate amount of all prior cash payments of the Term Loan Secured Claim (including payments made prior to the Effective Date).

The holders of the Term Loan Diminution Claim shall be entitled to administrative expense priority status senior to all other Administrative Expense Claims and secured by adequate protection liens on all of the Debtors' assets, subject only to claims covered by the Carve-Out as defined in the final Cash Collateral Order. All Available Cash, including the proceeds from the sale of unencumbered avoidance actions through the Sale Transaction, other than the proceeds of the Term Loan Collateral, shall be paid to the Term Loan Lenders until the Term Loan Diminution Claim is paid in full. In accordance with section 1129(a)(9) of the Bankruptcy Code, the Term Loan Agent and the Term Loan Lenders have agreed to the foregoing treatment of the Term Loan Diminution Claim, even though the holders of the Term Loan Diminution Claim may not receive payment in cash equal to the allowed amount of the Term Loan Diminution Claim.

Nothing in the Plan or the Confirmation Order shall prevent the Term Loan Agent or the Term Loan Lenders from asserting a Term Loan Diminution Claim in an amount greater than $25 million prior to or after the Effective Date, and all of the Term Loan Agent's and Term Loan Lenders' rights to assert such a claim are hereby preserved.

### D. **RELEASES**

Under the Plan, the Term Loan Agent and the Term Loan Lenders and their respective predecessors, successors and assigns, subsidiaries, Affiliates, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, and other professionals and such persons' respective heirs, executors, Estates, servants, and nominees (the "***Term Loan Lender Related Persons***") will be Released Parties. The Opt Outs will not be effective as to the Term Loan Lender Related Persons. The Opt Outs exercised by holders of Interests will be effective as to all parties who were granted releases under section 12.8 of the Second Plan, however, any holders of Interests who were not Opt Outs, will be bound to the releases provided in section 11.7 of the Plan. Given that the treatment of holders of Claims in Class 5 has changed under the Plan, holders of Claims in Class 5 are provided with an opportunity to consent to the releases to be provided to all Released Parties other than the Term Loan Lender Related Persons under section 11.7 of the Plan in connection with solicitation of the Plan (the "**Consensual Releases**"). Holders of Claims in Classes 1 and 2 are being provided with the opportunity to opt out of the Consensual Releases. The Debtors believe that the Released Parties contributed to the outcome of the Chapter 11 Cases, and urge holders of Claims in Class 5 to grant the Consensual Releases.

**The Debtors have concluded that the third party releases to be provided to the Term Loan Lender Related Persons are justified in light of the substantial contribution that the Term Loan Lenders have made to facilitate confirmation of the Plan and the conclusion of the Chapter 11 Cases. In connection with confirmation of the Plan, the Debtors will have to demonstrate that the releases fall within the standards set by the United States Court of Appeals for the Second Circuit in *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136 (2d Cir. 2005). Under the *Metromedia* test, third party releases may be approved when the provisions are important to a debtor's plan; where the claims are "channeled" to a settlement fund, rather than extinguished; where the enjoined claims would indirectly impact the debtor's reorganization by way of indemnity or contribution; where the released party provides substantial consideration; where the plan otherwise provides for the full payment of the enjoined claims; or where the creditors consent. *Metromedia*, 416 F.3d at 142. Parties may object to the third party releases and the Bankruptcy Court may find that such releases may only be approved with the consent of the applicable holder of a Claim or Interest.**

**THE DEBTORS URGE YOU TO READ THE PLAN IN ITS ENTIRETY**

### E.    CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

1.    *Additional Conditions Precedent to the Effective Date*

The occurrence of the Effective Date of the Plan is subject to the following conditions precedent:

(a)    the Professional Fee Escrow Account shall be funded in Cash in an amount acceptable to both the Debtors and the Term Loan Lenders;

(b)    Allowed Administrative Expense Claims, Priority Tax Claims, Other Priority Claims, and Other Secured Claims shall not exceed $7.0 million in the aggregate;

(c)    the Debtors shall have demonstrated that $2 million is sufficient funding with which to conduct the orderly wind-down of their estates;

(d)    the Term Loan Lenders shall have been paid all amounts upon Confirmation of the Plan required to be paid in accordance with the final Cash Collateral Order;

2.    *Effect of Failure of Conditions to Effective Date*

Unless otherwise extended by the Debtors, if the Effective Date does not occur on or before March 23, 2018 or if the Confirmation Order is vacated, (i) no distributions under the Plan shall be made, (ii) the Debtors and all holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (iii) all the Debtors' obligations with respect to the Claims and the Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any other entity in any further proceedings involving the Debtors or otherwise.

## II.

## CONFIRMATION OF THE PLAN

A. **CONFIRMATION HEARING**

    Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on **March 19, 2018 at 10:00 a.m. (Eastern Time)** before the Honorable Sean H. Lane at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, NY 10004-1408. The Confirmation Hearing may be adjourned from time to time without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

    Objections and responses to confirmation of the Plan, if any, must be in writing, must conform to the Bankruptcy Rules and the Local Bankruptcy Rules for the Bankruptcy Court, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, with a copy to the chambers of The Honorable Sean H. Lane, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York, together with proof of service thereof, and served upon the parties listed below so as to be received no later than the Plan Objection Deadline of **March 12, 2018 at 12:00 p.m. (Eastern Time)**:

| *Debtors* | *Counsel to the Debtors* |
|---|---|
| ARO Liquidation, Inc.<br>125 Chubb Avenue<br>Lyndhurst, New Jersey 07071<br>Attention: William Brandt Jr. | Weil, Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, NY 10153<br>Attn: Ray C. Schrock, P.C.<br>   Jacqueline Marcus<br>   Garrett A. Fail |
| *Office of the United States Trustee* | *Counsel to the Creditors' Committee* |
| 201 Varick Street<br>Suite 1006<br>New York, NY 10014<br>Attn: Brian Masumoto<br>   Susan Arbeit | Pachulski Stang Ziehl & Jones LLP<br>780 Third Avenue<br>34th Floor<br>New York, New York 10017<br>Attn: Robert J. Feinstein<br>   Bradford J. Sandler |
| *Counsel to the Prepetition Term Loan Lenders*<br><br>Kirkland & Ellis LLP<br>300 North LaSalle Street<br>Chicago, IL 60654<br>Attn: James A. Stempel<br>   Robert Britton | |

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

B. **CONFIRMATION REQUIREMENTS**

The Debtors believe that the Plan satisfies all of the confirmation requirements set forth in section 1129 of the Bankruptcy Code, including the requirement that each holder of an impaired Claim or Interest either (i) accepts the Plan or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date. This requirement is known as the "best interests test."

In applying the best interests test, the Debtors have taken into account (i) the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of impaired Claims and Interests and (ii) the Liquidation Analysis prepared by DSI, which is annexed as **Exhibit B** hereto.

The Liquidation Analysis is a comparison of (i) the estimated recoveries for creditors and equity holders of the Debtors that may result from the Plan and (ii) an estimate of the recoveries that may result from a hypothetical chapter 7 liquidation, subject to the assumptions set forth therein. There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that the Bankruptcy Court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

Specifically, under the Plan all holders of impaired Claims and Interests will receive property with a value not less than the value such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code. The Plan provides a recovery for Holders of Allowed Other General Unsecured Claims, Allowed Existing ARO Interests, and Allowed Other Equity Interests that is not less than they would receive in a chapter 7 liquidation because they would receive $0 under a chapter 7 liquidation, and they are receiving $0 under the Plan. Moreover, the Plan likely provides the Term Loan Lenders and holders of Administrative Expense Claims with a larger, more timely recovery because of the fees and expenses that would be incurred in a chapter 7 liquidation.

Finally, in a chapter 7 liquidation, the Term Loan Lenders, as holders of perfected liens on substantially all of the Debtors' assets, would be entitled to all of the proceeds of the Sale Transaction, before any amounts would be available for payment of administrative and priority claims. Accordingly, the Debtors believe that the Plan is in the best interests of creditors.

### III.

### CONCLUSION

The Debtors believe that confirmation and implementation of the Plan is in the best interests of all creditors.

Dated: February 9, 2018
New York, New York

Respectfully submitted,

By: /s/ William A. Brandt Jr.
Name: William A. Brandt Jr.
Title: Chief Restructuring Officer

8

# EXHIBIT A

**Recommendation of Official Committee of Unsecured Creditors**

To:   All Unsecured Creditors of ARO Liquidation, Inc., *et al.* (f/k/a Aéropostale, Inc. e*t al.*)
      Lead Bankruptcy Case No. 16-11275 (SHL)

Dear Unsecured Creditors:

We write on behalf of the Official Committee of Unsecured Creditors (the "Committee") of ARO Liquidation Inc., *et al.*, the Debtors in the above-referenced bankruptcy cases (the "Debtors"), in connection with the *Debtors' Third Amended Joint Chapter 11 Plan of ARO Liquidation, Inc. and its Affiliated Debtors* filed on December ___, 2017 (the "Plan").

Copies of the Plan and *Third Amended Disclosure Statement for Amended Joint Chapter 11 Plan of ARO Liquidation, Inc. and its Affiliated Debtors* (the "Disclosure Statement") containing detailed information regarding the Debtors, their businesses, and the proposed distributions to various Classes of Creditors can be accessed, at no charge, on the website of Prime Clerk, the Debtors' claims agent, at https://cases.primeclerk.com/aeropostale/.

The Debtors were a specialty retailer of casual apparel and accessories. As of the date the Debtors filed for bankruptcy (i.e., May 4, 2016) (the "Petition Date"), they operated approximately 800 Aéropostale stores in the United States and Canada. In addition, pursuant to certain licensing agreements, the Debtors' licensees operated over 300 Aéropostale locations in the Middle East, Asia, Europe, and Latin America. The Debtors had approximately $225 million of funded secured debt that was secured on substantially all of their assets. The secured parties were Aero Investors, LLC, MGF Sourcing Holdings, Limited, and MGF Sourcing US, LLC (collectively, the "Sycamore Parties"). Each of the secured parties was an affiliates of the private equity firm, Sycamore Partners. The unsecured debt was estimated to be in the range of $150-250 million, and was principally owed to vendors, landlords and employees.

The Debtors determined that they would not be able to restructure their debt obligations, and so decided to embark on a sale process. The sale process was unsuccessful, and it appeared as though the Debtors would be forced to liquidate and close all of their stores. The liquidation of the Debtors' business would have been a disaster for unsecured creditors since suppliers would have lost a major customer, landlords would have lost a substantial tenant, and thousands of employees would have lost their jobs. Through the efforts of the Committee and certain of its members, in particular, Simon Properties Group, Inc. ("Simon") and GGP Limited Partnership ("GGP"), a unique solution was developed and implemented that ultimately allowed for the Debtors to be sold as a going concern, thereby saving more than 500 of the 800 stores and thousands of jobs. The solution, which was a first in retail restructurings, involved two of the members of the Official Committee of Unsecured Creditors financing a joint venture that would save the Debtors' operations by providing for the sale of individual stores to an operating entity, the sale of the Debtors' intellectual property to a brand acquirer, and the liquidation of inventory by certain liquidators. The joint venture members were affiliates of Simon, GGP, Hilco Merchant Resources, LLC, Gordon Brothers Retail Partners, LLC, and Authentic Brands Group, LLC (the "Joint Venture Group").

As part of the solution, the Committee negotiated the sale of all preference actions to the Joint Venture Group, with the Joint Venture Group agreeing that they would neither sue on the preferences nor use them defensively. The result of this solution is that unsecured creditors benefit from the continued operation of Aéropostale as a going concern with no risk of being sued for a preference. But for this solution, hundreds of suppliers and landlords would have neither received a recovery nor had a customer or tenant, thousands of employees who are now employed would have been unemployed, and hundreds of unsecured creditors who are now free from litigation would have been sued for a preference recovery, adding insult to injury.

In order to achieve the solution, it was necessary for a substantial amount of the Sycamore Parties' collateral to be used during the bankruptcy case, and for this reason the Sycamore Parties have asserted a statutory superpriority "diminution claim" in an amount of more than $40 million that comes ahead of general unsecured creditors. The Committee analyzed the Sycamore Parties' alleged diminution claim and determined that while the exact number of the diminution could be disputed, it could not be disputed that the diminution claim was substantially greater than the value of unencumbered assets that were sold to the Joint Venture Group (i.e., the preferences, which were estimated to be worth no more than approximately $12 million) and, but for the diminution claim, arguably could be available to the unsecured creditors. Accordingly, the Committee determined that it would be a waste of the estates' resources to litigate over the size of the Sycamore Parties' diminution claim since there would be no benefit to the unsecured creditors, and the Plan reflects that outcome of no monetary distribution to general unsecured creditors.

Bankruptcy is rarely pleasant, and often its effects can be devastating; however, here, through the creative and hard work of the Committee and the Debtors' management, a unique solution was developed that not only avoided a disastrous scenario for suppliers, landlords, employees and other unsecured creditors, but also eliminated any preference exposure they may have had. The Plan is the product of significant investigation, analysis and extensive arm's-length discussions and negotiations among the Sycamore Parties, the Committee and the Debtors. We expect that the Plan will be confirmed and will bring the Debtors' dramatic and successful chapter 11 cases to a conclusion.

Official Committee of Unsecured Creditors of Aéropostale, Inc., *et al.*
By its counsel:

By:   */s/ Bradford J. Sandler*
      Robert J. Feinstein
      Bradford J. Sandler
      Pachulski Stang Ziehl & Jones, LLP
      780 Third Avenue, 34th Floor
      New York, NY  10027
      212.561.7700
      rfeinstein@pszjlaw.com
      bsandler@pszjlaw.com

# EXHIBIT B

**Liquidation Analysis**

**Aeropostale**
**Liquidation Analysis**
**$ in 000s**

|  | Plan of Reorganization | Liquidation | Difference |
|---|---:|---:|---:|
| **Non-Purchased Assets** | | | |
| 1) Licensing A/R | 111 | 111 | - |
| 2) Return on Assets from Canada | - | - | - |
| 3) Finazzo Litigation | - | - | - |
| 4) Visa Litigation | 500 | 500 | - |
| 5) Utility Deposits | 88 | 88 | - |
| 6) Tax Receivable | - | - | - |
| 7) Other Assets | 247 | 247 | - |
| **Total Receipts** | **945** | **945** | **-** |
| **Administrative Claims** | | | |
| 8) 503(b)(9) | (360) | | (360) |
| 9) Post-Petition Merch AP | (10) | | (10) |
| 10) IBNR Health Claims | (300) | | (300) |
| 11) Non-Merch AP | (2,330) | | (2,330) |
| **Priority Claims** | | | |
| 12) Other Taxes | (4,000) | | (4,000) |
| **Wind Down Claims** | | | |
| 13) Professional Fees Escrow Account | (2,000) | | (2,000) |
| **Total Disbursements** | **(9,000)** | **-** | **(9,000)** |
| **Net Cash Flow** | **(8,055)** | **945** | **(9,000)** |
| Starting Cash Balance (Book) | 12,763 | 12,763 | - |
| **Cash Available** | **4,708** | **13,708** | **(9,000)** |
| Secured Lender Payments | (4,708) | (13,708) | 9,000 |
| **Ending Balance** | **-** | **-** | **-** |
| | | | |
| **Total Payments to Administrative and Priority Claims** | 7,000 | - | 7,000 |